1             IN THE UNITED STATES DISTRICT COURT
               MIDDLE DISTRICT OF TENNESSEE
2                 NASHVILLE DIVISION

3    IN RE:  REALPAGE, INC.,      )
    RENTAL SOFTWARE ANTITRUST    ) Case No. 3:23-md-3071
4    LITIGATION (NO. II),       ) MDL No. 3071
                              )
5                              ) This Document Relates to:
                              ) ALL CASES
6                              )
                              )
7   - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

8                  BEFORE THE HONORABLE

9      CHIEF DISTRICT JUDGE WAVERLY D. CRENSHAW, JR.

10              TRANSCRIPT OF PROCEEDINGS

11                May 31, 2023
   - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
12

13

14

15

16

17

18

19

20

21

22

   PREPARED BY:
23             LISE S. MATTHEWS, RMR, CRR, CRC
                 Official Court Reporter
24          719 Church Street, Suite 2300
                 Nashville, TN 37203
25         lise_matthews@tnmd.uscourts.gov

APPEARANCES:

On behalf of the Plaintiffs:

**Gregory S. Asciolla**
**Karin E. Garvey**
Dicello Levitt Gutzler LLC (NY)
485 Lexington Ave
Ste 1001
New York, NY 10017

**Kate M. Baxter-Kauf**
Lockridge Grindal Nauen PLLP
100 Washington Avenue South
Suite 2200
Minneapolis, MN 55401

**Steve W. Berman**
Hagens, Berman, Sobol, Shapiro, LLP
(Seattle Office)
1301 Second Avenue
Suite 2000
Seattle, WA 98101

**Rio S. Pierce**
Hagens Berman Sobol Shapiro LLP
715 Hearst Avenue
Suite 202
Berkeley, CA 94710

**Swathi Bojedla**
Hausfeld LLP (DC)
888 16th St
Ste 300
Washington, DC 20006

**Edward C. Duckers**
Stoel Rives LLP
Three Embarcadero Center
Suite 1120
San Francisco, CA 94111

**Gary I. Smith, Jr.**
Hausfeld LLP (SF)
600 Montgomery Street
Suite 3200
San Francisco, CA 94111

**Jerry E. Martin**
**Paul J. Bruno**
Barrett Johnston Martin & Garrison, LLC
Philips Plaza
414 Union Street
Ste 900
Nashville, TN 37219

**Brendan P. Glackin**
Lieff, Cabraser, Heimann & Bernstein, LLP
(San Francisco)
275 Battery Street
29th Floor
San Francisco, CA 94111-3339

**Dean M. Harvey**
Lieff, Cabraser, Heimann & Bernstein, LLP
(San Francisco)
275 Battery Street
29th Floor
San Francisco, CA 94111-3339

**Kenneth S. Byrd**
**Mark P. Chalos**
Lieff, Cabraser, Heimann & Bernstein, LLP
(Nashville Office)
222 2nd Avenue South
Suite 1640
Nashville, TN 37201

**Elizabeth T. Castillo**
**Adam J. Zapala**
Cotchett Pitre & Mccarthy LLP (Burlingame)
840 Malcom Rd, Ste 200
Suite 200
Burlingame, CA 94010

**David M. Cialkowski**
Zimmerman Reed, PLLP
1100 IDS Center
80 South 8th Street
Minneapolis, MN 55402

**Patrick J. Coughlin**
**David W. Mitchell**
Robbins Geller Rudman & Dowd LLP (San Diego)
655 W Broadway
Suite 1900
San Diego, CA 92101

**Desiree Cummings**
Robbins Geller Rudman & Dowd LLP
420 Lexington Avenue
Suite 1832
New York, NY 10170

**Thomas Roe Frazer, II**
Frazer PLC
30 Burton Hills Blvd.
Suite 450
Nashville, TN 37215

**Daniel C. Hedlund**
Gustafson Gluek, PLLC
120 S Sixth Street
Suite 2600
Minneapolis, MN 55402

**Tricia Herzfeld**
Herzfeld, Suetholz, Gastel, Leniski & Wall, PLLC
TN
223 Rosa L Parks Avenue
Suite 300
Nashville, TN 37203

**Thomas J. Undlin**
Robins Kaplan LLP
800 Lasalle Avenue
Suite 2800
Minneapolis, MN 55402-2015

**Geoffrey H. Kozen**
Robins Kaplan LLP
800 Lasalle Avenue
Suite 2800
Minneapolis, MN 55402-2015

**Stacey Slaughter**
Robins Kaplan LLP
800 Lasalle Avenue
Suite 2800
Minneapolis, MN 55402-2015

**Patrick McGahan**
Scott + Scott, LLP (CT Office)
156 S Main Street
P O Box 192
Colchester, CT 06415

1          **Yaman Salahi**
        Edelson PC (SF)
2          150 California St
        Ste 18TH Floor
3          San Francisco, CA 94111

4          **James Gerard Stranch, IV**
        **James Gerard Stranch III**
5          Stranch, Jennings & Garvey, PLLC
        223 Rosa L. Parks Avenue
6          Freedom Building
        Ste 200
7          Nashville, TN 37203

8          **Daniel J. Walker**
        Berger Montague PC (DC)
9          2001 Pennsylvania Ave NW
        Ste 300
10        Washington, DC 20006

11        **Benjamin Jacobs Widlanski**
        Kozyak Tropin Throckmorton LLP
12        2525 Ponce De Leon Boulevard
        9th Floor
13        Miami, FL 33134

14        **Cadio Zirpoli**
        Joseph Saveri Law Firm, LLP
15        601 California Street, Suite 1000
        San Francisco, CA 94108
16

        **Amanda Boltax**
17

        **Margaret Shadid**
18

        **Isaac T. Conner**
19

20

21

22

23

24

25

```
 1   On behalf of the Defendants:

 2           Mark M. Bell
             Holland & Knight (Nashville)
 3           511 Union Street, Suite 2700
             Nashville, TN 37219
 4
             David C. Kully
 5           Holland & Knight LLP
             800 17th St. NW
 6           Suite 1100
             Washington, DC 20006
 7
             Kenneth L. Racowski
 8           Holland & Knight LLP
             Cira Centre
 9           2929 Arch Street
             Suite 800
10           Philadelphia, PA 19104

11           Michael D. Bonanno
             Quinn Emanuel Urquhart & Sullivan, LLP
12           1300 I Street NW
             Suite 900
13           Washington, DC 20005

14           Richard B. Brosnick
             Akerman, LLP
15           1251 Avenue of the Americas, 37th Floor
             New York, NY 10020
16
             Yehudah L. Buchweitz
17           Weil, Gotshal & Manges (NY Office)
             767 Fifth Avenue
18           New York, NY 10153

19           Edwin McAllister Buffmire
             Jackson Walker, LLP
20           2323 Ross Avenue
             Suite 600
21           Dallas, TX 75201

22           Joshua L. Burgener
             Dickinson Wright PLLC (Nashville Office)
23           424 Church Street
             Suite 800
24           Nashville, TN 37219

25
```

Jeremy J. Calsyn
Cleary Gottlieb Steen & Hamilton LLP
2112 Pennsylvania Avenue, NW
Washington, DC 20037

Scott D. Carey
Baker, Donelson, Bearman, Caldwell & Berkowitz, PC
(Nash)
1600 West End Avenue
Suite 2000
Nashville, TN 37203

Gregory J. Casas
Greenberg Traurig, LLP (Austin Office)
300 West 6th Street
Suite 2050
Austin, TX 78701

Leo D. Caseria
Sheppard, Mullin, Richter & Hampton LLP
333 S. Hope Street
43rd Floor
Los Angeles, CA 90071

Samuel D. Cowin
Gallagher, Evelius & Jones, LLP
Park Charles
218 N Charles Street
Suite 400
Baltimore, MD 21201

David D. Cross
Morrison & Foerster LLP
2100 L St NW
Ste 900
Washington, DC 20037

Robert W. Manoso
Morrison & Foerster LLP (DC)
2100 L St NW Ste 900
Ste 9000
Washington, DC 20037

Joshua C. Cumby
Adams and Reese LLP (Nashville-Church Street)
424 Church Street
Suite 2700
Nashville, TN 37219-0058

1

2       **Andrew B. Dickson**
        Venable LLP
        600 Massachusetts Avenue, NW
3       Washington, DC 20001

4       **Thomas H. Dundon**
        Neal & Harwell, PLC
        1201 Demonbreun Street
5       Suite 1000
        Nashville, TN 37203
6
        **Thomas L. Dyer**
7       Lewis Brisbois
        1700 Lincoln Street
8       Suite 4000
        Denver, CO 80203
9
        **Charles E. Elder**
10      Bradley Arant Boult Cummings LLP
        (Nashville, TN Office)
11      1600 Division Street
        Suite 700
12      P.O Box 340025
        Nashville, TN 37203-0025
13
        **Daniel T. Fenske**
14      Mayer Brown LLP (Chicago Office)
        71 S Wacker Drive
15      Chicago, IL 60606

16      **Evan M. Fray-Witzer**
        Ciampa Fray-Witzer, LLP
17      20 Park Plaza, Suite 804
        Suite 505
18      Boston, MA 02116

19      **Samuel P. Funk**
        Sims Funk, PLC
20      3322 West End Avenue
        Suite 200
21      Nashville, TN 37203

22      **Chelsea Leiann Futrell**
        Baker Lopez
23      5728 LBJ Freeway
        Ste. 150
24      Dallas, TX 75240

25

**Andrew Gardella**
Martin, Tate, Morrow & Marston, P.C.
315 Deaderick Street
Suite 1550
Nashville, TN 37238

**Marisa Secco Giles**
Vinson & Elkins (AUSTIN)
200 W 6TH ST
Ste 2500
Austin, TX 78701

**Michael Scarborough**
Vinson & Elkins, LLP
555 Mission Street
Suite 2000
San Francisco, CA 94105

**Craig P. Seebald**
Vinson & Elkins
2200 Pennsylvania Avenue
Suite 500 West
Washington, DC 20037

**Nicholas James Giles**
McGuire Woods LLP
Gateway Plaza
800 East Canal Street
Richmond, VA 23219

**J. Brent Justus**
McGuire Woods LLP
800 East Canal Street
Richmond, VA 23219

**Philip A. Giordano**
Hughes Hubbard & Reed LLP
1775 I Street NW
Washington, DC 20007

**Robert Dale Grimes**
Bass, Berry & Sims (Nashville Office)
150 Third Avenue South
Suite 2800
Nashville, TN 37201

1    **Jessalyn H. Zeigler**
     Bass, Berry & Sims (Nashville Office)
2    150 Third Avenue South
     Suite 2800
3    Nashville, TN 37201

4    **Diane Rebecca Hazel**
     Foley & Lardner LLP
5    1400 16th Street
     Suite 200
6    Denver, CO 80202

7    **Jay P. Srinivasan**
     Gibson Dunn & Crutcher LLP (LA/CA)
8    333 S GRAND AVE
     Los Angeles, CA 90071-3197
9
     **Caeli Higney**
10   Gibson, Dunn & Crutcher, LLP
     555 Mission Street
11   San Francisco, CA 94105-0921

12   **Stephen Weissman**
     Gibson Dunn & Crutcher (DC)
13   1050 Connecticut Ave NW
     Washington, DC 20036-5303
14
     **Carl W. Hittinger**
15   Baker & Hostetler LLP (PHILADELPHIA)
     1735 Market St
16   Ste 3300
     Philadelphia, PA 19103
17
     **Alyse F. Stach**
18   Baker & Hostetler LLP (Philadelphia)
     1735 Market St
19   Ste 3300
     Philadelphia, PA 19103
20
     **Jason J. Hoeft**
21   Karr Tuttle Campbell
     701 Fifth Ave
22   Ste 3300
     Seattle, WA 98104
23
     **Jose Dino Vasquez**
24   Karr Tuttle Campbell
     701 Fifth Ave
25   Ste 3300
     Seattle, WA 98104

```
 1          Ryan Thomas Holt
            Sherrard Roe Voigt & Harbison, PLC
 2          150 Third Avenue South
            Suite 1100
 3          Nashville, TN 37201

 4          Belinda S. Lee
            Latham & Watkins
 5          505 Montgomery Street
            Suite 2000
 6          San Francisco, CA 94111-2562

 7          Michael M. Maddigan
            Hogan Lovells US LLP
 8          1999 Avenue of the Stars
            Suite 1400
 9          Los Angeles, CA 90067

10          Laura Penaranda
            Hogan Lovells US LLP
11          1999 Avenue of the Stars
            Suite 1400
12          Los Angeles, CA 90067

13          Stephen McIntyre
            O'Melveny & Myers, LLP (LA Office)
14          400 S Hope Street
            18th Floor
15          Los Angeles, CA 90071-2899

16          Ian Simmons
            O'Melveny and Myers, LLP
17          1625 Eye Street, NW
            Washington, DC 20006-4001
18
            Benjamin R. Nagin
19          Sidley Austin LLP (NY)
            787 Seventh Ave
20          New York, NY 10019

21          Michael Antonio Parente
            Maynard Nexsen P.C.
22          1230 Main Street
            Suite 700
23          Columbia, SC 29201

24

25
```

