UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE

| | |
|---|---|
| IN RE: REALPAGE, INC., RENTAL SOFTWARE ANTITRUST LITIGATION (NO. II) | Case No. 3:23-md-3071<br>MDL No. 3071<br><br>This Document Relates to: ALL CASES |

**DECLARATION OF STACEY P. SLAUGHTER IN SUPPORT OF APPLICATION TO APPOINT SCOTT+SCOTT ATTORNEYS AT LAW LLP AND ROBINS KAPLAN LLP AS INTERIM CO-LEAD CLASS COUNSEL AND APPOINT PLAINTIFFS' LEADERSHIP STRUCTURE**

I, Stacey P. Slaughter, pursuant to 28 U.S.C. § 1746, declare that the following is true and correct to the best of my knowledge and belief.

1. I am a Partner with Robins Kaplan LLP ("Robins Kaplan" or "RK") and Co-Chair of the firm's Antitrust and Trade Regulation Practice Group ("Antitrust Group").

2. I have practiced law for 24 years and am a member in good standing in the state bars of Minnesota and New York. I am also admitted to practice in the United States District Courts for the District of Minnesota, Eastern District of New York, Southern District of New York, District of Colorado, and Eastern District of Michigan; the United States Court of Appeals for First, Second, Eighth, and Federal Circuits, as well as currently admitted pro hac vice in several federal courts around the country. Before joining Robins Kaplan LLP, I clerked in the United States District Court, District of Minnesota for Judge Michael J. Davis and Chief Judge Paul A. Magnuson.

3. In this litigation, I am counsel of record for Plaintiffs Brandon Watters, Selena Vincin, Laura Boelens, Anna Rodriguez, Kimele Carter, Billie Jo White, Priscilla Parker, Patrick Parker, Barry Amar-Hoover, Katherine Kramer, Jeffrey Weaver, Mary Bertlshofer, and Jason

1

Goldman. I submit this declaration in support of the Watters Plaintiffs' Application to Appoint Scott+Scott Attorneys At Law LLP and Robins Kaplan LLP ("Scott & RK") As Interim Co-Lead Class Counsel, Tricia Herzfeld as Liaison Counsel, and a Five Firm Plaintiffs' Steering Committee ("Watters Application"). This Application is supported by additional Plaintiffs who have filed complaints in this litigation. *See* Watters Application, Annex A for a complete list of Plaintiffs who support this application (collectively, "Watters Plaintiffs").

4. Pursuant to Fed. R. Civ. P. 23(g), the Application seeks appointment of: (a) Scott+Scott and Robins Kaplan as Interim Co-Lead Counsel for the proposed Multifamily Plaintiffs; (b) Ms. Tricia Herzfeld of Herzfeld, Suetholz, Gastel, Liniski and Wall, PLLC ("Attorney Herzfeld" and "HSGLaW," respectfully) as Plaintiffs' Liaison Counsel, and (c) Cafferty Clobes Meriwether & Sprengel LLP; Lowey Dannenberg, P.C.; Joseph Saveri Law Firm, LLP; Kozyak Tropin & Throckmorton LLP, and Korein Tillery P.C. to serve as members of the Plaintiffs' Steering Committee.

## About Robins Kaplan LLP And The Firm's Resources

5. Robins Kaplan is an AmLaw 200 law firm with more than 200 lawyers practicing in offices in Minnesota, New York, California, Massachusetts, North Dakota, and South Dakota. Robins Kaplan is a premier national trial law firm with a robust, complex litigation practice and numerous accolades for its Antitrust Group. Robins Kaplan antitrust attorneys represent both plaintiffs and defendants, which puts it in a unique position to address clients' most difficult legal challenges on either side of the "v." Attached hereto as Exhibit 1 is a true and correct copy of the current Robins Kaplan firm resumé and selected antitrust attorney biographies, detailing some of the firm's experience in antitrust litigation and trials. This resumé does not list all cases in which attorneys at Robins Kaplan have been Class Counsel or otherwise have served as counsel of record or all the firm's antitrust attorneys.

6. Robins Kaplan's attorneys have extensive experience with litigation, trial, and settlements in complex class action cases. The firm's attorneys have served in leadership positions in hundreds of class actions, mass tort actions, and complex litigation cases during its 85-year history. Some of Robins Kaplan's case results, including in antitrust, have been historic. Ex. 1, at 2, 4.

