| | |
|---|---|
| JASON GOLDMAN; JEFFREY WEAVER; BILLIE JO WHITE; NANCY ALEXANDER; BRANDON WATTERS; PRISCILLA PARKER and PATRICK PARKER; and BARRY AMAR-HOOVER; Individually and on Behalf of All Others Similarly Situated,<br><br>                    Plaintiffs,<br><br>v.<br><br>REALPAGE, INC.; THOMA BRAVO FUND XIII, L.P.; THOMA BRAVO FUND XIV, L.P.; THOMA BRAVO L.P.; APARTMENT INCOME REIT CORP., d/b/a AIR COMMUNITIES; ALLIED ORION GROUP, LLC; APARTMENT MANAGEMENT CONSULTANTS, LLC; AVENUE5 RESIDENTIAL, LLC; BELL PARTNERS, INC.; BH MANAGEMENT SERVICES, LLC; BOZZUTO MANAGEMENT COMPANY; BROOKFIELD PROPERTIES MULTIFAMILY LLC; CAMDEN PROPERTY TRUST; CH REAL ESTATE SERVICES, LLC; CONAM MANAGEMENT CORPORATION; CONTI CAPITAL; TF CORNERSTONE, INC.; CORTLAND MANAGEMENT, LLC; CWS APARTMENT HOMES LLC; DAYRISE RESIDENTIAL, LLC; EQUITY RESIDENTIAL; ESSEX PROPERTY TRUST, INC.; FPI MANAGEMENT, INC.; GREYSTAR MANAGEMENT SERVICES, LP; HIGHMARK RESIDENTIAL, LLC; INDEPENDENCE REALTY TRUST, INC.; KAIROI MANAGEMENT, LLC; KNIGHTVEST RESIDENTIAL; LANTOWER LUXURY LIVING, LLC; LINCOLN PROPERTY COMPANY; LYON MANAGEMENT GROUP, INC.; MID-AMERICA APARTMENT COMMUNITIES, INC.; MISSION ROCK RESIDENTIAL, LLC; MORGAN PROPERTIES MANAGEMENT COMPANY, LLC; PINNACLE PROPERTY | Case No. **3:23-md-03071**<br>MDL No. 3071<br><br>Judge Waverly D. Crenshaw, Jr.<br><br>**JURY TRIAL DEMANDED** |

MANAGEMENT SERVICES, LLC;
PROMETHEUS REAL ESTATE GROUP,
INC.; THE RELATED COMPANIES L.P.;
RELATED MANAGEMENT COMPANY L.P.;
ROSE ASSOCIATES, INC.; RPM LIVING,
LLC; SARES REGIS GROUP COMMERCIAL,
INC.; SECURITY PROPERTIES INC.;
SHERMAN ASSOCIATES, INC.; SIMPSON
PROPERTY GROUP, LLC; THRIVE
COMMUNITIES MANAGEMENT, LLC;
TRAMMELL CROW COMPANY, LLC; B/T
WASHINGTON, LLC d/b/a BLANTON
TURNER; UDR, INC.; WINDSOR
PROPERTY MANAGEMENT COMPANY;
WINNCOMPANIES LLC;
WINNRESIDENTIAL MANAGER CORP.;
AND ZRS MANAGEMENT, LLC;

                Defendants.

## **FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT**

Plaintiffs Jason Goldman, Jeffrey Weaver, Billie Jo White, Nancy Alexander, Brandon Watters, Priscilla Parker, Patrick Parker, and Barry Amar-Hoover, individually and on behalf of all others similarly situated (the "Class," as defined below), upon personal knowledge as to the facts pertaining to themselves and upon information and belief as to all other matters, and upon the investigation of counsel, bring this class action complaint to recover treble damages, injunctive relief, and other relief as appropriate, based on violations of federal antitrust laws and state laws against Defendants RealPage, Inc., Thoma Bravo Fund XIII, L.P., Thoma Bravo Fund XIV, L.P., and Thoma Bravo L.P. (collectively, "RealPage"); and Apartment Income REIT Corp., d/b/a Air Communities; Allied Orion Group, LLC; Apartment Management Consultants, LLC; Avenue5 Residential, LLC; Bell Partners, Inc.; BH Management Services, LLC; Bozzuto Management Company; Brookfield Properties Multifamily LLC; Camden Property Trust; CH Real Estate

Services, LLC; CONAM Management Corporation; Conti Capital; TF Cornerstone, Inc.; Cortland Management, LLC; CWS Apartment Homes LLC; Dayrise Residential, LLC; Equity Residential; Essex Property Trust, Inc.; FPI Management, Inc.; Greystar Management Services, LP; Highmark Residential, LLC; Independence Realty Trust, Inc.; Kairoi Management, LLC; Knightvest Residential; Lantower Luxury Living, LLC; Lincoln Property Company; Lyon Management Group, Inc.; Mid-America Apartment Communities, Inc.; Mission Rock Residential, LLC; Morgan Properties Management Company, LLC; Pinnacle Property Management Services, LLC; Prometheus Real Estate Group, Inc.; The Related Companies L.P.; Related Management Company L.P.; Rose Associates, Inc.; RPM Living, LLC; Sares Regis Group Commercial, Inc.; Security Properties Inc.; Sherman Associates, Inc.; Simpson Property Group, LLC; Thrive Communities Management, LLC; Trammell Crow Company, LLC; B/T Washington, LLC d/b/a Blanton Turner; UDR, Inc.; Windsor Property Management Company; WinnCompanies LLC; WinnResidential Manager Corp.; and ZRS Management, LLC (collectively, the "Lessors" or "Lessor Defendants," and together with RealPage, "Defendants").

## I.      INTRODUCTION

1.      From at least January 2016, through the present, Defendants engaged in a nationwide conspiracy to fix and inflate the price of multifamily rental housing across the country. Leveraging their control of the multifamily rental housing market from at least January 2016, Defendants each caused substantial damages to Plaintiffs and other members of the Class, whose ability to obtain affordable housing depended on getting competitive prices for the units they

rented. Several witness accounts, including 10 discussed herein, rental price and occupancy data, economic evidence, and public investigations,[1] confirm this anticompetitive conduct.

2. Defendants are RealPage, the developer of an integrated technology platform that provides a host of software solutions for the multifamily rental housing markets, including revenue management software solutions – a category which includes at least RealPage products, Lease Rent Options ("LRO"), YieldStar, and AI Revenue Management– and several managers of large-scale multifamily residential apartment buildings that used RealPage's Revenue Management Solutions[2] to coordinate and agree upon rental housing pricing and supply.

3. Each Lessor Defendant agreed that: they would delegate their rental price and supply decisions to a common decision maker, RealPage; share the proprietary data necessary for RealPage to make those decisions; and, then abide by RealPage's price and supply decisions. As RealPage put it, it offered clients the ability to "outsource daily pricing and ongoing revenue oversight"[3] to RealPage, allowing Defendant RealPage to set prices for its clients' properties "as though we [RealPage] own them ourselves."[4]

---

[1] Heather Vogell, *Rent Going Up? One Company's Algorithm Could Be Why.*, PROPUBLICA (Oct. 15, 2022), https://www.propublica.org/article/yieldstar-rent-increase-realpage-rent (ProPublica report shedding light on Defendants' conspiracy and showing that rents in areas where RealPage clients control a high percentage of rental units have increased at a significantly higher rate).

[2] RealPage's revenue management software solutions, including LRO, YieldStar, and AI Revenue Management, will be referred to collectively herein as "Revenue Management Solutions" or "RMS."

[3] Press Release, RealPage, Inc., YieldStar Offers Revenue Advisory Services to Multifamily Owners and Managers (Mar. 1, 2010), https://www.realpage.com/news/yieldstar-offers-revenue-advisory-services-to-multifamily-owners-and-managers/.

[4] RealPage Renewal Reporting Presentation, MEDVE, https://medve.com/assets/airm-renewal-reporting.pdf (last accessed June 14, 2023).

4.     Rather than function as separate economic entities, Lessor Defendants agreed to make key competitive decisions regarding the price and supply of multifamily apartments, collectively.  As Emily Mask, an executive from property management company ECI Group explained in 2019, "[t]he design and functionality of [RealPage's] LRO offers detailed insight into how actual competitors impact pricing strategies . . . With LRO we rarely make any overrides to the [pricing] recommendations . . . *[W]e are all technically competitors*, *LRO helps us to work together* . . . to make us all more successful in our pricing . . . LRO is designed to work with a community in pricing strategies, not work separately."[5]

5.     RealPage's clients provide RealPage with vast amounts of their non-public proprietary data, including their lease transactions, rent prices, and occupancy and inventory levels.  Each client's proprietary data is fed into a common data pool, along with additional data collected by Defendant RealPage's myriad other data-analytics and rental-management software products.  RealPage then trains its machine learning and artificial intelligence across that pool of its clients' proprietary data and uses algorithms to generate rental prices daily for each of RealPage's client's available units through its RMS.  Property managers agree to adopt RealPage's pricing up to 80%-90% of the time, knowing that if they, alongside their co-conspirators, adhere to RealPage's pricing decisions, they will collectively raise market prices and avoid price

---

[5]     The RealPage e-book, PROVEN: B & C Assets Ace the Market with RealPage: How Two Companies Pushed Performance Over 3+% Above Market (2019) (hereinafter, "RealPage e-book B & C Assets Ace the Market") (detailing two case studies in which RealPage clients achieved revenue growth and outperformed the market after adopting RealPage's pricing recommendations. ECI Group achieved 5%-7% year-over-year revenue growth after adopting RealPage's pricing recommendations and BH Management saw a 4.8% "outperformance to the market," and 4% between its own properties using RealPage's pricing recommendations against those that had not yet adopted RealPage pricing.

competition.[6] Jeffrey Roper, RealPage's main architect, publicly described the dilemma as: "If you have idiots undervaluing, it costs the whole system."[7]

6.     To prevent their staff from exercising independent judgment when setting rents, Lessor Defendants and Defendant RealPage have established a rigorous monitoring and compliance system to ensure decision making on pricing remains with RealPage.

7.     For example, Defendant RealPage assigns many of their clients "Pricing Advisors," also called "Revenue Managers,"[8] to monitor the client's compliance with RealPage's pricing

---

[6]     Moreover, witness accounts, discussed below, confirm that RealPage clients were aware that their proprietary information was being collected and pooled with that provided by their regional competitors and that RealPage's pricing algorithm made use of this data superset. Indeed, RealPage is transparent about its use of pooled data in its "Revenue Management FAQs," section, providing that in addition to a "variety of [other] sources, . . . competitor rent data is one of several data inputs" into the pricing algorithm. *Frequently Asked Questions About Revenue Management Software*, REALPAGE, INC., https://www.realpage.com/asset-optimization/revenue-management/?utm_source=google&utm_medium=cpc&utm_campaign=Spear+-+HDDR+Revenue+Management+-+Search&utm_content=search&utm_adgroup=Revenue+Management&utm_device=c&utm_keyword=ai%20revenue%20management&gad=1&gclid=Cj0KCQjwmZejBhC_ARIsAGhCqndpmEtz_7CgdbVOuCLdRHSoZlU42vJD2ors4fYig6K9svH0xlSoJ9saAnadEALw_wcB&showPdf=true (last accessed June 14, 2023) (hereinafter, "RealPage Revenue Management FAQs").

[7]     Vogell, *supra*, note 1.

[8]     *RealPage AI Revenue Management,* REALPAGE, INC., https://www.realpage.com/asset-optimization/revenue-management/?utm_source=google&utm_medium=cpc&utm_campaign=Spear+-+HDDR+Revenue+Management+-+Search&utm_content=search&utm_adgroup=Revenue+Management&utm_device=c&utm_keyword=ai%20revenue%20management&gad=1&gclid=Cj0KCQjwmZejBhC_ARIsAGhCqndpmEtz_7CgdbVOuCLdRHSoZlU42vJD2ors4fYig6K9svH0xlSoJ9saAnadEALw_wcB (last accessed June 14, 2023) (describing RealPage's Revenue Management Advisory services  as providing "expert oversight of [clients'] pricing strategy").  In a video posted on RealPage's website titled "Best Practices for Revenue Management Webcast," hosted by RealPage's Chief Economist, Greg Willett, Tracy Paulk, who holds two titles at RealPage according to LinkedIn – VP Consumer Solutions and Revenue Management and VP, LRO Professional Services – explained "You'll hear someone referred to as a revenue manager or pricing advisor, they're the same thing." *Best Practices for Revenue Management Webcast*, RealPage Videos, at (10:39-10:58), https://www.realpage.com/videos/best-practices-revenue-management-webcast/ (herein, "Best Practices Webcast").  Reference to "Pricing Advisors" herein refers to both Pricing Advisors and Revenue Managers.

decisions, and to disseminate confidential and commercially sensitive information provided to RealPage by the client's competitors to encourage compliance with RealPage's decisions. As RealPage put it to its property management clients, "[y]our Pricing Advisor is an extension of your team and empowered with the authority required for success."[9] Not all RealPage revenue management clients are assigned a Pricing Advisor. Indeed, some of RealPage's largest property management clients have their own internal revenue managers who have undergone extensive training provided by RealPage, to act in this capacity.[10] For many, any attempt to diverge from RealPage's daily unit pricing required the client to provide a justification to a Pricing Advisor, or if the client did not subscribe to RealPage's advisory services, to an internal RealPage-trained revenue manager in order to obtain their approval for the proposed deviation. RealPage accepts very few justifications for any requested override, routinely rejecting clients' claims that RealPage's prices were off-market or out-of-step with local property conditions. While RealPage claims that all pricing decisions are ultimately left to its clients, various witnesses confirm that, in their experience, no modifications to RealPage's recommended pricing can be made without RealPage's prior approval. According to one former RealPage Pricing Advisor ("Witness 1"),[11] at least some Pricing Advisors informed their assigned Lessors that they were without discretion to override pricing determined by RealPage and that Lessors had to adhere to those pricing

---

[9]  *AI Revenue Management*, THE MEDVE GROUP, INC., (June 23, 2021), https://medve.com/assets/airm-manager-training-medve-management-6.23.2021-(1).pdf.

[10]  According to RealPage's VP of Consumer Relations and Revenue Management, and VP of LRO Solutions, "often times when you hit that 20,000 units or more, you start to see the value [in hiring an internal revenue manager]." Best Practices Webcast, *supra* note 9 (17:40-18:53).

[11]  Defendants and the Court were provided with the identities of all Witnesses named herein, at the time of the filing of Plaintiffs' Amended Consolidated Complaint, ECF 291.

7

decisions.[12]   As one leasing manager at a RealPage client ("Witness 2")[13] put it, "I knew [RealPage's prices] were way too high, but [RealPage] barely budged [when I requested a deviation]."

8.      Aside from daily and weekly interactions, RealPage provides many of its RMS clients with quarterly one-on-one "Performance to Market" meetings, designed to identify how compliant the client was with RealPage's pricing recommendations during the prior quarter, and quantify any purported revenue loss that RealPage attributed to the client's deviations from its pricing recommendations.  A former RealPage executive ("Witness 3")[14] who was instrumental in the development of RealPage's RMS confirmed that RealPage's pricing recommendations were accepted at "very high rates."

9.      Property management companies' executives also placed pressure on their leasing managers to implement RealPage's prices.  For example, Defendant Lincoln Property Company forced leasing managers wishing to deviate from RealPage's prices to submit a request to the corporate office.  A former Lincoln Property Company Leasing Consultant in Nashville ("Witness 4") recalls that these deviation requests were rejected almost 99% of the time, and that Lincoln Property Company corporate would reiterate that RealPage's "rates are what they are."  Similarly,

---

[12]     Witness 1 worked as a RealPage Pricing Advisor from 2015 through 2018.

[13]     Witness 2 worked as the Assistant Community Manager for Sunrise Management (now "CloudTen Residential") from 2020 through August 2022, where she had regular, direct interactions with RealPage Pricing Advisors and was responsible for reviewing RealPage's daily price recommendations for the properties she managed.  Prior to that, Witness 2 worked as a leasing consultant for Defendant Greystar (October 2019 to June 2020), utilizing RealPage's pricing platform. Witness 2 also worked as a leasing consultant with Defendant FPI Management, Inc. ("FPI Management"), however she did not use RealPage's pricing platform at Defendant FPI Management as the building she worked at was classified as affordable housing.

[14]     Witness 3 is a data scientist and former innovation and marketing executive at RealPage, from 2015 through 2019.

one former RealPage Pricing Advisor ("Witness 5") recalls the agitation expressed by Christina Agra-Hughes, President of the property management company First Pointe Management Group, upon learning about her staff's deviation from Defendant RealPage's prices during a meeting with RealPage staff and asked rhetorically, "why the hell aren't my teams following the model!?"  To help their clients discipline staff, RealPage rolled out a new version of its RMS products in 2019, referred to internally as "Price Optimization 2" or "POV2."  That update tracked not only a client's acceptance rate, but the identity of the client's staff that requested a deviation from RealPage's price.  Additionally, to discourage any "temptation to override the [RealPage pricing] algorithm if rents appear too aggressive,"[15] compensation for certain property management personnel are tied to compliance with RealPage's pricing recommendations.

10.     As the stated goal of RealPage's RMS is for its clients to "outperform the market [by] 3% to 7%,"[16] the inevitable outcome of Defendants' coordinated price setting was that rents have been pushed above competitive levels.  Figure 1 below shows the steady increase in rental prices in various metropolitan areas as more and more property managers adopted RealPage:

---

[15]     Paul R. Bergeron III, *Revenue Management: Why It Works*, NAT'L APARTMENT ASS'N (July 30, 2015; updated Oct. 27, 2016), https://www.naahq.org/revenue-management-why-it-works.

[16]     Vogell, *supra*, note 1 (citing RealPage website, *YieldStar Predicts Market Impact Down to Unit Type and Street Location*, REALPAGE, INC., https://www.realpage.com/videos/yieldstar-data-scientists-help-manage-supply-demand/) (last accessed June 14, 2023).

**Figure 1:  Average Rents in Various Metro Areas, 2015-2023**



11.     RealPage and the Lessor Defendants admit the impact of Defendant RealPage's RMS on rental prices.  After praising a 14% increase in average rental prices across 2021 at an industry event, RealPage Vice President Jay Parsons asked Andrew Bowen, RealPage's then Vice President of Investor Markets, what role he thought RealPage had played in the unprecedented increase.  "I think it's driving it, quite honestly," Bowen replied.[17]  Individuals who previously worked for RealPage and its clients express dismay with the way RealPage has enabled Lessor Defendants to collectively set and raise rents and confirm that rental prices were artificially raised.  For example, one Leasing Manager (Witness 2) reported that, in 2021, the first year the property she worked at employed RealPage to set rents, rents for the building's standard two-bedroom units

---

[17]     Vogell, *supra*, note 1.

were raised from $1,650/month to $2,100/month, an increase of approximately 27%, despite no improvements made to the units. A business manager at Defendant Pinnacle Property Management Services, LLC ("Witness 6") said that RealPage caused them to raise monthly rents on some units by several hundreds of dollars during the beginning and middle of the Covid-19 pandemic: "[RealPage] was recommending that I raise rents $400 to $500 a month per unit[.] It was a nightmare. It was embarrassing. It was absolutely ridiculous." Witness 2, who also worked with RealPage in connection with her role as a Leasing Consultant with Defendant Greystar Property Management Services, LLC, "completely agrees" that rental prices in her region were artificially inflated upon the adoption of RealPage pricing recommendations.

12. Indeed, a former RealPage executive who was directly involved in the creation of the original software that is now integrated into RealPage's RMS expressed dismay with the way RealPage has enabled Lessors to collectively raise rents at record pace. Witness 3 described this practice of centrally setting, and consistently raising rental rates as having "bastardized" RealPage's original "supply and demand model."

13. In 2017, RealPage acquired the revenue management software developed by the Rainmaker Group, LRO. By integrating LRO into its own revenue management system, RealPage acknowledged the combined "data science talent and modeling tools through these acquisitions allows our customers to achieve better harvesting and placement of capital in the rental housing industry."[18] According to RealPage, "[t]his acquisition extended our revenue management footprint, augmented our repository of real-time lease transaction data, and increased our data science talent and capabilities. We also expect the acquisition of LRO to increase the market

---

[18] RealPage Inc., 2017 Annual Report (Form 10-K) at 39 (Mar. 1, 2018), https://www.sec.gov/Archives/edgar/data/1286225/000128622518000008/rp-20171231x10k.htm (hereinafter, RealPage 2017 10-K Form).

penetration of our YieldStar Revenue Management solution and drive revenue growth in our other asset optimization solutions."[19]  RealPage's acquisition of LRO indeed increased market penetration of its RMS, precipitating a structural shift in the forces of supply and demand.

14.     Both parties to the acquisition were excited by the concentration of data that would result from the deal, and in the hands of RealPage.  In a February 28, 2017 article concerning the pending deal, Tammy Farley, President of the Rainmaker Group was quoted as saying, "[w]e're obviously proud of our LRO successes over the past decade and this combining of two powerhouse players presents exciting opportunities and the ideal platform for our multifamily team to execute in a much bigger way on a global scale."[20]  Likewise, RealPage's Chairman and CEO, Steve Winn, echoed, "With many apartment markets softening around the US, now is the right time to bring together the best data-science talent, a comprehensive lease-transaction database and RealPage's powerful suite of pricing, demand and credit optimization tools into *one comprehensive platform*."[21]

15.     RealPage has since made "enhancements" to LRO and integrated both, YieldStar and LRO to "form the industry's most comprehensive suite of solutions for precision data analytics and asset optimization for rental housing assets,"[22] introduced as "AI Revenue Management" in 2020.

---

[19]     RealPage 2017 Form 10-K, *supra* note 18.

[20]     *The Rainmaker Group Announces Sale of Multifamily Housing Assets to RealPage, Inc.*, Hospitality Net (Feb. 28, 2017), https://www.hospitalitynet.org/news/4081257.html (last visited on June 30, 2023).

[21]     Paul Bubny, *RealPage Adds LRO to Analytics Platform*, ALM Glob., LLC (Feb. 28, 2017), https://www.globest.com/sites/paulbubny/2017/02/28/realpage-adds-lro-to-analytics-platform/ (last visited on June 30, 2023) (emphasis added).

[22]     "RealPage Closes Acquisition of Lease Rent Options, LRO®," Business Wire (Dec. 4, 2017), https://www.businesswire.com/news/home/20171204006136/en/RealPage-Closes-Acquisition-of-Lease-Rent-Options-LRO%C2%AE (last visited June 30, 2023).

16.     Witness 3 explained that in facilitating ever increasing prices, RealPage warped the original model and ultimately created what he described as "massive collusion."[23]  Another early developer of RealPage's pricing software ("Witness 7")[24] reflected on how RealPage's facilitation of collusion among Lessors has pushed rents higher at a breakneck pace: "[T]hese optimization systems are really efficient at extracting value and they will push things until they start to break."

17.     Aside from raising rents, Defendants' collective delegation of their decision-making authority to Defendant RealPage also raised vacancy rates and impacted the supply of multifamily apartments.

18.     Vacancy rates rose because each Lessor Defendant could (and did) allow a larger share of their units to remain vacant, thereby artificially restricting supply, while maintaining higher rental prices across their properties.  This behavior is only rational if Lessor Defendants know that their competitors are setting rental prices using the same algorithm and thus would not attempt to undercut them.

19.     This was a departure from prior practice.  Before the introduction of coordinated rent-setting software, residential property managers independently set prices, and generally did so to maximize occupancy.  If supply was high, market prices would drop, as allowing apartments to stand vacant at their advertised rental prices made little sense when similar apartments in the area were available for less.  Thus, in the past, property managers of multifamily housing properties had incentive to lower rents until all available units were occupied.

---

[23]     Upon the announcement of a potential antitrust investigation by the Department of Justice into RealPage's algorithmic pricing, on or around November 2022, Witness 3 turned around and disclaimed these statements.

[24]     Witness 7 worked in project management with the Rainmaker Group (developer of Lease Rent Options ("LRO")), from 2011 through 2017, at which time RealPage acquired LRO. Discussed further *infra*.

20.     Defendant RealPage has not been shy about its desire to raise vacancy rates. During a 2017 earnings call, then-CEO of RealPage, Steve Winn, described how one large client, managing over 40,000 units, drastically increased its profit by operating at a vacancy rate that "would have made [that property manager's] management uncomfortable before."[25] The client had previously targeted 97% or 98% occupancy rates in markets where it was a leader. After outsourcing rent prices and lease terms to RealPage, the company began targeting 3%-4% revenue growth while operating at a 95% occupancy rate (*i.e.*, 5% vacancy rate).[26]

21.     The impact of the Lessor Defendants' shift from a "heads in beds" strategy to RealPage's revenue maximization strategy is apparent from comparing average rental and vacancy rates as depicted in Figures 2 and 3, below. These graphs demonstrate that the forces of supply and demand no longer control the price of rent in some of the most populated and sought out metropolitan areas in the country. Specifically, these graphs show that from 2016 to the onset of the COVID-19 pandemic in 2020, Defendants were able to increase rents every year, whether vacancies were rising or falling, and in most instances, ***both*** rents ***and*** vacancy rates trended higher from 2014-2020, across various metropolitan regions where RealPage operates. For example, in the Greater Nashville Metro Area,[27] (Figure 2), despite rising vacancies, with the help of RealPage, Defendants were able to continue to raise rents year-over-year-over-year, demonstrating the

---

[25]     Vogell, *supra*, note 1.

[26]     *Id*.

[27]     As used throughout this Complaint, the Greater Nashville Metro Area is coterminous with the Nashville-Davidson -Murfreesboro-Franklin, TN Metropolitan Statistical Area, as established by the United States Office of Management and Budget. Specifically, the Greater Nashville Metro Area consists of the Tennessee cities of Nashville, Davidson, Murfreesboro, Franklin, and their surrounding areas. References to Nashville throughout this Complaint, unless specifically limited, refer to the Greater Nashville Metro Area. Metropolitan Statistical Areas are discussed further in §V.

disconnect between supply and demand. Likewise, Figure 3 demonstrates that beginning on or around 2016, rental prices continued to climb notwithstanding a consequent increase in vacancies in the Dallas metro area.

**Figure 2: Rent vs. Occupancy in the Greater Nashville Metro Area (2014-2019)**



Case 3:23-md-03071    Document 314    Filed 07/05/23    Page 15 of 167 PageID #: 2329

**Figure 3: Rent vs. Occupancy in the Dallas Metro Area (2014-2022)**



22.     Defendants also worked together to avoid periods of oversupply that might detrimentally impact rental prices.  Using its record of its clients' lease expirations and housing inventory, Defendant RealPage's daily pricing recommendations are accompanied with suggested lease terms that are staggered to avoid temporary periods of oversupply resulting from the natural ebb and flow of the market.[28]  As one executive explained in 2019, about one of RealPage's RMS products, "LRO is mapping out for our teams how they should be pacing their [lease]

---

[28]     Revenue Management: Proven in Any Market Cycle: See How These Top Companies Outperformed During Downturns (2020), https://www.realpage.com/ebooks/outperform-in-a-down-market/ (hereinafter, "Revenue Management: Proven in Any Market Cycle") (" . . . identifying the excess supply period and time horizon will allow [property managers] to strategize which lease terms will allow expirations to be minimized during the excess supply time horizon, therefore reducing the number of expirations and potential [revenue] exposure [property managers] will experience during this excess supply time").

expirations."[29]    Witness 6,[30] A former business manager for Defendant Pinnacle Property Management Services, LLC ("Pinnacle") explained how RealPage helped Pinnacle avoid a situation where there were a significant number of units renewing at the same time RealPage "would recommend a 10-month lease instead of a 12-month lease on certain people [to avoid simultaneous renewals]," he said. "Or a 13-month lease – to try to get it to that next month [so that] instead of having 15 renewals, you would end up with 10 renewals." Collectively manipulating supply to minimize naturally occurring periods of oversupply removes a source of periodic downward price pressure on rents, which is the strongest during these temporary oversupply periods.

23.    Not content to limit their conspiracy through indirect contact via RealPage, the Lessor Defendants also pursued direct contacts amongst themselves to facilitate information exchanges and coordinate prices.  RealPage hosts online forums, organizes in-person events for its clients,[31] and maintains standing committees of cartel members – including the 1,000 member

---

[29]    RealPage Revenue Management Maximizes Market Opportunity, RealPage Videos (Dec. 7, 2019), https://www.realpage.com/videos/revenue-management-maximizes-market-opportunity/

[30]    Witness 6 worked as a Business Manager for Defendant Pinnacle Property Management Services, LLC from 2019 through 2022.

