**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | |
|---|---|
| IN RE: REALPAGE, INC., RENTAL SOFTWARE ANTITRUST LITIGATION (NO. II) | Case No. 3:23-MD-3071<br>MDL No. 3071<br><br>This Document Relates to:<br>ALL CASES<br><br>Chief Judge Waverly D. Crenshaw, Jr. |

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF**
**MOTION TO DISMISS MULTIFAMILY PLAINTIFFS' FIRST AMENDED**
**CONSOLIDATED CLASS ACTION COMPLAINT**

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ................................................................................................ 1

II.     SUMMARY OF PLAINTIFFS' ALLEGATIONS ........................................... 3

     A.     RealPage Revenue Management Products........................................... 3

     B.     The Alleged Conspiracy ..................................................................... 5

III.    LEGAL STANDARD ....................................................................................... 6

IV.     ARGUMENT..................................................................................................... 7

     A.     Plaintiffs Do Not Plausibly Allege A Sherman Act Section 1 Per Se
            Violation .............................................................................................. 7

          i.      Plaintiffs Allege No Circumstantial Evidence Of Conspiracy ................ 10

               a)     Plaintiffs' Group Pleading Of An Agreement Is Insufficient ...... 10

               b)     Plaintiffs Do Not Allege "Parallel Conduct" ............................... 13

               c)     Plaintiffs' Alleged "Plus Factors" Fail ........................................ 16

          ii.     Plaintiffs' Allegations That RealPage Facilitated And Enforced
               The Horizontal Conspiracy Also Fail ...................................................... 23

          iii.    The Alleged Conspiracy Is Implausible On Its Face .............................. 25

     B.     The Rule Of Reason Applies To Plaintiffs' Section 1 Claims............................ 27

     C.     Plaintiffs Fail To State A Claim Under The Rule of Reason............................... 29

          i.      Plaintiffs Fail To Plead Plausible Relevant Markets ............................... 29

                a)     Plaintiffs Have Not And Cannot Allege A Plausible
                     Nationwide Geographic Market....................................... 30

                b)     Regional MSAs Also Are Not Plausible Relevant
                     Geographic Markets........................................................ 31

          ii.     Plaintiffs Have Not Adequately Alleged Market Power And
               Anticompetitive Effects .......................................................................... 32

     D.     Plaintiffs Do Not Have Antitrust Standing ........................................ 36

     E.     Plaintiffs' State-Law Claims Fail....................................................... 37

V.      CONCLUSION................................................................................................. 40

# TABLE OF AUTHORITIES

**Page**

**C**ASES

*Abbott Labs. v. Durrett*,
746 So. 2d 316 (Ala. 1999)................................................................................38

*Aladdins Lights Inc. v. Eye Lighting Int'l*,
96 N.E.3d 864 (Ohio Ct. App. 2017).................................................................37

*Am. Tobacco Co. v. United States*,
328 U.S. 781 (1946)..........................................................................................18

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)........................................................................................6, 7

*Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*,
459 U.S. 519 (1983)..........................................................................................36

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)..................................................6, 7, 11, 12, 13, 16, 22

*Bennett v. Visa U.S.A. Inc.*,
198 S.W.3d 747 (Tenn. Ct. App. 2006) ............................................................38

*Big River Indus., Inc. v. Headwaters Res., Inc.*,
971 F. Supp. 2d 609 (M.D. La. 2013) ...............................................................38

*Blankenship v. City of Crossville*,
2017 WL 4641799 (M.D. Tenn. Oct. 17, 2017) ...............................................24

*Blewett v. Abbott Labs.*,
938 P.2d 842 (Wash. 1997)...............................................................................38

*Bogan v. Hodgkins*,
166 F.3d 509 (2d Cir. 1999)..............................................................................31

*In re Broiler Chicken Antitrust Litig.*,
2023 WL 4303476 (N.D. Ill. June 30, 2023) ....................................................13

*Brown Shoe Co. v. United States*,
370 U.S. 294 (1962)..........................................................................................30

*C.S. Sewell, M.D. P.C. v. Amerigroup Tenn., Inc.*,
2018 WL 6591429 (M.D. Tenn. Dec. 14, 2018)...............................................10

*Cal. Dental Ass'n v. FTC*,
526 U.S. 756 (1999)..........................................................................................29

Case 3:23-md-03071    Document 341    Filed 07/07/23    Page 3 of 65 PageID #: 2933

*Care Heating & Cooling, Inc. v. Am. Standard, Inc.*,
   427 F.3d 1008 (6th Cir. 2005) ..............................................................27

*CBC Cos. v. Equifax, Inc.*,
   561 F.3d 569 (6th Cir. 2009) ................................................................36

*Conley Publ'g Grp., Ltd. v. Journal Commc'ns, Inc.*,
   665 N.W.2d 879 (Wis. 2003) ...............................................................38

*Cont'l Cablevision of Ohio, Inc. v. Am. Elec. Power Co.*,
   715 F.2d 1115 (6th Cir. 1983) ..............................................................17

*Cty. of Tuolumne v. Sonora Cmty. Hosp.*,
   236 F.3d 1148 (9th Cir. 2001) ..............................................................37

*Cupp v. Alberto-Culver USA, Inc.*,
   310 F. Supp. 2d 963 (W.D. Tenn. 2004) .........................................31, 32

*DaimlerChrysler Corp. v. Cuno*,
   547 U.S. 332 (2006) ..............................................................................38

*In re Dairy Farmers of Am., Inc. Cheese Antitrust Litig.*,
   2015 WL 3988488 (N.D. Ill. June 29, 2015) .......................................37

*Deich-Keibler v. Bank One*,
   243 F. App'x 164 (7th Cir. 2007) ........................................................37

*Dickson v. Microsoft Corp.*,
   309 F.3d 193 (4th Cir. 2002) ..........................................................33, 34

*Drs. Steuer & Latham, P.A. v. Nat'l Med. Enters., Inc.*,
   672 F. Supp. 1489 (D.S.C. 1987), *aff'd*, 846 F.2d 70 (4th Cir. 1988) ....................................37

*In re Dynamic Random Access Memory (DRAM) Indirect Purchaser Antitrust Litig.*,
   28 F.4th 42 (9th Cir. 2022) ............................................................21, 22

*E.I. DuPont de Nemours & Co. v. Kolon Indus., Inc.*,
   688 F. Supp. 2d 443 (E.D. Va. 2009) ..................................................31

*E.T. Barwick Indus., Inc. v. Walter E. Heller & Co.*,
   692 F. Supp. 1331 (N.D. Ga. 1987) .....................................................38

*In re Elec. Books Antitrust Litig.*,
   2014 WL 2535112 (S.D.N.Y. June 5, 2014) .......................................37

*In re Elevator Antitrust Litig.*,
   502 F.3d 47 (2d Cir. 2007) ...................................................................11

# TABLE OF AUTHORITIES
(continued)

**Page**

*In re: EpiPen (Epinephrine Injection, USP) Mktg., Sales Pracs. & Antitrust Litig.*,
    336 F. Supp. 3d 1256 (D. Kan. 2018) ...................................................................39

*Erie Cty. v. Morton Salt, Inc.*,
    702 F.3d 860 (6th Cir. 2012) ...................................................................22, 26

*Expert Masonry, Inc. v. Boone Cty.*,
    440 F.3d 336 (6th Cir. 2006) ...................................................................28

*Ezzo's Invs., Inc. v. Royal Beauty Supply, Inc.*,
    243 F.3d 980 (6th Cir. 2001) ...................................................................32

*Felder's Collision Parts, Inc v. All Star Advert. Agency, Inc.*,
    777 F.3d 756 (5th Cir. 2015) ...................................................................37

*Finley v. Kelly*,
    384 F. Supp. 3d 898 (M.D. Tenn. 2019) ...................................................................4

*Found. for Interior Design Educ. Research v. Savannah Coll. of Art & Design*,
    73 F. Supp. 2d 829 (W.D. Mich. 1999), *aff'd*, 244 F.3d 521 (6th Cir. 2001) ...................35

*Fox v. Saginaw Cty.*,
    67 F.4th 284 (6th Cir. 2023) ...................................................................39

*In re German Auto. Mfrs. Antitrust Litig.*,
    612 F. Supp. 3d 967 (N.D. Cal. 2020) ...................................................................22

*Gibson v. Miami Valley Milk Producers, Inc.*,
    299 N.E.2d 631 (Ind. Ct. App. 1973) ...................................................................38

*Hobart-Mayfield, Inc. v. Nat'l Operating Comm. on Standards for Athletic Equip.*,
    48 F.4th 656 (6th Cir. 2022) ...................................................................7, 9, 10, 20

*Hobart-Mayfield, Inc. v. Nat'l Operating Comm. on Standards for Athletic Equip.*,
    535 F. Supp. 3d 638 (E.D. Mich. 2021), *aff'd*, 48 F.4th 656 (6th Cir. 2022) ...................10

*Hogan v. Pilgrim's Pride Corp.*,
    2018 WL 1316979 (D. Colo. Mar. 14, 2018) ...................................................................15

*Hyland v. Homeservices of Am., Inc.*,
    771 F.3d 310 (6th Cir. 2014) ...................................................................9, 20

*In re ICE LIBOR Antitrust Litig.*,
    2020 WL 1467354 (S.D.N.Y. Mar. 26, 2020) ...................................................................21

*Innovation Ventures, L.L.C. v. Custom Nutrition Lab'ys, L.L.C.*,
    451 F. Supp. 3d 769 (E.D. Mich. 2020) ...................................................................35

Page

*In re Ins. Brokerage Antitrust Litig.*,
    618 F.3d 300 (3d Cir. 2010)........................................................................17

*In re Interest Rate Swaps Antitrust Litig.*,
    261 F. Supp. 3d 430 (S.D.N.Y. 2017)...................................................21, 37

*Island Tobacco Co. v. R. J. Reynolds Indus., Inc.*,
    513 F. Supp. 726 (D. Haw. 1981).............................................................37

*Jones v. Micron Tech. Inc.*,
    400 F. Supp. 3d 897 (N.D. Cal. 2019).......................................................22

*Jones v. Varsity Brands, LLC*,
    618 F. Supp. 3d 725 (W.D. Tenn. 2022)...................................................38

*In re K-Dur Antitrust Litig.*,
    2008 WL 2660780 (D.N.J. Feb. 28, 2008) ...............................................38

*Kendall v. Visa U.S.A., Inc.*,
    518 F.3d 1042 (9th Cir. 2008) ..................................................................10

*Kleen Prods. LLC v. Int'l Paper*,
    276 F. Supp. 3d 811 (N.D. Ill. 2017), *aff'd* 910 F.3d 927 (7th Cir. 2018) ..............................25

*Krause Marine Towing Corp. v. Ass'n of Md. Pilots*,
    44 A.3d 1043 (Md. 2012) .........................................................................37

*State ex rel. Leech v. Levi Strauss & Co.*,
    1980 WL 4696 (Tenn. Ch. Ct. Sept. 25, 1980).........................................38

*Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*,
    551 U.S. 877 (2007)..................................................................................27

*Lewis v. Casey*,
    518 U.S. 343 (1996)..................................................................................39

*Lifeline Ltd. No. II v. Conn. Gen. Life Ins.*,
    821 F. Supp. 1201 (E.D. Mich. 1993)..................................................25, 27

*In re Linerboard Antitrust Litig.*,
    223 F.R.D. 335 (E.D. Pa. 2004)................................................................38

*Llacua v. W. Range Ass'n*,
    930 F.3d 1161 (10th Cir. 2019) ................................................................25

*In re Local TV Advert. Antitrust Litig.*,
    2022 WL 3716202 (N.D. Ill. Aug. 29, 2022) ................................18, 19, 25

*Lorix v. Crompton Corp.*,
    736 N.W.2d 619 (Minn. 2007)................................................................................37

*Maris Distrib. Co. v. Anheuser-Busch, Inc.*,
    302 F.3d 1207 (11th Cir. 2002) ........................................................................33, 34

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
    475 U.S. 574 (1986)............................................................................................27

*Med. Ctr at Elizabeth Place, LLC v. Atrium Health Sys.*,
    922 F.3d 713 (6th Cir. 2019) ..............................................................................28

*Mich. Div.-Monument Builders of N. Am. v. Mich. Cemetery Ass'n*,
    524 F.3d 726 (6th Cir. 2008) .........................................................................30, 32

*Midwest Auto Auction, Inc. v. McNeal*,
    2012 WL 3478647 (E.D. Mich. Aug. 14, 2012) ....................................................21

*Mosaic Health Inc. v. Sanofi-Aventis U.S., LLC*,
    2022 WL 4017895 (W.D.N.Y. Sept. 2, 2022) .......................................................14

*In re Musical Instruments & Equip. Antitrust Litig.*,
    798 F.3d 1186 (9th Cir. 2015) ............................................14, 15, 20, 21, 22, 36

*NAACP v. Claiborne Hardware Co.*,
    393 So. 2d 1290 (Miss. 1980), *rev'd on other grounds*, 458 U.S. 886 (1982) .......................37

*Nat'l Hockey League Players Ass'n v. Plymouth Whalers Hockey Club*,
    419 F.3d 462 (6th Cir. 2005) ..............................................................................30

*NCAA v. Bd. of Regents of Univ. of Okla.*,
    468 U.S. 85 (1984)..............................................................................................32

*New Orleans Ass'n of Cemetery Tour Guides & Cos. v. New Orleans Archdiocesan Cemeteries*,
    56 F.4th 1026 (5th Cir. 2023) ..............................................................................30

*In re Niaspan Antitrust Litig.*,
    42 F. Supp. 3d 735 (E.D. Pa. 2014) ....................................................................39

*NicSand, Inc. v. 3M Co.*,
    507 F.3d 442 (6th Cir. 2007) ..............................................................................36

*Odom v. Fairbanks Mem'l Hosp.*,
    999 P.2d 123 (Alaska 2000)................................................................................37

*Ogden v. Little Caesar Enters.*,
    393 F. Supp. 3d 622 (E.D. Mich. 2019)................................................................28

*In re Omnicare, Inc. Sec. Litig.*,
769 F.3d 455 (6th Cir. 2014) ................................................................4

*In re Online Travel Co. (OTC) Hotel Booking Antitrust Litig.*,
997 F. Supp. 2d 526 (N.D. Tex. 2014) ..................................................16

*Or. Laborers-Emp'rs. Health & Welfare Tr. Fund v. Philip Morris Inc.*,
185 F.3d 957 (9th Cir. 1999) ................................................................37

*Par v. Wolfe Clinic, P.C.*,
70 F.4th 441 (8th Cir. 2023) ................................................................30

*Park Irmat Drug Corp. v. Express Scripts Holding Co.*,
911 F.3d 505 (8th Cir. 2018) ................................................................14

*In re Pork Antitrust Litig.*,
2019 WL 3752497 (D. Minn. Aug. 8, 2019) ........................................16

*PSI Repair Servs., Inc. v. Honeywell, Inc.*,
104 F.3d 811 (6th Cir. 1997) ................................................................32

*SD3, LLC v. Black & Decker (U.S.) Inc.*,
801 F.3d 412 (4th Cir. 2015) ................................................................12

*In re Se. Milk Antitrust Litig.*,
739 F.3d 262 (6th Cir. 2014) ....................................................8, 27, 28

*Sec'y of Labor v. Macy's, Inc.*,
2021 WL 5359769 (S.D. Ohio Nov. 17, 2021)......................................23

