# EXHIBIT A

# SEATTLE - APARTMENT LEASE CONTRACT



Date of Lease Contract: **May 20, 2021**
(when the Lease Contract is filled out)

*This is a binding document. Read carefully before signing.*

## Moving In — General Information

**1. PARTIES.** This Lease Contract (sometimes referred to as the "lease") is between *you*, the resident(s) *(list all people signing the Lease Contract):*

**Kimen Trochalakis**

and *us*, the owner: **225 Roy LLC**

*(name of apartment community or title holder).* You've agreed to rent Apartment No. **1606** , at **205 Roy Street, Apt. 1606**
_____ *(street address)* in
**Seattle** *(city),*
Washington, **98109** *(zip code)* (the "apartment" or "premises") for use as a private residence only. The terms "you" and "your" refer to all residents listed above. The terms "we," "us," and "our" refer to the owner listed above (or any of owner's successors' in interest or assigns). Written notice to or from our managers constitutes notice to or from us. If anyone else has guaranteed performance of this Lease Contract, a separate Lease Contract Guaranty for each guarantor is attached.

**2. OCCUPANTS.** The apartment will be occupied only by you and *(list all other occupants not signing the Lease Contract):*

No one else may occupy the apartment. Persons not listed above must not stay in the apartment for more than _____ days in any 12 month period or **7** consecutive days without our prior written consent. If the previous space isn't filled in, two days per month is the limit. Receipt of mail at the apartment by any person not listed on this agreement shall be deemed to be proof of occupancy by that person. Any person in the unit, with or without the Resident's knowledge, including but not limited to invitees of guests or other invitees, shall be deemed to be guests for purposes of this agreement.

**3. LEASE TERM.** *(Check one):*

1. ☐ This tenancy is a month to month tenancy commencing on _____.

2. ☒ This tenancy is a lease for **18** months that commences on **April 3rd**, **2021** and ends at 11:59 p.m. on **October 2nd** , **2022** .

If box 1 is checked above, at least 30 days notice to terminate is required before the end of the monthly rental period.

If box 2 is checked above:

3. ☐ The tenancy shall automatically revert to a month to month tenancy unless either party gives written notice to terminate at least 20 days prior to the last day of the lease.

4. ☐ The lease shall terminate automatically by operation of law with no notice and no right of holdover.

If neither box 3 or 4 is checked, then the default shall be box

**4. SECURITY DEPOSIT.** Unless modified by addenda, the total security deposit at the time of execution of this Lease Contract for all residents in the apartment is $ **1461.00** , due on or before the date this Lease Contract is signed. **Your security deposit will be held in an escrow company or bank escrow account located in Washington until disposition.** See paragraphs 48 (Security Deposit Deductions and Other Charges), and 49 (Deposit Return, Surrender, and Abandonment) for security deposit return information. Any nonrefundable fees will be described in paragraph 10 (Special Provisions) or on addendums to this lease. If we sell the apartments, we will transfer your security deposit to the new owner who will give you any required statutory notices. In the case of multiple residents, the security deposit shall not be returned until the final Resident on the agreement has vacated and Owner reserves the right to issue any refund check in the name of all Residents or only in the name of the final remaining Resident. It is the Residents' sole responsibility to allocate any refunded amount between themselves.

Your security deposit will be kept in a account at (name and address of financial institution):

**Wells Fargo**
**6811 S. 204th Street Suite 380**
**Kent, WA 98032**

**5. KEYS.** You will be provided **0** apartment key(s), **2** mailbox key(s), **2** FOB(s), and/or **0** other access device(s) for access to the building and amenities at no additional cost at move-in. If the key, FOB, or other access device is lost or becomes damaged during your tenancy or is not returned or is returned damaged when you move out, you will be responsible for the costs for the replacement and/or repair of the same.

**6. RENT AND CHARGES.** Unless modified by addenda, you will pay $ **1461.00** per month for rent, payable in advance and without demand:

☒ at the on-site manager's office, or
☒ at our online payment site, or
☒ at **WIPS**

Prorated rent of $ **1363.60** is due for the remainder of the *[check one]:* ☒ 1st month or ☐ 2nd month, on **April 3** , **2021** .

Otherwise, you must pay your rent, in advance, on or before the 1st day of each month (due date) with no grace period. No matter what day the rent is actually due under this Lease, the rental period shall be from the first day of the month to the last day of the month during the Lease and during any month-to-month tenancy following the end of the Lease. All move in costs, including the first month's rent, deposit, and non-refundable fee, if applicable, shall be paid only by certified check or cashier's check—not by personal check. Any amount paid after the first day of the month shall be paid only by money order, certified check or cashier's check. Cash is unacceptable for any amount due under this Agreement, without our prior written permission. You must not withhold or offset rent unless authorized by statute. We may, at our option, require at any time that you pay all rent and other sums in cash, certified or cashier's check, money order, or one monthly check rather than multiple checks. At our discretion, we may convert any and all checks via the Automated Clearing House (ACH) system for the purposes of collecting payment. Rent is not considered accepted if the payment/ACH is rejected, does not clear, or is stopped for any reason. If you don't pay all rent on or before the **5th** day of the month (which date shall be before the 5th day after the date rent is due), you'll pay a late charge. Your late charge will be *(check one):* ☒ a flat rate of $ **75.00** or $ _____ % of your total monthly rent payment. Resident understands and agrees that the rent is due on or before the first day of the month, and any grace period before late charges accrue shall not change the rent due date. If you pay your rent after the late date specified in this paragraph or after the issuance of a 14-day notice, payments must be by certified check, cashier's check or money order. You'll also pay a charge of $ **75.00** for each returned check or rejected electronic payment, plus a late charge. After **2** checks are returned by

©2020, National Apartment Association, Inc. - 8/2020, Washington
Page 1 of 9

Document digitally signed using RENTCafe eSignature services. Document ID: 4061807

your bank for any reason, all future payments due during the remainder of your tenancy, notwithstanding the signing of any new lease agreements, must be by cashier's check, certified check or money order only. If you don't pay rent on time, you'll be delinquent and all remedies under this Lease Contract will be authorized. We'll also have all other remedies for such violation. If this community has a drop box, it is provided only as a convenience to the Residents. Use of the drop box for payment of rent, or any other amount, and for providing notices to the Owner are at the sole risk of loss or theft of the Resident. If any payment is lost prior to receipt by the Owner, Resident agrees to immediately replace the payment at their sole cost. Resident is strongly encouraged to make all payments directly to the Owner and to obtain a receipt for all payments. All payment obligations under this Lease Contract shall constitute rent under this Lease Contract.

**7. UTILITIES.** We'll pay for the following items, if checked:

☐ water ☐ gas ☐ electricity ☐ master antenna
☐ wastewater ☐ trash ☐ cable TV
☐ other **None**

You'll pay in full as billed for all other utilities, related deposits, and any charges, fees, or services on such utilities. You must not allow utilities to be disconnected—including disconnection for not paying your bills—until the lease term or renewal period ends. Cable channels that are provided may be changed during the lease term if the change applies to all residents. Utilities may be used only for normal household purposes and must not be wasted. If your electricity is ever interrupted, you must use only battery-operated lighting. If any utilities are sub-metered for the apartment, or prorated by an allocation formula, we will attach an addendum to this Lease Contract in compliance with state agency rules or city ordinance. If recycling is mandated by law, then Residents will be equally charged if the community is assessed any recycling related fines.

**8. INSURANCE.** We do not maintain insurance to cover your personal property or personal injury. We are not responsible to any resident, guest, or occupant for damage or loss of personal property or personal injury from (including but not limited to) fire, smoke, rain, flood, water and pipe leaks, hail, ice, snow, lightning, wind, explosions, earthquake, interruption of utilities, theft, hurricane, negligence of other residents, occupants, or invited/uninvited guests or vandalism, unless otherwise required by law.

In addition, we urge all Tenants, and particularly those residing in coastal areas, areas near rivers, and areas prone to flooding, to obtain flood insurance. Renter's insurance may not cover damage to your property due to flooding. A flood insurance resource which may be available includes the National Flood Insurance Program managed by the Federal Emergency Management Agency (FEMA).

We ☐ require ☒ do not require you to get your own insurance for losses to your personal property or injuries due to theft, fire, water damage, pipe leaks and the like. If no box is checked, renter's insurance is not required.

Additionally, you are *[check one]* ☒ required to purchase personal liability insurance ☐ not required to purchase personal liability insurance. If no box is checked, personal liability insurance is not required. If required, failure to maintain personal liability insurance throughout your tenancy, including any renewal periods and/or lease extensions, may be an incurable breach of this Lease Contract and may result in the termination of tenancy and eviction and/or any other remedies as provided by this Lease Contract or state law. If personal liability insurance is required, you are required to provide proof of insurance upon commencement of the tenancy and upon written request.

You acknowledge that no portion of the rent paid by you under this agreement will be applied to the owner's structural fire insurance and that you are in no way a co-insured under any such policy.

**9. LOCKS AND LATCHES.** Keyed lock(s) will be rekeyed after the prior resident moves out. The rekeying will be done before you move into your apartment.

You may at any time ask us to change or rekey locks or latches during the Lease Term. We must comply with those requests, but you must pay for them, unless otherwise provided by law.

**Payment for Rekeying, Repairs, Etc.** You must pay for all repairs or replacements arising from misuse or damage to devices by you or your occupants, or guests during your occupancy. You may be required to pay in advance if we notify you within a reasonable time after your request that you are more than 30 days delinquent in reimbursing us for repairing or replacing a device which was misused or damaged by you, your guest or an occupant; or if you have requested that we repair or change or rekey the same device during the 30 days preceding your request and we have complied with your request. Otherwise, you must pay immediately after the work is completed.

---

## Special Provisions and "What If" Clauses

**10. SPECIAL PROVISIONS.** The following special provisions and any addenda or written rules furnished to you at or before signing will become a part of this Lease Contract and will supersede any conflicting provisions of this printed lease form.

**See special provisions on the last page**
_____
_____
_____
_____
_____

See any additional special provisions.

**11. EARLY MOVE-OUT.** You'll be liable to us for a reletting charge of *[check one]* ☒ $ _____500_____ or ☐ _____ % of the rent (not to exceed 100% of the highest monthly rent during the Lease Contract term) if you:

(1) fail to give written move-out notice as required in paragraph 44 (Move-Out Notice) or any other applicable law; or
(2) move out without paying rent in full for the entire lease term or renewal period; or
(3) move out at our demand because of your default; or
(4) are judicially evicted.

The reletting charge is not a cancellation fee and does not release you from your obligations under this Lease Contract.

**Not a Release.** The reletting charge is not a lease cancellation fee or buyout fee. It is an agreed-to liquidated amount covering only part of our damages, that is, our time, effort, and expense in finding and processing a replacement. These damages are uncertain and difficult to ascertain—particularly those relating to inconvenience, paperwork, advertising, showing apartments, utilities for showing, checking prospects, office overhead, marketing costs, and locator-service fees. You agree that the reletting charge is a reasonable estimate of such damages and that the charge is due whether or not our reletting attempts succeed. If no amount is stipulated, you must

pay our actual reletting costs so far as they can be determined. The reletting charge does not release you from continued liability for: future or past-due rent; charges for cleaning, repairing, repainting, or unreturned keys; or other sums due.

**Lease Buy Out.** If you desire to buy out your Lease Contract early please refer to your Lease Buy Out Agreement. If you have not been provided with a Lease Buy Out Agreement you must contact us regarding such an agreement. A lease buy out may not be available in all cases. Other than as required by law or otherwise stated in this Lease Contract the Lease Buy Out Agreement shall govern the means by which you may terminate your tenancy before the end of its term.

**12. REIMBURSEMENT.** You must promptly reimburse us for loss, damage, government fines, or cost of repairs or service in the apartment community due to a violation of the Lease Contract or rules, improper use, or negligence, by you or your guests or occupants. In addition, unless the damage or wastewater stoppage is due to our negligence, we're not liable for--and you must pay for--repairs, replacement costs, and damage to the following that result from you or your invitees, guests, or occupants' negligence or intentional acts: (1) damage to doors, windows, or screens; (2) damage from windows or doors left open; and (3) damage from wastewater stoppages caused by improper objects in lines exclusively serving your apartment. We may require payment at any time, including advance payment of repairs for which you're liable. Delay in demanding sums you owe is not a waiver.

**13. PROPERTY LEFT IN APARTMENT.**
**Removal After Surrender, Abandonment, or Eviction.** We or law officers may remove and/or store all property remaining in the apartment or in common areas (including any vehicles you or any occupant or guest owns or uses) if you are judicially evicted or if you surrender or abandon the apartment (see definitions in paragraph 49 - Deposit Return, Surrender, and Abandonment).

©2020, National Apartment Association, Inc. - 8/2020, Washington
Page 2 of 9
Document digitally signed using RENTCafe eSignature services. Document ID: 4061807

**Storage.** We may store, but **other than as may be required by law** have no duty to store, property removed after judicial eviction, surrender, or abandonment of the apartment. We're not liable for casualty loss, damage, or theft unless otherwise provided by law. You must pay reasonable charges for our packing, removing, storing, and selling any property.

**Redemption.** If we've seized and stored property as authorized by the state statute, you may redeem the property by paying all reasonable moving and storage fees if you make written request for the return of the property before we have sold or disposed of it. We may return redeemed property at the place of storage, the management office, or the apartment (at our option). We may require payment by cash, money order, or certified check.

**Disposition or Sale.** We may throw away or give to a charitable organization all items of personal property that are: (1) left in the apartment after surrender or abandonment; or (2) left outside more than 1 day after a writ of restitution is executed, following a judicial eviction.

Animals removed after surrender, abandonment, or eviction may be kenneled or turned over to local authorities or humane societies. Property described in (1) and (2) above not thrown away or given to charity may be disposed of only by sale, which must be held no sooner than 45 days after written notice to you. Our notice may be sent to you first class mail to your last known address or to any other addresses you provided us in writing or any other address known to us for you. Our notice will include (1) our name and the address where we may be contacted, (2) the place where your property is stored, (3) a statement informing you that a sale or disposition of your property will take place in accordance with state law, (4) the date of the sale or disposal (which may be no sooner than 45 days from the date of the notice), and (5) a statement informing you of your right (upon payment of storage charges) to have the property returned prior to its sale or disposition. Sale may be public or private, is subject to any third-party ownership or lien claims, must be to the highest cash bidder, and may be in bulk, in batches, or item-by-item. We'll hold any excess proceeds from the sale for you for one year from the date of the sale. If no claim is made to the proceeds in that year, we may retain the proceeds.

However, if your property that we are storing has a cumulative value of $250 or less, we may sell or dispose of your property (except for personal papers, family pictures, and keepsakes) after 7 days from the date that we mailed notice to you of the prospective sale or disposal. We'll send you a 45 day notice before we dispose of any personal papers, family pictures, and keepsakes.

After writ of restitution is issued, if we receive timely notice from you or your representative that you want us to store your personal property, we will do so in accordance with the requirements of RCW 59.18.312.

14. **FAILING TO PAY FIRST MONTH'S RENT.** If you don't pay the first month's rent when or before the Lease Contract begins, or your failure to pay any subsequent rent or other charges owing under this Lease Contract, all future rent will be automatically accelerated without notice and immediately due. We also may end your right of occupancy and recover damages, future rent, reletting charges, attorney's fees, court costs, and other lawful charges. Our rights and remedies under paragraphs 11 (Early Move-Out) and 33 (Default by Resident) apply to acceleration under this paragraph.

15. **RENT INCREASES AND LEASE CONTRACT CHANGES.** No rent increases or Lease Contract changes are allowed before the initial Lease Contract term ends, except for changes allowed by any special provisions in paragraph 10 (Special Provisions), by a written addendum or amendment signed by you and us, or by reasonable changes of apartment rules allowed under paragraph 19 (Community Policies or Rules/Facilities). If we give you at least 60 days written notice of rent increases or lease changes effective when the Lease term or renewal period ends, this Lease Contract will automatically continue month-to-month with the increased rent or lease changes. The new modified Lease Contract will begin on the date stated in the notice (without necessity of your signature) unless you give us written move-out notice under paragraph 44 (Move-Out Notice).

16. **DELAY OF OCCUPANCY.** If occupancy is or will be delayed for construction, repairs, cleaning, or a previous resident's holding over, we're not responsible for the delay. The lease will remain in force subject to: (1) abatement of rent on a daily basis during delay; and (2) your right to terminate as set forth below. Termination notice must be in writing. After termination, you are entitled only to refund of deposit(s) and any rent paid. Rent abatement or lease termination does not apply if delay is for cleaning or repairs that don't prevent you from occupying the apartment.

If there is a delay and we haven't given notice of delay as set forth immediately below, you may terminate up to the date when the apartment is ready for occupancy, but not later.

(1) If we give written notice to any of you when or after the initial term as set forth in paragraph 3 (Lease Term)—and the notice states that occupancy has been delayed because of construction or a previous resident's holding over, and that the apartment will be ready on a specific date—you may terminate the Lease Contract within 3 days of your receiving the notice, but not later.

(2) If we give written notice to any of you before the initial term as set forth in paragraph 3 (Lease Term) and the notice states that construction delay is expected and that the apartment will be ready for you to occupy on a specific date, you may terminate the Lease Contract within 7 days after any of you receives written notice, but not later. The readiness date is considered the new initial term as set forth in paragraph 3 (Lease Term) for all purposes. This new date may not be moved to an earlier date unless we and you agree.

17. **AD VALOREM TAXES/FEES AND CHARGES - ADDITIONAL RENT.** Unless otherwise prohibited by law, if, during the term of this Agreement, any locality, city, state, or Federal Government imposes upon Us, any fee, charge, or tax, which is related to or charged by the number of occupants, or by the apartment unit itself, such that we are charged a fee, charge, or tax, based upon your use or occupancy of the apartment, we may add this charge as Additional Rent, during the term of the Lease Contract, with thirty (30) days advance written notice to you. After this written notice (the amount or approximate amount of the charge, will be included), you agree to pay, as Additional Rent, the amount of the charge, tax or fee imposed upon us, as a result of your occupancy. As examples, these charges can include, but are not limited to: any charges we receive for any zoning violation, sound, noise or litter charge; any charge under any nuisance or chronic nuisance type statute, 911 or other life safety, per person, or per unit charge or tax and any utility bill unpaid by you, which is then assessed to us for payment.

18. **DISCLOSURE RIGHTS.** If someone requests information on you or your rental history for law-enforcement, governmental, or business purposes, we may provide it without prior notice to you.

## While You're Living in the Apartment

19. **COMMUNITY POLICIES OR RULES/FACILITIES.** You and all guests and occupants must comply with any written apartment rules and community policies, including instructions for care of our property. After 30 days written notice, we may make changes to written rules, effective on completion of your lease term, or in a month-to-month tenancy, effective at the end of the next calendar month. You understand and agree that any and all facilities provided by us are provided as a gratuity and their use is not part of the rent that you pay. We reserve the right to change or limit the hours of any such facilities, or to eliminate them completely without prior notice to you or any other residents, and that any such action shall not constitute any claim by you for diminished rental value or a claim of default under the terms of this agreement by us.

20. **LIMITATIONS ON CONDUCT.** The apartment and other areas reserved for your private use must be kept clean and free of trash, garbage, and other debris. Trash must be disposed of at least weekly in appropriate receptacles in accordance with local ordinances. Passageways may be used only for entry or exit. You agree to keep all passageways and common areas free of obstructions such as trash, storage items, and all forms of personal property. No person shall ride or allow bikes, skateboards, or other similar objects in the passageways. Any swimming pools, saunas, spas, tanning beds, exercise rooms, storerooms, laundry rooms, and similar areas must be used with care in accordance with apartment rules and posted signs. Glass containers are prohibited in all common areas. You, your occupants, or guests may not anywhere in the apartment community: use candles or use kerosene lamps or kerosene heaters without our prior written approval; cook on balconies or outside; or solicit business or contributions. Conducting any kind of business in your apartment or in the apartment community is prohibited—except that any lawful business conducted "at home" by computer, mail, or telephone is permissible if customers, clients, patients, or other business associates do not come to your apartment for business

©2020, National Apartment Association, Inc. - 8/2020, Washington

Page 3 of 9

Document digitally signed using RENTCafe eSignature services. Document ID: 4061807

purposes. We may regulate: (1) the use of patios, balconies, and porches; (2) the conduct of furniture movers and delivery persons; and (3) recreational activities in common areas. You'll be liable to us for damage caused by you or any guests or occupants.

We may exclude from the apartment community guests or others who, in our judgment, have been violating the law, violating this Lease Contract or any apartment rules, or disturbing other residents, neighbors, visitors, or owner representatives. We may also exclude from any outside area or common area a person who refuses to show photo identification or refuses to identify himself or herself as a resident, occupant, or guest of a specific resident in the community.

You agree to notify us if you or any occupants are convicted of any felony, or misdemeanor involving a controlled substance, violence to another person or destruction of property. You also agree to notify us if you or any occupant registers as a sex offender in any state. Informing us of criminal convictions or sex offender registry does not waive our right to evict you.

21. **PROHIBITED CONDUCT.** You, your occupants or guests, or the guests of any occupants, may not engage in the following: criminal activities, behaving in a loud or obnoxious manner; disturbing or threatening the rights, comfort, health, safety, or convenience of others (including our agents and employees) in or near the apartment community; disrupting our business operations; manufacturing, delivering, possessing with intent to deliver, or otherwise possessing a controlled substance or drug paraphernalia (as defined by either Washington State or Federal Law, including marijuana); engaging in or threatening violence; possessing a weapon prohibited by state law; discharging a firearm in the apartment community; displaying or possessing a gun, knife, or other weapon in the common area in a way that may alarm others; storing anything in closets having gas appliances, or anything that may increase our insurance costs; tampering with utilities or telecommunications; bringing hazardous materials into the apartment community; or injuring our reputation by making bad faith allegations against us to others.

22. **PARKING.** We may regulate the time, manner, and place of parking of all cars, trucks, motorcycles, bicycles, boats, trailers, and recreational vehicles by anyone. Parking spaces may not be used for storage of vehicles. Your vehicle(s) must be moved every ____7____ days, including vehicles parked in all guest or handicapped spaces. If you have a reserved parking space, or a garage, you are required to use that space, or your garage, first. We may have unauthorized or illegally parked vehicles towed. A vehicle is unauthorized or illegally parked in the apartment community if it:

(1) has a flat tire or other condition rendering it inoperable; or
(2) is on jacks, blocks or has wheel(s) missing; or
(3) has no current license plate or no current registration and/or inspection sticker; or
(4) takes up more than one parking space; or
(5) belongs to a resident or occupant who has surrendered or abandoned the apartment; or
(6) is parked in a marked handicap space without the legally required handicap insignia; or
(7) is parked in a space marked for manager, staff, or guest at the office; or
(8) blocks another vehicle from exiting; or
(9) is parked in a fire lane or designated "no parking" area; or
(10) is parked in a space marked for other resident(s) or unit(s); or
(11) is parked on the grass, sidewalk, or patio; or
(12) blocks garbage trucks from access to a dumpster; or
(13) belongs to a resident and is parked in a visitor or retail parking space.

23. **RELEASE OF RESIDENT.** Unless you're entitled to terminate your tenancy under paragraphs 10 (Special Provisions), 16 (Delay of Occupancy), 32 (Responsibilities of Owner), 44 (Move-Out Notice), or any other applicable law, you won't be released from this Lease Contract for any reason—including but not limited to voluntary or involuntary school withdrawal or transfer, voluntary or involuntary job transfer, marriage, separation, divorce, reconciliation, loss of co-residents, loss of employment, or bad health.

24. **MILITARY PERSONNEL CLAUSE.** All parties to this Lease Contract agree to comply with any federal law, including, but not limited to the Service Member's Civil Relief Act, or any applicable state law(s), if you are seeking to terminate this Lease Contract and/or subsequent renewals and/or Lease Contract extensions under the rights granted by such laws.

25. **RESIDENT SAFETY AND PROPERTY LOSS.** You and all occupants and guests must exercise due care for your own and others' safety and security, especially in the use of smoke and carbon monoxide detectors, keyed deadbolt locks, keyless bolting devices, window latches, and other access control devices.

**Statutory Notice Regarding Smoke Detectors and Carbon Monoxide Detectors.** We'll furnish a smoke detector and carbon monoxide detector in the apartment as required by statute. We'll test the smoke detector and carbon monoxide detector and provide working batteries (if applicable) when you first take possession. After that, you must maintain the smoke detector and carbon monoxide detector and replace any batteries as needed, at your expense. We may replace dead or missing batteries at your expense, without prior notice to you. You must immediately report smoke-detector and carbon monoxide detector malfunctions to us. Neither you nor others may disable, remove, or damage smoke detectors or carbon monoxide detectors. If the foregoing is violated or you fail to replace a dead battery or report malfunctions to us, you will be liable to us and others for any loss, damage, or fines from fire, smoke, or water. You acknowledge that we have advised you: (i) that the apartment is equipped with a smoke detector and carbon monoxide detector, (ii) that it's your responsibility to maintain the smoke detector and carbon monoxide detector in proper working condition, and (iii) that you may be subject to fines of up to $200 or other penalties for your failure to comply with the provisions of RCW 43.44.110. You confirm that the smoke detector and carbon monoxide detector was operational as of the date of your inspection, and (iv) following the commencement of the lease term, you will pay for and replace the smoke detector and carbon monoxide detector batteries, if any, as needed. You must not permit or cause the removal, disconnection, or disabling of the smoke detector or carbon monoxide detector.

**Casualty Loss.** Unless caused exclusively by our negligence, we're not liable to any resident, guest, or occupant for personal injury or damage or loss of personal property from any cause, including but not limited to: fire, smoke, rain, flood, water and pipe leaks, hail, ice, snow, lightning, wind, explosions, earthquake, interruption of utilities, theft, or vandalism, unless otherwise required by law. During freezing weather, you must ensure that the temperature in the apartment is sufficient to make sure that the pipes do not freeze (the appropriate temperature will depend upon weather conditions and the size and layout of your unit). If the pipes freeze or any other damage is caused by your failure to properly maintain the heat in your apartment, you'll be liable for damage to our and other's property. If you ask our representatives to perform services not contemplated in this Lease Contract, you will indemnify us and hold us harmless from all liability for those services.

**Crime or Emergency.** Dial 911 or immediately call local medical emergency, fire, or police personnel in case of accident, fire, smoke, or suspected criminal activity, or other emergency involving imminent harm. You should then contact our representative. Unless otherwise provided by law, we're not liable to you or any guests or occupants for injury, damage, or loss to person or property caused by criminal conduct of other persons, including theft, burglary, assault, vandalism, or other crimes. We're not obliged to furnish security personnel, security lighting, security gates or fences, or other forms of security unless required by statute. If we provide any access control devices or security measures upon the property, they are not a guarantee to prevent crime or to reduce the risk of crime on the property. You agree that no access control or security measures can eliminate all crime and that you will not rely upon any provided access control or security measures as a warranty or guarantee of any kind. We're not responsible for obtaining criminal-history checks on any residents, occupants, guests, or contractors in the apartment community. If you or any occupant or guest is affected by a crime, you must make a written report to our representative and to the appropriate local law-enforcement agency. You must also furnish us with the law-enforcement agency's incident report number upon request.

26. **CONDITION OF THE PREMISES AND ALTERATIONS.** You accept the apartment, fixtures, and furniture as is, except for conditions materially affecting the health or safety of ordinary persons. To the extent allowed by law, we disclaim all implied warranties. You'll be given an Inventory and Condition form on or before move-in which must be completed by you and returned to us. Unless otherwise noted on the form, everything will be considered to be in a clean, safe, and good working condition upon move-in. You understand that items noted on a move in inspection form do not indicate an agreement by us to clean, repair or replace that noted item. All maintenance requests must be in writing and on a separate maintenance request form.

©2020, National Apartment Association, Inc. - 8/2020, Washington
Page 4 of 9
Document digitally signed using RENTCafe eSignature services. Document ID: 4061807

You must use customary diligence in maintaining the apartment and not damaging or littering the common areas. Unless authorized by statute or by us in writing, you must not perform any repairs, painting, wallpapering, carpeting, electrical changes, or otherwise alter our property. No holes or stickers are allowed inside or outside the apartment. But we'll permit a reasonable number of small nail holes for hanging pictures on sheetrock walls and in grooves of wood-paneled walls, unless our rules state otherwise. No water furniture, washing machines, additional phone or TV-cable outlets, alarm systems, or lock changes, additions, or rekeying is permitted unless statutorily allowed or we've consented in writing. You may install a satellite dish or antenna provided you sign our satellite dish or antenna lease addendum which complies with reasonable restrictions allowed by federal law. You agree not to alter, damage, or remove our property, including alarm systems, smoke detectors and carbon monoxide detectors, furniture, telephone and cable TV wiring, screens, locks, and access control devices. When you move in, we'll supply light bulbs for fixtures we furnish, including exterior fixtures operated from inside the apartment; after that, you'll replace them at your expense with bulbs of the same type and wattage. Your improvements to the apartment (whether or not we consent) become ours unless we agree otherwise in writing.

**27. REQUESTS, REPAIRS, AND MALFUNCTIONS.** IF YOU OR ANY OCCUPANT NEEDS TO SEND A NOTICE OR REQUEST—FOR EXAMPLE, FOR REPAIRS, INSTALLATIONS, SERVICES, OR SECURITY-RELATED MATTERS—IT MUST BE SUBMITTED THROUGH EITHER THE ONLINE TENANT/MAINTENANCE PORTAL, OR SIGNED AND IN WRITING AND DELIVERED TO OUR DESIGNATED REPRESENTATIVE (except in case of fire, smoke, gas, explosion, overflowing sewage, uncontrollable running water, electrical shorts, or crime in progress). Our written notes on your oral request do not constitute a written request from you.

Our complying with or responding to any oral request regarding security or non-security matters doesn't waive the strict requirement for written notices under this Lease Contract. You must promptly notify us in writing of: water leaks; broken windows, wet areas on floors, walls or ceilings; electrical problems; malfunctioning lights; broken or missing locks or latches, toilets or faucets; and other conditions that pose a hazard to property, health, or safety. We may change or install utility lines or equipment serving the apartment if the work is done reasonably without substantially increasing your utility costs. We may turn off equipment and interrupt utilities as needed to prevent property damage or to perform work. If utilities malfunction or are damaged by fire, water, or similar cause, you must notify our representative immediately. Air conditioning problems are not emergencies. If air conditioning or other equipment malfunctions, you must notify our representative as soon as possible on a business day. We'll act with customary diligence to make repairs and reconnections. Rent will not abate in whole or in part.

If we believe that fire or catastrophic damage is substantial, or that performance of needed repairs poses a danger to you, we may terminate your tenancy within a reasonable time by giving you written notice. If your tenancy is so terminated, we'll refund prorated rent and all deposits, less lawful deductions.

**28. ANIMALS.** Unless otherwise provided under federal, state, or local law, no animals (including mammals, reptiles, birds, fish, rodents, and insects) are allowed, even temporarily, anywhere in the apartment or apartment Community unless we've so authorized in writing. You must remove an illegal or unauthorized animal within 24 hours of notice from us, or you will be considered in default of this Lease Contract. If we allow an animal as a pet, you must execute a separate animal addendum which may require additional deposits, rents, fees or other charges. An animal deposit is considered a general security deposit. We will authorize an assistance animal for a disabled person. When allowed by applicable laws, before we authorize an assistance animal, if the disability is not readily apparent, we may require a written statement from a qualified professional verifying the disability-related need for the assistance animal. If we authorize an assistance animal, we may require you to execute a separate animal and/or assistance animal addendum. Animal deposits, additional rents, fees or other charges will not be required for an assistance animal needed due to disability, including an emotional support or service animal, as authorized under federal, state, or local law. You must not feed stray or wild animals. No pets will be allowed to visit the property and no "pet-sitting" shall be allowed. If a pet becomes a problem in our sole opinion, we reserve the right to require that the pet be removed from the property. Once a pet has been removed from the property, the pet deposit for that pet shall not be returned during the tenancy even though the animal is no longer on the property. If you have pets, assistance or service animals, they must be secured during maintenance work. If they are not secured and pose any type of danger to Maintenance, in our sole opinion, Maintenance shall be entitled to leave the unit prior to the completion of the work and it shall be your sole responsibility to schedule a return by Maintenance for the completion of the work after the animal has been secured.

