# EXHIBIT 6



# WINDOW

## ON RENTAL HOUSING

MAR APR 2018

**THIS ISSUE:
APRIL *is* CAREER MONTH**

**REAL COMMUNITIES**

**REAL CAREERS**

**RPM CAREERS MONTH
APRIL 2018**

+

**20** Incentives for Green Living
**24** Green is the New Gold Standard

THE OFFICIAL PUBLICATION OF THE
*Austin Apartment Association*

Case 3:23-md-03071   Document 378-7   Filed 07/21/23   Page 2 of 5 PageID #: 3351

# LAW IN ORDER
## *The Warren Report*

**THE 2018 TAA LEASE IN DEPTH**



William S. Warren,
Warren Law Firm

Reliable Questions, Answers and Practices Concerning the 2018 TAA Lease

On January 23 and January 25, 2018, this author and Texas Apartment Association General Counsel Sandy Hoy presented a statewide lease webinar. The webinar addressed the new TAA lease form. Hundreds attended online, and many insightful questions were submitted throughout and following the webinar. The purpose of this Law in Order: The Warren Report is to address some of these great questions in a short Q&A format. Let's begin.

**Question from Jerry G.: When can month-to-month fees be charged?**
**Answer:** They should never be charged. Paragraph three of the lease provides a date certain on which the lease term ends. "…[A]fter that, this Lease will automatically renew month-to-month unless either party gives at least ____ days' written notice of termination or intent to move out." Renewal of the lease means that all of the terms from the original lease carry forward, with the exception of agreed upon changes, including the scheduled ending date of the month-to-month term.

If you give an offer letter to the current resident, and present options for the existing resident to renew the lease, or enter a new lease with you, you will state various rental rates for various lengths of a proposed new lease term. Since longer term tenancies are often preferred, the lowest rate may be for a 12-month term, the next lowest rate may be for a six-month term, and the highest rate may be for a month-to-month term.

It is important to remember that the terms "month-to-month fee" and "month-to-month premium" are inaccurate terms, which if used will make an offer letter misleading. There is no fee, and there is no premium. There is a new lease term, for which a specified amount of monthly rent will be due.

**Questions from Darby H.: "How can a lease renew month-to-month with an increased rental rate under the provisions of lease paragraph 16? Does the rent increase notice need to be received or postmarked at least five days prior?"**
**Answer:** Paragraph 16 of the TAA lease provides as follows: "…If, at least five days before the advance-notice deadline referred to in paragraph three, we give you written notice of rent increases…that become effective when the Lease term or renewal period ends, this Lease will automatically continue month-to-month with the increased rent.…"

The purpose of this contractual provision is to give the resident an opportunity to have enough time to still satisfy the advance-notice requirement, imposed upon the resident by lease paragraph three, if the resident does not want the new terms to take effect. Stated another way, if the resident believes that the proposed month-to-month rental rate is too high, that resident essentially has five days within which to decide to test the market and possibly move elsewhere by giving the notice of intent to move out. This extra time within which to decide is very important.

Darby's question alludes to a

Case 3:23-md-03071    Document 378-7    Filed 07/21/23    Page 3 of 5 PageID #: 3352

possible postmark. Mailing the notice, however, is unlikely to satisfy the purpose of paragraph 16, for three or more days could easily be lost if the notice containing the five-day "cushion" is sent by mail. Paragraph 16 of the lease specifically states, "we give you written notice". To effectively "give notice" there must be a realistic expectation of prompt receipt.

Lease paragraph 33.1 contains a new revision, very relevant to this discussion, which provides as follows: "...Notice may be given electronically by us to you if allowed by law." Take advantage of this new clause. Email the offer letter, containing the proposed month-to-month rental rate, if you are confident that you have a current email address for your resident. If you lack that confidence, the next best alternative would be personal delivery of the offer letter, containing the proposed month-to-month rental rate, to the inside of the main entry door. If you do that, moreover, make notations on your copy of the offer letter, which you keep in the tenant file, stating who delivered it, at what time of day, and in what manner; and have the delivery person sign that note. You will keep that in your records for possible future use. A photograph showing the delivered offer letter would be helpful.

During the webinar, the importance of identifying all adults as residents was emphasized, rather than occupants.

**Question from Stacee V:** "What verbiage would you use with parents that push back on requiring their 18-year-old child to sign the lease [as a resident] instead of remaining an occupant [who is not required to sign]?"
**Answer:** We will assume that the 18-year-old has already reached the age of 18 and will not reach it during the term of the lease. If there is an already existing 18-year-old at the time the lease is signed, that 18-year-old is legally considered an adult. That adult person should sign the lease, along with the parents. By making this your policy, you avoid "making the call" whether the young adult will sign or not on a case-by-case basis. You want to avoid having some 18-year-old individuals sign as resident and allowing other 18-year-old individuals not to sign, and instead be identified as occupants. This could needlessly raise fair housing concerns for you.

In many cases, the 18-year-old person may still be fully claimed as a dependent by parents. The 18-year-old may be a full-time student, not earning any noteworthy income. There may be other reasons why it



might appear to make some sense, on a case-by-case basis, to allow an 18-year-old adult to be identified in paragraph two of the lease as an occupant and omitted from identification in paragraph one as a resident. Do not, however, talk yourself out of the right decision.

You do not want to make this a subjective determination. A fair housing complaint may loom around the corner if you do. The best practice is to require all adults (that is, age 18 and above) to be identified in lease paragraph one as a resident and to sign and initial the lease. Tell the parents who want to push back that paragraph 29 provides that "each resident is jointly and severally liable for all lease obligations." The parents, therefore, if they so choose can take care of all the monetary obligations; and therefore, they can control whether their 18-year-old child will not have to pay any of them.

