**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | | |
|---|---|---|
| **IN RE: REALPAGE, INC., RENTAL SOFTWARE ANTITRUST LITIGATION (NO. II)** | ) ) ) ) ) ) ) ) ) ) ) | **Case No. 3:23-md-3071**<br>**MDL No. 3071**<br><br>**Chief Judge Waverly D. Crenshaw, Jr.**<br><br>**JURY DEMAND**<br><br>**This Document Relates to:**<br>**ALL CASES** |

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO CERTAIN DEFENDANTS' MOTION TO DISMISS FOR FAILURE TO PLEAD AGENCY LIABILITY**

## I. INTRODUCTION

Defendants Avenue5 Residential, LLC ("Avenue5"), Bozzuto Management Company ("BMC"), FPI Management, Inc. ("FPI"), Pinnacle Property Management Services, LLC ("Pinnacle"), and ZRS Management, LLC ("ZRS") (collectively, "the Property Management Defendants") move this Court to dismiss claims against them on the erroneous grounds that they are mere agents of property owners, and so have not independently joined and participated in the conspiracy Plaintiffs allege. Property Management Defendants' contention that they are mere innocent agents, however, cannot be squared with the plausible allegations in Plaintiffs' First Amended Consolidated Class Action Complaint.[1]

Plaintiffs allege that the Property Management Defendants—large, sophisticated companies each managing between 60,000 and 180,000 apartment units nationwide—did more than just passively accept rent payments on behalf of building owners. The Complaint alleges how each type of Defendant (whether property manager, owner, or RealPage[2]) implemented and contributed to the conspiracy. As for the Property Management Defendants, Plaintiffs allege that each used RealPage's Revenue Management Solutions ("RMS") software in managing their rental properties "with the explicit and common goal of increasing rents for all members of the cartel." ¶¶ 10, 22, 27, 48, 51, 63, 75, 90, 116, 121, 141, 153, 174. Plaintiffs allege that the Property Management Defendants did so with the specific intent to artificially inflate rental prices and restrict the supply of apartment units. ¶¶ 4-5, 174. By using the RMS software, the Property Management Defendants themselves directly and affirmatively provided confidential, proprietary data to RealPage, including actual rents paid, occupancy rates, and other information regarding

[1] Unless specified otherwise, all references to "¶" or "¶¶" are to paragraphs from Plaintiffs' First Amended Consolidated Class Action Complaint (the "AC" or "Complaint").
[2] Unless otherwise defined herein, all terms are used as defined in the Complaint.

their lease transactions, to feed into RealPage's RMS software to the benefit of all conspirators. ¶ 224. And finally, to ensure the success of the scheme, the Property Management Defendants enforced the internal adoption of RealPage's pricing recommendations, including by hiring dedicated revenue managers trained by RealPage to monitor compliance with RealPage's pricing decisions, tying compensation for personnel to compliance, and conducting performance reviews directly with RealPage to manage acceptance rates. ¶¶ 7, 9, 154-55, 162, 180. These allegations, taken together, are more than enough to plead the Property Management Defendants' conscious commitment to a common scheme to fix the prices of multifamily rental housing.

In sum, Plaintiffs allege that the Property Management Defendants were not only knowing participants in the conspiracy, but as the parties that provided RealPage with the competitively sensitive data for the units they managed, also integral to its success. The Court should deny the Property Management Defendants' motion in its entirety.

## II. LEGAL STANDARD

In analyzing a motion to dismiss, courts "construe the complaint in the light most favorable to the plaintiff and accept all allegations as true." *Elec. Merchant Sys. LLC v. Gaal*, 58 F.4th 877, 882 (6th Cir. 2023) (citation omitted); *Fritz v. Charter Township of Comstock*, 592 F.3d 718, 722 (6th Cir. 2010).

