# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF TENNESSEE
# NASHVILLE DIVISION

|  |  |
|---|---|
| IN RE: REALPAGE, INC., RENTAL SOFTWARE ANTITRUST LITIGATION (NO. II) | Case No. 3:23-md-3071<br>MDL No. 3071<br><br>Chief Judge Waverly D. Crenshaw, Jr.<br><br>JURY DEMAND<br><br>This Document Relates to:<br>ALL CASES |

## PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO LRO USER DEFENDANTS' 12(b)(6) MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM

I. **INTRODUCTION**

LRO Defendants' ("LRO Users")[1] Motion to Dismiss ignores allegations in Plaintiffs' First Amended Consolidated Class Action Complaint ("AC")[2] that plausibly plead LRO Users' conscious commitment to the alleged conspiracy, misapprehends the applicable law, inappropriately raises evidentiary and factual disputes that cannot be resolved at the pleading stage, and relies on inapposite authorities that address fundamentally different claims and issues than those before the Court. The Court should deny the Motion for at least the following reasons.

First, LRO Users misconstrue the essence of the alleged conspiracy. Each Lessor Defendant agreed to delegate their rental price and supply decisions to RealPage and to abide by those decisions, knowing other competitors were doing the same. ¶¶ 2-4. Whether certain RealPage clients took different steps to implement that agreement in restraint of trade—by using different software interfaces, exchanging more or less information with RealPage, or employing internal as opposed to external RealPage Pricing Advisors—is immaterial. *See SD3, LLC v. Black & Decker (U.S.) Inc.*, 801 F.3d 412, 427 (4th Cir. 2015) (rejecting defendants' argument that parallel conduct requires uniform adherence to the alleged conspiracy, or for defendants to have achieved the alleged objective in the same way).[3] If all the Lessor Defendants agreed to abide by the common

---

[1] LRO Users are Defendants Bell Partners, Inc.; Brookfield Properties Multifamily LLC; CONAM Management Corporation; Equity Residential; Independence Realty Trust, Inc.; Mid-America Apartment Communities, Inc.; Morgan Properties Management Company, LLC; The Related Companies, L.P.; Related Management Company, L.P.; Security Properties Inc.; Simpson Property Group, LLC; Thrive Communities Management, LLC; Windsor Property Management Company; and WinnCompanies LLC and WinnResidential Manager Corp. *See* Dkt. 323, fn.1.

[2] Unless specified otherwise, all references to "¶," or "¶¶" are to paragraphs from the AC, Dkt. 314. Unless specified otherwise, all terms are used according to their definition in the AC.

[3] *See also* ABA Model Jury Instructions in Civil Antitrust Cases at 13 (2d ed. 2016) ("The members of the conspiracy need not necessarily have met together, directly stated what their object or purpose was to one another, or stated the details or the means by which they would accomplish their purpose . . . A conspiracy may be formed without all parties coming to an agreement at the

1

pricing decisions of "a guy named Bob[,]" it is irrelevant whether Bob communicated those pricing decisions via short text messages or long emails accompanied by other information about the recipient's competitors.[4] ¶ 118. The same is true here.

Second, LRO Users compound this mistake by erroneously claiming that Plaintiffs have "plead themselves out of court." Dkt. 324 ("LRO MTD"), at 6. Contrary to LRO Users' tortured readings of Plaintiffs' prior complaints, Plaintiffs never "admitted LRO's algorithm *uses* only public information and thus is not anticompetitive." *Id*. (emphasis added). Rather, the portions of the specific superseded pleadings cited by LRO Users address only the *original design* of LRO ten years before RealPage acquired it, *i.e.*, what it *used* to do. Those allegations do not contradict Plaintiffs' extensive allegations regarding how RealPage altered LRO *after* RealPage purchased the product in 2017. LRO Users simply ignore those operative allegations. For example, Plaintiffs plead that: RealPage merged both the algorithm and data pool behind LRO after acquiring it in 2017 with RealPage's pre-existing and subsequent RMS offerings, ¶¶ 13-16, 106, 108-113, 121, 134, 171; LRO Users consciously continued to use LRO to set their prices and use their data alongside other RealPage RMS clients despite those changes, ¶¶ 106, 110 n.69; and LRO Users also accepted RealPage's imposition of Pricing Revenue Managers post-acquisition. ¶ 112. These allegations demonstrate LRO Users' participation in the alleged anticompetitive agreement after RealPage's acquisition; they are also perfectly consistent with the earlier, inoperative pleadings.

