# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

|  |  |
|---|---|
| IN RE: REALPAGE, INC., RENTAL SOFTWARE ANTITRUST LITIGATION (NO. II) | Case No. 3:23-md-3071 <br> MDL No. 3071 <br><br> Chief Judge Waverly D. Crenshaw, Jr. <br><br> JURY DEMAND <br><br> This Document Relates to: <br> ALL CASES |

## PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE MULTI-FAMILY CONSOLIDATED AMENDED COMPLAINT

# TABLE OF CONTENTS

I.    INTRODUCTION ................................................................................................ 1

II.   FACTUAL BACKGROUND ............................................................................... 2

III.  THE PLEADING STANDARD IN AN ANTITRUST CASE ............................ 5

IV.   ARGUMENT ...................................................................................................... 6

   A.   The Complaint Adequately Alleges a *Per Se* Price-Fixing Agreement ............................. 7

     1.   Plaintiffs Allege a *Per Se* Violation. ............................................................. 7

     2.   The Complaint Alleges Direct Evidence of an Agreement. ....................................... 11

     3.   The Complaint Includes Circumstantial Factual Allegations of Conspiracy. ............ 15

       a.   Plaintiffs Allege Parallel Conduct. ....................................................... 16

       b.   The Complaint Pleads Plus Factors Supporting the Inference that Defendants Entered into a Price-Fixing Agreement. ............................................... 20

     4.   The Complaint Provides Each Defendant Notice of the Claims Against It. .............. 26

     5.   Defendants' Factual Disputes Are Inappropriate at the Pleading Stage. .................... 29

   B.   The Complaint States a Claim Under the Rule of Reason. ................................. 30

     1.   Plaintiffs Allege Direct Evidence of Market Power. ........................................... 31

     2.   Plaintiffs Define Relevant Antitrust Markets and Submarkets. ................................ 33

     3.   Plaintiffs Allege the Defendants Had Market Power. ........................................... 35

   C.   Plaintiffs Have Antitrust Standing to Bring Their Claims. ................................ 36

   D.   Plaintiffs Have Adequately Alleged State Law Claims. ................................... 38

V.    CONCLUSION .................................................................................................. 40

# TABLE OF AUTHORITIES

Page(s)

**CASES**

*Abbott Lab. v. Durrett*,
  746 So. 2d 316 (Ala. 1999) ..................................................................... 39

*Allen v. Bank of Am. Corp.*,
  2016 WL 4446373 (S.D.N.Y. Aug. 23, 2016) ........................................ 37

*Am. Tobacco Co. v. United States*,
  328 U.S. 781 (1946) ................................................................................. 7

*Anderson News, L.L.C. v. Am. Media, Inc.*,
  680 F.3d 162 (2d Cir. 2012) ................................................................. 18

*Arizona v. Maricopa Cnty. Med. Soc.*,
  457 U.S. 332 (1982) ................................................................................. 8

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ............................................................................. 5, 6

*B & R Supermarket v. Visa, Inc.*,
  2016 WL 5725010 (N.D. Cal. Sep. 30, 2016) ...................................... 12

*Baird Tree Co. v. City of Oak Ridge*,
  2008 WL 2510581 (Tenn. Ct. App. June 24, 2008) .............................. 39

*Bates v. Green Farms Condo. Ass'n*,
  958 F.3d 470 (6th Cir. 2020) ................................................................ 30

*Bell Atlantic Corp. v. Twombly*,
  550 U.S. 544 (2007) ............................................................. 5, 6, 11, 26

*Bennett v. Visa U.S.A. Inc.*,
  198 S.W.3d 747 (Tenn. Ct. App. 2006) ................................................ 38

*Brown Shoe Co., Inc. v. United States*,
  370 U.S. 294 (1962) ............................................................................... 34

*Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.*,
  429 U.S. 477 (1977) ............................................................................... 37

*Budicak, Inc. v. Lansing Trade Grp., LLC*,
  452 F. Supp. 3d 1029 (D. Kan. 2020) ............................................ 15, 37

*Cal. Dental Ass'n v. FTC*,
526 U.S. 756 (1999) ............................................................................................ 7, 11

*Catalano, Inc. v. Target Sales, Inc.*,
446 U.S. 643 (1980) ................................................................................................... 7

*Cataldo v. U.S. Steel Corp.*,
676 F.3d 542 (6th Cir. 2012) .................................................................................... 39

*Champagne Metals v. Ken-Mac Metals, Inc.*,
458 F.3d 1073 (10th Cir. 2006) .......................................................................... 12, 15

*City of Philadelphia v. Bank of Am. Corp.*,
498 F. Supp. 3d 516 (S.D.N.Y. 2020) ...................................................................... 19

*City of Rockford v. Mallinckrodt ARD, Inc.*,
360 F. Supp. 3d 730 (N.D. Ill. 2019) ......................................................................... 7

*Concord Assocs., L.P. v. Entm't Props. Tr.*,
2014 WL 1396524 (S.D.N.Y. Apr. 9, 2014) ............................................................ 27

*Cont'l Ore Co. v. Union Carbide & Carbon Corp.*,
370 U.S. 690 (1962) ................................................................................................. 16

*Cupp v. Alberto-Culver USA, Inc.*,
310 F. Supp. 2d 963 (W.D. Tenn. 2004) .................................................................. 34

*Dover v. British Airways, PLC (UK)*,
2014 WL 317845 (E.D.N.Y. Jan. 24, 2014) ............................................................. 19

*E.I. DuPont de Nemours & Co. v. Kolon Indus., Inc.*,
688 F. Supp. 2d 443 (E.D. Va. 2009) ....................................................................... 34

*Erie Cnty., Ohio v. Morton Salt, Inc.*,
702 F.3d 860 (6th Cir. 2012) ................................................................ 16, 20, 25, 26

*F.T.C. v. Ind. Fed'n of Dentists*,
476 U.S. 447 (1986) ........................................................................... 30, 31, 32, 33

*Fallick v. Nationwide Mut. Ins. Co.*,
162 F.3d 410 (6th Cir. 1998) .................................................................................... 40

*Fox v. Saginaw Cnty., Mich.*,
67 F.4th 284 (6th Cir. 2023) .................................................................................... 40

*Gamboa v. Ford Motor Co.*,
2020 WL 7047612 (E.D. Mich. Nov. 30, 2020) ...................................................... 13

*Gelboim v. Bank of Am. Corp.*,
  823 F.3d 759 (2d Cir. 2016) ............................................................................ 8, 36, 37, 38

*Gym Door Repairs, Inc. v. New York City Dept. of Educ.*,
  2015 WL 3883243 (S.D.N.Y. June 23, 2015) ........................................................ 15

*Hogan v. Cleveland Ave Restaurant Inc.*,
  2018 WL 1475398 (S.D. Ohio Mar. 26, 2018) ...................................................... 16

*Hosp. Auth. of Metro. Gov't of Nashville & Davidson Cnty., Tennessee v. Momenta Pharms., Inc.*,
  333 F.R.D. 390 (M.D. Tenn. 2019) ........................................................................ 40

*Hyland v. HomeServices of Am., Inc.*,
  771 F.3d 310 (6th Cir. 2014) ................................................................... 6, 24, 25

*In re Auto. Parts Antitrust Litig.*,
  2014 WL 1746579 (E.D. Mich. Apr. 30, 2014) ...................................................... 6

*In re Blood Reagents Antitrust Litig.*,
  756 F. Supp. 2d 623 (E.D. Pa. 2010) .................................................................... 18

*In re Blue Cross Blue Shield Antitrust Litig.*,
  2017 WL 2797267 (N.D. Ala. June 28, 2017) ...................................................... 34

*In re Broiler Chicken Antitrust Litig.*,
  290 F. Supp. 3d 772 (N.D. Ill. 2017) ................................................... 17, 21, 29

*In re Cardizem CD Antitrust Litig.*,
  332 F.3d 896 (6th Cir. 2003) ................................................................................ 31

*In re Cast Iron Soil Pipe And Fittings Antitrust Litig.*,
  2015 WL 5166014 (E.D. Tenn. June 24, 2015) ............................................... 5, 15

*In re Commodity Exch., Inc.*,
  213 F. Supp. 3d 631 (S.D.N.Y. 2016) ................................................................... 37

*In re Currency Conversion Fee Antitrust Litig.*,
  264 F.R.D. 100 (S.D.N.Y. 2010) ................................................................... 17, 18

*In re Dealer Mgmt. Sys. Antitrust Litig.*,
  313 F. Supp. 3d 931 (N.D. Ill. 2018) .................................................................... 15

*In re Dealer Mgmt. Sys. Antitrust Litig.*,
  362 F. Supp. 3d 510 (N.D. Ill. 2019) .................................................................... 39

*In re Diisocyanates Antitrust Litig.*,
  2020 WL 1140244 (W.D. Pa. Mar. 9, 2020) ......................................................... 18

*In re Domestic Airline Travel Antitrust Litig.*,
  221 F. Supp. 3d 46 (D.D.C. 2016).........................................................17, 19, 21, 29

*In re Elevator Antitrust Litig.*,
  502 F.3d 47 (2nd Cir. 2007) ..............................................................................29

*In re Flat Glass Antitrust Litig.*,
  385 F.3d 350 (3d Cir. 2004) .........................................................................21, 22

*In re Foreign Exch. Benchmark Rates Antitrust Litig.*,
  74 F. Supp. 3d 581 (S.D.N.Y. 2015) ..................................................................37

*In re GSE Bonds Antitrust Litig.*,
  396 F. Supp. 3d 354 (S.D.N.Y. 2019) ................................................................19

*In re High Fructose Corn Syrup Antitrust Litig.*,
  295 F.3d 651 (7th Cir. 2002) .............................................................................26

*In re Ins. Brokerage Antitrust Litig.*,
  618 F.3d 300 (3d Cir. 2010) .........................................................................11, 24

*In re Local TV Advert. Antitrust Litig.*,
  2022 WL 3716202 (N.D. Ill. Aug. 29, 2022) .......................................................9

*In re Local TV Advert. Antitrust Litig.*,
  2020 WL 6557665 (N.D. Ill. Nov. 6, 2020) ........................................9, 19, 23, 37

*In re Musical Instruments & Equip. Antitrust Litig.*,
  798 F.3d 1186 (9th Cir. 2015) ...........................................................................19

*In re Packaged Ice Antitrust Litig.*,
  723 F. Supp. 2d 987 (E.D. Mich. 2010) ...........................................................6, 27

*In re Polyurethane Foam Antitrust Litig.*,
  152 F. Supp. 3d 968 (N.D. Ohio 2015) ..............................................................22

*In re Publication Paper Antitrust Litig.*,
  690 F.3d 51 (2d Cir. 2012) ...........................................................................25, 26

*In re Se. Milk Antitrust Litig.*,
  555 F. Supp. 2d 934 (E.D. Tenn. 2008)........................................................5, 6, 20, 27

*In re Se. Milk Antitrust Litig.*,
  739 F.3d 262 (6th Cir. 2014) .........................................................................33, 34

*In re Text Messaging Antitrust Litig.*,
  630 F.3d 622 (7th Cir. 2010) .............................................................................21

*In re Travel Agent Comm'n Antitrust Litig.*,
  2007 WL 3171675 (N.D. Ohio Oct. 29, 2007) ........................................................ 28

*In re Travel Agent Comm'n Antitrust Litig.*,
  583 F.3d 896 (6th Cir. 2009) ................................................................. 5, 30

*In re Urethane Antitrust Litig.*,
  913 F. Supp. 2d 1145 (D. Kan. 2012) ................................................................. 12

*In re Urethane Antitrust Litig.*,
  768 F.3d 1245 (10th Cir. 2014) ................................................................. 12

*Interstate Circuit v. United States*,
  306 U.S. 208 (1939) ........................................................ 9, 11, 17, 24, 25

*Iowa Pub. Employees' Ret. Sys. v. Merrill Lynch, Pierce, Fenner & Smith Inc.*,
  340 F. Supp. 3d 285 (S.D.N.Y. 2018) ................................................................. 27

*Jefferson Parish Hosp. Dist. No. 2 v. Hyde*,
  466 U.S. 2 (1984) ................................................................. 36

*Jien v. Perdue Farms, Inc.*,
  2022 WL 2818950 (D. Md. July 19, 2022) ........................................................ 34, 35

*John v. Whole Foods Mkt. Grp., Inc.*,
  858 F.3d 732 (2d Cir. 2017) ................................................................. 19, 20

*Jones v. Micron Tech. Inc.*,
  400 F. Supp. 3d 897 (N.D. Cal. 2019) ................................................................. 26

*Jones v. Varsity Brands, LLC*,
  618 F. Supp. 3d 725 (W.D. Tenn. 2022) ................................................................. 33

*Kleen Prods. LLC v. Georgia-Pacific LLC*,
  910 F.3d 927 (7th Cir. 2018) ................................................................. 6

*Kleen Prods. LLC v. Int'l Paper*,
  276 F. Supp. 3d 811 (N.D. Ill. 2017) ................................................................. 29

*Lie v. St. Joseph Hosp. of Mount Clemens, Mich.*,
  964 F.2d 567 (6th Cir. 1992) ........................................................ 30, 31, 35

*Lifeline Ltd. No. II v. Connecticut Gen. Life Ins. Co.*,
  821 F. Supp. 1201 (E.D. Mich. 1993) ................................................................. 30

*Llacua v. W. Range Ass'n*,
  930 F.3d 1161 (10th Cir. 2019) ................................................................. 29

*M.A.C. by next friend M.E.C. v. Smith*,
576 F. Supp. 3d 552 (M.D. Tenn. 2021) ................................................................. 30

*Markson v. CRST Int'l, Inc.*,
2019 WL 6354400 (C.D. Cal. Mar. 7, 2019) ...................................................... 14, 15

*Mich. Div.-Monument Builders of N. Am. v. Mich. Cemetery Ass'n*,
524 F.3d 726 (6th Cir. 2008) .................................................................................. 35

