UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

|  |  |  |
|---|---|---|
| IN RE: REALPAGE, INC., RENTAL SOFTWARE ANTITRUST LITIGATION (NO. II) | ) ) ) ) ) ) ) ) ) ) ) | Case No. 3:23-md-3071<br>MDL No. 3071<br><br>Chief Judge Waverly D. Crenshaw, Jr.<br><br>**JURY DEMAND**<br><br>**This Document Relates to:**<br>**3:23-cv-00326**<br>**3:23-cv-00378**<br>**3:23-cv-00380**<br>**3:23-cv-00391**<br>**3:23-cv-00445** |

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO
THE THOMA BRAVO DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' FIRST
<u>AMENDED CONSOLIDATED CLASS ACTION COMPLAINT</u>**

I. INTRODUCTION

Defendants Thoma Bravo Fund XIII, L.P.; Thoma Bravo Fund XIV, L.P.;[1] and Thoma Bravo, L.P. (collectively, "Thoma Bravo" or the "Thoma Bravo Defendants") seek dismissal, arguing in pertinent part[2] that Plaintiffs have not pled sufficient facts beyond Thoma Bravo's ownership of co-Defendant RealPage, Inc.[3] for the Court to plausibly infer that Thoma Bravo actively participated in the conspiracy.[4] Thoma Bravo's argument ignores both Plaintiffs' well-pled facts concerning Thoma Bravo's involvement and highly relevant caselaw. As to the former, Plaintiffs plead that Thoma Bravo made statements at the time of its 2021 purchase of RealPage, Inc. that it intended to be more than a passive owner or mere investment advisor. Plaintiffs further allege that Thoma Bravo followed through with its stated intent and took active steps to advise and

---

[1] As defined in Plaintiffs' First Amended Consolidated Class Action Complaint ("AC"), Dkt. 314, Defendants Thoma Bravo Fund XIII, L.P. and Thoma Bravo Fund XIV, L.P. are referred to herein collectively as the "Thoma Bravo Funds" or the "Funds" ¶ 42. Unless otherwise defined herein, all terms are used pursuant to their respective definitions in the AC, and all citations to "¶" or "¶¶" refer to the AC. Thoma Bravo's Memorandum in Support of Motion to Dismiss, Dkt. 336, is referred to herein as "TB MTD."
[2] The Thoma Bravo Defendants also argue that they could not have conspired with RealPage, Inc. as a matter of law because Thoma Bravo and RealPage, Inc. are a single economic entity under *Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752 (1984) and that Plaintiffs do not allege the Thoma Bravo Defendants directly interacted with Lessor Defendants. *See* TB MTD at 7-9. Plaintiffs agree that the three Thoma Bravo Defendants and RealPage, Inc. are a single economic entity, and concede, for the purpose of this motion only, that the AC does not allege direct interaction between Thoma Bravo and Lessor Defendants. The Thoma Bravo Defendants further argue that this Court lacks personal jurisdiction over them. *See* TB MTD at 2, n.1. Plaintiffs believe this argument has been, or will soon be, mooted once Plaintiffs' recent filing in this district is added to the MDL docket. *See* Complaint, *Kabisch v. RealPage, Inc., et al.*, (M.D. Tenn.) (filed concurrently on this date). Finally, to the extent the Thoma Bravo Defendants purport to adopt arguments from Defendants' Motion to Dismiss Multifamily Plaintiffs' First Amended Consolidated Class Action Complaint, Dkt. 341 ("Joint MTD"), *see* TB MTD at 2, n.2, Plaintiffs address those arguments in their opposition to the Joint MTD.
[3] Thoma Bravo does not dispute that it indirectly owns RealPage, Inc. the hub of the conspiracy that Plaintiffs allege. *See* TB MTD at 4-5 (explaining how RealPage is owned by Thoma Bravo Funds).
[4] *See* TB MTD at 9-12.

assist RealPage, Inc. in administering the anticompetitive scheme. In so doing, Thoma Bravo actively participated in RealPage's violation of state and federal antitrust laws.

