| | |
|---|---|
| IN RE: REALPAGE, INC., RENTAL SOFTWARE ANTITRUST LITIGATION (NO. II) | Case No. 3:23-md-3071<br>MDL No. 3071<br><br>This Document Relates to:<br>3:23-cv-00742<br>3:23-cv-00979 |

**DEFENDANT APARTMENT INCOME REIT CORP.'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF ITS MOTION TO DISMISS**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................................... ii

INTRODUCTION ........................................................................................................................ 1

CONFERRAL ............................................................................................................................... 1

BACKGROUND .......................................................................................................................... 2

I. Plaintiffs' Alleged Conspiracy .......................................................................................... 2

II. Summary of Plaintiffs' Allegations against AIR ............................................................. 5

LEGAL STANDARD ................................................................................................................... 5

ARGUMENT ................................................................................................................................ 7

CONCLUSION ............................................................................................................................. 9

# TABLE OF AUTHORITIES

**OTHER AUTHORITIES**

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) ............................................................................................ 5, 6, 8

*In re Processed Egg Prods. Antitrust Litig.*,
    821 F. Supp. 2d 709 (E.D. Pa. 2011) ....................................................................... 6

*In re Travel Agent Comm'n Antitrust Litig.*,
    583 F.3d 896 (6th Cir. 2009) ............................................................................ 6, 7, 9

*Jung v. Ass'n of Am. Med. Colls.*,
    300 F. Supp. 2d 119 (D.D.C. 2004) ......................................................................... 6

*Koshani v. Barton*,
    No. 3:17-CV-265, 2018 WL 3150345
    (E.D. Tenn. June 27, 2018) ...................................................................................... 5

*Mich. Div.-Monument Builders of N. Am. v. Mich. Cemetery Ass'n*,
    458 F. Supp. 2d 474 (E.D. Mich. 2006) ................................................................... 6

*Monsanto Co. v. Spray-Rite Serv. Corp.*,
    465 U.S. 752 (1984) .............................................................................................. 6, 9

*Trs. of Detroit Carpenters Fringe Benefit Funds v. Patrie Const. Co.*,
    618 F. App'x 246 (6th Cir. 2015) ............................................................................. 5

# INTRODUCTION

Apartment Income REIT Corp. d/b/a Air Communities ("AIR") joins Defendants' Joint Motion to Dismiss and urges the Court to dismiss Plaintiffs' claims for the reasons stated therein. But Plaintiffs' claims against AIR fail for another, independent reason: the central premise of their conspiracy claim—that each Defendant agreed to share its confidential, competitively sensitive information with its competitors by using RealPage's Revenue Management Software ("RMS")—does not apply to AIR, and so Plaintiffs have withdrawn that allegation as to AIR. The elimination of that central allegation as to AIR further confirms that Plaintiffs' claims against AIR cannot stand.

The few remaining allegations <u>pertaining to AIR</u> in Plaintiffs' Second Amended Complaint do not come close to supporting antitrust conspiracy claims against AIR. Setting aside conclusory assertions, Plaintiffs' allegations about AIR are only that: AIR contracted with RealPage to use its RMS; the rental prices AIR charged tenants for one-bedroom units in certain regional markets were generally consistent with its competitors' prices (i.e., purported parallel pricing); and AIR attended unspecified trade industry events. (*See* Background § II, *supra*.) These thin allegations, standing alone, are legally insufficient to state a plausible conspiracy claim against AIR.

# CONFERRAL

Plaintiffs oppose the relief sought in this motion. In conferral with Plaintiffs' counsel, AIR requested that Plaintiffs correct the Second Amended Complaint by deleting the following allegations from Paragraph 68, highlighted in gray:

> During the Conspiracy Period, Defendant AIR entered a written contract, paid for, and used at least one RealPage RMS—YieldStar—to manage some or all of its more than 25,000 multifamily rental units nationwide, knowing that doing so required it to share confidential, competitively sensitive pricing and lease information with its horizontal competitors in order to allow them to adjust their

rental prices, and in turn, to allow AIR to benefit from its horizontal competitors' sensitive pricing and lease information before it set or adjusted its own rental prices. By agreeing to regularly share confidential, competitively sensitive pricing and lease information with horizontal competitors in order to allow them to adjust prices, AIR agreed to join a cartel with those horizontal competitors. The conspiracy resulted in higher prices for multifamily residential leases across the nation and in each submarket in which AIR operates. AIR would not have paid for RealPage's RMS pricing services unless: (1) doing so enabled it to set prices above a competitive level; and (2) it knew its competitors were, likewise, using RealPage RMS to set their rental prices in the submarkets in which it operated.

