# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | |
|---|---|
| IN RE: REALPAGE, INC., RENTAL SOFTWARE ANTITRUST LITIGATION (NO. II) | Case No. 3:23-MD-3071<br>MDL No. 3071<br><br>This Document Relates to:<br>3:23-cv-00757 (M.D. Tenn.)<br>3:23-cv-00792 (M.D. Tenn.)<br><br>Chief Judge Waverly D. Crenshaw, Jr. |

## DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF
## MOTION TO DISMISS STUDENT PLAINTIFFS' FIRST AMENDED CONSOLIDATED
## CLASS ACTION COMPLAINT

# TABLE OF CONTENTS

Page

I.    INTRODUCTION ................................................................................ 1

II.   SUMMARY OF PLAINTIFFS' ALLEGATIONS ................................ 3

    A.   RealPage Revenue Management Products............................................ 3

    B.   The Alleged Conspiracy ...................................................................... 4

III.  LEGAL STANDARD........................................................................... 5

IV.   ARGUMENT........................................................................................ 7

    A.   Plaintiffs Do Not Plausibly Allege a *Per Se* Illegal Agreement, or Any Horizontal Agreement, Between Student Lessors ................................. 7

        i.    Plaintiffs' Group Pleading Is Improper and Insufficient ......................... 7

        ii.   Plaintiffs Allege No Plausible Direct Evidence or Circumstantial Evidence Of Conspiracy ....................................................................... 11

            a)   Plaintiffs Do Not Allege "Parallel Conduct" ............................... 12

            b)   Plaintiffs' Alleged Plus Factors Do Not Support an Inference Of Conspiracy ..................................................................... 14

        iii.  Plaintiffs' Allegations That RealPage Facilitated and Enforced The Horizontal Conspiracy Also Fail .................................................... 20

        iv.   The Alleged Conspiracy Is Implausible On Its Face .............................. 22

    B.   Plaintiffs Fail to State A Claim Under The Rule Of Reason ............................... 23

        i.    The Rule Of Reason Applies To Plaintiffs' Section 1 Claims................. 23

        ii.   Plaintiffs Do Not Plead Plausible Relevant Markets .............................. 25

        iii.  Plaintiffs Have Not Pleaded Anticompetitive Effects ............................ 27

            a)   Plaintiffs Do Not Allege Direct Evidence Of Effects................. 27

            b)   Plaintiffs Do Not Allege Indirect Evidence Of Effects .............. 29

    C.   Plaintiffs Do Not Have Antitrust Standing ......................................... 31

    D.   Plaintiffs' State-Law Claims Fail........................................................ 32

    E.   Because Plaintiffs Do Not Plead Fraudulent Concealment With Particularity, They Cannot Assert Claims For Damages That Allegedly Accrued More Than Four Years Before They Filed Their Action ..................... 35

        i.    Plaintiffs Do Not Plead Any Affirmative Acts Of Concealment............ 36

        ii.   Plaintiffs Do Not Plead Ignorance Of The Operative Facts ................... 37

        iii.  Plaintiffs Do Not Plead Due Diligence. ................................................. 38

V.    CONCLUSION................................................................................... 39

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*42nd Parallel N. v. E Street Denim Co.*,
    286 F.3d 401 (7th Cir. 2002) ........................................................................ 28

*Abbott Labs v. Durrett*,
    746 So.2d 316 (Ala. 1999) ............................................................................ 33

*Aladdins Lights Inc. v. Eye Lighting Int'l*,
    96 N.E.3d 864 (Ohio Ct. App. 2017) ............................................................. 33

*Am. Tobacco Co. v. United States*,
    328 U.S. 781 (1946) ...................................................................................... 17

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ........................................................................................ 6

*Assoc. Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*,
    459 U.S. 519 (1983) ...................................................................................... 32

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) ................................................................................ passim

*Bennett v. Visa U.S.A. Inc.*,
    198 S.W.3d 747 (Tenn. Ct. App. 2006) ........................................................ 33

*Blewett v. Abbott Labs*,
    938 P.2d 842 (Wash Ct. App. 1997) .............................................................. 33

*Brunson Commc'ns, Inc. v. Arbitron, Inc.*,
    239 F. Supp. 2d 550 (E.D. Pa. 2002) ............................................................ 22

*C.S. Sewell, M.D. P.C. v. Amerigroup Tenn., Inc.*,
    2018 WL 6591429 (M.D. Tenn. Dec. 14, 2018) ........................................... 12

*Cal. Dental Ass'n v. FTC*,
    526 U.S. 756 (1999) ...................................................................................... 25

*Care Heating & Cooling, Inc. v. Am. Standard, Inc.*,
    427 F.3d 1008 (6th Cir. 2005) ....................................................................... 23

*Carrier Corp. v. Outokumpu Oyj*,
    673 F.3d 430 (6th Cir. 2012) .......................................................... 35, 36, 37, 38

*CBC Cos. v. Equifax, Inc.*,
    561 F.3d 569 (6th Cir. 2009) ......................................................................... 32

*Cnty. of Tuolumne v. Sonora Cmty. Hosp.*,
    236 F.3d 1148 (9th Cir. 2001) ....................................................................... 32

*Cole v. Am. Specialty Health Network, Inc.*,
    2015 WL 1734926 (M.D. Tenn. Apr. 16, 2015) ........................................... 29

# TABLE OF AUTHORITIES
(continued)

*Cont'l Cablevision of Ohio, Inc. v. Am. Elec. Power Co.*,
  715 F.2d 1115 (6th Cir. 1983) ............................................................................... 17

*Cupp v. Alberto-Culver USA, Inc.*,
  310 F. Supp. 2d 963 (W.D. Tenn. 2004) ............................................................. 26

*DaimlerChrysler Corp. v. Cuno*,
  547 U.S. 332 (2006) ............................................................................................. 34

*Dayco Corp. v. Goodyear Tire & Rubber Co.*,
  523 F.2d 389 (6th Cir. 1975) ......................................................................... 37, 38

*Deich-Keibler v. Bank One*,
  243 F. App'x 164 (7th Cir. 2007) ........................................................................ 33

*Dickson v. Microsoft Corp.*,
  309 F.3d 193 (4th Cir. 2002) ............................................................................... 31

*Disney Enters., Inc. v. VidAngel, Inc.*,
  2017 WL 6883685 (C.D. Cal. Aug. 10, 2017) .................................................... 30

*Drs. Steuer and Latham, P.A. v. Nat'l Med. Enters., Inc.*,
  672 F. Supp. 1489 (D.S.C. 1987) ........................................................................ 33

*E.I. DuPont de Nemours & Co. v. Kolon Indus., Inc.*,
  688 F. Supp. 2d 443 (E.D. Va. 2009) .................................................................. 26

*E.T. Barwick Indus., Inc. v. Walter E. Heller & Co.*,
  692 F. Supp. 1331 (N.D. Ga. 1987) ............................................................... 33, 35

*Erie Cnty. v. Morton Salt, Inc.*,
  702 F.3d 860 (6th Cir. 2012) ......................................................................... 20, 22

*Expert Masonry, Inc. v. Boone Cnty.*,
  440 F.3d 336 (6th Cir. 2006) ............................................................................... 24

*Felder's Collision Parts, Inc v. All Star Advantage Agency, Inc.*,
  777 F.3d 756 (5th Cir. 2015) ............................................................................... 33

*Finley v. Kelly*,
  384 F. Supp. 3d 898 (M.D. Tenn. 2019) ................................................................ 4

*Found. for Interior Design Educ. Rsch. v. Savannah Coll. of Art & Design*,
  73 F. Supp. 2d 829 (W.D. Mich. 1999) ............................................................... 30

*Fox v. Saginaw County*,
  67 F.4th 284 (6th Cir. 2023) ............................................................................... 34

*Goff v. Nationwide Mut. Ins. Co.*,
  2019 WL 7604826 (S.D. Ohio Sept. 30, 2019) ................................................... 39

*Gold Medal LLC v. USA Track & Field*,
   187 F. Supp. 3d 1219 (D. Or. 2016) ...................................................................... 30

*Hobart-Mayfield, Inc. v. Nat'l Operating Comm. On Standard for Athletic Equip.*,
   535 F. Supp. 3d 638 (E.D. Mich. 2021)................................................................ 8, 12

*Hobart-Mayfield, Inc. v. Nat'l Operating Comm. on Standards for Athletic Equip.*,
   48 F.4th 656 (6th Cir. 2022) ..................................................................... 6, 7, 15, 16

*Hogan v. Pilgrim's Pride Corp.*,
   2018 WL 1316979 (D. Colo. Mar. 14, 2018) ........................................................ 13

*Hoover v. Langstron Equip. Assocs., Inc.*,
   958 F.2d 742 (6th Cir. 1992) ................................................................................ 37

*Hyland v. HomeServices of Am., Inc.*,
   771 F.3d 310 (6th Cir. 2014) .......................................................................... 11, 16

*In re Amazon.com, Inc. eBook Antitrust Litig.*,
   2023 WL 6006525 (S.D.N.Y. July 31, 2023) ....................................................... 31

*In re Cedar Shakes and Shingles Antitrust Litig.*,
   2020 WL 832324 (W.D. Wash. Feb. 20, 2020) .................................................... 14

*In re Dairy Farmers of Am., Inc. Cheese Antitrust Litig.*,
   2015 WL 3988488 (N.D. Ill. June 29, 2015) ........................................................ 33

*In re Dynamic Random Access Memory (DRAM) Indirect Purchaser Antitrust Litig.*,
   28 F.4th 42 (9th Cir. 2022) ..................................................................... 15, 17, 20

*In re Elec. Books Antitrust Litig.*,
   2014 WL 2535112 (S.D.N.Y. June 5, 2014) ........................................................ 33

*In re GSE Bonds Antitrust Litig.*,
   396 F. Supp. 3d 354 (S.D.N.Y. 2019) .................................................................. 28

*In re ICE LIBOR Antitrust Litig.*,
   2020 WL 1467354 (S.D.N.Y. Mar. 26, 2020) ...................................................... 17

*In re Ins. Brokerage Antitrust Litig.*,
   618 F.3d 300 (3d Cir. 2010) ....................................................................... 10, 11, 19

*In re Int. Rate Swaps Antitrust Litig.*,
   261 F. Supp. 3d 430 (S.D.N.Y. 2017) ............................................................ 33, 38

*In re K-Dur Antitrust Litig.*,
   2008 WL 2660780 (D.N.J. Feb. 28, 2008) ........................................................... 33

*In re Local TV Advertising Antitrust Litigation*,
   2022 WL 3716202 (N.D. Ill. Aug. 29, 2022) ....................................................... 18

iv

*In re Musical Instruments & Equip. Antitrust Litig.*,
   798 F.3d 1186 (9th Cir. 2015) ................................................................. 12, 16, 17, 19

*In re Niaspan Antitrust Litig.*,
   42 F. Supp. 3d 735 (E.D. Pa. 2014) ................................................................. 34

*In re Omnicare, Inc. Sec. Litig.*,
   769 F.3d 455 (6th Cir. 2014) ................................................................. 4

*In re Online Travel Co. (OTC) Hotel Booking Antitrust Litig.*,
   997 F. Supp. 2d 526 (N.D. Tex. 2014) ................................................................. 16

*In re Processed Egg Prods. Antitrust Litig.*,
   2012 WL 6645533 (E.D. Pa. Dec. 20, 2012) ................................................................. 36

*In re Refrigerant Compressors Antitrust Litig.*,
   795 F. Supp. 2d 647 (E.D. Mich. 2011) ................................................................. 36

*In re Se. Milk Antitrust Litig.*,
   739 F.3d 262 (6th Cir. 2014) ................................................................. 23, 24

*In re Sulfuric Acid Antitrust Litig.*,
   703 F.3d 1004 (7th Cir. 2012) ................................................................. 24

*In re Travel Agent Comm'n Antitrust Litig.*,
   2007 WL 3171675 (N.D. Ohio Oct. 29, 2007) ................................................................. 15, 17

*In re Travel Agent Comm'n Antitrust Litig.*,
   583 F.3d 896 (6th Cir. 2009) ................................................................. passim

*In re: EpiPen (Epinephrine Injection, USP) Mktg., Sales Pracs. & Antitrust Litig.*,
   336 F. Supp. 3d 1256 (D. Kan. 2018) ................................................................. 34

*Interstate Circuit, Inc. v. United States*,
   306 U.S. 208 (1939) ................................................................. 9, 10, 11, 12

*Island Tobacco Co. v. R. J. Reynolds Indus., Inc.*,
   513 F. Supp. 726 (D. Haw. 1981) ................................................................. 33

*Jones v. Varsity Brands, LLC*,
   618 F. Supp. 3d 725 (W.D. Tenn. 2022) ................................................................. 33

*Kendall v. Visa U.S.A., Inc.*,
   518 F.3d 1042 (9th Cir. 2008) ................................................................. 8

*Kleen Prods. LLC v. Int'l Paper*,
   276 F. Supp. 3d 811 (N.D. Ill. 2017) ................................................................. 20

*Krause Marine Towing Corp. v. Ass'n of Md. Pilots*,
   44 A.3d 1043 (Md. 2012) ................................................................. 33

*Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*,
 551 U.S. 877 (2007)....................................................................................... 23

*Lewis v. Casey*,
 518 U.S. 343 (1996)....................................................................................... 34

*Lifeline Ltd. No. II v. Conn. Gen. Life Ins. Co.*,
 821 F. Supp. 1201 (E.D. Mich. 1993)........................................................... 22

*Llacua v. W. Range Ass'n*,
 930 F.3d 1161 (10th Cir. 2019) ..................................................................... 20

*Lorix v. Crompton Corp.*,
 736 N.W.2d 619 (Minn. 2007) ...................................................................... 33

*Maris Distrib. Co. v. Anheuser-Busch, Inc.*,
 302 F.3d 1207 (11th Cir. 2002) ..................................................................... 31

*Med. Ctr at Elizabeth Place, LLC v. Atrium Health Sys.*,
 922 F.3d 713 (6th Cir. 2019) ......................................................................... 24