**Margaret M. Siller**
Maynard Nexsen P.C.
1201 Villa Place
Suite 103
Nashville, TN 37212

**Marguerite S. Willis**
Maynard Nexsen, PC
104 South Main Street
Suite 900
Greenville, SC 29601

**Noah Byron Pinegar**
Paul Hastings LLP (NY)
200 Park Ave
New York, NY 10166

**Heather T. Rankie**
Zelle LLP (OAKLAND)
555 12TH ST
Ste 1230
Oakland, CA 94607

**Ezekiel Rosenberg**
Wilson Sonsini Goodrich & Rosati, P.C.
1301 Avenue of the Americas
40th Fl.
New York, NY 10019

**Yonaton M. Rosenzweig**
Davis Wright Tremaine (Los Angeles)
865 S Figueroa St Ste 2400
Suite 2400
90017
Los Angeles, CA 90017-2566

**Ryan M. Sandrock**
Shook Hardy & Bacon LLP (SF)
555 Mission St Ste 2300
San Francisco, CA 94105

**Todd R. Seelman**
Lewis, Brisbois, Bisgaard & Smith, LLP
(Denver Office)
1700 Lincoln Street
Suite 4000
Denver, CO 80203

```
 1          John Joseph Sullivan
            Cozen O'Connor
 2          3 WTC, 175 Greenwich Street
            Ste 55th Floor
 3          New York, NY 10007

 4          Tara L. Swafford
            The Swafford Law Firm, PLLC
 5          321 Billingsly Court
            Suite 19
 6          Franklin, TN 37067

 7          David Alan Walton
            Bell Nunnally & Martin LLP
 8          2323 Ross Avenue
            Suite 1900
 9          Dallas, TX 75201

10          Bradley C. Weber
            Locke Lord LLP
11          2200 Ross, Ave
            Ste 2800
12          Dallas, TX 75201

13          Michael T. Williams
            Wheeler Trigg O'Donnell LLP
14          370 17th Street
            Suite 4500
15          Denver, CO 80202

16          Kylie S. Wood
            ArentFox Schiff LLP
17          233 S. Wacker Dr.
            Suite 7100
18          Chicago, IL 60606

19          Stephen J. Zralek
            Spencer Fane LLP
20          511 Union Street
            Suite 1000
21          Nashville, TN 37219

22          Scott Perlin

23          Val Hoy

24

25
```

1          The above-styled cause came on to be heard on
2   May 31, 2023, before the Honorable Waverly D. Crenshaw, Jr.,
3   Chief District Judge, when the following proceedings were
4   had, to-wit:
5          THE COURT:  All right.  Be seated.
6          Good afternoon --
7          ALL:  Good afternoon.
8          THE COURT:  -- and welcome to Nashville for those
9   who aren't from Nashville.  I understand there are a couple.
10         All right.  We're here on Case 23-MD-3071, *In Re:*
11  *RealPage, Inc., Rental Software Antitrust Litigation (No. 2).*
12         And at this point I'm going to ask the courtroom
13  deputy to announce the names of those who are here, and if
14  you would respond with "present," we'll have you on the
15  record.
16         MS. PARISE:  David Mitchell.
17         MR. MITCHELL:  Here.
18         MS. PARISE:  Stacey Slaughter.
19         MR. SLAUGHTER:  Here.
20         MS. PARISE:  Adam Zapala.
21         MR. ZAPALA:  Present.
22         MS. PARISE:  Benjamin Widlanski.
23         MR. WIDLANSKI:  Present.
24         MS. PARISE:  Brendant Glackin.
25         MR. GLACKIN:  Present.

```
 1              MS. PARISE:  Cadio Zirpoli.

 2              MR. ZIRPOLI:  Present.

 3              MS. PARISE:  Dan Hedlund.

 4              MR. HEDLUND:  Present.

 5              MS. PARISE:  Daniel Walker.

 6              MR. WALKER:  Present.

 7              MS. PARISE:  David Cialkowski.

 8              MR. CIALKOWSKI:  Present.

 9              MS. PARISE:  Dean Harvey.

10              MR. HARVEY:  Present.

11              MS. PARISE:  Desiree Cummings.

12              MS. CUMMINGS:  Present.

13              MS. PARISE:  Elizabeth Tran Castillo.

14              MS. CASTILLO:  Present.

15              MS. PARISE:  Gary Smith.

16              MR. SMITH:  Present.

17              MS. PARISE:  Geoff Kozen.

18              MR. KOZEN:  Present.

19              MS. PARISE:  Greg Asciolla.

20              MR. ASCIOLLA:  Present.

21              MS. PARISE:  Isaac Conner.

22              MR. CONNER:  Present.

23              MS. PARISE:  J. Gerard Stranch IV.

24              MR. STRANCH IV:  Present.

25              MS. PARISE:  J. Gerard Stranch III.
```

```
 1              MR. STRANCH III:  Present.

 2              MS. PARISE:  Jerry Martin.

 3              MR. MARTIN:  Present.

 4              MS. PARISE:  Karin Garvey.

 5              MR. GAREY:  Present.

 6              MS. PARISE:  Kate Baxter-Kauf.

 7              MS. BAXTER-KAUF:  Present.

 8              MS. PARISE:  Kenneth Byrd.

 9              MR. BYRD:  Present.

10              MS. PARISE:  Kevin Landau -- he's not here.

11      Margaret Shadid.

12              MS. SHADID:  Present.

13              MS. PARISE:  Mark Chalos.

14              MR. CHALOS:  Present.

15              MS. PARISE:  Patrick Coughlin.

16              MR. COUGHLIN:  Present.

17              MS. PARISE:  Patrick McGahan.

18              MR. MCGAHAN:  Present.

19              MS. PARISE:  Paul Bruno.

20              MR. BRUNO:  Present.

21              MS. PARISE:  Rio Pierce.

22              MR. PIERCE:  Present.

23              MS. PARISE:  Roe Frazer.

24              MR. FRAZER:  Present.

25              MS. PARISE:  Steve Berman.
```

| | |
|---|---|
| 1 | MR. BERMAN:  Present. |
| 2 | MS. PARISE:  Swathi Bojedla. |
| 3 | MR. BOJEDLA:  Present. |
| 4 | MS. PARISE:  Tom Undlin. |
| 5 | MR. UNDLIN:  Present. |
| 6 | MS. PARISE:  Tricia Herzfeld. |
| 7 | MS. HERZFELD:  Present. |
| 8 | MS. PARISE:  Yaman Salahi. |
| 9 | MR. SALAHI:  Present. |
| 10 | MS. PARISE:  Amanda Boltax. |
| 11 | MS. BOLTAX:  Present. |
| 12 | MS. PARISE:  Alyse Stach. |
| 13 | MS. STACH:  Present. |
| 14 | MS. PARISE:  Andrew Dickson. |
| 15 | MR. DICKSON:  Present. |
| 16 | MS. PARISE:  Andrew Gardella. |
| 17 | MR. GARDELLA:  Present. |
| 18 | MS. PARISE:  Belinda Lee. |
| 19 | MS. LEE:  Present. |
| 20 | MS. PARISE:  Benjamin Nagin. |
| 21 | MR. NAGIN:  Present. |
| 22 | MS. PARISE:  Bradley Weber. |
| 23 | MR. WEBER:  Present. |
| 24 | MS. PARISE:  Brent Justus. |
| 25 | MR. JUSTUS:  Present. |

```
 1              MS. PARISE:  Caeli Higney.

 2              MS. HIGNEY:  Present.

 3              MS. PARISE:  Carl Hittinger.

 4              MR. HITTINGER:  Present.

 5              MS. PARISE:  Chad Elder.

 6              MR. ELDER:  Present.

 7              MS. PARISE:  Chelsea Futrell.

 8              MS. FUTRELL:  Present.

 9              MS. PARISE:  Craig Seebald.

10              MR. SEEBALD:  Present.

11              MS. PARISE:  Daniel Fenske.

12              MR. FENSKE:  Present.

13              MS. PARISE:  David Cross.

14              MR. CROSS:  Present.

15              MS. PARISE:  David Kully.

16              MR. KULLY:  Present.

17              MS. PARISE:  David Walton.

18              MR. WALTON:  Present.

19              MS. PARISE:  Diane Hazel.

20              MR. HAZEL:  Present.

21              MS. PARISE:  Edward Duckers.

22              MR. DUCKERS:  Present.

23              MS. PARISE:  Edwin Buffmire.

24              MR. BUFFMIRE:  Present.

25              MS. PARISE:  Evan Fray-Witzer.
```

```
 1              MR. FRAY-WITZER:  Present.

 2              MS. PARISE:  Ezekiel Rosenberg.

 3              MR. ROSENBERG:  Present.

 4              MS. PARISE:  Gregory Casas.

 5              MR. CASAS:  Present.

 6              MS. PARISE:  Heather Rankie.

 7              MS. RANKIE:  Present.

 8              MS. PARISE:  Ian Simmons.

 9              MR. SIMMONS:  Present.

10              MS. PARISE:  J. Dino Vasquez.

11              MR. VASQUEZ:  Present.

12              MS. PARISE:  Jason Hoeft.

13              MR. HOEFT:  Present.

14              MS. PARISE:  Jay Srinivasan.

15              MR. SRINIVASAN:  Present.

16              MS. PARISE:  Jeremy Calsyn.

17              MR. CALSYN:  Present.

18              MS. PARISE:  Jessalyn Zeigler.

19              MS. ZEIGLER:  Present.

20              MS. PARISE:  John Sullivan.

21              MR. SULLIVAN:  Present.

22              MS. PARISE:  Joshua Burgener.

23              MR. BURGENER:  Present.

24              MS. PARISE:  Joshua Cumby.

25              MR. CUMBY:  Present.
```

```
 1              MS. PARISE:  Kenneth Racowski.

 2              MR. RACOWSKI:  Present.

 3              MS. PARISE:  Kylie Wood.

 4              MR. WOOD:  Present.

 5              MS. PARISE:  Laura Penaranda.

 6              MS. PENARANDA:  Present.

 7              MS. PARISE:  Leo Caseria.

 8              MR. CASERIA:  Present.

 9              MS. PARISE:  Margaret Siller.

10              MS. SILLER:  Present.

11              MS. PARISE:  Marguerite Willis.

12              MS. WILLIS:  Present.

13              MS. PARISE:  Marissa Secco Giles.

14              MS. GILES:  Present.

15              MS. PARISE:  Mark Bell.

16              MR. BELL:  Present.

17              MS. PARISE:  Michael Bonanno.

18              MR. BONANNO:  Present.

19              MS. PARISE:  Michael Maddigan.

20              MR. MADDIGAN:  Present.

21              MS. PARISE:  Michael Parente.

22              MR. PARENTE:  Present.

23              MS. PARISE:  Mike Scarborough.

24              MR. SCARBOROUGH:  Present.

25              MS. PARISE:  Mike Williams.
```

```
1              MR. WILLIAMS:  Present.

2              MS. PARISE:  Nick Giles.

3              MR. GILES:  Present.

4              MS. PARISE:  Noah Pinegar.

5              MR. PINEGAR:  Present.

6              MS. PARISE:  Philip Giordano.

7              MR. GIORDANO:  Present.

8              MS. PARISE:  R. Dale Grimes.

9              MR. GRIMES:  Present.

10             MS. PARISE:  Richard Brosnick.

11             MR. BROSNICK:  Present.

12             MS. PARISE:  Robert Manoso.

13             MR. MANOSO:  Present.

14             MS. PARISE:  Ryan Holt.

15             MR. HOLT:  Present.

16             MS. PARISE:  Ryan Sandrock.

17             MR. SANDROCK:  Present.

18             MS. PARISE:  Sam Cowin.

19             MR. COWIN:  Present.

20             MS. PARISE:  Sam Funk.

21             MR. FUNK:  Present.

22             MS. PARISE:  Scott D. Carey.

23             MR. CAREY:  Present.

24             MS. PARISE:  Scott Perlin.

25             MR. PERLIN:  Present.
```

```
 1              MS. PARISE:  Stephen McIntyre.
 2              MR. MCINTYRE:  Present.
 3              MS. PARISE:  Stephen Weissman.
 4              MR. WEISSMAN:  Present.
 5              MS. PARISE:  Stephen Zralek.
 6              MR. ZRALEK:  Present.
 7              MS. PARISE:  Tara Swafford.
 8              MS. SWAFFORD:  Present.
 9              MS. PARISE:  Thomas Dundon.
10              MR. DUNDON:  Present.
11              MS. PARISE:  Thomas Dyer.
12              MR. DYER:  Present.
13              MS. PARISE:  Todd Seelman.
14              MR. SEELMAN:  Present.
15              MS. PARISE:  Val Hoy.
16              MR. HOY:  Present.
17              MS. PARISE:  Yehudah Buchweitz.
18              MR. BUCHWEITZ:  Present.
19              MS. PARISE:  Yonaton Rosenzweig.
20              MR. ROSENZWEIG:  Present.
21              THE COURT:  -- all right.  Again, thanks for being
22   here.  I've got a list of things I want to go through, and
23   then I think that's going to precipitate some conversation
24   with many of you, but not all of you.
25              Based on the docket sheet -- and I've been told
```