7. Global Competition Review recently recognized Robins Kaplan as one of four elite antitrust law firms in the U.S. Ex. 1, at 10. As reported by Chambers USA, the Robins Kaplan Antitrust Group "has an enviable track record litigating and winning big antitrust cases and securing favorable settlements." *Id.* at 9. The firm has been ranked consistently in Tier 1 for antitrust by Chambers USA, Benchmark Litigation, and U.S. News & World Report, and named one of the nation's top firms for antitrust class actions by The Legal 500 each of the past six years. *Id.* at 10.

8. If appointed as Co-Lead Counsel for the Multifamily Plaintiffs, Robins Kaplan would bring to bear all the resources and experiences of the firm, including its antitrust attorneys, who have been heralded by judges, peers, and clients alike as "highly experienced," "top-end lawyers," "whip smart," "forward-thinking," "creative," and "simply amazing." *See* Ex. 1, at 8-9.

9. I will lead the firm's core team working on this case, which includes attorneys Geoffrey H. Kozen (Partner and Chair, Pro Bono Committee) and Heather Chang (Associate). Our core team will be assisted by several other attorneys in the firm's Antitrust Group: Thomas J. Undlin, J. Austin Hurt, Stephanie A. Chen, Eric Barstad, and K. Craig Wildfang. Additional Robins Kaplan antitrust attorneys will also be available to help as needed. Selected attorney biographies are included in the firm resumé. Ex. 1, at 11.

3

Case 3:23-md-03071    Document 257-5    Filed 06/06/23    Page 3 of 15 PageID #: 966

10. The Robins Kaplan team of lawyers will be supported by the firm's in-house suite of interdisciplinary professional services to manage litigation costs. Robins Kaplan employs Ph.D. economic, science, and technology advisors, financial consultants, and dedicated Ediscovery professionals. These professionals work with our attorneys and leverage their expertise to increase efficiency and limit the need for costly external experts and resources. The firm was named to *The National Law Journal*'s Legal Technology Trailblazers list in 2022 and honored with the *New York Law Journal*'s Innovation Award in 2022 in recognition of its innovative, litigation-aligned services. Exhibit 2 is a true and correct copy of the firm's brochure outlining its professional suite of in-house litigation services.

11. When it comes to *pro bono* legal service, Robins Kaplan has earned a national reputation as a law firm that gives back. Since 2008, the firm has contributed at least 5% of its total billable hours to *pro bono* matters. *The American Lawyer* consistently ranks Robins Kaplan high on its list of top *pro bono* firms in the nation. Within the housing industry specifically, Robins Kaplan has devoted significant *pro bono* resources to help low-income tenants. Robins Kaplan attorneys participate in a monthly clinic to provide advice to low-income tenants on matters such as repairs and eviction expungements. Robins Kaplan also staffs a full representation eviction defense clinic for low-income tenants. In the last two years, the firm's attorneys have spent 1,765 hours and more than $1 million in attorney time on *pro bono* housing representations alone. For more information about Robins Kaplan's *pro bono* service, please see the firm's current brochure, attached as Exhibit 3.

12. Finally, the firm also has substantial resources within its nationally-recognized Intellectual Property & Technology Practice Group to assist with analyzing the RealPage software at issue in this case. Our firm's technical experience in connection with software-related disputes

4

Case 3:23-md-03071   Document 257-5   Filed 06/06/23   Page 4 of 15 PageID #: 967

includes: application software, system software, firmware, freeware, shareware, and open-source software, video and audio streaming and broadcast delivery methods, IoT and AI software technologies, mobile wireless telecommunications and broadband, TCP/IP communications standards and protocols, server architecture, data encryption, computer processing and graphics/display, semiconductor design and fabrication, consumer electronics and peripherals, and aircraft and vehicle navigation. *See* the Robins Kaplan webpage with details on the firm's software litigation expertise at https://www.robinskaplan.com/services/intellectual-property-and-technology-litigation/software.