[31]    *See* Susan Gaide, *Real World 2022 Customer Conference Recap*, REALPAGE, INC., (July 29, 2022), https://www.realpage.com/blog/realworld-2022-customer-conference-recap/ (three-day conference hosted by RealPage in Las Vegas with over 1,500 industry attendees, including keynote speakers, "Lynne Ann Chase, Chief Accounting Officer for Winn Residential (the ninth largest apartment manager in the country with more than 103,000 units under management across affordable housing, military housing and conventional), Yetta Tropper, Head of Multifamily Asset Manager for PGIM (the real estate investment arm of Prudential) and Scott Pechersky, Chief Technology Officer for RPM Living (#7 on the NMHC manager list with more than 112,000 units.")).

strong User Group – to advise on pricing strategy.[32]  RealPage hosts webinars, screen sharing

training modules, frequent calls, in-person "roundtables," and annual conferences in efforts to

combine forces with the largest property management companies in the United States and align on

price-setting methods in the multifamily rental housing market.[33]  RealPage would use these events

to explain the many financial benefits of working together instead of as competitors.  According

to James M. Nelson, the researcher whose work sparked the ProPublica report regarding

RealPage's RMS, "the cartel [took] root in these various summits."

24.     RealPage also encourages its clients to communicate directly with one another to

exchange pricing information.  In training materials that RealPage provides to clients, in a section

addressing how property managers should answer initial pricing inquiries titled "Overcoming

Objections Guide," RealPage gives the following "Protips" on how its clients can obtain

confidential, competitively sensitive information directly from one another:

---

[32]     *User Group Overview*, REALPAGE, INC., https://www.realpage.com/user-group/overview/
(last accessed June 14, 2023) (hereinafter, "User Group Overview") (formed in 2003, the User
Group "is the organization recognized by RealPage to improve communications between RealPage
and the user community, and to promote communications between users."

[33]     Since 2000, every year the executive-level users of RealPage convene for a three-day
conference called the "RealWorld User Conference" ("RealWorld").  *See RealPage Sets Stage in
Vegas for 11th Annual RealWorld User Conference*, REALPAGE NEWS (Mar. 14, 2011),
https://www.realpage.com/news/realpage-sets-stage-in-vegas-for-11th-annual-realworld-user-
conference/; *see also* Chris Wood, New Expectations *in* Multifamily Technology *ROI*: Q&A With
RealPage's   Steve   Winn,   MULTIFAMILY   EXECUTIVE   (July   15,   2009),
https://www.multifamilyexecutive.com/technology/new-expectations-in-multifamily-technology-
roi-q-a-with-realpages-steve-winn_o.

**Figure 4:  Excerpt from RealPage's Overcoming Objections Guide**



**Protips**

·Shop your competitors over the phone, in-person, and view their websites. Be knowledgeable about their pricing, specials, and product
·Utilize a calendar to narrow down a lease start date
·Utilize a calculator to compute their savings

25.     Interviews with witnesses who worked at various Lessor Defendants confirm this practice. One former Leasing Consultant from Defendant Lessor Mid-America Apartment Communities ("Witness 8")[34] described that, to assist in collecting competitors' pricing data, RealPage even provided a form containing the names of competitors to call and the information to obtain. According to the witness, she called competing properties every Tuesday to obtain updated pricing information, or "the price for that day," and would use the RealPage form to guide those calls: "You kind of just go down the list and fill out the blanks."

26.     After ProPublica's reporting brought Defendants' misconduct to light, multiple members of Congress have urged the Department of Justice ("DOJ") and the Federal Trade Commission ("FTC") to investigate the collusion facilitated by the collection and use of rent data input and exchanged through RealPage's RMS.  While the DOJ has yet to announce any formal investigation into RealPage, it has announced that it will hold an expert workshop "to inform potential guidance updates around anticompetitive information sharing" in consumer facing markets, including the multifamily rental housing market.[35]

---

[34]     Witness 8 worked as a property manager with Defendant Mid-America Apartment Communities from 2019 through 2021.

[35]     Chris May, US DOJ to Support FTC, CFPB Push Against Rent Prices with Guidance on Anticompetitive Information Sharing, MLEX (Jan. 25, 2023), https://content.mlex.com/#/content/1445159.

27.     Defendants' price-fixing conspiracy is a *per se* unlawful restraint of trade under Section 1 of the Sherman Act.  It has resulted in artificially inflated rent prices and a diminished supply of multifamily rental units throughout the United States.  Plaintiffs and the Class, who rent multifamily rental units from property managers that use Defendant RealPage's RMS, paid significant overcharges on rent, and suffered harm from the reduced availability of rental units they could reasonably afford.  This suit is brought to recover for that harm.

## II.     JURISDICTION AND VENUE

28.     Plaintiffs bring this antitrust class action lawsuit pursuant to Sections 4 and 16 of the Clayton Act (15 U.S.C. §§15 and 26), to recover treble damages and the costs of suit, including reasonable attorneys' fees, for the injuries sustained by Plaintiffs and members of the Class; to enjoin Defendants' anticompetitive conduct; and for such other relief as is afforded under the laws of the United States for Defendants' violations of Section 1 of the Sherman Act (15 U.S.C. §1).

29.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§1331, 1337, and Sections 4 and 16 of the Clayton Act (15 U.S.C. §§15(a), 26).

30.     Venue is proper in this District pursuant to Sections 4, 12, and 16 of the Clayton Act (15 U.S.C. §§15, 22, and 26), and pursuant to 28 U.S.C. §1391(b), (c), and (d), because, at all relevant times, one or more of the Defendants resided, transacted business, was found, is licensed to do business, and/or had agents in this District.

31.     This Court has personal jurisdiction over each Defendant because, among other things, each Defendant: (a) transacted business throughout the United States, including in this District; and/or (b) engaged in an antitrust conspiracy that was directed at and had a direct, foreseeable, and intended effect of causing injury to the business or property of persons residing in, located in, or doing business throughout the United States, including in this District.  Moreover,

certain Defendants leased residential units to individuals throughout the United States, including in this District.

32.     The activities of the Defendants and their co-conspirators, as described herein, were within the flow of, were intended to, and did have direct, substantial, and reasonably foreseeable effects on the interstate commerce of the United States.

33.     No other forum would be more convenient for the parties and witnesses to litigate this case.

## III.    THE PARTIES

34.     Plaintiff Jason Goldman is a resident of Nashville, Tennessee.  Mr. Goldman rented a residential unit in a property known as Lincoya Bay Townhomes in Nashville, Tennessee from April 2021 through the present.  During that time, Defendant Morgan Properties Management Company, LLC ("Morgan") managed the property using Defendant RealPage's RMS and Morgan imposed on Mr. Goldman two rent increases on or around November 15, 2021, and November 15, 2022, representing a 4.6% increase, and a nearly 10% increase, year-over-year.  Consequently, Mr. Goldman paid higher rental prices by reason of the violations alleged herein.

35.     Plaintiff Jeffrey Weaver is a resident and citizen of the State of Colorado. Mr. Weaver rented residential units in properties managed by Lessor Defendants Bell Partners, Inc., and Camden Property Trust using Defendant RealPage's RMS, including Bell Denver Tech Center and Camden Belleview Station, in Denver, Colorado, beginning in 2017 through the date of this filing.  Mr. Weaver has paid higher rental prices by reason of the violations alleged herein.

36.     Plaintiff Billie Jo White is a resident of Peabody, Massachusetts.  She has rented a residential unit in a property known as Highlands at Dearborn in Peabody, Massachusetts from 2016 through the date of this filing.  During that time, Simpson Housing LLLP, along with Defendant Simpson Property Group, LLC, its affiliate, managed this property using Defendant

RealPage's RMS. Consequently, Billie Jo White paid higher rental prices by reason of the violations alleged herein.

37. Plaintiff Nancy Alexander is a citizen and resident of the State of North Carolina. Ms. Alexander rented a multifamily residential unit in a property managed by Lessor Defendant Greystar Management Services, LP ("Greystar") in Asheville, North Carolina, beginning in approximately January 2021 through January 2022. During that time, Defendant Greystar managed this property using Defendant RealPage's RMS. Ms. Alexander has paid higher rental prices directly to a co-conspirator by reason of the violation alleged herein.

38. Plaintiff Brandon Watters is a resident of Antioch, Tennessee. Mr. Watters rented a residential unit in a property known as 2010 West End in Nashville, Tennessee from 2021 through 2022. During that time Defendant Lincoln Property Company and Pegasus Property Management managed the property using RealPage RMS. Consequently, Mr. Watters paid higher rental prices by reason of the violations alleged herein. Additionally, Mr. Watters rented a residential unit in a property known as The Preserve in Brentwood, Tennessee from 2019 through 2021. During that time, Defendant UDR, Inc. managed this property using RealPage RMS.

39. Plaintiffs Priscilla Parker and Patrick Parker are residents of Odessa, Florida. Mrs. and Mr. Parker rented a residential unit in a property known as Lantower Asturia in Odessa, Florida from 2019 through the date of this filing. During that time, Defendant Lantower Luxury Living, LLC managed the property using RealPage RMS for at least portions of the Plaintiffs' tenancy. Consequently, Mrs. and Mr. Parker have paid higher rental prices by reason of the violations alleged herein.

40. Plaintiff Barry Amar-Hoover is a resident of Jacksonville, Florida. Mr. Amar-Hoover rented a residential unit in a property known as the Florida Club at Deerwood in

Jacksonville, Florida from 2018 through the date of this filing. During that time, Defendant ConAm Management Corp. managed the property using RealPage RMS. Consequently, Mr. Amar-Hoover paid higher rental prices by reason of the violations alleged herein.

41. Defendant RealPage is a corporation headquartered in Richardson, Texas, organized and existing under the laws of Delaware. RealPage provides software and services to managers of residential rental apartments, including the RMS described herein. RealPage was a public company from 2010 until December 2020, when it was purchased by Chicago-based private equity firm Thoma Bravo, LP, in a transaction that valued RealPage at approximately $10.2 billion.[36] At that time, RealPage had over 31,700 clients, including each of the 10 largest multifamily property management companies in the United States.[37]

42. Defendants Thoma Bravo Fund XIII, L.P. and Thoma Bravo Fund XIV, L.P. are Delaware limited partnerships (collectively, "Thoma Bravo Funds"). Defendant Thoma Bravo L.P. ("Thoma Bravo") is a Delaware limited partnership. Thoma Bravo is a private equity firm. In its capacity as the investment manager of over $122 billion in assets spread across several investment vehicles, including the Thoma Bravo Funds, Thoma Bravo controls the strategic operation and investment decisions of those funds and the assets they own. In April 2021, Thoma Bravo directed the Thoma Bravo Funds to acquire RealPage in an all-cash go-private transaction. On information and belief, Thoma Bravo was aware of RealPage's anticompetitive activities and acquired RealPage with the intent to maintain and enhance its cartel profits, which RealPage, with Thoma Bravo's active guidance and participation, has done.

---

[36] Press Release, RealPage, Inc., Thoma Bravo Completes Acquisition of RealPage (Apr. 22, 2021), https://www.realpage.com/news/thoma-bravo-completes-acquisition-of-realpage/ (hereinafter, "Merger Closing Press Release").

[37] RealPage Inc., 2020 Annual Report (Form 10-K) at 6 (Mar. 1, 2021), (hereinafter, "RealPage 2020 Form 10-K").

43.     Both RealPage and Thoma Bravo anticipated Thoma Bravo would provide strategic guidance to RealPage post-acquisition.  In the Merger Closing Press Release, Steve Winn, Chairman of the Board and CEO of RealPage, stated that "Thoma Bravo brings significant expertise from its deep experience with software companies, and together we are committed to helping our customers innovate, grow and serve the next generation of multifamily operators and residents."[38]  Thoma Bravo Founder and Managing Partner Orlando Bravo adds: "As a firm, we embrace these fundamental shifts in industries where software driven solutions are making meaningful advancements and we have the expertise and resources to help grow these capabilities at companies like RealPage. We believe our partnership can accelerate RealPage's momentum as it innovates on behalf of its customers."[39]

44.     Plaintiffs are informed and believe that Thoma Bravo has carried through on those stated intentions and is actively involved in the day-to-day operations of RealPage, including selecting and approving acquisition targets for RealPage, setting company policies, and hiring top RealPage executives from other Thoma Bravo companies, including CEO Dana Jones and COO Vinit Doshi, both of whom were recruited from Thoma Bravo subsidiary Sparta Systems.  Thoma Bravo Operating Partner Charles Goodman is Chairman of RealPage's board of directors.[40]

45.     Defendant Apartment Income REIT Corp., d/b/a Air Communities ("AIR"), is a publicly traded real estate investment trust ("REIT") headquartered in Denver, Colorado.

---

[38]     Merger Closing Press Release, *supra* note 36.

[39]     *Id.*

[40]     Press Release, RealPage, Inc., RealPage Appoints Dana Jones as Chief Executive Officer (June 29, 2021), https://www.realpage.com/news/realpage-appoints-dana-jones-as-chief-executive-officer/ (last accessed on July 3, 2023).

Defendant AIR uses RealPage's RMS to manage some or all of its more than 25,000 rental units nationwide.

46.     Defendant Allied Orion Group, LLC ("Allied Orion") is a limited liability company headquartered in Houston, Texas, organized and existing under the laws of Texas. Allied Orion uses RealPage's RMS to manage some or all of its more than 20,000 apartments nationally.

47.     Defendant Apartment Management Consultants, LLC ("AMC") is a Utah limited liability corporation headquartered in Sandy, Utah. AMC is the sixth largest apartment management company in the United States, using RealPage's RMS to manage some or all of its more than 90,000 apartment units across the country.

48.     Defendant Avenue5 Residential, LLC ("Avenue5") is a limited liability company headquartered in Seattle, Washington, organized and existing under the laws of Delaware. Avenue5 uses RealPage's RMS to manage some or all of its over 86,000 rental units.

49.     Defendant Bell Partners, Inc. ("Bell Partners") is a corporation headquartered in Greensboro, North Carolina, organized and existing under the laws of North Carolina. Bell Partners uses RealPage's RMS to manage some or all of its approximately 69,000 apartments nationally.

50.     Defendant BH Management Services, LLC ("BH") is a limited liability company headquartered in Des Moines, Iowa, organized and existing under the laws of Iowa. BH uses RealPage's RMS to manage some or all of its more than 106,000 apartments nationally, including approximately five properties in the Greater Nashville Metro Area.

51.     Defendant Bozzuto Management Company ("Bozzuto") is a corporation headquartered in Greenbelt, Maryland, organized and existing under the laws of Maryland. Bozzuto is the thirteenth largest manager of multifamily rental real estate in the United States with

over 80,000 multifamily units under management in 12 states. Bozzuto uses RealPage's RMS to manage some or all of its over 83,000 units nationwide.

52. Defendant Brookfield Properties Multifamily LLC ("Brookfield") is a Delaware limited liability company headquartered in New York, New York. Brookfield uses RealPage's RMS to manage some or all of its over 27,000 multifamily rental units throughout the United States.

53. Defendant Camden Property Trust ("Camden") is a real estate investment trust headquartered in Houston, Texas, organized and existing under the laws of Texas. Camden uses RealPage's RMS to manage some or all of its over 58,000 rental units, including approximately two properties in the Greater Nashville Metro Area.

54. Defendant CH Real Estate Services, LLC ("Carter-Haston") is Delaware limited liability corporation headquartered in Nashville, Tennessee. It is a privately owned real estate firm involved in real estate investment, property management, and leasing worldwide. Carter-Haston uses RealPage's RMS to manage some or all of its approximately 21,000 multifamily rental units in the United States.

55. Defendant CONAM Management Corporation ("CONAM") is a California corporation headquartered in San Diego, California. CONAM is the one of the largest managers of multifamily rental real estate in the United States, using RealPage's RMS to manage some or all of its more than 51,000 units across the country.

56. Defendant Conti Capital ("Conti") is a real estate investment company headquartered in Dallas, Texas, organized and existing under the laws of Delaware. Conti managed thousands of units in multiple states during the Class Period using RealPage's RMS.

57.     Defendant TF Cornerstone, Inc. ("Cornerstone") is a New York corporation with its principal place of business in New York, New York.  Cornerstone develops and uses RealPage's RMS to manage some or all of its thousands of multifamily rental units nationally.

58.     Defendant Cortland Management, LLC ("Cortland") is a limited liability company headquartered in Atlanta, Georgia, organized and existing under the laws of Georgia.  Cortland uses RealPage's RMS to manage some or all of its more than 58,000 apartments nationally, including approximately three properties in the Greater Nashville Metro Area.

59.     Defendant CWS Apartment Homes LLC ("CWS") is a Delaware limited liability company headquartered in Austin, Texas.  CWS is one of the largest managers of multifamily rental real estate in the United States, using RealPage's RMS to manage some or all of its more than 29,000 units under management across the country.

60.     Defendant Dayrise Residential, LLC ("Dayrise") is a limited liability company headquartered in Houston, Texas, organized and existing under the laws of Texas.  Dayrise uses RealPage's RMS to manage some or all of its 81 properties nationally.

61.     Defendant Equity Residential ("Equity") is a real estate investment trust headquartered in Chicago, Illinois, organized and existing under the laws of Maryland.  Equity uses RealPage's RMS to manage some or all of its more than 80,000 rental units nationally.

62.     Defendant Essex Property Trust, Inc. ("Essex") is a Maryland corporation headquartered in San Mateo, California. Essex is the twenty-fourth largest manager of multifamily rental real estate in the United States, with over 61,00 units under management in California and Washington.  Essex uses RealPage's RMS to manage some or all of its nearly 10,000 apartments nationally.

63. Defendant FPI Management, Inc. ("FPI Management") is a corporation headquartered in Folsom, California, organized and existing under the laws of California. FPI Management uses RealPage's RMS to manage some or all of its more than 140,000 units nationally.

64. Defendant Greystar Management Services, LP ("Greystar") is a limited partnership headquartered in Charleston, South Carolina, organized and existing under the laws of Delaware. Greystar is by far the largest manager of residential rental apartments in the country, using RealPage's RMS to manage some or all of its more than 698,000 units nationally, including approximately 21 properties in the Greater Nashville Metro Area.

65. Defendant Highmark Residential, LLC ("Highmark") is a limited liability company headquartered in Dallas, Texas, organized and existing under the laws of Delaware. Highmark uses RealPage's RMS to manage some or all of its more than 79,000 units nationally, including approximately eight properties in the Greater Nashville Metro Area.

66. Defendant Independence Realty Trust, Inc. ("IRT") is a real estate investment trust headquartered in Philadelphia, Pennsylvania, organized and existing under the laws of Maryland. IRT uses RealPage's RMS to manage some or all of its more than 36,000 rental units, including approximately five properties in the Greater Nashville Metro area.

67. Defendant Kairoi Management, LLC ("Kairoi") is a limited liability company headquartered in Dallas, Texas, organized and existing under the laws of Texas. Kairoi uses RealPage's RMS to manage some or all of its more than 28,000 rental units nationally.

68. Defendant Knightvest Residential ("Knightvest") is a limited liability company headquartered in Dallas, Texas, organized and existing under the laws of Texas. Knightvest uses RealPage's RMS to manage some or all of its more than 30,000 rental units nationally.

28

69. Defendant Lantower Luxury Living, LLC ("Lantower") is a limited liability company headquartered in Dallas, Texas, organized and existing under the laws of Delaware. Lantower uses RealPage's RMS to manage some or all of its more than 3,800 multifamily rental units nationally.

70. Defendant Lincoln Property Company ("Lincoln") is a corporation headquartered in Dallas, Texas, organized and existing under the laws of Texas. Lincoln is a residential uses RealPage's RMS to manage some or all of its more than 210,000 rental units, including approximately 31 properties in the Greater Nashville Metro Area.

71. Defendant Lyon Management Group, Inc. ("Lyon") is a corporation headquartered in Newport Beach, California, organized and existing under the laws of California. Lyon uses RealPage's RMS to manage some or all of its more than 8,000 apartments nationally.

72. Defendant Mid-America Apartment Communities, Inc. ("MAA") is a corporation headquartered in Germantown, Tennessee, organized and existing under the laws of Tennessee. MAA uses RealPage's RMS to manage some or all of its more than 100,000 rental units, including approximately 12 properties in the Greater Nashville Metro Area.

73. Defendant Mission Rock Residential, LLC ("Mission Rock") is a Delaware limited liability company headquartered in Denver, Colorado. Mission Rock is one of the largest managers of multifamily rental real estate in the United States using RealPage's RMS to manage some or all of its more than 29,000 units across the country.

74. Defendant Morgan Properties Management Company, LLC ("Morgan") is a Delaware limited liability company headquartered in King of Prussia, Pennsylvania. Morgan is the eleventh largest property manager of multifamily rental properties in the United States and

uses RealPage's RMS to manage some or all of its more than 96,000 multifamily housing units across 20 states, including five properties in the Greater Nashville Metro area.

75. Defendant Pinnacle Property Management Services, LLC ("Pinnacle") is a Delaware limited liability corporation headquartered in Addison, Texas. Pinnacle uses RealPage's RMS to manage some or all of its approximately 172,000 units nationally, including 10 properties in the Greater Nashville Metro Area.

76. Defendant Prometheus Real Estate Group, Inc. ("Prometheus") is a California corporation headquartered in San Mateo, California. Prometheus is one of the largest managers of multifamily rental real estate in the United States, using RealPage's RMS to manage some or all of its 12,000 multifamily units under management in California, Oregon, and Washington.

77. Defendants The Related Companies L.P. and Related Management Company L.P. (collectively, "Related") are headquartered in New York, New York. Related uses RealPage's RMS to manage some or all of its more than 65,000 rental units nationally.

78. Defendant Rose Associates, Inc. ("Rose Associates") is a New York corporation with its principal place of business in New York, New York. Rose Associates uses RealPage's RMS to manage some or all of its more than 24,000 multifamily rental units nationally.

79. Defendant RPM Living, LLC ("RPM") is a limited liability company headquartered in Austin, Texas, organized and existing under the laws of Texas. RPM uses RealPage's RMS to manage some or all of its more than 112,000 rental units nationally.

80. Defendant Sares Regis Group Commercial, Inc. ("Sares Regis") is a California corporation headquartered in Newport Beach, California. Sares Regis is one of the largest managers of multifamily rental real estate in the United States, using RealPage's RMS to manage some or all of its more than 29,000 units across the country.

81.     Defendant Security Properties Inc. ("Security") is a corporation headquartered in Seattle, Washington organized and existing under the laws of Washington.  Security uses RealPage's RMS to manage some or all of its more than 22,000 rental units nationally, including approximately seven properties in the Greater Nashville Metro Area.

82.     Defendant Sherman Associates, Inc. ("Sherman") is a corporation headquartered in Minneapolis, Minnesota organized and existing under the laws of Minnesota. Sherman uses RealPage's RMS to manage some or all of its more than 7,000 apartments nationally.

83.     Defendant Simpson Property Group, LLC ("Simpson") is a limited partnership headquartered in Denver, Colorado, formed under the laws of Delaware.  Simpson, alongside its affiliate, Simpson Housing LLLP,[41] uses RealPage's RMS to manage some or all of its approximately 100 multi-unit residential rental properties nationally, including approximately four properties in the Greater Nashville Metro Area.

84.     Defendant Thrive Communities Management, LLC ("Thrive") is a Washington Limited Liability Company headquartered in Seattle, Washington.  Thrive has over 18,000 units under management in the greater Pacific Northwest.  Thrive uses RealPage's RMS to manage some or all of its 122 properties nationwide.

---

[41]     Simpson markets Simpson Property Group, LLC and Simpson Housing, LLP, as a joint enterprise, offering a "fully integrated real estate firm providing services in commercial and multifamily property management, development and construction." See *e.g.* *https://www.simpsonpropertygroup.com/about* ("Simpson Housing [LLLP] and Simpson Property Group, LLC was established for the purpose of building and operating high-quality residential communities in the Southwest. The Company has since become one of the largest privately-held residential developers and managers in the nation, we operate throughout the United States and continue to expand.").

85.     Defendant Trammell Crow Company, LLC ("Trammell Crow") is a Delaware limited liability corporation headquartered in Dallas, Texas. Trammell Crow owned thousands of properties nationwide during the Class Period that were managed using RealPage's RMS.

86.     Defendant B/T Washington, LLC d/b/a Blanton Turner ("Turner") is a Washington limited liability company headquartered in Seattle, Washington.  Turner uses RealPage's RMS to manage some or all of its more than 5,300 rental units nationwide.

87.     Defendant UDR, Inc. ("UDR") is a corporation headquartered in Highlands Ranch, Colorado, organized and existing under the laws of Maryland.  UDR uses RealPage's RMS to manage some or all of its more than 56,000 rental units nationally, including approximately eight properties in the Greater Nashville Metro Area.

88.     Defendant Windsor Property Management Company ("Windsor") is a Delaware corporation headquartered in Boston, Massachusetts.  Windsor uses RealPage's RMS to manage some or all of its more than 86,000 apartments nationally.

89.     Defendant WinnCompanies LLC and WinnResidential Manager Corp. (collectively "Winn") are a family of companies headquartered in Boston, Massachusetts, organized and existing under the laws of Massachusetts.  Winn uses RealPage's RMS to manage some or all of its more than 103,000 rental units nationally.

90.     Defendant ZRS Management, LLC ("ZRS") is a Florida limited liability company headquartered in Orlando, Florida.  ZRS is the one of the largest managers of multifamily rental real estate in the United States, using RealPage's RMS to manage some or all of its over 60,000 units across the country.

91.     Various other persons, firms, and corporations not named as defendants have participated as co-conspirators with Defendants and have performed acts and made statements in

furtherance of the conspiracy. The Defendants are jointly and severally liable for the acts of their co-conspirators whether or not named as defendants in this Complaint.

92.     Whenever reference is made to any act of any corporation, the allegation means that the corporation engaged in the act by or through its officers, directors, agents, employees, or representatives while they were actively engaged in the management, direction, control, or transaction of the corporation's business or affairs. Each of the Defendants named herein acted as the agent of, or for, the other Defendants with respect to the acts, violations, and common course of conduct alleged herein.

93.     Defendants are also liable for acts done in furtherance of the alleged conspiracy by companies they acquired through mergers and acquisitions.

## IV.    FACTUAL ALLEGATIONS

### A.    Historical Competition Among Residential Property Managers

94.     Before the widespread adoption of RealPage's RMS, competition in the multifamily rental housing market was driven by property managers' desire to keep "heads in beds" – in other words, maintain the highest possible occupancy levels and keep turnover among tenants to a minimum.[42] Property managers' adherence to the "heads in beds" strategy signaled the market was operating competitively.

95.     That "heads in beds" is the prevailing competitive response is easy to intuit. Not only do vacant apartments lead to lost rental income, but it also saves the property manager almost no marginal cost because the costs of owning and maintaining a rental apartment are not significantly different whether the unit is occupied or not. This provides a strong incentive for property managers to lower their rents to fill vacant units. While property managers knew in theory

---

[42]     Vogell, *supra*, note 1.

that if they all resisted this temptation, they would all benefit from higher average rents, any individual property manager that lowered its rents to fill vacancies while the others did not would be able to gain market share at the others' expense and achieve lower vacancy rates, higher revenues, and higher profits.

96.     As Donald Davidoff, the principal developer of the competing price-setting software that Defendant RealPage acquired in 2017, LRO, explained in a 2020 blog post:

> All [property managers] would be better off limiting their rent reductions; however, should one property manager lower their rents while the others don't, then that operator would outperform.  The result can be a race to the bottom that is not good for anyone, but the fear of missing out coupled with laws prohibiting collusion make this the most likely outcome.[43]

Mr. Davidoff described this paradigm as a "classic prisoners' dilemma."  This so-called "race to the bottom" might be bad for all property managers but is, of course, good for renters and is what the law demands.  It represents healthy price competition.