*Semertzides v. Bethesda N. Hosp.*,
2014 WL 2573073 (S.D. Ohio June 9, 2014), *aff'd*, 608 F. App'x 378 (6th Cir. 2015) .........31

*State Oil v. Khan*,
522 U.S. 3 (1997)..................................................................................27

*In re Sulfuric Acid Antitrust Litig.*,
703 F.3d 1004 (7th Cir. 2012) ..............................................................28

*Tampa Elec. Co. v. Nashville Coal Co.*,
365 U.S. 320 (1961)..............................................................................30

*Techmatic, Inc. v. Plating Specialists, Inc.*,
2022 WL 16542106 (M.D. Tenn. Oct. 28, 2022) .................................32

*Tennessean Truckstop, Inc. v. NTS, Inc.*,
875 F.2d 86 (6th Cir. 1989) ..................................................................36

*Total Benefits Planning Agency Inc. v. Anthem Blue Cross & Blue Shield*,
    630 F. Supp. 2d 842 (S.D. Ohio 2007), *aff'd*, 552 F.3d 430 (6th Cir. 2008)...........................35

*Total Benefits Planning Agency, Inc. v. Anthem Blue Cross & Blue Shield*,
    552 F.3d 430 (6th Cir. 2008) ................................................................8, 9, 11, 12, 13, 27, 29

*In re Travel Agent Comm'n Antitrust Litig.*,
    2007 WL 3171675 (N.D. Ohio Oct. 29, 2007), *aff'd*, 583 F.3d 896 (6th Cir. 2009) .............18

*In re Travel Agent Comm'n Antitrust Litig.*,
    583 F.3d 896 (6th Cir. 2009) .......................................................7, 10, 12, 13, 16, 21

*Tri-State Rubbish, Inc. v. Waste Mgmt., Inc.*,
    875 F. Supp. 8 (D. Me. 1994) ...............................................................................37

*United States v. True*,
    250 F.3d 410 (6th Cir. 2001) ...............................................................................18

*United States v. U.S. Gypsum Co.*,
    438 U.S. 422 (1978).......................................................................................20, 28

*Wallace v. Bank of Bartlett*,
    55 F.3d 1166 (6th Cir. 1995) ...............................................................................28

*Wash. Cty. Health Care Auth., Inc. v. Baxter Int'l Inc.*,
    328 F. Supp. 3d 824 (N.D. Ill. 2018) ....................................................................23

*White v. R.M. Packer Co.*,
    635 F.3d 571 (1st Cir. 2011).................................................................................22

**STATUTES**

79 Okla. Stat. § 212........................................................................................................37

740 Ill. Comp. Stat. 10/11 ..............................................................................................37

Ala. Code § 6-2-38(l) ......................................................................................................38

Ariz. Stat. § 44-1412 .......................................................................................................37

D.C. Code § 28-4515 .......................................................................................................37

Fla. Stat. § 542.32 ............................................................................................................37

Idaho Code § 48-102(3) ..................................................................................................37

Ind. Code § 24-1-1-1 .......................................................................................................38

Page

Iowa Code § 553.2 ....................................................................................................37

Kan. Stat. § 50-163(b) ...........................................................................................37

Kan. Stat. § 60-512(2) ...........................................................................................38

Mass. Gen. Laws ch. 93 § 1 ...................................................................................37

Mass. Gen. Laws, ch. 93 § 2 ..................................................................................38

Mass. Gen. Laws, ch. 93 § 4 ..................................................................................38

Mich. Comp. Laws § 445.784(2) ............................................................................37

Mo. Rev. Stat. § 416.141 ........................................................................................37

N.H. Rev. Stat. § 356:14 ........................................................................................37

N.J. Rev. Stat. § 56:9-18 .......................................................................................37

N.M. Stat. § 57-1-15 ..............................................................................................37

Neb. Rev. St. § 59-829 ..........................................................................................37

S.D. Codified Laws § 37-1-22 ...............................................................................38

Utah Code § 76-10-3118 ........................................................................................38

Va. Code § 59.1-9.17 ..............................................................................................38

W. Va. Code § 47-18-16 .........................................................................................38

**OTHER AUTHORITIES**

ABA, Antitrust Law Developments (9th ed. 2022) ...........................................32, 33

**RULES**

Fed. R. Civ. P. 12(b)(6) ............................................................................................6

## I.    INTRODUCTION

Plaintiffs' Complaint attempts to advance an implausible theory: that 48 defendants who own or manage multifamily rental housing in different parts of the country (collectively, the "Lessor Defendants") ***agreed with one another*** to share proprietary data with RealPage and delegate to, and abide by, RealPage's price and supply decisions, in violation of Section 1 of the Sherman Act and state-law analogues. *See* MC ¶ 3.[1] But Plaintiffs do not allege *facts* supporting that theory, and even accepting their allegations, the Complaint does not state a viable antitrust claim for multiple reasons.

*First*, the Complaint fails to allege facts that, even if true, plausibly suggest that the Lessor Defendants agreed with *each other* to do *anything*. Indeed, the Complaint lacks any facts about the vast majority of Lessor Defendants beyond (1) their use of an unspecified one of RealPage's three different revenue management products, (2) the location of their corporate headquarters, and (3) general statements about their property locations and units. Such generic, or "group," pleading does not state a conspiracy claim.

*Second,* the few facts Plaintiffs do allege are as consistent with unilateral decisions by rational property owners or managers—in fact, more so—than an unlawful agreement among Defendants. No unlawful agreement among the Lessor Defendants can be inferred from the fact that each uses a RealPage revenue management product. Despite having purportedly gathered information from more than ten former-employee "witnesses," Plaintiffs cannot muster a statement from even one of them claiming the existence of any agreement between any Lessor Defendants to do *anything*, let alone fix rents.

---

[1] As used herein, "MC" or "Complaint" refers to the First Amended Consolidated Class Action Complaint filed on July 5, 2023 by Jason Goldman and seven other plaintiffs (ECF No. 314).

*Third*, Plaintiffs rely solely on circumstantial evidence of the alleged conspiracy, but the Complaint's allegations do not establish parallel conduct or the existence of so-called "plus factors." Plaintiffs broadly aver that all Lessor Defendants used some RealPage software product at some unidentified time, but do not allege facts suggesting (a) when each Lessor Defendant began (or ceased) using a RealPage revenue management product, (b) the actual product used, or (c) the area in which the product was deployed. The Complaint thus permits no inference that Lessor Defendants adopted RealPage software products *in parallel*. Likewise, the Complaint does not even suggest that Defendants set rents or made supply decisions in parallel. Instead, Plaintiffs rely on *average* rent and occupancy rates in various regions, without differentiating between Lessor Defendants and every other lessor in these regions.

The same defects pervade the putative "plus factors," such as allegedly concentrated markets, motives or opportunities to conspire, or alleged information exchanges. Most of the "plus factor" averments recite market characteristics that do not plausibly imply collusion, and all are at least as consistent with rational and competitive *independent* business behavior as with an unlawful agreement.

*Fourth*, the Complaint suffers from other assorted infirmities. Having failed to allege *any* concerted action among the Lessor Defendants, much less one that fits the stringent criteria for application of the *per se* rule, it follows that Plaintiffs have not alleged any *per se* violation of the Sherman Act. To the extent that Plaintiffs rely on each Lessor Defendant's contract to use RealPage software to satisfy the concerted action element of a Section 1 claim, those supplier-customer agreements must be analyzed under the rule of reason, which requires allegations of market power and anticompetitive effects. Plaintiffs default on both.

*Finally*, Plaintiffs' state antitrust claims are identical to those applicable to the federal claim

and thus fail for the same reasons. And, by conceding that RealPage revenue management products do not affect at least ten to twenty percent of lessees, Plaintiffs fail to establish that they themselves have been injured by the putatively unlawful conduct, and thus lack antitrust standing under either federal or state law.

At bottom, Plaintiffs allege nothing more than that the Lessor Defendants independently decided to use revenue management software from a common provider at unidentified, various points in time and ask this Court to infer from that fact that they conspired to fix rental rates. Such threadbare assertions do not state an antitrust claim of any kind. This case should be dismissed.

## II.    SUMMARY OF PLAINTIFFS' ALLEGATIONS

### A.    RealPage Revenue Management Products

RealPage provides a "comprehensive platform of data analytics and on demand software solutions and services for the rental real estate industry." MC ¶ 100. This includes RealPage's revenue management products for multifamily housing: YieldStar, AI Revenue Management ("AIRM"), and Lease Rent Options ("LRO"). MC ¶ 2. Plaintiffs[2] allege that YieldStar has been

---

[2] Several previously named Plaintiffs were not named in the Complaints filed in this MDL, including every plaintiff that was identified as being subject to an arbitration agreement. *See* ECF No. 261 at 4–5. These previously named Plaintiffs were the only Plaintiffs across several transferor actions against certain defendants (*i.e.*, Brookfield Properties Multifamily LLC; Apartment Income REIT Corp., d/b/a Air Communities; Apartment Management Consultants, LLC; B/T Washington, LLC d/b/a Blanton Turner; CH Real Estate Services, LLC; Conti Capital; Dayrise Residential, LLC; Essex Property Trust, Inc.; Kairoi Management LLC; Knightvest Residential; Rose Associates, Inc.; Trammell Crow Company, LLC; and Windsor Property Management Company). Since the formerly named Plaintiffs did not join the Multifamily Consolidated Amended Complaint ("CAC") or Multifamily First Amended CAC, there is no named Plaintiff from any transferor action that has sued these Defendants in the MDL. However, these "ghost plaintiffs" have participated in the MDL, including by dismissing at least one party. *See, e.g.,* ECF No. 309. If this Motion is not granted with prejudice, Plaintiffs should be required to clarify the status of these "ghost plaintiffs." They must either be named in this MDL and be subject to discovery and motions to enforce arbitration agreements, or their claims must be dismissed.

available since at least 2006. MC ¶ 138. The other Defendants[3] in this case include building owners (including real estate investment trusts and others) and property management companies, all of whom allegedly use RealPage's revenue management software ("Lessor Defendants").[4] MC ¶¶ 45–90. The vast majority of RealPage's customers are not named as Defendants. *See* MC ¶ 113 (referring to RealPage's "over 31,700 clients").

Plaintiffs allege that RealPage's revenue management products use algorithms that analyze data to generate a recommended price "daily for each of RealPage's client's available units." MC ¶ 5. The algorithms consider a customer's own internal data to determine as a first step whether to recommend a change in price. MC ¶ 116; Ex. A[5] (FAQ) at 3 ("RealPage Revenue Management software prioritizes a property's internal rent data (what renters are willing to pay for their community) and internal availability data (unit and unit types that are or will be coming available to rent at that community) when determining whether a rental price should be increased, decreased, or remain at the current level.").

If RealPage software recommends a pricing change, the algorithm allegedly proceeds at the next step to consider "competitor rent data." MC ¶ 171; Ex. A (FAQ) at 3–4 (if the analysis

---

[3] Certain Defendants are filing motions to dismiss that challenge personal jurisdiction and other deficiencies in the Complaint. Those Defendants join this Motion without waiver of those other motions.

[4] Plaintiffs also name Thoma Bravo L.P., Thoma Bravo Fund XIII, L.P., and Thoma Bravo Fund XIV, L.P. (the "Thoma Bravo Entities") as Defendants. MC ¶ 42. Plaintiffs allege that Thoma Bravo L.P. directed the Thoma Bravo Funds to acquire RealPage in April 2021. *Id.*

[5] Plaintiffs' Complaint quotes from or cites to this document at ¶ 5 & n.6; ¶ 102 & n.51; and ¶ 171 & n.104. At the motion to dismiss stage, this Court may consider external documents cited in the complaint. *See In re Omnicare, Inc. Sec. Litig.*, 769 F.3d 455, 466 (6th Cir. 2014); *see also Finley v. Kelly*, 384 F. Supp. 3d 898, 908 (M.D. Tenn. 2019) (Crenshaw, J.) ("[A] court may consider a document not formally incorporated by reference in a complaint when the complaint refers to the document and the document is central to the claims." (internal quotation marks omitted)).

of internal data "indicates that a price should be adjusted either upward or downward, then the software uses aggregated, anonymized rent data from a variety of sources to help determine . . . the appropriate magnitude of change in price"). The competitor data used by the algorithm is "aggregated" and anonymized. MC ¶¶ 112, 115, 133 n.91, 171; Ex. A (FAQ) at 3. Plaintiffs do not allege that RealPage discloses pricing or other data of a competitor to any other party. *See* Ex. A (FAQ) at 4 ("RealPage Revenue Management does not use specific competitor rent data in its algorithm – only aggregate data. RealPage clients do not have visibility into a competitor's actual rents.").

A user of RealPage revenue management products who receives a pricing recommendation for a unit can "(1) 'Accept'; (2) 'keep yesterday['s prices]'; or (3) 'propose [an] override.'" MC ¶ 143. Plaintiffs allege that RealPage representatives attempt to "persuade[]" (MC ¶ 160) or "encourage" (MC ¶ 7) users to accept RealPage's price recommendations, seemingly to create the impression that it is difficult for users to reject those recommendations (*e.g.*, MC ¶¶ 7, 145–146, 149), but Plaintiffs do not allege that a customer is required (contractually or otherwise) to accept a pricing recommendation, do not identify any consequence for non-acceptance, and admit that some users have "low acceptance rate[s]." MC ¶ 170.

## B. The Alleged Conspiracy

Plaintiffs allege that the Defendants entered into a "single unlawful conspiracy to fix, raise, stabilize, or maintain at artificially high levels" lease prices in specific Metropolitan Statistical Areas ("MSAs"). *See* MC ¶¶ 237, 246. Specifically, Plaintiffs claim that Defendants agreed to "delegate their rental price and supply decisions to a common decision maker, RealPage; share the proprietary data necessary for RealPage to make those decisions; and, then abide by RealPage's price and supply decisions." MC ¶ 3. Plaintiffs allege that this conspiracy began in 2016. MC

¶ 1. They acknowledge, however, that a number of Lessor Defendants began using RealPage's revenue management software well before 2016. *See, e.g.*, MC ¶ 138 (Lessor Defendant alleged to have used YieldStar since 2006). Despite this, Plaintiffs claim the alleged conspiracy began in 2016 because that was supposedly when the "RealPage pricing platform became more sophisticated and gained user confidence and additional data inputs," such that lessors thereafter "used [it] less as an advisory product and more as a rent-setting software." MC ¶ 104. But Plaintiffs include no allegations about how individual Lessor Defendants purportedly entered into an agreement with each other to use the software to fix prices in 2016 or how Lessor Defendants could have entered into a conspiracy simply by continuing to use software they used for years before that date. Nor do they explain how Lessor Defendants' use of the software has been different since that date.