If you or any guest or occupant violates animal restrictions (with or without your knowledge), you'll be subject to charges, damages, eviction, and other remedies provided in this Lease Contract. If an animal has been in the apartment at any time during your term of occupancy (with or without our consent), we'll charge you for defleaing, deodorizing, and shampooing. Initial and daily animal-violation charges and animal-removal charges are liquidated damages for our time, inconvenience, and overhead (except for attorney's fees and litigation costs) in enforcing animal restrictions and rules. We may kennel the animal or contact a humane society or local authority for pick up. When kenneling an animal, we won't be liable for loss, harm, sickness, or death of the animal unless due to our negligence. We'll return the animal to you upon request if it has not already been turned over to a humane society or local authority. You must pay for the animal's reasonable care and kenneling charges. We have no lien on the animal for any purpose.

**29. WHEN WE MAY ENTER.** If you or any guest or occupant is present and gives permission to enter, then repairers, servicers, contractors, our representatives or other persons listed in (2) below may peacefully enter the apartment at reasonable times for the purposes listed in (2) below. Otherwise, the persons listed in (2) below may enter peacefully and at reasonable times by duplicate or master key (or by breaking a window or other means when necessary) if:

(1) written notice of the entry is hand delivered to someone in the apartment or is left in a conspicuous place in the apartment at least 48 hours before entry (or 24 hours before entry if entry is to show the apartment to prospective residents or purchasers at a specified time). No prior notice is needed in emergencies or situations when prior notice is impractical; and

(2) entry is for: responding to your request; making repairs or replacements; estimating repair or refurbishing costs; performing pest control; doing preventive maintenance; changing filters; testing or replacing smoke-detector or carbon monoxide detector batteries; retrieving unreturned tools, equipment or appliances; preventing waste of utilities; exercising our contractual lien; leaving notices; delivering, installing, reconnecting, or replacing appliances, furniture, equipment, or access control devices; removing or rekeying unauthorized access control devices; removing unauthorized window coverings; stopping excessive noise; removing health or safety hazards (including hazardous materials), or items prohibited under our rules; removing perishable foodstuffs if your electricity is disconnected; retrieving property owned or leased by former residents; inspecting when immediate danger to person or property is reasonably suspected; allowing entry by a law officer with a search or arrest warrant, or in hot pursuit; showing apartment to prospective residents (after move-out or vacate notice has been given); or showing apartment to government inspectors for the limited purpose of determining housing and fire ordinance compliance by us and to lenders, appraisers, contractors, prospective buyers, or insurance agents. We reserve the right to refuse maintenance work if only a person under age 18 is present at the time of the scheduled work. Refusal to allow us or our agents or vendors to enter the unit after proper notice, if required, shall be a material violation of this agreement.

**30. JOINT AND SEVERAL RESPONSIBILITY.** Each resident is jointly and severally liable for all lease obligations. If you or any guest or occupant violates the Lease Contract or rules, all residents are considered to have violated the Lease Contract. Our requests and notices (including sale notices) to any resident constitute notice to all residents and occupants. In eviction suits, each resident is considered the agent of all other residents in the apartment for service of process. Security-deposit refunds and deduction itemizations of multiple residents will comply with paragraph 49 (Deposit Return, Surrender and Abandonment).

©2020, National Apartment Association, Inc. - 8/2020, Washington

Document digitally signed using RENTCafe eSignature services. Document ID: 4061807

## Replacements

**31. REPLACEMENTS AND SUBLETTING.** Replacing a resident, subletting, assignment or granting a right or license to occupy is allowed only when we expressly consent in writing. If departing or remaining residents find a replacement resident acceptable to us before moving out and we expressly consent, in writing, to the replacement, subletting, assignment, or granting a right or any license to occupy, then:

(1) a reletting charge will not be due;
(2) a reasonable administrative (paperwork) fee will be due, and a rekeying fee will be due if rekeying is requested or required; and
(3) the departing and remaining residents will remain liable for all lease obligations for the rest of the original lease term.

**Procedures for Replacement.** If we approve a replacement resident, then, at our option: (1) the replacement resident must sign this Lease Contract with or without an increase in the total security deposit; *or* (2) the remaining and replacement residents must sign an entirely new Lease Contract. Unless we agree otherwise in writing, your security deposit will automatically transfer to the replacement resident as of the date we approve. The departing resident will no longer have a right to occupancy or a security deposit refund, but will remain liable for the remainder of the original lease term unless we agree otherwise in writing—even if a new Lease Contract is signed.

## Responsibilities of Owner and Resident

**32. RESPONSIBILITIES OF OWNER.** We'll act with customary diligence to:

(1) keep common areas reasonably clean, subject to paragraph 26 (Condition of the Premises and Alterations);
(2) maintain fixtures, furniture, hot water, heating and A/C equipment;
(3) comply with applicable federal, state, and local laws regarding safety, sanitation, and fair housing;
(4) make all reasonable repairs, subject to your obligation to pay for damages for which you are liable;
(5) commence steps, within 24 hours after our receipt of written notice from you (except where circumstances are beyond our control), to restore hot or cold water, heat, electricity or to remedy situations imminently hazardous to life;
(6) commence steps, within 72 hours after our receipt of written notice from you (except where circumstances are beyond our control), to remove or remedy a condition that deprives you of the use of a refrigerator, range and oven, or major plumbing fixture supplied by us; and
(7) commence steps, within 10 days after our receipt of written notice from you (except where circumstances are beyond our control), to repair or remedy all other items for which we are responsible that are not described in (5) or (6) above.

We have no duty to repair if the defective condition was caused by you, your guests, or others acting under your control, or if you unreasonably fail to allow us access to the apartment to make such repairs.

You may not repair items yourself and deduct the cost of repairs from your rent unless you have fully complied with the statutory requirements for doing so. Under state statute, you must be current in your payment of rent (including utilities) before exercising any statutory or Lease Contract remedy.

**33. DEFAULT BY RESIDENT.** You'll be in default if you or any guest or occupant violates any terms of this Lease Contract including but not limited to the following violations: (1) you don't pay rent or other amounts that you owe when due; (2) you or any guest or occupant violates the apartment rules, or fire, safety, health, or criminal laws, regardless of whether or where arrest or conviction occurs; (3) you abandon the apartment; (4) you give incorrect or false answers in a rental application; (5) you or any occupant, in bad faith, makes an invalid habitability complaint to an official or employee of a utility company or the government; (6) you or any occupant is arrested, convicted, or given deferred adjudication for a felony offense involving actual or potential physical harm to a person, or involving possession, manufacture, or delivery of a controlled substance, marijuana, or drug paraphernalia under state statute; (7) you or any guest or occupant engages in any of the prohibited conduct described in paragraph 21 (Prohibited Conduct); or (8) any illegal drugs or paraphernalia are found in your apartment or illegal drugs are used in your apartment.

**Lease Renewal When a Breach or Default Has Occurred.** In the event that you enter into a subsequent Lease prior to the expiration of this Lease and you breach or otherwise commit a default under this Lease, we may, at our sole and absolute discretion, terminate the subsequent Lease, even if the subsequent Lease term has yet to commence. We may terminate said subsequent Lease by sending you written notice of our desire to terminate said subsequent Lease.

**Eviction—Nonpayment of Rent.** If you default in rent payment we may end your right of occupancy by giving you 14 days written notice to vacate. The notice will state that you are required to either pay rent in full within 14 days or vacate. Notice may be by: (1) personal delivery to any resident; (2) if a resident is unavailable, personal delivery at the apartment to any occupant of suitable age and discretion in addition to regular mail delivery to a resident; or (3) if no one of suitable age and discretion is home, by leaving a copy of the notice in a conspicuous place in the unit or on the door, delivering a copy to any person in the apartment (if one can be found), and mailing notice to a resident. Termination of your possession rights or subsequent reletting doesn't release you from liability for future rent or other lease obligations. After giving notice to vacate or filing an eviction suit, we may still accept rent or other sums due; the filing or acceptance doesn't waive or diminish our right of eviction, or any other contractual or statutory right. Accepting money at any time doesn't waive our right to damages; or to past or future rent or other sums; or to continue with eviction proceedings.

**Eviction—All Other Violations.** If you default other than by nonpayment of rent, as defined by Washington state law, we may end your right of occupancy by giving you 10 day notice, and this notice will state that you must either remedy your breach or vacate the apartment within the 10 day period. Notice may be given in the same manner as the nonpayment of rent notice described above. However, if you permit waste on the premises, operate an unlawful business, or if conduct by you or your guests constitutes a nuisance, or if you are occupying the unit without color of title or the permission of the owner, we may give you 3 days notice to vacate. If you fail to vacate the apartment after service of a termination notice made 20 days or more before the end of the monthly rental period, we are not required to give you any additional notice. Resident understand that if Resident is given a notice to pay or comply or vacate and chooses to vacate the unit during the period of the notice, that the Resident shall remain liable for the rent through the end of the lease term or the next month in the case of a month-to-month tenancy.

**Acceleration.** All monthly rent for the rest of the lease term or renewal period will be accelerated automatically without notice or demand (before or after acceleration) and will be immediately due and delinquent if, without our written consent: (1) you move out, remove property in preparing to move out, or give oral or written notice (by you or any occupant) of intent to move out before the lease term or renewal period ends; and (2) you've not paid all rent for the entire lease term or renewal period. Such conduct is considered a default for which we need not give you notice. Remaining rent also will be accelerated if you're judicially evicted or move out when we demand because you've defaulted. Acceleration is subject to our mitigation obligations below.

**Holdover.** You or any occupant, invitee, or guest must not hold over beyond the date contained in your move-out notice or our notice to vacate (or beyond a different move-out date agreed to by the parties in writing). If a holdover occurs, then: (1) holdover rent is due in advance on a daily basis and may become delinquent without notice or demand; (2) rent for the holdover period will be increased by 25% over the then-existing rent, without notice; (3) subject to our mitigation duties, you'll be liable to us for all rent for the full term of the previously signed Lease Contract of a new resident who can't occupy because of the holdover; and (4) at our option, we may extend the lease term—for up to one month from the date of notice of lease extension—by delivering written notice to you or your apartment while you continue to hold over.

**Remedies Cumulative.** Any remedies set forth herein shall be cumulative, in addition to, and not in limitation of, any other remedies available to Landlord under any applicable law.

©2020, National Apartment Association, Inc. - 8/2020, Washington

Document digitally signed using RENTCafe eSignature services. Document ID: 4061807

**Other Remedies.** We may report unpaid amounts to credit agencies. If you default and move out early, you will pay us any amounts stated to be rental discounts in paragraph 10 (Special Provisions), in addition to other sums due. Upon your default, we have all other legal remedies, including tenancy termination. Unless a party is seeking exemplary, punitive, sentimental or personal-injury damages, the prevailing party may recover from the non-prevailing party reasonable attorney's fees and all other litigation costs. The Owner shall be deemed to be the prevailing party if the action voluntarily is halted by the Owner prior to judgment, or if the case is not filed, prior to filing, on the basis that the Owner accepted from the Resident all or part of the amounts alleged to be owing, or on the basis that the Resident vacated the rental unit. Late charges are liquidated

for our time, inconvenience, and overhead in collecting late rent (but are not for attorney's fees and litigation costs). All unpaid amounts bear 12% interest per year from due date, compounded annually. You must pay all collection-agency fees if you fail to pay all sums due within 10 days after we mail you a letter demanding payment and stating that collection agency fees will be added if you don't pay all sums by that deadline.

**Mitigation of Damages.** If you move out early, you'll be subject to paragraph 11 (Early Move-Out) and all other remedies. We'll make a reasonable effort to relet and mitigate damages after we learn of your early move out or abandonment. We'll credit all subsequent rent that we actually receive from subsequent residents against your liability for past-due and future rent and other sums due.

## General Clauses

**34. ENTIRE AGREEMENT.** Neither we nor any of our representatives have made any oral promises, representations, or agreements. This Lease Contract is the entire agreement between you and us.

**35. NO AUTHORITY TO AMEND UNLESS IN WRITING.**
Our representatives (including management personnel, employees, and agents) have no authority to waive, amend, or terminate this Lease Contract or any part of it, unless in writing, and no authority to make promises, representations, or agreements that impose security duties or other obligations on us or our representatives unless in writing. No verbal agreements, advertisements, warranties or representations have been made or relied upon by either party or any agent or employee of either party, and neither party.

**36. NO WAIVER.** No action or omission of our representative will be considered a waiver of any subsequent violation, default, or time or place of performance. Our not enforcing or belatedly enforcing written-notice requirements, rental due dates, acceleration, liens, or other rights, or our acceptance of rent after a notice of non-compliance or non-payment isn't a waiver under any circumstances.

**37. NOTICE.** Except when notice or demand is required by statute, you waive any notice and demand for performance from us if you default. Written notice to or from our managers constitutes notice to or from us. Any person giving a notice under this Lease Contract should retain a copy of the memo, letter or fax that was given. Fax signatures are binding. All notices must be signed. All notices and documents may be in English and, at our option, in any language that you read or speak.

**38. MISCELLANEOUS.**
A. Exercising one remedy won't constitute an election or waiver of other remedies.
B. Unless prohibited by law or the respective insurance policies, insurance subrogation is waived by all parties.
C. All remedies are cumulative.
D. No employee, agent, or management company is personally liable for any of our contractual, statutory, or other obligations merely by virtue of acting on our behalf.
E. This Lease Contract binds subsequent owners.
F. Neither an invalid clause nor the omission of initials on any page invalidates this Lease Contract.
G. All provisions regarding our non-liability and non-duty apply to our employees, agents, and management companies.
H. This Lease Contract is subordinate or superior to existing and future recorded mortgages, at lender's option.
I. All lease obligations must be performed in the county where the apartment is located.
J. Resident has completed an application in connection with executing this Lease. Owner has relied upon the statements set forth in said application in deciding to rent the Premises to Resident. It is agreed that should Owner subsequently discover any misstatements of fact in the Resident's application, such misstatements shall be

deemed a material and incurable breach of this Lease and shall entitle Owner to serve Resident with a three-day notice terminating the tenancy under RCW 59.12.030(6).
K. All discretionary rights reserved for us within this Lease Contract or any accompanying addenda are at our sole and absolute discretion.

**39. OBLIGATION TO VACATE.** If we provide you with a notice to vacate, or if you provide us with a written notice to vacate or intent to move-out in accordance with the Lease Terms paragraph, and we accept such written notice, then you are required to vacate the Apartment and remove all of your personal property therefrom at the expiration of the Lease term, or by the date set forth in the notice to vacate, whichever date is earlier, without further notice or demand from us.

**40. CONTACTING YOU.** By signing this lease, you are agreeing that we, our representative(s) or agent(s) may contact you. You agree that we may contact you using any contact information relating to your lease including any number (i) you have provided to us (ii) from which you called us, or (iii) which we obtained and through which we reasonably believe we can reach you. You agree we may use any means to contact you. This may include calls made to your cellular telephone using an automatic telephone dialing system, artificial or prerecorded voice messages, text messages, mail, e-mail, and calls to your phone or Voice over Internet Protocol (VoIP) service, or any other data or voice transmission technology. You agree to promptly notify us if you change any contact information you provide to us. You are responsible for any service provider charges as a result of us contacting you.

**41. FORCE MAJEURE.** If we are prevented from completing performances of any obligations hereunder by an act of God, strikes, epidemics, war, acts of terrorism, riots, flood, fire, hurricane, tornado, sabotage, or other occurrence which is beyond the control of the parties, then we shall be excused from any further performance of obligations and undertakings hereunder, to the full extent allowed under applicable law.

Furthermore, if such an event damages the property to materially affect its habitability by some or all residents, we reserve the right to vacate any and all leases and you agree to excuse us from any further performance of obligations and undertakings hereunder, to the full extent allowed under applicable law.

**42. PAYMENTS.** Payment of all sums is an independent covenant. All sums other than rent are due upon our demand. After the due date, we do not have to accept the rent or any other payments.

**43. ASSOCIATION MEMBERSHIP.** We represent that either: (1) we or; (2) the management company that represents us, is at the time of signing this Lease Contract or a renewal of this Lease Contract, a member of both the National Apartment Association and any affiliated state and local apartment (multi-housing) associations for the area where the apartment is located.

## When Moving Out

**44. MOVE-OUT NOTICE.** Unless this lease terminates automatically by operation of law with no notice and no right of holdover (see paragraph 3 Lease Term), you must give our representative advance written move-out notice as provided below. Your move-out notice will not release you from liability for the full term of the Lease Contract or renewal term. You will still be liable for the entire lease term if you move out early (paragraph 23 - Release of Resident) except under any other applicable law. YOUR MOVE-OUT NOTICE MUST COMPLY WITH EACH OF THE FOLLOWING:

- We must receive advance written notice of your move-out date. The advance notice must be at least the number of days of notice required in paragraph 3 (Lease Term). Oral move-out notice will not be accepted and will not terminate your Lease Contract.
- Your move-out notice must not terminate the Lease Contract sooner than the end of the lease term or renewal period.

YOUR NOTICE IS NOT ACCEPTABLE IF IT DOES NOT COMPLY WITH ALL OF THE ABOVE. Please use our written move-out form. You must obtain from our representative written acknowledgment that we received your move-out notice. If we terminate the Lease Contract, we must give you the same advance notice—unless you are in default.

©2020, National Apartment Association, Inc. - 8/2020, Washington

Page 7 of 9

Document digitally signed using RENTCafe eSignature services. Document ID: 4061807

**45. MOVE-OUT PROCEDURES.** The move-out date can't be changed unless we and you both agree in writing. You won't move out before the lease term or renewal period ends unless all rent for the entire lease term or renewal period is paid in full. Early move-out may result in reletting charges and acceleration of future rent under paragraphs 11 (Early Move-Out) and 33 (Default by Resident). You're prohibited by law from applying any security deposit to rent. You won't stay beyond the date you are supposed to move out. All residents, guests, and occupants must vacate the apartment before the 21-day period (or as amended by state law) for deposit refund begins. You must give us and the U.S. Postal Service, in writing, each resident's forwarding address.

**46. CLEANING.** You must thoroughly clean the apartment, including doors, windows, furniture, bathrooms, kitchen appliances, patios, balconies, garages, carports, and storage rooms. Carpets must be professionally cleaned by a third party truck style cleaner. You must follow move-out cleaning instructions if they have been provided. If you don't clean adequately, you'll be liable for reasonable cleaning charges. In lieu of liability for cleaning charges, we may charge you a non-refundable cleaning fee which will be described in paragraph 10 (Special Provisions) or an addendum to this Lease Contract and will not be construed as part of any security deposit.

**47. MOVE-OUT INSPECTION.** You should meet with our representative for a move-out inspection, but the move out inspection will not be delayed to accommodate your schedule. Our representative has no authority to bind or limit us regarding deductions for repairs, damages, or charges. Any statements or estimates by us or our representative are subject to our correction, modification, or disapproval before final refunding or accounting.

If a pre-move out inspection is held, the final charges for move out damages will be determined at the inspection after you have vacated the unit. No statements made by us during any pre-move out inspection shall limit those charges.

**48. SECURITY DEPOSIT DEDUCTIONS AND OTHER CHARGES.** You'll be liable for the following charges, if applicable, which may be withheld from your security deposit upon expiration of the Lease Contract (this list is not deemed to exclude charges for damages not specifically listed): unpaid rent; unpaid utilities; unreimbursed service charges; repairs or damages caused by negligence, carelessness, accident, or abuse, including stickers, scratches, tears, burns, stains, or unapproved holes; replacement cost of our property that was in or attached to the apartment and is missing; replacing dead or missing smoke-detector or carbon monoxide detector batteries; utilities for repairs or cleaning; trips to let in company representatives to remove your telephone or TV cable services or rental items (if you so request or have moved out); trips to open the apartment when you or any guest or occupant is missing a key; unreturned keys; missing or burned-out light bulbs; removing or rekeying unauthorized access control devices or alarm systems; agreed reletting charges; packing, removing, or storing property removed or stored under paragraph 13 (Property Left in Apartment); removing illegally parked vehicles; special trips for trash removal caused by parked vehicles blocking dumpsters; false security-alarm charges unless due to our negligence; animal-related charges; government fees or fines against us for violation (by you, your occupants, or guests) of local ordinances relating to smoke detectors and carbon monoxide detectors, false alarms, recycling, or other matters; late-payment and returned-check charges; a charge (not to exceed $100) for owner/manager's time and inconvenience in our lawful removal of an animal or in any valid eviction proceeding against you, plus attorney's fees, court costs, and filing fees actually paid; and other sums due under this Lease Contract.

You acknowledge and agree that any cleaning or damages due to smoke damage from any source, including but not limited to cigarettes, cigars, pipes, candles or incense, shall not be considered to be normal wear and tear and that you will be charged for all such cleaning, repair or replacement costs.

You'll be liable to us for: (1) charges for replacing all keys and access devices referenced in paragraph 5 (Keys) if you fail to return them on or before your actual move-out date; (2) accelerated rent if you have violated paragraph 33 (Default by Resident); and (3) a reletting fee if you have violated paragraph 11 (Early Move-Out).

**49. DEPOSIT RETURN, SURRENDER, AND ABANDONMENT. Deposit Return and Forwarding Address.** You are required to provide us written notice of your forwarding address, on or before termination of this Lease Contract. We'll mail you your security deposit refund (less lawful deductions) and an itemized accounting of any deductions no later than 21 days or as amended by Washington state law after the lease is terminated, and you surrender the apartment, or 21 days or as amended by Washington state law after we learn of your abandonment. We reserve the right to amend the charges listed due to later-discovered damages, or if only an estimate was available during the 21 day or as amended by Washington state law period and the actual amount differs from the estimated charges.

**Surrender.** You have surrendered the apartment when: (1) the move-out date has passed and no one is living in the apartment in our reasonable judgment; or (2) all apartment keys and access devices listed in paragraph 5 (Keys) have been turned in where rent is paid—whichever date occurs first.

**Abandonment.** You have abandoned the apartment when all of the following have occurred: (1) you are in default for nonpayment of rent, and (2) you have either told us you do not intend to continue tenancy or evidence indicates this intention. Evidence of this intention includes without limitation your removal of some or all of your clothes, furniture, or personal belongings or the disconnection of utilities to your unit that are not in our name.

Surrender, abandonment, or judicial eviction end your right of possession for all purposes and gives us the immediate right to: clean up, make repairs in, and relet the apartment; determine any security deposit deductions; and remove property left in the apartment. Surrender, abandonment, and judicial eviction affect your rights to property left in the apartment (paragraph 13 - Property Left in Apartment), but do not affect our mitigation obligations (paragraph 33 - Default by Resident).

## Severability, Originals and Attachments, and Signatures

**50. SEVERABILITY.** If any provision of this Lease Contract is invalid or unenforceable under applicable law, such provision shall be ineffective to the extent of such invalidity or unenforceability only without invalidating or otherwise affecting the remainder of this Lease Contract. The court shall interpret the lease and provisions herein in a manner such as to uphold the valid portions of this Lease Contract while preserving the intent of the parties.

**51. ORIGINALS AND ATTACHMENTS.** This Lease Contract has been executed in multiple originals, with original signatures. We will provide you with a copy of the Lease Contract. Your copy of the Lease Contract may be in paper format, in an electronic format at your request, or sent via e-mail if we have communicated by e-mail about this Lease. Our rules and community policies, if any, will be attached to the Lease Contract and provided to you at signing. When an Inventory and Condition form is completed, you should retain a copy, and we should retain a copy. Any addenda or amendments you sign as a part of executing this Lease Contract are binding and hereby incorporated into and made part of the Lease Contract between you and us. This lease is the entire agreement between you and us. You acknowledge that you are NOT relying on any oral representations. A copy or scan of this Lease Contract and related addenda, amendments, and agreements may be used for any purpose and shall be treated as an original.

**Name, address and phone number of owner or owner's representative for notice and process purposes (include name of county in State of Washington)**

Avenue5 Residential LLC
225 Roy St

Seattle, WA 98109
King
(206) 466-8850

**Your security deposit will be deposited in:**

Escrow Company or Bank Name: Wells Fargo

Address:
6811 S. 204th Street Suite 380
Kent, WA 98032
Your canceled check will be your deposit receipt.

> **You are legally bound by this document.**
> **Read it carefully before signing.**

©2020, National Apartment Association, Inc. - 8/2020, Washington     Page 8 of 9

Document digitally signed using RENTCafe eSignature services. Document ID: 4061807

**Resident or Residents** *(all sign below)*

_____

_____

_____

_____

_____

_____

**Owner or Owner's Representative** *(signing on behalf of owner)*

_____

**Name and address of locator service** *(if applicable)*

_____

_____

_____

**Date form is filled out** *(same as on top of page 1)*

05/20/2021
_____

State of Washington

County of _____

I certify that I know or have satisfactory evidence that _____

is/are the person(s) who appeared before me and acknowledged that he/she/they signed this instrument, and acknowledged it to be his/her/their free and voluntary act for the uses and purposes mentioned in the instrument.

_____        _____
Dated                          My Commission Expires

_____
Printed Name of Notary Public

_____
Signature of Notary Public

*Note: Signature of Owner must be notarized if lease is for more than one year.*

[notary stamp/seal box]

*(Use above space for notary stamp/seal)*

SPECIAL PROVISIONS (CONTINUED FROM PAGE 2). **We do not accept payments in the form of cash. Should the owner serve any notice authorized by RCW59.12, the resident will pay $25.00 as a service fee for each notice served. Maximum of 2 guests per resident in any common area.**

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

© 2020, National Apartment Association, Inc.    Washington/National Apartment Association Official Form, August 2020    Page 9 of 9

Document digitally signed using RENTCafe eSignature services. Document ID: 4061807



# Rent Addendum

**Resident Name(s):** Kimen Trochalakis
**Lease Start Date:** 04/03/2021      **Unit No.:** 1606

Resident shall be charged the amount of $_____, covering either (as applicable): (i) rent and other charges (identified below) from the commencement date of this Lease through the end of the calendar month in which the Lease commences, if the commencement of the term is prior to the twentieth (20th) day of the calendar month; or (ii) rent and other charges (identified below) from the commencement of this lease through the end of the first full calendar month of this Lease if the commencement date of the term is on or after the twentieth (20th) day of the calendar month.

Beginning with the first day of the next calendar month of the term of this Lease and continuing throughout the term of this Lease (including any month-to-month renewal), Resident shall pay the following amount per month payable in advance and without demand on or before the first day of each month with *no grace period*:

Base Monthly Rent      $_____

Less Monthly Concession Amount      $_____
Concession Description:

**Base Monthly Payment after Concession**      $_____

**Other Monthly Charges:**      $_____

         Laundry Equipment      $_____
             Washer Serial No. _____
             Dryer Serial No. _____

         Additional Monthly Rent for Animal      $_____

         Trash      $_____

         Other _____      $_____

         Other_____      $_____

         Other_____      $_____

         Other_____      $_____

         Other_____      $_____

         Tax (if applicable)      $_____

**Total Monthly Rent and Other Charges after Concession (the "Rent)**      $_____

SPECIAL PROVISIONS:

The above monthly rental charges do not include utility fees and charges.

All Monthly rental payments must be made by one check, not multiple checks. Partial payment of rent is not acceptable at any time; all payments must be made in full to include all amounts due. Post-dated or third party checks will not be accepted. Payment made to the office will not be held at the request of anyone; all payments made to the office will be directly deposited. All payments made after (2) NSF's must be in the form of cashier's check or money order.

Case 3:23-md-03071    Document 346-1    Filed 07/07/23    Page 11 of 75 PageID #: 3055

Document digitally signed using RENTCafe eSignature services. Document ID: 4061807



**Resident(s) Name:** Kimen Trochalakis

**Lease Start Date:** 04/03/2021          **Apartment No.:** 1606

**Rent Concession:** Resident acknowledges that Residents' right to receive a Concession detailed above is conditional upon Residents' full, complete and timely performance of all obligations under this Lease and the documents pertaining to this Lease. If Resident fails to pay Rent on or before the first day of each month pursuant to the terms of this Lease during any month of this Lease term, in addition to any other rights or remedies, the Owner has as a result of Residents' default, Resident shall not be entitled to the prorated portion of the Concession attributed to that month and Resident shall owe the full amount of rent as stated in this Lease for that month (as if no concession was given) plus any applicable late charges as a result of Residents' failure to timely pay rent in the event the resident is asked to leave, is evicted or moves out prior to the expiration of this Lease or any applicable renewal period, Resident shall pay to Owner, upon demand, the full amount of the Concession in addition to any other rent, fees, charges or expenses Resident is required to pay under this Lease as a result of Residents' failure to comply with the terms of this Lease. Resident acknowledges that the Concession constitutes a discount of Rent only and not a discount of any other charges which Resident may be required to pay pursuant to the terms of this Lease.

**Month to Month Charge**: This Lease Contract will automatically renew month-to-month unless either party gives at least ___20___days written notice of termination or intent to move-out as required by paragraph __37__ (Move-Out Notice). Once the lease contract has been renewed on a Month-to-Month basis either party is required to give at least __20__days written notice of termination of intent to vacate to move-out. A month-to-month charge in the amount of $___300.00___will be due in addition to the below stated monthly rental rate while the Resident continues on a month-to-month lease. Communities utilizing a yield management pricing tool will pull a new Quote Rate for the apartment at the time of notice and charge that current rental rate.

_____          _____
                                                                          **Owner Representative**

_____

_____

_____
**Resident(s) Signature**



Document digitally signed using RENTCafe eSignature services. Document ID: 4061807



**1. DWELLING UNIT DESCRIPTION.**
Unit No. **1606** , **205 Roy Street,**
**Apt. 1606**
_____ *(street address)* in
**Seattle**
*(city)*, Washington, **98109** *(zip code)*.

**2. LEASE CONTRACT DESCRIPTION.**
Lease Contract Date: **May 20, 2021**
Owner's name: **225 Roy LLC**

Residents *(list all residents)*:
**Kimen Trochalakis**

This Addendum constitutes an Addendum to the above described Lease Contract for the above described premises, and is hereby incorporated into and made a part of such Lease Contract. Where the terms or conditions found in this Addendum vary or contradict any terms or conditions found in the Lease Contract, this Addendum shall control.

**3. CONCESSION/DISCOUNT AGREEMENT.** As consideration for your agreement to remain in your dwelling and to fulfill your Lease obligations throughout the full term of your Lease, you will receive the following rent Concession and or Discount.

*(Check all that apply)*

☒ **One-Time Concession.** You will receive a One-Time Concession off the rent indicated in the Rent and Charges paragraph of the Lease Contract in the total amount of $ **1461** .This Concession will be credited to your rent due for the month(s) of: **One month free rent for June 2021**

☐ **Monthly Discount/Concession.** The rent indicated in the Rent and Charges paragraph of the Lease Contract includes a Monthly Discount of $ **0.00** per month off of the suggested rental rate for your dwelling.

☐ **Other Discount/Concession.** You will receive the following discount off the rent indicated in Paragraph 6 of the Lease Contract:

**Resident or Residents**
*(All residents must sign)*

☐ **Non-Monetary Concession.** You will receive the following non-monetary concession during the term of the Lease.

**4. CONCESSION CANCELLATION AND CHARGE-BACK.** The concession and discounts indicated above are provided to you as an incentive and with the understanding that you will fulfill your obligations under the Lease Contract through the entire term of your Lease.

If you fail to pay your initial move in charges, or those payments are returned for any reason, your concession will immediately terminate, and you will be responsible for any amounts to which the concession was applied.

If your lease is terminated early due to your default (for example, if you abandon the premises without paying rent or are evicted), this Concession/Discount Agreement will be immediately terminated, and you will be required to immediately repay to the Owner the amounts of all *(Check all that apply)*

☒ Concessions
☒ Discounts

that you have actually received for the months you resided in the Premises, and without further notice from us.

**5. MARKET RENT.** The market rent for this dwelling is the rent stated in the NAA Lease Contract. You acknowledge that the market rent is a fair representation of what the specific dwelling would actually rent for at the time the Lease Contract was negotiated and executed, and is reflective of the rent for a similar dwelling at comparable properties.

**6. SPECIAL PROVISIONS.** The following special provisions control over any conflicting provisions of this printed Addendum form or the Lease Contract:

**The full amount of any and all concessions or discounts must be paid back in full if the lease contract is not fulfilled. If the lease is terminated early, the full amount will be added to the buy-out fee.**

**Owner or Owner's Representative**
*(Signs here)*

**Date of Lease Contract**

**May 20, 2021**

©2019, National Apartment Association, Inc. - 2/2019, Washington
Document digitally signed using RENTCafe eSignature services. Document ID: 4061801

# LEASE CONTRACT BUY-OUT AGREEMENT



**1. DWELLING UNIT DESCRIPTION.**
Unit No. __1606__, 205 Roy Street,
__Apt. 1606__
_____ *(street address)* in
_____Seattle_____
*(city)*, Washington, __98109__ *(zip code)*.