**Question from Jerry G.:** "Is it lawful to charge the reletting fee after a judgment has been issued in an eviction case"?
**Answer:** Absolutely. There are four scenarios, identified in lease paragraph 10.1, under which one will have to pay the reletting charge. Judicial eviction is one (item [D]) of them. Remember, as this lease paragraph reminds the resident, the "reletting charge" is not a cancellation fee and does not release you from your obligations under this Lease.

**Question from Brittany D.:** "Should everyone sign the pet addendum at move-in to avoid them not knowing the rules and the amounts due?"
**Answer:** Sometimes yes and sometimes no. If there is no pet involved at move-in, no one should sign the animal addendum until an animal is moving in to the rental unit. The Animal Addendum is designed for a specific animal, which is to be specifically identified, not speculated about. On the other hand, if there is at least one animal which will be living in the leased premises at the time the Lease is signed, all the residents should sign the animal addendum.

Paragraph 20 of the Animal Addendum expressly states that each resident who signed the Lease Contract must also sign the addendum. It goes on to provide that each resident is jointly and severally for damages and all other obligations set forth in the Animal Addendum, even if the resident does not own the animal. Paragraph 18 of the Animal Adden-

> You want to avoid having some 18-year-old individuals sign as resident and allowing other 18-year-old individuals not to sign, and instead be identified as occupants.

Case 3:23-md-03071    Document 378-7    Filed 07/21/23    Page 4 of 5 PageID #: 3353

dum, furthermore, makes it clear that "… you [the animal owner] and all co-residents are jointly and severally liable for the entire amount of any damage the animal causes, including cleaning, defleaing or deodorizing …."

The animal addendum language on liability for damages is mirrored in the Lease itself. As was noted in the answer to an earlier question, on the topic of joint and several liability, paragraph 29 of the Lease states "each resident is jointly and severally liable for all lease obligations." The obligations imposed upon the tenant (and animal owner) become part of the lease through paragraph 42, provided the box in front of animal addendum is checked. If an animal causes damages to the premises, therefore, all the residents who reside in those premises are jointly and severally liable for those damages. Ownership of the animal is not the determining factor, at least not from the landlord's perspective. Whether one owns the pet or not, therefore, if an animal is going to be living in the leased premises (even a service or support animal), all the human residents who will also be living in the leased premises should sign the animal addendum.

**Question that just crossed your mind: Are we allowed to require that an animal addendum be signed if there is a service or emotional support animal?**
**Answer:** Yes, and be certain that you do so. Whenever there is an animal living on your property, require that it have your approval to be there and that the resident(s) who have it living with them sign the animal addendum. Do not charge an animal deposit or pet rent if the animal is a service or support animal; but the owner of that assistance animal must still agree to comply with all the other provisions in the animal addendum. These include terms affecting care and control of the animal, a detailed identification of the animal, and a clause which provides that failure to comply with the addendum constitutes a failure to comply with (and a breach of) the Lease.

The Animal Addendum, in addition, will specifically identify and describe the animal which will occupy the rental unit. Require specificity. See if each resident who signs the Animal Addendum describes the



animal, if asked to, in essentially the same way. This is very important information. With the internet making it easy to misrepresent several facts pertaining to service and support animals, you want every opportunity to confirm that the animal who lives on your property as a service or support animal is the same animal you made a reasonable accommodation to your resident for.

**Tiffany G. asked this question, which is being asked more and more, as follows: "Can residents refuse to initial the class action waiver?"**

**Answer:** No. Absolutely not. The class action waiver is in the Lease, paragraph number 43. It is as much a part of the Lease as any of the other 42 preceding paragraphs. Its terms are as important, for example, as the terms concerning payment of rent (paragraph 6) or concerning not engaging in prohibited conduct (paragraph 20).

You would not allow one to refuse to agree to the amount of rent to be paid, or its due date, would you? Would you allow someone to refuse to be bound by the prohibited conduct provisions of paragraph 20? Of course, you would not. Would you permit the resident to pick and choose which obligations will bind them? No way. If one refuses to agree to the terms of lease paragraph 43, which concerns the class action waiver, they are not agreeing to your lease.

The lease is your contract with the resident. If the resident won't agree to the terms of that contract, they should not be allowed to lease from you. If your efforts at persuasion fail, just tell them they will have to live elsewhere if they will not agree to all the terms of your lease.

There are certainly many more questions which have been asked, and which will be asked by those who view the lease webinar in the future. The purpose of this article was to highlight some of the more common questions and provide reliable guidance on how to proceed with a best practice. To the extent you are able, I encourage you to view the lease webinar, and attend the upcoming Redbook presentation, both of which are compelling educational opportunities. Keep on learning! Ⓦ

> The Animal Addendum, in addition, will specifically identify and describe the animal which occupy the rental unit. Require specificity.

BILL WARREN is in his 37th year as a lawyer. His law practice focuses on a variety of issues and cases, the majority of which address the concerns of those active in the multi-family industry. He founded and manages Warren Law Firm. In addition, he serves as Of Counsel for the Texas Apartment Association and as Legal Counsel of the Austin Apartment Association. Bill is also a Credentialed Mediator in Texas. He writes and speaks regularly, and as author of *Law In Order: The Warren Report* he has had over 120 articles published. His topics cover all nature of issues pertaining to rental housing, from onsite to the boardroom to the courtroom. Bill has been Board Certified in Civil Trial Law by the Texas Board of Legal Specialization for 30 years, and is also a Fellow of the College of the State Bar of Texas. He can be reached at Warren Law Firm, 1011 Westlake Drive, Austin, Texas 78746, (512) 347-8777, or through his firm's website at www.WLFtexas.com.

Case 3:23-md-03071   Document 378-7   Filed 07/21/23   Page 5 of 5 PageID #: 3354