While *Twombly* requires a complaint to "contain factual matter sufficient to identify which allegations pertain to which defendant," *City of Pontiac Police & Fire Ret. Sys. v. Jamison*, 2022 WL 884618, at *9 n.12 (M.D. Tenn. Mar. 24, 2022), "[d]ismissal is not required merely because Plaintiffs did not name each Defendant in the allegations pleaded in support of their Sherman Act claim." *In re Auto. Parts Antitrust Litig.*, 2017 WL 7689654, at *7 (E.D. Mich. May 5, 2017) (citations omitted). "'[L]ump[ing] Defendants together at [] points in the Complaint" where the

allegations apply generally to all Defendants "does not negate or undermine" the validity of the complaint. *Rodriguez v. Providence Cmty. Corr., Inc.*, 191 F. Supp. 3d 758, 772-73 (M.D. Tenn. 2016).

## III. ARGUMENT

### A. The Property Management Defendants Were Directly Involved in the Antitrust Cartel.

The Complaint details numerous allegations illustrating how the Property Management Defendants affirmatively and directly participated in the conspiracy—beyond just accepting rent payments on behalf of building owners. The Complaint alleges that each Property Management Defendant used RealPage's RMS software in connection with its management of multifamily rental properties. ¶¶ 10, 27, 48, 51, 63, 75, 90. The Property Management Defendants had direct and substantial roles in adopting RealPage's pricing recommendations at supracompetitive levels, manipulating other lease terms, and sharing non-public, proprietary information with RealPage for the benefit of all other conspirators (including other property managers). For example:

- The Property Management Defendants "outsource[d] lease pricing decisions to RealPage's RMS," and "accept[ed] RealPage's pricing 'recommendations.'" ¶¶ 116, 121, 141, 153. "The price acceptance process begins with the Community Manager[s]," who are "individuals who work for the property management company," and are "responsible for reviewing RealPage's daily pricing recommendations." ¶ 141 n. 97. And RealPage "push[ed] to ensure property managers . . . accept its price and lease term recommendations." ¶ 129.
- In at least one instance, Property Management Defendant, Pinnacle, used RealPage to "avoid a situation where there were a significant number of units renewing at the same

time," by adopting RealPage's recommendations for a 10-month lease instead of a 12-month lease. ¶ 22.

- The Property Management Defendants communicated directly and frequently with RealPage by interfacing directly with RealPage Pricing Advisors "to [receive] training and guidance on RealPage's Revenue Management Solutions and to discuss specific aspects of the system and its processes." ¶¶ 125 n.5, 163. On-site managers, regional managers, and even "senior ranking executives from the property management companies," including Vice Presidents and Asset Managers, routinely interfaced with RealPage on a periodic (such as quarterly) basis. *Id.*

- The Property Management Defendants themselves directly supplied confidential, proprietary data to RealPage. "[P]roperty managers . . . input data on actual rents paid and occupancy rates, along with records of lease transactions." ¶¶ 5, 224. "This data, which would normally be kept private, is fed into RealPage's RMS algorithm(s) which set coordinated rents among competing property managers." ¶ 224. The Property Management Defendants provided this commercially sensitive information knowing it would be used to assist them and their competitors. ¶¶ 5, 7, 116, 224.

- The Property Management Defendants also directly enforced compliance with RealPage's leasing recommendations. "RealPage's largest property management clients have their own internal revenue managers who have undergone extensive training provided by RealPage" "to monitor the client[]s' compliance with RealPage's pricing decision." ¶ 7. "Property management companies' executives placed pressure on their leasing managers to implement RealPage's prices," including tying "compensation for certain property management personnel . . . to compliance with RealPage's pricing recommendations."

¶¶ 9, 162, 180. And beginning in late 2019, "property management companies monitor[ed] acceptance rates more closely within their own ranks" using RealPage's Price Optimization 2 product that "Regional Managers or Vice Presidents from the property management company" reviewed in conjunction RealPage Pricing Advisors. ¶¶ 154-55.

These allegations, taken as true and evaluated holistically with the other allegations in the Complaint, demonstrate the Property Management Defendants' substantial participation in the antitrust conspiracy. Plaintiffs have sufficiently pled "specific misconduct attributable" to the Property Management Defendants to support their liability as direct contributors to the price-fixing cartel. *Prodanova v. H.C. Wainwright & Co., LLC*, No. LA CV17-07926-JAK (ASx), 2018 8017791, at *10 (C.D. Cal. Dec. 11, 2018).