Third, even if there were a disconnect between the AC and these prior pleadings—and

---

same time. Similarly, it is not essential that all persons acted exactly alike, nor is it necessary that they all possessed the same motive for entering the agreement.") (hereinafter, "ABA Model Jury Instructions").

[4] Moreover, it appears that LRO Users do not contest that they provided their own confidential and proprietary information to RealPage to permit it to price their units.

2

Case 3:23-md-03071     Document 385     Filed 07/24/23     Page 3 of 18 PageID #: 3431

there is not—LRO Users ignore that "amended pleadings supersede original pleadings." *Braden v. U.S.*, 817 F.3d 926, 930 (6th Cir. 2016). Thus, any alleged "admission" is (at most) an evidentiary issue that has no bearing at the motion to dismiss stage. *See Uhlig LLC v. CoreLogic, Inc., et al.*, 2023 WL 4234612, at *11 (D. Kan. June 28, 2023) (denying a party's request that the court treat certain factual allegations from abandoned pleadings as admissions, concluding that doing so "poses an evidentiary issue—not an issue the court can decide on a motion to dismiss."). Because an "evidentiary admission does not preclude contrary proof to dispute a fact," *Davis v. Echo Valley Condo. Ass'n*, 349 F. Supp. 3d 645, 653 (E.D. Mich. 2018), *aff'd*, 945 F.3d 483 (6th Cir. 2019), such admissions are suited for summary judgment and trial, not at the motion to dismiss stage.

## II. RELEVANT FACTS

From at least January 2016 through the present, Defendants engaged in a nationwide conspiracy to fix and inflate the price of multifamily rental housing across the country. ¶ 1. Defendants are (a) RealPage, the developer of an integrated technology platform that provides software solutions for the multifamily rental housing market, including its RMS software (which includes at least LRO, YieldStar, and AI Revenue Management), and (b) Lessor Defendants, managers of large-scale multifamily residential apartment buildings—including the 15 LRO Users—that used one or more of RealPage's RMS software products to coordinate and agree upon rental housing pricing and supply. ¶¶ 2, 49, 52, 55, 61, 66, 72, 74, 77, 81, 83, 84, 88, 89.

RealPage acquired LRO from the Rainmaker Group in 2017, thereby doubling the lease transaction data used to provide pricing decisions to Lessor Defendants. ¶¶ 13, 106, 110. Since its acquisition and integration of LRO, RealPage has made "enhancements" to the original LRO design. ¶¶ 15, 106, 110-13. It has also notified LRO legacy users that their proprietary non-public

3

information input into RealPage's hosted platform did not qualify as confidential information and could be disseminated in a form "determined by RealPage in its sole discretion" to competitors for the purpose of providing comparables and pricing recommendations through its RMS software. ¶¶ 108-09, 111-13, 133 n.91, 171. Through their continued use of LRO post-acquisition, LRO Users consciously choose to "work together" with their "competitors" and with RealPage as a "community in pricing strategies" to accept RealPage's pricing decisions and avoid periods of oversupply of multifamily rental housing units in the market. ¶¶ 4, 22, 25, 103, 139.

As demonstrated more fully in Section III.A, Plaintiffs plead facts that show LRO Users adopted RealPage's RMS software to delegate their price and supply decisions to RealPage, with the explicit and common goal of increasing rents for all RealPage RMS clients. ¶¶ 171-74.

**III. ARGUMENT**

In analyzing a motion to dismiss, courts "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." *In re Travel Agent Comm'n Antitrust Litig.*, 583 F.3d 896, 902-03 (6th Cir. 2009). *Bell Atlantic Corp. v. Twombly* calls for "a complaint with enough factual matter (taken as true) to suggest that" a violation of the Sherman Act occurred. 550 U.S. 544, 556 (2007). The pleading standard requires only enough "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly,* 550 U.S. at 556). The reviewing court must determine not whether the plaintiff will ultimately prevail, but whether the facts permit the court to infer "more than the mere possibility of misconduct," which is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679. In the Sixth Circuit, a complaint must simply "put defendants on notice concerning the basic nature of [plaintiff's] complaints

4

against the defendants and the grounds upon which their claims exist." *In re Se. Milk Antitrust Litig.*, 555 F. Supp. 2d 934, 943 (E.D. Tenn. 2008).