*Minpeco, S.A. v. Hunt*,
718 F. Supp. 168 (S.D.N.Y. 1989) .......................................................................... 36

*Nat'l Hockey League Players Ass'n v. Plymouth Whalers Hockey Club*,
419 F.3d 462 (6th Cir. 2005) .................................................................................. 35

*NCAA v. Bd. of Regents*,
468 U.S. 85 (1984) ................................................................................................. 11

*New Orleans Ass'n of Cemetery Tour Guides & Cos. v. New Orleans Archdiocesan Cemeteries*,
56 F.4th 1026 (5th Cir. 2023) ................................................................................. 35

*Nicholson v. City of Clarksville*,
2022 WL 1256661 (M.D. Tenn. Apr. 27, 2022) ...................................................... 39

*Ohio v. American Express*,
138 S. Ct. 2274 (2018) ........................................................................................... 32

*Paper Sys., Inc. v. Nippon Paper Indus. Co., Ltd.*,
281 F.3d 629 (7th Cir. 2002) .................................................................................. 36

*Par v. Wolfe Clinic, P.C.*,
70 F.4th 441 (8th Cir. 2023) .................................................................................. 35

*PharmacyChecker.com, LLC v. Nat'l Ass'n of Boards of Pharmacy*,
530 F. Supp. 3d 301 (S.D.N.Y. 2021) ..................................................................... 35

*Re/Max Int'l, Inc. v. Realty One, Inc.*,
173 F.3d 995 (6th Cir. 1999) ................................................................... 20, 21, 22, 23

*Realcomp II, Ltd. v. F.T.C.*,
635 F.3d 815 (6th Cir. 2011) ............................................................................. 30, 32

*Rebel Oil Co., Inc. v. Atl. Richfield Co.*,
51 F.3d 1421 (9th Cir. 1995) .................................................................................. 35

*SD3, LLC v. Black & Decker (U.S.) Inc.*,
801 F.3d 412 (4th Cir. 2015) ............................................................................. 17, 22

*Semertzides v. Bethesda N. Hosp.*,
  2014 WL 2573073 (S.D. Ohio June 9, 2014) ........................................................ 34

*Sitts v. Dairy Farmers of Am., Inc.*,
  417 F. Supp. 3d 433 (D. Vt. 2019) .................................................................... 36

*Snyder-Hill v. Ohio State Univ.*,
  48 F.4th 686 (6th Cir. 2022) ........................................................................... 39

*Stanislaus Food Prod. Co. v. USS-POSCO Indus.*,
  803 F.3d 1084 (9th Cir. 2015) ......................................................................... 24

*Starr v. Sony BMG Music Entm't*,
  592 F.3d 314 (2d Cir. 2010) ........................................................................... 27

*Tichy v. Hyatt Hotels Corp.*,
  376 F. Supp. 3d 821 (N.D. Ill. 2019) ............................................................... 22

*Todd v. Exxon Corp.*,
  275 F.3d 191 (2d Cir. 2001) ............................................................................. 8

*Toledo Mack Sales & Serv., Inc. v. Mack Trucks, Inc.*,
  530 F.3d 204 (3d Cir. 2008) ............................................................................ 14

*Total Benefits Planning Agency Inc. v. Anthem Blue Cross & Blue Shield*,
  2006 WL 3855349 (S.D. Ohio Nov. 2, 2006) .................................................... 28

*Total Benefits Planning Agency Inc. v. Anthem Blue Cross & Blue Shield*,
  630 F. Supp. 2d 842 (S.D. Ohio 2007) ....................................................... 28, 29

*Total Benefits Planning Agency, Inc. v. Anthem Blue Cross & Blue Shield*,
  552 F.3d 430 (6th Cir 2008) ..................................................................... 28, 35

*Toys "R" Us, Inc. v. F.T.C.*,
  221 F.3d 928 (7th Cir. 2000) ............................................................... 9, 10, 11

*U.S. Anchor Mfg., Inc. v. Rule Indus., Inc.*,
  7 F.3d 986 (11th Cir. 1993) ............................................................................ 38

*United States v. Apple, Inc.*,
  791 F.3d 290 (2d Cir. 2015) ............................................................. 7, 8, 10, 11

*United States v. Blue Cross Blue Shield of Mich.*,
  809 F. Supp. 2d 665 (E.D. Mich. 2011) ........................................................... 34

*United States v. Brown Univ. in Providence in State of R.I.*,
  5 F.3d 658 (3d Cir. 1993) ............................................................................... 11

*United States v. Carell*,
    681 F. Supp. 2d 874 (M.D. Tenn. 2009) ............................................................. 39

*United States v. Socony-Vacuum Oil Co.*,
    310 U.S. 150 (1940) ........................................................................... 7, 8, 31

*United States v. U.S. Gypsum*,
    438 U.S. 422 (1978) ..................................................................................... 8

*Washington Cnty. Health Care Auth., Inc. v. Baxter Int'l Inc.*,
    328 F. Supp. 3d 824 (N.D. Ill. 2018) ............................................................. 16

*Watson Carpet & Floor Covering, Inc. v. Mohawk Indus., Inc.*,
    648 F.3d 452 (6th Cir. 2011) ......................................................................... 20

*Wilk v. Am. Med. Ass'n*,
    895 F.2d 352 (7th Cir. 1990) ......................................................................... 35

*William Inglis & Sons Baking Co. v. ITT Cont'l Baking Co.*,
    668 F.2d 1014 (9th Cir. 1981) ....................................................................... 13

**STATUTES**

15 U.S.C. § 1 .......................................................................................... *passim*

15 U.S.C. § 45(a)(1) ...................................................................................... 38

Ind. Code § 24-1-1-1 ..................................................................................... 38

Ind. Code § 24-1-2-1 ..................................................................................... 38

Mass. Gen. Laws ch. 93 § 2 ........................................................................... 38

Mass. Gen. Laws ch. 93 § 4 ........................................................................... 38

Mass. Gen. Laws ch. 93A ............................................................................. 38

73 Pa. Stat. § 201-9.2 .................................................................................... 38

**RULES**

Fed. R. Civ. P. 8 ..................................................................................... 11, 26

Fed. R. Civ. P. 12(b)(6) ................................................................................. 18

**OTHER AUTHORITIES**

ABA Model Jury Instructions in Civil Antitrust Cases at 13 (2d ed. 2016) ................................. 17

Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* (5th ed. Supp. 2022) ............. 7, 8, 24, 36

x

# I.    INTRODUCTION

In 2017, former FTC Chairwoman Maureen Ohlhausen asked "[w]hat if algorithms" are used in a way to "become a clearing house for confidential pricing information?"[1] – just like the Defendants here have used RealPage's Revenue Management Solutions software ("RMS"). She provided a simple thought exercise:

> Imagine a group of competitors sub-contracting their pricing decisions to a common, outside agent that provides algorithmic pricing services. Each firm communicates its pricing strategy to the vendor, and the vendor then programs its algorithm to reflect the firm's pricing strategy. But because the same outside vendor now has confidential price strategy information from multiple competitors, it can program its algorithm to maximize industry-wide pricing. In effect, the firms themselves don't directly share their pricing strategies, but that information still ends up in common hands, and that shared information is then used to maximize market- wide prices.

*Id.* She continued: "Everywhere the word 'algorithm' appears, please just insert the words 'a guy named Bob'. ***Is it ok for a guy named Bob to collect confidential price strategy information from all the participants in a market, and then tell everybody how they should price? If it isn't ok for a guy named Bob to do it, then it probably isn't ok for an algorithm to do it either.***" *Id.* This is the exact situation in front of the Court.

Plaintiffs' Complaint articulates how some of the largest property owners, managers, and lessors of apartment buildings in the U.S. shared their confidential pricing information with RealPage, who then used that information in its RMS to facilitate a cartel between Lessor Defendants, allowing them to artificially increase rental prices above competitive levels. In the words of a user of RealPage's RMS: "[W]e are all technically competitors," but RealPage's RMS "helps us to work together . . . to make us all more successful in our pricing . . . ." ¶ 4. Plaintiffs

---

[1] First. Am. Cons. Class Action Compl., Dkt. 314 ("Complaint" or "AC") ¶ 118. All references to "¶," "¶¶," or "Fig." are to paragraphs and figures, respectively, from the Complaint.

have sufficiently alleged an antitrust conspiracy under the Sherman Act, 15 U.S.C. § 1, and Defendants' Omnibus Motion to Dismiss, Dkt. 341 ("MTD"), should be denied.

## II.     FACTUAL BACKGROUND

RealPage is a developer of real estate management products, including multiple RMS products. ¶ 2. The purpose of RealPage's RMS is to help lessors and property managers of multi-family housing units set the prices of their units. ¶ 5. To do this, RealPage RMS rely on non-public data they receive from licensed users: the Lessor Defendants. *Id.* Through its RMS, RealPage facilitates a conspiracy among competing Lessor Defendants to fix rent prices nationwide. RealPage publicly advertises this conspiracy to induce Lessor Defendants to join, telling potential clients that it offers them the ability to "outsource daily pricing and ongoing revenue oversight," allowing RealPage to set prices for its clients' properties "as though we [RealPage] own them ourselves." ¶ 3. By using RealPage RMS, each Lessor Defendant agrees: (1) to remove itself as an independent decision center and to instead delegate pricing authority to RealPage, a common decision maker; and (2) to share whatever confidential and proprietary data is necessary to effectuate those pricing decisions, knowing that its competitors are doing likewise. ¶¶ 3-4.

*First*, the stated purpose of RealPage's RMS is to set and raise the price of its clients' units. ¶¶ 10-12, 16, 19-21, 176, 192-95. As one former RealPage Strategic Account Analyst explained, RealPage pitches its RMS software "as a learning system that would analyze comparable properties and set prices that multifamily real estate owners and operators 'wouldn't have to mess with.'" ¶ 121 (RealPage's RMS pitched "as saving owners and operators of multifamily residential rental properties the time from 'having to do their own research.'"). Lessor Defendants' adoption of RealPage's RMS "replac[ed] independent centers of decision making with a single effective decisionmaker – RealPage." *Id.* Witnesses at Lessor Defendant properties describe RealPage as auto-populating rental rates and setting prices such that the property managers no longer needed

2

to "look at all the comps and decide, 'what is the [unit] going to lease for today?'" ¶¶ 4, 121-23. To facilitate centralized price-setting among competitors, RealPage deployed Pricing Advisors. ¶¶ 7, 9, 125-37, 142-47, 155-58, 163-70. As RealPage explained to its clients, "[y]our Pricing Advisor is an extension of your team and empowered with the authority required for success." *Id.* Some of RealPage's largest clients had an in-house revenue manager, trained by RealPage, to act in the same capacity as a Pricing Advisor. *Id.*

***Second***, so RealPage could set their prices, Lessor Defendants provided RealPage with "detailed, real-time, and non-public information concerning pricing, inventory, occupancy rates, as well as their units and unit types available, or that will soon be available for rent." ¶ 116. Lessor Defendants share this proprietary information knowing that RealPage will use it to assist them and their competitors to set prices and control supply. ¶¶ 3, 5, 7, 112, 171-75. They also share this information so that they can benefit from the proprietary data their competitors are likewise providing to RealPage. ¶¶ 116, 133-35, 139.

Lessor Defendants agree, and RealPage ensures, that RealPage's "recommended" prices are actually implemented. ¶¶ 6-9. Defendants used many mechanisms to ensure cartel members adopted RealPage's pricing recommendations the overwhelming majority of the time, even when they defied economic logic. ¶¶ 122, 129, 141-60, 177-78. RealPage institutes blockades both within its software and through its personnel to police Lessor Defendants. ¶¶ 144-47. One former Assistant Community Manager at Sunrise Management and Leasing Consultant for Defendant Greystar recalled that RealPage never accepted a client's attempt to override a price recommendation on the basis that it did not reflect fair market value. ¶¶ 140, 149. A former Leasing Consultant for Defendant Lincoln Property Company explained that "99% of the time," his team was told by Lincoln's corporate office that RealPage's rates could not be modified. ¶¶ 9, 151.

3

Indeed, some Pricing Advisors informed their assigned Lessors that the Lessors had no discretion to override pricing determined by RealPage. *Id.* Pricing Advisors monitored clients' compliance with RealPage's pricing and disseminated confidential and commercially sensitive information provided to RealPage by the client's competitors to encourage compliance with RealPage's pricing decisions. ¶¶ 7-8. RealPage's policing of the cartel was successful; property managers overwhelmingly accept RealPage's pricing recommendations. ¶¶ 129, 147, 177-78, 183.

RealPage upended the multifamily rental housing market, to the detriment of renters. ¶¶ 21-22. Prior to widespread adoption of RealPage's RMS, lease prices were set to maximize occupancy rates. ¶¶ 94-97, 124. This was an economically rational way to manage properties absent collusion. Vacant apartments lead to lost rental income and save few marginal costs as the costs of owning and maintaining a rental unit are not significantly different whether the unit is occupied or not. ¶¶ 94-95. RealPage convinced its clients to focus on increasing rent and sacrificing physical occupancy (*i.e.* reducing output). ¶¶ 120, 124, 130-31. This is economically irrational absent collusion; emphasizing high prices over occupancy risks significant losses if renters can flee to competing properties. ¶¶ 97-98.