As to the latter, Thoma Bravo ignores that courts across the country have recognized that economic reality, rather than corporate form, determines whether two related entities are viewed as separate or unified economic entities for antitrust purposes. To state a claim based on the anticompetitive conduct of a unified economic entity, plaintiffs need not allege every element of every Sherman Act violation as to each constituent piece of the single economic entity. Instead, those cases counsel that the Court should evaluate Plaintiffs' allegations of anticompetitive conduct by the single economic entity (here, RealPage) holistically, and if well-pled as to the single entity (which Plaintiffs' allegations are), then each constituent piece of that single entity that actively participated in the anticompetitive conduct can be included as a Defendant. Here, Plaintiffs have adequately alleged that Thoma Bravo, as a constituent piece, actively participated in the anticompetitive conduct by the single economic entity that is RealPage.[5]

Nothing further is required at this stage. Plaintiffs' allegations plausibly state a claim against Thoma Bravo, and therefore, the Court should deny Thoma Bravo's Motion to Dismiss.

## II. RELEVANT BACKGROUND

In late 2022 and into early 2023, various Plaintiffs filed dozens of complaints across the United States alleging that RealPage, Inc. was the hub of a conspiracy by which Lessor Defendants coordinated prices and supply of rental units in multifamily residences in major urban areas across the country. Several of those complaints named Thoma Bravo, L.P. as a defendant.[6]

---

[5] *See* ¶ 2, Introduction (defining "Defendants RealPage, Inc., Thoma Bravo Fund XIII, L.P., Thoma Bravo Fund XIV, L.P., and Thoma Bravo L.P." as "(collectively, 'RealPage')").
[6] *See Marchetti v. RealPage, Inc.*, No. 1:23-cv-20263 (S.D. Fla. filed Jan. 23, 2023); *Schmidig v. RealPage, Inc.*, No. 1:23-cv-00108 (E.D. Cal. filed Jan. 23, 2023); *Bauman v. RealPage, Inc.*, No. 3:23-cv-00326 (M.D. Tenn. filed Apr. 13, 2023); and *Blosser v. RealPage, Inc.*, No 3:23-cv-00445 (M.D. Tenn. filed May 4, 2023).

2

On June 16, 2023, Plaintiffs filed a Consolidated Amended Complaint ("CAC"), Dkt. 291, and just days later, Thoma Bravo informed the Court and Plaintiffs of its intent to move to dismiss Plaintiffs' CAC "because it is not the owner of RealPage, Inc." Dkt. 297 at 5. Plaintiffs subsequently learned that two Thoma Bravo funds, Thoma Bravo Fund XIII, L.P. and Thoma Bravo Fund XIV, L.P., own RealPage, Inc., and promptly met and conferred with the Thoma Bravo Defendants to discuss this issue.

Following the meet and confer,[7] Plaintiffs amended their Complaint to name these two Funds as Defendants and further alleged that Thoma Bravo, L.P. directed the Funds to acquire RealPage. ¶ 42. Beyond naming these additional parties, the AC adds numerous allegations that illustrate Thoma Bravo's active participation in RealPage Inc.'s business, exactly the allegations Thoma Bravo claimed were missing from the CAC during the parties' meet and confer. For example, the AC quotes Thoma Bravo's Founder and Managing Partner, in which he highlighted the "fundamental shift" in the industry driven by RealPage, and stated that he expected to leverage Thoma Bravo's "expertise and resources to help grow these capabilities at companies like RealPage." ¶ 43. RealPage's CEO lauded Thoma Bravo's "significant expertise from its deep experience with software companies" and predicted working "together" to serve RealPage's clients. *Id.* The AC further alleges that "Thoma Bravo has carried through on those stated intentions and is actively involved in the day-to-day operations of RealPage, including selecting and approving acquisition targets for RealPage [and] setting company policies . . ." ¶ 44. Consistent

---

[7] During the meet and confer, Plaintiffs asked Thoma Bravo about the nature of Thoma Bravo's ownership of RealPage, Inc., including what percentage of RealPage the Thoma Bravo Funds owned. Thoma Bravo declined to provide this information. *Cf.* TB MTD at 6 (complaining that the AC did not "specify[] the nature of the Thoma Bravo Defendants' ownership of RealPage, including whether or not the Thoma Bravo Funds directly or indirectly hold ownership interests in RealPage, or whether any other parties hold any ownership interest.").

with this, Plaintiffs allege that a Thoma Bravo Operating Partner is Chairman of RealPage's Board of Directors, and that RealPage has hired other top executives (including its CEO and COO) from Thoma Bravo companies. *Id.*

The allegations in Plaintiffs' AC concerning Thoma Bravo suffice to plausibly infer that each Thoma Bravo Defendant was part of a single economic entity with RealPage, Inc., and that each Thoma Bravo entity independently participated in that entity's Sherman Act violations. That is all that is required at this stage.