(Second Am. Consol. Class Action Compl. ("Second Am. Compl.") ¶ 68, ECF No. 530.) After further conferral, Plaintiffs "agree[d] to withdraw"—without amending—"portions of the allegations in paragraph 68 of the Second Amended Consolidated Class Action Complaint that indicate that AIR Communities was contractually required to share confidential, competitively sensitive pricing and lease information with its horizontal competitors in order to allow them to adjust their rental prices." While Plaintiffs have not taken any formal action with the Court to withdraw these allegations, Plaintiffs agreed in conferral that AIR is "free to represent that fact to the Court, including during motion to dismiss briefing."

## BACKGROUND

### I.  Plaintiffs' Alleged Conspiracy

Plaintiffs allege a sweeping, nationwide conspiracy based on Defendants' use of RealPage's RMS. Plaintiffs theorize that, by using RealPage's RMS, each Defendant joined the conspiracy by agreeing to the following three "overarching principles of the cartel":

> (1) all members . . . would *share the proprietary data* necessary for RealPage's RMS to generate rental price recommendations; (2) all members would delegate their rental price and supply decisions to a common decision maker, RealPage; and (3) . . . all members would abide by RealPage's price and supply decisions generated by RMS.

Second Am. Compl. ¶ 6 (emphasis added); *accord* First Am. Consol. Class Action Compl. ("First Am. Compl.") ¶ 3, ECF No. 314.) Those allegations form the crux of the alleged conspiracy.

Plaintiffs' First Amended Complaint contained few factual allegations to support this theory, and no meaningful allegations directly related to AIR. The First Amended Complaint all but ignored the vast majority of Defendants, including AIR, alleging only the location of their headquarters, vague statements about the number and location of their rental units, and their use of an unidentified revenue management product offered by RealPage to manage an unspecified portion of the units. (*See* Defs.' Mem. of Law in Supp. of Mot. to Dismiss Multifamily Pls.' First Am. Consol. Class Action Compl. at 3−6, 10−13, ECF No. 341.) For the most part, that complaint relied on generic pleading about "Lessor Defendants" as a group, with little to no differentiation among them. (*Id.*)

After complete briefing on Defendants' motions to dismiss demonstrated the legal deficiency of Plaintiffs' generic, group pleading approach, Plaintiffs chose to amend their complaint, ostensibly to add more detailed factual allegations—though it still largely ignores AIR. Plaintiffs' Second Amended Complaint reasserts the same basic conspiracy claim based on the reciprocal sharing of confidential information among competitors:

> 5. Use of RealPage's RMS was conditioned on contributing non-public, competitively sensitive data to RealPage's data pool. That was the bargain on offer—to access this price-setting tool that promised revenue growth even in a down market, every member (including the Owners, Owner-Operators, and Managing Defendants) agreed to participate in the data co-operative and price their multifamily rental units according to RealPage's RMS. . . .
>
> 6. By using RealPage's RMS, each Owner, Owner-Operator, and Managing Defendant[] agreed with the overarching principles of the cartel: that (1) all members, who were otherwise horizontal competitors, would share the proprietary data necessary for RealPage's RMS to generate rental price recommendations; (2) all members would delegate their rental price and supply decisions to a common decision maker, RealPage; and (3) knowing that

3

cooperation was essential to the successful operation of the scheme, all members
would abide by RealPage's price and supply decisions generated by RMS.

(Second Am. Compl. ¶¶ 5−6.)