*Mich. Div.-Monument Builders of N. Am. v. Mich. Cemetery Ass'n*,
 524 F.3d 726 (6th Cir. 2008) ................................................................... 25, 29

*Midwest Auto Auction, Inc. v. McNeal*,
 2012 WL 3478647 (E.D. Mich. Aug. 14, 2012)............................................ 16

*Mosaic Health Inc. v. Sanofi-Aventis U.S., LLC*,
 2022 WL 4017895 (W.D.N.Y. Sep. 2, 2022) ................................................ 13

*NAACP v. Claiborne Hardware Co.*,
 393 So.2d 1290 (Miss. 1980)......................................................................... 33

*Nat'l Hockey League Players Ass'n v. Plymouth Whalers Hockey Club*,
 419 F.3d 462 (6th Cir. 2005) ......................................................................... 25

*New Orleans Ass'n of Cemetery Tour Guides & Cos. v. New Orleans Archdiocesan Cemeteries*,
 56 F.4th 1026 (5th Cir. 2023) ........................................................................ 25

*NicSand, Inc. v. 3M Co.*,
 507 F.3d 442 (6th Cir. 2007) ......................................................................... 31

*Odom v. Fairbanks Mem'l Hosp.*,
 999 P.2d 123 (Alaska 2000) .......................................................................... 32

*Ogden v. Little Caesar Enters., Inc.*,
 393 F. Supp. 3d 622 (E.D. Mich. 2019)................................................... 24, 29

*Ohio v. Am. Express Co.*,
 138 S. Ct. 2274 (2018)............................................................................. 27, 28

*Olstad v. Microsoft Corp.*,
700 N.W.2d 139 (Wis. 2005) ............................................................................... 33

*Or. Laborers-Emps. Health & Welfare Tr. Fund v. Philip Morris Inc.*,
185 F.3d 957 (9th Cir. 1999) ............................................................................... 33

*Par v. Wolfe Clinic, P.C.*,
70 F.4th 441 (8th Cir. 2023) ............................................................................... 25

*Park Irmat Drug Corp. v. Express Scripts Holding Co.*,
911 F.3d 505 (8th Cir. 2018) ............................................................................... 12

*Peck v. Gen. Motors Corp.*,
894 F.2d 844 (6th Cir. 1990) ............................................................................... 36

*Pinney Dock & Transp. Co. v. Penn Cent. Corp.*,
838 F.2d 1445 (6th Cir. 1988) ............................................................................. 36

*PSI Repair Servs., Inc. v. Honeywell, Inc.*,
104 F.3d 811 (6th Cir. 1997) ............................................................................... 29

*Reveal Chat Holdco, LLC v. Facebook, Inc.*,
471 F. Supp. 3d 981 (N.D. Cal. 2020) ................................................................. 19

*Sec'y of Labor v. Macy's, Inc.*,
2021 WL 5359769 (S.D. Ohio Nov. 17, 2021) .................................................... 20

*Semertzides v. Bethesda N. Hosp.*,
2014 WL 2573073 (S.D. Ohio June 9, 2014) ...................................................... 26

*Shadow Creek Apts., LLC v. Hartford Fire Ins. Co.*,
44 F. App'x 640 (4th Cir. 2002) ......................................................................... 29

*State ex rel. Leech v. Levi Strauss & Co.*,
1980 WL 4696 (Tenn. Ch. Ct. Sept. 25, 1980) ................................................... 33

*State Oil Co. v. Khan*,
522 U.S. 3 (1997) ................................................................................................. 23

*Tennessean Truckstop, Inc. v. NTS, Inc.*,
875 F.2d 86 (6th Cir. 1989) ................................................................................. 32

*Total Benefits Planning Agency, Inc. v. Anthem Blue Cross & Blue Shield*,
552 F.3d 430 (6th Cir. 2008) ........................................................................ passim

*Toys "R" Us, Inc. v. FTC*,
221 F.3d 928 (7th Cir. 2000) ......................................................................... 10, 11

*Tri-State Rubbish, Inc. v. Waste Mgmt., Inc.*,
875 F. Supp. 8 (D. Me. 1994) .............................................................................. 33

*United States v. Apple, Inc.*,
 791 F.3d 290 (2d Cir. 2015) ....................................................................... 10, 11

*United States v. Connecticut National Bank*,
 418 U.S. 656 (1974)............................................................................................27

*United States v. True*,
 250 F.3d 410 (6th Cir. 2001) ............................................................................ 17

*United States v. U.S. Gypsum Co.*,
 438 U.S 422. ......................................................................................................... 24

*Venture Glob. Eng'g, LLC v. Satyam Comput. Servs. Ltd.*,
 2012 WL 12897904 (E.D. Mich. Mar. 30, 2012) ....................................... 39

*Wallace v. Bank of Bartlett*,
 55 F.3d 1166 (6th Cir. 1995) ............................................................................ 24

*Wash. Cnty. Health Care Auth., Inc. v. Baxter Int'l Inc.*,
 328 F. Supp. 3d 824 (N.D. Ill. 2018) ............................................................ 20

*White v. R.M. Packer Co.*,
 635 F.3d 571 (1st Cir. 2011)............................................................................. 20

*Winn-Dixie Stores, Inc. v. E. Mushroom Mktg. Co-op, Inc.*,
 2023 WL 5521221 (3d Cir. Aug. 28, 2023)................................................... 25

*Woori Bank v. Merrill Lynch*,
 923 F. Supp. 2d 491 (S.D.N.Y.) ...................................................................... 38

**Statutes**

15 U.S.C. § 15b ............................................................................................................ 35

42 Pa. Cons. Stat. § 5527(b) .................................................................................... 35

740 Ill. Comp. Stat. 10/7.2 ...................................................................................... 35

740 Ill. Comp. Stat. 10/11 ....................................................................................... 32

Ala. Code § 6-2-38(l).................................................................................................. 35

Alaska Stat. § 45.50.588 ........................................................................................... 35

Ariz. Rev. Stat. § 44-1410(A).................................................................................. 35

Ariz. Rev. Stat. § 44-1412 ....................................................................................... 32

Cal. Bus. & Prof. Code § 16750.1 .......................................................................... 35

D.C. Code § 28-4511(b).............................................................................................. 35

D.C. Code § 28-4515 ................................................................................................... 32

Fla. Stat. § 542.26(1).................................................................................................. 35

Fla. Stat. § 542.32 ................................................................................................. 32

Ga. Code Ann. § 13-8-2-1 .................................................................................... 35

Haw. Rev. Stat. § 480-24 ..................................................................................... 35

Idaho Code § 48-102(3) ....................................................................................... 32

Idaho Code § 48-115 ............................................................................................ 35

Ind. Code § 24-1-1-1 ........................................................................................... 33

Ind. Code § 34-11-2-4 ......................................................................................... 35

Iowa Code § 553.2 ............................................................................................... 32

Iowa Code § 553.16(2) ........................................................................................ 35

Kan. Stat. Ann. § 50-163(b) ............................................................................... 32

Kan. Stat. Ann. § 60-512(2) ............................................................................... 35

La. Civ. Code Ann. art. 3492 .............................................................................. 35

Mass. Gen. Laws ch. 93 § 1 ................................................................................ 33

Mass. Gen. Laws ch. 93 § 2 ................................................................................ 33

Mass. Gen. Laws ch. 93 § 4 ................................................................................ 33

Mass. Gen. Laws ch. 93 § 13 .............................................................................. 35

Md. Com. Law Code Ann. § 11-209(d)(1) .......................................................... 35

Me. Rev. Stat. Ann. tit. 14, § 752 ....................................................................... 35

Mich. Comp. Laws § 445.781 .............................................................................. 35

Mich. Comp. Laws § 445.784(2) ......................................................................... 33

Minn. Stat. § 325D.64, subd. 1 ........................................................................... 35

Mo. Rev. Stat. § 416.131.2 .................................................................................. 35

Mo. Rev. Stat. § 416.141 ..................................................................................... 33

Mont. Code Ann. § 27-2-231 .............................................................................. 35

N.C. Gen. Stat. § 75-16.2 .................................................................................... 35

N.D. Cent. Code § 51-08.1-10(2) ........................................................................ 35

N.H. Rev. Stat. § 356.12(II) ................................................................................ 35

N.H. Rev. Stat. § 356:14 ...................................................................................... 33

N.J. Stat. Ann. § 56:9-14 ..................................................................................... 35

N.J. Stat. Ann. § 56:9-18 ..................................................................................... 33

ix

N.M. Stat. § 57-1-12(B) ......................................................................... 35

N.M. Stat. § 57-1-15 .............................................................................. 33

N.Y. Gen. Bus. Law § 340(5) ................................................................ 35

Neb. Rev. Stat. § 59-829 ........................................................................ 33

Neb. Rev. Stat. § 59-1612 ...................................................................... 35

Ohio Rev. Code § 1331.12(B) ............................................................... 35

Okla. Stat. tit. 79 § 205(C) ..................................................................... 35

Okla. Stat. tit. 79 § 212 .......................................................................... 33

Or. Rev. Stat. § 646.800(2) .................................................................... 35

S.C. Code § 15-3-530(2) ........................................................................ 35

S.C. Code § 39-3-30 ............................................................................... 33

S.D. Codified Laws § 37-1-14.4 ............................................................ 35

S.D. Codified Laws § 37-1-22 ............................................................... 33

Tenn. Code Ann. § 28-3-105 .................................................................. 35

Utah Code Ann. § 76-10-3117 ............................................................... 35

Utah Code Ann. § 76-10-3118 ............................................................... 33

Va. Code Ann. § 59.1-9.14(A) ............................................................... 35

Va. Code Ann. § 59.1-9.17 ..................................................................... 33

Vt. Stat. tit 12, § 511 .............................................................................. 35

W. Va. Code § 47-18-11 ......................................................................... 35

W. Va. Code § 47-18-16 ......................................................................... 33

Wash. Rev. Code Ann. § 19.86.120 ....................................................... 35

Wis. Stat. § 133.18(2) ............................................................................ 35

Wyo. Stat. Ann. § 1-3-105(a)(iv)(C) ..................................................... 35

**Other Authorities**

ABA, Antitrust Law Developments 71–72 (9th ed. 2022) ..................... 29

**Rules**

Fed. R. Civ. P. 9(b) ................................................................................ 35

Fed. R. Civ. P. 12(b)(6) ............................................................................ 5

## I.    INTRODUCTION

Like the Multifamily Plaintiffs, Student Plaintiffs stake their claims on an implausible theory, unsupported by factual allegations: that *any* company that uses *any* RealPage revenue management software ("RMS") has joined an unlawful price-fixing conspiracy.[1] But Plaintiffs plead facts disproving that theory and, for multiple reasons, do not state an antitrust claim.

*First*, the Complaint alleges the Defendants who own or manage student housing (collectively, the "Student Lessors") signed up with RealPage to use its RMS, but the Complaint does not allege facts that plausibly suggest any Student Lessors agreed *with each other* to do anything—much less that they agreed to fix prices. The Complaint makes only generic claims that unnamed "defendants" conspired at unspecified times in unspecified ways; it barely mentions the individual Student Lessors at all. This "group" pleading does not state a conspiracy claim.

*Second*, lacking direct evidence, Plaintiffs rely on ostensible circumstantial evidence of the alleged conspiracy, but they do not allege parallel conduct or so-called "plus factors" supporting an inference of conspiracy. Plaintiffs do not allege that Student Lessors adopted RealPage RMS in parallel: they concede that Student Lessors adopted different RealPage RMS products at different times and use them in different configurations, in different ways. And all of Plaintiffs' so-called "plus factors" are more readily explained as rational independent decisions than a conspiracy.

*Third*, the conspiracy Plaintiffs allege is implausible. Plaintiffs acknowledge that an agreement to use RealPage RMS to set artificially high prices could work only if Student Lessors have "mutual assurances" that their competitors would "also keep prices high." FASC ¶ 64. But

---

[1] As used herein, "FASC" or "Complaint" refers to the First Amended Consolidated Class Action Complaint filed on September 7, 2023 (ECF No. 527). "Student Plaintiffs" or "Plaintiffs" refers to the plaintiffs who filed the Complaint. "SAMC" refers to the Second Amended Consolidated Class Action Complaint filed on September 7, 2023, by different plaintiffs (ECF No. 530). "Multifamily Plaintiffs" refers to the plaintiffs who filed the SAMC.

Plaintiffs' Complaint suggests that, at most, RealPage RMS is used for only *10% of student housing units in the alleged submarkets.* No Student Lessor could have "assurances" all—or even a significant number—of their competitors were adopting RealPage RMS pricing.

*Fourth*, Plaintiffs do not allege a *per se* violation of the Sherman Act or the necessary elements of a rule-of-reason claim. Plaintiffs' claims are subject to the rule of reason because they either rely on the vertical supplier-customer agreements between RealPage and Student Lessors or do not fit within the narrow categories of agreement that courts have deemed to be "unquestionably" anticompetitive. And Plaintiffs do not plead facts showing the Defendants have market power or have caused anticompetitive effects, as one must in a rule-of-reason case. On the contrary, per Plaintiffs' own allegations, Student Lessors are responsible for only a fraction of student leases, a segment dwarfed by the broader rental industry.

*Fifth*, Plaintiffs do not establish they have been injured by the putatively unlawful conduct because they concede that Student Lessors retain discretion over pricing.

*Sixth*, Plaintiffs' state antitrust claims fail for the same reasons as their federal claims.

*Seventh*, because Plaintiffs do not plead any element of fraudulent concealment with the necessary particularity, they cannot pursue damages allegedly sustained prior to the limitations periods provided by federal and state law.

At bottom, Plaintiffs allege only that at unidentified points in time since 2009, Student Lessors and other unidentified lessors each used RealPage's RMS for market research and pricing recommendations, which Student Lessors could accept or disregard at their discretion. Despite affirmatively pleading numerous procompetitive reasons Student Lessors might have chosen to use RealPage's RMS, they ask this Court to infer, solely based on their alleged use of the software,

that they are all part of a decade-long conspiracy to fix rental rates. Plaintiffs' claims are not plausible. The Court should dismiss them with prejudice.