1  that, Mr. Srinivasan, you're going to speak for all of the
2  defendants or most of the defendants.  I can't tell from the
3  docket sheet.  Maybe it hasn't been filed.
4          But will the defendants agree to accept service so
5  we can accomplish that?
6          MR. SRINIVASAN:  We haven't discussed that as a
7  group, Your Honor, but I imagine that would not be an issue.
8          THE COURT:  Do you think you all can discuss it
9  and maybe agree on that?  And I'll let you set a deadline.
10          MR. SRINIVASAN:  I don't think it should take more
11  than a few days for us to discuss that.
12          What would be convenient for Your Honor?
13          THE COURT:  June 7th, a week from today.
14          MR. SRINIVASAN:  Sure.  That would be great, Your
15  Honor.  It's not a problem for my client, but I imagine that
16  will be the case for most.  But we'll confirm.
17          THE COURT:  And then I guess this is for everyone,
18  but I'll start back with Mr. Srinivasan:  Are you aware if
19  any of the defendants have any objection to subject matter or
20  personal jurisdiction as it arose from the transferor court?
21          MR. SRINIVASAN:  I am not aware of any particular
22  discussion in that regard, Your Honor, but, again, I should
23  confirm that with the defendants.  But it's not something
24  that's been subject of discussion among the group at this
25  point.

1          THE COURT:  Can we set June the 7th to file

2   something that all defendants concede that personal

3   jurisdiction and subject matter jurisdiction existed in the

4   transfer court?

5          MR. SRINIVASAN:  Absolutely, Your Honor.  And, if

6   somebody has an objection, we'll note that in the filing.

7          THE COURT:  I guess I'll see a motion eventually.

8   All right.

9          But I do see from the joint statement from the

10  plaintiffs and the defendants that everybody agrees to venue?

11  Is that accurate?

12         MR. SRINIVASAN:  That's correct from our

13  perspective.

14         THE COURT:  And who wants to say yes for the

15  plaintiffs?

16         MR. GLACKIN:  Yes, Your Honor.

17         THE COURT:  There you go.

18         All right.  So we're going to cover some things,

19  but this is a date that most, if not all of you, might want

20  to put down.  We're going to convene the initial case

21  management conference on Monday, August the 7th, at 1:00 p.m.

22  And I want to spend the rest of the time today getting ready

23  for that, that conference.

24         In the joint statement, it appears the plaintiffs

25  and defendants agree that the plaintiffs need to file a

```
1   consolidated amended complaint.  Mr. Glackin, Ms. Herzfeld,
2   whoever's going to speak
3               MS. HERZFELD:  Yes, that's true, Your Honor.
4               THE COURT:  Okay.  And Mr. Srinivasan?
5               MR. SRINIVASAN:  Agreed, Your Honor.
6               THE COURT:  I have a date in mind.  What's your
7   date?
8               MR. GLACKIN:  Your Honor, I think that -- excuse
9   me.  Pardon me.
10              I think that the plaintiffs had collectively
11  proposed 45 days after Your Honor entered an order on
12  leadership so we know which firms will be responsible for the
13  case.
14              THE COURT:  Okay.  Mr. Srinivasan?
15              MR. SRINIVASAN:  Yes, Your Honor, we had agreed
16  with that schedule.  We thought 45 days after they have a
17  decision on who's going to be running things on their side.
18              THE COURT:  Okay.  So what I plan to do between
19  now and -- and August the 7th is to get you all to make your
20  leadership applications.  Pretty quickly.  I intend to rule
21  on those before we get back together for the case management
22  conference so, when we come back, those people will be in
23  place, including interim class representatives for the
24  plaintiffs and defendants.
25              So timing it based on that appointment probably
```

1  isn't what I had in mind.  Because I assume that you all have

2  had some thoughts about what's going to be in those

3  amended -- and I want to talk about some concerns I see.

4            So, with that, I'm going to share with you this

5  date.  It may be aspirational, but I hope not.  Because I do

6  want to come back for the initial case management conference

7  on the 7th with this in place.  June the 16th for the

8  consolidated amended complaints.

9            I gather for the multifamily rental group and the

10  student rental group -- and that's where we need Mr. Berman?

11            MR. BERMAN:  Present, Your Honor.

12            THE COURT:  So I assume since Navarro is the

13  student case, you're going to draft that --

14            MR. BERMAN:  That's correct, Your Honor.  We would

15  file a standalone consolidated complaint, and we could be

16  ready by June 16th.

17            THE COURT:  All right.  Mr. -- well, I'm sure the

18  defendants don't mind, but they don't know the dates -- the

19  other dates I have in mind.

20            Can the plaintiffs accomplish June 16th?

21            MR. MARTIN:  Your Honor, I think -- I think we are

22  all in agreement on our (indiscernible).  I think four

23  different plaintiffs counsel are speaking.  And I think some

24  of us huddled beforehand.

25            I think our preference would be to go through the

process and, you know, we could file -- we've been -- I think
we're all basically prepared to move -- you know, file our
applications for leadership.  I think our preference would be
to know who the lead -- you know, who -- who the lead counsel
and liaison counsel are going to be and then have those firms
leading the charge to file the consolidated amended
complaint.  That would be our preference.

It sounds like you're looking at a schedule that's
going to put the -- the consolidated amended complaint before
that process.  But I know I at least speak for myself -- I
think I speak for others -- that we would -- our preference
would be -- obviously, we'll do whatever the Court orders us
to do, but our preference would be to try to shake that out
sooner rather than possible, and I think we could file our
applications, like, you know, very quickly.

THE COURT:  Does "very quickly" mean you could
file them by next -- by next Wednesday, the 7th?

MR. MARTIN:  We could, Your Honor.

MS. HERZFELD:  Yes, Your Honor, we could.

THE COURT:  Okay, good.

MR. GLACKIN:  Yes, Your Honor.

MS. HERZFELD:  Absolutely.

THE COURT:  So that will be the date.

So at least that part of your motion that I
reserved for discussion, I think it's Document 82 is going to

```
1    be granted in part -- and those would be applications for
2    interim class counsel, as well as the steering committee and
3    everything else.  Correct?
4              MR. BERMAN:  That's correct.
5              MS. HERZFELD:  Yes, Your Honor, that's correct.
6              Can I ask one point of clarification, Your Honor?
7              THE COURT:  Sure.
8              MS. HERZFELD:  There was an issue about whether
9    our applications should be under seal in their entirety, and
10   I think we had all agreed, if it's Your Honor's pleasure, to
11   have the applications be under seal if parts are necessary.
12             THE COURT:  Yeah.  I had that in the order.  But I
13   guess now I'm wondering -- you know, that was why I really
14   didn't enter your order.  I'm not sure what you're going to
15   put under seal and why.
16             MS. HERZFELD:  So actually I don't anticipate we,
17   from our group, would have anything we would need to put
18   under seal.  I think maybe the typical stuff, if anybody has
19   particular financial information.  But, otherwise, we think
20   everything should be as open as possible for the public --
21             THE COURT:  I agree.
22             MS. HERZFELD:  -- and absent class members and
23   anybody else that wants to see who's being considered for
24   leadership.
25             THE COURT:  And, in the same vein, you all can
```

1    file -- that will be on the docket, and anybody that wants to
2    respond or share information to the Court, I welcome all the
3    information I can get.
4            MR. GLACKIN:  We have the same view about sealing,
5    Your Honor.
6            THE COURT:  That you don't want it?
7            MR. GLACKIN:  That we don't want it.
8            THE COURT:  Me either.
9            MR. GLACKIN:  Great.
10           THE COURT:  But if it's something that you want to
11   file and you think it's -- merits being sealed, then
12   certainly file the motion and I'll look at it and rule.
13   Okay.
14           MS. HERZFELD:  Can I ask one more point of
15   clarification, Your Honor.
16           THE COURT:  Sure.
17           MS. HERZFELD:  We as a group, the entire
18   plaintiffs group, had gotten together and decided over some
19   conversations that we didn't feel the need to do responsive
20   briefing to the applications, unless of course Your Honor
21   would like responsive briefing.
22           THE COURT:  I'm not going to bar responsive
23   briefing.  You know, if -- if, you know, Mr. or Mrs. X wants
24   to be it but somebody else has information that'd be helpful
25   to the Court, bring -- let's share that with the Court.

1          MS. HERZFELD:  Thank you, Your Honor.

2          THE COURT:  Okay.  So, when you file those on the

3  7th, I'm going to -- I'm going to try to look at them as soon

4  as they're filed.  If I need to meet with someone, you'll get

5  a quick call and we'll do that probably in chambers, but on

6  the record.  So I anticipate being able to get back with

7  whoever that is.

8          So I still want -- I want to use as an

9  aspirational date, at least, for right now, getting the --

10  the -- well, y'all have met.  I mean, somebody, somewhere in

11  this group of lawyers has got an outline of the consolidated

12  amended complaint.

13          I know Mr. Berman has one for the students.

14          MR. BERMAN:  I'm good to go, Your Honor.

15          MS. HERZFELD:  Yes, Your Honor, and I think we can

16  continue to work collaboratively to get towards that.  But,

17  you know, getting to a final before we know who gets to make

18  those final calls -- we're happy to work towards it.

19          THE COURT:  Okay.

20          MR. GLACKIN:  Honestly, if you're taking the

21  leadership applications on June 7th, it could be challenging

22  to get a complaint on file by June 16th.  Especially if we're

23  not barring responsive pleadings.

24          I don't know that you'll know on the 7th,

25  unless -- unless there's an agreement -- unless we can

represent to the Court that we've talked and nobody wants to
put in a responsive pleading, you might not know that you
have all the information you need.

I'm sorry to be the -- the fly in the ointment,
but it does seem hard to get from June 7th to June 16th in
terms of doing a CAC, even if we -- excuse me -- consolidated
amended complaint even if we have been working on it and are
advanced in our thinking about it.

THE COURT:  All right.  Okay.  I guess that's why
I shared the date for the initial case management conference.
That's pretty firm for me.  Because my month of August is
going to be getting ready for what's turned out to be just
two months of trial and maybe just six weeks of trial.  It
was going to be four months.

But, nevertheless, I don't want you all to -- I
don't want this to bleed over until late -- late fall.