### Robins Kaplan's Antitrust and Class Action Experience and Results

13. Robins Kaplan has served in leadership roles, including as Lead, Co-Lead, or Lead Liaison Counsel in numerous cases filed in district courts throughout the United States. A list of exemplar cases is included in Exhibit 1, at 6. Some of those cases are highlighted below:

a. *In re Cattle and Beef Antitrust Litig.*, MDL No. 3031 (D. Minn.) (Alleging price fixing in the cattle processing industry);

b. *In re Payment Card Interchange Fee and Merchant Discount Antitrust Litigation*, MDL No. 1720 (E.D.N.Y.) (Alleging major credit card issuers conspired to fix swipe fees charged to merchants for accepting payment cards);

c. *BCBSM, Inc. v. Vyera Pharmaceuticals, LLC, et al.*, No. 1:21-CV-01884 (S.D.N.Y.) (Alleging that Martin Shkreli and his former companies illegally monopolized the market for the drug Daraprim);

d. *In re Bank of Nova Scotia Spoofing Litigation*, No. 3:20-CV-11059 (D.N.J.) (Alleging that bank defendant and individual traders unlawfully manipulated precious metals futures contracts);

e. *In re Hard Disk Drive Suspension Assemblies Antitrust Litigation*, MDL No. 2918 (N.D. Cal.) (Alleging price fixing of hard disk drive suspension assemblies);

f. *In re Wells Fargo Collateral Protection Insurance Litigation*, MDL No. 2797 (C.D. Cal.) (Alleging that Wells Fargo force-placed automobile insurance on its auto-loan customers);

g. *In re Disposable Contact Lens Antitrust Litigation*, MDL No. 2626 (M.D. Fla.) (Alleging price fixing in the disposable contact lens industry);

h. Washington County Health Care Authority, Inc., d/b/a Washington County Hospital & Nursing Home, et al. v. Baxter International Inc., et al., No 1:16-CV-10324 (N.D. Ill.) (Alleging that manufacturers colluded to restrict output and increase prices of IV saline solution);

i. *Dahl, et al. v. Bain Capital Partners, LLC, et al.*, No. 1:08-CV-10254 (D. Mass.) (Alleging that private equity firms conspired to rig bids and divvy up the market for providing private equity services to leveraged buyouts);

j. *In re Automotive Parts Antitrust Litigation*, MDL No. 2311 (E.D. Mich.) (Alleging auto-parts manufacturers participated in bid rigging and price fixing);

k. *In re Vehicle Carrier Services Antitrust Litigation*, MDL No. 2471 (D.N.J.) (Alleging ocean shipping companies conspired to fix the prices of vehicle carrier services);

l. *In re Air Cargo Shipping Services Antitrust Litigation*, MDL No. 1775 (E.D.N.Y.) (Alleging that a host of airlines of conspired to raise cargo rates worldwide in the early 2000s);

m. *In re Crude Oil Commodity Futures Litigation*, No. 1:11-CV-03600 (S.D.N.Y.) (Alleging that energy derivatives traders manipulated derivative financial contract

prices for West Texas Intermediate Crude Oil traded on the New York Mercantile Exchange);

n. *In re Keurig Green Mountain Single-Serve Coffee Antitrust Litigation*, MDL No. 2542 (S.D.N.Y.) (Alleging Keurig engaged in monopoly abuse by freezing out competitors' coffee cups from its coffee makers);

o. *In re Optiver Commodities Litigation*, No. 1:08-CV-06842 (S.D.N.Y.) (Alleging manipulation of NYMEX settlement prices of light sweet crude oil, heating oil, and gasoline);

p. *In re Polyurethane Foam Antitrust Litigation*, MDL No. 2196 (N.D. Ohio) (Alleging polyurethane foam makers conspired to fix prices);

q. *Anastasio, et al. v. Total Gas & Power North America, Inc.*, No. 1:15-CV-09689 (S.D.N.Y.) (Alleging one of the world's largest natural gas companies illegally manipulated the physical and financial natural gas market in the U.S.);

r. *In re Merck Mumps Vaccine Antitrust Litigation*, No. 2:12-CV-03555 (E.D. Pa.) (Alleging that Merck & Co. monopolized the U.S. market for Mumps Vaccine by engaging in a decade-long scheme to falsify the true efficacy of its vaccine.);

s. *In re Interior Molded Doors Indirect Purchaser Antitrust Litigation*, No. 3:18-CV-00850 (E.D. Va.) (Alleging that JELD-WEN, Inc. and Masonite Corporation participated in a conspiracy to artificially raise prices of interior molded doors);

t. *In re Local TV Advertising Antitrust Litigation*, MDL No. 2867 (N.D. Ill.) (Alleging television stations engaged in a scheme to artificially inflate advertisement prices);

u. *County of Monmouth, New Jersey v. Florida Cancer Specialists, P.L., et al.*, No. 2:18-CV-00201 (M.D. Fla.) (Alleging a Florida cancer treatment center colluded with others to monopolize oncology services in Southwest Florida).