97.     Absent collusion, property managers could not unilaterally raise rents above market rates – any property manager that did so would lose tenants to its competitors who offered rental units at market rates, earning those competitors a higher share of the available profits.  This dynamic causes rental prices in a competitive marketplace to be sensitive to changes in demand.  For example, rents have historically gone up quickly in neighborhoods that become trendy or where new public transportation infrastructure is added and have fallen in areas where businesses close or which new generations find less desirable than previous ones did.  Any number of factors that made people want to live in a certain area or a certain type of apartment could cause rents to

---

[43]     Donald Davidoff, *They're Heckling Revenue Management Again*, THE DEMAND SOLUTIONS BLOG (Aug. 18, 2020), https://www.d2demand.com/mfhblog/theyre-heckling-revenue-management-again.

rise or fall accordingly. Rents were also historically responsive to changes in renters' average income.

98. As described more fully below, Defendants' conspiracy avoids the competition-driven race to the bottom. As Donald Davidoff explained, "[n]ow, rent growth and occupancy are co-equals."[44] David Romano, the vice president of pricing and revenue management at Defendant Equity, one of the largest publicly traded apartment owners in the United States, is quoted in a New York Times article dated November 29, 2011, as saying, "[w]e don't have occupancy targets per se. We let the system determine at what rate revenue is maximized at a given occupancy level."[45]

99. The "system" does so, however, at the financial expense of renters – Plaintiffs and the Class. With competition between property managers reduced or eliminated, renters are forced to spend higher and higher portions of their incomes on housing.

**B.     Evolution of RealPage's Revenue Management Solutions**

100. Defendant RealPage provides a "comprehensive platform of data analytics and on demand software solutions and services for the rental real estate industry."[46] Its clients are managers of residential rental apartments, to which it offers an array of products for: (1) marketing and leasing of apartments; (2) resident experience (including IT portals and rent payment software); (3) site management; (4) vendor and expense management; (5) budgeting and

---

[44]     Joe Bousquin, *In the Back Office, Revenue Management Software is Causing a Revolution*, MULTIFAMILY EXEC. (Apr. 20, 2009), https://www.multifamilyexecutive.com/technology/in-the-back-office-revenue-management-software-is-causing-a-revolution_o.

[45]     Matt Hudgins, *When Apartment Rents Climb, Landlords Can Say 'The Computer Did It*,' N.Y.          TIMES          (Nov.          29,          2011), https://www.nytimes.com/2011/11/30/realestate/commercial/landlords-use-computers-to-arrive-at-the-right-rental-fee.html.

[46]     RealPage 2020 Form 10-K, *supra*, note 37, at 6.

investment; (6) accounting; (7) data analytics; and (8) so-called "revenue management" – advisory services on how to obtain higher rents on every unit. While other products facilitate gathering Lessor Defendants' confidential competitive information, RealPage's RMS services are the linchpin of Defendants' anticompetitive scheme.

101.   RealPage was founded in 1998. In 2002, it acquired revenue management software, YieldStar, from Defendant Camden.[47] Two years later in 2004, the company hired Jeffrey Roper as its principal scientist to improve RealPage revenue management software performance and grow its client base.[48] Roper saw that RealPage's customers could use that software to drive higher average rents, but in order to do so, RealPage needed huge amounts of detailed data regarding rent prices and occupancy of individual units across many properties.[49] RealPage began collating data from its clients and other sources in a "data warehouse," for the algorithms that now power Defendant RealPage's RMS to train on. Beyond rent prices and occupancy rates, RealPage collects records of actual lease transactions, signed lease documents, lease renewal dates, records of rent payments, and detailed data on tenants and their finances.

102.   RealPage's increased access to data, coupled with advances in machine learning and artificial intelligence technology used to synthesize and analyze large pools of data, led Roper to design a pricing and lease term algorithm for the multifamily rental industry. This algorithm built upon the price-setting software that Roper designed for Alaska Airlines, who was accused by

---

[47]   Press Release, RealPage, Inc., RealPage Acquires YieldStar Multifamily Revenue Management System (July 19, 2002), https://www.realpage.com/news/realpage-acquires-yieldstar-multifamily-revenue-management-system/.

[48]   *See* Vogell, *supra*, note 1.

[49]   *See id*.

the DOJ of illegally facilitating information exchange and price-fixing between 1988-1992.[50] Indeed, RealPage is unreserved about the origins of its RMS, acknowledging on its website that "[t]he technology is similar to revenue management approaches that were originally adopted by the airline industry . . ."[51] During Roper's tenure as director of revenue management at Alaska Airlines – 1986-1991 – Alaska Airlines and its competitor airlines began using common software, designed by Roper, to exchange information regarding planned routes and ticket prices before that information became public.[52] Roper's software allowed the airlines using it to avoid price competition that would have lowered ticket prices. The DOJ's Antitrust Division filed suit against eight of the largest U.S. airlines, alleging that Roper's software-enabled information exchange amounted to anticompetitive price fixing under the antitrust laws.[53] A government economist calculated that the scheme cost consumers up to $1.9 billion.[54] All eight airlines eventually entered into consent decrees requiring them to eliminate the information exchange features of the software that had enabled the conspiracy.[55] Roper – who had his computer and documents seized by federal agents – relayed about that experience, "We all got called up before the Department of Justice in the early 1980s because we were colluding." He adds that at the time, "we had no idea" that conduct was unlawful. Having now brought analogous coordinated algorithmic pricing to

---

[50]   Press Release, U.S. Dep't of Just., Justice Department Settles Airlines Price Fixing Suit, May Save Consumers Hundreds of Millions of Dollars (Mar. 17, 1994), https://www.justice.gov/archive/atr/public/press_releases/1994/211786.htm. (hereinafter, "DOJ Press Release, Mar. 17, 1994").

[51]   RealPage Revenue Management FAQs, *supra*, note 6.

[52]   Vogell, *supra* note 1.

[53]   Press Release, U.S. Dep't of Just., Justice Department Files Price Fixing Suit Against Eight Airlines and Fare Dissemination System (Dec. 21, 1992), https://www.justice.gov/archive/atr/public/press_releases/1992/211323.htm.

[54]   DOJ Press Release, Mar. 17, 1994, *supra*, note 51.

[55]   *Id.*

multifamily residential real estate leasing after the DOJ's airline settlements, however, Roper can no longer claim ignorance of the unlawful nature of this conduct.[56]

103.     Much like the airlines' price-fixing cartel, Defendants' cartel eliminates price competition and the "race to the bottom" during periods of oversupply.  As Defendant RealPage declared to potential clients in its 2020 advertising materials: "You don't have to sacrifice rent growth during a softening market."[57]

104.     Defendants' efforts to raise rents in concert through RealPage's RMS became more effective as RealPage continued to acquire competing revenue management products and additional property managers implemented it, and the algorithm was able to take information from more market participants into account.  Beginning no later than early 2016, as the RealPage pricing platform became more sophisticated and gained user confidence and additional data inputs, it was used less as an advisory product and more as a rent-setting software.

105.     Defendant RealPage became the primary price-setting vendor to the multifamily housing rental software market through acquisitions of its competitors.  RealPage began buying up similar and competing software companies, and it has completed 26 acquisitions since its founding.[58]  Indeed, one former RealPage Strategic Account Analyst ("Witness 9") recalled that during her tenure, it seemed like RealPage was "acquiring businesses on a bi-weekly basis," intent on becoming "the largest multifamily real estate software provider in the world."[59]  According to

---

[56]     Vogell, *supra* note 1.

[57]     Revenue Management: Proven in Any Market Cycle, s*upra*, note 28.

[58]     Bloomberg Company Report, RealPage, Inc. (generated Nov. 1, 2022).

[59]     From 2020 through 2022, Witness 9's responsibilities included reaching out to current and former RealPage clients to identify other needs that could be satisfied with one of RealPage's more than 100 and growing, software offerings.  Given her role at RealPage, Witness 9 was required to remain apprised of all RealPage offerings, which were ever-changing as the result of its ongoing acquisitions.

its 2021 S-1 filing with the Securities and Exchange Commission ("SEC"), RealPage acknowledged "As part of our strategy, we plan to continue to pursue acquisitions of complementary businesses, products, and technologies."[60]

106.   The most important of these transactions came in 2017, when RealPage acquired LRO, RealPage's strongest rival. The acquisition included LRO's revenue-management software, which at the time of acquisition, provided revenue management services for over 1.5 million apartments throughout the country.[61]  RealPage merged LRO into its existing RMS, announcing that "[a]s revenue management becomes more broadly accepted, we expect [LRO and RealPage's] combined platform to drive accelerated, sustained revenue growth in our Asset Optimization[62] product family over the long run."[63] LRO's software was not the most valuable piece of the acquisition for Defendant RealPage, however – LRO's customer base was.  At the time of the merger, RealPage was pricing 1.5 million units.  That number doubled with the acquisition.[64] RealPage announced that "the acquisition of LRO will extend our revenue management footprint, augment our repository of real-time lease transaction data, and increase our data science talent and capabilities.  We expect the acquisition of LRO to increase the market penetration of our YieldStar Revenue Management solution and drive revenue growth in our other asset optimization

---

[60]     RealPage 2020 Form 10-K, *supra*, note 37.

[61]     Mary Salmonsen, "RealPage Agrees to Acquire LRO Revenue Management Services, *Multifamily Executives* (Feb. 28, 2017), https://www.multifamilyexecutive.com/business-finance/transactions/realpage-agrees-to-acquire-lro-revenue-management-services_o.

[62]     RealPage's Asset Optimization product suite includes among other things, its revenue management software, business intelligence and benchmarking software, and market analytics tools.  *See Asset Optimization Solutions*, RealPage, Inc., https://www.realpage.com/asset-optimization/ (last accessed June 15, 2023).

[63]     Press Release, RealPage, Inc., RealPage to Acquire Lease Rent Options, LRO, (Feb. 27, 2017), https://www.realpage.com/news/realpage-to-acquire-lease-rent-options/.

[64]     Vogell, *supra*, note 1.

solutions."[65] The reference to "augment[ing]" RealPage's "repository of real-time lease transaction" made it clear that RealPage intended to comingle the data pools on which Yieldstar and LRO previously trained their pricing algorithms, expanding the volume of commercially sensitive data that Yieldstar and LRO users were receiving and providing to their competitors to permit RealPage make pricing decisions on their behalf.

107. While the DOJ issued a "Second Request" in connection with the proposed merger due to its potential effects on competition, the DOJ took no further action, and RealPage completed the acquisition.[66] Even Jeffrey Roper, RealPage's principal data scientist exclaimed, "I was surprised the DOJ let that go through." [67] After its acquisition of LRO, RealPage effectively had a monopoly, such that RealPage's RMS would influence rental prices over the entire market.

108. Certain market participants evidently knew that using LRO, particularly after its acquisition by RealPage, could lead to information sharing and price setting that posed grave antitrust concerns. In March of 2017, AvalonBay Communities Inc. ("AvalonBay"), one of the country's largest lessors, entered into a contract with Rainmaker (predecessor to Defendant RealPage) for the use of LRO. A month after RealPage's acquisition was announced on February 27, 2017, AvalonBay insisted on a contractual provision in its March 27, 2017 LRO Master Services Agreement ("LRO MSA") that prohibited Rainmaker (and later, RealPage)[68] from: (1) utilizing any data in the LRO solution provided to AvalonBay other than AvalonBay's own data

---

[65]     RealPage 10Q, March 31, 2017, at 11.

[66]     Vogell, *supra*, note 1.

[67]     *Id.*

[68]     RealPage signed an amendment to the LRO MSA in 2022, which kept in place the Input Representation and Data Entry Representation, and labelled RealPage "The Rainmaker Group Real Estate, LLC['s]" "successor in interest".

and publicly available data; and (2) utilizing AvalonBay's data or disclosing the LRO recommendations made to AvalonBay to any other Rainmaker (later, RealPage) client:

> 4.5  With respect to the LRO® Revenue Management Solutions, **Rainmaker** shall be responsible for the following:
>
> - In no event will Rainmaker utilize any data other than data provided by Customer expressly for such purpose or data obtained through publicly available sources or such other sources as identified in the applicable Module which Customer has opted to purchase in writing in the Rainmaker System licensed to Customer without the prior express written consent of Customer (the "Data Entry Representation").
>
> - In no event will Rainmaker utilize in the Rainmaker System licensed to anyone other than Customer any Customer Data that is not obtained through other sources or otherwise developed independently by Rainmaker without use of the Customer Data provided by Customer to Rainmaker. Furthermore, Rainmaker will not provide any recommendations as to rent provided to Customer for

---
6
---

> Customer's Managed Properties through the Rainmaker System to any other parties (the "Input Representation")

109.    AvalonBay was apparently so concerned by the possibility that Rainmaker and RealPage's RMS might use AvalonBay's data to set competitors' prices and/or use those competitors' prices to set AvalonBay's prices – notwithstanding that Clause 4.5 prohibits them from doing so – that AvalonBay insisted on even further protection.  It required clauses that require Rainmaker and RealPage to expressly "represent and warrant that [they] will not violate the Input Representation or the Data Entry Representation," Clause 8.1.6, and "indemnify, defend and hold harmless [AvalonBay] from and against any and all claims, costs, expenses, losses, damages and liabilities (including legal costs and reasonable attorney's fees) incurred by [AvalonBay] in the event that" Rainmaker and RealPage breach these terms. Clause 8.1.1.  The indemnification requirement is repeated again in Clause 9.2: "Rainmaker shall defend, indemnify and hold

harmless [AvalonBay and its employees] from any claims, damages and liabilities arising out of (i) any violation of the Input Representation or the Data Entry Representation…".

110.    Although the integration of LRO and YieldStar is understood to have begun shortly after LRO's acquisition closed at the beginning of January 2018,[69] in 2020, RealPage announced a new Revenue Management Solution: AI Revenue Management, or AIRM, which it touted as a combination of its legacy revenue management platforms and a "super-charged price optimization and revenue management tool."[70] "Following decades of proven performance with our YieldStar and LRO solutions, we've supercharged the next generation of price optimization.  Bringing components of both systems together to provide even more pricing precision and extending optimization to amenities, to identify hidden yield within each unit."[71]  "AI Revenue Management is a game-changing innovation in price optimization that maximizes asset value.  By combining the best of YieldStar and LRO with improved algorithms, precision AI forecasting and optimized amenity pricing, it can help you realize a 400% year-one ROI [return on investment], achieve up to 200 basis points (bps) and outperform the market by 2%-7% year over year."[72]  Built upon the

---

[69]    Mary Salmonsen, *RealPage Closes on Lease Rent Options Acquisition*, MULTIFAMILY EXEC. (Jan. 3, 2018), https://www.multifamilyexecutive.com/business-finance/realpage-closes-on-lease-rent-options-acquisition/ (last visited on July 3. 2023) ("Integration is expected to be completed in 2018.").

[70]    Guy Leman, *Don't Miss This! Unveiling of "AIRM" AI Revenue Management at RealWorld*, REALPAGE BLOG (Sept. 8, 2020), https://www.realpage.com/blog/dont-miss-this-unveiling-of-airm-ai-revenue-management-at-realworld/ (last visited on June 30, 2023).

[71]    *Id.*

[72]    The RealPage e-book, Introducing AI Revenue Management: Next-Generation Price Optimization That Unlocks Hidden Yield, REALPAGE, INC. (2020) (hereinafter, "Introducing AI Revenue Management e-book").

bedrock of its legacy products, LRO and YieldStar, "[t]he backbone of AIRM is historical data collected from six million lease transactions across the U.S. over the last five years."[73]

111.    While it remains unclear whether RealPage offers new subscriptions to its legacy revenue management products – YieldStar and LRO – these products, or some iteration thereof, remain within its RMS portfolio and RealPage continues to license these solutions to some RealPage customers, including various Defendants in this action.

112.    While certain Defendants may use one RealPage revenue management software over the other, RealPage's RMS are integrated on the RealPage side at the software and data levels. Indeed, the Terms of Service governing RealPage's post-acquisition licensing of LRO confirms that when a LRO customer inputs data into the RealPage system, that data is not treated as confidential if "transformed or aggregated" at RealPage's discretion, and not specifically identifiable to the customer.[74]   Moreover, while RealPage continues to license LRO in some fashion, the LRO program available post-RealPage acquisition "include[es] Enhancements provided by RealPage" and allows RealPage to make "ongoing modifications."[75]   Additionally, the Terms of Service provide that "RealPage will assume or otherwise facilitate the role of Pricing Revenue Manager" for LRO customers.[76]

113.    RealPage's control over multifamily rental prices continued to grow after its acquisition of LRO.  By the end of 2022, RealPage claimed that its its RMS set the price for more

---

[73]    Wendy Broffman, *Same Assets. Better Performance*, Yield Pro (Oct. 16, 2022), https://yieldpro.com/

[74]    Terms of Service for Rainmaker System Modules (Dec. 7, 2017), https://www.realpage.com/rainmakermfh-terms/

[75]    *Id*.

[76]    Notably, numerous individuals who currently hold the title of Revenue Manager or Pricing Advisor at RealPage, simultaneously hold the position of "LRO Advisor."

than four million rental units.[77]  These four million units, however, provide only a portion of the data available to train Defendant RealPage's algorithm.  RealPage is also able to mine data from property managers that rely on RealPage software other than its RMS.  According to RealPage's last annual report before being acquired by Thoma Bravo, as of December 31, 2020, its "client base of over 31,700 clients used one or more of [its] integrated data analytics or on demand software solutions to help manage the operations of approximately 19.7 million rental real estate units."[78]

114.   RealPage's vast client base provides it with real-time data on every aspect of the rental housing market, including actual rent prices as opposed to advertised rents – data which was previously unavailable to landlords.  With this data, Defendant RealPage is able to calculate and disseminate supracompetitive unit-by-unit pricing on a daily basis for use by the Lessor Defendants, touting that its algorithm "crunches ***millions of transactions each night***, pinpointing price shifts for ***every single unit*** on the platform at any point in time."[79]

115.   Figure 5, below, is a diagram from an eBook published by Defendant RealPage on its website.[80]  It demonstrates how RealPage aggregates the data (including nonpublic lease transaction data) that enables RealPage to coordinate pricing among its clients.

---

[77]   *RealPage AI Revenue Management*, REALPAGE, INC., https://www.realpage.com/asset-optimization/revenue-management/(last accessed June 14, 2023).

[78]   *See* RealPage 2020 Form 10-K, *supra*, note 37.

[79]   *YieldStar Calculates the Right Rent Price at the Right Time*, REALPAGE VIDEOS, https://www.realpage.com/videos/yieldstar-measures-price-elasticity/ (last accessed June 14, 2023) (emphasis added).

[80]   *3 Ways to Leverage AI for Maximum NOI 8* (2022), https://www.realpage.com /ebooks/leverage-ai-maximum-noi/ (last accessed June 14, 2023).

44

**Figure 5: Excerpt from RealPage e-Book "3 Ways to Leverage AI for Maximum NOI"**

How Quality Data Is Processed to Produce Powerful AI



### C. Property Management Companies Effectively Outsourced Pricing and Supply Decisions to RealPage, Eliminating Competition

116. RealPage clients, including the Lessor Defendants, provide RealPage with detailed, real-time, and non-public information concerning pricing, inventory, occupancy rates, as well as their units and unit types available, or that will soon be available for rent. The Lessor Defendants share this proprietary data knowing that RealPage will use it to assist them and their competitors, including through price and lease term recommendations. Lessor Defendants also share this proprietary data with Defendant RealPage so that they can benefit from the proprietary data that their competitors are likewise providing to RealPage.

117. The U.S. Department of Justice has stated that the exchange of the kind of information the Lessor Defendants agree to exchange with their direct competitors raises serious antitrust concerns:

> . . . the sharing of information related to a market in which . . . the participants are actual or potential competitors may increase the likelihood of collusion on matters such as price, output, or other competitively sensitive variables. The competitive concern depends on the nature of the information shared. Other things being equal, the sharing of information relating to price, output, costs, or strategic planning is

more likely to raise competitive concern than the sharing of information relating to less competitively sensitive information.[81]

118.    In 2017, then Chairman of the Federal Trade Commission, Maureen Ohlhausen similarly explained how multiple firms outsourcing pricing decisions to a single third-party actor – just as the Lessor Defendants have done with RealPage – raise serious antitrust concerns:

> What if algorithms are not used in such a clearly illegal way, but instead effectively become a clearing house for confidential pricing information? Imagine a group of competitors sub-contracting their pricing decisions to a common, outside agent that provides algorithmic pricing services. Each firm communicates its pricing strategy to the vendor, and the vendor then programs its algorithm to reflect the firm's pricing strategy. But because the same outside vendor now has confidential price strategy information from multiple competitors, it can program its algorithm to maximize industry-wide pricing. In effect, the firms themselves don't directly share their pricing strategies, but that information still ends up in common hands, and that shared information is then used to maximize market-wide prices. Again, this is fairly familiar territory for antitrust lawyers, and we even have an old fashioned term for it, the hub-and-spoke conspiracy. Just as the antitrust laws do not allow competitors to exchange competitively sensitive information directly in an effort to stabilize or control industry pricing, they also prohibit using an intermediary to facilitate the exchange of confidential business information. Let's just change the terms of the hypothetical slightly to understand why. Everywhere the word "algorithm" appears, please just insert the words "a guy named Bob". ***Is it ok for a guy named Bob to collect confidential price strategy information from all the participants in a market, and then tell everybody how they should price? If it isn't ok for a guy named Bob to do it, then it probably isn't ok for an algorithm to do it either.***[82]

119.    Not content to merely facilitate this anticompetitive information exchange, RealPage prices each client's multifamily rental "properties as though we [RealPage] own them

---

[81]    US DOJ and FTC, Antitrust Guidelines for Collaboration Among Competitors (April 2000) at 15, https://www.ftc.gov/sites/default/files/documents/public_events/joint-venture-hearings-antitrust-guidelines-collaboration-among-competitors-2.pdf.

[82]    Maureen K. Ohlhausen, Should We Fear The Things That Go Beep In the Night? Some Initial Thoughts on the Intersection of Antitrust law and Algorithmic Pricing, FED. TRADE COMM'N (May 23, 2017), https://www.ftc.gov/system/files/documents/public_statements/1220893/ohlhausen_-_concurrences_5-23-17.pdf (last visited on July 3, 2023) (emphasis added).

ourselves,"[83] with the benefit of RealPage's access to each competitor's past, current, and future pricing, and leasing decisions. RealPage then pressures and actively assists its clients to "outsource [their] daily pricing and ongoing revenue oversight" to RealPage.[84]

120. Following RealPage's entry into the market, the Lessor Defendants all concertedly shifted from prioritizing occupancy (*i.e.*, market share) over price, to prioritizing price over occupancy – a telltale sign of anticompetitive coordination.

121. By enabling property managers to outsource lease pricing decisions to RealPage's RMS, Defendant RealPage has corrupted rental markets, replacing independent centers of decision making with a single effective decisionmaker – RealPage. Indeed, Witness 9 explained that RealPage's RMS were pitched to clients as a learning system that would analyze comparable properties and set prices that multifamily real estate owners and operators "wouldn't have to mess with." Moreover, Witness 9 explained that RealPage's RMS were pitched as saving owners and operators of multifamily residential rental properties the time from "having to do their own research." A former industry executive closely involved in the development of LRO (Witness 7) explained that, in conjunction with Pricing Advisors, the vast amount of data RealPage holds allows its RMS to act as "a deterministic tool" wherein "if you put in the same values you get the same results" across Lessors.

122. A former Leasing Consultant and Assistant Property Manager for two properties managed by Defendant Lincoln in the Greater Nashville Metro Area (Witness 4)[85] explained that

---

[83]     RealPage Renewal Reporting Presentation, *supra*, note 4.

[84]     Press Release, RealPage, Inc., YieldStar Offers Revenue Management Advisory Services to Multifamily Owners and Managers, *supra*, note 3.

[85]     From 2017 through 2018, Witness 4 worked as a Leasing Consultant at a property located in the Greater Nashville Metro Area and managed by Defendant Lincoln. Subsequently, from 2019 until 2020, Witness 4 worked as an Assistant Property Manager at another property in the

rental rates in Lincoln's new leases were auto-populated by RealPage's pricing platform. Witness 4 indicated that renewal rates were also generated by RealPage and subject to a 3%-5% increase, despite the fact that at times, vacant units in the property were rented for less than renewal units subject to RealPage's imposed price increase.

123.    As Defendant Camden's Regional Manager Bill Ramsey explained, "[w]e trust the system . . . [w]e don't have to sit and look at all the comps and decide, 'what is the [unit] going to lease for today?' That is all history now."[86]

124.    Where lease prices were formerly set to maximize occupancy rates, RealPage's RMS have one goal: increasing overall revenue by raising prices on individual rental units. David Hannan, senior vice president at Defendant Morgan., a Houston-based property manager that saw its revenues grow by 5% above expectations when it implemented AI Revenue Management, characterized the transformation like this: "My generation grew up worshipping the occupancy gods. We learned that if you were not 95 percent-plus occupied, the asset was failing. But that's not necessarily true anymore . . . [RealPage] totally turns the industry upside down."[87] RealPage characterizes this transformation as a shift from an "occupancy focus" to "rent growth" focus.[88] This is a central mantra of RealPage, to sacrifice "physical" occupancy (*i.e.*, to decrease output) in exchange for "economic" occupancy, a manufactured term RealPage uses to refer to increasing prices and decreasing physical occupancy levels (output) in the market.

---

Greater Nashville Metro Area managed by Defendant Lincoln. In both these roles, Witness 4 checked RealPage's pricing recommendations daily. However, he was unable to change or offer different pricing terms than that provided by RealPage.

[86]    Rachel Azoff, *New Dynamic*, MULTIFAMILY EXEC. (Oct. 17, 2005), https://www.multifamilyexecutive.com/property-management/new-dynamic_o. (last visited on July 3, 2023).

[87]    Bousquin, *supra*, note 44.

[88]    Vogell, *supra*, note 1.

125.     A former RealPage Pricing Advisor (Witness 5)[89] disclosed that in addition to daily pricing recommendations, RealPage provides its clients, including the Lessor Defendants, with a wealth of information during one-on-one, quarterly "Performance to Market" meetings ("PTMs").

126.     Witness 5 stated that the PTMs were attended by high-ranking executives from the client and RealPage's then Director of YieldStar Revenue Management, Jonathan Olson, the client's assigned Pricing Advisors, and at least one member from RealPage's Analyst group.

127.     The purpose of these meetings, per Witness 5, is to provide clients with information regarding overall market performance within the applicable region, as well as a client-specific performance review.

128.     Witness 5, along with other Pricing Advisors and their respective supervisors and analysts, spent weeks reviewing client and market data to prepare compelling charts to be presented at these PTMs.

129.     Revenue growth is strongly emphasized to property managers during these meetings, according to Witness 5, and consistent with RealPage's push to ensure property managers accept its price and term recommendations at least 80% of the time.

---

[89]     During her tenure as a Pricing Advisor, Witness 5 worked closely with RealPage clients that utilized its pricing platform.  Witness 5 interfaced with property management companies daily to provide training and guidance on RealPage's Revenue Management Solutions and to discuss specific aspects of the system and its processes.  Witness 5 stressed that it was incumbent on her and other Pricing Advisors to train and remind clients to enter all required leasing information into the revenue management system daily.  While a typical RealPage Pricing Advisor was expected to maintain a portfolio between 60 and 65 properties, Witness 5 was responsible for overseeing 90 properties that used RealPage software and her primary contacts at the property management companies included on-site managers, Regional Managers, as well as Vice Presidents and Asset Managers.  Witness 5, along with other Pricing Advisors, also interfaced quarterly with senior ranking executives from the property management companies they were responsible for.

130. Witness 5 explained that the need to accept price and occupancy recommendations was RealPage's constant focus. RealPage continually reiterated to its clients that "you can run a property with fewer people living there, and still meet or exceed what you've made in the past."

131. As part of RealPage's ongoing "education" and "training" of its property management clients, RealPage's Pricing Advisors frequently explained that any losses incurred due to units remaining vacant are recaptured through higher rental prices when a lease is executed. Witness 5 explained that every day a unit sits vacant, that vacancy "loss" is "built into" RealPage's daily pricing recommendation in that market.

132. Put another way, by outsourcing their pricing decisions to RealPage, each Lessor Defendant knows that the impact of the ever-rising prices set by RealPage's algorithm will outpace their vacancy losses. In the absence of coordinated behavior, this price-over-volume strategy is economically irrational behavior, particularly for a perishable resource like multifamily rentals (if a unit sits vacant for a month, that Lessor Defendant(s) can never monetize that lost month of rent). This irrational behavior was only accomplishable because RealPage allowed Lessors to avoid the prisoner's dilemma that would, absent collusion, dictate that Lessors keep "heads in the beds."