### III.   LEGAL STANDARD

The Court must dismiss a cause of action that fails to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). To survive a motion to dismiss, Plaintiffs must plead "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). That requires more than "labels and conclusions," or a "formulaic recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 555. Instead, the allegations in a complaint "must be enough to raise a right to relief above the speculative level." *Id.*

*Twombly*, itself an antitrust conspiracy case, has particular relevance here. Section 1 of the Sherman Act prohibits agreements to restrain trade; it does not reach unilateral conduct or independent decision-making, regardless of any anticompetitive effect. *See Twombly*, 550 U.S. at 553–54. Thus, "[t]he crucial question" in assessing Section 1 claims "is whether the challenged

anticompetitive conduct stem[s] from independent decision or from an agreement." *Id.* at 553 (alternations in original) (internal quotation marks omitted). For this reason, antitrust law has long "hedged against [the] false inferences" of conspiracy that arise from ambiguous or "parallel conduct"—*i.e.*, uniform business conduct that is equally consistent with independent decisions "prompted by common perceptions of the market." *Id.* Drawing on that history, the *Twombly* Court held that a complaint alleging violations under § 1 of the Sherman Act cannot survive a motion to dismiss unless it avers facts that "plausibly suggest an unlawful agreement," as opposed to conduct that is equally consistent with rational, unilateral behavior. *Iqbal*, 556 U.S. at 680 (discussing *Twombly*); *accord In re Travel Agent Comm'n Antitrust Litig.*, 583 F.3d 896, 904 (6th Cir. 2009) ("The *Twombly* decision provides an additional safeguard against the risk of 'false inferences from identical behavior' at an earlier stage of the trial sequence—the pleading stage." (quoting *Twombly*, 550 U.S. at 554)). Thus, to plead an antitrust conspiracy, the allegations must plausibly "tend[] to exclude the possibility of independent conduct." *Hobart-Mayfield, Inc. v. Nat'l Operating Comm. on Standards for Athletic Equip.*, 48 F.4th 656, 664 (6th Cir. 2022).

## IV.    ARGUMENT[6]

### A.    Plaintiffs Do Not Plausibly Allege A Sherman Act Section 1 *Per Se* Violation

Plaintiffs allege that Defendants entered into a horizontal agreement that constitutes a *per se* violation of Section 1 of the Sherman Act. Plaintiffs' theory of "conspiracy through indirect

---

[6] Defendant Trammell Crow Company, LLC ("TCC") does not join this motion. TCC was not a party to any transferor action when the cases were consolidated before this Court and has not appeared in any transferor case or this MDL proceeding. The undersigned Defendants are unaware whether Plaintiffs served TCC with the new claims against it. Two different Plaintiffs sued TCC in two separate transferor cases, but each of those Plaintiffs voluntarily dismissed TCC a few days after service of the lawsuits. *See* Notice of Voluntary Dismissal, *Cherry et al. v. RealPage, Inc. et al.*, 22-CV-01618 (W.D. Wash. Nov. 21, 2022), ECF No. 18; Notice of Voluntary Dismissal, *Boelens v. RealPage, Inc. et al.*, 22-CV-1802-RSL (W.D. Wash. Jan. 27, 2023), ECF No. 38.

contact via RealPage" (MC ¶ 23) is predicated on each Lessor Defendant entering into an agreement with RealPage to use RealPage's revenue management software. But these separate agreements with RealPage are "vertical," not "horizontal," because RealPage and the Lessor Defendants do not compete with each other; therefore, the alleged agreements with RealPage are "agreements between parties at different levels of the market structure." *In re Se. Milk Antitrust Litig.*, 739 F.3d 262, 272 (6th Cir. 2014). And "all [alleged] vertical price restraints are to be judged under the rule-of-reason standard." *Total Benefits Planning Agency, Inc. v. Anthem Blue Cross & Blue Shield*, 552 F.3d 430, 435 (6th Cir 2008).

Plaintiffs therefore attempt to warp the vertical agreements between RealPage and each Lessor Defendant into a *horizontal* agreement to fix prices that Plaintiffs contend is subject to *per se* condemnation. MC ¶ 27. To be clear, while pleading a horizontal agreement is a *necessary* condition of obtaining *per se* treatment, it is not *sufficient* on its own because the per se rule applies only to those restraints that "clearly and unquestionably" fall into "one of a handful of categories that have been collectively deemed" anticompetitive, such as bid rigging or price fixing between competitors. *See In re Se. Milk*, 739 F.3d at 273 (holding that the rule of reason applies to horizontal agreements unless they fall into such a category); *see also* Section 4.B *infra*. But here Plaintiffs have failed to plausibly allege a horizontal agreement, and thus their *per se* claim fails out of the gate.

Although not explicitly, it appears that Plaintiffs attempt to invoke a "hub and spoke" theory, which involves both vertical agreements between a hub (RealPage) and the spokes (Lessor Defendants), *and* a horizontal agreement *among and between* the spokes (*i.e.*, the rim). MC ¶¶ 3, 23. To survive dismissal under this theory, Plaintiffs must allege sufficient facts to plausibly raise an inference of a *horizontal* agreement among the Lessor Defendants—*i.e.*, an agreement *among*

*competitors*, not merely a set of agreements between RealPage and each Lessor Defendant. *See Total Benefits,* 552 F.3d at 435–36 (affirming dismissal where the complaint alleged vertical agreements but failed to include plausible factual allegations of a horizontal agreement between the spokes, because the "critical issue for establishing a *per se* violation with the hub and spoke system is how the spokes are connected to each other").

To plead a horizontal price-fixing agreement, Plaintiffs must allege facts that, if accepted as true, would constitute either (1) direct evidence of such an illegal agreement between competitors or (2) circumstantial evidence plausibly "tending to exclude the possibility of independent conduct." *Hobart-Mayfield*, 48 F.4th at 664. But while Plaintiffs make one vague and conclusory reference to "the horizontal nature of the alleged conspiracy," MC ¶ 239, they fail to plead any direct or circumstantial allegations to support it.

Plaintiffs certainly allege no "direct evidence[, which] is tantamount to an acknowledgment of guilt." *Hyland v. Homeservices of Am., Inc.*, 771 F.3d 310, 318 (6th Cir. 2014) (internal quotation marks omitted). Direct evidence must be "explicit and require[] no inferences to establish the proposition or conclusion being asserted." *Id.* (internal quotation marks omitted). Plaintiffs allege nothing of the sort. They do not allege any "acknowledgement" by *any* Lessor Defendants that they entered into a horizontal agreement with any (much less all) others, let alone to fix prices. Further, while Plaintiffs rely heavily on statements from unnamed witnesses— including alleged former employees of Defendants—*none* of these witnesses is alleged to have any knowledge of a price-fixing agreement.

Thus, to survive this Rule 12(b)(6) motion, Plaintiffs must plead a circumstantial case. As shown below, they have not.

### i.       Plaintiffs Allege No Circumstantial Evidence Of Conspiracy

To plausibly allege circumstantial evidence of a price-fixing conspiracy, Plaintiffs here attempt to allege both (1) "parallel conduct" by each Defendant and (2) "'plus factors' to support plaintiff's allegation that the actions of the Defendants are not independent." *Hobart-Mayfield*, 48 F.4th at 665.  To survive a motion to dismiss for failure to state a claim, these allegations must tend to "exclude the possibility of independent conduct." *Id.* at 664; *see C.S. Sewell, M.D. P.C. v. Amerigroup Tenn., Inc.*, 2018 WL 6591429, at *4 (M.D. Tenn. Dec. 14, 2018) (Crenshaw, J.) (dismissing complaint lacking "sufficient circumstantial facts that, in context, negate the likelihood of independent action and raise an inference of coordination").  Plaintiffs have not and cannot allege the requisite facts here.

### a)       Plaintiffs' Group Pleading Of An Agreement Is Insufficient

Plaintiffs theorize that dozens upon dozens of property management companies and property owners across the United States agreed with one another to use RealPage's price recommendation software to fix prices for residential rental units over a span of many years.  To sustain this sweeping claim, Plaintiffs must plead facts showing that each Defendant had a "conscious commitment" to the alleged agreement to fix prices.  *Hobart-Mayfield, Inc. v. Nat'l Operating Comm. on Standards for Athletic Equip.*, 535 F. Supp. 3d 638, 646 (E.D. Mich. 2021), *aff'd*, 48 F.4th 656 (6th Cir. 2022) (quoting *Travel Agent*, 583 F.3d at 907).  At a bare minimum, this pleading burden requires answers to "basic questions" about each Defendant's involvement: "who, did what, to whom (or with whom), where, and when?"  *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1048 (9th Cir. 2008).  Because Plaintiffs do not plead these basic facts about the alleged conspirators, Plaintiffs' Section 1 conspiracy claim does not get out of the gate.

Plaintiffs paint with the broadest of brushes, levying allegations at dozens of "Lessor Defendants" *en masse*. *See, e.g.*, MC ¶¶ 3–4, 21, 104, 116, 120. The Complaint ignores fundamental differences among the Lessor Defendants, such as the fact that some own property, while others merely manage properties on behalf of others. The Complaint also offers no facts about the vast majority of Lessor Defendants beyond identifying the location of their corporate headquarters and vague statements about their property locations and number of units managed. MC ¶¶ 45–90.[7] Plaintiffs describe *31* of the 48 Lessor Defendants in the "Parties" section of their complaint and *never refer to them again*. *See* Ex. B.[8] Another 13 of the Lessor Defendants are mentioned in only one other paragraph of the Complaint, while another is specifically named in only two additional paragraphs. *Id.*[9] This "guilt by association" pleading does not cut it: as the Sixth Circuit instructs, "alleging misconduct against defendants without specifics as to the role each played in the alleged conspiracy" falls short of *Twombly*'s demands. *Total Benefits*, 552 F.3d at 436 (citing *Twombly*, 550 U.S. at 565 n.10); *see also In re Elevator Antitrust Litig.*, 502 F.3d 47, 50–51 (2d Cir. 2007) (finding conclusory allegations enumerating "basically every type of conspiratorial activity that one could imagine . . . without any specification of any particular activities by any particular defendant" did not support a factual basis for plaintiff's assertion of conspiracy (internal quotations omitted)).

---

[7] Even where Plaintiffs allege facts regarding a specific Lessor Defendant, they merely address the Lessor Defendant's unilateral internal processes or vertical relationship with RealPage rather than any *horizontal agreement* with other Lessor Defendants. *E.g.*, MC ¶¶ 9, 11.

[8] Ex. B is a table listing each Defendant in the Complaint and the paragraphs within that pleading where each Defendant is referenced.

[9] Similarly, the Complaint does not mention the Thoma Bravo Entities anywhere but the "Parties" Section and one paragraph outside it. *See* MC ¶¶ 41–44, 113.

*In re Travel Agent Commission Antitrust Litigation* is instructive. There, the Sixth Circuit affirmed the dismissal of four defendants from an antitrust conspiracy case where the complaint did not "mention[] [the individual defendants] in the body of the [complaint]" or "specify how these defendants are involved in the alleged conspiracy." 583 F.3d at 905. Instead, Plaintiffs sought to "implicate [them] in the purported conspiracy by relying on several vague allegations . . . that refer to 'defendants' or 'defendants' executives.'" *Id.* at 905–06. The court found these indeterminate assertions inadequate, holding that "they represent precisely the type of naked conspiratorial allegations rejected by the Supreme Court in *Twombly*." *Id.* at 905 (citing *Twombly*, 550 U.S. at 565 n.10).

The Complaint suffers from the same defect here. Plaintiffs do not allege *when* or *how* each (or any) Lessor Defendant entered an unlawful agreement, *what* RealPage software each Lessor Defendant agreed to use to fix rental prices, *which* of Lessor Defendants' properties were in the alleged markets, or *how* Defendants policed a conspiracy spanning so many alleged markets and among so many members. *Cf. Twombly*, 550 U.S. at 565 n.10 (dismissal warranted where complaint "furnishes no clue as to which of the four [defendants] (much less which of their employees) supposedly agreed, or when and where the illicit agreement took place"); *Total Benefits*, 552 F.3d at 436 (affirming dismissal where plaintiffs did not allege "when Defendants joined the [] conspiracy, where or how this was accomplished").

Plaintiffs' reliance on "[g]eneric pleading" is reason enough to dismiss their conspiracy claims. *Total Benefits*, 552 F.3d at 436. Making "vague, non-specific allegations" against Defendants "as a group" without alleging "particular facts against a particular defendant" does not suffice to plead a plausible agreement among dozens of property owners and managers. *See SD3, LLC v. Black & Decker (U.S.) Inc.*, 801 F.3d 412, 422 (4th Cir. 2015) (citing, *inter alia*, *Travel*

*Agent*, 583 F.3d at 905; *Total Benefits*, 552 F.3d at 436). And for good reason: Plaintiffs' bare-bone allegations give Defendants "'little idea where to begin'" to respond to the Complaint, especially regarding the requirement that there was a "rim" among Lessor Defendants. *Travel Agent*, 583 F.3d at 905 (quoting *Twombly*, 550 U.S. at 565 n.10). Absent more detailed factual allegations, individual Lessor Defendants do not know which of the Complaint's 400-plus paragraphs of allegations are intended to apply to them, or as to what rental units, in what markets, for what time periods, and pursuant to what purported agreement with which other Lessor Defendants. Indeed, an individual Lessor Defendant cannot even determine what specific conduct is being challenged, beyond its decision to license RealPage's revenue management software.

### b) Plaintiffs Do Not Allege "Parallel Conduct"

Plaintiffs attempt to support their antitrust conspiracy claim by asserting that the Lessor Defendants engaged in parallel behavior. *See, e.g.*, MC ¶¶ 17–18, 212. But, even if allegations of parallel business behavior were enough to state a conspiracy claim—they clearly are not, *see Twombly*, 550 U.S. at 553—Plaintiffs fail to identify any plausible parallel conduct by the Defendants. This failure directly undermines the plausibility of Plaintiffs' claims here because parallel behavior is usually an integral, although not alone sufficient, part of stating a claim of an antitrust conspiracy based on allegations of circumstantial evidence. *See, e.g.*, *Travel Agent*, 583 F.3d at 903 (observing that "[a]llegations of concerted action by competitors are frequently based on a pattern of uniform business conduct"); *In re Broiler Chicken Antitrust Litig.*, 2023 WL 4303476, at *8 (N.D. Ill. June 30, 2023) ("[T]he presence of parallel conduct is generally thought to be an integral part of the economic evidence necessary to prove price fixing with circumstantial evidence.").

*First*, Plaintiffs' allegations regarding Defendants' alleged adoption and use of RealPage revenue management software are not sufficient to plead parallel conduct. MC ¶ 2. Plaintiffs do not even identify *when* (even approximately) each Defendant allegedly adopted the software, and they further acknowledge that some Defendants were using it long *before* any alleged conspiracy began. *See, e.g.*, MC ¶¶ 98, 138. This is fatal because parallel conduct requires temporal proximity. *See Park Irmat Drug Corp. v. Express Scripts Holding Co.*, 911 F.3d 505, 516–17 (8th Cir. 2018) (actions six months apart under dissimilar circumstances did not constitute parallel conduct); *In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1193 (9th Cir. 2015) (parallel conduct means "competitors adopting *similar* policies around the *same* time . . . ." (emphases added)); *Mosaic Health Inc. v. Sanofi-Aventis U.S., LLC*, 2022 WL 4017895, at *6 (W.D.N.Y. Sept. 2, 2022) (policies that were "different in their particulars, their timing, and their outcomes" were not parallel).

Further, Plaintiffs acknowledge significant variation in Defendants' behavior, including that (1) Lessor Defendants use different revenue management software and algorithms (without alleging which Lessor Defendant uses which product(s), where, how, or for how long) (MC ¶ 106); (2) "many" Lessor Defendants utilize RealPage's "Pricing Advisors," but RealPage's "largest" clients do not (MC ¶ 7); and (3) some Lessor Defendants frequently rejected RealPage's pricing recommendations, *i.e.* had "low acceptance rates" (MC ¶ 170), while others adopted the software's pricing recommendations at varying levels "up to 80–90% of the time." MC ¶¶ 5, 129. In sum, Plaintiffs allege that at different, unspecified points in time over the last seven years, Lessor Defendants began using different, unspecified RealPage products that offer a wide variety of pricing recommendations that Lessor Defendants accepted to different degrees. This is the antithesis of parallel conduct. *See, e.g.*, *Musical Instruments*, 798 F.3d at 1193 (parallel conduct

means "competitors adopting *similar* policies around the *same* time in response to *similar* market conditions" (emphases added)).