**2. LEASE CONTRACT DESCRIPTION.**
Lease Contract Date: __May 20, 2021__
Owner's name: __225 Roy LLC__
_____
_____
_____
_____

Residents *(list all residents)*:
__Kimen Trochalakis__
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

**3.** The purpose of this Buy-Out Agreement is to give you the right to buy out of your Lease Contract early—subject to any special provisions in paragraph 9 below. In order to buy out early, your notice must be signed by all residents listed in paragraph 1 of the Lease Contract and you must comply with all provisions of this Buy-Out Agreement.

**4. BUY-OUT PROCEDURES.** You may buy out of the Lease Contract prior to the end of the lease term and cut off all liability for paying rent for the remainder of the lease term if all of the following occur:

(a) you give us written notice of buy-out at least __20__ days prior to the new termination date (i.e., your new move-out date), which *(check one)* ☐ must be the last day of a month or ☒ may be during a month (if no number is entered, then the default is 30 days notice);

(b) you specify the new termination date in the notice, i.e., the date by which you'll move out;

(c) you are not in default under the Lease Contract on the date you give us the notice of buy-out;

(d) you are not in default under the Lease Contract on the new termination date (move-out date);

(e) you move out on or before the new termination date and do not hold over;

(f) you pay us a buy-out fee (consideration) of $ __2922.00__ ;

(g) you pay us the amount of any concessions you received when signing the Lease Contract on the date that you give notice to buy-out;

(h) you are current in the payment of rent and all other amounts owing under the lease through the terminating date;

(i) you comply with any special provisions in paragraph 9 below; and

(j) if you choose to exercise the buy-out provision, and the unit re-rented at any time, you understand and agree that you are not eligible for, nor will receive any refund of any portion of the buy-out fee.

**5. WHEN PAYABLE.** The buy-out fee in paragraph 4(f) is due and payable no later than __0__ days after you give us your buy-out notice. If no number is written in, the default shall be seven (7) days. The total dollar amount of any concessions regarding rent or other monetary lease obligations for the entire lease term is $ _____ and is due payable on the same day as the buy-out fee, subject to any special provisions in paragraph 9 regarding the amount, calculation method, or payment date.

**6. SHOWING UNIT TO PROSPECTIVE RESIDENTS.** After you give us notice of buy-out, the Lease Contract gives us the right to begin showing your unit to prospective residents and telling them it will be available immediately after your new termination date.

**7. COMPLIANCE ESSENTIAL.** Our deposit of all amounts due under paragraphs 4(f) and 4(g) constitutes our approval of the new termination date stated in your notice of buy-out. If you fail to comply with any of the procedures or requirements in this agreement after we deposit such monies, your buy-out right and this agreement will be voided automatically; and (1) any amounts you have paid under this agreement will become part of your security deposit, and (2) the lease will continue without buy-out. Then, if you move out early, you are subject to all lease remedies, including reletting fees and liability for all rents for the remainder of the original lease term.

**8. MISCELLANEOUS.** If moving out by the new termination date becomes a problem for you, contact us. An extension may be possible if we have not already relet the dwelling unit to a successor resident. We and any successor residents who may be leasing your unit will be relying on your moving out on or before the new termination date. Therefore, you may not hold over beyond such date without our written consent—even if it means you have to make plans for temporary lodging elsewhere. "Default" as used in paragraphs 4(c) and 4(d) of this agreement means default as defined in the Lease Contract. You will continue to be liable for any damages and any sums accruing and unpaid prior to the new termination date.

**9. SPECIAL PROVISIONS.** Your right of buy-out *(check one)* ☐ is or ☒ is not limited to a particular fact situation. If limited, buy-out may be exercised only if the following facts (see below) occur and any described documents are furnished to us. Any special provisions below will supersede any conflicting provision of this printed agreement. Any false statements or documents presented to us regarding buy-out will automatically void your right to buy-out of the Lease Contract. The special provisions are:

__Buy-Out fee is equivalent to two (2)__
__months rent and must be paid at the time__
__written notice is provided to the__
__management company. Buy-Out fee must be__
__paid in Certified funds. Cash payment or__
__personal checks will not be accepted. The__
__Full Concession must be paid back if the__
__Lease Term is not fulfilled for any__
__reason.__
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

©2018, National Apartment Association, Inc. - 9/2018, Washington

Document digitally signed using RENTCafe eSignature services. Document ID: 4061807

**Resident or Residents**
*(All residents must sign)*

**Owner or Owner's Representative**
*(Signs below)*

**Date of Lease Contract**

May 20, 2021

© 2018, National Apartment Association, Inc.

Washington/National Apartment Association Official Form, September 2018.

Document digitally signed using RENTCafe eSignature services. Document ID: 4061807

# UTILITY AND SERVICES ADDENDUM



This Utility Addendum is incorporated into the Lease Contract (referred to in this addendum as "Lease Contract" or "Lease") dated __May 20, 2021__ between __225 Roy LLC__

("We" and/or "we" and/or "us) and __Kimen Trochalakis__

("You" and/or "you") of Apt. No. __1606__ located at __205 Roy Street, Apt. 1606__

(street address) in __Seattle, WA 98109__ and is in addition to all terms and conditions in the Lease. This Addendum constitutes an Addendum to the above described Lease Contract for the above described premises, and is hereby incorporated into and made a part of such Lease Contract. Where the terms or conditions found in this Addendum vary or contradict any terms or conditions found in the Lease Contract, this Addendum shall control.

1. Responsibility for payment of utilities, and the method of metering or otherwise measuring the cost of the utility, will be as indicated below.
   a) **Water** service to your dwelling will be paid by you either:
      - ❑ directly to the utility service provider; or
      - ☒ water bills will be billed by the service provider to us and then allocated to you based on the following formula: __6__
        - ❑ If flat rate is selected, the current flat rate is $ _____ per month.
        - ☒ 3rd party billing company if applicable __Conserve__
   b) **Sewer** service to your dwelling will be paid by you either:
      - ❑ directly to the utility service provider; or
      - ☒ sewer bills will be billed by the service provider to us and then allocated to you based on the following formula: __6__
        - ❑ If flat rate is selected, the current flat rate is $ _____ per month.
        - ☒ 3rd party billing company if applicable __Conserve__
   c) **Gas** service to your dwelling will be paid by you either:
      - ❑ directly to the utility service provider; or
      - ❑ gas bills will be billed by the service provider to us and then allocated to you based on the following formula: _____
        - ❑ If flat rate is selected, the current flat rate is $ _____ per month.
        - ❑ 3rd party billing company if applicable _____
   d) **Trash** service to your dwelling will be paid by you either:
      - ❑ directly to the utility service provider; or
      - ☒ trash bills will be billed by the service provider to us and then allocated to you based on the following formula: __6__
        - ❑ If flat rate is selected, the current flat rate is $ _____ per month.
        - ☒ 3rd party billing company if applicable __Conserve__
   e) **Electric** service to your dwelling will be paid by you either:
      - ☒ directly to the utility service provider; or
      - ❑ electric bills will be billed by the service provider to us and then allocated to you based on the following formula: _____
        - ❑ If flat rate is selected, the current flat rate is $ _____ per month.
        - ❑ 3rd party billing company if applicable _____
   f) **Stormwater** service to your dwelling will be paid by you either:
      - ❑ directly to the utility service provider; or
      - ❑ stormwater bills will be billed by the service provider to us and then allocated to you based on the following formula: _____
        - ❑ If flat rate is selected, the current flat rate is $ _____ per month.
        - ❑ 3rd party billing company if applicable _____
   g) **Cable TV** service to your dwelling will be paid by you either:
      - ❑ directly to the utility service provider; or
      - ❑ cable TV bills will be billed by the service provider to us and then allocated to you based on the following formula: _____
        - ❑ If flat rate is selected, the current flat rate is $ _____ per month.
        - ❑ 3rd party billing company if applicable _____
   h) **Master Antenna** service to your dwelling will be paid by you either:
      - ❑ directly to the utility service provider; or
      - ❑ master antenna bills will be billed by the service provider to us and then allocated to you based on the following formula: _____
        - ❑ If flat rate is selected, the current flat rate is $ _____ per month.
        - ❑ 3rd party billing company if applicable _____
   i) **Internet** service to your dwelling will be paid by you either:
      - ☒ directly to the utility service provider; or
      - ❑ internet bills will be billed by the service provider to us and then allocated to you based on the following formula: _____
        - ❑ If flat rate is selected, the current flat rate is $ _____ per month.
        - ❑ 3rd party billing company if applicable _____
   j) (Other) __King County Sewer Capacity__ service to your dwelling will be paid by you either:
      - ❑ directly to the utility service provider; or
      - ☒ bills will be billed by the service provider to us and then allocated to you based on the following formula: __10__
        - ❑ If flat rate is selected, the current flat rate is $ _____ per month.
        - ☒ 3rd party billing company if applicable __Conserve__
   k) (Other) __Common Area Electric and Gas__ service to your dwelling will be paid by you either:
      - ❑ directly to the utility service provider; or
      - ☒ bills will be billed by the service provider to us and then allocated to you based on the following formula: __10__
        - ❑ If flat rate is selected, the current flat rate is $ _____ per month.
        - ☒ 3rd party billing company if applicable __Conserve__

METERING/ALLOCATION METHOD KEY
"1"- Sub-metering of all of your water/gas/electric use
"2" - Calculation of your total water use based on sub-metering of hot water
"3" - Calculation of your total water use based on sub-metering of cold water
"4"- Flat rate per month
"5"- Allocation based on the number of persons residing in your dwelling unit
"6"- Allocation based on the number of persons residing in your dwelling unit using a ratio occupancy formula
"7" - Allocation based on square footage of your dwelling unit
"8"- Allocation based on a combination of square footage of your dwelling unit and the number of persons residing in your dwelling unit
"9" - Allocation based on the number of bedrooms in your dwelling unit
"10"- Allocation based on a lawful formula not listed here
   (Note: if method "10" is selected, a separate sheet will be attached describing the formula used)

© 2021, National Apartment Association, Inc. - 4/2021, Washington
Page 1 of 2
Document digitally signed using RENTCafe eSignature services. Document ID: 4061807

2. If an allocation method is used, we or our billing company will calculate your allocated share of the utilities and services provided and all costs in accordance with state and local statutes. Under any allocation method, Resident may be paying for part of the utility usage in common areas or in other residential units as well as administrative fees. Both Resident and Owner agree that using a calculation or allocation formula as a basis for estimating total utility consumption is fair and reasonable, while recognizing that the allocation method may or may not accurately reflect actual total utility consumption for Resident. Where lawful, we may change the above methods of determining your allocated share of utilities and services and all other billing methods, in our sole discretion, and after providing written notice to you. More detailed descriptions of billing methods, calculations and allocation formulas will be provided upon request.

   If a flat fee method for trash or other utility service is used, Resident and Owner agree that the charges indicated in this Agreement (as may be amended with written notice as specified above) represent a fair and reasonable amount for the service(s) provided and that the amount billed is not based on a monthly per unit cost.

3. When billed by us directly or through our billing company, you must pay utility bills within ____30____ days of the date when the utility bill is issued at the place indicated on your bill, or the payment will be late. If a payment is late, you will be responsible for a late fee as indicated below. The late payment of a bill or failure to pay any utility bill is a material and substantial breach of the Lease and we will exercise all remedies available under the Lease, up to and including eviction for nonpayment. To the extent there are any new account, monthly administrative, late or final bill fees, you shall pay such fees as indicated below.

   | | | |
   |---|---|---|
   | New Account Fee: | $ _____ | (not to exceed $ _____ ) |
   | Monthly Administrative Billing Fee: | $ _____5.00_____ | (not to exceed $ _____ ) |
   | Late Fee: | $ _____ | (not to exceed $ _____ ) |
   | Final Bill Fee: | $ _____ | (not to exceed $ _____ ) |

   If allowed by state law, we at our sole discretion may amend these fees, with written notice to you.

4. You will be charged for the full period of time that you were living in, occupying, or responsible for payment of rent or utility charges on the dwelling. If you breach the Lease, you will be responsible for utility charges for the time period you were obliged to pay the charges under the Lease, subject to our mitigation of damages. In the event you fail to timely establish utility services, we may charge you for any utility service billed to us for your dwelling and may charge a reasonable administration fee for billing for the utility service in the amount of $ _____50.00_____ .

5. When you move out, you will receive a final bill which may be estimated based on your prior utility usage. This bill must be paid at the time you move out or it will be deducted from the security deposit.

6. We are not liable for any losses or damages you incur as a result of outages, interruptions, or fluctuations in utility services provided to the dwelling unless such loss or damage was the direct result of negligence by us or our employees. You release us from any and all such claims and waive any claims for offset or reduction of rent or diminished rental value of the dwelling due to such outages, interruptions, or fluctuations.

7. You agree not to tamper with, adjust, or disconnect any utility sub-metering system or device. Violation of this provision is a material breach of your Lease and you may be subject you to eviction or other remedies available to us under your Lease, this Utility Addendum and at law.

8. Where lawful, all utilities, charges and fees of any kind under this Lease shall be considered additional rent, and if partial or full payments are accepted by the Owner, they will be allocated first to non-rent charges and to rent last.

9. **The following language replaces the language in Paragraph 8 for any community located in the city limits of Seattle.**
   Pursuant to Seattle Municipal Code 7.24.030.E., when any monthly or periodic payment is made pursuant to the rental agreement, we shall first apply the payment to the rent due before applying it to other payments due by you to us, except that if the payment is made in response to a notice issued pursuant to RCW 59.12.030 during the period of that notice, we shall first apply the payment to the amount specified in that notice, before applying it to the rent due or to other payments due by you to us.

10. You represent that all occupants that will be residing in the Unit are accurately identified in the Lease. You agree to promptly notify in writing Owner of any change in such number of occupants.

11. You agree that you may, upon thirty (30) days prior written notice from Owner to you, begin receiving a bill for additional utilities and services, at which time such additional utilities and services shall for all purposes be included in the term Utilities.

12. This Addendum is designed for use in multiple jurisdictions, and no billing method, charge, or fee mentioned herein will be used in any jurisdiction where such use would be unlawful. If any provision of this Addendum or the Lease is invalid or unenforceable under applicable law, such provision shall be ineffective to the extent of such invalidity or unenforceability without otherwise affecting the remainder of this Addendum or the Lease. Except as specifically stated herein, all other terms and conditions of the Lease shall remain unchanged. In the event of any conflict between the terms of this Addendum and the terms of the Lease, the terms of this Addendum shall control.

13. The following special provisions and any addenda or written rules furnished to you at or before signing will become a part of this Utility Addendum and will supersede any conflicting provisions of this printed Utility Addendum and/or the Lease Contract.
    **Pest control is billed at $3.00 monthly. KCommon area electric and common area gas are billed RUBS per unit. The property's provider bills will be divided equally among occupied units to determine monthly per unit amounts. King County Sewer Capacity expenses are billed on RUBS per unit. The property's provider bills will be divided equally among all units to determine monthly per unit amounts.**

   _____
   _____
   _____
   _____
   _____
   _____
   _____
   _____
   _____
   _____
   _____
   _____
   _____
   _____
   _____
   _____

   | | | |
   |---|---|---|
   | Resident Signature | _____ | Date _____ |
   | Resident Signature | _____ | Date _____ |
   | Resident Signature | _____ | Date _____ |
   | Resident Signature | _____ | Date _____ |
   | Resident Signature | _____ | Date _____ |
   | Resident Signature | _____ | Date _____ |
   | Management | _____ | Date _____ |

© 2021, National Apartment Association, Inc.     Washington/National Apartment Association Official Form, April 2021     Page 2 of 2

Document digitally signed using RENTCafe eSignature services. Document ID: 4061807

# SUSTAINABLE LIVING ADDENDUM



1. **DWELLING UNIT DESCRIPTION.**
Unit No. _____**1606**_____, **205 Roy Street, Apt. 1606** _____ *(street address)* in _____**Seattle**_____ *(city)*, Washington, _____**98109**_____ *(zip code)*.

2. **LEASE CONTRACT DESCRIPTION.**
Lease Contract Date: **May 20, 2021**
Owner's name: **225 Roy LLC**
_____
_____
_____

Residents *(list all residents - leaseholders and occupants)*:
**Kimen Trochalakis**
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

Occupants:
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

This Addendum constitutes an Addendum to the above-described Lease Contract for the above-described premises and is hereby incorporated into and made a part of such Lease Contract. Where the terms or conditions found in this Addendum vary or contradict any terms or conditions found in the Lease Contract, this Addendum shall control.

3. **PURPOSE OF ADDENDUM.** This Addendum will provide requirements and guidelines that are beneficial to improve the quality of the Community's social, environmental, and economic impact for all. All Residents are required to sign this Addendum.

4. **ENERGY EFFICIENCY.** The following are guidelines recommended to reduce overall energy consumption and reduce electricity/gas expenses.

**Thermostat Settings.** During the winter months, Energy.gov (https://www.energy.gov/) recommends setting your thermostat to 68°F while you are awake and setting it lower while you are asleep or away from home. Considerations should be made for extremely cold temperatures as to avoid freezing pipes.

During the summer months, with central air conditioning, Energy.gov recommends setting the thermostat to 78°F while you are occupying the apartment and need cooling and setting the thermostat higher while you are away. Energy.gov recommends that you set your thermostat at as high a temperature as comfortably possible and ensure humidity control if needed.

Please note that the thermostat settings listed above are only recommended guidelines and that the appropriate thermostat setting will depend upon weather conditions and the size and layout of your unit.

**Lighting and Light Bulbs.** Use natural light when possible. Consider replacing standard incandescent light bulbs with energy-saving compact fluorescent light bulbs (CFLs) or light-emitting diodes (LEDs).

**Appliances.** We strongly encourage the use of appliances that have the ENERGY STAR label or other energy-efficient labeling.

**Conserve Electricity.** Consider unplugging chargers for power tools, mobile phones, laptops, televisions, and other electronic devices when not in use, or when you plan to be away from the apartment for an extended period of time.

5. **WATER EFFICIENCY – REQUIREMENTS AND SUGGESTIONS.** The following requirements and suggestions will help reduce overall water consumption at the Community.

**Requirements.**

- Residents are required to report leaks to owner immediately to prevent damage, conserve water, and manage water/sewer costs.

- The apartment may come equipped with water saving fixtures and appliances, including, but not limited to, showerheads, toilets, faucets, dishwashers, and washing machines. Residents are required to receive written approval from us prior to replacing or altering any of these fixtures/appliances.

**Suggestions.**

- Every drop counts! Turn off water when shaving, washing hands, and brushing your teeth.

- When doing laundry, also consider only washing full loads. When washing small loads, be sure to use the appropriate water level setting.

6. **WASTE AND RECYCLING – REQUIREMENTS AND SUGGESTIONS.** The following requirements and suggestions will help reduce overall waste consumption and reduce waste expenses.

**Requirements.**

- All Residents are required to dispose of waste and recyclables in the appropriate containers in accordance with the Owner's Rules and Regulations, in addition to any applicable local ordinances.

- Per common practice, the following materials are generally not recyclable: Styrofoam, window glass and mirrors, electronic waste (TVs and computers), motor oil containers, yard waste, chemicals, cleaning products or solutions, chemical containers, shredded paper, plastic bags, ceramics or dishes, food waste, scrap metal, monitors.

**Suggestions.**

- For materials that are not recyclable, we recommend finding ways to reduce and reuse those items. Visit https://www.plasticfilmrecycling.org for additional information.

- We encourage you to contact your local Waste Industries branch or recycling center to find a list of accepted materials for your recycling center.

© 2021, National Apartment Association, Inc. - 4/2021, Washington

Page 1 of 2

Document digitally signed using RENTCafe eSignature services. Document ID: 4061807

7. **INDOOR ENVIRONMENT AND WELLNESS.** The following are guidelines which promote the quality of the indoor environment and wellness:

- This Community ☒ is ☐ is not a smoke-free environment. If the Community is a smoke-free environment, then no smoking or vaping is allowed anywhere in the Community, at any time. Smoking refers to any use or possession of a cigar, cigarette, e-cigarette, hookah, vaporizer, or pipe containing tobacco or a tobacco product while that tobacco or tobacco product is burning, lighted, vaporized, or ignited, regardless of whether the person using or possessing the product is inhaling or exhaling the smoke from such product. The term tobacco includes, but is not limited to any form, compound, or synthesis of the plant of the genus Nicotiana or the species N. tabacum which is cultivated for its leaves to be used in cigarettes, cigars, e-cigarettes, hookahs, vaporizers, or pipes. Smoking also refers to use or possession of burning, lighted, vaporized, or ignited non-tobacco products if they are noxious, offensive, unsafe, unhealthy, or irritating to other persons. Please refer to the No-Smoking Addendum for further information.

- Owner provides common area cleaning using only products that have the Green Cleaning® seal or a similar green certification. Owner recommends that Residents also use like products in the cleaning of their units.

8. **SEVERABILITY.** If any provision of this Addendum to the Lease Contract is invalid or unenforceable under applicable law, such provision shall be ineffective to the extent of such invalidity or unenforceability only without invalidating or otherwise affecting the remainder of this Addendum to the Lease Contract. The court shall interpret the lease and provisions herein in a manner such as to uphold the valid portions of this Addendum to the Lease Contract while preserving the intent of the parties.

9. **SPECIAL PROVISIONS.** The following special provisions control over conflicting provisions of this printed form:

_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

**Resident or Residents**
*(All residents must sign)*

_____
_____
_____
_____
_____
_____

**Owner or Owner's Representative**
*(signs below)*

_____

**Date of Signing Addendum**

_____

© 2021, National Apartment Association, Inc. - 4/2021, Washington

Page 5 of 2

Document digitally signed using RENTCafe eSignature services. Document ID: 4061807

# THIRD PARTY BILLING REGULATION
# SEATTLE MUNICIPAL CODE (SMC) 7.25

**SMC 7.25.010 Short title and purpose.**

A. This chapter may be known and be cited as "Third Party Billing Regulation." The general purpose of this chapter is to prevent landlords, either themselves or through a third party billing agent, from billing tenants for master metered or other unmetered utility services without proper notice and disclosure of billing practices to tenants, and to protect tenants from deceptive or fraudulent billing practices, and to these ends the provisions of this chapter shall be liberally construed.

B. Nothing in this chapter shall be construed to prevent a landlord from including a tenant's cost of master metered or other unmetered utility services within the rent set forth in a rental agreement, and the practice of including such cost within a tenant's rent shall not be considered a billing practice or methodology affected by the provisions of this chapter.

C. Nothing in this chapter shall be construed to affect the practices used by Seattle Public Utilities or Seattle City Light to bill and collect residential multi-unit building owners or landlords for master metered or other unmetered utility service.

**SMC 7.25.020 Definitions.**
As used in this chapter:

A. "Billing entity" means the landlord or third party billing agent, as the case may be, responsible for billing residential multi-unit building tenants for master metered or other unmetered utility service.

B. "Disclosure" means providing tenants with complete and accurate written information in a clear, concise, and understandable manner in all notices required under this chapter and on each bill presented from the billing entity to tenants.

C. "Landlord" means a "landlord" as defined in and within the scope of RCW 59.18.030 and RCW 59.18.040 of the Residential Landlord Tenant Act of 1973 ("RLTA") in effect at the time the rental agreement is executed, and shall also mean the owner of a mobile home park or boat moorage. At the time of passage of the ordinance codified in this chapter, RLTA defined "landlord" as "the owner, lessor, or sublessor of the dwelling unit or the property of which it is a part," and included "any person designated as representative of the landlord."

D. "Master metered utility service" means a utility service supplied to more than one (1) unit in a multi-unit building and measured through a single inclusive metering system.

E. "Methodology" refers to any method, technique, or criterion used to apportion to tenants charges billed to the landlord by the utility for master metered utility service or unmetered utility service, including but not limited to Ratio Utility Billing Systems, installation of submetering, and hot water metering.

F. "Multi-unit building" refers to a residential building or group of buildings (which may include a mobile home park or boat moorage) with 3 or more tenant units with a master metered utility service or unmetered utility service, such as solid waste collection, that is provided to the building or group of buildings as a whole.

G. Personally identifiable information" means specific information about a tenant, including but not limited to the tenant's social security number, birth date, mother's maiden name, banking data or information, or any other personal or private information.

H. "Ratio Utility Billing System" or "RUBS" refers to any methodology by which the cost of master metered or other unmetered utility service provided to tenants and common areas of a multi-unit building is apportioned to tenants through the use of a formula that estimates the utility usage of each rental unit in the building based on the number of occupants in a unit, number of bedrooms in a unit, square footage of a unit, or any similar criterion.

I. "Rental agreement" means a "rental agreement" as defined in and within the scope of RCW 59.18.030 and RCW 59.18.040 of the RLTA in effect at the time the rental agreement is executed, and is deemed to include any month-to-month tenancy arrangement, whether written or oral. At the time of the passage of the ordinance codified in this chapter, the RLTA defined "rental agreement" as "all agreements which establish or modify the terms, conditions, rules, regulations, or any other provisions concerning the use and occupancy of a dwelling unit."

J. "Service charge" refers to any charge or fee imposed by the billing entity to cover the costs of providing or administering the billing practices, regardless of the label applied to such charge or fee.

Document digitally signed using RENTCafe eSignature services. Document ID: 4061807

K. "Tenant" means a "tenant" as defined in and within the scope of RCW 59.18.030 and RCW 59.18.040 of the RLTA in effect at the time the rental agreement is executed, and shall also mean a tenant of a mobile home park or boat moorage. At the time of passage of the ordinance codified in this chapter, the RLTA defined "tenant" as "any person who is entitled to occupy a dwelling unit primarily for living or dwelling purposes under a rental agreement."

L. "Billing practices" refers to the practices of a landlord or third party billing agent, as defined herein, that bills residential multi-unit building tenants for the purpose of apportioning master metered or other unmetered utility services provided to the building(s) as a whole, either by directly submetering tenants' usage or by otherwise apportioning such utility services among tenants, and also refers to any practices related thereto, including but not limited to collecting, using or disclosing tenants' personally identifiable information (other than name and address), attempting to collect unpaid amounts from tenants, verifying tenants' credit, and reporting unpaid balances to credit reporting agencies.

M. "Third party billing agent" refers to any entity retained or authorized by a landlord to bill tenants for master metered or other unmetered utility service on behalf of and as the agent of a landlord.

N. "Utilities" or "utility service(s)" refers to water, sewer, electric, and solid waste services.

**SMC 7.25.030 Prohibited billing practices.**
A. It is a deceptive and fraudulent business practice for any landlord or third party billing agent to bill tenants separately for utility services except as permitted in this chapter.

B. It is a deceptive and fraudulent business practice for a landlord to engage, retain, or authorize, and a landlord shall be liable for the actions of, a third party billing agent that does not comply with the requirements of this chapter.

C. As of the effective date of this ordinance, no landlord may disclose to a third party billing agent a tenant's personally identifiable information under any circumstances, provided, however, that nothing in this chapter shall prevent a landlord from disclosing a tenant's name and address to a third party billing agent for the purpose of engaging in permitted billing practices.

D. A third party billing agent who prior to the effective date of this ordinance has obtained any tenant's personally identifiable information (other than name and address) shall not use, sell, convey, or otherwise disclose that personally identifiable information to any other person, except as expressly permitted in this chapter, and must destroy all such information upon a tenant's request, when the tenancy terminates and the account is paid, or when the landlord terminates the third party billing agency relationship.

E. No third party billing agent may inform a credit reporting agency of a claim against a tenant except as expressly permitted in RCW Chapter 19.16, regardless of whether the third party billing agent is licensed by the state pursuant to that chapter.

**SMC 7.25.040 Billing requirements.**
A. Notwithstanding the prohibition against submetering electric service in SMC 21.49.100(G), a landlord may, itself or through a third party billing agent, bill tenants for master metered or other unmetered utility services, including electric service provided to tenants of multi-unit buildings, provided that the following requirements are met:

1. Notice. Billing practices may be adopted only upon advance written notice to a tenant as part of a new or renewed rental agreement. Tenants must receive such written notice at least 90 days before expiration of their rental agreements, or, in the case of month-to-month tenancies, at least 90 days before any such billing practices may become effective. Notwithstanding the foregoing two sentences, if billing practices are already in place at the time the ordinance codified in this chapter becomes effective, written notice must be given within 30 days of the effective date of the ordinance codified in this chapter.

2. Methodology. The notice required under section A.1 above must include a copy of this chapter and a detailed written disclosure of the methodology used by the billing agent to allocate the charges to each tenant, including the methodology used to allocate utility services for common areas of the building, along with all other terms and conditions of the billing arrangement. If submetering is used, the notice required under section A.1 shall also include descriptions of the location of the submeter and of the access requirements, if any, required by the landlord for access to tenant units for submeter installation, reading, repair, maintenance, or inspections, including removal of the submeter for testing, consistent with the provisions of RCW 59.18.150 of the RLTA. An additional written notice must also be given at least 30 days prior to the due date of the next rental payment in order to implement a change in billing agents, apportionment methodology, fees, or other terms and conditions of the billing arrangement.

Document digitally signed using RENTCafe eSignature services. Document ID: 4061807

3. Posting of Information.
   a. In addition to the written notification required by subsection A.2. above, any landlord employing billing practices shall post in a conspicuous public space in the interior of the building copies of the three most current utility bills for master metered or other unmetered utility services provided to the building as a whole that are included in the bill sent to the tenant, together with a written description of the methodology used to allocate each such utility service and a copy of this chapter.
   b. Where such posting is physically impracticable due to the absence of a suitable conspicuous public space, a landlord may satisfy this posting requirement by hand-delivering or mailing to tenants a paper copy of the written notification required by subsection A2, together with a written description of the methodology used to allocate each such utility service and a copy of this chapter. In lieu of posting the three most current utility bills for master metered or other unmetered utility services provided to the building as a whole that are included in the bill sent to the tenant, the landlord must make such utility bills available upon request within 5 business days and must inform tenants in the written notification required by subsection A.2 of the method by which they may request such utility bills.
   c. Landlords shall keep bills for master metered or other unmetered utility services on file in the building for at least two years and shall make such bills available to tenants for inspection and copying upon request. Where it is physically impracticable to keep such bills on file due to the absence of a suitable office or other storage space, a landlord may store the bills in another location and must make such bills available within 5 business days of receiving a request from a tenant.

4. Limitations on Charges. The total of all charges for any utility service included in the bills sent to all units cumulatively shall not exceed the amount of the bill sent by the utility itself for the building as a whole, less any late charges, interest or other penalties owed by the landlord, with the exception of the following, which may be included in each bill covering an independent unit within the multi-unit building:
   a. A service charge of no more than $2 per utility per month, not to exceed a cumulative service charge of $5 per month for all the utilities included in any bill.
   b. Late payment charges of no more than $5 per month plus interest at a rate not to exceed 1% per month, which late payment charge shall not accrue until at least 30 days after the tenant receives the bill.
   c. Insufficient funds check charges for dishonored checks, not to exceed $31 per dishonored check.

5. Licensing of Third Party Billing Agents. Any third party billing agent must be properly registered and licensed to do business in the State of Washington and City of Seattle and must be in compliance with all applicable Washington state and Seattle laws and regulations, and all applicable Washington and Seattle license identification numbers, if any, must be disclosed upon request.

6. Content of Bills. Each billing statement sent to a tenant by a billing entity must disclose all required information in a clear and conspicuous manner and at minimum must:
   a. Include the name, business address & telephone number of the billing entity;
   b. Identify and show the basis for each separate charge, including service charges and late charges, if any, as a line item, and show the total amount of the bill;
   c. If the building units are submetered, include the current and previous meter readings, the current read date, and the amount consumed (or estimated to have been consumed if Seattle Public Utilities or Seattle City Light has provided the landlord with an estimated bill);
   d. Specify the due date, the date upon which the bill becomes overdue, the amount of any late charges or penalties that may apply, and the date upon which such late charges or penalties may be imposed;
   e. Identify any past due dollar amounts;
   f. Identify a mailing address and telephone number for billing inquiries and disputes, identify the entity responsible for resolving billing inquiries and disputes and its business hours and days of availability, and describe the process used to resolve disputes  related to bills as set forth in this chapter; and
   g. Include a statement to the effect that "this bill is from (landlord name) and not from Seattle Public Utilities or Seattle City Light."