**B. Plaintiffs Sufficiently Plead the Property Management Defendants' Liability as Agents.**

Not only do the Property Management Defendants ignore the well-pleaded allegations about their own involvement in the antitrust conspiracy, but they also rely on an agency theory to claim they cannot be held liable for the conduct of the owners of the properties that they manage. However, "if an agent commits a tort in the course of his agency, 'the fact of agency will not relieve him of liability, and this is so even though the principal may be liable also.'" *Lambert v. Kazinetz*, 250 F. Supp. 2d 908, 915 (S.D. Ohio 2003); *see also B&L Mgmt. Grp., LLC v. Adair*, 2019 WL 3459244, at *7 (W.D. Tenn. July 31, 2019).

That general rule holds equally true in the antitrust context: "[O]ne's status as an 'agent' for some purposes does not mean that he lacks conspiratorial capacity with its principal in other respects." Areeda & Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application*, ¶ 1473d2 (2021); *see also C & W Constr. Co. v. Bhd. of Carpenters & Joiners of Am. Local 745, AFL-CIO*, 687 F. Supp. 1453, 1464-65 (D. Haw. 1988) (rejecting "claim that [agents]

cannot be held liable under the antitrust laws because they were acting entirely within the scope of their authority as agents" because "[t]his argument ignores basic precepts of agency law").[3] An agent may be liable for the acts of its principal in an antitrust conspiracy if the agent: (1) had knowledge of the principal's unlawful objective to restrain trade (*e.g.*, ¶¶ 5, 18, 116, 171, 174); (2) intended to restrain trade rather than simply earn its usual and customary commission (*e.g.*, ¶¶ 5, 174); and (3) contributed materially to the restraint (*e.g.*, ¶¶ 5, 7, 9-10, 22, 27, 48, 51, 63, 75, 90, 116, 121, 125, 141, 153-55, 162-63, 180, 224). *See In re Fresh & Process Potatoes Antitrust Litig.*, 834 F. Supp. 2d 1141, 1170 (D. Idaho 2011); *Marion Diagnostic Ctr., LLC v. Becton Dickinson & Co.*, 29 F.4th 337, 350 (7th Cir. 2022);[4] *see also Brown v. Donco Enters., Inc.*, 783 F.2d 644, 646 (6th Cir. 1986) (*per curiam*) ("It is undisputed that a corporation's officers and agents may be held individually liable for corporate actions that violate the antitrust laws if they authorize or

[3] Moreover, the agency exception to antitrust liability that the Property Management Defendants appear to invoke does not apply to horizontal restraints of trade involving competitors at the same level in an industry, like in the case here. *See* Areeda & Hovenkamp ¶ 1473f (noting "the importance of distinguishing vertical and horizontal restraints when considering agency," "exclud[ing]" horizontal agreements from the agency exception); *see also id.* ¶ 1473f ("[N]one of [the policy justifications for an agency exception] make[] any difference in the case of a horizontal agreement") (discussing *U.S. v. Apple, Inc.*, 952 F. Supp. 2d 638 (S.D.N.Y. 2013), *aff'd* 791 F.3d 290 (2d Cir. 2015); *In re Elec. Books Antitrust Litig.*, 859 F. Supp. 2d 671, 690 (S.D.N.Y. 2012)). For example, in *In re Sulfuric Acid Antitrust Litig.*, the court rejected the "broad proposition" "that companies in an agency relationship cannot conspire to commit violations of § 1 of the Sherman Act," where, as here, the defendant's "role as [a] sales agent [for a principal] *merely streamlined the process* by which the two . . . companies [aided the principal's] co-conspirators" in a horizontal cartel." 743 F. Supp. 2d 827, 886 (N.D. Ill. 2010) (emphasis added). The court concluded that because the agent assisted its principal's participation in a horizontal restraint, "the agency relationship d[id] not insulate [the agent or principal] from liability under the Sherman Act." *Id.* The same is true here.