### A. Plaintiffs Plausibly Plead LRO Users' Conscious Commitment to the Alleged Conspiracy.

Plaintiffs plead facts that show LRO Users used RealPage's RMS software to delegate their price and supply decisions to RealPage—knowing other competitors were doing the same and with the explicit and common goal of increasing rents for all RealPage RMS clients. ¶¶ 2-4, 22, 121, 132, 171-74. Immediately upon RealPage's acquisition of LRO, RealPage merged LRO with its existing "modeling tools," and the data on which they trained, thereby doubling the amount of lease transaction data RealPage uses to provide pricing decisions to Lessor Defendants, including LRO Users, through its RMS software. ¶¶ 13, 15, 106, 110, 112. As to legacy users who elected to continue to use LRO through RealPage's hosted platform, RealPage also notified them that their proprietary information input into the RealPage RMS platform was not confidential and could be circulated in aggregated form to their competitors—RealPage's RMS software clients—for the purpose of providing comparables and pricing recommendations. ¶¶ 111-13, 133 n.91, 171. In other words, LRO Users were aware that the pricing information exchanged in connection with their use of RealPage's LRO contained their *competitors'* non-public and proprietary transactional data. ¶ 171-74. Since then, RealPage has made further "enhancements" to the original LRO, and integrated LRO and YieldStar to form a new RMS software, AI Revenue Management. ¶¶ 15, 106, 110-13.

By continuing to use LRO post-acquisition, LRO Users consciously committed to a common scheme, design, and understanding to "work together" with their "competitors" and RealPage, accept RealPage's pricing decisions, and, in doing so, "make . . . all [RealPage RMS clients] more successful in our pricing." ¶ 4. Aware of the antitrust concerns posed by using

5

RealPage's LRO, at least one LRO user, AvalonBay, demanded a contractual provision (renewed last year) that prohibited RealPage from (1) utilizing any data in the LRO pricing recommendation to AvalonBay other than AvalonBay's own data and publicly available data; and (2) utilizing AvalonBay's data or disclosing the LRO recommendations made to AvalonBay to any other RealPage client. ¶¶ 108-09. To Plaintiffs' knowledge, no other alleged co-conspirator similarly withdrew from or declined to acquiesce in the alleged anticompetitive agreement.

LRO Users also implemented the alleged conspiracy in other key ways. For example, LRO Users acted upon RealPage's urging to "shop [their] competitors over the phone, in-person, and view their websites." ¶ 173. A former employee of Lessor Defendant and LRO User Mid-America Apartment Communities ("MAA") confirmed this and described how RealPage provided MAA with a form listing the competitors to call and the information to obtain in order to facilitate the collection of competitor data. ¶ 25. Using the form to guide her, the MAA employee called competitor properties weekly to obtain their updated pricing information. *Id.*

LRO Users, alongside other Lessor Defendants, also worked together to avoid periods of oversupply of multifamily rental housing units. ¶¶ 13, 17-18, 22, 103, 139, 174. The LRO system charts how users should pace lease renewals, thereby smoothing out natural fluctuations of supply and demand, which further reduces any incentive for Lessor Defendants to undercut their inflated prices. ¶¶ 22, 139.

That LRO Users *may* have used a different interface to achieve the same ultimate objective, or *may* have received slightly repackaged competitor data from users of RealPage's other RMS software—albeit Plaintiffs do not contend or concede that they did—is immaterial. *See SD3,* 801 F.3d at 427 (rejecting defendants' argument that their conduct must be "deemed dissimilar," and therefore not parallel, because they did not uniformly adhere to the alleged

6

conspiracy or achieve the alleged objective in the same way). In *SD3*, the Fourth Circuit rejected defendant's argument that a plaintiff must allege parallel conduct in "relative lockstep," finding that argument to have "no support in any existing authority" and holding instead that "[a] plaintiff establishes parallel conduct when it pleads facts indicating that the defendants acted 'similarly.'" *Id.* at 427-29. "[I]t is well settled . . . that the law does not require every defendant to participate in the conspiracy by identical means throughout the entire class period." *In re Currency Conversion Fee Antitrust Litig.*, 264 F.R.D. 100, 114 (S.D.N.Y. 2010).[5] There is no requirement that LRO Users participate in all aspects of the conspiracy or respond identically for the conspiracy to be plausible. Plaintiffs have pled sufficient facts to show LRO Users: (1) joined the common agreement to delegate pricing decisions to RealPage post-acquisition; and (2) abide by that agreement. ¶¶ 13-16, 106-13, 139, 171. That is sufficient to state a claim against LRO Users.