But RealPage has access to pricing, occupancy, and other non-public data from a property's competitors when setting recommended pricing (and occupancy levels) for its clients' property. With knowledge of what the competition was doing, Lessor Defendants can confidently sacrifice occupancy to increase rental rates, even if that results in longer vacancy periods. ¶ 137. RealPage allows Lessor Defendants to avoid the prisoner's dilemma that would, absent collusion, dictate that they keep "heads in beds." ¶ 132. "[B]y outsourcing their pricing decisions to RealPage, each Lessor Defendant knows that the impact of the ever-rising prices set by RealPage's [RMS software's] algorithm will outpace their vacancy losses." *Id.*

RealPage's RMS allow horizontal competitors—Lessor Defendants—to fix prices, regulate supply, and interfere with free market setting of rents across the country. And the conspiracy has been a success. Prior to 2016, occupancy rates rose with prices. ¶¶ 196-210. One would expect this under the basic laws of supply and demand—as supply drops, prices rise. But since approximately 2016, there has been a marked shift as occupancy rates became divorced from pricing; prices rose while occupancy rates fell (*i.e.*, prices rose while supply increased). ¶ 21. Preliminary statistical analysis also plausibly alleges that Lessor Defendants increased revenues by raising rent prices, consistent with the goal of the conspiracy. ¶¶ 192-195.

## III. THE PLEADING STANDARD IN AN ANTITRUST CASE

In analyzing a motion to dismiss, courts "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." *In re Travel Agent Comm'n Antitrust Litig.*, 583 F.3d 896, 903 (6th Cir. 2009). *Bell Atlantic Corp. v. Twombly* calls for "a complaint with enough factual matter (taken as true) to suggest that" a violation of the Sherman Act occurred. 550 U.S. 544, 556 (2007).

*Twombly* imposes neither "a probability requirement at the pleading stage," *id.*, nor a heightened pleading standard. *In re Cast Iron Soil Pipe And Fittings Antitrust Litig.*, 2015 WL 5166014, at *11 (E.D. Tenn. June 24, 2015). A complaint must simply "put defendants on notice concerning the basic nature of [plaintiff's] complaints against the defendants and the grounds upon which their claims exist." *In re Se. Milk Antitrust Litig.*, 555 F. Supp. 2d 934, 943 (E.D. Tenn. 2008). It must contain only enough "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556).[2] The reviewing court must then determine *not*

---

[2] Unless otherwise indicated, emphasis is added and internal citations are omitted.

whether the plaintiff will ultimately prevail, but whether the facts permit the court to infer "more than the mere possibility of misconduct," which is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679.[3]

## IV.   ARGUMENT

To state a Section 1 claim, the threshold question is whether the plaintiff has plausibly alleged "an agreement, tacit or express." *Twombly*, 550 U.S. at 553. Plaintiffs need not point to a written admission of agreement; rather, the complaint need only contain "plausible grounds to infer an agreement." *In re Auto. Parts Antitrust Litig.*, 2014 WL 1746579, at *5 (E.D. Mich. Apr. 30, 2014); *Kleen Prods. LLC v. Georgia-Pacific LLC*, 910 F.3d 927, 936 (7th Cir. 2018) ("[E]ven a wink and a nod [suffice]—formal agreements have never been required . . . ."). In the Sixth Circuit, an agreement exists where the conspirators have "a unity of purpose" or "common understanding . . . ." *Hyland v. HomeServices of Am., Inc.*, 771 F.3d 310, 318 (6th Cir. 2014).

Here, the plausibility of the alleged cartel is established through admissions contained in internal RealPage and Lessor Defendant documents, economic analysis, and public statements from the Defendants and their co-conspirators. At this stage of the case, these materials plausibly establish the existence of a conspiracy in restraint of trade, a "unity of purpose" to raise prices and limit the supply of multifamily properties, subject to *per se* scrutiny. Defendants' additional bases to request dismissal are unavailing.

---

[3] Despite Defendants' attempt to characterize the "who, did what, to whom (or with whom), where, and when?" standard as the "bare minimum" this Court should require, MTD 10, that pleading standard has been repeatedly rejected in the Sixth Circuit. *In re Se. Milk Antitrust Litig.*, 555 F. Supp. 2d at 943 (complaints need not answer "all specific questions about 'who, what, when and where'"); *In re Packaged Ice Antitrust Litig.*, 723 F. Supp. 2d 987, 1008 (E.D. Mich. 2010) (denying motion to dismiss over Defendants' repeated "refrain throughout their briefs" that the complaint omitted "the who, what, when and where" of the alleged conspiracy).

### A. The Complaint Adequately Alleges a *Per Se* Price-Fixing Agreement.

#### 1. Plaintiffs Allege a *Per Se* Violation.

A restraint of trade can be analyzed under three different levels of scrutiny: *per se*, Rule of Reason, or quick look. *Cal. Dental Ass'n v. FTC*, 526 U.S. 756, 770 (1999). The Court need not decide at the pleading stage which mode of analysis to apply.[4] Despite this, Defendants argue that Plaintiffs' allegations cannot be evaluated under a *per se* standard. MTD 27-29. Their argument rests on a mischaracterization of the Complaint and a misreading of the relevant authority.

The Supreme Court holds that any agreement with the purpose or effect of "raising, depressing, fixing, pegging, or stabilizing [prices]," constitutes a *per se* violation of Section 1 of the Sherman Act. *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 222-23 (1940) (*per se* unlawful "price-fixing includes more than the mere establishment of uniform prices"); *Catalano, Inc. v. Target Sales, Inc.*, 446 U.S. 643, 647-48 (1980) (even "agreements . . . [with a] less direct impact on price" still "fall[] squarely within the traditional per se rule against price fixing").[5] "[P]er se condemnation is not limited to agreements that literally set or restrict prices." *United States v. Apple, Inc.*, 791 F.3d 290, 327 (2d Cir. 2015) (quotation omitted). Instead, any conspiracy "formed for the purpose and with the effect of raising, depressing, fixing, pegging, or stabilizing the price of a commodity . . . is illegal per se." *Id.*

Defendants ask the Court to ignore that well-settled law and abjure the *per se* standard.

---

[4] Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law*, ¶ 305 (5th ed. Supp. 2022) ("Often, however, the decision about which rule is to be employed will await facts that are developed only in discovery."); *City of Rockford v. Mallinckrodt ARD, Inc.*, 360 F. Supp. 3d 730, 754 (N.D. Ill. 2019) ("After discovery, the court can better determine whether and how to take a more detailed look at the effects of defendants' conduct. . . . At this stage, it is sufficient for plaintiffs to plausibly allege that defendants engaged in conduct that resulted in an unreasonable restraint of trade.").

[5] Proof of a *per se* unlawful conspiracy, like any other Sherman Act Section 1 violation, includes "evidence of [] action taken in concert," and can be found in or inferred from a common "course of dealings or other circumstances as well as in any exchange of words." *Am. Tobacco Co. v. United States*, 328 U.S. 781, 809-10 (1946). "No formal agreement is necessary." *Id.*

First, Defendants claim that using an algorithm to fix prices must push their conduct into Rule of Reason territory. MTD 28. But it is the purpose and effect that dictate the mode of analysis; "the precise machinery employed . . . is immaterial." *Apple*, 791 F.3d at 327; *Socony-Vacuum*, 310 U.S. at 223; *Gelboim v. Bank of Am. Corp.*, 823 F.3d 759, 771 (2d Cir. 2016) (the "unfamiliar context of" a claim "provides no basis to disturb application of the per se rule"). Courts are perfectly familiar with price-fixing, and application of the *per se* rule need not be "rejustified for every industry that has not been subject to significant antitrust litigation." *Arizona v. Maricopa Cnty. Med. Soc.*, 457 U.S. 332, 348-51 (1982).

Second, Defendants claim that information sharing among competitors is not, without more, *per se* unlawful. MTD 28. But Defendants' information exchange is not pled in isolation. Instead, it is alleged to be a facilitating practice in furtherance of a naked price-fixing agreement subject to *per se* treatment. *Todd v. Exxon Corp.*, 275 F.3d 191, 198 (2d Cir. 2001) (in addition to stating Rule of Reason violations, "[i]nformation exchange is an example of a facilitating practice that can help support an inference of a price-fixing agreement").[6]

Third, Defendants argue that because the conspiracy was facilitated by RealPage, who they claim purportedly has vertical (not horizontal) arrangements with each Lessor Defendant, Plaintiffs cannot plausibly allege a horizontal restraint subject to *per se* scrutiny. MTD 27-28. As a factual matter, RealPage is not a vertical player in the chain of distribution, such as would be the case between a manufacturer and its downstream distributors or retailers. It acts as an intermediary between horizontal competitors pertaining to those horizontal competitors' sales functions. For

---

[6] The footnote Defendants cite concludes "[e]xchanges of current price information, of course, have the greatest potential for generating anticompetitive effects" and "have consistently been held to violate the Sherman Act." *United States v. U.S. Gypsum*, 438 U.S. 422, 443 n.16 (1978). Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law*, ¶ 2113 (5th ed. Supp. 2022) ("direct inter[firm] communications of current prices on specific transactions [are] nearly naked restraints").

that reason, traditional horizontal-price fixing authority applies, and the conspiracy here is a garden-variety price-fixing case. *In re Local TV Advert. Antitrust Litig.*, 2020 WL 6557665, at *8 (N.D. Ill. Nov. 6, 2020) (upholding conspiracy claims against Sales Rep Firms that acted as intermediary between colluding horizontal competitors).[7]

Even if RealPage was at a different level of a vertical distribution chain sufficient to characterize its agreements with the other Defendants as vertical, Plaintiffs' claims easily satisfy the applicable pleading standards under a hub-and-spoke theory. It is telling that, in arguing against *per se* treatment, Defendants ignore the most frequently cited cases in hub-and-spoke jurisprudence, which support *per se* treatment of claims similar to those alleged here. In *Interstate Circuit v. United States*, the Supreme Court affirmed a decision holding a group of horizontal competitors liable for participating in a conspiracy with a common distributor. 306 U.S. 208 (1939). There, the hub of the conspiracy sent a letter to each of the distributor conspirators outlining the terms of the conspiracy. While there was no direct evidence of communication between the horizontal competitors, the Court found that "[i]t was enough that, knowing that concerted action was contemplated and invited, the distributors gave their adherence to the scheme and participated in it." *Id.* at 226. Here, Lessor Defendants' acceptance of RealPage's "invitation to participate in a plan, the necessary consequence of which, if carried out, is restraint of interstate commerce, is sufficient to establish an unlawful conspiracy." *Id.* at 227.

Similarly, in *Toys "R" Us, Inc. v. F.T.C.*, the hub of the conspiracy was a toy retailer that

---

[7] Defendants' reliance on a later decision in *In re Local TV Advertising Antitrust Litigation*, is misplaced. 2022 WL 3716202 (N.D. Ill. Aug. 29, 2022). Unlike here, there was no allegation that an intermediary was using competitor data or a common algorithm and formula to determine price recommendations for horizontal competitors; not all co-conspirators even received the intermediaries' recommendations; and there was no allegation that the prices were adopted on more than on an infrequent basis. *Id.* at *8.

was losing sales to warehouse-store competitors. 221 F.3d 928 (7th Cir. 2000). To avoid that competition, the retailer coordinated a group boycott of the warehouse stores among several competing toy manufacturers. This benefitted the manufacturers, who did not want to compete on price at the warehouse stores, but (absent the conspiracy) worried that demanding higher prices from warehouse stores would allow their competitors to gain an advantage in that growing niche. The FTC, and then the Seventh Circuit, found this to be a *per se* restraint of trade, inferring a horizontal restraint based on evidence that the manufacturers would not limit sales to warehouse stores without assurance that their competitors would too. *Id.* at 932, 935-36.

Again, like in *Toys "R" Us*, the publisher defendants in *United States v. Apple* were frustrated that Amazon (rather than the publishers) set e-book prices made on its e-bookstore, and did so at levels substantially below what publishers charged for new, hardcover books, which in turn lowered the publishers' revenues. 791 F.3d 290. In response, Apple offered to allow publishers to set their own prices for sales made through Apple's e-bookstore, with Apple taking a cut of the sale price. However, both Apple and the publishers realized there would be no benefit from the deal if Apple was "left with a brand new marketplace brimming with titles, but devoid of customers." *Id.* at 303. To solve the problem, Apple required all the competitor publishers to "switch all of their other ebook retailers—including Amazon" to the same pricing model Apple adopted. *Id.* at 303-04. Both Apple and the publishers "knew [the change] would result in higher consumer-facing ebook prices." *Id.* at 316. In evaluating the deal, the circuit court explained that "the promise of higher prices as a bargaining chip to induce the Publisher Defendants to participate in the iBookstore constituted a conscious commitment to the goal of raising ebook prices." *Id.* at 317. Same here: RealPage publicly declared its intention to raise rent prices through its algorithmic price-setting RMS software; the fact that Lessor Defendants accepted that offer and contracted

10

with RealPage demonstrates a conscious commitment to the horizontal price-fixing scheme.

Each of these cases shares another feature with this litigation—the abrupt shift in strategy brought on by the alleged conspiracy. In *Interstate Circuit*, the Supreme Court noted that the distributors' agreement with the manufacturer's proposal involved a "radical departure from the previous business practices of the industry" and a "drastic increase in . . . prices." *Interstate Circuit*, 306 U.S. at 222. In *Toys "R" Us*, the Seventh Circuit found that "not only was the manufacturers' decision to stop dealing with the warehouse clubs an abrupt shift from the past," but considered alongside alleged actions against interest, and communications between competitors, tended to support concerted action. *Toys "R" Us*, 221 F.3d at 935-36. Similarly, in *Apple*, the publisher defendants' switch from one sales model to another signaled collusion. *Apple*, 791 F.3d at 318.