## III. LEGAL STANDARD

In analyzing a motion to dismiss, courts "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." *In re Travel Agent Comm'n Antitrust Litig.*, 583 F.3d 896, 903 (6th Cir. 2009). *Bell Atl. Corp. v. Twombly* calls for "a complaint with enough factual matter (taken as true) to suggest that" a violation of the Sherman Act occurred. 550 U.S. 544, 556 (2007). The pleading standard requires only enough "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly,* 550 U.S. at 556).[8] The reviewing court must determine not whether the plaintiff will ultimately prevail, but whether the facts permit the court to infer "more than the mere possibility of misconduct," which is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679. In the Sixth Circuit, a complaint must simply "put defendants on notice concerning the basic nature of [plaintiff's] complaints against the defendants and the grounds upon which their claims exist." *In re Se. Milk Antitrust Litig.*, 555 F. Supp. 2d 934, 943 (E.D. Tenn. 2008).

---

[8] Unless otherwise noted, all internal citations and quotations are omitted and emphasis is added.

## IV. ARGUMENT

The Thoma Bravo Defendants seek to duck accountability for their alleged strategic guidance of, and partnership with, RealPage as a single economic entity by mischaracterizing the pleadings: arguing that Plaintiffs have alleged Thoma Bravo has "some (unspecified) ownership interest in [RealPage, Inc.]—but nothing materially more." TB MTD at 2-3. But that is not correct. Plaintiffs plead that Thoma Bravo controls RealPage, Inc., such that Thoma Bravo and RealPage, Inc. constitute a single economic unit for antitrust purposes under *Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752 (1984), a conclusion Thoma Bravo does not contest. The Court should deny Thoma Bravo's Motion, because Plaintiffs' pleadings are more than enough for the Court to "draw the reasonable inference that [Thoma Bravo] is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

### A. Thoma Bravo Admits That It and RealPage Constitute a Single Enterprise for Antitrust Purposes.

In its Motion, Thoma Bravo admits that Thoma Bravo and RealPage, Inc. are a single economic entity under *Copperweld*. *See* TB MTD at 6-7 ("A parent company and subsidiaries who share 'common' objectives and 'centers of decisionmaking,' cannot combine or conspire in a manner that would violate Section 1 of the Sherman Act.") (citing *Copperweld*).[9] Plaintiffs agree, and this is the conclusion the law requires. *See Copperweld*, 467 U.S. at 771 ("[T]he coordinated activity of a parent and its wholly owned subsidiary *must* be viewed as that of a single enterprise for purposes of § 1 of the Sherman Act.").

---

[9] Importantly, Thoma Bravo does not argue that the Lessor Defendants were part of a single economic unit with either the Thoma Bravo Defendants or RealPage, Inc. Consequently, it concedes that the conduct of Thoma Bravo and RealPage, Inc. as a single economic entity, interacting with the Lessor Defendants, can infringe Section 1 of the Sherman Act.

B.     **Single Enterprise Liability for Sherman Act Violations Under *Copperweld*, *Arandell,* and *Lenox MacLaren*.**

In *Copperweld*, the Supreme Court held that a parent company and its wholly owned subsidiaries cannot conspire to violate the Sherman Act because "a parent company and wholly-owned subsidiary have already-converged goals and thus their actions 'must be viewed as that of a single enterprise for purposes of § 1 of the Sherman Act.'" *Jones v. Varsity Brands, LLC*, 618 F. Supp. 3d 713, 722 (W.D. Tenn. 2022) (quoting *Copperweld*).