In addition, Plaintiffs uniformly allege, still without any specificity, that each Operator, Owner-Operator, and Managing Defendant "agreed to join the cartel" by contracting with RealPage. (*See id.* ¶¶ 68−193.) Plaintiffs theorize that each Defendant supposedly knew that by contracting with RealPage, it would be "required to share confidential, competitively sensitive pricing and lease information with its horizontal competitors in order to" allow RealPage to generate price recommendations for both AIR and its competitors—<u>an allegation Plaintiffs have "agree[d] to withdraw" as to AIR</u>. (*Id.*) Plaintiffs also uniformly allege that each Owner, Owner-Operator, and Managing Defendant would not have contracted with RealPage to use its RMS "unless" it knew that doing so would allow "it to set prices above a competitive level" and that "its competitors, likewise, were using RealPage to set their rental prices." (*Id.*)

Despite the central premise of their alleged conspiracy, as set forth in paragraphs 5 and 6 of their Second Amended Complaint, Plaintiffs acknowledge that entities may contract with RealPage and use its RMS without agreeing to share competitively sensitive information. (Second Am. Compl. ¶¶ 219−20 (alleging that AvalonBay's contract with RealPage precluded RealPage from sharing AvalonBay's competitively sensitive information).) Plaintiffs also recognize that an entity can use RealPage's RMS without involvement of a RealPage Pricing Advisor or even regular acceptance of RealPage's pricing recommendations and, thus, without "delegating" its pricing decisions to RealPage. (*See id.* ¶ 286 (recognizing an entity may have "a low acceptance rate of RealPage's pricing recommendations"); *id.* ¶ 17 (alleging that "Pricing Advisors are used for approximately 60% of all units using RealPage's RMS").)

4

## II. Summary of Plaintiffs' Allegations against AIR

Following the filing of the Second Amended Complaint, Plaintiffs agreed to withdraw their core allegations against AIR in Paragraph 68, leaving few factual allegations specifically concerning AIR. Aside from identifying the location of AIR's headquarters and the regional "submarkets" in which it operates (Second Am. Compl. ¶ 67), Plaintiffs allege the following about AIR:

- AIR contracted with RealPage to use YieldStar "for some or all of its more than 25,000 multifamily rental units nationwide." (Second Am. Compl. ¶ 68.)

- AIR would not have contracted with RealPage "unless" use of RealPage's RMS "enabled it to set prices above a competitive level" and "it knew its competitors were, likewise, using RealPage RMS to set their rental prices." (*Id.*)

- The average price of AIR's units in certain regional submarkets during the conspiracy period is consistent with that of other Defendants, purportedly showing "coordinated price increases" by Defendants in these regions. (*Id.* ¶¶ 337−49.)

- AIR attended unspecified events hosted by the National Multifamily Housing Council. (*Id.* ¶ 386.)

Plaintiffs' Second Amended Complaint contains no other material allegations pertaining specifically to AIR.[1]

## LEGAL STANDARD

To survive a motion to dismiss, Plaintiffs must plead sufficient facts to suggest the formation of an unlawful conspiracy was plausible, not merely possible. *Bell Atl. Corp. v.*

---

[1] To the extent Plaintiffs attempt to recharacterize their conspiracy theory and insert new or modified allegations against AIR that extend beyond the current allegations in the Second Amended Complaint, such unpled allegations cannot be considered in ruling on AIR's motion to dismiss. *See, e.g.*, *Trs. of Detroit Carpenters Fringe Benefit Funds v. Patrie Const. Co.*, 618 F. App'x 246, 255 (6th Cir. 2015) ("In considering a Rule 12(b)(6) motion, a district court cannot consider matters beyond the complaint."); *Koshani v. Barton*, No. 3:17-CV-265, 2018 WL 3150345, at *3 n. 2 (E.D. Tenn. June 27, 2018) ("On a Rule 12(b)(6) motion to dismiss, the Court normally has to confine its analysis to the allegations within the four corners of the complaint.").

*Twombly*, 550 U.S. 544, 555−56, 570 (2007); *In re Travel Agent Comm'n Antitrust Litig.*, 583 F.3d 896, 902−03 (6th Cir. 2009). That, in turn, requires sufficient facts to raise plausible grounds for inferring that Defendants had a "conscious commitment" to an allegedly unlawful agreement—here, an agreement to fix rental prices. *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 768 (1984); *see also Twombly*, 550 U.S. at 554 (recognizing that "the crucial question" in assessing § 1 claims "is whether the challenged anticompetitive conduct stems from independent decision or from an agreement" (internal quotation marks and alterations omitted)). Alleged conduct that, while consistent with a conspiracy, is equally compatible with independent and economically-rational free-market behavior is not sufficient to allege a plausible conspiracy. *See Travel Agent*, 583 F.3d at 903−04 (discussing *Twombly*). A complaint based on "allegations of parallel conduct and bare assertions of conspiracy" does not "support a plausible § 1 claim" and must be dismissed. *Travel Agent*, 583 F.3d at 902−03 (citing *Twombly*, 550 U.S. at 556).