## II.     SUMMARY OF PLAINTIFFS' ALLEGATIONS

### A.     RealPage Revenue Management Products

RealPage provides RMS products for student housing: YieldStar Student Housing, AI Revenue Management ("AIRM"), and LRO Student. FASC ¶¶ 40, 46, 48. Plaintiffs allege that YieldStar Student Housing has been available since approximately 2009, and that over ten years later it is still only used by around 50 of RealPage's clients. *Id.* ¶ 40, 47. In total, there are allegedly more than 31,700 clients using RealPage software products, many of which are non-RMS products not related to pricing rental units. *Id.* ¶¶ 21, 49. The other Defendants include Student Lessors— building owners and property management companies that allegedly use RealPage RMS—and unidentified "John Doe" users. *Id.* ¶¶ 3, 32.[2]

RealPage's RMS products help property owners and managers "better understand supply and demand in their markets and to price things accordingly" (*id.* ¶¶ 40, 77), so they can "continuously maximize asset value with precision pricing capabilities" (*id.* ¶ 48). Plaintiffs allege that RealPage's RMS products use algorithms that analyze data to generate a recommended price for units on a daily basis. *Id.* ¶ 50. The algorithms analyze a customer's own internal data in providing price recommendations, including data related to "bed availability by unit type," "future expirations," "historic rental patterns," "leasing velocity," and other criteria. *Id.* ¶ 74. The algorithm may also analyze competitor rent data, which is "aggregated." *Id.* ¶¶ 5, 51, 53. Plaintiffs

---

[2] Plaintiffs also name Thoma Bravo L.P., Thoma Bravo Fund XIII, L.P., and Thoma Bravo Fund XIV, L.P. (the "Thoma Bravo Entities") as Defendants. FASC ¶ 22. Plaintiffs allege that Thoma Bravo L.P. directed the Thoma Bravo Funds to acquire RealPage in April 2021. *Id.*

3

do not allege that RealPage discloses the pricing or other data of one competitor to another.[3] The sources that Plaintiffs cite acknowledge that RealPage's student data is limited in scope: RealPage claimed to have historical data on only about 1 million of the 8.5 million beds thought to be in the student housing segment. *See* FASC ¶ 63; Ex. A (cited at FASC ¶ 53 n.67).[4]

Plaintiffs acknowledge that RealPage provides Student Lessors with "recommendations" that they can accept or reject. FASC ¶¶ 5, 6, 87. The RMS products can recommend price increases *or decreases* based on a Student Lessors' particular situation. *See* Ex. B, at 24 (cited at FASC ¶ 50 n.64); Ex. C, at 11 (cited at FASC ¶ 11 n.10). A RealPage software user can accept or "override" a recommended price, and Student Lessors sometimes offered prices that were "lower than what RealPage recommended." FASC ¶¶ 88.

## B. The Alleged Conspiracy

Plaintiffs raise two claims under the Sherman Act. First, Plaintiffs claim Student Lessors violated the Sherman Act by entering into a "conspiracy to fix, raise, stabilize, or maintain at artificially high levels" student housing lease prices by agreeing "to set prices using RealPage's coordinated algorithmic pricing." FASC ¶¶ 67, 156, 219. Second, Plaintiffs claim that Student Lessors violated the Sherman Act by agreeing to the "facilitating practice" of "exchang[ing] competitively sensitive information through RealPage." *Id.* ¶¶ 156, 224. Plaintiffs also claim these alleged agreements violate various state antitrust laws. *Id.* ¶¶ 243–85.

---

[3] Plaintiffs assert that users have access to a "dashboard" with "a view by competitor," but the website screenshot Plaintiffs cite does not show any competitor-specific data. FASC ¶¶ 11, 42.

[4] All citations to "Ex." are references to exhibits attached to the concurrently-filed Declaration of Stephen J. McIntyre. The Court may consider external documents cited in the complaint. *See In re Omnicare, Inc. Sec. Litig.*, 769 F.3d 455, 466 (6th Cir. 2014); *see also Finley v. Kelly*, 384 F. Supp. 3d 898, 908 (M.D. Tenn. 2019) (Crenshaw, J.) ("[A] court may consider a document not formally incorporated by reference in a complaint when the complaint refers to the document and the document is central to the claims.").

4

Plaintiffs claim the conspiracy began in 2010 (*id.* ¶ 204) but do not plead any facts about how the individual Student Lessors purportedly entered into an agreement with each other at that time. Plaintiffs acknowledge the relevant software was available before 2010. *See, e.g.*, *id.* ¶ 40 (alleging YieldStar Student Housing was launched in 2009). Though Plaintiffs claim that "[f]ollowing widespread adoption of RealPage, [Student] Lessors swiftly and concertedly shifted from the previous competitive 'market share over price' strategy to a new collusive 'price over volume' strategy" (*id.* ¶ 63), Plaintiffs include no allegations about how this occurred, or how Lessors' use of the software differed "following widespread adoption" of it. Nor do Plaintiffs offer any explanation of why the alleged student conspiracy began in 2010 while the alleged multifamily conspiracy began in 2016. *See* SAMC ¶ 1.

In lieu of Defendant-specific facts, Plaintiffs rely on the assertion that using RealPage's RMS is only in a Student Lessor's interest if part of a conspiracy to fix prices. But Plaintiffs acknowledge that Student Lessors had numerous unilateral, procompetitive reasons for using the software: RealPage provided a "unified platform specifically designed to streamline the unique day-to-day challenges of Student Housing" (FASC ¶ 63 (cleaned up)), which could help users "better understand supply and demand in their markets" (*id.* ¶ 77), "reduce vacanc[ies]" (*id.* ¶ 48), "maximize asset value" (*id.* ¶ 48), "improve[] user revenues" (*id.* ¶ 142), see "a more complete picture of the market" (*id.* ¶ 40), eliminate manual research into market conditions and other manual tasks (*id.* ¶¶ 15, 40, 66), and manage fluid inventory (*id.* ¶¶ 98, 103, 105).

## III.  LEGAL STANDARD

The Court must dismiss a cause of action that fails to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). To survive a motion to dismiss, Plaintiffs must plead "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).[5] The allegations in a complaint "must be enough to raise a right to relief above the speculative level." *Id.* at 855.

*Twombly*, itself an antitrust conspiracy case, has particular relevance here. Section 1 of the Sherman Act prohibits agreements to restrain trade; it does not reach unilateral conduct or independent decision-making, regardless of any anticompetitive effect. *See Twombly*, 550 U.S. at 553–54. Thus, "the crucial question" in assessing Section 1 claims "is whether the challenged anticompetitive conduct stems from independent decision or from an agreement." *Id.* at 553 (cleaned up). For this reason, antitrust law has long "hedged against [the] false inferences" of conspiracy that arise from ambiguous or "parallel conduct"—*i.e.*, uniform business conduct that is equally consistent with independent decisions "prompted by common perceptions of the market." *Id.* at 554. Drawing on that history, the *Twombly* Court held that a complaint alleging violations under Section 1 of the Sherman Act cannot survive a motion to dismiss unless it alleges facts that "plausibly suggest an unlawful agreement," as opposed to conduct that is equally consistent with rational, unilateral behavior. *Iqbal*, 556 U.S. at 680 (discussing *Twombly*); *accord In re Travel Agent Comm'n Antitrust Litig.*, 583 F.3d 896, 904 (6th Cir. 2009) ("The *Twombly* decision provides an additional safeguard against the risk of 'false inferences from identical behavior' at an earlier stage of the trial sequence—the pleading stage." (quoting *Twombly*, 550 U.S. at 554)). And so, to plead an antitrust conspiracy, the allegations must plausibly "tend[] to exclude the possibility of independent conduct." *Hobart-Mayfield, Inc. v. Nat'l Operating Comm. on Standards for Athletic Equip.*, 48 F.4th 656, 664 (6th Cir. 2022).

---

[5] Unless otherwise noted, all internal quotation marks and citations are omitted.

# IV.   ARGUMENT

## A.   Plaintiffs Do Not Plausibly Allege a *Per Se* Illegal Agreement, or Any Horizontal Agreement, Between Student Lessors

Plaintiffs attempt to invoke a "hub and spoke" theory, which involves vertical agreements between a hub (RealPage) and the spokes (Student Lessors) and a horizontal agreement between and among the spokes (i.e., the rim). FASC ¶¶ 3, 23. As a necessary but insufficient prerequisite for *per se* condemnation, Plaintiffs asserting a hub-and-spoke claim must allege sufficient facts to plausibly raise an inference of a horizontal agreement among the spokes. *See Total Benefits Planning Agency, Inc. v. Anthem Blue Cross & Blue Shield*, 552 F.3d 430, 435–36 (6th Cir. 2008) (affirming dismissal where the complaint alleged vertical agreements but no facts suggesting a horizontal agreement between spokes). To plead a horizontal conspiracy, Plaintiffs must plead facts that, if accepted as true, would constitute either (1) direct evidence of an illegal agreement between competitors or (2) circumstantial evidence plausibly "tending to exclude the possibility of independent conduct." *Hobart-Mayfield*, 48 F.4th at 664.

Plaintiffs do not plead any direct or circumstantial evidence supporting an inference of a horizontal conspiracy between Student Lessors. Because both of Plaintiffs' Sherman Act claims are predicated on a horizontal conspiracy between Student Lessors, they should be dismissed.

### i.   Plaintiffs' Group Pleading Is Improper and Insufficient

Plaintiffs claim that Student Lessors across the United States—the majority of whom are unnamed "John Doe" Defendants—agreed with one another to set prices and share information using RealPage products over many years. Whether relying on direct or circumstantial evidence, to plausibly allege this grand scheme Plaintiffs must plead facts showing that each Defendant had a "conscious commitment" to a horizontal agreement to fix prices—not merely a vertical agreement with RealPage to use its products. *Hobart-Mayfield, Inc. v. Nat'l Operating Comm. On*

*Standard for Athletic Equip.*, 535 F. Supp. 3d 638, 646 (E.D. Mich. 2021), *aff'd* 48 F.4th 656 (6th Cir. 2022) (quoting *Travel Agent*, 583 F.3d at 907). To that end, Plaintiffs must answer "basic questions" about each Defendant's participation in the alleged conspiracy: "who, did what, to whom (or with whom), where, and when?" *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1048 (9th Cir. 2008). The Complaint does not do that.

Plaintiffs do not allege, for example, when any Student Lessor began using, or agreed with competitors to use, RealPage's products; or who entered into any price-fixing agreement on a lessor's behalf, whether they did so knowingly, or when or where that purportedly happened. The only Defendant-specific allegations say nothing about any Defendant's involvement in a horizontal price-fixing agreement: Plaintiffs describe their corporate headquarters (FASC ¶¶ 25–30), some of their internal decision-making and benefits they perceive from RealPage software (*see, e.g.*, *id.* ¶¶ 6, 66), their relationship with RealPage as a software vendor (*see, e.g.*, *id.* ¶¶ 8, 56–60, 65, 84–93), and their general awareness that RealPage has other customers (*see, e.g.*, *id.* ¶¶ 9, 67). Without more, the Complaint cannot survive dismissal. *See Twombly*, 550 U.S. at 565 n.10 (dismissal warranted where complaint "furnishes no clue as to which of the four [defendants] (much less which of their employees) supposedly agreed, or when and where the illicit agreement took place"); *Total Benefits*, 552 F.3d at 436 (affirming dismissal where plaintiffs did not allege "when Defendants joined the [] conspiracy, where or how this was accomplished").

Rather than alleging facts connecting each Defendant to the alleged horizontal agreement, Plaintiffs make boilerplate assertions that RealPage "quickly obtained buy-in from a critical mass of customers in the student housing market" (FASC ¶ 40) and that "each of the [Student] Lessor[s] participated in RealPage's scheme to artificially inflate prices of student housing through the use of revenue management software" (*id.* ¶¶ 55–60). These conclusory, "generic" assertions must be

disregarded. *Total Benefits*, 552 F.3d at 436. As the Sixth Circuit explained in *In re Travel Agent Commission Antitrust Litigation*, trying to "implicate [each defendant] in the purported conspiracy by relying on several vague allegations . . . that refer to 'defendants' or 'defendants' executives' . . . represent[s] precisely the type of naked conspiratorial allegations rejected by the Supreme Court in *Twombly*." 583 F.3d at 905–06 (citing *Twombly*, 550 U.S. at 565 n.10).

Plaintiffs also appear to assert that any user of RealPage's RMS is necessarily a member of the alleged conspiracy.[6] But Plaintiffs also plead facts showing that using RealPage's RMS is not the same as agreeing to fix prices. Plaintiffs admit that RealPage's prices are merely recommendations, and that users can disregard those recommendations and leave their existing rates in place. *See*, *e.g.*, FASC ¶¶ 6 ("RealPage recommends that participants accept its recommended prices"), 84 (citing document stating "Rates that are not agreed to will be researched. . . . In the meantime, yesterday's rates will persist."). And the price recommendation for any given unit at any moment may be the same as or lower than the existing rental rate. *Supra* at 4. A price-fixing conspiracy where the members have discretion to depart from the purportedly conspiratorial, supracompetitive prices whenever they choose, and where the mechanism for setting those prices can and does recommend price reductions, is simply not plausible. Plaintiffs recognize a conspiracy could not succeed under these conditions. *See* FASC ¶ 64 (admitting that Student Lessors could not fix prices where competitors were free to charge lower rates).

Unable to allege "how the spokes are connected to each other" among Student Lessors, *Total Benefits*, 552 F.3d at 436, Plaintiffs may point the Court to *Interstate Circuit, Inc. v. United States*, 306 U.S. 208 (1939). In that case, the Supreme Court affirmed a Sherman Act Section 1

---

[6] *See* FASC ¶ 32 (naming as "John Does . . . entities whose names are unknown at this time, but who used RealPage's pricing software to price leases in the market for student housing").

claim based on findings that a group of competing film distributors "did in fact agree with each other." *Id.* at 214. This case is nothing like *Interstate Circuit* for at least three reasons.