MR. GLACKIN:  May I make a suggestion, Your Honor?

THE COURT:  Sure.

MR. GLACKIN:  Which is that if we have until the
23rd to file the consolidated amended complaint, we can
confirm among ourselves -- and I think -- I haven't heard
anybody say they want to file oppositions or responses to
motions for leadership --

THE COURT:  I'm going to take care of that.  If
you want to file something, you're going to have 24 hours to

1  file it after you all do it.

2          MR. GLACKIN:  Very good.  Perfect.

3          THE COURT:  And then maybe the other thing --

4  maybe it's good for me to share with everybody what I'm

5  envisioning.  We're going to get back together on August the

6  7th.  By then the Court will have ruled on leadership for

7  both plaintiffs and defendants.  By then you would have filed

8  your amended -- consolidated amended complaints, which I want

9  to talk about, and by then defendants will have filed their

10 responsive pleadings.

11         And I would like for all those to all be fully

12 briefed so, when we come back on the 7th, I'm ready to give

13 you my thoughts on what's been filed by the defendants.

14         So that's my goal.

15         MR. GLACKIN:  In that case we better stick with

16 the 16th.

17         THE COURT:  There you go.  So, to help the Court

18 get ready for the 7th and to anticipate what's going to be

19 filed, I guess let's start with Mr. Srinivasan.

20         And, again, I'm not going to hold you to this.

21 You can change your mind.  You can amplify on it as you want.

22 But, as I read what's in the joint statement, I'm left to

23 wonder -- so I'm going to ask you for a proffer on how did

24 the RealPage customers maintain their individual

25 decision-making discretion on pricing and supply?  How did

1  that occur?

2          MR. SRINIVASAN:  Sure, Your Honor.  And we think

3  there are some clarifications needed for, you know, what's

4  described in these complaints and -- where the allegations

5  don't quite allege the agreements that would typically be

6  needed in a conspiracy.

7          In other words, to specifically -- if your

8  question is how do defendants make these pricing decisions,

9  our answer is simply that this software is just one tool.

10 Cutting to the chase -- and I'm happy to back up and give you

11 more details in terms of what various defendants -- and I

12 should add, by the way, that the -- you know, we represent

13 the software company, but most of the people here represent

14 lessor defendants, who are property managers or owners who

15 have disparate businesses, disparate situations.

16         The way in which they use the software -- and I

17 should also emphasize that one of the issues in our -- for us

18 is some of the defendants here don't use the software.  Some

19 of the defendants use software from RealPage that has nothing

20 to do with revenue management.  And the revenue management

21 software at RealPage itself is varied.  There are multiple

22 products, different defendants, the ones that do use it have

23 used different versions of that product, and that's changed

24 over time.

25         So we don't have this uniform sort of world that

1   the allegations suggest.

2          And then, as you might imagine, these folks have

3   multiple properties, and each property manager will take the

4   input from the software, which is just one piece of input

5   into the various other inputs that they take on.  So it's

6   quite independent behavior.  And, in fact, you know, our view

7   is the allegations in the complaint don't come close to what

8   the case law says you have to prove for a conspiracy.

9          THE COURT:  So how do you -- how do you -- and

10  there are -- there are many complaints.  I haven't read them

11  all, but I've looked at a great deal of them.  And they're

12  repetitious in many respects.  And several of them talk about

13  how the RealPage advisors crack the whip and make sure that

14  they do accept certain recommended pricing.

15         What's -- how does that maintain what you all call

16  independent economic self-interest?

17         MR. SRINIVASAN:  I mean, I understand in our

18  motion to dismiss we have to take the allegations as they

19  come.  However, you know, most of us in this room have read

20  all of them, and they're not uniform.  Some accurately do not

21  allege that there's any whip-cracking at all.

22         And I'll tell you as a matter of reality --

23         THE COURT:  I suspect we're going to see more of

24  that in the consolidated complaint.

25         MR. SRINIVASAN:  It's possible.  It's possible.

```
 1              THE COURT:  So what's your response?  Is that just
 2    made up?
 3              MR. SRINIVASAN:  I think there are other
 4    elements -- I mean, I think what that issue goes to is this
 5    idea that RealPage is policing the conduct --
 6              THE COURT:  So is there a position in RealPage
 7    called RealPage advisors?
 8              MR. SRINIVASAN:  They're -- I believe that
 9    position exists, but it's -- they're not cracking whip.
10    They're not --
11              THE COURT:  And they're assigned to individual,
12    what, lessors?
13              MR. SRINIVASAN:  Some are.
14              THE COURT:  And they have contact on a daily,
15    weekly basis?
16              MR. SRINIVASAN:  I would say for -- it varies.
17    Right?  The short answer for that is it dramatically varies.
18              For some customers, they may ask for that contact.
19    There may be regular contact.  For some there may be none.
20              And I've just been -- about only 30 percent of the
21    defendants overall -- I'm sorry -- customers of RealPage, not
22    necessarily defendants in this room -- properties --
23    properties have an advisor attached to it.  So many don't.
24    Many don't have that.
25              And in our view -- I think you're getting towards
```

sort of how is this policed. And, if you read these
complaints -- and given what we're saying -- there -- it's --
it -- we think it's not plausible on its face. The products
themselves are not the same, much less the policing. And, as
we just said, a minority of people have these advisors.

So we think there's major Blomley issues,
plausibility issues with this conspiracy, and that's sort of
where we are in the motion to dismiss. And we have other
arguments.

THE COURT: Sure. And we'll get to all those in
time.

I guess what I'm still -- so, in a nutshell,
you're telling me that RealPage and its customers -- you just
give them information and they can do with it whatever they
want? Is that -- is that it in a nutshell?

MR. SRINIVASAN: Absolutely, Your Honor.

THE COURT: Whether they accept it or don't accept
it is totally up to your customer?

MR. SRINIVASAN: That's correct.

THE COURT: And the allegations about -- what? --
70, 80 percent of the time or 90 percent of the time they
have to abide by that, that's -- that's -- that's at least
disputed fact?

MR. SRINIVASAN: It is absolutely disputed. There
is no compulsion by any customer to take the feedback from

1  RealPage.

2           THE COURT:  Okay.  And then in the joint

3  statement, you refer that there are going to be certain -- I

4  emphasize the word "certain" -- plaintiffs who are precluded

5  due to binding arbitration.

6           How many is "certain"?

7           MR. SRINIVASAN:  Yeah.  "Certain" is a word we all

8  like to use.  It's hard to know.

9           One issue that we have in general, speaking about

10 the consolidated amended complaint, we are not sure -- you

11 know, in our experience -- right? -- not every defendant

12 makes it into the consolidated amended complaint.  But,

13 leaving that uncertainty aside, just with the group we have

14 now, we haven't taken a poll, but there are many -- I would

15 say more than half -- have an arbitration agreement with, you

16 know, their tenant.

17          And it gets very complicated --

18          THE COURT:  And that's in their lease agreement?

19          MR. SRINIVASAN:  That's in the lease agreement.

20          THE COURT:  Okay.

21          MR. SRINIVASAN:  And it gets complicated because

22 some of the defendants who operate in different states will

23 have different versions of that arbitration agreement,

24 depending on the state and what's allowed in the state.

25 That's just among one defendant.

 1          THE COURT:  Well, are you intending to make a
 2   motion to compel arbitration?
 3          MR. SRINIVASAN:  That is absolutely the goal --
 4          THE COURT:  By the deadline we're going to set
 5   today, I think?
 6          MR. SRINIVASAN:  Well, we wanted to talk to you
 7   about that deadline.  I think these -- some of these motions
 8   will be pretty complicated, I think.  I mean, we will try to
 9   simplify it.  Every defendant might not -- I don't want to
10   say every single defendant has a different provision, but
11   it's likely that the language is different.  We think the
12   issues will hopefully be same generally.
13          THE COURT:  Well, if there's one consolidated
14   complaint, you're saying each defendant is going to file a
15   separate motion?
16          MR. SRINIVASAN:  Well, we -- we will first of all
17   endeavor to do as much of this as we can collectively.
18   Absolutely, Your Honor.
19          But, to the extent sometimes these decisions in
20   forcing an arbitration agreement comes down to the language
21   of the agreement, we're going to have perhaps various
22   versions of that language.  We could try to frame it into a
23   motion and maybe have exhibits.  But I don't know how we can
24   avoid that, Your Honor.
25          And I would just add that there is also a

1   concern -- I think at a minimum, you know, you're going to

2   have other defendants with whom a -- let me say -- the issue

3   equitable estoppel.  So, if you've got a plaintiff with an

4   arbitration agreement against one defendant, and the other

5   defendants are alleged to be co-conspirators, the other

6   defendants also can move to compel arbitration under that

7   agreement.  That's an argument also that we are

8   contemplating.

9                THE COURT:  So you're -- are you also

10  contemplating how many certain plaintiffs have class action

11  waivers?

12               MR. SRINIVASAN:  That's correct, Your Honor.  It

13  sort of depends on -- that's right.  I'm sorry.  You asked

14  about class action waivers.  That's another issue --

15               THE COURT:  And the same's going to be true to

16  waiver of jury trial?

17               MR. SRINIVASAN:  Yes, Your Honor.  And there are

18  some I think that have some damages limitations provisions

19  too.  That may be able to come later in the case.

20               THE COURT:  And I don't mean to get ahead, and I

21  don't mean to put you on the spot, so all this is in

22  preparation for August the 7th, would I be correct in

23  anticipating that RealPage is going to take the lead on

24  behalf of all the defendants?

25               MR. SRINIVASAN:  Well, we are talking -- again,

1    the defense group, I think, again, sort of -- we haven't come

2    up with a -- with a liaison consult team yet, because, again,

3    some folks are waiting to see who ends up in the consolidated

4    complaint.

5            THE COURT:  Well, are you going to apply to be the

6    liaison for the defendant?

7            MR. SRINIVASAN:  We will be absolutely, Your

8    Honor, along with some colleagues.

9            THE COURT:  And I assume Grey Star is going to

10   have a big issue -- a big vote in that.

11           Where are you?  Oh, Grey Star.

12           MR. MADDIGAN:  Good afternoon, Your Honor.

13           Yes, Your Honor, we would like to.  Yes, that is

14   correct.

15           THE COURT:  And the same is going to be true for

16   Lincoln Property Company?

17           MR. CASAS:  Yes, Your Honor, that is correct.

18           THE COURT:  And probably the same is going to be

19   true for Mid-America Apartment Communities, Inc.?

20           MR. FENSKE:  Yes, Your Honor, that's correct.

21           THE COURT:  And Avenue5.  But I don't think

22   they're here.  Avenue5 is -- Avenue5 Residential, LLC, is not

23   here.  But they're in 30 of these -- now 40 cases, I think.