14. Robins Kaplan attorneys are responsible for some of the largest settlements ever recorded in matters alleging antitrust violations, including in both class and individual actions. The firm broke new ground when it obtained a landmark $6.6 billion settlement—following a fifteen-week trial—on behalf of the State of Minnesota and Blue Cross and Blue Shield of Minnesota in an antitrust and consumer-fraud lawsuit against the tobacco industry. *See Minnesota and BCBS of Minn. v. Philip Morris Inc. et al.*, No. Cl-95-1324 (Minn.). The $6.24 billion settlement that Robins Kaplan secured in *In re Payment Card Interchange Fee and Merchant Discount Antitrust Litigation*, MDL No. 1720 (E.D.N.Y.), is the largest known settlement of any private action under the Sherman Act. Robins Kaplan attorneys also achieved settlements in excess of $1.2 billion in both *In re Air Cargo Shipping Services Antitrust Litigation*, MDL No. 1775 (E.D.N.Y.) and *In re Automotive Parts Antitrust Litigation* (43 separate actions) MDL No. 2311 (E.D. Mich.). In *Dahl et al. v. Bain Capital Partners, LLC, et al.*, No. 1:08-CV-10254 (D. Mass.), the firm and its co-counsel achieved a $590.5 million settlement on behalf of its clients. Ex. 1, at 2, 4. And on the eve of trial, Robins Kaplan secured a $75 million settlement in *In re Disposable Contact Lens Antitrust Litigation*, No. 3:15-MD-02626 (M.D. Fla.), bringing the total settlements in that case to $118 million.

15. Robins Kaplan attorneys have also brought antitrust cases to trial and achieved superior results. In *In re TFT-LCD (Flat Panel) Antitrust Litigation*, MDL No. 1827 (N.D. Cal.), Robins Kaplan obtained a unanimous jury verdict on behalf of its client Best Buy, requiring the sole remaining defendant to pay a $22.5 million dollar judgment for its participation in a global

price-fixing conspiracy. Robins Kaplan also secured more than $400 million in settlements from other defendants. Similarly, Robins Kaplan achieved a multi-million dollar judgment for its client BCBS of Minnesota after trial in *In re Lorazepam and Clorazepate Antitrust Litigation*, 1:99-mc-00276 (D.D.C.).

16. As a result of its performance and reputation in cases like those described above, Robins Kaplan has been recognized by various courts throughout the United States and elsewhere for its impressive efforts in litigating and resolving antitrust class actions on behalf of plaintiffs. Ex. 1, at 8. Even short of settlement, courts have called out counsel's professionalism during the course of conducting cases, as Magistrate Judge Bowbeer did in the *In re Cattle and Beef Antitrust Litig.*:

> You have been just remarkable in your civility toward each other and your – and your dealings not only with me but also with my staff…And so I don't think it would be improper for me to say that when I talk to the other judges or when I am out visiting with people in other districts, I brag on you and let them know how – just what a pleasure and privilege it has been to work with you and watch how you not only zealously represent your own clients but how you work with each other to make this case make sense going forward. It really embodies the spirit of Rule 1.

MDL No. 3031 (D. Minn.), June 17, 2022, Hr'g Tr. At 41:20-42:13.

**Robins Kaplan's Efforts to Investigate and Prosecute This Case**

17. I, along with members from our core leadership team, investigated the claims against RealPage and the Lessor Defendants, as alleged in the Watters Plaintiffs' complaints. On December 14, 2022, Scott & RK filed the first complaint to include any economic analysis on behalf of plaintiff Jeffrey Weaver and several other lessors in and around Denver, Colorado. *See* Compl., *Weaver v. RealPage, Inc. et al.*, No. 1:22-cv-03224, ECF No. 1 (D. Colo. Dec. 14, 2022) ("Weaver Complaint"). The first case in the Middle District of Tennessee before Your Honor was filed by Scott & RK two weeks later, on December 30, 2022, for Plaintiff Watters. Compl., *Watters v. RealPage, Inc., et al.,* No. 3:22-cv-01082 (M.D. Tenn. Dec. 30, 2022).