133. During PTMs, RealPage also shares market intelligence with its clients. Witness 5 explained that RealPage obtained intelligence from two sources. The first of these is "survey data" which is collected through in-person or telephone interviews and obtained by RealPage through third-party vendors such as CoStar.[90] The second source is what RealPage refers to as "transactional data," by which RealPage means the actual lease terms, rental prices, vacancy rates,

---

[90] CoStar is the self-described, "industry leader in commercial real estate information, analytics, and news [ ] provid[ing] clients with the data and tools they need to make smart decisions and stay ahead of competition," including in the multifamily rental housing market. *About CoStar*, COSTAR, https://www.costar.com/about (last accessed July 3, 2023).

and other data points that it requires its clients using its RMS, as well as other RealPage software to provide. Witness 5 explains that "survey data" and "transactional data" are "blended" into a comprehensive data set used during PTM meetings to compare the region's market performance with clients' performance.[91] Despite the "blended" nature of this data set, Witness 5 explained that RealPage representatives regularly advise and emphasize to clients at PTM meetings that the data presented contains ample and granular transactional data, pooled from the client's direct competitors in the region.

134. Witness 5 reports that this was often done in instances when a client would bring their own dataset (largely based on survey data) to PTMs to assess whether RealPage's data varied. When it did, RealPage representatives were quick to qualify its own data as more reliable than any data pulled by a property management company independently, as RealPage's data contained actual transactional data from across the market and the client's key competitors, Witness 5 clarified that "any time we use the term 'transactional data' we make clear to the client that [this] is RealPage user's data."

135. Witness 5 stated that during weekly Revenue Management team conference calls and annual team summits, RealPage Vice President and Industry Principal, Andrew Bowen[92] often

---

[91]    Similarly, to track its legacy LRO users' performance post-acquisition, RealPage provided users with certain historic reports "determined by RealPage in its sole discretion," including "aggregate[d] historical reports that include data regarding [at least 5] third party comparable properties (as determined by RealPage)," and identified the market or submarkets for which the reports were developed. (Terms of Service, *supra* note 74). Additionally, RealPage notified its LRO users that the data they input into the RealPage host system "in a method and format prescribed by RealPage," did ***not*** qualify as "confidential information or trade secrets" per the Terms of Service, "if transformed or aggregated" by RealPage, and not identifiable to the LRO customer. *Id.*

[92]    At the time, Witness 5 worked as a Pricing Advisor, Andrew Bowen served as RealPage's "Industry Principal – Asset Optimization," a role Bowen held from October 2010 through February 2022, in which his "expertise center[ed] around [RealPage's] Investment Analytics, Performance Analytics, Business Intelligence and Revenue Management solutions, and how [RealPage's]

51

shared his "talking points" that contained information he intended to convey to RealPage clients during meetings with their executives. Bowen's "talking points" typically emphasized how RealPage's transactional data was a significant differentiator in the industry and impressed "the importance of explaining to our clients the benefits of transactional data that's coming from other RealPage users."

136. Witness 5 explained that data relating to "vacant days" – how many days rental units remained vacant – was also discussed with clients during PTMs. This data was also displayed as a comparison between the client and regional competitors.

137. RealPage Pricing Advisors frequently discussed the upside to units remaining vacant for periods beyond what conventional industry wisdom might suggest. Witness 5 states that these discussions were typically framed as to whether it was worth having units "sit vacant for a few more days to get $50 more for a month in rent?" During PTMs, RealPage personnel stressed the benefits of relying on the pricing recommendation offered by RealPage, even when that meant a certain unit or units might remain vacant for longer periods. Defendants' coordinated efforts have been effective in driving anticompetitive outcomes: higher rental prices and lower occupancy levels.

138. RealPage also encouraged its clients, including Lessor Defendants, to abandon other traditional market share maximizing practices, such as keeping low turnover rates. Ric Campo, the CEO of Defendant Camden, admitted that Camden's turnover rates increased around

---

partners can leverage them to produce the results they desire." Bowen served in several roles over the course of his career at RealPage, including as a consultant implementing YieldStar Revenue Management, a manager of RealPage's Professional Service team, assisting clients in "maximiz[ing] the effectiveness of YieldStar," and as Director of Business Development for all RealPage Asset Optimization products. *See* Andrew Bowen, LINKEDIN, https://www.linkedin.com/in/andrewbowen2/ (last accessed June 14, 2023).

15 percentage points in 2006 after implementing a RealPage RMS, here, YieldStar. Despite that increase in turnover rates, Defendant Camden's overall same-property revenue grew over 7% in its first year using YieldStar. "What we found," Campo said, "was that driving our turnover rate up actually captured additional revenue."[93] While Defendant Camden's turnover expenses increased by $2.5 million, revenue increased $12.5 million. According to Campo, "[T]he net effect of driving revenue and pushing people out was $10 million in income."[94]

139.    Defendant RealPage also provides its customers with real-time information about their competitors' lease terms, and provides lease term recommendations aimed at avoiding oversupply of units caused by natural ebbs and flows in the market. RealPage's RMS use the occupancy data that it collects to recommend lease renewal dates that are staggered to avoid any period of oversupply. Property managers can then hold units vacant for a period, while keeping rent prices inflated.[95] This strategy of the staggering of lease renewal dates smooths out natural fluctuations of supply and demand, which further reduces any incentive for Defendants and their coconspirators to undercut their inflated prices. This incentive is always the greatest in periods of oversupply, when the individual benefits of reducing rents to increase occupancy are highest. As one multifamily executive explained in 2019, "LRO is mapping out for our teams how they should be pacing their [lease] expirations."[96]

140.    A former Assistant Community Manager at Sunrise Management and Greystar Leasing Consultant (Witness 2) confirmed that among the factors considered in RealPage's pricing

---

[93]    Bousquin, *supra*, note 44.

[94]    *Id.*

[95]    RealPage e-book B & C Assets Ace the Market, *supra*, note 5, at 4-5.

[96]    RealPage Revenue Management Maximizes Market Opportunity, RealPage Videos (Dec. 2, 2019), https://www.realpage.com/videos/revenue-management-maximizes-market-opportunity/

recommendation is the number of months in a lease term, as pricing would go up or down depending on the length of the lease to avoid too many vacancies and/or renewals falling on the same month.

### D. Defendants' Collectively Monitor Compliance with the Scheme

141.    Defendant RealPage has various stops in place to closely monitor the Lessor Defendants' "discipline," or compliance, with the price-fixing scheme.  These include the specific "workflows," pictured below and taken from RealPage's "YieldStar Revenue Management – Manager Training" deck, which details the times and processes by which property managers accept RealPage's pricing "recommendations":

**Figure 6: "Daily Workflow" Slide from RealPage's 2022 "YieldStar Revenue Management – Manager Training" Deck[97]**



### Daily Workflow

- Every weekday, the Community Manager will log into YieldStar and review recommendations no later than 9:30 AM local time
- The Revenue Management Advisor accepts agreed upon pricing within 1 hour
   - The Community Manager, Regional Manager and Asset Manager will receive an e-mail once rates have been accepted
- Pricing disputes will be escalated to the Regional Manager
- Rates that are not agreed to will be researched and responded to by the end of the day
   - In the meantime, yesterday's rents will persist
- On the weekends, rates that fall within auto acceptance parameters will be accepted
- Once prices are set for the day, the onsite team will print and save electronically the Rent Summary and the Unit Availability report and save electronically the New Lease Rents report from YieldStar
- The Community Manager should always relay pricing changes to the leasing team

30     ©2022 RealPage Inc.

---

[97]     Hereinafter, "RealPage's YieldStar Manager Training Deck."  "Community Manager," "Regional Manager," and "Asset Manager" refer to individuals who work for the property management company.  The price acceptance process begins with the Community Manager who is responsible for reviewing RealPage's daily pricing recommendations.  "Revenue Management Advisor" refers to RealPage's Pricing Advisors assigned to that particular property management

142.    Witness 5 explained that Pricing Advisors received daily alerts as to when a particular client had reviewed the daily price recommendations.    As part of their daily responsibilities, RealPage Pricing Advisors were required to review the pricing recommendations issued for each assigned client.

143.    Any review had to occur before 9:30 a.m. local time.  *See* Fig. 6 above.  Witness 5 recalls that the client is able to: (1) "Accept"; (2) "keep yesterday"; or (3) "propose override" for each pricing recommendation.

144.    To the extent a client elected to keep the previous day's proposed pricing or propose an override altogether, the client was met with a "mandatory" on-screen prompt to provide a legitimate "business reason" in writing to justify to Defendant RealPage its decision to veer from RealPage's daily pricing recommendations.  As Witness 5 explained, "if the model recommended a price increase and the client said 'no,' [RealPage] would need to know what the business reason was."  Figure 7 below contains an image of the pricing screen for training purposes, as depicted in RealPage's YieldStar Manager Training Deck.

---

company or internal RealPage-trained revenue managers who worked for the property management company.

**Figure 7: "Rate Review" Slide from RealPage's 2022 YieldStar Manager Training Deck**



©2022 RealPage Inc.

145.    Pricing Advisors were trained to use the phrase "business reason" when interacting with clients regarding their justification for an override.  Witness 5 explained this was designed to impart the notion that a client's explanation had to provide acceptable reasons pertaining to property management operations to override a pricing recommendation.

146.    Witness 5 explained that if a client sought to override a pricing recommendation because the property had a higher vacancy rate for example, RealPage Pricing Advisors were trained to push back and communicate that vacancy rates were not an "acceptable business reason" because the algorithm had already taken vacancy rates into account when making its daily pricing recommendation.

147.    For Pricing Advisors, a legitimate business reason had to be "something that the model could not see."  To ensure clients remained "in the 80 to 85% acceptance rate" target that RealPage sought, Witness 5 and other Pricing Advisors often spent considerable time

communicating this premise to "educate" clients on the pricing methodology and associated benefits of accepting all, or almost all RealPage pricing recommendations, despite increasing vacancy rates. While Witness 5 references an appropriate acceptance range would be between 80 to 85%, in her practice, Witness 1 reported that RealPage recommended Lessors accept RealPage's pricing recommendations "100% of the time," other than in limited mitigating circumstances.

148.  Witness 2 "consistently" relayed to RealPage representatives that the price recommendations provided for her community were way too high. Based on her experience in the market, Witness 2 believed the fair market rents for the properties in that region were much lower than RealPage's pricing recommendations. Witness 2 reported that she, "knew [rental prices] were way too high, but [RealPage] barely budged."

149.  Witness 2 recalled that while most of the reasons offered to RealPage for a pricing override were deemed not "good enough," RealPage *never* accepted any attempt by the client to reject its recommendation on the basis that the price did not reflect fair market values.

150.  Highlighting this, Witness 2 noted that she understood the property markets in the areas [she] acted in, while RealPage's Texas-based employees were not familiar with the individual local markets in which their pricing recommendations are pushed: "I'm on the ground, I see the value." In Witness 2's opinion, that value was constantly overstated by RealPage's pricing recommendations to the detriment of renters, but because RealPage is such a "monster" in the industry, people were reticent to speak up against the system.

151.  Witness 4 explained that if his property management team wanted to make changes to the price that the RealPage RMS autogenerated every morning, before they could even reach out to RealPage they were required to contact Defendant Lincoln Property's corporate office. In response to a request to Lincoln's corporate office for any modification to RealPage's

recommended pricing, Witness 4 explained that "99% of the time," field employees were told "the rates are what they are."

152.    In fact, Witness 4 explained that any adjustments to rental prices were only accepted if Defendant Lincoln's website advertised a different price than that recommended by RealPage for a given unit, which would have occurred only as a result of human error.  In these instances, Witness 4's Regional Manager was required to obtain approval from Defendant Lincoln's corporate office to veer from RealPage's pricing recommendation.

153.    Defendant RealPage closely tracked the rates at which property managers accepted its recommendations.  Witness 5 explained that RealPage created "Rate Acceptance Reports" that detail the rate at which any given client accepted the daily recommended price provided by the RealPage algorithm over the last 28 days.

154.    Beginning in late 2019, Defendant RealPage began the rollout of a new version of one of its RMS products, referred to internally as "Price Optimization 2" or "POV2."  Witness 5 recalls that with this updated technology, RealPage began tracking not only a client's acceptance rate, but also the identity of the personnel within a client's business that issued a "keep yesterday" or "propose override" request.  This increased granularity in the reports provided by RealPage and enabled property management companies to monitor acceptance rates more closely within their own ranks.

155.    Reports tracking a client's rent rates and rent variances – the amount the rent prices charged varied from what the model suggested – were used by Defendant RealPage Pricing Advisors to review with Regional Managers or Vice Presidents from the property management company during periodic performance reviews, including Performance to Market meetings.

During these reviews, Pricing Advisors would notify their client if they were succeeding in embracing the algorithm, or if the property was underperforming.

156.    In addition to Rate Acceptance Reports, Defendant RealPage created "Lease Compliance Reports" which Witness 5 referred to as "one of [RealPage's] top auditing tools." Beyond the acceptance rate, Lease Compliance Reports show the variance between a particular pricing action taken by a client for a given unit, and the pricing terms of the executed lease for that unit.  On the left-hand side, these reports display the pricing action taken by the client (accept, keep yesterday, or override) and the right-hand side displays the rental price in the associated lease. In other words, the Lease Compliance Reports show whether a property management company actually charged the renter the price RealPage's RMS recommended, and which the property management company accepted.

157.    Witness 5 explained that Lease Compliance Reports also list an overall compliance rate at the bottom of the report, which is expressed as a negative percentage.  During her tenure as Pricing Advisor 2 (2014-2020), if a client was fully "compliant" in transferring Defendant RealPage's pricing recommendations into the executed lease, they received a score of zero percent. If a client deviated by 15% it would be expressed as -15%.  Per Witness 5 acceptable deviation rates between the client's pricing decision in the RealPage RMS and executed leases should be no higher than -2% to -3%.[98]

158.    Importantly, Lease Compliance Reports provide a figure for the total revenue lost due to a client's deviation, including present losses and extended losses calculated over the course of a one-year period.  These figures are intended to impress on cartel members the collective

---

[98]    Note, this a separate measurement to acceptance of the rate recommended by RealPage in the software environment.

benefit of adherence to Defendant RealPage's pricing recommendations. Witness 5 stressed that during PTMs, RealPage personnel were trained to, and did, emphasize the significant pecuniary impact associated with non-compliance.

159. Defendant RealPage's provision of these reports and resources to the Lessor Defendants is economically irrational absent a price-fixing cartel and is done for the sole purpose of encouraging acceptance rates to be as high as possible, and deviations from accepted pricing in executed leases as close to zero as possible, by helping Lessor Defendants identify employees that deviated from RealPage's pricing recommendations.

160. Through the review and discussion of these Lease Compliance Reports during PTM meetings, Witness 5 reported that Defendant RealPage personnel successfully persuaded clients that it was in their best interest to: (1) accept all or substantially all of RealPage's pricing recommendations; and (2) ensure those rates were effectively included in the operative lease agreement.

161. Because Defendant RealPage's revenue is largely derived from "license and subscription fees relating to [RealPage's] on demand software solutions, typically licensed over one year terms; commission income from sales of renter's insurance policies; and transaction fees for certain of our on demand software solutions," in addition to selling new software licenses, RealPage has an interest in facilitating the cartel to ensure property management companies see the revenue increases RealPage claims its RMS products yield, thereby incentivizing existing clients to renew their software licenses annually.[99]

162. Witness 5 explained that when Lease Compliance Reports reflected lower than expected compliance rates, high-ranking executives from property management companies often

---

[99]    RealPage 2020 Form 10-K, *supra* note 37.

expressed frustration with their own internal compliance measures. As one example, Witness 5 indicated that during discussions concerning the compliance rate reflected in the Lease Compliance Report prepared for client, First Pointe Management Group ("First Pointe"), First Pointe President Christina Agra-Hughes became agitated at the deviation rate reported and asked rhetorically during the PTM, "why the hell aren't my teams following the model!?"

163. According to Witness 5, Defendant RealPage would, in addition to the PTMs, and depending on the client, have its Pricing Advisors host weekly, bi-weekly, and/or monthly calls with property management companies.[100] During these calls, Pricing Advisors would conduct "Performance Reviews." A RealPage Pricing Advisor's task was to assist clients in understanding the methodology behind RealPage's RMS so that clients would more closely adhere to RealPage's pricing recommendations. Notably, Witness 5 stated that Defendant RealPage almost exclusively recruited its Pricing Advisors/Manager from property management companies, trusting that this permitted its Pricing Advisors to exude a level of expertise and authority that would convince clients to trust RealPage's pricing recommendations over their local knowledge. Likewise, Witness 5 explained that property management companies recruit their internal RMS experts from RealPage Pricing Advisors.

164. Following her employer's implementation of a RealPage RMS in or around 2021, Witness 2 attended weekly meetings with RealPage representatives during which the Pricing Advisor would review Sunrise Management's acceptance rate and executed leases. During one of these meetings, Witness 2 was questioned as to why certain leases did not adopt RealPage's recommended pricing. In one instance, a rental unit was advertised at $1,650/month despite

---

[100] Likewise, as part of the Terms of Service to license LRO from RealPage, LRO users were required to participate in weekly pricing calls with RealPage. *See* Terms of Service, *supra* note 79.

RealPage recommending a price of $1,895/month, nearly 15% higher. Witness 2 elected to honor the advertised price over RealPage's recommended price and was consequently reprimanded by her supervisor, a Sunrise Management Regional Manager.

165. RealPage Pricing Advisors ensure and advance coordination in price setting between Lessors. RealPage assigns each Pricing Advisor to a group of competing Lessors in a given geographic area or city, who are tasked with integrating themselves into each of their assigned competing Lessor's price setting processes. It is problematic enough that groups of competing Lessors in a given area or city are outsourcing their price-setting functions to the same algorithm and same individual Pricing Advisor. But each Pricing Advisor also coordinates price increases with other Pricing Advisors that are assigned to different groups of competing Lessors in the same region or city. They are incentivized to do so because a percentage of each Pricing Advisor's compensation is linked to the amount that prices increase across their assigned geographic area or city – not to their ability to meet revenue goals for the individual Lessors they advise. Pricing Advisors accordingly aim to raise rental prices across their assigned group of competing Lessors as well as coordinate with other Pricing Advisors assigned to different groups of competing Lessors in the same area or city on forward-looking pricing, thereby collectively inflating prices across an area or city.

166. Witness 3 confirmed that either there are no firewalls in place to prevent a Pricing Advisor representing one group of competing Lessors in an area or city from coordinating on pricing with Pricing Advisors representing different groups of competing Lessors, or that, if there are such firewalls, they are systematically disregarded, and Pricing Advisors regularly engage in precisely this type of coordination.

167.    A former RealPage Pricing Analyst ("Witness 10")[101] explained that some property management companies did not subscribe to Defendant RealPage's advisory services and therefore, were not assigned a Pricing Advisor, but instead had their own internal revenue managers. Witness 10 explained that in order to become a certified internal revenue management advisor at a property management company, one would have to undergo an extensive two-to-three-day training session with RealPage, and the title was granted only after passing a cumulative final exam about pricing theory, RMS settings, and strategies.

168.    After years working as a Pricing Analyst for Defendant RealPage, Witness 5 was recruited by a property management company to serve as their in-house RealPage RMS manager. Witness 5 explained that RealPage maintains two groups that provide RMS support. The first group is known as "Client Services" and this group supports clients that have dedicated internal staff which serve in a capacity similar to RealPage's Pricing Advisors, working daily with RealPage's RMS. The second group is called "Pricing Advisory Services" and is the group that services clients who do not have internal pricing advisory or revenue management capabilities (*i.e.*, RealPage's Pricing Advisors). Consistent with Witness 10's account, Witness 5 explained that the Client Services group had fewer day-to-day interactions with property management clients compared to those in the Pricing Advisory group.

169.    Witness 10 stated that typically "smaller and mid-tiered" clients paid for Defendant RealPage's Pricing Advisory services, while larger property management companies often had their own internal revenue manager. Those that utilized RealPage's Pricing Advisors had daily calls with RealPage, which was the only way their RMS software settings could be calibrated. In

---

[101]    Witness 10 worked as a RealPage Pricing Analyst from May 2017 through December 2019. In this role, Witness 10 was responsible for reviewing reports for his portfolio of properties.

a Webcast hosted by RealPage's Chief Economist, Greg Willett, Tracy Paulk, who currently holds two titles at RealPage – VP, Consumer Solutions and Revenue Management, and VP, LRO Professional Services – explained that typically, once a property management company manages twenty thousand or more units, "you start to see the value" in having an in-house expert.[102]  While Paul explained that RealPage "offer[s] full-on training . . . whether it's a certification process or a meeting once a month," RealPage's Chief Economist intimated that RealPage in fact "do[es] a lot of babysitting" for those who work for a property management company as internal advisors of RealPage's RMS.[103]

170.    Notably, Witness 10 stated that a property management company using Defendant RealPage revenue management advisory services had no ability to change their own settings in any way that could impact pricing.  In order to change any settings, a property management company employee at the Regional Manager level or higher needed to speak directly with a RealPage Pricing Advisor.  While companies with internal RealPage revenue advisors had more access to adjust their own settings in accordance with their RealPage training, still, Witness 10 explained that even for companies with internal revenue managers, there were periodic reviews with RealPage Pricing Advisors if the company was underperforming, had a low acceptance rate of RealPage's pricing recommendations, or high variance rate.  In these instances, if a RealPage Pricing Advisor concluded that RealPage's pricing platform was not being used "correctly," then the situation was escalated.

---

[102]    Best Practices Webcast, *supra* note 8 at 17:00-19:00.

[103]    *Id.* at 20:00-22:00.

**E. Property Managers Who Adopted RealPage's Pricing Recommendations Did so with the Common Goal of Raising Rent Prices Which Conspiracy, Caused Inflated Rental Prices and Reduced Occupancy Levels in Their Respective Metro Areas**

171. Cartel members share their confidential data with the knowledge that Defendant RealPage will recommend rents to their competitors based on the data provided, in essence providing their competitors with clear insight into their confidential business information. Cartel members also know their competitors are likewise sharing their own confidential business information with RealPage, from which each cartel member can glean information about their competitors' pricing, as well as other data points. Defendant RealPage informs both current and prospective clients that its RMS include "competitor rent data [as] one of the several data inputs" into its algorithm in the "FAQs" section of its website relating to RMS.[104] Witness 5 also confirmed that RealPage representatives regularly advised clients during PTMs that the pooled data reviewed during these meetings contained their regional competitors' transactional data. Likewise, per the Terms of Service, legacy LRO users are informed that their data may be aggregated into pooled data sets, and may be provided with their regional competitors' pooled data.

172. Defendant RealPage calls this information exchange "continuous optimization through connected intelligence" and brags that it is "[b]uilt on the market's largest real-time data set."[105] Coordinated algorithmic pricing allows property managers to, in RealPage's own words, "outsource daily pricing and ongoing revenue oversight" to RealPage, allowing RealPage to set

---

[104] RealPage Revenue Management FAQs, *supra* note 6.

[105] The RealPage e-book, Introducing AI Revenue Management: Next-Generation Price Optimization That Unlocks Hidden Yield, REALPAGE, INC. (2020).

prices for client property managers' properties "as though we [RealPage] own them ourselves."[106] Put differently, RealPage's RMS allow Lessors to operate as if they were one company setting prices at the monopoly level, which is the goal of any cartel.

173. This mutual sharing of information only makes sense when cartel members are confident that their competitors will not use the information to gain a competitive advantage by lowering rents to lure away customers. As Davidoff stated, while all property management companies "would be better off limiting their rent reductions," if any property management company "lower[ed] their rents while the others don't, then that [property management company] would outperform."[107] Recognizing this, Defendant RealPage urged its clients to "shop your competitors over the phone, in-person, and view their websites."[108]

174. Property managers who use Defendant RealPage's RMS do so with the explicit and common goal of increasing rents for all members of the cartel by using coordinated algorithmic pricing. RealPage advertises that its customers outperform the market by 3–7% year over year.[109] RealPage's clients find its RMS particularly helpful because, as RealPage explains, those services allow the property managers to "make sure we're limiting our supply when there isn't too much demand."[110]

---

[106] RealPage Renewal Reporting Presentation, *supra*, note 4.

[107] Davidoff, *supra*, note 43.

[108] *See* Figure 4, *supra.*

[109] *YieldStar Predicts Market Impact Down to Unit Type and Street Location*, REALPAGE, INC., https://www.realpage.com/videos/yieldstar-data-scientists-help-manage-supply-demand/ (last accessed on June 15, 2023) ("Find out how YieldStar can help you outperform the market 3% to 7%").

[110] *RealPage Revenue Management Maximizes Market Opportunity*, REALPAGE VIDEOS (Dec 2, 2019), https://www.realpage.com/videos/revenue-management-maximizes-market-opportunity/ (last accessed on July 3, 2020) (interview with John Kirchmann, CFO of IRET Property Management).

175.    In a promotional video on Defendant RealPage's website, Holly Casper, Vice President of Operations for RKW Residential described that RealPage takes on the burden of "implementing the increases in these rents . . . it's running the lease expiration for us and we're not manually doing it which means we're increasing our revenue for those units."[111]

176.    In training materials provided to Defendant RealPage clients, titled "Revenue Management System, Quick Reference Guide" (2022), RealPage describes its RMS as one specifically designed to "maximize rents," and explained that "RealPage['s] Revenue Management system allows you to continuously maximize asset value by leveraging data to consistently reduce vacancy and maximize rent."

177.    Witness 5 explained that every Friday, Witness 5, along with other Pricing Advisors and members of the revenue management team, participated in conference calls to discuss various operational matters.   During these calls, Defendant RealPage executives, including Andrew Bowen, regularly stressed to call participants that a key company objective concerns the rate at which clients accepted RealPage's pricing recommendation.

178.    In a 2018 promotional video posted on Defendant RealPage's website, a multifamily executive credits the 10% growth achieved for a Denver, Colorado property that previously "had issues" maintaining rent growth, on her team having "really embraced LRO," otherwise, having consistently accepted RealPage's recommended pricing.[112]

---

[111]    *YieldStarTM Revenue Management Optimizes Rent Pricing*, REALPAGE VIDEOS (Sept. 10, 2019), https://www.realpage.com/videos/yieldstar-optimizes-rent-pricing/ (last accessed on July 3, 2020) (testimonial of Holly Casper, Vice President of Operations for RKW Residential).
[112]    *LRO Revenue Management Review Lynn Owen*, REALPAGE VIDEOS (Nov. 13, 2018), https://www.realpage.com/videos/revenue-management-software-review-truamerica-multifamily/ (last visited on July 3, 2023).

179.    By enforcing price discipline and setting rents that result in lower occupancy rates, Defendant RealPage provides assurances that all property managers using its RMS are doing the same thing – raising rents and accepting lower occupancy instead of lowering the price to fill units. It also provides assurances to each of RealPage's clients to know that their competitors will not be able to "cheat" on the cartel and expand market share by undercutting RealPage's price recommendations.  In this way, RealPage enables property managers to overcome the prisoner's dilemma that prevented coordinated pricing in the historical market for residential rental apartments.[113]

180.    Indeed, property management companies have their own internal measures in place to enforce price discipline in accordance with the conspiracy.  Amy R. Smith, Managing Partner of Bella Investment Group, LLC ("Bella") explained that during her revenue management system training, "[w]e were warned that the biggest hurdle is overcoming the emotions and instincts of experienced property managers.  Many managers and regional staff will see rents rising at a rate greater than they are used to and may want to override what the system suggests we charge. Because of the rent-based parameters we set within the system that is generally not necessary." To combat this and encourage adherence to Defendant RealPage's recommendations, many property management companies base staff members' bonuses, in part, on revenue.   Smith explained that without such incentives the staff might:  "bring a level of caution to rental rates that they might set," and that "[u]ntil they trust the system, there will be temptation to override the algorithm if rents appear too aggressive."[114]  Put another way, Smith admits that RealPage leads

---

[113]    See Salil K. Mehra, Price Discrimination-Driven Algorithmic Collusion: Platforms for Durable Cartels, 26 STAN. J.L. BUS. & FIN. 171, 197-203 (2021).

[114]    Bergeron III, *supra*, note 15.