The absence of alleged parallel conduct does not stop there. Despite alleging a *price* fixing conspiracy, Plaintiffs identify no parallel *pricing* (or parallel supply reductions) among the Defendants. Indeed, Plaintiffs say nothing about any Defendants' actual pricing at all. To be sure, Plaintiffs allege that in certain "Selected Metro Areas" (MC Figure 1) and "regression submarkets," their analysis shows that prices have risen (including, purportedly, at the same time as vacancies) since 2016. MC ¶¶ 196–210. But Plaintiffs rely exclusively on average pricing and vacancy data for *all* units in these regions leased by thousands of property owners, as opposed to data specific to *Defendants*. These analyses offer no insight into the specific pricing and vacancy rates of Lessor Defendants, and thus cannot demonstrate that Lessor Defendants made any *parallel* pricing or vacancy decisions.[10] *See Musical Instruments*, 798 F.3d at 1197 (analysis indicating an increase in the "average retail price" of all goods sold, instead of an increase in price of the goods "manufactured by defendants" insufficient). Still worse, Plaintiffs have not alleged that any two of RealPage's rent recommendations for competing properties were the same (or even similar), much less that they were accepted. Nor have they alleged the frequency with which RealPage's revenue management software recommends raising rent, as opposed to keeping it unchanged or reducing it. *See Hogan v. Pilgrim's Pride Corp.*, 2018 WL 1316979, at *7 (D. Colo. Mar. 14, 2018) (dismissing for failing to allege "how [a defendant's] actions compared with those of its co-conspirators").

Even if Plaintiffs had alleged parallel conduct, "without more" such conduct is ambiguous

---

[10] Plaintiffs' selective use of alleged pricing data by a *single* Lessor Defendant (MC Fig. 12) offers no support for alleged parallel conduct by *each* Lessor Defendant.

at best: "consistent with conspiracy, but just as much in line with a wide swath of rational and competitive business strategy." *Travel Agent*, 583 F.3d at 903. Indeed, by alleging that RealPage and only certain of its revenue management customers have conspired to fix prices, *see, e.g.*, MC ¶ 2, Plaintiffs concede that lessors can adopt and use the software without conspiring. *See In re Pork Antitrust Litig.*, 2019 WL 3752497, at *7 n.7 (D. Minn. Aug. 8, 2019) ("disagree[ing]" that "the use of Agri Stats alone is sufficient to allege a conspiracy"). Further, Plaintiffs identify numerous reasons why Lessor Defendants unilaterally decide to use RealPage's software, including that it can help users "reduce vacancies" (MC ¶ 176); realize "significant revenue increases" (MC ¶ 183); eliminate manual research into market conditions and other manual tasks (MC ¶¶ 121, 175); manage inventory to avoid large numbers of residents moving in or out of a property at the same time (MC ¶ 140); and provide insight into a property's "own individual supply and demand exposure" (MC ¶ 187). And Plaintiffs acknowledge that these benefits were conferred on users before any alleged conspiracy began. *Compare* MC ¶ 138 (alleging revenue growth in 2006 for one defendant, ten years before the alleged conspiracy began), *with* MC ¶ 1. These benefits accruing to each user of RealPage's software are wholly consistent with independent, unilateral behavior and further undermine an inference of conspiracy here. *In re Online Travel Co. (OTC) Hotel Booking Antitrust Litig.*, 997 F. Supp. 2d 526, 537–38 (N.D. Tex. 2014) ("natural" and "obvious" reasons for adoption of resale price maintenance agreements precluded inference of conspiracy).

### c) Plaintiffs' Alleged "Plus Factors" Fail

Plaintiffs' plus-factor allegations likewise do not supply the "factual matter" needed to infer "that an agreement was made." *Twombly*, 550 U.S. at 556. To the contrary, Plaintiffs' allegations are "in line with a wide swath of rational and competitive business strategy unilaterally

prompted by common perceptions of the market." *Id.* at 554.

**Alleged Information Sharing.** Plaintiffs' information-sharing allegations do not support an inference of any horizontal agreement—much less a *per se* illegal conspiracy.

*First*, allegations of information sharing do not support the inference of a horizontal conspiracy when they do not allege information sharing *between or among horizontal competitors*. *See In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 329 (3d Cir. 2010) (allegations that insurance-broker "hub" shared competitive information with insurer "spokes" did not permit inference of conspiracy absent allegations of "horizontal" sharing between insurers; affirming dismissal). Here, Plaintiffs' allegations all but exclusively relate to the provision of information from Lessor Defendants to RealPage, rather than exchanges between Lessor Defendants themselves. Plaintiffs claim Lessor Defendants submit "competitively sensitive information" to RealPage, including "pricing, inventory, occupancy rates," "signed lease documents," and other transactional data (*e.g.*, MC ¶¶ 101, 116, 224), but the Complaint is devoid of allegations that Lessors shared this same information with each other. And Plaintiffs ignore the obvious, unilateral reason that a Lessor Defendant shares its own internal data with RealPage: so that RealPage can use that data in providing an individual price recommendation for that Lessor Defendant.

Plaintiffs' only suggestion of Lessor-to-Lessor information sharing is that RealPage encourages Lessor Defendants to "[b]e knowledgeable" about others' "pricing, specials, and product" by calling them, "view[ing] their websites," or visiting properties, and that RealPage has provided a form to reference when doing so. MC ¶¶ 24–25. But this is just market research, something that virtually every company in virtually every industry undertakes. Indeed, courts have recognized that it is standard business practice to consider "rates charged by similar companies" when making independent and unilateral pricing decisions. *See, e.g.*, *Cont'l Cablevision of Ohio,*

*Inc. v. Am. Elec. Power Co.*, 715 F.2d 1115, 1119 (6th Cir. 1983) (affirming summary judgment). Learning a competitor's prices, even directly from a competitor, does not imply the requisite "unity of purpose or a common design and understanding, or a meeting of minds in an unlawful arrangement." *Id.* (citing *Am. Tobacco Co. v. United States*, 328 U.S. 781, 810 (1946)); *see also United States v. True*, 250 F.3d 410, 423 (6th Cir. 2001) (distinguishing "legitimate, after-the-fact, price verifications" among competitors from "agreements to fix prices"); *In re Travel Agent Comm'n Antitrust Litig.*, 2007 WL 3171675, at *11 (N.D. Ohio Oct. 29, 2007) ("availability of Defendants' commission rates" is not "evidence of a conspiracy"; dismissing complaint), *aff'd*, 583 F.3d 896 (6th Cir. 2009). Scattered allegations of possible price-checking by unspecified Defendants do not plausibly support Plaintiffs' allegation of a seven-year-long conspiracy between several dozen Defendants.

*Second*, Plaintiffs' information-sharing allegations fall short of plausibly alleging RealPage facilitated any horizontal conspiracy among Lessor Defendants. *In re Local TV Advert. Antitrust Litig.*, 2022 WL 3716202 (N.D. Ill. Aug. 29, 2022), is instructive. The plaintiffs alleged that a data-aggregating intermediary, ShareBuilders—which "provide[d] yield management solutions" to "increase[] [clients'] revenue"—"facilitated the reciprocal exchange of competitively sensitive market information among" TV broadcasters by collecting detailed pricing information from clients and then providing market data, along with pricing recommendations, for clients' specific products. *Id.* at *2–3. The court held that these allegations did not plausibly suggest that ShareBuilders facilitated collusion among broadcasters. *Id.* at *7–8. The court explained that "to plausibly infer that a [data-aggregating intermediary] defendant *facilitated* a conspiracy, plaintiffs must allege facts showing that the conduit's circulation of information enabled co-conspirators to tacitly communicate with one another," which generally requires "'concrete' allegations that the

conduit-defendant compromised 'the ostensible anonymity' of competitively sensitive information." *Id.* at *6 (collecting cases). As the data provided by ShareBuilders was "aggregate[d from] tens if not hundreds of companies," it gave "a picture of what is happening in the market as a whole," but did not include "so much specificity that [defendants] could use them to police a secret or tacit conspiracy to fix prices." *Id.* at *6–8 (cleaned up).

Here, Plaintiffs acknowledge that RealPage aggregates and anonymizes any competitor information it uses in providing pricing recommendations to Lessors. For example, Plaintiffs allege that RealPage "crunches" customer data (MC ¶ 114), feeds it into an algorithm (MC ¶ 224), and then provides only "*aggregate[d]*" market data to customers (MC ¶¶ 115 (emphasis added), 133 n.91, 171). Similarly, while Plaintiffs allege that RealPage Pricing Advisors' meetings—in which Plaintiffs acknowledge many Defendants did not even participate, *see* MC ¶ 7—provided customers with a "wealth of information," they concede that shared data was "pooled" and "blended" to capture "overall market performance within the applicable region." MC ¶¶ 125, 127, 133; *see also* Ex. A (FAQ) at 4 ("RealPage Revenue Management does not use specific competitor rent data in its algorithm – only aggregate data. RealPage clients do not have visibility into a competitor's actual rents."). Thus, while Plaintiffs allege that certain RealPage products may use data about competitor pricing in the process of providing pricing recommendations to a Defendant Lessor, they do not enable Lessors to "tacitly communicate with one another" or "police a secret or tacit conspiracy to [fix] prices." *Local TV*, 2022 WL 3716202, at *6 (alteration in original). Even assuming *arguendo* that RealPage collects "ample and granular transactional data" (MC ¶ 133), as Plaintiffs claim, the Complaint does not plead facts showing that RealPage provides

Lessors with access to correspondingly "granular" competitor data. [11]

Finally, as noted in Section 4.B *infra*, even if Plaintiffs had plausibly alleged facts showing an *agreement* among Defendants to share data (either with RealPage or each other), any such agreement would necessarily be subject to the rule of reason. *See, e.g.*, *United States v. U.S. Gypsum Co.*, 438 U.S. 422, 441 n.16 (1978).

**Motive and Opportunity to Conspire.**  Allegations that Defendants had the "motive" (MC ¶ 225) to collude, and "opportunities" to do so (MC ¶¶ 226–36), do not support a plausible inference of conspiracy.  "[C]ommon motive does not suggest an agreement." *Musical Instruments*, 798 F.3d at 1194; *see Hobart-Mayfield,* 48 F.4th at 668 (rejecting "motive" and "strong incentives to collude" plus factors).

Plaintiffs insist Defendants had a "motive to conspire" because RealPage promised they could "outperform the market" and "increase revenue."  MC ¶¶ 174, 225.  But the "motive to maximize profits cannot support an inference of conspiracy," since "all businesses" have the motive to maximize profits.  *Hyland*, 771 F.3d at 321 (6th Cir. 2014) (affirming summary judgment).  Similarly, Lessor Defendants' awareness that "their proprietary information was being collected and pooled with that provided by their regional competitors," and that RealPage's pricing recommendations, in part, "ma[ke] use of this data superset" (MC ¶ 5 n.7), does not imply an agreement to fix prices.  *See Musical Instruments*, 798 F.3d at 1193 (through "mutual awareness" of competitor's "anticipated reactions," "two firms may arrive at identical decisions independently, as they are cognizant of—and reacting to—similar market pressures").

---

[11] While Plaintiffs attempt to draw parallels between this case and the DOJ's investigation of information sharing among certain airlines in the 1980s and 1990s, MC ¶¶ 102–03, the differences are patent.  The airlines shared granular competitive data, including "what fares they wanted to charge in which markets, what competitors' fares were acceptable to them, and what deals they were willing to make."  *See* DOJ Press Release, cited in MC ¶ 102 n.52.

Plaintiffs' "opportunities to collude" allegations also fail. Even alleged "'[n]umerous opportunities' [to collude] are not sufficient" to support an inference of conspiracy. *Midwest Auto Auction, Inc. v. McNeal*, 2012 WL 3478647, at *10 (E.D. Mich. Aug. 14, 2012). Plaintiffs allege that some unnamed Lessor Defendants had "opportunities to collude" through unspecified online forums, trade associations and RealPage committees, and at RealPage-hosted events, MC ¶¶ 227–236, but these allegations are "based wholly in speculation and wishful thinking as to what Defendants *might* have done." *In re ICE LIBOR Antitrust Litig.*, 2020 WL 1467354, at *4 (S.D.N.Y. Mar. 26, 2020) (dismissing claims). Courts recognize that industry groups "often serve legitimate functions." *In re Dynamic Random Access Memory (DRAM) Indirect Purchaser Antitrust Litig.*, 28 F.4th 42, 52 (9th Cir. 2022). That is why "gather[ing] at industry trade association meetings" does not suggest "an illegal agreement," but is "more likely explained by [] lawful, free-market behavior." *Travel Agent*, 583 F.3d at 910–11; *Musical Instruments*, 798 F.3d at 1196 ("[M]ere participation in trade-organization meetings where information is exchanged and strategies are advocated does not suggest [conspiracy].").[12]

**Market Structure.** Plaintiffs further assert that a price-fixing conspiracy between and among RealPage and Lessor Defendants is plausible because alleged characteristics of the "multifamily rental housing market" are "conducive to collusion." MC ¶ 211. Specifically, Plaintiffs claim that (1) the alleged markets are "concentrated" (a facially implausible allegation, given the number of Defendants named here and the other lessors operating in a given alleged

---

[12] Similarly, allegations that a Texas trade association began publishing a form lease agreement "before the emergence and adoption" of the alleged conspiracy with RealPage (MC ¶¶ 231–33) do not raise an inference of conspiracy. *See In re Interest Rate Swaps Antitrust Litig.*, 261 F. Supp. 3d 430, 470 (S.D.N.Y. 2017) (dismissing conspiracy claims after finding that allegation of "forum for inter-Dealer communication" that was founded "seven years before the start of the alleged conspiracy" was "not evidence of the alleged conspiracy").

21

market), (2) there are high entry barriers, (3) renters face "high switching costs," (4) demand is inelastic, and (5) rental units are fungible. MC ¶ 212. None of these allegations get Plaintiffs any closer to "the line between possibility and plausibility." *Twombly*, 550 U.S. at 557.