7. Protection of Personally Identifiable Information.
   a. A third party billing agent who prior to the effective date of this ordinance has obtained a tenant's personally identifiable information shall take such actions as are necessary to protect such personally identifiable information and to prevent its use or disclosure except as expressly permitted in this chapter.
   b. A third party billing agent who prior to the effective date of this ordinance has obtained a tenant's personally identifiable information may disclose such personally identifiable information only to the extent necessary to render its billing services.
   c. To the extent required by federal, state, or local law, a billing entity may disclose personally identifiable information in its possession (i) pursuant to a subpoena or valid court order authorizing such disclosure, or (ii) to a governmental

Document digitally signed using RENTCafe eSignature services. Document ID: 4061807

8.  Estimated Billing. If Seattle Public Utilities or Seattle City Light has billed the landlord using an estimate of utility service consumed, the billing agent may estimate the charges to be billed to tenants until billing based on actual consumption resumes. Upon receipt of a corrected bill showing that the estimated bill overstated charges, the landlord must refund the difference to tenants. Upon receipt of a corrected bill showing that the estimated bill understated charges, the landlord may attempt to recover the underpayment from the tenants that actually incurred the charges during the billing period, but shall not attempt to recover an underpayment from a tenant who did not reside in the unit during the billing period in which the charges were incurred.

9.  Submetering. Submetering is permitted as a way of allocating master metered utility services to tenants provided the following conditions are met:
    a.  The submeters must be read prior to each billing.
    b.  A landlord may not enter a unit without, and a tenant may not unreasonably withhold, consent to enter the unit in order to perform submeter installation, reading, repair, maintenance, and inspection, including removal of the submeter for testing, provided, however, that a landlord may enter a unit without a tenant's consent in the case of a submeter leak or emergency related to that unit's submeter.
    c.  If a tenant contests the accuracy of the submeter, the tenant shall have the option of demanding an independent test of the meter through the Consumer Affairs Division of the Department of Executive Administration. If the meter reads within a 5% range of accuracy, the tenant requesting the test shall pay the cost of the meter test. If the meter reads outside a 5% range of accuracy, the landlord shall pay for the cost of the meter test and within 30 days refund any overpayments for the past three months based on a recalculation of the past year's billings by correcting for the inaccuracy of the submeter. Submetering thereafter shall only be permitted with a repaired submeter.

B.  Nothing in this section shall be construed to prevent a landlord from addressing billing of master metered or other unmetered utility services in a written addendum to a lease. A lease addendum may be used to give the notice required under subsection A.1 of this subsection, so long as the lease addendum is provided to the tenant with the notice required under that subsection, and so long as all other requirements of this chapter are satisfied.

**SMC 7.25.050 Dispute resolution and remedies.**
A.  A dispute regarding the amount of charges or other terms and conditions contained in a bill shall be resolved as follows:
    1.  The tenant must notify the entity responsible for billing disputes as identified in the bill ("Responsible Entity") of the nature of and reason for the dispute by calling the number shown on the bill or by writing a letter to the Responsible Entity within 30 days of receiving the bill. The tenant must have a good faith basis for any such dispute.
    2.  Within 30 days of receiving notice of a billing dispute, the Responsible Entity must contact the tenant to discuss the dispute, and the Responsible Entity and tenant must determine the amount of disputed and undisputed charges. The tenant must pay all undisputed charges within 30 days of reaching agreement with the Responsible Entity.
    3.  No late fees or interest charges shall accrue on any disputed portions of a bill while the amount is being resolved in accordance with subsections A.1 and 2, and no collection activity related to the disputed portions of a bill may be instituted against a tenant that has notified the Responsible Entity of a dispute in accordance with this chapter.
    4.  The tenant and Responsible Entity shall continue to discuss in good faith any remaining disputed amounts and attempt to reach an agreement on the amount due, if any, within 60 days of the Responsible Entity's receipt of notice of a billing dispute. If a tenant is unable to reach a satisfactory resolution of any portion of a disputed charge within the allotted time, the tenant may exercise any of the remedies set forth in Section B below or any other available remedies, provided, however, that if within 120 days of the Responsible Entity's receipt of notice of a billing dispute, the tenant has not either exercised one of the remedies set forth in Section B or paid the remaining disputed amounts, the landlord may exercise any legal or equitable remedies available to it to collect the unpaid amounts, and provided further that nothing in this subsection shall be construed to deprive a landlord of its right to exercise any legal or equitable remedies available to it against a tenant that has not paid any undisputed charges, has not followed the procedures set forth in this section, or has not exercised good faith in disputing a charge.

B.  If a tenant believes that it has been or will be subject to billing practices that violate any provision set forth in this chapter, the tenant may, at its option, file a complaint against the landlord with the Office of the Hearing Examiner or institute a civil action against the landlord, as follows:
    1.  The Office of the Hearing Examiner is hereby vested with the authority to hear and resolve tenant complaints against landlords regarding billing practices in accordance with its rules and procedures then in force governing contested cases. The filing fee for such a case shall be set at $5.00. Upon the finding of a violation of this chapter, the Hearing Examiner shall award actual damages (including but not limited to refund of any overpayment or other fees or charges resulting from such violation, and costs of pursuing the claim) and a penalty of one hundred dollars, and may permit the tenant to terminate the rental agreement by written notice in accordance with RCW 59.18.090. If the Hearing Examiner determines that the landlord engaged in prohibited billing practices in deliberate violation of this chapter, the penalty mentioned in the preceding sentence shall be two hundred dollars, and the Hearing Examiner shall also

Document digitally signed using RENTCafe eSignature services. Document ID: 4061807

award attorneys' fees to the tenant. A final order or decision of the Hearing Examiner may be subject to judicial review in the King County Superior Court in accordance with the Hearing Examiner's rules and procedures.

2. In the alternative, a tenant may institute a civil action against the landlord. Upon a finding that a landlord engaged in billing practices that violate this chapter, the court shall award actual damages (including but not limited to refund of any overpayment or other fees or charges resulting from such violation, and costs of pursuing the claim) and a penalty of one hundred dollars, and may permit the tenant to terminate the rental agreement by written notice in accordance with RCW 59.18.090. If the court determines that the landlord engaged in prohibited billing practices in deliberate violation of this chapter, the penalty mentioned in the preceding sentence shall be two hundred dollars, and the court shall also award attorneys' fees to the tenant.

3. No late fees or interest charges shall accrue on any disputed portions of a bill while the amount is being resolved by the Hearing Examiner or court, and no collection activity or unlawful detainer action alleging default in the payment of rent related to the disputed portions of a bill may be instituted against a tenant that has filed a complaint with the Hearing Examiner or instituted a civil action in accordance with this chapter while the amount is being resolved by the Hearing Examiner or court. If the Hearing Examiner or court resolves the dispute and finds that a tenant that has not acted in good faith in asserting a billing dispute, the Hearing Examiner or court may order the tenant to pay late fees and/or interest charges on some or all of the disputed portions of the bill.

4. A landlord shall not pass on, charge, or otherwise allocate to tenants, in any manner whatsoever, any damages, fine or penalty (including attorneys' fees) that the landlord is ordered to pay under this chapter.

C. The existence of an unresolved or pending billing dispute does not relieve a tenant of its obligation to pay in a timely fashion all undisputed charges, including those undisputed charges that accrue after the dispute resolution procedures of this chapter have been invoked.

Document digitally signed using RENTCafe eSignature services. Document ID: 4061807



# LEASE ADDENDUM
## LIABILITY INSURANCE REQUIRED OF RESIDENT

1. **Addendum.** This is an addendum to the Lease Contract between you and Owner.

2. **Acknowledgment Concerning Insurance or Damage Waiver.** You acknowledge that we do not maintain insurance to protect you against personal injury, loss or damage to your personal property or belongings, or to cover your own liability for injury, loss or damage you (or your occupants or guests) may cause others. You also acknowledge that by not maintaining your own policy of personal liability insurance, you may be responsible to others (including us) for the full cost of any injury, loss or damage caused by your actions or the actions of your occupants or guests. You understand that paragraph 8 of the Lease Contract requires You to maintain a liability insurance policy, which provides limits of liability to third parties in an amount not less than $ 100,000 per occurrence. You will ensure that the liability insurance policy identifies this apartment community, C/O Avenue5, P.O. Box 979138, Miami, FL. 33197-9138 as a "Party of Interest" or "Interested Party" (or similar language as may be available). You understand and agree to maintain at all times during the Term of the Lease Contract and any renewal periods, a policy of personal liability insurance with this limit and otherwise satisfying the requirements listed below, at your sole expense.

3. **Required Policy.** You are required to purchase and maintain personal liability insurance covering you, your occupants and guests, for personal injury and property damage any of you cause to third-parties (including damages to our property), with the minimum policy coverage amount set forth in paragraph 2 above, from a carrier with an AM Best rating of A-VII or better, authorized to issue such insurance in (state). The Carrier must provide notice to us within 30 days of any cancellation, non-renewal, or material change in your coverage. We retain the right to hold you responsible for any loss in excess of your insurance coverage.

4. **No Solicitation.** Unless otherwise acknowledged in writing, you acknowledge that we have made no solicitations, guarantees, representations, or promises whatsoever concerning any insurance or services provided by any insurance company. You were and are free to contract for the required insurance with the provider of

your choosing so long as that provider comports with the requirements of paragraph 3 above.

5. **Subrogation Allowed.** You and we agree that subrogation is allowed by all parties and that this agreement supersedes any language to the contrary in the Lease Contract. Accordingly, our insurance carrier may sue you for losses it pays as a result of your negligence, and your insurance carrier may sue us for losses it pays as a result of our negligence.

6. **Your Insurance Coverage.** By signing this addendum, you acknowledge that you have purchased (or will purchase) the insurance described in paragraphs 2 and 3, and that you will provide written proof of this insurance to on-site staff prior to taking possession of the apartment. You further acknowledge that you will keep this insurance policy in-force for the entire term of the lease and provide written proof of active renter's liability coverage upon request. If any material terms of your insurance policy change, you agree to promptly provide proof of the modified policy terms to the on-site staff. For the purposes of this paragraph, either the written policy itself or the declaration page to the policy shall constitute written proof.

7. **Default.** Unless otherwise prohibited by law, any default under the terms of this Addendum shall be deemed an immediate, material and incurable default under the terms of the Lease Contract, and we shall be entitled to exercise all rights and remedies under the law. If you allow your outside policy to expire or cancel, you will be in default under the terms of your lease. If you fail to provide written proof of insurance as required by paragraph 6, we reserve the right to procure coverage to address the deficiency and you agree to reimburse us for the cost of such insurance. The monthly insurance charge is due in full each month with your rental payment. The insurance carrier will issue a policy to you via mail, naming you as the certificate holder or as the insured party. You will also receive a policy in the mail as evidence of your enrollment into the program. We may continue to charge you for such insurance coverage until such time as you provide proof of insurance pursuant to paragraph 6.

8. **Miscellaneous.** Except as specifically stated in this Addendum, all other terms and conditions of the Lease Contract shall remain unchanged. In the event of any conflict between the terms of this Addendum and the terms of the Lease Contract, the terms of this Addendum shall control.

### IMPORTANT DISCLOSURES – READ CAREFULLY BEFORE SIGNING

1. The insurance required by the Lease Contract is not required by any law. Your obligation to provide insurance stems solely from the Lease Contract.
2. The insurance required by the Lease is not an attempt to limit the Owner's liability for its own negligence or your liability for your own negligence.
3. Owner may be receiving remuneration from insurance companies where permitted by law. Avenue5 Insurance LLC, a licensed affiliate of the property manager, may also receive compensation on policies issued by some insurance companies for administrative or marketing support.
4. The insurance required by the Lease Contract is not in lieu of, or in any way a component of, the security deposit required by the Lease Contract.
5. You understand that every term of the agreement between you and the Owner is set forth in the Lease Contract, any addenda thereto, and in the Rules and Regulations which collectively constitute the entire agreement between you and the Owner. There are no other terms except those which may be implied by law.
6. You agree that you have not received any oral representations from Owner or any representative of Owner which are inconsistent with or not contained in the Lease Contract, the addenda attached to the Lease Contract, or in the Rules and Regulations. If you have received any such oral representations, you agree that you did not rely on them to decide to enter in the Lease Contract or this Addendum.
7. You understand that the liability-only insurance we may procure on your behalf in the event of your default may cost more than similar insurance you can purchase on your own. You also understand that this liability-only insurance purchased on your behalf is limited in scope and may not fully protect your interests.
8. If Avenue5 Residential LLC no longer manages this community in the future, the liability insurance may terminate and may not transfer to the new management company. Regardless, the insurance company will provide you notice of such occurrence.

Resident or Residents
*[All residents must sign here]*

Owner or Owner's Representative
*[signs here]*

_____

_____

_____

_____

Date of Lease Contract
05/20/2021

Document digitally signed using RENTCafe eSignature services. Document ID: 4061807



## POINT OF LEASE ADDENDUM
## LIABILITY INSURANCE REQUIRED OF RESIDENT

To satisfy this requirement, you may provide your own insurance coverage by purchasing an annual term policy from an insurance agent or insurance carrier of your choice and providing us with a copy of the policy prior to move-in.

If you choose not to purchase your own insurance coverage, you have the option to obtain coverage under a group liability insurance policy issued by an insurance carrier we have partnered with. As a resident of this property, you automatically qualify for this coverage with no underwriting or credit application. Participation in this program allows you to conveniently pay the insurance charges with your monthly rent.

**Please initial one of the boxes below indicating how you will meet the lease's insurance requirement.**

_____ I have purchased an annual term renter's insurance policy from the carrier of my choice and have provided a copy or other satisfactory evidence to the leasing representative.

     Insurance Provider: _____

     Policy Number: _____

     Policy Expiration Date: _05/21/2021_____

_____ I have not purchased an annual term policy and agree to participate in the group insurance program (Point of Lease Insurance) that meets the lease's insurance requirement. I understand that I will be billed a $**14.50** monthly charge with my rent to cover the costs of securing coverage. The insurance company will issue and send a certificate of insurance to me that will fully describe the limits, conditions and terms of the coverage provided. I have been provided the insurance company's brochure and/or website that describes the general terms of this group insurance program, and I hereby agree to and accept such terms. I understand that Point of Lease Insurance covers my personal liability and includes $10,000 of coverage for my personal property.

### IMPORTANT DISCLOSURES – READ CAREFULLY BEFORE SIGNING

1. **If you have an annual renter's insurance policy and decide to switch to the Point of Lease Insurance, please compare the terms of coverage between the two policies, as not all policies are the same and coverage may differ.**
2. **If we no longer manage this community in the future, the Point of Lease Insurance may terminate and may not transfer to the new management company. Regardless, the insurance company will provide you notice of such occurrence. To maintain coverage after this occurs, you are strongly encouraged to purchase renter's insurance through the carrier or agent of your choice.**
3. **By providing certain marketing and administrative functions on behalf of the insurance carrier, the Property Owner (or one of its affiliates) may have a financial interest in placement of insurance under the above-described group program.**

Document digitally signed using RENTCafe eSignature services. Document ID: 4061807



**ELECTRONIC PAYMENTS ADDENDUM  OR/WA**

DATE 05/20/2021_____    PROPERTY NAME/NUMBER 225 Roy LLC_____
RESIDENT NAME(s) Kimen Trochalakis_____
UNIT NUMBER 1606_____    STREET ADDRESS 205 Roy Street, Apt. 1606_____
CITY **Seattle**_____    STATE **WA**____ ZIP 98109_____

This Addendum constitutes an Addendum to that Rental Agreement entered into by and between the Landlord and Tenant on 05/20/2021_____ (date) for the premises commonly known as 205 Roy_____ Street, Apt. 1606,_____ (address) at **Center Steps**_____ Apartments. Where the terms or conditions found in this Addendum vary or contradict any terms or conditions found in the Rental Agreement, this Addendum shall control.

All amounts due Landlord are payable to 225 Roy LLC_____
_____ [*name of person or entity, street address and telephone number*].  Payment must be made by: **ACH (details below)** or ☒ Cashiers Check ☒ Money Order

The normal hours available to make payments in person are from 9:00 AM_____ to 6:00 PM_____, on all non-holiday ☒ Weekdays, 9:00 AM_____ to 6:00 PM_____ on Saturdays, and 9:00 AM_____ to 6:00 PM_____ on Sundays. ☐ *(If checked)* A twenty-four hour, seven days a week rent payment drop box is available at the address above.

**PAYMENT BY "ACH" DEBIT IS STRONGLY ENCOURAGED:** Landlord strongly encourages that Tenant make all payments of rent, together with any utility charges and/or other charges, of any nature whatsoever, by Automated Clearing House ("ACH") debit.

**AUTOMATIC DEBIT FORM:** If Tenant wants to make payments by ACH, Resident will complete an automatic debit form provided by Landlord authorizing Landlord to establish arrangements for the transfer of payments from Resident to Landlord by ACH debit(s) initiated by Landlord from an account in the name of Resident established at a United States bank.

**TIMING OF PAYMENT:** For purposes of determining the timing of Resident's ACH payment(s) to Landlord, Resident shall be deemed to have paid Landlord upon receipt of the Resident's funds in Landlord's bank account.

**REFUSAL OF TENDER(S):** Notwithstanding the foregoing ACH debit (payment) procedures, Landlord may, at its sole option, refuse any amount tendered by Resident (a) that is or has been tendered late, (b) that constitutes a partial payment of debts, (c) constitutes a payment of rent past any existing termination date, and/or (d) for any other lawful reason whatsoever.

**DEFAULT BY RESIDENT:** In the event that Landlord is unable, through no fault of Landlord or its bank, to successfully receive and/or process any ACH debit hereunder, Resident shall be deemed not to have paid Landlord, and Landlord shall be deemed not to have received, such payment from Resident. If, for any reason, an ACH debit is later returned for nonsufficient funds, or for any other reason, Resident shall be deemed to have defaulted in the tender of said debit/payment.  If any electronic payment to Landlord is declined, reversed or results in a "charge back," Tenant will be responsible for the full

Document digitally signed using RENTCafe eSignature services. Document ID: 4061807



amount of the unpaid amount, late fees and any additional cost to Landlord. Additionally, Landlord will retain all rights and remedies, including the right to terminate Tenant's tenancy.

Occupant: **Kimen Trochalakis**

By: _____
(Occupant Signature)

Date: _____


Occupant: _____

By: _____
(Occupant Signature)

Date: _____


Occupant: _____

By: _____
(Occupant Signature)

Date: _____


Occupant: _____

By: _____
(Occupant Signature)

Date: _____


Landlord: _____

By: _____
(Authorized Signature)

Date: _____

Document digitally signed using RENTCafe eSignature services. Document ID: 4061807

# SEATTLE - RESIDENT PARKING ADDENDUM



Date: _____ **May 20, 2021** _____
(when this Addendum is filled out)

## 1. DWELLING UNIT DESCRIPTION.

Unit No. _____ **1606** _____, **205 Roy Street,**
**Apt. 1606** _____
_____ *(street address)* in
_____ **Seattle** _____
*(city)*, Washington, _____ **98109** _____ *(zip code)*.

## 2. LEASE CONTRACT DESCRIPTION.

Lease Contract Date: **May 20, 2021** _____
Owner's name: **225 Roy LLC** _____
_____
_____
_____

Residents *(list all residents)*:

**Kimen Trochalakis** _____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

The term of this Parking Addendum is as follows:
Begins on _____ **April 3rd** ____, ____ **2021** ____ and
ending on _____ **October 2nd** ____, ____ **2022** ____.

This Addendum constitutes an Addendum to the above described Lease Contract for the above described premises, and is hereby incorporated into and made a part of such Lease Contract. Where the terms or conditions found in this Addendum vary or contradict any terms or conditions found in the Lease Contract, this Addendum shall control.

## RESIDENT AND OWNER AGREE AS FOLLOWS:

**3.** You agree to properly register all vehicles with management. If you get a new or replacement vehicle you must notify us and complete a revised agreement. If you fail to do so, your unregistered vehicle may be towed at your sole expense.

**4.** If you are provided with a parking tag or sticker it must be properly installed and displayed, and any vehicle without a properly displayed tag or sticker is subject to tow.

**5.** Unless your vehicle(s) has been assigned a specific space(s) you may park in any available space(s) in the parking areas, with the exception of spaces reserved for a particular use or any marked handicap space, unless you posses a government issued handicap decal or similar signage.

**6.** If you are assigned a specific parking space(s) we shall assign you the space(s) and retain the right to change assigned spaces at our sole discretion with thirty (30) days written notice, even during a lease term.

**7.** You understand and accept that we have the right at any time, without notice, to tow unauthorized or non-registered vehicles from any parking space on the property.

**8.** You agree to use parking spaces in accord with the terms of the Lease and Community Rules.

**9.** Any vehicles which are improperly parked or are in violation of this addendum, the terms of the Lease or Community Rules will be towed at your expense. You agree that, to the greatest extent allowed by law, we shall not be liable to you for damages related to the physical towing nor any consequential damages you may incur through loss of use of the vehicle(s).

**10.** Parking spaces may not be used for storage of vehicles. Your vehicle(s) must be moved every _____ **7** _____ days, including vehicles parked in all guest or handicapped spaces. If you have a reserved parking space, or a garage, you are required to use that space, or your garage, first.

**11.** You understand that we will not be held liable for any damage or theft that may occur while your vehicle(s) is parked on any part of the property. Upon signing this agreement you knowingly accept the risk of parking any vehicle(s) on the property.

**12.** Any action by you, any occupant, guest, or visitor that violates this addendum shall constitute a material violation of the Lease Contract.

**13.** You understand and agree that any judgment of possession entered against you shall be a judgment for possession of any parking spaces which you are entitled to under this addendum. Once such judgment is rendered and executed upon you, you shall immediately remove all vehicles from the property parking areas. If you fail to remove your vehicle(s), we shall tow the vehicle(s) at your expense. You agree that we shall not be liable to you for damages related to the physical towing nor any consequential damages you may incur through loss of use of the vehicle(s).

## COST FOR PARKING:

Resident agrees to pay $_____ monthly per vehicle due on or before the _____ **1st** _____ day of the month. If no amount is filled in parking shall be free for properly registered and authorized vehicles.

Resident understands and accepts that all-parking rights and privileges will immediately be revoked in the case that Resident is _____ **30** _____ days delinquent in paying the required parking fee.

Resident agrees to pay $_____ **75.00** _____ NSF fee for all checks returned for non-sufficient funds.

## VEHICLE INFORMATION:

### Vehicle 1
Make: _____
Model & Year: _____
State: _____
License Plate: _____
Permit Number: _____
Phone Number: _____
Parking Space: _____

### Vehicle 2
Make: _____
Model & Year: _____
State: _____
License Plate: _____
Permit Number: _____
Phone Number: _____
Parking Space: _____

### Vehicle 3
Make: _____
Model & Year: _____
State: _____
License Plate: _____
Permit Number: _____
Phone Number: _____
Parking Space: _____

©2016, National Apartment Association, Inc. - 9/2016, Washington

Page 1 of 2

Document digitally signed using RENTCafe eSignature services. Document ID: 4061807

14. **SPECIAL PROVISIONS.**

<u>There is a $25 replacement fee for any</u>
<u>lost, damaged, or stolen, parking tag or</u>
<u>permit.</u>

 

**Resident or Residents**
*(All residents must sign)*

 

**Owner or Owner's Representative**
*(Signs below)*

**Date of Signing Addendum**

Page 2 of 2

© 2018, National Apartment Association, Inc.
Washington/National Apartment Association Official Form, September 2018.

Document digitally signed using RENTCafe eSignature services. Document ID: 4061807

# SEATTLE - LEASE CONTRACT ADDENDUM FOR
# ENCLOSED GARAGE, CARPORT, OR STORAGE UNIT



**1. DWELLING UNIT DESCRIPTION.**
Unit No. **1606**, **205 Roy Street,**
**Apt. 1606**
_____ *(street address)* in
**Seattle**
*(city)*, Washington, **98109** *(zip code)*.

**2. LEASE CONTRACT DESCRIPTION.**
Lease Contract Date: **May 20, 2021**
Owner's name: **225 Roy LLC**
_____
_____
_____

Residents *(list all residents)*:
**Kimen Trochalakis**
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

This Addendum constitutes an Addendum to the above described Lease Contract for the above described premises, and is hereby incorporated into and made a part of such Lease Contract. Where the terms or conditions found in this Addendum vary or contradict any terms or conditions found in the Lease Contract, this Addendum shall control.

**3. GARAGE, CARPORT, OR STORAGE UNIT.** You are entitled to exclusive possession of: *(check as applicable)*
❏ garage or carport attached to the dwelling;
☒ garage space number(s) _____ ;
☒ carport space number(s) _____ ; and/or
❏ storage unit number(s) _____ .
All terms and conditions of the Lease Contract apply to the above areas unless modified by this addendum.

**4. SECURITY DEPOSIT.** An additional security deposit of $ _____ will be charged for the checked areas above. We will consider this additional security deposit part of the general security deposit for all purposes. The security deposit amount in the Security Deposit paragraph of the Lease Contract *(check one)* ❏ does or ☒ does not include this additional deposit amount. This deposit is a general deposit and is not limited in use to damages caused within the checked areas above, and is subject to forfeiture as a general deposit.

**5. ADDITIONAL MONTHLY RENT.**
You will pay $ **0.00** as additional monthly charges for the item(s) checked above. The monthly rent amount in the Rent and Charges paragraph of the Lease Contract does not include this additional rent.

**6. USE RESTRICTIONS.** Garage or carport may be used only for storage of operable motor vehicles unless otherwise stated in our rules or community policies. Storage units may be used only for storage of personal property. No one may sleep, cook, barbeque, or live in a garage, carport, or storage unit. Persons not listed as a resident or occupant in the Lease Contract may not use the areas covered by this Addendum. No plants may be grown in such areas.

**7. NO DANGEROUS ITEMS.** Items that pose an environmental hazard or a risk to the safety or health of other residents, occupants, or neighbors in our sole judgment or that violate any government regulation may not be stored. Prohibited items include fuel (other than in a properly capped fuel tank of a vehicle or a closed briquette lighter fluid container), fireworks, rags, piles of paper, or other material that may

create a fire or environmental hazard. We may remove from such areas, without prior notice, items that we believe might constitute a fire or environmental hazard. Because of carbon monoxide risks, you may not run the motor of a vehicle inside a garage unless the garage door is open to allow fumes to escape.

**8. NO SMOKE, FIRE, OR CARBON MONOXIDE DETECTORS.** No smoke, fire, or carbon monoxide detectors will be furnished by us unless required by law.

**9. GARAGE DOOR OPENER.** If an enclosed garage is furnished, you ☒ will ❏ will not be provided with a ☒ garage door opener and/or ❏ garage key. You will be responsible for maintenance of any garage door opener, including battery replacement. Transmitter frequency settings may not be changed on the garage door or opener without our prior written consent.

**10. SECURITY.** Always remember to lock any door of a garage or storage unit and any door between a garage and the dwelling. When leaving, be sure to lock all keyed deadbolt locks.

**11. INSURANCE AND LOSS/DAMAGE TO YOUR PROPERTY.** You will maintain liability and comprehensive insurance coverage for any vehicle parked or stored. We are not responsible for pest control in such areas.

**12. COMPLIANCE.** As allowed by law, we may periodically open and enter garages and storerooms to ensure compliance with this Addendum. In the event we enter the garage or storerooms, we will comply with the notice provisions set forth in the Lease Contract.

**13. NO LOCK CHANGES, ALTERATIONS, OR IMPROVEMENTS.** Without our prior written consent, locks on doors of garages and storage units may not be rekeyed, added, or changed, and improvements, alterations, or electrical extensions or changes to the interior or exterior of such areas are not allowed. You may not place nails, screws, bolts, or hooks into walls, ceilings, floors, or doors. Any damage not caused by us or our representatives to areas covered by this Addendum will be paid for by you.

**14. MOVE-OUT AND REMEDIES.** Any termination of tenancy shall automatically terminate any right of storage or parking without further notice required. Any items remaining after you have vacated the dwelling will be removed, sold, or otherwise disposed of according to the Lease Contract, which addresses disposition or sale of property left in an abandoned or surrendered dwelling. All remedies in the Lease Contract apply to areas covered by this addendum.

**15. SPECIAL PROVISIONS.** The following special provisions control over conflicting provisions of this printed form:
**Garages must be used for parking only.**
**Garages cannot be used for storage of**
**personal items. A $100.00 fee will be**
**charged for lost garage door openers. Your**
**deposit will be reduced by $100.00 if**
**garage remote is not returned upon move**
**out.**
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

©2018, National Apartment Association, Inc. - 9/2018, Washington
Document digitally signed using RENTCafe eSignature services. Document ID: 4061807

Page 1 of 2

**Resident or Residents**
*(All residents must sign here)*

**Owner or Owner's Representative**
*(Signs here)*

_____

_____

_____

**Date of Lease Contract**

_____

May 20, 2021

_____

_____

_____

© 2018, National Apartment Association, Inc.

Washington/National Apartment Association Official Form, September 2018.

Document digitally signed using RENTCafe eSignature services. Document ID: 4061807

# SEATTLE - LEASE ADDENDUM
## FOR REMOTE CONTROL, CARD, OR CODE ACCESS GATE



**1. DWELLING UNIT DESCRIPTION.**
Unit No. **1606** , **205 Roy Street,**
**Apt. 1606**
_____ *(street address)* in
**Seattle**
*(city)*, Washington, **98109** *(zip code).*

**2. LEASE CONTRACT DESCRIPTION.**
Lease Contract Date: **May 20, 2021**
Owner's name: **225 Roy LLC**
_____
_____
_____

Residents *(list all residents)*:
**Kimen Trochalakis**
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

This Addendum constitutes an Addendum to the above described Lease Contract for the above described premises, and is hereby incorporated into and made a part of such Lease Contract. Where the terms or conditions found in this Addendum vary or contradict any terms or conditions found in the Lease Contract, this Addendum shall control.

**3. REMOTE CONTROL/CARDS/CODE FOR GATE ACCESS.**
☒ **Remote control for gate access.** Each person who is listed as a resident on the lease will be given a remote control at no cost to use during his or her residency.

☐ **Cards for gate access.** Each person who is listed as a resident on the lease will be given a card at no cost to use during his or her residency.

☐ **Code for gate access.** Each resident will be given, at no cost, an access code (keypad number) for the pedestrian or vehicular access gates. It is to be used only during your residency. We may change the access code at any time and will notify you of any such changes.

**4. DAMAGED, LOST OR UNRETURNED REMOTE CONTROLS, CARDS OR CODE CHANGES.**
☒ If a remote control is lost, stolen or damaged, a $ **100.00** fee will be charged for a replacement. If a remote control is not returned or is returned damaged when you move out, there will be a $ **100.00** deduction from the security deposit.

☐ If a card is lost, stolen or damaged, a $ _____ fee will be charged for a replacement card. If a card is not returned or is returned damaged when you move out, there will be a $ _____ deduction from the security deposit.

☐ We may change the code(s) at any time and notify you of such changes.

**5. REPORT DAMAGE OR MALFUNCTIONS.** Please immediately report to the office any malfunction or damage to gates, fencing, locks or related equipment.

**6. FOLLOW WRITTEN INSTRUCTIONS.** We ask that you and all other occupants read the written instructions that have been furnished to you regarding the access gates. This is important because if the gates are damaged by you or other occupants, guests or invitees through negligence or misuse, you are liable for the damages under your lease, and collection of damage amounts will be pursued.

**7. PERSONAL INJURY AND/OR PERSONAL PROPERTY DAMAGE.** Except as specifically required by law, we have no duty to maintain the gates and cannot guaranty against gate malfunctions. We make no representations or guarantees to you concerning security of the community. Any measures, devices,or activities taken by us are solely for the benefit of us and for the protection of our property and interests, and any benefit to you of the same is purely incidental. Anything mechanical or electronic is subject to malfunction. Fencing, gates or other devices will not prevent all crime. No security system or device is foolproof or 100 percent successful in deterring crime. Crime can still occur. Protecting residents, their families, occupants, guests and invitees from crime is the sole responsibility of residents, occupants and law enforcement agencies. You should first call 911 or other appropriate emergency police numbers if a crime occurs or is suspected. We are not liable to any resident, family member, guest, occupant or invitee for personal injury, death or damage/loss of personal property from incidents related to perimeter fencing, automobile access gates and/or pedestrian access gates. We reserve the right to modify or eliminate security systems other than those statutorily required. You will be held responsible for the actions of any persons to whom you provide access to the community.

**8. RULES IN USING VEHICLE GATES.**

- Always approach entry and exit gates with caution and at a very slow rate of speed, and wait for gate to stop moving before proceeding under it.

- Never stop your car where the gate can hit your vehicle as the gate opens or closes.

- Never follow another vehicle into an open gate. Always use your card to gain entry.

- Report to management the vehicle license plate number of any vehicle that piggybacks through the gate.

- Never force the gate open with your car.

- Never get out of your vehicle while the gates are opening or closing.

- If you are using the gates with a boat or trailer, please contact management for assistance. The length and width of the trailer may cause recognition problems with the safety loop detector and could cause damage.

- Do not operate the gate if there are small children nearby who might get caught in it as it opens or closes.

- If you lose your card, please contact the management office immediately.

- Do not give your card or code to anyone else.