[4] The Property Management Defendants' reliance on these cases is misplaced. In *Marion Diagnostic Center*, there were no allegations about the distributor agents' knowledge of the conspiracy. 29 F.4th at 350. And similarly, in *In re Fresh & Process Potatoes*, the plaintiffs asked the court to infer the marketing agents' knowledge despite not alleging any facts supporting that knowledge. 843 F. Supp. 2d at 1170. Nonetheless, these cases stand for the proposition that an agent cannot escape liability for an antitrust conspiracy once the requisite circumstances have been pleaded.

participate in the unlawful acts."); *In re Se. Milk Antitrust Litig.*, 555 F. Supp. 2d 934, 949 (E.D. Tenn. 2008) ("The Sixth Circuit unequivocally held that corporate 'officers and agents may be held individually liable for corporate actions that violate the antitrust laws if they authorize or participate in the unlawful acts.'"); *Northstar Energy LLC v. Encana Corp.*, 2014 WL 5343423, at *13 (W.D. Mich. Mar. 10, 2014) ("Agents of a corporation can be held liable for violating antitrust laws if they are 'actively and knowingly engaged in a scheme designed to achieve anticompetitive ends.'").[5]

Plaintiffs allege all requisite elements to establish the Property Management Defendants' liability as agents of the building owners. As a preliminary matter, it is undisputed that the Property Management Defendants are agents of the building owners. *See* Dkt. 345 at 5, 8-9. As to liability, Plaintiffs first allege that the Property Management Defendants each knew about the unlawful objective of the conspiracy facilitated by RealPage and intended to accomplish its end, namely, to artificially inflate rental prices and diminish the supply of multifamily rental units through their use of RMS: "Property managers agree to adopt RealPage's pricing up to 80%-90% of the time, *knowing* that if they, along with their co-conspirators, adhere to RealPage's pricing decisions, they will collectively raise market prices *and avoid price competition*." ¶ 5 (emphases added). Plaintiffs further allege that "[p]roperty managers who use Defendant RealPage's RMS do so *with the explicit and common goal* of increasing rents for all members of the cartel by using coordinated algorithmic pricing." ¶ 174 (emphasis added); *see also* ¶ 129 (former RealPage Pricing Advisor

[5] *See also Reifert v. S. Cent. Wisc. MLS Corp.*, 368 F. Supp. 2d 912, 913 (W.D. Wis. 2005) (holding liability extends to those who "knowingly participate[] in effecting the illegal contract, combination, or conspiracy . . . regardless of whether he is acting in a representative capacity."); *Bergians Farm Dairy Co. v. Sanitary Milk Producers*, 241 F. Supp. 476, 482 (E.D. Mo. 1965) ("Corporate officers, directors and agents are personally liable for acts of the corporation that violate the antitrust laws if they participate in those actions or authorize them.").

confirming RealPage pushed clients to accept its "price and term recommendations at least 80% of the time.").

Second, not only do Plaintiffs allege that the Property Management Defendants knew about and intended to effectuate the scheme, but as detailed above, Plaintiffs also allege that the Property Management Defendants were integral to the scheme's success. The Property Management Defendants each used RealPage's RMS software, by "outsourc[ing] lease pricing decisions to RealPage's RMS," "accept[ing] RealPage's pricing 'recommendations,'" and even relying on RealPage for other leasing terms such as renewals. *See, e.g.*, ¶¶ 10, 22, 27, 48, 51, 63, 75, 90, 116, 121, 125, 141, 153, 163. The Property Management Defendants communicated frequently with RealPage, and supplied confidential, proprietary leasing data to them, including rents paid, occupancy rates, and lease transaction records, all of which enabled RealPage's RMS algorithm to set coordinated rents among the Property Management Defendants and their other competitors. ¶¶ 5, 7, 116, 224. The Property Management Defendants also directly enforced the adoption of RealPage's leasing recommendations, by "monitor[ing] . . . compliance," "pressur[ing] . . . their leasing managers," and tying "compensation for certain property management personnel" to the acceptance of RealPage recommendations. ¶¶ 7, 9, 162, 180, 154-55. These allegations demonstrate the Property Management Defendants "actively and knowingly engaged" in the scheme, not merely accepted rent payments on behalf of building owners passively. *Northstar Energy LLC*, 2014 WL 5343423, at *13.