### B. LRO Users Mischaracterize the Superseded Pleadings to Obscure the AC's Properly Plead and Operative Allegations.

#### 1. LRO Users Mischaracterize Plaintiffs' Prior Pleadings.

Likely aware that the AC renders their entire argument meritless, LRO Users ignore it completely. Rather than identifying any purported factual or legal deficiency in Plaintiffs' operative complaint, their brief spends 7 of its 10 pages promoting a distortion of Plaintiffs' prior pleadings. LRO MTD, at 1, 3-8. LRO Users attempt to create an "admission against [Plaintiffs]" by warping the following statement, which LRO Users define as the "LRO Allegation":

---

[5] *See also* ABA Model Jury Instructions, *supra* note 3; *Anderson News, L.L.C. v. Am. Media, Inc.,* 680 F.3d 162, 191 (2d Cir. 2012) (holding that defendants' "varied" actions during the initial stages of the alleged conspiracy did not render the existence of a conspiracy implausible); *In re Diisocyanates Antitrust Litig.*, 2020 WL 1140244, at *3 (W.D. Pa. Mar. 9, 2020) ("[T]he bulk of Defendants' assertions are more appropriate for resolution at a later stage in this litigation . . . At [the motion to dismiss] stage, for example, Plaintiffs need not explain why some Defendants took many actions and others took few.").

7

> Naturally, YieldStar's coordinated pricing strategy became more and more effective as more property managers implemented it. To this end, Defendant RealPage began buying up similar and competing software companies, and it has completed 26 acquisitions since its founding. The most important of these transactions came in 2017, when RealPage acquired Lease Rent Options ("LRO"), a company which offered a similar rent-setting software that was YieldStar's strongest rival. *Instead of relying on nonpublic data from competitors, however, LRO's algorithm used only public market data as [an] input. LRO's chief architect, Donald Davidoff, designed it that way specifically to avoid the potential antitrust violations arising from the use of nonpublic data to coordinate prices among competitors.*

*Id.* at 3 (emphasis in original).

LRO Users contend that the AC cannot be squared with that allegation. That is not accurate.

As is clear from the face of the LRO Allegation, it concerns LRO's structure at its *origin*:

> Instead of relying on nonpublic data from competitors, [ ] LRO's algorithm *used* only public market data as [an] input. LRO's chief architect, Donald Davidoff, *designed* it that way specifically to avoid the potential antitrust violations arising from the use of nonpublic data to coordinate prices among competitors.

*Id.* (emphases added). That language makes clear that it describes only the *original* design of the LRO software by the Rainmaker Group, before RealPage acquired it and leveraged its data to supplement its existing anticompetitive software during the relevant time period. No amount of misleading argument can create a fatal contradiction on the operative pleadings when they speak to how LRO operated at different points in time, under different ownership. Given the lack of any contradiction between the LRO Allegation and the operative allegations in the AC, LRO Users are incorrect that Plaintiffs have somehow "plead themselves out of court." LRO MTD, at 6 (emphasis added) (citing *NicSand, Inc. v. 3M Co.*, 507 F.3d 442, 458 (6th Cir. 2007)).[6] Plaintiffs have done no such thing.

---

[6] LRO Users' reliance on *NicSand* is unavailing. *NicSand* was a Sherman Act § 2 case in which one competitor (NicSand) sued another (3M), alleging 3M had monopolized or attempted to monopolize the market for automotive sandpaper. *Id.* at 449. Explaining "courts typically have

8

Indeed, to accept LRO Users' argument, one must believe that: (1) "Plaintiffs have *already admitted* LRO's algorithm *uses* only public information and thus is not anticompetitive," LRO MTD, at 6 (emphasis added); (2) "Plaintiffs have represented that LRO's algorithm lacks the supposed use of non-public information that Plaintiffs allege is necessary for their conspiracy theory," *id.*; *and* (3) "Plaintiffs have alleged that LRO is a different algorithm that uses only public information as an input." *Id.* at 8. Plaintiffs have made no such admissions, representations, or allegations in either prior pleadings or the operative AC. Even if the LRO Allegation was *not* superseded by the AC—which it is—LRO Users are simply using these prior pleadings as a vehicle to raise factual disputes that cannot be resolved at the pleadings stage. *See Solo v. United Parcel Serv. Co.*, 819 F.3d 788, 796 (6th Cir. 2016) (holding that it is not appropriate to resolve a factual dispute on a motion to dismiss).