All three of those cases fell under a *per se* analysis. Here, too, Lessor Defendants' shift away from a volume to price strategy infers the existence of a *per se* conspiracy.[8]

## 2. The Complaint Alleges Direct Evidence of an Agreement.

"[S]ufficiently detailed" allegations of direct evidence "are independently adequate" to plead an agreement under Fed. R. Civ. P. 8. *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 323 (3d Cir. 2010) (citing *Twombly,* 550 U.S. at 554). Allegations are "sufficiently detailed" where Plaintiffs offer "enough fact to raise a reasonable expectation that discovery will reveal" evidence of the illegal agreement." *Ins. Brokerage*, 618 F.3d at 324 (quoting *Twombly,* 550 U.S. at 556*.*)

---

[8] If not subject to *per se*, discovery will demonstrate that Defendants' agreements should be subject to "quick look" scrutiny—an "intermediate" abbreviated Rule of Reason standard, applied "where *per se* condemnation is inappropriate, but where 'no elaborate industry analysis is required to demonstrate the anticompetitive character' of an inherently suspect restraint." *United States v. Brown Univ. in Providence in State of R.I.*, 5 F.3d 658, 669 (3d Cir. 1993) (quoting *NCAA v. Bd. of Regents*, 468 U.S. 85, 109 (1984)). Under quick look, the court need not conduct a detailed market analysis where "an observer with even a rudimentary understanding of economics could conclude that the arrangements in question would have an anticompetitive effect on customers and markets." *Cal. Dental Ass'n v. FTC*, 526 U.S. 756, 770 (1999). Here, Plaintiffs plead the common sense and rudimentary economic theory supporting their claims. *Supra* 1-2, ¶ 118.

11

Direct evidence can include witness statements, such as a co-conspirator's reference to "collective action" among horizontal competitors, *Champagne Metals v. Ken-Mac Metals, Inc.*, 458 F.3d 1073, 1083 (10th Cir. 2006), or an admission from a co-conspirator that they "needn't worry about low pricing from competitors because [they] had already talked to the competition." *In re Urethane Antitrust Litig.*, 913 F. Supp. 2d 1145, 1154 (D. Kan. 2012), *aff'd,* 768 F.3d 1245 (10th Cir. 2014). In *B & R Supermarket v. Visa, Inc.*, a much less explicit statement by a MasterCard executive that "the card brands are not going to delay the liability shift date" was credited as direct evidence of an agreement among Visa, MasterCard, and American Express to shift liability to merchants who failed to adopt chip technology. 2016 WL 5725010, at *6 (N.D. Cal. Sep. 30, 2016).

Plaintiffs allege several pieces of direct evidence that Defendants agreed to fix rent prices. First, RealPage and its employees have admitted to the existence of the alleged agreement. RealPage admits that: (1) Lessor Defendants consciously sought to "outsource daily pricing and ongoing revenue oversight" to RealPage, permitting it to set Lessor Defendants' rental price "as though we own [their properties] ourselves," ¶¶ 3, 119, 172; (2) the purpose of its Pricing Advisors was to provide "expert oversight of pricing strategy" and that these Pricing Advisors were "an extension of [the client's] team and empowered with the authority required for success," ¶ 7 & n.8; and (3) RMS works by shifting Lessor Defendants from an "occupancy focus" to a "rent growth" focus. ¶ 124. *See also* ¶ 121 (former RealPage employee confirmed that RealPage pitched its RMS products as setting prices its clients "wouldn't have to mess with," freeing them from "having to do their own research," *i.e.* make independent decisions); ¶ 8 (former RealPage executive reported that RealPage's clients accepted RealPage pricing recommendation at "very high rates," confirming RealPage was monitoring compliance and Lessor Defendants were complying).

Second, RealPage published guides encouraging RMS clients to directly share confidential,

competitively sensitive information, ¶ 24 Fig. 4, and established a "User Group" web forum that exists to "promote communications between" RealPage's RMS clients, leaving no doubt that Lessor Defendants were consciously aware of each other's commitments to RealPage's pricing decision. ¶¶ 23 n.32, 227-29. *Cf.* MTD, 17. A former Mid-America Apartment Communities leasing consultant confirmed she acted on RealPage instructions when calling competitors to obtain their current pricing. ¶ 25.

Third, Plaintiffs detail admissions of concerted action from the Lessor Defendants and their co-conspirators.[9] One client explained that while Lessors "are all *technically* competitors," RealPage RMS "*helps us to work together* . . . to make us all more successful in our pricing. . . . LRO is designed to work with a community in pricing strategies, not work separately." ¶ 4. Various leasing managers confirmed that Lessor Defendants gave effective control of their price setting to RealPage, leading to aggressive price hikes. ¶ 9 (witness reported that Lincoln would reject requests by local leasing managers to deviate from RealPage pricing 99% of the time, and that executives would reiterate to staff that RealPage's "rates are what they are," *i.e.*, that that were being set by RealPage and could not be changed); ¶ 7 (leasing manager stated "I knew [RealPage's prices] were way too high, but [RealPage] barely budged" when she requested deviations); ¶ 11 (business manager at Pinnacle Property confirmed Pinnacle's conscious commitment to RealPage price recommendations, despite RealPage recommending increases of "$400 to $500 a month per

---

[9] Plaintiffs specifically plead that Defendants conspired with unnamed co-conspirators, namely other RealPage RMS users, with whom Defendants are jointly and severally liable. ¶ 91. Contrary to Defendants' suggestion, MTD 16, Plaintiffs are not required to name each co-conspirator, and choosing not to is not an admission that RealPage RMS can be used innocently. *See William Inglis & Sons Baking Co. v. ITT Cont'l Baking Co.*, 668 F.2d 1014, 1053 (9th Cir. 1981) (plaintiff not required to identify all conspirators to state a claim "inasmuch as antitrust coconspirators are jointly and severally liable for all damages caused by the conspiracy"); *Gamboa v. Ford Motor Co. et al.*, 2020 WL 7047612, at *9 (E.D. Mich. Nov. 30, 2020) (applying *William Inglis & Sons Baking*).

13

unit," a move she described as "a nightmare[,] . . . embarrassing [and] absolutely ridiculous"); *Id.* (leasing manager reported that RealPage instructed that rents for the building's standard two-bedroom units be raised from $1,650/month to $2,100/month, an increase of approximately 27%, despite no improvements being made to the units). Such behavior would not have occurred had RealPage's RMS clients not been confident that other RMS users were doing the same.

Courts regularly find that these types of admissions constitute direct evidence sufficient to generate a fact issue on motions for *summary judgment*, which is a far higher standard than the pleading stage. For example, in *Toledo Mack Sales & Service, Inc. v. Mack Trucks, Inc.*, the court held that testimony describing statements of Mack truck dealers that they "did not compete on price," and other testimony that dealers had a "gentlemen's agreement" or "unwritten understandings" not to compete in each other's territories, was direct evidence of an agreement precluding judgment. 530 F.3d 204, 220 (3d Cir. 2008). Importantly, even at summary judgment the court rejected the argument Defendants raise here: that Plaintiffs' proffered statements did not describe direct communications among competing dealers or the "exact extent" of the alleged agreements. *Id.* The court held that while the absence of such details might "leave a jury unpersuaded that such agreements did in fact exist," it does not "mean that the jury should not consider it." *Id.*

Similarly, it does not matter that Plaintiffs' direct evidence does not confirm the exact date each Lessor Defendant adopted RMS, what RMS solution they used, and for which specific properties. *Cf.* MTD 12. *Markson v. CRST Int'l, Inc.*, 2019 WL 6354400, at *4 (C.D. Cal. Mar. 7, 2019) ("Defendants' argument that Plaintiffs must specifically allege which persons, on behalf of Defendants, consummated the conspiracy and exactly when they did so goes beyond the pleading requirement—otherwise, those subjected to a conspiracy would almost never be able to survive a

14

motion to dismiss because, by definition, they were not privy to such transactions . . . .").

Nor can Defendants dismiss Plaintiffs' direct evidence with claims that the alleged conspiracy is "implausible on its face" or "practically and economically implausible." MTD 25-27. *In re Dealer Mgmt. Sys. Antitrust Litig.*, 313 F. Supp. 3d 931, 952 (N.D. Ill. 2018) (rejecting defendants' arguments that "alleged confessions [were] 'nonsensical'" as the court could not "ignore well-pleaded allegations of fact (that the executives admitted the agreement)"); *Champagne Metals*, 458 F.3d at 1085 ("concerns over the reasonableness of inferences do not apply to direct evidence of an agreement" and the court "need not worry whether such an agreement would have been a rational one to enter into"). Defendants also cannot undercut Plaintiffs' allegations of direct evidence by asking the Court to accept Defendant-friendly inferences from those allegations. *Gym Door Repairs, Inc. v. New York City Dept. of Educ.*, 2015 WL 3883243, at *5 (S.D.N.Y. June 23, 2015) ("[W]hether a finder of fact will choose to credit Defendants' interpretation of the email exchange [is] . . . not resolvable at the pleadings stage."); *Budicak, Inc. v. Lansing Trade Grp., LLC*, 452 F. Supp. 3d 1029, 1047, 1052 (D. Kan. 2020) (defendants' alternative reading of direct evidence was "at best . . . a competing inference that may be weighed by a fact-finder at later stages of the proceeding").

As Plaintiffs have offered direct evidence of Defendants' agreement, the Court should deny Defendants' motion without further consideration of their other arguments.

### 3. The Complaint Includes Circumstantial Factual Allegations of Conspiracy.

Plaintiffs also allege facts that circumstantially indicate the existence of a conspiracy. An agreement among competitors can be inferred circumstantially from parallel conduct, along with "plus factors" that allow courts to infer, pre-discovery, that the conduct may have been concerted rather than independent. *In re Cast Iron Soil Pipe And Fittings Antitrust Litig.*, 2015 WL 5166014, at *11 (E.D. Tenn. June 24, 2015). In evaluating circumstantial allegations of a conspiracy, this

15

Court must look at the complaint as a whole rather than "dismembering it and viewing its separate parts." *Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962); *Erie Cnty., Ohio v. Morton Salt, Inc.*, 702 F.3d 860, 870 (6th Cir. 2012) (same). Plaintiffs' allegations of parallel conduct and plus factors, viewed in their totality, allow this Court to draw the plausible inference that Defendants' behavior evidences a unity of purpose or a common design and understanding to increase rental prices, and discovery will reveal evidence of the conspiracy.

### a. Plaintiffs Allege Parallel Conduct.

The AC alleges parallel conduct—a marked shift in the multifamily rental housing market after widespread adoption of RealPage's RMS. Before the conspiracy period, competition in the multifamily rental housing market was driven by keeping "heads in beds," an economically rational way to manage properties absent collusion. ¶¶ 94-95.[10] Starting around 2016, the AC alleges that traditional supply and demand principles began to lose hold on multifamily rental markets around the country as more and more Lessor Defendants adopted RealPage RMS, abandoned their longstanding practices, and prioritized rent growth over occupancy—an economically irrational price-over-volume strategy in a competitive industry. ¶¶ 196-210. That led to explosive rent growth even in the face of declining occupancy, a structural break strongly indicative of collusive activity among market participants. ¶¶ 200-10, Figs. 11-15.

That the Lessors may not have joined the conspiracy simultaneously or that RealPage was less successful in coordinating Lessors' prices until it reached a critical mass of users in 2016 is

---

[10] While Plaintiffs plead parallel conduct through Lessors' common and parallel adoption of RealPage RMS, parallel conduct is not required to plead a case based on circumstantial evidence, as parallel conduct "is but one of many varieties of circumstantial evidence plaintiffs can employ to state a" *per se* price fixing claim. *Washington Cnty. Health Care Auth., Inc. v. Baxter Int'l Inc.*, 328 F. Supp. 3d 824, 840 (N.D. Ill. 2018); *Hogan v. Cleveland Ave Restaurant Inc.*, 2018 WL 1475398, at *4 (S.D. Ohio Mar. 26, 2018) ("Plaintiffs are not required to show parallel conduct; it is merely a vehicle . . . that can be used to show circumstantial evidence of a conspiracy.").

irrelevant. MTD 14. "The Supreme Court has long held that simultaneous action is not a requirement to demonstrate parallel conduct." *In re Broiler Chicken Antitrust Litig.*, 290 F. Supp. 3d 772, 791 (N.D. Ill. 2017); *Interstate Circuit*, 306 U.S. at 227 ("It is elementary that an unlawful conspiracy may be and often is formed without simultaneous action or agreement on the part of the conspirators.").[11]

From around January 2016 onwards, increasing levels of RealPage RMS adoption led more and more Lessor Defendants to *shift their pricing strategy* away from occupancy and towards rent growth. ¶¶ 21, 94-97. As each new conspirator began delegating their rental price and supply decisions to RealPage RMS, their pricing strategy similarly shifted. ¶¶ 3, 17. Those parallel shifts in strategy upon adoption, and similar means of execution, reflect parallel conduct indicative of a conspiracy. *In re Domestic Airline Travel Antitrust Litig.*, 221 F. Supp. 3d 46, 69 (D.D.C. 2016) (plaintiffs need not allege that conspirators acted "in exactly the same way in order to adequately allege parallel conduct," but rather a "marked change in industry" was sufficient); *SD3, LLC v. Black & Decker (U.S.) Inc.*, 801 F.3d 412, 428-29 (4th Cir. 2015) (reversing grant of motion to dismiss because parallel conduct does not require defendants to "move in relative lockstep, achieving their common anticompetitive ends . . . only by substantially identical means").

Although Defendants claim that differences among the Lessor Defendants' use of RealPage RMS belie Plaintiffs' allegations of parallel conduct, "it is well settled . . . that the law does not require every defendant to participate in the conspiracy by identical means throughout the entire

---

[11] ABA Model Jury Instructions in Civil Antitrust Cases at 13 (2d ed. 2016) ("The members of the conspiracy need not necessarily have met together, directly stated what their object or purpose was to one another, or stated the details or the means by which they would accomplish their purpose. . . . A conspiracy may be formed without all parties coming to an agreement at the same time. Similarly, it is not essential that all persons acted exactly alike, nor is it necessary that they all possessed the same motive for entering the agreement.").

class period." *In re Currency Conversion Fee Antitrust Litig.*, 264 F.R.D. 100, 114 (S.D.N.Y. 2010); *Anderson News, L.L.C. v. Am. Media, Inc.,* 680 F.3d 162, 191 (2d Cir. 2012) (holding that defendants' "varied" actions during the initial stages of the alleged conspiracy did not render the existence of a conspiracy implausible); *In re Diisocyanates Antitrust Litig.*, 2020 WL 1140244, at *3 (W.D. Pa. Mar. 9, 2020) ("At [the motion to dismiss] stage . . . Plaintiffs need not explain why some Defendants took many actions and others took few.").