Accepting that premise, courts across the country have recognized that the underlying logic of *Copperweld*, that corporate affiliates are to be viewed as single economic entity for antitrust purposes, also applies when determining which constituent corporate entities can be held liable for Sherman Act violations. *See City of Mt. Pleasant, Iowa v. Associated Elec. Co-op., Inc.*, 838 F.2d 268, 274-75 (8th Cir. 1988) (observing that "the logic of *Copperweld* reaches beyond its bare result" and "economic reality, not corporate form, should control the decision of whether related entities can conspire").[10] Accepting that premise avoids the "counterintuitive" conclusion that Thoma Bravo proposes the Court reach here: "that a parent can direct and require anticompetitive conduct of its subsidiaries, like any principal directing the conduct of an agent, and then escape antitrust liability by hiding behind its separate" legal status. *Nobody in Particular Presents, Inc. v. Clear Channel Commc'ns, Inc.*, 311 F. Supp. 2d 1048, 1069 (D. Colo. 2004) ("*Nobody in Particular*"); *Lenox MacLaren Surgical Corp. v. Medtronic, Inc.*, 847 F.3d 1221, 1236 (10th Cir. 2017) (holding *Copperweld* "forecloses" a result that would enable a "sophisticated competitor[]" to "spread its anticompetitive scheme over multiple subsidiaries, such that no one entity met all

---

[10] The Sixth Circuit has not explicitly endorsed the single enterprise framework, however nearly all courts that have addressed the application of the *Copperweld* principle have accepted parent liability for a subsidiary's anticompetitive conduct, including *Lenox MacLaren*, which Thoma Bravo cites. *See* TB MTD at 8. And while this Court has not addressed the question, the Western District of Tennessee has adopted this same approach. *Varsity Brands*, 618 F. Supp. 3d. at 722.

the requirements for individual antitrust liability," allowing the single enterprise to violate the Sherman Act "with impunity").

Thus, when determining whether a conspiracy claim is adequately pled against a parent company based on anticompetitive conduct of its subsidiary, a court should examine the conduct of the "economic unit" as a whole and assign liability to any participating or directing corporate entity. *See Arandell Corp. v. Centerpoint Energy Servs., Inc.*, 900 F.3d 623, 630-31 (9th Cir. 2018) (the holding of *Copperweld* "leads inescapably to the corollary conclusion that, for antitrust purposes, it is legally impossible for firms within a single 'economic unit' to act together in furtherance of the same price-fixing scheme for independent and distinct purposes."); *cf. Lenox MacLaren*, 847 F.3d at 1236 (in a Section 2 case, holding that "in a single-enterprise situation, it is the affiliated corporations' collective conduct—i.e., the conduct of the *enterprise* they jointly compose—that matters; it is the *enterprise* which must be shown to satisfy the elements of a monopolization or attempted monopolization claim."); *Freeman v. San Diego Ass'n of Realtors*, 322 F.3d 1133, 1148 (9th Cir. 2003), as amended on denial of reh'g (Apr. 24, 2003) ("[w]here there is substantial common ownership, a fiduciary obligation to act for another entity's economic benefit or an agreement to divide profits and losses, individual firms function as an economic unit and are generally treated as a single entity").

Accordingly, Plaintiffs may adequately state a claim against a single economic entity under the Sherman Act based on that entity's "aggregate conduct," without having to allege each specific constituent piece of the enterprise "independently satisfied each necessary element of the claims." *Lenox MacLaren*, 847 F.3d at 1236.[11]

---

[11] This theory of liability does not require allegations of "veil-piercing, alter ego, or respondeat superior," which "operate independently of the single-enterprise theory." *Lenox MacLaren*, 847

7

### C. Plaintiffs Sufficiently Allege Thoma Bravo Independently Participated in the Anticompetitive Conduct.

As the final step to hold any given corporate entity "liable as part of the enterprise," Plaintiffs must allege that entity "independently participated in the enterprise's scheme." *Lenox MacLaren*, 847 F.3d at 1237; *Varsity Brands*, 618 F. Supp. 3d at 723 (same) (citing *Arandell*).