This well-established standard applies equally to individual defendants, meaning Plaintiffs must plead enough factual matter to plausibly suggest that <u>each</u> individual defendant joined the alleged conspiracy. *See Travel Agent*, 583 F.3d at 905−06 (affirming dismissal of conspiracy claims against certain defendants when the complaint lacked factual allegations "specify[ing] how these defendants are involved in the alleged conspiracy").[2] "Plaintiffs cannot escape [this] burden . . . by using the term 'defendants' to apply to numerous parties without any specific allegations as to any individual . . . defendant." *Mich. Div.-Monument Builders of N. Am.*

---

[2] *See also, e.g.*, *In re Processed Egg Prods. Antitrust Litig.*, 821 F. Supp. 2d 709, 719 (E.D. Pa. 2011) ("To provide reasonable notice to a specific defendant of the claim(s) against it, a complaint must plausibly suggest that the individual defendant actually joined and participated in the conspiracy."); *Jung v. Ass'n of Am. Med. Colls.*, 300 F. Supp. 2d 119, 164 (D.D.C. 2004) ("Although the Court must consider defendants' motions to dismiss in the context of the larger conspiracy, . . . plaintiffs are not relieved from alleging that each individual defendant joined the conspiracy and played some role in it.").

*v. Mich. Cemetery Ass'n*, 458 F. Supp. 2d 474, 485 (E.D. Mich. 2006) (dismissing antitrust conspiracy claims); *accord Travel Agent*, 583 F.3d at 905 ("[P]laintiffs' reliance on these indeterminate assertions [regarding "defendants" or "defendants' executives"] is misplaced because they represent precisely the type of naked conspiratorial allegations rejected by the Supreme Court in *Twombly*."). If a complaint fails to sufficiently allege that a particular defendant joined and participated in the alleged conspiracy, then the claim must be dismissed as to that defendant.

## ARGUMENT

Plaintiffs' Second Amended Complaint fails to plead any plausible grounds for inferring that AIR joined any alleged price-fixing conspiracy. As alleged by Plaintiffs, the three "overarching principles of the cartel" are that Defendants agreed to: (1) share their confidential, competitively sensitive information with each other (which allegation Plaintiffs have agreed to withdraw as to AIR); (2) delegate decision-making authority concerning rental prices to RealPage (which Plaintiffs do not specifically plead as to AIR); and (3) abide by RealPage's price recommendations (which Plaintiffs do not specifically plead as to AIR). (Second Am. Compl. ¶¶ 5-6.) In fact, Plaintiffs' factual allegations regarding AIR do not come close to supporting these conclusory assertions.

To begin, the Court may disregard Plaintiffs' generic allegation that each Owner, Owner-Operator, and Managing Defendant agreed to share its confidential information with competitors simply by contracting with RealPage; Plaintiffs have withdrawn this allegation as to AIR.

Setting aside the withdrawn allegation, Plaintiffs refer to AIR in 14 of the Second Amended Complaint's 750-plus paragraphs. Of those 14 paragraphs:

- one consists of a single factual allegation (i.e., that AIR contracted with RealPage to use YieldStar), coupled with the speculative, boilerplate assertion that AIR would not have used RealPage's RMS "unless" its use allowed AIR to set supra-competitive

7

- prices and that its competitors were also using RealPage's RMS—which assertions Plaintiffs levy verbatim against all other Owner, Owner-Operator, and Managing Defendants (*id.* ¶ 68);

- two allege only the location of AIR's headquarters, the cities in which it operates, and that it attended unspecified industry events hosted by a single trade association (*id.* ¶ 67, 386); and

- eleven amount only to vague allegations of purported parallel pricing in certain regional markets, based on the average price AIR charged for a one-bedroom apartment (Second Am. Compl. ¶¶ 339−49; *see also id.* ¶¶ 337−38).

Those allegations, whether standing alone or together, are legally insufficient to support Plaintiffs' conspiracy claims against AIR.