*First*, "[k]ey to *Interstate Circuit*'s conspiracy finding was its determination that each distributor's decision to accede to Interstate's demands would have been economically self-defeating unless the other distributors did the same: Each was aware that without substantially unanimous action there was risk of a substantial loss of the business and good will." *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 331–32 (3d Cir. 2010). Here, Plaintiffs do not allege that using RealPage's RMS is "economically self-defeating unless" other lessors do the same. To the contrary, as explained above, Plaintiffs concede that there are numerous reasons why Student Lessors unilaterally decide to use RealPage's software.

*Second*, in *Interstate Circuit*—as well as its progeny, *Toys "R" Us, Inc. v. FTC* ("*TRU*"), 221 F.3d 928 (7th Cir. 2000) and *United States v. Apple, Inc.*, 791 F.3d 290 (2d Cir. 2015)—the alleged hub-and-spoke conspiracies brought together virtually all of the few competitors in the relevant markets. *TRU*, 221 F.3d at 930–31, 934 (seven toy manufacturers); *Apple*, 791 F.3d at 317 n.16 (five publishers); *Interstate Circuit*, 306 U.S. at 215–17 & n.2 (eight film distributors). Those few competitors purportedly were organized by powerful "ringmaster[s]"—hubs supposedly able to secure compliance by either threatening to impose or offering to solve looming "mortal threats." *TRU*, 221 F.3d at 934; *Apple*, 791 F.3d at 317 n.16. Here, Plaintiffs admit RealPage has no such power and, regardless, could hardly enlist all the property owners in each relevant market.[7] This case thus "stands in stark contrast to the hub-and-spoke conspiracies found in *Interstate Circuit* and *Toys 'R' Us*," in which only a few competitors were alleged to have

---

[7] Based on the Complaint's allegations and cited sources, the vast majority of lessors in the alleged geographic submarkets do not use RealPage software. *See* Section IV.B.iii(b) *infra*; Ex. D.

conspired, they did so under a hub that wielded power over them, and "each firm's motivation to enter into the vertical agreement was contingent on all of its competitors' [sic] doing the same." *Ins. Brokerage*, 618 F.3d at 333 n.30.

*Third*, *Interstate Circuit* and its progeny involved other factual circumstances—not alleged here—supporting an inference of conspiracy. In *Interstate Circuit*, the hub sent an offer letter to each competing distributor listing all the distributors, and each acceded to the offer in "substantial unanimity." 306 U.S. at 223. As explained below, Plaintiffs do not allege any similar "parallel" conduct here. In *Toys "R" Us*, the vertical agreements between the hub and spokes to restrict output were executed "on the condition that other [spokes] would do the same." 221 F.3d at 930. Plaintiffs do not allege that any Student Lessors' agreement with RealPage contains a condition that others will use it. And in *Apple*, the spokes were "in constant communication regarding their negotiations" with the hub and all shifted their pricing model at the same time. 791 F.3d at 318. Again, Plaintiffs here do not allege parallel conduct, nor do they allege any specific, direct communications between Student Lessors.

### ii. Plaintiffs Allege No Plausible Direct Evidence or Circumstantial Evidence Of Conspiracy

To constitute "direct evidence" of a conspiracy, an allegation must be "tantamount to an acknowledgment of guilt." *Hyland v. HomeServices of Am., Inc.*, 771 F.3d 310, 318 (6th Cir. 2014). It must be "explicit and require[] no inferences to establish the proposition or conclusion being asserted." *Id.* Plaintiffs allege nothing of the sort. They allege no "acknowledgement" that any Student Lessor entered into an agreement with any (much less all) others.

Lacking direct evidence, Plaintiffs rely on ostensible circumstantial evidence of a conspiracy. To plausibly allege a conspiracy based on circumstantial evidence, a plaintiff must allege both (1) "parallel conduct" by defendants and (2) "plus factors" to support the plaintiff's

allegation that the actions of the Defendants are not independent. *Hobart-Mayfield*, 535 F. Supp. 3d at 665. Plaintiffs' allegations fall short here because they do not allege parallel conduct under circumstances tending to "exclude the possibility of independent conduct." *Id.* at 664; *see C.S. Sewell, M.D. P.C. v. Amerigroup Tenn., Inc.*, 2018 WL 6591429, at *4 (M.D. Tenn. Dec. 14, 2018) (Crenshaw, J.) (dismissing complaint lacking "sufficient circumstantial facts that, in context, negate the likelihood of independent action and raise an inference of coordination").

### a) Plaintiffs Do Not Allege "Parallel Conduct"

Plaintiffs allege no plausible "uniform business conduct" or other concerted action by Student Lessors. *See, e.g.*, *Travel Agent*, 583 F.3d at 903. Plaintiffs' failure to allege parallel conduct—a necessary but insufficient allegation, *see Twombly*, 550 U.S. at 553—highlights the weakness of their claims.

*First*, Plaintiffs do not allege that *any* Student Lessors started using RealPage RMS products in parallel with one another. They assert that RealPage "quickly obtained buy-in" (FASC ¶ 40) but are silent on when each Student Lessor started using RealPage. They discuss marketing materials from RealPage (*id.* ¶¶ 71–82), but do not allege any facts showing that Student Lessors responded to RealPage's pitch or purchased its software at or around the same time. *Cf. Interstate Circuit*, 306 U.S. at 221–22 (defendants imposed boycott and minimum price simultaneously after receiving same letter from supplier demanding both). And they do not allege *any* facts about the temporal proximity between *any* Student Lessors' adoption of *any* RealPage product, much less the sort of allegations that imply conspiracy. *See In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1193 (9th Cir. 2015) (parallel conduct means "competitors adopting *similar* policies around the *same* time") (emphases added); *see also Park Irmat Drug Corp. v. Express Scripts Holding Co.*, 911 F.3d 505, 516–17 (8th Cir. 2018) (actions six months apart under dissimilar circumstances not parallel).

12

*Second*, Plaintiffs concede significant variation in Student Lessors' behavior, including that (1) some use different RMS products (FASC ¶¶ 4, 14, 45, 116); (2) some use RealPage's "Pricing Advisors," but others rely on their own employees (*id.* ¶ 54); and (3) some had different configurations of RealPage's RMS software enabled (*id.* ¶¶ 54–60). *See Mosaic Health Inc. v. Sanofi-Aventis U.S., LLC*, 2022 WL 4017895, at *6 (W.D.N.Y. Sep. 2, 2022) (policies that were "different in their particulars, their timing, and their outcomes" were not parallel). Whereas some Defendants are alleged to use YieldStar Student, others use LRO Student—an entirely different piece of software. FASC ¶¶ 55–56. Whereas some Defendants required manual entry to override a recommended price, others apparently did not. *Id.* ¶¶ 56–60. In short, Plaintiffs allege that over the last decade or so, Student Lessors began using different RealPage RMS products at different times that were configured differently and that offer a wide variety of pricing recommendations which Student Lessors accepted or rejected to different degrees—and this includes recommendations to maintain or *reduce* prices. That is not parallel conduct.

*Third*, Plaintiffs do not allege any parallel price movements by Defendants. Plaintiffs claim that Student Lessors engaged in "coordinated algorithmic pricing" (*Id.* ¶ 67), but do not allege that any prices moved in parallel at any time. Plaintiffs do not allege there were purported price increases based on a recommendation from RealPage, nor do they allege that any two of RealPage's price recommendations for competing properties were the same or even similar or that those competing properties each adopted the recommendations. *See Hogan v. Pilgrim's Pride Corp.*, 2018 WL 1316979, at *7 (D. Colo. Mar. 14, 2018) (dismissing for failing to allege "how [a defendant's] actions compared with those of its co-conspirators").

The most Plaintiffs attempt to offer is a chart of static prices they vaguely describe as a "preliminary economic regression," but that chart does not show any price movements at all, much

less seemingly coordinated ones. The chart depicts average "asking" rents in four cities during a single month, August 2023. FASC ¶ 141. Even though Plaintiffs themselves allege that RealPage disseminates pricing recommendations daily, that rental rates change frequently, and that *executed* rents differ from publicly available or "asking" rents,[8] Plaintiffs do not allege that Student Lessors changed asking rents in parallel, and they say nothing at all about actual rental prices. Whether the chart even represents a "regression" analysis is questionable—Plaintiffs do not identify all the variables tested, the number of properties analyzed, or whether there was more than a single day of asking-price observations. A pricing analysis that could mask substantial pricing variation and fails to demonstrate parallel price movements does not support an inference of conspiracy. *See In re Cedar Shakes and Shingles Antitrust Litig.*, 2020 WL 832324, at *10 (W.D. Wash. Feb. 20, 2020) (dismissing claims based on "[g]eneric price increase data").

### b) Plaintiffs' Alleged Plus Factors Do Not Support an Inference Of Conspiracy

Even if Plaintiffs had pleaded parallel conduct, their plus-factor allegations do not supply the "factual matter" needed to infer a conspiracy. *Twombly*, 550 U.S. at 556. To the contrary, Plaintiffs' allegations are "in line with a wide swath of rational and competitive business strategy unilaterally prompted by common perceptions of the market." *Id.* at 554.

**Actions Against Self-Interest.** Plaintiffs assert that, "[f]ollowing widespread adoption of RealPage," Lessors shifted from a focus on "maximiz[ing] occupancy" (FASC ¶¶ 3, 63) to a "collusive" focus on "price over volume" that would "quickly fail" in a competitive market (*id.* ¶¶ 63–64). To begin, the Complaint's allegations do not support these conclusory assertions. Though Plaintiffs suggest that vacancy rates for *some* Lessors in *some* locations increased at *some* times,

---

[8] FASC ¶ 131 (acknowledging that "the advertised rates for student housing real estate leases typically diverge from the actual rates."); *see also id.* ¶¶ 14, 50.

they acknowledge that one goal of RealPage's RMS is to "consistently *reduce* vacancies *and* maximize rents." FASC ¶ 48 (emphasis added); *see also id.* ¶ 74 (achieving "maximum revenue" requires an "ideal *balance* of occupancy and rent price" (emphasis added)). And they quote statistics directly contradicting their assertions about the alleged "price over volume" strategy. *Compare id.* ¶¶ 73–74 (asserting Student Lessors charged higher prices and accepted higher vacancies before Fall semester at unidentified time), *with id.* ¶ 105 (noting a "record" number of beds were "pre-leased" by RealPage RMS users in Fall 2022).

Even assuming *arguendo* that Plaintiffs adequately pleaded a supply restriction, that conduct is independently rational and lawful. *See In re Dynamic Random Access Memory (DRAM) Indirect Purchaser Antitrust Litig.*, 28 F.4th 42, 49–50 (9th Cir. 2022) (it is "economically rational" to "focus on profitability" over "market share"; affirming dismissal). Plaintiffs assert that focusing on price over volume would "quickly fail" in a competitive market absent "mutual assurances that other [Student Lessors] would also keep prices high." FASC ¶ 64. But Lessors' use of RealPage's RMS to "maximiz[e] profitability and total revenue" by allegedly focusing on price over volume (*id.* ¶¶ 63, 71) is not "so unusual" that "no reasonable firm" would have done it absent conspiracy. *See In re Travel Agent Comm'n Antitrust Litig.,* 2007 WL 3171675, at *11 (N.D. Ohio Oct. 29, 2007), *aff'd*, 583 F.3d 896 (6th Cir. 2009); *see also Hobart-Mayfield*, 48 F.4th at 667 (conduct is not a "plus factor" where it was consistent with defendants' "vested interest[s]" and it was "not inconceivable that it would be prudent" absent collusion).

**Incentive to Conspire.** Plaintiffs insist Lessors had a "clear incentive" to conspire (FASC ¶ 113) because RealPage "boasts openly and often" that using its RMS will allow users to "beat the market" and "improve[]" revenues (*id.* ¶ 142). But a Lessor's decision to try RealPage software based on its advertised potential to increase revenue is not evidence of collusion; the "motive to

maximize profits cannot support an inference of conspiracy," since "all businesses" have that motive. *Hyland*, 771 F.3d at 321 (affirming summary judgment); *see Hobart-Mayfield,* 48 F.4th at 668 (rejecting "motive" and "strong incentives to collude" plus factors; affirming dismissal). That certain Student Lessors allegedly believed they could increase overall profitability by optimizing rental rates is a rational independent reason to use RMS. *In re Online Travel Co. (OTC) Hotel Booking Antitrust Litig.*, 997 F. Supp. 2d 526, 537–38 (N.D. Tex. 2014) ("natural" or "obvious" reasons for conduct negate inference of conspiracy).

The allegation that "lessors" are "likely . . . aware of one another's use of RealPage" RMS (FASC ¶ 140) also does not move the needle. If anything, that allegation underscores the independent rationality of deciding to use RealPage RMS. A business's decision to use a product that promises to beat the market and is used by some of its competitors is "no more consistent with an illegal agreement than with rational and competitive business strategies." *Musical Instruments*, 798 F.3d at 1189. The fact that notable companies use RealPage RMS is just one more reason to believe the product does what RealPage promises: increase revenues. Plaintiffs do not plead any facts plausibly suggesting that any Lessor's decision to use RealPage RMS was contingent on or influenced by another Lessor's decision, and even that would not be enough to infer conspiracy. *See id.* at 1195 ("[I]nterdependent firms may engage in consciously parallel conduct through observation of their competitors' decisions, even absent an agreement.").

**Opportunity to Conspire.** Plaintiffs' conjecture that Defendants could have conspired through RealPage committees and pricing advisors, online user groups, and trade associations (FASC ¶¶ 133–40) does not imply collusion. Mere opportunities to collude, even if "[n]umerous," are not sufficient to support an inference of conspiracy. *Midwest Auto Auction, Inc. v. McNeal*, 2012 WL 3478647, at *10 (E.D. Mich. Aug. 14, 2012). Plaintiffs' allegations are "based wholly

in speculation and wishful thinking as to what Defendants *might* have done." *In re ICE LIBOR Antitrust Litig.*, 2020 WL 1467354, at *4 (S.D.N.Y. Mar. 26, 2020). Since industry groups "often serve legitimate functions," *DRAM*, 28 F.4th at 52, parties "gather[ing] at industry trade association meetings" does not suggest "an illegal agreement," but is "more likely explained by their lawful, free-market behavior," *Travel Agent*, 583 F.3d at 910–11; *see Musical Instruments*, 798 F.3d at 1196 ("[M]ere participation in trade-organization meetings where information is exchanged and strategies are advocated does not suggest [conspiracy].").