24           And I assume y'all have all been in contact with

25   each other.

```
 1              MR. SRINIVASAN:  We are, Your Honor.  Everybody
 2   that signed on for the defense, we've been working together.
 3              THE COURT:  Okay.
 4              Now, you mentioned earlier that some of the
 5   defendants don't use the RealPage software?
 6              MR. SRINIVASAN:  That's correct, Your Honor.
 7              THE COURT:  Okay.  And I hope whatever -- whatever
 8   cases those defendants are in, now is a good time to have
 9   discussion with whatever plaintiff brought that, so it's
10   just -- save everybody a lot of time and money if you didn't
11   use that.  At least the plaintiffs know that before they --
12              MR. SRINIVASAN:  That's our hope, Your Honor.  I
13   believe a few defendants have been dismissed here and there
14   in the individual cases.
15              THE COURT:  Yeah.
16              MR. SRINIVASAN:  But I believe there are
17   defendants who remain who don't use the software or use
18   different software entirely that has nothing to do with
19   revenue management.
20              THE COURT:  And it sounds like you've got an idea
21   who they are.
22              MR. SRINIVASAN:  I think those discussions have
23   been occurring, and we do hope that they're able to get
24   dismissed or not show up in the amended complaint, if
25   possible.  That's certainly our hope.
```

```
1              THE COURT:  How many is that, or is that also an
2    uncertain --
3              MR. SRINIVASAN:  I don't know that number, Your
4    Honor.  I -- I -- yeah.
5              THE COURT:  One more.  Then in your joint
6    statement, you said -- you put out "standing."
7              Is that anything more than what we've been talking
8    about, or is it your standing --
9              MR. SRINIVASAN:  You mean in terms of possible
10   standing defense?
11             THE COURT:  Concern.
12             MR. SRINIVASAN:  Yeah.  I think that what we've
13   talked about covers it, Your Honor.
14             THE COURT:  Ah, okay.  Well, let me add -- oh, you
15   can -- well, I'm just going to throw this out.  You don't
16   have to stand if you don't want to, but I guess whoever ends
17   up -- I guess I am going to appoint you for right now.
18             The Court would like to know, with some
19   certainty -- or within a low number -- give or take a low
20   number, you know -- how many arbitration provisions are out
21   there, how many class action waivers are out there.  And at a
22   minimum identify whether any of the named -- the purported
23   named plaintiff class representatives have signed that.
24             And if -- can you -- can you at least do that?
25             MR. SRINIVASAN:  Sure, Your Honor.  We can
```

```
 1  endeavor to do that and have that to you in this June 7th
 2  submission.  Is that -- would that be okay?
 3              THE COURT:  Okay.  Right.  And we're going to
 4  share that, because Mr. Bauman is going to need it for his
 5  amended complaint and whoever else writes the multifamily
 6  complaint.  Okay.
 7              All right.  Thanks.
 8              Well, one more.  When I look -- and I'll get to
 9  the plaintiffs here in a minute.  The plaintiffs are all over
10  the place in terms of when the purported class starts.  And I
11  think I see 2010, and it goes all the way up to 2019.
12              What does RealPage say?
13              MR. SRINIVASAN:  Well, Your Honor, of course --
14              THE COURT:  I know you say there's no class
15  action, but just in case we get there.
16              MR. SRINIVASAN:  Well, what we -- what I would say
17  to that is, you know, certainly some of our clients have been
18  using our software since, you know, I think 2010 at least,
19  right?  For a long time.
20              Of course, we don't think there's ever been a
21  conspiracy of any kind, so we can't really speak to when, you
22  know, that happened, because it didn't happen.
23              THE COURT:  And would 2010 coincide with when the
24  rental software was fully developed and offered to the
25  public?
```

```
1              MR. SRINIVASAN:  I don't know that it -- that
2   coincides.  I don't know that there's a magic number there.
3              THE COURT:  No.  I'm talking for RealPage.
4              MR. SRINIVASAN:  I understand what you mean.  I
5   don't know when the software started being marketed.  I
6   imagine it's evolved over the years and started even earlier.
7              THE COURT:  Oh.  I was going to say no later than
8   2010.  But it could have been before 2010?
9              MR. SRINIVASAN:  It's possible, Your Honor, yes.
10             THE COURT:  When did you start marketing it?
11             MR. SRINIVASAN:  I just -- the late 2000s, is what
12  I'm --
13             THE COURT:  Yeah.  I think I saw a 2008/2009
14  number.
15             MR. SRINIVASAN:  That's --
16             THE COURT:  That's when you started marketing it
17  to the public?
18             MR. SRINIVASAN:  That sounds --
19             THE COURT:  To lessors and managers?
20             (Overlapping speech.)
21             MR. SRINIVASAN:  That sounds in the right range,
22  yes.
23             I'll add, Your Honor, that we did acquire one of
24  the companies in 2017 that makes up one of the many products
25  that we offer.  So that's a -- maybe a particular date that's
```

```
 1   of interest.  But even that would be a year before the
 2   statute of limitations
 3              THE COURT:  And then, in one of -- well,
 4   Mr. Navarro's -- in Mr. Berman's complaint in Navarro -- it
 5   was -- it was -- there are allegations that RealPage created
 6   a special student housing software that -- that happened --
 7   that existed, correct?
 8              MR. SRINIVASAN:  That's correct, Your Honor.
 9              THE COURT:  And did it get merged into the
10   RealPage software for multifamily?
11              MR. SRINIVASAN:  I think the products are -- they
12   are distinct.
13              THE COURT:  They're distinct.
14              MR. SRINIVASAN:  That's right, Your Honor.
15              THE COURT:  Mr. Bauman?
16              MR. BERMAN:  It's Berman, Your Honor.
17              THE COURT:  Berman.
18              MR. BERMAN:  Yes.  It's our allegation that they
19   are distinct products and that the company recognizes --
20              THE COURT:  And how is it different from the
21   multifamily?
22              MR. BERMAN:  Well, the company recognizes that
23   student housing is a separate and distinct real estate niche.
24   And so it developed very similar software, but it has
25   different information that is tied to the specifics of the
```

1  student housing market.  But it operates pretty much the same
2  as the multifamily.
3          THE COURT:  So let's turn to the student rental
4  group.  Help me understand -- I could have a multifamily
5  apartment complex and -- and lease it to students, and then I
6  could -- is that what you're talking about?  Any multifamily
7  product that happens to be, here, close to Vanderbilt, that's
8  part of the student rental --
9          MR. BERMAN:  Yes.  So the company recognizes --
10 and the real estate industry recognizes that student housing
11 is different than multifamily.  So multifamily is going to be
12 a lot of young professionals in downtown Nashville.  We're
13 talking about here is multi- -- you know, -unit apartment
14 buildings near a college campus --
15         THE COURT:  That are not associated with the
16 university or college.
17         MR. BERMAN:  They're not associated with the
18 university.
19         THE COURT:  So we're not talking about dormitories
20 or anything like that?
21         MR. BERMAN:  No, sir.  But it is -- the defendants
22 recognize it as a unique market.  The industry literature
23 recognizes it as a unique market.  And they're different kind
24 of plaintiffs.
25         THE COURT:  So -- and you're going to rewrite the

1   complaint.  But I guess let's look at -- I'm -- the class

2   definition you have on -- it's paragraph 73.  It says (as

3   read):

4            All persons and entities... that are direct

5            purchase -- direct purchasers of student housing

6            real estate leases in the United States.

7            Do you really mean to include entities, since

8   there's no named plaintiff that's an entity?

9            MR. BERMAN:  Well, I think we were just being belt

10  and suspenders.

11           THE COURT:  I'm sorry?

12           MR. BERMAN:  I think we were just trying to be

13  belt and suspenders.  I don't know if every renter is a

14  person or whether some people use an LLC or some other entity

15  to rent --

16           THE COURT:  For student housing?

17           MR. BERMAN:  Just trying to cover the --

18  everything we could.

19           THE COURT:  Okay.  And then what do you mean by

20  "direct purchases of student housing real estate leases"?

21           MR. BERMAN:  Well, we were trying --

22           THE COURT:  Yeah.

23           MR. BERMAN:  Yeah.  That basically -- the parent

24  or the student sign the lease with the defendant.

25           THE COURT:  Oh.

1          MR. BERMAN:  That's all.  It's an antitrust term

2     we were being very careful with, to claim that we were not

3     what are called indirect purchasers, which have different

4     antitrust issues.

5          THE COURT:  And then you say RealPage's pricing

6     software, but what you really mean is the special student

7     RealPage pricing software.

8          MR. BERMAN:  That's correct.

9          THE COURT:  And does it have -- it did have a name

10    different from others.  Does it still?

11         MR. BERMAN:  It did have a different name.  I

12    believe it still has a different name.

13         THE COURT:  And that name is?

14         MR. BERMAN:  That name is escaping me at the

15    moment.

16         THE COURT:  That's all right.  That's okay.

17         And you say this one starts in 2010 to the

18    present?

19         MR. BERMAN:  That's correct.  We believe the

20    software was introduced in late 2009.

21         THE COURT:  But what you're really getting at is

22    students, isn't it, who were presumably injured by the

23    price -- the alleged price-fixing activity of RealPage and

24    its customers?

25         MR. BERMAN:  Correct.

 1          THE COURT:  And there's nothing special about

 2  student housing?  You're talking about any -- any -- any --

 3  any multifamily residence --

 4          MR. BERMAN:  Any multiunit student facility near a

 5  campus.

 6          THE COURT:  Units?

 7          MR. BERMAN:  Yes.

 8          THE COURT:  We're not talking about beds?

 9          MR. BERMAN:  No.

10          THE COURT:  So Grey Star, I'm sure you notice that

11  you're in about six -- in about 16 of the complaints, the

12  plaintiffs repeat the same allegations that Grey Star owns

13  student beds.

14          So do you see -- how does Grey Star fit into these

15  housing units?  I guess you get to answer my question.

16          MR. MADDIGAN:  I thought it was directed to the

17  plaintiffs.

18          THE COURT:  I'm going to get to them.

19          Are you in a student market?

20          MR. MADDIGAN:  As I understand it, Your Honor, the

21  allegation is Grey Star is the property manager for these

22  buildings that are focused on student housing.

23          THE COURT:  As you're the property manager for

24  buildings that are leased to nonstudents?

25          MR. MADDIGAN:  That's correct.  Also in the

1  multi-family complaints, that same general allegation is --

2          THE COURT:  So is there really in your mind any

3  distinction between students and nonstudents that you lease

4  to?

5          MR. MADDIGAN:  It depends what you mean, but in

6  the -- I think in the real estate property management area,

7  those are considered different types of -- types of entities

8  to lease to, yes.  And they have different focuses.

9          THE COURT:  Based on physical -- yeah, physical

10  location to the college?  Or something else?

11          MR. MADDIGAN:  Partly based on that.  And I

12  believe it's also true that the nature of the units or the

13  mix of the characteristics of the units in the buildings can

14  also be different.  Some types of things are more appealing

15  to a student population than to multifamily population.

16          THE COURT:  So do you use the RealStar [sic]

17  software for students and the RealStar software that's not

18  for students?  Do you use them both?

19          MR. MADDIGAN:  My understanding is that that is

20  true, yes.

21          THE COURT:  Well, Mr. -- I'm sorry -- Mr. Berman?

22          MR. BERMAN:  Yes, sir.

23          THE COURT:  Do we -- are you envisioning we're

24  going to have a proposed separate class for student rental?

25          MR. BERMAN:  That's what I envision.

```
 1            THE COURT:  And that's because they use a
 2   different software?
 3            MR. BERMAN:  Correct.
 4            THE COURT:  Any other reason?
 5            MR. BERMAN:  And it's a different market.
 6            THE COURT:  And it's a different market?
 7            MR. BERMAN:  Yes.  And it's just not me saying
 8   that, Your Honor.  The literature that we cite at paragraphs
 9   28 and 29 --
10            THE COURT:  So you're not going to be in favor of
11   just making -- if we did have a class action, having it just
12   be a subclass of a -- of a larger multifamily?
13            MR. BERMAN:  No, I'm not, Your Honor.  And I don't
14   think anyone's advocating that.
15            THE COURT:  I know.  It was just my idea.
16            But I guess, in any case, your amended complaint's
17   going to try to clarify some of these issues?
18            MR. BERMAN:  Yes, Your Honor.  The amended
19   complaint is going to have some more detail.  Listening to
20   Your Honor's questions, we'll probably amp up a few things.
21            THE COURT:  And then you've got about six
22   defendants here -- six or seven or eight -- that are solely
23   in the student market.
24            In fact, you allege they manage certain student
25   areas -- student markets.
```

1          MR. BERMAN:  That's correct.

2          THE COURT:  Are there others that you're going to

3     bring in, or do we have the main group here?

4          MR. BERMAN:  I think we have the main group.

5          THE COURT:  Okay.  And we're going to talk about

6     alternative ways to resolve this dispute.

7          Do you see them being part of mediation when we

8     get to that point with everyone else, or do you think they

9     need a special mediator just because it's a -- an alleged

10    special market?

11         MR. BERMAN:  I think we would -- we would be

12    welcoming sharing a mediator, but I think it's important that

13    the mediations be conducted separately.  Because what I don't

14    want is a situation where some class member would say, "Well,

15    it was all jumbled up, and maybe they traded the value of our

16    claim settling the multifamily claim."  I think there needs

17    to be two separate counsel and two separate negotiations.

18         THE COURT:  Okay.  All right.  So we've got June

19    the 7th for the leadership applications for both sides.  And

20    anybody who wants to object or it respond or -- you'll have

21    24 hours to file your documents.