9

18. In addition to the *Weaver* and *Watters* Complaints, Scott & RK filed seven additional cases on behalf of ten clients in U.S. District Courts in six states, plus the District of Columbia prior to the establishment of this MDL.[1] Scott & RK subsequently filed another case containing updated and expanded allegations, *Goldman v. RealPage, Inc., et al.*, in the Middle District of Tennessee.[2] Other Plaintiffs also support Scott & RK, for a total of 25 Plaintiffs who support the Watters Application.

19. Robins Kaplan undertook significant and particularized pre-complaint factual and economic investigations prior to the filing of each Complaint. That work included research into statements and disclosures Defendants made to government agencies, expert economic analysis of data obtained from public and private rental price and vacancy databases to determine the markets affected by Defendants' conduct, and discussions with experts in the field of real estate rental. Each case asserts that Defendants colluded to fix prices in the rental housing market where the Plaintiffs lived, supported by economic analysis tailored to the economic realities of that rental market. Indeed, the *Weaver* action was the first Complaint to include any economic analysis of the Denver, CO rental market. The same is true for the other cases, including the *Watters* case for the Nashville, TN metro area.

---

[1] *See* Compl., *White v. RealPage, Inc.*, No. 1:22-cv-12134 (D. Mass. Dec. 16, 2022); Compl., *Vincin v. RealPage, Inc.*, No. 1:22-cv-1329 (W.D. Tex. Dec. 19, 2022); Compl., *Carter v. RealPage, Inc.*, No. 1:22-cv-01332 (W.D. Tex. Dec. 19, 2022); Compl., *Boelens v. RealPage, Inc.*, No. 2:22-cv-01802 (W.D. Wash. Dec. 20, 2022); Compl., *Kramer v. RealPage, Inc.*, No. 1:22-cv-03835 (D.D.C. Dec. 29, 2022); Compl., *Bertlshofer v. RealPage, Inc.,* No. 2:23-cv-00018 (D. Ariz. Jan. 4, 2023); and Compl., *Parker v. RealPage, Inc.,* No. 1:23-cv-20160 (S.D. Fla. Jan. 13, 2023).

[2] No. 3:23-cv-552 (M.D. Tenn. May 30, 2023).

20.     Robins Kaplan, along with proposed Co-Lead, Scott+Scott, reviewed (a) Defendants' security filings[3] and public statements[4]; (b) the substantial media published by RealPage featuring representatives of Defendant Property Manager Organizations and emphasizing RealPage's market power;[5] and (c) scholarly articles and considerable industry reporting that described RealPage's precipitating a shift in Lessors' focus from higher occupancy to higher rents.[6] The firms also utilized investigators to contact potential witnesses and spoke to those witnesses to obtain information regarding the RealPage's operations.

21.     Robins Kaplan, along with our proposed Co-lead, Scott+Scott, spoke with industry participants with experience in Defendants' leasing strategies, and economic consultants with experience in cartel and price fixing issues, to ensure they pleaded the contours and operation of the relevant rental markets appropriately under relevant binding precedent regarding the pleading standards for antitrust geographic markets.

22.     Watters Plaintiffs' Counsel have taken considerable steps to advance this litigation. They have prepared 181 service packages and effectuated service on 41 Defendants across thirteen actions. Robins Kaplan has also coordinated the filings of sixteen status reports in thirteen different