Bella to set prices at levels higher than it otherwise would if "experienced property managers" were allowed to set rents.

181. Defendants and their co-conspirators are aware that the higher revenues they obtain using Defendant RealPage's RMS are the result of increasing average rent prices in the neighborhoods they serve. In a video to attract additional cartel members that was shown at a conference for real estate executives in the summer of 2021, RealPage Vice President Jay Parsons noted that average rents had recently shot up by 14%. "Never before have we seen these numbers," he said.[115] Parsons then asked Andrew Bowen, RealPage's then Vice President of Investor Markets, what role he thought the company had played in the unprecedented increase. "I think it's driving it, quite honestly," Bowen replied.[116]

182. Witness 2 explained that in 2020, prior to implementing a Defendant RealPage's RMS, a two-bedroom unit in the Sunrise Management community she oversaw was priced at $1,650/month. Upon adopting a RealPage RMS the following year in 2021, rents for those same units immediately increased over 27% to nearly $2,100, with no improvements to the units whatsoever. Witness 2 characterized these units as "very basic, standard homes" built in the 40s, with no in-unit washer and dryer, and "completely agrees" that rental prices in her region were artificially inflated upon its adoption of RealPage pricing recommendations.

183. After her tenure at Defendant RealPage, Witness 5 assisted a Seattle-based property management company with the rollout of its first five RMS-enabled (YieldStar/AI Revenue Management) properties. Prior to using RealPage's RMS, the management company was "really [a] mom and pop" operation. Since implementing RealPage's RMS however, it has enjoyed

---

[115]    Vogell, *supra*, note 1.

[116]    *Id.*

significant revenue increases by accepting RealPage's daily recommended pricing for a portfolio of properties that had not raised rents "for years."

184.     Indeed, Witness 5 confirmed that every RealPage client she managed during her tenure as a Pricing Advisor saw revenue growth once they adopted RealPage's RMS.  For example, one RealPage client saw a revenue increase of 21% in the first year after adopting AI Revenue Management.  Prior to implementing AI Revenue Management, this client had increased rents by 3% every year, around $25 per lease renewal.  The incredible growth after the client adopted AI Revenue Management was realized across all of client's 20 properties, confirming that RealPage RMS, rather than any other factors, drove the results.

185.     Defendant RealPage's impact on the multifamily rental market through its RMS is best summarized by Kortney Balas, Director of JVM Realty Corporation in a testimonial video since removed from RealPage's website: "the beauty of using YieldStar is that it pushes you to go places that you wouldn't have gone if you weren't using it."[117]  In other words, RealPage pushes rents higher in a way that would be economically irrational if firms were behaving unilaterally, as opposed to collectively.

186.     Senior Vice President for Management at Post Properties, Jamie Teabo, similarly noted that "[i]n our Florida markets, we let the system push as hard as it would go, and we saw increases as high as 20 percent . . . Left to our own devices, I can assure you we would have never pushed rents that hard.  That was a big number."[118]

187.     Defendant RealPage's RMS not only facilitates price hikes, but also allows conspirators to ***maintain*** higher prices.  RealPage claims that Defendant property managers and

---

[117]     Vogell, *supra*, note 1.

[118]     Bousquin, *supra*, note 44.

their co-conspirators were able to maintain rent prices 7% above the competitive market rate. Speaking at a RealPage webcast June 17, 2020, America Melragon, a former VP of revenue management for Defendant IRT, discussed how property managers can stabilize rents by using RealPage's RMS. According to Melragon, "We've noticed . . . competitors that are manually pricing have already started to experience pretty significant swings in their effective price. . . . For us, really having that insight into our own individual supply and demand exposure has helped our price pretty much stay in line with where we anticipated it to be."[119] RealPage refers to independent, competitive pricing as "manual pricing."

188. Defendants' conspiracy allows property managers to hike rents even higher when demand is strong without needing to lower them when it is weak. It untethers rent prices from their natural constraints, forcing renters to spend more money than they would have in a competitive rental market. This collusion has contributed to the national housing crisis by placing massive pressure on renters' efforts to keep roofs over their heads.

189. Defendants and co-conspirators control hundreds of thousands of apartment units, including tens of thousands of units in the most desirable neighborhoods.

190. Yet, in the years preceding the COVID-19 pandemic, vacancies trended upwards.[120] Despite rising vacancies, with the help of RealPage, Defendants were able to continue to raise rents year over year over year, demonstrating the disconnect between supply and demand.

---

[119] *IRT Gains Pricing Stability with RealPage Revenue Management*, REALPAGE VIDEOS (June 17, 2020), https://www.realpage.com/videos/irt-gains-pricing-stability/ (last visited on July 3, 2023).

[120] *See* Figure 2, *supra*.

**F. Preliminary Economic Analysis Confirms the Impact of RealPage's Revenue Management on Multifamily Rental Markets Nationwide**

191. Preliminary economic analysis provides a glimpse into the impact of Defendant RealPage's RMS on multifamily rental markets and corroborates evidence of the alleged conspiracy, including witness accounts. Specifically, it suggests (i) Defendants' increased revenues were the result of proportionally higher and artificially inflated rental price increases paid by Plaintiffs and Members of the Class; and (ii) the increase in multifamily rental housing prices near the start of 2016, and through the present, cannot be explained by common supply or demand drivers, rather a significant structural break in these relationships can be observed in various multifamily rental housing markets near the start of the Class Period.

**i. Defendants' Increased Revenues Resulted from Proportionally Higher, Artificially Inflated Rent Increases**

192. As discussed in Section E, Defendant RealPage's RMS model works to increase revenue by raising rent prices while accepting lower occupancy levels. RealPage has not been shy about this mechanism of action. During a 2017 earnings call, then-CEO of RealPage, Steve Winn, offered as an example one large property company, managing over 40,000 units, which learned it could make more profit by operating at a lower occupancy level that "would have made [that property manager's] management uncomfortable before."[121] Prior to adopting RealPage's RMS, here, YieldStar, the company had targeted 97% or 98% occupancy rates in markets where it was a leader. After outsourcing rent prices and lease terms to RealPage, the company began targeting 3%-4% revenue growth while operating at a 95% occupancy rate. In other words, RealPage claimed to increase the revenue of rental properties by 2%-7%[122] despite the cost of having

---

[121] Vogell, *supra*, note 1.

[122] *Id.*

vacancy rates that were at least two percentage points higher on average. Since the property manager realizes the increase revenue despite leasing fewer units, the property manager's per-unit rental price increased by more than 2%-7%.

193. Consider the scenario depicted in Figure 8, which reflects the Nashville market. Prior to 2015, monthly rents in the Greater Nashville Metro area were $1,258.89 according to the Zillow Observed Rent Index Model ("ZORI"),[123] and vacancy rates were 3.70% according to the United States Census Bureau, in December 2015. Thus, a building with 100 units representative of the Nashville area as of December 2015 would have 96.3 occupied units,[124] and assuming rental price of $1,258.89 across those units, implies revenue of $121,230.72 to the owners ($1,258.89 x 96.3 occupied units).

**Figure 8: Demonstrative Table Using Zillow Zori Model and U.S. Census Bureau 2015 Data (Without RealPage)**

| *Without RealPage* | | |
|---|---|---|
| Building Number of Units | (A) | 100 |
| Nashville Monthly Rental Prices (Zillow Zori Model) | (B) | $1,258.89 |
| Nashville Vacancy Rates (US Census) | (C) | 3.70% |
| Occupied Building Units | (D=A x (1-C)) | 96.30 |
| **Total Revenue/Month** | (E=B x D) | $121,230.72 |

---

[123] The ZORI Model measures changes in asking rents over time, controlling for the changes in the quality of available rental stock. ZORI is currently calculated at the national, metropolitan, county, city, and ZIP Code levels for all regions where sufficient data is available. Joshua Clark, *Methodology: The Zillow Observed Rent Index (ZORI)*, ZILLOW (Sept. 19, 2022), https://www.zillow.com/research/methodology-zori-repeat-rent-27092/ (last visited on July 3, 2023).

[124] For the purpose of this simple regression model, fractional units are assumed possible.

194.     Figure 9 below demonstrates the following: at the low end of the range Defendant RealPage advertised increased revenue of 2%, this would amount to an increase of $2,424.62 in revenue, for a total revenue of $123,655.34 for this same building.   However, assuming a simultaneous increase of vacancy by two percentage points like that touted by RealPage's CEO during its 2017 earnings call, this would result in only 94.3 units occupied.   This implies that to achieve the targeted 2% revenue increase the monthly rent per unit would need to rise to $1,311.30 per month, a 4.16% rise.   To achieve RealPage's advertised revenue increase of 7%, RealPage clients would need to raise their monthly rent by 9.27% to recover the occupancy increase.   These increases amount to $52.41 to $116.69 in extra monthly rent per unit, respectively.

**Figure 9: Demonstrative Table Using Zillow Zori Model and U.S. Census Bureau 2015 Data (with RealPage)**

| With RealPage | | | |
|---|---|---|---|
| Increased Performance Scenario | (F) | 2% | 7% |
| New Revenue | (G=E x (1+ F)) | $123,655.34 | $129,716.87 |
| New Vacancy Rate (2 percentage points higher) | (H) | 5.700% | 5.700% |
| Occupied Building Units | (I=A x (1-H)) | 94.3 | 94.3 |
| Nashville Rental Prices (Using RealPage) | (J=G/I) | $1,311.30 | $1,375.58 |

| | | |
|---|---|---|
| **Increase in Rent (%)** | **4.16%** | **9.27%** |
| **Increase in Rent ($)/Month** | **$52.41** | **$116.69** |

195.     Further, as discussed above, market participants perceived that Defendant RealPage's price decisions raised rental prices above competitive levels.  For example, Witness 2, who also worked with RealPage in connection with her role as a Leasing Consultant with

Defendant Greystar, confirmed she "completely agrees" that rental prices were artificially inflated upon the adoption of RealPage pricing recommendations through its RMS.

### ii. Supply and Demand Factors Do Not Explain Inflated Rental Prices

196. A regression analysis is a statistical method that describes the relationship between two or more variables. Typically expressed in a graph, the regression method tests the relationship between a dependent variable against independent variables.

197. Preliminary regression analyses conducted in several regional sub-markets for multifamily rental housing suggest a structural break between the forces of supply and demand nearing the start of the Class Period. For the purpose of this preliminary regression, the markets analyzed include the cities within the Atlanta, Phoenix, Orlando, and Dallas Submarkets, as defined below in §V.B, collectively "Regression Submarkets."

198. Figure 10 below illustrates the rising rental costs in the Regression Submarkets from 2015 through 2023.

**Figure 10:  Average Rents in Phoenix, AZ, Orlando, FL, Fort Worth, TX, and Atlanta, GA.**



199.    Here, each regression first tested the impact of vacancy rates on rental rates in the respective submarket during the period from 2011 through 2016 ("pre-period") to understand the relationship between vacancy rates and rental prices in the time period before Defendant RealPage's RMS became pervasive.  The pre-period is depicted on the left side of the regression models in Figures 11, 13-15.  The right-side of each regression model represents the same regression analysis performed, but for the post-2016 period ("post-period"), during which RealPage's RMS were increasingly adopted.

### a)    Atlanta Submarket

200.    Lessors use revenue management software to set rents for approximately 81.30% of all multifamily rental units in Atlanta, Georgia.  Widespread adoption of Defendant RealPage's

RMS has caused rents to increase explosively in recent years, with renters in Atlanta paying approximately 80% more in rent today than they paid in 2016. The regression model depicted in Figure 11 below tests the relationship between vacancy rates and rental prices in the Atlanta Submarket and demonstrates the effects of Defendants' conspiracy.

201. The left side of Figure 11 shows that during the pre-period, there was a negative relationship between effective rents and vacancy rates in the Atlanta Submarket, which is expected from economic theory. That is, it shows that an increase in vacancy rates (supply) generally resulted in a decrease in rental price. Specifically, during the pre-period, the regression suggests that a one percentage point increase in the vacancy rate in Atlanta will reduce rental prices by $33.02 per month. While the pre-period regression is simplistic, it yielded a R-square[125] of 83.1%, which is substantial. In other words, during the pre-period, 83% of rental price variations in the Atlanta Submarket can be explained by the operative vacancy rate.

202. The pre-period regression results are consistent with property managers previously pursuing the "heads in beds" policy to rent setting.

---

[125]    R-square is a statistical measure in a regression model that determines the proportion of variance in the dependent or "response" variable (rental prices) that can be explained by the independent variable or "mean" (vacancy rates). 0% represents a model that does not explain any of the variation in the response variable around the mean and R-square of 100% represents a model that explains all the variation in the response on the mean.

**Figure 11: Atlanta Effective Rents and Vacancy Rates Regression (2011 – 2022)**



203. Note that during the post-period depicted on the right side of Figure 11, rental prices no longer exhibited any relation to vacancy rates, but in general tended to move in the opposite direction than that predicted by economic theory. That is, as vacancy rates trended upwards, meaning there was an increase in supply of multifamily rental housing units, rental prices did not decrease in response as they had in the pre-period. Instead, rents continued to rise in conflict to basic economic principles of supply and demand. Indeed, the post-period R-square of 19.3% indicates that the previously strong relationship between vacancy rates and rental prices had been

severed in the post 2016 period.[126]  This structural break is indicative of the impact of Lessor Defendants' adoption of RealPage's pricing decisions.

204.    The structural shift between vacancy rates and rental prices observed in the Atlanta Submarket regression is further depicted in Figure 12 below, which graphically represents the relationship between rental prices and occupancy rates for properties managed by Defendant Camden in Atlanta, Georgia.  Note that in Figure 12, the percentage of vacant units is expressed as an "occupancy rate" rather than a vacancy rate.  That is, as the occupancy rate increases, vacancies decrease, and vice versa.

205.    Notably, Figure 12 demonstrates that as occupancy rates at Defendant Camden's Atlanta properties decreased rapidly beginning 2017, rental prices drastically increased over that same time.  As an example, in the second quarter of 2017, the occupancy rates across Defendant Camden's Atlanta properties measured approximately 95.8%, while the average rental price was $1,299.  While occupancy rates at these same properties in fact dropped by Q2 2018 to 95.6%, and to their lowest since prior to the time captured in this graph sometime between 2017 and 2018, rents at Defendant Camden's Atlanta properties had increased *over 31%* in the span of just one year.

---

[126]    R-square figures corresponding to the Atlanta, Georgia preliminary regression differ from that cited in the Goldman v. RealPage, Inc., complaint, owing to updates to Reis's quarterly data.

**Figure 12: Defendant Camden Property Trust - Effective Rents and Occupancy Rates in Atlanta, GA (2008-2022)**



### b) Orlando Submarket

206. A preliminary regression analysis was performed for the Orlando Submarket, testing the relationship between vacancy rates and rental prices in the pre-and-post 2016 periods. Figure 13 demonstrates the pre-period negative, and subsequent inverse directional relationship between vacancy rates and rental prices in the Orlando Submarket as observed in Figure 11 above. The Orlando Submarket pre-period regression yielded a R-square of 84.2%, showing a significant correlation between rental prices and vacancy rates before 2016. Specifically, during the pre-period, the regression suggests that a one percentage point increase in the vacancy rate in Orlando

will reduce rental prices by $40.39 per month. In the post-2016 period, vacancy rates only explained about 21% of rental price variations (21.1% R-square).

**Figure 13: Orlando Effective Rents and Vacancy Rates Regression (2011 – 2022)**



c) **Phoenix Submarket**

207. Lessors use revenue management software to set rents for approximately 74.70% of all multifamily rental units in the Phoenix Submarket. Widespread adoption of Defendant RealPage's RMS has caused rents to increase significantly in recent years, whereby Phoenix renters are paying nearly 68% more in rent today than they paid in 2017. Figure 14 demonstrates the pre-and-post-2016 regression performed in the Phoenix Submarket, which yielded a pre-period R-square figure of 74.3% and post-period of 19.7%, evincing another significant break from

observed forces of supply and demand in some of the most sought out metropolitan regions in the United States. Here, the regression suggests that prior to 2016, a one percentage point increase in the vacancy rate in Phoenix would reduce rental prices by $25.45 per month.

**Figure 14: Phoenix Effective Rents and Vacancy Rates Regression (2011 – 2022)**



### d)    Fort Worth (Dallas Submarket)

208.    Figure 15 represents a preliminary regression performed for the Fort Worth region of the Dallas Submarket, and which illustrates this same structural shift observed in the pre-and-post periods for all other Regression Markets, as well as the graph depicted in Figure 3, *supra*.

209.    The Forth Worth regression indicates that prior to 2016, approximately 74.8% of rental price variations could be explained by examining the vacancy rate at a given time.

Specifically, during the pre-period, the regression suggests that a one percentage point increase in the vacancy rate in the Fort Worth section of the Dallas Metro area will reduce rental prices by $28.02 per month. After Lessors increasingly adopted Defendant RealPage's RMS in the post-2016 period, the significant correlation between rental prices and vacancies ceased, as illustrated by the post-period R-square of 18.8%.

**Figure 15: Fort Worth Effective Rents and Vacancy Rates Regression (2011 – 2022)**



210. The foregoing preliminary economic evidence corroborates the existence of the alleged conspiracy and confirms the impact of Defendant RealPage's rental pricing recommendations provided through its RMS on Plaintiffs and Members of the Class.

### G. "Plus Factors" in the Multifamily Rental Housing Market Provide Additional Evidence of a Price Fixing Conspiracy

211. The presence of a number of factors, referred to as "plus factors" and "super plus factors" render the market for multifamily rental housing units highly conducive to collusion. Plus factors are "economic actions and outcomes, above and beyond parallel conduct by oligopolistic firms, that are largely inconsistent with unilateral conduct but largely consistent with explicitly coordinated action," and therefore support an inference of collusion.[127] "Super plus factors are actions or outcomes that would almost never be observed in the absence of collusion, [such that], it is reasonable to presume that the cartel finds these conducts or outcomes important to the implementation and operation of the collusive structures."[128]

212. Specifically, the following plus and super plus factors support an inference that Defendants' actions constituted a *per se* unlawful price fixing conspiracy not merely parallel conduct: the multifamily rental housing market (i) is highly concentrated; (ii) has high barriers to entry for would-be competitors; (iii) has high switching costs for renters; (iv) has inelastic demand; and (v) offers a fungible product. In addition, Defendants (vi) exchange competitively sensitive information; (vii) and have motive, opportunities, and invitations to collude.

#### i. The Multifamily Rental Market Is Highly Concentrated

213. The market for multifamily rental housing units is highly concentrated. A relatively small number of large property management companies, including the Lessor Defendants, control a significant number of the multifamily rental housing properties in metropolitan areas throughout the United States. Moreover, the market for multifamily revenue management software is even

---

[127] William E. Kovacic, *Plus Factors and Agreement in Antitrust Law*, 110 MICH. L. REV. 393, 393 (2011).

[128] *See id.* at 426.

more concentrated. While Defendant RealPage claims it collects data on over 16 million units, its 2020 10-K filing indicates RealPage clients in fact control 19.7 million, out of a total 22 million investment-grade units in the country. In other words, RealPage's clients comprise nearly 90% of the U.S. market for multifamily rental housing units.[129]

### ii. High Barriers to Entry

214. Any prospective competitor seeking to enter the market for multifamily rental housing and compete with the large property management companies faces significant barriers to entry, including the time and financial resources needed to develop a multifamily rental housing property portfolio through some combination of acquisition and new construction.

215. In addition to the costs to build or acquire, developing and maintaining a multifamily rental housing property takes years, meaning new entrants into the market are unlikely to discipline cartel pricing in the short or medium term.

216. Similarly, any software company seeking to provide software that competes with Defendant RealPage – in a non-collusive manner – faces significant barriers to entry, including convincing cartel members to switch to a service that will, by definition, provide them with less revenue and less profit than the RealPage cartel does, given the vast swaths of data collected by RealPage.

### iii. High Switching Costs for Renters

217. Significant switching costs prevent effective price competition in the multifamily rental housing market. A significant portion of Defendants' anticompetitive scheme involves increasing rents to supracompetitive levels when a lease comes up for renewal. Many tenants are

---

[129] Gal Meiron, *How Business Intelligence Can Clear Up a Cloudy Forecast*, REALPAGE, INC., (July 29, 2020), https://www.realpage.com/blog/how-business-intelligence-can-clear-up-a-cloudy-forecast/ (last visited on July 3, 2023).

forced to absorb inflated rents owing to the costs associated with moving altogether, the time and labor required to locate a new apartment, and the disruption to family, work, and personal life caused by moving, make switching to a better-priced alternative – if one were available – cost prohibitive.

218.     Additionally, for renters who seek to switch to a better-priced alternative – if one were available – mid-lease, they will likely face significant financial penalties for doing so. These penalties may include, among other things: the forfeiture of a security deposit that typically amounts to at least one month's rent or the requirement that the renter continue paying rent until the property is released.

219.     Because of these high switching costs and lack of substitutability, renters cannot readily switch from one rental unit to another in the event their current rental unit no longer aligns with market prices. This creates a certain degree of natural market power for owners of rental properties and makes collusion more effective because even if a competing property manager were to offer lower prices on available units, customers will not typically break their leases to enter a lease for a lower cost property given the substantial cost of doing so. Moreover, where price increases are occurring throughout broad geographic areas – as they do when the dominant landlords all enter a pricing cartel – renters often do not have any lower-priced options available in reasonable proximity to their work, school, or home. As such, renters cannot simply turn to alternative lessors in their region to discipline cartel pricing.

### iv.     Inelasticity of Demand

220.     The demand for multifamily rental housing units is highly inelastic, meaning an increase in rental housing prices tends to result in increased profits to the property management company without triggering substitutions sufficient to outweigh the benefit of profits reaped from units rented at the higher price points. The only reasonable alternative to renting is purchasing a

home, and for many renters, that is not an option either financially or logistically. Owing to this and the high switching costs discussed above, no reasonable substitutes exist to discipline cartel pricing.

<strong>v.      Multifamily Rental Housing Units Are a Fungible Product</strong>

221. When controlling for certain characteristics of multifamily rental housing properties, including among other things, the age of the building, the number of bedrooms and bathrooms, amenities available, location, and access to public transportation, units within like classes of properties are generally interchangeable. That is, each unit has the basic requirements for all tenants which drive marketing, sales, and leasing decisions for units within that class.

222. Indeed, many units in multifamily rental housing properties located in metro areas have similar amenities, including parking, exercise facilities, swimming pools, common areas, business centers, and internet access, and are thus readily comparable based on these objective features, as well as by rent and square footage. Defendant RealPage itself recognizes this and through its analytics services classifies and clusters similar multifamily rental properties and "benchmarks them at the market, submarket and ZIP code level." Those services provide property management companies with "a true apples-to-apples comparison" between largely fungible apartments in its pricing recommendations.[130]

223. Property Management companies recognize this too. Emily Mask, ECI Group's Associate VP of Operations and Revenue has acknowledged that, Defendant RealPage is

---

[130] Brandon Crowell, *Property Classification: It's Important to Get it Right*, REALPAGE ANALYTICS (Mar. 21, 2016), https://www.realpage.com/analytics/property-classification-its-important-to-get-right/ (last access on July 3, 2023).

"correctly looking at 'like' competitor properties and 'truly comparing apples to apples' as it relates to competitor apartment pricing."[131]

### vi.     Defendants Exchange Competitively Sensitive Information

224.    The reciprocal sharing of firm-specific competitively sensitive information that would normally remain private is a "super plus factor" that leads to a strong inference of active collusion.[132] As described above, Defendant RealPage requires client property managers to input data on actual rents paid and occupancy rates, along with detailed records of lease transactions. This data, which would normally be kept private, is fed into RealPage's RMS algorithm(s) which sets coordinated rents among competing property managers. Importantly, individual property managers would be competitively disadvantaged by providing private data to other property managers unilaterally, and rational actors will only do so with the expectation that they will benefit from similar private information shared by their competitors.

### vii.     Motive, Opportunities, and Invitations to Collude

225.    Defendant RealPage provides property managers with a motive to conspire by advertising its RMS can increase revenue by 3% to 7%.[133]

226.    Defendant RealPage's RMS provides its clients with an opportunity to coordinate prices and thereby achieve revenues that would be unavailable if a rental management company acted unilaterally. RealPage's advertisements are explicit that this is both the goal and the effect, a naked invitation to collude.

---

[131]    RealPage e-book B & C Assets Ace the Market, *supra*, note 5, at 5.

[132]    Christopher R. Leslie, *The Probative Synergy of Plus Factors in Price-Fixing Litigation*, 115 Nw. Univ. L. Rev. 1581, 1608 (2021).

[133]    Revenue Management: Proven in any Market Cycle, *supra*, note 28, at 6.

227.    Defendants have multiple opportunities to conspire through virtual or face-to-face meetings, online user groups, and through participation in various trade associations.  For example, Defendant RealPage's User Group provides Lessor Defendants with a private, password-protected forum that is only available to RealPage clients and its employees, in which Defendants can "interact with product managers and other clients"[134] and "create a completely integrated solution for the multifamily industry."[135]  The User Group has over 1,000 members and includes an "Idea Exchange" forum, monitored by RealPage, in which Defendants are encouraged to share ideas and comment on RealPage practices.

228.    Additionally, Defendant RealPage hosts online forums and in-person conferences for property managers[136] and maintains standing committees of cartel members to advise on pricing strategy,[137] all of which provide opportunities for more direct collusion.  Committee members are required to join quarterly conference calls and attend the annual meeting at the "RealWorld" conference, discussed below.

229.    Defendant RealPage hosts an annual RealWorld three-day conference, which typically draws over 1,000 attendees, including representatives from Lessor Defendants, among others, and which not only provides Defendants with the opportunity to collude, but in fact *encourages* the exchange of ideas between and among the Defendants.

230.    Industry trade associations serve as conduits of the cartel and facilitate opportunities to conspire and exchange information through meetings, webinars, and information

---

[134]    *Best Practices*, REALPAGE, INC., https://www.realpage.com/user-group/best-practices/ (last accessed June 14, 2023).

[135]    User Group Overview, *supra*, note 32.

[136]    *RealWorld 2023*, REALPAGE, INC., https://www.realpage.com/realworld/ (last accessed June 14, 2023).

[137]    User Group Overview, *supra*, note 32.

portals, all of which are accessible only to trade association members. For example, the National Multifamily Housing Council ("NMHC") hosts several events each year in cities throughout the United States; its "Chair Circle Sponsors" include Defendants RealPage, Greystar, and other prominent property management companies.

231. On information and belief, many Defendants in this action are members of the Texas Apartment Association ("TAA"), which drafted and revises the standard lease that approximately 85% of landlords use in the state of Texas. The standard lease is drafted by a committee of the TAA. These committee meetings, and other meetings held by the TAA, provide another opportunity for collusion amongst a group of landlords who have shared economic goals.

232. This committee gathers every other year to discuss changes to the standard lease form, typically resulting in revisions which unsurprisingly have increasingly favored landlords. At a minimum, the lease standardization facilitates the coordination of prices through Defendant RealPage's RMS because it narrows the areas where landlords are competing, which makes competitor price information more informative.

233. Even before the emergence and adoption of Defendant RealPage's RMS, the TAA's standardization of rental terms constitutes overt coordination in violation of the Sherman Act. A number of those provisions are directly linked to rent prices, including standardizing an interest rate of 18% on all amounts owed by the tenant and standardizing a late penalty for a broken lease of approximately 85% of one month's rent. As a result, the impact of the conduct alleged herein is boosted by the impact of RealPage's customers' collusion through the TAA. Each of the relevant provisions functions to increase landlords' profits even further.

234.	Nearly 50 additional national and regional trade associations (or their local chapters) serve as conduits of the cartel, much like NMHC and the TAA, by providing venues for Defendant RealPage and its participating Lessors to further their cartel's goals.

235.	National industry trade associations include: (1) Institute of Real Estate Management, (2) National Apartment Association, (3) National Association of Residential Property Managers, (4) Pension and Real Estate Association, and (5) Urban Land Institute.