To start, despite claiming that Defendants conspired to use RealPage's revenue management software to fix prices in over 50 local markets, Plaintiffs do not allege that any one of those supposed markets has these characteristics. *See* MC ¶¶ 213–23.[13] More problematically, even if Plaintiffs had plausibly alleged that each of their claimed local markets is concentrated, has high entry barriers, and so forth, such allegations are "no more consistent with an illegal agreement than with rational and competitive business strategies, independently adopted by firms acting within an independent market." *Musical Instruments*, 798 F.3d at 1189 (affirming dismissal). The allegations "are simply descriptions of the market, not allegations of anything the defendants did." *Erie Cty. v. Morton Salt, Inc.*, 702 F.3d 860, 870 (6th Cir. 2012) (holding that market-characteristic allegations "d[id] not give rise to an inference of unlawful agreement" and affirming dismissal); *see Jones v. Micron Tech. Inc.*, 400 F. Supp. 3d 897, 917 (N.D. Cal. 2019) ("[M]arket characteristics are . . . neutral facts."). That is why courts routinely hold that the very market characteristics Plaintiffs allege do not imply collusion. *See, e.g.*, *DRAM*, 28 F.4th at 52 (affirming dismissal despite allegations of "extreme market concentration"); *White v. R.M. Packer Co.*, 635 F.3d 571, 582 (1st Cir. 2011) (holding that allegations of "[h]igh barriers to entry and inelastic demand" do not "help[] to distinguish between agreement and mere conscious parallelism"); *In re German Auto. Mfrs. Antitrust Litig.*, 612 F. Supp. 3d 967, 983 (N.D. Cal. 2020) (noting that allegations that market was "susceptible to collusion" are "of little help in pleading an antitrust

---

[13] Nor do Plaintiffs explain why the local markets they allege, opposed to the many they omit (*e.g.*, Rochester, NY; Honolulu, HI; and Fresno, CA), are the ones in which Defendants have supposedly restrained competition.

conspiracy"); *Wash. Cty. Health Care Auth., Inc. v. Baxter Int'l Inc.*, 328 F. Supp. 3d 824, 841 (N.D. Ill. 2018) (holding that allegations that market was "highly concentrated, the product at issue is homogeneous [*i.e.*, fungible], and demand is inelastic" did not "get the complaint across the finish line").

      ii.      **Plaintiffs' Allegations That RealPage Facilitated And Enforced The Horizontal Conspiracy Also Fail**

Plaintiffs allege that RealPage "facilitate[s]" the alleged horizontal conspiracy by recommending and enforcing adherence to cartel-level pricing, and by serving as a "conduit" for information sharing. MC ¶¶ 7, 16, 161. These allegations fail to support any inference of a horizontal price fixing conspiracy.

*First*, Plaintiffs attempt to create the impression that RealPage has the ability to force Lessor Defendants to accept pricing. But other allegations in the Complaint refute these claims, and the Court need not "and indeed cannot" accept as true allegations of fact that are contradicted by other allegations in the Complaint. *See Sec'y of Labor v. Macy's, Inc.*, 2021 WL 5359769, at *5 (S.D. Ohio Nov. 17, 2021).

Plaintiffs repeatedly concede that Lessor Defendants maintain discretion over pricing. For instance, Plaintiffs allege that "[a] client is able to: (1) 'Accept'; (2) 'keep yesterday['s prices]'; or (3) 'propose override'" in response to each RealPage pricing recommendation. MC ¶ 143. While Plaintiffs allege that Defendants accept pricing recommendations "*up to*" 80–90% of the time (MC ¶ 5), the hedged use of "up to" renders this allegation meaningless—even if taken as true, any given Lessor Defendant could accept pricing recommendations 50% of the time, or even 10%. Regardless, Plaintiffs *acknowledge* that Lessor Defendants choose to reject *at least* one out of every five of RealPage's recommendations. MC ¶¶ 5, 129, 147. And ultimately, Plaintiffs

acknowledge that some of the Defendants have "low acceptance rate[s] of RealPage's pricing recommendations." MC ¶ 170.

Further, the sources Plaintiffs rely on in their Complaint directly contradict any claim that RealPage has ultimate pricing authority. As one RealPage document quoted by Plaintiffs explains: "[T]he pricing recommendation output from RealPage Revenue Management may be followed, modified, or ignored by an apartment provider in any particular case. Ultimately, it is up to each apartment provider to execute a pricing strategy that it determines to be appropriate for its property." Ex. A (FAQ) at 2. The Court is not "bound to accept . . . unwarranted inferences, including allegedly inferable 'facts' or conclusions which contradict documentary evidence appended to, or referenced within, the plaintiff's complaint." *Blankenship v. City of Crossville*, 2017 WL 4641799, at *2 (M.D. Tenn. Oct. 17, 2017) (Crenshaw, J.) (internal quotation marks omitted).

Plaintiffs also allege that RealPage "Pricing Advisors" "monitor the client's compliance with RealPage's pricing decisions" and that "at least some" of them told customers "they were without discretion to override pricing [recommendations]." MC ¶ 7. But Plaintiffs acknowledge that only *a fraction of* Defendants subscribe to Pricing Advisor services, and that the "larger property management companies often had their own internal revenue manager." MC ¶¶ 7, 169. Regardless, even for the customers who subscribe to the service, the Complaint acknowledges that Pricing Advisors *recommend*—they do not and cannot require—adoption of RealPage pricing recommendations. For example, Plaintiffs allege that RealPage representatives "persuade[] clients that it was in their best interest to . . . accept all or substantially all of RealPage's pricing recommendations," MC ¶ 160, and "assist clients in understanding the methodology behind RealPage's [Revenue Management Software] so that clients would more closely adhere to

RealPage's pricing recommendations," MC ¶ 163. It is not surprising that RealPage, in the business of providing software that recommends prices, encourages customers to use them. But such encouragement would make little sense if RealPage had control over Lessor Defendants' pricing decisions.

And despite conclusory allegations that RealPage is "enforcing price discipline" among conspiracy members, MC ¶ 179, Plaintiffs provide *no* factual allegations of any disciplinary mechanism to prevent or punish "cheating" by alleged conspiracy members, nor is any such mechanism even plausible here. *See Llacua v. W. Range Ass'n*, 930 F.3d 1161, 1180 & n.30 (10th Cir. 2019) (affirming dismissal of conspiracy claims where plaintiffs failed to allege a "key factor": "an enforcement mechanism, binding on all members" of the alleged conspiracy); *Kleen Prods. LLC v. Int'l Paper*, 276 F. Supp. 3d 811, 842 (N.D. Ill. 2017), *aff'd* 910 F.3d 927 (7th Cir. 2018) ("With no punishment, or even a mechanism to punish, the inference tends toward no agreement.").

*Second*, with respect to information sharing, as noted above, Plaintiffs allege that RealPage provides only "'blended'" and "'aggregate[d]'" data to capture "'overall market performance within the applicable region.'" *Supra* at 18–19. Such data, however, is far too generalized to permit Lessor Defendants "'to police a secret or tacit conspiracy to fix prices.'" *Id.* (quoting *Local TV*, 2022 WL 3716202, at *6). Plaintiffs' conduit theory thus fails.

### iii.     The Alleged Conspiracy Is Implausible On Its Face

Plaintiffs' horizontal conspiracy claim also fails because the alleged national conspiracy is "practically and economically implausible." *Lifeline Ltd. No. II v. Conn. Gen. Life Ins*. Co., 821 F. Supp. 1201, 1205–06 (E.D. Mich. 1993) (dismissing antitrust claims).

Plaintiffs' theory is internally inconsistent. While Plaintiffs acknowledge that the

conspiracy they envision would work only if all or substantially all competitors in a given alleged market were conspirators, they fail to allege that this necessary predicate exists in any alleged market. According to Plaintiffs, it is "rational" for Defendants to "artificially restrict[] supply" and set "higher prices" using RealPage's software *only* if they "know that their competitors are setting rental prices using the same algorithm and thus would not attempt to undercut them." MC ¶ 18. But missing from Plaintiffs' theory is any allegation that all, or substantially all, of the competing lessors operating in an alleged market use RealPage revenue management software to price units. Indeed, as discussed in Section 4.C.ii *infra*, Plaintiffs do not even claim that the Lessor Defendants collectively hold a 30% share of the rental units in any alleged market.

No conspiracy to artificially raise prices could succeed in a purported market where the Lessor Defendants do not have market power. Plaintiffs acknowledge as much, alleging that a property manager who "raise[d] rents above market rates" would "lose tenants to its competitors who offered units at market rates, earning those competitors a higher share of the available profits." MC ¶ 97. The conspiracy as alleged would thus be an "exercise in futility." *Morton Salt,* 702 F.3d at 872 (affirming dismissal where alleged "sham bidding" conspiracy would be an "exercise in futility"). Further, aggregating all Defendants' shares in a given market still would not suffice, even if it did cross some threshold, because Plaintiffs do not claim that all Defendants are even using the "same algorithm." Instead, the Complaint describes at least three separate pieces of software and alleges notable design differences between them. MC ¶¶ 106, 110–112.

Further, many of the Lessor Defendants—despite allegedly joining together in "a single unlawful conspiracy" to fix prices for multifamily housing, MC ¶ 237—are not even alleged to compete with other Lessor Defendants in the same alleged local markets. For example, other than specifying that 13 of the 48 Lessor Defendants operate in the alleged Nashville submarket, the

Complaint fails even to identify the specific submarket(s) in which the 48 Lessor Defendants allegedly compete—and thus fails to provide any plausible allegation that these Defendants have any motive to enter into a "single unlawful conspiracy" together. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 596–97 (1986) (where there is no "plausible motive to engage in the conduct charged" that conduct "does not give rise to an inference of conspiracy"); *Lifeline*, 821 F. Supp. at 1205 ("[W]hen an antitrust plaintiff is relying on circumstantial evidence to show that a conspiracy occurred, the question of whether engaging in the conspiracy makes economic sense for the defendant must be considered by the court." (internal quotation marks omitted)).

### B. The Rule Of Reason Applies To Plaintiffs' Section 1 Claims

Section 1 of the Sherman Act prohibits only "unreasonable" restraints. *State Oil v. Khan*, 522 U.S. 3, 10 (1997). The "accepted standard" to assess reasonableness is the rule of reason, under which a court "weighs all of the circumstances of a case," such as the relevant market and the history, nature, and effect of the challenged practice. *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 885 (2007). Plaintiffs cannot overcome the Sixth Circuit's "automatic presumption in favor of the rule of reason standard." *In re Se. Milk*, 739 F.3d at 273 (internal quotation marks omitted). Having failed to plead a plausible or even coherent horizontal conspiracy to fix prices, Plaintiffs are left with allegations that a number of entities started sharing information through RealPage by adopting and using different types of RealPage revenue management software at varying unspecified times in different geographic markets. Such an alleged arrangement, even if plausible, would not be subject to the *per se* rule.

*First*, as noted above*,* any agreements between RealPage and Lessor Defendants are vertical in nature and must be analyzed under the rule of reason. *Care Heating & Cooling, Inc. v. Am. Standard, Inc.*, 427 F.3d 1008, 1012 (6th Cir. 2005); *Total Benefits*, 552 F.3d at 430 ("[A]ll

vertical price restraints are to be judged under the rule-of-reason standard.").

*Second*, Plaintiffs' claim that Defendants furthered the alleged conspiracy by sharing competitively sensitive information through RealPage's software, even if it were well-pleaded, would also be subject to the rule of reason. *E.g.*, MC ¶¶ 23, 171. The Supreme Court has stressed that "[t]he exchange of price data and other information among competitors . . . do[es] not constitute a *per se* violation of the Sherman Act," since information sharing can "render markets more, rather than less, competitive." *U.S. Gypsum*, 438 U.S. at 443 n.16; *see Wallace v. Bank of Bartlett*, 55 F.3d 1166, 1169 (6th Cir. 1995) (same).

*Third*, even if Plaintiffs had alleged a plausible horizontal agreement among the Lessor Defendants to use RealPage software, that too must be evaluated under the rule of reason. Because it "is a bad idea to subject a novel way of doing business (or an old way in a new and previously unexamined context . . .) to *per se* treatment," *In re Sulfuric Acid Antitrust Litig.*, 703 F.3d 1004, 1008 (7th Cir. 2012), the Sixth Circuit "refuse[s] to apply the per se rule in the absence of judicial experience with the challenged restraint," *Med. Ctr at Elizabeth Place, LLC v. Atrium Health Sys.*, 922 F.3d 713, 731 (6th Cir. 2019). Courts have little-to-no experience evaluating whether competitors' use of algorithmic pricing recommendation software is unlawful under Section 1. Nor does the use of this software "clearly and unquestionably fall[] within one of the handful of categories that have been collectively deemed *per se* anticompetitive," *Expert Masonry, Inc. v. Boone Cty.*, 440 F.3d 336, 343–44 (6th Cir. 2006), such as "naked, horizontal restraints pertaining to prices or territories," *Ogden v. Little Caesar Enters.*, 393 F. Supp. 3d 622, 632 (E.D. Mich. 2019). To the contrary, Plaintiffs *acknowledge* the efficiency-enhancing benefits of the software. *See* Section 4.A.i(b) *supra*. Thus, the rule of reason would apply even if Plaintiffs had alleged a plausible horizontal agreement. *See In re Se. Milk*, 739 F.3d at 273 ("[E]ven if the agreement is

horizontal in the way Plaintiffs now claim, applying the rule of reason is the default position and can be applied to horizontal restraints as well if they do not fit into existing categories of *per se* violations.").

Finally, Plaintiffs' alternative argument that the Court should apply the "quick-look" standard—an abbreviated form of the rule of reason—fails for similar reasons. *See* MC ¶¶ 238, 419. "Quick-look" analysis is appropriate only when "an observer with even a rudimentary understanding of economics could conclude that the arrangements in question would have an anticompetitive effect on customers and markets." *Cal. Dental Ass'n v. FTC*, 526 U.S. 756, 770 (1999). For all the reasons discussed above—including the potential pro-competitive benefits of the software at issue and the lack of any judicial experience evaluating restraints involving that type of software—"quick look" treatment is unwarranted.

### C. Plaintiffs Fail To State A Claim Under The Rule of Reason

Even if Plaintiffs had pleaded a plausible agreement among Defendants, to avoid dismissal under the rule of reason Plaintiffs must allege sufficient facts to demonstrate that "the combination or conspiracy produced adverse, anticompetitive effects within relevant product and geographic markets." *Total Benefits*, 552 F.3d at 436. Plaintiffs have not met this burden.

### i. Plaintiffs Fail To Plead Plausible Relevant Markets

To state a rule-of-reason claim, an antitrust plaintiff must plead both "relevant product and geographic markets" in which defendants' conduct allegedly caused "adverse, anticompetitive effects." *Total Benefits*, 552 F.3d at 436. This requires factual allegations that allow the court to determine "the boundaries of the relevant . . . market." *Id.* at 437 (affirming dismissal for failure to plead relevant market). The Sixth Circuit routinely affirms dismissals "on the basis of an insufficiently pled or totally unsupportable proposed market." *Mich. Div.-Monument Builders of*

*N. Am. v. Mich. Cemetery Ass'n*, 524 F.3d 726, 733 (6th Cir. 2008); *see Nat'l Hockey League Players Ass'n v. Plymouth Whalers Hockey Club*, 419 F.3d 462, 473 (6th Cir. 2005) (affirming dismissal because "the alternative markets proposed by Plaintiffs must fail"); *see also New Orleans Ass'n of Cemetery Tour Guides & Cos. v. New Orleans Archdiocesan Cemeteries,* 56 F.4th 1026, 1039 (5th Cir. 2023) (affirming dismissal where plaintiff had not "properly defined the relevant market as required to bring its claims under the Sherman Act"); *Par v. Wolfe Clinic, P.C.*, 70 F.4th 441 (8th Cir. 2023) (affirming dismissal and finding district court did not abuse its discretion in denying plaintiff's motion to amend complaint where plaintiff failed to allege a relevant geographic market).