- Do not tamper with gate or allow your occupants to tamper or play with gates.

©2016, National Apartment Association, Inc. - 9/2016, Washington
Page 1 of 2

Document digitally signed using RENTCafe eSignature services. Document ID: 4061807

**9. SPECIAL PROVISIONS.** The following special provisions control over conflicting provisions of this printed form:

<u>Only one (1) additional FOB is allowed per</u>
<u>apartment home at a $100.00 fee. If FOB is</u>
<u>not returned upon end of lease term a</u>
<u>charge of $100.00 will be applied to move</u>
<u>out charges. Only one (1) remote is</u>
<u>allowed per parking space.</u>

|  |  |
|---|---|
| **Resident or Residents** | **Owner or Owner's Representative** |
| *(All residents must sign here)* | *(Signs here)* |

|  |  |
|---|---|
|  | **Date of Lease Contract** |
|  | May 20, 2021 |

Page 2 of 2                                      © 2018, National Apartment Association, Inc.
Washington/National Apartment Association Official Form, September 2018.

Document digitally signed using RENTCafe eSignature services. Document ID: 4061807



Date: _____ **May 20, 2021** _____
(when this Addendum is filled out)

> *Please note: We consider animals a serious responsibility and a risk to each resident in the dwelling. If you do not properly control and care for your animal, you'll be held liable if it causes any damage or disturbs other residents.*

*In this document, the terms "you" and "your" refer to all residents listed below and all occupants or guests; and the terms "we," "us," and "our" refer to the owner named in the Lease Contract (not to the property manager or anyone else).*

**1. DWELLING UNIT DESCRIPTION.**
Unit No. _____ **1606** _____, **205 Roy**
**Street, Apt. 1606** _____
_____ *(street address)* in
_____ **Seattle** _____
*(city)*, Washington, _____ **98109** _____ *(zip code).*

**2. LEASE CONTRACT DESCRIPTION.**
Lease Contract Date: **May 20, 2021**
Owner's name: **225 Roy LLC**
_____
_____
_____

Residents *(list all residents)*:
**Kimen Trochalakis**
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

This Addendum constitutes an Addendum to the above described Lease Contract for the above described premises, and is hereby incorporated into and made a part of such Lease Contract. Where the terms or conditions found in this Addendum vary or contradict any terms or conditions found in the Lease Contract, this Addendum shall control.

**3. A. ☐ NO APPROVED ANIMALS.** If this box is checked, you are not allowed to have animals (including mammals, reptiles, birds, fish, rodents, and insects), even temporarily, anywhere in the apartment or apartment community unless we've authorized so in writing. We will authorize support and/or service animals for you, your guests, and occupants pursuant to the parameters and guidelines established by the Federal Fair Housing Act, HUD regulatory guidelines, and any applicable state and/or local laws.

**B. ☐ CONDITIONAL AUTHORIZATION FOR ANIMAL.** If this box is checked, you may keep the animal that is described below in the dwelling until the Lease Contract expires. But we may terminate this authorization sooner if your right of occupancy is lawfully terminated or if in our judgment you and your animal, your guests, or any occupant violate any of the rules in this Addendum.

**4. ANIMAL DAMAGE DEPOSIT.** An animal damage deposit of $ _____ **0.00** _____ will be charged. This deposit is not a general security deposit and is limited in use to damages caused by any animal(s), and is subject to forfeiture. If the animal(s) become an assistive animal(s) during your tenancy, this deposit will not be held for the duration of the tenancy.

**5. ADDITIONAL MONTHLY RENT.** Your total monthly rent (as stated in the Lease Contract) will be increased by $ _____ **0.00** _____. The monthly rent amount in the Rent and Charges paragraph of the Lease Contract does not include this additional animal rent.

**6. LIABILITY NOT LIMITED.** The additional monthly rent and additional security deposit under this Animal Addendum do not limit residents' liability for property damages, cleaning, deodorization, defleaing, replacements, or personal injuries.

**7. DESCRIPTION OF ANIMAL(S).** You may keep only the animal(s) described below. You may not substitute any other animal(s). Neither you nor your guests or occupants may bring any other animal(s)—mammal, reptile, bird, amphibian, fish, rodent, arachnid, or insect—into the dwelling or apartment community.

Animal's name: **Delilah** _____
Type: **Dog** _____
Breed: **Chihuahua** _____
Color: **Tan and White** _____
Weight: **9.00** _____ Age: **3** _____
City of license: _____
License no.: _____
Date of last rabies shot: _____
Housebroken? _____
Animal owner's name: _____
_____
_____

Animal's name: _____
Type: _____
Breed: _____
Color: _____
Weight: _____ Age: _____
City of license: _____
License no.: _____
Date of last rabies shot: _____
Housebroken? _____
Animal owner's name: _____
_____
_____

**8. SPECIAL PROVISIONS.** The following special provisions control over conflicting provisions of this printed form:

**The following constitutes a list of animals, and/or breed of animals, that shall not be permitted in, on or upon any dwelling unit or common area. Animals not listed below, but which display substantially similar physical characteristics or traits to those animals listed below, shall be treated as though they had been listed below. Breeds of Dogs: Pit Bull, Rottweiler, Presa Canario, German Shepherd, Husky, Malamute, Doberman, Chow Chow, St. Bernard, Great Dane, Akita, Staffordshire Terriers, American Bull Dog, Karelian Bear Dog. Exotic Animals: Reptiles, Ferrets, Skunks, Raccoons, Squirrels, Rabbits, Birds, Pigs, Arachnids, Piranha, other farm or poisonous animals. Aquarium max 5 gallons, must be first floor, management must approve.**

**9. EMERGENCY.** In an emergency involving an accident or injury to your animal, we have the right, but not a duty, to take the animal to the following veterinarian for treatment, at your expense.

Doctor: _____
Address: _____
City/State/Zip: _____
Phone: _____

©2020, National Apartment Association, Inc. - 2/2020, Washington

Document digitally signed using RENTCafe eSignature services. Document ID: 4061807

**10. ANIMAL RULES.** You are responsible for the animal's actions at all times. You agree to abide by these rules:

- The animal must not disturb the neighbors or other residents, regardless of whether the animal is inside or outside the dwelling.

- Dogs, cats, and service animals must be housebroken. All other animals must be caged at all times. No animal offspring are allowed.

- Inside, the animal may urinate or defecate *only* in these designated areas: **Litter Box**

- Outside, the animal may urinate or defecate *only* in these designated areas: **Designated Pet Areas**

- Animals may not be tied to any fixed object anywhere outside the dwelling units, except in fenced yards (if any) for your exclusive use.

- You must not let an animal other than service animals into swimming-pool areas, laundry rooms, offices, clubrooms, other recreational facilities, or other dwelling units.

- Your animal must be fed and watered inside the dwelling unit. Don't leave animal food or water outside the dwelling unit at any time, except in fenced yards (if any) for your exclusive use.

- You must keep the animal on a leash and under your supervision when outside the dwelling or any private fenced area. We or our representative may pick up unleashed animals and/or report them to the proper authorities. We may impose reasonable charges for picking up and/or keeping unleashed animals.

- Unless we have designated a particular area in your dwelling unit or on the grounds for animal defecation and urination, you are prohibited from letting an animal defecate or urinate *anywhere* on our property. You must take the animal off our property for that purpose. If we allow animal defecation inside the dwelling unit in this Addendum, you must ensure that it's done in a litter box with a kitty litter-type mix. If the animal defecates anywhere on our property (including in a fenced yard for your exclusive use), you'll be responsible for immediately removing the waste and repairing any damage. Despite anything this Addendum says, you must comply with all local ordinances regarding animal defecation.

**11. ADDITIONAL RULES.** We have the right to make reasonable changes to the animal rules from time to time if we distribute a written copy of any changes to every resident who is allowed to have animals.

**12. VIOLATION OF RULES.** If you, your guest, or any occupant violates any rule or provision of this Animal Addendum (based upon our judgment) and we give you written notice, you must permanently remove the animal from the premises within the time period specified in our notice. We also have all other rights and remedies set forth in the Lease Contract, including damages, eviction, and attorney's fees to the extent allowed by law.

**13. COMPLAINTS ABOUT ANIMAL.** You must immediately and permanently remove the animal from the premises if we receive a reasonable complaint from a neighbor or other resident or if we, in our sole discretion, determine that the animal has disturbed neighbors or other residents.

**14. OUR REMOVAL OF ANIMAL.** In some circumstances, we may enter the dwelling unit and remove the animal with one day's notice left in a conspicuous place. We can do this if, in our sole judgment, you have:

- abandoned the animal;
- left the animal in the dwelling unit for an extended period of time without food or water; or
- failed to care for a sick animal;
- violated our animal rules; or
- let the animal defecate or urinate where it's not supposed to.

In doing this, we must follow the procedures of the Lease Contract, and we may kennel the animal or contact a humane society or local authority for pick up. We'll return the animal to you upon request if we haven't already turned it over to a humane society or local authority. We don't have a lien on the animal for any purpose, but you must pay for reasonable care and kenneling charges for the animal. If you don't pick up the animal within 5 days after we remove it, it will be considered abandoned.

**15. LIABILITY FOR DAMAGES, INJURIES, CLEANING, ETC.** You and all co-residents will be jointly and severally liable for the entire amount of all damages caused by the animal, including all cleaning, defleaing, and deodorizing.This provision applies to all parts of the dwelling unit, including carpets, doors, walls, drapes, wallpaper, windows, screens, furniture, appliances, as well as landscaping and other outside improvements. If items cannot be satisfactorily cleaned or repaired, you must pay for us to replace them completely. Payment for damages, repairs, cleaning, replacements, etc. are due immediately upon demand.

As owner of the animal, you're strictly liable for the entire amount of any injury that the animal causes to a person or anyone's property. You'll indemnify us for all costs of litigation and attorney's fees resulting from any such damage.

**16. MOVE-OUT.** When you move out, you'll pay for defleaing, deodorizing, and shampooing to protect future residents from possible health hazards, regardless of how long the animal was there. We—not you—will arrange for these services.

**17. JOINT AND SEVERAL RESPONSIBILITY.** Each resident who signed the Lease Contract must sign this Animal Addendum. You, your guests, and any occupants must follow all animal rules. Each resident is jointly and severally liable for damages and all other obligations set forth in this Animal Addendum, even if the resident does not own the animal.

**18. GENERAL.** You acknowledge that no other oral or written agreement exists regarding animals. Except for written rule changes under paragraph 9 above, our representative has no authority to modify this Animal Addendum or the animal rules except in writing. This Animal Addendum and the animal rules are considered part of the Lease Contract described above. It has been executed in multiple originals, one for you and one or more for us.

**This is a binding legal document. Read it carefully before signing.**

**Resident or Residents**
*(All residents must sign)*

**Owner or Owner's Representative**
*(Signs below)*

_____

_____

_____

_____

_____

©2020, National Apartment Association, Inc. - 2/2020, Washington

Document digitally signed using RENTCafe eSignature services. Document ID: 4061807



# Service Animal Policy

**BACKGROUND**

The Federal Fair Housing Act requires that applicants and Residents with disabilities be provided with "reasonable accommodations" as needed, in order for them to have an opportunity for full use and enjoyment of their housing. Allowing Residents and their guests who have disabilities to be accompanied by their service animals is a reasonable accommodation to housing policy and practice.

**WHO NEEDS SERVICE ANIMALS?**

Some disabled people require the assistance of an animal because of their disabling conditions. Under most federal laws, a person is considered to be disabled if he/she has a sensory, mental or physical condition that substantially limits one or more major life activities (such as walking, seeing, working, etc.).

**WHAT IS A SERVICE ANIMAL?**

The most common service animals are dogs, but sometimes other species are used (for example, a cat or bird). Service animals may be any breed, size, weight. Some, but not all, service animals wear special collars and harnesses. Some, but not all, are licensed or "certified" and/or have identification papers. However, **there is no legal requirement for service animals to be visibly identified or to have documentation.**

In addition, there are many types of service animals with different names which are not certified and don't have special training. For example, companion animals, which don't perform specific tasks, are considered service animals. The next two sections explain in detail the different types of service animals.

**WHAT'S THE DIFFERENCE BETWEEN A SERVICE ANIMAL AND A PET?**

Service animals are not considered to be pets. A person with a disability uses a service animal as an auxiliary aid—similar to the use of a cane, crutches or wheelchair. Service animals are a medical device necessary for the full enjoyment of a home. For this reason, fair housing laws require that housing providers make modifications to "No Pet" policies to permit the use of a service animal by an individual with a disability. Service animals sometimes are called assistance animals or emotional support animals and, as stated previously, companion animals.

**WHAT DO SERVICE ANIMALS DO?**

- A guide animal serves as a travel tool by a person who is legally blind.
- A hearing animal alerts a person with a significant hearing loss or who is deaf when a sound occurs; such as a ringing alarm or knock on the door.
- A service animal helps a person who has a mobility or health disability. Duties may include carrying, fetching, opening doors, ringing doorbells, activating elevator buttons, steadying a person walking, helping a person up after a fall, etc.
- A seizure response animal assists a person with a seizure disorder. The animal's service depends on the person's needs. The animal may go for help, or may stand guard over the person during a seizure. Some animals have learned to predict a seizure and warn the person.
- A companion animal or emotional support animal assists people with psychological disabilities. Emotional support animals can help alleviate symptoms such as depression, anxiety, stress and difficulties regarding social interactions, allowing Residents to live independently and fully use and enjoy their living environment.

Service Animal Policy; 1

Document digitally signed using RENTCafe eSignature services. Document ID: 4061807



**PRACTICAL GUIDELINES FOR RESIDENTS WHO WANT OR NEED SERVICE ANIMALS**

**REQUEST FOR A SERVICE ANIMAL ACCOMMODATION:**
The Resident who needs a service/companion animal can submit a request to the housing provider for an accommodation for the Resident's disability. The Resident will be provided with the Avenue5 Residential form "Request of Reasonable Accommodation". If the resident/applicant chooses another form, or verbally tells Avenue5 Residential, they may do so and it will be acceptable by Avenue5 Residential. If this option is chosen Avenue5 Residential will document the time and date that the request was made. Written requests should be dated, copied and copies retained by the Resident for proof that the request was made. NOTE: A Request for a Reasonable Accommodation is **NOT** required when the disability is visible.

**VERIFICATION OF DISABILITY AND NEED FOR A SERVICE ANIMAL**
The Resident must be prepared to provide written verification that he/she has a disability and that the accommodation is necessary to give the Resident equal opportunity to use and enjoy the housing and/or housing community. If the resident/applicant's situation requires that they get a third person to verify the disability or the need for the accommodation, (this happens when a person's disability is not obvious), the Resident/applicant should obtain verification on the Avenue5 Residential form "Reasonable Accommodation Verification Form". This verification form must be from his/her healthcare or mental health provider to the housing provider answering the following questions:

- Is the person disabled as defined by the fair housing laws?
- In the health care provider's professional opinion, does the person need the requested accommodation (use of a service animal) to have the same opportunity as a non-disabled person to use and enjoy the housing community?

While the property management may not require the requester of an accommodation to disclose the nature or severity of his/her disability, the requester might be required to show the relationship between the disability and the need for the requested accommodation.

For example, a Resident may need a seizure response animal. The seizures may come and go unexpectedly and due to genetics, an injury or some other situations. The only thing they need to disclose is that they have had seizures and many have seizures in the future and that the seizures come and go unexpectedly. Either the Resident can explain this or have it explained by a health care provider. The Resident does not have to say how often they have seizures, how severe the seizures are or what causes the seizures.

**ANIMAL CARE AND SUPERVISION:**
The Resident/handler is responsible for the care of his/her service animal. The animal must be supervised and the Resident/handler must retain full control of the animal at all times. This generally means that while the animal is in common areas, is it on a leash, in a carrier, or otherwise in the direct control of the animal owner/handler. When in the presence of others, the animal is expected to be well behaved. The Resident is responsible for the proper disposal of animal waste.

- Never allow the service animal to defecate on any property, public or private (except the Resident's own property), unless the Resident immediately removes the waste.

Case 3:23-md-03071    Document 346-1    Filed 07/07/23    Page 38 of 75 PageID #: 3082

Document digitally signed using RENTCafe eSignature services. Document ID: 4061807


- Always carry equipment sufficient to clean up the animal's feces whenever the service animal is in the common areas or off the Resident's property.
- Properly dispose of waste and/or litter.
- If you need assistance with cleanup, make arrangements for such help through family, friends or advocates.

---

**SERVICE ANIMAL POLICY**
**ACKNOWLEDGEMENT OF RECEIPT**

I hereby acknowledge the receipt of the Service Animal Policy implemented and enforced by Avenue5 Residential.

_____
Resident Signature/Date

_____
Resident Signature/Date

_____
Resident Signature/Date

_____
Resident Signature/Date

_____
Property Manager Signature/Date

_____

Service Animal Policy;                                                                                     3



Document digitally signed using RENTCafe eSignature services. Document ID: 4061807

# SUPPORT OR SERVICE ANIMAL AMENDMENT
# TO ANIMAL ADDENDUM



Date: _____ **May 20, 2021** _____
*(when this Addendum is filled out)*

1. **DWELLING UNIT DESCRIPTION.**
Unit No. _____ **1606** _____, **205 Roy Street,**
**Apt. 1606** _____
_____ *(street address)* in
_____ **Seattle** _____
*(city)*, Washington, _____ **98109** _____ *(zip code)*.

2. **LEASE CONTRACT DESCRIPTION.**
Lease Contract Date: **May 20, 2021** _____
Owner's name: **225 Roy LLC** _____
_____
_____
_____
_____

Residents *(list all residents)*:

**Kimen Trochalakis** _____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

You acknowledge that the ownership of or need for the support or service animal does not entitle you to permit the animal to bother, threaten or harm other residents or persons without cause. While in common areas the animal must be supervised and the resident must retain control of the animal at all times. Resident is responsible for the proper disposal of animal waste. You acknowledge that if the animal violates the rules in the Animal Addendum or community rules, we have the right to evict both you and the support or service animal, as well as exercise other remedies under the lease.

The resident is responsible for the care of the support or service animal. In the event the support or service animal is sick or injured and you are unavailable to seek treatment for the animal, we will have the right (but not the duty) to contact a veterinarian and incur on your behalf any necessary veterinarian charges to render aid or treatment to the animal.

We will not charge a security deposit for your support or service animal. You will, however, be liable for any damages that this animal may cause.

3. **SPECIAL PROVISIONS.** The following special provisions control over conflicting provisions of this printed form:

_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

**You are legally bound by this document. Please read it carefully.**

**Resident or Residents**
*(All residents must sign)*

_____
_____
_____
_____
_____
_____

**Owner or Owner's Representative**
*(Signs below)*

_____

**Date of Signing Addendum**

_____

© 2017, National Apartment Association, Inc. - 9/2018, Washington
Document digitally signed using RENTCafe eSignature services. Document ID: 4061807



# COMMUNITY POLICIES, RULES AND REGULATIONS
# ADDENDUM

*This Addendum is incorporated into the Lease Contract (the "Lease") identified below and is in addition to all the terms and conditions contained in the Lease. If any terms of this Addendum conflict with the Lease, the terms of this Addendum shall be controlling:*

Property Owner: **225 Roy LLC**

Resident(s): **Kimen Trochalakis**

Unit No./Address: **#1606, 205 Roy Street, Apt. 1606, Seattle, WA 98109**

Lease Date: **05/20/2021**

## I.  GENERAL CONDITIONS FOR USE OF DWELLING PROPERTY AND RECREATIONAL FACILITIES.

Resident(s) permission for use of all common areas, Resident amenities, and recreational facilities (together, "Amenities") located at the Dwelling Community is a privilege and license granted by Owner, and not a contractual right except as otherwise provided for in the Lease. Such permission is expressly conditioned upon Resident's adherence to the terms of the Lease, this Addendum, and the Community rules and regulations ("Rules") in effect at any given time, and such permission may be revoked by Owner at any time for any lawful reason. In all cases, the most strict terms of either the Lease, this Addendum, or the Community Rules shall control. Owner reserves the right to set the days and hours of use for all Amenities and to change the character of or close any Amenity based upon the needs of Owner and in Owner's sole and absolute discretion, without notice, obligation or recompense of any nature to Resident. As allowed by law, Owner and management may make changes to the Rules for use of any Amenity at any time.

**Additionally, Resident(s) expressly agrees to assume all risks of every type, including but not limited to risks of personal injury or property damage, of whatever nature or severity, related to Resident's use of the amenities at the Community. Resident(s) agrees to hold Owner harmless and release and waive any and all claims, allegations, actions, damages, losses, or liabilities of every type, whether or not foreseeable, that Resident(s) may have against Owner and that are in any way related to or arise from such use. This provision shall be enforceable to the fullest extent of the law.**

**THE TERMS OF THIS ADDENDUM SHALL ALSO APPLY TO RESIDENT(S)' OCCUPANTS, AGENTS AND INVITEES, TOGETHER WITH THE HEIRS, ASSIGNS, ESTATES AND LEGAL REPRESENTATIVES OF THEM ALL, AND RESIDENT(S) SHALL BE SOLELY RESPONSIBLE FOR THE COMPLIANCE OF SUCH PERSONS WITH THE LEASE, THIS ADDENDUM, AND COMMUNITY RULES AND REGULATIONS, AND RESIDENT(S) INTEND TO AND SHALL INDEMNIFY AND HOLD OWNER HARMLESS FROM ALL CLAIMS OF SUCH PERSONS AS DESCRIBED IN THE PRECEDING PARAGRAPH. The term "Owner" shall include the Management, officers, partners, employees, agents, assigns, Owners, subsidiaries and affiliates of Owner.**

## II.  POOL.  This Community ☐ DOES;  ☒ DOES NOT have a pool. When using the pool, Resident(s) agrees to the following:
- Residents and guests will adhere to the rules and regulations posted in the pool area and Management policies.
- All Swimmers swim at their own risk. Owner is not responsible for accidents or injuries. No lifeguard is provided by Owner.
- For their safety, Residents should not swim alone.
- Pool hours are posted at the pool.
- No glass, pets, or alcoholic beverages are permitted in the pool area. Use paper or plastic containers only.
- Proper swimming attire is required at all times and a swimsuit "cover up" should be worn to and from the pool.
- No running or rough activities are allowed in the pool area. Respect others by minimizing noise, covering pool furniture with a towel when using suntan oils, leaving pool furniture in pool areas, disposing of trash, and keeping pool gates closed.
- Resident(s) must accompany their guests at all times.
- Resident(s) must notify Owner any time there is a problem or safety hazard at the pool.

### IN CASE OF EMERGENCY DIAL 911

## III.  FITNESS CENTER.  This Community ☒ DOES;  ☐ DOES NOT have a fitness center. When using the fitness center, Resident agrees to the following:
- Residents and guests will adhere to the rules and regulations posted in the fitness center and Management policies.
- The Fitness Center is not supervised. Resident(s) are solely responsible for their own appropriate use of equipment.
- Resident(s) shall carefully inspect each piece of equipment prior to Resident's use and shall refrain from using any equipment that may be functioning improperly or that may be damaged or dangerous.
- Resident(s) shall immediately report to Management any equipment that is not functioning properly, is damaged or appears dangerous, as well any other person's use that appears to be dangerous or in violation of Management Rules and Policies.
- Resident(s) shall consult a physician before using any equipment in the Fitness Center and before participating in any aerobics or exercise class, and will refrain from such use or participation unless approved by Resident's physician.
- Resident(s) will keep Fitness Center locked at all times during Resident's visit to the Fitness Center.
- Resident(s) will not admit any person to the Fitness Center who has not registered with the Management Office.
- Resident(s) must accompany guests, and no glass, smoking, eating, alcoholic beverages, pets, or black sole shoes are permitted in the Fitness Center.

Card # issued:  (1) _____  (3) _____  (5) _____
                (2) _____  (4) _____  (6) _____

Revised 9/2018, Washington                                                    Page 1 of 3

Document digitally signed using RENTCafe eSignature services. Document ID: 4061807

**IV.** **PACKAGE RELEASE.** This Community ☒ **DOES;** ☐ **DOES NOT** accept packages on behalf of Residents.

*For communities that do accept packages on behalf of its Residents:*

Resident(s) gives Owner permission to sign and accept any parcels or letters sent to Resident(s) through UPS, Federal Express, Airborne, United States Postal Service or the like. Resident agrees that, to the fullest extent allowed by law, Owner does not accept responsibility or liability for any lost, damaged, or unordered deliveries, and agrees to hold Owner harmless for the same. Any packages not picked up after 30 days notice to Resident shall be returned to sender at Resident's expense. No packages addressed to persons not listed on the Lease will be accepted, and will be refused or returned immediately to sender. Packages accepted by Owner will not be delivered to Resident's unit.

**V.** **BUSINESS CENTER.** This Community ☐ **DOES;** ☒ **DOES NOT** have a business center.

Resident(s) agrees to use the business center at Resident(s) sole risk and according to the Rules and Regulations posted in the business center and Management policies. Owner is not responsible for data, files, programs or any other information lost or damaged on Business Center computers or in the Business Center for any reason. No software may be loaded on Business Center computers without the prior written approval of Community Management. For reasons of safety and protection of equipment, no inappropriate, offensive, or pornographic images or files (in the sole judgment of Owner) will be viewed or loaded onto the Business Center computers at any time. Residents will limit time on computers to _____ minutes if others are waiting to use them. Smoking, eating, alcoholic beverages, pets, and any disturbing behavior are prohibited in the business center.

**VI.** **AUTOMOBILES/BOATS/RECREATIONAL VEHICLES.** The following policies are in addition to those in the Lease, and may be modified by the additional rules in effect at the Community at any given time:
- Only _____1_____ vehicle(s) per unit is (are) allowed. Parking is not guaranteed.
- All vehicles must be registered at the Management office.
- Any vehicle(s) not registered, considered abandoned, or violating the Lease, this Addendum, or the Community Rules, in the sole judgment of Management, will be towed at the vehicle owner's expense after a _____24_____ hour notice is placed on the vehicle.
- Notwithstanding this, any vehicle illegally parked in a fire lane, designated no parking space or handicapped space, or blocking an entrance, exit, driveway, dumpster, or parked illegally in a designated parking space, will immediately be towed, without notice, at the vehicle owner's expense.
- The washing of vehicles is not permitted on the property unless specifically allowed in designated area.
- Any on property repairs and/or maintenance of any vehicle must be with the prior written permission of the Management.
- Recreational vehicles, boats or trailers may only be parked on the property with Management's permission (in Management's sole discretion), and must be registered with the Management Office and parked in the area(s) designated by Management.

**VII.** **FIRE HAZARDS.** In order to minimize fire hazards and comply with city ordinances, Resident shall comply with the following:
- Residents and guests will adhere to the Community rules and regulations other Management policies concerning fire hazards, which may be revised from time to time.
- No person shall knowingly maintain a fire hazard.
- **Grills, Barbeques, and any other outdoor cooking or open flame devices will be used only on the ground level and will be placed a minimum of _____10_____ feet from any building including overhangs or ceilings.** Such devices will not be used close to combustible materials, tall grass or weeds, on exterior walls or on roofs, indoors, on balconies or patios, or in other locations which may cause fires.
- **Fireplaces:** Only firewood is permitted in the fireplace. No artificial substances, such as Duraflame® logs are permitted. Ashes must be disposed of in metal containers, after ensuring the ashes are cold.
- Flammable or combustible liquids and fuels shall not be used or stored (including stock for sale) in dwellings, near exits, stairways breezeways, or areas normally used for the ingress and egress of people. This includes motorcycles and any
- apparatus or engine using flammable or combustible liquid as fuel.
- No person shall block or obstruct any exit, aisle, passageway, hallway or stairway leading to or from any structure.
- Resident(s) are solely responsible for fines or penalties caused by their actions in violation of local fire protection codes.

**VIII.** **EXTERMINATING.** Unless prohibited by statute or otherwise stated in the Lease, Owner may conduct extermination operations in Residents' dwelling several times a year and as needed to prevent insect infestation. Owner will notify Residents in advance of extermination in Residents' Dwelling, and give Resident instructions for the preparation of the Dwelling and safe contact with insecticides. Residents will be responsible to prepare the Dwelling for extermination in accordance with Owner's instructions. If Residents are unprepared for a scheduled treatment date Owner will prepare Residents' dwelling and charge Residents accordingly. Residents must request extermination treatments in addition to those regularly provided by Owner in writing and those treatments shall be at Resident's expense. **Residents agree to perform the tasks required by Owner on the day of interior extermination to ensure the safety and effectiveness of the extermination. These tasks will include, but are not limited to, the following:**
- Clean in all cabinets, drawers and closets in kitchen and pantry.
- If roaches have been seen in closets, remove contents from shelves and floor.
- Remove infants and young children from the dwelling.
- Remove pets or place them in bedrooms, and notify Owner of such placement.
- Remove chain locks or other types of obstruction on day of service.
- Cover fish tanks and turn off their air pumps.
- Do not wipe out cabinets after treatment.

In the case of suspected or confirmed bed bug infestation, resident will agree to the following:
- Resident will wash all clothing, bed sheets, draperies, towels, etc. in extremely hot water.
- Resident will thoroughly clean, off premises, all luggage, handbags, shoes and clothes hanging containers.]
- Resident will cooperate with Owner's cleaning efforts for all mattresses and seat cushions or other upholstered furniture, and will dispose of same if requested.

<u>**RESIDENTS ARE SOLELY RESPONSIBLE TO NOTIFY OWNER IN WRITING PRIOR TO EXTERMINATION OF ANY ANTICIPATED HEALTH OR SAFETY CONCERNS RELATED TO EXTERMINATION AND THE USE OF INSECTICIDES**</u>

Revised 9/2018, Washington

Page 2 of 3

Document digitally signed using RENTCafe eSignature services. Document ID: 4061807

**IX.** **DRAPES AND SHADES.** Drapes or shades installed by Resident, when allowed, must be lined in white and present a uniform exterior appearance.

**X.** **WATER BEDS.** Resident shall not have water beds or other water furniture in the dwelling without prior written permission of Owner.

**XI.** **BALCONY or PATIO.** Balconies and patios shall be kept neat and clean at all times. No rugs, towels, laundry, clothing, appliances or other items shall be stored, hung or draped on railings or other portions of balconies or patios. No misuse of the space is permitted, including but not limited to, throwing, spilling or pouring liquids or other items, whether intentionally or negligently, over the balconies or patios.

**XII.** **SIGNS.** Resident shall not display any signs, exterior lights or markings on dwelling. No awnings or other projections shall be attached to the outside of the building of which dwelling is a part.

**XIII.** **SATELLITE DISHES/ANTENNAS.** You must complete a satellite addendum and abide by its terms prior to installation or use.

**XIV.** **WAIVER/SEVERABILITY CLAUSE.** No waiver of any provision herein, or in any Community rules and regulations, shall be effective unless granted by the Owner in a signed and dated writing. If any court of competent jurisdiction finds that any clause, phrase, or provision of this Part is invalid for any reason whatsoever, this finding shall not effect the validity of the remaining portions of this Addendum, the Lease Contract or any other addenda to the Lease Contract.

**XV.** **SPECIAL PROVISIONS.** The following special provisions control over conflicting provisions of this printed form:

All BBQ equipment is subject to management approval. Grills, Barbeques and any other outdoor flame devices will be used only on the ground level and will be placed a minimum of 10 feet from any building. A maximum of one propane BBQ with a tank no larger than 5 gallons is permitted with management approval. No Hibachi or charcoal style BBQ grills or smoker grills allowed anywhere on the premises. All residents and guests must observe the residential quiet hours listed below: 10PM to 8AM Seven days a week.

I have read, understand and agree to comply with the preceding provisions.

| | | | |
|---|---|---|---|
| Resident | Date | Resident | Date |
| Resident | Date | Resident | Date |
| Resident | Date | Resident | Date |
| Owner Representative | | Date | |

Case 3:23-md-03071    Document 346-1    Filed 07/07/23    Page 43 of 75 PageID #: 3087

Document digitally signed using RENTCafe eSignature services. Document ID: 4061807



This Addendum is incorporated into the Lease Contract (the "Lease") identified below and is in addition to all the terms and conditions contained in the Lease. If any terms of this Lease Addendum conflict with the Lease, the terms of this Lease Addendum shall be controlling:

*Property Owner:* **225 Roy LLC**

*Resident(s):* **Kimen Trochalakis**

*Unit No./Address:* **205 Roy Street, Apt. 1606 #1606, Seattle, WA 98109**

*Lease Date:* **05/20/2021**

1. The Community has made certain amenities and recreational facilities, including **Rooftop Decks,Pet Park,Dog Spa,Lounges,Game Rm,Courtyard,Rain Garden,Fitness**, available for use by residents subject to the below acknowledgment and release.