Although not necessary to state a claim, Plaintiffs also allege that each Property Management Defendant had a strong motive to conspire, as each could (and did) increase its profits significantly as it increased revenues and profits for building owners. ¶¶ 10, 20, 225. Opposing those allegations, Defendants improperly rely on caselaw evaluating economic motive *at the*

*summary judgment or trial stages* (*see* Dkt. 345 at 13-17)—which are decided under a different standard than motions to dismiss at the pleading stage. *See Riverview Invs., Inc. v. Ottawa Cmty. Improvement Corp.*, 899 F.2d 474, 483-84 (6th Cir. 1990) (affirming judgment notwithstanding the verdict where plaintiffs failed to establish motive to conspire, given the ambiguous evidence introduced at trial); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 575 (1986) (reversing summary judgment where the lower court failed to consider the absence of a plausible motive to engage in predatory pricing); *Anderson News, L.L.C. v. Am. Media, Inc.*, 899 F.3d 87, 112-13 (2d Cir. 2018) (affirming summary judgment where plaintiff presented insufficient evidence of a common motive to conspire).

Finally, whether the Property Management Defendants were parties to the actual leases with tenants (*see* Dkt. 345 at 6, 11) is irrelevant, because each is alleged to have had the independent authority to implement and enforce the adoption of RealPage's leasing recommendations. *See, e.g.*, ¶¶ 5, 7, 9, 11, 162, 180, 154-55.

**C. Plaintiffs Did Not Engage in Impermissible Group Pleading.**

Under Fed. R. Civ. P. 8(a)(2) and *Twombly*, Plaintiffs are obligated to provide each defendant "fair notice of what the . . . claim is and the grounds upon which it resets." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Property Management Defendants label the Complaint as "group pleading." But the Complaint plausibly alleges exactly how each Lessor Defendant, including the Property Management Defendants, was involved in the conspiracy—through each Lessor Defendant's use of RealPage's RMS to manage its properties. ¶¶ 10, 27, 48, 51, 63, 75, 90. Further, as discussed above, the Complaint lays out the actions specific to property managers made in furtherance of the conspiracy.

Group pleading does not exist where, as here, the complaint "specifically alleges that each Defendant agreed to participate in the conspiracy." *Iowa Pub. Employees' Ret. Sys. v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 340 F. Supp. 3d 285, 317 (S.D.N.Y. 2018). The Property Management Defendants' argument relating to group pleading appears to suggest the use of the term "Lessor Defendants," as opposed to "Property Management and Owner Defendants" as somehow fatal to Plaintiffs' claim. That Plaintiffs "'lump' Defendants together at [certain] points in the Complaint does not negate or undermine" allegations merely because each Defendant acted in a similar fashion. *Rodriguez*, 191 F. Supp. 3d at 773 ("Plaintiffs allege an overarching conspiracy that unites the Defendants . . . [O]ne might read Plaintiffs' decision to distinguish between the Defendants at various points in the Complaint but not at others to indicate that when they do use the term 'Defendants,' they intend to impute that allegation to all Defendants."); *see also PFS HR Sols., LLC v. Black Wolf Consulting, Inc.*, 2018 WL 5263031, at *2 (E.D. Tenn. June 28, 2018).

Moreover, Property Management Defendants admit that the Complaint "refers to [property managers and building owners] *separately in various places*" when such distinctions are relevant to Plaintiffs' claims. *See* Dkt. 345 at 9 (emphasis added). As explained above, Plaintiffs offer facts specific to the property managers, including the Property Management Defendants, demonstrating their participation in the conspiracy. Each of the Property Management Defendants adopted RealPage's RMS software, and each agreed to rely upon and enforce the use of RealPage's lease recommendations. *See, e.g.*, ¶¶ 7, 9-10, 22, 27, 48, 51, 63, 75, 90, 116, 121, 141, 153-55, 162, 180. The Property Management Defendants also frequently communicated with RealPage to provide proprietary leasing information and facilitate the conspiracy. ¶¶ 125, 163, 224. Property Management Defendants participated in forums and conferences that RealPage hosted specifically

for them, through which they discussed and shared RealPage practices. ¶¶ 227-29. The Property Management Defendants also ensured compliance with RealPage recommendations. ¶¶ 7, 9, 154-55, 162-80. These allegations are specific to property managers, including the Property Management Defendants. These allegations are also a far cry from "the type of 'everyone did everything' allegations that warrant the application of the group pleading rule."[6]