The AC pleads facts sufficient to show that post-acquisition, LRO served to facilitate a cartel by allowing Lessor Defendants to collectively set prices through the exchange of non-public information within RealPage's RMS software. The LRO Allegation does not contradict that.

### 2. Plaintiffs' AC Supersedes All Prior Pleadings.

Even if the LRO Allegation were incompatible with the AC—and it is not—LRO Users ignore black letter law which provides that "amended pleadings supersede original pleadings[,]" *Braden*, 817 F.3d at 930, such that "the original pleading no longer performs any function in the case . . ." *Leggett v. W. Express, Inc.*, 2020 WL 1161974, at *1 n.1 (M.D. Tenn. Jan. 6, 2020) (cleaned up). To circumvent this basic principle, LRO Users rely on a host of inapposite cases, and

---

permitted such claims to proceed only when one of the rivals has engaged in predatory pricing," the court affirmed dismissal owing to NicSand's concession that its "Amended Complaint [Was] Not Premised on Predatory Pricing." *Id.* at 451-52.

9

a distorted reading of the LRO Allegation, to paint it as an "admission[] against the pleader." LRO MTD, at 7.

In a 70-year-old case cited by Defendants, the court found that statements made in an original pleading, later altered substantially (unlike here), could be considered "admissions against the pleader." *Pennsylvania R. R. Co. v. City of Girard*, 210 F.2d 437, 440-41 (6th Cir. 1954). The Sixth Circuit has since acknowledged its error in doing so. *Shell v. Parrish*, 448 F.2d 528, 530 (6th Cir. 1971) ("While we have on one occasion on appeal taken judicial notice of a superseded pleading . . . we think the better rule is against such practice.") (citing *Pennsylvania R. R.*, 448 F.2d at 530); *Hayward v. Cleveland Clinic Found.*, 759 F.3d 601, 617 (6th Cir. 2014) ("Generally, amended pleadings supersede original pleadings.").[7]

The Sixth Circuit law mandates that Plaintiffs' AC supersedes any prior allegations. For that reason, the Court can dispense with Defendants' flawed dissection of Plaintiffs' prior pleadings.

### 3. Evidentiary Issues Are Improper at The Motion to Dismiss Stage.

Even if the LRO Allegation *was* an "admission," this presents an evidentiary issue that cannot be resolved at the motion to dismiss stage. *See Uhlig,* 2023 WL 4234612, at *11 (denying request that the court treat factual allegations from abandoned pleadings as admissions, concluding that doing so "poses an evidentiary issue—not an issue the court can decide on a motion to

---

[7] In another case cited by Defendants, on a completely anomalous set of facts involving a *pro se* corporate defendant who claimed to no longer exist (and who later obtained counsel and reversed its answer to say that it did exist, in order to avoid personal liability for the owner), at summary judgment, the court held the defendant to the statement it made about itself in its original answer, which is much more akin to a typical evidentiary admission against interest than a statement in a class complaint. *See PetroJebla, SA de C.V. v. Betron Enters., Inc.*, 2020 WL 95802 (E.D. Mich. Jan. 8, 2020).

10

dismiss."); *see also Davis*, 349 F. Supp. 3d at 653 (holding that while "pleadings withdrawn or superseded by amended pleadings [might be] admissions against the pleader in the action in which they were filed . . . those 'admissions' are evidentiary admissions, not judicial admissions."); *United States v. Avanir Pharms., Inc.*, 2020 WL 4339339, at *5 (N.D. Ohio July 28, 2020) (concluding that under *Pennsylvania Railroad,* even superseded pleadings that constitute admissions against interest "may be refuted by competent evidence at the appropriate time."). Thus, any alleged "admission" is an evidentiary issue that has no bearing at the motion to dismiss stage and can be overcome by competent and contrary record evidence developed through fact discovery in this MDL.