Put another way, all Lessor Defendants agreed to the same basic methodology and ultimate goal: providing pricing and other confidential data to RealPage and delegating pricing decisions to RealPage. From that baseline, some Lessor Defendants participated in the conspiracy more actively, for example through Pricing Advisors or regular pricing meetings. The fact that some members of the conspiracy were more enthusiastic and avid price-fixers than others does not excuse those who may have fixed prices less frequently or more surreptitiously. Defendants do not cite any authority suggesting otherwise.[12]

Next, Defendants argue that because "Plaintiffs have not alleged that any two of RealPage's rent recommendations for competing properties were the same," parallel conduct cannot be inferred. MTD 15. Defendants' argument is wrong on the law: plaintiffs "are not required to plead simultaneous price increases—or that the price increases were identical—in order to demonstrate parallel conduct." *In re Blood Reagents Antitrust Litig.*, 756 F. Supp. 2d 623, 630 (E.D. Pa. 2010). It also improperly confounds Plaintiffs' factual allegations (what is alleged in the AC) with the foundations of those allegations (a matter not at issue in a Fed. R. Civ. P. 12(b)(6)

---

[12] Defendants' arguments regarding the purported differences between YieldStar, Lease Rent Options ("LRO"), and AIRM fare no better, as they wrongly presume there is a material difference between the three software interfaces relevant for the purposes of Plaintiffs' Complaint. MTD 14. There is not. Each was used by Lessor Defendants to delegate their pricing to RealPage with the knowledge that competitors were doing likewise.

motion). This is not a *Daubert* motion. *City of Philadelphia v. Bank of Am. Corp.*, 498 F. Supp. 3d 516, 528 (S.D.N.Y. 2020) ("[T]he Court need not now engage in a *Daubert*-like analysis of Plaintiffs' statistical pleadings. Instead, the Court may, indeed must, accept as true Plaintiffs' factual assertions regarding pricing and other economic data.") (quotations omitted).

Without the benefit of discovery and relying on publicly available data, Plaintiffs have developed statistical and economic analyses, which need only be plausible,[13] to show how using RealPage's RMS, and subsequent exchanges of information by Defendants, caused a market-wide shift in pricing strategy and increased prices. ¶¶ 21, 191-210. Unlike the Ninth Circuit case *Musical Instruments*, upon which Defendants rely, Plaintiffs here have tied their statistical and economic analysis to other plausible factual allegations about the conspiracy. *Compare In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1197 (9th Cir. 2015) ("Plaintiffs do not allege any facts connecting the purported price increase to an illegal agreement among competitors.") *with Local TV Advert.*, 2020 WL 6557665, at *8 ("Unlike the plaintiffs in *Musical Instruments*, however, Plaintiffs do not fail to connect the aggregate data to price increases; instead, they specifically allege that Defendants' conduct has caused . . . prices to rise."). In addition, the results of these analyses reinforce Plaintiffs' allegations that RealPage had market power in the RMS market, ¶ 107, and that Defendants knew RealPage's RMS was "driving" explosive rent increases. ¶ 11. At the pleading stage, that is sufficient. *John v. Whole Foods Mkt. Grp., Inc.*, 858 F.3d 732, 737 (2d Cir. 2017) (pleadings stage "is not the proper stage to determine" either "the accuracy" of

---

[13] *City of Philadelphia*, 498 F. Supp. 3d at 528 ("At this stage, a statistical analysis, like any other allegation, need only be plausible. Merely pointing out that there are problems with the analysis, or that a better method is available, will not suffice."); *In re GSE Bonds Antitrust Litig.*, 396 F. Supp. 3d 354, 364 (S.D.N.Y. 2019) (same); *Domestic Airline*, 221 F. Supp. 3d at 69 (analyzing plaintiffs' economic analysis as factual allegation); *Dover v. British Airways, PLC (UK),* 2014 WL 317845, at *2 (E.D.N.Y. Jan. 24, 2014) ("[Plaintiff's] statistical analysis is not a conclusory assertion; it is a factual allegation that the Court must credit.").

plaintiffs' allegations or the "methodology" that underlies them).

Finally, Defendants claim that Plaintiffs have failed to adequately allege parallel conduct because their actions were equally consistent with independent, unilateral behavior. MTD 15-16. But that is the summary judgment standard, not the pleading standard. *Watson Carpet & Floor Covering, Inc. v. Mohawk Indus., Inc.*, 648 F.3d 452, 458 (6th Cir. 2011) ("Ferreting out the most likely reason for the defendants' actions is not appropriate at the pleadings stage."); *Erie Cnty.*, 702 F. 3d at 869 (at the motion to dismiss stage, a Section 1 "plaintiff need not allege a fact pattern that 'tends to exclude the possibility' of lawful, independent conduct").[14] Even if it were the appropriate test, the AC details how Defendants' parallel shift to a price-over-occupancy pricing strategy, coupled with the plus factors below, weighs strongly against independent conduct. The facts alleged in the AC, taken as true, raise a plausible inference of conspiracy. That is all that is required at this stage.

> **b. The Complaint Pleads Plus Factors Supporting the Inference that Defendants Entered into a Price-Fixing Agreement.**

In the Sixth Circuit, courts consider four non-exhaustive plus factors in evaluating the circumstantial allegations offered in support of a Section 1 conspiracy claim:

> (1) whether the defendants' actions, if taken independently, would be contrary to their economic self-interest; (2) whether the defendants have been uniform in their actions; (3) whether the defendants have exchanged or have had the opportunity to exchange information relative to the alleged conspiracy; and (4) whether the defendants have a common motive to conspire.

*Re/Max Int'l, Inc. v. Realty One, Inc.*, 173 F.3d 995, 1009 (6th Cir. 1999). "Ordinarily, an affirmative answer to the first of these factors will consistently tend to exclude the likelihood of

---

[14] *In re Se. Milk Antitrust Litig.*, 555 F. Supp. 2d 934, 944 (E.D. Tenn. 2008) ("Whether the acts committed by the defendants are simple, benign business decisions made by these individual defendants or whether they represent concerted effort in violation of the Sherman Act are issues of fact which this Court cannot decide on the pleadings…. and which require discovery prior to resolution.").

20

independent conduct." *Id.*

Plus factors "must be evaluated holistically." *Domestic Airline*, 221 F. Supp. 3d at 58; *Broiler Chicken*, 290 F. Supp. 3d at 797 (improper to "argue against Plaintiffs' claim by isolating each factor"). The Court should decline Defendants' request to parse each factor and view it in isolation, and instead should consider whether the plus factors, together with Plaintiffs' allegations of parallel conduct, support the inference of a conspiracy. *In re Text Messaging Antitrust Litig.*, 630 F.3d 622, 627 (7th Cir. 2010) ("mixture of parallel behaviors, details of industry structure, and industry practices" sufficient to state a claim).

Plaintiffs plausibly allege three of the four plus factors identified by the Sixth Circuit, as well as one other: (1) conduct inconsistent with independent self-interest; (2) opportunities to exchange confidential, competitively sensitive information and otherwise to collude, and actual exchange of such information; (3) significant and common motive to collude; and (4) the multifamily rental market was conducive to collusion. Viewed collectively and with Plaintiffs' allegations of parallel conduct, these alleged factors compel an inference of price fixing.

**Actions Against Self Interest**: Defendants' MTD conveniently omits discussion of Defendants' conduct against self-interest, a plus factor which this Circuit considers to "exclude the likelihood of independent conduct." *Re/Max,* 173 F.3d at 1009. The AC shows Lessor Defendants acted against self-interest by shifting from prioritizing occupancy (*i.e.*, market share) to prioritizing rent increases, thereby artificially restricting supply, while maintaining higher rental prices. ¶¶ 18, 120, 124, 137, 179, 188. As explained *supra* 4-5, those allegations are inconsistent with Lessor Defendants' unilateral self-interest, because if they followed that strategy unilaterally in a competitive market, significantly higher prices would cause them to lose renters to other lessors and lead to lower revenues as units sat empty. *In re Flat Glass Antitrust Litig.*, 385 F.3d

350, 360-61 (3d Cir. 2004) ("Evidence that the defendant acted contrary to its interests means evidence of conduct that would be irrational assuming that the defendant operated in a competitive market."). "In a competitive industry, for example, a firm would cut its price with the hope of increasing its market share if its competitors were setting prices above marginal costs." *Id*.

Lessor Defendants' behavior is only economically rational if they knew their competitors were also setting rental prices using the same algorithm, and thus would not attempt to undercut them. ¶ 18; *In re Polyurethane Foam Antitrust Litig*., 152 F. Supp. 3d 968, 989 (N.D. Ohio 2015) ("[D]efendants' behavior would not be reasonable or explicable (i.e.[,] not in their legitimate economic self-interest) if they were not conspiring to fix prices or otherwise restrain trade—that is, that the defendants would not have acted as they did had they not been conspiring in restraint of trade."). It is consistent with the co-conspirators' collective interest, but against each Lessor Defendants' individual interest. ¶ 18; *Tichy v. Hyatt Hotels Corp*., 376 F. Supp. 3d 821, 836 (N.D. Ill. 2019) ("forego[ing] opportunities to take business away from the other Defendants" is against a firm's unilateral self-interest). As such, Defendants' conduct "tend[s] to exclude the likelihood of independent conduct." *Re/Max Int'l, Inc*., 173 F.3d at 1009.

**Opportunities to Collude**: In the Sixth Circuit, opportunity to collude is another plus factor that constitutes circumstantial evidence of a price fixing agreement. *Re/Max*, 173 F.3d at 1009; *see also SD3, LLC* 801 F.3d at 432 ("Allegations of communications and meetings among conspirators can support an inference of agreement . . . ."). The AC plausibly alleges Defendants' participation in and opportunities to collude through virtual or face-to-face meetings, online user groups, and through participation in various trade associations. ¶¶ 226-36. In particular, the AC describes how RealPage hosted "webinars, screen sharing training modules, frequent calls, in-person 'roundtables,' and annual conferences" to explain the many financial benefits of working

22

together instead of as competitors. ¶ 23. RealPage also maintains standing committees of cartel members—including the 1,000-member User Group—to advise on pricing strategy. *Id.* RealPage's own website states that the purpose of the User Group is "to promote communications between users." ¶ 23 n.32. According to the researcher whose work was featured in reporting regarding RealPage's RMS, "the cartel [took] root in these various summits." ¶ 23.

Plaintiffs also allege that Defendants had ample opportunity to agree through their exchange of confidential information. *Re/Max*, 173 F.3d at 1009. Although Defendants argue that "Plaintiffs' allegations all but exclusively relate to the provision of information from Lessor Defendants to RealPage, rather than exchanges between Lessor Defendants themselves," MTD 17, that is a distinction without a difference in the case law. *Local TV Advert.*, 2020 WL 6557665, at *9 (exchanges of information through "Sales Rep Firms" acting as "conduits" of horizontal competitors supported a *per se* Section 1 claim).

It is also an incorrect reading of the AC, which (1) explains that pricing "recommendations" provided by RealPage to Lessor Defendants take into account voluminous competitor data, even if RealPage did not necessarily provide the raw data, ¶ 119; (2) details specific mechanisms by which RealPage encourages Lessor Defendants to exchange competitively sensitive information (on standard RealPage generated forms) *directly with* one another, without providing the information to RealPage as an intermediate step, and provides witness evidence that Lessor Defendants' employees *complied* with these "Protips," ¶¶ 24-25; and (3) alleges that RealPage directly discloses confidential data collected from a client's competitors during quarterly one-on-one "Performance to Market," or PTM, meetings. *E.g.*, ¶¶ 125, 133-34 (RealPage emphasized that the data presented in the PTMs came directly from the client's competitors). Far from "[s]cattered allegations of possible price-checking by unspecified Defendants," MTD 18, Plaintiffs allege the

exchange of "*detailed, real-time, and non-public* information concerning pricing, inventory, occupancy rates, as well as their units and unit types available, or that will soon be available for rent"— used by Defendants not to "price check" but to price set. ¶¶ 25, 116.

Defendants cite *In re Insurance Brokerage Antitrust Litigation* to argue Plaintiffs must allege information sharing between or among horizontal competitors. 618 F.3d 300 (3d Cir. 2010); MTD 17. But *Insurance Brokerage* is inapposite. There, the Third Circuit determined that an information exchange by various insurer "spokes" with a broker "hub" did not support an inference of a horizontal conspiracy among the insurers because each insurer's market share depended on "its ability to gain the broker's favor, *not on the choices of its competitors*." *Ins. Brokerage*, 618 F.3d at 333. That factual context is absent here; Lessor Defendants' ability to charge supracompetitive rents and restrict vacancy depends on the "substantial unanimity" with which the Lessor Defendants adopt RealPage's pricing; in "the absence of common action, agreeing to [the hub's] demands would have meant reducing output . . . with no reasonable prospect of countervailing benefits; only collective conduct . . . could exert the market power necessary to increase profits." *Interstate Circuit*, 306 U.S. at 222; ¶¶ 18, 116, 171, 224.

Plaintiffs have adequately plead that RealPage provided Lessor Defendants with ample opportunities to collude, and that it subsequently facilitated the exchange of detailed, contemporaneous, non-public information between the various Lessor Defendants.