Plaintiffs are not aware of any court that has adopted a bright-line pleading test for "what must be shown in order to hold a particular affiliated corporation liable as part of an inter-corporate scheme." *Lenox MacLaren*, 847 F.3d at 1239 (leaving that question "for another day").[12] However, courts recognize that the contours of specific affiliates' conduct within a corporate group are often unclear from the outside, and so many courts have adopted a relatively forgiving standard at the motion to dismiss stage, allowing efforts to determine the precise roles each related corporate entity played in a conspiracy to continue through discovery. *See, e.g., In re Lantus Direct Purchaser Antitrust Litig.*, 2021 WL 8016913, at *5 (D. Mass. June 11, 2021) (noting lack of consensus and leaving exact role each corporate entity played in furtherance of anticompetitive scheme to be "resolved following development of the evidence"); *cf. Varsity Brands*, 618 F. Supp. 3d at 725, n.8 (observing that "[d]iscovery may elucidate further facts as to [parents'] direct participation in the scheme, which will be required at later litigation phases," but declining to parse "whether [corporate defendants] share liability as an enterprise for violations or can be held separately and individually liable for any individual anticompetitive conduct" because that inquiry was "not an issue to be determined at the motion to dismiss stage").

---

F.3d at 1237. Accordingly, Thoma Bravo's arguments pointing to the lack of those allegations in the AC, *see* TB MTD at 9-11, are irrelevant.

[12] While no court has offered a bright-line test, many have accepted clear limiting principles. To state a claim for antitrust liability against a parent, it is clear a plaintiff must allege "more than mere ownership." *Varsity Brands*, 618 F. Supp. 3d at 723. At the same time, however, it is equally clear that the parent need not be an actual "seller, competitor, or participant" in the affected market. *Nobody in Particular*, 311 F. Supp. 2d at 1069.

Plaintiffs have adequately alleged that Thoma Bravo was more than a passive owner of RealPage, Inc. First, Thoma Bravo purchased RealPage, Inc. in 2021 for over $10 billion, after which it had the ability to control RealPage, Inc.'s business as it saw fit. ¶ 41. Despite that unfettered right of control, Thoma Bravo allowed RealPage, Inc.'s anticompetitive rent-fixing to continue unabated. *See* ¶¶ 42, 141-53 (describing a post-acquisition 2022 RealPage Yieldstar Manager Training Deck that educates Lessor Defendants on how to train their employees to implement fixed prices); ¶ 10, n.16 (citing RealPage website touting RealPage RMS as capable of helping lessors "outperform the market 3% to 7%," which is publicly available as of July 2023).

Given Plaintiffs' allegations that Thoma Bravo provided "active guidance" and "control[led] the strategic operation" of RealPage, ¶ 42, Plaintiffs are entitled to an inference that RealPage Inc.'s continued participation in the anticompetitive scheme was done with Thoma Bravo's knowledge and blessing. *See In re Packaged Seafood Prod. Antitrust Litig.*, 2022 WL 836951, at *11 (S.D. Cal. Mar. 21, 2022) (plaintiff pled parent's participation in pre-existing conspiracy by alleging parent "ratified and encouraged" subsidiary's continued participation, including "by knowingly setting [subsidiary]'s financial goals at levels which were untenable in the absence of collusion").

Indeed, it is not plausible that Thoma Bravo was ignorant of RealPage Inc.'s role in the conspiracy, either before or after the transaction. Thoma Bravo touts itself as a "leading private equity firm focused on the software and technology-enabled services sectors [w]ith more than $76 billion in assets under management."[13] Plaintiffs are entitled to the inference that a sophisticated boutique software investor like Thoma Bravo would have spent dozens, if not hundreds, of hours

---

[13] *See* Press Release, RealPage, Inc., Thoma Bravo Completes Acquisition of RealPage (Apr. 22, 2021), https://www.realpage.com/news/thoma-bravo-completes-acquisition-of-realpage/ (cited in AC, ¶ 41, n.36).

performing due diligence before purchasing a $10 billion company. Plaintiffs are also entitled to the resulting conclusion that Thoma Bravo either knew or should have known that RealPage: (1) had a monopoly position in the market after RealPage's acquisition of LRO (and indeed, RealPage Inc.'s monopoly profits were likely a driving reason Thoma Bravo purchased RealPage); (2) was using its RMS software to facilitate widespread rent-fixing even prior to the LRO acquisition; and (3) that rents had exploded as a result of RealPage's RMS. Given RealPage and Lessor Defendant executives' public laudings of the effectiveness of RealPage's RMS in raising rents and facilitating cooperation, this conclusion is inescapable. *See, e.g.*, ¶¶ 4, 10, 11, 171-87. And, even if a sophisticated boutique software investor like Thoma Bravo spent $10 billion to purchase RealPage, Inc. without doing proper due diligence, it is even less plausible to conclude that Thoma Bravo did not identify RealPage's role in the conspiracy during Thoma Bravo's multiple years of active ownership.