Plaintiffs' assertion that AIR would not have contracted to use YieldStar "unless" it knew RealPage's RMS would yield supra-competitive prices and that its competitors were also using RMS is conclusory (Second Am. Compl. ¶ 68), and the same boilerplate allegation is lodged against each Owner, Owner-Operator, and Managing Defendant (*see id.* ¶¶ 68−193). Plaintiffs cannot avoid the deficiencies in their group pleading approach by just replacing generic allegations about "Defendants," as a group, with equally conclusory allegations about a specific Defendant.

The only factual allegations Plaintiffs offer to show AIR's participation in the alleged conspiracy are that (1) AIR contracted with RealPage to use YieldStar (*id.* ¶ 68), (2) AIR attended unspecified industry events (*id.* ¶ 386), and (3) the average price of AIR's one-bedroom units was purportedly consistent with that of its competitors in certain regional markets (*id.* ¶¶ 339−49). These allegations are not enough to "nudge[] their claims [against AIR] across the line from conceivable to plausible" because all allege conduct that is equally consistent, if not more so, with independent and economically rational decision-making as it is with Plaintiffs' conspiracy claim. *Twombly*, 583 F.3d at 570. Indeed, courts have repeatedly recognized that attending industry events and generally consistent pricing are just that—lawful conduct that is

8

more readily explained by unilateral, free-market behavior. *See Travel Agent*, 583 F.3d at 911 ("[A] mere opportunity to conspire does not, standing alone, plausibly suggest an illegal agreement because [defendants'] presence at such trade meetings is more likely explained by their lawful, free-market behavior."); *id.* at 908, 910 (explaining that parallel pricing behavior is easily explained by "reasonable, independent economic interest" and unilateral decision-making). And Plaintiffs' own allegations demonstrate that contracting with RealPage is itself economically rational, even in the absence of a conspiracy. Plaintiffs, for instance, admit that at least some Defendants began using RealPage RMS products before the conspiracy allegedly began. (Second Am. Compl. ¶ 235 n.137.)

Equally important, none of Plaintiffs' allegations even hint at an agreement by AIR to share confidential information with competitors, to delegate pricing and supply decisions to RealPage, or to abide by RealPage's recommendations. To the contrary, Plaintiffs acknowledge that (1) not all RealPage customers agreed to share their confidential information (*see* Second Am. Compl. ¶¶ 219−20 (regarding AvalonBay)) or to use RealPage Pricing Advisors to delegate pricing to RealPage (*id.* ¶ 17) and (2) RealPage customers may have "low acceptance rate[s]" or "high variance rate[s]" when it comes to RealPage's price recommendations (*id.* ¶ 286).

Accordingly, the dearth of operative factual allegations applicable to AIR, specifically, is fatal to Plaintiffs' ability to state a plausible conspiracy claim against AIR. The few facts Plaintiffs actually allege about AIR suggest no "conscious commitment" to the alleged agreement to fix prices. *Monsanto*, 465 U.S. at 768. Plaintiffs' conspiracy claims against AIR should be dismissed.

## CONCLUSION

For the reasons stated herein and in Defendants' Joint Motion to Dismiss, AIR respectfully requests that the Court dismiss all claims asserted against it.

Dated: October 9, 2023						Respectfully submitted,

						*/s/ Kathryn A. Reilly*
						Kathryn A. Reilly
						Michael T. Williams
						Judith P. Youngman
						Wheeler Trigg O'Donnell LLP
						370 Seventeenth Street, Suite 4500
						Denver, CO 80202
						Telephone: 303.244.1800
						Facsimile: 303.244.1879
						Email: reilly@wtotrial.com
						      williams@wtotrial.com
						      youngman@wtotrial.com

						And

						Mark Bell
						Holland & Knight LLP
						511 Union Street, Suite 2700
						Nashville, Tennessee 37219
						Telephone: 615.244.6380
						Email: mark.bell@hklaw.com

						Attorneys for Apartment Income REIT Corp.
						d/b/a AIR Communities

# CERTIFICATE OF SERVICE (CM/ECF)

I HEREBY CERTIFY that on October 9, 2023, I electronically filed the foregoing **DEFENDANT APARTMENT INCOME REIT CORP.'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF ITS MOTION TO DISMISS** with the Clerk of Court using the CM/ECF system which will send notification of such filing to all counsel of record:

                                                      *s/ Claudia L. Jones for Kathryn A. Reilly*