**Information Sharing.** Plaintiffs' allegations that Student Lessors shared data with RealPage and RealPage shared aggregated, anonymized data with subscribers also do not support an inference of conspiracy. *First*, Plaintiffs do not allege that Student Lessors share data directly pursuant to or in facilitation of a horizontal conspiracy. Plaintiffs' only suggestion of direct Lessor-to-Lessor information-sharing is that RealPage encourages Lessors to "[b]e knowledgeable" about others' "pricing, specials, and product" through "direct communications." FASC ¶ 132. But it is standard business practice to consider "rates charged by similar companies"—sometimes learned directly from a competitor—when making pricing decisions. *See, e.g.*, *Cont'l Cablevision of Ohio, Inc. v. Am. Elec. Power Co.*, 715 F.2d 1115, 1119 (6th Cir. 1983) (citing *Am. Tobacco Co. v. United States*, 328 U.S. 781, 810 (1946)); *see also United States v. True*, 250 F.3d 410, 423 (6th Cir. 2001) (distinguishing "legitimate, after-the-fact, price verifications" among competitors from "agreements to fix prices"); *Travel Agent*, 2007 WL 3171675, at *11 ("availability of Defendants' commission rates" is not "evidence of a conspiracy"; dismissing complaint).

*Second*, because Plaintiffs concede any data RealPage shares with subscribers is aggregated and anonymized, they do not plausibly allege RealPage facilitated any horizontal conspiracy among Lessors. *In re Local TV Advertising Antitrust Litigation*, 2022 WL 3716202

(N.D. Ill. Aug. 29, 2022), is instructive. The plaintiffs there alleged that a data-aggregating intermediary, ShareBuilders—which "provide[d] yield management solutions" to "increase[] [clients'] revenue"—"facilitated the reciprocal exchange of competitively sensitive market information among" TV broadcasters by collecting pricing information from clients and then providing market data, along with pricing recommendations, for clients' specific products. *Id.* at *2–3. The court dismissed the plaintiffs' claims against ShareBuilders, explaining that "to plausibly infer that a [conduit] *facilitated* a conspiracy, plaintiffs must allege facts showing that the conduit's circulation of information enabled co-conspirators to tacitly communicate with one another," which generally requires "'concrete' allegations that the conduit-defendant compromised 'the ostensible anonymity' of competitively sensitive information." *Id.* at *6 (collecting cases). As the data provided by ShareBuilders was "aggregate[d from] tens if not hundreds" it gave "a picture of what is happening in the market as a whole," but did not include "so much specificity that [defendants] could use [it] to police a secret or tacit conspiracy to fix prices." *Id.* at *6–8 (cleaned up).

Here, Plaintiffs do not allege any sharing of competitor-specific data, and in fact acknowledge that RealPage aggregates and anonymizes any competitor information it uses in providing pricing recommendations to Lessors. Plaintiffs allege that RealPage's algorithm "aggregat[es]" and "summariz[es]" customer data prior to providing any pricing recommendations. FASC ¶¶ 51, 53. And Plaintiffs offer no "'concrete' allegations that [RealPage] compromised 'the ostensible anonymity' of competitively sensitive information" making it possible to "tacitly communicate with one another" or "police a secret or tacit conspiracy to [fix] prices." *Local TV*, 2022 WL 3716202, at *6. Plaintiffs' information-sharing allegations are, in essence, that each Lessor independently provides leasing data and, in return, receives optimized

pricing recommendations. These allegations do not show collusion; rather, they provide a clear rationale for why each Lessor retained RealPage. *Cf. Ins. Brokerage*, 618 F.3d at 329 (allegations that broker "hub" shared with insurer "spokes" the details of its commission deals with other insurers did not support inference of conspiracy where there was an "obvious reason" for sharing); *Reveal Chat Holdco, LLC v. Facebook, Inc.*, 471 F. Supp. 3d 981, 988–89, 1003 (N.D. Cal. 2020) (data-sharing agreements between Facebook and developers did not imply conspiracy among developers).

**Market Structure.** Plaintiffs further assert that a price-fixing conspiracy between Defendants is plausible because the "market for the sale of student housing residential real estate leases" is "susceptible to collusion." FASC ¶ 118. Specifically, Plaintiffs claim there are barriers to entry and exit, inelastic demand, "highly concentrated" markets, and "relatively" fungible rental units. *Id.* ¶¶ 119–30.

None of these allegations support an inference of conspiracy. Plaintiffs claim Defendants conspired to use RealPage's RMS to fix prices in 27 local markets, but they do not allege that any one of those supposed markets has these characteristics. *See id.* ¶¶ 165–91. Whether property is expensive or cheap, apartments are abundant or limited, and whether one apartment is comparable to another plainly varies widely from city to city and neighborhood to neighborhood. More problematically, even if Plaintiffs had plausibly alleged that each of their claimed local markets is concentrated, has high entry barriers, and exhibits the other alleged characteristics, those allegations are "no more consistent with an illegal agreement than with rational and competitive business strategies, independently adopted by firms acting within an independent market." *Musical Instruments,* 798 F.3d at 1189 (affirming dismissal). The allegations "are simply descriptions of the market, not allegations of anything the defendants did." *Erie Cnty. v. Morton Salt, Inc.,* 702

F.3d 860, 870 (6th Cir. 2012) (holding that market-characteristic allegations "d[id] not give rise to an inference of unlawful agreement" and affirming dismissal); *see DRAM,* 28 F.4th at 52 (affirming dismissal despite allegations of "extreme market concentration"); *White v. R.M. Packer Co.*, 635 F.3d 571, 582 (1st Cir. 2011) (affirming dismissal despite allegations of "[h]igh barriers to entry and inelastic demand"); *Wash. Cnty. Health Care Auth., Inc. v. Baxter Int'l Inc.*, 328 F. Supp. 3d 824, 841 (N.D. Ill. 2018) (dismissing claims despite allegations that market was "highly concentrated, the product at issue is homogeneous [*i.e.,* fungible], and demand is inelastic").

### iii. Plaintiffs' Allegations That RealPage Facilitated and Enforced The Horizontal Conspiracy Also Fail

Plaintiffs allege that RealPage "facilitate[s]" the alleged horizontal conspiracy by recommending and enforcing adherence to cartel-level pricing, and by serving as a "conduit" for information sharing. FASC ¶¶ 61, 69, 93, 131. As explained above, because Plaintiffs concede any data RealPage shares with subscribers is aggregated and anonymized, their conduit theory fails. *Supra* at 17–19. As to the "enforcement" theory, Plaintiffs' factual allegations refute their assertion that RealPage has the ability to force Lessors to accept recommendations. The Court need not "and indeed cannot" accept as true allegations of fact that are contradicted by other allegations. *See Sec'y of Labor v. Macy's, Inc*., 2021 WL 5359769, at *5 (S.D. Ohio Nov. 17, 2021).

*First*, despite Plaintiffs' assertions that RealPage is imposing "discipline" among conspiracy members (FASC ¶¶ 74, 84, 140), Plaintiffs provide *no* factual allegations of any disciplinary mechanism to prevent or punish "cheating," nor is any such mechanism even plausible here. *See Llacua v. W. Range Ass'n*, 930 F.3d 1161, 1180 & n.30 (10th Cir. 2019) (affirming dismissal of conspiracy claims where plaintiffs failed to allege a "key factor": "an enforcement mechanism, binding on all members" of the alleged conspiracy); *Kleen Prods. LLC v. Int'l Paper*, 276 F. Supp. 3d 811, 842 (N.D. Ill. 2017), *aff'd* 910 F.3d 927 (7th Cir. 2018) ("With no

punishment, or even a mechanism to punish, the inference tends toward no agreement.").

*Second*, Plaintiffs repeatedly concede that Lessors maintain discretion over pricing. *See, e.g.*, FASC ¶ 87 (users can reject pricing recommendations by "overriding"). Unlike the Multifamily Plaintiffs, Student Plaintiffs do not allege any purported general acceptance rate by Student Lessors,[9] instead offering only the vague and conclusory assertion that RealPage's recommendations are "overwhelmingly accepted" by unspecified users. *Id.* ¶ 86; *cf.* SAMC ¶ 15 (alleging multifamily defendants accept "up to" 80–90% of recommendations). But, like the Multifamily Plaintiffs, the Student Plaintiffs acknowledge that Student Lessors do not uniformly accept RealPage's recommendations. FASC ¶¶ 88 (alleging a defendant's prices were "lower than what RealPage recommended"), 58 (describing process if defendant "chose not to accept" recommendations), 59 (describing process if defendant "declined the rent recommendation").

*Third*, Plaintiffs allege that RealPage "Pricing Advisors" "monitor [the client's] compliance with RealPage's recommended rates" (FASC ¶¶ 7, 89) but acknowledge that only some RealPage users subscribe to Pricing Advisor services (*id.* ¶ 54). Regardless, even for the customers who subscribe to the service, Plaintiffs acknowledge that Pricing Advisors do not enforce "compliance" with recommendations but instead "adjust configurations and pricing to align with your asset objectives as market conditions and business strategies change." *Id.* ¶¶ 89, 140. Nor is it surprising that RealPage, in the business of providing software that recommends prices, "wanted" customers to adopt those recommendations. *Id.* ¶ 86. And, in any event, such encouragement would make little sense if RealPage had control over Lessors' pricing decisions.

---

[9] Plaintiffs do allege that one Defendant, Greystar, "accepted RealPage's pricing recommendations '98 to 99%' of the time." FASC ¶¶ 56, 86. But this claim is contradicted by Plaintiffs' allegation, based on purported confidential witness testimony, that RealPage would "push back" on Greystar's prices that "were lower than what RealPage recommended." *Id.* ¶ 88.

#### iv.    The Alleged Conspiracy Is Implausible On Its Face

Plaintiffs' horizontal conspiracy claim also fails because the alleged conspiracy is "practically and economically implausible." *Lifeline Ltd. No. II v. Conn. Gen. Life Ins*. Co., 821 F. Supp. 1201, 1205–06 (E.D. Mich. 1993) (dismissing antitrust claims); *Brunson Commc'ns, Inc. v. Arbitron, Inc.*, 239 F. Supp. 2d 550, 563–64, n.5 (E.D. Pa. 2002) (collecting cases and dismissing a conspiracy claim that did not make economic sense). According to Plaintiffs, the "strategy" of "increasing prices notwithstanding market conditions" only works if Student Lessors have "mutual assurances" that other lessors in the market would "also keep prices high." FASC ¶ 64. Otherwise the "strategy would quickly fail—any units listed at prices exceeding the market price would stay empty and the property manager would eventually go out of business." *Id.*

But Plaintiffs do not allege that RealPage RMS is used to price enough rental units in any regional submarket that Student Lessors would feel "assured" their prices would not be undercut. For example, in the alleged Austin submarket, Plaintiffs claim there is "an estimated student population of at least 56,000," but allege that only *two* Student Lessors operate there, with *one building each*. *Id.* ¶ 165. The same is true in Plaintiffs' other alleged markets. *See, e.g.*, *id.* ¶¶ 175 (College Station, TX "has an estimated student population of 75,230" but only two Defendants operate there, with one building each), 184 (West Lafayette, IN "has an estimated student population of 50,344," but only two Defendants operate there, with one building each). As explained below, Plaintiffs' allegations and cited sources suggest that, at most, Student Lessors control 10% of some regional submarkets. *See* Section IV.B.iii(b) *infra*. Under Plaintiffs' "assurance" theory, there would be no economic benefit for Student Lessors to conspire: any adoption of a high price would put them out of business. FASC ¶ 64. The conspiracy would be an "exercise in futility." *Morton Salt,* 702 F.3d at 872 (affirming dismissal where alleged "sham bidding" conspiracy would be an "exercise in futility").

**B.      Plaintiffs Fail to State A Claim Under The Rule Of Reason**

Even assuming Plaintiffs have alleged an agreement or conspiracy, Plaintiffs' claims are subject to the rule of reason because they either rely on the vertical supplier-customer agreements between RealPage and Student Lessors or do not fit within the narrow categories of *per se* illegal agreements. And Plaintiffs do not plead the necessary elements of a rule-of-reason case: that Defendants have market power and their alleged agreement caused anticompetitive effects.

**i.      The Rule Of Reason Applies To Plaintiffs' Section 1 Claims**

Section 1 of the Sherman Act prohibits only "unreasonable" restraints. *State Oil Co. v. Khan*, 522 U.S. 3, 10 (1997). The "accepted standard" to assess reasonableness is the rule of reason, under which a court "weighs all of the circumstances of a case," such as the history, nature, and effect of the challenged practice. *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 885 (2007). Plaintiffs cannot overcome the Sixth Circuit's "automatic presumption in favor of the rule of reason standard." *In re Se. Milk Antitrust Litig.*, 739 F.3d 262, 273 (6th Cir. 2014).

*First*, having failed to plead a plausible or even coherent horizontal conspiracy, Plaintiffs are left with allegations that Student Lessors agreed *with RealPage* to share information with RealPage and use its RMS products. Any agreements between RealPage and Student Lessors are "vertical," not "horizontal," because RealPage and Student Lessors do not compete with each other—they are "parties at different levels of the market structure." *In re Se. Milk*, 739 F.3d at 272; *see also Care Heating & Cooling, Inc. v. Am. Standard, Inc.*, 427 F.3d 1008, 1012 (6th Cir. 2005). And "all vertical price restraints are . . . judged under the rule-of-reason standard." *Total Benefits*, 552 F.3d at 435.

*Second*, even assuming *arguendo* Plaintiffs have plausibly alleged a horizontal conspiracy between Student Lessors to use RealPage software to set prices or share information, that too must be evaluated under the rule of reason. As to Plaintiffs' information-sharing claim, Plaintiffs do not

claim it is a *per se* violation (*see* FASC ¶¶ 223–35), and with good reason—the Supreme Court has long-held that "[t]he exchange of price data and other information among competitors . . . do[es] not constitute a *per se* violation of the Sherman Act," since information sharing can "render markets more, rather than less, competitive." *United States v. U.S. Gypsum Co.*, 438 U.S. 422, 443 n.16 (1978); *see Wallace v. Bank of Bartlett*, 55 F.3d 1166, 1169 (6th Cir. 1995) (same).