22         Well, Mr. -- Mr. Berman, do you envision we need

23    separate leadership for the student rental?

24         MR. BERMAN:  Absolutely, Your Honor.

25         THE COURT:  Okay.

1          MR. BERMAN:  For the reason I just stated.  And a
2    simple reason is that none of the multifamily lawyers
3    actually represent a student.
4          THE COURT:  Only you do?
5          MR. BERMAN:  That's correct.
6          THE COURT:  Okay.
7          MR. BERMAN:  So I just want a small piece of this
8    big fight, Your Honor.  Let the big dogs fight over the. . .
9          THE COURT:  That's a good transition.
10         So, now that I've granted the plaintiffs' Motion
11   Number 82, you've really already given me your thoughts about
12   case progression?  Correct?  That's what's in the joint
13   statement.  You did that --
14         MS. HERZFELD:  Yes, Your Honor.
15         MR. GLACKIN:  Yes.
16         THE COURT:  Okay.  So let me share some more.
17         So that part of your joint submission -- well, you
18   did have agreement.  And I agree and I think it's already
19   been done, but just so the record's clear, all the cases that
20   have been transferred or conditionally transferred to this
21   district will be consolidated under Middle District Case
22   Number 23-MD-3071.
23         And that includes the ones that were directly
24   filed -- now four cases -- directly filed here in the Middle
25   District:  Alexander, Blosser, Kempton, and, this morning,

Goldman.  So those are all direct-filed here in the Middle
District.  They're going to be part of this and consolidated
for pretrial purposes.  We'll reserve trial, but I'll be
surprised if I have four trials here in the Middle District
on the same day.

However, when you all come back on the 7th, for
those here in the Middle District, in addition to case
progression, discovery, and whatnot, I do want you all to
have me a target trial date.  And just give me a target trial
date.  If we do it all as one case, then we all have a trial
date.  If for some reason I don't do it -- separate cases,
we'll take up the next one when we finish the first one.

But I want to get on your calendars now so I'll --
you won't forget about me.

And then, obviously, any additional cases that are
transferred here will be part of the same case number.  The
consolidation doesn't constitute any determination that the
actions will be consolidated for trial or that a class should
be certified or have the effect of making any entity or party
an action in which it's not been named, served, or added in
accordance with the Federal Rules of Civil Procedure.

And I think you all have seen that the -- the
clerk has set up the docketing such that, when you file in a
particular case, you identify that case.  Or, if it's for all
cases, then that's spread on the docket.  So, when you all

1  return back to your transferor district, the record will be
2  clear what's in that case.
3          So I do anticipate we're going to get a
4  consolidated complaint filed, and it sounds like the
5  plaintiffs are going to want to file some motions or answer.
6          MR. SRINIVASAN:  That's correct, Your Honor.
7          THE COURT:  Okay.
8          MR. SRINIVASAN:  As I mentioned, we'll have
9  motions to compel arbitration.  And, again, that's -- that
10 could be a number of them, even if the main motion is the
11 same or similar.  Also, motions to dismiss.
12         And, again, we have a lot of defendants here.
13 We're hoping to consolidate that into just -- as much as we
14 can into a main motion, but others may have separate
15 arguments.
16         We're just concerned about, if we have a June 15th
17 filing date for the complaint, you know, that puts two weeks
18 out July 4th.  And so two weeks with this many defendants to
19 coordinate and file coordinated motions, whether arbitration
20 or motions to dismiss, we think is unrealistic.
21         THE COURT:  Okay.  Well, given my goal that when
22 we come back I've got ripe motions, you've got to file your
23 opening brief, the plaintiffs need to respond, you'll want a
24 short, pithy reply, what -- I've got a timetable, but I'm
25 willing to change mine.

 1          Tell me what you think we should do.  When do you
 2   want to file these motions?
 3          MR. SRINIVASAN:  Well, Your Honor, what the
 4   parties had put in the report -- and I know -- you
 5   undoubtedly saw it.
 6          THE COURT:  Yeah.
 7          MR. SRINIVASAN:  I think you're probably not
 8   enthusiastic about it.  But, you know, our thought was --
 9   particularly for a case of this many parties -- and I can't
10   emphasize how -- how difficult logistically it is to get
11   everybody on board, get people coordinated on -- you know,
12   particularly if we want to be efficient about motion practice
13   and reduce the number of motions Your Honor sees, you know,
14   it's -- you know, there's these jokes about different things,
15   but, you know, 75 lawyers, you're going to get 300 opinions.
16          Managing that, we worry that that's going to take
17   time.  And --
18          THE COURT:  Remember my goal:  August the 7th.
19          MR. SRINIVASAN:  I understand that, Your Honor.
20          THE COURT:  Okay.
21          MR. SRINIVASAN:  But, you know, working backwards
22   from August the 7th, it really makes -- you know, I imagine
23   you -- you know, to have a fully briefed motion by then --
24   now, if it's by, you know, having the opening brief in,
25   with -- you know, with oppositions and replies due later --

1  but it sounds like you want the entire thing.

2          If you work it backwards, it doesn't give us much

3  time.  It literally gives --

4          THE COURT:  I just want to know, when do you want

5  to file your opening brief?

6          MR. SRINIVASAN:  Oh, when do we want to file the

7  brief.  But with an idea having everything briefed by

8  August 7th?

9          THE COURT:  Ready for decision.

10          MR. SRINIVASAN:  That's --

11          THE COURT:  How about July the 3rd?

12          MR. SRINIVASAN:  Well, that gives us less than two

13  weeks to file a responsive motion, which we think is just

14  simply not --

15          THE COURT:  On a complaint that you are not

16  unfamiliar with.

17          MR. SRINIVASAN:  Well, we have many complaints.

18  And the issue -- one of the issues, of course, we have is

19  you've got some of these complaints that have regional metro

20  relevant markets, right?  And then you have other complaints

21  that say no, it's a national market.

22          We -- we have issues with both.  But, in

23  particular, a national market presents different arguments

24  and response versus regional markets.  So we don't know yet

25  how the consolidated amended complaint is going to wash out.

1          Certainly we can come up with some ideas, but
2    really, looking at these motions -- I'm sorry -- the actual
3    complaint, the allegations, you know, what they're saying,
4    there are detailed allegations at times; there aren't in
5    other places -- it really is -- I know it sounds -- I know
6    you don't want to hear it --
7          THE COURT:  So I don't mean to cut you off.  But I
8    approach this assuming that each and every defendant has had
9    a substantive meeting with your clients, that each and every
10   defendant has probably given your clients general counsel,
11   what have you, a pretty extensive, detailed analysis of this
12   case based on the complaints filed.  Not just the complaints
13   facing that defendant, but the complaints facing all the
14   defendants.  That each and every defendant has talked to
15   their clients about the strengths and weaknesses of this
16   case, and that you're not here today just reading the
17   complaints for the first time.
18         So I am assuming that a lot of work has already
19   been performed -- I think I'm right -- with your clients, so
20   that you may not have a final litigation strategy in place,
21   but you've got a pretty good outline of where your particular
22   client wants to go and how to get there, and the pitfalls of
23   getting there, so that you're probably pretty close to
24   knowing -- and you've probably even outlined your motion to
25   dismiss.

1          MR. SRINIVASAN:  That's -- you know, we have

2     certainly thought about it.  And -- and one -- one issue I do

3     worry about is, if it was just RealPage and we were the only

4     ones making a decision on what we put in the motion or not, I

5     think, you know, something that's in short order is more

6     realistic.

7          But trying to -- or -- you know, I don't think you

8     want 60 different motions to dismiss, and I'm not suggesting

9     that's where we would go.  But coordinating and making sure

10    everybody has relevant arguments that are covered -- again, I

11    think we can do it efficiently, reduce the number of motions

12    and paper you see, but that takes time.

13         Because we have to -- we do have to go back to our

14    clients --

15         THE COURT:  So that's what I'm asking.  How much

16    time?

17         MR. SRINIVASAN:  Well, again, in the constraints

18    that you've offered, it's hard for me to answer because I

19    would say we need at least a month to file that motion.  But

20    that's not going to give enough time to do the rest of it.

21         You know, that's kind of where -- I don't know if

22    there's any flexibility on that date at all.

23         THE COURT:  All right.

24         Mr. Glackin.

25         MR. GLACKIN:  Excuse me, Your Honor.  I apologize

1  for interrupting.  But, subject to anyone on the plaintiffs'
2  side not agreeing, I think we could move the leadership
3  application deadline up by a couple days to June 5th.
4        THE COURT:  Oh, you can file them before the 7th.
5  You can file them tomorrow if you want.
6        MR. GLACKIN:  What I'm also suggesting is that we
7  could also move the CAC deadline -- excuse me -- the
8  consolidated amended complaint deadline up a couple days,
9  from June 16th to June 14th.
10        Maybe that would help solve the problem.
11        THE COURT:  I mean, these are deadlines.  It's
12  nothing wrong with filing things before then.
13        All right.
14        MR. SRINIVASAN:  And that's --
15        THE COURT:  Unless you can give me some timetable,
16  I'm going to have to --
17        MR. SRINIVASAN:  Well, if pressed -- and, by the
18  way, there's also the motions to arbitrate that we have to
19  file in parallel with that.  And, again, that's going to be a
20  lot of work to do.
21        THE COURT:  I think you've got enough lawyers
22  that, if you assign one to everybody here, they could be
23  filed by Friday.
24        MR. SRINIVASAN:  Like I said, Your Honor --
25        THE COURT:  Next Friday.

1          MR. SRINIVASAN:  -- if everybody was the master of

2     their own responsive pleading, I would be more sanguine about

3     this, but that's the concern I have about that date.

4          THE COURT:  All right.  So this is what I'm going

5     to do.  We've got a date for the filing of the consolidated

6     amended complaints.  Defendants can answer or otherwise

7     respond to those on or before July the 3rd.  Plaintiffs'

8     response will be due on July the 21st, and any replies on

9     July the 28th.

10          The local rules apply.  The local rules apply as

11    it pertains to motions.  The Court -- in light of what

12    Mr. Srinivasan shared, I do want to streamline the motions.

13    It just makes no sense -- and it's really just a waste of

14    time and money for everybody to write the same thing.  That's

15    not necessary.

16          So there -- I -- I am not as familiar with the

17    case as you all are, but there are some areas where similar

18    defendants can file the same motion with the same supporting

19    brief.  I want you all to try to work it out first before I

20    try to work it out for you.  So, before the deadline for your

21    motions, I need some kind of report on where you are.

22          Now, we can get together again.  Some of you have

23    not experienced the humidity of Nashville in June, but you'll

24    get used to it.  But I need to get some idea.  Because,

25    you're right, I'm not going to entertain -- it's not going to

1   be your benefit for you to ask me to entertain 60 motions.
2   That's not going to help anybody.
3              MR. SRINIVASAN:  We understand that, Your Honor.
4              On your dates, would there be any flexibility on
5   that first date of July 3rd?
6              THE COURT:  Well, I wanted to give you the 4th
7   off.
8              MR. SRINIVASAN:  Well, I do appreciate that.  If
9   we could get --
10             THE COURT:  And then I need it all filed so I have
11  a chance to digest it, so when you come back on the 7th,
12  we'll. . .
13             MR. SRINIVASAN:  Yeah.  If we had -- okay.  Well,
14  if we had until --
15             THE COURT:  Go ahead.  Yeah.
16             MR. SRINIVASAN:  If we got even a few more days
17  into that week, say the 6th or the 7th, that would be
18  helpful, I think.  Because my concern is -- I do appreciate
19  getting the 4th off -- is that weekend we're going to have a
20  hard time finding clients and things like that.  And so it
21  would be nice if we could get some time to -- to sign off on
22  briefs, and even a relief to, say, the end of that week, that
23  Friday, would help us.
24             THE COURT:  All right.  So you're proposing July
25  the 7th?

1          MR. SRINIVASAN:  Yes, Your Honor.

2          THE COURT:  For the opening briefs.  All right.

3          Ms. Herzfeld, when do you all want to respond?

4          MS. HERZFELD:  If they'd like to file their briefs

5   on July 7th, I think that's fine, so long as we have a

6   sufficient amount of time to respond.