---

[3]     *See* RealPage, Inc. *Form 10-K 2020.* Richardson, TX: RealPage Inc., 2020.
[4]     *See* UDR, *UDR Announces Second Quarter 2007 Results,* July 30, 2007, available here: https://ir.udr.com/news-events-presentations/press-releases/news-details/2007/UDR-Announces-Second-Quarter-2007-Results/default.aspx.
[5]     RealPage AI Revenue Management, REALPAGE, INC., https://www.realpage.com/assetoptimization/revenue-management/ (last visited Nov. 1, 2022). See RealPage, *BH Management Responds in Real Time with RealPage Market Analytics*, July 14, 2020, available here: https://www.realpage.com/videos/bh-responds-with-market-analytics/. *See also* Press Release, RealPage, Inc., Thoma Bravo Completes Acquisition of RealPage (Apr. 22, 2021), https://www.realpage.com/news/thoma-bravo-completes-acquisition-of-realpage/.
[6]     Joe Bousquin, In the Back Office, Revenue Management Software is Causing a Revolution, MULTIFAMILY EXECUTIVE (Apr. 20, 2009), https://www.multifamilyexecutive.com/technology/in-the-back-office-revenue managementsoftware-is-causing-a-revolution_o (last visited on Dec. 8, 2022).

11

jurisdictions and taken the lead on identifying proposed mediators and coordinating across all Plaintiff groups.

23. Robins Kaplan and Scott+Scott have also continued to investigate the Plaintiffs' claims by speaking with witnesses, gathering direct evidence from RealPage's own training guide, and incorporating additional economic analysis. The most recent Complaint Scott & RK filed adds significant detail not previously included in any other Plaintiffs' Complaint. *Goldman v. RealPage, Inc., et al.*, No. 3:23-cv-552 (M.D. Tenn. May 30, 2023).

24. In this Action, since filing the initial Complaint, Robins Kaplan has worked diligently and cooperatively with Scott+Scott to ensure that all Plaintiffs' claims could move expeditiously once the JPML selected this transferee Court. Scott & RK advocated in filings before the JPML for alternative transfer to the Middle District of Tennessee—where they were the only plaintiffs on file at the time—because they recognized that its central location in the United States would be convenient for all parties. I presented oral argument at the JPML hearing, advocating for alternative transfer to this district.[7] Our firms coordinated with counsel for other Watters Plaintiffs and Defendants prior to the JPML ruling. After transfer to this Court, our firms coordinated with all counsel to submit proposed orders and respond to this Court's requests for submissions in advance of the May 31, 2023, status conference (ECF No. 3).

25. Specifically, Robins Kaplan, along with Scott+Scott, have:

- ***Advanced Discovery:*** by: (a) sending document hold letters to each of the 71 Defendants; (b) corresponding and negotiating with many of those Defendants; (c) initiating FOIA requests to the United States Department of Justice, Federal Trade Commission, and federal Department of Housing and Urban Development; (d) sending requests under equivalent state statutes to 23 relevant state and local government

---

[7] Proposed PSC member, Joseph Saveri Law Firm, LLP, and Dimond Kaplan & Rothstein, P.A., who supports Scott & Robins' leadership appointment, also supported the transfer of these actions to this Court with the JPML. Scott & RK also advocated for the centrally-located District of Colorado.

entities; (d) corresponding and negotiating with many of those local entities, including working collaboratively with agency employees to identify other state entities with relevant information; (e) submitting 51 document preservation letters to third parties likely to have relevant information, and subsequently negotiating the metes and bounds of the documents we request they preserve with at least 15 of those third parties; and (f) by preparing and circulating to the parties drafts of the Protective Order and ESI Protocol.

- ***Organized Joint Statement On Case Progression And Scheduling***: upon receiving the JPML's order, our firms immediately circulated a proposed Case Management Order to all parties and Defendants addressing many of the items later contained in the Court's April 19 Order setting the Initial Status Conference. Our firms then took the lead to prepare the initial draft of the Joint Statement on Case Progression and Scheduling requested by the Court's April 19 Order, and liaised with the parties to prepare a proposed agenda and appearance list for the Status Conference.

- ***Organized the Leadership Applications Schedule:*** upon receiving the Court's April 19 Order calling for leadership applications, our firms endeavored to coordinate the plaintiffs and circulated a proposed stipulation addressing the timing and length of leadership applications, which was ultimately filed on April 26, 2023. ECF No. 25. After certain newly filed Plaintiffs objected (ECF No. 28), our firms initiated the meet and confers that resulted in the Plaintiffs Joint Motion to Establish Deadlines for the Submission of Leadership Applications. ECF No. 82. The Court deferred any ruling on that motion and reserved the matter for discussion at the initial status conference.