236.	Regional associations and chapters include, among others: (1) Apartment and Office Building Association, (2) Apartment Association of Greater Dallas, (3) Apartment Association of Greater Orlando, (4) Apartment Association of Greater Los Angeles, (5) Apartment Association of Metro Denver, (6) Apartment Association of North Carolina, (7) Apartment Association of Orange County, (8) Apartment Association of Southeast Texas, (9) Apartment Owners Association of California, Inc., (10) Apartment Professionals Trade Society of New York, (11) Arizona Multihousing Association, (9) Atlanta Apartment Association, (12) Austin Apartment Association, (13) Austin Board of REALTORS, (14) Bay Area Apartment Association, (15) Baltimore Real Estate Investors Association, (16) Berkeley Property Owners Association, (17) California Apartment Association, (18) California Business Properties Association, (19) California Landlord Association, (20) California Rental Housing Association, (21) Chicagoland Apartment Association, (22) Colorado Apartment Association, (23) Colorado Landlords Association,  (24) East Bay Rental Housing Association, (25) First Coast Apartment Association, (26) Florida Apartment Association, (27) Georgia Apartment Association, (28) Greater Charlotte Apartment Association, (29) Greater Boston Real Estate Board, (30) Houston Apartment Association, (31) Illinois Rental Property Owners Association, (32) Landlord Protection Association of CA, (33) Maryland Multi-Housing Association, (34) Massachusetts Apartment

Association, (35) Miami Dade Real Estate Investors Association, (36) Mid-Atlantic Real Estate Investors Association, (37) Multifamily NW, (38) Nashville Apartment Association, (39) Nevada State Apartment Association, (40) Nor Cal Rental Property Association, (41) North Central Florida Apartment Association, (42) Northwest Florida Apartment Association, (43) Oregon Apartment Association, (44) Oregon Rental Housing Association, (45) Phoenix Metro Chapter of the National Association of Residential Property Managers, (46) Portland Area Rental Owners Association, (47) Professional Property Management Association of San Francisco, (48) Real Estate Council of Austin, (49) Rental Housing Association of Washington, (50) San Antonio Apartment Association, (51) San Diego County Apartment Association, (52) San Diego Creative Investors Association, (53) San Francisco Apartment Association, (54) South Coast Apartment Association, (55) Southern Arizona/Tucson Chapter of the National Association of Residential Property Managers, (56) South East Florida Apartment Association, (57) Southeast Regional Advisory Council for Apartment Life, (58) Southern California Rental Housing Association, (59) Southwest Florida Apartment Association, (60) Tennessee Apartment Association, (61) Texas Apartment Association (62) Washington Multi-Family Housing Association, (63) Washington Landlord Association, and (64) Wilmington Apartment Association.

## V.  RELEVANT MARKET

237.  Defendants' actions described herein constitute a single unlawful conspiracy to fix, raise, stabilize, or maintain at artificially high levels of rental costs charged for multifamily residential real estate across the United States, and is *per se* illegal under the Sherman Act.  This agreement was supported by a reciprocal exchange of competitively sensitive information through Defendant RealPage, which was a facilitating practice in furtherance of Defendants' cartel.

238.  Further, because the conduct alleged here increased prices and reduced output, if the Court declines to analyze this case under the *per se* mode of analysis, the Court could analyze

this case under the "quick look" mode of analysis. Under either mode of analysis, Plaintiffs are not required to prove that Defendants had market power in any defined antitrust market.

A.     **The Relevant Product Market Is Multifamily Residential Real Estate Leases.**

239.     To the extent the Court ultimately applies the "rule of reason" mode of analysis to these claims – notwithstanding the horizontal nature of the alleged conspiracy – the relevant product market is the market for the lease of multifamily residential real estate and a relevant geographic market is the United States.

240.     From the perspective of the consumer, multifamily rental apartment units are not an economic substitute with apartments, condominiums, or homes for purchase because, among other reasons, purchase of real estate requires the ability to make a substantial down payment and to obtain financing.

241.     Additionally, from the perspective of the consumer, single-family real estate is not an economic substitute for multifamily residential real estate. For example, single-family properties typically do not offer amenities and security. Indeed, industry participants in the multifamily residential real estate market typically distinguish between multifamily and single-family real estate when discussing customer preferences and market trends, including concerning their disparate respective pricing.

242.     Defendant RealPage itself differentiates the multifamily residential real estate market as a separate and distinct market from other residential markets. On its website, for example, RealPage lists "Multifamily" as its own market, distinct from affordable, military, senior, single-family, and student housing, as well as commercial properties.

243.     The multifamily residential real estate lease market satisfies the test for market definition used by federal antitrust enforcement agencies, widely known as the "SSNIP test." The test asks whether a hypothetical monopolist in a proffered market could profitably impose a small

but significant (typically 5%), non-transitory increase in price (a "SSNIP"), without causing a sufficient number of customers to switch to other products or services such that the SSNIP would be unprofitable to the monopolist. If the SSNIP is profitable, the market is properly defined. If the SSNIP is not profitable, the market is too narrowly defined, and does not encompass sufficient economic substitutes.

244. Here, the SSNIP test is satisfied, and the market is properly defined. As described above and below, pursuant to the Lessors' agreement not to compete on price, Lessors are able to increase rents "year over year, between 5% and 12% in every market," yet those increases have not driven enough renters out of the market such that the SSNIP has become unprofitable to Lessors. Because Lessors are able to increase prices by a SSNIP without losing sufficient sales to render the increase unprofitable, the Multifamily Rental Market is properly defined.

## B. Regional Submarkets

245. Defendant RealPage operates a nationwide business, with offices across the country and clients in every major metropolitan area. RealPage's RMS operate throughout the country in the same way, accounting for any regional variations in rental market conditions. Tenants across the country are impacted by the conspiracy facilitated by RealPage, as nationwide rental prices increase and output declines.

246. Given that commuting distance to a place of work or school is a significant (if not the primary) geographic constraint on where a person chooses to live, housing markets are regional, and many are tied to a center of commerce or education and the immediately surrounding areas. The U.S. Census Bureau and Office of Management and Budget establishes a Metropolitan Statistical Area ("MSA") for each major metropolitan area in the country. The Census Bureau defines an MSA as a geographic entity associated with at least one core urbanized area of 50,000

or more population, plus adjacent territory that has a high degree of social and economic integration with the core as measured by commuting ties.[138]

247.    Renters in any given MSA do not consider multifamily residential leases in other MSAs as adequate substitutes for multifamily residential leases in their own MSA.  Leases outside a MSA are not substitutable for leases inside a MSA because they would leave renters with inordinately long commutes to schools or jobs.  As a consequence, multifamily residential real estate outside the MSA are not within the relevant geographic markets for antitrust purposes.

248.    Plaintiffs allege that Defendants' scheme harmed competition in at least the following MSAs, each of which compromises a separate and distinct relevant regional geographic market under any potential Rule of Reason analysis:

### i.    Nashville, Tennessee

249.    The Nashville Submarket corresponds to the Census Bureau's Nashville-Davidson-Murfreesboro-Franklin MSA and includes Davidson and 12 other Tennessee counties.  There are approximately 156,928 multifamily rental units within the Nashville Regional Submarket.

250.    Through its suite of business products, including its RMS, Defendant RealPage collects and shares pricing and occupancy information for a high concentration of multifamily residential apartment units within the Nashville Submarket, as self-reported by RealPage on its website:[139]

---

[138]    *See*                https://www.gpo.gov/fdsys/pkg/FR-2010-06-28/pdf/2010-15605.pdf; https://www2.census.gov/geo/pdfs/reference/GARM/Ch13GARM.pdf.

[139]    https://www.realpage.com/explore/main/tn/nashville-davidson-murfreesboro-franklin.



251. Lessors and property managers who use revenue management software account for approximately 73% of all multifamily rental units in the Nashville Submarket.[140]

252. Widespread adoption of Defendant RealPage's RMS has caused rent to increase explosively in recent years, with Nashville renters paying 51% more in rent today than they paid in 2016.

253. Outside the use of RealPage's RMS, two active trade associations – the Greater Nashville Apartment Association and Tennessee Apartment Association – serve as conduits of the cartel, by providing venues for RealPage and participating Nashville Submarket Lessors to further their cartel's goals.

---

[140] The estimates of the market share of Lessors and property managers who use a form of revenue management software in the submarkets addressed in §V.B are derived from survey data acquired from ALN Apartment Data, a nationwide multifamily data services firm.

### ii.    Atlanta, Georgia

254.    The Atlanta Submarket corresponds to the Census Bureau's Atlanta–Sandy Springs–Alpharetta MSA.  There are approximately 483,529 multifamily rental units within the Atlanta Regional Submarket.

255.    Through its suite of business products, including RMS, Defendant RealPage collects and shares pricing and occupancy information for a high concentration of multifamily residential apartment units within the Atlanta Submarket, as self-reported by RealPage on its website:[141]



---

[141]    https://www.realpage.com/explore/main/ga/atlanta-sandy-springs-roswell.

256.     Lessors and property managers who use revenue management software account for approximately 81% of all multifamily rental units in the Atlanta Submarket.

257.     Widespread adoption of Defendant RealPage's RMS has caused rent to increase explosively in recent years, with Atlanta renters paying approximately 56% more in rent today than they paid in 2016.

258.     Outside the use of the Defendant RealPage's RMS, three active trade associations – the Atlanta Apartment Association, Georgia Apartment Association, and Southeast Regional Advisory Council for Apartment Life – serve as conduits of the cartel, by providing venues for RealPage and participating Atlanta Submarket Lessors to further their cartel's goals.

### iii.    Austin, Texas

259.     The Austin Submarket corresponds to the Austin-Round Rock-Georgetown MSA, and consists of the City of Austin, Bastrop County, Caldwell County, Hays County, Travis County, and Williamson County.   There are approximately 289,198 units within the Austin Regional Submarket.

260.    Through its suite of business products, including RMS, Defendant RealPage collects and shares pricing and occupancy information for a high concentration of multifamily residential apartment units within the Austin Submarket, as self-reported by RealPage on its website:[142]



261.    Lessors and property managers who use revenue management software account for approximately 70% of all multifamily rental units in the Austin Submarket.

262.    Widespread adoption of Defendant RealPage's RMS has caused rent to increase explosively in recent years, with Austin renters paying 49% more in rent today than they paid in 2016.

---

[142]    https://www.realpage.com/explore/main/tx/austin-round-rock.

263.    Outside the use of the Defendant RealPage's RMS, several active trade associations – the Austin Apartment Association, Texas Apartment Association, Austin Board of REALTORS, Austin, and the Real Estate Council of Austin – serve as conduits of the cartel, by providing venues for RealPage and participating Austin Submarket Lessors to further their cartel's goals.

### iv.    Baltimore, Maryland

264.    The Baltimore Submarket corresponds to the Census Bureau's Baltimore-Columbia-Towson MSA and consists of the City of Baltimore and six counties in Maryland. There are approximately 199,885 multifamily rental units within the Baltimore Regional Submarket.

265.    Through its suite of business products, including RMS, Defendant RealPage collects and shares pricing and occupancy information for a high concentration of multifamily residential apartment units within the Baltimore Submarket, as self-reported by RealPage on its website:[143]



---

[143]    https://www.realpage.com/explore/main/md/baltimore-columbia-towson.

266.     Lessors and property managers who use revenue management software account for approximately 57% of all multifamily rental units in the Baltimore Submarket.

267.     Widespread adoption of Defendant RealPage's RMS has caused rent to increase explosively in recent years, with Baltimore renters paying nearly 26% more in rent today than they paid in 2016.

268.     Outside the use of the Defendant RealPage's RMS, two active trade associations – the Maryland Multi-housing Association and the Baltimore Real Estate Investors Association – serve as conduits of the cartel, by providing venues for RealPage and participating Baltimore Submarket Lessors to further their cartel's goals.

269.     In addition to the high adoption of Defendant RealPage's RMS, competition in the Baltimore Submarket is also stymied by local permitting requirements, which inhibit new entrants to the market.

### v.     Boston, Massachusetts

270.     The Boston Submarket corresponds to the Census Bureau's Boston-Cambridge-Newton MSA, and includes Suffolk, Essex, Middlesex, Norfolk, and Plymouth counties in Massachusetts. There are approximately 171,981 multifamily rental units within the Boston Regional Submarket.

271. Through its suite of business products, including RMS, Defendant RealPage collects and shares pricing and occupancy information for a high concentration of multifamily residential apartment units within the Boston Submarket, as self-reported by RealPage on its website:[144]



272. Lessors and property managers who use revenue management software account for approximately 71% of all multifamily rental units in the Boston Submarket.

273. Widespread adoption of Defendant RealPage's RMS has caused rent to increase explosively in recent years, with Boston renters paying 40% more in rent in 2023 than they paid in 2016.

274. Outside the use of the Defendant RealPage's RMS, two active trade associations – the Greater Boston Real Estate Board and its affiliate, the Massachusetts Apartment Association

---

[144]        https://www.realpage.com/explore/main/ma/boston-cambridge-newton.

– serve as conduits of the cartel, by providing venues for RealPage and participating Boston Submarket Lessors to further their cartel's goals.

275.     In addition to the high adoption of Defendant RealPage's RMS, competition in the Boston Submarket is also stymied by local zoning laws which include direct restrictions on multifamily housing construction, building height, and dwelling units per acre, and which inhibit new entrants to the market.

### vi.     Charlotte, North Carolina

276.     The Charlotte Submarket corresponds to the Census Bureau's Charlotte-Gastonia-Concord MSA and includes 11 counties in North and South Carolina. There are approximately 205,487 rental units within the Charlotte Regional Submarket.

277.     Through its suite of business products, including RMS, Defendant RealPage collects and shares pricing and occupancy information for a high concentration of multifamily residential apartment units within the Charlotte Submarket, as self-reported by RealPage on its website:[145]

---

[145]     https://www.realpage.com/explore/main/nc/charlotte-concord-gastonia.



278.     Lessors and property managers who use revenue management software account for approximately 76% of all multifamily rental units in the Charlotte Submarket.

279.     Widespread adoption of Defendant RealPage's RMS has caused rent to increase explosively in recent years, with Charlotte renters paying 54% more in rent today than they paid in 2016.

280.     Outside the use of the Defendant RealPage's RMS, two active trade associations – the Greater Charlotte Apartment Association and the Apartment Association of North Carolina – serve as conduits of the cartel, by providing venues for RealPage and participating Charlotte Submarket Lessors to further their cartel's goals.

### vii.    Chicago, Illinois

281.    The Chicago Submarket corresponds to the Census Bureau's Chicago-Naperville-Elgin MSA, and includes 14 counties in Illinois, Indiana, and Wisconsin.  There are approximately 306,667 multifamily rental units within the Chicago Regional Submarket.

282.    Through its suite of business products, including RMS, Defendant RealPage collects and shares pricing and occupancy information for a high concentration of multifamily residential apartment units within the Chicago Submarket, as self-reported by RealPage on its website:[146]



283.    Lessors and property managers who use revenue management software account for approximately 53% of all multifamily rental units in the Chicago Submarket.

---

[146]    https://www.realpage.com/explore/main/il/chicago-naperville-elgin.

284.    Widespread adoption of Defendant RealPage's RMS has caused rent to increase explosively in recent years, with Chicago renters paying a year over year increase in rent of 5-19%.

285.    Outside the use of the Defendant RealPage's RMS, active trade associations, including the Chicagoland Apartment Association, serve as conduits of the cartel, by providing venues for RealPage and participating Chicago Submarket Lessors to further their cartel's goals.

### viii.    Dallas, Texas

286.    The Dallas Submarket corresponds to the Census Bureau's Dallas-Fort Worth-Arlington MSA and includes 11 Texas counties.  There are approximately 862,113 multifamily rental units within the Dallas Regional Submarket.

287.    Through its suite of business products, including RMS, Defendant RealPage collects and shares pricing and occupancy information for a high concentration of multifamily residential apartment units within the Dallas Submarket, as self-reported by RealPage on its website:[147]

---

[147]    https://www.realpage.com/explore/main/tx/dallas-plano-irving.



288.     Lessors and property managers who use revenue management software account for approximately 76% of all multifamily rental units in the Dallas Submarket.

289.     Widespread adoption of Defendant RealPage's RMS has caused rent to increase explosively in recent years, with Dallas renters paying 51% more in rent today than they paid in 2016.

290.     Outside the use of the Defendant RealPage's RMS, two active trade associations – the Apartment Association of Greater Dallas and the Texas Apartment Association – serve as conduits of the cartel, by providing venues for RealPage and participating Dallas Submarket Lessors to further their cartel's goals.

### ix.     Denver, Colorado

291.     The Denver Submarket corresponds to the Census Bureau's Denver-Aurora-Lakewood MSA, and ten Colorado Counties: the City and County of Denver, Arapahoe County, Jefferson County, Adams County, Douglas County, the City and County of Broomfield, Elbert

County, Park County, Clear Creek County, and Gilpin County. There are approximately 248,726 multifamily rental units within the Denver Regional Submarket.

292.     Through its suite of business products, including RMS, Defendant RealPage collects and shares pricing and occupancy information for a high concentration of multifamily residential apartment units within the Denver Submarket, as self-reported by RealPage on its website:[148]



293.     Lessors and property managers who use revenue management software account for approximately 78% of all multifamily rental units in the Denver Submarket.

294.     Widespread adoption of Defendant RealPage's RMS has caused rent to increase explosively in recent years. RealPage reported that "[o]ver the past five years, annual rent growth

---

[148]     https://www.realpage.com/explore/main/co/denver-aurora-lakewood.

in the Denver, CO, area averaged 4.9%" and that some months, the top 20% of properties saw year-over-year revenue increase as much as 30.7%.[149]

295.    Outside the use of the Defendant RealPage's RMS, several active trade associations – the Colorado Apartment Association, Apartment Association of Metro Denver, and the Colorado Landlords Association – serve as conduits of the cartel, by providing venues for RealPage and participating Denver Submarket Lessors to further their cartel's goals.

296.    In addition to the high adoption of Defendant RealPage's RMS, competition in the Denver Submarket is also stymied by local regulatory and low-income housing requirements, which inhibit new entrants to the market.

### x.    Houston, Texas

297.    The Houston Submarket corresponds to the Census Bureau's Houston-The Woodlands-Sugarland MSA and includes all of Harris County as well as the surrounding counties of Montgomery, Liberty, Austin, Chambers, Waller, Fort Bent, Brazoria, and Galveston. There are approximately 712,202 multifamily rental units within the Houston Regional Submarket.

---

[149]    *See* https://www.realpage.com/explore/main/co/denver-aurora-lakewood (last accessed Feb. 13, 2023).

298.     Through its suite of business products, including RMS, Defendant RealPage collects and shares pricing and occupancy information for a high concentration of multifamily residential apartment units within the Houston Submarket, as self-reported by RealPage on its website.[150]



299.     Lessors and property managers who use revenue management software account for approximately 66% of all multifamily rental units in the Houston Submarket.

300.     Widespread adoption of Defendant RealPage's RMS has caused rent to increase explosively in recent years, with Houston renters paying 33% more in rent today than they paid in 2016.

301.     Outside the use of the Defendant RealPage's RMS, two active trade associations – the Houston Apartment Association and the Texas Apartment Association – serve as conduits of the cartel, by providing venues for RealPage and participating Houston Submarket Lessors to further their cartel's goals.

---

[150]     https://www.realpage.com/explore/main/tx/houston-the-woodlands-sugar-land.

### xi. Jacksonville, Florida

302.     The Jacksonville Submarket corresponds to the Census Bureau's Jacksonville MSA, and includes Duval, St. Johns, Clay, Nassau, and Baker counties.  There are approximately 110,219 rental units within the Jacksonville Regional Submarket.

303.     Through its suite of business products, including RMS, Defendant RealPage collects and shares pricing and occupancy information for a high concentration of multifamily residential apartment units within the Jacksonville Submarket, as self-reported by RealPage on its website:[151]



---

[151]     https://www.realpage.com/explore/main/fl/jacksonville.

304.     Lessors and property managers who use revenue management software account for approximately 65% of all multifamily rental units in the Jacksonville Submarket.

305.     Widespread adoption of Defendant RealPage's RMS has caused rent to increase explosively in recent years, with Jacksonville renters paying 35.7% more in rent today than they paid in 2016.

306.     Outside the use of the Defendant RealPage's RMS, two active trade associations – the First Coast Apartment Association and Florida Apartment Association – serve as conduits of the cartel, by providing venues for RealPage and participating Jacksonville Submarket Lessors to further their cartel's goals.

### xii.     Las Vegas, Nevada

307.     The Las Vegas Submarket corresponds to the Census Bureau's Las Vegas-Henderson-Paradise MSA and includes all of Clark County.  There are approximately 183,900 rental units within the Las Vegas Regional Submarket.

308.     Through its suite of business products, including RMS, Defendant RealPage collects and shares pricing and occupancy information for a high concentration of multifamily residential apartment units within the Las Vegas Submarket, as self-reported by RealPage on its website:[152]

---

[152]     https://www.realpage.com/explore/main/nv/las-vegas-henderson-paradise.



309.     Lessors and property managers who use revenue management software account for approximately 61% of all multifamily rental units in the Las Vegas Submarket.

310.     Widespread adoption of Defendant RealPage's RMS has caused rent to increase explosively in recent years, with Las Vegas renters paying 63% more in rent today than they paid in 2016.

311.     Outside the use of the Defendant RealPage's RMS, active trade associations – including the Nevada State Apartment Association – serve as conduits of the cartel, by providing venues for RealPage and participating Las Vegas Submarket Lessors to further their cartel's goals.

### xiii. Los Angeles, California

312. The Los Angeles Submarket corresponds to the Census Bureau's Los Angeles-Long Beach-Anaheim MSA and includes Los Angeles and Orange counties. There are approximately 522,937 multifamily rental units within the Los Angeles Regional Submarket.

313. Through its suite of business products, including Defendant RealPage's RMS, RealPage collects and shares pricing and occupancy information for a high concentration of multifamily residential apartment units within the Los Angeles Submarket, as self-reported by RealPage on its website:[153]



314. Lessors and property managers who use revenue management software account for approximately 79% of all multifamily rental units in the Los Angeles Submarket.

---

[153] https://www.realpage.com/explore/main/ca/los-angeles-long-beach-glendale.

315. Widespread adoption of Defendant RealPage's RMS has caused rent to increase explosively in recent years, with Los Angeles renters paying 41% more in rent today than they paid in 2016.

316. Outside the use of the Defendant RealPage's RMS, six active trade associations – the Apartment Association of Greater Los Angeles, California Rental Housing Association, California Apartment Association, Landlord Protection Association of CA, Apartment Owners Association of California, and Building Owners and Managers' Association's Los Angeles Chapter – serve as conduits of the cartel, by providing venues for RealPage and participating Los Angeles Submarket Lessors to further their cartel's goals.

317. In addition to the high adoption of RealPage's RMS, competition in the Los Angeles Submarket is also stymied by local rent control and stabilization ordinances, which inhibit new entrants to the market.

### xiv. Miami, Florida

318. The Miami Submarket corresponds to the Census Bureau's Miami-Fort Lauderdale-Pompano Beach MSA, and includes Miami-Dade County, Broward County, and Palm Beach County. There are approximately 301,268 multifamily rental units within the Miami Regional Submarket.

319.    Through its suite of business products, including RMS, Defendant RealPage collects and shares pricing and occupancy information for a high concentration of multifamily residential apartment units within the Miami Submarket, as self-reported by RealPage on its website:[154]



320.    Lessors and property managers who use revenue management software account for approximately 79% of all multifamily units in the Miami Submarket.

321.    Widespread adoption of Defendant RealPage's RMS has caused rent to increase explosively in recent years, with Miami renters paying 23% more in rent in 2021 than they paid in 2016.

---

154      https://www.realpage.com/explore/main/fl/miami-miami-beach-kendall.

322.     Outside the use of the Defendant RealPage's RMS, two active trade associations –
the Florida Apartment Association and the Southeast Florida Apartment Association – serve as
conduits of the cartel, by providing venues for RealPage and participating Miami Submarket
Lessors to further their cartel's goals.

### xv.     New York, New York

323.     The New York Submarket corresponds to the Census Bureau's New York-Newark-
Jersey City MSA, and spans parts of New York, New Jersey, and Pennsylvania.   There are
approximately 527,575 multifamily rental units within the New York Regional Submarket.

324.     Through its suite of business products, including RMS, Defendant RealPage
collects and shares pricing and occupancy information for a high concentration of multifamily
residential apartment units within the New York Submarket, as self-reported by RealPage on its
website:[155]

---

[155]     https://www.realpage.com/explore/main/ny/new-york-white-plains.



325.    Lessors and property managers who use revenue management software account for approximately 60% of all multifamily rental units in the New York Submarket.

326.    Widespread adoption of Defendant RealPage's RMS has caused rent to increase explosively in recent years, with New York renters paying 28% more in rent today than they paid in 2016.

327.    Outside the use of the Defendant RealPage's RMS, active trade associations – including the Apartment Professionals Trade Society of New York – serve as conduits of the cartel, by providing venues for RealPage and participating New York Submarket Lessors to further their cartel's goals.

328.    In addition to the high adoption of Defendant RealPage's RMS, competition in the New York Submarket is also stymied by local rent stabilization and construction permitting requirements, which inhibit new entrants to the market.

### xvi.    Orlando, Florida

329.    The Orlando Submarket corresponds to the Census Bureau's Orlando-Kissimmee-Sanford MSA, and includes all of Orange, Kissimmee, Sanford, and Like counties.  There are approximately 221,482 multifamily rental units within the Orlando Regional Submarket.

330.    Through its suite of business products, including RMS, Defendant RealPage collects and shares pricing and occupancy information for a high concentration of multifamily residential apartment units within the Orlando Submarket, as self-reported by RealPage on its website:[156]



---

[156]      https://www.realpage.com/explore/main/fl/orlando-kissimmee-sanford.

331. Lessors and property managers who use revenue management software account for approximately 72% of all multifamily rental units in the Orlando Submarket.

332. Widespread adoption of Defendant RealPage's RMS has caused rent to increase explosively in recent years, with Orlando renters paying 43% more in rent in 2023 than they paid in 2016.

333. Outside the use of the Defendant RealPage's RMS, two active trade associations – the Florida Apartment Association and the Apartment Association of Greater Orlando – serve as conduits of the cartel, by providing venues for RealPage and participating Orlando Submarket Lessors to further their cartel's goals.

### xvii. Phoenix, Arizona

334. The Phoenix Submarket corresponds to the Census Bureau's Phoenix-Mesa-Chandler MSA and includes all of Maricopa and Pinal counties. There are approximately 339,083 multifamily rental units within the Phoenix Regional Submarket.

335. Through its suite of business products, including RMS, Defendant RealPage collects and shares pricing and occupancy information for a high concentration of multifamily residential apartment units within the Phoenix Submarket, as self-reported by RealPage on its website:



336.    Lessors and property managers who use revenue management software account for approximately 75% of all multifamily rental units in the Phoenix Submarket.

337.    Widespread adoption of Defendant RealPage's RMS has caused rent to increase explosively in recent years, with Phoenix renters paying 76% more in rent in 2023 than they paid in 2016.[157]

338.    Outside the use of the Defendant RealPage's RMS, two active trade associations – the Arizona Multihousing Association and the Phoenix Metro Chapter of the National Association of Residential Property Managers – serve as conduits of the cartel, by providing venues for RealPage and participating Phoenix Submarket Lessors to further their cartel's goals.

---

[157]    Moody's Analytics REIS data.

339.    In addition to the high adoption of Defendant RealPage's RMS, competition in the Phoenix Submarket is also stymied by local tax licensing and construction permitting requirements, which inhibit new entrants to the market.

**xviii.    Portland, Oregon**

340.    The Portland Submarket corresponds to the Census Bureau's Portland-Vancouver-Hillsboro MSA and is comprised of seven counties in Oregon and Washington state. There are approximately 153,476 multifamily rental units within the Portland Regional Submarket.

341.    Through its suite of business products, including RMS, Defendant RealPage collects and shares pricing and occupancy information for a high concentration of multifamily residential apartment units within the Portland Submarket, as self-reported by RealPage on its website:[158]



---

[158]    https://www.realpage.com/explore/main/or/portland-vancouver-hillsboro.

342.     Lessors and property managers who use revenue management software account for approximately 63% of all multifamily rental units in the Portland Submarket.

343.     Widespread adoption of Defendant RealPage's RMS has caused rent to increase explosively in recent years, with Portland renters paying 52% more in rent today than they paid in 2016.

344.     Outside the use of the Defendant RealPage's RMS, two active trade associations – Multifamily NW and the Portland Area Rental Owners Association – serve as conduits of the cartel, by providing venues for RealPage and participating Portland Submarket Lessors to further their cartel's goals.