A relevant geographic market is the "area of effective competition," or the "area in which the seller operates, and to which the purchaser can practicably turn for supplies." *Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 327 (1961). It must "both correspond to the commercial realities of the industry and be economically significant." *Brown Shoe Co. v. United States*, 370 U.S. 294, 336–37 (1962) (internal quotation marks omitted).

a)      **Plaintiffs Have Not And Cannot Allege A Plausible Nationwide Geographic Market**

Plaintiffs' allegation that "a relevant geographic market [for multifamily apartment rentals] is the United States," MC ¶ 239, belies common sense—as is evident from the Complaint. While purporting to allege this nationwide market, Plaintiffs elsewhere plead that, "[g]iven that commuting distance to a place of work or school is a significant (if not the primary) geographic constraint on where a person chooses to live, *housing markets are regional*, . . ." and "[r]enters in any given MSA do not consider multifamily residential leases in other MSAs as adequate substitutes for . . . leases in their own MSA." MC ¶¶ 246–47. These contradictory allegations

defeat Plaintiffs' assertion that the entire United States constitutes a relevant geographic market. *See Cupp v. Alberto-Culver USA, Inc.*, 310 F. Supp. 2d 963, 970 (W.D. Tenn. 2004) ("The disconnect between a strictly local or exclusive geographic area and some Defendants' global reach [left] the Court without any ability to formulate a relevant geographic market."); *Semertzides v. Bethesda N. Hosp.*, 2014 WL 2573073, at *4 (S.D. Ohio June 9, 2014), *aff'd*, 608 F. App'x 378 (6th Cir. 2015) (dismissing complaint because it alleged that relevant geographic market was certain counties or states and elsewhere that it was "the entire United States"); *E.I. DuPont de Nemours & Co. v. Kolon Indus., Inc.*, 688 F. Supp. 2d 443, 457 (E.D. Va. 2009) (dismissing antitrust counterclaim where relevant market allegations were "conclusory and self-defeating").[14]

### b) Regional MSAs Also Are Not Plausible Relevant Geographic Markets

Likewise, Plaintiffs' allegations that each broadly defined MSA constitutes a separate and independent relevant geographic market fails for similar reasons. Plaintiffs acknowledge that renters in an MSA do not consider residential leases in other MSAs to be adequate substitutes, MC ¶ 247, but they do not and cannot plausibly allege that renters consider all residential leases in their *own* MSAs to be adequate substitutes. For instance, Plaintiffs allege that the New York, NY regional submarket "corresponds to the Census Bureau's New York-Newark-Jersey City MSA, and spans parts of New York, New Jersey, and Pennsylvania." *Id.* ¶ 323. Given Plaintiffs' acknowledgement that commuting distance is a significant geographic constraint on where people choose to live, *see id.* ¶ 246, it defies credulity for Plaintiffs to allege that a renter who lives and

---

[14] Even if Plaintiffs had plausibly pleaded a horizontal agreement subject to the *per se* rule, Plaintiffs would still be required to "describe the relevant market in which [courts] may presume the anticompetitive effect would occur." *See Bogan v. Hodgkins*, 166 F.3d 509, 515 (2d Cir. 1999). Having failed to plausibly allege a national market, Plaintiffs' *per se* claim would necessarily be limited to alleged local submarkets.

works in New York City's Financial District, who walks to work and does not own a car, would consider any apartment in Pennsylvania or New Jersey (let alone other parts of New York) to be a reasonable substitute. *See Cupp*, 310 F. Supp. 2d at 970. Likewise, Plaintiffs allege that the Nashville submarket "corresponds to the Census Bureau's Nashville-Davidson-Murfreesboro-Franklin MSA and includes Davidson and 12 other Tennessee counties," but do not and cannot allege that a renter in Robertson County would view an apartment 85 miles away in Maury County to be a reasonable substitute. MC ¶ 249.

      **ii.    Plaintiffs Have Not Adequately Alleged Market Power And Anticompetitive Effects**

      To plausibly plead anticompetitive effects, Plaintiffs must allege facts demonstrating that Defendants had market power in the alleged relevant markets. "[W]ithout market power, a firm cannot have an adverse effect on competition." *Ezzo's Invs., Inc. v. Royal Beauty Supply, Inc*., 243 F.3d 980, 988 (6th Cir. 2001) (internal quotation marks omitted); *Techmatic, Inc. v. Plating Specialists, Inc.*, 2022 WL 16542106, at *14 (M.D. Tenn. Oct. 28, 2022) ("In the absence of market power in the relevant market, a company cannot have an adverse effect on competition." (internal quotation marks omitted)). "Market power is the ability to raise prices above those that would be charged in a competitive market." *NCAA v. Bd. of Regents of Univ. of Okla.*, 468 U.S. 85, 109 n.38 (1984). "[M]arket power is normally established by controlling a substantial share of the market." *Mich. Cemetery*, 524 F.3d at 732 (internal quotation marks omitted). In a Section 1 case, a plaintiff must allege that the supposed cartel has a market share in excess of 30%, if not substantially more, in addition to high barriers to entry. *See PSI Repair Servs., Inc. v. Honeywell, Inc.*, 104 F.3d 811, 818 (6th Cir. 1997) ("A thirty-percent share of the market, standing alone, provides an insufficient basis from which to infer market power."); *see also* ABA, Antitrust Law

Developments 71–72 (9th ed. 2022) ("Since [the Supreme Court's 1984 decision in] *Jefferson Parish*, no court has inferred the requisite market power from a market share below 30 percent."). Where a Section 1 claim relates to a vertical agreement, the *individual* market power of each defendant must be assessed; aggregation of the various defendants' market power is not permitted. *See Dickson v. Microsoft Corp.*, 309 F.3d 193, 210–11 (4th Cir. 2002); *Maris Distrib. Co. v. Anheuser-Busch, Inc.*, 302 F.3d 1207, 1218 (11th Cir. 2002).

Plaintiffs do not allege the requisite market power of Defendants in any alleged relevant market. With respect to the alleged national market, Plaintiffs include no market share allegations for individual Defendants, or Defendants collectively, in the "multifamily residential real estate" market. MC ¶ 239. And Plaintiffs concede that there are *tens of thousands* of lessors throughout the United States, compared to the 48 Lessor Defendants named in the Complaint. *See* MC ¶ 113 (alleging, in *addition to revenue management clients*, RealPage has more than 31,000 distinct clients who use some form of RealPage software to help them manage rental units).

Similarly, Plaintiffs fail to include any specific market share allegations for the individual submarkets they identify. For example, Plaintiffs allege that there are 156,928 multifamily rental units in the alleged Nashville Regional Submarket. MC ¶ 249. While Plaintiffs make the vague claim that "RealPage collects and shares pricing and occupancy information for a high concentration" of these units, MC ¶¶ 249–250, Plaintiffs do not specify *any* percentage share of Nashville units controlled by Defendants who use RealPage revenue management software. Further, according to Plaintiffs' own allegations, only 13 of the Defendants operate in Nashville, and individually each Defendant controls only a small number of properties. [15] Plaintiffs thus

---

[15] MC ¶ 50 (BH Management Services, LLC – five properties), ¶ 53 (Camden Property Trust – two properties), ¶ 58 (Cortland Management, LLC – three properties), ¶ 64 (Greystar Management

cannot show that any, let alone each, of these Defendants has individual market power in the Nashville Submarket—a necessary showing given Plaintiffs' failure to plausibly allege a horizontal agreement among Defendants. *Dickson*, 309 F.3d at 210–11; *Maris*, 302 F.3d at 1218.

Even if aggregation of market share were permitted, here Plaintiffs allege that, combined, Defendants control *only 121 properties* in Nashville. Plaintiffs provide no information about these properties and how many units they contain, much less claim that the properties make up a more than 30% share (or any particular share) of the market. Plaintiffs' allegations about the percentage of lessors in Nashville that "use revenue management software"—purportedly based on "survey data acquired from ALN Apartment Data" that Plaintiffs did not provide—fare no better. *See* MC ¶ 251 & n.140. Critically, Plaintiffs do not allege that this data shows the percentage of *RealPage* revenue management software users in Nashville—as opposed to users of *any* of the many kinds of revenue management software available in the market—and thus these allegations reveal nothing about the purported market power of *Defendants* (collectively or individually) in Nashville. More fundamentally, the alleged product market in this case is *not* the market for revenue management software, but instead the market for multifamily residential housing leases, and Plaintiffs do not allege any facts regarding share of that market. MC ¶ 244.

Plaintiffs' allegations regarding other submarkets follow the same course and fail for the same reason—they do not provide any plausible allegations of market share to support a finding of market power in *any* of the alleged relevant submarkets. Plaintiffs do not even identify how

Services, LP – 21 properties); ¶ 65 (Highmark Residential, LLC – eight properties); ¶ 66 (Independence Realty Trust – five properties); ¶ 70 (Lincoln Property Company – 31 properties); ¶ 72 (Mid-America Apartment Communities – 12 properties); ¶ 74 (Morgan Properties Management Company, LLC – five properties); ¶ 75 (Pinnacle Property Management Services, LLC – 10 properties); ¶ 81 (Security Properties Inc. – seven properties); ¶ 83 (Simpson Property Group, LLP – four properties); ¶ 87 (UDR, Inc. – eight properties).

many alleged properties or units the Lessor Defendants purportedly control in these submarkets, or even which Lessor Defendants are alleged to compete in a particular submarket (beyond the alleged Nashville submarket).  The Complaint must be dismissed on this basis alone.  *See Total Benefits Planning Agency Inc. v. Anthem Blue Cross & Blue Shield*, 630 F. Supp. 2d 842, 852 (S.D. Ohio 2007), *aff'd*, 552 F.3d 430 (6th Cir. 2008) ("[U]nless an antitrust plaintiff alleges the existence of market power, the complaint may be dismissed for failure to state a claim upon which relief can be granted."); *Found. for Interior Design Educ. Research v. Savannah Coll. of Art & Design*, 73 F. Supp. 2d 829, 837 (W.D. Mich. 1999), *aff'd*, 244 F.3d 521 (6th Cir. 2001) ("Market power must be alleged in more than vague and conclusory terms to prevent the dismissal of the complaint on a defendant's Rule 12(b)(6) motion." (internal quotation marks omitted)).

Nor do Plaintiffs offer plausible allegations of anticompetitive effects in a relevant market. *Innovation Ventures, L.L.C. v. Custom Nutrition Lab'ys, L.L.C.*, 451 F. Supp. 3d 769, 791 (E.D. Mich. 2020) ("[W]hile market power may be inferred from evidence of significant market share, Defendants still must show the anticompetitive nature of the restraint." (internal quotation marks omitted)).

For each submarket, Plaintiffs include a conclusory allegation that "widespread adoption of Defendant RealPage's revenue management software has caused rent to increase explosively in recent years."  *E.g.*, MC ¶¶ 252, 257, 262.  But Plaintiffs have not even attempted to plead any facts about the *Lessor Defendants'* pricing versus other pricing, despite the fact that rents are publicly advertised and readily available to Plaintiffs.  For example, in Nashville, Plaintiffs contend that renters are "paying 51% more in rent today than they paid in 2016," without differentiating between rents at Defendant-operated buildings and others.  MC ¶ 252.  And having failed to specify what percentage of rental units are priced *using RealPage software*, Plaintiffs

provide no plausible basis to infer that this alleged increase in *average* rents across the market is in any way related to *use of RealPage software.* *Cf. Musical Instruments,* 798 F.3d at 1197 (allegations that prices rose while sales dropped were insufficient because plaintiffs relied on "average retail price of *all* guitars and guitar amplifiers sold" rather than "the average retail price of guitars and amplifiers manufactured *by defendants*" and thus "fail[ed] to allege any facts connecting the purported price increase to an illegal agreement among competitors").

Plaintiffs' allegations regarding increasing prices in "Selected Metro Areas," MC Figure 1, and alleged increased pricing and supply (or vacancies) in the so-called "Regression Submarkets," MC ¶¶ 196–210, similarly rely on *average* industry data, not data specific to Defendants who are alleged to use RealPage software. Thus, they fail to plausibly allege anticompetitive effects *from the alleged restraint* in any of those "Selected Metro Areas." *See* Section 4.C.i(b) *supra.*

### D. Plaintiffs Do Not Have Antitrust Standing

Plaintiffs lack antitrust standing, which "is a threshold, pleading-stage inquiry and when a complaint by its terms fails to establish this requirement [a court] must dismiss it as a matter of law[.]" *NicSand, Inc. v. 3M Co.,* 507 F.3d 442, 450 (6th Cir. 2007); *see also Tennessean Truckstop, Inc. v. NTS, Inc.*, 875 F.2d 86, 91 (6th Cir. 1989) (noting "it is better to cut the string before the substantial costs of litigating an antitrust case have been incurred" when a complaint fails to allege antitrust injury). Plaintiffs must offer more than "allegations of consequential harm resulting from a violation of the antitrust laws." *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters,* 459 U.S. 519, 545 (1983). They must allege standing with specificity. *CBC Cos. v. Equifax, Inc.*, 561 F.3d 569, 571 (6th Cir. 2009). But Plaintiffs offer only vague, conclusory allegations that they paid "higher" rental prices (*see, e.g.*, MC ¶ 34). They do not allege specific

facts *causally* connecting any of those "higher" prices to the purported critical mechanism of the alleged conspiracy: RealPage revenue management software. Plaintiffs do not allege that any RealPage revenue management software was used to set their individual rents at all, much less increase them collusively. And Plaintiffs admit that Lessor Defendants do not accept RealPage's suggested pricing *at least* 10–20% of the time (MC ¶ 5), which very well could have included Plaintiffs' own rents on the face of the Complaint. That Plaintiffs allegedly paid "higher" rental prices—during a time of extraordinary inflation, no less—does not establish antitrust injury. It is conclusory and disconnected from the mechanism of the alleged conspiracy.

### E.     Plaintiffs' State-Law Claims Fail

Along with their Sherman Act claims, Plaintiffs have sued under the antitrust or consumer protection laws of 42 states and the District of Columbia. MC ¶¶ 428–70. Plaintiffs' state antitrust claims fail for the same reasons their Sherman Act claims do. [16]

---

[16] *See, e.g.*, *Odom v. Fairbanks Mem'l Hosp.*, 999 P.2d 123, 128 (Alaska 2000) ("We look to federal precedent when analyzing a[ state law] antitrust claim"); Ariz. Stat. § 44-1412; *Cty. of Tuolumne v. Sonora Cmty. Hosp.*, 236 F.3d 1148, 1160 (9th Cir. 2001) (California); D.C. Code § 28-4515; Fla. Stat. § 542.32; *Island Tobacco Co., Inc. v. R. J. Reynolds Indus.*, 513 F. Supp. 726, 738 (D. Haw. 1981) (Hawaii); Idaho Code § 48-102(3); 740 Ill. Comp. Stat. 10/11; *Deich-Keibler v. Bank One*, 243 F. App'x 164, 168 (7th Cir. 2007) (Indiana); Iowa Code § 553.2; Kan. Stat. § 50-163(b); *Felder's Collision Parts, Inc v. All Star Advert. Agency, Inc.*, 777 F.3d 756, 759 (5th Cir. 2015) (Louisiana); *Tri-State Rubbish, Inc. v. Waste Mgmt., Inc.*, 875 F. Supp. 8, 14 (D. Me. 1994) (Maine); *Krause Marine Towing Corp. v. Ass'n of Md. Pilots*, 44 A.3d 1043, 1053 (Md. 2012); Mass. Gen. Laws ch. 93 § 1; Mich. Comp. Laws § 445.784(2); *Lorix v. Crompton Corp.*, 736 N.W.2d 619, 627–29 (Minn. 2007); *NAACP v. Claiborne Hardware Co.*, 393 So. 2d 1290, 1301 (Miss. 1980), *rev'd on other grounds*, 458 U.S. 886 (1982); Mo. Rev. Stat. § 416.141; Neb. Rev. St. § 59-829; N.H. Rev. Stat. § 356:14; N.J. Rev. Stat. § 56:9-18; N.M. Stat. § 57-1-15; *Interest Rate Swaps*, 261 F. Supp. 3d at 498–99 (New York); *In re Elec. Books Antitrust Litig.*, 2014 WL 2535112, at *15 (S.D.N.Y. June 5, 2014) (North Dakota); *Aladdins Lights Inc. v. Eye Lighting Int'l*, 96 N.E.3d 864, 867–68 (Ohio Ct. App. 2017); 79 Okla. Stat. § 212; *Or. Laborers-Emp'rs. Health & Welfare Tr. Fund v. Philip Morris Inc.*, 185 F.3d 957, 963 n.4 (9th Cir. 1999) (Oregon); *In re Dairy Farmers of Am., Inc. Cheese Antitrust Litig.*, 2015 WL 3988488, at *14 (N.D. Ill. June 29, 2015) (North Carolina); *Drs. Steuer & Latham, P.A. v. Nat'l Med. Enters., Inc.*, 672 F. Supp. 1489, 1521 (D.S.C. 1987), *aff'd*, 846 F.2d 70 (4th Cir. 1988)

Many of Plaintiffs' state-law claims also fail for other, independent reasons. For example, neither Georgia nor Pennsylvania law allows private antitrust claims. *E.T. Barwick Indus., Inc. v. Walter E. Heller & Co.*, 692 F. Supp. 1331, 1349 (N.D. Ga. 1987); *In re K-Dur Antitrust Litig.*, 2008 WL 2660780, at *4 (D.N.J. Feb. 28, 2008).