2. Resident(s) acknowledge that the use of amenities and recreational facilities at the Community could expose Resident(s) to viruses or bacteria that could result in an infection or ailment. Resident(s) shall comply with the rules and regulations and owner policies relating to the mitigation or prevention of the spread of viruses and bacteria. Resident(s) shall comply with federal, state, county, and local laws, proclamations, orders, and guidelines regarding the use of face coverings while using amenity and recreational facilities. **Resident(s) assume the risks of personal injury, death and property damage relating to Resident(s)' use of the amenities at the apartment. Resident(s) hold harmless, indemnify, and release owner from any claims, allegations, actions, damages, losses, or liabilities, whether or not foreseeable, that Resident(s) may have against owner that is in any way related to such use. This release shall also apply to Resident(s)' occupants, invitees, guests, and their respective heirs, successors, assigns, estates, and legal representatives. The term "Owner" shall include the property owner, management, and each of their respective officers, employees, directors, managers, representatives, agents, and affiliates.**

I have read, understand and agree to comply with the preceding provisions.

| | |
|---|---|
| _____ | _____ |
| Residents | Date |
| _____ | _____ |
| Residents | Date |
| _____ | _____ |
| Residents | Date |
| _____ | _____ |
| Residents | Date |
| _____ | _____ |
| Residents | Date |
| _____ | _____ |
| Residents | Date |

| | |
|---|---|
| _____ | _____ |
| Owner Representative | Date |



Document digitally signed using RENTCafe eSignature services. Document ID: 4061807

# SEATTLE - LEASE CONTRACT ADDENDUM
## FOR SATELLITE DISH OR ANTENNA



Under a Federal Communications Commission (FCC) order, you as our resident have a right to install a transmitting or receiving satellite dish or antenna on the leased dwelling, subject to FCC limitations. We as a rental housing owner are allowed to impose reasonable restrictions relating to such installation. You are required to comply with these restrictions as a condition of installing such equipment. This addendum contains the restrictions that you and we agree to follow.

**1. DWELLING UNIT DESCRIPTION.**

Unit No. _____**1606**_____, **205 Roy Street,**

**Apt. 1606**

_____ *(street address)* in

_____**Seattle**_____

*(city)*, Washington, _____**98109**_____ *(zip code)*.

**2. LEASE CONTRACT DESCRIPTION.**

Lease Contract Date: **May 20, 2021**

Owner's name: **225 Roy LLC**

_____

_____

_____

Residents *(list all residents)*:

**Kimen Trochalakis**

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

This Addendum constitutes an Addendum to the above described Lease Contract for the above described premises, and is hereby incorporated into and made a part of such Lease Contract. Where the terms or conditions found in this Addendum vary or contradict any terms or conditions found in the Lease Contract, this Addendum shall control.

**3. NUMBER AND SIZE.** You may install _____**1**_____ satellite dish(es)or antenna(s) on the leased premises. A satellite dish may not exceed one meter (3.3 feet) in diameter. Antennas that only transmit signals or that are not covered by 47 CFR § 1.4000 are prohibited.

**4. LOCATION.** Your satellite dish or antenna must be located: (1) inside your dwelling; or (2) in an area outside your dwelling such as a balcony, patio, yard, etc. of which you have exclusive use under your lease. Installation is not permitted on any parking area, roof, exterior wall, window, window sill, fence or common area, or in an area that other residents are allowed to use. A satellite dish or antenna may not protrude beyond the vertical and horizontal space that is leased to you for your exclusive use. You understand that not all dwellings shall be capable of receiving satellite signals, depending on the location of the dwelling, and that inability to receive signals shall not be construed in any way as a breach of the agreement by Landlord nor for a reduction in the rent.

**5. SAFETY AND NON-INTERFERENCE.** Your installation: (1) must comply with all applicable ordinances and laws and all reasonable safety standards; (2) may not interfere with our cable, telephone or electrical systems or those of neighboring properties; (3) may not be connected to our telecommunication systems; and (4) may not be connected to our electrical system except by plugging into a 110-volt duplex receptacle. If the satellite dish or antenna is placed in a permitted outside area, it must be safely secured by one of three methods: (1) securely attaching it to a portable, heavy object such as a small slab of concrete; (2) clamping it to a part of the building's exterior that lies within your leased premises (such as a balcony or patio railing); or (3) any other method approved by us in writing. No other methods are allowed. We may require reasonable screening of the satellite dish or antenna by plants, etc., so long as it does not impair reception.

**6. SIGNAL TRANSMISSION FROM EXTERIOR DISH OR ANTENNA TO INTERIOR OF DWELLING.** You may not damage or alter the leased premises and may not drill holes through outside walls, door jams, window sills, etc. If your satellite dish or antenna is installed outside your dwelling (on a balcony, patio, etc.), the signals received by it may be transmitted to the interior of your dwelling only by the following methods: (1) running a "flat" cable under a door jam or window sill in a manner that does not physically alter the premises and does not interfere with proper operation of the door or window; (2) running a traditional or flat cable through a pre-existing hole in the wall (that will not need to be enlarged to accommodate the cable); (3) connecting cables "through a window pane," similar to how an external car antenna for a cellular phone can be connected to inside wiring by a device glued to either side of the window—without drilling a hole through the window; (4) wireless transmission of the signal from the satellite dish or antenna to a device inside the dwelling; or (5) any other method approved by us in writing. Running the cable along any portion of the common areas is strictly prohibited.

**7. SAFETY IN INSTALLATION.** In order to assure safety, the strength and type of materials used for installation must be approved by us. Installation must be done by a qualified person or company approved by us. Our approval will not be unreasonably withheld. An installer provided by the seller of the satellite dish or antenna is presumed to be qualified.

**8. MAINTENANCE.** You will have the sole responsibility for maintaining your satellite dish, antenna and all related equipment.

**9. REMOVAL AND DAMAGES.** You must remove the satellite dish or antenna and all related equipment when you move out of the dwelling. In accordance with the Lease Contract, you must pay for any damages and for the cost of repairs or repainting caused by negligence, carelessness, accident or abuse which may be reasonably necessary to restore the leased premises to its condition prior to the installation of your satellite dish, antenna or related equipment. You will not be responsible for normal wear.

**10. LIABILITY INSURANCE. You must take full responsibility for the satellite dish, antenna and related equipment. If the dish or antenna is installed at a height that could result in injury to others if it becomes unattached and falls, you must provide us with evidence of liability insurance (if available) to protect us against claims of personal injury and property damage to others, related to your satellite dish, antenna and related equipment.** The insurance coverage must be $ _____**100000.00**_____, which is an amount reasonably determined by us to accomplish that purpose. Factors affecting the amount of insurance include height of installation above ground level, potential wind velocities, risk of the dish/antenna becoming unattached and falling on someone, etc.

**11. SECURITY DEPOSIT.** An additional security deposit of $ _____**0.00**_____ will be charged. We will consider this additional security deposit a general security deposit for all purposes. The security deposit amount in the Security Deposit paragraph of the Lease Contract *(check one)* ☐ does or ☒ does not include this additional deposit amount. Refund of the additional security deposit will be subject to the terms and conditions set forth in the Lease Contract regardless of whether it is considered part of the general security deposit.

©2018, National Apartment Association, Inc. - 9/2018, Washington

Page 1 of 2

Document digitally signed using RENTCafe eSignature services. Document ID: 4061807

This additional security deposit is required to help protect us against possible repair costs, damages, or failure to remove the satellite dish, antenna and related equipment at time of move-out. Factors affecting any security deposit may vary, depending on: (1) how the dish or antenna is attached (nails, screws, lag bolts drilled into walls); (2) whether holes were permitted to be drilled through walls for the cable between the satellite dish and the TV; and (3) the difficulty and cost repair or restoration after removal, etc.

**12. WHEN YOU MAY BEGIN INSTALLATION.** You may start installation of your satellite dish, antenna or related equipment only after you have: (1) signed this addendum; (2) provided us with written evidence of the liability insurance referred to in paragraph 10 of this addendum; (3) paid us the additional security deposit, if applicable, in paragraph 11; and (4) received our written approval of the installation materials and the person or company that will do the installation, which approval may not be unreasonably withheld.

**13. MISCELLANEOUS.** If additional satellite dishes or antennas are desired, an additional lease addendum must be executed.

**14. SPECIAL PROVISIONS.** The following special provisions control over conflicting provisions of this printed form: <u>One (1) satellite dish per unit is permitted. Satellite dish may not be attached, or drilled into building in any way. Satellite dish may be placed on patio/balcony on a tripod but must not exceed living space.</u>

**Resident or Residents**
*(All residents must sign here)*

**Owner or Owner's Representative**
*(Signs here)*

**Date of Lease Contract**

May 20, 2021

© 20 National Apartment Association, Inc.
Washington/National Apartment Association Official Form, September 2018.

Case 3:23-md-03071    Document 346-1    Filed 07/07/23    Page 46 of 75    PageID #: 3090

Document digitally signed using RENTCafe eSignature services. Document ID: 4061807



**1. DWELLING UNIT DESCRIPTION.**
Unit No. **1606** , **205 Roy Street,**
**Apt. 1606**
_____ _(street address)_ in
**Seattle**
_(city)_, Washington, **98109** _(zip code)._

**2. LEASE CONTRACT DESCRIPTION.**
Lease Contract Date: **May 20, 2021**
Owner's name: **225 Roy LLC**
_____
_____
_____
_____

Residents _(list all residents)_:
**Kimen Trochalakis**
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

Occupants _(list all occupants)_:
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

This Addendum constitutes an Addendum to the above described Lease Contract for the above described premises, and is hereby incorporated into and made a part of such Lease Contract. Where the terms or conditions found in this Addendum vary or contradict any terms or conditions found in the Lease Contract, this Addendum shall control.

**3. PURPOSE OF ADDENDUM.** By signing this Addendum, you, without payment or other consideration, agree to grant us permission to use your likeness in photographs, videos and/ or other electronic and/or digital reproductions, including voice, in any and all of our publications, including, without limitation, any website entries, advertising websites, social media websites, and any other marketing materials. For purposes of this addendum, photographs, videos, written comments, statements, and other digital reproductions will hereinafter be collectively referred to as "media."

A. CONSENT FOR MINOR OCCUPANTS. By signing this Addendum, if any minor occupants are named above, you further certify that you are the parent, or legal guardian of the minor occupant(s) named above, and you, without payment or other consideration, agree to grant us permission to use their likeness in photographs, videos and/ or other electronic and/or digital reproductions, including voice, in any and all of our publications, including, without limitation, any website entries, advertising websites, social media websites, and any other marketing materials. For purposes of this addendum, photographs, videos, written comments, statements, and other digital reproductions will hereinafter be collectively referred to as "media."

**4. PHOTO AND VIDEO RELEASE.** You hereby grant us and our agents and affiliates (collectively, the "Released Parties") permission and a license to take, use, reuse, and publish the likeness of you and any minor occupants in all photographs or other electronic and/or digital media in any and all of our publications, including, without limitation, any website entries, advertising websites, and any other marketing materials. You understand and agree that these materials will become the property of the Released Parties and will not be returned. You agree to irrevocably authorize the Released Parties to edit, alter, copy, exhibit, publish, or distribute this media for any lawful purpose whatsoever including, without limitation, promotional and advertising uses. You waive the right to inspect or approve the finished product, including any written or electronic copy, wherein your likeness appears now or in the future. In addition, you waive any right to payment, royalties, or any other compensation arising or related to the use of the media.

**5. CONSENT TO USE YOUR NAME, LIKENESS, WRITTEN COMMENTS, AND STATEMENTS.** You are expressly agreeing to allow us to post your name, picture, written comments, and statements, and/or the names, pictures, written comments, and statements of any minor occupants in any and all of our publications, including, without limitation, any website entries, advertising websites, social media websites, and any other marketing materials. You hereby grant the Released Parties permission and a license to use, reproduce, and publish any media on its website, social media platforms, or in other marketing-related materials, whether in electronic or print form.

**6. RELEASE OF LIABILITY.** You hereby release, hold harmless, and forever discharge us from any claims or causes of actions including, without limitation, any and all claims for libel or violation of any right of publicity or privacy, related to our use of the media in any and all of our publications, including any website entries, advertising websites, social media websites, and any other marketing material so long as the claim or cause of action does not result from our intentional misconduct or gross negligence. This consent and release shall be binding upon you and your heirs, legal representatives and assigns.

**7. REVOCATION.** You have the right to revoke your consent to our use of your name, picture, video, voice, written comments, or statement, and/or the name, picture, video, voice, written comments, or statement of any minor occupants, by written notice to us.

**8. SPECIAL PROVISIONS.** The following special provisions control over conflicting provisions of this printed form:
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

©2018, National Apartment Association, Inc. - 9/2018, Washington
Page 1 of 2

Document digitally signed using RENTCafe eSignature services. Document ID: 4061807

**Resident or Residents**
*(All residents must sign)*

**Owner or Owner's Representative**
*(Signs below)*

**Date of Signing Addendum**

© 2018, Washington Multi-Family Housing Association

Washington/National Apartment Association Official Form, September 2018.

Document digitally signed using RENTCafe eSignature services. Document ID: 4061807



## COMMON AREA WIFI ADDENDUM

Any community wide services or amenities, including but not limited to WIFI signals or connections, are provided solely as a convenience for the residents of this community and residents using those services are solely responsible for insuring that they are used in a safe and legal manner. Resident understands that Management is not providing any security with these services, and that by using these services, Resident agrees that they are solely responsible for their own safety and the safety of their personal information and data.

Resident Signature: _____ Date: _____

Resident Signature: _____ Date: _____

Resident Signature: _____ Date: _____

Resident Signature: _____ Date: _____

Agent for Owner: _____ Date: _____

*Revised 9/24/2018*
*Owner:  Lux*
*Page **1** of **1***




Document digitally signed using RENTCafe eSignature services. Document ID: 4061807



# Elevator Addendum

Resident(s) Name:
**Kimen Trochalakis**_____

Address:**205 Roy Street, Apt. 1606**_____ Unit Number:**1606**_____
City:**Seattle**_____ State:**WA**_____ Zip Code:**98109**_____

This addendum to the Lease Contract is hereby attached to and made part of the Lease date
**05/20/2021**_____ between **Kimen Trochalakis**_____
_____ and **225 Roy LLC**_____
_____.

Resident(s).

In the event any provision in this Addendum is inconsistent with any provision or provisions contained in other portions or attachments to the above-mentioned Lease Contract, then the provisions of this Addendum shall control. For purposes of this addendum, the tam "unit" shall include the rental premises, all common areas, all other rental premises on the property or any common areas or other rental premises on or about other property owned by or managed by the Owner. The parties hereby amend and supplement the Lease Contract as follows:

Resident hereby acknowledges the existence of elevators on the property. Resident expressly represents that Resident fully understands how to properly use an elevator correctly and hereby agrees to properly use the elevators according to all posted instructions and generally acceptable methods.

Resident, Resident's occupants, and Resident's guests will be responsible for any damage incurred by or caused to the elevator by Resident, Resident's Occupants and Resident's guests, of any kind, including, without limitation, damage caused by any of said individual's negligence, improper use, or intentional misconduct.

Resident shall not stop the elevator at any floor longer than necessary to enter and exit the elevator. The elevator may not be monopolized by Resident, Resident's Occupants and Resident's guests.

*The information contained in this document, including all designs and related materials, is the exclusive property of Avenue5 Residential, LLC. All details included in this document are confidential, privileged, and solely for the purposes of informing and guiding current Avenue5 associates. No information in this document may be shared, used, published, reproduced, or redistributed without the prior written consent of Avenue5.*

*Revised 6/15/2018*
*Owner: Risk Management*
*Page **1** of **2***



Document digitally signed using RENTCafe eSignature services. Document ID: 4061807



Moving of furniture is permitted to and from the apartment between the hours of 8 a.m. and 9 p.m., and not outside of said time frame. Resident must notify Landlord prior to moving furniture in the elevator, so that pads can be placed in the elevator to protect the walls. If pads or protective devices are not available, or are not made available for Resident's use, then Resident shall be solely responsible for preventing damage to the elevator during any such moving event.

Resident is hereby notified that the elevators (check one) ___ are **x** are not equipped with video surveillance cameras.

Resident expressly acknowledges that elevators, like many other mechanized implements, may fail to operate for any of a variety of reasons, including, without limitation, mechanical malfunctions and/or power outages. Resident further expressly acknowledges that there are other means of ingress and egress to various floors within the apartment complex (e.g., via stairs), and that stairs provide access to the floor (level) upon which Resident's apartment is located. Therefore, Landlord and Resident expressly agree that temporary failure of the elevator to operate does not constitute a violation of the parties' Rental Agreement or constitute a habitability defect, and is instead a temporary inconvenience.

Any default in the performance of this Addendum shall constitute a default under the parties' Rental Agreement.

_____     _____
Resident                                               Date

_____     _____
Resident                                               Date

_____     _____
Resident                                               Date

_____     _____
Resident                                               Date

_____     _____
Owners Representatives                         Date

*The information contained in this document, including all designs and related materials, is the exclusive property of Avenue5 Residential, LLC. All details included in this document are confidential, privileged, and solely for the purposes of informing and guiding current Avenue5 associates. No information in this document may be shared, used, published, reproduced, or redistributed without the prior written consent of Avenue5.*

*Revised 6/15/2018*
*Owner:  Risk Management*
*Page **2** of **2***

Document digitally signed using RENTCafe eSignature services. Document ID: 4061807

# LEASE ADDENDUM
# FOR INTRUSION ALARM



**1. DWELLING UNIT DESCRIPTION.**
Unit No. ____**1606**____, **205 Roy Street,**
**Apt. 1606** _____
_____ *(street address)* in
_____**Seattle**_____
*(city)*, Washington, ____**98109**____ *(zip code)*.

**2. LEASE CONTRACT DESCRIPTION.**
Lease Contract Date: **May 20, 2021**
Owner's name: **225 Roy LLC**
_____
_____
_____
_____

Residents *(list all residents)*:
**Kimen Trochalakis**
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

This Addendum constitutes an Addendum to the above described Lease Contract for the above described premises, and is hereby incorporated into and made a part of such Lease Contract. Where the terms or conditions found in this Addendum vary or contradict any terms or conditions found in the Lease Contract, this Addendum shall control.

**3. INTRUSION ALARM.** Your dwelling is equipped with an intrusion alarm. It must not be considered a guaranty of safety or security. You should at all times take precautions as if the intrusion alarm were malfunctioning. You acknowledge that the security of you and your family, occupants, and guests are your responsibility. Your use of the alarm system is *(check one)* ☐ required or ☒ optional. You are responsible for all false alarm charges for your dwelling.

**4. PERMIT FROM CITY.** You *(check one)* ☐ do or ☒ do not have to obtain a city permit for activation and use of the intrusion alarm. If you do, the phone number to call is _____,
and it is your responsibility to obtain the permit.

**5. FOLLOW INSTRUCTIONS.** You agree to use reasonable care in operating the alarm and to follow the written instructions, rules and procedures furnished to you by us. Instructions ☐ are attached or ☐ will be provided to you when you move in.

**6. ALARM COMPANY.** You *(check one)* ☒ will or ☐ will not have to make arrangements with an independent alarm company to activate and maintain the alarm system. You *(check one)* ☒ may choose your own alarm company or ☐ are required to use _____ as your alarm company. The alarm

system is repaired and maintained by **Resident**
_____.

**7. ENTRY BY OWNER.** Upon activation of the alarm system, you must immediately provide us (management) with your security code and any special alarm system instructions for lawful entry into the unit when no one is there, as authorized in your Lease Contract. You must reimburse us for any expenses we incur in entering your dwelling, when those expenses are due to your failure to provide the foregoing information.

**8. REPAIRS OR MALFUNCTIONS.** If the intrusion alarm malfunctions, you agree to *(check one)* ☒ contact your intrusion alarm company immediately for repair or ☐ contact us immediately for repair. The cost of repair will be paid by *(check one)* ☒ you or ☐ us.

**9. NO WARRANTY.** We make no guarantees or warranties, express or implied, concerning the alarm system. All guarantees and warranties are expressly disclaimed. Crime can and does occur despite the best security measures. Anything electronic or mechanical in nature will malfunction from time to time.

**10. LIABILITY.** It is recommended that you purchase insurance to cover casualty loss of your property, including loss by theft.

**11. EMERGENCIES.** Always call 911 or law enforcement authorities or emergency medical services in the event of a crime or emergency. Then contact us. We are not required to answer the alarm, but we do have the right to enter and cut off the alarm to minimize annoyance to neighbors when it malfunctions or is not timely cut off.

**12. ENTIRE AGREEMENT.** We've made no promises or representations regarding the alarm system except those in this addendum.

**13. SPECIAL PROVISIONS.** The following special provisions control over conflicting provisions of this printed form: **Unit is not equipped with an Intrusion Alarm.**
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

|  |  |
|---|---|
| **Resident or Residents** | **Owner or Owner's Representative** |
| *(All residents must sign here)* | *(Signs here)* |

_____

_____

_____          **Date of Lease Contract**

_____          _____

_____          **May 20, 2021**

© 2017, National Apartment Association, Inc. - 9/2018, Washington

Document digitally signed using RENTCafe eSignature services. Document ID: 4061807

# BED BUG ADDENDUM

Date: **May 20, 2021**
(when this Addendum is filled out)



> *Please note: It is our goal to maintain a quality living environment for our residents. To help achieve this goal, it is important to work together to minimize the potential for any bed bugs in your dwelling or surrounding dwellings. This Addendum contains important information that outlines your responsibility and potential liability with regard to bed bugs.*

**1. DWELLING UNIT DESCRIPTION.**
Unit No. **1606** , **205 Roy Street, Apt. 1606**
_____ *(street address)* in
_____ **Seattle** _____
*(city)*, Washington, _____ **98109** _____ *(zip code)*.

**2. LEASE CONTRACT DESCRIPTION.**
Lease Contract Date: **May 20, 2021**
Owner's name: **225 Roy LLC**
_____
_____
_____
_____

Residents *(list all residents)*:
**Kimen Trochalakis**
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

This Addendum constitutes an Addendum to the above described Lease Contract for the above described premises, and is hereby incorporated into and made a part of such Lease Contract. Where the terms or conditions found in this Addendum vary or contradict any terms or conditions found in the Lease Contract, this Addendum shall control.

**3. PURPOSE.** This Addendum modifies the Lease Contract and addresses situations related to bed bugs *(cimex lectularius)* which may be discovered infesting the dwelling or personal property in the dwelling. You understand that we relied on your representations to us in this Addendum.

**4. INSPECTION AND INFESTATIONS.** BY SIGNING THIS ADDENDUM, YOU REPRESENT THAT:

- YOU HAVE INSPECTED THE DWELLING PRIOR TO MOVING IN, OR PRIOR TO SIGNING THIS ADDENDUM, AND YOU DID NOT FIND ANY EVIDENCE OF BED BUGS OR A BED BUG INFESTATION;

OR

- YOU WILL INSPECT THE DWELLING WITHIN 48 HOURS AFTER MOVING IN, OR WITHIN 48 HOURS AFTER SIGNING THIS ADDENDUM AND WILL NOTIFY US OF ANY BED BUGS OR BED BUG INFESTATIONS.

You agree that you have read the information provided in this Addendum and that you are not aware of any infestation or presence of bed bugs in your current or previous dwellings, furniture, clothing, personal property, or possessions. You also acknowledge that you have fully disclosed to us any previous bed bug infestations or bed bug issues that you have experienced.

If you disclose to us a previous experience with bed bug infestations or other bed bug related issues, we can review documentation of the previous treatment(s) and inspect your personal property and possession to confirm the absence of bed bugs.

**5. ACCESS FOR INSPECTION AND PEST TREATMENT.** You must allow us and our pest control agents access to the dwelling at reasonable times to inspect for or treat bed bugs as allowed by law. You and your family members, occupants, guests, and invitees must cooperate and will not interfere with inspections or treatments. We have the right to select any licensed pest control professional to treat the dwelling and building. We can select the method of treating the dwelling, building and common areas for bed bugs. We can also inspect and treat adjacent or neighboring dwellings to the infestation even if those dwellings are not the source or cause of the known infestation. Unless otherwise prohibited by law, you are responsible for and must, at your own expense, have your own personal property, furniture, clothing and possessions treated according to accepted treatment methods established by a licensed pest control firm that we approve. You must do so as close as possible to the time we treated the dwelling. If you fail to do so, you will be in default, and we will have the right to terminate your right of occupancy and exercise all rights and remedies under the Lease Contract. You agree not to treat the dwelling for a bed bug infestation on your own.

**6. NOTIFICATION.** You must promptly notify us in writing:
- of any known or suspected bed bug infestation or presence in the dwelling, or in any of your clothing, furniture or personal property.
- of any recurring or unexplained bites, stings, irritations, or sores of the skin or body which you believe is caused by bed bugs, or by any condition or pest you believe is in the dwelling.
- if you discover any condition or evidence that might indicate the presence or infestation of bed bugs, or of any confirmation of bed bug presence by a licensed pest control professional or other authoritative source.

**7. COOPERATION.** If we confirm the presence or infestation of bed bugs, you must cooperate and coordinate with us and our pest control agents to treat and eliminate the bed bugs. You must follow all directions from us or our agents to clean and treat the dwelling and building that are infested. You must remove or destroy personal property that cannot be treated or cleaned as close as possible to the time we treated the dwelling. Any items you remove from the dwelling must be disposed of off-site and not in the property's trash receptacles. If we confirm the presence or infestation of bed bugs in your dwelling, we have the right to require you to temporarily vacate the dwelling and remove all furniture, clothing and personal belongings in order for us to perform pest control services. If you fail to cooperate with us, you will be in default, and we will have the right to terminate your right of occupancy and exercise all rights and remedies under the Lease Contract.

**8. RESPONSIBILITIES.** You may be required to pay all reasonable costs of cleaning and pest control treatments incurred by us to treat your dwelling unit, other dwelling units, or common areas for bed bugs. If we confirm the presence or infestation of bed bugs after you vacate your dwelling, you may be responsible for the cost of cleaning and pest control treatments. If we must move other residents in order to treat adjoining or neighboring dwellings to your dwelling unit, you may be liable for payment of any lost rental income and other expenses incurred by us to relocate the neighboring residents and to clean and perform pest control treatments to eradicate infestations in other dwellings. If you fail to pay us for any costs you are liable for, you will be in default, and we will have the right to terminate your right of occupancy and exercise all rights and remedies under the Lease Contract, and obtain immediate possession of the dwelling. If you fail to move out after your right of occupancy has been terminated, you will be liable for holdover rent under the Lease Contract.

Case 3:23-md-03071    Document 346-1    Filed 07/07/23    Page 53 of 75 PageID #: 3097
© 2020, National Apartment Association, Inc. - 2/2020, Washington

Page 1 of 3

Document digitally signed using RENTCafe eSignature services. Document ID: 4061807

**9. TRANSFERS.** If we allow you to transfer to another dwelling in the community because of the presence of bed bugs, you must have your personal property and possessions treated according to accepted treatment methods or procedures established by a licensed pest control professional. You must provide proof of such cleaning and treatment to our satisfaction.

**10. SPECIAL PROVISIONS.** The following special provisions control over conflicting provisions of this printed form:

_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

**You are legally bound by this document. Please read it carefully.**

| **Resident or Residents** | **Owner or Owner's Representative** |
| *(All residents must sign)* | *(Signs below)* |

_____

_____          _____

_____          **Date of Signing Addendum**

_____

_____          _____

_____

*You are entitled to receive an original of this Addendum after it is fully signed. Keep it in a safe place.*

© 2020, National Apartment Association, Inc. - 2/2020, Washington

Document digitally signed using RENTCafe eSignature services. Document ID: 4061807

# BED BUGS — A Guide for Rental Housing Residents

Bed bugs, with a typical lifespan of 6 to 12 months, are wingless, flat, broadly oval-shaped insects. Capable of reaching the size of an apple seed at full growth, bed bugs are distinguishable by their reddish-brown color, although after feeding on the blood of humans and warm-blooded animals—their sole food source—the bugs assume a distinctly blood-red hue until digestion is complete.

**Bed bugs don't discriminate**

Bed bugs increased presence across the United States in recent decades can be attributed largely to a surge in international travel and trade. It's no surprise then that bed bugs have been found time and time again to have taken up residence in some of the fanciest hotels and apartment buildings in some of the nation's most expensive neighborhoods.

Nonetheless, false claims that associate bed bugs presence with poor hygiene and uncleanliness have caused rental housing residents, out of shame, to avoid notifying owners of their presence. This serves only to enable the spread of bed bugs.

While bed bugs are, by their very nature, more attracted to clutter, they're certainly not discouraged by cleanliness.

Bottom line: bed bugs know no social and economic bounds; claims to the contrary are false.

**Bed bugs don't transmit disease**

There exists no scientific evidence that bed bugs transmit disease. In fact, federal agencies tasked with addressing pest of public health concern, namely the U.S. Environmental Protection Agency and the Centers for Disease Control and Prevention, have refused to elevate bed bugs to the threat level posed by disease transmitting pests. Again, claims associating bed bugs with disease are false.

**Identifying bed bugs**

*Bed bugs can often be found in, around and between:*

- Bedding
- Bed frames
- Mattress seams
- Upholstered furniture, especially under cushions and along seams
- Around, behind and under wood furniture, especially along areas where drawers slide
- Curtains and draperies
- Along window and door frames
- Ceiling and wall junctions
- Crown moldings
- Behind and around wall hangings and loose wallpaper
- Between carpeting and walls (carpet can be pulled away from the wall and tack strip)
- Cracks and crevices in walls and floors
- Inside electronic devices, such as smoke and carbon monoxide detectors

- Because bed bugs leave some persons with itchy welts strikingly similar to those caused by fleas and mosquitoes, the origination of such markings often go misdiagnosed. However, welts caused by bed bugs often times appear in succession and on exposed areas of skin, such as the face, neck and arms. In some cases, an individual may not experience any visible reaction resulting from direct contact with bed bugs.
- While bed bugs typically prefer to act at night, they often do not succeed in returning to their hiding spots without leaving traces of their presence through fecal markings of a red to dark brown color, visible on or near beds. Blood stains tend also to appear when the bugs have been squashed, usually by an unsuspecting host in their sleep. And, because they shed, it's not uncommon for skin casts to be left behind in areas typically frequented by bed bugs.

**Preventing bed bug encounters when traveling**

Because humans serve as bed bugs' main mode of transportation, it is extremely important to be mindful of bed bugs when away from home. Experts agree that the spread of bed bugs across all regions of the United States is largely attributed to an increase in international travel and trade. Travelers are therefore encouraged to take a few minutes upon arriving to their temporary destination to thoroughly inspect their accommodations, so as to ensure that any uninvited guests are detected before the decision is made to unpack.

Because bed bugs can easily travel from one room to another, it is also recommended that travelers thoroughly inspect their luggage and belongings for bed bugs before departing for home.

**Bed bug do's and don'ts**

- **Do not bring used furniture from unknown sources into your dwelling.** Countless bed bug infestations have stemmed directly from the introduction to a resident's unit of second-hand and abandoned furniture. Unless the determination can be made with absolute certainty that a piece of second-hand furniture is bed bug-free, residents should assume that the reason a seemingly nice looking leather couch, for example, is sitting curbside, waiting to be hauled off to the landfill, may very well be due to the fact that it's teeming with bed bugs.
- **Do address bed bug sightings immediately.** Rental housing residents who suspect the presence of bed bugs in their unit must immediately notify the owner.
- **Do not attempt to treat bed bug infestations.** Under no circumstance should you attempt to eradicate bed bugs. Health hazards associated with the misapplication of traditional and non-traditional, chemical-based insecticides and pesticides poses too great a risk to you and your neighbors.
- **Do comply with eradication protocol.** If the determination is made that your unit is indeed playing host to bed bugs, you must comply with the bed bug eradication protocol set forth by both your owner and their designated pest management company.

Case 3:23-md-03071    Document 346-1    Filed 07/07/23    Page 55 of 75 PageID 3099

© 2020, National Apartment Association, Inc. - 2/2020, Washington

Page 1 of 3

Document digitally signed using RENTCafe eSignature services. Document ID: 4061807



> *Please note: It is our goal to maintain a quality living environment for our residents. To help achieve this goal, it is important to work together to minimize any mold growth in your dwelling. That is why this addendum contains important information for you, and responsibilities for both you and us.*

**1. DWELLING UNIT DESCRIPTION.**
Unit No. _____**1606**_____, **205 Roy Street,**
**Apt. 1606**
_____ *(street address)* in
**Seattle**
*(city)*, Washington, ___**98109**___ *(zip code)*.