Defendants rely on *In re Travel Agent Comm'n Antitrust Litig.* and *Total Benefits Plan*, but these cases illustrate the difference between impermissible group pleading and the Complaint here. In *Travel Agent*, the plaintiffs had no allegations tying the defendants to any common design or understanding. 2007 WL 3171675, at *3 (N.D. Ohio, Oct. 29, 2007), *aff'd* 583 F.3d 896 (6th Cir. 2009). And the complaint in *Total Benefits* was just *eleven* pages, three of which were the case caption. *See Total Benefits Plan. Agency Inc. v. Anthem Blue Cross & Blue Shield*, 2006 WL 3855349 (S.D. Ohio); *see also* 630 F. Supp. 2d 842, 851 (S.D. Ohio 2007), *aff'd* 552 F.3d 430 (6th Cir. 2008). In contrast, the AC contains over 100 pages of detailed allegations, specifically linking the Property Management Defendants to the conspiracy.

Thus, the AC adequately puts the Property Management Defendants on notice of the claims against them under Fed. R. Civ. P. 8(a)(2) and *Twombly*. It alleges actions undertaken by all Lessor Defendants (including Property Manager Defendants) in acquiescing to the conspiracy through use of RealPage's RMS. The AC contains detailed factual allegations concerning the types of conduct in which property managers, including Property Management Defendants, engaged in

[6] *Prodanova*, 2018 WL 8017791, at *10 (citing *Destfino v. Resiwig*, 630 F.3d 952, 958 (9th Cir. 2011)); *see also In re TFT-LCD (Flat Panel) Antitrust Litig.*, 599 F. Supp. 2d 1179, 1185 (N.D. Cal. 2009) (rejecting defendants' group pleading challenge because "[t]he complaints allege a complex, multinational price-fixing conspiracy and, taken as a whole, they sufficiently allege each defendants' participation in that conspiracy, as well as present a factual basis for the allegations of agency").

furtherance of the conspiracy. That alleged conduct is specific to the Property Management Defendants and not to building owners.

## IV. CONCLUSION

Plaintiffs have plausibly stated claims against the Property Management Defendants. Plaintiffs allege that the Property Management Defendants knew about the unlawful conspiracy to artificially increase rental prices and diminish the supply of rental housing—and participated in the conspiracy with the intent to do so. The Property Management Defendants also contributed materially to the scheme, by supplying confidential, proprietary data to RealPage to facilitate the rent-fixing and enforcing price discipline through internal measures, as well as direct communications with RealPage.

For the foregoing reasons, Plaintiffs respectfully request that the Property Management Defendants' Motion to Dismiss for Failure to Plead Agency Liability be denied in its entirety.

Dated: July 24, 2023

*/s/ Tricia R. Herzfeld*
Tricia R. Herzfeld (#26014)
Anthony A. Orlandi (#33988)
**HERZFELD SUETHOLZ GASTEL LENISKI AND WALL, PLLC**
223 Rosa L. Parks Avenue, Suite 300
Nashville, TN 37203
Telephone: (615) 800-6225
tricia@hsglawgroup.com
tony@hsglawgroup.com

*Liaison Counsel*

Patrick J. Coughlin
Carmen A. Medici
Fatima Brizuela
**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
600 West Broadway, Suite 3300
San Diego, CA 92101
Telephone: (619) 798-5325
Facsimile: (619) 233-0508

pcoughlin@scott-scott.com
cmedici@scott-scott.com
fbrizuela@scott-scott.com

Patrick McGahan
Amanda Lawrence
Michael Srodoski
G. Dustin Foster
Isabella De Lisi
**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
156 South Main Street
P.O. Box 192
Colchester, CT 06145
Telephone: (860) 537-5537
Facsimile: (860) 537-4432
pmcgahan@scott-scott.com
alawrence@scott-scott.com
msrodoski@scott-scott.com
gfoster@scott-scott.com
idelisi@scott-scott.com