LRO Users also claim "[t]he Court may also consider the allegations in the ProPublica article" concerning the origins of LRO because Plaintiffs' AC cites the article. LRO MTD, at 7. Of course, as an initial matter, that publication does not make any "allegations," so the argument is simply meritless. Further, while Federal Rule of Evidence 201 allows a court to take notice of facts not subject to reasonable dispute, LRO Users are asking the Court to take notice of the ProPublica article specifically to *refute* the allegations Plaintiffs make in the AC—effectively putting facts in dispute and taking it outside the bounds of Rule 201 judicial notice.[8] Even if the ProPublica article *was* considered, it does nothing more than confirm that, at its creation, LRO

---

[8] *See Downing v. Ford Motor Co.*, 2018 WL 4621955, at *1 (6th Cir. Sept. 24, 2018) (confirming "judicial notice is only proper where the fact is adjudicative, relevant, and beyond reasonable controversy"); *M.A.C. by next friend M.E.C. v. Smith*, 576 F. Supp. 3d 552, 557 (M.D. Tenn. 2021) (same). Indeed, even if the Court were to take judicial notice of the ProPublica article, it would do so only of the fact of the publication, and not for the truth of the matter asserted therein. See *In re Omnicare, Inc. Sec. Litig.*, 769 F.3d 455, 467 (6th Cir. 2014) (distinguishing that the court may take judicial notice "only of the fact that Omnicare filed the Audit Committee Charter and what that filing said, but we could not consider the statements contained in the document for the truth of the matter asserted, even at the motion-to-dismiss stage.").

11

used public data and was designed to avoid potential antitrust violations. Since RealPage acquired and integrated LRO into its other RMS in 2017, though, it no longer operates that way.

### C. Plaintiffs' AC Does Not Use Impermissible Group Pleading.

Plaintiffs' AC adequately alleges a plausible conspiracy between the Lessor Defendants facilitated by RealPage. LRO Users do not argue that Plaintiffs have named broad families of affiliated entities, they instead argue that by grouping RealPage's integrated multifamily rental housing pricing solutions under one acronym, "RMS," Plaintiffs have engaged in "impermissible group pleading[s]." LRO MTD, at 8. The key to Rule 8's "short and plain statement" requirement is that the factual allegations are sufficient to give the defendant fair notice of the claims brought against them and grounds upon which those claims rest. *See Twombly*, 550 U.S. at 555; *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 599 F. Supp. 2d 1179, 1184-85 (N.D. Cal. 2009) (rejecting defendants' "group pleadings" challenge, holding "[t]he complaints allege a complex, multinational price-fixing conspiracy, and taken as a whole, they sufficiently allege each defendant's participation in that conspiracy. . .").

LRO Users once again rely on their same weak mischaracterization of the AC in their group pleadings argument. LRO MTD, at 8. (". . . it was incumbent to allege at a bare minimum that each of the LRO defendants uses YieldStar or AIRM to participate in the alleged conspiracy."). Because Plaintiffs have clearly alleged that LRO was integrated into RealPage's comprehensive RMS platform, each LRO User's use of LRO ties them specifically to the agreement, and LRO Users' group pleading argument fails.

### IV. CONCLUSION

For the foregoing reasons, LRO Users' Motion to Dismiss should be denied in its entirety.

Dated: July 24, 2023  /s/ Tricia R. Herzfeld

Tricia R. Herzfeld (#26014)
Anthony A. Orlandi (#33988)
**HERZFELD SUETHOLZ GASTEL LENISKI AND WALL, PLLC**
223 Rosa L. Parks Avenue, Suite 300
Nashville, TN 37203
Telephone: (615) 800-6225
tricia@hsglawgroup.com
tony@hsglawgroup.com

*Liaison Counsel*

Patrick J. Coughlin
Carmen A. Medici
Fatima Brizuela
**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
600 West Broadway, Suite 3300
San Diego, CA 92101
Telephone: (619) 798-5325
Facsimile: (619) 233-0508
pcoughlin@scott-scott.com
cmedici@scott-scott.com
fbrizuela@scott-scott.com

Patrick McGahan
Amanda F. Lawrence
Michael Srodoski
G. Dustin Foster
Isabella De Lisi
**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
156 South Main Street
P.O. Box 192
Colchester, CT 06145
Telephone: (860) 537-5537
Facsimile:  (860) 537-4432
pmcgahan@scott-scott.com
alawrence@scott-scott.com
msrodoski@scott-scott.com
gfoster@scott-scott.com
idelisi@scott-scott.com

Stacey Slaughter
Thomas J. Undlin
Geoffrey H. Kozen
Stephanie A. Chen
J. Austin Hurt
**ROBINS KAPLAN LLP**
800 LaSalle Avenue, Suite 2800
Minneapolis, MN 55402
Telephone: (612) 349-8500
Facsimile: (612) 339-4181
sslaughter@robinskaplan.com
tundlin@robinskaplan.com
gkozen@robinskaplan.com
schen@robinskaplan.com
ahurt@robinskaplan.com