**Motive to Collude**: "It is an uncontroversial tenet of antitrust law that the clarity and intensity of a motivation may bear on the inferences to be drawn from ambiguous evidence of coordinated behavior." *Stanislaus Food Prod. Co. v. USS-POSCO Indus.*, 803 F.3d 1084, 1088 (9th Cir. 2015) (quoting Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law*, ¶ 1412f (4th ed. Supp. 2015)); *Hyland*, 771 F.3d at 317 ("[S]ummary judgment is generally discouraged in the

antitrust context due to the critical role that intent and motive have in antitrust claims and the difficulty of proving conspiracy by means other than factual inference.") (cleaned up). Here, Defendants admit they had an economically rational and common motive to collude: to increase revenues beyond what could be achieved in a competitive market. ¶¶ 225-26. Each Lessor Defendant knew that if they and their competitors agreed to delegate rental price and supply decisions to RealPage, and abide by those decisions, they could achieve greater profit than by making those decisions independently. ¶¶ 3-4. *Interstate Circuit*, 306 U.S. at 222 ("strong motive" to collude when loss of business would be expected without collusion, but "prospect of increased profits" could be achieved by colluding).

Defendants cite *Hyland* for the proposition that profit maximization is not a motive that supports the inference of agreement. MTD 20. *Hyland* was decided at summary judgment, where the Sixth Circuit found that plaintiffs' circumstantial evidence was inadequate to *rule out* the possibility of independent conduct. That is not the standard at the pleading stage. *Erie Cnty.*, 702 F. 3d at 869 (at the pleading stage, "plaintiff need not allege a fact pattern that 'tends to exclude the possibility' of lawful, independent conduct"). In any event, the AC alleges more than just an abstract desire for profit—RealPage advertised to Lessor Defendants that joining the conspiracy could increase their revenues by 3% to 7% over competitive levels. ¶¶ 10, 110, 174, 192, 225.

Taken together with the other plus factors, and not "dismembered" and viewed in isolation, Plaintiffs' plausible allegations of Defendants' motive to act in concert to achieve what they could not achieve alone support an inference of agreement.

**Market Structure**: Finally, the structure of the multifamily rental market is such that it cultivates collusive agreements. That industry structure constitutes a plus factor from which an inference of conspiracy can be drawn. *In re Publication Paper Antitrust Litig.*, 690 F.3d 51, 65 (2d

Cir. 2012); *In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 656-57 (7th Cir. 2002). Elements of the multifamily market that make it susceptible to collusion include: (1) market concentration, ¶ 213; (2) barriers to entry, ¶¶ 214-16; (3) switching costs, ¶¶ 217-19; (4) inelastic demand, ¶ 220; and (5) that multifamily rental housing is fungible. ¶¶ 221-22.

Defendants challenge those allegations first by erroneously claiming that the allegations are not specific to any submarkets. That is false; for each submarket Plaintiffs allege, they detail the highly concentrated nature of revenue management software adoption, barriers to entry, and opportunities to collude unique to that market. ¶¶ 245-390. Defendants next claim that allegations of market characteristics, standing alone, do not allow the inference of a conspiracy. MTD 21-23. But the law does not require that they stand alone; Plaintiffs' allegations should be viewed in conjunction with the other allegations of plus factors and parallel conduct. *Compare Erie Cnty.*, 702 F.3d at 870 ("Standing alone, [market characteristics] do not give rise to an inference of an unlawful agreement (*though they might, when combined with the other factors, strengthen the plausibility of such an inference*).") *with Jones v. Micron Tech. Inc.*, 400 F. Supp. 3d 897, 917 (N.D. Cal. 2019) (dismissing complaint where plaintiffs relied *exclusively* on market structure allegations "without more"). Properly placed in context, Plaintiffs' allegations "strengthen the plausibility" of an inference of unlawful agreement. *Erie Cnty.*, 702 F.3d at 870.

### 4. The Complaint Provides Each Defendant Notice of the Claims Against It.

Under Fed. R. Civ. P. 8(a)(2) and *Twombly*, Plaintiffs are obligated to provide each Defendant "fair notice of what the . . . claim is and the grounds upon which it rests." *Twombly*, 550 U.S. at 555. Plaintiffs have done so here. The AC details the mechanism by which the conspiracy allowed Defendants to avoid a "race to the bottom" and to instead price multi-family residential leases at supracompetitive rates. It explains how, by virtue of each Lessor Defendants' use of RealPage RMS, each became a member of the conspiracy.

26

Despite the clarity and detail of those allegations, Defendants claim that Plaintiffs have engaged in impermissible group pleading by ascribing conduct to "Lessor Defendants *en masse*." MTD 11. Defendants' argument misunderstands the group pleading doctrine. Group pleading occurs when "allegations are made against families of affiliated entities," such that the complaint does not include enough factual allegations to connect each defendant to the conspiracy. *Concord Assocs., L.P. v. Entm't Props. Tr.*, 2014 WL 1396524, at *24 (S.D.N.Y. Apr. 9, 2014), *aff'd*, 817 F.3d 46 (2d Cir. 2016). It does not occur when, as here, a plaintiff makes allegations that a group of entities engaged *in the same conduct*, and refers to the conduct of that group. There is no requirement that plaintiffs repetitively list out the names of each implicated defendant throughout a complaint. *Iowa Pub. Employees' Ret. Sys. v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 340 F. Supp. 3d 285, 317 (S.D.N.Y. 2018) (not group pleading where the complaint "specifically alleges that each Defendant agreed to participate in the conspiracy").[15]

Here, the AC connects each Defendant to the conspiracy, through each Lessor Defendant's use of RealPage's RMS. Contrary to Defendants' claim that Plaintiffs only identify the location of each Lessor Defendant and its number of units, MTD 11, the AC specifically alleges that each Lessor Defendant was linked to the conspiracy through its use of RealPage's RMS to manage its multifamily rental properties. ¶¶ 45-90. The rest of the AC explains how, by agreeing to use RealPage's RMS, each Lessor Defendant necessarily agreed to share confidential pricing information in order to help their competitors set pricing and to increase market-wide prices.

*Total Benefits Planning Agency, Inc. v. Anthem Blue Cross & Blue Shield*, which

---

[15] To the extent Defendants seek to impose a threshold on Plaintiffs to "identify the specific time, place, or person related to each conspiracy allegation," that standard is "incorrect" at the pleading stage. *Starr v. Sony BMG Music Entm't*, 592 F.3d 314, 325 (2d Cir. 2010); *In re Se. Milk Antitrust Litig.*, 555 F. Supp. 2d at 943 (same); *In re Packaged Ice Antitrust Litig.*, 723 F. Supp. 2d at 1008 (same).

27

Defendants cite multiple times, demonstrates the difference between impermissible group pleading and Plaintiffs' allegations here. 552 F.3d 430 (6th Cir 2008). The plaintiffs in *Total Benefits* filed an eleven-page complaint, three pages of which were the case caption. First Am. Compl., *Total Benefits Planning Agency Inc. v. Anthem Blue Cross & Blue Shield*, 2006 WL 3855349 (S.D. Ohio Nov. 2, 2006). The complaint alleged only that the defendants "had an agreement and common understanding" with respect to commissions paid and prices charged, and the district court found that beyond those conclusory allegations, there were no other "plausible grounds to infer an agreement." *Total Benefits Planning Agency Inc. v. Anthem Blue Cross & Blue Shield*, 630 F. Supp. 2d 842, 851 (S.D. Ohio 2007), *aff'd*, 552 F.3d 430 (6th Cir. 2008). In contrast, the AC contains over 100 pages of detailed allegations, including interviews with Defendant employees, internal Defendant documents, and public statements by Defendants. And it explicitly details, at length, why any Lessor's use of RealPage's RMS products to set prices demonstrates participation in the anticompetitive conspiracy. Finally, the AC includes the very thing that the district court in *Total Benefits* said was missing—the "complex and historically unprecedented changes in pricing structure" made "for no other discernible reason." *Total Benefits*, 630 F. Supp. 2d at 851.

Defendants' reliance on *In re Travel Agent Commission Antitrust Litigation* and *In re Elevator Antitrust Litigation* is equally unavailing. In *Travel Agent*, the plaintiffs did not even purport to tie certain defendants to any common design or understanding. 2007 WL 3171675, at *3 (N.D. Ohio Oct. 29, 2007), *aff'd*, 583 F.3d 896 (6th Cir. 2009). In *Elevator*, plaintiffs' conspiracy claims were dismissed when they offered no factual enhancement beyond parallel conduct and relied only on conclusory allegations. 502 F.3d 47, 50-51 (2nd Cir. 2007). In contrast to these cases, Plaintiffs' AC contains specific and detailed factual allegations that each Lessor Defendant used RealPage's RMS and further explains how this allowed each Defendant to

exchange pricing information with its competitors for the purpose of setting supracompetitive prices.

### 5. Defendants' Factual Disputes Are Inappropriate at the Pleading Stage.

Defendants' remaining arguments amount to improper factual disputes and attempts to "argue that each allegation in isolation is not sufficient to support an antitrust conspiracy claim." *Domestic Airline*, 221 F. Supp. 3d at 68 (court "is tasked with reviewing the Complaint as a whole when determining whether the allegations are sufficient").

First, Defendants contest Plaintiffs' allegations about how RealPage facilitated and enforced the conspiracy. MTD 23-25. Specifically, Plaintiffs allege that RealPage provided pricing "recommendations" and monitored Lessor Defendants for adherence recommendations. *Supra* at 3-4, 13; ¶ 7 (RealPage Pricing Advisors "informed their assigned Lessors that they were without discretion to override pricing determined by RealPage and that Lessors had to adhere to those pricing decisions."); ¶ 148 (RealPage client "knew [RealPage's prices] were way too high, but [RealPage] barely budged [when I requested a deviation]."). Those allegations sufficiently provide a factual basis for Plaintiffs' claims at the pleading stage.

Second, Defendants fault Plaintiffs for not alleging a "disciplinary mechanism," but none of their cited cases find that such a mechanism is necessary, particularly at the pleadings. *Llacua v. W. Range Ass'n*, 930 F.3d 1161, 1180 & n.30 (10th Cir. 2019) (dismissing claims due to lack of plausible inference of agreement, not because of lack of "enforcement mechanism"); *Kleen Prods. LLC v. Int'l Paper*, 276 F. Supp. 3d 811, 842 (N.D. Ill. 2017), *aff'd* 910 F.3d 927 (7th Cir. 2018) (at summary judgment, finding a punishment mechanism to constitute a non-exclusive means of excluding the possibility of independent action); *Broiler Chicken*, 290 F. Supp. 3d at 797 (rejecting the argument at the pleading stage that a punishment mechanism is required). In any event, the

Complaint includes detailed allegations about how price discipline was enforced. *Supra* 3-4.[16]

Finally, Defendants argue that the conspiracy alleged is implausible, citing a single 1993 district court case from Michigan. MTD 25-27. There, the court found that plaintiff's alleged conspiracy made no economic sense because it conferred no economic benefit upon the conspirators. *Lifeline Ltd. No. II v. Connecticut Gen. Life Ins. Co.*, 821 F. Supp. 1201, 1205 (E.D. Mich. 1993), *modified*, 821 F. Supp. 1213 (E.D. Mich. 1993). Here, the AC adequately details the economic motivation for Lessor Defendants to engage in the conspiracy—the ability to increase rents more than they would have been able to absent collective action. ¶ 185 ("[T]he beauty of using [RealPage's RMS] is that it pushes you to go places you wouldn't have gone if you weren't using it.").

## B. The Complaint States a Claim Under the Rule of Reason.

Even if the Court were to analyze Plaintiffs' claims under the Rule of Reason, Plaintiffs need only plausibly allege that Defendants possessed sufficient market power such that their restraint would be expected to harm competition. They can satisfy that burden by providing direct allegations of market power through "actual detrimental effects," such as increased prices or reduced output, or by providing indirect allegations of market power through the demonstration of sufficiently high shares in a properly defined antitrust market. *F.T.C. v. Ind. Fed'n of Dentists*, 476 U.S. 447, 460 (1986); *Realcomp II, Ltd. v. F.T.C.*, 635 F.3d 815, 827 (6th Cir. 2011); *Lie v. St.*

---

[16] Defendants cite to evidence from outside of the Complaint to dispute these allegations. MTD 24 and Ex. A. But it is "black-letter law" that a court evaluating a motion to dismiss "must focus only on the allegations in the pleadings." *Bates v. Green Farms Condo. Ass'n*, 958 F.3d 470, 483 (6th Cir. 2020). To the extent Defendants raise an evidentiary dispute based on facts outside of the Complaint, such a dispute is not appropriate on the pleadings, where Plaintiffs' allegations are to be accepted as true. *Travel Agent*, 583 F.3d at 902; *M.A.C. by next friend M.E.C. v. Smith*, 576 F. Supp. 3d 552, 558 (M.D. Tenn. 2021) (Crenshaw, J.).

30

*Joseph Hosp. of Mount Clemens, Mich.*, 964 F.2d 567, 569-70 (6th Cir. 1992).[17] Plaintiffs offer direct allegations of market power by pleading anticompetitive effects, and, alternatively, indirect allegations, including that Lessor Defendants possess significant aggregate market share.