Second, Plaintiffs point to documents contemporaneous to the acquisition in which both Thoma Bravo and RealPage, Inc. state their intent for Thoma Bravo to be actively involved in RealPage Inc.'s operations post-acquisition. ¶ 43 (speaking of "partnership" and operating "together," with Thoma Bravo bringing "expertise and resources" to "help" and "accelerate" RealPage Inc.'s growth).

Third, against that backdrop of a publicly professed intent to coordinate, Plaintiffs allege that Thoma Bravo, L.P. in fact "controls the strategic operation and investment decisions of [the Thoma Bravo Funds] and the assets [the Funds] own," including RealPage, Inc. ¶ 42. Other courts have found allegations that a parent controls strategic operations and investment decisions of an operating entity within the same economic entity as a favorable fact in determining whether plaintiffs sufficiently alleged the parent's participation in the anticompetitive scheme. *See Varsity*

*Brands*, 618 F. Supp. 3d at 724 (allegations parent was "providing funding" for subsidiary to "enhance, extend, and ensure their monopoly power" and "acquire rivals" showed direct involvement) (cleaned up); *Chandler v. Phoenix Servs.*, 2020 WL 1848047, at *14 (N.D. Tex. Apr. 13, 2020) (independent participation in single economic entity's infringement adequately pled where alleged that parent "controls, dictates or encourages" subsidiary's anticompetitive conduct); *Nobody in Particular*, 311 F. Supp. 2d at 1069 (independent participation by parent adequately pled where alleged it was "directing, controlling, and encouraging a wholly-owned subsidiary's anticompetitive conduct").

Plaintiffs also allege Thoma Bravo was "actively involved in the day-to-day operations of RealPage, including selecting and approving acquisition targets for RealPage, setting company policies, and hiring top RealPage executives from other Thoma Bravo companies, including CEO Dana Jones and COO Vinit Doshi, both of whom were recruited from Thoma Bravo subsidiary Sparta Systems." ¶ 44.[14] These allegations favor finding that Thoma Bravo actively participated in the anticompetitive scheme. *See Varsity Brands*, 618 F. Supp. 3d at 724 (concluding that plaintiffs adequately pled parent company independently participated in the conspiracy by alleging it was "involved in [its subsidiary]'s leadership" during time period spanning anticompetitive conduct).

---

[14] Thoma Bravo draws the Court's attention to the timing of these appointments vis-à-vis Thoma Bravo losing majority ownership of Sparta, *see* TB MTD at 11, n.7, but Plaintiffs have alleged that Thoma Bravo "recruited" and "hired" RealPage Inc.'s CEO and COO from another Thoma Bravo subsidiary. Whether Thoma Bravo exerted sufficient control over Sparta to force Sparta to give up those employees is beside the point—however, whether Thoma Bravo exerted sufficient control to force RealPage to accept those employees is of significance. Moreover, Thoma Bravo is not entitled to introduce its own contradictory factual allegations to assert alternative explanations on a motion to dismiss. *Bates v. Green Farms Condo. Ass'n*, 958 F.3d 470, 483 (6th Cir. 2020) (confirming "black-letter law" that a court evaluating a motion to dismiss "must focus only on the allegations in the pleadings").

Fourth, Plaintiffs allege Thoma Bravo controls RealPage, Inc. by among other things, the fact "Thoma Bravo Operating Partner Charles Goodman" acts as "Chairman of RealPage's board of directors." ¶ 44.[15] Similar allegations have also been credited in finding direct parent participation. *See Varsity Brands*, 618 F. Supp. 3d at 724 (finding plaintiffs plausibly pled parent company participation in single economic entities' infringement by alleging that its staff/executives were "sitting on [subsidiary]'s Board of Directors").

These allegations, when viewed in the aggregate,[16] are sufficient (if proven) to establish the Thoma Bravo Defendants acted independently as part of a single-entity enterprise in furtherance of the anticompetitive scheme described in the AC.