Plaintiffs' software-based price-setting claim is likewise subject to the rule of reason. Because it "is a bad idea to subject a novel way of doing business[,] or an old way in a new and previously unexamined context[,] . . . to per se treatment," *In re Sulfuric Acid Antitrust Litig.*, 703 F.3d 1004, 1011 (7th Cir. 2012), the Sixth Circuit "refuse[s] to apply the per se rule in the absence of judicial experience with the challenged restraint," *Med. Ctr at Elizabeth Place, LLC v. Atrium Health Sys.*, 922 F.3d 713, 731 (6th Cir. 2019). Courts have little to no experience evaluating whether competitors' use of pricing recommendation software is unlawful. Nor does the use of this software "clearly and unquestionably fall[] within one of the handful of categories that have been collectively deemed *per se* anticompetitive," *Expert Masonry, Inc. v. Boone Cnty.*, 440 F.3d 336, 343–44 (6th Cir. 2006), such as "naked, horizontal restraints pertaining to prices or territories," *Ogden v. Little Caesar Enters., Inc.*, 393 F. Supp. 3d 622, 632 (E.D. Mich. 2019); *see also In re Se. Milk*, 739 F.3d at 273 ("[A]pplying the rule of reason is the default position and can be applied to horizontal restraints as well if they do not fit into existing categories of *per se* violations."). To the contrary, Plaintiffs acknowledge the efficiency-enhancing benefits of the software. *Supra* at 5.

*Third*, Plaintiffs' alternative argument that the Court should apply the "quick-look" standard—an abbreviated form of the rule of reason—fails for similar reasons. *See* FASC ¶¶ 233, 414. "Quick-look" analysis is appropriate only when "an observer with even a rudimentary

understanding of economics could conclude that the arrangements in question would have an anticompetitive effect on customers and markets." *Cal. Dental Ass'n v. FTC*, 526 U.S. 756, 770 (1999). For all the reasons discussed above—including the potential pro-competitive benefits of the software and the lack of any judicial experience evaluating restraints involving it—"quick-look" treatment is unwarranted. *See Winn-Dixie Stores, Inc. v. E. Mushroom Mktg. Co-op, Inc.*, 2023 WL 5521221, at *7 (3d Cir. Aug. 28, 2023) (when court has not "amassed considerable experience" with an arrangement, "quick-look or *per se* condemnation is simply not appropriate").

### ii. Plaintiffs Do Not Plead Plausible Relevant Markets

To state a rule-of-reason claim, a plaintiff must plead both "relevant product and geographic markets" in which defendants' conduct caused "adverse, anticompetitive effects." *Total Benefits*, 552 F.3d at 436. Plaintiffs do not plead plausible geographic markets here.

The geographic market "includes the geographic area in which consumers can practically seek alternative sources of the product." *Mich. Div.-Monument Builders of N. Am. v. Mich. Cemetery Ass'n*, 524 F.3d 726, 733 (6th Cir. 2008). A plaintiff's factual allegations must allow the court to determine "the boundaries of the relevant . . . market." *Total Benefits*, 552 F.3d at 437 (affirming dismissal for failure to plead relevant market). The Sixth Circuit routinely affirms dismissals "on the basis of an insufficiently pled or totally unsupportable proposed market." *Mich. Cemetery Ass'n*, 524 F.3d at 733; *see Nat'l Hockey League Players Ass'n v. Plymouth Whalers Hockey Club*, 419 F.3d 462, 473 (6th Cir. 2005) (affirming dismissal because "markets proposed by Plaintiffs must fail"); *see also New Orleans Ass'n of Cemetery Tour Guides & Cos. v. New Orleans Archdiocesan Cemeteries,* 56 F.4th 1026, 1039 (5th Cir. 2023) (affirming dismissal where plaintiff had not "properly defined the relevant market"); *Par v. Wolfe Clinic, P.C.*, 70 F.4th 441 (8th Cir. 2023) (affirming dismissal where plaintiff failed to allege a plausible geographic market).

Plaintiffs' allegation that "the relevant geographic market is the United States" (FASC ¶ 158) is contradicted by the allegations of the Complaint and belies common sense. While purporting to allege a nationwide market, Plaintiffs elsewhere plead that "[b]ecause students live near the institutions they attend, markets for student housing are tied to those institutions." FASC ¶ 163. These contradictory allegations defeat Plaintiffs' assertion that the entire United States constitutes a relevant geographic market. *See Semertzides v. Bethesda N. Hosp.*, 2014 WL 2573073, at *4 (S.D. Ohio June 9, 2014), *aff'd*, 608 F. App'x 378 (6th Cir. 2015) (dismissing complaint because it alleged that relevant geographic market was certain counties or states and elsewhere that it was "the entire United States"); *Cupp v. Alberto-Culver USA, Inc.*, 310 F. Supp. 2d 963, 970 (W.D. Tenn. 2004) ("The disconnect between a strictly local or exclusive geographic area and some Defendants' global reach [left] the Court without any ability to formulate a relevant geographic market."); *E.I. DuPont de Nemours & Co. v. Kolon Indus., Inc.*, 688 F. Supp. 2d 443, 457 (E.D. Va. 2009) (dismissing antitrust counterclaim where nationwide relevant market allegations were "conclusory and self-defeating").

Plaintiffs' alleged regional submarkets—"student housing" in cities and towns where various colleges and universities are located (FASC ¶¶ 162–91)—are also implausible. Many of the cities and towns Plaintiffs identify are home to multiple colleges and universities, which renders Plaintiffs' geographic market definition overbroad. In San Antonio, for example, Plaintiffs allege no facts plausibly suggesting that students at the suburban campus of the University of Texas-San Antonio would consider "student housing" located near San Antonio College, a different university fifteen miles away in downtown San Antonio. As Plaintiffs admit, "students near a given institution do not consider student housing elsewhere . . . as an adequate substitute for a student housing lease near their institution." *Id.* ¶ 163. Plaintiffs also acknowledge that "students

live near the institutions they attend" (*id.* ¶ 163) but, taking Plaintiffs' allegations at face value, Plaintiffs suggest students at one university would not consider a single-family or multifamily building not marketed specifically as "student housing" located directly adjacent to campus, but those students *would* consider a "student housing" building located on the other side of the city near a different university. This is not plausible. *Cf. United States v. Connecticut National Bank*, 418 U.S. 656, 670 (1974) (plaintiffs "cannot rely, without more, on Standard Metropolitan Statistical Areas" because geographic market "must be charted by careful selection of the market area in which the seller operates" and "take[] into account the local nature of the demand").

### iii. Plaintiffs Have Not Pleaded Anticompetitive Effects

In addition to plausible relevant markets, Plaintiffs must also plausibly allege "that the challenged restraint has a substantial anticompetitive effect that harms consumers in the relevant market." *Ohio v. Am. Express Co*., 138 S. Ct. 2274, 2284 (2018). Plaintiffs may allege anticompetitive effects "directly or indirectly." *Id.* Plaintiffs do not allege either.

#### a) Plaintiffs Do Not Allege Direct Evidence Of Effects

Direct allegations of anticompetitive effects must establish "reduced output, increased prices, or decreased quality in the relevant market." *Id.* The Supreme Court has directed that antitrust law "will not infer competitive injury from price and output data absent some evidence that tends to prove that output was restricted or prices were above a competitive level." *Id.*

Plaintiffs do not allege restricted output. Though Plaintiffs repeatedly assert that Student Lessors had reduced occupancy rates at certain times, as explained above, those allegations are contradicted by other allegations in the Complaint. *Supra* at 14–15. As to the broader market, Plaintiffs cite charts showing the supply of "Off Campus Purpose Built" housing has *increased* by nearly 50,000 student beds per year since 2014 and the total student housing transaction volume has trended upward since 2007. FASC ¶ 103. They also allege hundreds of millions of dollars of

investments to build additional student housing. *Id.* ¶ 120. These allegations suggest that output *increased*, not decreased during the relevant period. *See Am. Express.*, 138 S. Ct. at 2288 (no anticompetitive effect shown where the "output of credit-card transactions grew dramatically").

Plaintiffs also do not allege facts showing prices above a competitive level. Plaintiffs point to student rental prices increasing in 2022 and 2023. *See* FASC ¶¶ 105–08. But as just explained, student housing output increased during that same period, and "[w]here output is expanding at the same time prices are increasing, rising prices are equally consistent with growing product demand." *Am. Express*, 138 S. Ct. at 2288 (cleaned up). Plaintiffs also ignore that during the same years, the country experienced the highest inflation seen in a generation. "In considering a motion to dismiss, the court is not required to don blinders and to ignore commercial reality." *42nd Parallel N. v. E Street Denim Co.*, 286 F.3d 401, 406 (7th Cir. 2002).

Plaintiffs' "preliminary" regression based on public data for Auburn, Baton Rouge, Tallahassee, and Eugene in August 2023 (FASC ¶¶ 10, 141) also does not establish Student Lessors charged supracompetitive prices. To begin, the only thing the regression purportedly shows is that the "average" rent at properties using YieldStar was greater than at properties that did not use YieldStar. *Id.* ¶ 141.[10] It does not distinguish between YieldStar users, and therefore does not suggest "each individual defendant was charging higher prices." *In re GSE Bonds Antitrust Litig.*, 396 F. Supp. 3d 354, 365 (S.D.N.Y. 2019).

Even if the regression did suggest Student Lessors charged higher prices than other lessors, the data only covers a *single* month, in *four* cities, in which Plaintiffs identify only a *handful* of buildings owned or managed by Student Lessors. FASC ¶¶ 166 (two Student Lessors, three

---

[10] The Complaint suggests that the regression compares "properties owned or managed by [Student Lessors] versus student housing owned or managed by non-defendants" but Plaintiffs' graph refers to the "Average Rent by Cartelist/YieldStar User." FASC ¶ 141.

properties); 169 (three student lessors, six properties), 170 (three Student Lessors, five properties), 172 (three Student Lessors, six properties). The sample size is miniscule, suggesting it was cherry-picked to engineer Plaintiffs' desired results. Plaintiffs do not disclose the variables they "controlled for" other than the "size of the unit and the distance of the property from the university." *Id.* ¶ 141. But there are numerous other variables—like amenities and the quality of the building—that could readily explain the difference in prices. *See id.* ¶ 112 (quoting an article that notes "student appetite for higher end product" and "a new format with highly amenitized and well-designed spaces").[11]

### b)    Plaintiffs Do Not Allege Indirect Evidence Of Effects

The Complaint also fails to allege indirect evidence of anticompetitive effects. Indirect evidence requires "proof of market power plus some evidence that the challenged restraint harms competition." *Ogden*, 393 F. Supp. 3d at 637. As just explained, Plaintiffs fail to allege any evidence that the alleged conspiracy harms competition. Plaintiffs also fail to allege market power.

In the Sixth Circuit, "market power is normally established by controlling a substantial share of the market." *Mich. Cemetery*, 524 F.3d at 732. In a Section 1 case, a plaintiff must allege that the supposed cartel has a market share in excess of 30%, if not substantially more, in addition to high barriers to entry. *See PSI Repair Servs., Inc. v. Honeywell, Inc*., 104 F.3d 811, 818 (6th Cir. 1997) ("A thirty-percent share of the market, standing alone, provides an insufficient basis from which to infer market power."); *see also* ABA, Antitrust Law Developments 71–72 (9th ed.

---

[11] Plaintiffs' assertion that student apartments are fungible (FASC ¶ 130) is conclusory and implausible. *See Shadow Creek Apts., LLC v. Hartford Fire Ins. Co.*, 44 F. App'x 640, 646 n.9 (4th Cir. 2002) ("apartments are not generally considered fungible"). It is also contradicted by other allegations in the Complaint (FASC ¶ 112), and should therefore be disregarded. *See Cole v. Am. Specialty Health Network, Inc.*, 2015 WL 1734926, at *7 (M.D. Tenn. Apr. 16, 2015) (dismissing claims where "Plaintiffs' allegations are directly contradicted by the Recruitment Letter to which the Complaint references").

2022) ("Since [the Supreme Court's 1984 decision in] *Jefferson Parish*, no court has inferred the requisite market power from a market share below 30 percent.").

Plaintiffs make *no attempt* to allege *any* Student Lessor's market share, either nationally or in *any* submarket. This dooms Plaintiffs' claim of anticompetitive effects. *Found. for Interior Design Educ. Rsch. v. Savannah Coll. of Art & Design*, 73 F. Supp. 2d 829, 837 (W.D. Mich. 1999) ("Market power must be alleged in more than vague and conclusory terms.") (cleaned up), *aff'd*, 244 F.3d 521 (6th Cir. 2001); *Savannah Coll.*, 73 F. Supp. 2d at 836 ("a defendant must have market power before its conduct can be shown to have an adverse effect on competition").

Nationwide, Plaintiffs allege that three of the named Student Lessors were the fourth, fourteenth, and fifteenth largest student housing managers in the United States. FASC ¶¶ 25–27. Even assuming the other named Student Lessors are similarly ranked, Plaintiffs allege no facts supporting an inference that this set of Student Lessors—just a handful among the top 20—collectively possess market power in student housing nationwide, much less in every alleged regional submarket. Plaintiffs' cursory mention of "John Does" does not save their claims because they allege *no* facts about these entities, and certainly no facts establishing their market shares. *See Gold Medal LLC v. USA Track & Field*, 187 F. Supp. 3d 1219, 1228 (D. Or. 2016) (holding that Plaintiffs' "conclusory statements" and "boilerplate accusations fail[ed] to implicate the nameless [Defendants]"), *aff'd*, 899 F.3d 712 (9th Cir. 2018); *Disney Enters., Inc. v. VidAngel, Inc.*, 2017 WL 6883685, at *7 (C.D. Cal. Aug. 10, 2017) (rejecting the argument that named and unnamed co-conspirators' market power can be aggregated because they all signed the same agreement).