7          THE COURT:  That's what I'm asking you for.

8          MS. HERZFELD:  Right.  We had had July 21st, I

9   think is what the Court had had us at, so looking at my

10  calendar, if we could perhaps have until July 24th.  That

11  gives us through the weekend to that Monday.

12          Does that jam the Court though?

13          THE COURT:  Then replies by the defendant will be

14  due when?

15          MS. HERZFELD:  The 28th?  Still making it June the

16  28th.

17          THE COURT:  Well, I guess Mr. Srinivasan --

18          MR. SRINIVASAN:  Thank you, Your Honor.  So, if

19  the briefs come in -- if their oppositions come in on

20  July 24th, it would be nice to get some time to react to

21  that.  I would think August 2nd would be great.

22          THE COURT:  Oh, no, no, no, no.

23          MR. SRINIVASAN:  That's not going to work.  I

24  think we need at least a week.

25          THE COURT:  Yeah, a week.  And a week from the

1  24th will be the 31st.

2              MR. SRINIVASAN:  31st.

3              THE COURT:  Yeah.

4              MR. SRINIVASAN:  Thank you, Your Honor.

5              THE COURT:  All right.  So then the briefing is

6  closed on the 31st.  And now you've got -- you've got me. . .

7  Okay.

8              So now on the plaintiffs, same thing goes for you

9  all as the defendants.  I expect the plaintiffs to get

10 together and, where one brief can be filed covering the same

11 issues adequately, that needs to occur

12             MR. GLACKIN:  Absolutely, Your Honor.

13             THE COURT:  Okay.  So when am I going to know that

14 that's -- that's the way we're going to bake your cake?

15             MR. GLACKIN:  Well, at the moment I only speak for

16 my clients.  But I imagine we could give you -- either

17 after -- after we see their briefs, that would be the time

18 when we could give you a report on what we're planning.

19             I -- I don't imagine that would take us more than

20 a few days to -- given the schedule, we're going to need to

21 know within a few days how many briefs we're filing.

22             So, not having a calendar in front of me --

23             THE COURT:  So you're going to get their briefs on

24 July the 7th.  We'll give you the weekend and Monday to look

25 at it.

```
 1              So certainly by July the 10th you'll have some
 2   idea how you're going to do your responses?
 3              MR. GLACKIN:  Could we have until the 11th, Your
 4   Honor?
 5              THE COURT:  The morning of?  Before noon.
 6              MR. GLACKIN:  Before noon Nashville time on the
 7   11th.
 8              THE COURT:  All right.
 9              And, Mr. Srinivasan, when are you going to report
10   back on your briefing?
11              MR. SRINIVASAN:  So, if the complaint is coming in
12   on June 16th, Your Honor, which is -- I don't have my
13   calendar --
14              THE COURT:  That's a Friday.
15              MR. SRINIVASAN:  That's a Friday?  Would a week be
16   too long for you?
17              THE COURT:  Yeah.
18              MR. SRINIVASAN:  For us to get together --
19              THE COURT:  Yes, that would --
20              MR. SRINIVASAN:  I think the longer we have, the
21   more consolidated, I think -- we can present you a plan with
22   more consolidated briefing.
23              THE COURT:  I like you incentivizing me, but. . .
24              So you get the amended complaints on the 16th.
25   Surely, surely -- it is a few more of you all to -- surely by
```

1  the 21st you're going to -- somebody somewhere is going to be
2  starting to write.  Say by noon on the 21st?
3          MR. SRINIVASAN:  Sure, Your Honor.  That works.
4  Thank you.
5          THE COURT:  Now, do you all want to just file
6  something, or do you want to come to Nashville?
7          MR. SRINIVASAN:  As much as I've enjoyed it here,
8  Your Honor, I think probably filing it --
9          MS. HERZFELD:  The plaintiffs are fine with filing
10 it, Your Honor.
11         THE COURT:  Mr. Stranch has got an idea.
12         MR. STRANCH IV:  Well, Your Honor, I was actually
13 going to ask you about how you wanted that to look.
14         So, for the plaintiffs, for all the motions that
15 are filed, does the Court want to hear this one will be
16 filing a motion or a response to; these two will be filing a
17 consolidated response to?  How would the Court envision
18 seeing that?
19         THE COURT:  My aspiration would be 100 percent of
20 the plaintiffs are going to file one response covering these
21 issues.  That would be. . .  You can go from there.
22         MR. STRANCH IV:  All right.
23         THE COURT:  But you need to anticipate -- give me
24 enough information so, if we need to have a follow-up
25 telephone conference or -- a follow-up telephone conference

1    is about all I can do.

2              MR. STRANCH IV:  We can identify if there's any

3    issues that we think we might need to discuss with the Court

4    in that filing.

5              THE COURT:  Okay.  So Mr. Srinivasan has been

6    talking for all the defendants.  I want to give other

7    defendants a chance to be heard on these deadlines.

8              Good.

9              And the plaintiffs?  I guess none of them are

10   here, other than. . .

11             And then, while some of you are writing briefs,

12   some others need to be meeting and conferring so you can file

13   by July the 24th a proposed scheduling order for the case.

14             Now, I know Mr. Bruno is pretty good at doing that

15   in criminal cases.  So we'll see how good he is in -- in

16   civil cases.  But that scheduling order needs to begin to

17   address all the -- all the deadlines in the case.

18             I see you all want to put off -- let's at least go

19   through expert witness disclosures.  And then I'm going to

20   give you all the first shot to tell me how we're going to --

21   how you all want to engage in discovery.  I -- I think you're

22   going to say there's a lot to be done.  But I guess it needs

23   to be staged in a way that the Court's comfortable that we're

24   progressing toward the end.

25             But I'm going leave -- I think you need to meet

1   and confer.  I really -- and I'm going to say that needs to
2   be done in person.  And maybe one more trip back to Nashville
3   to -- to have that very substantive meeting to iron out a
4   case progression.  On the discovery in particular, I'm going
5   to want -- I don't want minutiae and I don't want a lot of
6   detail.  But I do want some what I call mileposts.

7              So, I don't know, you know, by this date, the
8   defendants have decided they want to depose 20 plaintiffs and
9   testimony be done by this date.  And the plaintiffs want to
10  depose -- want to do 30(b)(6) depositions for RealPage and
11  Grey Star, what have you, by this date.  And it's a
12  reasonable number.  And it's not going to be duplicative.
13  And then we'll move on to the next stage of discovery,
14  whatever that is.

15             Same thing with your written discovery, whatever
16  needs to happen before you can do your depositions.  So, by
17  July the 24th, you'll file with me your proposed scheduling
18  order.  Remember, the Middle District of Tennessee cases can
19  tag along with the discovery.  But then you need to keep a
20  target trial date in mind.  But I do hope on the 7th to go
21  ahead and get you on my calendar for a trial.

22             Now, I appreciate the defendants' response and the
23  joint statement about mediators.  So I would ask that
24  somebody else on your team, Mr. Srinivasan -- you can't do it
25  all -- but give me a list of acceptable -- of the people you

gave me, who is available, no conflict, can serve, available
to serve, and rank them in the order of your preference.  And
I would encourage the plaintiffs to do the same.  Or, even
better.  I would encourage you all to talk about it and maybe
come up with one list of mediators, ranked in order of
preference.

And the reason I do want to have that in place by
the 7th is we were able to put together a chart -- I think
it's -- it's fairly accurate -- of -- but now I think we've
got 39 cases.  I think I did this when it was on 38 -- but,
in any case, I think we counted that we've got about -- and
you're mostly in the -- in the jury box here -- we've got
about 30 -- 35 defendants who are in three cases or less.
And it just strikes me that your clients -- some of you are
only in one case.  About 12, 13 -- maybe 15 -- you're in one
case.

I'm sure that you've had some discussion -- some
of you are in two cases and then a couple in three.  But it
strikes me that your clients might want to see if they can
make peace with the plaintiffs earlier than later.  So that's
the reason I want that list of mediators.  I want it on the
7th.

So, if some of these people -- some of these
companies that are only one case, two cases, or three can
find a happy place with the plaintiffs, then I want to make

1  that an opportunity for you to proceed -- at least
2  initially -- voluntarily.  But if I need to urge your clients
3  along, I'm -- we can talk about that on the 7th, too.
4          MR. STRANCH IV:  Excuse me, Your Honor.  Are you
5  asking for that by August 7th or June 7th?
6          THE COURT:  July the 25th.  Defendants shall and
7  the plaintiffs may provide a list of acceptable and available
8  mediators ranked in order of preference on or before July the
9  25th.
10          MR. STRANCH IV:  Okay.
11          THE COURT:  And, again, I would love it if y'all
12  could meet and confer, give me one list, order of preference.
13  Number 1's available?  Number 1 is it.
14          MR. SRINIVASAN:  Your Honor, just to clarify, was
15  that date July 24th or 25th?
16          THE COURT:  25th.
17          MR. SRINIVASAN:  Thank you, Your Honor.  Sorry.
18          THE COURT:  Which is -- which is a Tuesday.
19          And obviously I'm baking in some time for me.  And
20  I'll say -- I'll go ahead and tell you, if y'all can agree on
21  a mediator and we've got 30 or more defendants who may want
22  to pursue that, then I may have that mediator here on the
23  7th.
24          So let me ask this to all the lawyers:  Does the
25  Court need to clarify or restate or in any way address what

1   the parties' obligations are regarding preserving
2   electronically stored information?  I put that in the initial
3   order.  I said it all needs to be preserved.  But I thought,
4   since we have everybody here, if I need to clarify that, or
5   if somebody needs to -- needs to ask some questions about it,
6   now is the time.
7           So everybody has an understanding about your
8   obligations, and I'm sure we've got a group of good lawyers
9   here.  You've communicated that to your clients.
10          So I think I asked Mr. Srinivasan -- I didn't ask
11  the plaintiffs -- in the various complaints, you know, you
12  say the class -- proposed class starts in 2010, 2016, 2018,
13  one says 2019.
14          Anybody want to help me on what's -- what's the
15  basis and what's the number?  What's the year?
16          MR. GLACKIN:  Well, I don't mind starting, Your
17  Honor.  So our -- the group of firms that our firm is working
18  with, the clients we represent, their complaints were
19  filed -- the first one of them all was filed in October of
20  2022.  And so we picked as the start of the class period four
21  years prior, the statute of limitations period, four years
22  prior to the date of the filing of that first complaint, and
23  a number of other complaints have since selected the same
24  start date.
25          So I can't speak to 2019 or 2010 or 2016 or any

1  other dates, but that's the date that was selected by the
2  clients that we represent, Your Honor.
3          THE COURT:  All right.  Anyone else have another
4  rationale?
5          MS. HERZFELD:  And then I believe there were
6  also -- sorry, Your Honor.  I believe there were also some
7  allegations of fraudulent concealment, which would bring that
8  back a little bit earlier.  So I think that's why those dates
9  are fluctuating.  But I'm sure that that will all be
10 addressed in the consolidated amended complaint and that'll
11 all be nice and clear for everyone.
12         THE COURT:  Mr. Berman?
13         MR. BERMAN:  As we discussed earlier, we start on
14 the 10th -- with 2010, under fraudulent concealment theory,
15 and we'll probably stick to that.
16         THE COURT:  How do you get to 2010?
17         MR. BERMAN:  Because the software was introduced
18 in 2009.
19         THE COURT:  All right.  Anybody else want to help
20 me on that number -- that date?
21         So -- I don't know who of the plaintiffs I need to
22 address this to, but I just wanted some plaintiff lawyer to
23 just give me a little preview of what you think is going to
24 be the battleground on the class action issue.
25         MR. GLACKIN:  I'm happy to do that, Your Honor.

1                THE COURT:  We can let the people on the next row

2    talk too.  I know you're on the front row.

3                MR. MARTIN:  He's doing a great job, Your Honor.

4                THE COURT:  Until he messes up.  Then we'll see.

5                MR. GLACKIN:  I will say I was remembering some

6    briefing schedules in a prior case when we were having the

7    earlier conversation.  So I expect a principal -- I'm

8    thinking about two things when I think about class

9    certification in this case, Your Honor.