- ***Coordinated Mediator Selection***: on June 2, 2023, Scott & RK circulated a proposed list of mediators to other Plaintiffs' counsel and continued communications with Plaintiffs' counsel to identify which mediators they might propose jointly with Defendants to the Court on July 25, 2023. Watters Plaintiffs' list includes mediators drawn from Defendants' proposal. ECF No. 37, p. 8. Scott & RK are committed to pursuing a mediation track proceeds alongside the litigation track, and welcome having the case mediator appear at the parties' status conferences before Your Honor to provide periodic updates.

- ***Proposed Protocol for Common Benefit Work and Expenses***: Scott & RK drafted a proposed protocol establishing how, if selected as Interim Co-Leads and ordered by the Court, Plaintiffs' Lead Counsel, Liaison Counsel, and the Plaintiffs' Steering Committee will exercise billing judgment, maintain time records, report fees and costs, and staff the case. A draft of the preliminary proposed protocol is attached to this declaration as Exhibit 4.

26. Scott & RK have outlined a preliminary protocol and procedures for common benefit time and expenses. If appointed, Scott & RK would implement a protocol approved by the Court to control costs, manage workflow, and ensure that the case is run efficiently. The draft

13

protocol addresses the duties of Co-Lead and Liaison Counsel, Plaintiffs' Steering Committee counsel, committee appointments, and the use of additional law firms and attorneys; the requirements for the litigation fund to cover expenses and costs in the case; the exercise of billing judgment; the maintenance of contemporaneous, detailed time records; the monthly reporting of fees, expenses, and costs; staffing parameters; Co-Lead, Liaison, and PSC committee meetings; and rules for attendance at Court hearings.

**Robins Kaplan's Willingness to Devote the Resources Necessary for This Case**

27. Robins Kaplan has the financial resources necessary to represent the Plaintiffs in this action and will commit the resources necessary to vigorously litigate this case through to the end. Robins Kaplan has not engaged a litigation funder for this case. For example, Robins Kaplan served as co-lead counsel in *In re Payment Card Interchange Fee and Merchant Discount Antitrust Litigation*, MDL No. 1720 (E.D.N.Y.) with two other firms. Robins Kaplan invested more than $60 million in attorney time pursuing claims for the class, ultimately achieving the largest known private settlement in the 130-year history of the Sherman Act. In addition, Robins Kaplan advanced in excess of $10 million in costs to date, none of which has been reimbursed from the settlement funds. Robins Kaplan is likewise willing and able to make a similar investment in this case if the need arises to ensure the class is properly represented.

**Robins Kaplan Demonstrates The Ability to Work Cooperatively, Professionally, and Respectfully With Others**

28. Time and time again, Robins Kaplan has demonstrated an ability to work cooperatively, professionally, and respectfully with other lawyers representing both plaintiffs and defendants in complex, multi-party lawsuits. Just one recent example includes the ongoing Cattle and Beef MDL, *In re Cattle and Beef Antitrust Litig.*, No. 22-md-03031 (D. Minn.) There, Robins Kaplan serves as Lead Liaison Counsel, while Scott+Scott serves as Co-Lead Counsel for the

Cattle Producer and Exchange Classes alongside proposed PSC member here, Cafferty Clobes Meriwether & Sprengel LLP ("CCMS"). Robins Kaplan, Scott+Scott, and CCMS have taken the lead to coordinate that MDL across all the various plaintiffs' groups—consisting of five separately represented classes[8] and over 40 direct action opt-out Plaintiffs—and with Defendants. As noted above in paragraph 12, Magistrate Judge Bowbeer praised counsel's coordination efforts and professionalism.

29. I declare under the penalty of perjury that the foregoing is true and correct. Executed on this 6th day of June, 2023 in Minneapolis, MN.

                                                               s/Stacey P. Slaughter

**ROBINS KAPLAN LLP**
Stacey P. Slaughter
800 LaSalle Avenue, #2800
Minneapolis, MN 55402
Tel: (612) 349-8500
sslaughter@robinskaplan.com

---

[8] The other classes are represented by many of the same firms who act on behalf of other Plaintiffs in this MDL, including Hagens Berman, Lockridge Grindal Nauen PLLP, Hausfeld LLP, and Cotchett, Pitre & McCarthy, LLP.