345.     In addition to the high adoption of Defendant RealPage's RMS, competition in the Portland Submarket is also stymied by local permitting and affordable housing requirements, which inhibit new entrants to the market.

### xix.     San Diego, California

346.     The San Diego Submarket corresponds to the Census Bureau's San Diego-Carlsbad-San Marcos MSA and includes all of San Diego County. There are approximately 184,355 multifamily rental units within the San Diego Regional Submarket.

347.     Through its suite of business products, including RMS, Defendant RealPage collects and shares pricing and occupancy information for a high concentration of multifamily residential apartment units within the San Diego Submarket, as self-reported by RealPage on its website:[159]

---

[159]     https://www.realpage.com/explore/main/ca/san-diego-carlsbad.



348.     Lessors and property managers who use revenue management software account for approximately 63% of all multifamily rental units in the San Diego Submarket.

349.     Widespread adoption of Defendant RealPage's RMS has caused rent to increase explosively in recent years, with San Diego renters paying 41% more in rent today than they paid in 2016.

350.     Outside the use of the Defendant RealPage's RMS, several active trade associations – the Southern California Rental Housing Association, California Apartment Association, San Diego County Apartment Association, and San Diego Creative Investors Association – serve as conduits of the cartel, by providing venues for RealPage and participating San Diego Submarket Lessors to further their cartel's goals.

351.    In addition to the high adoption of Defendant RealPage's RMS, competition in the San Diego Submarket is also stymied by restrictive zoning and permitting requirements, which inhibit new entrants to the market.

xx.    **San Francisco, California**

352.    The San Francisco Submarket corresponds to the Census Bureau's San Francisco-Oakland-Fremont MSA, and includes San Francisco, Alameda, Marin, Contra Costa, and San Mateo counties.  There are approximately 194,642 rental units within the San Francisco Regional Submarket.

353.    Through its suite of business products, including RMS, Defendant RealPage collects and shares pricing and occupancy information for a high concentration of multifamily residential apartment units within the San Francisco Submarket, as self-reported by RealPage on its website:[160]

---

[160]    https://www.realpage.com/explore/main/ca/san-francisco-redwood-city-south-san-francisco.



354.     Lessors and property managers who use revenue management software account for approximately 70% of all multifamily rental units in the San Francisco Submarket.

355.     Widespread adoption of Defendant RealPage's RMS has caused rent to increase explosively in recent years, with San Francisco renters paying 12% more in rent today than they paid in 2016.

356.     Outside the use of the Defendant RealPage's RMS, three active trade associations – the San Francisco Apartment Association, California Apartment Association, and Professional Property Management Association of San Francisco –serve as conduits of the cartel, by providing

venues for RealPage and participating San Francisco Submarket Lessors to further their cartel's goals.

357.    In addition to the high adoption of Defendant RealPage's RMS, competition in the San Francisco Submarket is also stymied by local rent stabilization requirements, which inhibit new entrants to the market.

### xxi.    San Jose, California

358.    The San Jose Submarket corresponds to the Census Bureau's San Jose-Sunnyvale-Santa Clara MSA and includes all of San Benito and Santa Clara counties. There are approximately 123,166 multifamily rental units within the San Jose Regional Submarket.

359.    Through its suite of business products, including RMS, Defendant RealPage collects and shares pricing and occupancy information for a high concentration of multifamily residential apartment units within the San Jose Submarket, as self-reported by RealPage on its website:[161]

_____

[161]    https://www.realpage.com/explore/main/ca/san-jose-sunnyvale-santa-clara.



360.    Lessors and property managers who use revenue management software account for approximately 66% of all multifamily rental units in the San Jose Submarket.

361.    Widespread adoption of Defendant RealPage's RMS has caused rent to increase explosively in recent years, with San Jose renters paying 20.06% more in rent today than they paid in 2016.

362.    Outside the use of the Defendant RealPage's RMS, several active trade associations – the California Rental Housing Association, California Apartment Association, Landlord Protection Association of CA, and Apartment Owners Association of California. Inc. – serve as conduits of the cartel, by providing venues for RealPage and participating San Jose Submarket Lessors to further their cartel's goals.

363.    In addition to the high adoption of Defendant RealPage's RMS, competition in the San Jose Submarket is also stymied by rent control and/or stabilization ordinances, which inhibit new entrants to the market.

xxii.    Seattle, Washington

364.    The Seattle Submarket corresponds to the Census Bureau's Seattle-Tacoma-Bellevue MSA and contains the three largest counties in the state: King, Pierce, and Snohomish counties.  There are approximately 292,565 multifamily rental units within the Seattle Regional Submarket.

365.    Through its suite of business products, including RMS, Defendant RealPage collects and shares pricing and occupancy information for a high concentration of multifamily residential apartment units within the Seattle Submarket, as self-reported by RealPage on its website:[162]



366.    Lessors and property managers who use revenue management software account for approximately 74% of all multifamily rental units in the Seattle Submarket.

---

[162]    https://www.realpage.com/explore/main/wa/seattle-bellevue-everett.

367.    Widespread adoption of Defendant RealPage's RMS has caused rent to increase explosively in recent years, with Seattle renters paying 51% more in rent today than they paid in 2016.

368.    Outside the use of the Defendant RealPage's RMS, two active trade associations – the Rental Housing Association of Washington and the Washington Multi-Family Housing Association – serve as conduits of the cartel, by providing venues for RealPage and participating Seattle Submarket Lessors to further their cartel's goals.

369.    In addition to the high adoption of Defendant RealPage's RMS, competition in the Seattle Submarket is also stymied by local construction permitting requirements and a housing voucher program for low-income individuals, which inhibit new entrants to the market.

### xxiii.    Tampa, Florida

370.    The Tampa Submarket corresponds to the Census Tampa-St. Petersburg-Clearwater MSA, and includes all of Hernando, Pasco, Pinellas, and Hillsborough counties. There are approximately 213,780 multifamily rental units within the Tampa Regional Submarket.

371.    Through its suite of business products, including RMS, Defendant RealPage collects and shares pricing and occupancy information for a high concentration of multifamily residential apartment units within the Tampa Submarket, as self-reported by RealPage on its website:[163]

---

[163]    https://www.realpage.com/explore/main/fl/tampa-st-petersburg-clearwater.



372. Lessors and property managers who use revenue management software account for approximately 62% of all multifamily rental units in the Tampa Submarket.

373. Widespread adoption of Defendant RealPage's RMS has caused rent to increase explosively in recent years, with Tampa renters paying 47% more in rent in 2023 than they paid in 2016.

374. Outside the use of the Defendant RealPage's RMS, two active trade associations – the Florida Apartment Association and the Bay Area Apartment Association – serve as conduits of the cartel, by providing venues for RealPage and participating Tampa Submarket Lessors to further their cartel's goals.

### xxiv. Tucson, Arizona

375. The Tucson Submarket corresponds to the Census Bureau's Tucson MSA and includes all of Pima County. There are approximately 69,004 multifamily rental units within the Tucson Regional Submarket.

376.    Through its suite of business products, including RMS, Defendant RealPage collects and shares pricing and occupancy information for a high concentration of multifamily residential apartment units within the Tucson Submarket, as self-reported by RealPage on its website:[164]



377.    Lessors and property managers who use revenue management software account for approximately 54% of all multifamily rental units in the Tuscon Submarket.

378.    Widespread adoption of Defendant RealPage's RMS has caused rent to increase explosively in recent years, with Tucson renters paying 35% more in rent today than they paid in 2016.

---

[164]    https://www.realpage.com/explore/main/az/tucson.

379.     Outside the use of the Defendant RealPage's RMS, two active trade associations – the Arizona Multihousing Association and the Southern Arizona/Tucson Chapter of the National Association of Residential Property Managers – serve as conduits of the cartel, by providing venues for RealPage and participating Tucson Submarket Lessors to further their cartel's goals.

### xxv.     Washington, District of Columbia

380.     The Washington D.C. Submarket corresponds to the Census Bureau's Washington-Arlington-Alexandria MSA, and spans the District of Columbia and parts of Virginia and Maryland.  There are approximately 548,398 multifamily rental units within the Washington D.C. Regional Submarket.

381.     Through its suite of business products, including RMS, Defendant RealPage collects and shares pricing and occupancy information for a high concentration of multifamily residential apartment units within the Washington D.C. Submarket, as self-reported by RealPage on its website:[165]

---

[165]     https://www.realpage.com/explore/main/dc/washington-arlington-alexandria.



382. Lessors and property managers who use revenue management software account for approximately 79% of all multifamily rental units in the Washington D.C. Submarket.

383. Widespread adoption of Defendant RealPage's RMS has caused rent to increase explosively in recent years, with Washington D.C. renters paying 35% more in rent in 2022 than they paid in 2016.

384. Outside the use of the Defendant RealPage's RMS, active trade associations – including the Apartment and Office Building Association – serve as conduits of the cartel, by providing venues for RealPage and participating Washington D.C. Submarket Lessors to further their cartel's goals.

385. In addition to the high adoption of Defendant RealPage's RMS, competition in the Washington D.C. Submarket is also stymied by local zoning and rent control requirements, which inhibit new entrants to the market.

### xxvi. Wilmington, North Carolina

386. The Wilmington Submarket corresponds to the Census Bureau's Wilmington MSA and includes Pender and New Hanover counties. There are approximately 22,820 multifamily rental units within the Wilmington Regional Submarket.

387. Through its suite of business products, including RMS, Defendant RealPage collects and shares pricing and occupancy information for a high concentration of multifamily residential apartment units within the Wilmington Submarket, as self-reported by RealPage on its website:[166]



388. Lessors and property managers who use revenue management software account for approximately 62% of all multifamily rental units in the Wilmington Submarket.

---

[166] https://www.realpage.com/explore/main/nc/wilmington.

389.     Widespread adoption of Defendant RealPage's RMS has caused rent to increase explosively in recent years, with Wilmington renters paying 66.8% more in rent today than they paid in 2016.

390.     Outside the use of the Defendant RealPage's RMS, two active trade associations – the Apartment Association of North Carolina and the Wilmington Apartment Association – serve as conduits of the cartel, by providing venues for RealPage and participating Wilmington Submarket Lessors to further their cartel's goals.

### xxvii.     Additional Geographic Sub-markets

391.     In addition to the MSAs identified above, at least the following additional MSAs constitute distinct geographic markets for multifamily rental apartments:

(a) Philadelphia-Camden-Wilmington, PA-NJ-DE-MD MSA;

(b) Riverside-San Bernardino-Ontario, CA MSA;

(c) Detroit-Warren-Dearborn, MI MSA;

(d) Minneapolis-St. Paul-Bloomington, MN-WI MSA;

(e) St. Louis, MO-IL MSA;

(f) San Antonio-New Braunfels, TX MSA;

(g) Sacramento-Roseville-Folsom, CA MSA;

(h) Pittsburgh, PA MSA;

(i) Cincinnati, OH-KY-IN MSA;

(j) Kansas City, MO-KS MSA;

(k) Columbus, OH MSA;

(l) Indianapolis-Carmel-Anderson, IN MSA;

(m) Cleveland-Elyria, OH MSA;

(n) San Juan-Bayamón-Caguas, PR MSA;

(o) Virginia Beach-Norfolk-Newport News, VA-NC MSA;

(p) Providence-Warwick, RI-MA MSA;

(q) Milwaukee-Waukesha, WI MSA;

(r) Raleigh-Cary, NC MSA;

(s) Oklahoma City, OK MSA;

(t) Richmond, VA MSA;

(u) Memphis, TN-MS-AR MSA;

(v) Louisville/Jefferson County, KY-IN MSA;

(w) Salt Lake City, UT MSA;

(x) New Orleans-Metairie, LA MSA;

(y) Hartford-East Hartford-Middletown, CT MSA;

(z) Buffalo-Cheektowaga, NY MSA; and

(aa) Birmingham-Hoover, AL MSA.

392. Multifamily real estate leases in each MSA therefore comprise of a distinct product and geographic market for antitrust purposes.

393. While Plaintiffs have identified the foregoing distinct geographic sub-markets, Plaintiffs anticipate that additional submarkets will be uncovered in the course of discovery and upon expert analysis of the data produced, given that Defendants operate nationwide. Additional sub-markets will be included as appropriate, after sufficient discovery.

## VI. CLASS ACTION ALLEGATIONS

394. Plaintiffs bring this action on behalf of themselves and all others similarly situated as a class action under Federal Rules of Civil Procedure 23(a) and 23(b)(3), seeking damages as well as equitable and injunctive relief, on behalf of the following Class:

All persons and entities in the United States and its territories who paid rent on at least one multifamily residential real estate lease from any Lessor participating in RealPage's Revenue Management Solutions, including its pricing software and/or lease renewal staggering software programs, or from a division, subsidiary, predecessor, agent, or affiliate of any such Lessor, at any time during the period of October 18, 2018 until the Defendants' unlawful conduct and its anticompetitive effects cease to persist.

395. Specifically excluded from this Class are Defendants; the officers, directors, or employees of any Defendant; any entity in which any Defendant has a controlling interest; and any affiliate, legal representative, heir or assign of any Defendant. Also excluded from this Class are any federal, state, or local governmental entities, any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, any juror assigned to this action, and any co-conspirator identified in this action.

396. The Class is so numerous as to make joinder impracticable. Plaintiffs do not know the exact number of Class members because such information presently is in the exclusive control of Defendants. Plaintiffs believe that due to the nature of the residential rental market there are likely millions of Class members in the United States.

397. Common questions of law and fact exist as to all members of the Class. Plaintiffs and the Class were injured by the same unlawful price-fixing conspiracy, and Defendants' anticompetitive conduct was generally applicable to all the members of the Class, and relief to the Class as a whole is appropriate. Common issues of fact and law include, but are not limited to the following:

> (bb)    Whether Defendants and their co-conspirators engaged in a combination or conspiracy to fix, raise, maintain or stabilize rent prices for multifamily residential units in the United States;
>
> (cc)    The duration of the conspiracy alleged herein and the acts performed by Defendants and their co-conspirators in furtherance of the conspiracy;

138

(dd)        Whether such combination or conspiracy violated the federal antitrust laws;

(ee)        Whether the conduct of Defendants and their co-conspirators, as alleged in this Complaint, caused injury to the Plaintiffs and other members of the Class;

(ff) Whether Defendants caused Plaintiffs and the Class to suffer damages in the form of overcharges on rent for their multifamily residential units;

(gg)        The appropriate class-wide measure of damages; and

(hh)        The nature of appropriate injunctive relief to restore competition in the market for the lease of multifamily residential real estate.

398.    Plaintiffs' claims are typical of the claims of Class members, and Plaintiffs will fairly and adequately protect the interests of the Class. Plaintiffs and all members of the Class are similarly affected by Defendants' unlawful conduct in that they paid artificially inflated rent for residential units managed by cartel members.

399.    Plaintiffs' claims arise out of the same common course of conduct giving rise to the claims of the other members of the Class. Plaintiffs' interests are coincident with and typical of, and not antagonistic to, those of the other members of the Class.

400.    Plaintiffs have retained counsel with substantial experience litigating complex antitrust class actions in myriad industries and courts throughout the nation.

401.    The questions of law and fact common to the members of the Class predominate over any questions affecting only individual members, including issues relating to liability and damages.

402.     Class action treatment is a superior method for the fair and efficient adjudication of the controversy, in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that numerous individual actions would engender.  The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining redress for claims that it might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in management of this class action.  Moreover, the prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

403.     Plaintiffs know of no difficulty likely to be encountered in the maintenance of this action as a class action under Federal Rule of Civil Procedure 23.

## VII.     ANTITRUST INJURY

404.     Defendants' anticompetitive conduct had the following effects, among others:

(a)     Competition among Defendants has been restrained or eliminated with respect to multifamily residential rental units nationwide;

(b)     The price of residential rental units have been fixed, stabilized, or maintained at artificially high levels; and

(c)     The output of multifamily residential leases has been fixed, stabilized, or maintained at artificially low levels; and

(d)     Individuals have been deprived of free and open competition.

405.     Defendants' violations of the antitrust laws have caused Plaintiffs and the Class to pay higher prices for residential rental units in the U.S. than they would have in the absence of

140

Defendants' illegal contract, combination, or conspiracy, and as a result, have suffered damages in the form of overcharges paid on their rental units.

406. This is an injury of the type that the antitrust laws were meant to punish and prevent.

## VIII. CONTINUING VIOLATION

407. Plaintiffs' Sherman Act claims, which are subject to a four-year statute of limitations period, are timely under the continuing violations doctrine. The first complaint against Defendant RealPage was filed on October 18, 2022.[167] The conspiracy alleged above began at least as early as January 1, 2016, and continued into the non-time-barred class period, October 18, 2018, and beyond.

408. This complaint alleges Lessor Defendants set prices pursuant to recommendations from Defendant RealPage's RMS using algorithms trained on a pool of competitively sensitive transaction data within the four-year statutory period. *See* Section IV.C, above.

409. As a result of the anticompetitive conduct challenged in this complaint, throughout the Class Period and to the present, Lessor Defendants were able to and did inflate prices for multifamily housing.

410. Plaintiffs and members of the proposed Class purchased multifamily housing directly from a Lessor Defendant at artificially inflated prices, caused by the conduct challenged in this complaint, throughout the Class Period.

411. Thus, each Lessor Defendant's sale of multifamily housing leases at artificial and non-competitive prices constituted a new overt act causing injury to the proposed Class.

---

[167] *See Bason et al. v. RealPage, Inc., et al.*, No. 22-CV-1611 (S.D. Cal. Oct. 18, 2022), ECF No. 1.

412.    Accordingly, Plaintiffs and members of the proposed Class were injured and may recover for damages suffered at any point during the conspiracy.

413.    Defendants' unlawful acts and practices described above continue to this day.

## IX.    CLAIMS FOR RELIEF

### COUNT I

**Price Fixing in Violation of**
**Section 1 of the Sherman Act (15 U.S.C. §1)**

414.    Plaintiffs repeat the allegations set forth above as if fully set forth herein.

415.    Beginning at a time currently unknown to Plaintiffs, but at least as early as January 1, 2016 (further investigation and discovery may reveal an earlier date), and continuing through the present, Defendants and their co-conspirators entered and engaged in a contract, combination, or conspiracy to unreasonably restraint of trade in violation of Section 1 of the Sherman Act (15 U.S.C. §1).

416.    The contract, combination, or conspiracy consisted of an agreement among the Defendants and their co-conspirators to fix, raise, stabilize, or maintain at artificially high levels the rents they charge for residential units in Metro Areas nationwide, and involved the exchange of competitively sensitive information between and among Defendants, causing anticompetitive effects without sufficient procompetitive justifications.

417.    Plaintiffs and members of the Class have been injured and will continue to be injured in the form of overcharges on rent.

418.    Defendants' anticompetitive conduct had the following effects, among others:

(a) Competition among Defendants has been restrained or eliminated with respect to residential rental units;

(b) The price of residential rental units has been fixed, stabilized, or maintained at artificially high levels;

(c) The output of multifamily residential leases has been fixed, stabilized, or maintained at artificially low levels;  and

(d) Individuals have been deprived of free and open competition.

419.     This conduct is unlawful under the *per se* standard.  Defendants' conduct is also unlawful under either a "quick look" or rule of reason analysis because the agreement is factually anticompetitive with no valid procompetitive justifications.  Moreover, even if there were valid procompetitive justifications, such justifications could have been reasonably achieved through means less restrictive of competition.

420.     Plaintiffs and members of the Class are entitled to treble damages, attorneys' fees and costs, and an injunction against Defendants to end the ongoing violations alleged herein.

## COUNT II
### Violation of State Antitrust Statutes
### (On behalf of Plaintiffs and the Class)

421.     Plaintiffs repeat and reiterate the allegations set forth above as if fully set forth herein, and each of the state-specific causes of action described below incorporates the allegations as if fully set forth therein.

422.     During the Class Period, Defendants and their co-conspirators entered and engaged in a contract, combination, or conspiracy to fix, raise, stabilize, or maintain at artificially high levels, the rents they charge for residential units in various states to unreasonably restrain trade and commerce in violation of the various state antitrust laws set forth below.

423.     In formulating and effectuating this conspiracy, Defendants and their co-conspirators performed acts in furtherance of the combination and conspiracy, including: agreeing to fix, increase, maintain, or stabilize rents at artificially high levels which injured Plaintiffs and

members of the Class; exchange of competitively sensitive information between and among Defendants; and participating in meetings and trade association conversations among themselves in the United States and elsewhere to implement, adhere to, and police the unlawful agreements they reached.

424.    Defendants and their co-conspirators engaged in actions described above for the purpose of carrying out their unlawful agreements to fix, increase, maintain, or stabilize prices of rents for residential units at artificially high levels. As a direct and proximate result of Defendants' conduct, Plaintiffs and members of the Class were deprived of free and open competition and paid more to rent their apartments than they otherwise would have in the absence of Defendants' unlawful conduct. This injury is of the type the antitrust laws of the below states were designed to prevent and flows from that which makes Defendants' conduct unlawful.

425.    In addition, Defendants have profited significantly from the conspiracy. Defendants' profits derived from their anticompetitive conduct, and come at the expense of and to the detriment of Plaintiffs and members of the Class.

426.    Accordingly, Plaintiffs and the members of the Class in each of the following jurisdictions seek damages (including statutory damages where applicable), to be trebled or otherwise increased as permitted by each particular jurisdiction's antitrust law, and costs of suit, including reasonable attorneys' fees, to the extent permitted by the following state laws.

427.    Defendants' anticompetitive acts described above were knowing and willful and constitute violations of the following state antitrust statutes.

428.    **ALABAMA:** Defendants entered into an unlawful agreement to restrain trade in the State of Alabama in violation of ALA. CODE §6-5-60, *et seq*. Due to Defendants' unlawful conduct, (1) price competition for rentals was restrained, suppressed, and eliminated throughout

Alabama; (2) price of residential rental units in the State of Alabama were raised, fixed, maintained, stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition. Defendants' conspiracy substantially affected Alabama commerce and accordingly, Plaintiffs and the members of the Class seek all forms of relief available under ALA. CODE §6-5-60, *et seq*.

429. **ALASKA:** Defendants have entered into an unlawful agreement in restraint of trade in violation of ALASKA STAT. §45.50.562 *et seq*. Defendants' conspiracies had the following effects: (1) price competition for rentals was restrained, suppressed, and eliminated throughout Alaska; (2) price of residential rental units in the State of Alaska were raised, fixed, maintained, stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition. During the Class Period, Defendants' illegal conduct substantially affected Alaska commerce. Accordingly, Plaintiffs and members of the Class seek all forms of relief available under ALASKA STAT. §45.50.562 *et seq*.

430. **ARIZONA:** Defendants have entered into an unlawful agreement in restraint of trade in violation of ARIZ. REV. STAT. §44-1401, *et seq*. Defendants' conspiracies had the following effects: (1) price competition for rentals was restrained, suppressed, and eliminated throughout Arizona; (2) price of residential rental units in the State of Arizona were raised, fixed, maintained, stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition. During the Class Period, Defendants' illegal conduct substantially affected Arizona commerce. Accordingly, Plaintiffs and members of the Class seek all forms of relief available under ARIZ. REV. STAT. §44-1401, *et seq*.

431. **CALIFORNIA:** Defendants have entered into an unlawful agreement in restraint of trade in violation of CAL. BUS. & PROF. CODE §16700, *et seq*. During the Class Period,

Defendants and their co-conspirators entered into and engaged in a continuing unlawful trust in restraint of the trade and commerce. Each defendant has acted in violation of CAL. BUS. & PROF. CODE §16720 to fix, raise, stabilize, and maintain prices of residential apartment rentals at supracompetitive levels. The violations of CAL. BUS. & PROF. CODE §16720 consisted, without limitation, of a continuing unlawful trust and concert of action among Defendants and their co-conspirators, the substantial terms of which were to fix, raise, maintain, and stabilize the prices of residential apartment units. For the purpose of forming and effectuating the unlawful trust, Defendants and their coconspirators have done those things which they combined and conspired to do, including, but not limited to, the acts, practices and course of conduct set forth above, and creating a price floor, fixing, raising, and stabilizing the price of residential rentals. Defendants' conspiracies had the following effects: (1) price competition for rentals was restrained, suppressed, and eliminated throughout California; (2) price of residential rental units in the State of California were raised, fixed, maintained, stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition. As a result of Defendants' violation of CAL. BUS. & PROF. CODE §16720, Plaintiffs and members of the Class seek treble damages and their cost of suit, including a reasonable attorneys' fee, pursuant to CAL. BUS. & PROF. CODE §16750(a).

432. **DISTRICT OF COLUMBIA:** Defendants' actions have violated D.C. CODE §28-4501, *et seq*. Defendants' combinations or conspiracies had the following effects: (1) competition in the residential rental apartment market was restrained, suppressed, and eliminated throughout the District of Columbia; (2) residential apartment prices were raised, fixed, maintained, and stabilized at artificially high levels throughout the District of Columbia; and (3) Plaintiffs and members of the Class, including those who resided in the District of Columbia and rented an apartment in the District of Columbia, paid supracompetitive, artificially inflated prices for their

rentals. During the Class Period, Defendants' illegal conduct substantially affected commerce in the District of Columbia. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of D.C. CODE §28-4501, *et seq*. Accordingly, Plaintiffs and members of the Class seek all forms of relief available under D.C. CODE §28-4501, *et seq*.

433. **FLORIDA:** Defendants have violated the FL. STAT. §542.15 *et seq*. through their anticompetitive actions. Through their actions and actions of co-conspirators, rents of residential units in the State of Florida were raised, fixed, maintained, and stabilized at artificially high level, thereby injuring Plaintiffs and the Class. Throughout the Class Period, competition in the residential rental apartment market was restrained, suppressed, and eliminated throughout Florida. Plaintiffs and members of the Class, including those who resided and rented an apartment in the State of Florida, paid supracompetitive, artificially inflated prices for their rentals. During the Class Period, Defendants' illegal conduct substantially affected commerce in Florida. Accordingly, Plaintiffs and members of the Class seek all forms of relief available under FL. STAT. §542.15, *et seq*.

434. **GEORGIA:** Defendants have entered into an unlawful agreement in restraint of trade in violation of GA. CODE §13-8-2.1, *et seq*. Defendants' combinations or conspiracies had the following effects: (1) competition in residential rental market was restrained, suppressed, and eliminated throughout Georgia, and (2) residential rental prices were raised, fixed, maintained and stabilized at artificially high levels throughout Georgia. During the Class Period, Defendants' illegal conduct substantially affected Georgia commerce. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of GA. CODE §13-8-2.1. Accordingly, Plaintiffs and members of the Class seek all forms of relief available under GA. CODE §13-8-2.1, *et seq*.

435.  **HAWAII:** Defendants have violated Haw. Rev. Stat. Ann. §480-1, *et seq*., through their actions.  *See* HAW. REV. STAT. §480-4, 480-13.  Through Defendants' actions and the actions of their co-conspirators, rents of residential units in the State of Hawaii were raised, fixed, maintained, and stabilized at artificially high levels, thereby injuring Plaintiffs and the Class. Throughout the Class Period, competition in the residential rental apartment market was restrained, suppressed, and eliminated throughout Hawaii.  Plaintiffs and members of the Class, including those who resided in the State of Hawaii and rented an apartment in Hawaii, paid supracompetitive, artificially inflated prices for their rentals.  During the Class Period, Defendants' illegal conduct substantially affected commerce in Hawaii.  Accordingly, Plaintiffs and members of the Class seek all forms of relief available under HAW. REV. STAT. §480-1, *et seq*.

436.  **IDAHO:** Defendants have violated the IDAHO CODE §48-101, *et seq*. through their anticompetitive actions.  Through their actions and actions of co-conspirators, rents of residential units in the State of Idaho were raised, fixed, maintained, and stabilized at artificially high level, thereby injuring Plaintiffs and the Class.  Throughout the Class Period, competition in the residential rental apartment market was restrained, suppressed, and eliminated throughout Idaho. Plaintiffs and members of the Class, including those who resided in the State of Idaho and rented an apartment in Idaho, paid supracompetitive, artificially inflated prices for their rentals.  During the Class Period, Defendants' illegal conduct substantially affected commerce in Idaho. Accordingly, Plaintiffs and members of the Class seek all forms of relief available under IDAHO CODE §48-101, *et seq*.