Others fail because they do not apply to the conduct here. Tennessee's statute applies *only* to goods. *Bennett v. Visa U.S.A. Inc*., 198 S.W.3d 747, 751 (Tenn. Ct. App. 2006); *see also* Ind. Code § 24-1-1-1 (Indiana code provision applying only to "articles of merchandise"). Massachusetts's does not apply to real estate. Mass. Gen. Laws ch. 93 §§ 2, 4 ("trade or commerce" excludes "the conveyance, transfer or use of real property"). Alabama's statute does not apply to *interstate* commerce. *Abbott Labs. v. Durrett*, 746 So. 2d 316, 337 (Ala. 1999); *Jones v. Varsity Brands, LLC*, 618 F. Supp. 3d 725, 762 (W.D. Tenn. 2022). Even if some state claims survived, those claims barred by shorter limitations periods than the Sherman Act must be dismissed. *See, e.g.*, *Big River Indus., Inc. v. Headwaters Res., Inc.*, 971 F. Supp. 2d 609, 623 (M.D. La. 2013) (one year under Louisiana law); Ala. Code § 6-2-38(l) (two years); *Gibson v. Miami Valley Milk Producers, Inc.*, 299 N.E.2d 631, 637 (Ind. Ct. App. 1973) (two years under Indiana law); Kan. Stat. § 60-512(2) (three years); *In re Linerboard Antitrust Litig.*, 223 F.R.D. 335, 343 (E.D. Pa. 2004) (three years under South Carolina law).

Finally, many of these state-law claims must be dismissed because named Plaintiffs neither reside nor claim to have suffered injury in the relevant jurisdictions. It is blackletter law that "a plaintiff must demonstrate standing for each claim he seeks to press." *DaimlerChrysler Corp. v.*

---

(South Carolina); S.D. Codified Laws § 37-1-2; *State ex rel. Leech v. Levi Strauss & Co.*, 1980 WL 4696, at *2 n.2 (Tenn. Ch. Ct. Sept. 25, 1980); Utah Code § 76-10-3118; Va. Code § 59.1-9.17; *Blewett v. Abbott Labs.*, 938 P.2d 842, 845–46 (Wash. 1997); W. Va. Code § 47-18-16; *Conley Publ'g Grp., Ltd. v. Journal Commc'ns, Inc.*, 665 N.W.2d 879, 885–86 (Wis. 2003).

*Cuno*, 547 U.S. 332, 352 (2006).  "This is no less true with respect to class actions than with respect to other suits."  *Lewis v. Casey*, 518 U.S. 343, 357 (1996).  As the Sixth Circuit recently held in *Fox v. Saginaw Cty.*, 67 F.4th 284 (6th Cir. 2023), a class representative's standing to bring one claim does not bestow "a license to sue anyone over anything."  *Id.* at 293.  The plaintiff landowner there claimed to have suffered a taking at the hands of one county, but purported to sue on behalf of a class of landowners in 26 *other* counties for similar takings.  *Id.*  The Sixth Circuit held that absent class members' alleged injuries did not give the plaintiff standing to pursue claims against those other counties "because [absent class members] were not parties."  *Id.* at 295.

Here the named Plaintiffs live in only a handful of the 43 jurisdictions whose laws they invoke.  Plaintiffs leased apartments in Colorado, Florida, Massachusetts, North Carolina, and Tennessee.  MC ¶¶ 34–40.  They have not alleged that *they* were injured in the 37 other states, along with the District of Columbia, whose laws they have sued under.  Nor have they alleged markets in 15 states: Alaska, Hawaii, Idaho, Iowa, Maine, Montana, Nebraska, New Hampshire, New Mexico, South Carolina, South Dakota, North Dakota, Vermont, West Virginia, and Wyoming.

Because the named Plaintiffs have not alleged they were injured in the states where they do not live, they lack standing and their claims under those states' laws should be dismissed.  *Fox*, 67 F.4th at 293; *In re Niaspan Antitrust Litig.*, 42 F. Supp. 3d 735, 758 (E.D. Pa. 2014) ("Because standing must be resolved on a claim-by-claim basis . . . the named plaintiffs lack standing to assert claims under the laws of the states in which they do not reside or in which they suffered no injury." (internal quotation marks omitted)); *In re: EpiPen (Epinephrine Injection, USP) Mktg., Sales Pracs. & Antitrust Litig.*, 336 F. Supp. 3d 1256, 1310–13 (D. Kan. 2018) (dismissing state law

antitrust claims where complaint included no named plaintiffs from those states). [17]

## V.    CONCLUSION

The Court should dismiss Plaintiffs' claims with prejudice.


DATED:  July 7, 2023

Respectfully submitted,

---

[17] For essentially the same reasons, Plaintiffs lack standing to assert any claims, including their federal claims, as to alleged regional markets in which they do not reside and have never resided. *See* ECF No. 297 at 6 (Defendants' pre-filing notice contending that "the allegations related to the geographic markets in which no named Plaintiff claims to have been injured must be stricken").  Pursuant to the Court's June 22 order, Defendants will raise this argument at the appropriate time in the future.  *See* ECF No. 298 (finding that Defendants' motion on this point is "premature and reserved").

/s/ Jay Srinivasan

Jay Srinivasan (admitted *pro hac vice*)
jsrinivasan@gibsondunn.com
Daniel G. Swanson (admitted *pro hac vice*)
dswanson@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071
Telephone: (213) 229-7430

Stephen Weissman (admitted *pro hac vice*)
sweissman@gibsondunn.com
Michael J. Perry (admitted *pro hac vice*)
mjperry@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, NW
Washington, DC 20036
Telephone: (202) 955-8678

Stephen C. Whittaker (admitted *pro hac vice*)
cwhittaker@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
1361 Michelson Drive
Irvine, CA 92612
Telephone: (212) 351-2671

Ben A. Sherwood (admitted *pro hac vice*)
bsherwood@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166
Telephone: (212) 351-2671

*Counsel for Defendant RealPage, Inc.*

/s/ Edwin Buffmire

Edwin Buffmire
ebuffmire@jw.com
Michael Moran
mmoran@jw.com
JACKSON WALKER LLP
2323 Ross Ave., Suite 600
Dallas, TX 75201
Telephone: (214) 953-6000

Kevin Fulton
kevin@fultonlg.com
THE FULTON LAW GROUP PLLC
7676 Hillmont St., Suite 191
Houston, TX 77040
Telephone: (713) 589-6964

*Counsel for Defendant Allied Orion Group, LLC*

/s/ Katie A. Reilly

Katie A. Reilly
reilly@wtotrial.com
Michael T. Williams
williams@wtotrial.com
Judith P. Youngman
youngman@wtotrial.com
WHEELER TRIGG O'DONNELL LLP
370 Seventeenth Street, Suite 4500
Denver, CO 80202
Telephone: (303) 244-1800

Mark Bell
Mark.Bell@hklaw.com
HOLLAND & KNIGHT LLP
Nashville City Center
511 Union Street, Suite 2700
Nashville, TN 37219
Telephone: (615) 850-8850

*Counsel for Defendant Apartment Income REIT Corp., d/b/a AIR Communities*

/s/ Danny David
Danny David
danny.david@bakerbotts.com
BAKER BOTTS LLP
910 Louisiana Street
Houston, TX 77002
Telephone: (713) 229-4055

James Kress (*pro hac vice* forthcoming)
james.kress@bakerbotts.com
Paul Cuomo (*pro hac vice* forthcoming)
paul.cuomo@bakerbotts.com
BAKER BOTTS LLP
700 K. Street, NW
Washington, DC 20001
Telephone: (202) 639-7884

*Counsel for Defendant Avenue5 Residential, LLC*

/s/ Matt T. Adamson
Matt T. Adamson
madamson@jpclaw.com
JAMESON PEPPLE CANTU PLLC
801 Second Avenue, Suite 700
Seattle, WA 98104
Telephone: (206) 292-1994

*Counsel for Defendant B/T Washington, LLC d/b/a Blanton Turner*

/s/ Marguerite Willis
Marguerite Willis (admitted *pro hac vice*)
mwillis@maynardnexsen.com
MAYNARD NEXSEN PC
104 South Main Street
Greenville, SC 29601
Telephone: (864) 370-2211

Michael A. Parente (admitted *pro hac vice*)
mparente@maynardnexsen.com
MAYNARD NEXSEN PC
1230 Main Street, Suite 700
Columbia, SC 29201
Telephone: (803) 771-8900

Margaret M. Siller (BPR No. 039058)
msiller@maynardnexsen.com
MAYNARD NEXSEN PC
1201 Villa Place, Suite 103
Nashville, Tennessee 37212
Telephone: (629) 258-2253

*Counsel for Defendant Bell Partners, Inc.*

/s/ Ian Simmons
Ian Simmons
isimmons@omm.com
O'MELVENY & MYERS LLP
1625 Eye Street, NW
Washington, DC 20006
Telephone: (202) 383-5196

Stephen McIntyre
smcintyre@omm.com
O'MELVENY & MYERS LLP
400 South Hope Street, 18th Floor
Los Angeles, CA 90071
Telephone: (213) 430-6000

*Counsel for Defendant BH Management Services, LLC*

/s/ James D. Bragdon

James D. Bragdon
jbragdon@gejlaw.com
Sam Cowin
scowin@gejlaw.com
GALLAGHER EVELIUS & JONES LLP
218 N. Charles St., Suite 400
Baltimore, MD 21201
Telephone: (410) 727-7702

Philip A. Giordano (admitted *pro hac vice*)
philip.giordano@hugheshubbard.com
HUGHES HUBBARD & REED LLP
1775 I Street NW
Washington, DC 20007
Telephone: (202) 721-4776

Charles E. Elder, BPR # 038250
celder@bradley.com
BRADLEY ARANTBOULT CUMMINGS LLP
1600 Division Street, Suite 700
Nashville, Tennessee 37203
P: 615.252.3597

*Counsel for Defendant*
*Bozzuto Management Company*

/s/ Yehudah L. Buchweitz

Yehudah L. Buchweitz
yehudah.buchweitz@weil.com
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, NY 10153
Telephone: (212) 310-8256

Jeff L. White
Jeff.white@weil.com
WEIL, GOTSHAL & MANGES LLP
2001 M Street, NW
Washington, DC 20036
Telephone: (202) 682-7059

R. Dale Grimes, BPR #006223
dgrimes@bassberry.com
BASS, BARRY & SIMS PLC
150 Third Avenue South, Suite 2800
Nashville, TN 37201
Telephone: (615) 742-6244

*Counsel for Defendant Brookfield Properties*
*Multifamily LLC*

/s/ J. Douglas Baldridge

J. Douglas Baldridge
jbaldridge@venable.com
Danielle R. Foley
drfoley@venable.com
VENABLE LLP
600 Massachusetts Avenue, NW
Washington, D.C. 20001
(202) 344-4703

*Counsel for Defendant CH Real Estate Services, LLC*

/s/ Benjamin R. Nagin

Benjamin R. Nagin
bnagin@sidley.com
SIDLEY AUSTIN LLP
787 Seventh Avenue
New York, NY 10019
Telephone: (212) 839-5300

*Counsel for Defendant ConAm Management Corporation*

/s/ Lynn H. Murray

Lynn H. Murray
lhmurray@shb.com
Maveric Ray Searle
msearle@shb.com
SHOOK, HARDY & BACON L.L.P.
111 S. Wacker Dr., Suite 4700
Chicago, IL 60606
Telephone: (312) 704-7766

Ryan Sandrock
rsandrock@shb.com
Shook, Hardy & Bacon L.L.P.
555 Mission Street, Suite 2300
San Francisco, CA 94105
Telephone: (415) 544-1944

Laurie A. Novion
lnovion@shb.com
SHOOK, HARDY & BACON L.L.P.
2555 Grand Blvd.
Kansas City, MO 64108
Telephone: (816) 559-2352

*Counsel for Defendant Camden Property Trust*

/s/ Ronald W. Breaux

Ronald W. Breaux
Ron.Breaux@haynesboone.com
Bradley W. Foster
Brad.Foster@haynesboone.com
HAYNES AND BOONE LLP
2323 Victory Ave., Suite 700
Dallas, Texas 75219
Telephone: (214) 651-5000
Fax: (214) 200-0376

*Counsel for Defendant Conti Capital*

/s/ Kenneth Reinker

Kenneth Reinker
kreinker@cgsh.com
CLEARY GOTTLIEB STEEN & HAMILTON LLP
2112 Pennsylvania Avenue, NW
Washington, DC 20037
Telephone: (202) 974-1522

Joseph M. Kay
jkay@cgsh.com
CLEARY GOTTLIEB STEEN & HAMILTON LLP
One Liberty Plaza
New York, NY 10006
Telephone: (212) 225-2745

*Counsel for Defendant Pinnacle Property Management Services, LLC*

/s/ Todd R. Seelman

Todd R. Seelman
todd.seelman@lewisbrisbois.com
Thomas L. Dyer
thomas.dyer@lewisbrisbois.com
LEWIS BRISBOIS BISGAARD & SMITH LLP
1700 Lincoln Street, Suite 4000
Denver, CO 80203
Telephone: (720) 292-2002

*Counsel for Defendant Cortland Management, LLC*

/s/ Ann MacDonald

Ann MacDonald
Ann.macdonald@afslaw.com
Barry Hyman
Barry.hyman@afslaw.com
ARENTFOX SCHIFF LLP
233 South Wacker Drive, Suite 7100
Chicago, IL 60606
Telephone: (312) 258-5500

*Counsel for Defendant CWS Apartment Homes, LLC*

/s/ Bradley C. Weber

Bradley C. Weber (admitted *pro hac vice*)
bweber@lockelord.com
Locke Lord LLP
2200 Ross Avenue, Suite 2800
Dallas, TX 75201
Telephone:  (214) 740-8497

*Counsel for Defendant Dayrise Residential, LLC*

/s/ Charles H. Samel
Charles H. Samel
charles.samel@stoel.com
Edward C. Duckers
ed.duckers@stoel.com
STOEL RIVES LLP
1 Montgomery Street, Suite 3230
San Francisco, CA 94104
Telephone:  (415) 617-8900

George A. Guthrie
gguthrie@wilkefleury.com
WILKE FLEURY LLP
621 Capitol Mall, Suite 900
Sacramento, CA 95814
Telephone: (916) 441-2430

*Counsel for Defendant FPI Management, Inc.*

.