**2. LEASE CONTRACT DESCRIPTION.**
Lease Contract Date: **May 20, 2021**
Owner's name: **225 Roy LLC**
_____
_____
_____
_____

Residents *(list all residents)*:
**Kimen Trochalakis**
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

This Addendum constitutes an Addendum to the above described Lease Contract for the above described premises, and is hereby incorporated into and made a part of such Lease Contract. Where the terms or conditions found in this Addendum vary or contradict any terms or conditions found in the Lease Contract, this Addendum shall control.

**3. ABOUT MOLD.** Mold is found virtually everywhere in our environment—both indoors and outdoors and in both new and old structures. Molds are naturally occurring microscopic organisms which reproduce by spores and have existed practically from the beginning of time. All of us have lived with mold spores all our lives. Without molds we would all be struggling with large amounts of dead organic matter.

Mold breaks down organic matter in the environment and uses the end product for its food. Mold spores (like plant pollen) spread through the air and are commonly transported by shoes, clothing and other materials. When excess moisture is present inside a dwelling, mold can grow. A 2004 Federal Centers for Disease Control and Prevention study found that there is currently no scientific evidence that the accumulation of mold causes any significant health risks for person with normally functioning immune systems. Nonetheless, appropriate precautions need to be taken.

**4. PREVENTING MOLD BEGINS WITH YOU.** In order to minimize the potential for mold growth in your dwelling, you must do the following:

- Keep your dwelling clean—particularly the kitchen, the bathroom(s), carpets and floors. Regular vacuuming, mopping and using a household cleaner to clean hard surfaces is important to remove the household dirt and debris that harbor mold or food for mold. Immediately throw away moldy food.

- Remove visible moisture accumulation on windows, walls, ceilings, floors and other surfaces as soon as reasonably possible. Look for leaks in washing machine hoses and discharge lines—especially if the leak is large enough for water to infiltrate nearby walls. Turn on any exhaust fans in the bathroom and kitchen *before* you start showering

or cooking with open pots. When showering, be sure to keep the shower curtain *inside* the tub or fully close the shower doors. Also, the experts recommend that after taking a shower or bath, you: (1) wipe moisture off of shower walls, shower doors, the bathtub and the bathroom floor; (2) leave the bathroom door open until all moisture on the mirrors and bathroom walls and tile surfaces has dissipated; and (3) hang up your towels and bath mats so they will completely dry out.

- Promptly notify us in writing about any air conditioning or heating system problems you discover. Follow our rules, if any, regarding replacement of air filters. Also, it is recommended that you periodically open windows and doors on days when the outdoor weather is dry (i.e., humidity is below 50 percent) to help humid areas of your dwelling dry out.

- Promptly notify us in writing about any signs of water leaks, water infiltration or mold. We will respond in accordance with state law and the Lease Contract to repair or remedy the situation, as necessary.

- Keep the thermostat set to automatically circulate air in the event temperatures rise to or above 80 degrees Fahrenheit.

**5. IN ORDER TO AVOID MOLD GROWTH**, it is important to prevent excessive moisture buildup in your dwelling. Failure to promptly pay attention to leaks and moisture that might accumulate on dwelling surfaces or that might get inside walls or ceilings can encourage mold growth. Prolonged moisture can result from a wide variety of sources, such as:

- rainwater leaking from roofs, windows, doors and outside walls, as well as flood waters rising above floor level;

- overflows from showers, bathtubs, toilets, lavatories, sinks, washing machines, dehumidifiers, refrigerator or A/C drip pans or clogged up A/C condensation lines;

- leaks from plumbing lines or fixtures, and leaks into walls from bad or missing grouting/caulking around showers, tubs or sinks;

- washing machine hose leaks, plant watering overflows, pet urine, cooking spills, beverage spills and steam from excessive open-pot cooking;

- leaks from clothes dryer discharge vents (which can put lots of moisture into the air); and

- insufficient drying of carpets, carpet pads, shower walls and bathroom floors.

**6. IF SMALL AREAS OF MOLD HAVE ALREADY OCCURRED ON *NON-POROUS* SURFACES** (such as ceramic tile, formica, vinyl flooring, metal, wood or plastic), the federal Environmental Protection Agency (EPA) recommends that you first clean the areas with soap (or detergent) and water, let the surface dry, and then within 24 hours apply a pre-mixed, spray-on-type household biocide, such as Lysol Disinfectant®, Pine-Sol Disinfectant® (original pine-scented), Tilex Mildew Remover® or Clorox Cleanup®. (Note: Only a few of the common household cleaners will actually kill mold). Tilex® and Clorox® contain bleach which can discolor or stain. **Be sure to follow the instructions on the container.** Applying biocides without first cleaning away the dirt and oils from the surface is like painting over old paint without first cleaning and preparing the surface.

Always clean and apply a biocide to an area 5 or 6 times larger than any visible mold because mold may be adjacent in quantities not yet visible to the naked eye. A vacuum cleaner

©2021, National Apartment Association, Inc. - 3/2021, Washington
Page 1 of 3

Document digitally signed using RENTCafe eSignature services. Document ID: 4061807

with a high-efficiency particulate air (HEPA) filter can be used to help remove non-visible mold products from porous items, such as fibers in sofas, chairs, drapes and carpets—provided the fibers are completely dry. Machine washing or dry cleaning will remove mold from clothes.

**7. DO NOT CLEAN OR APPLY BIOCIDES TO:** (1) visible mold on *porous surfaces*, such as sheetrock walls or ceilings, or (2) *large areas* of visible mold on *non-porous* surfaces. Instead, notify us in writing, and we will take appropriate action.

**8. COMPLIANCE.** Complying with this addendum will help prevent mold growth in your dwelling, and both you and we will be able to respond correctly if problems develop that could lead to mold growth. If you have questions regarding this addendum, please contact us at the management office or at the phone number shown in your Lease Contract.

**If you fail to comply with this Addendum, you can be held responsible for property damage to the dwelling and any health problems that may result. We can't fix problems in your dwelling unless we know about them.**

**9. SPECIAL PROVISIONS.** The following special provisions control over conflicting provisions of this printed form:

_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____



Washington State Department of
# Health

www.doh.wa.gov/mold

## Mold

### What are molds?
Molds are tiny microscopic organisms that digest organic matter and reproduce by releasing spores. Molds are a type of fungi and there are over 100,000 species. In nature, mold helps decompose or break-down leaves, wood and other plant debris. Molds become a problem when they go where they are not wanted and digest materials such as our homes.

### What makes molds grow in my home?
Mold enters your home as tiny spores. The spores need moisture to begin growing, digesting and destroying. Molds can grow on almost any surface, such as wood, ceiling tiles, wallpaper, paints, carpet, sheet rock, and insulation. The mold grows best when there is lots of moisture from a leaky roof, high humidity, or flood. There is no way to get rid of all molds and mold spores from your home. But you can control mold growth by keeping your home dry.

### Can I be exposed to mold?
When molds are disturbed, they release spores into the air. You can be exposed by breathing air containing these mold spores. You can also be exposed through touching moldy items, eating moldy food or accidental hand to mouth contact.

### Do molds affect my health?
Most molds do not harm healthy people. But people who have allergies or asthma may be more sensitive to molds. Sensitive people may experience skin rash, running nose, eye irritation, cough, nasal congestion, aggravation of asthma or difficulty breathing. People with an immune suppression or underlying lung disease, may be at increased risk for infections from molds. A small number of molds produce toxins called mycotoxins. When people are exposed to high levels of mold mycotoxins they may suffer toxic effects, including fatigue, nausea, headaches, and irritation to the lungs and eyes. If you or your family members have health problems that you suspect are caused by exposure to mold, you should consult with your physician.

### When is mold a problem?
You know you have mold when you smell the "musty" odor or see small black or white specks along your damp bathroom or basement walls. Some mold is hidden growing behind wall coverings or ceiling tiles. Even dry, dead mold can cause health problems, so always take precautions when you suspect mold. Mold is often found in areas where water has damaged building materials and furniture from flooding or plumbing leaks. Mold can also be found growing along walls where warm moist air condenses on cooler wall surfaces, such as inside cold exterior walls, behind dressers, headboards, and in closets where articles are stored against walls. Mold often grows in rooms with both high water usage and humidity, such as kitchens, bathrooms, laundry rooms, and basements. If you notice mold or know of water damaged areas in your home, it is time to take action to control its growth.

### When should I sample for mold?
You don't need to sample for mold because in most cases you can see or smell mold. Even a clean, dry house will have some mold spores, but not enough to cause health problems. If you smell mold it may be hidden behind wallpaper, in the walls or ceiling, or under the carpet. If you suspect you have hidden mold be very careful when you investigate, protect yourself from exposure in the same manner as you would for a clean-up. See the chart below.

### Can I control mold growth in my home?
Yes you can. Dry out the house and fix any moisture problems in your home:
- Stop water leaks, repair leaky roofs and plumbing. Keep water away from concrete slabs and basement walls.
- Open windows and doors to increase air flow in your home, especially along the inside of exterior walls. Use a fan if there are no windows available.
- Make sure that warm air flows into all areas of the home. Move large objects a few inches away from the inside of exterior walls to increase air circulation.
- Install and use exhaust fans in bathrooms, kitchens, and laundry rooms.
- Ventilate and insulate attic and crawl spaces. Use heavy plastic to cover earth floors in crawl spaces.

©2021, National Apartment Association, Inc. - 3/2021, Washington

Document digitally signed using RENTCafe eSignature services. Document ID: 4061807

Page 2 of 3

- Clean and dry water damaged carpets, clothing, bedding, and upholstered furniture within 24 to 48 hours, or consider removing and replacing damaged furnishings.
- Vacuum and clean your home regularly to remove mold spores.
- Check around your windows for signs of condensation and water droplets. Wipe them up right away so mold can't start to grow.

## What can I use to clean up mold?

Clean up mold and take care of the problem by following the advice above to keep your home dry and keep mold out. Act fast! Mold damages your home as it grows. Clean it up as soon as possible.

### Size the Moldy Area

Decide if you have a large or small area of mold. A small area is less than about ten square feet, or a patch three feet by three feet square. To clean a small area, follow the advice below. You may use a cotton face mask for protection. If you have a lot of mold damage (more than ten square feet) consider hiring a cleaning professional. If the moldy area has been contaminated by sewage or is in hidden places, hire a professional. To find a professional, check under "Fire and Water Damage Restoration" in your Yellow Pages. If you decide to clean up on your own, follow the guidance below.

### Use Protection

Wear goggles, gloves, and breathing protection while working in the area. For large consolidated areas of mold growth, you should wear an Occupational Safety and Health Administration (OSHA) approved particle mask.

### Seal the Area

Seal off area from the rest of your home. Cover heat registers or ventilation ducts/grills. Open a window before you start to clean up.

### Remove Items

Remove all your furnishings to a mold-free area. Clean the surrounding moldy area then follow cleaning directions below for the items you removed and the new space.

### Bag Moldy Trash

Bag all moldy materials and tie off the top of the bag. Bring them outdoors and place in your garbage container right away.

### Scrub Surfaces

- First wash with a mild detergent solution, such as laundry detergent and warm water. Allow to dry.
- (Optional step) Then wipe with a solution of 1/4 cup bleach to one gallon of water. Wait 20 minutes and repeat. Wait another 20 minutes.
- Last apply a borate-based detergent solution and don't rinse. This will help prevent mold from growing again. A borate-based laundry or dish washer detergent has "borate" listed on the ingredients label.

### Clean and Wash

Give the entire area a good cleaning, vacuum floors, and wash any exposed bedding or clothing.

### Monitor

Check regularly to make sure mold has not returned to the clean-up area.

## What cleans moldy furniture and other items?

- For wood, metal, plastic, glass, ceramics, and other objects that don't absorb water but are washable - wipe them with a solution of lukewarm water and laundry detergent.
- For clothes, bedding, and other materials that absorb water and are washable - wash them in the laundry.
- For beds, sofas, and other furniture that absorb water but are not washable - these items may need to be discarded. Or, try to save them by vacuuming well and allowing to air out. If there is no odor it may be okay. Mold can come back, so watch for any mold growth or mold related health problems. Discard the item if you suspect mold is growing inside or outside the item.

## Should I paint over mold?

No. Don't paint or caulk over mold. The mold will grow under the paint and the paint will peel.

## I'm a renter or landlord, what help can you provide for a mold problem?

Mold problems in buildings are a result of water and moisture problems. Excess moisture comes from leaks or condensation. Tenants and landlords both have responsibilities for addressing water and moisture problems that can cause mold. Generally, fixing leaks is the landlord's responsibility and reducing condensation is the renter's responsibility. See our mold resources for renters and landlords (www.doh.wa.gov/rentermold).

## Who are my local contacts for more information about mold?

In Washington, you can contact your local county health department (www.doh.wa.gov/localhealth) for more information about mold. If you live outside of Washington State, try contacting your county or state health department.

## More Information

- Mold and Indoor Air Quality Information Line: 360-236-3090
- Mold, CDC (www.cdc.gov/mold)
- Mold, EPA (www.epa.gov/mold)

| Resident or Residents | Owner or Owner's Representative |
|---|---|
| *(All residents must sign here)* | *(Signs here)* |

_____

_____

_____     **Date of Lease Contract**

_____     **May 20, 2021**

_____

_____

© 2021 National Apartment Association, Inc.
Washington/National Apartment Association Official Form, March 2021.

Document digitally signed using RENTCafe eSignature services. Document ID: 4061807

# SMOKE/CARBON MONOXIDE ALARM ADDENDUM



Date: _____ May 20, 2021 _____
*(when this Addendum is filled out)*

This SMOKE/CARBON MONOXIDE ALARM ADDENDUM is incorporated into the Apartment Lease Contract dated _____ May 20, 2021 _____, by and between **Kimen Trochalakis** _____

_____

_____

_____

_____

_____

_____

_____

_____

Resident(s) *(list all residents)* and **225 Roy LLC**

_____

_____

_____

the Landlord located at _____ **1606** _____ *(Apt. No.)*, **205 Roy Street, Apt. 1606**

*(street address)*, in _____ **Seattle** _____ *(city)*, Washington, _____ **98109** _____ *(zip code)*.

**SMOKE ALARM:** Your Premises are equipped with _____ (number) smoke alarms. Each smoke alarm is powered by ❏ a battery ❏ electricity ☒ electricity with battery backup. The smoke alarms were tested by the Landlord at the commencement of your tenancy and found to be in good working condition.

**CARBON MONOXIDE ALARM:** As required by law, your Premises are outfitted with a carbon monoxide alarm. The carbon monoxide alarm is a ❏ **battery** ❏ **electric** ☒ **electric with battery backup** powered device. The carbon monoxide alarm was tested by the Landlord at the commencement of your tenancy and found to be in good working condition.

**RESIDENT'S DUTIES:** Resident shall (a) test any alarm so provided at least once every six months (but preferably once per month); (b) keep the alarm's case clean and free from dirt, debris, and infestation; (c) replace batteries as needed; (d) immediately notify Landlord of any operating deficiencies; and (e) not remove, damage, alter, modify, obstruct, or tamper with any properly functioning alarm or remove working batteries from the same. If the Premises are so equipped, Resident shall not tamper with, obstruct, damage or otherwise alter or modify the indoor sprinkler system.

❏ If the foregoing box is checked, then (a) do not replace batteries, (b) immediately notify the Landlord if you think that any batteries should be replaced, and (c) initial here:

_____

**TESTING YOUR ALARM:** You must test the alarm by using the test button. (When pressed, this button affects the smoke alarm like real smoke would during a fire, and the carbon monoxide alarm if carbon monoxide exceeds the alarm's acceptable levels.) To use the test button, firmly press the test button until the alarm sounds (normally 2-10 seconds later). Shortly after the button is released, the alarm will stop sounding. Do not test any alarm with a flame. When battery power is low, the alarm will beep about once a minute for at least 30 days. When the battery is dead, the alarm will not sound.

**HUSH FEATURE:** You can silence an alarm equipped with a hush feature by holding the hush button until the alarm stops sounding. Do not disconnect battery to stop alarm sounding.

**BATTERY:** Use only with the following batteries: Mallory or Duracell Alkaline No. MN 1604, Eveready 552 9-volt, or an equivalent of these batteries. Do not use ordinary or heavy-duty carbon-zinc batteries. Use of any other battery may be detrimental to the operation of the alarm.

**WHEN TO REPLACE:** A defective, low power, or dying battery must be replaced immediately so as to ensure proper operation and safety.

**TAMPERING FEE:** Removal of or tampering with a smoke alarm and/or carbon monoxide alarm will result, without limitation, in a $250.00 fee and/or a termination notice.

## SMOKE AND CARBON MONOXIDE ALARMS: RESIDENT RESPONSIBILITIES

I have received the smoke alarm, carbon monoxide alarm, in Apartment # _____ **1606** _____ in good working order. I understand it is MY responsibility to test and maintain the alarm(s) within said unit and to immediately notify the Landlord or authorized agent of any deficiencies.

**Resident or Residents** *(sign here)*                    **Date of Signing Addendum**

_____    _____

_____    _____

_____    _____

_____    _____

_____    _____

**Landlord or Landlord's Representative** *(sign here)*          **Date of Signing Addendum**

_____    _____

© 2019, National Apartment Association, Inc. - 4/2019, Washington

Document digitally signed using RENTCafe eSignature services. Document ID: 4061807

# FIRE SAFETY AND PROTECTION INFORMATION

This Fire Safety and Protection Information form is incorporated into the Lease Contract executed on _____ **May 20, 2021** _____ between **225 Roy LLC**

_____

_____ ( "We" ) and

**Kimen Trochalakis** _____

_____

_____

_____

("You") of Unit No. _____ **1606** _____ located at **205 Roy Street, Apt. 1606**

(street address) in **Seattle, WA 98109**

_____ and is in addition to all terms and conditions in the Lease Contract.

1. The dwelling is equipped with smoke detection devices as required by RCW 43.44.110. These smoke detection devices are ☒ hard wired ☒ battery operated. The devices have been inspected and are properly operating at the commencement of the tenancy. It is the resident's responsibility to maintain the devices in proper operating condition including replacement of batteries, if necessary. A fine can be imposed for failure to comply with the provisions of RCW 43.44.110.

2. A diagram showing the emergency evacuation routes for residents is attached as Exhibit A.

3. The dwelling complex ☒ does ☐ does not have a fire sprinkler system.

4. The dwelling complex ☒ does ☐ does not have a fire alarm system.

5. The dwelling complex ☒ does ☐ does not have a smoking policy. A copy of any smoking policy is attached as Exhibit B.

6. The dwelling complex ☐ does ☒ does not have an emergency notification plan for residents. A copy of any such plan is attached as Exhibit C.

7. The dwelling complex ☐ does ☒ does not have an emergency relocation plan for residents. A copy of any such plan is attached as Exhibit D.

8. The dwelling complex ☐ does ☒ does not have an emergency evacuation plan for residents. A copy of any such plan is attached as Exhibit E.


**Resident or Residents**
*(All residents must sign here)*

_____

_____

_____

_____

_____

_____

**Owner or Owner's Representative**
*(signs here)*

_____

**Date of Lease Contract**

**May 20, 2021**

©2019, National Apartment Association, Inc. - 9/2019, Washington

Document digitally signed using RENTCafe eSignature services. Document ID: 4061807

# NO-SMOKING ADDENDUM

Date: **May 20, 2021**
(when this Addendum is filled out)



*All use of any tobacco product involving smoking, burning, or combustion of tobacco is prohibited in any portion of the apartment community. You are entitled to receive an original of this No-Smoking Addendum after it is fully signed. Keep it in a safe place.*

1. **DWELLING UNIT DESCRIPTION.**
   Unit No. **1606** , **205 Roy Street,**
   **Apt. 1606**
   _____ *(street address)* in
   **Seattle**
   *(city)*, Washington, **98109** *(zip code).*

2. **LEASE CONTRACT DESCRIPTION.**
   Lease Contract Date: **May 20, 2021**
   Owner's name: **225 Roy LLC**
   _____
   _____
   _____
   _____

   Residents *(list all residents)*:
   **Kimen Trochalakis**
   _____
   _____
   _____
   _____
   _____
   _____
   _____
   _____
   _____
   _____
   _____

   This Addendum constitutes an Addendum to the above described Lease Contract for the above described premises, and is hereby incorporated into and made a part of such Lease Contract. Where the terms or conditions found in this Addendum vary or contradict any terms or conditions found in the Lease Contract, this Addendum shall control.

3. **DEFINITION OF SMOKING.** Smoking refers to any use or possession of a cigar, cigarette, e-cigarette, hookah, vaporizer, or pipe containing tobacco or a tobacco product while that tobacco or tobacco product is burning, lighted, vaporized, or ignited, regardless of whether the person using or possessing the product is inhaling or exhaling the smoke from such product. The term tobacco includes, but is not limited to any form, compound, or synthesis of the plant of the genus Nicotiana or the species N. tabacum which is cultivated for its leaves to be used in cigarettes, cigars, e-cigarettes, hookahs, vaporizers, or pipes. Smoking also refers to use or possession of burning, lighted, vaporized, or ignited non-tobacco products if they are noxious, offensive, unsafe, unhealthy, or irritating to other persons.

4. **SMOKING ANYWHERE INSIDE BUILDINGS OF THE APARTMENT COMMUNITY IS STRICTLY PROHIBITED.** All forms and use of burning, lighted, vaporized, or ignited tobacco products and smoking of tobacco products inside any dwelling, building, or interior of any portion of the apartment community is strictly prohibited. Any violation of the no-smoking policy is a material and substantial violation of this Addendum and the Lease Contract.

   The prohibition on use of any burning, lighted, vaporized, or ignited tobacco products or smoking of any tobacco products extends to all residents, their occupants, guests, invitees and all others who are present on or in any portion of the apartment community. The no-smoking policy and rules extend to, but are not limited to, the management and leasing offices, building interiors and hallways, building common areas, dwellings, club house, exercise or spa facility, tennis courts, all interior areas of the apartment community, commercial shops, businesses, and spaces, work areas, and all other spaces whether in the interior of the apartment community or in the enclosed spaces on the surrounding community grounds.

Smoking of non-tobacco products which are harmful to the health, safety, and welfare of other residents inside any dwelling or building is also prohibited by this Addendum and other provisions of the Lease Contract.

5. **SMOKING OUTSIDE BUILDINGS OF THE APARTMENT COMMUNITY.** Smoking is permitted only in specially designated areas outside the buildings of the apartment community. Smoking must be at least **25** feet from the buildings in the apartment community, including administrative office buildings. If the previous field is not completed, smoking is only permitted at least 25 feet from the buildings in the apartment community, including administrative office buildings. The smoking-permissible areas are marked by signage.

   Smoking on balconies, patios, and limited common areas attached to or outside of your dwelling ☐ is ☒ is not permitted.

   The following outside areas of the community may be used for smoking: **Smoking is not permitted anywhere within the Center Steps property line; both inside or outside.**

   Even though smoking may be permitted in certain limited outside areas, we reserve the right to direct that you and your occupants, family, guests, and invitees cease and desist from smoking in those areas if smoke is entering the dwellings or buildings or if it is interfering with the health, safety, or welfare or disturbing the quiet enjoyment, or business operations of us, other residents, or guests.

6. **YOUR RESPONSIBILITY FOR DAMAGES AND CLEANING.** You are responsible for payment of all costs and damages to your dwelling, other residents' dwellings, or any other portion of the apartment community for repair, replacement, or cleaning due to smoking or smoke related damage caused by you or your occupants, family, guests, or invitees, regardless of whether such use was a violation of this Addendum. Any costs or damages we incur related to repairs, replacement, and cleaning due to your smoking or due to your violation of the no-smoking provisions of the Lease Contract are in excess of normal wear and tear. Smoke related damage, including but not limited to, the smell of tobacco smoke which permeates sheetrock, carpeting, wood, insulation, or other components of the dwelling or building is in excess of normal wear and tear in our smoke free apartment community.

7. **YOUR RESPONSIBILITY FOR LOSS OF RENTAL INCOME AND ECONOMIC DAMAGES REGARDING OTHER RESIDENTS.** You are responsible for payment of all lost rental income or other economic and financial damages or loss to us due to smoking or smoke related damage caused by you or your occupants, family, guests, or invitees which results in or causes other residents to vacate their dwellings, results in disruption of other residents' quiet enjoyment, or adversely affects other residents' or occupants' health, safety, or welfare.

8. **LEASE CONTRACT TERMINATION FOR VIOLATION OF THIS ADDENDUM.** We have the right to terminate your Lease Contract or right of occupancy of the dwelling for any violation of this No-Smoking Addendum. Violation of the no-smoking provisions is a material and substantial default or violation of the Lease Contract. Despite the termination of the Lease Contract or your occupancy, you will remain liable for rent through the end of the Lease Contract term or the date on which the dwelling is re-rented to a new occupant, whichever comes first. Therefore, you may be responsible for payment of rent after you vacate the leased premises even though you are no longer living in the dwelling.

©2018, National Apartment Association, Inc. - 10/2018, Washington

Page 1 of 2

Document digitally signed using RENTCafe eSignature services. Document ID: 4061807

9. **EXTENT OF YOUR LIABILITY FOR LOSSES DUE TO SMOKING.** Your responsibility for damages, cleaning, loss of rental income, and loss of other economic damages under this No-Smoking Addendum are in addition to, and not in lieu of, your responsibility for any other damages or loss under the Lease Contract or any other addendum.

10. **YOUR RESPONSIBILITY FOR CONDUCT OF OCCUPANTS, FAMILY MEMBERS, AND GUESTS.** You are responsible for communicating this community's no-smoking policy and for ensuring compliance with this Addendum by your occupants, family, guests, and invitees.

11. **THERE IS NO WARRANTY OF A SMOKE FREE ENVIRONMENT.** Although we prohibit smoking in all interior parts of the apartment community, there is no warranty or guaranty of any kind that your dwelling or the apartment community is smoke free. Smoking in certain limited outside areas is allowed as provided above. Enforcement of our no-smoking policy is a joint responsibility which requires your cooperation in reporting incidents or suspected violations of smoking. You must report violations of our no-smoking policy before we are obligated to investigate and act, and you must thereafter cooperate with us in prosecution of such violations.

This is an important and binding legal document. By signing this Addendum you are agreeing to follow our no-smoking policy and you are acknowledging that a violation could lead to termination of your Lease Contract or right to continue living in the dwelling. If you or someone in your household is a smoker, you should carefully consider whether you will be able to abide by the terms of this Addendum.

12. **SPECIAL PROVISIONS.** The following special provisions control over conflicting provisions of this printed form:

_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

**Resident or Residents**
*(All residents must sign here)*

_____
_____
_____
_____
_____
_____

**Owner or Owner's Representative**
*(Signs here)*

_____

Page 2 of 2

© 2018, National Apartment Association, Inc.

Washington/National Apartment Association Official Form, October 2018.

Document digitally signed using RENTCafe eSignature services. Document ID: 4061807

# CRIME/DRUG FREE HOUSING ADDENDUM



**1. DWELLING UNIT DESCRIPTION.**

Unit No. _____ **1606** _____, **205 Roy Street,**

**Apt. 1606** _____

_____ *(street address)* in

_____ **Seattle** _____

*(city)*, Washington, _____ **98109** _____ *(zip code)*.

**2. LEASE CONTRACT DESCRIPTION.**

Lease Contract Date: **May 20, 2021** _____

Owner's name: **225 Roy LLC** _____

_____

_____

_____

Residents *(list all residents)*:

**Kimen Trochalakis** _____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

**3. ADDENDUM APPLICABILITY.** In the event any provision in this Addendum is inconsistent with any provision(s) contained in other portions of, or attachments to, the above-mentioned Lease Contract, then the provisions of this Addendum shall control. For purposes of this Addendum, the term "Premises" shall include the dwelling unit, all common areas, all other dwelling units on the property or any common areas or other dwelling units on or about other property owned by or managed by the Owner. The parties hereby amend and supplement the Lease Contract as follows:

**4. CRIME/DRUG FREE HOUSING.** Resident, members of the Resident's household, Resident's guests, and all other persons affiliated with the Resident:

A. Shall not engage in any illegal or criminal activity on or about the premises. The phrase, "illegal or criminal activity" shall include, but is not limited to, the following:

1. Engaging in any act intended to facilitate any type of criminal activity.

2. Permitting the Premises to be used for, or facilitating any type of criminal activity or drug related activity, regardless of whether the individual engaging in such activity is a member of the household, or a guest.

3. The unlawful manufacturing, selling, using, storing, keeping, purchasing or giving of an illegal or controlled substance or paraphernalia as defined in city, county, state or federal laws, including but not limited to the State of Washington and/or the Federal Controlled Substances Act.

4. Violation of any federal drug laws governing the use, possession, sale, manufacturing and distribution of marijuana, regardless of state or local laws. (So long as the use, possession, sale, manufacturing and distribution of marijuana remains a violation of federal law, violation of any such federal law shall constitute a material violation of this rental agreement.)

5. Engaging in, or allowing, any behavior that is associated with drug activity, including but not limited to having excessive vehicle or foot traffic associated with his or her unit.

6. Any breach of the Lease Contract that otherwise jeopardizes the health, safety, and welfare of the Owner, Owner's agents, or other Residents, or involving imminent, actual or substantial property damage.

7. Engaging in or committing any act that would be a violation of the Owner's screening criteria for criminal conduct or which would have provided Owner with a basis for denying Resident's application due to criminal conduct.

8. Engaging in any activity that constitutes waste, nuisance, or unlawful use.

B. AGREE THAT ANY VIOLATION OF THE ABOVE PROVISIONS CONSTITUTES A MATERIAL VIOLATION OF THE PARTIES' LEASE CONTRACT AND GOOD CAUSE FOR TERMINATION OF TENANCY. A single violation of any of the provisions of this Addendum shall be deemed a serious violation, and a material default, of the parties' Lease Contract. It is understood that a single violation shall be good cause for termination of the Lease Contract. Notwithstanding the foregoing comments, Owner may terminate Resident's tenancy for any lawful reason, and by any lawful method, with or without good cause.

**5. CRIMINAL CONVICTION NOT REQUIRED.** Unless otherwise provided by law, proof of violation of any criminal law shall not require a criminal conviction.

**6. SPECIAL PROVISIONS.** The following special provisions control over conflicting provisions of this printed form:

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

|  |  |
|---|---|
| **Resident or Residents** *(sign here)* | **Date of Signing Addendum** |
| _____ | _____ |
| _____ | _____ |
| _____ | _____ |
| _____ | _____ |
| _____ | _____ |
| **Owner or Owner's Representative** *(signs here)* | **Date of Signing Addendum** |

© 2018, National Apartment Association, Inc. - 9/2018, Washington

Document digitally signed using RENTCafe eSignature services. Document ID: 4061807



1. **DWELLING UNIT DESCRIPTION.**
   Unit No. _____1606_____, 205 Roy Street,
   Apt. 1606 _____
   _____ (street address) in
   _____Seattle_____
   (city), Washington, ____98109____ (zip code).

2. **LEASE CONTRACT DESCRIPTION.**
   Lease Contract Date: **May 20, 2021**
   Owner's name: **225 Roy LLC**
   _____
   _____
   _____

   Residents (list all residents):
   **Kimen Trochalakis**
   _____
   _____
   _____
   _____
   _____
   _____
   _____
   _____
   _____
   _____

   This Addendum constitutes an Addendum to the above
   described Lease Contract for the above described premises,
   and is hereby incorporated into and made a part of such Lease
   Contract. Where the terms or conditions found in this
   Addendum vary or contradict any terms or conditions found
   in the Lease Contract, this Addendum shall control.

3. Washington State law permits the limited use of medical and
   recreational marijuana in specific and limited circumstances.
   However, this is not the case under federal law. Under federal
   law, specifically the Federal Controlled Substances Act (CSA),
   marijuana is still categorized as a Schedule I substance. This
   means that under federal law, and U.S. Supreme Court
   decisions, the manufacture, distribution, or possession of
   marijuana is strictly prohibited. Because the U.S. Department
   of Housing and Urban Development is controlled by the federal
   government, HUD policy is that the use of marijuana, whether
   prescribed for medical reasons or not, is a criminal offense
   and will not be protected under the fair housing laws or
   allowed in HUD funded housing. Therefore, apartment
   complexes are not required to accommodate the use of
   marijuana by a tenant who is a current medical marijuana
   user. Disabled tenants who are registered medical marijuana
   users, however, should not feel discouraged to request
   reasonable accommodations if the need arises.

4. The Premises listed above follows and complies with federal
   law regarding marijuana use and is, and will continue to be,
   a drug free community. Possession, use, manufacture or sale
   of any illegal substance, including marijuana, or any use of
   marijuana by the tenant and/or guests will result in immediate
   termination. If you have any questions or concerns about this
   policy, please speak to management.