Stacey P. Slaughter
Thomas J. Undlin
Geoffrey H. Kozen
Stephanie A. Chen
J. Austin Hurt
**ROBINS KAPLAN LLP**
800 LaSalle Avenue, Suite 2800
Minneapolis, MN 55402
Telephone: (612) 349-8500
Facsimile: (612) 339-4181
sslaughter@robinskaplan.com
tundlin@robinskaplan.com
gkozen@robinskaplan.com
schen@robinskaplan.com
ahurt@robinskaplan.com

Swathi Bojedla
Mandy Boltax
**HAUSFELD LLP**
888 16th Street, N.W., Suite 300
Washington, DC 20006
Telephone: (202) 540-7200
sbojedla@hausfeld.com
mboltax@hausfeld.com

Gary I. Smith, Jr.
**HAUSFELD LLP**
600 Montgomery Street, Suite 3200
San Francisco, CA 94111
Tel: (415) 633-1908
gsmith@hausfeld.com

Katie R. Beran
**HAUSFELD LLP**
325 Chestnut Street, Suite 900
Philadelphia, PA 19106
Telephone: 1 215 985 3270
kberan@hausfeld.com

*Interim Co-Lead Counsel*

Eric L. Cramer
Michaela L. Wallin
**BERGER MONTAGUE PC**
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Telephone: (215) 875-3000
ecramer@bm.net
mwallin@bm.net

Daniel J. Walker
**BERGER MONTAGUE PC**
2001 Pennsylvania Avenue, NW, Suite 300
Washington, DC 20006
Telephone: (202) 559-9745
dwalker@bm.net

Brendan P. Glackin
Dean M. Harvey
**LIEFF CABRASER HEIMANN & BERNSTEIN, LLP**
275 Battery Street, Suite 2900
San Francisco, CA 94111
Telephone: 415-956-1000
bglackin@lchb.com
dharvey@lchb.com

Steve W. Berman
Breanna Van Engelen
**HAGENS BERMAN SOBOL SHAPIRO LLP**
1301 Second Avenue, Suite 2000
Seattle, Washington 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
steve@hbsslaw.com
breannav@hbsslaw.com

Benjamin J. Widlanski
Javier A. Lopez
**KOZYAK TROPIN & THROCKMORTON LLP**
2525 Ponce de Leon Blvd., 9th Floor
Coral Gables, Florida 33134
Telephone: (305) 372-1800
bwidlanski@kttlaw.com

Christian P. Levis
Vincent Briganti
Peter Demato
Radhika Gupta
**LOWEY DANNENBERG, P.C.**
44 South Broadway, Suite 1100
White Plains, NY 10601
Telephone: (914) 997-0500
Facsimile: (914) 997-0035
vbriganti@lowey.com
clevis@lowey.com
pdemato@lowey.com
rgupta@lowey.com

Christopher M. Burke
Walter W. Noss
Yifan (Kate) Lv
**KOREIN TILLERY P.C.**
707 Broadway, Suite 1410
San Diego, CA 92101
Telephone: (619) 625-5621
Facsimile (314) 241-3525
cburke@koreintillery.com
wnoss@koreintillery.com
klv@koreintillery.com

**JOSEPH SAVERI LAW FIRM, LLP**
Joseph R. Saveri
Steven N. Williams
Cadio Zirpoli
Kevin E. Rayhill
601 California Street, Suite 1000
San Francisco, CA 94108
Telephone: (415) 500-6800
jsaveri@saverilawfirm.com
swilliams@saverilawfirm.com
czirpoli@saverilawfirm.com
krayhill@saverilawfirm.com

Jennifer W. Sprengel
Daniel O. Herrera
Alexander Sweatman
**CAFFERTY CLOBES MERIWETHER & SPRENGEL LLP**
135 S. LaSalle, Suite 3210
Chicago, IL 60603

jal@ktllaw.com

Telephone: 312-782-4880
Facsimile: 312-782-4485
jsprengel@caffertyclobes.com
dherrera@caffertyclobes.com
asweatman@caffertyclobes.com

*Plaintiffs' Steering Committee Counsel for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that on July 24, 2023, I caused the foregoing to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the email addresses denoted on the Electronic Mail Notice List.

*/s/ Tricia R. Herzfeld*
Tricia R. Herzfeld