Swathi Bojedla
Mandy Boltax
**HAUSFELD LLP**
888 16th Street, N.W., Suite 300
Washington, DC 20006
Telephone: (202) 540-7200
sbojedla@hausfeld.com
mboltax@hausfeld.com

Gary I. Smith, Jr.
**HAUSFELD LLP**
600 Montgomery Street, Suite 3200
San Francisco, CA 94111
Tel: (415) 633-1908
gsmith@hausfeld.com

Katie R. Beran
**HAUSFELD LLP**
325 Chestnut Street, Suite 900
Philadelphia, PA 19106
Telephone: 1 215 985 3270
kberan@hausfeld.com

*Interim Co-Lead Counsel*

Eric L. Cramer
Michaela L. Wallin
**BERGER MONTAGUE PC**
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Telephone: (215) 875-3000
ecramer@bm.net
mwallin@bm.net

Daniel J. Walker
**BERGER MONTAGUE PC**
2001 Pennsylvania Avenue, NW, Suite 300
Washington, DC 20006
Telephone: (202) 559-9745
dwalker@bm.net

Brendan P. Glackin
Dean M. Harvey
**LIEFF CABRASER HEIMANN & BERNSTEIN, LLP**
275 Battery Street, Suite 2900
San Francisco, CA 94111
Telephone: 415-956-1000
bglackin@lchb.com
dharvey@lchb.com

Mark P. Chalos
Hannah R. Lazarz
Kenneth S. Byrd
**LIEFF CABRASER HEIMANN & BERNSTEIN, LLP**
222 2nd Avenue South, Ste. 1640
Nashville, TN 37201
(615) 313-9000
mchalos@lchb.com
hlazarz@lchb.com
kbyrd@lchb.com

Steve W. Berman
Breanna Van Engelen
**HAGENS BERMAN SOBOL SHAPIRO LLP**
1301 Second Avenue, Suite 2000
Seattle, Washington 98101

Christian P. Levis
Vincent Briganti
Peter Demato
Radhika Gupta
**LOWEY DANNENBERG, P.C.**
44 South Broadway, Suite 1100
White Plains, NY 10601
Telephone: (914) 997-0500
Facsimile: (914) 997-0035
vbriganti@lowey.com
clevis@lowey.com
pdemato@lowey.com
rgupta@lowey.com

Christopher M. Burke
Walter W. Noss
Yifan (Kate) Lv
**KOREIN TILLERY P.C.**
707 Broadway, Suite 1410
San Diego, CA 92101
Telephone: (619) 625-5621
Facsimile (314) 241-3525
cburke@koreintillery.com
wnoss@koreintillery.com
klv@koreintillery.com

**JOSEPH SAVERI LAW FIRM, LLP**
Joseph R. Saveri
Steven N. Williams
Cadio Zirpoli
Kevin E. Rayhill
601 California Street, Suite 1000
San Francisco, CA 94108
Telephone: (415) 500-6800
jsaveri@saverilawfirm.com
swilliams@saverilawfirm.com
czirpoli@saverilawfirm.com
krayhill@saverilawfirm.com

Jennifer W. Sprengel
Daniel O. Herrera
Alexander Sweatman
**CAFFERTY CLOBES MERIWETHER & SPRENGEL LLP**
135 S. LaSalle, Suite 3210

15

Telephone: (206) 623-7292  
Facsimile: (206) 623-0594  
steve@hbsslaw.com  
breannav@hbsslaw.com  

Benjamin J. Widlanski  
Javier A. Lopez  
**KOZYAK TROPIN &  
THROCKMORTON LLP**  
2525 Ponce de Leon Blvd., 9th Floor  
Coral Gables, Florida 33134  
Telephone: (305) 372-1800  
bwidlanski@kttlaw.com  
jal@kttlaw.com  

Chicago, IL 60603  
Telephone: 312-782-4880  
Facsimile: 312-782-4485  
jsprengel@caffertyclobes.com  
dherrera@caffertyclobes.com  
asweatman@caffertyclobes.com  

*Plaintiffs' Steering Committee Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on July 24, 2023, I caused the foregoing to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the email addresses denoted on the Electronic Mail Notice List.

*/s/ Tricia R. Herzfeld*
Tricia R. Herzfeld