### 1. Plaintiffs Allege Direct Evidence of Market Power.

Plaintiffs allege that the challenged conspiracy had multiple anticompetitive effects, which provide direct evidence of market power. *Ind. Fed'n of Dentists*, 476 U.S. at 460. To start, Plaintiffs allege an increase in rental prices. Figs. 1 & 10, ¶¶ 249-390. In fifteen submarkets, plaintiffs allege that prices increased between 40% and 76% over the relevant period. *Id.* Plaintiffs also allege (using RealPage's own words) that the cartel increased Lessor Defendants' revenues by up to 7%. ¶ 192. Further, Plaintiffs allege that normal supply and demand drivers cannot explain these price increases. ¶ 197. Plaintiffs conducted preliminary regression analyses in four submarkets—Atlanta, Phoenix, Orlando, and Dallas—testing the impact of vacancy rates on rental prices before and during the conspiracy. ¶¶ 197-99. All four regressions found a negative relationship between rent and vacancy rates before the conspiracy, meaning that prices increased when supply decreased, as expected in a competitive market; during the conspiracy period, those relationships evaporated in each test market. ¶¶ 201, 203, 206, 207, 209. Plaintiffs describe specific instances in which individual Lessor Defendants increased rental prices at the behest of RealPage's RMS. *E.g.*, ¶ 11 (Pinnacle Property Management Services increased monthly rents by several hundreds of dollars because of RealPage's RMS). The AC quotes RealPage publicly attributing

---

[17] Defendants also incorrectly claim that plaintiffs must allege a relevant market for their *per se* claim. MTD 31 n.14. In the Sixth Circuit, however, "the law is clear that once it is decided that a restraint is subject to *per se* analysis, the claimed lack of any actual anticompetitive effects or presence of procompetitive effects is irrelevant." *In re Cardizem CD Antitrust Litig.*, 332 F.3d 896, 909 (6th Cir. 2003) (finding a *per se* violation without defining a relevant market); *Socony-Vacuum*, 310 U.S. at 224 n.59 ("the law does not permit an inquiry into [*per se* restraints'] reasonableness" or the "economic justifications" defendants might proffer, such restraints "are all banned because of their actual or potential threat to the central nervous system of the economy").

31

increased rental prices to its RMS, bragging that "the stated goal of RealPage's RMS is for its clients to 'outperform the market [by] 3% to 7%'"; a RealPage Vice President attributed a 14% average increase in rental prices to RealPage's RMS. *Id.* ¶¶ 10-11 ("I think it's driving it, quite honestly."); ¶¶ 185, 187 (similar statements from other lessors).

Plaintiffs also allege the other textbook anticompetitive effect: reduced output. ¶ 18 (Lessor Defendants have increased vacancies because of the cartel); Figs. 2, 3, 10, 11, 13, 15 (exemplar data showing that vacancy rates increased in the Nashville, Dallas, Atlanta, Orlando, and Phoenix metro areas); ¶ 192 (RealPage's CEO stating that its RMS caused one of its large clients, managing over 40,000 units, to decrease its targeted occupancy rates from at least 97% down to 95%).

Defendants largely sidestep these allegations, claiming that they are irrelevant because Plaintiffs must first define relevant markets and allege market power. But that is not the case; an inquiry into market power is a "'surrogate for detrimental effects.'" *Realcomp II*, 635 F.3d 815, 827 (6th Cir. 2011) (quoting *Ind. Fed'n of Dentists*, 476 U.S. at 461). The only purpose of that inquiry "is to determine whether an arrangement has the potential for genuine adverse effects on competition." *Ind. Fed'n of Dentists*, 476 U.S. at 460-61 (quotation omitted). However, "[i]f adverse effects are clear, inquiry into market power is unnecessary." *Realcomp II*, 635 F.3d at 827. The Supreme Court recently affirmed that principle in *Ohio v. American Express*, 138 S. Ct. 2274, 2285 n.7 (2018) ("Given that horizontal restraints involve agreements between competitors not to compete in some way, this Court concluded [in *Indiana Federation of Dentists*] that it did not need to precisely define the relevant market to conclude that these agreements were anticompetitive.").

Where, as here, horizontal price competition has been restrained, direct evidence of market power (increased prices and lower supply) not only satisfies Plaintiffs' burden under the Rule of Reason, but is *preferable* to indirect forms of proof that are only a "surrogate" for the direct

32

evidence Plaintiffs allege. *Ind. Fed'n of Dentists*, 476 U.S. at 460-61.

### 2. Plaintiffs Define Relevant Antitrust Markets and Submarkets.

In any event, Plaintiffs have alleged relevant markets. The Sixth Circuit recognizes the so-called "SSNIP test" used by federal regulators as an analytical framework for courts analyzing antitrust violations. *In re Se. Milk Antitrust Litig.*, 739 F.3d 262, 277 (6th Cir. 2014). That test asks whether a hypothetical monopolist in the market could profitably impose a "SSNIP," a small but significant—typically 5%—non-transitory increase in price. If the SSNIP is profitable, Plaintiffs properly defined the market.

Here, the relevant product market is multifamily residential real estate leases, and the relevant geographic market is the United States. ¶ 239. Plaintiffs also allege that at least fifty-three Metropolitan Statistical Areas ("MSAs") are regional submarkets. ¶ 245-391. Defendants only challenge Plaintiffs' geographic market definitions. MTD 30-32.[18] A geographic market is "the region in which the seller operates, and to which the purchaser can practicably turn for supplies." *Se. Milk*, 739 F.3d at 277. Plaintiffs' national market for the lease of multifamily residential real estate satisfies that test. The Complaint explains that "pursuant to the Lessors' agreement not to compete on price, Lessors are able to increase rents 'year over year, between 5% and 12% in every market,' yet those increases have not driven enough renters out of the market such that the SSNIP has become unprofitable to Lessors." ¶ 244.

Defendants challenge Plaintiffs' national market as overbroad *solely* because Plaintiffs also allege smaller regional submarkets. MTD 30-31. If Defendants were correct, then no plaintiff could ever allege a submarket. That argument cannot be squared with the Supreme Court's

---

[18] As a threshold matter, Defendants ignore that defining the market is a deeply fact-intensive inquiry, and courts are hesitant to dismiss a claim for failure to plead a relevant market until a factual inquiry into the commercial realities facing consumers is undertaken. *Se. Milk*, 739 F.3d at 277; *Jones v. Varsity Brands, LLC*, 618 F. Supp. 3d 725, 749 (W.D. Tenn. 2022).

33

acknowledgement that while there may be broad "outer boundaries" of a market, "within [that] broad market, well-defined submarkets may exist.'"[19] *Brown Shoe Co., Inc.*, 370 U.S. at 325. But recognizing that "practical indicia" of distinct submarkets exist, *id.*, does not negate that an outer boundary also exists. Defendants' cases do not support their purported "contradiction," particularly because none involve submarkets.[20]

Defendants also argue that even Plaintiffs' submarkets are too "broadly defined" because a hypothetical New York or Nashville renter might not consider every single residential lease in their MSA to be a completely interchangeable substitute. But that is not the legally relevant question: the relevant question is whether a hypothetical monopolist of Nashville- or New York-area real estate could profitably sustain a small but significant non-transitory increase in price. As discussed above, they clearly could. Regardless, at the pleadings stage the Court must accept as true Plaintiffs' allegations that (1) commuting distances constrain where people live; and (2) MSAs capture the geographic zone from which individuals commute to each major metropolitan area. ¶¶ 246-47. Courts have previously recognized that MSAs plausibly define geographic markets.[21]

Defendants' challenges to Plaintiffs' geographic markets share an additional flaw. Essentially, they contend the markets are too big. But an overly *broad* market definition is not deficient and does not warrant dismissal of pleadings. *Jien v. Perdue Farms, Inc.*, 2022 WL

---

[19] *Brown Shoe Co., Inc. v. United States*, 370 U.S. 294, 325 (1962).
[20] *Semertzides v. Bethesda N. Hosp.*, 2014 WL 2573073, at *4 (S.D. Ohio June 9, 2014), *aff'd*, 608 F. App'x 378 (6th Cir. 2015) (plaintiff pled multiple definitions for a *single* geographic market, identifying the "Tri-State area" but also "Ohio, Kentucky, Indiana and beyond" as the sole relevant market); *E.I. DuPont de Nemours & Co. v. Kolon Indus., Inc.*, 688 F. Supp. 2d 443, 457 (E.D. Va. 2009) (plaintiff alleged a single national market but also discussed the market as worldwide); *Cupp v. Alberto-Culver USA, Inc.*, 310 F. Supp. 2d 963, 970 (W.D. Tenn. 2004) (plaintiff "neglect[ed] entirely to define a geographic market").
[21] *United States v. Blue Cross Blue Shield of Mich.*, 809 F. Supp. 2d 665, 673 (E.D. Mich. 2011); *In re Blue Cross Blue Shield Antitrust Litig.*, 2017 WL 2797267, at *11 (N.D. Ala. June 28, 2017).

34

2818950, at *10 (D. Md. July 19, 2022); *PharmacyChecker.com, LLC v. Nat'l Ass'n of Boards of Pharmacy*, 530 F. Supp. 3d 301, 348 (S.D.N.Y. 2021). While an overly *narrow* market "could create the illusion of market power where no market power exists, via the exclusion of [competitors]" and is thus deficient, *Jien*, 2022 WL 2818950, at *10, the type of overbroad market Defendants claim Plaintiffs allege cannot create that illusion. *Id.* If Defendants have power to reduce competition in a larger market, they *ipso facto* can reduce it in a smaller, narrower market. None of the cases Defendants rely on hold otherwise. MTD 29-30.[22]

### 3. Plaintiffs Allege the Defendants Had Market Power.

Though Plaintiffs' direct allegations of anticompetitive effects "obviate the need to prove the defendant's market power," *Lie*, 964 F.2d at 570, Plaintiffs nonetheless allege that Defendants possess power in the relevant market, by alleging that Defendants have significant market share.

Market shares provide circumstantial evidence of market power if Plaintiffs allege Defendants collectively have at least 30 percent of the market, and barriers to entry exist. *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 30 (1984). When a defendant affects the relevant market through an agreement with participants in that market, the participants' market share demonstrates market power. *Wilk v. Am. Med. Ass'n*, 895 F.2d 352, 360 (7th Cir. 1990); *accord Rebel Oil Co., Inc. v. Atl. Richfield Co.*, 51 F.3d 1421, 1438 (9th Cir. 1995) ("The aggregation of market shares of several rivals is justified if the rivals are alleged to have conspired to

---

[22] *Total Benefits*, 552 F.3d at 435 (rejecting market allegations that failed to define competitors or explain what or whether products or services were at issue); *Mich. Div.-Monument Builders of N. Am. v. Mich. Cemetery Ass'n*, 524 F.3d 726, 734-36 (6th Cir. 2008) (rejecting proposed geographic market as too narrow for including only a single provider of burial plots); *Nat'l Hockey League Players Ass'n v. Plymouth Whalers Hockey Club*, 419 F.3d 462, 473 (6th Cir. 2005) (rejecting product market as too narrow for failing to address cross-elasticity of demand for reasonable substitutes); *New Orleans Ass'n of Cemetery Tour Guides & Cos. v. New Orleans Archdiocesan Cemeteries*, 56 F.4th 1026, 1039 (5th Cir. 2023) (same); *Par v. Wolfe Clinic, P.C.*, 70 F.4th 441, 448 (8th Cir. 2023) (rejecting geographic market as too narrow for failing to consider reasonable alternative).

35

monopolize."); *Sitts v. Dairy Farmers of Am., Inc.*, 417 F. Supp. 3d 433, 478 (D. Vt. 2019) (relevant inquiry is "the alleged conspiracy's aggregate market share"). Accordingly, the relevant inquiry here is whether the overall "combination" has market power. Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law*, ¶ 532b n.4 (5th ed. Supp. 2022); *Minpeco, S.A. v. Hunt*, 718 F. Supp. 168, 173 (S.D.N.Y. 1989). This is also consistent with bedrock conspiracy law, which holds each conspirator liable for the harm done by any other member of the conspiracy.[23]

Here, the Complaint alleges RealPage had "over 31,700 clients, including each of the 10 largest multifamily property management companies in the United States" and that Lessors use its products to manage "approximately 19.7 million rental real estate units" as of December 2020. ¶¶ 113, 213. With respect to each MSA, the percentage of lessors and property managers using revenue management software ranges from 53% to 81%. ¶¶ 256, 283. Given RealPage's dominant position in the revenue management software space, Plaintiffs' allegations support the reasonable inference that RealPage affects more than 30% of each regional submarket. ¶ 107.

Last, the Complaint alleges high barriers to entry in the multifamily rental housing market, ¶¶ 214-15, which, combined with the aggregate market share of its Lessor clients, support an inference that RealPage's unlawful scheme wields market power in the relevant market.

## C. Plaintiffs Have Antitrust Standing to Bring Their Claims.

Plaintiffs allege that each of them leased directly from one of the Lessor Defendants and "paid higher rental prices by reason of" Defendants' anticompetitive scheme. ¶¶ 34-40 (alleging that each named Plaintiff rented from a Lessor Defendant that was using RealPage RMS to artificially inflate rental rates during the period). Those allegations, if proven, establish that the named Plaintiffs paid "prices that no longer reflect[ed] ordinary market conditions . . . ." *Gelboim*,

---

[23] Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 33d (5th ed. Supp. 2022); *Paper Sys., Inc. v. Nippon Paper Indus. Co., Ltd.*, 281 F.3d 629, 634 (7th Cir. 2002).

823 F.3d at 772. That is enough to establish both Article III and antitrust standing.

Nevertheless, Defendants argue that Plaintiffs lack antitrust standing because they provide inadequate detail connecting Lessor Defendants' conduct to each Plaintiff's alleged harm. MTD 36-37. To Defendants, Plaintiffs were required to plead that "RealPage revenue management software was used to set [each named Plaintiff's] individual rents." *Id*. at 37. But because Plaintiffs allege that "Lessor Defendants do not accept RealPage's suggested pricing at least 10-20% of the time," they have not done so. *Id.*

The Court should reject Defendants' well-worn argument, which "ultimately amounts to a demand for specifics that are not required, and that Plaintiffs could not be reasonably expected to know, at the pleading stage." *In re Foreign Exch. Benchmark Rates Antitrust Litig.*, 74 F. Supp. 3d 581, 595 (S.D.N.Y. 2015) (rejecting defendants' argument that failure to plead "actual harm in real trades in specific currencies on particular days" is fatal). "Generally, when consumers, because of a conspiracy, must pay prices that no longer reflect ordinary market conditions, they suffer 'injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful.'" *Gelboim*, 823 F.3d at 772 (quoting *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.*, 429 U.S. 477, 489 (1977)).[24] Further, the Court should reject the assumption

_____

[24] *Budicak, Inc. v. Lansing Trade Grp., LLC*, 452 F. Supp. 3d 1029, 1044 (D. Kan. 2020) (plaintiffs' allegations that "they sold wheat futures and options on days when Lansing manipulated the contracts' prices downward, and that they purchased wheat futures and options on days when Lansing manipulated the contracts' prices upward" sufficient to establish standing); *In re Commodity Exch., Inc.*, 213 F. Supp. 3d 631, 653 (S.D.N.Y. 2016) (finding sufficient injury-in-fact where "Defendants artificially depressed the price of gold for some period of time around the PM Fixing in order to profit from gold and gold futures trading at prices that were advantageous to them vis à vis Plaintiffs and other less-informed market participants"); *Allen v. Bank of Am. Corp.*, 2016 WL 4446373, at *4 (S.D.N.Y. Aug. 23, 2016) (rejecting argument that plaintiffs were "required to allege how the price was manipulated for each individual transaction" for standing); *Local TV Advert.*, 2020 WL 6557665, at *6 (rejecting argument that plaintiffs must plead that they suffered harm from specific exchanges of information tied to specific transactions).