## V. CONCLUSION

For these reasons, the Court should deny Thoma Bravo's Motion to Dismiss.

---

[15] Whether and to what extent the employment status of Thoma Bravo Operating Partners is relevant to Thoma Bravo's control over them, *see* TB MTD at 12, n.8, is a fact issue unsuitable for determination at this stage. As is the manner in which Thoma Bravo exerts control over its "private investment funds" through the "investment advisory services" it provides. TB MTD at 4-5. This is particularly true here as these Defendant-provided "facts" are again drawn from outside the four walls of the complaint. *Green Farms Condo,* 958 F.3d at 483.

[16] *See Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962) (courts must view Sherman Act claim in aggregate, without "dismembering it and viewing its separate parts"); *Erie Cnty., Ohio v. Morton Salt, Inc.*, 702 F.3d 860, 870 (6th Cir. 2012) (same). Thoma Bravo's compartmentalized, alternative fact-laden explanations for each of Plaintiffs' allegations cannot be credited at the Rule 12 stage. Indeed, the case Thoma Bravo cites in support of these alternative explanations, *United States v. Bestfoods*, *see* TB MTD at 11-12, is an environmental cleanup case decided on principles that are not applicable in the antitrust context. *Compare* 524 U.S. 51, 62 (1998) (reciting common law principle of respecting corporate separation, noting that "nothing in CERCLA purports to reject this bedrock principle"), *with Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 166 (2001) (holding that individual employee and corporate employer are separate actors for purposes of RICO, which was not "inconsistent with antitrust law's intracorporate conspiracy doctrine; [as] that doctrine *turns on specific antitrust objectives*") (citing *Copperweld*). Thoma Bravo makes no effort at all to address Plaintiffs' allegations of their involvement in RealPage's anticompetitive conduct in the aggregate.

| Dated: July 24, 2023 | /s/ *Tricia R. Herzfeld* |
|---|---|
| | Tricia R. Herzfeld (#26014) |
| | Anthony A. Orlandi (#33988) |
| | **HERZFELD SUETHOLZ GASTEL LENISKI AND WALL, PLLC** |
| | 223 Rosa L. Parks Avenue, Suite 300 |
| | Nashville, TN 37203 |
| | Telephone: (615) 800-6225 |
| | tricia@hsglawgroup.com |
| | tony@hsglawgroup.com |
| | |
| | *Liaison Counsel* |
| | |
| | Patrick J. Coughlin |
| | Carmen A. Medici |
| | Fatima Brizuela |
| | **SCOTT+SCOTT ATTORNEYS AT LAW LLP** |
| | 600 West Broadway, Suite 3300 |
| | San Diego, CA 92101 |
| | Telephone: (619) 798-5325 |
| | Facsimile: (619) 233-0508 |
| | pcoughlin@scott-scott.com |
| | cmedici@scott-scott.com |
| | fbrizuela@scott-scott.com |
| | |
| | Patrick McGahan |
| | Amanda F. Lawrence |
| | Michael Srodoski |
| | G. Dustin Foster |
| | Isabella DeLisi |
| | **SCOTT+SCOTT ATTORNEYS AT LAW LLP** |
| | 156 South Main Street |
| | P.O. Box 192 |
| | Colchester, CT 06145 |
| | Telephone: (860) 537-5537 |
| | Facsimile: (860) 537-4432 |
| | pmcgahan@scott-scott.com |
| | alawrence@scott-scott.com |
| | msrodoski@scott-scott.com |
| | gfoster@scott-scott.com |
| | idelisi@scott-scott.com |
| | |
| | Stacey Slaughter |
| | Thomas J. Undlin |
| | Geoffrey H. Kozen |
| | Stephanie A. Chen |

13

J. Austin Hurt
**ROBINS KAPLAN LLP**
800 LaSalle Avenue, Suite 2800
Minneapolis, MN 55402
Telephone: (612) 349-8500
Facsimile: (612) 339-4181
sslaughter@robinskaplan.com
tundlin@robinskaplan.com
gkozen@robinskaplan.com
schen@robinskaplan.com
ahurt@robinskaplan.com