Plaintiffs also make no attempt to allege Student Lessors' market shares in any alleged regional submarket. Plaintiffs' allegations and the sources Plaintiffs cite suggest that Defendants'

market shares—whether considered individually[12] or combined—fall well short of the established 30% threshold both nationally and in the alleged regional submarkets. The allegations and sources cited imply a paltry 2% to 10% combined market share in the various regional submarkets. *See* Ex. D.[13] For example, in Knoxville, Plaintiffs allege a student population of 34,000 and that three Defendants operate buildings. FASC ¶ 168. Based on the materials Plaintiffs cite, those Lessors' beds per building, when combined, total just 3,547 beds. Ex. D. The Lessors' beds in Knoxville divided by the total student population implies a 10.43% combined market share. *Id.* Combined market shares in the other alleged regional submarkets are even lower. *Id.*

## C. Plaintiffs Do Not Have Antitrust Standing

Plaintiffs lack antitrust standing, which "is a threshold, pleading-stage inquiry and when a complaint by its terms fails to establish this requirement [a court] must dismiss it as a matter of law[.]" *NicSand, Inc. v. 3M Co.*, 507 F.3d 442, 450 (6th Cir. 2007); *see also Tennessean Truckstop,*

---

[12] Where a Section 1 claim relates to a vertical agreement, the individual market power of each defendant must be assessed; aggregation of the various defendants' market power is not permitted. *See Dickson v. Microsoft Corp.*, 309 F.3d 193, 210–11 (4th Cir. 2002); *Maris Distrib. Co. v. Anheuser-Busch, Inc.*, 302 F.3d 1207, 1218 (11th Cir. 2002); *In re Amazon.com, Inc. eBook Antitrust Litig.*, 2023 WL 6006525, at *25 (S.D.N.Y. July 31, 2023) (rejecting aggregation where plaintiff's theory was based purely on vertical agreements between spokes and the hub and there was no plausible horizontal conspiracy). As explained above, Plaintiffs have failed to allege any plausible horizontal agreement among Student Lessors. As a result, Plaintiffs must allege that each Defendant individually has market power. They have not.

[13] Plaintiffs cite public sources for the number of properties managed by certain Defendants. *See* FASC ¶¶ 25 n.28, 26 n.30, 27 n.32. They cite the websites of other Defendants. *See id.* ¶¶ 27 n.33, 29 n.36. These sources show the number of buildings operated by each Defendant, which, divided by the total number of student beds alleged (*see id.* ¶¶ 25, 26, 29, 27 n.32) provides the average number of beds per building for each Defendant, respectively. Plaintiffs do not cite to sources providing statistics for Cardinal Group Holdings, LLC, however, public sources cited by Plaintiffs provide the statistics for Cardinal Group Management, which were used for Defendant Cardinal Group Holdings, LLC. While Defendants utilize the figures from these sources for the purpose of calculating Student Lessors' market shares, Defendants do not concede the accuracy of the sources nor do they concede that RealPage RMS was actually used at any particular property identified by Plaintiffs and listed in Exhibit D.

*Inc. v. NTS, Inc.*, 875 F.2d 86, 91 (6th Cir. 1989) (noting "it is better to cut the string before the substantial costs of litigating an antitrust case have been incurred" when a complaint fails to allege antitrust injury). Plaintiffs must offer more than "allegations of consequential harm resulting from a violation of the antitrust laws." *Assoc. Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 545 (1983). They must allege standing with specificity. *CBC Cos. v. Equifax, Inc.*, 561 F.3d 569, 571 (6th Cir. 2009).

But Plaintiffs offer only vague, conclusory allegations that they paid "higher" rental prices. *See, e.g.*, FASC ¶ 17. They do not allege specific facts causally connecting any of those "higher" prices to the purported critical mechanism of the alleged conspiracy: RealPage RMS. Plaintiffs do not allege that any RealPage RMS was used to *set* their individual rents, much less increase them collusively. Plaintiffs admit that Lessors maintain discretion over pricing and state only that RealPage's recommendations are "overwhelmingly accepted" by unspecified users. FASC ¶ 86; *see* Section IV.C *supra*. Even assuming *arguendo* that Lessors' average acceptance rate is 80–90% (as alleged by the Multifamily Plaintiffs, *see* SAMC ¶ 15), Plaintiffs very well could have been among the 10–20% of tenants unaffected by the alleged conspiracy. That Plaintiffs allegedly paid "higher" rental prices—during a time of extraordinary inflation, no less—does not establish antitrust injury.

### D. Plaintiffs' State-Law Claims Fail

On top of their Sherman Act claims, Plaintiffs sued under the antitrust or consumer protection laws of 42 states and the District of Columbia. FASC ¶¶ 243–85. Plaintiffs' state-law claims should be dismissed for all the reasons discussed above.[14]

---

[14] *See Odom v. Fairbanks Mem'l Hosp.*, 999 P.2d 123, 128 (Alaska 2000) ("We look to federal precedent when analyzing a[ state law] antitrust claim); Ariz. Rev. Stat. § 44-1412; *Cnty. of Tuolumne v. Sonora Cmty. Hosp.*, 236 F.3d 1148, 1160 (9th Cir. 2001) (California); D.C. Code

Many of Plaintiffs' state-law claims also fail for other, independent reasons. For example, neither Georgia nor Pennsylvania law allows private antitrust claims. *E.T. Barwick Indus., Inc. v. Walter E. Heller & Co.*, 692 F. Supp. 1331, 1349 (N.D. Ga. 1987); *In re K-Dur Antitrust Litig.*, 2008 WL 2660780, at \*4 (D.N.J. Feb. 28, 2008). Other state claims fail because they do not apply to the conduct here. Several states' statutes apply only to goods or "articles." *Bennett v. Visa U.S.A. Inc.*, 198 S.W.3d 747, 751 (Tenn. Ct. App. 2006) (holding the "TTPA applies only to tangible goods"); Ind. Code § 24-1-1-1 (applies only to "articles of merchandise"); S.C. Code § 39-3-30 (damages allowed only for purchase of "goods, wares, merchandises or articles"); *see also* Mass. Gen. Laws ch. 93 §§ 2, 4 (does not apply to "the conveyance, transfer or use of real property"). Alabama's statute does not apply to interstate commerce. *Abbott Labs v. Durrett*, 746 So.2d 316, 337 (Ala. 1999); *Jones v. Varsity Brands, LLC*, 618 F. Supp. 3d 725, 762 (W.D. Tenn. 2022).

---

§ 28-4515; Fla. Stat. § 542.32; *Island Tobacco Co. v. R. J. Reynolds Indus., Inc.*, 513 F. Supp. 726, 738 (D. Haw. 1981) (Hawaii); Idaho Code § 48-102(3); 740 Ill. Comp. Stat. 10/11; *Deich-Keibler v. Bank One*, 243 F. App'x 164, 168 (7th Cir. 2007) (Indiana); Iowa Code § 553.2; Kan. Stat. Ann. § 50-163(b); *Felder's Collision Parts, Inc v. All Star Advantage Agency, Inc.*, 777 F.3d 756, 759 (5th Cir. 2015) (Louisiana); *Tri-State Rubbish, Inc. v. Waste Mgmt., Inc.*, 875 F. Supp. 8, 14 (D. Me. 1994) (Maine); *Krause Marine Towing Corp. v. Ass'n of Md. Pilots*, 44 A.3d 1043, 1052 (Md. 2012); Mass. Gen. Laws ch. 93 § 1; Mich. Comp. Laws § 445.784(2); *Lorix v. Crompton Corp.*, 736 N.W.2d 619, 627–29 (Minn. 2007); *NAACP v. Claiborne Hardware Co.*, 393 So.2d 1290, 1301 (Miss. 1980), *rev'd on other grounds*, 458 U.S. 886 (1982); Mo. Rev. Stat. § 416.141; Neb. Rev. Stat. § 59-829; N.H. Rev. Stat. § 356:14; N.J. Stat. Ann. § 56:9-18; N.M. Stat. § 57-1-15; *In re Int. Rate Swaps Antitrust Litig.*, 261 F. Supp. 3d 430, 498-99 (S.D.N.Y. 2017) (New York); *In re Elec. Books Antitrust Litig.*, 2014 WL 2535112, at \*15 (S.D.N.Y. June 5, 2014) (North Dakota); *Aladdins Lights Inc. v. Eye Lighting Int'l*, 96 N.E.3d 864, 867-868 (Ohio Ct. App. 2017); Okla. Stat. tit. 79 § 212; *Or. Laborers-Emps. Health & Welfare Tr. Fund v. Philip Morris Inc.*, 185 F.3d 957, 963 n.4 (9th Cir. 1999) (Oregon); *In re Dairy Farmers of Am., Inc. Cheese Antitrust Litig.*, 2015 WL 3988488, at \*33 (N.D. Ill. June 29, 2015) (North Carolina); *Drs. Steuer and Latham, P.A. v. Nat'l Med. Enters., Inc.*, 672 F. Supp. 1489, 1521 (D.S.C. 1987), *aff'd*, 846 F.2d 70 (4th Cir. 1988) (South Carolina); S.D. Codified Laws § 37-1-22; *State ex rel. Leech v. Levi Strauss & Co.*, 1980 WL 4696, at \*2 n.2 (Tenn. Ch. Ct. Sept. 25, 1980); Utah Code Ann. § 76-10-3118; Va. Code Ann. § 59.1-9.17; *Blewett v. Abbott Labs*, 938 P.2d 842, 845-46 (Wash Ct. App. 1997); W. Va. Code § 47-18-16; *Olstad v. Microsoft Corp.*, 700 N.W.2d 139, 150 (Wis. 2005).

In addition, most of these state-law claims must be dismissed because named Plaintiffs neither reside nor claim to have suffered injury in the relevant jurisdictions. It is blackletter law that "a plaintiff must demonstrate standing for each claim he seeks to press." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006). "This is no less true with respect to class actions than with respect to other suits." *Lewis v. Casey*, 518 U.S. 343, 356 (1996). As the Sixth Circuit recently held in *Fox v. Saginaw County*, 67 F.4th 284 (6th Cir. 2023), a class representative's standing to bring one claim does not bestow "a license to sue anyone over anything." *Id.* at 293. The plaintiff landowner there claimed to have suffered a taking at the hands of one county, but purported to sue on behalf of a class of landowners in 26 other counties for similar takings. *Id.* The Sixth Circuit held that absent class members' alleged injuries did not give the plaintiff standing to pursue claims against those other counties "because [absent class members] were not parties." *Id.* at 295.

Here the named plaintiffs live in only a few of the 43 jurisdictions whose laws they invoke. FASC ¶¶ 17–20 (Plaintiffs leased apartments in Alabama, Florida, and Oregon). They have not alleged that *they* were injured in the 39 other states, along with the District of Columbia, whose laws they have sued under. Nor have they alleged markets in 14 states: Alaska, Hawaii, Idaho, Iowa, Maine, Montana, Nebraska, New Hampshire, New Mexico, South Dakota, North Dakota, Vermont, West Virginia, and Wyoming. Because the named plaintiffs have not alleged they were injured in the states where they do not live, they lack standing and their claims under those states' laws should be dismissed. *Fox*, 67 F.4th at 293; *In re EpiPen (Epinephrine Injection, USP) Mktg., Sales Pracs. & Antitrust Litig.*, 336 F. Supp. 3d 1256, 1310–13 (D. Kan. 2018); *In re Niaspan Antitrust Litig.*, 42 F. Supp. 3d 735, 758 (E.D. Pa. 2014) ("Because standing must be resolved on a claim-by-claim basis . . . the named plaintiffs lack standing to assert claims under the laws of the states in which they do not reside or in which they suffered no injury." (cleaned up)).

**E.** **Because Plaintiffs Do Not Plead Fraudulent Concealment With Particularity, They Cannot Assert Claims For Damages That Allegedly Accrued More Than Four Years Before They Filed Their Action**

Plaintiffs' federal antitrust claims, and nearly all of their state-law claims, are subject to four-year statutes of limitations.[15] Plaintiffs filed this action on November 2, 2022, but allege a class period that begins on January 1, 2010—almost 13 years earlier. FASC ¶ 204. They contend they can seek damages extending more than a decade into the past because Defendants fraudulently concealed their alleged conduct. *Id*. To establish fraudulent concealment, a plaintiff must plead "with particularity": "(1) wrongful concealment of their actions by the defendants; (2) failure of the plaintiff to discover the operative facts that are the basis of his cause of action within the limitations period; and (3) plaintiff's due diligence until discovery of the facts." *Carrier Corp. v. Outokumpu Oyj*, 673 F.3d 430, 446 (6th Cir. 2012); *see* Fed. R. Civ. P. 9(b).

Because Plaintiffs do not plead *any* of these elements with particularity, the Court should dismiss their claims for damages predating the limitations periods. *See Pinney Dock & Transp.*

---

[15] 15 U.S.C. § 15b; Alaska Stat. § 45.50.588; Ariz. Rev. Stat. § 44-1410(A); Cal. Bus. & Prof. Code § 16750.1; D.C. Code § 28-4511(b); Fla. Stat. § 542.26(1); Haw. Rev. Stat. § 480-24; Idaho Code § 48-115; 740 Ill. Comp. Stat. 10/7.2; Iowa Code § 553.16(2); Md. Com. Law Code Ann. § 11-209(d)(1); Mass. Gen. Laws ch. 93 § 13; Mich. Comp. Laws § 445.781; Minn. Stat. § 325D.64, subd. 1; Mo. Rev. Stat. § 416.131.2; Neb. Rev. Stat. § 59-1612; N.H. Rev. Stat. § 356.12(II); N.J. Stat. Ann. § 56:9-14; N.M. Stat. § 57-1-12(B); N.Y. Gen. Bus. Law § 340(5); N.C. Gen. Stat. § 75-16.2; N.D. Cent. Code § 51-08.1-10(2); Ohio Rev. Code § 1331.12(B); Okla. Stat. tit. 79 § 205(C); Or. Rev. Stat. § 646.800(2); S.D. Codified Laws § 37-1-14.4; Utah Code Ann. § 76-10-3117; Va. Code Ann. § 59.1-9.14(A); Wash. Rev. Code Ann. § 19.86.120; W. Va. Code § 47-18-11; Wyo. Stat. Ann. § 1-3-105(a)(iv)(C).