10               So the first thing I think about is the data

11   analysis that's going to be necessary on damages.  I think --

12   I'm hopeful that, because of the nature of this case and what

13   we believe happened -- which they dispute -- that much of

14   that data and information may actually be in the -- in the

15   possession of one defendant, which is RealPage, because

16   that's their job, is to provide pricing recommendations, but

17   also to collect vast amounts of data from their customers

18   that feed into the algorithm.

19               So, in terms of advancing class certification, I

20   would really want to prioritize getting that data, because

21   the damages analysis is always an issue in class cert.

22   Getting the data and processing the data is kind of the big

23   boulder in the schedule, in terms of it just takes a certain

24   amount of time.

25               Almost everything else can kind of be flexed

1   around, but that is a boulder.

2           So that's the -- the good news is that it may

3   be -- I'm hoping -- fingers crossed -- that if one defendant

4   has all that data, that may simplify the process.  On the

5   other hand, if that's not the case, the process could be more

6   complex.  I feel like the data conversation is one that -- it

7   would be just good to prioritize starting to have that

8   conversation in terms of the discovery process.

9           The battleground -- I mean, interestingly -- I

10  mean, I see -- I think the battleground -- a big -- another

11  big battleground on the merits in addition to the discovery

12  analysis issue -- excuse me -- the damages analysis issue is

13  going to be what they previewed before.  You know, their

14  defense that, you know, every unit is a snowflake.  Every

15  landlord is an independent actor who can do whatever they

16  want.  That's not just going to be the merits defense on the

17  conspiracy; I would assume that's also going to be the

18  defense on class certification.  They're going to say that we

19  need to haul in every landlord to, you know, testify at the

20  evidentiary hearing about whether or not they followed the

21  recommendation.

22          I don't mean to be pejorative.  But it'll be

23  something like that.  There -- there will be a big

24  battleground on the -- both on the merits, but as to class

25  certification on this question of the degree of discretion

1   that is exercised by the landlords in setting prices and how

2   that feeds into the predominance analysis.  It's not

3   determinative one way or the other, but that will be their

4   argument, that there's so much -- so much individual

5   decision-making and discretion that it -- the individual

6   issues predominate, can't certify class.

7           THE COURT:  I don't want to cut you off, but I do

8   want to pause.  Because in some of the complaints -- and I

9   have to say, other than *qui tam* or false claim cases, I've

10  never seen it in a civil -- we've got some unnamed

11  confidential -- not undercover agents, but some unnamed

12  RealPage workers who are unnamed.

13          So you plan on naming them in the consolidated

14  complaint, I hope?

15          MR. GLACKIN:  So, Your Honor, that was -- yes.

16  Those were our -- I believe that the only complaints that I'm

17  aware of that have confidential informant allegations were

18  those filed by our group.  That work was done by the Berger

19  Montague firm.

20          THE COURT:  We're not going to do that in the

21  consolidated --

22          MR. GLACKIN:  They're not going to be able to be

23  secret forever.

24          THE COURT:  Right.  Correct.

25          MS. HERZFELD:  And I do believe the complaint that

1  was filed this morning from our group does contain some

2  additional witnesses.  So that will obviously have to come

3  out at some point.

4            Your Honor, if I could also.

5            THE COURT:  Sure.  Just point out that we do have

6  a slight difference of opinion from my good friend here on

7  how the class would work, whether that be a national class or

8  regional classes.  We do think that there's some differences

9  in discovery and damages, and that will, you know, shade a

10  little bit on how things move forward.

11            So I think that's the only thing I would add.

12            MR. GLACKIN:  I agree, that's a difference -- a

13  difference among the complaints that have been filed.  And

14  whoever is responsible for filing the consolidated amended

15  complaint is going to have to make a decision in their best

16  judgment as lawyers on behalf of the class.

17            THE COURT:  Well, if we had -- if -- and

18  Mr. Srinivasan and his colleagues say big if -- there is a

19  national class, do we really need anything else?

20            Ms. Herzfeld?

21            MS. HERZFELD:  Well, yes, Your Honor.  Because we

22  actually think there would be difficulties certifying a

23  national class, perhaps, given the differences.  You know,

24  not necessarily.  I'm not sure.  But we would definitely have

25  to get into those -- into those differences regionally.  And

1  we believe really they should be regional classes and not a
2  national class.
3           THE COURT:  All right.  So, when you all meet and
4  confer -- I hope somebody's taking notes here -- that's
5  certainly an issue you need to have a face-to-face discussion
6  about, especially as it pertains to what you put in the
7  proposed scheduling order.  Because I'm hoping that -- well,
8  my plan is on the 7th we're going to end the day with a
9  comprehensive scheduling order as much as possible.  And
10 that -- we may have to take some pauses, but we're going to
11 plan our pauses.
12          Also, when you do that, go ahead and incorporate
13 some schedule -- some status conferences.
14          Now, the plaintiffs suggested every six weeks.  As
15 much as -- as much fun as that sounds like, I don't know if
16 we really need to do every six weeks.  But I do want to get
17 on your calendars.
18          Now, that doesn't mean everybody has to come.  But
19 everybody needs to know we're going to -- I need, you know,
20 the leaders here and -- for a status conference.  And I want
21 to be on your calendar.  I want you on my calendar.  So we
22 can always cancel it, but it's hard to schedule those.
23          And I guess -- I'll leave it to your good
24 judgment how far in the future we want to schedule those.
25 But to the extent your scheduling order is pertaining to work

```
 1  to be done, getting ready to go back to the case -- returning
 2  back to the court of origin, we need to be having scheduled
 3  status conferences.
 4           I would say you could schedule those at -- you
 5  know, at 1:00 so people could potentially fly in and fly out.
 6           MR. GLACKIN:  And may we communicate with the
 7  Court in advance of filing that joint CMO to find out your
 8  availability?
 9           THE COURT:  Yeah.  Don't worry about that.  We'll
10  do that on the 7th.  I'd rather get on --
11           MR. GLACKIN:  Oh, I understand.  I misunderstood.
12           THE COURT:  I mean, it's more of you than it is
13  with me, but I'm going to try to be accommodating.
14           And just to save some time, when you all file
15  your -- make your filing regarding combination of motions by
16  defendants and by plaintiffs, obviously you need to give me
17  your rationale for the combinations so I can look at them and
18  agree or agree to disagree or have further discussion.
19           So whatever the link you think is that's bringing
20  50 defendants together, tell me what that is so I can see it
21  makes as much sense -- same thing, I guess -- sounds like --
22  for the plaintiffs.
23           All right.  And that takes me to Mr. -- Mr. Funk.
24           Mr. Funk, I had you over there, although you
25  really belong in this group of -- of defendants who are in
```

1  three cases or less.

2          So, meaning no disrespect to anyone -- his name I

3  just recognize -- I'm going to deputize you to get with this

4  group so when we come back on the 7th I have some idea of who

5  wants to take advantage of finding a resolution to this

6  earlier than later.

7          MR. FUNK:  And that's the group of three or less;

8  is that right, Your Honor?

9          THE COURT:  Yes.

10          MR. FUNK:  I'd be happy to.

11          THE COURT:  We can add to -- yeah.  Let's just

12  deal with the group of three or less.

13          MR. FUNK:  Okay.

14          THE COURT:  Yeah, let's just deal with the group

15  of three or less.

16          All right.  That's almost everything I have.  So

17  I'm going to go to at least the lawyers here at the table.

18          Anything else -- Mr. Martin, you've said not a

19  word, which is quite unusual.

20          MR. MARTIN:  It is unusual, Your Honor.  I guess I

21  just want to a point of clarification.

22          THE COURT:  Come onto the podium so I can hear you

23  better.

24          MR. MARTIN:  Yes, Your Honor.  Thank you.

25          So I think -- and I would be surprised if my

colleagues on the plaintiffs' side are not asking themselves
or thinking about this in the same way -- we're going to file
our applications for leadership in a week, and people are
going to respond within 24 hours.  And then there's a lot of
decisions that are going to have to be made, like, pretty
quickly, soon thereafter.

　　　　　And so I just wanted to -- until somebody's
empowered to lead this case, both as a lead counsel and as
liaison counsel, that's going to be -- it was hard to get --
I mean, we got the joint statement done together.

　　　　　THE COURT:  It looked easy from here.

　　　　　MR. MARTIN:  Well, I'm glad.  We want everything
to look, from the Court's perspective, is easy.  That would
be one of my objectives in this case.

　　　　　Not everything I thought was perfect.  I didn't
agree with every single piece of that.  But in order to --
rather than flood you with sort of like marginally different
proposals.  But I could foresee, like, having that answer
from this Court before we file -- you know, while we're
trying to do the -- the consolidated amended complaint and
the scheduling and all the things you've gone through
today -- which I think are great and I think the schedule is
fantastic, because we want to put this thing on a trajectory
to move it -- but getting that answer from the Court and that
guidance I think is going to be tremendously helpful.

```
 1              THE COURT:  And I think -- I would -- I would
 2   actually highlight everything to the plaintiffs' lawyer that
 3   Mr. Martin has said.  So those who are going to apply, you
 4   know what you're applying to do.  It's not going to change by
 5   your awesome leadership, because we do want to -- we need to
 6   get to work.  Y'all have a lot of work to do.  So --
 7              MR. MARTIN:  That's all I have, Your Honor.  Thank
 8   you.
 9              THE COURT:  Anybody else?  Mr. Bruno?
10              MR. BRUNO:  Nothing, Your Honor.
11              THE COURT:  And I don't -- let's see.
12   Ms. Cummings?
13              MS. CUMMINGS:  Nothing, Your Honor.
14              THE COURT:  Mr. Mitchell?
15              MR. MITCHELL:  No, Your Honor.  Thank you.
16              THE COURT:  Or anybody else?
17              Okay.  All right.  Mr. Srinivasan.
18              MR. SRINIVASAN:  Nothing further from me, Your
19   Honor.  I don't know if anybody --
20              THE COURT:  Well, Grey Star, you're in -- you're
21   in almost the real estate row.  RealPage is in 38 cases;
22   you're in 38 cases.  So you need to have a big say in this.
23              MR. MADDIGAN:  Yeah.  I think we're in every one,
24   Your Honor, but I don't have anything to add right now.
25   Thank you very much.
```

1    THE COURT:  Mr. Maddigan?

2    MR. MADDIGAN:  Yes.

3    THE COURT:  Thanks.  All right.

4    And then we should have Lincoln Property?

5    MR. CASAS:  Yes, Your Honor.  Greg Casas.

6    Nothing further at this time, Your Honor.

7    THE COURT:  And Mr. Fenske?

8    MR. FENSKE:  Yes, Your Honor.  Nothing further.

9    THE COURT:  Any other defendants?  You can come up

10   to the podium.

11   MR. FUNK:  Your Honor, just real briefly on the

12   group of the smaller number of defendants, do you want that

13   filed on the 24th with the proposed schedule once I corral

14   everybody to try to find out if they want to participate?

15   THE COURT:  24th of?

16   MR. FUNK:  Of July.

17   THE COURT:  Yes.

18   MR. FUNK:  Okay.  I'll file then.

19   THE COURT:  Okay.  All right.

20   If there's nothing else, then we'll enter an order

21   setting the deadlines, and I'll wait to get your filings.

22   Thank you.

23   ALL:  Thank you, Your Honor.

24   (Court adjourned.)

25

1   REPORTER'S CERTIFICATE

2

3           I, Lise S. Matthews, Official Court Reporter for

4   the United States District Court for the Middle District of

5   Tennessee, with offices at Nashville, do hereby certify:

6           That I reported on the Stenograph machine the

7   proceedings held in open court on May 31, 2023, in the matter

8   of IN RE:  REALPAGE, INC., RENTAL SOFTWARE ANTITRUST

9   LITIGATION (NO. II) Case No. 23-MD-3071; that said

10  proceedings in connection with the hearing were reduced to

11  typewritten form by me; and that the foregoing transcript

12  (pages 1 through 82) is a true and accurate record of said

13  proceedings.

14          This the 3rd day of June, 2023.

15

16                              /s/ Lise S. Matthews
                                LISE S. MATTHEWS, RMR, CRR, CRC
17                              Official Court Reporter

18

19

20

21

22

23

24

25