437.  **ILLINOIS:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Section 740 ILCS 10/1, *et seq*.  Defendants' combinations or conspiracies had the following effects: (1) competition in residential rental market was restrained, suppressed, and

148

eliminated throughout Illinois, and (2) residential rental prices were raised, fixed, maintained and stabilized at artificially high levels throughout Illinois. During the Class Period, Defendants' illegal conduct substantially affected Illinois commerce. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Section 740 ILCS 10/1, *et seq*. Accordingly, Plaintiffs and members of the Class seek all forms of relief available under Section 740 ILCS 10/1, *et seq*.

438. **INDIANA:** Defendants violated the IND. CODE §§24-1-1-1, *et seq*.; 24-1-2-1, *et seq*.; and 24-1-3-1, *et seq*. by entering into unlawful agreement in restraint of trade in the State of Indiana. Specifically, Defendants' combinations or conspiracies detrimentally affected the competition in the Indiana residential rental market by restraining, suppressing, and eliminating competition. Further, Defendants' unlawful conduct raised, fixed, maintained, and stabilized rents in Indiana at artificially high levels. During the Class Period, Defendants' illegal conduct substantially affected Indiana commerce. Accordingly, Plaintiffs and Members of the Class seek all relief available under IND. CODE §§24-1-1-1, *et seq*.; 24-1-2-1, *et seq*.; and 24-1-3-1, *et seq*.

439. **IOWA:** Defendants have entered into an unlawful agreement in restraint of trade in violation of IOWA CODE §553.1, *et seq*. Defendants' combinations or conspiracies had the following effects: (1) competition in residential rental market was restrained, suppressed, and eliminated throughout Iowa, and (2) residential rental prices were raised, fixed, maintained and stabilized at artificially high levels throughout Iowa. During the Class Period, Defendants' illegal conduct substantially affected Iowa commerce. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of IOWA CODE §553.1, *et seq*. Accordingly, Plaintiffs and members of the Class seek all forms of relief available under Iowa Code §553.1, *et seq*.

440.     **KANSAS:** Defendants have entered into an unlawful agreement in restraint of trade in violation of KAN. STAT. §50-101, *et seq*.  Defendants' combinations or conspiracies had the following effects: (1) price competition for rentals was restrained, suppressed, and eliminated throughout Kansas; (2) price of residential rental units in the State of Kansas were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition.  During the Class Period, Defendants' illegal conduct substantially affected Kansas commerce.  Accordingly, Plaintiffs and members of the Class seek all forms of relief available under KAN. STAT. §50-101, *et seq*.

441.     **LOUISIANA:** Defendants have entered into an unlawful agreement in restraint of trade in violation of LA. STAT. §51:121, *et seq*.  Defendants' combinations or conspiracies had the following effects: (1) price competition for rentals was restrained, suppressed, and eliminated throughout Louisiana; (2) price of residential rental units in the State of Louisiana were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition.  During the Class Period, Defendants' illegal conduct substantially affected Louisiana commerce.  Accordingly, Plaintiffs and members of the Class seek all forms of relief available under LA. STAT.  §51:121, *et seq*.

442.     **MAINE:** Defendants have entered into an unlawful agreement in restraint of trade in violation of ME. REV. STAT. ANN. tit. 10, §1101.  Defendants' combinations or conspiracies had the following effects: (1) competition in the Maine residential rental market was restrained, suppressed, and eliminated, and (2) rental prices for Maine residential units were raised, fixed, maintained, and stabilized at artificially high levels.  During the Class Period, Defendants' illegal conduct substantially affected Maine commerce.  Accordingly, Plaintiffs and members of the Class seek all relief available under ME. REV. STAT. ANN. tit. 10, §1104.

443.     **MARYLAND:** Defendants violated the MD. CODE ANN., COM. LAW §11-201, *et seq*. by entering into unlawful agreement in restraint of trade in the State of Maryland. Specifically, Defendants' combinations or conspiracies detrimentally affected the competition in the Maryland residential rental market by restraining, suppressing, and eliminating competition. Further, Defendants' unlawful conduct raised, fixed, maintained, and stabilized rents in Maryland at artificially high levels. During the Class Period, Defendants' illegal conduct substantially affected Maryland commerce. Accordingly, Plaintiffs and Members of the Class seek all relief available under MD. CODE ANN., COM. LAW §11-201, *et seq*.

444.     **MASSACHUSETTS:** Defendants have entered into an unlawful agreement in restraint of trade in violation of MASS. GEN. LAWS ch. 93, §1, *et seq*. Defendants' combinations or conspiracies had the following effects: (1) competition in the Massachusetts residential rental market was restrained, suppressed, and eliminated, and (2) Massachusetts residential rental prices were raised, fixed, maintained, and stabilized at artificially high levels. During the Class Period, Defendants' illegal conduct substantially affected Massachusetts commerce. Accordingly, Plaintiffs and members of the Class seek all relief available under MASS. GEN. LAWS ch. 93, §1, *et seq*.

445.     **MICHIGAN:** Defendants have entered into an unlawful agreement in restraint of trade in violation of MICH. COMP. LAWS §445.771, *et seq*. Defendants' combinations or conspiracies had the following effects: (1) competition in the residential rental market was restrained, suppressed, and eliminated throughout Michigan, and (2) residential rental prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Michigan. During the Class Period, Defendants' illegal conduct substantially affected Michigan commerce.

Accordingly, Plaintiffs and members of the Class seek all relief available under MICH. COMP. LAWS §445.771, *et seq.*

446.    **MINNESOTA:** Defendants have violated the MINN. STAT. §325D.49, *et seq.* through their anticompetitive actions. Through their actions and actions of co-conspirators, rents of residential units in the State of Minnesota were raised, fixed, maintained, and stabilized at artificially high level, thereby injuring Plaintiffs and the Class. Throughout the Class Period, competition in the residential rental apartment market was restrained, suppressed, and eliminated throughout Minnesota. Plaintiffs and members of the Class, including those who resided in the State of Minnesota and rented an apartment there, paid supracompetitive, artificially inflated prices for their rentals. During the Class Period, Defendants' illegal conduct substantially affected commerce in Minnesota. Accordingly, Plaintiffs and members of the Class seek all forms of relief available under MINN. STAT. §325D.49, *et seq.*

447.    **MISSISSIPPI:** Defendants have entered into an unlawful agreement in restraint of trade in violation of MISS. CODE §75-21-1, *et seq.* Defendants' combinations or conspiracies had the following effects: (1) competition in the residential rental market was restrained, suppressed, and eliminated throughout Mississippi, and (2) residential rental prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Mississippi. During the Class Period, Defendants' illegal conduct substantially affected Mississippi commerce. Accordingly, Plaintiffs and members of the Class seek all relief available under MISS. CODE §75-21-1, *et seq.*

448.    **MISSOURI:** Defendants have entered into an unlawful agreement in restraint of trade in violation of MO. REV. STAT. §416.011, *et seq.* Defendants' combinations or conspiracies had the following effects: (1) competition in the residential rental market was restrained, suppressed, and eliminated throughout Missouri, and (2) residential rental prices were raised,

fixed, maintained, and stabilized at artificially high levels throughout Missouri. During the Class Period, Defendants' illegal conduct substantially affected Missouri commerce. Accordingly, Plaintiffs and members of the Class seek all relief available under MO. REV. STAT. §416.011, *et seq*.

449. **MONTANA:** Defendants have entered into an unlawful agreement in restraint of trade in violation of MONT. CODE ANN. §30-14-201, *et seq*. See also MONT. CODE ANN. §30-14-205. Specifically, Defendants' combinations or conspiracies detrimentally affected the competition in the Montana residential rental market by restraining, suppressing, and eliminating competition. Further, Defendants' unlawful conduct raised, fixed, maintained, and stabilized rents in Montana at artificially high levels. During the Class Period, Defendants' illegal conduct substantially affected Montana commerce. Accordingly, Plaintiffs and Members of the Class seek all relief available under MONT. CODE ANN. §30-14-201, *et seq*.

450. **NEBRASKA:** Defendants restrained trade and commerce in the State of Nebraska by entering into an unlawful agreement in violation of NEB. REV. STAT. §59-801, *et seq*. Defendants' combinations or conspiracies had the following effects: (1) competition in the residential rental market was restrained, suppressed, and eliminated throughout Nebraska, and (2) residential rental prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Nebraska. During the Class Period, Defendants' illegal conduct substantially affected Nebraska commerce. Accordingly, Plaintiffs and members of the Class seek all relief available under NEB. REV. STAT. §59-801, *et seq*.

451. **NEW HAMPSHIRE:** Defendants have entered into an unlawful agreement in restraint of trade in violation of N.H. REV. STAT. ANN. §356:1, *et seq*. Specifically, Defendants' combinations or conspiracies detrimentally affected the competition in the New Hampshire

residential rental market by restraining, suppressing, and eliminating competition. Further, Defendants' unlawful conduct raised, fixed, maintained, and stabilized rents in New Hampshire at artificially high levels. During the Class Period, Defendants' illegal conduct substantially affected New Hampshire commerce. Accordingly, Plaintiffs and Members of the Class seek all relief available under N.H. REV. STAT. ANN. §356:1, *et seq.*

452.     **NEW JERSEY:** Defendants restrained trade and commerce in the State of New Jersey by entering into an unlawful agreement in violation of N.J. REV. STAT. §56:9-1, *et seq.* Defendants' combinations or conspiracies had the following effects: (1) competition in the residential rental market was restrained, suppressed, and eliminated throughout New Jersey, and (2) residential rental prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New Jersey. During the Class Period, Defendants' illegal conduct substantially affected New Jersey commerce. Accordingly, Plaintiffs and members of the Class seek all relief available under N.J. REV. STAT. § 56:9-1, *et seq.*

453.     **NEW MEXICO:** Defendants violated the N.M. STAT. ANN. §57-1-1, *et seq.* by entering into unlawful agreement in restraint of trade in the State of New Mexico. Specifically, Defendants' combinations or conspiracies detrimentally affected the competition in the New Mexico residential rental market by restraining, suppressing, and eliminating competition. Further, Defendants' unlawful conduct raised, fixed, maintained, and stabilized rents in New Mexico at artificially high levels. During the Class Period, Defendants' illegal conduct substantially affected commerce in New Mexico. Accordingly, Plaintiffs and Members of the Class seek all relief available under N.M. STAT. ANN. §57-1-1, *et seq.*

454.     **NEW YORK:** Defendants have entered into an unlawful agreement in restraint of trade in violation of N.Y. GEN. BUS. LAW §340, *et seq.* Defendants' combinations or conspiracies

had the following effects: (1) competition in the residential rental market was restrained, suppressed, and eliminated throughout New York, and (2) residential rental prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New York. During the Class Period, Defendants' illegal conduct substantially affected New York commerce. The conduct set forth above is a per se violation of the Donnelly Act, N.Y. GEN. BUS. LAW §340, *et seq*. Accordingly, Plaintiffs and members of the Class seek all relief available under N.Y. GEN. BUS. LAW §340, *et seq*.

455. **NORTH CAROLINA:** Defendants have entered into an unlawful agreement in restraint of trade in violation of N.C. GEN. STAT. §75-1, *et seq*. Defendants' combinations or conspiracies had the following effects: (1) competition in the residential rental market was restrained, suppressed, and eliminated throughout North Carolina, and (2) residential rental prices were raised, fixed, maintained, and stabilized at artificially high levels throughout North Carolina. During the Class Period, Defendants' illegal conduct substantially affected North Carolina commerce. Accordingly, Plaintiffs and members of the Class seek all relief available under N.C. GEN. STAT. §75-1, *et seq*.

456. **NORTH DAKOTA:** Defendants' actions have violated the N.D. CENT. CODE §51-08.1-01, *et seq*. through their anticompetitive actions. Through their actions and actions of co-conspirators, rents of residential units in the State of North Dakota were raised, fixed, maintained, and stabilized at artificially high level, thereby injuring Plaintiffs and the Class. Throughout the Class Period, competition in the residential rental apartment market was restrained, suppressed, and eliminated throughout North Dakota. Plaintiffs and members of the Class, including those who resided in the State of North Dakota and rented an apartment there, paid supracompetitive, artificially inflated prices for their rentals. During the Class Period, Defendants' illegal conduct

substantially affected commerce in North Dakota. Accordingly, Plaintiffs and members of the Class seek all forms of relief available under N.D. CENT. CODE §51-08.1-01, *et seq.*

457. **OHIO:** Defendants violated the OHIO REV. CODE §1331:01, *et seq.* by entering into unlawful agreement in restraint of trade in the State of Ohio. Specifically, Defendants' combinations or conspiracies detrimentally affected the competition in the Ohio residential rental market by restraining, suppressing, and eliminating competition. Further, Defendants' unlawful conduct raised, fixed, maintained, and stabilized rents in Ohio at artificially high levels. During the Class Period, Defendants' illegal conduct substantially affected commerce in Ohio. Accordingly, Plaintiffs and Members of the Class seek all relief available under OHIO REV. CODE §1331:01, *et seq.*

458. **OKLAHOMA:** Defendants have entered into an unlawful agreement in restraint of trade in violation of OKLA. STAT. tit. 79 §201, *et seq.* Defendants' combinations or conspiracies had the following effects: (1) competition in the Oklahoma residential rental market was restrained, suppressed, and eliminated, and (2) Oklahoma residential rental prices were raised, fixed, maintained, and stabilized at artificially high levels. During the Class Period, Defendants' illegal conduct substantially affected Oklahoma commerce. Accordingly, Plaintiffs and members of the Class seek all relief available under OKLA. STAT. tit. 79 §201, *et seq.*

459. **OREGON:** Defendants have entered into an unlawful agreement in restraint of trade in violation of OR. REV. STAT. §646.725, *et seq.* Defendants' combinations or conspiracies had the following effects: (1) price competition for rentals was restrained, suppressed, and eliminated throughout Oregon; (2) price of residential rental units in the State of Oregon were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition. During the Class Period, Defendants' illegal conduct

substantially affected Oregon commerce. Accordingly, Plaintiffs and members of the Class seek all forms of relief available under OR. REV. STAT. §646.725, *et seq*.

460. **PENNSYLVANIA:** Defendants have violated the Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 PA. CONS. STAT. §201-1, *et seq*., through their actions. Defendants engaged in unfair trade practice that artificially raised, fixed, maintained, and stabilized rent prices for residential units in Pennsylvania. Throughout the Class Period, competition in the residential rental apartment market was restrained, suppressed, and eliminated throughout Pennsylvania. Plaintiffs and members of the Class, including those who resided in Pennsylvania and rented an apartment there, paid artificially inflated prices for their residential units. During the Class Period, Defendants' illegal conduct substantially affected commerce in Pennsylvania. Accordingly, Plaintiffs and members of the Class seek all forms of relief available under 73 PA. CONS. STAT. §201-1, *et seq*.

461. **SOUTH CAROLINA:** Defendants' have violated the antitrust laws of South Carolina, S.C. CODE ANN. §39-3-10, *et seq*., through their anticompetitive actions. Through Defendants' actions and the actions of their co-conspirators, rents of residential units in the State of South Carolina were raised, fixed, maintained, and stabilized at artificially high levels, thereby injuring Plaintiffs and the Class. Throughout the Class Period, competition in the market for residential units was restrained, suppressed, and eliminated throughout South Carolina. Plaintiffs and members of the Class, including those who resided in the State of South Carolina and rented residential units there, paid supracompetitive, artificially inflated prices for their rentals. During the Class Period, Defendants' illegal conduct substantially affected commerce in South Carolina. Accordingly, Plaintiffs and members of the Class seek all forms of relief available under S.C. CODE ANN. §39-3-10, *et seq*.

462. **SOUTH DAKOTA:** Defendants have violated the S.D. CODIFIED LAWS §37-1-3.1, *et seq*. through their anticompetitive actions. Through their actions and actions of co-conspirators, rents of residential units in the State of South Dakota were raised, fixed, maintained, and stabilized at artificially high level, thereby injuring Plaintiffs and the Class. Throughout the Class Period, competition in the residential rental apartment market was restrained, suppressed, and eliminated throughout South Dakota. Plaintiffs and members of the Class, including those who resided in the State of South Dakota and rented an apartment there, paid supracompetitive, artificially inflated prices for their rentals. During the Class Period, Defendants' illegal conduct substantially affected commerce in South Dakota. Accordingly, Plaintiffs and members of the Class seek all forms of relief available under S.D. CODIFIED LAWS §37-1-3.1, *et seq*.

463. **TENNESSEE:** Defendants have entered into an unlawful agreement in restraint of trade in violation of TENN. CODE ANN. §47-25-101, *et seq*. Defendants' combinations or conspiracies had the following effects: (1) price competition for rentals was restrained, suppressed, and eliminated throughout Tennessee; (2) price of residential rental units in the State of Tennessee were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition. During the Class Period, Defendants' illegal conduct substantially affected commerce in Tennessee. Accordingly, Plaintiffs and members of the Class seek all forms of relief available under TENN. CODE ANN. §47-25-101, *et seq*.

464. **UTAH:** Defendants violated the UTAH CODE ANN. §76-10-3101, *et seq*. by entering into unlawful agreement in restraint of trade in the State of Utah. Specifically, Defendants' combinations or conspiracies detrimentally affected the competition in the Utah residential rental market by restraining, suppressing, and eliminating competition. Further, Defendants' unlawful conduct raised, fixed, maintained, and stabilized rents in Utah at artificially high levels. During

the Class Period, Defendants' illegal conduct substantially affected commerce in Utah. Accordingly, Plaintiffs and Members of the Class seek all relief available under UTAH CODE ANN. § 76-10-3101, *et seq*.

465. **VERMONT:** Defendants have entered into an unlawful agreement in restraint of trade in violation of VT. STAT. ANN. tit 9, §2453, *et seq*. Defendants' combinations or conspiracies had the following effects: (1) price competition for rentals was restrained, suppressed, and eliminated throughout Vermont; (2) price of residential rental units in Vermont were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition. During the Class Period, Defendants' illegal conduct substantially affected commerce in the State of Vermont. Accordingly, Plaintiffs and members of the Class seek all forms of relief available under VT. STAT. ANN. tit 9, §2465, *et seq*.

466. **VIRGINIA:** Defendants have entered into an unlawful agreement in restraint of trade in violation of VA. CODE ANN. §59.1-9.1, *et seq*. Defendants' combinations or conspiracies had the following effects: (1) price competition for rentals was restrained, suppressed, and eliminated throughout Virginia; (2) price of residential rental apartments were raised, fixed, maintained, and stabilized at artificially high levels throughout Virginia; and (3) individuals have been deprived of free and open competition. During the Class Period, Defendants' illegal conduct substantially affected commerce in the State of Virginia. Accordingly, Plaintiffs and members of the Class seek all forms of relief available under VA. CODE ANN. §59.1-9.1, *et seq*.

467. **WASHINGTON:** Defendants have entered into an unlawful agreement in restraint of trade in violation of WASH. REV. CODE ANN. §19.86.010, *et seq*. *See* WASH. REV. CODE ANN. §19.86.030. Defendants' combinations or conspiracies had the following effects: (1) price competition for residential units was restrained, suppressed, and eliminated throughout

Washington; (2) price of residential units were raised, fixed, maintained, and stabilized at artificially high levels throughout Washington; and (3) individuals have been deprived of free and open competition for residential units. During the Class Period, Defendants' illegal conduct substantially affected commerce in the State of Washington. Accordingly, Plaintiffs and members of the Class seek all forms of relief available under WASH. REV. CODE ANN. §19.86.010, *et seq*.

468. **WEST VIRGINIA:** Defendants have violated the W. VA. CODE §47-18-3, *et seq*. through their anticompetitive actions. Through their actions and actions of co-conspirators, rents of residential units in West Virginia were raised, fixed, maintained, and stabilized at artificially high levels, thereby injuring Plaintiffs and the Class. Throughout the Class Period, competition in the residential rental apartment market was restrained, suppressed, and eliminated throughout West Virginia. Plaintiffs and members of the Class, including those who resided in the State of West Virginia and rented an apartment there, paid supracompetitive, artificially inflated prices for their rentals. During the Class Period, Defendants' illegal conduct substantially affected commerce in West Virginia. Accordingly, Plaintiffs and members of the Class seek all forms of relief available under W. VA. CODE § 47-18-3, *et seq*.

469. **WISCONSIN:** Defendants have entered into an unlawful agreement in restraint of trade in violation of WIS. STAT. §133.01, *et seq*. Defendants' combinations or conspiracies had the following effects: (1) price competition for rentals was restrained, suppressed, and eliminated throughout Wisconsin; (2) price of residential rental apartments were raised, fixed, maintained, and stabilized at artificially high levels throughout Wisconsin; and (3) individuals have been deprived of free and open competition. During the Class Period, Defendants' illegal conduct substantially affected commerce in the State of Wisconsin. Accordingly, Plaintiffs and members of the Class seek all forms of relief available under WIS. STAT. §133.01, *et seq*.

470. **WYOMING:** Defendants' actions have violated the WY. STAT. ANN. §0-4-101, *et seq*. through their anticompetitive actions. Through their actions and actions of co-conspirators, rents of residential units in Wyoming were raised, fixed, maintained, and stabilized at artificially high level, thereby injuring Plaintiffs and the Class. Throughout the Class Period, competition in the residential rental apartment market was restrained, suppressed, and eliminated throughout Wyoming. Plaintiffs and members of the Class, including those who resided in the State of Wyoming and rented an apartment in Wyoming, paid supracompetitive, artificially inflated prices for their rentals. During the Class Period, Defendants' illegal conduct substantially affected commerce in Wyoming. Accordingly, Plaintiffs and members of the Class seek all forms of relief available under WY. STAT. ANN. §40-4-101, *et seq*.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and the Class of all others so similarly situated, respectfully request that:

A. The Court determine that this action may be maintained as a class action under Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure, appoint Plaintiffs as Class Representative and their counsel of record as Class Counsel, and direct that notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to the Class, once certified;

B. The Court adjudge and decree that the acts of Defendants are illegal and unlawful, including the agreement, contract, combination, or conspiracy, and acts done in furtherance thereof by Defendants and their co-conspirators be adjudged to have been a *per se* violation (or alternatively illegal as a quick look or full-fledged rule of reason violation) of Section 1 of the Sherman Act (15 U.S.C. §1);

C. The Court permanently enjoin and restrain Defendants, their affiliates, successors, transferees, assignees, and other officers, directors, agents, and employees thereof, and all other

persons acting or claiming to act on their behalf, from in any manner continuing, maintaining, or renewing the conduct, contract, conspiracy, or combination alleged herein, or from entering into any other contract, conspiracy, or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

D.     The Court enter judgment against Defendants, jointly and severally, and in favor of Plaintiffs and members of the Class for treble the amount of damages sustained by Plaintiffs and the Class as allowed by law, together with costs of the action, including reasonable attorneys' fees, pre- and post-judgment interest at the highest legal rate from and after the date of service of this Complaint to the extent provided by law; and

E.     The Court award Plaintiffs and members of the Class such other and further relief as the case may require and the Court may deem just and proper under the circumstances.

**JURY TRIAL DEMANDED**

Plaintiffs demand a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, of all issues so triable.

Dated: July 3, 2023                    */s/ Tricia R. Herzfeld*

Tricia R. Herzfeld (#26014)
Anthony A. Orlandi (#33988)
**HERZFELD SUETHOLZ GASTEL LENISKI AND WALL, PLLC**
223 Rosa L. Parks Avenue, Suite 300
Nashville, TN 37203
Telephone: (615) 800-6225
tricia@hsglawgroup.com
tony@hsglawgroup.com

*Liaison Counsel*

Patrick J. Coughlin
Carmen A. Medici
Fatima Brizuela
**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
600 West Broadway, Suite 3300
San Diego, CA 92101

162

Telephone: (619) 798-5325
Facsimile: (619) 233-0508
pcoughlin@scott-scott.com
cmedici@scott-scott.com
fbrizuela@scott-scott.com

Patrick McGahan
Michael Srodoski
G. Dustin Foster
Isabella De Lisi
**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
156 South Main Street
P.O. Box 192
Colchester, CT 06145
Telephone: (860) 537-5537
Facsimile:  (860) 537-4432
pmcgahan@scott-scott.com
msrodoski@scott-scott.com
gfoster@scott-scott.com
idelisi@scott-scott.com

Stacey Slaughter
Thomas J. Undlin
Geoffrey H. Kozen
J. Austin Hurt
**ROBINS KAPLAN LLP**
800 LaSalle Avenue, Suite 2800
Minneapolis, MN 55402
Telephone:  (612) 349-8500
Facsimile:  (612) 339-4181
sslaughter@robinskaplan.com
tundlin@robinskaplan.com
gkozen@robinskaplan.com
ahurt@robinskaplan.com

Swathi Bojedla
Mandy Boltax
**HAUSFELD LLP**
888 16th Street, N.W., Suite 300
Washington, DC 20006
Telephone: (202) 540-7200
sbojedla@hausfeld.com
mboltax@hausfeld.com

Gary I. Smith, Jr.

**HAUSFELD LLP**
600 Montgomery Street, Suite 3200
San Francisco, CA 94111
Tel: (415) 633-1908
gsmith@hausfeld.com

Katie R. Beran
**HAUSFELD LLP**
325 Chestnut Street, Suite 900
Philadelphia, PA 19106
Telephone: 1 215 985 3270
kberan@hausfeld.com

*Interim Co-Lead Counsel*

Eric L. Cramer
Michaela L. Wallin
**BERGER MONTAGUE PC**
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Telephone: (215) 875-3000
ecramer@bm.net
mwallin@bm.net

Daniel J. Walker
**BERGER MONTAGUE PC**
2001 Pennsylvania Avenue, NW, Suite 300
Washington, DC 20006
Telephone: (202) 559-9745
dwalker@bm.net

Brendan P. Glackin
Dean M. Harvey
**LIEFF CABRASER HEIMANN & BERNSTEIN, LLP**
275 Battery Street, Suite 2900
San Francisco, CA 94111
Telephone: 415-956-1000
bglackin@lchb.com
dharvey@lchb.com

Steve W. Berman
Breanna Van Engelen
**HAGENS BERMAN SOBOL SHAPIRO LLP**
1301 Second Avenue, Suite 2000
Seattle, Washington 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
steve@hbsslaw.com
breannav@hbsslaw.com

Benjamin J. Widlanski
Javier A. Lopez
**KOZYAK TROPIN & THROCKMORTON LLP**
2525 Ponce de Leon Blvd., 9th Floor
Coral Gables, Florida 33134
Telephone: (305) 372-1800
bwidlanski@kttlaw.com

Christian P. Levis
Vincent Briganti
Peter Demato
Radhika Gupta
**LOWEY DANNENBERG, P.C.**
44 South Broadway, Suite 1100
White Plains, NY 10601
Telephone: (914) 997-0500
Facsimile: (914) 997-0035
vbriganti@lowey.com
clevis@lowey.com
pdemato@lowey.com
rgupta@lowey.com

Christopher M. Burke
Walter W. Noss
Yifan (Kate) Lv
**KOREIN TILLERY P.C.**
707 Broadway, Suite 1410
San Diego, CA 92101
Telephone: (619) 625-5621
Facsimile (314) 241-3525
cburke@koreintillery.com
wnoss@koreintillery.com
klv@koreintillery.com

**JOSEPH SAVERI LAW FIRM, LLP**
Joseph R. Saveri
Steven N. Williams
Cadio Zirpoli
Kevin E. Rayhill
601 California Street, Suite 1000
San Francisco, CA 94108
Telephone: (415) 500-6800
jsaveri@saverilawfirm.com
swilliams@saverilawfirm.com
czirpoli@saverilawfirm.com
krayhill@saverilawfirm.com

Jennifer W. Sprengel
Daniel O. Herrera
Alexander Sweatman
**CAFFERTY CLOBES MERIWETHER & SPRENGEL LLP**
135 S. LaSalle, Suite 3210
Chicago, IL 60603

165

jal@kttlaw.com

Telephone:  312-782-4880
Facsimile: 312-782-4485
jsprengel@caffertyclobes.com
dherrera@caffertyclobes.com
asweatman@caffertyclobes.com

*Plaintiffs' Steering Committee Counsel for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that on July 3, 2023, I caused the foregoing to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the email addresses denoted on the Electronic Mail Notice List.

_/s/ Tricia R. Herzfeld_
Tricia R. Herzfeld