/s/ Carl W. Hittinger
Carl W. Hittinger
chittinger@bakerlaw.com
Alyse F. Stach
astach@bakerlaw.com
Tyson Y. Herrold
therrold@bakerlaw.com
BAKER & HOSTETLER LLP
1735 Market Street, Suite 3300
Philadelphia, PA 19103-7501
Telephone: (215) 568-3100

Stephen J. Zralek, BPR #018971
szralek@spencerfane.com
S. Chase Fann, BPR #036794
cfann@spencerfane.com
SPENCER FANE LLP
511 Union Street, Suite 1000
Nashville, TN 37219
Telephone: (615) 238-6300

*Counsel for Defendant Equity Residential*

/s/ Leo D. Caseria
Leo D. Caseria
lcaseria@sheppardmullin.com
Helen C. Eckert
heckert@sheppardmullin.com
SHEPPARD MULLIN RICHTER & HAMPTON LLP
2099 Pennsylvania Avenue, NW, Suite 100
Washington, DC, 20006
Telephone: (202) 747-1925

Arman Oruc
aoruc@goodwinlaw.com
GOODWIN PROCTER, LLP
1900 N Street, NW
Washington, DC 20036
Telephone:  (202) 346-4000

*Counsel for Defendant Essex Property Trust, Inc.*

/s/ *Michael D. Bonanno*
Michael D. Bonanno
mikebonanno@quinnemanuel.com
QUINN EMANUEL URQUHART & SULLIVAN LLP
1300 I St. NW, Suite 900
Washington, DC 20005
Telephone: (202) 538-8225

Christopher Daniel Kercher (admitted *pro hac vice*)
christopherkercher@quinnemanuel.com
QUINN EMANUEL URQUHART & SULLIVAN LLP
51 Madison Avenue, 22nd Floor,
New York, New York 10010
Telephone: (212) 849-7000

Andrew Gardella, Esq. (TN Bar #027247)
agardella@martintate.com
MARTIN, TATE, MORROW & MARSTON P.C.
315 Deaderick Street, Suite 1550
Nashville, TN 37238
Telephone: (615) 627-0668

*Counsel for Defendant Highmark Residential, LLC*

/s/ *Cliff A. Wade*
Cliff A. Wade
cliff.wade@bakerlopez.com
Chelsea L. Futrell
chelsea.futrell@bakerlopez.com
BAKER LOPEZ PLLC
5728 LBJ Freeway, Suite 150
Dallas, Texas 75240
Telephone: (469) 206-9384

*Counsel for Defendant Knightvest Residential*

/s/ *Michael M. Maddigan*
Michael M. Maddigan
michael.maddigan@hoganlovells.com
HOGAN LOVELLS US LLP
1999 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067
Telephone: (310) 785-4727

William L. Monts, III
william.monts@hoganlovells.com
Benjamin F. Holt
benjamin.holt@hoganlovells.com
HOGAN LOVELLS US LLP
555 Thirteenth Street, NW
Washington, DC 20004
Telephone: (202) 637-6440

Joshua C. Cumby (BPR No. 37949)
joshua.cumby@arlaw.com
F. Laurens Brock (BPR No. 17666)
larry.brock@arlaw.com
Rocklan W. King, III (BPR No. 30643)
rocky.king@arlaw.com
ADAMS AND REESE LLP
1600 West End Avenue, Suite 1400
Nashville, Tennessee 37203
Telephone: (615) 259-1450

*Counsel for Defendant Greystar Real Estate Partners, LLC (formerly Greystar Management Services, LP)*

47

/s/ Gregory J. Casas
Gregory J. Casas (admitted *pro hac vice*)
casasg@gtlaw.com
Emily W. Collins (admitted *pro hac vice*)
Emily.Collins@gtlaw.com
GREENBERG TRAURIG, LLP
300 West 6th Street, Suite 2050
Austin, TX 78701-4052
Telephone: (512) 320-7200

Robert J. Herrington (admitted *pro hac vice*)
HerringtonR@gtlaw.com
GREENBERG TRAURIG, LLP
1840 Century Park East, Suite 1900
Los Angeles, CA 90067
Telephone: (310) 586-7700

Becky L. Caruso (admitted *pro hac vice*)
carusob@gtlaw.com
GREENBERG TRAURIG, LLP
500 Campus Drive, Suite 400
Florham Park, NJ 07932
Telephone: (973) 443-3252

/s/ Ryan T. Holt
Ryan T. Holt (No. 30191)
rholt@srvhlaw.com
Mark Alexander Carver (No. 36754)
acarver@srvhlaw.com
SHERRARD ROE VOIGT & HARBISON, PLC
150 Third Avenue South, Suite 1100
Nashville, Tennessee 37201
Tel. (615) 742-4200

*Counsel for Defendant Lincoln Property
Company*

/s/ John J. Sullivan
John J. Sullivan
jsullivan@cozen.com
COZEN O'CONNOR P.C.
3 WTC, 175 Greenwich St., 55th Floor
New York, NY 10007
Telephone: (212) 453-3729

*Counsel for Defendant Independence Realty
Trust, Inc.*

/s/ Eliot Turner
Eliot Turner
eliot.turner@nortonrosefulbright.com
NORTON ROSE FULBRIGHT US LLP
1301 McKinney, Suite 5100,
Houston, Texas 77010
Telephone: (713) 651-5151

*Counsel for Defendant Kairoi Management
LLC*

/s/ Michael W. Scarborough
Michael W. Scarborough (admitted *pro hac vice*)
mscarborough@velaw.com
Dylan I. Ballard (admitted *pro hac vice*)
dballard@velaw.com
VINSON & ELKINS LLP
555 Mission Street, Suite 2000
San Francisco, CA 94105
Telephone: (415) 979-6900

*Counsel for Defendant Lantower Luxury Living LLC*

/s/ Britt M. Miller
Britt M. Miller (admitted *pro hac vice*)
bmiller@mayerbrown.com
Daniel T. Fenske (admitted *pro hac vice*)
dfenske@mayerbrown.com
Matthew D. Provance (admitted *pro hac vice*)
mprovance@mayerbrown.com
MAYER BROWN LLP
71 South Wacker Drive
Chicago, IL 6006
Telephone: (312) 701-8663

Scott D. Carey (#15406)
scarey@bakerdonelson.com
Ryan P. Loofbourrow (#33414)
rloofbourrow@bakerdonelson.com
BAKER, DONELSON, BEARMAN, CALDWELL & BERKOWITZ, P.C.
1600 West End Avenue, Suite 2000
Nashville, TN 37203
Telephone: (615) 726-5600

*Counsel for Defendant Mid-America Apartment Communities, Inc.*

/s/ Karen H. Safran
Karen H. Safran
ksafran@goodspeedmerrill.com
Robert S. Hunger
rhunger@goodspeedmerrill.com
GOODSPEED MERRILL
9605 South Kingston Court, Suite 200
Englewood, CO 80112
Telephone: (720) 473-7644

*Counsel for Defendant Lyon Management Group, Inc.*

/s/ Jeffrey C. Bank
Jeffrey C. Bank
jbank@wsgr.com
WILSON SONSINI GOODRICH & ROSATI PC
1700 K Street NW, Fifth Floor
Washington, DC 20006
Telephone: (202) 973-8800

*Counsel for Defendant Morgan Properties
Management Company, LLC*

/s/ Richard P. Sybert
Richard P. Sybert (WSBA No. 8357)
rsybert@grsm.com
GORDON REES SCULLY MANSUKHANI
701 Fifth Avenue, Suite 2100
Seattle, WA 98104
Telephone: (206) 321-5222

*Counsel for Defendant Rose Associates Inc.*

/s/ Judith A. Zahid
Judith A. Zahid (admitted *pro hac vice*)
jzahid@zellelaw.com
Heather T. Rankie (admitted *pro hac vice*)
hrankie@zellelaw.com
ZELLE LLP
555 12th Street, Suite 1230
Oakland, CA 94607
Telephone: (415) 633-1916

*Counsel for Defendant Prometheus Real Estate
Group, Inc.*

_/s/ Valentine Hoy_
Valentine Hoy
vhoy@allenmatkins.com
Scott Perlin
sperlin@allenmatkins.com
ALLEN MATKINS LECK GAMBLE MALLORY &
NATSIS
600 West Broadway, 27th Floor
San Diego, CA 92101
Telephone: (619) 233-1155

Patrick E. Breen
pbreen@allenmatkins.com
ALLEN MATKINS LECK GAMBLE MALLORY &
NATSIS
865 South Figueroa Street, Suite 2800
Los Angeles, CA 90017
Telephone: (213) 622-5555

_Counsel for Defendant Sares Regis Group_
_Commercial, Inc._


_/s/ Jose Dino Vasquez_
Jose Dino Vasquez
dvasquez@karrtuttle.com
Jason Hoeft
jhoeft@karrtuttle.com
KARR TUTTLE CAMPBELL
701 Fifth Avenue, Suite 3300
Seattle, WA 98104
Telephone: (206) 223-1313

_Counsel for Defendant Security Properties, Inc._

_/s/ David A. Walton_
David A. Walton
dwalton@bellnunnally.com
Troy Lee (T.J.) Hales
thales@bellnunnally.com
BELL NUNNALLY & MARTIN, LLP
2323 Ross Avenue, Suite 1900
Dallas, TX 75201

_Counsel for Defendant RPM Living, LLC_


_/s/ Diane R. Hazel_
Diane R. Hazel
dhazel@foley.com
FOLEY & LARDNER LLP
1400 16th Street, Suite 200
Denver, CO 80202
Telephone: (720) 437-2000

Elizabeth A. N. Haas (admitted _pro hac vice_)
ehaas@foley.com
Ian Hampton (admitted _pro hac vice_)
ihampton@foley.com
FOLEY & LARDNER LLP
777 East Wisconsin Avenue
Milwaukee, WI 53202
Telephone: (414) 271-2400

Tara L. Swafford, BPR #17577
tara@swaffordlawfirm.com
Dylan Harper, BPR #36820
dylan@swaffordlawfirm.com
THE SWAFFORD LAW FIRM, PLLC
321 Billingsly Court, Suite 19
Franklin, Tennessee 37067
Telephone: (615) 599-8406

_Counsel for Defendant Sherman Associates,_
_Inc._

/s/ Brent Justus
Brent Justus
bjustus@mcguirewoods.com
Nick Giles
ngiles@mcguirewoods.com
MCGUIREWOODS LLP
800 East Canal Street
Richmond, VA 23219-3916
Telephone: (804) 775-1000

*Counsel for Defendant Simpson Property Group, LLC*

/s/ Andrew Harris
Andrew Harris
Andrew.Harris@Levittboccio.com
LEVITT & BOCCIO, LLP
423 West 55th Street
New York, NY 10019
Telephone: (212) 801-1104

/s/ Nicholas A. Gravante, Jr.
Nicholas A. Gravante, Jr. (admitted *pro hac vice*)
nicholas.gravante@cwt.com
Philip J. Iovieno (admitted *pro hac vice*)
philp.iovieno@cwt.com
CADWALADER, WICKERSHAM & TAFT LLP
200 Liberty Street
New York, NY 10281
Telephone: (212) 504-6000

*Counsel for Defendants The Related Companies, L.P. and Related Management Company, L.P.*

/s/ Yonaton Rosenzweig
Yonaton Rosenzweig
yonirosenzweig@dwt.com
DAVIS WRIGHT TREMAINE LLP
865 S. Figueroa Street, Suite 2400
Los Angeles, CA 90017

Fred B. Burnside
fredburnside@dwt.com
MaryAnn T. Almeida
maryannalmeida@dwt.com
DAVIS WRIGHT TREMAINE LLP
920 Fifth Avenue, Suite 3300
Seattle, WA 98104
Telephone: (206) 757-8016

*Counsel for Defendant Mission Rock Residential, LLC*

/s/ Benjamin I. VandenBerghe
Benjamin I. VandenBerghe
biv@montgomerypurdue.com
Kaya R. Lurie
klurie@montgomerypurdue.com
MONTGOMERY PURDUE PLLC
701 Fifth Avenue, Suite 5500
Seattle, Washington 98104-7096

*Counsel for Defendant Thrive Communities Management, LLC*

/s/ David D. Cross
David D. Cross (admitted *pro hac vice*)
dcross@mofo.com
Jeffrey A. Jaeckel (admitted *pro hac vice*)
jjaeckel@mofo.com
Robert W. Manoso (admitted *pro hac vice*)
rmanoso@mofo.com
MORRISON & FOERSTER LLP
2100 L Street, NW, Suite 900
Washington, D.C., 20037
Telephone: (202) 887-1500

Eliot A. Adelson (admitted *pro hac vice*)
eadelson@mofo.com
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, CA 94105
Telephone: (415) 268-7000

/s/ Joshua L. Burgener
Joshua L. Burgener
jburgener@dickinsonwright.com
DICKINSON WRIGHT PLLC
424 Church Street, Suite 800
Nashville, TN 37219
Telephone: (615) 620-1757

*Counsel for Defendant UDR, Inc.*


/s/ Evan Fray-Witzer
Evan Fray-Witzer
Evan@CFWLegal.com
CIAMPA FRAY-WITZER, LLP
20 Park Plaza, Suite 505
Boston, MA 02116
Telephone: 617-426-0000

*Counsel for Defendants WinnCompanies LLC,*
*and WinnResidential Manager Corp.*

/s/ Craig Seebald
Jessalyn H. Zeigler
jzeigler@bassberry.com
BASS, BERRY & SIMS, PLC
150 Third Avenue South
Suite 2800
Nashville, TN 37201
Telephone: (615) 742-6200

Craig P. Seebald (admitted *pro hac vice*)
cseebald@velaw.com
Stephen M. Medlock (admitted *pro hac vice*)
smedlock@velaw.com
VINSON & ELKINS LLP
2200 Pennsylvania Ave., N.W.
Suite 500 West
Washington, D.C. 20037
Telephone: (202) 639-6500

Christopher W. James (admitted *pro hac vice*)
cjames@velaw.com
VINSON & ELKINS LLP
555 Mission Street
Suite 2000
San Francisco, CA 94105
Telephone: (415) 979-6900

*Counsel for Defendant Windsor Property*
*Management Company*

/s/ Ferdose al-Taie
Ferdose al-Taie (admitted *pro hac vice*)
faltaie@bakerdonelson.com
BAKER, DONELSON, BEARMAN CALDWELL &
BERKOWITZ, P.C.
956 Sherry Lane, 20th Floor
Dallas, TX 75225
Telephone: (214) 391-7210

Christopher E. Thorsen (BPR # 21049)
cthorsen@bakerdonelson.com
BAKER, DONELSON, BEARMAN CALDWELL &
BERKOWITZ, P.C.
Baker Donelson Center, Suite 800
211 Commerce Street
Nashville, TN 37201
Telephone: (615) 726-5600

*Counsel for Defendant ZRS Management, LLC*

/s/ James H. Mutchnik
James H. Mutchnik
james.mutchnik@kirkland.com
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, IL 60654
Telephone: (312) 862-2000

*Counsel for Defendant Thoma Bravo L.P.*

**CERTIFICATE OF SERVICE**

I hereby certify that on July 7, 2023, I electronically filed the foregoing document with the

Clerk of the Court using the CM/ECF system, which will send notification of such filing to all

attorneys of record registered on the CM/ECF system.

DATED this 7th day of July, 2023.


_____/s/ *Jay Srinivasan*_____
Jay Srinivasan