5. By signing below, the resident acknowledges his or her
   understanding of the terms and conditions as stated above,
   and his or her agreement to comply with those terms and
   conditions.

6. **SPECIAL PROVISIONS.** The following special provisions
   control over conflicting provisions of this printed form:
   _____
   _____
   _____
   _____
   _____
   _____
   _____
   _____
   _____
   _____
   _____
   _____
   _____
   _____
   _____
   _____
   _____
   _____

**Resident or Residents** (sign here)          **Date of Signing Addendum**

_____          _____
_____          _____
_____          _____
_____          _____
_____          _____

**Owner or Owner's Representative** (signs here)          **Date of Signing Addendum**

_____          _____

© 2019, National Apartment Association, Inc. - 8/2019, Washington

Document digitally signed using RENTCafe eSignature services. Document ID: 4061837



**1. DWELLING UNIT DESCRIPTION.**
Unit No. _____ 1606 _____, 205 Roy Street,
Apt. 1606
_____ (street address) in
Seattle
(city), Washington, _____ 98109 _____
(zip code).

**2. LEASE CONTRACT DESCRIPTION.**
Lease Contract Date: May 20, 2021
Owner's name: 225 Roy LLC
_____
_____
_____

Residents (list all residents):
Kimen Trochalakis
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

This Addendum constitutes an Addendum to the above described Lease Contract for the above described premises, and is hereby incorporated into and made a part of such Lease Contract. Where the terms or conditions found in this Addendum vary or contradict any terms or conditions found in the Lease Contract, this Addendum shall control.

**3. SHORT TERM SUBLEASE OR RENTING PROHIBITED.** Without limiting the prohibition in the Lease on subletting, assignment, and licensing, and without limiting any of our rights or remedies, this Addendum to the Lease further supplements and defines the requirements and prohibitions contained in the Lease Contract between you and us. You are hereby strictly prohibited from subletting, and licensing, or renting to any third party, or allowing occupancy by any third party, of all or any portion of the dwelling, whether for an overnight use or duration of any length, without our prior written consent in each instance. This prohibition applies to overnight stays or any other stays arranged on Airbnb.com or other similar internet sites.

**4. PROHIBITION ON LISTING OR ADVERTISING DWELLING ON OVERNIGHT SUBLETTING OR RENTING WEBSITES.** You agree not to list or advertise the dwelling as being available for short term subletting or rental or occupancy by others on Airbnb.com or similar internet websites. You agree that listing or advertising the dwelling on Airbnb.com or similar internet websites shall be a violation of this Addendum and a breach of your Lease Contract.

**5. VIOLATION OF LEASE AGREEMENT.** Your Lease Contract allows for use of your dwelling as a private residence only and strictly prohibits conducting any kind of business in, from, or involving your dwelling unless expressly permitted

by law. Separately, your Lease Contract prohibits subletting or occupancy by others of the dwelling for any period of time without our prior written consent. Permitting your dwelling to be used for any subletting or rental or occupancy by others (including, without limitation, for a short term), regardless of the value of consideration received or if no consideration is received, is a violation and breach of this Addendum and your Lease Contract.

**6. REMEDY FOR VIOLATION.** Any violation of this Addendum constitutes a material violation of the Lease Contract, and as such we may exercise any default remedies permitted in the Lease Contract, including termination of your tenancy, in accordance with local law. This clause shall not be interpreted to restrict our rights to terminate your tenancy for any lawful reason, or by any lawful method.

**7. RESIDENT LIABILITY.** You are responsible for and shall be held liable for any and all losses, damages, and/or fines that we incur as a result of your violations of the terms of this Addendum or the Lease Contract. Further, you agree you are responsible for and shall be held liable for any and all actions of any person(s) who occupy your dwelling in violation of the terms of this Addendum or the Lease Contract, including, but not limited to, property damage, disturbance of other residents, and violence or attempted violence to another person. In accordance with applicable law, without limiting your liability you agree we shall have the right to collect against any renter's or liability insurance policy maintained by you for any losses or damages that we incur as the result of any violation of the terms of this Addendum.

**8. SEVERABILITY.** If any provision of this Addendum or the Lease Contract is invalid or unenforceable under applicable law, such provision shall be ineffective to the extent of such invalidity or unenforceability only without invalidating or otherwise affecting the remainder of this Addendum or the Lease Contract. The court shall interpret the lease and provisions herein in a manner such as to uphold the valid portions of this Addendum while preserving the intent of the parties.

**9. SPECIAL PROVISIONS.** The following special provisions control over conflicting provisions of this printed form:
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

**Resident or Residents**
*(All residents must sign)*

_____
_____
_____
_____

**Owner or Owner's Representative**
*(Signs below)*

_____

**Date of Signing Addendum**

_____

© 2017, National Apartment Association, Inc. - 9/2018, Washington
Document digitally signed using RENTCafe eSignature services. Document ID: 4061807

# CLASS ACTION WAIVER ADDENDUM



**1. DWELLING UNIT DESCRIPTION.**
Unit No. _____1606_____, 205 Roy Street,
Apt. 1606
_____ (street address) in
_____Seattle_____
(city), Washington, _____98109_____ (zip code).

**2. LEASE CONTRACT DESCRIPTION.**
Lease Contract Date: **May 20, 2021**
Owner's name: **225 Roy LLC**
_____
_____
_____

Residents *(list all residents)*:
**Kimen Trochalakis**
_____
_____
_____
_____
_____
_____
_____
_____
_____

**3. ADDENDUM.** This Addendum constitutes an Addendum to the above described Lease Contract for the above described premises. Where the terms or conditions found in this Addendum vary or contradict any terms or conditions found in the Lease Contract, this Addendum shall control.

**4. CLASS ACTION WAIVER.** You agree that you hereby waive your ability to participate either as a class representative or member of any class action claim(s) against us or our agents. While you are not waiving any right(s) to pursue claims against us related to your tenancy, you hereby agree to file any claim(s) against us in your individual capacity, and you may not be a class action plaintiff, class representative, or member in any purported class action lawsuit ("Class Action"). Accordingly, **you expressly waive any right and/or ability to bring, represent, join, or otherwise maintain a Class Action or similar proceeding against us or our agents in any forum.**

Any claim that all or any part of this Class Action waiver provision is unenforceable, unconscionable, void, or voidable shall be determined solely by a court of competent jurisdiction.

YOU UNDERSTAND THAT, WITHOUT THIS WAIVER, YOU MAY HAVE POSSESSED THE ABILITY TO BE A PARTY TO A CLASS ACTION LAWSUIT. BY SIGNING THIS AGREEMENT, YOU UNDERSTAND AND CHOOSE TO WAIVE SUCH ABILITY AND CHOOSE TO HAVE ANY CLAIMS DECIDED INDIVIDUALLY. THIS CLASS ACTION WAIVER SHALL SURVIVE THE TERMINATION OR EXPIRATION OF THIS LEASE CONTRACT.

**5. SEVERABILITY.** If any clause or provision of this Addendum is illegal, invalid or unenforceable under any present or future laws, then it is the intention of the parties hereto that the remainder of this Addendum shall not be affected thereby.

**6. SPECIAL PROVISIONS.** The following special provisions control over conflicting provisions of this printed form:
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

**Resident's Acknowledgment**   **Date of Signing Addendum**

_____   _____
_____   _____
_____   _____
_____   _____
_____   _____

**Landlord (or Landlord Agent) Acknowledgment**   **Date of Signing Addendum**

_____   _____

© 2017, National Apartment Association, Inc. - 9/2018, Washington
Document digitally signed using RENTCafe eSignature services. Document ID: 4061807

# REASONABLE MODIFICATIONS AND
# ACCOMMODATIONS POLICY



1. **DWELLING UNIT DESCRIPTION.**
Unit No. _____ **1606** _____ , **205 Roy Street,**
**Apt. 1606**
_____ *(street address)* in
_____ **Seattle** _____
*(city)*, Washington, _____ **98109** _____ *(zip code).*

2. **LEASE CONTRACT DESCRIPTION.**
Lease Contract date: **May 20, 2021**
Owner's name: **225 Roy LLC**
_____
_____
_____
_____
Residents *(list all residents)*:
**Kimen Trochalakis**
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

3. **EQUAL HOUSING OPPORTUNITY POLICY.** We provide rental housing on an equal opportunity basis. Consistent with this policy, we welcome persons with disabilities to our community and will not discriminate against any person because of his or her disability, or his or her association with anyone with a disability. In addition, we know that it may sometimes be necessary for persons with disabilities to be able to make modifications to their surroundings or to have accommodations made in our practices or procedures to enable them to fully enjoy and use their housing, and we have created the policy described herein to meet that need.

4. **PURPOSE OF POLICY.** A resident or applicant may be entitled under state and federal fair housing laws to a reasonable accommodation and/or reasonable modification when needed because of a disability of the resident, the applicant, and/or a person associated with a resident or applicant, such as a member of the household or frequent guest. The reasonable accommodation and/or reasonable modification must be necessary for the individual with the disability to have an equal opportunity to fully use and enjoy housing services offered to other residents and/or the individual dwelling unit. We will grant requests for accommodations or modifications that are reasonable and necessary because of a disability, would not impose an undue financial or administrative burden on our operations, and do not fundamentally alter the nature of services or resources we provide as part of our housing program.

5. **DEFINITIONS.**
    **A. Disability.** The Federal Fair Housing Act defines a person with a disability to include: (1) individuals with a physical or mental impairment that substantially limits one or more major life activities; (2) individuals who are regarded as having such an impairment; or (3) individuals with a record of such an impairment.

    **B. Reasonable Modifications.** A reasonable modification is a structural change made to existing premises, occupied or to be occupied, by a person with a disability, in order to afford such person full enjoyment of the premises. These are typically structural changes to interiors and exteriors of dwellings and to common and public use areas, which are necessary to accommodate a person with a disability. Depending on the nature of the request, and the type of federal funding associated with the tenancy, reasonable modifications are typically granted at the expense of the

**C. Reasonable Accommodation.** A reasonable accommodation is a change, exception, or adjustment to a rule, policy, practice, or service that may be necessary for a person with a disability to have an equal opportunity to use and enjoy a dwelling, including public and common areas.

6. **REQUESTS FOR REASONABLE MODIFICATIONS.**
    **A. Generally.** If you are a resident or an applicant (i) with a disability, or (ii) with someone associated with you who has a disability, you have the right to request a reasonable modification to your dwelling or the common areas, in accordance with fair housing laws, if such modifications may be necessary to allow you to have an equal opportunity to fully use and/or enjoy your dwelling.

    **B. Reasonable Modification Expenses.** Expenses for reasonable modifications, and restoration expenses, if applicable, of such modifications, shall be allocated in accordance with state and federal fair housing laws.

    **C. Permission Required, Evaluation of Disability.**
    If you would like to request a reasonable modification to your dwelling or the common areas of the community that is necessary because of a disability, you must first obtain permission from us. We prefer that you use the attached "Reasonable Accommodation and/or Modification to Rental Unit" form, but you are not required to use this form. If you would like or need assistance in completing this form, please let us know, and we will be glad to provide assistance. Whether you use our form or your own form of request, we will need to know what specific modification is being sought. In addition, if the disability or the disability-related need for the modification is not obvious, we may ask for information that is reasonably necessary to evaluate the disability-related need for the modification; however, we will only request information necessary to evaluate your request, and all information will be kept confidential.

    **D. Reasonable Assurances.** Depending on the modification requested, we may require you to provide reasonable assurances that the modification will be done in a workmanlike manner and that any required building permits will be obtained. In some cases, any third-party retained to perform the modification may also have to be approved in writing by us, and be properly licensed and insured. During and upon completion of the modification, we may inspect the work in connection with our overall property management responsibilities. We will not increase your security deposit as a result of a modification request. However, when applicable, if you fail to restore the interior of the dwelling to its original condition, excluding normal wear and tear, at the end of the tenancy, we may assess the cost of restoration against your security deposit and/or final account upon move-out.

    **E. Restoration Reimbursement.** At the end of your tenancy, you may be responsible to restore the interior of your dwelling to its pre-modification condition at your expense, depending on the nature of the modification. Again, depending on the modification, we may request that you deposit sufficient funds for that restoration in an interest bearing escrow account to ensure any required restoration can be completed. Regardless of modification, you will remain responsible to pay for damage to your dwelling in excess of ordinary wear and tear.

    **F. Alternative Modification.** Depending on the circumstances, we may not be able to grant the exact modification you have requested and we may ask to discuss other alternatives with you.

©2020 National Apartment Association, Inc. - 4/2020, Washington
Document digitally signed using RENTCafe eSignature services. Document ID: 4061807

7. **REQUESTS FOR REASONABLE ACCOMMODATIONS.**

   **A. Generally.** We will make reasonable accommodations in our rules, policies, practices, and/or services, to the extent that such accommodations may be reasonably necessary to give you, as a disabled person, an equal opportunity to fully use and enjoy your dwelling, and the public and common areas of the premises, and as otherwise required by law.

   **B. Request for Accommodation, Evaluation of Disability.** If you would like a reasonable accommodation that is necessary because of a disability, please submit a request to us, preferably using the attached "Reasonable Accommodation and/or Modification to Rental Unit" form, but you are not required to use this form. If you would like or need assistance completing this form please let us know and we will be glad to provide assistance. Whether you use our form or your own form of request, we will need to know what accommodation is being sought. In addition, if the disability is not obvious, we may ask for information that is reasonably necessary to evaluate the disability-related need for the accommodation. We will only request information that is reasonably necessary for us to evaluate your request, and we will keep all information you provide confidential.

   **C. Alternative Accommodation.** Depending on the circumstances, we may not be able to grant the exact accommodation you have requested and we may ask to discuss other alternatives with you.

8. **OWNER RESPONSIBILITY.** We will respond to all requests for a reasonable accommodation and/or modification in a timely manner. If we deny your request for a reasonable modification and/or accommodation, we will explain the reason for our denial and we will discuss with you whether there are alternative accommodations and/or modifications that we could provide that would meet your needs. We also are committed to entering into an interactive dialogue with you in relation to any request, and therefore agree to speak with you in relation to any request so that you have sufficient opportunity to provide us with any information you believe is relevant to our evaluation of your request for the modification(s) and/or accommodation(s).

9. **AMENDMENT TO POLICY.** This policy may be amended and updated at any time upon written notice to you. In addition, in the event of any conflict between this policy and/or state, local or federal law, the provisions of such law shall control.

   If you have any questions about this policy, you should contact:

   <u>Center Steps Leasing Office</u>

   by writing or calling:

   <u>centersteps@avenue5apt.com or (206) 588-</u>
   <u>2820</u>

|  |  |
| --- | --- |
| **Resident or Residents** | **Owner or Owner's Representative** |
| *(All resident's must sign)* | *(Signs below)* |

_____

_____

**Date of Signing**

©2020 National Apartment Association, Inc. - 4/2020, Washington

Document digitally signed using RENTCafe eSignature services. Document ID: 4061807

Page 2 of 2



1. **DWELLING UNIT DESCRIPTION.**
   Unit No. _____ **1606** _____, **205 Roy Street, Apt. 1606** _____
   _____ *(street address)* in _____ **Seattle** _____ *(city)*,
   Washington, _____ **98109** _____ *(zip code)*.

2. **LEASE CONTRACT DESCRIPTION.**
   Lease Contract Date: **May 20, 2021** _____
   Owner's name: **225 Roy LLC** _____
   _____
   _____

   Residents *(list all residents)*:
   **Kimen Trochalakis** _____
   _____
   _____
   _____
   _____
   _____

By his/her signature below, the Servicemember hereby waives his/her protections under 50 U.S.C. 3958, to the extent set out below:

Anytime the Servicemember vacates the unit, he/she hereby consents to the Landlord's right to dispose of any remaining personal property without a court order after storing that personal property for not less than the time period required by RCW 59.18.310, and to allowance of the Landlord to charge reasonable charges for that disposal, as allowed by RCW 59.18.

The Servicemember specifically authorizes the Landlord to immediately dispose of, without any storage requirement, any items that is reasonably interpreted by the Landlord as garbage.

|  |  |
|---|---|
| **Resident or Residents** | **Owner or Owner's Representative** |
| *(All residents must sign)* | *(Signs below)* |
| _____ | _____ |
| _____ | |
| _____ | **Date of Signing Addendum** |
| _____ | _____ |
| _____ | |
| _____ | |

© 2019, National Apartment Association, Inc. - 9/2019, Washington

Document digitally signed using RENTCafe eSignature services. Document ID: 4061807



## AFFORDABLE HOUSING ADDENDUM

This Affordable Housing Addendum ("Addendum") is entered into by and between ___**Kimen Trochalakis**___ ("Resident") and _____ ("Resident") and _____225 Roy LLC_____ ("Owner"), through its agent and serves as an addendum to the lease agreement dated ___05/20/2021___ ("Lease") for the premises located at _____205 Roy Street, Apt. 1606 #1606, Seattle, WA 98109_____ ("Premises").

1. **Participation in Program.** Resident is a participant of the ___**MFTE**_____ Affordable Housing Program ("Program"). The terms of the Lease and Resident's tenancy are made in accordance with the requirements of the Program and any related restrictions or requirements.

2. **Domicile of Resident**. The Resident must occupy the Premises as his/her only domicile.

3. **Sublease Prohibition.** Subleasing is prohibited and Resident shall not sublease, assign or transfer any rights or interest in the Premises or the Lease, in whole or part, to any other person or entity, for any duration whatsoever.

4. **Certification of Accuracy.** Resident certifies and warrants that all of the information contained within, provided as part of, provided in support of Resident's application, provided as part of the application process, and/or used to determine Resident's eligibility for the Program is complete, true and accurate. Resident acknowledges that Resident has knowingly and voluntarily provided all such information. Resident agrees that if such information is false or misleading in any material respect Resident shall have committed a material breach of the Lease which said breach is not remediable.

5. **Initial Certification**. Resident must be initially certified for occupancy and will be re-certified annually thereafter. Upon request by Owner, Resident must promptly complete the certification process. This may include, without limitation, an interview with Owner's managing agent to determine eligibility; verification of all income, asset and other eligibility information; and signing a new Income Certification Form. It is Resident's responsibility to provide all necessary information so the Owner's managing agent may perform this task. Acceptable documents that may be requested by Owner for this purpose include, but are not limited to, birth certificates for each minor child who will occupy the Premises; copies of social security cards or numbers; copy of a driver's license, or other acceptable means of identification; federal and state income tax returns and W-2 or 1099 Internal Revenue Service forms (or their equivalent) for Resident and the other members of the Resident's household for the calendar year prior to the year in which any such request is made; and/or such additional or substitute information as Owner or its agent may request. Resident authorizes Owner to verify all sources of income in the household. Resident certifies that such certifications and proofs are true and accurate, and that the total annual income of all the members of Resident's household who occupy the Premises does not exceed the amount set forth in such certification.

6. **Annual Income Verification.** Resident shall continue to comply with the Program's income eligibility criteria established by ___**City of Seattle**___ (Agency with Jurisdiction over the program) or its designee during the course of the tenancy. Resident shall promptly comply with all requests from Owner or ___**City of Seattle**___ (Agency with jurisdiction over the program) to provide certification, information or other documentation as necessary to determine whether the Resident qualifies or continues to qualify for the Program. Failure to provide truthful or accurate information regarding eligibility or income requirements (regardless of whether such inaccuracy is intentional or unintentional) or the refusal to comply with the request for information with respect thereto, shall be deemed a violation of this Lease provision, and a material breach of the Lease and shall constitute cause for immediate termination of Resident's right to occupy the Premises or the Lease.

   Owner may contact Resident any time prior to the annual certification date to begin processing the necessary paperwork. It will be the responsibility of the Resident to cooperate fully and provide all necessary information to expedite this process pursuant to the request. Resident is obligated to provide such subsequent recertification of family composition and documents as Owner shall require, including but not limited to the documents named above in paragraph 5. Resident authorizes Owner to verify all sources of income in the household. Resident certifies that such certifications and proofs are true and accurate, and that the total annual income of all the members of Resident's household who occupy the Premises does not exceed the amount set forth in such certification. Failure to provide the necessary information may result in the non-renewal of the Lease.

7. **Household Change**. Resident agrees that the Premises shall only be occupied by those individuals who are both (a) listed on the most recent certification and (b) authorized to reside in the Premises by Owner as stated in the Lease. If, at any time, the occupancy status of the household changes, the Resident must notify Owner in writing and complete another certification at the current area median income level as governed by the applicable regulations. Resident understands that if the number of household members should increase or decrease so that the household size is in conflict with the occupancy criteria established for this Community, the household will be required to move to the appropriate size unit within thirty (30) days of a unit being available or will be required to move from this Community. If there is no appropriate size unit, or if the household income exceeds the maximum allowable income limit then Resident may be required to move from the Premises.

Document digitally signed using RENTCafe eSignature services. Document ID: 4061807



8. **Rental Adjustments**. The Maximum Allowable Rental Rates and other allowances are reviewed by the appropriate agencies and adjusted to reflect changes in certain criteria as defined by local ordinance and/or law. Owner reserves the right to adjust the rental rate identified on page one of the Lease in accordance with these published changes by giving the Resident at least 30 days' prior written notice and Resident shall be obligated to pay such changed rate as provided in Owner's Notice of Change of Terms. Additionally, Owner reserves the right to bill residents individually for utilities if metering devices are installed and deduct the appropriate utility allowance from the total rent. Resident understands that such changes may occur during the term of the Lease.

9. **Student Status.** Resident(s)understands that if any time the household is compromised solely of full-time students and the household does not meet the provisions set forth in IRS Sec.42 (i) (3) (d), the household will no longer be eligible for a Tax Credit or Bond (or any other program governed by the student rule) unit. By signing this Addendum, you agree that you have fully, truthfully and accurately disclosed whether you or any occupant of the household are, or will be, students during all or part of the year. You also agree to immediately notify the Owner in writing should there be any changes in student status of any resident/occupant of the household.

10. **Termination for Non-Compliance**.  It is specifically agreed that each term, condition and obligation of this Addendum, as well as the Lease, application and certification, is material. Any violation of these terms, conditions or obligations, or misrepresentation of any information, shall constitute a material breach of the Lease. Resident is fully aware that this Lease may not be canceled or otherwise terminated by Resident prior to its expiration without the written consent of the Owner. Abandonment of the Premises or termination of Resident's right to possession of the Premises for breach of this Addendum or Lease will not release Resident from the obligation to pay future rent. For rental properties participating in Affordable Housing programs it is understood that the Owner may not evict a resident or terminate a tenancy except for good cause.

11. **No Lien for Unpaid Sums**. Unless otherwise expressly provided by law, we shall not have a lien on your property for unpaid rent or other sums, except that we will have a lien to cover packing, removal and storage charges for property left in the dwelling after you move out. This paragraph overrides any contrary provisions contained in the Lease Agreement.

12. **Conflict with Governing Law.** To the extent that any part of your Lease Agreement or this Addendum conflicts with applicable federal, state, or local laws or regulations, the law or regulation overrides that portion of your Lease Agreement or this addendum.

13. **Elimination of Jury Waiver.** Any provision in the Lease Agreement that waives a trial by jury is hereby deleted and unenforceable.

14. **Miscellaneous**. The terms and conditions of this Addendum shall supersede the terms and conditions of the Lease if they are found to be inconsistent. Unless otherwise indicated, the terms used herein shall have the same meaning ascribed thereto in the main body of the Lease. This Addendum shall be construed and enforced in accordance with and governed by the laws of the state in which the Premises is located. The Addendum may be modified, amended or rescinded by Owner upon 30-day written notice to Resident.

**Special Provisions.**   The following special provisions control over conflicting provision of this printed form:
_____
Properties located in the City of Seattle only: Affordable Housing Requirements: Information about affordable housing requirements pursuant to SMC Chapter 5.73 is available from the City's Office of Housing.
_____
Properties located in the **State of California** only: **Over-Income-** Resident understands that Resident may no longer be eligible for occupancy in this apartment community's Affordable Housing program if Resident's income exceeds the maximum allowable adjusted area median income (AMI) as defined by the AMI Income Limits set forth by the federal Department of Housing and Urban Development (HUD) or the appropriate agency that governs the program.

**RESIDENT(S):**

_____     Date: _____

_____     Date: _____

_____     Date: _____

_____     Date: _____

**OWNER'S REPRESENTATIVE**

_____     Date: _____

Document digitally signed using RENTCafe eSignature services. Document ID: 4061807

# STANDARD CLEANING AND REPAIR CHARGES

The following information is provided to assist you in your move-out and assist in assessing any charges that may be applicable. A full inspection of the apartment will be made only after you have moved out. If the move-out occurs during regular business hours, a property representative should be scheduled to walk the apartment with you. If the apartment is in need of cleaning or repair, the following estimated charges will be used as a guide to assess amounts to be deducted from your Security Deposit and charged to you, if the amount assessed exceeds your security deposit. Please note that this is not a complete list of all possible estimated charges that you may incur when your apartment is inspected. **Please also note that these charges are estimates only to give you an idea of the charges you may incur for particular items. You may be charged more than the maximum, depending upon the costs or charges we incur**. Please leave a forwarding address on file with the office.

| KITCHEN CLEANING | |
|---|---|
| **Oven** | $15.00 - $50.00 |
| **Stove and Vent-a-Hood** | $10.00 - $15.00 |
| **Refrigerator/ Freezer** | $10.00 - $50.00 |
| **Dishwasher/ Microwave** | $10.00 - $25.00 |
| **Cabinets and Countertops** | $10.00 - $20.00 |
| **Floors** | $15.00 - $50.00 |
| **BATHROOM CLEANING** | |
| **Toilet** | $10.00 - $20.00 |
| **Tub/ Shower** | $10.00 - $60.00 |
| **Sinks/ Counters/ Mirrors** | $10.00 - $20.00 |
| **MISCELLANEOUS** | |
| **Blinds (Windows/ Patio)** | $15.00 to estimate |
| **Carpet Repairs** | Based on actual cost including labor and installation |
| **Washer/ Dryer Cleaning** | $15.00 to $30.00 |
| **Tile Floor Repair or Waxing/ Cleaning** | $15.00 to estimate |
| **Sheetrock Repairs** | $10.00 to estimate |
| **Window Cleaning – Window** | $10.00 each |
| **Window Cleaning – Sliding Glass Doors** | $15.00 each |
| **Graffiti Removal** | $5.00 per letter to estimate |
| **Carpet Cleaning/ Stain Removal per vendor** | $45.00 to estimate |
| **Standard Trash Removal** | $20.00 per bag |
| **HVAC Smoke Damage/ Duct Cleaning/ Ozone Treatments** | **$250.00 - $650.00** |

# REMOVING PROPERTY

| **Cost of removing property (such as furniture pieces), including storage** | $25.00 – $100.00 each piece |
|---|---|

# REPLACEMENT CHARGES

If any items are missing/ damaged to the point that they must be replaced when you move out, you will be charged for the current cost of the item in addition to possible labor services. A list of various replacement charges has been provided below. Please note that this is not a complete list of possible charges that you may incur when your apartment is inspected, and additional labor cost may be considered. Please also note that these charges are estimates only to give you an idea of the charges you may incur for particular items. You may be charged more than the maximum, depending upon the cost or charges we incur.

Document digitally signed using RENTCafe eSignature services. Document ID: 4061807

| | |
|---|---|
| **Window Glass** | Estimate |
| **Patio Door Glass** | Estimate |
| **Window Screens** | $10.00 - $35.00 |
| **Patio Screen Doors** | $80.00 - $90.00 |
| **Mail Box Keys/ New Lock** | $10.00 per key / $45.00 per lock |
| **Keys Not Returned/ New Lock** | $25.00 - $85.00 |
| **Ice Maker Tray** | $10.00 each |
| **Refrigerator Shelves/ Racks** | $35.00 - $60.00 |
| **Microwave Glass Tray** | $25.00 - $60.00 |
| **Disposal Damage** | $65.00 - $80.00 |
| **Dishwasher Rack** | $50.00 - $150.00 |
| **Dishwasher Silverware Basket** | $35.00 - $85.00 |
| **Blinds Replaced** | $12.00 - $75.00 |
| **Interior Door/ Door Jam** | $50.00 - $150.00 |
| **Door Hardware/ Knobs/ Latches** | $20.00 - $40.00 |
| **Fire Extinguisher** | $25.00 - $60.00 |
| **Mirrors/ Medicine Cabinets** | $40.00 - $200.00 |
| **Shower Rods/ Towel Bars** | $15.00 - $150.00 |
| **Ceiling Fans (if original is not available in apartment)** | $50.00 - $175.00 |
| **Light Fixtures (if original is not available in apartment)** | $15.00 - $175.00 |
| **Faucets/ Bath/ Tub** | $15.00 - $50.00 |
| **Toilet Tanks/ Lids** | $30.00 - $60.00 |
| **Toilet Seats** | $15.00 - $20.00 |
| **Parking Tag** | $20.00 each |
| **Counter Top Repairs** | $50.00 - $200.00 |
| **Drip Pan** | $5.00 each |
| **Broiler Pans** | $25.00 - $50.00 |
| **Oven Racks** | $20.00 - $60.00 |
| **Smoke Detectors** | $25.00 - $75.00 |
| **Gate Cards** | $10.00 each |
| **Gate Remotes/ Key Fobs** | $25.00 - $75.00 each |
| **Cabinet Repairs** | Based on labor and cost of repair |
| **Wall Damage/ Sheet Rock Repair** | Based on labor and cost of repair |
| **Full Painting** | Based on labor and cost of paint |
| **Pest Extermination; bedbugs/ fleas** | Based on labor and cost of pest extermination |
| **Carpet Replacement/ Pet Urine/ Floor Sealing** | Based on actual cost including labor and installation |

Blinds, carpet, vinyl, appliance, replacements will be based on actual cost including labor and installation.

| Carpet Wear & Tear is taken into consideration based upon the following ratio: | |
|---|---|
| 5 years old: 20% of cost | 2 years old: 80% of cost |
| 4 years old: 40% of cost | 1 year old or less: 100% of cost |
| 3 years old: 60% of cost | |

I have reviewed the Charge Rate Sheet and understand the potential costs associated with the turnover of my apartment if cleaning, repairs or replacements are necessary at the time of move-out. The above price list will be used in determining the standard costs to bring the apartment back to its original condition, with exception of wear and tear.

_____          _____
*Resident*                                                           *Date*

Document digitally signed using RENTCafe eSignature services. Document ID: 4061807

The following information states that the identified document has been signed electronically by the parties detailed below:

| Signee Details | Role | Signature | Initials | Date Signed |
|---|---|---|---|---|
| Kimen Trochalakis<br>Email ID: thanasi2011@gmail.com | Resident | *K Trochalakis* | *KT* | 05/25/2021 |
| Robert Rodriguez<br>Email ID: rrodriguez@avenue5.com | Manager | *Robert Rodriguez* | *RR* | 06/03/2021 |

Document digitally signed using RENTCafe eSignature services. Document ID: 4061807

## Document Information

Document Reference Number: 4061807

Document Pages: 73                 Signatures: 2                     Status: Completed
                                                     Initials: 2

| Signature Summary | Signature | Initials | Timestamp | Signing Status |
|---|---|---|---|---|
| Kimen Trochalakis | *(signature)* | *(initials)* | 05/25/2021 01:06:17 PM PST | Completed |
| Document Started: | 05/23/2021 12:17:45 PM PST | | | |
| Email Address: | thanasi2011@gmail.com | | | |
| Robert Rodriguez | *(signature)* | *(initials)* | 06/03/2021 09:59:03 AM PST | Completed |
| Document Started: | 05/23/2021 01:42:17 PM PST | | | |
| Email Address: | rrodriguez@avenue5.com | | | |

| Signature Details | Page | Signature/Initials | Signing Status | Tracking Details |
|---|---|---|---|---|
| Kimen Trochalakis | 73 | *(initials)* | Completed | IP Address: 24.19.122.90<br>Timestamp: 05/25/2021 01:06:13 PM PST<br>User Agent: Chrome on Windows |
| Kimen Trochalakis | 73 | *(signature)* | Completed | IP Address: 24.19.122.90<br>Timestamp: 05/25/2021 01:06:10 PM PST<br>User Agent: Chrome on Windows |
| Robert Rodriguez | 73 | *(initials)* | Completed | IP Address: 10.37.61.153<br>Timestamp: 06/03/2021 09:59:03 AM PST<br>UserAgent: Bulk Countersign |
| Robert Rodriguez | 73 | *(signature)* | Completed | IP Address: 10.37.61.153<br>Timestamp: 06/03/2021 09:59:03 AM PST<br>UserAgent: Bulk Countersign |

This document is digitally signed using RENTCafe eSignature services. Document ID: 4061807