37

buried in Defendants' argument—that the prices Lessor Defendants set during the 10-20% of the time they overrode RealPage recommendations reflected competitive conditions such that renters in those units suffered no harm. It is plausible that even the overridden prices that the Lessors charged were inflated as a result of the marketwide distortion of prices caused by Defendants.

**D. Plaintiffs Have Adequately Alleged State Law Claims.**

Defendants' arguments to dismiss Plaintiffs' state antitrust claims are largely unsuccessful for the same reason their arguments to dismiss Plaintiffs' Sherman Act claims fail.

Many of Defendants' additional arguments are simply incorrect. For example, contrary to Defendants' assertion that neither Pennsylvania nor Georgia law allow for private antitrust claims, Pennsylvania's Unfair Trade Practices and Consumer Protection Law, 73 Pa. Stat. § 201-9.2, explicitly creates a private right of action for antitrust claims. Similarly, while Georgia's competition statute does not contain a private right of action, "Georgia recognizes a common law tort action in favor of third parties who are injured by a conspiracy in restraint of trade." *U.S. Anchor Mfg., Inc. v. Rule Indus., Inc.*, 7 F.3d 986, 1002 (11th Cir. 1993). Likewise, Defendants cite Ind. Code § 24-1-1-1 for the proposition that Indiana's antitrust law applies only to "articles of merchandise," MTD 38, but ignore Ind. Code § 24-1-2-1, which states that "[e]very scheme, contract, or combination in restraint of trade or commerce, or to create or carry out restrictions in trade or commerce" is illegal. They play a similar game with Massachusetts law, noting that Mass. Gen. Laws ch. 93 §§ 2 & 4 exclude "the conveyance, transfer or use of real property," MTD 38, but ignore that Mass. Gen. Laws ch. 93A—which parallels section 5(a)(1) of the Federal Trade Commission Act (15 U.S.C. § 45(a)(1))—does not exclude the use of real property. And while Defendants cite *Bennett v. Visa U.S.A. Inc.*, for the proposition that the Tennessee antitrust law applies only to goods, MTD 38, Tennessee law actually distinguishes between "tangible goods," on the one hand, and "intangible services," on the other. 198 S.W.3d 747, 752 (Tenn. Ct. App.

38

2006); *Baird Tree Co. v. City of Oak Ridge*, 2008 WL 2510581, at *7 (Tenn. Ct. App. June 24, 2008). It is far from clear that the provision of apartments to lessees constitutes a "service," rather than a "good" under Tennessee antitrust law. *Cf. In re Dealer Mgmt. Sys. Antitrust Litig.*, 362 F. Supp. 3d 510, 551 (N.D. Ill. 2019) (allowing claims under Tennessee Trade Practices Act to proceed over challenge that software is "intangible" and so not a "good" under the Act).

Similarly, Defendants are incorrect that any claims are subject to dismissal based on varied statutes of limitations. MTD 38. It is well established that the statute of limitations is an affirmative defense. *Snyder-Hill v. Ohio State Univ.*, 48 F.4th 686, 698 (6th Cir. 2022). Thus, "a motion under Rule 12(b)(6) . . . is generally an inappropriate vehicle for dismissing a claim based upon the statute of limitations." *Cataldo v. U.S. Steel Corp.*, 676 F.3d 542, 547 (6th Cir. 2012). A motion to dismiss on statute of limitations grounds can only be granted when "it is apparent from the face of the complaint that the deadline for bringing the claim has passed." *Nicholson v. City of Clarksville*, 2022 WL 1256661, at *2 (M.D. Tenn. Apr. 27, 2022). Here, no such deadline appears in the AC. Indeed, Plaintiffs allege that Defendants' conduct constitutes a continuing violation. ¶¶ 407, 413. Thus, the Court should deny Defendants' motion to dismiss based on state statutes of limitations. *Cf. United States v. Carell*, 681 F. Supp. 2d 874, 883 (M.D. Tenn. 2009) (unresolved issues of fact preclude dismissal based on statute of limitations at the Rule 12 stage). And while Defendants are correct that Alabama's antitrust statute applies only to intrastate commerce, Plaintiffs have alleged that Defendants operated an intrastate regional submarket in the Birmingham-Hoover, Alabama MSA. ¶¶ 245-248, 391(aa); *Abbott Lab. v. Durrett*, 746 So. 2d 316, 339 (Ala. 1999) ("[Alabama antitrust laws] regulate monopolistic activities that occur 'within this state'—within the geographic boundaries of this state."). If the Court dismisses Plaintiffs' Sherman Act claims, at least *some* of Plaintiffs' claims would be actionable under Alabama law, rendering dismissal inappropriate.

Finally, Defendants argue that Plaintiffs' claims arising under the laws of states in which they do not reside must be dismissed for lack of standing, largely citing out-of-circuit caselaw. MTD 38-40. But this Court has recently considered and rejected Defendants' position, recognizing that while "[t]hreshold individual standing is a prerequisite for all actions, including class actions . . . 'once an individual has alleged a distinct and palpable injury to himself he has standing to challenge a practice even if the injury is of a sort shared by a large class of possible litigants.'" *Hosp. Auth. of Metro. Gov't of Nashville & Davidson Cnty., Tennessee v. Momenta Pharms., Inc.*, 333 F.R.D. 390 (M.D. Tenn. 2019) (Crenshaw, J.) (quoting *Fallick v. Nationwide Mut. Ins. Co.*, 162 F.3d 410, 423 (6th Cir. 1998)). Once an individual's standing to bring claims is established, "whether a plaintiff will be able to represent the putative class, including absent class members, depends solely on whether he is able to meet the additional criteria encompassed in Rule 23 of the Federal Rules of Civil Procedure." *Id.* In light of that principle, the Court determined that the plaintiffs had standing to bring claims not only under the antitrust laws of the states in which they lived—Tennessee and New York—but also "under the various states' [antitrust] statutes on behalf of absent class members." *Id.* The Court determined that the plaintiff had standing to bring the class action because the statutes at issue were materially identical, and, thus, success "under one state's law will more or less dictate success under another state's law." *Id.* The Court should once again adopt its own sound reasoning in *Momenta*.[25]

## V. CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court deny Defendants' Omnibus Motion to Dismiss.

---

[25] Defendants' reliance on *Fox v. Saginaw County, Michigan*, 67 F.4th 284 (6th Cir. 2023) is misplaced. That case involved an attempt by a plaintiff to name *defendants* who had not harmed her personally and were not jointly and severally liable. *Id.* at 293-94.

40

Dated:   July 24, 2023                              /s/ Tricia R. Herzfeld
                                                    Tricia R. Herzfeld (#26014)
                                                    Anthony A. Orlandi (#33988)
                                                    **HERZFELD SUETHOLZ GASTEL LENISKI
                                                    AND WALL, PLLC**
                                                    223 Rosa L. Parks Avenue, Suite 300
                                                    Nashville, TN 37203
                                                    Telephone: (615) 800-6225
                                                    tricia@hsglawgroup.com
                                                    tony@hsglawgroup.com

                                                    *Liaison Counsel*

                                                    Patrick J. Coughlin
                                                    Carmen A. Medici
                                                    Fatima Brizuela
                                                    **SCOTT+SCOTT ATTORNEYS AT LAW LLP**
                                                    600 West Broadway, Suite 3300
                                                    San Diego, CA 92101
                                                    Telephone: (619) 798-5325
                                                    Facsimile: (619) 233-0508
                                                    pcoughlin@scott-scott.com
                                                    cmedici@scott-scott.com
                                                    fbrizuela@scott-scott.com

                                                    Patrick McGahan
                                                    Amanda F. Lawrence
                                                    Michael Srodoski
                                                    G. Dustin Foster
                                                    Isabella De Lisi
                                                    **SCOTT+SCOTT ATTORNEYS AT LAW LLP**
                                                    156 South Main Street
                                                    P.O. Box 192
                                                    Colchester, CT 06145
                                                    Telephone: (860) 537-5537
                                                    Facsimile: (860) 537-4432
                                                    pmcgahan@scott-scott.com
                                                    alawrence@scott-scott.com
                                                    msrodoski@scott-scott.com
                                                    gfoster@scott-scott.com
                                                    idelisi@scott-scott.com

                                                    Stacey Slaughter
                                                    Thomas J. Undlin
                                                    Geoffrey H. Kozen
                                                    Stephanie A. Chen

41

J. Austin Hurt
**ROBINS KAPLAN LLP**
800 LaSalle Avenue, Suite 2800
Minneapolis, MN 55402
Telephone: (612) 349-8500
Facsimile: (612) 339-4181
sslaughter@robinskaplan.com
tundlin@robinskaplan.com
gkozen@robinskaplan.com
schen@robinskaplan.com
ahurt@robinskaplan.com

Swathi Bojedla
Mandy Boltax
**HAUSFELD LLP**
888 16th Street, N.W., Suite 300
Washington, DC 20006
Telephone: (202) 540-7200
sbojedla@hausfeld.com
mboltax@hausfeld.com

Gary I. Smith, Jr.
**HAUSFELD LLP**
600 Montgomery Street, Suite 3200
San Francisco, CA 94111
Tel: (415) 633-1908
gsmith@hausfeld.com

Katie R. Beran
**HAUSFELD LLP**
325 Chestnut Street, Suite 900
Philadelphia, PA 19106
Telephone: 1 215 985 3270
kberan@hausfeld.com

*Interim Co-Lead Counsel*

Eric L. Cramer
Michaela L. Wallin
**BERGER MONTAGUE PC**
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Telephone: (215) 875-3000
ecramer@bm.net
mwallin@bm.net

Daniel J. Walker
**BERGER MONTAGUE PC**
2001 Pennsylvania Avenue, NW, Suite 300
Washington, DC 20006
Telephone: (202) 559-9745
dwalker@bm.net

Brendan P. Glackin
Dean M. Harvey
**LIEFF CABRASER HEIMANN & BERNSTEIN, LLP**
275 Battery Street, Suite 2900
San Francisco, CA 94111
Telephone: 415-956-1000
bglackin@lchb.com
dharvey@lchb.com

Mark P. Chalos
Hannah R. Lazarz
Kenneth S. Byrd
**LIEFF CABRASER HEIMANN & BERNSTEIN, LLP**
222 2nd Avenue South, Ste. 1640
Nashville, TN 37201
(615) 313-9000
mchalos@lchb.com
hlazarz@lchb.com
kbyrd@lchb.com

Steve W. Berman
Breanna Van Engelen
**HAGENS BERMAN SOBOL SHAPIRO LLP**
1301 Second Avenue, Suite 2000
Seattle, Washington 98101
Telephone: (206) 623-7292

Christian P. Levis
Vincent Briganti
Peter Demato
Radhika Gupta
**LOWEY DANNENBERG, P.C.**
44 South Broadway, Suite 1100
White Plains, NY 10601
Telephone: (914) 997-0500
Facsimile: (914) 997-0035
vbriganti@lowey.com
clevis@lowey.com
pdemato@lowey.com
rgupta@lowey.com

Christopher M. Burke
Walter W. Noss
Yifan (Kate) Lv
**KOREIN TILLERY P.C.**
707 Broadway, Suite 1410
San Diego, CA 92101
Telephone: (619) 625-5621
Facsimile (314) 241-3525
cburke@koreintillery.com
wnoss@koreintillery.com
klv@koreintillery.com

**JOSEPH SAVERI LAW FIRM, LLP**
Joseph R. Saveri
Steven N. Williams
Cadio Zirpoli
Kevin E. Rayhill
601 California Street, Suite 1000
San Francisco, CA 94108
Telephone: (415) 500-6800
jsaveri@saverilawfirm.com
swilliams@saverilawfirm.com
czirpoli@saverilawfirm.com
krayhill@saverilawfirm.com

Jennifer W. Sprengel
Daniel O. Herrera
Alexander Sweatman
**CAFFERTY CLOBES MERIWETHER & SPRENGEL LLP**
135 S. LaSalle, Suite 3210
Chicago, IL 60603

43

Facsimile: (206) 623-0594
steve@hbsslaw.com
breannav@hbsslaw.com

Benjamin J. Widlanski
Javier A. Lopez
**KOZYAK TROPIN &**
**THROCKMORTON LLP**
2525 Ponce de Leon Blvd., 9th Floor
Coral Gables, Florida 33134
Telephone: (305) 372-1800
bwidlanski@kttlaw.com
jal@kttlaw.com

Telephone: 312-782-4880
Facsimile: 312-782-4485
jsprengel@caffertyclobes.com
dherrera@caffertyclobes.com
asweatman@caffertyclobes.com

*Plaintiffs' Steering Committee Counsel for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that on July 24, 2023, I caused the foregoing to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the email addresses denoted on the Electronic Mail Notice List.

*/s/ Tricia R. Herzfeld*
Tricia R. Herzfeld