Swathi Bojedla
Mandy Boltax
**HAUSFELD LLP**
888 16th Street, N.W., Suite 300
Washington, DC 20006
Telephone: (202) 540-7200
sbojedla@hausfeld.com
mboltax@hausfeld.com

Gary I. Smith, Jr.
**HAUSFELD LLP**
600 Montgomery Street, Suite 3200
San Francisco, CA 94111
Tel: (415) 633-1908
gsmith@hausfeld.com

Katie R. Beran
**HAUSFELD LLP**
325 Chestnut Street, Suite 900
Philadelphia, PA 19106
Telephone: 1 215 985 3270
kberan@hausfeld.com

*Interim Co-Lead Counsel*

Eric L. Cramer
Michaela L. Wallin
**BERGER MONTAGUE PC**
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Telephone: (215) 875-3000
ecramer@bm.net
mwallin@bm.net

Daniel J. Walker
**BERGER MONTAGUE PC**
2001 Pennsylvania Avenue, NW, Suite 300
Washington, DC 20006
Telephone: (202) 559-9745
dwalker@bm.net

Brendan P. Glackin
Dean M. Harvey
**LIEFF CABRASER HEIMANN & BERNSTEIN, LLP**
275 Battery Street, Suite 2900
San Francisco, CA 94111
Telephone: 415-956-1000
bglackin@lchb.com
dharvey@lchb.com

Mark P. Chalos
Hannah R. Lazarz
Kenneth S. Byrd
**LIEFF CABRASER HEIMANN & BERNSTEIN, LLP**
222 2nd Avenue South, Ste. 1640
Nashville, TN 37201
(615) 313-9000
mchalos@lchb.com
hlazarz@lchb.com
kbyrd@lchb.com

Steve W. Berman
Breanna Van Engelen
**HAGENS BERMAN SOBOL SHAPIRO LLP**
1301 Second Avenue, Suite 2000
Seattle, Washington 98101
Telephone: (206) 623-7292

Christian P. Levis
Vincent Briganti
Peter Demato
Radhika Gupta
**LOWEY DANNENBERG, P.C.**
44 South Broadway, Suite 1100
White Plains, NY 10601
Telephone: (914) 997-0500
Facsimile: (914) 997-0035
vbriganti@lowey.com
clevis@lowey.com
pdemato@lowey.com
rgupta@lowey.com

Christopher M. Burke
Walter W. Noss
Yifan (Kate) Lv
**KOREIN TILLERY P.C.**
707 Broadway, Suite 1410
San Diego, CA 92101
Telephone: (619) 625-5621
Facsimile (314) 241-3525
cburke@koreintillery.com
wnoss@koreintillery.com
klv@koreintillery.com

**JOSEPH SAVERI LAW FIRM, LLP**
Joseph R. Saveri
Steven N. Williams
Cadio Zirpoli
Kevin E. Rayhill
601 California Street, Suite 1000
San Francisco, CA 94108
Telephone: (415) 500-6800
jsaveri@saverilawfirm.com
swilliams@saverilawfirm.com
czirpoli@saverilawfirm.com
krayhill@saverilawfirm.com

Jennifer W. Sprengel
Daniel O. Herrera
Alexander Sweatman
**CAFFERTY CLOBES MERIWETHER & SPRENGEL LLP**
135 S. LaSalle, Suite 3210
Chicago, IL 60603

Facsimile: (206) 623-0594
steve@hbsslaw.com
breannav@hbsslaw.com

Benjamin J. Widlanski
Javier A. Lopez
**KOZYAK TROPIN &
THROCKMORTON LLP**
2525 Ponce de Leon Blvd., 9th Floor
Coral Gables, Florida 33134
Telephone: (305) 372-1800
bwidlanski@kttlaw.com
jal@kttlaw.com

Telephone: 312-782-4880
Facsimile: 312-782-4485
jsprengel@caffertyclobes.com
dherrera@caffertyclobes.com
asweatman@caffertyclobes.com

*Plaintiffs' Steering Committee Counsel for Plaintiffs*

# CERTIFICATE OF SERVICE

I hereby certify that on July 24, 2023, I caused the foregoing to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the email addresses denoted on the Electronic Mail Notice List.

*/s/ Tricia R. Herzfeld*
Tricia R. Herzfeld

17