The remaining states' statutes of limitations range from one to six years. See Ala. Code § 6-2-38(l) (two years); Ind. Code § 34-11-2-4 (two years); Kan. Stat. Ann. § 60-512(2) (three years); La. Civ. Code Ann. art. 3492 (one year); Me. Rev. Stat. Ann. tit. 14, § 752 (six years); Mont. Code Ann. § 27-2-231 (five years); 42 Pa. Cons. Stat. § 5527(b) (six years); S.C. Code § 15-3-530(2) (three years); Tenn. Code Ann. § 28-3-105 (three years); Vt. Stat. tit 12, § 511 (six years); Wis. Stat. § 133.18(2) (six years). Georgia's statute, Ga. Code Ann. § 13-8-2-1, does not permit recovery of money damages for private plaintiffs. *See E.T. Barwick Indus.*, 692 F. Supp. at 1349.

35

*Co. v. Penn Cent. Corp.*, 838 F.2d 1445, 1478–80 (6th Cir. 1988) (affirming dismissal of antitrust damages claims that accrued more than four years before the complaint).[16]

### i.    Plaintiffs Do Not Plead Any Affirmative Acts Of Concealment.

To satisfy the "wrongful concealment" element, a plaintiff must plead "affirmative acts of concealment," including allegations that "specify the time, place, and content of the alleged fraudulent acts." *Carrier*, 673 F.3d at 446-47. "Mere silence or unwillingness to divulge wrongful activities is not sufficient"; a plaintiff must plead "some trick or contrivance intended to exclude suspicion and prevent inquiry." *Id.* (cleaned up). Plaintiffs do not meet this bar.

*First*, that RealPage's "pricing recommendations" and "list of RealPage participants" are not available to the public (FASC ¶ 193), and that Student Lessors did not reveal "the extent of their [alleged] information exchange" (*id.* ¶ 192), do not reflect "active steps to hide evidence." *Carrier*, 673 F.3d at 447 (general allegations of "covert meetings" did not suffice to show wrongful concealment); *see In re Refrigerant Compressors Antitrust Litig.*, 795 F. Supp. 2d 647, 663–66 (E.D. Mich. 2011) (allegations that defendants "exchanged market information during regular, secret meetings and communications" did not show wrongful concealment).

*Second*, certain Defendants' alleged boilerplate statements about RealPage providing "fair" and "competitive" pricing (FASC ¶¶ 194–96) are hardly "trick[s] or contrivance[s] intended to exclude suspicion and prevent inquiry." *Carrier*, 673 F.3d at 446-47; *In re Processed Egg Prods. Antitrust Litig.*, 2012 WL 6645533, at *4 (E.D. Pa. Dec. 20, 2012) (statements that "free market conditions" drove price increases "fail[] to plausibly suggest" fraudulent concealment).

---

[16] Even accepting as true Plaintiffs' allegations that Defendants commit continuing violations of the antitrust laws, FASC ¶¶ 204–08, Plaintiffs would still be limited to their damages during the four-year limitations period. *Peck v. Gen. Motors Corp.*, 894 F.2d 844, 849 (6th Cir. 1990) ("[E]ven when a plaintiff alleges a continuing violation, an overt act by the defendant is required to restart the statute of limitations and the statute runs from the last over act.").

*Third*, Plaintiffs' allegations about "trainings" provided by RealPage also do not constitute wrongful concealment. Plaintiffs allege RealPage provided video trainings to teach Lessors to "stick to a script" that units were "priced individually" (FASC ¶¶ 197, 199) and taught Student Lessors "not to mention the use of 'AI Revenue Management software'" (*id.* ¶ 199). But Plaintiffs do not "specify the time, place, and content" of any actual communications between any Lessor and any tenant. *See Carrier*, 673 F.3d at 447 (allegation that defendants gave "false and pretextual reasons for the pricing of" allegedly price-fixed products lacked the "requisite particularity"). And, in any event, "an unwillingness to provide information is not an 'affirmative act.'" *Carrier*, 673 F.3d at 447.

### ii. Plaintiffs Do Not Plead Ignorance Of The Operative Facts

Plaintiffs also do not plead particularized facts showing that they were ignorant of "the operative facts that are the basis of [their] cause of action" before November 2018. *Carrier*, 673 F.3d at 446. For purposes of this prong, "[a]ny fact that should excite [the plaintiff's] suspicion is the same as actual knowledge of his entire claim." *Dayco Corp. v. Goodyear Tire & Rubber Co.*, 523 F.2d 389, 394 (6th Cir. 1975).

Plaintiffs' assertion that they "did not discover[] and could not have discovered" the alleged conspiracy "until shortly before filing their complaint" (FASC ¶ 201) is not pleaded with particularity and is contradicted by Plaintiffs' factual allegations. Plaintiffs do not plead *when* they actually discovered the operative facts (which would not suffice, in any event). *See Hoover v. Langstron Equip. Assocs., Inc.*, 958 F.2d 742, 745 (6th Cir. 1992) (rejecting plaintiffs' argument that "they are required to plead only the date of discovery"). Plaintiffs assert that "[o]nly after" the October 2022 ProPublica article "was there a comprehensive presentation of the full scope of the confidential services that RealPage provides to its clients in the real estate industry." FASC ¶ 203. But "comprehensive" knowledge is not the standard, and Plaintiffs repeatedly rely on years-old

public sources that should have "excite[d] . . . suspicion." *Dayco Corp.*, 523 F.2d at 394. Plaintiffs substantially derive their allegations from public documents—conference presentations, e-books, press releases, and more (*see id.* ¶¶ 39–117)—many of which pre-date November 2018. *See id.* ¶¶ 11–13, 42–44, 68–69 (citing a 2014 presentation in which RealPage explained that its product "utilizes competitive data" and compares customers' rents "to the top and bottom of the competitive range for [their] selected competitors."); *id.* ¶ 40 (citing "a 2013 article" for the allegation that YieldStar Student uses "competitor pricing data" to provide customers with "suggested price point[s]").

Plaintiffs cannot "simultaneously claim[] that the generalized evidence cited as the basis of [their] complaint—the vast majority of which involves factual allegations published prior to [the limitations period]—is sufficiently detailed to state a cognizable claim for relief and that, nevertheless, these facts were somehow insufficiently particular to cause the statute of limitations to run." *Woori Bank v. Merrill Lynch*, 923 F. Supp. 2d 491, 495–96 (S.D.N.Y.), *aff'd*, 542 F. App'x 81 (2d Cir. 2013); *see In re Interest Rate Swaps Antitrust Litig.*, 261 F. Supp. 3d at 489 n.38 (reliance on "voluminous news articles and other public sources, many published before [limitations period]" belied fraudulent concealment).

### iii. Plaintiffs Do Not Plead Due Diligence.

Finally, Plaintiffs do not plead that they undertook any due diligence to pursue their claims. They just say they could not have discovered the facts earlier "through the exercise of reasonable diligence." FASC ¶ 201. This "mere allegation of due diligence without asserting what steps were taken" will not do. *Carrier*, 673 F.3d at 448 (quotation omitted). Consistent with Rule 9, Plaintiffs "must fully plead the facts and circumstances surrounding [their] belated discovery" to demonstrate that any delay is "consistent with the requisite diligence." *Dayco*, 523 F.3d at 394. It need hardly be stated that Plaintiffs' failure to identify any diligence does not come close to

meeting that standard. *See Venture Glob. Eng'g, LLC v. Satyam Comput. Servs. Ltd.*, 2012 WL 12897904, at *10 (E.D. Mich. Mar. 30, 2012) (plaintiffs failed to plead fraudulent concealment where complaint did not allege that plaintiffs "did anything at all to exercise reasonable diligence"); *Goff v. Nationwide Mut. Ins. Co.*, 2019 WL 7604826, at *11 (S.D. Ohio Sept. 30, 2019) (allegation that plaintiffs "were not, and could not have been, aware of the facts" any earlier was "entirely conclusory" and "devoid of any facts"; dismissing claims as untimely).

## V.    CONCLUSION

The Court should dismiss Plaintiffs' claims with prejudice.


DATED: October 9, 2023

Respectfully submitted,

/s/ Jay Srinivasan
Jay Srinivasan (admitted *pro hac vice*)
jsrinivasan@gibsondunn.com
Daniel G. Swanson (admitted *pro hac vice*)
dswanson@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071
Telephone: (213) 229-7430

Stephen Weissman (admitted *pro hac vice*)
sweissman@gibsondunn.com
Michael J. Perry (admitted *pro hac vice*)
mjperry@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, NW
Washington, DC 20036
Telephone: (202) 955-8678

Stephen C. Whittaker (admitted *pro hac vice*)
cwhittaker@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
1361 Michelson Drive
Irvine, CA 92612
Telephone: (212) 351-2671

Ben A. Sherwood (admitted *pro hac vice*)
bsherwood@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166
Telephone: (212) 351-2671

Thomas H. Dundon (SBN: 004539)
tdundon@nealharwell.com
Neal & Harwell, PLC
1201 Demonbreun Street, Suite 1000
Nashville, TN 37203
Telephone: (615) 244-1713

*Counsel for Defendant RealPage, Inc.*

/s/ Ian Simmons
Ian Simmons
isimmons@omm.com
O'MELVENY & MYERS LLP
1625 Eye Street, NW
Washington, DC 20006
Telephone: (202) 383-5196

Stephen McIntyre
smcintyre@omm.com
O'MELVENY & MYERS LLP
400 South Hope Street, 18th Floor
Los Angeles, CA 90071
Telephone: (213) 430-6000

*Counsel for Defendants BH Management Services, LLC and B.HOM Student Living LLC*

/s/ Marisa Secco Giles
Marisa Secco Giles
mgiles@velaw.com
VINSON & ELKINS LLP
200 West 6th Street, Suite 2500
Austin, Texas 78701
Telephone: (512) 542-8781

Jason M. Powers
jpowers@velaw.com
VINSON & ELKINS LLP
845 Texas Avenue, Suite 4700
Houston, Texas 77002
Telephone: (713) 758-2522

/s/ Samuel P. Funk
Samuel P. Funk (#19777)
sfunk@simsfunk.com
Grace A. Fox (#37367)
gfox@simsfunk.com
SIMS|FUNK, PLC
3322 West End Ave., Ste. 200
Nashville, TN 37203
Telephone: (615) 292-9335

*Counsel for Defendant Campus Advantage, Inc.*

/s/ Timothy R. Beyer
Timothy R. Beyer
tim.beyer@bclplaw.com
BRYAN CAVE LEIGHTON PAISNER LLP
1700 Lincoln Street, Suite 4100
Denver, CO 80203
Telephone: (303) 866-0481

Sarah Hartley
sarah.hartley@bclplaw.com
BRYAN CAVE LEIGHTON PAISNER LLP
1155 F Street, N.W.
Washington, DC 20004
Telephone: (303) 866-0363

/s/ Samuel P. Funk
Samuel P. Funk (#19777)
sfunk@simsfunk.com
Grace A. Fox (#37367)
gfox@simsfunk.com
SIMS|FUNK, PLC
3322 West End Ave., Ste. 200
Nashville, TN 37203
Telephone: (615) 292-9335

*Counsel for Defendant Cardinal Group Holdings LLC*

/s/ Michael F. Murray
Michael F. Murray
michaelmurray@paulhastings.com
PAUL HASTINGS LLP
2050 M Street, NW
Washington, DC 20036
Telephone: (202) 551-1730

Noah Pinegar
noahpinegar@paulhastings.com
PAUL HASTINGS LLP
200 Park Avenue
New York, NY 10166
Telephone: (212) 318-6057

/s/ Samuel P. Funk
Samuel P. Funk (#19777)
sfunk@simsfunk.com
Grace A. Fox (#37367)
gfox@simsfunk.com
SIMS|FUNK, PLC
3322 West End Ave., Ste. 200
Nashville, TN 37203
Telephone: (615) 292-9335

*Counsel for Defendant CA Student Living
Operating Company, LLC*

/s/ Michael M. Maddigan
Michael M. Maddigan
michael.maddigan@hoganlovells.com
HOGAN LOVELLS US LLP
1999 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067
Telephone: (310) 785-4727

William L. Monts, III
william.monts@hoganlovells.com
Benjamin F. Holt
benjamin.holt@hoganlovells.com
HOGAN LOVELLS US LLP
555 Thirteenth Street, NW
Washington, DC 20004
Telephone: (202) 637-6440

Joshua C. Cumby (BPR No. 37949)
joshua.cumby@arlaw.com
F. Laurens Brock (BPR No. 17666)
larry.brock@arlaw.com
Rocklan W. King, III (BPR No. 30643)
rocky.king@arlaw.com
ADAMS AND REESE LLP
1600 West End Avenue, Suite 1400
Nashville, Tennessee 37203
Telephone: (615) 259-1450

*Counsel for Defendant Greystar
Management Services, LLC*

/s/ Lee A. Peifer
Lee A. Peifer (admitted *pro hac vice*)
leepeifer@eversheds-sutherland.com
EVERSHEDS SUTHERLAND (US) LLP
999 Peachtree Street NE, Suite 2300
Atlanta, Georgia 30309-3996
Telephone: (404) 853-8000

Douglas Berry (#6927)
doug.berry@millermartin.com
Jessica Malloy-Thorpe (#35234)
jessica.malloy-thorpe@millermartin.com
MILLER & MARTIN PLLC
401 Commerce Street, Suite 1010
Nashville, Tennessee 37219
Telephone: (615) 244-9270

*Counsel for Defendant TREV Management II
LLC*

/s/ James H. Mutchnik
James H. Mutchnik
james.mutchnik@kirkland.com
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, IL 60654
Telephone: (312) 862-2000

*Counsel for Defendants Thoma Bravo L.P.,
Thoma Bravo Fund XIII, L.P., and Thoma
Bravo Fund XIV, L.P.*

43

**CERTIFICATE OF SERVICE**

I hereby certify that on October 9, 2023, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all attorneys of record registered on the CM/ECF system.

DATED this 9th day of October, 2023.


_____
        /s/ *Ian Simmons*
        Ian Simmons