# EXHIBIT 3

## Declaration of
## Jamee Slater

**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | |
|---|---|
| IN RE: REALPAGE, INC., RENTAL SOFTWARE ANTITRUST LITIGATION (NO. II) | Case No. 3:23-MD-3071<br>MDL No. 3071<br><br>**This Document Relates to:**<br>**3:22-cv-01082**<br>**3:23-cv-00357**<br>**3:23-cv-00332**<br>**3:23-cv-00410**<br>**3:23-cv-00742**<br><br>**Chief Judge Waverly D. Crenshaw, Jr.** |

**DECLARATION OF JAMEE SLATER IN SUPPORT OF DEFENDANTS' MOTION TO ENFORCE CLASS ACTION WAIVERS**

## DECLARATION

I, Jamee Slater, declare:

1.    I am employed by Greystar Management Services, LLC, and currently hold the title of Senior Director, Technology Systems. In the ordinary course of my work and in carrying out my regular responsibilities, I have regular access to and frequently use various property management system databases (the "System") utilized at multi-family properties managed by Greystar Management Services, LLC ("Greystar"). Greystar uses the System to, among other things, store in electronic form certain business records, such as resident leases for properties it manages on behalf of the owners of those properties.

2.    Attached to this Declaration as Exhibit 3-A is a true and correct copy of a lease contract entered into on May 13, 2022 by Joshua Kabisch to rent unit 1201 at 908 Division St., Nashville, Tennessee, 37203. The lease term began on June 26, 2022, and ended on June 26, 2023 ("Kabisch Lease"). At page 32, the Kabisch Lease contains a Class Action Waiver Addendum providing as follows:

> **4. CLASS ACTION WAIVER.** You agree that you hereby waive your ability to participate either as a class representative or member of any class action claim(s) against us or our agents. While you are not waiving any right(s) to pursue claims against us related to your tenancy, you hereby agree to file any claim(s) in your individual capacity, and you may not be a class action plaintiff, class representative, or member in any purported class action lawsuit ("Class Action"). Accordingly, **you expressly waive any right and/or ability to bring, represent, join, or otherwise maintain a Class Action or similar proceeding against us or our agents in any forum**.
>
> **Any claim that all or any part of this Class Action waiver provision is unenforceable, unconscionable, void, or voidable shall be determined solely by a court of competent jurisdiction.**

1

**YOU UNDERSTAND THAT, WITHOUT THIS WAIVER, YOU MAY HAVE POSSESSED THE ABILITY TO BE A PARTY TO A CLASS ACTION LAWSUIT. BY SIGNING THIS AGREEMENT, YOU UNDERSTAND AND CHOOSE TO WAIVE SUCH ABILITY AND CHOOSE TO HAVE ANY CLAIMS DECIDED INDIVIDUALLY. THIS CLASS ACTION WAIVER SHALL SURVIVE THE TERMINATION OR EXPIRATION OF THIS LEASE CONTRACT.**

The bottom of page 32 of the Kabisch Lease reflects Mr. Kabisch's electronic signature. I obtained Mr. Kabisch's lease from the System, where it was stored in the ordinary course of business.

      3.      Attached to this Declaration as Exhibit 5-A is a lease contract entered into on August 5, 2018, by Christopher Berg, now known as Meghan Cherry, to rent the apartment at 1819 23rd Ave., Seattle, Washington, 98122. The lease term began on August 8, 2018 and ended on November 7, 2019 ("Cherry Lease"). Attached to this Declaration as Exhibit 5-B is a renewal of Ms. Cherry's lease from November 8, 2019 until August 7, 2020, which Ms. Cherry entered into on November 1, 2019 ("Cherry Lease Renewal"). At page 54, the Cherry Lease Renewal contains a Class Action Waiver Addendum providing as follows:

> **4. CLASS ACTION WAIVER.** You agree that you hereby waive your ability to participate either as a class representative or member of any class action claim(s) against us or our agents. While you are not waiving any right(s) to pursue claims against us related to your tenancy, you hereby agree to file any claim(s) against us in your individual capacity, and you may not be a class action plaintiff, class representative, or member in any purported class action lawsuit ("Class Action"). Accordingly, **you expressly waive any right and/or ability to bring, represent, join, or otherwise maintain a Class Action or similar proceeding against us or our agents in any forum.**
>
> **Any claim that all or any part of this Class Action waiver provision is unenforceable, unconscionable, void, or voidable shall be determined solely by a court of competent jurisdiction.**

**YOU UNDERSTAND THAT, WITHOUT THIS WAIVER, YOU MAY HAVE POSSESSED THE ABILITY TO BE A PARTY TO A CLASS ACTION LAWSUIT. BY SIGNING THIS AGREEMENT, YOU UNDERSTAND AND CHOOSE TO WAIVE SUCH ABILITY AND CHOOSE TO HAVE ANY CLAIMS DECIDED INDIVIDUALLY. THIS CLASS ACTION WAIVER SHALL SURVIVE THE TERMINATION OR EXPIRATION OF THIS LEASE CONTRACT.**

The bottom of page 54 of the Cherry Lease Renewal reflects Ms. Cherry's electronic signature. I obtained the Cherry lease from the System, where it was stored in the ordinary course of business.

I declare under penalty of perjury of the laws of the United States of America that the facts stated in this declaration are true and correct.

Executed at _Bixby_____, Oklahoma on October 9, 2023.

Signature: _Jamee Slater_____

Name: Jamee Slater

3

# EXHIBIT 3-A

**Kabisch's Lease**



Date of Lease Contract: _____ **May 13, 2022**
*(when the Lease Contract is filled out)*

*This is a binding document. Read carefully before signing.*

---

### Moving In — General Information

**1. PARTIES.** This Lease Contract (sometimes referred to as the "lease") is between *you*, the resident(s) *(list all people signing the Lease Contract):*

__Joshua Kabisch,__ ▇▇▇▇▇▇▇▇▇▇

_____
_____
_____
_____
_____
_____
_____
_____

and *us*, the owner: **Gulch, LLC** _____
_____
_____

*(name of community or title holder).* You've agreed to rent Dwelling Unit _____ **1201** _____ at **908 Division St. #1201** _____
_____ *(street address)* in
_____**Nashville**_____ 
*(city),* Tennessee, _____**37203**_____ *(zip code)* for use as a private residence only. The terms "you" and "your" refer to all residents listed above. The terms "we," "us," and "our" refer to the owner listed above (or any of owner's successors' in interest or assigns). Written notice to or from our managers constitutes notice to or from us. If anyone else has guaranteed performance of this Lease Contract, a separate Lease Contract Guaranty for each guarantor is attached.

**2. OCCUPANTS.** The dwelling unit will be occupied only by you and *(list all other occupants not signing the Lease Contract):*

_____
_____
_____
_____
_____
_____
_____
_____

No one else may occupy the dwelling unit. Persons not listed above must not stay in the dwelling unit for more than ___**7**___ consecutive days without our prior written consent, and no more than twice that many days in any one month. If the previous space isn't filled in, two days per month is the limit.

**3. LEASE TERM.** The initial term of the Lease Contract begins on the __**26th**__ day of _____**June**_____, __**2022**__ and ends at 11:59 p.m. the __**26th**__ day of _____**June**_____, __**2023**__.

**Renewal.** This Lease Contract will automatically renew month-to-month unless either party gives at least __**60**__ days written notice of termination or intent to move-out as required by paragraph 45 (Move-Out Notice). If the number of days isn't filled in, at least 30 days notice is required.

**4. SECURITY DEPOSIT.** Unless modified by addenda, the total security deposit at the time of execution of this Lease Contract for all residents in the dwelling unit is $ ____**500.00**____ due on or before the date this Lease Contract is signed. Resident's security deposit is deposited at _____
_____
*(name and address of bank).* This account is used only for the deposit of resident's security deposits.

**5. KEYS.** You will be provided ____**0**____ key(s), ____**2**____ mailbox key(s), ____**2**____ FOB(s), and/or ____**0**____ other access device(s) for access to the building and amenities at no additional cost at move-in. If the key, FOB, or other access device becomes damaged or lost during your tenancy or is not returned or is returned damaged when you move out, you will be responsible for the costs for the replacement and/or repair of the same.

**6. RENT AND CHARGES.** Unless modified by addenda, you will pay $ __**3950.00**__ per month for rent, payable in advance and without demand.

☐ at the on-site manager's office, or
☒ at our online payment site, or
☐ at _____
_____
_____

### You specifically waive the right to receive notice of termination of tenancy for non-payment of rent. Therefore, a detainer warrant may be filed immediately upon breach of the agreement for failure to pay rent.

Prorated rent of $ ___**658.33**___ is due for the remainder of *(check one):* ☒ 1st month or ☐ 2nd month, on ____**June 26**____, __**2022**__.

Otherwise, you must pay your rent on or before the 1st day of each month (due date). Cash is unacceptable without our prior written permission. You must not withhold or offset rent unless authorized by statute. We may, at our option, require at any time that you pay all rent and other sums in cash, certified or cashier's check, money order, or one monthly check rather than multiple checks. At our discretion, we may convert any and all checks via the Automated Clearing House (ACH) system for the purposes of collecting payment. Rent is not considered accepted, if the payment/ACH is rejected, does not clear, or is stopped for any reason. Any rent installment received after the fifth (5th) day of the month in which said installment is due shall include a late charge equal to the ten (10%) percent of the rent. This late charge shall become a portion of the rent due under the terms and conditions of this lease. Resident agrees to pay all late rents by money order, or certified funds. We will not impose the late charge if the fifth (5th) day falls on a Sunday or legal holiday and the rent is paid on the next business day. In addition, you will also pay a charge of $ ____**75.00**____ (not to exceed $30.00) for each returned check or rejected electronic payment. If you don't pay rent on time, you'll be delinquent and all remedies under this Lease Contract will be authorized. We'll also have all other remedies for such violation. All payment obligations under this Lease Contract shall constitute rent under this Lease Contract.

**7. UTILITIES.** We'll pay for the following items, if checked:
☐ water      ☐ gas         ☐ electricity    ☐ master antenna
☐ wastewater ☐ trash       ☐ cable TV
☐ other _____

You'll pay for all other utilities or services, related deposits, and any other charges or maintenance fees related to those other utilities or services. You must not allow utilities to be disconnected—including disconnection for not paying your bills—until the lease term or renewal period ends. Cable channels that are provided may be changed during the lease term if the change applies to all residents. Utilities may be used only for normal household purposes and must not be wasted. If your electricity is ever interrupted, you must use only battery-operated lighting. If any utilities or services are submetered for the dwelling unit, or prorated by an allocation formula, we will attach an addendum to this Lease Contract in compliance with state agency rules or city ordinance.

**8. INSURANCE.** We do not maintain insurance to cover your personal property or personal injury. We are not responsible to any resident, guest, or occupant for damage or loss of personal property or personal injury from (including but not limited to) fire, smoke, rain, flood, water and pipe leaks, hail, ice, snow, lightning, wind, explosions, earthquake, interruption of utilities, theft, hurricane, negligence of other residents, occupants, or invited/uninvited guests or vandalism unless otherwise required by law.

In addition, we urge all residents, and particularly those residing in coastal areas, areas near rivers, and areas prone to flooding, to obtain flood insurance. Renter's insurance may not cover damage to your property due to flooding. A flood insurance resource which may be available includes the National Flood Insurance Program managed by the Federal Emergency Management Agency (FEMA).

We urge you to get your own insurance for losses to your personal property or injuries due to theft, fire, water damage, pipe leaks and the like.

Additionally, you are *[check one]* ☒ required to purchase personal liability insurance ☐ not required to purchase personal liability insurance. If no box is checked, personal liability insurance is not required. If required, failure to maintain personal liability insurance throughout your tenancy, including any renewal periods and/or lease extensions, is an incurable breach of this Lease Contract and may result in the termination of tenancy and eviction and/or any other remedies as provided by this Lease Contract or state law.

You acknowledge that no portion of the rent paid by you under this agreement will be applied to the owner's structural fire insurance and that you are in no way a co-insured under any such policy, and that, in order to reduce the cost of insurance, the Owner has chosen to purchase fire and extended coverage insurance for the property for which the above rental agreement applies, with a deductible in the amount of $ _____. If you or any member of your

household, guest or invitee causes damages to the premises in an amount that is less than the amount of this insurance deductible, you agree to indemnify and reimburse the Owner for the amount of such damages, and that you may be liable for costs in excess of the deductible under any subrogation clause of the said policy. It is recommended that you secure insurance to protect your interest in the event of such a loss.

9. **LOCKS AND LATCHES.** Keyed lock(s) will be rekeyed after the prior resident moves out. The rekeying will be done either before you move in or within 7 days after you move in.

You may at any time ask us to change or rekey locks or latches during the Lease Term. We must comply with these requests, but you must pay for them, unless otherwise provided by law.

**Payment for Rekeying, Repairs, Etc.** You must pay for all repairs or replacements arising from misuse or damage to devices by you or your occupants, or guests during your occupancy. You may be required to pay in advance if we notify you within a reasonable time after your request that you are more than 30 days delinquent in reimbursing us for repairing or replacing a device which was misused or damaged by you, your guest or an occupant; or if you have requested that we repair or change or rekey the same device during the 30 days preceding your request and we have complied with your request. Otherwise, you must pay immediately after the work is completed.

<table><tr><td colspan="2">**Special Provisions and "What If" Clauses**</td></tr></table>

10. **SPECIAL PROVISIONS.** The following special provisions and any addenda or written rules furnished to you at or before signing will become a part of this Lease Contract and will supersede any conflicting provisions of this printed lease form.

_____
_____
_____
_____
_____

See any additional special provisions.

11. **EARLY MOVE-OUT.** You'll be liable to us for a reletting charge of $ __3950.00__ (not to exceed 100% of the highest monthly rent during the lease term) if you:

(1) fail to give written move-out notice as required in paragraph 45 (Move-Out Notice) or any other applicable law; or

(2) move out without paying rent in full for the entire lease term or renewal period; or

(3) move out at our demand because of your default; or

(4) are judicially evicted.

The reletting charge is not a cancellation fee and does not release you from your obligations under this Lease Contract.

**Not a Release.** The reletting charge is not a lease cancellation fee or buyout fee. It is an agreed-to liquidated amount covering only part of our damages, that is, our time, effort, and expense in finding and processing a replacement. These damages are uncertain and difficult to ascertain—particularly those relating to inconvenience, paperwork, advertising, showing dwelling units, utilities for showing, checking prospects, office overhead, marketing costs, and locator-service fees. You agree that the reletting charge is a reasonable estimate of such damages and that the charge is due whether or not our reletting attempts succeed. If we reinstate or is stipulated, you must pay our actual reletting costs so far as they can be determined. The reletting charge does not release you from continued liability for: future or past-due rent; charges for cleaning, repairing, repainting, or unreturned keys; or other sums due.

12. **REIMBURSEMENT.** You must promptly reimburse us for loss, damage, government fines, or cost of repairs or service in the community due to a violation of the Lease Contract or rules, improper use, or negligence by you or your guests or occupants. **Unless the damage or wastewater stoppage is due to our negligence, we're not liable for—and you must pay for—repairs, replacement costs, and damage to the following that result from your or your invitees, guests, or occupants' negligence or intentional acts: (1) damage to doors, windows, or screens; (2) damage from windows or doors left open; and (3) damage from wastewater stoppages caused by improper objects in lines exclusively serving your dwelling unit.** We may require payment at any time, including advance payment of repairs for which you're liable. Delay in demanding sums you owe is not a waiver.

13. **CONTRACTUAL LIEN AND PROPERTY LEFT IN DWELLING UNIT. Contractual Lien.** When perfected by the filing of form UCC-1, you hereby give us a lien upon all your property situated upon the said premises, including all furniture and household furnishings, for the

rent agreed to be paid hereunder, for any damage caused by you, and for court costs and attorney's fees incurred under the terms hereof.

**Property Left in Dwelling Unit.** After abandonment, under Paragraph 50 (Deposit Return, Surrender, and Abandonment), we shall remove your possessions and personal effects from the premises and store such personal possessions and personal effects for not less than thirty days. You may reclaim such possessions and personal effects from us within such thirty-day period. If you do not reclaim such possessions and personal effects within such thirty-day period, we may sell or otherwise dispose of your possessions and personal effects and apply the proceeds of the sale to the unpaid rents, damages, storage fees, sale costs and attorney's fees. Any balances are to be held by us for a period of six months after the sale.

14. **FAILING TO PAY FIRST MONTH'S RENT.** If you don't pay the first month's rent when or before the Lease Contract begins, we may end your right of occupancy and recover damages, future rent, reletting charges, attorney's fees, court costs, and other lawful charges. Our rights and remedies under paragraphs 11 (Early Move-Out) and 33 (Default by Resident) apply to acceleration under this paragraph.

15. **RENT INCREASES AND LEASE CONTRACT CHANGES.** No rent increases or Lease Contract changes are allowed before the initial Lease Contract term ends, except for changes allowed by any special provisions in paragraph 10 (Special Provisions), by a written addendum or amendment signed by you and us, or by reasonable changes of dwelling unit rules allowed under paragraph 19 (Community Policies or Rules). If, at least 5 days before the advance notice deadline referred to in paragraph 3 (Lease Term), we give you written notice of rent increases or lease changes effective when the lease term or renewal period ends, this Lease Contract will automatically continue month-to-month with the increased rent or lease changes. The new modified Lease Contract will begin on the date stated in the notice (without necessity of your signature) unless you give us written move-out notice under paragraph 45 (Move-Out Notice).

16. **DELAY OF OCCUPANCY.** If occupancy is or will be delayed for construction, repairs, cleaning, or a previous resident's holding over, we're not responsible for the delay. The Lease Contract will remain in force subject to: (1) abatement of rent on a daily basis during delay; and (2) your right to terminate as set forth below. Termination notice must be in writing. After termination, you are entitled only to refund of deposit(s) and any rent paid. Rent abatement or lease termination does not apply if delay is for cleaning or repairs that don't prevent you from occupying the dwelling unit.

If there is a delay and we haven't given notice of delay as set forth immediately below, you may terminate up to the date when the dwelling unit is ready for occupancy, but not later.

(1) If we give written notice to any of you when or after the initial term as set forth in Paragraph 3 (Lease Term)—and the notice states that occupancy has been delayed because of construction or a previous resident's holding over, and that the dwelling unit will be ready on a specific date—you may terminate the Lease Contract within 3 days of your receiving the notice, but not later.

(2) If we give written notice to any of you before the initial term as set forth in Paragraph 3 (Lease Term) and the notice states that construction delay is expected and that the dwelling unit will be ready for you to occupy on a specific date, you may terminate the Lease Contract within 7 days after any of you receives written notice, but not later. The readiness date is considered the new initial term as set forth in Paragraph 3 (Lease Term) for all purposes. This new date may not be moved to an earlier date unless we and you agree.

**17. AD VALOREM TAXES/FEES AND CHARGES - ADDITIONAL RENT.** Unless otherwise prohibited by law, if, during the term of this Agreement, any locality, city, state, or Federal Government imposes upon Us, any fee, charge, or tax, which is related to or charged by the number of occupants, or by the Premises itself, such that we are charged a fee, charge, or tax, based upon your use or occupancy of the Premises, we may add this charge as Additional Rent, during the term of the Lease Contract, with thirty (30) days advance written notice to you. After this written notice (the amount or approximate amount of the charge, will be included), you agree to pay, as Additional Rent, the amount of the charge, tax or fee imposed upon us, as a result of your occupancy. As examples, these charges can include, but are not limited to: any charges we receive for any zoning violation, sound, noise or litter charge; any charge under any nuisance or chronic nuisance type statute, 911 or other life safety, per person, or per unit charge or tax and any utility bill unpaid by you, which is then assessed to us for payment.

**18. DISCLOSURE RIGHTS.** If someone requests information on you or your rental history for law-enforcement, governmental, or business purposes, we may provide it.

---

## While You're Living in the Dwelling Unit

**19. COMMUNITY POLICIES OR RULES.** You and all guests and occupants must comply with any written dwelling unit rules and community policies, including instructions for care of our property. Our rules are considered part of this Lease Contract. We may make reasonable changes to written rules, that become effective after reasonable notice, if they are distributed and applicable to all units in the community and do not change dollar amounts on page 1 of this Lease Contract.

**20. LIMITATIONS ON CONDUCT.** The dwelling unit and other areas reserved for your private use must be kept clean and free of trash, garbage, and other debris. Trash must be disposed of at least weekly in appropriate receptacles in accordance with local ordinances. Passageways may be used only for entry or exit. You agree to keep all passageways and common areas free of obstructions such as trash, storage items, and all forms of personal property. No person shall ride or allow bikes, skateboards, or other similar objects in the passageways. Any swimming pools, saunas, spas, tanning beds, exercise rooms, storerooms, laundry rooms, and similar areas must be used with care in accordance with dwelling unit rules and posted signs. Glass containers are prohibited in all common areas. You, your occupants, or guests may not anywhere in the community: use candles or use kerosene lamps or kerosene heaters without our prior written approval; cook on balconies or outside; or solicit business or contributions. Conducting any kind of business (including child care services) in your dwelling unit or in the community is prohibited—except that any lawful business conducted "at home" by computer, mail, or telephone is permissible if customers, clients, patients, or other business associates do not come to your dwelling unit for business purposes. We may regulate: (1) the use of patios, balconies, and porches; (2) the conduct of furniture movers and delivery persons; and (3) recreational activities in common areas. You'll be liable to us for damage caused by you or any guests or occupants.

We may exclude from the community guests or others who, in our judgment, have been violating the law, violating this Lease Contract or any dwelling unit rules, or disturbing other residents, neighbors, visitors, or owner representatives. We may also exclude from any outside area or common area a person who refuses to show photo identification or refuses to identify himself or herself as a resident, occupant, or guest of a specific resident in the community.

You agree to notify us if you or any occupants are convicted of any felony, or misdemeanor involving a controlled substance, violence to another person or destruction of property. You also agree to notify us if you or any occupant registers as a sex offender in any state. Informing us of criminal convictions or sex offender registry does not waive our right to evict you.

**21. PROHIBITED CONDUCT.** You, your occupants or guests, or the guests of any occupants, may not engage in the following activities: behaving in a loud or obnoxious manner; disturbing or threatening the rights, comfort, health, safety, or convenience of others (including our agents and employees) in or near the community; disrupting our business operations; manufacturing, delivering, possessing with intent to deliver, or otherwise possessing a controlled substance or drug paraphernalia; engaging in or threatening violence; possessing a weapon prohibited by state law; discharging a firearm in the community; displaying or possessing a gun, knife, or other weapon in the common area in a way that may alarm others; storing anything in closets having gas appliances; tampering with utilities or telecommunications; bringing hazardous materials into the community; or injuring our reputation by making bad faith allegations against us to others.

**22. PARKING.** We may regulate the time, manner, and place of parking cars, trucks, motorcycles, bicycles, boats, trailers, and recreational vehicles by anyone. We may have unauthorized or illegally parked vehicles towed under an appropriate statute. A vehicle is unauthorized or illegally parked in the apartment community if it:

(1) has a flat tire or other condition rendering it inoperable; or
(2) is on jacks, blocks or has wheel(s) missing; or
(3) has not been in compliance with all applicable local or state laws relative to titling and licensing, operation, and registration for more than thirty (30) days; or
(4) takes up more than one parking space; or
(5) belongs to a resident or occupant who has surrendered or abandoned the dwelling unit; or
(6) is parked in a marked accessible parking area for persons with disabilities without the legally required placard or insignia; or
(7) is parked in space marked for manager, staff, or guest at the office; or
(8) blocks another vehicle from exiting; or
(9) is parked in a fire lane or designated "no parking" area; or
(10) is parked in a space marked for other resident(s) or unit(s); or
(11) is parked on the grass, sidewalk, or patio; or
(12) blocks garbage trucks from access to a dumpster; or
(13) belongs to a resident and is parked in a visitor or retail parking space.

**23. RELEASE OF RESIDENT.** Unless you're entitled to terminate your tenancy under paragraphs 10 (Special Provisions), 16 (Delay of Occupancy), 32 (Responsibilities of Owner), 45 (Move-Out Notice), or any other applicable law, you won't be released from this Lease Contract for any reason—including but not limited to voluntary or involuntary school withdrawal or transfer, voluntary or involuntary job transfer, marriage, separation, divorce, reconciliation, loss of co-residents, loss of employment, bad health, or death.

**24. MILITARY PERSONNEL CLAUSE.** All parties to this Lease Contract agree to comply with any federal law, including, but not limited to the Service Member's Civil Relief Act, or any applicable state law(s), if you are seeking to terminate this Lease Contract and/or subsequent renewals and/or Lease Contract extensions under the rights granted by such laws.

**25. RESIDENT SAFETY AND PROPERTY LOSS.** You and all occupants and guests must exercise due care for your own and others' safety and security, especially in the use of smoke detectors and/or carbon monoxide detectors, if provided, keyed deadbolt locks, keyless bolting devices, window latches, and other access control devices.

**Smoke Detectors and Carbon Monoxide Detectors.** We'll furnish smoke detectors and/or carbon monoxide detectors only if required by statute, and if not, we'll only test them and provide working batteries when you first take possession. After that, you must test the smoke detectors and/or the carbon monoxide detectors on a regular basis, if provided, and pay for and replace batteries as needed, unless the law provides otherwise. We may replace dead or missing batteries at your expense, without prior notice to you. You must immediately report to us any malfunction of the smoke-detector and/or carbon monoxide detector, if provided. Neither you nor others may disable the smoke detectors and/or carbon monoxide detectors, if provided. If you damage or disable the smoke detector and/or carbon monoxide detector or remove a battery without replacing it with a working battery, you may be liable to us for $100 plus one month's rent, actual damages, and attorney's fees. If you disable or damage the smoke detector and/or carbon monoxide detector, if provided, or fail to replace a dead battery or report malfunctions to us, you will be liable to us and others for any loss, damage, or fines from fire, smoke, or water.

**Fire or Casualty, Damage or Loss.** We're not liable to any resident, guest, or occupant for personal injury or damage or loss of personal property from any cause, including but not limited to: fire, smoke, rain, flood, water and pipe leaks, hail, ice, snow, lightning, wind, explosions, earthquake, interruption of utilities, theft, or vandalism unless otherwise required by law. We have no duty to remove any ice, sleet, or snow but may remove any amount with or without notice. During freezing weather, you must ensure that the temperature in the Dwelling Unit is sufficient to make sure that the pipes do not freeze (the appropriate temperature will depend upon weather conditions and the size and layout of your unit). If the pipes freeze or any other damage is caused by your failure to properly maintain the heat in your dwelling unit, you'll be liable for damage to our and other's property. If you ask our representatives to perform services not contemplated in this Lease Contract, you hereby indemnify us and hold us harmless from all liability for those services.

If the leased premises is damaged or destroyed by fire or casualty to an extent that the use of the leased premises is substantially impaired, as defined in Tennessee Code Annotated, you (1) may immediately vacate the premises; and you (2) shall notify us in writing within fourteen (14) days thereafter of your intention to terminate the lease, in which case the Lease terminates as of the date of vacating.

If the leased premises are damaged or destroyed by fire or casualty to an extent that restoring the leased premises to its undamaged condition requires you to vacate the premises, we are authorized to terminate the Lease within fourteen (14) days of providing written notice to you. If this Lease is terminated as a result of damages or destruction of the leased premises, we shall return all prepaid rent and security deposits that are recoverable by law. Accounting for rent is to occur as of the date you return the keys to us or have in fact vacated the leased premises, whichever date is earlier.

**Crime or Emergency.** Dial 911 or immediately call local medical emergency, fire, or police personnel in case of accident, fire, smoke, or suspected criminal activity or other emergency involving imminent harm. You should then contact our representative. Unless otherwise provided by law, we're not liable to you or any guests or occupants for injury, damage, or loss to person or property caused by criminal conduct of other persons, including theft, burglary, assault, vandalism, or other crimes. We're not obliged to furnish security personnel, security lighting, security gates or fences, or other forms of security, unless required by law. If we provide any access control devices or security measures upon the property, they are not a guarantee to prevent crime or to reduce the risk of crime on the property. You agree that no access control or security measures can eliminate all crime and that you will not rely upon any provided access control or security measures as a warranty or guarantee of any kind. We're not responsible for obtaining criminal-history checks on any residents, occupants, guests, or contractors in the community. If you or any occupant or guest is affected by a crime, you must make a written report to the appropriate law enforcement agency and our representative. You must also furnish us with the law-enforcement agency's incident report number upon request.

**26. CONDITION OF THE PREMISES AND ALTERATIONS.** You accept the dwelling unit, fixtures, and furniture as is. We disclaim all implied warranties. You'll be given an Inventory and Condition form on or before move-in. You must note on the form all defects or damage and return it to our representative. Otherwise, everything will be considered to be in a clean, safe, and good working condition.

You must use customary diligence in maintaining the dwelling unit and not damaging or littering the common areas. Unless authorized by statute or by us in writing, you must not perform any repairs, painting, wallpapering, carpeting, electrical changes, or otherwise alter our property. No holes or stickers are allowed inside or outside the dwelling unit. But we'll permit a reasonable number of small nail holes for hanging pictures on sheetrock walls and in grooves of wood-paneled walls, unless our rules state otherwise. No water furniture, washing machines, additional phone or TV-cable outlets, alarm systems, or lock changes, additions, or rekeying is permitted unless statutorily allowed or we've consented in writing. You may install a satellite dish or antenna provided you sign our satellite dish or antenna lease addendum which complies with reasonable restrictions allowed by federal law. Installation of any such device without execution of a separate lease addendum may be considered a default under the terms and conditions of this lease contract. You agree not to alter, damage, or remove our property, including alarm systems, smoke detectors and/or carbon monoxide detectors, if provided, furniture, telephone and cable TV wiring, screens, locks, and access control devices. When you move in, we'll supply light bulbs for fixtures we furnish, including exterior fixtures operated

from inside the dwelling unit; after that, you'll replace them at your expense with bulbs of the same type and wattage. Your improvements to the dwelling unit (whether or not we consent) become ours unless we agree otherwise in writing.

**27. REQUESTS, REPAIRS, AND MALFUNCTIONS.** IF YOU OR ANY OCCUPANT NEEDS TO SEND A NOTICE OR REQUEST—FOR EXAMPLE, FOR REPAIRS, INSTALLATIONS, SERVICES, OR SECURITY-RELATED MATTERS—IT MUST BE SUBMITTED THROUGH EITHER THE ONLINE TENANT/MAINTENANCE PORTAL, OR SIGNED AND IN WRITING AND DELIVERED TO OUR DESIGNATED REPRESENTATIVE (except in case of fire, smoke, gas, explosion, overflowing sewage, uncontrollable running water, electrical shorts, or crime in progress). Our written notes on your oral request do not constitute a written request from you.

Our complying with or responding to any oral request regarding security or non-security matters doesn't waive the strict requirement for written notices under this Lease Contract. You must promptly notify us in writing of: water leaks; electrical problems; malfunctioning lights; broken or missing locks or latches; and other conditions that pose a hazard to property, health, or safety. We may change or install utility lines or equipment serving the dwelling unit if the work is done reasonably without substantially increasing your utility costs. We may turn off equipment and interrupt utilities as needed to avoid property damage or to perform work. If utilities malfunction or are damaged by fire, water, or similar cause, you must notify our representative immediately. Air conditioning problems are not emergencies. If air conditioning or other equipment malfunctions, you must notify our representative as soon as possible on a business day. We'll act with customary diligence to make repairs and reconnections. Rent will not abate in whole or in part.

**28. ANIMALS.** Unless otherwise provided under federal, state, or local law, no animals (including mammals, reptiles, birds, fish, rodents, and insects) are allowed, even temporarily, anywhere on the Premises unless we've so authorized in writing. You must remove an illegal or unauthorized animal within 24 hours of notice from us, or you will be considered in default of this Lease Contract. If we allow an animal as a pet, you must execute a separate animal addendum which may require additional deposits, rents, fees or other charges. An animal deposit is considered a general security deposit. When allowed by applicable laws, we will authorize an assistance animal for a disabled person. When allowed by applicable laws, before we authorize an assistance animal, if the disability is not readily apparent, we may require reliable documentation verifying the need for the assistance animal. If we authorize an assistance animal, we may require you to execute a separate animal and/or assistance animal addendum. Animal deposits, additional rents, fees or other charges will not be required for an assistance animal needed due to disability, including an emotional support or service animal, as authorized under federal, state, or local law. You must not feed stray or wild animals.

If you or any guest or occupant violates animal restrictions (with or without your knowledge), you'll be subject to charges, damages, eviction, and other remedies provided in this Lease Contract. If an animal has been in the dwelling unit at any time during your term of occupancy (with or without our consent), we'll charge you for defleaing, deodorizing, and shampooing. Initial and daily animal-violation charges and animal-removal charges are liquidated damages for our time, inconvenience, and overhead (except for attorney's fees and litigation costs) in enforcing animal restrictions and rules. We may remove an unauthorized animal by (1) leaving, in a conspicuous place in the dwelling unit, a 24-hour written notice of intent to remove the animal, and (2) following the procedures of paragraph 29 (When We May Enter). We may keep or kennel the animal or turn it over to a humane society or local authority. When keeping or kenneling an animal, we won't be liable for loss, harm, sickness, or death of the animal unless due to our negligence. We'll return the animal to you upon request if it has not already been turned over to a humane society or local authority. You must pay for the animal's reasonable care and kenneling charges. We have no lien on the animal for any purpose.

**29. WHEN WE MAY ENTER.** You shall not unreasonably withhold consent for us to enter into the dwelling unit in order to inspect the premises, make necessary or agreed repairs, decorations, alterations, or improvements, supply necessary or agreed services, or exhibit the dwelling unit to prospective or actual purchasers, mortgagees, tenants, workers or contractors.

We may enter the dwelling unit without consent in case of emergency. "Emergency" means a sudden, generally unexpected occurrence or set of circumstances demanding immediate action.

Case 3:23-md-03071 Document 590-3 Filed 10/09/23 Page 10 of 170 PageID #: 6290

Where no emergency exists, if any utility has been turned off due to no fault of us, we shall be permitted to enter the premises. We may then inspect the premises, ascertain any damages and make necessary repairs that have resulted from the lack of utilities.

We also have the right of access by Court Order; if you are deceased, incapacitated, or incarcerated; if you have abandoned or surrendered the premises; or during your extended absence in excess of seven (7) days. We may enter the premises without notice if you fail to repair, replace or clean as promptly as conditions require a breach of lease that materially affects health and safety.

We may also upon twenty-four (24) hours notice enter the premises within thirty (30) days of termination of tenancy for the purpose of showing the subject premises to prospective tenants.

**30. JOINT AND SEVERAL RESPONSIBILITY.** Each resident is jointly and severally liable for all lease obligations. If you or any guest or occupant violates the Lease Contract or rules, all residents are considered to have violated the Lease Contract. Our requests and notices (including sale notices) to any resident constitute notice to all residents and occupants. Notices and requests from any resident or occupant (including notices of tenancy termination, repair requests, and entry permissions) constitute notice from all residents. In eviction suits, each resident is considered the agent of all other residents in the dwelling unit for service of process. Security-deposit refunds and deduction itemizations of multiple residents will comply with paragraph 50 (Deposit Return, Surrender, and Abandonment).

| Replacements |
| --- |

**31. REPLACEMENTS AND SUBLETTING.** Replacing a resident, subletting, assignment, or granting a right or license to occupy, no matter the length of the term, the subject area, or the use of the subject area, is strictly prohibited unless we expressly consent in writing. If departing or remaining residents find a replacement resident acceptable to us before moving out and we expressly consent, in writing, to the replacement, subletting, assignment, or granting a right or any license to occupy, then:

(1) a reletting charge *will not* be due; and

(2) a reasonable administrative (paperwork) and/or transfer fee *will* be due, and a rekeying fee *will* be due if rekeying is requested or required.

**Procedures for Replacement.** If we approve a replacement resident, then, the departing, remaining, and new residents must properly execute our Lease Contract Amendment to Add or Change a Roommate During Lease Term. The Addendum will not be effective until executed by all departing, remaining, and new residents, as well as Owner or Owner's representative.

| Responsibilities of Owner and Resident |
| --- |

**32. RESPONSIBILITIES OF OWNER.** We will act with customary diligence to comply with requirements of applicable building and housing codes materially affecting health and safety.

Notice of any non-compliance by us must be properly given to us in writing.

**33. DEFAULT BY RESIDENT.** You'll be in default if you or any guest or occupant violates any terms of this Lease Contract or statutory obligations including but not limited to the following violations: (1) you don't pay rent or other amounts that you owe when due; (2) you or any guest or occupant violates the dwelling unit rules, or fire, safety, health, or criminal laws, regardless of whether or where arrest or conviction occurs; (3) you abandon the dwelling unit; (4) you give incorrect or false answers in a rental application, no matter when we discover the false or incorrect statements; (5) you or any occupant is arrested, convicted, or given deferred adjudication for a felony offense involving actual or potential physical harm to a person, or involving possession, manufacture, or delivery of a controlled substance, marijuana, or drug paraphernalia under state statute (6) any illegal drugs or paraphernalia are found in your dwelling unit; (7) you or any guest or occupant engages in any of the prohibited conduct described in paragraph 21 (Prohibited Conduct); or (8) you or any occupant, in bad faith, makes an invalid complaint to an official or employee of a utility company or the government.

**Eviction—Counties Where Tennessee Uniform Residential Landlord and Tenant Act Applies.**

(1) With the exception of non-payment of rent, if you fail to pay for the costs of repairs, damages or any other amount due to us pursuant to this Lease Contract, you will receive a written notice specifying the violation and advising you that your tenancy will terminate upon a date not less than fourteen (14) days after receipt of this notice, if the violation is not cured within fourteen (14) days. If the violation is a repeat offense of an earlier violation occurring within six (6) months, for which notice was given, your tenancy will terminate on seven (7) days notice without a right to cure the default. If your breach involves a required repair of physical damages, you shall not proceed with the repair of those damages without our specific written consent. Any repairs made by you without our specific written consent will be additional grounds for termination of your tenancy.

**NOTICE OF TERMINATION OF TENANCY FOR NON-PAYMENT OF RENT IS HEREBY SPECIFICALLY WAIVED.**

(2) Your tenancy will terminate three (3) days from the date written notice is delivered to you, if you or any other persons in the dwelling unit, with your consent (a) willfully or intentionally commit a violent act, (b) behave in a manner which constitutes or threatens to be a real and present danger to the health, safety, or welfare of the life or property of other tenants or persons on the premises, (c) create a hazardous or unsanitary condition on the property that affects the health, safety or welfare of the life

or property of other tenants or persons on the premises, or (d) refuses to vacate the premises after entering the premises as an unauthorized subtenant or unauthorized occupant.

(3) For all other defaults other than non-payment of rent, you may receive notice that your tenancy will terminate upon a date not less than fourteen (14) days after the receipt of the notice.

After giving notice to vacate or filing an eviction suit, any rental payments tendered are hereby accepted with reservations of all our rights and remedies; this acceptance does not waive or diminish our right of eviction, or any other contractual or statutory right. Accepting money at any time does not waive our right to damages; past or future rent or other sums; or to continue with eviction proceedings.

**Eviction—Counties Where Tennessee's Uniform Residential Landlord and Tenant Act Does Not Apply.** If (1) you neglect or refuse to pay rent that is due and is in arrears, upon demand, and you have not waived your right to notice of termination of tenancy for non-payment of rent; or, (2) you or members of your household or guests damage the subject premises beyond normal wear and tear, you will receive a written notice specifying the violation and advising you that your tenancy will terminate upon a date not less than fourteen (14) days after receipt of the notice if the violation is not cured within fourteen (14) days. If the violation is a repeat offense of an earlier violation occurring within six (6) months, your tenancy will terminate on fourteen (14) days' notice without a right to cure the default. When allowed by statute, three (3) days' notice shall be sufficient to terminate tenancy if you, or any other person on the premises with your consent, willfully or intentionally commits a violent act; engages in any drug-related activity; or behaves in a manner that constitutes or threatens to be a real and present danger to the health, safety or welfare of the life or property of other tenants, the landlord, the landlord's representatives or other persons on the premises, or if an unauthorized subtenant or unauthorized occupant refuses to vacate the premises.

Termination of your possession rights or subsequent reletting does not release you from liability for future rent or other lease obligations. After giving notice to vacate or filing an eviction suit, any rental payments tendered are hereby accepted with reservations of all our rights and remedies. The filing or acceptance does not waive or diminish our right of eviction or any other contractual or statutory right. Accepting money at any time with reservation of our rights and remedies does not waive our right to damages; past or future rent or other sums; or to continue with eviction proceedings.

**Acceleration.** All monthly rent for the rest of the lease term or renewal period will be accelerated automatically without notice or demand (before or after acceleration) and will be immediately due and delinquent if, without our written consent: (1) you move out, remove property in preparing to move out, or give oral or written notice (by you or any occupant) of intent to move out before the lease term or renewal period ends; and (2) you've not paid all rent for the entire lease term or renewal period. Such conduct is considered a default for which we need not give you notice. Remaining rent also

Case 3:23-md-03071   Document 590-3   Filed 10/09/23   Page 11 of 170 PageID #: 6291

will be accelerated if you're judicially evicted or move out when we demand because you've defaulted. Acceleration is subject to our mitigation obligations below.

**Holdover.** You or any occupant, invitee, or guest must not hold over beyond the date contained in your move-out notice or our notice to vacate (or beyond a different move-out date agreed to by the parties in writing). If a holdover occurs, then: (1) holdover rent is due in advance on a daily basis and may become delinquent without notice or demand; (2) rent for the holdover period will be increased by 25% over the then-existing rent, without notice; (3) you'll be liable to us for all rent for the full term of the previously signed Lease Contract of a new resident who can't occupy because of the holdover; and (4) at our option, we may extend the lease term—for up to one month from the date of notice of lease extension—by delivering written notice to you or your dwelling unit while you continue to hold over.

**Remedies Cumulative.** Any remedies set forth herein shall be cumulative, in addition to, and not in limitation of, any other remedies available to Landlord under any applicable law.

**Other Remedies.** We may report unpaid amounts to credit agencies. If you default and move out early, you will pay us any amounts stated to be rental discounts in paragraph 10 (Special Provisions), in addition to other sums due. Upon your default, we have all other legal remedies, including tenancy termination. In the event we incur attorney's fees in enforcing this Lease Contract against you or any occupants or guests, you must pay our reasonable attorneys' fees and other litigation costs. In the event we incur attorneys' fees in any lawsuits brought by you against us and we prevail, you must pay our reasonable attorneys' fees and litigation costs. Late charges are liquidated damages for our time, inconvenience, and overhead in collecting late rent (but are not for attorney's fees and litigation costs). All unpaid amounts bear 18% interest per year from due date, compounded annually. You must pay all costs of collection including but not limited to collection agency fees.

**Mitigation of Damages.** If you move out early, you'll be subject to paragraph 11 (Early Move-Out) and all other remedies. We'll exercise customary diligence to relet and mitigate damages. We'll credit all subsequent rent that we actually receive from subsequent residents against your liability for past-due and future rent and other sums due.

## General Clauses

**34. ENTIRE AGREEMENT.** Neither we nor any of our representatives have made any oral promises, representations, or agreements. This Lease Contract is the entire agreement between you and us.

**35. NO AUTHORITY TO AMEND UNLESS IN WRITING.** Our representatives (including management personnel, employees, and agents) have no authority to waive, amend, or terminate this Lease Contract or any part of it, unless in writing, and no authority to make promises, representations, or agreements that impose security duties or other obligations on us or our representatives unless in writing.

**36. NO WAIVER.** No action or omission of our representative will be considered a waiver of any subsequent violation, default, or time or place of performance. Our not enforcing or belatedly enforcing written-notice requirements, rental due dates, acceleration, liens, or other rights isn't a waiver under any circumstances.

**37. NOTICE.** Written notice to or from our managers constitutes notice to or from us. Any person giving a notice under this Lease Contract should retain a copy of the memo, letter or fax that was given. Fax signatures are binding.

**38. MISCELLANEOUS.**
A. Exercising one remedy won't constitute an election or waiver of other remedies.
B. Insurance subrogation is waived by all parties.
C. All remedies are cumulative.
D. Unless prohibited by law or the respective insurance policies insurance subrogation is waived by all parties.
E. No employee, agent, or management company is personally liable for any of our contractual, statutory, or other obligations merely by virtue of acting on our behalf.
F. This Lease Contract binds subsequent owners.
G. Neither an invalid clause nor the omission of initials on any page invalidates this Lease Contract.
H. All provisions regarding our non-liability and non-duty apply to our employees, agents, and management companies.
I. This Lease Contract is subordinate or superior to existing and future recorded mortgages, at lender's option.
J. All lease obligations must be performed in the county where the dwelling unit is located.
K. All discretionary rights reserved for us within this Lease Contract or any accompanying addenda are at our sole and absolute discretion.

**39. WAIVER OF JURY TRIAL.** To minimize legal expenses and, to the extent allowed by law, you and we agree that a trial of any lawsuit based on statute common law, and/or related to this Lease Contract shall be to a judge and not a jury.

**40. CONTACTING YOU.** By signing this lease, you are agreeing that we, our representative(s) or agent(s) may contact you. You agree that we may contact you using any contact information relating to your lease including any number (i) you have provided to us (ii) from which you called us, or (iii) which we obtained and through which we reasonably believe we can reach you. You agree we may use any means to contact you. This may include calls made to your cellular telephone using an automatic telephone dialing system, artificial or prerecorded voice messages, text messages, mail, e-mail, and calls to your phone or Voice over Internet Protocol (VoIP) service, or any other data or voice transmission technology. You agree to promptly notify us if you change any contact information you provide to us. You are responsible for any service provider charges as a result of us contacting you.

**41. OBLIGATION TO VACATE.** If we provide you with a notice to vacate, you shall vacate the dwelling unit and remove all your personal property therefrom at the expiration of the lease term, or by the date set forth in the notice to vacate, whichever date is earlier, without further notice or demand from us.

**42. FORCE MAJEURE.** If we are prevented from completing performances of any obligations hereunder by an act of God, strikes, epidemics, war, acts of terrorism, riots, flood, fire, hurricane, tornado, sabotage, or other occurrence which is beyond the control of the parties, then we shall be excused from any further performance of obligations and undertakings hereunder, to the full extent allowed under applicable law.

Furthermore, if such an event damages the property to materially affect its habitability by some or all residents, we reserve the right to vacate any and all leases and you agree to excuse us from any further performance of obligations and undertakings hereunder, to the full extent allowed under applicable law.

**43. PAYMENTS.** Payment of all sums is an independent covenant. At our option and without notice, we may apply money received [other than sale proceeds under paragraph 13 (Contractual Lien and Property Left in Dwelling Unit) or utility payments subject to governmental regulations] first to any of your unpaid obligations, then to current rent—regardless of notations on checks or money orders and regardless of when the obligations arose. All sums other than rent are due upon our demand. After the due date, we do not have to accept the rent or any other payments.

**44. ASSOCIATION MEMBERSHIP.** We represent that either: **(1)** we or; (2) the management company that represents us, is at the time of signing this Lease Contract or a renewal of this Lease Contract, a member of both the National Apartment Association and any affiliated state and local dwelling unit (multi-housing) associations for the area where the dwelling unit is located.

## When Moving Out

**45. MOVE-OUT NOTICE.** Before moving out, either at the end of the lease term, any extension of the lease term, or prior to the end of the lease term, you must give our representative advance written notice of your intention to vacate as required by paragraph 3 (Lease Term). If you move out prior to the end of the lease term, your notice does not act as a release of liability for the full term of the Lease Contract. You will still be liable for the entire Lease Contract term if you move out early (paragraph 23 - Release of Resident) except if you terminate the Lease Contract in accordance with any other applicable law. All notices to vacate must be in writing and must provide the date by which you intend to vacate. If the notice does not comply with the time requirements of paragraph 3 (Lease Term), even if you move by the last date in the lease term, you will be

responsible for an additional month's rent. If you fail to vacate by the date set forth in your notice, your notice is void and you must submit a new written notice. If you fail to provide proper notice and vacate, you will be responsible for an additional month's rent.

**46.MOVE-OUT PROCEDURES.** The move-out date can't be changed unless we and you both agree in writing. You won't move out before the lease term or renewal period ends unless all rent for the entire lease term or renewal period is paid in full. Early move-out may result in reletting charges and acceleration of future rent under paragraphs 11 (Early Move-Out) and 33 (Default by Resident). You're prohibited by law from applying any security deposit to rent. You won't stay beyond the date you are supposed to move out. All residents, guests, and occupants must vacate the dwelling unit before the deposit refund process begins. You must give us and the U.S. Postal Service, in writing, each resident's forwarding address.

**47.CLEANING.** You must thoroughly clean the dwelling unit, including doors, windows, furniture, bathrooms, kitchen appliances, patios, balconies, garages, carports, and storage rooms. You must follow move-out cleaning instructions if they have been provided. If you don't clean adequately, you'll be liable for reasonable cleaning charges.

**48.MOVE-OUT INSPECTION.** You have the right to be present with our representative at the premises for a scheduled move-out inspection, during normal business hours, to determine if there are any damages to the premises that are in excess of normal wear and tear. This mutual inspection will be set by us and held on the day, or within four (4) days after, you have completely vacated the premises, surrendered possession of the premises, and have returned all means of access to the premises. If you fail to attend a scheduled move-out inspection, you waive the right to contest any damage found as a result of our move-out inspection. Our representative has no authority to bind or limit us regarding deductions for repairs, damages, or charges. Any statements or estimates by us or our representative are subject to our accounting.

**49.SECURITY DEPOSIT DEDUCTIONS AND OTHER CHARGES.** You'll be liable for the following charges, if applicable: unpaid rent; unpaid utilities; unreimbursed service charges; repairs or damages caused by negligence, carelessness, accident, or abuse, including stickers, scratches, tears, burns, stains, or unapproved holes; replacement cost of our property that was in or attached to the dwelling unit and is missing; replacing dead or missing smoke-detector and/or carbon monoxide detector batteries, if provided; utilities for repairs or cleaning; trips to let in company representatives to remove your telephone or TV cable services or rental items (if you so request or have moved out); trips to open the dwelling unit when you or any guest or occupant is missing a key; unreturned keys; missing or burned-out light bulbs; removing or rekeying unauthorized access control devices or alarm systems; agreed reletting charges; packing, removing, or storing property removed or stored under paragraph 13 (Contractual Lien and Property Left in Dwelling Unit); removing illegally parked vehicles; special trips for trash removal caused by parked vehicles blocking dumpsters; false security-alarm charges unless due to our negligence; animal-related charges under paragraphs 6 (Rent and Charges) and 28 (Animals); government fees or fines against us for violation (by you, your occupants, or guests) of local ordinances relating to smoke detectors and carbon monoxide detectors, false alarms, recycling, or other matters; late-payment and returned-check charges; a charge (not to exceed $100) for owner/manager's time and inconvenience in our lawful removal of an animal or in any valid eviction proceeding against you, plus reasonable attorney's fees, court costs, and filing fees actually paid; and other sums due under this Lease Contract.

You'll be liable to us for: (1) charges for replacing all keys and access devices referenced in paragraph 5 (Keys) if you fail to return them on or before your actual move-out date; (2) accelerated rent if you have violated paragraph 33 (Default by Resident); and (3) a reletting fee if you have violated paragraph 11 (Early Move-Out).

**50.DEPOSIT RETURN, SURRENDER, AND ABANDONMENT.**
**Deposit Return and Forwarding Address.** You are required to provide us written notice of your forwarding address, on or before termination of this Lease Contract. Within a reasonable time, we will mail you to the forwarding address you provide, your security deposit refund (less lawful deductions) and an itemized accounting of any deductions within the time frames and parameters set forth under state law after surrender or abandonment of the premises.

**Surrender.** You have *surrendered* the dwelling unit when: (1) the move-out date has passed and no one is living in the dwelling unit in our reasonable judgment; or (2) all dwelling unit keys and access devices listed in paragraph 5 (Keys) have been turned in to our managers—whichever date occurs first.

**Abandonment.** You have *abandoned* the dwelling unit when you exceed 30 days or more of unexplained and/or extended absence from the premises without payment of rent or we send proper notice to you, after you have not paid rent for fifteen (15) days past the rental due date and other reasonable factual circumstances indicate that you have permanently vacated the premises, and you fail to respond to our notice in accordance with the law.

Surrender, abandonment, and judicial eviction ends your right of possession for all purposes and gives us the immediate right to: clean up, make repairs in, and relet the dwelling unit; determine any security deposit deductions; and remove property left in the dwelling unit. Surrender, abandonment, and judicial eviction affect your rights to property left in the dwelling unit (paragraph 13 (Contractual Lien and Property Left in Dwelling Unit)), but do not affect our mitigation obligations (paragraph 33 (Default by Resident)).

## Severability, Originals and Attachments, and Signatures

**51.SEVERABILITY.** If any provision of this Lease Contract is invalid or unenforceable under applicable law, such provision shall be ineffective to the extent of such invalidity or unenforceability only without invalidating or otherwise affecting the remainder of this Lease Contract. The court shall interpret the lease and provisions herein in a manner such as to uphold the valid portions of this Lease Contract while preserving the intent of the parties.

**52.ORIGINALS AND ATTACHMENTS.** This Lease Contract has been executed in multiple originals, with original signatures. We will provide you with one copy of the Lease Contract, to be retained by you, for your records. Your copy of the Lease Contract may be in paper format, in an electronic format at your request, or sent via e-mail if we have communicated by e-mail about this Lease. Our rules and community policies, if any, will be attached to the Lease Contract and provided to you at signing. When an Inventory and Condition form is completed and you should retain a copy for your records. Any addenda or amendments you sign as a part of executing this Lease Contract are binding and hereby incorporated into and made part of the Lease Contract between you and us. This lease is the entire agreement between you and us. You acknowledge that you are NOT relying on any oral representations. A copy or scan of this Lease Contract and related addenda, amendments, and agreements may be used for any purpose and shall be treated as an original.

> **You are legally bound by this document.**
> **Read it carefully before signing.**

**Resident or Residents** *(all sign below)*        **Date of Execution**

_____        _____

_____        _____

_____        _____

_____        _____

_____        _____

**Owner or Owner's Representative** *(signing on behalf of owner)*        **Date of Execution**

_____        _____

Address and phone number of owner's representative for notice purposes

908 Division St.

Nashville TN 37203
████████████████

Name and address of locater service *(if applicable)*

Date form is filled out *(same as on top of page 1)*

05/13/2022

**SPECIAL PROVISIONS (CONTINUED FROM PAGE 2)** _____

# INVENTORY AND CONDITION FORM



**DWELLING UNIT DESCRIPTION.** Unit No. _____**1201**_____ , _**908 Division St. #1201**_

_____ *(street address)* in
_____**Nashville**_____ *(city)*, Tennessee, _____**37203**_____ *(zip code)*.

**LEASE CONTRACT DESCRIPTION.** Lease Contract date: _**May 13, 2022**_ Owner's name: **Gulch, LLC**

_____

_____

Residents *(list all residents):*

**Joshua Kabisch,** ▮▮▮▮▮▮▮ _____

_____

_____

_____

_____

**Within 48 hours after move-in, you must note on this form all defects, damage, or safety or pest-related concerns and return it to our representative. Otherwise, everything will be considered to be in a clean, safe, and good working condition. Please mark through items listed below or put "none" if the items don't exist. This form protects both you (the resident) and us (the owner). We'll use it in determining what should and should not be considered your responsibility upon move-out. You are entitled to a copy of this form after it is filled out and signed by you and us.**

Resident's Name:**Joshua Kabisch**
Home Phone: (_____) _____ Work Phone: (_____) _____

Resident's Name:▮▮▮▮▮▮▮
Home Phone: (_____) _____ Work Phone: (_____) _____

Resident's Name:
Home Phone: (_____) _____ Work Phone: (_____) _____

Resident's Name:
Home Phone: (_____) _____ Work Phone: (_____) _____

Resident's Name:
Home Phone: (_____) _____ Work Phone: (_____) _____

Resident's Name:
Home Phone: (_____) _____ Work Phone: (_____) _____

| ☒ **Move-In** or ☐ **Move-Out Condition** *(Check one)* |
|---|

**Living Room**
Walls _____

_____
Wallpaper _____
Plugs, Switches, A/C Vents _____
Woodwork/Baseboards _____
Ceiling _____
Light Fixtures, Bulbs _____
Floor/Carpet _____

_____
Doors, Stops, Locks _____
Windows, Latches, Screens _____
Window Coverings _____
Closets, Rods, Shelves _____
Closet Lights, Fixtures _____
Lamps, Bulbs _____
Other _____

**Kitchen**
Walls _____

_____
Wallpaper _____
Plugs, Switches, A/C Vents _____
Woodwork/Baseboards _____
Ceiling _____
Light Fixtures, Bulbs _____
Floor/Carpet _____

_____
Doors, Stops, Locks _____
Windows, Latches, Screens _____
Window Coverings _____
Cabinets, Drawers, Handles _____
Countertops _____
Stove/Oven, Trays, Pans, Shelves _____
Vent Hood

Refrigerator, Trays, Shelves _____
Refrigerator Light, Crisper _____
Dishwasher, Dispensers, Racks _____
Sink/Disposal _____
Microwave _____
Other _____

**General Items**
Thermostat _____
Cable TV or Master Antenna _____
A/C Filter _____
Washer/Dryer _____
Garage Door _____
Ceiling Fans _____
Exterior Doors, Screens/Screen Doors, Doorbell _____
Fireplace _____
Other _____

_____

_____

**Dining Room**
Walls _____

_____
Wallpaper _____
Plugs, Switches, A/C Vents _____
Woodwork/Baseboards _____
Ceiling _____
Light Fixtures, Bulbs _____
Floor/Carpet _____

_____
Doors, Stops, Locks _____
Windows, Latches, Screens _____
Window Coverings _____
Closets, Rods, Shelves _____
Closet Lights, Fixtures _____
Other _____

_____

© 2021, National Apartment Association, Inc. - 12/2021, Tennessee

**Halls**
Walls _____
_____
Wallpaper _____
Plugs, Switches, A/C Vents _____
Woodwork/Baseboards _____
Ceiling _____
Light Fixtures, Bulbs _____
Floor/Carpet _____
_____
Doors, Stops, Locks _____
Closets, Rods, Shelves _____
Closet Lights, Fixtures _____
Other _____

**Exterior** *(if applicable)*
Patio/Yard _____
Fences/Gates/Gate Latches or Locks _____
Faucets _____
Balconies _____
Other _____
_____

**Bedroom** *(describe which one):* _____
Walls _____
_____
Wallpaper _____
Plugs, Switches, A/C Vents _____
Woodwork/Baseboards _____
Ceiling _____
Light Fixtures, Bulbs _____
Floor/Carpet _____
_____
Doors, Stops, Locks _____
Windows, Latches, Screens _____
Window Coverings _____
Closets, Rods, Shelves _____
Closet Lights, Fixtures _____
Other _____
_____

**Bedroom** *(describe which one):* _____
Walls _____
_____
Wallpaper _____
Plugs, Switches, A/C Vents _____
Woodwork/Baseboards _____
Ceiling _____
Light Fixtures, Bulbs _____
Floor/Carpet _____
_____
Doors, Stops, Locks _____
Windows, Latches, Screens _____
Window Coverings _____
Closets, Rods, Shelves _____
Closet Lights, Fixtures _____
Other _____
_____

**Bath** *(describe which one):* _____
Walls _____
_____
Wallpaper _____
Plugs, Switches, A/C Vents _____
Woodwork/Baseboards _____
Ceiling _____
Light Fixtures, Bulbs _____
Exhaust Fan/Heater _____
Floor/Carpet _____
_____
Doors, Stops, Locks _____
Windows, Latches, Screens _____
Window Coverings _____
Sink, Faucet, Handles, Stopper _____
Countertops _____
Mirror _____
Cabinets, Drawers, Handles _____
Toilet, Paper Holder _____
Bathtub, Enclosure, Stopper _____
Shower, Doors, Rods _____

**Tile** _____
Other _____
_____

**Half Bath**
Walls _____
_____
Wallpaper _____
Plugs, Switches, A/C Vents _____
Woodwork/Baseboards _____
Ceiling _____
Light Fixtures, Bulbs _____
Exhaust Fan/Heater _____
Floor/Carpet _____
_____
Doors, Stops, Locks _____
Windows, Latches, Screens _____
Window Coverings _____
Sink, Faucet, Handles, Stopper _____
Countertops _____
Mirror _____
Cabinets, Drawers, Handles _____
Toilet, Paper Holder _____
Tile _____
Other _____
_____

**Bedroom** *(describe which one):* _____
Walls _____
_____
Wallpaper _____
Plugs, Switches, A/C Vents _____
Woodwork/Baseboards _____
Ceiling _____
Light Fixtures, Bulbs _____
Floor/Carpet _____
_____
Doors, Stops, Locks _____
Windows, Latches, Screens _____
Window Coverings _____
Closets, Rods, Shelves _____
Closet Lights, Fixtures _____
Other _____
_____

**Bath** *(describe which one):* _____
Walls _____
_____
Wallpaper _____
Plugs, Switches, A/C Vents _____
Woodwork/Baseboards _____
Ceiling _____
Light Fixtures, Bulbs _____
Exhaust Fan/Heater _____
Floor/Carpet _____
_____
Doors, Stops, Locks _____
Windows, Latches, Screens _____
Window Coverings _____
Sink, Faucet, Handles, Stopper _____
Countertops _____
Mirror _____
Cabinets, Drawers, Handles _____
Toilet, Paper Holder _____
Bathtub, Enclosure, Stopper _____
Shower, Doors, Rods _____
Tile _____
Other _____
_____

**Safety-Related Items** *(Put "N/A" if not applicable)*
Door Knob Locks _____
Keyed Deadbolt Locks _____
_____
Keyless Deadbolts _____
_____
Sliding Door Pin Locks _____
Sliding Door Latches _____
Sliding Door Secutiry Bars _____
Doorviewers _____

Window Latches _____
Porch and Patio Lights _____
Smoke Detectors _____
Alarm System _____
Fire Extinguishers (look at charge level BUT DON'T TEST!)
_____
Garage Door Opener _____
Gate Access Card(s) _____
Other _____
_____
_____

**Date of Move-In:**  06/26/2022 _____

*or*

**Date of Move-Out:** _____

**SPECIAL PROVISIONS.**  The following special provisions control over conflicting provisions of this printed form:

_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

**Acknowledgment.** You agree you will complete and submit this form in accordance with this Lease and our Community Policies. You acknowledge you will inspect and test all safety-related items in the dwelling unit, including smoke alarms and any other detector(s), and confirm that they are working, except as noted on your completed Inventory and Condition Form**.** All items will be considered to be in good and working condition unless otherwise noted. You acknowledge you will receive written operating instructions on the alarm system and gate access entry systems (if there are any). You acknowledge that you will inspect the dwelling unit and confirm no signs of bed bugs or other pests are present, or, if bugs are present**,** that you will promptly report any bed bug or pest issues on this Inventory and Condition Form and through a written work order or other written repair request. You agree that this returned completed Inventory and Condition Form accurately reflects the condition of the dwelling unit for purposes of determining any refund of deposit due to you when you move out. You acknowledge that if you do not return the form within 48 hours after move-in, we will consider the dwelling unit to be clean, safe, free of pest or insect infestations, and in good working condition for purposes of determining any refund of deposit due to you at move-out.

*In signing below, you accept this inventory as part of the Lease Contract and agree that it accurately reflects the condition of the premises for purposes of determining any refund due to you when you move out.*

**Resident or Resident's Agent:** _____     **Date of Signing:** _____

**Resident or Resident's Agent:** _____     **Date of Signing:** _____

**Resident or Resident's Agent:** _____     **Date of Signing:** _____

**Resident or Resident's Agent:** _____     **Date of Signing:** _____

**Resident or Resident's Agent:** _____     **Date of Signing:** _____

**Resident or Resident's Agent:** _____     **Date of Signing:** _____

**Owner or Owner's Representative:** _____     **Date of Signing:** _____

# UTILITY ADDENDUM



This Utility Addendum is incorporated into the Lease Contract (referred to in this addendum as "Lease Contract" or "Lease") dated **May 13, 2022** between **Gulch, LLC**

("We" and/or "we" and/or "us") and **Joshua Kabisch,** ▮▮▮▮▮

("You" and/or "you") of Apt. No. **1201** located at **908 Division St. #1201**

(street address) in **Nashville, TN 37203**
and is in addition to all terms and conditions in the Lease. This Addendum constitutes an Addendum to the above described Lease Contract for the above described premises, and is hereby incorporated into and made a part of such Lease Contract. Where the terms or conditions found in this Addendum vary or contradict any terms or conditions found in the Lease Contract, this Addendum shall control.

**1.** Responsibility for payment of utilities, and the method of metering or otherwise measuring the cost of the utility, will be as indicated below.

a) **Water** service to your dwelling will be paid by you either:
- ☐ directly to the utility service provider; or
- ☒ water bills will be billed by the service provider to us and then allocated to you based on the following formula: **1**
  - ☐ If flat rate is selected, the current flat rate is $ _____ per month.
  - ☐ 3rd party billing company if applicable **Conservice**

b) **Sewer** service to your dwelling will be paid by you either:
- ☐ directly to the utility service provider; or
- ☒ sewer bills will be billed by the service provider to us and then allocated to you based on the following formula: **1**
  - ☐ If flat rate is selected, the current flat rate is $ _____ per month.
  - ☐ 3rd party billing company if applicable **Conservice**

c) **Gas** service to your dwelling will be paid by you either:
- ☐ directly to the utility service provider; or
- ☒ gas bills will be billed by the service provider to us and then allocated to you based on the following formula: **6**
  - ☐ If flat rate is selected, the current flat rate is $ _____ per month.
  - ☐ 3rd party billing company if applicable **Conservice**

d) **Trash** service to your dwelling will be paid by you either:
- ☐ directly to the utility service provider; or
- ☒ trash bills will be billed by the service provider to us and then allocated to you based on the following formula: **4**
  - ☒ If flat rate is selected, the current flat rate is $ **25.00** per month.
  - ☐ 3rd party billing company if applicable

e) **Electric** service to your dwelling will be paid by you either:
- ☒ directly to the utility service provider; or
- ☐ electric bills will be billed by the service provider to us and then allocated to you based on the following formula: _____
  - ☐ If flat rate is selected, the current flat rate is $ _____ per month.
  - ☐ 3rd party billing company if applicable

f) **Stormwater** service to your dwelling will be paid by you either:
- ☐ directly to the utility service provider; or
- ☐ stormwater bills will be billed by the service provider to us and then allocated to you based on the following formula: _____
  - ☐ If flat rate is selected, the current flat rate is $ _____ per month.
  - ☐ 3rd party billing company if applicable

g) **Cable TV** service to your dwelling will be paid by you either:
- ☐ directly to the utility service provider; or
- ☐ cable TV bills will be billed by the service provider to us and then allocated to you based on the following formula: _____
  - ☐ If flat rate is selected, the current flat rate is $ _____ per month.
  - ☐ 3rd party billing company if applicable

h) **Master Antenna** service to your dwelling will be paid by you either:
- ☐ directly to the utility service provider; or
- ☐ master antenna bills will be billed by the service provider to us and then allocated to you based on the following formula: _____
  - ☐ If flat rate is selected, the current flat rate is $ _____ per month.
  - ☐ 3rd party billing company if applicable

i) **Internet** service to your dwelling will be paid by you either:
- ☐ directly to the utility service provider; or
- ☐ internet bills will be billed by the service provider to us and then allocated to you based on the following formula: _____
  - ☐ If flat rate is selected, the current flat rate is $ _____ per month.
  - ☐ 3rd party billing company if applicable

j) **Pest Control** service to your dwelling will be paid by you either:
- ☐ directly to the utility service provider; or
- ☒ pest control bills will be billed by the service provider to us and then allocated to you based on the following formula: **4**
  - ☒ If flat rate is selected, the current flat rate is $ **5.00** per month.
  - ☐ 3rd party billing company if applicable

k) (Other) **Technology Bundle** service to your dwelling will be paid by you either:
- ☐ directly to the utility service provider; or
- ☒ bills will be billed by the service provider to us and then allocated to you based on the following formula: **4**
  - ☒ If flat rate is selected, the current flat rate is $ **70.00** per month.
  - ☐ 3rd party billing company if applicable

© 2019, National Apartment Association, Inc. - 1/2019, Tennessee

l)  (Other) **Common Area Electricity** _____ service to your dwelling will be paid by you either:
☐  directly to the utility service provider; or
☒  bills will be billed by the service provider to us and then allocated to you following the formula: **8** _____
  ☐  If flat rate is selected, the current flat rate is $ _____**5.00**_____ per month.
  ☐  3rd party billing company if applicable **Conserve** _____

METERING/ALLOCATION METHOD KEY
"1"  - Sub-metering of all of your water/gas/electric use
"2"  - Calculation of your total water use based on sub-metering of hot water
"3"  - Calculation of your total water use based on sub-metering of cold water
"4"  - Flat rate per month
"5"  - Allocation based on the number of persons residing in your dwelling unit
"6"  - Allocation based on the number of persons residing in your dwelling unit using a ratio occupancy formula
"7"  - Allocation based on square footage of your dwelling unit
"8"  - Allocation based on a combination of square footage of your dwelling unit and the number of persons residing in your dwelling unit
"9"  - Allocation based on the number of bedrooms in your dwelling unit
"10"- Allocation based on a lawful formula not listed here
      (Note: if method "10" is selected, a separate sheet will be attached describing the formula used)

2.  If an allocation method is used, we or our billing company will calculate your allocated share of the utilities and services provided and all costs in accordance with state and local statutes. Under any allocation method, Resident may be paying for part of the utility usage in common areas or in other residential units as well as administrative fees. Both Resident and Owner agree that using a calculation or allocation formula as a basis for estimating total utility consumption is fair and reasonable, while recognizing that the allocation method may or may not accurately reflect actual total utility consumption for Resident. Where lawful, we may change the above methods of determining your allocated share of utilities and services and all other billing methods, in our sole discretion, and after providing written notice to you. More detailed descriptions of billing methods, calculations and allocation formulas will be provided upon request.

    If a flat fee method for trash or other utility service is used, Resident and Owner agree that the charges indicated in this Agreement (as may be amended with written notice as specified above) represent a fair and reasonable amount for the service(s) provided and that the amount billed is not based on a monthly per unit cost.

3.  When billed by us directly or through our billing company, you must pay utility bills within _____**3**_____ days of the date when the utility bill is issued at the place indicated on your bill, or the payment will be late. If a payment is late, you will be responsible for a late fee as indicated below. The late payment of a bill or failure to pay any utility bill is a material and substantial breach of the Lease and we will exercise all remedies available under the Lease, up to and including eviction for nonpayment. To the extent there are any new account, monthly administrative, late or final bill fees, you shall pay such fees as indicated below.

    New Account Fee:                        $ ___**15.00**___ (not to exceed $ ___**20.00**___ )
    Monthly Administrative Billing Fee:     $ ___**5.00**___ (not to exceed $ ___**8.00**___ )
    Late Fee:                               $ _____ (not to exceed $ _____ )
    Final Bill Fee:                         $ ___**15.00**___ (not to exceed $ ___**20.00**___ )

    If allowed by state law, we at our sole discretion may amend these fees, with written notice to you.

4.  You will be charged for the full period of time that you were living in, occupying, or responsible for payment of rent or utility charges on the dwelling. If you breach the Lease, you will be responsible for utility charges for the time period you were obliged to pay the charges under the Lease, subject to our mitigation of damages. In the event you fail to timely establish utility services, we may charge you our utility service billed to us for your dwelling and may charge a reasonable administration fee for billing for the utility service in the amount of $ ___**50.00**___.

5.  When you move out, you will receive a final bill which may be estimated based on your prior utility usage. This bill must be paid at the time you move out or it will be deducted from the security deposit.

6.  We are not liable for any losses or damages you incur as a result of outages, interruptions, or fluctuations in utility services provided to the dwelling unless such loss or damage was the direct result of negligence by us or our employees. You release us from any and all such claims and waive any claims for offset or reduction of rent or diminished rental value of the dwelling due to such outages, interruptions, or fluctuations.

7.  You agree not to tamper with, adjust, or disconnect any utility sub-metering system or device. Violation of this provision is a material breach of your Lease and may subject you to eviction or other remedies available to us under your Lease, this Utility Addendum and at law.

8.  Where lawful, all utilities, charges and fees of any kind under this lease shall be considered additional rent, and if partial payments are accepted by the Owner, they will be allocated first to non-rent charges and to rent last.

9.  You represent that all occupants that will be residing in the Unit are accurately identified in the Lease. You agree to promptly notify Owner of any change in such number of occupants.

10. You agree that you may, upon thirty (30) days prior written notice from Owner to you, begin receiving a bill for additional utilities and services, at which time such additional utilities and services shall for all purposes be included in the term Utilities.

11. This Addendum is designed for use in multiple jurisdictions, and no billing method, charge, or fee mentioned herein will be used in any jurisdiction where such use would be unlawful. If any provision of this addendum or the Lease is invalid or unenforceable under applicable law, such provision shall be ineffective to the extent of such invalidity or unenforceability only without invalidating or otherwise affecting the remainder of this addendum or the Lease. Except as specifically stated herein, all other terms and conditions of the Lease shall remain unchanged. In the event of any conflict between the terms of this Addendum and the terms of the Lease, the terms of this Addendum shall control.

**12.** The following special provisions and any addenda or written rules furnished to you at or before signing will become a part of this Utility Addendum and will supersede any conflicting provisions of this printed Utility Addendum and/or the Lease Contract.

<u>Formula 10: Amounts are calculated based on the total expense billed to the community by the service provider(s) and divided equally to all occupied units. Trash includes, but is not limited to, trash hauling, recycling, trash clean-up, trash sorting, contamination fees, and bulk/junk item removal.</u>

Resident Signature _____ Date _____

Resident Signature _____ Date _____

Resident Signature _____ Date _____

Resident Signature _____ Date _____

Resident Signature _____ Date _____

Resident Signature _____ Date _____

Management _____ Date _____

© 2019, National Apartment Association, Inc. - 1/2019, Tennessee

# MOLD INFORMATION AND PREVENTION ADDENDUM

NATIONAL APARTMENT ASSOCIATION
We Lead the Way Home

***Please note: It is our goal to maintain a quality living environment for our residents. To help achieve this goal, it is important to work together to minimize any mold growth in your dwelling. That is why this addendum contains important information for you, and responsibilities for both you and us.***

**1. DWELLING UNIT DESCRIPTION.**
Unit No. 1201, 908 Division St. #1201 *(street address)* in Nashville *(city)*, Tennessee, 37203 *(zip code)*.

**2. LEASE CONTRACT DESCRIPTION.**
Lease Contract Date: May 13, 2022
Owner's name: Gulch, LLC

Residents *(list all residents)*:
Joshua Kabisch, [redacted]

This Addendum constitutes an Addendum to the above described Lease Contract for the above described premises, and is hereby incorporated into and made a part of such Lease Contract. Where the terms or conditions found in this Addendum vary or contradict any terms or conditions found in the Lease Contract, this Addendum shall control.

**3. ABOUT MOLD.** Mold is found virtually everywhere in our environment—both indoors and outdoors and in both new and old structures. Molds are naturally occurring microscopic organisms which reproduce by spores and have existed practically from the beginning of time. All of us have lived with mold spores all our lives. Without molds we would all be struggling with large amounts of dead organic matter.

Mold breaks down organic matter in the environment and uses the end product for its food. Mold spores (like plant pollen) spread through the air and are commonly transported by shoes, clothing and other materials. When excess moisture is present inside a dwelling, mold can grow. A 2004 Federal Centers for Disease Control and Prevention study found that there is currently no scientific evidence that the accumulation of mold causes any significant health risks for person with normally functioning immune systems. Nonetheless, appropriate precautions need to be taken.

**4. PREVENTING MOLD BEGINS WITH YOU.** In order to minimize the potential for mold growth in your dwelling, you must do the following:

- Keep your dwelling clean—particularly the kitchen, the bathroom(s), carpets and floors. Regular vacuuming, mopping and using a household cleaner to clean hard surfaces is important to remove the household dirt and debris that harbor mold or food for mold. Immediately throw away moldy food.
- Remove visible moisture accumulation on windows, walls, ceilings, floors and other surfaces as soon as reasonably possible. Look for leaks in washing machine hoses and discharge lines—especially if the leak is large enough for water to infiltrate nearby walls. Turn on any exhaust fans in the bathroom and kitchen *before* you start showering or cooking with open pots. When showering, be sure to keep the shower curtain *inside* the tub or fully close the shower doors. Also, the experts recommend that after taking a shower or bath, you: (1) wipe moisture off of shower walls, shower doors, the bathtub and the bathroom floor; (2) leave the bathroom door open until all moisture on the mirrors and bathroom walls and tile surfaces has dissipated; and (3) hang up your towels and bath mats so they will completely dry out.
- Promptly notify us in writing about any air conditioning or heating system problems you discover. Follow our rules, if any, regarding replacement of air filters. Also, it is recommended that you periodically open windows and doors on days when the outdoor weather is dry (i.e., humidity is below 50 percent) to help humid areas of your dwelling dry out.
- Promptly notify us in writing about any signs of water leaks, water infiltration or mold. We will respond in accordance with state law and the Lease Contract to repair or remedy the situation, as necessary.
- Keep the thermostat set to automatically circulate air in the event temperatures rise to or above 80 degrees Fahrenheit.

**5. IN ORDER TO AVOID MOLD GROWTH,** it is important to prevent excessive moisture buildup in your dwelling. Failure to promptly pay attention to leaks and moisture that might accumulate on dwelling surfaces or that might get inside walls or ceilings can encourage mold growth. Prolonged moisture can result from a wide variety of sources, such as:

- rainwater leaking from roofs, windows, doors and outside walls, as well as flood waters rising above floor level;
- overflows from showers, bathtubs, toilets, lavatories, sinks, washing machines, dehumidifiers, refrigerator or A/C drip pans or clogged up A/C condensation lines;
- leaks from plumbing lines or fixtures, and leaks into walls from bad or missing grouting/caulking around showers, tubs or sinks;
- washing machine hose leaks, plant watering overflows, pet urine, cooking spills, beverage spills and steam from excessive open-pot cooking;
- leaks from clothes dryer discharge vents (which can put lots of moisture into the air); and
- insufficient drying of carpets, carpet pads, shower walls and bathroom floors.

**6. IF SMALL AREAS OF MOLD HAVE ALREADY OCCURRED ON *NON-POROUS* SURFACES** (such as ceramic tile, formica, vinyl flooring, metal, wood or plastic), the federal Environmental Protection Agency (EPA) recommends that you first clean the areas with soap (or detergent) and water, let the surface dry, and then within 24 hours apply a pre-mixed, spray-on-type household biocide, such as Lysol Disinfectant®, Pine-Sol Disinfectant® (original pine-scented), Tilex Mildew Remover® or Clorox Cleanup®. (Note: Only a few of the common household cleaners will actually kill mold). Tilex® and Clorox® contain bleach which can discolor or stain. **Be sure to follow the instructions on the container.** Applying biocides without first cleaning away the dirt and oils from the surface is like painting over old paint without first cleaning and preparing the surface.

Always clean and apply a biocide to an area 5 or 6 times larger than any visible mold because mold may be adjacent in quantities not yet visible to the naked eye. A vacuum cleaner with a high-efficiency particulate air (HEPA) filter can be

© 2019, National Apartment Association, Inc. - 1/2019, Tennessee

used to help remove non-visible mold products from *porous* items, such as fibers in sofas, chairs, drapes and carpets—provided the fibers are completely dry. Machine washing or dry cleaning will remove mold from clothes.

**7. DO NOT CLEAN OR APPLY BIOCIDES TO:** (1) visible mold on *porous surfaces,* such as sheetrock walls or ceilings, or (2) *large areas* of visible mold on *non-porous* surfaces. Instead, notify us in writing, and we will take appropriate action.

**8. COMPLIANCE.** Complying with this addendum will help prevent mold growth in your dwelling, and both you and we will be able to respond correctly if problems develop that could lead to mold growth. If you have questions regarding this addendum, please contact us at the management office or at the phone number shown in your Lease Contract.

**If you fail to comply with this Addendum, you can be held responsible for property damage to the dwelling and any health problems that may result. We can't fix problems in your dwelling unless we know about them.**

**9. SPECIAL PROVISIONS.** The following special provisions control over conflicting provisions of this printed form:

_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

**Resident or Residents**
*(All residents must sign here)*

_____
_____
_____
_____
_____

**Owner or Owner's Representative**
*(Signs here)*

_____

**Date of Lease Contract**

**May 13, 2022**
_____

# BED BUG ADDENDUM

Date: **May 13, 2022**
(when this Addendum is filled out)



> *Please note: It is our goal to maintain a quality living environment for our residents. To help achieve this goal, it is important to work together to minimize the potential for any bed bugs in your dwelling or surrounding dwellings. This addendum contains important information that outlines your responsibility and potential liability with regard to bed bugs.*

## 1. DWELLING UNIT DESCRIPTION.

Unit No. **1201**, **908 Division St. #1201**
_____ *(street address)* in
**Nashville**
*(city)*, Tennessee, **37203** *(zip code)*.

## 2. LEASE CONTRACT DESCRIPTION.

Lease Contract Date: **May 13, 2022**
Owner's name: **Gulch, LLC**
_____
_____
_____
_____

Residents *(list all residents)*:

**Joshua Kabisch,** ▮▮▮▮▮▮▮▮
_____
_____
_____
_____
_____
_____
_____
_____

This Addendum constitutes an Addendum to the above described Lease Contract for the above described premises, and is hereby incorporated into and made a part of such Lease Contract. Where the terms or conditions found in this Addendum vary or contradict any terms or conditions found in the Lease Contract, this Addendum shall control.

## 3. PURPOSE.
This Addendum modifies the Lease Contract and address situations related to bed bugs *(cimex lectularius)* which may be discovered infesting the dwelling or personal property in the dwelling. You understand that we relied on your representations to us in this Addendum.

## 4. INSPECTION AND INFESTATIONS.
BY SIGNING THIS ADDENDUM, YOU REPRESENT THAT:

- YOU HAVE INSPECTED THE DWELLING PRIOR TO MOVING IN, OR PRIOR TO SIGNING THIS ADDENDUM, AND YOU DID NOT FIND ANY EVIDENCE OF BED BUGS OR A BED BUG INFESTATION;

OR

- YOU WILL INSPECT THE DWELLING WITHIN 48 HOURS AFTER MOVING IN, OR WITHIN 48 HOURS AFTER SIGNING THIS ADDENDUM AND WILL NOTIFY US OF ANY BED BUGS OR BED BUG INFESTATIONS.

You agree that you have read the information provided in this Addendum and that you are not aware of any infestation or presence of bed bugs in your current or previous dwellings, furniture, clothing, personal property, or possessions. You also acknowledge that you have fully disclosed to us any previous bed bug infestations or bed bug issues that you have experienced.

If you disclose to us a previous experience with bed bug infestations or other bed bug related issues, we can review documentation of the previous treatment(s) and inspect your personal property and possession to confirm the absence of bed bugs.

## 5. ACCESS FOR INSPECTION AND PEST TREATMENT.
You must allow us and our pest control agents access to the dwelling at reasonable times to inspect for or treat bed bugs as allowed by law. You and your family members, occupants, guests, and invitees must cooperate and will not interfere with inspections or treatments. We have the right to select any licensed pest control professional to treat the dwelling and building. We can select the method of treating the dwelling, building and common areas for bed bugs. We can also inspect and treat adjacent or neighboring dwellings to the infestation even if those dwellings are not the source or cause of the known infestation. Unless otherwise prohibited by law, you are responsible for and must, at your own expense, have your own personal property, furniture, clothing and possessions treated according to accepted treatment methods established by a licensed pest control firm that we approve. You must do so as close as possible to the time we treated the dwelling. If you fail to do so, you will be in default, and we will have the right to terminate your right of occupancy and exercise all rights and remedies under the Lease Contract. You agree not to treat the dwelling for a bed bug infestation on your own.

## 6. NOTIFICATION.
You must promptly notify us:

- of any known or suspected bed bug infestation or presence in the dwelling, or in any of your clothing, furniture or personal property.
- of any recurring or unexplained bites, stings, irritations, or sores of the skin or body which you believe is caused by bed bugs, or by any condition or pest you believe is in the dwelling.
- if you discover any condition or evidence that might indicate the presence or infestation of bed bugs, or of any confirmation of bed bug presence by a licensed pest control professional or other authoritative source.

## 7. COOPERATION.
If we confirm the presence or infestation of bed bugs, you must cooperate and coordinate with us and our pest control agents to treat and eliminate the bed bugs. You must follow all directions from us or our agents to clean and treat the dwelling and building that are infested. You must remove or destroy personal property that cannot be treated or cleaned as close as possible to the time we treated the dwelling. Any items you remove from the dwelling must be disposed of off-site and not in the property's trash receptacles. If we confirm the presence or infestation of bed bugs in your dwelling, we have the right to require you to temporarily vacate the dwelling and remove all furniture, clothing and personal belongings in order for us to perform pest control services. If you fail to cooperate with us, you will be in default, and we will have the right to terminate your right of occupancy and exercise all rights and remedies under the Lease Contract.

## 8. RESPONSIBILITIES.
You may be required to pay all reasonable costs of cleaning and pest control treatments incurred by us to treat your dwelling unit for bed bugs. If we confirm the presence or infestation of bed bugs after you vacate your dwelling, you may be responsible for the cost of cleaning and pest control treatments. If we must move other residents in order to treat adjoining or neighboring dwellings to your dwelling unit, you may be liable for payment of any lost rental income and other expenses incurred by us to relocate the neighboring residents and to clean and perform pest control treatments to eradicate infestations in other dwellings. If you fail to pay us for any costs you are liable for, you will be in default, and we will have the right to terminate your right of occupancy and exercise all rights and remedies under the Lease Contract, and obtain immediate possession of the dwelling. If you fail to move out after your right of occupancy has been terminated, you will be liable for holdover rent under the Lease Contract.

© 2020, National Apartment Association, Inc. - 2/2020, Tennessee

9. **TRANSFERS.** If we allow you to transfer to another dwelling in the community because of the presence of bed bugs, you must have your personal property and possessions treated according to accepted treatment methods or procedures established by a licensed pest control professional. You must provide proof of such cleaning and treatment to our satisfaction.

10. **SPECIAL PROVISIONS.** The following special provisions control over conflicting provisions of this printed form:

_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

**You are legally bound by this document. Please read it carefully.**

**Resident or Residents**
*(All residents must sign)*

**Owner or Owner's Representative**
*(Signs below)*

_____

_____

**Date of Signing Addendum**

_____

_____

_____

*You are entitled to receive an original of this Addendum after it is fully signed. Keep it in a safe place.*

# BED BUGS — A Guide for Rental Housing Residents

Bed bugs, with a typical lifespan of 6 to 12 months, are wingless, flat, broadly oval-shaped insects. Capable of reaching the size of an apple seed at full growth, bed bugs are distinguishable by their reddish-brown color, although after feeding on the blood of humans and warm-blooded animals—their sole food source—the bugs assume a distinctly blood-red hue until digestion is complete.

**Bed bugs don't discriminate**

Bed bugs increased presence across the United States in recent decades can be attributed largely to a surge in international travel and trade. It's no surprise then that bed bugs have been found time and time again to have taken up residence in some of the fanciest hotels and apartment buildings in some of the nation's most expensive neighborhoods.

Nonetheless, false claims that associate bed bugs presence with poor hygiene and uncleanliness have caused rental housing residents, out of shame, to avoid notifying owners of their presence. This serves only to enable the spread of bed bugs.

While bed bugs are, by their very nature, more attracted to clutter, they're certainly not discouraged by cleanliness.

Bottom line: bed bugs know no social and economic bounds; claims to the contrary are false.

**Bed bugs don't transmit disease**

There exists no scientific evidence that bed bugs transmit disease. In fact, federal agencies tasked with addressing pest of public health concern, namely the U.S. Environmental Protection Agency and the Centers for Disease Control and Prevention, have refused to elevate bed bugs to the threat level posed by disease transmitting pests. Again, claims associating bed bugs with disease are false.

**Identifying bed bugs**

*Bed bugs can often be found in, around and between:*

- Bedding
- Bed frames
- Mattress seams
- Upholstered furniture, especially under cushions and along seams
- Around, behind and under wood furniture, especially along areas where drawers slide
- Curtains and draperies
- Along window and door frames
- Ceiling and wall junctions
- Crown moldings
- Behind and around wall hangings and loose wallpaper
- Between carpeting and walls (carpet can be pulled away from the wall and tack strip)
- Cracks and crevices in walls and floors
- Inside electronic devices, such as smoke and carbon monoxide detectors

- Because bed bugs leave some persons with itchy welts strikingly similar to those caused by fleas and mosquitoes, the origination of such markings often go misdiagnosed. However, welts caused by bed bugs often times appear in succession and on exposed areas of skin, such as the face, neck and arms. In some cases, an individual may not experience any visible reaction resulting from direct contact with bed bugs.
- While bed bugs typically prefer to act at night, they often do not succeed in returning to their hiding spots without leaving traces of their presence through fecal markings of a red to dark brown color, visible on or near beds. Blood stains tend also to appear when the bugs have been squashed, usually by an unsuspecting host in their sleep. And, because they shed, it's not uncommon for skin casts to be left behind in areas typically frequented by bed bugs.

**Preventing bed bug encounters when traveling**

Because humans serve as bed bugs' main mode of transportation, it is extremely important to be mindful of bed bugs when away from home. Experts agree that the spread of bed bugs across all regions of the United States is largely attributed to an increase in international travel and trade. Travelers are therefore encouraged to take a few minutes upon arriving to their temporary destination to thoroughly inspect their accommodations, so as to ensure that any uninvited guests are detected before the decision is made to unpack.

Because bed bugs can easily travel from one room to another, it is also recommended that travelers thoroughly inspect their luggage and belongings for bed bugs before departing for home.

**Bed bug do's and don'ts**

- **Do not bring used furniture from unknown sources into your dwelling.** Countless bed bug infestations have stemmed directly from the introduction into a resident's unit of second-hand and abandoned furniture. Unless the determination can be made with absolute certainty that a piece of second-hand furniture is bed bug-free, residents should assume that the reason a seemingly nice looking leather couch, for example, is sitting curbside, waiting to be hauled off to the landfill, may very well be due to the fact that it's teeming with bed bugs.
- **Do address bed bug sightings immediately.** Rental housing residents who suspect the presence of bed bugs in their unit must immediately notify the owner.
- **Do not attempt to treat bed bug infestations.** Under no circumstance should you attempt to eradicate bed bugs. Health hazards associated with the misapplication of traditional and non-traditional, chemical-based insecticides and pesticides poses too great a risk to you and your neighbors.
- **Do comply with eradication protocol.** If the determination is made that your unit is indeed playing host to bed bugs, you must comply with the bed bug eradication protocol set forth by both your owner and their designated pest management company.



# CRIME/DRUG FREE HOUSING ADDENDUM



**1. DWELLING UNIT DESCRIPTION.**
Unit No. _____**1201**_____, **908 Division**
**St. #1201**_____
_____ *(street address)* in
_____**Nashville**_____
*(city)*, Tennessee, _____**37203**_____ *(zip code).*

**2. LEASE CONTRACT DESCRIPTION.**
Lease Contract Date: **May 13, 2022**
Owner's name: **Gulch, LLC**
_____
_____
_____
_____

Residents *(list all residents)*:
**Joshua Kabisch,** ████████████
_____
_____
_____
_____
_____
_____
_____
_____

**3. ADDENDUM APPLICABILITY.** In the event any provision in this Addendum is inconsistent with any provision(s) contained in other portions of, or attachments to, the above-mentioned Lease Contract, then the provisions of this Addendum shall control. For purposes of this Addendum, the term "Premises" shall include the dwelling unit, all common areas, all other dwelling units on the property or any common areas or other dwelling units on or about other property owned or managed by the Owner. The parties hereby amend and supplement the Lease Contract as follows:

**4. CRIME/DRUG FREE HOUSING.** Resident, members of the Resident's household, Resident's guests, and all other persons affiliated with the Resident:

A. Shall not engage in any illegal or criminal activity. The phrase, "illegal or criminal activity" shall include, but is not limited to, the following:

1. Engaging in any act intended to facilitate any type of criminal activity.

2. Permitting the Premises to be used for, or facilitating any type of criminal activity or drug related activity, regardless of whether the individual engaging such activity is a member of the household, or a guest.

3. The unlawful manufacturing, selling, using, storing, keeping, purchasing or giving of an illegal or controlled substance or paraphernalia as defined in city, county, state or federal laws, including but not limited to the State of Tennessee and/or the Federal Controlled Substances Act.

4. Violation of any federal drug laws governing the use, possession, sale, manufacturing and distribution of marijuana, regardless of state or local laws. (So long as the use, possession, sale, manufacturing and distribution of marijuana remains a violation of federal law, violation of any such federal law shall constitute a material violation of this rental agreement.)

5. Engaging in, or allowing, any behavior that is associated with drug activity, including but not limited to having excessive vehicle or foot traffic associated with his or her unit.

6. Any breach of the Lease Contract that otherwise jeopardizes the health, safety, and welfare of the Owner, Owner's agents, or other Residents, or involving imminent, actual or substantial property damage.

7. Engaging in or committing any act that would be a violation of the Owner's screening criteria for criminal conduct or which would resulted in denial of Resident's application due to criminal conduct.

8. Engaging in any activity that constitutes waste, nuisance, or unlawful use.

B. AGREE THAT ANY VIOLATION OF THE ABOVE PROVISIONS CONSTITUTES A MATERIAL VIOLATION OF THE PARTIES' LEASE CONTRACT AND GOOD CAUSE FOR TERMINATION OF TENANCY. A single violation of any of the provisions of this Addendum shall be deemed a serious violation, and a material default, of the parties' Lease Contract. It is understood that a single violation shall be good cause for termination of the Lease Contract. Notwithstanding the foregoing comments, Owner may terminate Resident's tenancy for any lawful reason, and by any lawful method, with or without good cause.

**5. CRIMINAL CONVICTION NOT REQUIRED.** Unless otherwise provided by law, proof of violation of any criminal law shall not require a criminal conviction.

**6. SPECIAL PROVISIONS.** The following special provisions control over conflicting provisions of this printed form:
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

| **Resident or Residents** *(sign here)* | **Date of Signing Addendum** |
|---|---|
| _____ | _____ |
| _____ | _____ |
| _____ | _____ |
| _____ | _____ |
| **Owner or Owner's Representative** *(signs here)* | **Date of Signing Addendum** |
| _____ | _____ |

© 2019, National Apartment Association, Inc. - 1/2019, Tennessee



# LEASE CONTRACT BUY-OUT AGREEMENT



**1. DWELLING UNIT DESCRIPTION.**
Unit No. _____**1201**_____, **908 Division**
**St. #1201**_____
_____ *(street address)* in
_____**Nashville**_____
*(city)*, Tennessee, _____**37203**_____ *(zip code)*.

**2. LEASE CONTRACT DESCRIPTION.**
Lease Contract Date: **May 13, 2022**_____
Owner's name: **Gulch, LLC**_____
_____
_____
_____

Residents *(list all residents)*:

**Joshua Kabisch,** ████████████_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

**3.** The purpose of this Buy-Out Agreement is to give you the right to buy out of your Lease Contract early—usually with special provisions in paragraph 9 below. In order to buy out early, your notice must be signed by all residents listed in the Lease Contract and you must comply with all provisions of this Buy-Out Agreement.

**4. BUY-OUT PROCEDURES.** You may buy out of the Lease Contract prior to the end of the lease term and cut off all liability for paying rent for the remainder of the lease term *if all of the following occur:*

(a) you give us written notice of buy-out at least __**60**__ days prior to the new termination date (i.e., your new move-out date), which *(check one)* ☐ must be the last day of a month or ☒ may be during a month;

(b) you specify the new termination date in the notice, i.e., the date by which you'll move out;

(c) you are not in default under the Lease Contract on the date you give us the notice of buy-out;

(d) you are not in default under the Lease Contract on the new termination date (move-out date);

(e) you move out on or before the new termination date and do not hold over;

(f) you pay us a buy-out fee (consideration) of $ __**7900.00**__ ;

(g) you pay us the amount of any concessions you received when signing the Lease Contract; and

(h) you comply with any special provisions in paragraph 9 below.

**5. WHEN PAYABLE.** The buy-out fee in paragraph 4(f) is due and payable no later than __**7**__ days after you give us your buy-out notice. The total dollar amount of any concessions regarding rent or other monetary lease obligations for the entire lease term is $ __**4950.00**__ and is due payable on the same day as the buy-out fee, subject to any special provisions in paragraph 9 regarding the amount, calculation method, or payment date.

**6. SHOWING UNIT TO PROSPECTIVE RESIDENTS.** After you give us notice of buy-out, the Lease Contract gives us the right to begin showing your unit to prospective residents and telling them it will be available immediately after your new termination date.

**7. COMPLIANCE ESSENTIAL.** Our deposit of all amounts due under paragraphs 4(f) and 4(g) constitutes our approval of the new termination date stated in your notice of buy-out. If you fail to comply with any of the procedures or requirements in this agreement after we deposit such monies, your buy-out right and this agreement will be voided automatically; and (1) any amounts you have paid under this agreement will become part of your security deposit, and (2) the lease will continue without buy-out. Then, if you move out early, you are subject to all lease remedies, including reletting fees and liability for all rents for the remainder of the original lease term.

**8. MISCELLANEOUS.** If moving out by the new termination date becomes a problem for you, contact us. An extension may be possible if we have not already relet the dwelling unit to a successor resident. We and any successor residents who may be leasing your unit will be relying on your moving out on or before the new termination date. Therefore, you may not hold over beyond such date without our written consent—even if it means you have to make plans for temporary lodging elsewhere. "Default" as used in paragraphs 4(c) and 4(d) of this agreement means default as defined in the Lease Contract. You will continue to be liable for any damages and any sums accruing and unpaid prior to the new termination date.

**9. SPECIAL PROVISIONS.** Your right of buy-out *(check one)* ☐ is or ☒ is not limited to a particular fact situation. If limited, buy-out may be exercised only if the following facts *(see below)* occur and any described documents are furnished to us. Any special provisions below will supersede any conflicting provision of this printed agreement. Any false statements or documents presented to us regarding buy-out will automatically void your right to buy-out of the Lease Contract. The special provisions are:

_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

| **Resident or Residents** | **Owner or Owner's Representative** |
|:---:|:---:|
| *(All residents must sign)* | *(signs below)* |

_____
_____
_____          **Date of Lease Contract**
_____          **May 13, 2022**
_____
_____

© 2019, National Apartment Association, Inc. - 1/2019, Tennessee



# CONSTRUCTION ADDENDUM



**1. DWELLING UNIT DESCRIPTION.**
Unit No. **1201** , **908 Division St. #1201**
_____ *(street address)* in
_____ 
*(city)*, Tennessee, **Nashville**
_____ *(zip code)*.
**37203**

**2. LEASE CONTRACT DESCRIPTION.**
Lease Contract Date: **May 13, 2022**
Owner's name: **Gulch, LLC**
_____
_____
_____

Residents *(list all residents)*:
**Joshua Kabisch,** ▮▮▮▮▮▮▮▮
_____
_____
_____
_____
_____
_____
_____
_____

This Addendum constitutes an Addendum to the above described Lease Contract for the above described premises and is hereby incorporated into and made a part of such Lease Contract. Where the terms or conditions found in this Addendum vary or contradict any terms or conditions found in the Lease Contract, this Addendum shall control.

**3. PURPOSE OF ADDENDUM.** By signing this Addendum, Resident acknowledges that existing, on-going, or future construction on the property may affect your use, view from, and enjoyment of such property.

**4. RESIDENT ACKNOWLEDGMENT OF CONSTRUCTION ON PROPERTY.** Resident acknowledges that the property, including its common areas and dwelling units, may currently or in the future, be under repair, renovation, improvement, or construction. Owner does not guarantee that the repair, renovation, improvement, or construction will be completed on a set date or time and therefore, is not under any obligation to have said repair, renovation, improvement, or construction completed by a set date or time. Resident also acknowledges that the repair, renovation, improvement, or construction does not represent a breach of Owner's obligations under the Lease Contract or applicable state law or local ordinance.

**5. USE OF AMENITIES AND SERVICES.** To the extent permitted by applicable state law or local ordinance, repair, renovation, improvement, or construction at the property may create conditions where Resident's use of the property's amenities and services may be limited or not available.

**6. NOISE AND OTHER DISTURBANCES.** Repair, renovation, improvement, or construction at or near the property may create noise or other disturbances, and the property itself, or portions thereof, may be unfinished for some time with respect to landscaping, building exteriors, interiors, amenities, walkways, lighting and the like. Resident acknowledges that these conditions may create inconveniences. Resident agrees that despite these inconveniences, the obligations of the Resident, including payment of rent, as set forth in the Lease Contract will still be in effect.

**7. RELEASE OF LIABILITY.** To the extent allowed by state law or local ordinance, by signing this Addendum, Resident agrees to waive all claims related to Resident's inability to access, use, and enjoy the amenities, services, and facilities affected by existing, on-going, or future repair, renovation, improvement, or construction on the property.

The existing, on-going, or future construction at the property includes but is not limited to:

Title/Description: _____
_____
Anticipated Start Date: _____
Anticipated End Date: _____

To the extent allowed by state law or local ordinance, Resident further agrees that any inconvenience associated with the repair, renovation, improvement, or construction, such as, but not limited to, those disclosed herein, will not be deemed to give Resident any offset to rent obligations, or other compensation, nor will they be the basis for a complaint(s) or defense(s) against Owner for rent relief, constructive eviction, fitness and habitability, peaceful and quiet enjoyment, nuisance, or any other claim, right or remedy.

**8. DELAY OF OCCUPANCY.** Resident acknowledges that occupancy of the dwelling unit may be delayed due to repair, renovation, improvement, or construction of the property, including common areas and dwelling units. Such repair, renovation, improvement, or construction may cause unforeseen delays due to scheduling conflicts, delay in permit issuance, acts of God, and other things beyond the control of Owner. The Lease Contract will remain in effect subject to: (1) the start date of the term of the lease contract shall be changed to the first day that Owner provides Resident the Dwelling Unit for occupancy, and rent shall be abated until occupancy is provided; and (2) your right to terminate as set forth in your Lease Contract under DELAY OF OCCUPANCY, and in accordance with applicable state law or local ordinance.

Resident hereby knowingly and voluntarily accepts the risks of delays and the dwelling unit not being ready for occupancy on the date set forth in the Lease Contract. Resident agrees that Owner's failure to have the dwelling unit ready on the set date in the Lease Contract due to a repair, renovation, improvement, or construction delay does not constitute a willful failure to deliver possession of the dwelling unit. Resident hereby waives and relinquishes any rights, claims, or causes of action against Owner related to delays in delivering the dwelling unit, including, but not limited to, any holdover rent, or other penalties imposed at Resident's current place of residence, provided however, that Owner agrees that rent will not commence under the Lease Contract until possession is available to Resident.

**9. DISPLACEMENT.** In the event Resident must be displaced from the dwelling unit that is the subject of the Lease Contract due to repair, renovation, improvement, or construction in or around the dwelling unit, Owner, at Owner's sole option, shall transfer Resident to another dwelling unit within the community that is not affected by the repair, renovation, improvement, or construction or shall provide appropriate comparable accommodations for Resident. However, in the event of Resident's displacement and subsequent re-location, the terms of the Lease Contract, including but not limited to the payment of rent shall remain in full force and effect.

**10. SEVERABILITY.** If any provision of this Lease Contract is invalid or unenforceable under applicable law, such provision shall be ineffective to the extent of such invalidity or unenforceability only without invalidating or otherwise affecting the remainder of this Lease Contract. The court shall interpret the lease contract and provisions herein in a manner such as to uphold the valid portions of this Lease Contract while preserving the intent of the parties.

© 2019, National Apartment Association, Inc. - 2/2019, Tennessee

**11. SPECIAL PROVISIONS.** The following special provisions
control over conflicting provisions of this printed form:

_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

**Resident or Residents**
*(All residents must sign)*

**Owner or Owner's Representative**
*(signs below)*

_____

_____

_____         **Date of Signing Addendum**

_____

_____         _____

_____

© 2019, National Apartment Association, Inc. - 2/2019, Tennessee

# ADDENDUM PROHIBITING
## SHORT-TERM SUBLETTING OR RENTAL



**1. DWELLING UNIT DESCRIPTION.**
Unit No. **1201** , **908 Division**
**St. #1201**
_____ *(street address)* in
_____ **Nashville** _____
*(city)*, Tennessee, _____ **37203** _____ *(zip code).*

**2. LEASE CONTRACT DESCRIPTION.**
Lease Contract Date: **May 13, 2022**
Owner's name: **Gulch, LLC**
_____
_____
_____
_____

Residents *(list all residents)*:
**Joshua Kabisch,** ███████████
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

This Addendum constitutes an Addendum to the above described Lease Contract for the above described premises, and is hereby incorporated into and made a part of such Lease Contract. Where the terms or conditions found in this Addendum vary or contradict any terms or conditions found in the Lease Contract, this Addendum shall control.

**3. SHORT TERM SUBLEASE OR RENTING PROHIBITED.**
Without limiting the prohibition in the Lease on subletting and assignment and without limiting any of our rights or remedies, this Addendum to the Lease further supplements and defines the requirements and prohibitions contained in the Lease Contract between you and us. You are hereby strictly prohibited from subletting or renting to any third party, or allowing occupancy by any third party, of all or any portion of the dwelling, whether for an overnight use or duration of any length, without our prior written consent in each instance. This prohibition applies to overnight stays or any other stays arranged on Airbnb.com or other similar internet sites.

**4. PROHIBITION ON LISTING OR ADVERTISING DWELLING ON OVERNIGHT SUBLETTING OR RENTING WEBSITES.**
You agree not to list or advertise the dwelling as being available for short term subletting or rental or occupancy by others on Airbnb.com or similar internet websites. You agree that listing or advertising the dwelling on Airbnb.com or similar internet websites shall be a violation of this Addendum and a breach of your Lease Contract.

**5. VIOLATION OF LEASE AGREEMENT.** Your Lease Contract allows for use of your dwelling as a private residence only and strictly prohibits conducting any kind of business in, from, or involving your dwelling unless expressly permitted by law. Separately, your Lease Contract prohibits subletting or occupancy by others of the dwelling for any period of time

without our prior written consent. Permitting your dwelling to be used for any subletting or rental or occupancy by others (including, without limitation, for a short term), regardless of the value of consideration received or if no consideration is received, is a violation and breach of this Addendum and your Lease Contract.

**6. REMEDY FOR VIOLATION.** Any violation of this Addendum constitutes a material violation of the Lease Contract, and as such we may exercise any default remedies permitted in the Lease Contract, including termination of your tenancy, in accordance with local law. This clause shall not be interpreted to restrict our rights to terminate your tenancy for any lawful reason, or by any lawful method.

**7. RESIDENT LIABILITY.** You are responsible for and shall be held liable for any and all losses, damages, and/or fines that we incur as a result of your violations of the terms of this Addendum or the Lease Contract. Further, you agree you are responsible for and shall be held liable for any and all actions of any person(s) who occupy your dwelling in violation of the terms of this Addendum or the Lease Contract, including, but not limited to, property damage, disturbance of other residents, and violence or attempted violence to another person. In accordance with applicable law, without limiting your liability you agree we shall have the right to collect against any renter's or liability insurance policy maintained by you for any losses or damages that we incur as the result of any violation of the terms of this Addendum.

**8. SEVERABILITY.** If any provision of this Addendum or the Lease Contract is invalid or unenforceable under applicable law, such provision shall be ineffective to the extent of such invalidity or unenforceability only without invalidating or otherwise affecting the remainder of this Addendum or the Lease Contract. The court shall interpret the lease and provisions herein in a manner such as to uphold the valid portions of this Addendum while preserving the intent of the parties.

**9. SPECIAL PROVISIONS.** The following special provisions control over conflicting provisions of this printed form:
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

**Resident or Residents**
*(All residents must sign)*

_____
_____
_____
_____
_____

**Owner or Owner's Representative**
*(Signs below)*

_____

**Date of Signing Addendum**

_____

© 2019, National Apartment Association, Inc. - 1/2019, Tennessee 

# LEASE ADDENDUM FOR RENT CONCESSION
## OR OTHER RENT DISCOUNT



**1. DWELLING UNIT DESCRIPTION.**
Unit No. _____**1201**_____, **908 Division St.**
**#1201**
_____ *(street address)* in
_____**Nashville**_____
*(city)*, Tennessee, ____**37203**____ *(zip code)*.

**2. LEASE CONTRACT DESCRIPTION.**
Lease Contract Date: **May 13, 2022**
Owner's name: **Gulch, LLC**
_____
_____
_____

Residents *(list all residents)*:
**Joshua Kabisch,** ▮▮▮▮▮▮▮▮▮
_____
_____
_____
_____
_____
_____
_____
_____

This Addendum constitutes an Addendum to the above
described Lease Contract for the above described premises,
and is hereby incorporated into and made a part of such Lease
Contract. Where the terms or conditions found in this
Addendum vary or contradict any terms or conditions found
in the Lease Contract, this Addendum shall control.

**3. CONCESSION/DISCOUNT AGREEMENT.** As consideration
for your agreement to remain in your dwelling and to fulfill
your Lease obligations throughout the full term of your Lease,
you will receive the following rent Concession and or Discount.

*(Check all that apply)*

☒ **One-Time Concession.** You will receive a One-Time
Concession off the rent indicated in the Lease Contract
in the total amount of $ __**4950.00**__. This Concession
will be credited to your rent due for the month(s) of:
**July 2022**
_____
_____
_____.

☐ **Monthly Discount/Concession.** The rent indicated in
the Lease Contract includes a Monthly Discount of
$ _____ per month off of the suggested rental
rate for your dwelling.

☐ **Other Discount/Concession.** You will receive the
following discount off the rent indicated in the Lease
Contract:
_____
_____
_____
_____

☐ **Non-Monetary Concession.** You will receive the
following non-monetary concession during the term of
the Lease:
_____
_____
_____
_____
_____

**4. CONCESSION CANCELLATION AND CHARGE-BACK.**
The concession and discounts indicated above are provided
to you as an incentive and with the understanding that you
will fulfill your obligations under the Lease Contract through
the entire term of your Lease.

If your lease is terminated early due to your default (for
example, if you abandon the premises without paying rent or
are evicted), this Concession/Discount Agreement will be
immediately terminated, and you will be required to
immediately repay to the Owner the amounts of all *(Check all
that apply)*

☒ Concessions
☐ Discounts

that you have actually received for the months you resided
in the Premises, and without further notice from us.

**5. MARKET RENT.** The market rent for this dwelling is the
rent stated in the Lease Contract. You acknowledge that the
market rent is a fair representation of what the specific
dwelling would actually rent for at the time the Lease Contract
was negotiated and executed, and is reflective of the rent for
a similar dwelling at comparable properties.

**6. SPECIAL PROVISIONS.** The following special provisions
control over any conflicting provisions of this printed
Addendum form or the Lease Contract.
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

**Resident or Residents**
*(All residents must sign)*

_____
_____
_____
_____
_____

**Owner or Owner's Representative**
*(signs here)*

_____

**Date of Lease Contract**

**May 13, 2022**

© 2019, National Apartment Association, Inc. - 2/2019, Tennessee




Date: **May 13, 2022**
(when this Addendum is filled out)

*Please note: We consider animals a serious responsibility and a risk to each resident in the dwelling. If you do not properly control and care for an animal, you'll be held liable if it causes any damage or disturbs other residents.*

*In this document, the terms "you" and "your" refer to all residents listed below and all occupants or guests; and the terms "we," "us," and "our" refer to the owner named in the Lease Contract (not to the property manager or anyone else).*

**1. DWELLING UNIT DESCRIPTION.**
Unit No. __**1201**__, __**908 Division**__
__**St. #1201**__ *(street address)* in
_____
__**Nashville**__
*(city)*, Tennessee, ____**37203**____ *(zip code)*.

**2. LEASE CONTRACT DESCRIPTION.**
Lease Contract Date: **May 13, 2022**
Owner's name: **Gulch, LLC**
_____
_____
_____
_____

Residents *(list all residents):*
**Joshua Kabisch,** ████████████
_____
_____
_____
_____
_____
_____
_____
_____
_____

This Addendum constitutes an Addendum to the above described Lease Contract for the above described premises, and is hereby incorporated into and made a part of such Lease Contract. Where the terms or conditions found in this Addendum vary or contradict any terms or conditions found in the Lease Contract, this Addendum shall control. The Lease Contract is referred to in this Addendum as the "Lease Contract."

**3. A. ☒ NO APPROVED ANIMALS.** If this box is checked, you are not allowed to have animals (including mammals, reptiles, birds, fish, rodents, and insects), even temporarily, anywhere on the Premises unless we've authorized so in writing. We will authorize support and/or service animals for you, your guests, and occupants pursuant to the parameters and guidelines established by the Fair Housing Act, HUD regulatory guidelines, and any applicable state and/or local laws.

**B. ☐ CONDITIONAL AUTHORIZATION FOR ANIMAL.**
If this box is checked, you may keep the animal that is described below in the dwelling until the Lease Contract expires. But we may terminate this authorization sooner if your right of occupancy is lawfully terminated or if in our sole judgment you and your animal, your guests, or any occupant violate any of the rules in this Addendum.

**4. ANIMAL DEPOSIT.** An animal deposit of $ _____ will be charged. We *[check one]* ☐ will consider, or ☐ will not consider this additional security deposit the general security deposit for all purposes. The security deposit amount in the Lease Contract *[check one]* ☐ does, or ☒ does not include this additional deposit amount. Refund of the animal deposit will be subject to the terms and conditions set forth in the Lease Contract regardless of whether it is considered part of the general security deposit.

**5. ADDITIONAL MONTHLY RENT.** Your total monthly rent (as stated in the Lease Contract) will be increased by $ _____. The monthly rent amount in the Lease Contract *[check one]* ☐ includes ☐ does not include this additional animal rent.

**6. ADDITIONAL FEE.** You must also pay a one-time non-refundable fee of $ _____ for having the animal in the dwelling unit.

**7. LIABILITY NOT LIMITED.** The additional monthly rent and additional security deposit under this Animal Addendum do not limit residents' liability for property damages, cleaning, deodorization, defleaing, replacements, or personal injuries.

**8. DESCRIPTION OF ANIMAL(S).** You may keep only the animal(s) described below. You may not substitute any other animal(s). Neither you nor your guests or occupants may bring any other animal(s)—mammal, reptile, bird, amphibian, fish, rodent, arachnid, or insect—into the dwelling or apartment community.

Animal's name: _____
Type: _____
Breed: _____
Color: _____
Weight: _____ Age: _____
City of license: _____
License no.: _____
Date of last rabies shot: _____
Housebroken? _____
Animal owner's name: _____
_____

Animal's name: _____
Type: _____
Breed: _____
Color: _____
Weight: _____ Age: _____
City of license: _____
License no.: _____
Date of last rabies shot: _____
Housebroken? _____
Animal owner's name: _____
_____

**9. SPECIAL PROVISIONS.** The following special provisions control over conflicting provisions of this printed form:
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

© 2020, National Apartment Association, Inc. - 2/2020 Tennessee

**10. EMERGENCY.** In an emergency involving an accident or injury to your animal, we have the right, but not a duty, to take the animal to the following veterinarian for treatment, at your expense.

Doctor: _____
Address: _____
City/State/Zip: _____
Phone: _____

**11. ANIMAL RULES.** You are responsible for the animal's actions at all times. You agree to abide by these rules:

• The animal must not disturb the neighbors or other residents, regardless of whether the animal is inside or outside the dwelling.

• Dogs, cats, and support animals must be housebroken. All other animals must be caged at all times. No animal offspring are allowed.

• Inside, the animal may urinate or defecate *only* in these designated areas:
_____
_____

• Outside, the animal may urinate or defecate *only* in these designated areas: _____
_____

• Animals may not be tied to any fixed object anywhere outside the dwelling units, except in fenced yards (if any) for your exclusive use.

• You must not let an animal other than support animals into swimming-pool areas, laundry rooms, offices, clubrooms, other recreational facilities, or other dwelling units.

• Your animal must be fed and watered inside the dwelling unit. Don't leave animal food or water outside the dwelling unit at any time, except in fenced yards (if any) for your exclusive use.

• You must keep the animal on a leash and under your supervision when outside the dwelling or any private fenced area. We or our representative may pick up unleashed animals and/or report them to the proper authorities. We may impose reasonable charges for picking up and/or keeping unleashed animals.

• Unless we have designated a particular area in your dwelling unit or on the grounds for animal defecation and urination, you are prohibited from letting an animal defecate or urinate *anywhere* on our property. You must take the animal off our property for that purpose. If we allow animal defecation inside the dwelling unit in this Addendum, you must ensure that it's done in a litter box with a kitty litter-type mix. If the animal defecates anywhere on our property (including in a fenced yard for your exclusive use), you'll be responsible for immediately removing the waste and repairing any damage. Despite anything this Addendum says, you must comply with all local ordinances regarding animal defecation.

**12. ADDITIONAL RULES.** We have the right to make reasonable changes to the animal rules from time to time if we distribute a written copy of any changes to every resident who is allowed to have animals.

**13. VIOLATION OF RULES.** If you, your guest, or any occupant violates any rule or provision of this Animal Addendum (based upon our sole judgment) and we give you written notice, you must remove the animal immediately and permanently from the premises. We also have all other rights and remedies set forth in the Lease Contract, including damages, eviction, and attorney's fees to the extent allowed by law.

**14. COMPLAINTS ABOUT ANIMAL.** You must immediately and permanently remove the animal from the premises if we receive a reasonable complaint from a neighbor or other resident or if we, in our sole discretion, determine that the animal has disturbed neighbors or other residents.

**15. LIABILITY FOR DAMAGES, INJURIES, CLEANING, ETC.** You and all co-residents will be jointly and severally liable for the entire amount of all damages caused by the animal, including all cleaning, defleaing, and deodorizing. This provision applies to all parts of the dwelling unit, including carpets, doors, walls, drapes, wallpaper, windows, screens, furniture, appliances, as well as landscaping and other outside improvements. If items cannot be satisfactorily cleaned or repaired, you must pay for us to replace them completely. Payment for damages, repairs, cleaning, replacements, etc. are due immediately upon demand.

As owner of the animal, you're strictly liable for the entire amount of any injury that the animal causes to a person or anyone's property. You'll indemnify us for all costs of litigation and attorney's fees resulting from any such injury.

**16. MOVE-OUT.** When you move out, you'll pay for defleaing, deodorizing, and shampooing to protect future residents from possible health hazards, regardless of how long the animal was there. We—not you—will arrange for these services.

**17. JOINT AND SEVERAL RESPONSIBILITY.** Each resident who signed the Lease Contract must sign this Animal Addendum. You, your guests, and any occupants must follow all animal rules. Each resident is jointly and severally liable for damages and all other obligations set forth in this Animal Addendum, even if the resident does not own the animal.

**18. GENERAL.** You acknowledge that no other oral or written agreement exists regarding animals. Except for written rule changes under paragraph 9 above, our representative has no authority to modify this Animal Addendum or the animal rules except in writing. This Animal Addendum and the animal rules are considered part of the Lease Contract described above. It has been executed in multiple originals, one for you and one or more for us.

**This is a binding legal document. Read it carefully before signing.**

Resident or Residents
*(All residents must sign)*

Owner or Owner's Representative
*(Signs below)*

_____        _____
_____
_____
_____
_____
_____

# RESIDENT PARKING ADDENDUM



Date: _____ **May 13, 2022** _____
(when this Addendum is filled out)

**1. DWELLING UNIT DESCRIPTION.**
Unit No. _____ **1201** _____, **908 Division**
**St. #1201** _____
_____ (street address) in
_____ **Nashville** _____
(city), Tennessee, _____ **37203** _____ (zip code).

**2. LEASE CONTRACT DESCRIPTION.**
Lease Contract Date: **May 13, 2022** _____
Owner's name: **Gulch, LLC** _____
_____
_____
_____
_____

Residents (list all residents):
**Joshua Kabisch,** ▓▓▓▓▓▓▓▓
_____
_____
_____
_____
_____
_____
_____
_____
_____

The term of this Parking Addendum is as follows:
Begins on _____, _____ and
ending on _____, _____.

This Addendum constitutes an Addendum to the above described Lease Contract for the above described premises, and is hereby incorporated into and made a part of such Lease Contract. Where the terms or conditions found in this Addendum vary or contradict any terms or conditions found in the Lease Contract, this Addendum shall Addendum.

**RESIDENT AND OWNER AGREE AS FOLLOWS:**

**3.** You agree to properly register all vehicles with management. If you get a new or replacement vehicle you must notify us and complete a revised agreement.

**4.** If you are provided with a parking tag or sticker it must be properly installed and displayed.

**5.** Unless your vehicle(s) has been assigned a specific space(s) you may park in any available space(s) in the parking areas, with the exception of spaces reserved for a particular use or any accessible parking for persons with disabilities, unless you possess a government issued disabled parking decal or similar signage.

**6.** If you are assigned a specific parking space(s) we shall assign you the space(s) and retain the right to change assigned space(s) at our sole discretion.

**7.** You understand and accept that we have the right at any time, without notice, to tow unauthorized or non-registered vehicles from any parking space on the property.

**8.** You agree to use parking spaces in accordance with the terms of the Lease and Community Rules.

**9.** Any vehicles which are improperly parked or are in violation of this addendum, the terms of the Lease or Community Rules will be towed at your expense. You agree that we shall not be liable to you for damages related to the physical towing nor any consequential damages you may incur through loss of use of the vehicle(s).

**10.** You understand that we will not be held liable for any damage or theft that may occur while your vehicle(s) are parked on any part of the property. Upon signing this agreement you knowingly accept the risk of parking any vehicle(s) on the property.

**11.** Any action by you, any occupant, guest, or visitor that violates this addendum shall constitute a violation of the Lease Contract.

**12.** You understand and agree that any judgment of possession entered against you shall be a judgment for possession of any parking spaces which you are entitled to under this addendum. Once such judgment is rendered and executed upon you, you shall immediately remove all vehicles from the property parking areas. If you fail to remove your vehicle(s), we shall tow the vehicle(s) at your expense. You agree that we shall not be liable to you for damages related to the physical towing nor any consequential damages you may incur through loss of use of the vehicle(s).

**COST FOR PARKING**

Resident agrees to pay a onetime fee of $ _____ per vehicle on or before the _____ day of _____, _____. In alternative resident agrees to pay $ __100.00__ monthly per vehicle due on or before the _____ day of the month. If no amount is filled in parking shall be free for properly registered and authorized vehicles.

Resident understands and accepts that all-parking rights and privileges will immediately be revoked in the case that Resident is _____ days delinquent in paying the required parking fee. After which, Resident's vehicle may be towed, in accordance with the law.

Resident agrees to pay $ _____ returned check fee (fee is not to exceed $30.00) for all checks returned for any reason.

**VEHICLE INFORMATION:**

**Vehicle 1**
Make: **Volkswagen** _____
Model & Year: **Jetta 2017** _____
State: **FL** _____
License Plate: _____
Permit Number: _____
Phone Number: ▓▓▓▓▓▓▓
Parking Space: _____

**Vehicle 2**
Make: _____
Model & Year: _____
State: _____
License Plate: _____
Permit Number: _____
Phone Number: _____
Parking Space: _____

**Vehicle 3**
Make: _____
Model & Year: _____
State: _____
License Plate: _____
Permit Number: _____
Phone Number: _____
Parking Space: _____

© 2019, National Apartment Association, Inc. - 1/2019, Tennessee

**13. SPECIAL PROVISIONS.**

_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

**Resident or Residents**
_(All residents must sign)_

_____
_____
_____
_____
_____
_____

**Owner or Owner's Representative**
_(Signs below)_

_____

**Date of Signing Addendum**

_____

© 2019, National Apartment Association, Inc. - 1/2019, Tennessee

# NO-SMOKING ADDENDUM



Date: _____ **May 13, 2022** _____
(when this Addendum is filled out)

*All use of any tobacco product involving smoking, burning, or combustion of tobacco is prohibited in any portion of the apartment community. You are entitled to receive an original of this No-Smoking Addendum after it is fully signed. Keep it in a safe place.*

**1. DWELLING UNIT DESCRIPTION.**
Unit No. _____ **1201** _____, **908 Division**
**St. #1201** _____
_____ *(street address)* in
_____ **Nashville** _____
*(city)*, Tennessee, _____ **37203** _____ *(zip code)*.

**2. LEASE CONTRACT DESCRIPTION.**
Lease Contract Date: **May 13, 2022**
Owner's name: **Gulch, LLC** _____
_____
_____
_____
_____

Residents *(list all residents)*:

**Joshua Kabisch,** ███████████ _____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

This Addendum constitutes an Addendum to the above described Lease Contract for the above described premises, and is hereby incorporated into and made a part of such Lease Contract. Where the terms or conditions found in this Addendum vary or contradict any terms or conditions found in the Lease Contract, this Addendum shall control.

**3. DEFINITION OF SMOKING.** Smoking refers to any use or possession of a cigar, cigarette, e-cigarette, hookah, vaporizer, or pipe containing tobacco or a tobacco product while that tobacco or tobacco product is burning, lighted, vaporized, or ignited, regardless of whether the person using or possessing the product is inhaling or exhaling the smoke from such product. The term tobacco includes, but is not limited to any form, compound, or synthesis of the plant of the genus Nicotiana or the species N. tabacum which is cultivated for its leaves to be used in cigarettes, cigars, e-cigarettes, hookahs, vaporizers, or pipes. Smoking also refers to use or possession of burning, lighted, vaporized, or ignited non-tobacco products if they are noxious, offensive, unsafe, unhealthy, or irritating to other persons.

**4. SMOKING ANYWHERE INSIDE BUILDINGS OF THE APARTMENT COMMUNITY IS STRICTLY PROHIBITED.** All forms and use of burning, lighted, vaporized, or ignited tobacco products and smoking of tobacco products inside any dwelling, building, or interior of any portion of the apartment community is strictly prohibited. Any violation of the no-smoking policy is a material and substantial violation of this Addendum and the Lease Contract.

The prohibition on use of any burning, lighted, vaporized, or ignited tobacco products or smoking of any tobacco products extends to all residents, their occupants, guests, invitees and all others who are present on or in any portion of the apartment community. The no-smoking policy and rules extend to, but are not limited to, the management and leasing offices, building interiors and hallways, building common areas, dwellings, club house, exercise or spa facility, tennis courts, all interior areas of the apartment community, commercial shops, businesses, and spaces, work areas, and all other spaces whether in the interior of the apartment community or in the enclosed spaces on the surrounding community grounds.

Smoking of non-tobacco products which are harmful to the health, safety, and welfare of other residents inside any dwelling or building is also prohibited by this Addendum and other provisions of the Lease Contract.

**5. SMOKING OUTSIDE BUILDINGS OF THE APARTMENT COMMUNITY.** Smoking is permitted only in specially designated areas outside the buildings of the apartment community. Smoking must be at least __25__ feet from the buildings in the apartment community, including administrative office buildings. If the previous field is not completed, smoking is only permitted at least 25 feet from the buildings in the apartment community, including administrative office buildings. The smoking-permissible areas are marked by signage.

Smoking on balconies, patios, and limited common areas attached to or outside of your dwelling ☐ is ☒ is not permitted.

The following outside areas of the community may be used for smoking: _____
_____
_____
_____

Even though smoking may be permitted in certain limited outside areas, we reserve the right to direct that you and your occupants, family, guests, and invitees cease and desist from smoking in those areas if smoke is entering the dwellings or buildings or if it is interfering with the health, safety, or welfare or disturbing the quiet enjoyment, or business operations of us, other residents, or guests.

**6. YOUR RESPONSIBILITY FOR DAMAGES AND CLEANING.** You are responsible for payment of all costs and damages to your dwelling, other residents' dwellings, or any other portion of the apartment community for repair, replacement, or cleaning due to smoking or smoke related damage caused by you or your occupants, family, guests, or invitees, regardless of whether such use was a violation of this Addendum. Any costs or damages we incur related to repairs, replacement, and cleaning due to your smoking or due to your violation of the no-smoking provisions of the Lease Contract are in excess of normal wear and tear. Smoke related damage, including but not limited to, the smell of tobacco smoke which permeates sheetrock, carpeting, wood, insulation, or other components of the dwelling or building is in excess of normal wear and tear in our smoke free apartment community.

**7. YOUR RESPONSIBILITY FOR LOSS OF RENTAL INCOME AND ECONOMIC DAMAGES REGARDING OTHER RESIDENTS.** You are responsible for payment of all lost rental income or other economic and financial damages or loss to us due to smoking or smoke related damage caused by you or your occupants, family, guests, or invitees which results in or causes other residents to vacate their dwellings, results in disruption of other residents' quiet enjoyment, or adversely affects other residents' or occupants' health, safety, or welfare.

**8. LEASE CONTRACT TERMINATION FOR VIOLATION OF THIS ADDENDUM.** We have the right to terminate your Lease Contract or right of occupancy of the dwelling for any violation of this No-Smoking Addendum. Violation of the no-smoking provisions is a material and substantial default or violation of the Lease Contract. Despite the termination of the Lease Contract or your occupancy, you will remain liable for rent through the end of the Lease Contract term or the date on which the dwelling is re-rented to a new occupant, whichever comes first. Therefore, you may be responsible for payment of rent after you vacate the leased premises even though you are no longer living in the dwelling.

© 2019, National Apartment Association, Inc. - 1/2019, Tennessee

**9. EXTENT OF YOUR LIABILITY FOR LOSSES DUE TO SMOKING.** Your responsibility for damages, cleaning, loss of rental income, and loss of other economic damages under this No-Smoking Addendum are in addition to, and not in lieu of, your responsibility for any other damages or loss under the Lease Contract or any other addendum.

**10. YOUR RESPONSIBILITY FOR CONDUCT OF OCCUPANTS, FAMILY MEMBERS, AND GUESTS.** You are responsible for communicating this community's no-smoking policy and for ensuring compliance with this Addendum by your occupants, family, guests, and invitees.

**11. THERE IS NO WARRANTY OF A SMOKE FREE ENVIRONMENT.** Although we prohibit smoking in all interior parts of the apartment community, there is no warranty or guaranty of any kind that your dwelling or the apartment community is smoke free. Smoking in certain limited outside areas is allowed as provided above. Enforcement of our no-smoking policy is a joint responsibility which requires your cooperation in reporting incidents or suspected violations of smoking. You must report violations of our no-smoking policy before we are obligated to investigate and act, and you must thereafter cooperate with us in prosecution of such violations.

This is an important and binding legal document. By signing this Addendum you are agreeing to follow our no-smoking policy and you are acknowledging that a violation could lead to termination of your Lease Contract or right to continue living in the dwelling. If you or someone in your household is a smoker, you should carefully consider whether you will be able to abide by the terms of this Addendum.

**12. SPECIAL PROVISIONS.** The following special provisions control over any conflicting provisions of this printed Addendum form or the Lease Contract:

_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

**Resident or Residents**
*(All residents must sign here)*

_____
_____
_____
_____
_____
_____

**Owner or Owner's Representative**
*(Sign here)*

_____

# CLASS ACTION WAIVER ADDENDUM



**1. DWELLING UNIT DESCRIPTION.**
Unit No. **1201**, **908 Division St. #1201**
_____ (street address) in
**Nashville**
(city), Tennessee, **37203** (zip code).

**2. LEASE CONTRACT DESCRIPTION.**
Lease Contract Date: **May 13, 2022**
Owner's name: **Gulch, LLC**
_____
_____
_____
_____

Residents (list all residents):
**Joshua Kabisch,** ▮▮▮▮▮▮▮
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

This Addendum constitutes an Addendum to the above described Lease Contract for the above described premises, and is hereby incorporated into and made a part of such Lease Contract. Where the terms or conditions found in this Addendum vary or contradict any terms or conditions found in the Lease Contract, this Addendum shall control.

**3. ADDENDUM.** This Addendum constitutes an Addendum to the above described Lease Contract for the above described premises. Where the terms or conditions found in this Addendum vary or contradict any terms or conditions found in the Lease Contract, this Addendum shall control.

**4. CLASS ACTION WAIVER.** You agree that you hereby waive your ability to participate either as a class representative or member of any class action claim(s) against us or our agents. While you are not waiving any right(s) to pursue claims against us related to your tenancy, you hereby agree to file any claim(s) against us in your individual capacity, and you may not be a class action plaintiff, class representative, or member in any purported class action lawsuit ("Class Action"). Accordingly, **you expressly waive any right and/or ability to bring, represent, join, or otherwise maintain a Class Action or similar proceeding against us or our agents in any forum.**

Any claim that all or any part of this Class Action waiver provision is unenforceable, unconscionable, void, or voidable shall be determined solely by a court of competent jurisdiction.

YOU UNDERSTAND THAT, WITHOUT THIS WAIVER, YOU MAY HAVE POSSESSED THE ABILITY TO BE A PARTY TO A CLASS ACTION LAWSUIT. BY SIGNING THIS AGREEMENT, YOU UNDERSTAND AND CHOOSE TO WAIVE SUCH ABILITY AND CHOOSE TO HAVE ANY CLAIMS DECIDED INDIVIDUALLY. THIS CLASS ACTION WAIVER SHALL SURVIVE THE TERMINATION OR EXPIRATION OF THIS LEASE CONTRACT.

**5. SEVERABILITY.** If any clause or provision of this Addendum is illegal, invalid or unenforceable under any present or future laws, then it is the intention of the parties hereto that the remainder of this Addendum shall not be affected thereby.

**6. SPECIAL PROVISIONS.** The following special provisions control over any conflicting provisions of this printed Addendum form or the Lease Contract.

_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

**Resident's Acknowledgment**

_____
_____
_____
_____
_____

**Date of Signing Addendum**

_____
_____
_____
_____
_____

**Landlord (or Landlord Agent) Acknowledgment**

_____

**Date of Signing Addendum**

_____

© 2019, National Apartment Association, Inc. - 1/2019, Tennessee



# LEASE ADDENDUM
## LIABILITY INSURANCE REQUIRED OF RESIDENT



**1. DWELLING UNIT DESCRIPTION.**
Unit No. **1201** , **908 Division St. #1201**
_____ *(street address)* in
_____ **Nashville** _____
*(city)*, Tennessee, _____ **37203** _____ *(zip code)*.

**2. LEASE CONTRACT DESCRIPTION.**
Lease Contract Date: **May 13, 2022**
Owner's name: **Gulch, LLC**
_____
_____
_____
_____

Residents *(list all residents)*:
**Joshua Kabisch,** ▬▬▬▬▬▬▬▬
_____
_____
_____
_____
_____
_____
_____
_____

This Addendum constitutes an Addendum to the above described Lease Contract for the above described premises, and is hereby incorporated into and made a part of such Lease Contract. Where the terms or conditions found in this Addendum vary or contradict any terms or conditions found in the Lease Contract, this Addendum shall control.

**3. ACKNOWLEDGMENT CONCERNING INSURANCE OR DAMAGE WAIVER.** You acknowledge that we do not maintain insurance to protect you against personal injury, loss or damage to your personal property or belongings, or to cover your own liability for injury, loss or damage you (or your occupants or guests) may cause others. You also acknowledge that by not maintaining your own policy of personal liability insurance, you may be responsible to others (including us) for the full cost of any injury, loss or damage caused by your actions or the actions of your occupants or guests. You understand that the Lease Contract requires you to maintain a liability insurance policy, which provides limits of liability to third parties in an amount not less than $ _____ per occurrence. You understand and agree to maintain at all times during the Term of the Lease Contract and any renewal periods a policy of personal liability insurance satisfying the requirements listed below, at your sole expense.

**4. REQUIRED POLICY.** You are required to purchase and maintain personal liability insurance covering you, your occupants and guests, for personal injury and property damage any of you cause to third parties (including damage to our property), in a minimum policy coverage amount of $ **100000.00** , from a carrier with an AM Best rating of A-VII

or better, licensed to do business in Tennessee. The carrier is required to provide notice to us within 30 days of any cancellation, non-renewal, or material change in your coverage. We retain the right to hold you responsible for any loss in excess of your insurance coverage.

**5. We may provide you with information of an insurance program that we make available to residents, which provides you with an opportunity to buy renter's insurance from a preferred company. However, you are free to contract for the required insurance with a provider of your choosing.**

**6. SUBROGATION ALLOWED.** You and we agree that subrogation is allowed by all parties and that this agreement supersedes any language to the contrary in the Lease Contract.

**7. YOUR INSURANCE COVERAGE.** You have purchased the required personal liability insurance from the insurance company of your choosing listed below that is licensed to do business in this state, and have provided us with written proof of this insurance prior to the execution and commencement of the Lease Contract. You will provide additional proof of insurance in the future at our request.

Insurance Company: _____
_____

**8. DEFAULT.** Any default under the terms of this Addendum shall be deemed an immediate, material and incurable default under the terms of the Lease Contract, and we shall be entitled to exercise all rights and remedies under the law.

**9. MISCELLANEOUS.** Except as specifically stated in this Addendum, all other terms and conditions of the Lease Contract shall remain unchanged. In the event of any conflict between the terms of this Addendum and the terms of the Lease Contract, the terms of this Addendum shall control.

**10. SPECIAL PROVISIONS:**
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

**I have read, understand and agree to comply with the preceding provisions.**

| **Resident or Residents** | **Owner or Owner's Representative** |
|---|---|
| *(All residents must sign here)* | *(signs here)* |

_____     _____
_____
_____     **Date of Lease Contract**
_____
_____     **May 13, 2022**
_____

© 2019, National Apartment Association, Inc. - 1/2019, Tennessee

# Community Policies/Master Lease Addendum

## 1. Preface

This Master Lease Addendum contains community rules, regulations, and/or policies that are incorporated into and part of your Lease Contract. They apply to you and your occupants, guests, and invitees. Use of "we", "us", and "our" in this Addendum refers collectively to the owner of the community and the owner's authorized agents/representatives. Violation of any provision of this Addendum may result in termination of your right of possession and/or your Lease Contract. The community rules, regulations, and/or policies in this Addendum may be added to, amended or repealed at any time in accordance with your Lease Contract. This Addendum is intended to supplement your Lease Contract. To the extent there is any inconsistency between this Addendum and the Lease Contract, the provisions of the Lease Contract control.

## 2. No Reliance on Security Devices or Measures

You acknowledge that cameras may be installed at some or all of the gates and in various common areas throughout the community. If cameras are installed, these areas may be recorded. Cameras, if installed, are for the sole purpose of protecting our real and personal property. Such cameras are not intended to protect, monitor, provide security for, or give a sense of security to you or any occupant or guest. You acknowledge that, given the limited purpose for which cameras may be installed or used, we have no obligation to cause such cameras to be monitored. We have no obligation to preserve or make available the contents of any recordings to you or others.

## 3. Entry Devices

In the event your community requires an entry device, the following policies apply.
a)  **Access Card, Remote or Key Fob:** You and each occupant if you request, will receive one controlled access device of our choice. Additional devices may be available for an additional charge of $_____
b)  **Damaged, Lost or Unreturned Cards, Remotes, or Fobs:** If a controlled access device is lost, misplaced, stolen damaged, or not returned at termination of this Agreement, a fee of $_____ will be charged for each device replacement.
c)  **Duplicate, Lost or Unreturned Keys:** A charge of $_____ will be owed for each duplicate, lost or unreturned key.
d)  **Re-keying Lock:** If you wish to have your apartment home, storage, mailbox, and/or garage lock(s) re-keyed because you have lost your key or for any other reason you agree to pay a re-keying fee of $_____ which is due prior to changing your locks.
e)  **After Hours Lock Outs:** After office hours, you must contact and pay for a locksmith if you have locked yourself out.
f)  **Lock Outs During Office Hours:** If you are locked out of your apartment home during business hours, contact us. A picture I.D. may be required to gain access to your apartment home.

## 4. Patios / Balconies / Private Yards

In the event your community has patios, balconies, or private yards, the following policies apply.

**Items Prohibited**

| | | |
|---|---|---|
| Combustible Materials | Flags | Furniture designed for Indoor Use |
| Firewood | Charcoal & Gas Grills | Bicycles hung from ceilings or walls |
| Unsightly or Heavy Items | Propane Tanks | Laundry |
| Motorcycles | Automobile Tires, Parts, Equipment | Signs |

a)  **Resident Responsible for Private Yard:** In the event your apartment home has a private yard and you are responsible for maintenance of the yard, maintenance will include, but not be limited to, mowing, edging, shrub trimming, watering, debris removal, weeding, etc. You agree to maintain the landscaping in a healthy condition (free of weeds, holes, fungus/parasites, pet feces, trash, debris and consistent color in sod, etc.). If your private yard is not maintained to the community standards, we have the right to maintain it and charge our actual cost each time maintenance is required. Upon move-out, we can deduct any amounts owed for damage to the private yard which exceed ordinary wear and tear from the security deposit as allowable under the Lease Contract.
b)  **Community Landscaper Utilized for Private Yard:** In the event your apartment home has a private yard and your community landscaper maintains the private yard, there may be an additional monthly fee of $_____ required. You are still responsible for maintaining the landscaping in a healthy condition (free of weeds, holes, fungus/parasites, pet feces, trash, debris and consistent color in sod, regular watering, etc.). You agree to provide access so that routine yard management maintenance can occur. If your private yard is not maintained to the community standards, we have the right to maintain it and charge our actual cost each time maintenance is required. Upon move-out, we can deduct any amounts owed for damage to the private yard which exceed ordinary wear and tear from the security deposit paid as allowable under the Lease Contract.

## 5. Gardens

In the event your community has a garden for the enjoyment of all residents, the following policies apply.
a)  Unless otherwise posted, the hours are from dawn to dusk.
b)  Use at your own risk. In case of emergency, call 911.
c)  You agree to plant the garden plot within two weeks of being assigned a designated area.
d)  You agree to maintain the designated plot and to keep plants within the assigned/designated area.
e)  We encourage an organic gardening program. Use of pesticides, herbicides, and insecticides made from synthetic materials as well as use of chemical fertilizers are not advisable. Slug bait is permitted only when used in enclosed containers, which must be removed from the site after use. Use of raw human and/or animal waste is not allowed due to environmental and health concerns. Fully composted manures, such as steer and chicken manure, are allowed.
f)  No illegal plants may be grown, including but not limited to any plant listed by the state agencies and weed control board as noxious weeds.
g)  Only water your assigned garden plot.
h)  Maintain healthy plants and remove dead plants in a timely manner (not to exceed one week duration).
i)  Materials other than plants are prohibited, except items that assist in growth.
j)  All tools provided by us must remain in designated areas. We are not responsible for injuries due to the use of tools. If you need any additional tools, they are your responsibility.
k)  Debris after planting, any remaining soil, fertilizer, etc. must be swept immediately.
l)  Garden plots will expire with your lease, and may be renewed at the time of lease renewal. If you decide not to renew usage, the plot must be cleaned out and left in the original condition. Renewal is not guaranteed.
m)  We are not responsible for lost, stolen, or damaged plants or other items.
n)  Please be respectful of the neighbors who live around the gardens. No smoking, noise disturbances, or horseplay is allowed.
o)  Animals are not allowed in the garden plot areas, except assistance animals.

## 6. Inside or Near the Apartment Home

**6.1 Windows and Doors:** Any window treatment installed by you shall present a uniform appearance with the exterior of the building. The use of foil and other similar materials, on windows is strictly prohibited. You will not obstruct any windows or doors.

**6.2 Welcome Mats and Heavy Items:** You may place a welcome mat in front of your entry door subject to our approval. Rugs or carpet remnants are not permitted. You shall not place any unusually heavy objects on the floor of the Premises, such as pool tables, waterbeds, etc. without our prior written permission. You will not obstruct any doorways, stairs, entry passages, breezeways, courtyards, or halls of the community.

**6.3 Soliciting:** Soliciting is not permitted in the community. Unless allowed by law or following our prior written permission, you shall not distribute, post, or hang any signs, flyers, advertisements, or notices in any portion of the community.

Case 3:23-md-03071   Document 590-3   Filed 10/09/23   Page 40 of 170 PageID #: 6320

**6.4 Fireplace:** In the event your apartment home has a fireplace, you agree to use the fireplace for the intended purpose and at your own risk. Never use flammable liquids to start fires and never burn anything other than seasoned firewood. Clean your hearth of any flammable materials. Do not attempt to clean the inside of the chimney. Report maintenance needs to us immediately. Use a mesh screen and leave glass doors open when burning fires. If applicable, open the flue/damper before lighting a fire. Close the flue/damper only when the fire is completely out, the smoke has ceased to rise, and the wood is cool. Never leave a fire unattended. Put all fires out completely before going to bed or leaving the apartment home.

**6.5 Furniture, Televisions, Appliances:** In the event your apartment home has furniture, televisions, and/or appliances included, you agree to maintain them in a clean condition, reasonable wear and tear excepted. Removal of these items is not allowed. Upon move-out, these items must be placed in the same location they were upon move-in. You will pay the cost to repair, replace, or clean the furniture, televisions, and/or appliances.

**6.6 Wires and Personal Items Outside the Home:** No radio, television other wires are permitted on any part of the apartment home. You shall not store personal items in the outside walkways, breezeways or under stairs.

## 7. Odors

You, your occupants, guests, and invitees acknowledge that we cannot prevent odors in and around your apartment home and community.

**7.1 Resident Responsibilities:** If you create odors, you shall provide proper ventilation so you do not disturb or cause inconvenience to others.

**7.2 Removal of Odors:** If the carpet, walls, A/C ducts, or other items in the apartment home retain odors due to your use or surrounding residents complain about the odors, you will be responsible for the cost for removing unwanted smells and odors.

## 8. Parking and Vehicles

In the event your community has parking for residents, the following policies apply. Guests must park in guest parking only.
   a) **Speed Limit:** Unless otherwise posted, the speed limit is ten (10) miles per hour.
   b) **Posted Signs:** You are responsible for following all posted signs including height restrictions, mounted mirrors, and traffic control devices.
   c) **Unassigned Parking:** In the event parking at your community is unassigned, you can park on a first-come, first-serve basis, except in designated areas. Parking spaces are not guaranteed.
   d) **Assigned Parking:** In the event parking at your community is assigned, you must park only in your assigned space.
   e) **Limitation of Vehicles:** We will advise you if your community has a limitation on the number of vehicles allowed.
   f) **Restricted Vehicles:** Unless specifically allowed in designated areas, including carports and/or garages, the following are not allowed: campers, trailers, boats, buses, large trucks, commercial vehicles, mobile homes, trailers, recreational vehicles and equipment. Violators will be towed away without notice at the vehicle/equipment owner's expense.
   g) **No Vehicle Repairs:** Automobile repair work is not allowed on the community. Washing vehicles is not allowed unless there is a designated car care facility.
   h) **Vehicle Insurance:** All vehicles will be parked at your own or the vehicle's owner's risk, and you will maintain proper insurance on your vehicles.
   i) **No Loitering or Recreational Activities:** You, your occupants, guests, and invitees may not engage in the following activities in parking areas: loitering (standing or waiting around), recreational activities, or disrupting the flow of traffic.
   j) Improperly parked, non-operable, abandoned, or unauthorized vehicles or equipment are not permitted in the community and may be removed by us at your expense or the expense of any other person owning same, for storage or public or private sale, at our option with no right of recourse against us. The definition of improperly parked, non-operable, abandoned, or unauthorized vehicles or equipment shall be liberally construed in our favor. In addition, but not limited to their generally accepted definitions, "improperly parked", "non-operable", "abandoned", and "unauthorized" shall also mean vehicles or equipment which: (1) Are noxious, offensive, unsightly, unpleasant or unkempt such as could reasonably affect the appearance or rental marketability of the community or such as could reasonably cause embarrassment, discomfort, annoyance, or nuisance to us or other residents; (2) Are not displaying any required hangtag, decal, or other identifier provided by us; (3) Are left unattended for a period of not less than thirty (30) days without anyone having claimed ownership of it.

## 9. Parking Tags/Stickers

In the event your community requires parking tags/stickers, the parking tag/sticker must be visibly displayed either on the rear-view mirror or taped next to the vehicle registration. We are not responsible for damage to window tint or glass due to the sticker. The vehicle can be towed without notice at the vehicle owner's expense in accordance with state law.
   a) You agree to advise your guests and invitees to park in the designated guest parking spaces only.
   b) If your sticker/tag is lost, stolen, damaged, or not returned upon move-out, a replacement fee of $_____ will be assessed to your account.

## 10. Animals

**10.1 Assistance Animals:** Assistance animals required pursuant to a disability-related need are welcome. Assistance animals must be disclosed to and approved by us. The appropriate reasonable accommodation process will apply.

**10.2 Pet Policies:** No animals of any kind are permitted in your apartment or the community without our prior written consent. In the event your community allows pets, the following policies apply.
   a) **No More Than Two Pets:** A maximum of two pets per apartment home is permitted.
   b) **Weight Limits:** Pets shall not exceed your community's weight limit.
   c) **Restricted Breeds and Prohibited Dogs:** The following breeds are not permitted on the community: Rottweiler, Doberman Pinscher, Pit Bull Terrier/Staffordshire Terrier, Chow, Presa Canarios, Akita, Alaskan Malamutes, Wolf-Hybrid, or any mix thereof. Specific communities may have additional breed restrictions. In addition, we prohibit any dog with a history of biting, injuring any person or animal, or damaging property.
   d) **Determination of Breed:** Regardless of your representation as to the breed or classification of any animal, you agree that we shall make the final determination as to the breed or classification of your pet or animal in our sole and absolute discretion. Restricted Breeds shall have the broadest possible meaning, and includes, but is not limited to, any animal displaying physical traits or characteristics of any restricted breed animal, whether by observation or by standards established by the American Kennel Club, or other applicable association, or defined by any law, statute, or ordinance. If applicable, a canine DNA test may be requested at your expense.
   e) **Cats:** Cats must be spayed or neutered.
   f) **Animals Not Allowed in Amenities:** Animals, except Assistance Animals, are not permitted in the pool, pool area, or community amenity areas such as the business and fitness centers. No animals will be allowed in the pool or spa water.
   g) **No Staking Animals:** Animals may not be tied to any fixed object anywhere outside the dwelling units, except in fenced yards (if any) for your exclusive use.
   h) **Aquariums:** Aquariums up to 20 gallons are allowed without a pet deposit or fee. Aquariums over 20 gallons may require a pet deposit or fee in addition to proof of renter's insurance.
   i) **Secure Animals During Service Requests:** Remove animals or place them in a room behind a closed door or kennel/crate with notification to us.

## 11. Trash Removal and Disposal

   a) **Curbside Pick Up:** In the event your community offers curbside trash pick-up, contact us for the scheduled days and times of pick-up. You agree not to leave any trash out on days that are not scheduled for pick-up. We reserve the right to remove curbside trash pick-up service upon written notice to you of the change.
   b) **No Curbside Pick Up:** In the event your community does not offer curbside trash pick-up, you shall dispose of your bagged and tied trash inside the compactor/dumpster facility as instructed by us or by the sign near the compactor/dumpster.
   c) **Trash Chutes:** In the event your community has trash chutes, contact us for the scheduled hours of operation. Securely tied, kitchen-sized bags are required. No loose items can be put in the trash chute. Do not use the chute for recycling. No boxes or large trash can be placed in the chutes. Contact us for details or questions regarding the use of the trash chute.
   d) **Recycling:** In the event recycling is offered at your community, you are responsible for complying with all recycling regulations.
   e) **Potential Charges:** You may be charged $25 per bag for any trash left outside your apartment home or in breezeways. Please contact us if you require further instruction regarding proper disposal of garbage with the compactors, dumpsters, or chutes.

f) **No Litter:** Do not leave cigarette butts or other trash near or around patios/balconies, under windows, or near entry doors. We reserve the right to assess a fine of $25 per incident.
g) **No Furniture as Trash:** No furniture may be left for trash removal.
h) **Dumpster Use for Residents Only:** Only you and your occupants are permitted to use the dumpster/compactor.
i) **No Dumpster Diving:** Do not retrieve items from the dumpster. Digging or scavenging is prohibited.
j) **General:** Please break down empty boxes. Keep the area clean and litter free. If applicable, close the lid after use.
k) **No Parking in Front of Dumpster:** Parking in front of the dumpster/compactor is not allowed.
l) **Prohibited Items:** You understand that you cannot place the following items in or around the trash dumpster or compactor: propane tanks, flammable or toxic materials, furniture, bedding, appliances, auto batteries, tires, and oil/petroleum products.

## 12. Pest Control

**12.1 Extermination:** Unless prohibited by statute or otherwise stated in your Lease Contract, we may have extermination operations conducted in the apartment home several times a year and as needed to prevent insect infestation. If pest control services are provided, you shall pay the amount of $ _____ on or before the first day of each month to reimburse us for extermination services to the apartment home. You shall pay such fee in the same time and manner as you pay rent pursuant to your Lease Contract. You must request in writing extermination treatments in addition to those regularly provided by us.

**12.2 Preparations for Extermination:** If the apartment home is not prepared for a scheduled treatment date, we will reschedule treatment at your expense. You agree to perform the tasks necessary to prepare the apartment home for extermination, including:
a) removing people sensitive to the extermination treatment from the apartment home;
b) removing animals or placing them in bedrooms with notification to us;
c) removing animal food bowls;
d) removing all food, utensils, glasses, and dishes and food containers from countertops and floors;
e) removing chain locks or other obstructions on the day of service;
f) removing contents from shelves, cabinets, and floors where pests have been seen;
g) cleaning all cabinets, drawers, and closets in kitchen and pantry; and
h) refraining from wiping out cabinets after the treatment.

**12.3 Notify Us of Health Issues:** You are solely responsible for notifying us in writing prior to extermination of any anticipated health or other concerns related to extermination and the use of pesticides.

**12.4 Your Responsibilities:** To reduce the possibility of pests, you shall: (a) store all food in sealed containers; (b) not leave food or dirty dishes out; (c) empty all cans and bottles and rinse them with water; (d) immediately dispose of unused paper grocery sacks; (e) sweep and mop the kitchen regularly; (vi) vacuum carpets frequently to remove crumbs and other food particles; (f) remove trash immediately; (g) not put wet garbage in the trash; (h) use the garbage disposal if available; (i) not leave windows or doors open allowing pests to enter; and (j) comply with any instructions/protocol from the extermination company.

## 13. Packages / Deliveries

In the event your community accepts packages for residents we do so in our sole discretion and the following policies apply:
a) We will only accept packages from a commercial delivery service (UPS, Federal Express, etc.) and United States Postal Service. We will not accept any package shipped COD or having postage due.
b) In the event your community offers a package locker system, couriers will make all deliveries exclusively through the locker system. Refer to your community for the locker location name to be placed on address delivery label(s), which will instruct couriers of proper delivery.
c) We will not be responsible or liable for any lost or stolen deliveries which we sign for or accept. While your deliveries are in our possession, both during and after office hours, your deliveries are not secured.
d) Pick up your deliveries within 48 hours. If you do not pick up your delivery within 48 hours, we reserve the right to return to sender.
e) Occasionally the number of deliveries may become too great or too cumbersome; therefore, we reserve the right at all times to refuse deliveries.
f) We have no obligation to contact you when accepting packages. This is your and the deliverer's responsibility.
g) Deliveries or service requiring entrance into your apartment home by anyone other than us will be allowed only with your prior written permission.
h) We are not responsible for articles or parcels left at your door or in the office by delivery services.
i) We will not be available after hours to allow you access to your deliveries. You must pick up your packages during regular office hours.
j) You shall not have perishable goods delivered to the office unless your community has approved such delivery in advance or offers refrigerated lockers.
k) We may not accept packages that are over 25 pounds or larger than 2'x2'x2'.
l) You may be required to present a photo ID and/or signature when picking up a package.

## 14. Maintenance Emergencies

Service requests will be handled after office hours if they are emergencies. We define emergencies as the following:
a) Electrical or gas failure of any nature
b) Broken or non-working exterior doors, locks, windows
c) Malfunctioning access gates that are locked and will not open
d) No heat (when outside temperature is below 60 degrees)
e) No air conditioning (when outside temperature is above 85 degrees)
f) No water
g) Overflowing toilet
h) Flooding
i) Broken pipes
j) Fire (call 911 immediately)
k) After business hours, emergency service requests can be reported by calling the office. The on-duty service technician will be notified and will respond as quickly as possible.

## 15. Apartment Home Transfers

When transferring to another apartment home within the community:
a) You shall not replace or transfer your interest in the Lease Contract, or any part hereof, without our prior written consent. If you are in violation of the Lease Contract, you will not be approved for a transfer.
b) You must sign a Transfer form.
c) The criteria for qualifications of credit, income and employment, residence, and criminal must be met for residents that transfer within the lease term or at the end of the lease term.
d) You must fulfill at least 3 months of your current lease term before you will be eligible to transfer to a new apartment home.
e) If applicable, a transfer fee must be paid prior to transferring. A new security deposit may be required to secure the new apartment home. In addition, market rent, new pool deposits (if applicable) and other applicable fees must be paid.
f) You are required to provide a written move-out notice according to your Lease Contract from the current apartment home. The vacated apartment home must be left in the condition described in the move-out cleaning instructions. We will inspect the apartment home and forward statements and deposit refunds to your new address.
g) If you cancel the transfer after the new apartment home has been assigned and taken off the market, you will be responsible for any economic loss sustained resulting from your failure to rent the new apartment home.
h) You shall be responsible for all moving costs including those associated with switching utilities and services to the new apartment home if a transfer is approved.

## 16. Amenities / Facilities

| | | | | |
|---|---|---|---|---|
| Swimming Pool | BBQ Grill/Fire Pit | Spa or Hot Tub | Club Room | Dog Park/Spa |
| Sports Court | Car Cleaning Facility | Game Room/Theater | Laundry Room | |
| Tanning Facilities | Sauna | Business Center | Fitness Facilities | |
| Video Library | Nature/Hiking Trail | Playground | Roof Top Deck | |

In the event that your community hosts any of the above or other amenities, the following apply:

- In an emergency, call 911
- Attendants are not provided
- Use amenities at your own risk
- Comply with posted signs
- Use equipment in the manner it is intended
- Do not destroy any equipment/amenity
- Report any equipment needing repair or vandalism
- Do not remove any equipment
- Wear appropriate attire
- Be mindful of others when using amenities and limit time as necessary
- Only two guests are allowed and must be accompanied by you
- We are not responsible for accidents, injuries, or lost, stolen, damaged, or misplaced items
- You agree to hold us harmless from any and all claims, damages, or expenses related to the use of amenities

## 17. Amenity / Facility Safety-Related Restrictions

**17.1 Safety-Related Restrictions:** Our community contains amenities/facilities that are intended to enhance the living experience for you and your occupants. You agree that, for safety-related reasons, certain amenities/facilities may require restrictions on use. You agree to abide by posted signs. You further agree that you, your occupants or guests will be supervised, as needed, by someone possessing the proper skills to supervise the particular activity at the amenities/facilities.

**17.2 Residents Shall Exercise Their Own Prudent Judgment:** You, occupants and guests are advised to exercise their own prudent judgment with respect to the unsupervised use of the facilities located throughout the community. By establishing safety-related use restrictions, we are not in any manner representing, guaranteeing or ensuring the safety of any persons when participating in the activities or using the facilities of the community with or without supervision.

## 18. Swimming Pool and Spa / Hot Tub

In the event your community has a pool and/or hot tub for the enjoyment of all residents, the following policies apply. Please follow posted signage.
- a) We do not provide, at any time, safety or supervisory personnel at the pools, hot tubs, spas, or any other common area. LIFEGUARDS ARE NOT PROVIDED. SWIM AT YOUR OWN RISK. FOR YOUR SAFETY, DO NOT SWIM ALONE.
- b) No diving. Diving may result in injury or death.
- c) We cannot and do not assure, guarantee or warrant your safety.
- d) Assistance animals are allowed in the pool area if necessary due to a disability-related need; however, no animals will be allowed in the pool or spa water.
- e) We are not responsible for accidents, injuries, or lost, stolen, damaged or misplaced items.
- f) No jumping into the pool from balconies, patios, fountains, or other structures near the pool.
- g) Keep gates closed at all times.
- h) Respect others by covering pool furniture with a towel. Do not remove pool furniture from pool areas. Dispose of trash properly.
- i) Overexposure to hot water may cause dizziness, nausea, and fainting. Hot water exposure limitations vary from person to person.
- j) Check the hot tub temperature before entering the hot tub. Do not use the hot tub if the temperature is above 104 degrees. Do not operate the hot tub if the suction outlet cover is missing, broken, or loose.
- k) Do not place electrical appliances (telephone, radio, TV, etc.) within five feet of the pool or hot tub.
- l) Appropriate swimwear is required at all times as determined by us. Diapers are not allowed unless they are swim diapers.
- m) You are limited to 2 guests to any pool/hot tub area, and you must accompany your guests at all times.

## 19. Sports Courts (Tennis, Volleyball, Basketball, etc.)

In the event your community has sports courts (tennis, volleyball, basketball, etc.) for the enjoyment of all residents, the following policies apply.
- a) Motorcycles, bicycles, tricycles, roller blades, skateboards and skates are not permitted on the court surface.
- b) Do not sit or lean on the net. Do not hang from or climb on the goal or nets.
- c) Proper athletic shoes with rubber soles are required.

## 20. Club Room / Game Room / Theater

In the event that your community provides a club room, game room, and/or theater for the enjoyment of all residents, the following policies apply.
- a) No wet clothing permitted.
- b) Clubroom hours are determined by us.
- c) All items must be returned, in the condition in which they were received prior to leaving.
- d) Use the facility at your own risk. Use the equipment only in the manner intended by manufacturer.
- e) Do not remove or damage equipment and supplies.

## 21. Tanning Bed, Tanning Dome, or Spray Tan Booth

In the event a tanning device(s) is provided for the enjoyment of all residents, the following policies apply:
- a) Failure to use the eye protection may result in permanent damage to your eyes.
- b) Overexposure to ultraviolet light (whether from natural or artificial sources) causes burns.
- c) Repeated exposure to ultraviolet light (whether from natural or artificial sources) may result in premature aging of the skin and skin cancer.
- d) Abnormal skin sensitivity or burning may be caused by reactions of ultraviolet light to certain food, cosmetics, and medications.

## 22. Video / DVD Library

In the event your community provides a video/DVD library, the following policies apply.
- a) You acknowledge and agree to be fully responsible for any and all videos/DVDs borrowed by self or other occupants while using the video services provided.
- b) All videos/DVDs must be returned in good working condition (except reasonable wear and tear) within 48 hours.
- c) We are not responsible for persons borrowing videos/DVDs that may not be suitable for themselves or others.
- d) We may charge your account the total amount owed including late charges and/or market value of all items not returned in good working condition.

## 23. Business / Computer Center

In the event your community has a business center for the enjoyment of all residents, the following policies apply:
- a) The center is for use by you and occupants only.
- b) We are not responsible for lost, stolen or damaged items, content viewed, viruses or loss of information.

c) Smoking, food and drinks are prohibited.
d) Please be considerate of others. Limit computer use to 30 minutes when others are waiting.
e) You must provide their own document/data storage. Do not install or download any program, file or software on the business center equipment. Data created, stored or saved on the business center equipment will not be private, may be used by us for any purpose and will likely be deleted. *Incoming faxes are prohibited.*
f) We reserve the right to monitor, intercept, review, and erase, without further notice, all content created on, transmitted to, received or printed from, or stored or recorded on the courtesy devices.
g) Users should not use the courtesy device to transmit or store personal information, including user names, passwords, addresses, driver's license numbers, social security numbers, bank information, or credit card information.
h) The courtesy device and associated access to the internet may not be used to (a) violate United States, state, or foreign laws; (b) transmit or receive material that is threatening, obscene, harassing, discriminatory, defamatory, illicit, or pornographic; or (c) interfere with or disrupt network users, services, or equipment.
i) Attempts to remove equipment from the business center will engage the alarm system.
j) Users may not alter or damage existing hardware or software. Do not modify screensavers or background images on business center equipment.
k) Violation of any or all of the above stated rules may result in termination of business center use or other remedies under the lease.

## 24. Barbecue Grill / Outdoor Kitchen / Fire Pit / Fire Place

In the event your community has barbecue grills, outdoor kitchens, fire pits, or fire places for the enjoyment of all residents, the following policies apply.
a) Barbecue grill instructions must be posted at each location or are available from us. Please contact us before attempting to use these grills.
b) Keep pets and persons requiring supervision away from open flames.
c) Your community may require a deposit or fee to use the facility. Contact us for further details.
d) Never leave a fire unattended. Do not leave until the fire is completely out.
e) Keep flammable materials away from the fire.

## 25. Laundry Room

In the event your community has laundry rooms, the following policies apply.
a) Use appropriate settings on washers and dryers. Any loss or damage to clothing is not our responsibility.
b) No dying of clothes is permitted.
c) Do not wash or dry oversized items.
d) Remove lint from dryer before and after each use. Wipe down after use. Please leave machines clean.
e) Facilities are for use by you and occupants only.

## 26. Dog Park/Spa

In the event your community has a Dog Park or Spa for the enjoyment of all residents, the following policies apply.
a) Animal owners are responsible their animal's behavior, for damage or injury inflicted to or by their animal(s). Animal owners must remain with dogs in fenced area at all times.
b) You are limited to 2 animals per person in the Dog Park or Spa
c) Dogs must be leashed when entering and exiting the park and must be leashed in the transition corridor, if applicable. You must have a visible leash for each dog at all times.
d) Animals with a known history of dangerous or aggressive behavior are prohibited. Immediately leash your dog(s) and leave the Dog Park if your dog behaves aggressively.
e) Puppies under 6 months of age and female dogs in heat are not allowed in the Dog Park.

## 27. Roof Top Deck

In the event your community has a roof top deck for the enjoyment of all residents, the following policies apply.
a) You, your occupants and guests shall not walk in any areas on the roof other than the designated walkway and roof top deck itself.
b) Nothing shall be thrown or intentionally dropped over the edge of the roof. You, upon the first infraction of this policy by you, your occupants or guests, may have use privileges revoked and/or residency terminated.

## 28. Photographs, Digital Images, Video

All residents, occupants, visitors and guests, while in common areas, give Owner, management company, their employees, agents, subsidiaries and authorized vendors the right to record their image and/or voice, and grant Owner and management company all rights to use these sound, still, or moving images in any and all media, now or hereafter known, and for any purpose whatsoever.

A release to Owner, management company, their employees, agents, subsidiaries and authorized vendors is granted for all rights to exhibit this work in all media, including electronic form, publicly or privately. The rights, claims or interest controlling the use of identity or likeness in the sound, still or moving images is waived and any uses described herein may be made without compensation or consideration.

## 29. Wildlife

**29.1 Definition of Wildlife:** Wildlife can include the presence of alligators, bears, crocodiles, snakes, opossums, raccoons, or other non-domesticated animals. In the event wildlife is found on the community, you agree to the following.

**29.2 Resident Acknowledgements:** You assume the risk with respect to having wildlife near your apartment home and acknowledge that we are not liable for any injuries, damages or losses to persons or property caused by or related to the wildlife.

**29.3 Resident Responsibilities:** You will be responsible for informing occupants, guests and invitees about the wildlife and enforcing their compliance with the following:
You, your occupants and guests will not:
a) feed, get close to, or attempt to catch the wildlife;
b) swim, wade or play near the wildlife;
c) dispose of garbage of scraps near a water source, pond, lake, or other area that may contain wildlife.

## 30. Body of Water (Lake, Pond, Water Features)

You will be responsible for informing occupants, guests and invitees about the bodies of water and enforcing their compliance with the following:
No one will
a) swim or wade in any body of water that is not designated as a swimming pool;
b) boat on any body of water unless approved by us;
c) ice skate or conduct any other type of water sport in or on the bodies of water.

## 31. Elevators

In the event your community has an elevator (s) for the enjoyment of all residents, the following policies apply.
a) Do not attempt to maneuver or stop closing doors. Wait for the next elevator car.
b) In the event of a fire or other situation that could lead to a disruption in electrical services, take the stairs.
c) When entering and exiting the elevator, watch your step as the elevator car may not be perfectly level with the floor.
d) Do not climb out of a stalled elevator. Use the alarm, help, or telephone button to call for assistance.

## 32. Construction or Renovation

In the event your community is under construction or renovation, the following policies apply:
a) **Inform Occupants and Guests:** You will be responsible for informing occupants, guests, and invitees about these policies.
b) **Stay Away from Construction Areas:** You agree to observe all warning signs and blockades. You agree to stay away from the construction areas and shall not climb on or enter onto scaffolding or other construction equipment at any time. You acknowledge there may be construction debris, trip hazards, and uneven surfaces. Construction crews may work throughout the days to complete construction.
c) **Machinery and Equipment:** You acknowledge the construction areas will have machinery and equipment to be used by authorized personnel only and entry into those areas by you, your occupants, guests or invitees is strictly prohibited.
d) **Minor Disturbances:** You acknowledge that the construction/renovation may cause noise, dust, and minor disturbances to the egress/ingress on or about the community and minor disturbances to the quiet and enjoyment of the apartment home.
e) **Amenities May Be Unavailable:** You further agree that the amenities, including the clubhouse, pool, or other common areas, may be unavailable for use by you, your occupants, guests and invitees during the period of construction.
f) **Resident Waives Right to Withhold Rent:** Except as otherwise prohibited by law, you hereby waive any right to withhold rent due to inconvenience or disturbance of quiet enjoyment of your apartment home or the inability to use the amenities or common areas or put forward such noise or construction activity as a breach of our duty pursuant to applicable law.
g) **Move-In Date Not Guaranteed Due to Construction Delays:** You acknowledge that the move-in date cannot be guaranteed in the case of unforeseen construction delays. You acknowledge that you will not be compensated for any unforeseen occupancy delays. If you terminate the Lease Contract early for any reason other than construction delays, you will be responsible for all applicable early termination charges and procedures.

<h3>33. Prevention of Mold</h3>

You agree not to conduct any mold or other environmental testing of your apartment without giving us at least 72 hours advance written notice to enable us to have a representative present during testing. You agree that failure to provide such notice means the testing is not admissible in any legal proceedings.

<h3>34. Fire/Freezing Weather/Floods/Other Emergencies</h3>

Emergency situations may occur during your residency. Please remember that you are responsible for your own safety and the safety of your occupants, guests and invitees. You should look to the proper authorities for any assistance when needs exceed your abilities. Please note the following regarding certain emergency situations.

**34.1 Fire Hazards:**
a) Follow fire safety and fire safety regulations while in the apartment home and community.
b) No flammable or combustible objects/substances are to be stored on patios, balconies, under stairwells, in your garage or storage space and should not be within 30 inches of an item which produces heat (water heater, furnace, stove, oven, candle, curling iron, etc.).
c) Items which require an open flame to operate or which produce heat (e.g., Bunsen burners, sterno/canned heat, lighted candles, alcohol burners, heating elements, irons, curling irons, halogen bulbs, stove, oven) must be supervised at all times during use and should never be left unattended.
d) Do not obstruct or use the driveways, sidewalks, entry passages, stairs, breezeways, courtyards, or halls for any purpose other than ingress or egress.
e) Fireworks are prohibited inside the apartment home or anywhere within the community.

**34.2 Fire Alarms:** In the event residents are given procedures for fire alarms, you, your occupants, guests and invitees are required to adhere to all procedures.
a) You and your occupants, guests, and invitees must not tamper with, interfere with, or damage any alarm equipment and/or installation.
b) In the event the community has a fire sprinkler system, you acknowledge and hereby agree that it is important to be careful near fire sprinkler heads so as not to falsely trigger or activate them. If you trigger or activate the fire sprinkler system, you will be responsible for all damages caused by the activation.
c) Anyone found to falsely pull a fire alarm will be subject to criminal charges, a fine, and/or a default of the Lease Contract.
d) An extension cord must be UL approved, 16 gauges, and not exceed an un-spliced length of six feet with a polarized plug and a single outlet; it may not be placed under floor coverings or furnishings and may not be secured by penetrating the insulation.

**34.3 Freezing Weather:** You shall follow these precautions when subfreezing weather occurs.
a) Leave the heat on 24 hours a day at a temperature setting of no less than 55 degrees. Keep all windows closed.
b) Leave open the cabinet doors under the kitchen sink and bathroom sink to allow heat to get to the plumbing.
c) Drip all your water faucets 24 hours a day. If severe subfreezing weather occurs, it may be necessary to run your faucets at a steady, pencil-lead stream when you are in the apartment home and when you are gone. This includes hot and cold water in your kitchen, bathroom lavatories, bathtubs, shower, wet bar sinks, etc.
d) Leave all drains open and clear of obstacles; including lavatories, sinks and bathtubs.
e) If you notice a water leak, icy spot or other hazardous condition on the community, notify us IMMEDIATELY.

**34.4 Floods:**
a) If heavy rain, storms or flooding is forecast, you should follow the guidelines below. Do not put tape on the windows unless directed by us.
b) Unplug all appliances and televisions. Do not plug appliances back in until the water completely recedes and community personnel give you permission.

<h3>35. Power Outage</h3>

In the event of a power outage that lasts more than 24 hours, we have the right, but not an obligation, to dispose of the contents of the refrigerator/freezer in your apartment home. You waive any claim and hold us harmless for the disposal of such contents. You agree not to seek recovery against us for interruption of power that results in disposal, loss, or spoilage of refrigerated or frozen food.

<h3>36. Payments</h3>

Unless otherwise allowed at your community, we only accept electronic payments. Cash, paper checks, paper money orders or other forms of payment will not be accepted. Credit and Debit Card transactions may not be allowed.

**36.1 ACH, Credit, and Debit Cards:** Automated electronic payments include ACH and Credit and Debit Card transactions. ACH refers to the nationwide network of banking institutions that have agreed to process electronic payments automatically from your bank account to our bank accounts. Virtually all banks and credit unions participate. Credit and debit card transactions refers to credit and debit card transactions, including those cards bearing the Visa, MasterCard, Discover and American Express logos. Collectively, "automated electronic payments" are paperless transactions that occur instantly and automatically without a check being hand-processed through a local bank clearinghouse or the Federal Reserve System.

**36.2 Advantages in Paying Rent via ACH:** There are advantages for you in paying your rent via automated electronic payments, including:
a) Greater convenience since you won't have to worry each month with writing, mailing or delivering a rent check;
b) No late charges since your rent will be paid timely, assuming there are sufficient funds in your checking account;
c) Greater security since there is little chance that a check signed by you will fall into the wrong hands or get lost in the mail; and
d) Proof that you've paid since your bank statement is evidence of payment according to ACH and card network rules.

**36.3 Electronic Money Orders:** We also accept electronic money orders. Details on this payment option are available at the office.

**36.4 Check Scanner:** If your community accepts paper checks and uses a check scanner, you are hereby advised that personal checks remitted for normal payments will be scanned and the funds will be electronically withdrawn from your bank account via "Automated Clearing House" (ACH). If you wish to opt out of this process, you must choose another payment method. Standard ACH bank drafts occur after one business day.

**36.5 Electronic Check Conversion:** If your community accepts paper checks, please be aware that we may use electronic check conversion. This is a process in which your check is used as a source of information (for the check number, your account number, and the number that identifies your financial institution). The information is then used to make a one-time electronic payment from your account (an electronic fund transfer). The check itself is not the method of payment. Your electronic transaction may be processed faster than a check. Be sure you have enough money in your account at

the time you make a purchase or payment. Your financial institution will not return any checks that are converted, even if you normally receive your original checks or images of those checks with your statement. Always review your regular account statement from your financial institution. You should immediately contact your financial institution if you see a problem. You have only 60 days (from the date your statement was sent) to tell the financial institution about a problem. Depending on the circumstances, the financial institution may take up to 45 days from the time you notify it to complete its investigation. Your checking account statement will contain information about your payment, including the date, the check number, the name of the person or company you have paid, and the amount of the payment.

### 37. Data and Communication

You understand and accept that we may collect, retain, use, transfer, and disclose personal information, such as the first name, last name, email address, and phone number of you or your occupants in the unit. We may collect, retain, and use that information, or disclose that information to third parties to, among other things, (a) operate the Property; (b) provide services consistent with the Lease; (c) refer you to third parties that provide products or services that may be of interest to you or your occupants in the unit; (d) collect debts; and (e) conduct and analyze resident surveys. Please review the privacy policy of the owner's authorized agent at the time of residence for a discussion of the treatment of information during your lease. The current policy may be viewed at https://www.greystar.com/privacy.

Providing an email address or cell phone number to us enables us to send important announcements, including notices regarding an emergency water shut off, work to be done at the Property, or changes in office hours. By providing this contact information, you and your occupants consent to receive communications regarding marketing materials, promotional offers, community messages, and service reminders via e-mail, voicemail, calls and/or text.

By providing your and your occupants' phone numbers, you acknowledge and agree that we may contact you and your occupants at the phone number(s) that you and your occupants have provided, including through an automatic telephone dialing system and/or an artificial prerecorded voice, with information and notifications about the community and for other non-marketing, informational purposes, including in connection with expiration of your lease. You further warrant to us that you or your occupants are the subscriber for any wireless number that you or your occupants have provided. You agree to immediately notify us if you or your occupants are no longer the subscriber for a wireless number, or if a wireless number changes. Text messaging and data rates may apply.

You authorize us to deliver messages regarding renewal of your lease and other offers to you at the telephone number(s) that you have provided, including through the use of an automatic telephone dialing system and/or artificial or prerecorded voice. You acknowledge and agree that this authorization is made voluntarily.

The permissions and consents granted herein apply to the owner of the community and the owner's authorized agents/representatives, including its property manager, and will continue even after your lease expires, the owner of the community sells the community, or the property manager no longer manages the community.

### 38. Subletting and Replacements

**38.1 When Allowed:** Replacing a resident, subletting, assigning, or licensing a resident's rights are allowed only when we consent in writing. Residency at your community is subject to an application and/or approval by us. Occupancy is restricted to only the named residents and occupants that are identified in your Lease Contract.

**38.2 Advertising Your Apartment:** You are not allowed to advertise your apartment homes(s) without our written consent. This prohibition on advertising includes online postings, print advertising or other formats such as craigslist, Airbnb, etc.

### 39. Conduct

You agree to communicate and conduct yourself at all times in a lawful, courteous, and reasonable manner when interacting with us; our employees, agents, independent contractors, and vendors; other residents, occupants, guests or invitees; or any other person in the community. Any acts of unlawful, discourteous, or unreasonable communication or conduct by you or your occupants, guests or invitees, shall be a material breach of this Agreement and will entitle us to exercise all of our rights and remedies for default.

You agree not to engage in any abusive behavior, either verbal or physical, or any form of intimidation or aggression directed at us; our employees, agents, independent contractors, and vendors; other residents, occupants, guests or invitees; or any other person in the community. Any acts of abusive or offensive behavior whether verbal or physical by you or your occupants, guests or invitees, shall be a material breach of this Lease and will entitle us to exercise all of our rights and remedies for default.

If requested by us, you agree to conduct all further business with us in writing.

| Summary | |
|---|---|
| **Section and Description** | **Charge** |
| Additional Controlled Access Device | $ |
| Damaged/Lost/Unreturned Cards/Remotes/Fobs (per device) | $ |
| Duplicate/Lost/Unreturned Key | $ |
| Re-keying Lock | $ |
| Private Yard Maintenance Fine | $ |
| Lost/Stolen/Unreturned Parking Tag/Sticker (per item) | $ |
| Trash Clean-up (per bag) | $ 25 |
| Litter Fine (per incident) | $ 25 |
| Pest Control Monthly Fee | $ |

This is a binding document. Read carefully before signing.

**Resident(s) Signature(s)** *(18 years of age and over)*

_____
Date:

_____
Date:

_____
Date:

_____
Date:

_____
Date:

_____
Date:

**Owner's Representative Signature:**

_____

# Blue Moon Lease - Harlowe

## Signature Details

| Signer | IP Address | Date Signed |
|---|---|---|
| **Blue Moon Lease - Harlowe** | | |
| 1 ████ Co-Applicant (████ | ████ | 05/13/2022 12:42:52 PM |
| 2 ████ Co-Applicant (████ | ████ | 05/13/2022 12:42:52 PM |
| 3 ████ Co-Applicant (████ | ████ | 05/13/2022 12:42:52 PM |
| 4 ████ Co-Applicant (████ | ████ | 05/13/2022 12:42:52 PM |
| 5 ████ Co-Applicant (████ | ████ | 05/13/2022 12:42:52 PM |
| 6 ████ Co-Applicant (████ | ████ | 05/13/2022 12:42:52 PM |
| 7 ████ Co-Applicant (████ | ████ | 05/13/2022 12:42:52 PM |
| 8 ████ Co-Applicant (████ | ████ | 05/13/2022 12:42:52 PM |
| 9 ████ Co-Applicant (████ | ████ | 05/13/2022 12:42:52 PM |
| 10 ████ Co-Applicant (████ | ████ | 05/13/2022 12:42:52 PM |
| 11 ████ Co-Applicant (████ | ████ | 05/13/2022 12:42:52 PM |
| 12 ████ Co-Applicant (████ | ████ | 05/13/2022 12:42:52 PM |
| 13 ████ Co-Applicant (████ | ████ | 05/13/2022 12:42:52 PM |
| 14 ████ Co-Applicant (████ | ████ | 05/13/2022 12:42:52 PM |
| 15 ████ Co-Applicant (████ | ████ | 05/13/2022 12:42:52 PM |
| 16 ████ Co-Applicant (████ | ████ | 05/13/2022 12:42:52 PM |
| 17 ████ Co-Applicant (████ | ████ | 05/13/2022 12:42:52 PM |
| 18 ████ Co-Applicant (████ | ████ | 05/13/2022 12:42:52 PM |
| 19 ████ Co-Applicant (████ | ████ | 05/13/2022 12:42:52 PM |
| 20 ████ Co-Applicant (████ | ████ | 05/13/2022 12:42:52 PM |
| 21 ████ Co-Applicant (████ | ████ | 05/13/2022 12:42:52 PM |
| 22 ████ Co-Applicant (████ | ████ | 05/13/2022 12:42:52 PM |
| 23 ████ Co-Applicant (████ | ████ | 05/13/2022 12:42:52 PM |
| 24 ████ Co-Applicant (████ | | 05/13/2022 12:42:52 PM |

| 25 | ███████ | | ████ | 05/13/2022 12:42:52 PM |
|----|---------|---|------|------------------------|
| | Co-Applicant (██████ | | | |
| 26 | ███████ | | ████ | 05/13/2022 12:42:52 PM |
| | Co-Applicant (██████ | | | |
| 27 | ███████ | | ████ | 05/13/2022 12:42:52 PM |
| | Co-Applicant (██████ | | | |
| 28 | ███████ | | ████ | 05/13/2022 12:42:52 PM |
| | Co-Applicant (██████ | | | |
| 29 | ███████ | | ████ | 05/13/2022 12:42:52 PM |
| | Co-Applicant (██████ | | | |
| 30 | ███████ | | ████ | 05/13/2022 12:42:52 PM |
| | Co-Applicant (██████ | | | |
| 31 | ███████ | | ████ | 05/13/2022 12:42:52 PM |
| | Co-Applicant (██████ | | | |
| 32 | ███████ | | ████ | 05/13/2022 12:42:52 PM |
| | Co-Applicant (██████ | | | |
| 33 | ███████ | | ████ | 05/13/2022 12:42:52 PM |
| | Co-Applicant (██████ | | | |
| 34 | ███████ | | ████ | 05/13/2022 12:42:52 PM |
| | Co-Applicant (██████ | | | |
| 35 | ███████ | | ████ | 05/13/2022 12:42:52 PM |
| | Co-Applicant (██████ | | | |
| 36 | ███████ | | ████ | 05/13/2022 12:42:52 PM |
| | Co-Applicant (██████ | | | |
| 37 | ███████ | | ████ | 05/13/2022 12:42:52 PM |
| | Co-Applicant (██████ | | | |
| 38 | ███████ | | ████ | 05/13/2022 12:42:52 PM |
| | Co-Applicant (██████ | | | |
| 39 | ███████ | | ████ | 05/13/2022 12:42:52 PM |
| | Co-Applicant (██████ | | | |
| 40 | ███████ | | ████ | 05/13/2022 12:42:52 PM |
| | Co-Applicant (██████ | | | |
| 41 | **Joshua M Kabisch** | | ████ | 05/13/2022 01:27:40 PM |
| | Primary (███ | | | |
| 42 | **Joshua M Kabisch** | | ████ | 05/13/2022 01:27:40 PM |
| | Primary (███ | | | |
| 43 | **Joshua M Kabisch** | | ████ | 05/13/2022 01:27:40 PM |
| | Primary (███ | | | |
| 44 | **Joshua M Kabisch** | | ████ | 05/13/2022 01:27:40 PM |
| | Primary (███ | | | |
| 45 | **Joshua M Kabisch** | | ████ | 05/13/2022 01:27:40 PM |
| | Primary (███ | | | |
| 46 | **Joshua M Kabisch** | | ████ | 05/13/2022 01:27:40 PM |
| | Primary (███ | | | |
| 47 | **Joshua M Kabisch** | | ████ | 05/13/2022 01:27:40 PM |
| | Primary (███ | | | |
| 48 | **Joshua M Kabisch** | | ████ | 05/13/2022 01:27:40 PM |
| | Primary (███ | | | |
| 49 | **Joshua M Kabisch** | | ████ | 05/13/2022 01:27:40 PM |
| | Primary (███ | | | |
| 50 | **Joshua M Kabisch** | | ████ | 05/13/2022 01:27:40 PM |
| | Primary (███ | | | |
| 51 | **Joshua M Kabisch** | | ████ | 05/13/2022 01:27:40 PM |
| | Primary (███ | | | |

| 52 | **Joshua M Kabisch**<br>Primary ( ██████ ) | ████████ | 05/13/2022 01:27:40 PM |
|----|---|---|---|
| 53 | **Joshua M Kabisch**<br>Primary ( ██████ ) | ████████ | 05/13/2022 01:27:40 PM |
| 54 | **Joshua M Kabisch**<br>Primary ( ██████ ) | ████████ | 05/13/2022 01:27:40 PM |
| 55 | **Joshua M Kabisch**<br>Primary ( ██████ ) | ████████ | 05/13/2022 01:27:40 PM |
| 56 | **Joshua M Kabisch**<br>Primary ( ██████ ) | ████████ | 05/13/2022 01:27:40 PM |
| 57 | **Joshua M Kabisch**<br>Primary ( ██████ ) | ████████ | 05/13/2022 01:27:40 PM |
| 58 | **Joshua M Kabisch**<br>Primary ( ██████ ) | ████████ | 05/13/2022 01:27:40 PM |
| 59 | **Joshua M Kabisch**<br>Primary ( ██████ ) | ████████ | 05/13/2022 01:27:40 PM |
| 60 | **Joshua M Kabisch**<br>Primary ( ██████ ) | ████████ | 05/13/2022 01:27:40 PM |
| 61 | **Joshua M Kabisch**<br>Primary ( ██████ ) | ████████ | 05/13/2022 01:27:40 PM |
| 62 | **Joshua M Kabisch**<br>Primary ( ██████ ) | ████████ | 05/13/2022 01:27:40 PM |
| 63 | **Joshua M Kabisch**<br>Primary ( ██████ ) | ████████ | 05/13/2022 01:27:40 PM |
| 64 | **Joshua M Kabisch**<br>Primary ( ██████ ) | ████████ | 05/13/2022 01:27:40 PM |
| 65 | **Joshua M Kabisch**<br>Primary ( ██████ ) | ████████ | 05/13/2022 01:27:40 PM |
| 66 | **Joshua M Kabisch**<br>Primary ( ██████ ) | ████████ | 05/13/2022 01:27:40 PM |
| 67 | **Joshua M Kabisch**<br>Primary ( ██████ ) | ████████ | 05/13/2022 01:27:40 PM |
| 68 | **Joshua M Kabisch**<br>Primary ( ██████ ) | ████████ | 05/13/2022 01:27:40 PM |
| 69 | **Joshua M Kabisch**<br>Primary ( ██████ ) | ████████ | 05/13/2022 01:27:40 PM |
| 70 | **Joshua M Kabisch**<br>Primary ( ██████ ) | ████████ | 05/13/2022 01:27:40 PM |
| 71 | **Joshua M Kabisch**<br>Primary ( ██████ ) | ████████ | 05/13/2022 01:27:40 PM |
| 72 | **Joshua M Kabisch**<br>Primary ( ██████ ) | ████████ | 05/13/2022 01:27:40 PM |
| 73 | **Joshua M Kabisch**<br>Primary ( ██████ ) | ████████ | 05/13/2022 01:27:40 PM |
| 74 | **Joshua M Kabisch**<br>Primary ( ██████ ) | ████████ | 05/13/2022 01:27:40 PM |
| 75 | **Joshua M Kabisch**<br>Primary ( ██████ ) | ████████ | 05/13/2022 01:27:40 PM |
| 76 | **Joshua M Kabisch**<br>Primary ( ██████ ) | ████████ | 05/13/2022 01:27:40 PM |
| 77 | **Joshua M Kabisch**<br>Primary ( ██████ ) | ████████ | 05/13/2022 01:27:40 PM |
| 78 | **Joshua M Kabisch**<br>Primary ( ██████ ) | ████████ | 05/13/2022 01:27:40 PM |

| 79 | **Joshua M Kabisch**<br>Primary ( ███ ) | ██████ | 05/13/2022 01:27:40 PM |
|----|------|------|------|
| 80 | **Joshua M Kabisch**<br>Primary ( ███ ) | ██████ | 05/13/2022 01:27:40 PM |
| 81 | **Rachel Halvaei**<br>Greystar Agent | 156.146.99.182 | 05/17/2022 04:52:22 PM |
| 82 | **Rachel Halvaei**<br>Greystar Agent | 156.146.99.182 | 05/17/2022 04:52:22 PM |
| 83 | **Rachel Halvaei**<br>Greystar Agent | 156.146.99.182 | 05/17/2022 04:52:22 PM |
| 84 | **Rachel Halvaei**<br>Greystar Agent | 156.146.99.182 | 05/17/2022 04:52:22 PM |
| 85 | **Rachel Halvaei**<br>Greystar Agent | 156.146.99.182 | 05/17/2022 04:52:22 PM |
| 86 | **Rachel Halvaei**<br>Greystar Agent | 156.146.99.182 | 05/17/2022 04:52:22 PM |
| 87 | **Rachel Halvaei**<br>Greystar Agent | 156.146.99.182 | 05/17/2022 04:52:22 PM |
| 88 | **Rachel Halvaei**<br>Greystar Agent | 156.146.99.182 | 05/17/2022 04:52:22 PM |
| 89 | **Rachel Halvaei**<br>Greystar Agent | 156.146.99.182 | 05/17/2022 04:52:22 PM |
| 90 | **Rachel Halvaei**<br>Greystar Agent | 156.146.99.182 | 05/17/2022 04:52:22 PM |
| 91 | **Rachel Halvaei**<br>Greystar Agent | 156.146.99.182 | 05/17/2022 04:52:22 PM |
| 92 | **Rachel Halvaei**<br>Greystar Agent | 156.146.99.182 | 05/17/2022 04:52:22 PM |
| 93 | **Rachel Halvaei**<br>Greystar Agent | 156.146.99.182 | 05/17/2022 04:52:22 PM |
| 94 | **Rachel Halvaei**<br>Greystar Agent | 156.146.99.182 | 05/17/2022 04:52:22 PM |
| 95 | **Rachel Halvaei**<br>Greystar Agent | 156.146.99.182 | 05/17/2022 04:52:22 PM |
| 96 | **Rachel Halvaei**<br>Greystar Agent | 156.146.99.182 | 05/17/2022 04:52:22 PM |
| 97 | **Rachel Halvaei**<br>Greystar Agent | 156.146.99.182 | 05/17/2022 04:52:22 PM |
| 98 | **Rachel Halvaei**<br>Greystar Agent | 156.146.99.182 | 05/17/2022 04:52:22 PM |
| 99 | **Rachel Halvaei**<br>Greystar Agent | 156.146.99.182 | 05/17/2022 04:52:22 PM |
| 100 | **Rachel Halvaei**<br>Greystar Agent | 156.146.99.182 | 05/17/2022 04:52:22 PM |
| 101 | **Rachel Halvaei**<br>Greystar Agent | 156.146.99.182 | 05/17/2022 04:52:22 PM |
| 102 | **Rachel Halvaei**<br>Greystar Agent | 156.146.99.182 | 05/17/2022 04:52:22 PM |
| 103 | **Rachel Halvaei**<br>Greystar Agent | 156.146.99.182 | 05/17/2022 04:52:22 PM |
| 104 | **Rachel Halvaei**<br>Greystar Agent | 156.146.99.182 | 05/17/2022 04:52:22 PM |
| 105 | **Rachel Halvaei**<br>Greystar Agent | 156.146.99.182 | 05/17/2022 04:52:22 PM |

| | | | |
|---|---|---|---|
| **106** | **Rachel Halvaei**<br>Greystar Agent | 156.146.99.182 | 05/17/2022 04:52:22 PM |
| **107** | **Rachel Halvaei**<br>Greystar Agent | 156.146.99.182 | 05/17/2022 04:52:22 PM |
| **108** | **Rachel Halvaei**<br>Greystar Agent | 156.146.99.182 | 05/17/2022 04:52:22 PM |
| **109** | **Rachel Halvaei**<br>Greystar Agent | 156.146.99.182 | 05/17/2022 04:52:22 PM |
| **110** | **Rachel Halvaei**<br>Greystar Agent | 156.146.99.182 | 05/17/2022 04:52:22 PM |
| **111** | **Rachel Halvaei**<br>Greystar Agent | 156.146.99.182 | 05/17/2022 04:52:22 PM |
| **112** | **Rachel Halvaei**<br>Greystar Agent | 156.146.99.182 | 05/17/2022 04:52:22 PM |
| **113** | **Rachel Halvaei**<br>Greystar Agent | 156.146.99.182 | 05/17/2022 04:52:22 PM |
| **114** | **Rachel Halvaei**<br>Greystar Agent | 156.146.99.182 | 05/17/2022 04:52:22 PM |
| **115** | **Rachel Halvaei**<br>Greystar Agent | 156.146.99.182 | 05/17/2022 04:52:22 PM |
| **116** | **Rachel Halvaei**<br>Greystar Agent | 156.146.99.182 | 05/17/2022 04:52:22 PM |
| **117** | **Rachel Halvaei**<br>Greystar Agent | 156.146.99.182 | 05/17/2022 04:52:22 PM |
| **118** | **Rachel Halvaei**<br>Greystar Agent | 156.146.99.182 | 05/17/2022 04:52:22 PM |
| **119** | **Rachel Halvaei**<br>Greystar Agent | 156.146.99.182 | 05/17/2022 04:52:22 PM |
| **120** | **Rachel Halvaei**<br>Greystar Agent | 156.146.99.182 | 05/17/2022 04:52:22 PM |

# EXHIBIT 5-A

**Cherry Lease**



APARTMENT
ASSOCIATION

# Seattle - Apartment Lease Contract

Date of Lease Contract: __**August 5, 2018**__
(when the Lease Contract is filled out)

This is a binding document. Read carefully before signing.

## Moving In — General Information

1. **PARTIES.** This Lease Contract (sometimes referred to as the "lease") is between *you*, the resident(s) (*list all people signing the Lease Contract*):
**Christopher Berg,** _____
_____
_____
_____ and *us*, the owner:
**Madison Summit LLC** _____
_____

(*name of apartment community or title holder*). You've agreed to rent Apartment No. __**E214**__, at __**1819 23rd Ave #E214**__ (street address) in __**Seattle**__ (city), Washington, __**98122**__ (*zip code*) for use as a private residence only. The terms "you" and "your" refer to all residents listed above. The terms "we," "us," and "our" refer to the owner listed above (or any of owner's successors' in interest or assigns). Written notice to or from our managers constitutes notice to or from us. If anyone else has guaranteed performance of this Lease Contract, a separate Lease Contract Guaranty for each guarantor is attached.

2. **OCCUPANTS.** The apartment will be occupied only by you and (*list all other occupants not signing the Lease Contract*):
_____
_____
_____
_____

No else one may occupy the apartment. Persons not listed above must not stay in the apartment for more than __**7**__ consecutive days within any three months. If the previous space isn't filled in, two days per month is the limit. Receipt of mail at the apartment by any person not listed in this agreement shall be deemed to be proof of occupancy by that person. Any person in the unit, with or without the Resident's knowledge, including but not limited to invitees of guests or other invitees, shall be deemed to be guests for purposes of this agreement.

3. **LEASE TERM.** The initial term of the Lease Contract begins on the __**8th**__ day of __**August**__, __**2018**__, and ends at midnight the __**7th**__ day of __**November**__, __**2019**__. This Lease Contract will automatically renew month-to-month unless either party gives at least __**20**__ days written notice of termination to move-out as required by paragraph 37. If the number of days isn't filled in, at least 20 days notice is required before the expiration date above or, if the lease has renewed on a month-to-month basis, at least 20 days notice is required before the end of the monthly rental period.

4. **SECURITY DEPOSIT.** Unless modified by addenda, the total security deposit at the time of execution of this Lease Contract for all residents in the apartment is $__**485.00**__ , due on or before the date this Lease Contract is signed. **Your security deposit will be held in an escrow company or bank escrow account located in Washington until disposition.** See paragraphs 41, 42, and 43 for security deposit return information. Any nonrefundable fees will be described in paragraph 10 or on addendums to this lease. If we sell the apartments, we will transfer your security deposit to the new owner who will give you any required statutory notices. In the case of multiple residents, the security deposit shall not be returned until the final Resident on the agreement has vacated and Owner reserves the right to issue any refund check in the name of all Residents or only in the name of the final remaining Resident. It is the Residents' sole responsibility to allocate any refunded amount between themselves.

Your security deposit will be kept in a account at (name and address of financial institution):
**BANK OF AMERICA**
**800 FIRST AVENUE, 24TH FLOOR**
**SEATTLE, WA 98104**

5. **KEYS AND FURNITURE.** You will be provided __**2**__ apartment key(s), __**2**__ mailbox key(s), and __**2**__ other access devices for __**fobs**__ . Your apartment will be [check one]:
☐ furnished or ☒ unfurnished.

6. **RENT AND CHARGES.** Unless modified by addenda, you will pay $__**2090.00**__ per month for rent, payable in advance and without demand:
☐ at the on-site manager's office, or
☒ at our online payment site, or
☐ at _____

Prorated rent of $ __**1618.07**__ is due for the remainder of the [check one]: ☒ 1st month or ☐ 2nd month, on __**August 8**__, __**2018**__ .

Otherwise, you must pay your rent, in advance, on or before the 1st day of each month (due date) with no grace period. Cash is unacceptable without our prior written permission. You must not withhold or offset

---

rent unless authorized by statute. We may, at our option, require at any time that you pay all rent and other sums in cash, certified or cashier's check, money order, or one monthly check rather than multiple checks. If you don't pay all rent on or before the __**5th**__ of the month, you'll pay an initial late charge of $__**150.00**__ plus a late charge of $ __**5.00**__ per day after that date paid in full. You'll also pay a charge of $ __**50.00**__ for each returned check or rejected electronic payment, plus initial and daily late charges from due date until we receive acceptable payment. After __**2**__ checks are returned by your bank for any reason, all future payments due during the remainder of your tenancy, notwithstanding the signing of any new lease agreements, must be by cashier's check, certified check or money order only. If you don't pay rent on time, you'll be delinquent and all remedies under this Lease Contract will be authorized. We'll also have all other remedies for such violation. If this community has a drop box, it is provided only as a convenience to the Residents. Use of the drop box for payment of rent or any other amount and for providing notices to the Owner are at the sole risk of the Resident. If any payment is lost prior to receipt by the Owner, Resident agrees to immediately replace the payment at their sole cost. Resident is strongly encouraged to make all payments directly to the Owner and to obtain a receipt for all payments.

7. **UTILITIES.** We'll pay for the following items, if checked:
☐ water      ☐ gas      ☐ electricity   ☐ master antenna
☐ wastewater ☐ trash    ☐ cableTV       ☐ other _____
You'll pay in full as billed for all other utilities, related deposits, and any charges, fees, or services on such utilities. You must not allow utilities to be disconnected—including disconnection for not paying your bills—until the lease term or renewal period ends. Cable channels that are provided may be changed during the lease term if the change applies to all residents. Utilities may be used only for normal household purposes and must not be wasted. If your electricity is ever interrupted, you must use only battery-operated lighting. If any utilities are sub-metered for the apartment, or prorated by an allocation formula, we will attach an addendum to this Lease Contract in compliance with state agency rules or city ordinance. If recycling is mandated by law, then Residents will be equally charged if the community is assessed any recycling related fines.

8. **INSURANCE.** We do not maintain insurance to cover your personal property or personal injury. We are not responsible to any resident, guest, or occupant for damage or loss of personal property or personal injury from (including but not limited to) fire, smoke, rain, flood, water and pipe leaks, hail, ice, snow, lightning, wind, explosions, earthquake, interruption of utilities, theft, hurricane, negligence of other residents, occupants, or invited/uninvited guests or vandalism unless otherwise required by law.

We urge you to get your own insurance for losses to your personal property or injuries due to theft, fire, water damage, pipe leaks and the like.

Additionally, you are [check one] ☐ required to purchase personal liability insurance ☐ not required to purchase personal liability insurance. If no box is checked, personal liability insurance is not required. If required, failure to maintain personal liability insurance is an incurable breach of this Lease Contract and may result in the termination of tenancy and eviction and/or any other remedies as provided by this Lease Contract or state law.

You acknowledge that no portion of the rent paid by you under this agreement will be applied to your owner's structural fire insurance and that you are in no way a co-insured under any such policy.

9. **LOCKS AND LATCHES.** Keyed lock(s) will be rekeyed after the prior resident moves out. The rekeying will be done either before you move in.

You may at any time ask us to: (1) install one keyed deadbolt lock on an exterior door if it does not have one; (2) install a bar and/or sliding door pinlock on each sliding glass door; (3) install one door viewer on each exterior door; and (4) change or rekey locks or latches during the lease term. We must comply with those requests, but you must pay for them.

**What You Are Now Requesting.** You now request the following to be installed at your expense (if one is not already installed), subject to any statutory restrictions on what you may request.

☒ keyed deadbolt lock    ☐ door viewer    ☐ sliding door bar
☒ sliding door pinlock

**Payment for Rekeying, Repairs, Etc.** You must pay for all repairs or replacements arising from misuse or damage to devices by you or your family, occupants, or guests during your occupancy. You may be required to pay in advance if we notify you within a reasonable time after your request that you are more than 30 days delinquent in reimbursing us for repairing or replacing a device which was misused or damaged by you, your guest or an occupant; or if you have requested that we repair, install, change or rekey the same device during the 30 days preceding your request and we have complied with your request.

## Special Provisions and "What If" Clauses

**10. SPECIAL PROVISIONS.** The following special provisions and any addenda or written rules furnished to you at or before signing will become a part of this lease Contract and will supersede any conflicting provisions of this printed lease form.

__See special provisions on the last page__
_____
_____
_____
_____
_____

See any additional special provisions.

**11. EARLY MOVE-OUT.** You'll be liable to us for a reletting charge of $__1649.00__ if you:

(1) fail to give written move-out notice as required in paragraphs 23 or 37; or
(2) move out without paying rent in full for the entire lease term or renewal period; or
(3) move out at our demand because of your default; or
(4) are judicially evicted.

The reletting charge is not a cancellation fee and does not release you from your obligations under this Lease Contract.

**Not a Release.** The reletting charge is a liquidated amount covering only part of our damages, that is, our time, effort, and expense in finding and processing a replacement. These damages are uncertain and difficult to ascertain—particularly those relating to inconvenience, paperwork, advertising, showing apartments, utilities for showing, checking prospects, office overhead, marketing costs, and locator-service fees. You agree that the reletting charge is a reasonable estimate of such damages and that the charge is due whether or not our reletting attempts succeed. If no amount is stipulated, you must pay our actual reletting costs so far as they can be determined. The reletting charge does not release you from continued liability for: future or past-due rent; charges for cleaning, repairing, repainting, or unreturned keys; or other sums due.

**Lease Buy Out.** If you desire to buy out your Lease Contract early please refer to your Lease Buy Out Agreement. If you have not been provided with a Lease Buy Out Agreement you must contact us regarding such an agreement. A lease buy out may not be available in all cases. Other than as required by law or otherwise stated in this Lease Contract the Lease Buy Out Agreement shall govern the means by which you may terminate this Lease Contract before the end of its term.

**12. REIMBURSEMENT.** You must promptly reimburse us for loss, damage, government fines, or cost of repairs or service in the apartment community due to a violation of the Lease Contract or rules, improper use, or negligence, by you or your guests or occupants. In addition, unless the damage or wastewater stoppage is due to our negligence, we're not liable for—and you must pay for—repairs, replacement costs, and damage to the following if occurring during the lease term or renewal period: (1) damage to doors, windows, or screens; (2) damage from windows or doors left open; and (3) damage from wastewater stoppages caused by improper objects in lines exclusively serving your apartment. We may require payment at any time, including advance payment of repairs for which you're liable. Delay in demanding sums you owe is not a waiver.

**13. PROPERTY LEFT IN APARTMENT.**

**Removal After Surrender, Abandonment, or Eviction.** We or law officers may remove and/or store all property remaining in the apartment or in common areas (including any vehicles you or any occupant or guest owns or uses) if you are judicially evicted or if you surrender or abandon the apartment (see definitions in paragraph 42).

**Storage.** We may store, but **other than as may be required by law** have no duty to store, property removed after judicial eviction, surrender, or abandonment of the apartment. We're not liable for casualty loss, damage, or theft unless otherwise provided by law. You must pay reasonable charges for our packing, removing, storing, and selling any property.

**Redemption.** If we've seized and stored property as authorized by the state statute, you may redeem the property by paying all reasonable moving and storage fees if you make written request for the return of the property before we have sold or disposed of it. We may return redeemed property at the place of storage, the management office, or the apartment (at our option). We may require payment by cash, money order, or certified check.

**Disposition or Sale.** We may throw away or give to a charitable organization all items of personal property that are: (1) left in the apartment after surrender or abandonment; or (2) left outside more than 1 day after a writ of restitution is executed, following a judicial eviction.

Animals removed after surrender, abandonment, or eviction may be kenneled or turned over to local authorities or humane societies. Property described in (1) and (2) above not thrown away or given to charity may be disposed of only by sale, which must be held no sooner than 45 days after written notice to you. Our notice may be sent to you first class mail to your last known address or to any other addresses you provided us in writing or any other address known to us for you. Our notice will include (1) our name and the address where we may be contacted, (2) the place where your property is stored, (3) a statement informing you that a sale or disposition of your property will take place in accordance with state law, (4) the date of the sale or disposal (which may be no sooner than 45 days from the date of notice), and (5) a statement informing you of your right (upon payment of storage charges) to have the property returned prior to its sale or disposition. Sale may be public or private, is subject to any third-party ownership or lien claims, must be to the highest cash bidder, and may be in bulk, in batches, or item-by-item. We'll hold any excess proceeds from the sale for you for one year from the date of the sale. If no claim is made to the proceeds in that year, we may retain the proceeds.

However, if your property that we are storing has a cumulative value of $250 or less, we may sell or dispose of your property (except for personal papers, family pictures, and keepsakes) after 7 days from the date that we mailed notice to you of the prospective sale or disposal. We'll send you a 45 day notice before we dispose of any personal papers, family pictures, and keepsakes.

After writ of restitution is issued, if we receive timely notice from you or your representative that you want us to store your personal property, we will do so in accordance with the requirements of RCW 59.18.312.

**14. FAILING TO PAY FIRST MONTH'S RENT.** If you don't pay the first month's rent when or before the Lease Contract begins, or your failure to pay any subsequent rent or other charges owing under this Lease Contract, all future rent will be automatically accelerated without notice and immediately due. We also may end your right of occupancy and recover damages, future rent, reletting charges, attorney's fees, court costs, and other lawful charges. Our rights and remedies under paragraphs 11 and 32 apply to acceleration under this paragraph.

**15. RENT INCREASES AND LEASE CONTRACT CHANGES.** No rent increases or Lease Contract changes are allowed before the initial Lease Contract term ends, except for changes allowed by any special provisions in paragraph 10, by a written addendum or amendment signed by you and us, or by reasonable changes of apartment rules allowed under paragraph 18. If we give you at least 30 days written notice (60 days written notice within the City of Seattle if the increase is 10% or higher) of rent increases or lease changes effective when the Lease term or renewal period ends, this Lease Contract will automatically continue month-to-month with the increased rent or lease changes. The new modified Lease Contract will begin on the date stated in the notice (without necessity of your signature) unless you give us written move-out notice under paragraph 37.

**16. DELAY OF OCCUPANCY.** If occupancy is or will be delayed for construction, repairs, cleaning, or a previous resident's holding over, we're not responsible for the delay. The lease will remain in force subject to: (1) abatement of rent on a daily basis during delay; and (2) your right to terminate as set forth below. Termination notice must be in writing. After termination, you are entitled only to refund of deposit(s) and any rent paid. Rent abatement or lease termination does not apply if delay is for cleaning or repairs that don't prevent you from occupying the apartment.

If there is a delay and we haven't given notice of delay as set forth immediately below, you may terminate up to the date when the apartment is ready for occupancy, but not later.

(1) If we give written notice to any of you when or after the initial term as set forth in Paragraph 3—and the notice states that occupancy has been delayed because of construction or a previous resident's holding over, and that the apartment will be ready on a specific date —you may terminate the Lease Contract within 3 days of your receiving the notice, but not later.
(2) If we give written notice to any of you before the initial term as set forth in Paragraph 3 and the notice states that construction delay is expected and that the apartment will be ready for you to occupy on a specific date, you may terminate the Lease Contract within 7 days after any of you receives written notice, but not later. The readiness date is considered the new initial term as set forth in Paragraph 3 for all purposes. This new date may not be moved to an earlier date unless we and you agree.

**17. DISCLOSURE RIGHTS.** If someone requests information on you or your rental history for law-enforcement, governmental, or business purposes, we may provide it without prior notice to you.

## While You're Living in the Apartment

**18. COMMUNITY POLICIES OR RULES/FACILITIES.** You and all guests and occupants must comply with any written apartment rules and community policies, including instructions for care of our property. After 30 days written notice, we may make changes to written rules, effective on completion of your lease term, or in a month-to-month tenancy, effective at the end of the next calendar month. You understand and agree that any and all facilities provided by us are provided as a gratuity and their use is not part of the rent that you pay. We reserve the right to change or limit the hours of any such facilities, or to eliminate them completely without prior notice to you or any other residents, and that any such action shall not constitute any claim by you for diminished rental value or a claim of default under the terms of this agreement by us.

**19. LIMITATIONS ON CONDUCT.** The apartment and other areas reserved for your private use must be kept clean. Trash must be disposed of at least weekly in appropriate receptacles in accordance with local ordinances. Passageways may be used only for entry or exit. Any swimming pools, saunas, spas, tanning beds, exercise rooms, storerooms, laundry rooms, and similar areas must be used with care in accordance with apartment rules and posted signs. Glass containers are prohibited in all common areas. You, your occupants, or guests may not anywhere in the apartment community: use candles or use kerosene lamps or kerosene heaters without our prior written approval; cook on balconies or outside; or solicit business or contributions. Conducting any kind of business in your apartment or in the apartment community is prohibited—except that any lawful business conducted "at home" by computer, mail,

or telephone is permissible if customers, clients, patients, or other business associates do not come to your apartment for business purposes. We may regulate: (1) the use of patios, balconies, and porches; (2) the conduct of furniture movers and delivery persons; and (3) recreational activities in common areas. You'll be liable to us for damage caused by you or any guests or occupants.

We may exclude from the apartment community guests or others who, in our judgment, have been violating the law, violating this Lease Contract or any apartment rules, or disturbing other residents, neighbors, visitors, or owner representatives. We may also exclude from any outside area or common area a person who refuses to show photo identification or refuses to identify himself or herself as a resident, occupant, or guest of a specific resident in the community.

You agree to notify us if you or any occupants are convicted of any felony, or misdemeanor involving a controlled substance, violence to another person or destruction of property. You also agree to notify us if you or any occupant registers as a sex offender in any state. Informing us of criminal convictions or sex offender registry does not waive our right to evict you.

**20. PROHIBITED CONDUCT.** You and your occupants or guests may not engage in the following: criminal activities, behaving in a loud or obnoxious manner; disturbing or threatening the rights, comfort, health, safety, or convenience of others (including our agents and employees) in or near the apartment community; disrupting our business operations; manufacturing, delivering, possessing with intent to deliver, or otherwise possessing a controlled substance or drug paraphernalia (as defined by either Washington State or Federal Law, including marijuana); engaging in or threatening violence; possessing a weapon prohibited by state law; discharging a firearm in the apartment community; displaying or possessing a gun, knife, or other weapon in the common area in a way that may alarm others; storing anything in closets having gas appliances, or anything that may increase our insurance costs; tampering with utilities or telecommunications; bringing hazardous materials into the apartment community; or injuring our reputation by making bad faith allegations against us to others.

**21. PARKING.** We may regulate the time, manner, and place of parking cars, trucks, motorcycles, bicycles, boats, trailers, and recreational vehicles by anyone. We may have unauthorized or illegally parked vehicles towed. A vehicle is unauthorized or illegally parked in the apartment community if it:

  (1) has a flat tire or other condition rendering it inoperable; or
  (2) is on jacks, blocks or has wheel(s) missing; or
  (3) has no current license or no current inspection sticker; or
  (4) takes up more than one parking space; or
  (5) belongs to a resident or occupant who has surrendered or abandoned the apartment; or
  (6) is parked in a marked handicap space without the legally required handicap insignia; or
  (7) is parked in a space marked for manager, staff, or guest at the office; or
  (8) blocks another vehicle from exiting; or
  (9) is parked in a fire lane or designated "no parking" area; or
  (10) is parked in a space marked for other resident(s) or unit(s); or
  (11) is parked on the grass, sidewalk, or patio; or
  (12) blocks garbage trucks from access to a dumpster.

**22. RELEASE OF RESIDENT.** Unless you're entitled to terminate this Lease Contract under paragraphs 10, 16, 23, 31, or 37, you won't be released from this Lease Contract for any reason—including but not limited to voluntary or involuntary school withdrawal or transfer, voluntary or involuntary job transfer, marriage, separation, divorce, reconciliation, loss of co-residents, loss of employment, or bad health.

**23. MILITARY PERSONNEL CLAUSE.** You agree to comply with any federal law, including but not limited to the ServiceMember's Civil Relief Act, or any applicable state law, if you are seeking to terminate a lease or month to month rental agreement under the rights granted by such laws.

**24. RESIDENT SAFETY AND PROPERTY LOSS.** You and all occupants and guests must exercise due care for your own and others' safety and security, especially in the use of smoke and carbon monoxide detectors, keyed deadbolt locks, keyless bolting devices, window latches, and other safety or security devices. **YOU AGREE TO MAKE EVERY EFFORT TO FOLLOW THE SECURITY GUIDELINES IN THIS LEASE CONTRACT.**

**Statutory Notice Regarding Smoke Detectors and Carbon Monoxide Detectors.** We'll furnish a smoke detector and carbon monoxide detector in the apartment as required by statute. We'll test the smoke detector and carbon monoxide detector and provide working batteries (if applicable) when you first take possession. After that, you must maintain the smoke detector and carbon monoxide detector and replace any batteries as needed, at your expense. We may replace dead or missing batteries at your expense, without prior notice to you. You must immediately report smoke-detector and carbon monoxide detector malfunctions to us. Neither you nor others may disable, remove, or damage smoke detectors or carbon monoxide detectors. If the foregoing is violated or you fail to replace a dead battery or report malfunctions to us, you will be liable to us and others for any loss, damage, or fines from fire, smoke, or water. You acknowledge that we have advised you: (i) that the apartment is equipped with a smoke detector and carbon monoxide detector, (ii) that it's your responsibility to maintain the smoke detector and carbon monoxide detector in proper working condition, and (iii) that you may be subject to fines of up to $200 or other penalties for your failure to comply with the provisions of RCW 43.44.110. You may replace the smoke detector and carbon monoxide detector was operational as of the date of your inspection, and (iv) following the commencement of the lease term, you will pay for and replace the smoke detector and carbon monoxide detector batteries, if any, as needed. You must not permit or cause the removal, disconnection, or disabling of the smoke detector or carbon

monoxide detector.

**Casualty Loss.** We're not liable to any resident, guest, or occupant for personal injury or damage or loss of personal property from any cause, including but not limited to: fire, smoke, rain, flood, water and pipe leaks, hail, ice, snow, lightning, wind, explosions, earthquake, interruption of utilities, theft, or vandalism unless otherwise required by law. Unless we instruct otherwise, you must—for 24 hours a day during freezing weather—(1) keep the apartment heated to at least 50 degrees; (2) keep cabinet and closet doors open; and (3) drip hot and cold water faucets. You'll be liable for damage to our and others' property if damage is caused by broken water pipes due to your violating these requirements. If you ask our representatives to perform services not contemplated in this Lease Contract, you will indemnify us and hold us harmless from all liability for those services.

**Crime or Emergency.** Dial 911 or immediately call local medical emergency, fire, or police personnel in case of accident, fire, smoke, or suspected criminal activity, or other emergency involving imminent harm. You should then contact our representative. You won't treat any of our security measures as an express or implied warranty of security, or as a guarantee against crime or of reduced risk of crime. Unless otherwise provided by law, we're not liable to you or any guests or occupants for injury, damage, or loss to person or property caused by criminal conduct of other persons, including theft, burglary, assault, vandalism, or other crimes. We're not obliged to furnish security personnel, security lighting, security gates or fences, or other forms of security unless required by statute. We're not responsible for obtaining criminal-history checks on any residents, occupants, guests, or contractors in the apartment community. If you or any occupant or guest is affected by a crime, you must make a written report to our representative and to the appropriate local law-enforcement agency. You must also furnish us with the law-enforcement agency's incident report number upon request.

**25. CONDITION OF THE PREMISES AND ALTERATIONS.** You accept the apartment, fixtures, and furniture as is, except for conditions materially affecting the health or safety of ordinary persons. To the extent allowed by law, we disclaim all implied warranties. You'll be given an Inventory and Condition form on or before move-in which must be completed by you and returned to us. Unless otherwise noted on the form, everything will be considered to be in a clean, safe, and good working condition upon move-in. You understand that items noted on a move in inspection form do not indicate an agreement by us to clean, repair or replace that noted item. All maintenance requests must be in writing and on a separate maintenance request form.

You must use customary diligence in maintaining the apartment and not damaging or littering the common areas. Unless authorized by statute or by us in writing, you must not perform any repairs, painting, wallpapering, carpeting, electrical changes, or otherwise alter our property. No holes or stickers are allowed inside or outside the apartment. But we'll permit a reasonable number of small nail holes for hanging pictures on sheetrock walls and in grooves of wood-paneled walls, unless our rules state otherwise. No water furniture, washing machines, additional phone or TV-cable outlets, alarm systems, or lock changes, additions, or rekeying is permitted unless statutorily allowed or we've consented in writing. You may install a satellite dish or antenna provided you sign our satellite dish or antenna lease addendum which complies with reasonable restrictions allowed by federal law. You agree not to alter, damage, or remove our property, including alarm systems, smoke detectors and carbon monoxide detectors, furniture, telephone and cable TV wiring, screens, locks, and security devices. When you move in, we'll supply light bulbs for fixtures we furnish, including exterior fixtures operated from inside the apartment; after that, you'll replace them at your expense with bulbs of the same type and wattage. Your improvements to the apartment (whether or not we consent) become ours unless we agree otherwise in writing.

**26. REQUESTS, REPAIRS, AND MALFUNCTIONS.** IF YOU OR ANY OCCUPANT NEEDS TO SEND A NOTICE OR REQUEST—FOR EXAMPLE, FOR REPAIRS, INSTALLATIONS, SERVICES, OR SECURITY-RELATED MATTERS—IT MUST BE SIGNED AND IN WRITING TO OUR DESIGNATED REPRESENTATIVE (except in case of fire, smoke, gas, explosion, overflowing sewage, uncontrollable running water, electrical shorts, or crime in progress). Our written notes on your oral request do not constitute a written request from you.

Our complying with or responding to any oral request regarding security or non-security matters doesn't waive the strict requirement for written notices under this Lease Contract. You must promptly notify us in writing of: water leaks; broken windows, wet areas on floors, walls or ceilings; electrical problems; malfunctioning lights; broken or missing locks or latches, toilets or faucets; and other conditions that pose a hazard to property, health, or safety. We may change or install utility lines or equipment serving the apartment if the work is done reasonably without substantially increasing your utility costs. We may turn off equipment and interrupt utilities as needed to avoid property damage or to perform work. If utilities malfunction or are damaged by fire, water, or similar cause, you must notify our representative immediately. Air conditioning problems are not emergencies. If air conditioning or other equipment malfunctions, you must notify our representative as soon as possible on a business day. We'll act with customary diligence to make repairs and reconnections. Rent will not abate in whole or in part.

If we believe that fire or catastrophic damage is substantial, or that performance of needed repairs poses a danger to you, we may terminate this Lease Contract within a reasonable time by giving you written notice. If the Lease Contract is so terminated, we'll refund prorated rent and all deposits, less lawful deductions.

**27. ANIMALS.** No animals (including mammals, reptiles, birds, fish, rodents and insects) are allowed, even temporarily, anywhere in the apartment or apartment community unless we've so authorized in

writing. If we allow an animal, you must sign a separate animal addendum. You must remove an illegal animal within 24 hours of notice from us, or you will be considered in default of this Lease Contact. We will authorize a service animal for a disabled (handicapped) person. We may require a written statement from a qualified professional verifying the need for the service animal. You must not feed stray or wild animals. No pets will be allowed to visit the property and no "pet-sitting" shall be allowed. If a pet becomes a problem in our sole opinion, we reserve the right to require that the pet be removed from the property. Once a pet has been removed from the property, the pet deposit for that pet shall not be returned during the tenancy even though the animal is no longer on the property. If you have pets, companion or service animals, they must be secured during maintenance work. If they are not secured and pose any type of danger to Maintenance, in our sole opinion, Maintenance shall be entitled to leave the unit prior to the completion of the work and it shall be your sole responsibility to schedule a return by Maintenance for the completion of the work after the animal has been secured.

If you or any guest or occupant violates animal restrictions (with or without your knowledge), you'll be subject to charges, damages, eviction, and other remedies provided in this Lease Contract. If an animal has been in the apartment at any time during your term of occupancy (with or without our consent), we'll charge you for defleaing, deodorizing, and shampooing. Initial and daily animal-violation charges and animal-removal charges are liquidated damages for our time, inconvenience, and overhead (except for attorney's fees and litigation costs) in enforcing animal restrictions and rules. We may kennel the animal or contact a humane society or local authority for pick up. When kenneling an animal, we won't be liable for loss, harm, sickness, or death of the animal unless due to our negligence. We'll return the animal to you upon request if it has not already been turned over to a humane society or local authority. You must pay for the animal's reasonable care and kenneling charges. We have no lien on the animal for any purpose.

**28. WHEN WE MAY ENTER.** If you or any guest or occupant is present and gives permission to enter, then repairers, servicers, contractors, our representatives or other persons listed in (2) below. Otherwise, the persons listed in (2) below may enter peacefully and at reasonable times by duplicate or master key (or by breaking a window or other means when necessary) if:

(1) written notice of the entry is hand delivered to someone in the

apartment or is left in a conspicuous place in the apartment at least 48 hours before entry (or 24 hours before entry if entry is to show the apartment to prospective residents or purchasers at a specified time). No prior notice is needed in emergencies or situations when prior notice is impractical; and

(2) entry is for: responding to your request; making repairs or replacements; estimating repair or refurbishing costs; performing pest control; doing preventive maintenance; changing filters; testing or replacing smoke-detector or carbon monoxide detector batteries; retrieving unreturned tools, equipment or appliances; preventing waste of utilities; exercising our contractual lien; leaving notices; delivering, installing, reconnecting, or replacing appliances, furniture, equipment, or security devices; removing or rekeying unauthorized security devices; removing unauthorized window coverings; stopping excessive noise; removing health or safety hazards (including hazardous materials), or items prohibited under our rules; removing perishable foodstuffs if your electricity is disconnected; retrieving property owned or leased by former residents; inspecting when immediate danger to person or property is reasonably suspected; allowing persons to enter as you authorized in your rental application (if you die, are incarcerated, etc.); allowing entry by a law officer with a search or arrest warrant, or in hot pursuit; showing apartment to prospective residents (after move-out or vacate notice has been given); or showing apartment to government inspectors for the limited purpose of determining housing and fire ordinance compliance by us and to lenders, appraisers, contractors, prospective buyers, or insurance agents. We reserve the right to refuse maintenance work if only a person under age 18 is present at the time of the scheduled work. Refusal to allow us or our agents or vendors to enter the unit after proper notice, if required, shall be a material violation of this agreement.

**29. MULTIPLE RESIDENTS OR OCCUPANTS.** Each resident is jointly and severally liable for all lease obligations. If you or any guest or occupant violates the Lease Contract or rules, all residents are considered to have violated the Lease Contract. Our requests and notices (including sale notices) to any resident constitute notice to all residents and occupants. In eviction suits, each resident is considered the agent of all other residents in the apartment for service of process. Security-deposit refunds and deduction itemizations of multiple residents will comply with paragraph 42.

## Replacements

**30. REPLACEMENTS AND SUBLETTING.** Replacing a resident, sub-letting, or assignment is allowed only when we consent in writing. If departing or remaining residents find a replacement resident acceptable to us before moving out and we expressly consent to the replacement, subletting, or assignment, then:

(1) a reletting charge will not be due;
(2) a reasonable administrative (paperwork) and/or transfer fee will be due, and a rekeying fee will be due if rekeying is requested or required; and
(3) the departing and remaining residents will remain liable for all lease obligations for the rest of the original lease term.

**Procedures for Replacement.** If we approve a replacement resident, then, at our option: (1) the replacement resident must sign this Lease Contract with or without an increase in the total security deposit; or (2) the remaining and replacement residents must sign an entirely new Lease Contract. Unless we agree otherwise in writing, your security deposit will automatically transfer to the replacement resident as of the date we approve. The departing resident will no longer have a right to occupancy or a security deposit refund, but will remain liable for the remainder of the original lease term unless we agree otherwise in writing—even if a new Lease Contract is signed.

## Responsibilities of Owner and Resident

**31. RESPONSIBILITIES OF OWNER.** We'll act with customary diligence to:

(1) keep common areas reasonably clean, subject to paragraph 25;
(2) maintain fixtures, furniture, hot water, heating and A/C equipment;
(3) substantially comply with applicable federal, state, and local laws regarding safety, sanitation, and fair housing;
(4) make all reasonable repairs, subject to your obligation to pay for damages for which you are liable.
(5) commence steps, within 24 hours after our receipt of written notice from you (except where circumstances are beyond our control), to restore hot or cold water, heat, electricity or to remedy situations imminently hazardous to life;
(6) commence steps, within 72 hours after our receipt of written notice from you (except where circumstances are beyond our control), to remove or remedy a condition that deprives you of the use of a refrigerator, range and oven, or rated plumbing fixture supplied by us; and
(7) commence steps, within 10 days after our receipt of written notice from you (except where circumstances are beyond our control), to repair or remedy all other items for which we are responsible that are not described in (5) or (6) above.

We have no duty to repair if the defective condition was caused by you, your guests, or others acting under your control, or if you unreasonably fail to allow us access to the apartment to make such repairs.

You must not repair items yourself and deduct the cost of repairs from your rent unless you have fully complied with the statutory requirements for doing so. Under state statute, you must be current in your payment of rent (including utilities) before exercising any statutory or Lease Contract remedy.

**32. DEFAULT BY RESIDENT.** You'll be in default if you or any guest or occupant violates any terms of this Lease Contract including but not limited to the following violations: (1) you don't pay rent or other amounts that you owe when due; (2) you or any guest or occupant violates the apartment rules, or fire, safety, health, or criminal laws, regardless of whether or where arrest or conviction occurs; (3) you abandon the apartment; (4) you give incorrect or false answers in a rental application; (5) you or any occupant is arrested, in bad faith, makes an invalid

habitability complaint to an official or employee of a utility company or the government; (6) you or any occupant is arrested, convicted, or given deferred adjudication for a felony offense involving actual or potential physical harm to a person, or involving possession, manufacture, or delivery of a controlled substance, marijuana, or drug paraphernalia under state statute; (7) you or any guest or occupant engages in any of the prohibited conduct described in Paragraph 20; or (8) any illegal drugs or paraphernalia are found in your apartment or illegal drugs are used in your apartment.

**Eviction—Nonpayment of Rent.** If you default in rent payment we may end your right of occupancy by giving you 3 days written notice to vacate. The notice will state that you are required to either pay rent in full within 3 days or vacate. Notice may be by: (1) personal delivery to any resident; (2) if a resident is unavailable, personal delivery at the apartment to any occupant of suitable age and discretion in addition to regular mail delivery to a resident; or (3) if no one of suitable age and discretion is home, by leaving a copy of the notice in a conspicuous place in the unit or on the door, delivering a copy to any person in the apartment (if one can be found), and mailing notice to a resident. Termination of your possession rights or subsequent reletting doesn't release you from liability for future rent or other lease obligations. After giving notice to vacate or filing an eviction suit, we may still accept rent or other sums due; the filing or acceptance doesn't waive or diminish our right of eviction, or any other contractual or statutory right. Accepting money at any time doesn't waive our right to damages; or to past or future rent or other sums; or to continue with eviction proceedings.

**Eviction—All Other Violations.** If you default other than by nonpayment of rent, we may end your right of occupancy by giving you 10 day notice, and this notice will state that you must either remedy your breach or vacate the apartment within the 10 day period. Notice may be given in the same manner as in the description of rent notice described above. However, if you permit waste on the premises, operate an unlawful business, or if conduct by you or your guests constitutes a nuisance, we may give you 3 days notice to vacate. If you fail to vacate the apartment after service of a termination notice made 20 days or more before the end of the monthly rental period, we are not required to give you any additional notice. Resident understand that if Resident is given a notice to pay or comply or vacate and chooses to vacate the unit during the period of the notice, that the Resident shall remain liable for the rent through the end of the lease term or the next month in the case of a month-

to-month tenancy.

However, if your default involves (1) drug related activities, (2) imminent hazard to the physical safety of other persons on the premises for which you were arrested, or (3) gang related activity, you have no 30 day right to cure.

**Acceleration.** All monthly rent for the rest of the lease term or renewal period will be accelerated automatically without notice or demand (before or after acceleration) and will be immediately due and delinquent if, without our written consent: (1) you move out, remove property in preparing to move out, or give oral or written notice (by you or any occupant) of intent to move out before the lease term or renewal period ends; and (2) you've not paid all rent for the entire lease term or renewal period. Such conduct is considered a default for which we need not give you notice. Remaining rent also will be accelerated if you're judicially evicted or move out when we demand because you've defaulted. Acceleration is subject to our mitigation obligations below.

**Holdover.** You or any occupant, invitee, or guest must not hold over beyond the date contained in your move-out notice or our notice to vacate (or beyond a different move-out date agreed to by the parties in writing). If a holdover occurs, then: (1) holdover rent is due in advance on a daily basis and may become delinquent without notice or demand; (2) rent for the holdover period will be increased by 25% over the then-existing rent, without notice; (3) subject to our mitigation duties, you'll be liable to us for all rent for the full term of the previously signed Lease Contract of a new resident who can't occupy because of the holdover; and (4) at our option, we may extend the lease term—for up to one month from the date

of notice of lease extension—by delivering written notice to you or your apartment while you continue to hold over.

**Other Remedies.** We may report unpaid amounts to credit agencies. If you default and move out early, you will pay us any amounts stated to be rental discounts in paragraph 10, in addition to other sums due. Upon your default, we have all other legal remedies, including lease termination. Unless a party is seeking exemplary, punitive, sentimental or personal-injury damages, the prevailing party may recover from the non-prevailing party reasonable attorney's fees and all other litigation costs. The Owner shall be deemed to be the prevailing party if the action voluntarily is halted by the Owner prior to judgment, or if the case is not filed, prior to filing, on the basis that the Owner accepted from the Resident of all or part of the amounts alleged to be owing, or on the basis that the Resident vacated the rental unit. Late charges are liquidated damages for our time, inconvenience, and overhead in collecting late rent (but are not for attorney's fees and litigation costs). All unpaid amounts bear 12% interest per year from due date, compounded annually. You must pay all collection-agency fees if you fail to pay all sums due within 10 days after we mail you a letter demanding payment and stating that collection agency fees will be added if you don't pay all sums by that deadline

**Mitigation of Damages.** If you move out early, you'll be subject to paragraph 11 and all other remedies. We'll make a reasonable effort to relet and minimize damages after we learn of your early move out or abandonment. We'll credit all subsequent rent that we actually receive from subsequent residents against your liability for past-due and future rent and other sums due.

## General Clauses

**33. MISCELLANEOUS.** Neither we nor any of our representatives have made any oral promises, representations, or agreements. This Lease Contract is the entire agreement between you and us notwithstanding the contents of any prior agreement, assumptions, advertisements, warranties or representations by any person or entity. Our representatives (including management personnel, employees, and agents) have no authority to waive, amend, or terminate this Lease Contract or any part of it, unless in writing, and no authority to make promises, representations, or agreements that impose security duties or other obligations on us or our representatives unless in writing. No verbal agreements, advertisements, warranties or representations have been made or relied upon by either party or any agent or employee of either party, and neither party. No action or omission of our representative will be considered a waiver of any subsequent violation, default, or time or place of performance. Our not enforcing or belatedly enforcing written-notice requirements, rental due dates, acceleration, liens, or other rights, or our acceptance of rent after a notice of non-compliance or non-payment isn't a waiver under any circumstances. Except when notice or demand is required by statute, you waive any notice and demand for performance from us if you default. Written notice to or from our managers constitutes notice to or from us. Any person giving a notice under this Lease Contract should retain a copy of the memo, letter or fax that was given. Fax signatures are binding. All notices must be signed.

Exercising one remedy won't constitute an election or waiver of other remedies. Unless prohibited by law or the respective insurance policies, insurance subrogation is waived by all parties. All remedies are cumulative. No employee, agent, or management company is personally liable for any of our contractual, statutory, or other obligations merely by virtue of acting on our behalf. This Lease Contract binds subsequent owners. Neither an invalid clause nor the omission of initials on any page invalidates this Lease Contract. All notices and documents may be in English and, at our option, in any language that you read or speak. All provisions regarding our non-liability and non-duty apply to our employees, agents, and management companies. This Lease Contract is subordinate or superior to existing and future recorded mortgages, at lender's option. All lease obligations must be performed in the county where the apartment is located.

Resident has completed an application in connection with executing this Lease. Owner has relied upon the statements set forth in said application

in deciding to rent the Premises to Resident. It is agreed that should Owner subsequently discover any misstatements of fact in the Resident's application, such misstatements shall be deemed a material and incurable breach of this Lease and shall entitle Owner to serve Resident with a three-day notice terminating the tenancy under RCW 59.12.030(6).

All discretionary rights reserved for us within this Lease Contract or any accompanying addenda are at our sole and absolute discretion.

**Obligation to Vacate.** Resident shall vacate the Premises and remove all of Resident's personal property therefrom at the expiration of the lease term without further notice or demand from Owner.

**FORCE MAJEURE:** If we are prevented from completing performances of any obligations hereunder by an act of God, strikes, epidemics, war, acts of terrorism, riots, flood, fire, hurricane, tornado, sabotage, or other occurrence which is beyond the control of the parties, then we shall be excused from any further performance of obligations and undertakings hereunder, to the full extent allowed under applicable law.

Furthermore, if such an event damages the property to materially affect its habitability by some or all residents, we reserve the right to vacate any and all leases and you agree to excuse us from any further performance of obligations and undertakings hereunder, to the full extent allowed under applicable law.

**34. PAYMENTS.** Payment of all sums is an independent covenant. All sums other than rent are due upon our demand. After the due date, we do not have to accept the rent or any other payments.

**35. ASSOCIATION MEMBERSHIP.** We represent that either: (1) we or; (2) the management company that represents us, is at the time of signing this Lease Contract or a renewal of this Lease Contract, a member of both the National Apartment Association and any affiliated state and local apartment (multi-housing) associations for the area where the apartment is located.

## Security Guidelines for Residents

**36. SECURITY GUIDELINES.** In cooperation with the National Apartment Association, we'd like to give you some important safety guidelines. We recommend that you follow these guidelines and use common sense in practicing safe conduct. Inform all other occupants in your apartment, including any children you may have, about these guidelines.

**PERSONAL SECURITY—WHILE INSIDE YOUR APARTMENTS**
1. Lock your doors and windows—even while you're inside.
2. When answering the door, see who is there by looking through a window or peephole. If you don't know the person, first talk with him or her without opening the door. Don't open the door if you have any doubts.
3. If children (who are old enough to take care of themselves) are left alone in your apartment, tell them to refuse to let anyone inside while you are gone—regardless of whether the person is a stranger or an apartment maintenance or management employee.
4. Don't put your name, address, or phone number on your key ring.
5. If you're concerned because you've lost your key or because someone you distrust has a key, ask the management to rekey the locks. Management may, at their option, rekey for you as long as you pay for the rekeying
6. Dial 911 for emergencies. If the 911 number does not operate in your area, keep phone numbers handy for the police, fire, and emergency medical services. If an emergency arises, call the appropriate governmental authorities first, then call the management.
7. Check your smoke detector and carbon monoxide detector monthly to make sure it is working properly and the batteries are still okay.

8. Check your doorlocks, window latches, and other devices regularly to be sure they are working properly.
9. If your doors or windows are unsecured due to break-ins or malfunctioning locks or latches, stay with friends or neighbors until the problem is fixed.
10. Immediately report to management—in writing, dated and signed—any needed repairs of locks, latches, doors, windows, smoke detectors and carbon monoxide detectors, and alarm systems.
11. Immediately report to management—in writing, dated and signed—any malfunction of other safety devices outside your apartment, such as broken gate locks, burned-out lights in stairwells and parking lots, blocked passages, broken railings, etc.
12. Close curtains, blinds, and window shades at night.
13. Mark or engrave your driver's license number or other identification on valuable personal property.

**PERSONAL SECURITY—WHILE OUTSIDE YOUR APARTMENT**
14. Lock your doors while you're gone. Lock any door handle lock, keyed deadbolt lock, sliding door pin lock, sliding door handle latch, and sliding door bar that you have.
15. Leave a radio or TV playing softly while you're gone.
16. Close and latch your windows while you're gone, particularly when you're on vacation.
17. Tell your roommate or spouse where you're going and when you'll be back.
18. Don't walk alone at night. Don't allow your family to do so.
19. Don't hide a key under the doormat or a nearby flowerpot. These

are the first places a burglar will look.

20. Don't give entry keys, codes or electronic gate cards to anyone.

21. Use lamp timers when you go out in the evening or go away on vacation. They can be purchased at most hardware stores.

22. Let the manager and your friends know if you'll be gone for an extended time. Ask your neighbors to watch your apartment since the management cannot assume that responsibility.

23. While on vacation, temporarily stop your newspaper and mail delivery, or have your mail and newspaper picked up daily by a friend.

24. Carry your door key in your hand, whether it is daylight or dark, when walking to your entry door. You are more vulnerable when looking for your keys at the door.

**PERSONAL SECURITY—WHILE USING YOUR CAR**

25. Lock your car doors while driving. Lock your car doors and roll up the windows when leaving your car parked.

26. Don't leave exposed items in your car, such as cassette tapes, wrapped packages, briefcases, or purses.

27. Don't leave your keys in the car.

28. Carry your key ring in your hand whenever you are walking to your car—whether it is daylight or dark and whether you

are at home, school, work, or on vacation.

29. When parking at night, park in a well-lighted area. If possible, try to park your car in an off-street parking area rather than on the street.

30. Check the backseat before getting into your car.

31. Be careful when stopping at gas stations or automatic-teller machines at night—or anytime when you suspect danger.

**PERSONAL SECURITY AWARENESS**

No security system is failsafe. Even the best system can't prevent crime. Always act as if security systems don't exist since they are subject to malfunction, tampering, and human error. We disclaim any express or implied warranties of security. The best safety measures are the ones you perform as a matter of common sense and habit.

**YOU ARE SOLELY RESPONSIBLE FOR YOUR OWN PERSONAL SAFETY AND THE SAFETY OF YOUR PERSONAL PROPERTY AT ALL TIMES WHILE ON THE PREMISES. WE ARE NOT PROVIDING ANY SECURITY FOR YOU PERSONALLY, THE MEMBERS OF YOUR HOUSEHOLD OR GUESTS, AND DO NOT PROVIDE SECURITY OF YOUR PERSONAL PROPERTY. ANY SECURITY YOU SEE ON THE PROPERTY, INCLUDING CAMERAS OR GATES, ARE FOR THE SOLE BENEFIT OF OUR PROPERTY.**

## When Moving Out

**37. MOVE-OUT NOTICE.** Before moving out, you must give our representative advance written move-out notice as provided below. Your move-out notice will not release you from liability for the full term of the Lease Contract or renewal term. You will still be liable for the entire lease term if you move out early (paragraph 22) except under the military clause (paragraph 23). YOUR MOVE-OUT NOTICE MUST COMPLY WITH EACH OF THE FOLLOWING:

- We must receive advance written notice of your move-out date. The advance notice must be at least the number of days of notice required in paragraph 3. Oral move-out notice will not be accepted and will not terminate your Lease Contract.

- Your move-out notice must not terminate the Lease Contract sooner than the end of the lease term or renewal period.

YOUR NOTICE IS NOT ACCEPTABLE IF IT DOES NOT COMPLY WITH ALL OF THE ABOVE. Please use our written move-out form. You must obtain from our representative written acknowledgment that we received your move-out notice. If we terminate the Lease Contract, we must give you the same advance notice—unless you are in default.

**38. MOVE-OUT PROCEDURES.** The move-out date can't be changed unless we and you both agree in writing. You won't move out before the lease term or renewal period ends unless all rent for the entire lease term or renewal period is paid in full. Early move-out may result in reletting charges and acceleration of future rent under paragraphs 11 and 32. You're prohibited by law from applying any security deposit to rent. You won't stay beyond the date you are supposed to move out. All residents, guests, and occupants must vacate the apartment before the 21-day period or as amended by Washington state law for deposit refund begins. You must give us and the U.S. Postal Service, in writing, each resident's forwarding address.

**39. CLEANING.** You must thoroughly clean the apartment, including doors, windows, furniture, bathrooms, kitchen appliances, patios, balconies, garages, carports, and storage rooms. Carpets must be professionally cleaned by a third party truck style cleaner. You must follow move-out cleaning instructions if they have been provided. If you don't clean adequately, you'll be liable for reasonable cleaning charges. In lieu of liability for cleaning charges, we may charge you a non-refundable cleaning fee which will be described in paragraph 10 or an addendum to this Lease Contract and will not be construed as part of any security deposit.

**40. MOVE-OUT INSPECTION.** You should meet with our representative for a move-out inspection, but the move out inspection will not be delayed to accommodate your schedule. Our representative has no authority to bind or limit us regarding deductions for repairs, damages, or charges. Any statements or estimates by us or our representative are subject to our correction, modification, or disapproval before final refunding or accounting.

**41. SECURITY DEPOSIT DEDUCTIONS AND OTHER CHARGES.** You'll be liable for the following charges, if applicable, which may be withheld from your security deposit upon expiration of the Lease Contract (this list is not deemed to exclude charges for damages not specifically listed): unpaid rent; unpaid utilities; unreimbursed service charges; repairs or damages caused by negligence, carelessness, accident, or abuse,

including stickers, scratches, tears, burns, stains, or unapproved holes; replacement cost of our property that was in or attached to the apartment and is missing; replacing dead or missing smoke-detector or carbon monoxide detector batteries; utilities for repairs or cleaning; trips to let in company representatives to remove your telephone or TV cable services or rental items (if you so request or have moved out); trips to open the apartment when you or any guest or occupant is missing a key; unreturned keys; missing or burned-out light bulbs; removing or rekeying unauthorized security devices or alarm systems; agreed reletting charges; packing, removing, or storing property removed or stored under paragraph 13; removing illegally parked vehicles; special trips for trash removal caused by parked vehicles blocking dumpsters; false security-alarm charges unless due to our negligence; animal-related charges; government fees or fines against us for violation (by you, your occupants, or guests) of local ordinances relating to smoke detectors and carbon monoxide detectors, false alarms, recycling, or other matters; late-payment and returned-check charges; a charge (not to exceed $100) for owner/manager's time and inconvenience in our lawful removal of an animal or in any valid eviction proceeding against you, plus attorney's fees, court costs, and filing fees actually paid; and other sums due under this Lease Contract.

You acknowledge and agree that any cleaning or damages due to smoke damage from any source, including but not limited to cigarettes,cigars, pipes, candles or incense, shall not be considered to be normal wear and tear and that you will be charged for all such cleaning, repair or replacement costs.

You'll be liable to us for: (1) charges for replacing all keys and access devices referenced in paragraph 5 if you fail to return them on or before your actual move-out date; (2) accelerated rent if you have violated paragraph 32; and (3) a reletting fee if you have violated paragraph 11.

**42. DEPOSIT RETURN, SURRENDER, AND ABANDONMENT.** We'll mail you your security deposit refund (less lawful deductions) and an itemized accounting of any deductions no later than 21 days or as amended by Washington state law after the lease is terminated, and you surrender the apartment, or 21 days or as amended by Washington state law after we learn of your abandonment. We reserve the right to amend this deposit due to later-discovered damages, or if only an estimate was available during the 21 day or as amended by Washington state law period and the actual amount differs from the estimated charges.

You have surrendered the apartment when: (1) the move-out date has passed and no one is living in the apartment in our reasonable judgment; or (2) all apartment keys and access devices listed in paragraph 5 have been turned in where rent is paid—whichever date occurs first.

You have abandoned the apartment when all of the following have occurred: (1) you are in default for nonpayment of rent, and (2) you have either told us you do not intend to continue tenancy or evidence indicates this intention. Evidence of this intention includes without limitation your removal of some or all of your clothes, furniture, or personal belongings or the disconnection of utilities to your unit that are not in our name.

Surrender, abandonment, or judicial eviction end your right of possession for all purposes and gives us the immediate right to: clean up, make repairs in, and relet the apartment; determine any security deposit deductions; and remove property left in the apartment. Surrender, abandonment, and judicial eviction affect your rights to property left in the apartment (paragraph 13), but do not affect our mitigation obligations (paragraph 32).

## Signatures, Originals and Attachments

**43. ORIGINALS AND ATTACHMENTS.** This Lease Contract has been executed in multiple originals, with original signatures—one for you and one or more for us. Our rules and community policies, if any, will be attached to the Lease Contract and given to you at signing. When an Inventory and Condition form is completed, both you and we should retain a copy. The items checked below are attached to this Lease Contract and are binding even if not initialed or signed and your signature below acknowledges receipt of copies of them.

☒ Animal Addendum
☒ Inventory and Condition Form
☒ Mold Addendum
☒ Enclosed Garage Addendum
☒ Community Policies Addendum
☐ Lease Contract Guaranty (_____ guaranties, if more than one)
☒ Notice of Intent to Move Out Form
☒ Parking Permit or Sticker (quantity: _____)
☒ Satellite Dish or Antenna Addendum
☐ Asbestos Addendum (if asbestos is present)
☐ Lead Hazard Information and Disclosure Addendum (federal)
☒ Utility Addendum
☒ Remote Control, Card or Code Access Gate Addendum
☒ Lease Contract Buy-Out Agreement
☐ Intrusion Alarm Addendum
☒ Tenant Rights Information Packet (City of Seattle Only)
☒ Copy of SMC 7.25 (City of Seattle Only)
☒ Other **Renter's Insurance**
☒ Other **Bed Bug Addendum**

**Name, address and phone number of owner or owner's representative for notice and process purposes (include name of county in State of Washington)**

**Summit at Madison Park Manager**
**1819 23RD AVENUE, SUITE 101**
**SEATTLE WA 98122**
**KING**
**(206)720-5553**

**Your security deposit will be deposited in:**

Escrow Company or Bank Name: **BANK OF AMERICA**
Address:
**800 FIRST AVENUE, 24TH FLOOR**
**SEATTLE, WA 98104**

Your cancelled check will be your deposit receipt.

---

You are legally bound by this document.

Read it carefully before signing.

**Resident or Residents** *(all sign below)*

_____
_____
_____
_____

**Owner or Owner's Representative** *(signing on behalf of owner)*

_____

**Name and address of locator service** *(if applicable)*

_____
_____
_____

**Date form is filled out** *(same as on top of page 1)* ____08/05/2018____

State of Washington

County of _____

I certify that I know or have satisfactory evidence that _____

is/are the person(s) who appeared before me and acknowledged that he/she/they signed this instrument, and acknowledged it to be his/her/their free and voluntary act for the uses and purposes mentioned in the instrument.

_____        _____
Dated                                     My Commission Expires

_____        _____
Printed Name of Notary Public      Signature of Notary Public

*Note: Signature of owner must be notarized if lease is for more than one year.*

*(Use above space for notary stamp/seal)*

---

SPECIAL PROVISIONS (CONTINUED FROM PAGE 2). **Please refer to the Additional Special Provisions Addendum for important information regarding required Personal Liability Insurance. ONLINE PAYMENTS SUBMITTED AFTER 12:00 AM CST WILL BE POSTED THE FOLLOWING DAY. KEYS MUST BE RETURNED BY 12:00 PM UPON MOVE OUT.**

---

**Summit at Madison Park**
Christopher Berg,



**NATIONAL APARTMENT ASSOCIATION**

# UTILITY AND SERVICES ADDENDUM

This Utility Addendum is incorporated into the Lease Contract (referred to in this addendum as "Lease Contract" or "Lease") dated **August 5, 2018** between **Madison Summit LLC**
_____ ("We" and/or "we" and/or "us") and
**Christopher Berg,** _____
_____ ("You" and/or "you") of Apt. No. **E214**
located at **1819 23rd Ave #E214** _____ (street address) in
**Seattle, WA 98122** and is in addition to all terms and conditions in the Lease.
To the extent that the terms of this Utility Addendum conflict with those of the Lease, this Utility Addendum shall control.

1. Responsibility for payment of utilities, and the method of metering or otherwise measuring the cost of the utility, will be as indicated below.

   a)  **Water** service to your dwelling will be paid by you either:
       - ☐ directly to the utility service provider; or
       - ☒ water bills will be billed by the service provider to us and then allocated to you based on the following formula: __**2/3**__
         - ☐ If flat rate is selected, the current flat rate is $_____ per month.
       - ☒ 3rd party billing company if applicable **Conservice**

   b)  **Sewer** service to your dwelling will be paid by you either:
       - ☐ directly to the utility service provider; or
       - ☒ sewer bills will be billed by the service provider to us and then allocated to you based on the following formula: __**1**__
         - ☐ If flat rate is selected, the current flat rate is $_____ per month.
       - ☒ 3rd party billing company if applicable **Conservice**

   c)  **Gas** service to your dwelling will be paid by you either:
       - ☐ directly to the utility service provider; or
       - ☒ gas bills will be billed by the service provider to us and then allocated to you based on the following formula: __**6**__
         - ☐ If flat rate is selected, the current flat rate is $_____ per month.
       - ☒ 3rd party billing company if applicable **Conservice**

   d)  **Trash** service to your dwelling will be paid by you either:
       - ☐ directly to the utility service provider; or
       - ☒ trash bills will be billed by the service provider to us and then charged to you based on the following formula: __**6**__
         - ☐ If flat rate is selected, the current flat rate is $_____ per month.
       - ☒ 3rd party billing company if applicable **Conservice**

   e)  **Electric** service to your dwelling will be paid by you either:
       - ☒ directly to the utility service provider; or
       - ☐ electric bills will be billed by the service provider to us and then allocated to you based on the following formula: _____
         - ☐ If flat rate is selected, the current flat rate is $_____ per month.
       - ☐ 3rd party billing company if applicable

   f)  **Stormwater** service to your dwelling will be paid by you either:
       - ☐ directly to the utility service provider; or
       - ☐ stormwater bills will be billed by the service provider to us and then allocated to you based on the following formula: _____
         - ☐ If flat rate is selected, the current flat rate is $_____ per month.
       - ☐ 3rd party billing company if applicable

   g)  **Cable TV** service to your dwelling will be paid by you either:
       - ☒ directly to the utility service provider; or
       - ☐ cable TV bills will be billed by the service provider to us and then allocated to you based on the following formula: _____
         - ☐ If flat rate is selected, the flat rate is $_____ per month.
       - ☐ 3rd party billing company if applicable

   h)  **Master Antenna** service to your dwelling will be paid by you either:
       - ☐ directly to the utility service provider; or
       - ☐ master antenna bills will be billed by the service provider to us and then allocated to you based on the following formula: _____
         - ☐ If flat rate is selected, the current flat rate is $_____ per month.
       - ☐ 3rd party billing company if applicable

   i)  **Internet** service to your dwelling will be paid by you either:
       - ☒ directly to the utility service provider; or
       - ☐ internet bills will be billed by the service provider to us and then allocated to you based on the following formula: _____
         - ☐ If flat rate is selected, the current flat rate is $_____ per month.
       - ☐ 3rd party billing company if applicable

   j)  (Other) _____ service to your dwelling and costs will be paid by you either:
       - ☐ directly to the utility service provider; or
       - ☐ bills will be billed by the service provider to us and then allocated to you based on the following formula: _____
         - ☐ If flat rate is selected, the current flat rate is $_____ per month.
       - ☐ 3rd party billing company if applicable

   k)  (Other) _____ service to your dwelling and costs will be paid by you either:
       - ☐ directly to the utility service provider; or
       - ☐ bills will be billed by the service provider to us and then allocated to you based on the following formula: _____
         - ☐ If flat rate is selected, the current flat rate is $_____ per month.
       - ☐ 3rd party billing company if applicable

METERING/ALLOCATION METHOD KEY
"1"  - Sub-metering of all of your water/gas/electric use
"2"  - Calculation of your total water use based on sub-metering of hot water
"3"  - Calculation of your total water use based on sub-metering of cold water
"4"  - Flat rate per month
"5"  - Allocation based on the number of persons residing in your dwelling unit
"6"  - Allocation based on the number of persons residing in your dwelling unit using a ratio occupancy formula
"7"  - Allocation based on square footage of your dwelling unit
"8"  - Allocation based on a combination of square footage of your dwelling unit and the number of persons residing in your dwelling unit
"9"  - Allocation based on the number of bedrooms in your dwelling unit
"10"  - Allocation based on a lawful formula not listed here
        (Note: if method "10" is selected, a separate sheet will be attached describing the formula used)

Page 1 of 2
© 2015, National Apartment Association, Inc. - 9/2015, Washington

2. If an allocation method is used, we or our billing company will calculate your allocated share of the utilities and services provided and all costs in accordance with state and local statutes. Under any allocation method, Resident may be paying for part of the utility usage in common areas or in other residential units as well as administrative fees. Both Resident and Owner agree that using a calculation or allocation formula as a basis for estimating total utility consumption is fair and reasonable, while recognizing that the allocation method may or may not accurately reflect actual total utility consumption for Resident. Where lawful, we may change the above methods of determining your allocated share of utilities and services and all other billing methods, in our sole discretion, and after providing written notice to you. More detailed descriptions of billing methods, calculations and allocation formulas will be provided upon request.

If a flat fee method for trash or other utility service is used, Resident and Owner agree that the charges indicated in this Agreement (as may be amended with written notice as specified above) represent a fair and reasonable amount for the service(s) provided and that the amount billed is not based on a monthly per unit cost.

3. When billed by us directly or through our billing company, you must pay utility bills within _____ days of the date when the utility bill is issued or the payment will be late. If a payment is late, you will be responsible for a late fee as indicated below. The late payment of a bill or failure to pay any utility bill is a material and substantial breach of the Lease and we will exercise all remedies available under the Lease, up to and including eviction for nonpayment. To the extent there are any new account, monthly administrative, late or final bill fees, you shall pay such fees as indicated below.

|  |  |  |  |
|---|---|---|---|
| New Account Fee: | $ ___0.00___ | (not to exceed $ | ___0.00___ ) |
| Monthly Administrative Billing Fee: | $ ___5.00___ | (not to exceed $ | ___5.03___ ) |
| Late Fee: | $ ___5.00___ | (not to exceed $ | ___5.00___ ) |
| Final Bill Fee: | $ _____ | (not to exceed $ | _____ ) |

If allowed by state law, we at our sole discretion may amend these fees, with written notice to you.

4. You will be charged for the full period of time that you were living in, occupying, or responsible for payment of rent or utility charges on the dwelling. If you breach the Lease, you will be responsible for utility charges for the time period you are obliged to pay the charges under the Lease, subject to our mitigation of damages. In the event you fail to timely establish utility services, we may charge you for any utility service billed to us for your dwelling and may charge a reasonable administration fee for billing for the utility service in the amount of $ ___50.00___.

5. When you move out, you will receive a final bill which may be estimated based on your prior utility usage. This bill must be paid at the time you move out or it will be deducted from the security deposit.

6. We are not liable for any losses or damages you incur as a result of outages, interruptions, or fluctuations in utility services provided to the dwelling unless such loss or damage was the direct result of negligence by us or our employees. You release us from any and all such claims and waive any claims for offset or reduction of rent or diminished rental value of the dwelling due to such outages, interruptions, or fluctuations.

7. You agree not to tamper with, adjust, or disconnect any utility sub-metering system or device. Violation of this provision is a material breach of your Lease and may subject you to eviction or other remedies available to us under your Lease, this Utility Addendum and at law.

8. Where lawful, all utilities, charges and fees of any kind under this Lease shall be considered additional rent, and if partial or full payments are accepted by the Owner, they will be allocated first to non-rent charges and to rent last.

9. You represent that all occupants that will be residing in the Unit are accurately identified in the Lease. You agree to promptly notify in writing Owner of any change in such number of occupants.

10. You agree that you may, upon thirty (30) days prior written notice from Owner to you, begin receiving a bill for additional utilities and services, at which time such additional utilities and services shall for all purposes be included in the term Utilities.

11. This Addendum is designed for use in multiple jurisdictions, and no billing method, charge, or fee mentioned herein will be used in any jurisdiction where such use would be unlawful. If any provision of this Addendum or the Lease is invalid or unenforceable under applicable law, such provision shall be ineffective to the extent of such invalidity or unenforceability only without invalidating or otherwise affecting the remainder of this Addendum or the Lease. Except as specifically stated herein, all other terms and conditions of the Lease shall remain unchanged. In the event of any conflict between the terms of this Addendum and the terms of the Lease, the terms of this Addendum shall control.

12. The following special provisions and any addenda or written rules furnished to you at or before signing will become a part of this Utility Addendum and will supersede any conflicting provisions of this printed Utility Addendum and/or the Lease Contract.

_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

| Resident Signature | _____ | Date | _____ |
|---|---|---|---|
| Resident Signature | _____ | Date | _____ |
| Resident Signature | _____ | Date | _____ |
| Resident Signature | _____ | Date | _____ |
| Management | _____ | Date | _____ |

# Mold Information and Prevention Addendum

**NATIONAL
APARTMENT
ASSOCIATION**

*Please note: It is our goal to maintain a quality living environment for our residents. To help achieve this goal, it is important to work together to minimize any mold growth in your dwelling. That is why this addendum contains important information for you, and responsibilities for both you and us.*

1. **DWELLING UNIT DESCRIPTION.** Unit No. **E214**
   **1819 23rd Ave #E214** *(street address)*
   in **Seattle** *(city)*,
   Washington, **98122** *(zip code)*.

2. **LEASE CONTRACT DESCRIPTION.**
   Lease Contract date: **August 5, 2018**
   Owner's name: **Madison Summit LLC**

   Residents *(list all residents):* **Christopher Berg,**

3. **ABOUT MOLD.** Mold is found virtually everywhere in our environment—both indoors and outdoors and in both new and old structures. Molds are naturally occurring microscopic organisms which reproduce by spores and have existed practically from the beginning of time. All of us have lived with mold spores all our lives. Without molds we would all be struggling with large amounts of dead organic matter.

   Mold breaks down organic matter in the environment and uses the end product for its food. Mold spores (like plant pollen) spread through the air and are commonly transported by shoes, clothing and other materials. When excess moisture is present inside a dwelling, mold can grow. A 2004 Federal Centers for Disease Control and Prevention study found that there is currently no scientific evidence that the accumulation of mold causes any significant health risks for person with normally functioning immune systems. Nonetheless, appropriate precautions need to be taken.

4. **PREVENTING MOLD BEGINS WITH YOU.** In order to minimize the potential for mold growth in your dwelling, you must do the following:

   • Keep your dwelling clean—particularly the kitchen, the bathroom(s), carpets and floors. Regular vacuuming, mopping and using a household cleaner to clean hard surfaces is important to remove the household dirt and debris that harbor mold or food for mold. Immediately throw away moldy food.

   • Remove visible moisture accumulation on windows, walls, ceilings, floors and other surfaces as soon as reasonably possible. Look for leaks in washing machine hoses and discharge lines—especially if the leak is large enough for water to infiltrate nearby walls. Turn on any exhaust fans in the bathroom and kitchen *before* you start showering or cooking with open pots. When showering, be sure to keep the shower curtain *inside* the tub or fully close the shower doors. Also, the experts recommend that after taking a shower or bath, you: (1) wipe moisture off of shower walls, shower doors, the bathtub and the bathroom floor; (2) leave the bathroom door open until all moisture on the mirrors and bathroom walls and tile surfaces has dissipated; and (3) hang up your towels and bath mats so they will completely dry out.

   • Promptly notify us in writing about any air conditioning or heating system problems you discover. Follow our rules, if any, regarding replacement of air filters. Also, it is recommended that you periodically open windows and doors on days when the outdoor weather is dry (i.e., humidity is below 50 percent) to help humid areas of your dwelling dry out.

   • Promptly notify us in writing about any signs of water leaks, water infiltration or mold. We will respond in accordance with state law and the Lease Contract to repair or remedy the situation, as necessary.

   • Keep the thermostat set to automatically circulate air in the event temperatures rise to or above 80 degrees Fahrenheit.

5. **IN ORDER TO AVOID MOLD GROWTH,** it is important to prevent excessive moisture buildup in your dwelling. Failure to promptly pay attention to leaks and moisture that might accumulate on dwelling surfaces or that might get inside walls or ceilings can encourage mold growth. Prolonged moisture can result from a wide variety of sources, such as:

   • rainwater leaking from roofs, windows, doors and outside walls, as well as flood waters rising above floor level;

   • overflows from showers, bathtubs, toilets, lavatories, sinks, washing machines, dehumidifiers, refrigerator or A/C drip pans or clogged up A/C condensation lines;

   • leaks from plumbing lines or fixtures, and leaks into walls from bad or missing grouting/caulking around showers, tubs or sinks;

   • washing machine hose leaks, plant watering overflows, pet urine, cooking spills, beverage spills and steam from excessive open-pot cooking;

   • leaks from clothes dryer discharge vents (which can put lots of moisture into the air); and

   • insufficient drying of carpets, carpet pads, shower walls and bathroom floors.

6. **IF SMALL AREAS OF MOLD HAVE ALREADY OCCURRED ON *NON-POROUS* SURFACES** (such as ceramic tile, formica, vinyl flooring, metal, wood or plastic), the federal Environmental Protection Agency (EPA) recommends that you first clean the areas with soap (or detergent) and water, let the surface dry, and then within 24 hours apply a pre-mixed, spray-on-type household biocide, such as Lysol Disinfectant®, Pine-Sol Disinfectant® (original pine-scented), Tilex Mildew Remover® or Clorox Cleanup®. (Note: Only a few of the common household cleaners will actually kill mold). Tilex® and Clorox® contain bleach which can discolor or stain. **Be sure to follow the instructions on the container.** Applying biocides without first cleaning away the dirt and oils from the surface is like painting over old paint without first cleaning and preparing the surface.

   Always clean and apply a biocide to an area 5 or 6 times larger than any visible mold because mold may be adjacent in quantities not yet visible to the naked eye. A vacuum cleaner with a high-efficiency particulate air (HEPA) filter can be used to help remove non-visible mold products from *porous* items, such as fibers in sofas, chairs, drapes and carpets—provided the fibers are completely dry. Machine washing or dry cleaning will remove mold from clothes.

7. **DO NOT CLEAN OR APPLY BIOCIDES TO:** (1) visible mold on *porous surfaces,* such as sheetrock walls or ceilings, or (2) *large areas* of visible mold on *non-porous* surfaces. Instead, notify us in writing, and we will take appropriate action.

8. **COMPLIANCE.** Complying with this addendum will help prevent mold growth in your dwelling, and both you and we will be able to respond correctly if problems develop that could lead to mold growth. If you have questions regarding this addendum, please contact us at the management office or at the phone number shown in your Lease Contract.

   **If you fail to comply with this Addendum, you can be held responsible for property damage to the dwelling and any health problems that may result. We can't fix problems in your dwelling unless we know about them.**

9. **SPECIAL PROVISIONS.** The following special provisions control over conflicting provisions of this printed form:

**Resident or Residents**
*(All residents must sign here)*

**Owner or Owner's Representative**
*(Signs here)*

**Date of Lease Contract**

**August 5, 2018**

Christopher Berg,

Washington/National Apartment Association Official Form, December 2012

Benjamin Levin



# Bed Bug Addendum

Date: **August 6, 2018**
(when this Addendum is filled out)

NATIONAL
APARTMENT
ASSOCIATION

*Please note: It is our goal to maintain a quality living environment for our residents. To help achieve this goal, it is important to work together to minimize the potential for any bed bugs in your dwelling or surrounding dwellings. This Addendum contains important information that outlines your responsibility and potential liability with regard to bed bugs.*

1. **DWELLING UNIT DESCRIPTION.** Unit No. **E214** ,
**1819 23rd Ave #E214** *(street address)*
in **Seattle** *(city),*
Washington, **98122** *(zip code).*

2. **LEASE CONTRACT DESCRIPTION.**
Lease Contract date: **August 5, 2018**
Owner's name: **Madison Summit LLC**

Residents *(list all residents):* **Christopher Berg,**

3. **PURPOSE.** This Addendum modifies the Lease Contract and addresses situations related to bed bugs *(cimex lectularius)* which may be discovered infesting the dwelling or personal property in the dwelling. You understand that we relied on your representations to us in this Addendum.

4. **INSPECTION.** You agree that you: *(Check one)*
   ☐ have inspected the dwelling prior to move-in and that you did not observe any evidence of bed bugs or bed bug infestation; OR
   ☒ will inspect the dwelling within 48 hours after move-in/renewal and notify us in writing of any bed bugs or bed bug infestation.

5. **INFESTATIONS.**

   You agree that you have read all of the information on this Addendum about bed bugs and:
   *(Check one)*
   ☒ you are not aware of any infestation or presence of bed bugs in your current or previous apartments, home or dwelling. You agree that you are not aware of any bed bug infestation or presence in any of your furniture, clothing, personal property or possessions. You agree that you have not been subjected to conditions in which there was any bed bug infestation or presence. OR
   ☐ you agree that if you previously lived anywhere that had a bed bug infestation that all of your personal property (including furniture, clothing and other belongings) has been treated by a licensed pest control professional, and remained free of bedbugs for the duration of your previous tenancy. You agree that such items are free of further infestation. If you disclose a previous experience of bed bug infestation, we can review documentation of the treatment and inspect your personal property and possessions to confirm the absence of bed bugs. You agree that any previous bed bug infestation which you may have experienced is disclosed here:
   **NA**

6. **ACCESS FOR INSPECTION AND PEST TREATMENT.**
   You must allow us and our pest control agents access to the dwelling at reasonable times to inspect for or treat bed bugs as allowed by law. You and your family members, occupants, guests, and invitees must cooperate and will not interfere with inspections or treatments. We have the right to select any licensed pest control professional to treat the dwelling and building. We can select the method of treating the dwelling, building and common areas for bed bugs. We can also inspect and treat adjacent or neighboring dwellings to the infestation even if those dwellings are not the source or cause of the known infestation. You are responsible for and must, at your own expense, have your own personal property, furniture, clothing and possessions treated according to accepted treatment methods established by a licensed pest control firm that we approve. You must do so as close as possible to the time we treated the dwelling. If you fail to do so, you will be in default, and we will have the

right to terminate your right of occupancy and exercise all rights and remedies under the Lease Contract. You agree not to treat the dwelling for a bed bug infestation on your own.

7. **NOTIFICATION.** You must promptly notify us in writing:
   • of any known or suspected bed bug infestation or presence in the dwelling, or in any of your clothing, furniture or personal property.
   • of any recurring or unexplained bites, stings, irritations, or sores of the skin or body which you believe is caused by bed bugs, or by any condition or pest you believe is in the dwelling.
   • if you discover any condition or evidence that might indicate the presence or infestation of bed bugs, or of any confirmation of bed bug presence by a licensed pest control professional or other authoritative source.

8. **COOPERATION.** If we confirm the presence or infestation of bed bugs, you must cooperate and coordinate with us and our pest control agents to treat and eliminate the bed bugs. You must follow all directions from us or our agents to clean and treat the dwelling and building that are infested. You must remove or destroy personal property that cannot be treated or cleaned as close as possible to the time we treated the dwelling. Any items you remove from the dwelling must be disposed of off-site and not in the property's trash receptacles. If we confirm the presence or infestation of bed bugs in your dwelling, we have the right to require you to temporarily vacate the dwelling and remove all furniture, clothing and personal belongings in order for us to perform pest control services. If you fail to cooperate with us, you will be in default, and we will have the right to terminate your right of occupancy and exercise all rights and remedies under the Lease Contract.

9. **RESPONSIBILITIES.** You may be required to pay all reasonable costs of cleaning and pest control treatments incurred by us to treat your dwelling unit, other dwelling units, or common areas for bed bugs. If we confirm the presence or infestation of bed bugs after you vacate your dwelling, you may be responsible for the cost of cleaning and pest control treatments. If we must move other residents in order to treat adjoining or neighboring dwellings to your dwelling unit, you may be liable for payment of any lost rental income and other expenses incurred by us to relocate the neighboring residents and to clean and perform pest control treatments to eradicate infestations in other dwellings. If you fail to pay us for any costs you are liable for, you will be in default, and we will have the right to terminate your right of occupancy and exercise all rights and remedies under the Lease Contract, and obtain immediate possession of the dwelling. If you fail to move out after your right of occupancy has been terminated, you will be liable for holdover rent under the Lease Contract.

10. **TRANSFERS.** If we allow you to transfer to another dwelling in the community because of the presence of bed bugs, you must have your personal property and possessions treated according to accepted treatment methods or procedures established by a licensed pest control professional. You must provide proof of such cleaning and treatment to our satisfaction.

DocuSign Envelope ID: E33C303B-9131-45DF-B72E-AD4CCCAADD92

# BED BUGS — A Guide for Rental Housing Residents

Bed bugs, with a typical lifespan of 6 to 12 months, are wingless, flat, broadly oval-shaped insects. Capable of reaching the size of an apple seed at full growth, bed bugs are distinguishable by their reddish-brown color, although after feeding on the blood of humans and warm-blooded animals—their sole food source—the bugs assume a distinctly blood-red hue until digestion is complete.

## Bed bugs don't discriminate

Bed bugs increased presence across the United States in recent decades can be attributed largely to a surge in international travel and trade. It's no surprise then that bed bugs have been found time and time again to have taken up residence in some of the fanciest hotels and apartment buildings in some of the nation's most expensive neighborhoods.

Nonetheless, false claims that associate bed bugs presence with poor hygiene and uncleanliness have caused rental housing residents, out of shame, to avoid notifying owners of their presence. This serves only to enable the spread of bed bugs.

While bed bugs are, by their very nature, more attracted to clutter, they're certainly not discouraged by cleanliness.

Bottom line: bed bugs know no social and economic bounds; claims to the contrary are false.

## Bed bugs don't transmit disease

There exists no scientific evidence that bed bugs transmit disease. In fact, federal agencies tasked with addressing pest of public health concern, namely the U.S. Environmental Protection Agency and the Centers for Disease Control and Prevention, have refused to elevate bed bugs to the threat level posed by disease transmitting pests. Again, claims associating bed bugs with disease are false.

## Identifying bed bugs

*Bed bugs can often be found in, around and between:*
- Bedding
- Bed frames
- Mattress seams
- Upholstered furniture, especially under cushions and along seams
- Around, behind and under wood furniture, especially along areas where drawers slide
- Curtains and draperies
- Along window and door frames
- Ceiling and wall junctions
- Crown moldings
- Behind and around wall hangings and loose wallpaper
- Between carpeting and walls (carpet can be pulled away from the wall and tack strip)
- Cracks and crevices in walls and floors
- Inside electronic devices, such as smoke and carbon monoxide detectors
- Because bed bugs leave some persons with itchy welts strikingly similar to those caused by fleas and mosquitoes,

the origination of such markings often go misdiagnosed. However, welts caused by bed bugs often times appear in succession and on exposed areas of skin, such as the face, neck and arms. In some cases, an individual may not experience any visible reaction resulting from direct contact with bed bugs.
- While bed bugs typically prefer to act at night, they often do not succeed in returning to their hiding spots without leaving traces of their presence through fecal markings of a red to dark brown color, visible on or near beds. Blood stains tend also to appear when the bugs have been squashed, usually by an unsuspecting host in their sleep. And, because they shed, it's not uncommon for skin casts to be left behind in areas typically frequented by bed bugs.

## Preventing bed bug encounters when traveling

Because humans serve as bed bugs' main mode of transportation, it is extremely important to be mindful of bed bugs when away from home. Experts agree that the spread of bed bugs across all regions of the United States is largely attributed to an increase in international travel and trade. Travelers are therefore encouraged to take a few minutes upon arriving to their temporary destination to thoroughly inspect their accommodations, so as to ensure that any uninvited guests are detected before the decision is made to unpack.

Because bed bugs can easily travel from one room to another, it is also recommended that travelers thoroughly inspect their luggage and belongings for bed bugs before departing for home.

## Bed bug do's and don'ts
- **Do not bring used furniture from unknown sources into your dwelling.** Countless bed bug infestations have stemmed directly from the introduction into a resident's unit of second-hand and abandoned furniture. Unless the determination can be made with absolute certainty that a piece of second-hand furniture is bed bug-free, residents should assume that the reason a seemingly nice looking leather couch, for example, is sitting curbside, waiting to be hauled off to the landfill, may very well be due to the fact that it's teeming with bed bugs.
- **Do address bed bug sightings immediately.** Rental housing residents who suspect the presence of bed bugs in their unit must immediately notify the owner.
- **Do not attempt to treat bed bug infestations.** Under no circumstance should you attempt to eradicate bed bugs. Health hazards associated with the misapplication of traditional and non-traditional, chemical-based insecticides and pesticides poses too great a risk to you and your neighbors.
- **Do comply with eradication protocol.** If the determination is made that your unit is indeed playing host to bed bugs, you must comply with the bed bug eradication protocol set forth by both your owner and their designated pest management company.

**You are legally bound by this document. Please read it carefully.**

Resident or Residents
*(All residents must sign)*

Owner or Owner's Representative
*(Signs below)*

_____

_____

Date of Signing Addendum

_____

_____

_____

*You are entitled to receive an original of this Addendum after it is fully signed. Keep it in a safe place.*



Christopher Berg,

Benjamin Levin

# Community Policies/Master Lease Addendum

## 1. Preface

This Master Lease Addendum contains community rules, regulations, and/or policies that are incorporated into and part of your Lease Contract. They apply to you and your occupants, guests, and invitees. Use of "we", "us", and "our" in this Addendum refers collectively to the owner of the community and the owner's authorized agents/representatives. Violation of any provision of this Addendum may result in termination of your right of possession and/or your Lease Contract. The community rules, regulations, and/or policies in this Addendum may be added, amended or repealed at any time in accordance with your Lease Contract. This Addendum is intended to supplement your Lease Contract. To the extent there is any inconsistency between this Addendum and the Lease Contract, the provisions of the Lease Contract control.

## 2. No Reliance on Security Devices or Measures

You acknowledge that cameras may be installed at some or all of the gates and in various common areas throughout the community. If cameras are installed, these areas may be recorded. Cameras, if installed, are for the sole purpose of protecting our real and personal property. Such cameras are not intended to protect, monitor, provide security for, or give a sense of security to you or any occupant or guest. You acknowledge that, given the limited purpose for which cameras may be installed or used, we have no obligation to cause such cameras to be monitored. We have no obligation to preserve or make available the contents of any recordings to you or others.

## 3. Entry Devices

In the event your community requires an entry device, the following policies apply.
a) **Access Card, Remote or Key Fob:** You and each occupant if you request, will receive one controlled access device of our choice. Additional devices may be available for an additional charge of $_____50_____.
b) **Damaged, Lost or Unreturned Cards, Remotes, or Fobs:** If a controlled access device is lost, misplaced, stolen damaged, or not returned at termination of this Agreement, a fee of $_____50_____ will be charged for each device replacement.
c) **Duplicate, Lost or Unreturned Keys:** A charge of $_____5_____ will be owed for each duplicate, lost or unreturned key.
d) **Re-keying Lock:** If you wish to have your apartment home, storage, mailbox, and/or garage lock(s) re-keyed because you have lost your key or for any other reason you agree to pay a re-keying fee of $_____50_____ which is due prior to changing your locks.
e) **After Hours Lock Outs:** After office hours, you must contact and pay for a locksmith if you have locked yourself out.
f) **Lock Outs During Office Hours:** If you are locked out of your apartment home during business hours, contact us. A picture I.D. may be required to gain access to your apartment home.

## 4. Patios / Balconies / Private Yards

In the event your community has patios, balconies, or private yards, the following policies apply.

**Items Prohibited**

| | | |
|---|---|---|
| Combustible Materials | Flags | Furniture designed for Indoor Use |
| Firewood | Charcoal & Gas Grills | Bicycles hung from ceilings or walls |
| Unsightly or Heavy Items | Propane Tanks | Laundry |
| Motorcycles | Automobile Tires, Parts, Equipment | Signs |

a) **Resident Responsible for Private Yard:** In the event your apartment home has a private yard and you are responsible for maintenance of the yard, maintenance will include, but not be limited to, mowing, edging, shrub trimming, watering, debris removal, weeding, etc. You agree to maintain the landscaping in a healthy condition (free of weeds, holes, fungus/parasites, pet feces, trash, debris and consistent color in sod, etc.). If your private yard is not maintained to the community standards, we have the right to maintain it and charge our actual cost each time maintenance is required. Upon move-out, we can deduct any amounts owed for damage to the private yard which exceed ordinary wear and tear from the security deposit as allowable under the Lease Contract.
b) **Community Landscaper Utilized for Private Yard:** In the event your apartment home has a private yard and your community landscaper maintains the private yard, there may be an additional monthly fee of $_____0_____ required. You are still responsible for maintaining the landscaping in a healthy condition (free of weeds, holes, fungus/parasites, pet feces, trash, debris and consistent color in sod, regular watering, etc.). You agree to provide access so that routine yard management maintenance can occur. If your private yard is not maintained to the community standards, we have the right to maintain it and charge our actual cost each time maintenance is required. Upon move-out, we can deduct any amounts owed for damage to the private yard which exceed ordinary wear and tear from the security deposit paid as allowable under the Lease Contract.

## 5. Gardens

In the event your community has a garden for the enjoyment of all residents, the following policies apply.
a) Unless otherwise posted, the hours are from dawn to dusk.
b) Use at your own risk. In case of emergency, call 911.
c) You agree to plant the garden plot within two weeks of being assigned a designated area.
d) You agree to maintain the designated plot and to keep plants within the assigned/designated area.
e) We encourage an organic gardening program. Use of pesticides, herbicides, and insecticides made from synthetic materials as well as use of chemical fertilizers are not advisable. Slug bait is permitted only when used in enclosed containers, which must be removed from the site after use. Use of raw human and/or animal waste is not allowed due to environmental and health concerns. Fully composted manures, such as steer and chicken manure, are allowed.
f) No illegal plants may be grown, including but not limited to any plant listed by the state agencies and weed control board as noxious weeds.
g) Only water your assigned garden plot.
h) Maintain healthy plants and remove dead plants in a timely manner (not to exceed one week duration).
i) Materials other than plants are prohibited, except items that assist in growth.
j) All tools provided by us must remain in designated areas. We are not responsible for injuries due to the use of tools. If you need any additional tools, they are your responsibility.
k) Debris after planting, any remaining soil, fertilizer, etc. must be swept immediately.
l) Garden plots will expire with your lease, and may be renewed at the time of lease renewal. If you decide to not renew usage, the plot must be cleaned out and left in the original condition. Renewal is not guaranteed.
m) We are not responsible for lost, stolen, or damaged plants or other items.
n) Please be respectful of the neighbors who live around the gardens. No smoking, noise disturbances, or horseplay is allowed.
o) Animals are not allowed in the garden plot areas, except assistance animals.

## 6. Inside or Near the Apartment Home

**6.1 Windows and Doors:** Any window treatment installed by you shall present a uniform appearance with the exterior of the building. The use of foil and other similar materials, on windows is strictly prohibited. You will not obstruct any windows or doors.

**6.2 Welcome Mats and Heavy Items:** You may place a welcome mat in front of your entry door subject to our approval. Rugs or carpet remnants are not permitted. You shall not place any unusually heavy objects on the floor of the Premises, such as pool tables, waterbeds, etc. without our prior written permission. You will not obstruct any doorways, stairs, entry passages, breezeways, courtyards, or halls of the community.

**6.3 Soliciting:** Soliciting is not permitted in the community. Unless allowed by law or following our prior written permission, you shall not distribute, post, or hang any signs, flyers, advertisements, or notices in any portion of the community.

**6.4 Fireplace:**  In the event your apartment home has a fireplace, you agree to use the fireplace for the intended purpose and at your own risk.  Never use flammable liquids to start fires and never burn anything other than seasoned firewood.  Clean your hearth of any flammable materials.  Do not attempt to clean the inside of the chimney. Report maintenance needs to us immediately.  Use a mesh screen and leave glass doors open when burning fires.  If applicable, open the flue/damper before lighting a fire.  Close the flue/damper only when the fire is completely out, the smoke has ceased to rise, and the wood is cool.  Never leave a fire unattended.  Put all fires out completely before going to bed or leaving the apartment home.

**6.5 Furniture, Televisions, Appliances:**  In the event your apartment home has furniture, televisions, and/or appliances included, you agree to maintain them in a clean condition, reasonable wear and tear excepted.  Removal of these items is not allowed.  Upon move-out, these items must be placed in the same location they were upon move-in.  You will pay the cost to repair, replace, or clean the furniture, televisions, and/or appliances.

**6.6 Wires and Personal Items Outside the Home:** No radio, television other wires are permitted on any part of the apartment home.  You shall not store personal items in the outside walkways, breezeways or under stairs.

## 7. Odors

You, your occupants, guests, and invitees acknowledge that we cannot prevent odors in and around your apartment home and community.

**7.1 Resident Responsibilities:**  If you create odors, you shall provide proper ventilation so you do not disturb or cause inconvenience to others.

**7.2 Removal of Odors:**  If the carpet, walls, A/C ducts, or other items in the apartment home retain odors due to your use or surrounding residents complain about the odors, you will be responsible for the cost for removing unwanted smells and odors.

## 8. Parking and Vehicles

In the event your community has parking for residents, the following policies apply.  Guests must park in guest parking only.
   a) **Speed Limit:**  Unless otherwise posted, the speed limit is ten (10) miles per hour.
   b) **Posted Signs:**  You are responsible for following all posted signs including height restrictions, mounted mirrors, and traffic control devices.
   c) **Unassigned Parking:**  In the event parking at your community is unassigned, you can park on a first-come, first-serve basis, except in designated areas.  Parking spaces are not guaranteed.
   d) **Assigned Parking:**  In the event parking at your community is assigned, you must park only in your assigned space.
   e) **Limitation of Vehicles:**  We will advise you if your community has a limitation on the number of vehicles allowed.
   f) **Restricted Vehicles:**  Unless specifically allowed in designated areas, including carports and/or garages, the following are not allowed:  campers, trailers, boats, buses, large trucks, commercial vehicles, mobile homes, trailers, recreational vehicles and equipment.  Violators will be towed away without notice at the vehicle/equipment owner's expense.
   g) **No Vehicle Repairs:**  Automobile repair work is not allowed on the community, unless allowed unless there is a designated car care facility.
   h) **Vehicle Insurance:**  All vehicles will be parked at your own or the vehicle's owner's risk, and you will maintain proper insurance on your vehicles.
   i) **No Loitering or Recreational Activities:**  You, your occupants, guests, and invitees may not engage in the following activities in parking areas: loitering (standing or waiting around), recreational activities, or disrupting the flow of traffic.
   j) Improperly parked, non-operable, abandoned, or unauthorized vehicles or equipment are not permitted in the community and may be removed by us at your expense or the expense of any other person owning same, for storage or public or private sale, at our option with no right of recourse against us.  The definition of improperly parked, non-operable, abandoned, or unauthorized vehicles or equipment shall be liberally construed in our favor.  In addition, but not limited to their generally accepted definitions, "improperly parked", "non-operable", "abandoned", and "unauthorized" shall also mean vehicles or equipment which: (1) Are noxious, offensive, unsightly, unpleasant or unkempt such as could reasonably affect the appearance or rental marketability of the community or such as could reasonably cause embarrassment, discomfort, annoyance, or nuisance to us or other residents; (2) Are not displaying any required hangtag, decal, or other identifier provided by us; (3) Are left unattended for a period of not less than thirty (30) days without anyone having claimed ownership of it.

## 9. Parking Tags/Stickers

In the event your community requires parking tags/stickers, the parking tag/sticker must be visibly displayed either on the rear-view mirror or taped next to the vehicle registration.  We are not responsible for damage to tint or glass due to the sticker.  The vehicle can be towed without notice at the vehicle owner's expense in accordance with state law.
   a) You agree to advise your guests and invitees to park in the designated guest parking spaces only.
   b) If your sticker/tag is lost, stolen, damaged, or not returned upon move-out, a replacement fee of $_____0_____ will be assessed to your account.

## 10. Animals

**10.1 Assistance Animals:**  Assistance animals required pursuant to a disability-related need are welcome.  Assistance animals must be disclosed to and approved by us. The appropriate reasonable accommodation process will apply.

**10.2 Pet Policies:**  No animals of any kind are permitted in your apartment or the community without our prior written consent.  In the event your community allows pets, the following policies apply.
   a) **No More Than Two Pets:**  A maximum of two pets per apartment home is permitted.
   b) **Weight Limits:**  Pets shall not exceed your community's weight limit.
   c) **Restricted Breeds and Prohibited Dogs:**  The following breeds are not permitted on the community:  Rottweiler, Doberman Pinscher, Pit Bull Terrier/Staffordshire Terrier, Chow, Presa Canarios, Akita, Alaskan Malamutes, Wolf-Hybrid, or any mix thereof.  Specific communities may have additional breed restrictions.  In addition, we prohibit any dog with a history of biting, injuring any person or animal, or damaging property.
   d) **Determination of Breed:**  Regardless of your representation as to the breed or classification of any animal, you agree that we shall make the final determination as to the breed or classification of your pet or animal in our sole and absolute discretion.  Restricted Breeds shall have the broadest possible meaning, and includes, but is not limited to, any animal displaying physical traits or characteristics of any restricted breed animal, whether by observation or by standards established by the American Kennel Club, or other applicable association, or defined by any law, statute, or ordinance.  If applicable, a canine DNA test may be requested at your expense.
   e) **Cats:**  Cats must be spayed or neutered.
   f) **Animals Not Allowed in Amenities:**  Animals, except Assistance Animals, are not permitted in the pool, pool area, or community amenity areas such as the business and fitness centers.  No animals will be allowed in the pool or spa water.
   g) **No Staking Animals:**  Animals may not be tied to any fixed object anywhere outside the dwelling units, except in fenced yards (if any) for your exclusive use.
   h) **Aquariums:**  Aquariums up to 20 gallons are allowed without a pet deposit or fee. Aquariums over 20 gallons may require a pet deposit or fee in addition to proof of renter's insurance.
   i) **Secure Animals During Service Requests:**  Remove animals or place them in a room behind a closed door or kennel/crate with notification to us.

## 11. Trash Removal and Disposal

   a) **Curbside Pick Up:**  In the event your community offers curbside trash pick-up, contact us for the scheduled days and times of pick-up.  You agree not to leave any trash out on days that are not scheduled for pick-up.  We reserve the right to remove curbside trash pick-up service upon written notice to you of the change.
   b) **No Curbside Pick Up:**  In the event your community does not offer curbside trash pick-up, you shall dispose of your bagged and tied trash inside the compactor/dumpster facility as instructed by us or by the sign near the compactor/dumpster.
   c) **Trash Chutes:**  In the event your community has trash chutes, contact us for the scheduled hours of operation.  Securely tied, kitchen-sized bags are required.  No loose items can be put in the trash chute.  Do not use the chute for recycling.  No boxes or large trash can be placed in the chutes.  Contact us for details or questions regarding the use of the trash chutes.
   d) **Recycling:**  In the event recycling is offered at your community, you are responsible for complying with all recycling regulations.
   e) **Potential Charges:**  You may be charged $25 per bag for any trash left outside your apartment home or in breezeways.  Please contact us if you require further instruction regarding proper disposal of garbage with the compactors, dumpsters, or chutes.

f) **No Litter:** Do not leave cigarette butts or other trash near or around patios/balconies, under windows, or near entry doors. We reserve the right to assess a fine of $25 per incident.
g) **No Furniture as Trash:** No furniture may be left for trash removal.
h) **Dumpster Use for Residents Only:** Only you and your occupants are permitted to use the dumpster/compactor.
i) **No Dumpster Diving:** Do not retrieve items from the dumpster. Digging or scavenging is prohibited.
j) **General:** Please break down empty boxes. Keep the area clean and litter free. If applicable, close the lid after use.
k) **No Parking in Front of Dumpster:** Parking in front of the dumpster/compactor is not allowed.
l) **Prohibited Items:** You understand that you cannot place the following items in or around the trash dumpster or compactor: propane tanks, flammable or toxic materials, furniture, bedding, appliances, auto batteries, tires, and oil/petroleum products.

## 12. Pest Control

**12.1 Extermination:** Unless prohibited by statute or otherwise stated in your Lease Contract, we may have extermination operations conducted in the apartment home several times a year and as needed to prevent insect infestation. If pest control services are provided, you shall pay the amount of $_____ on or before the first day of each month to reimburse us for extermination services to the apartment home. You shall pay such fee in the same time and manner as you pay rent pursuant to your Lease Contract. You must request in writing extermination treatments in addition to those regularly provided by us.

**12.2 Preparations for Extermination:** If the apartment home is not prepared for a scheduled treatment date, we will reschedule treatment at your expense. You agree to perform the tasks necessary to prepare the apartment home for extermination, including:
a) removing people sensitive to the extermination treatment from the apartment home;
b) removing animals or placing them in bedrooms with notification to us;
c) removing animal food bowls;
d) removing all food, utensils, glasses, and dishes and food containers from countertops and floors;
e) removing chain locks or other obstructions on the day of service;
f) removing contents from shelves, cabinets, and floors where pests have been seen;
g) cleaning all cabinets, drawers, and closets in kitchen and pantry; and
h) refraining from wiping out cabinets after the treatment.

**12.3 Notify Us of Health Issues:** You are solely responsible for notifying us in writing prior to extermination of any anticipated health or other concerns related to extermination and the use of pesticides.

**12.4 Your Responsibilities:** To reduce the possibility of pests, you shall: (a) store all food in sealed containers; (b) not leave food or dirty dishes out; (c) empty all cans and bottles and rinse them with water; (d) immediately dispose of unused paper grocery sacks; (e) sweep and mop the kitchen regularly; (vi) vacuum carpets frequently to remove crumbs and other food particles; (f) remove trash immediately; (g) not put wet garbage in the trash; (h) use the garbage disposal if available; (i) not leave windows or doors open allowing pests to enter; and (j) comply with any instructions/protocol from the extermination company.

## 13. Packages / Deliveries

In the event our community accepts packages for residents we do so in our sole discretion and the following policies apply:
a) We will only accept packages from a commercial delivery service (UPS, Federal Express, etc.) and United States Postal Service. We will not accept any package shipped COD or having postage due.
b) In the event your community offers a package locker system**,** couriers will make all deliveries exclusively through the locker system. Refer to your community for the locker location name to be placed on address delivery label(s), which will instruct couriers of proper delivery.
c) We will not be responsible or liable for any lost or stolen deliveries which we sign for or accept. While your deliveries are in our possession, both during and after office hours, your deliveries are not secured.
d) Pick up your deliveries within 48 hours. If you do not pick up your delivery within 48 hours, we reserve the right to return to sender.
e) Occasionally the number of deliveries may become too great or too cumbersome; therefore, we reserve the right at all times to refuse deliveries.
f) We have no obligation to contact you when accepting packages. This is your and the deliverer's responsibility.
g) Deliveries or service requiring entrance into your apartment home by anyone other than us will be allowed only with your prior written permission.
h) We are not responsible for articles or parcels left at your door or in the office by delivery services.
i) We will not be available after hours to allow you access to your deliveries. You must pick up your packages during regular office hours.
j) You shall not have perishable goods delivered to the office unless your community has approved such delivery in advance or offers refrigerated lockers.
k) We may not accept packages that are over 25 pounds or larger than 2'x2'x2'.
l) You may be required to present a photo ID and/or signature when picking up a package.

## 14. Maintenance Emergencies

Service requests will be handled after office hours if they are emergencies. We define emergencies as the following:
a) Electrical or gas failure of any nature
b) Broken or non-working exterior doors, locks, windows
c) Malfunctioning access gates that are locked and will not open
d) No heat (when outside temperature is below 60 degrees)
e) No air conditioning (when outside temperature is above 85 degrees)
f) No water
g) Overflowing toilet
h) Flooding
i) Broken pipes
j) Fire (call 911 immediately)
k) After business hours, emergency service requests can be reported by calling the office. The on-duty service technician will be notified and will respond as quickly as possible.

## 15. Apartment Home Transfers

When transferring to another apartment home within the community:
a) You shall not replace or transfer your interest in the Lease Contract, or any part hereof, without our prior written consent. If you are in violation of the Lease Contract, you will not be approved for a transfer.
b) You must sign a Transfer form.
c) The criteria for qualifications of credit, income and employment, residence, and criminal must be met for residents that transfer within the lease term or at the end of the lease term.
d) You must fulfill at least 3 months of your current lease term before you will be eligible to transfer to a new apartment home.
e) If applicable, a transfer fee must be paid prior to transferring. A new security deposit may be required to secure the new apartment home. In addition, market rent, new pet deposit/fees (if applicable) and other applicable fees must be paid.
f) You are required to provide a written move-out notice according to your Lease Contract from the current apartment home. The vacated apartment home must be left in the condition described in the move-out cleaning instructions. We will inspect the apartment home and forward statements and deposit refunds to your new address.
g) If you cancel the transfer after the new apartment home has been assigned and taken off the market, you will be responsible for any economic loss sustained resulting from your failure to rent the new apartment home.
h) You shall be responsible for all moving costs including those associated with switching utilities and services to the new apartment home if a transfer is approved.

## 16. Amenities / Facilities

| | | | | |
|---|---|---|---|---|
| Swimming Pool | BBQ Grill/Fire Pit | Spa or Hot Tub | Club Room | Dog Park/Spa |
| Sports Court | Car Cleaning Facility | Game Room/Theater | Laundry Room | |
| Tanning Facilities | Sauna | Business Center | Fitness Facilities | |
| Video Library | Nature/Hiking Trail | Playground | Roof Top Deck | |

In the event that your community hosts any of the above or other amenities, the following apply:

- In an emergency, call 911
- Attendants are not provided
- Use amenities at your own risk
- Comply with posted signs
- Use equipment in the manner it is intended
- Do not destroy any equipment/amenity
- Report any equipment needing repair or vandalism
- Do not remove any equipment
- Wear appropriate attire
- Be mindful of others when using amenities and limit time as necessary
- Only two guests are allowed and must be accompanied by you
- We are not responsible for accidents, injuries, or lost, stolen, damaged, or misplaced items
- You agree to hold us harmless from any and all claims, damages, or expenses related to the use of amenities

## 17. Amenity / Facility Safety-Related Restrictions

**17.1 Safety-Related Restrictions:** Our community contains amenities/facilities that are intended to enhance the living experience for you and your occupants. You agree that, for safety-related reasons, certain amenities/facilities may require restrictions on use. You agree to abide by posted signs. You further agree that you, your occupants or guests will be supervised, as needed, by someone possessing the proper skills to supervise the particular activity at the amenities/facilities.

**17.2 Residents Shall Exercise Their Own Prudent Judgment:** You, occupants and guests are advised to exercise their own prudent judgment with respect to the unsupervised use of the facilities located throughout the community. By establishing safety-related use restrictions, we are not in any manner representing, guaranteeing or ensuring the safety of any persons when participating in the activities or using the facilities of the community with or without supervision.

## 18. Swimming Pool and Spa / Hot Tub

In the event your community has a pool and/or hot tub for the enjoyment of all residents, the following policies apply. Please follow posted signage.
- a) We do not provide, at any time, safety or supervisory personnel at the pools, hot tubs, spas, or any other common area. LIFEGUARDS ARE NOT PROVIDED. SWIM AT YOUR OWN RISK. FOR YOUR SAFETY, DO NOT SWIM ALONE.
- b) No diving. Diving may result in injury or death.
- c) We cannot and do not assure, guarantee or warrant your safety.
- d) Assistance animals are allowed in the pool area if necessary due to a disability-related need; however, no animals will be allowed in the pool or spa water.
- e) We are not responsible for accidents, injuries, or lost, stolen, damaged or misplaced items.
- f) No jumping into the pool from balconies, patios, fountains, or other structures near the pool.
- g) Keep gates closed at all times.
- h) Respect others by covering pool furniture with a towel. Do not remove pool furniture from pool areas. Dispose of trash properly.
- i) Overexposure to hot water may cause dizziness, nausea, and fainting. Hot water exposure limitations vary from person to person.
- j) Check the hot tub temperature before entering the hot tub. Do not use the hot tub if the temperature is above 104 degrees. Do not operate the hot tub if the suction outlet cover is missing, broken, or loose.
- k) Do not place electrical appliances (telephone, radio, TV, etc.) within five feet of the pool or hot tub.
- l) Appropriate swimwear is required at all times as determined by us. Diapers are not allowed unless they are swim diapers.
- m) You are limited to 2 guests to any pool/hot tub area, and you must accompany your guests at all times.

## 19. Sports Courts (Tennis, Volleyball, Basketball, etc.)

In the event your community has sports courts (tennis, volleyball, basketball, etc.) for the enjoyment of all residents, the following policies apply.
- a) Motorcycles, bicycles, tricycles, roller blades, skateboards and skates are not permitted on the court surface.
- b) Do not sit or lean on the net. Do not hang from or climb on the goal or nets.
- c) Proper athletic shoes with rubber soles are required.

## 20. Club Room / Game Room / Theater

In the event that your community provides a club room, game room, and/or theater for the enjoyment of all residents, the following policies apply.
- a) No wet clothing permitted.
- b) Clubroom hours are determined by us.
- c) All items must be returned, in the condition in which they were received prior to leaving.
- d) Use the facility at your own risk. Use the equipment only in the manner intended by manufacturer.
- e) Do not remove or damage equipment and supplies.

## 21. Tanning Bed, Tanning Dome, or Spray Tan Booth

In the event a tanning device(s) is provided for the enjoyment of all residents, the following policies apply:
- a) Failure to use the eye protection may result in permanent damage to your eyes.
- b) Overexposure to ultraviolet light (whether from natural or artificial sources) causes burns.
- c) Repeated exposure to ultraviolet light (whether from natural or artificial sources) may result in premature aging of the skin and skin cancer.
- d) Abnormal skin sensitivity or burning may be caused by reactions of ultraviolet light to certain food, cosmetics, and medications.

## 22. Video / DVD Library

In the event your community provides a video/DVD library, the following policies apply.
- a) You acknowledge and agree to be fully responsible for any and all videos/DVDs borrowed by self or other occupants while using the video services provided.
- b) All videos/DVDs must be returned in good working condition (except reasonable wear and tear) within 48 hours.
- c) We are not responsible for persons borrowing videos/DVDs that may not be suitable for themselves or others.
- d) We may charge your account the total amount owed including late charges and/or market value of all items not returned in good working condition.

## 23. Business / Computer Center

In the event your community has a business center for the enjoyment of all residents, the following policies apply:
- a) The center is for use by you and occupants only.
- b) We are not responsible for lost, stolen or damaged items, content viewed, viruses or loss of information.

c) Smoking, food and drinks are prohibited.
d) Please be considerate of others.  Limit computer use to 30 minutes when others are waiting.
e) You must provide their own document/data storage.  Do not install or download any program, file or software on the business center equipment. Data created, stored or saved on the business center equipment will not be private, may be used by us for any purpose and will likely be deleted. *Incoming faxes are prohibited.*
f) We reserve the right to monitor, intercept, review, and erase, without further notice, all content created on, transmitted to, received or printed from, or stored or recorded on the courtesy devices.
g) Users should not use the courtesy device to transmit or store personal information, including user names, passwords, addresses, driver's license numbers, social security numbers, bank information, or credit card information.
h) The courtesy device and associated access to the internet may not be used to (a) violate United States, state, or foreign laws; (b) transmit or receive material that is threatening, obscene, harassing, discriminatory, defamatory, illicit, or pornographic; or (c) interfere with or disrupt network users, services, or equipment.
i) Attempts to remove equipment from the business center will engage the alarm system.
j) Users may not alter or damage existing hardware or software.  Do not modify screensavers or background images on business center equipment.
k) Violation of any or all of the above stated rules may result in termination of business center use or other remedies under the lease.

## 24. Barbecue Grill / Outdoor Kitchen / Fire Pit / Fire Place

In the event your community has barbeque grills, outdoor kitchens, fire pits, or fire places for the enjoyment of all residents, the following policies apply.
a) Barbecue grill instructions may be posted at each location or are available from us.  Please contact us before attempting to use these grills.
b) Keep pets and persons requiring supervision away from open flames.
c) Your community may require a deposit or fee to use the facility.  Contact us for further details.
d) Never leave a fire unattended.  Do not leave until the fire is completely out.
e) Keep flammable materials away from the fire.

## 25. Laundry Room

In the event your community has laundry rooms, the following policies apply.
a) Use appropriate settings on washers and dryers.  Any loss or damage to clothing is not our responsibility.
b) No dying of clothes is permitted.
c) Do not wash or dry oversized items.
d) Remove lint from dryer before and after each use.  Wipe down after use.  Please leave machines clean.
e) Facilities are for use by you and occupants only.

## 26.  Dog Park/Spa

In the event your community has a Dog Park or Spa for the enjoyment of all residents, the following policies apply.
a) Animal owners are responsible their animal's behavior, for damage or injury inflicted to or by their animal(s). Animal owners must remain with dogs in fenced area at all times.
b) You are limited to 2 animals per person in the Dog Park or Spa
c) Dogs must be leashed when entering and exiting the park and must be leashed in the transition corridor, if applicable.  You must have a visible leash for each dog at all times.
d) Animals with a known history of dangerous or aggressive behavior are prohibited. Immediately leash your dog(s) and leave the Dog Park if your dog behaves aggressively.
e) Puppies under 6 months of age and female dogs in heat are not allowed in the Dog Park.

## 27.  Roof Top Deck

In the event your community has a roof top deck for the enjoyment of all residents, the following policies apply.
a) You, your occupants and guests shall not walk in any areas on the roof other than the designated walkway and roof top deck itself.
b) Nothing shall be thrown or intentionally dropped over the edge of the roof.  You, upon the first infraction of this policy by you, your occupants or guests, may have use privileges revoked and/or residency terminated.

## 28. Photographs, Digital Images, Video

All residents, occupants, visitors and guests, while in common areas, give Owner, management company, their employees, agents, subsidiaries and authorized vendors the right to record their image and/or voice, and grant Owner and management company all rights to use these sound, still, or moving images in any and all media, now or hereafter known, and for any purpose whatsoever.

A release to Owner, management company, their employees, agents, subsidiaries and authorized vendors is granted for all rights to exhibit this work in all media, including electronic form, publicly or privately. The rights, claims or interest controlling the use of identity or likeness in the sound, still or moving images is waived and any uses described herein may be made without compensation or consideration.

## 29. Wildlife

**29.1 Definition of Wildlife:**  Wildlife can include the presence of alligators, bears, crocodiles, snakes, opossums, raccoons, or other non-domesticated animals.  In the event wildlife is found on the community, you agree to the following.

**29.2 Resident Acknowledgements:**  You assume the risk with respect to having wildlife near your apartment home and acknowledge that we are not liable for any injuries, damages or losses to persons or property caused by or related to the wildlife.

**29.3 Resident Responsibilities:**  You will be responsible for informing occupants, guests and invitees about the wildlife and enforcing their compliance with the following:
You, your occupants and guests will not:
a) feed, get close to, or attempt to catch the wildlife;
b) swim, wade or play near the wildlife;
c) dispose of garbage of scraps near a water source, pond, lake, or other area that may contain wildlife.

## 30. Body of Water (Lake, Pond, Water Features)

You will be responsible for informing occupants, guests and invitees about the bodies of water and enforcing their compliance with the following:
No one will
a) swim or wade in any body of water that is not designated as a swimming pool;
b) boat on any body of water unless approved by us;
c) ice skate or conduct any other type of water sport in or on the bodies of water.

## 31. Elevators

In the event your community has an elevator (s) for the enjoyment of all residents, the following policies apply.
a) Do not attempt to maneuver or stop closing doors.  Wait for the next elevator car.
b) In the event of a fire or other situation that could lead to a disruption in electrical services, take the stairs.
c) When entering and exiting the elevator, watch your step as the elevator car may not be perfectly level with the floor.
d) Do not climb out of a stalled elevator.  Use the alarm, help, or telephone button to call for assistance.

## 32. Construction or Renovation

In the event your community is under construction or renovation, the following policies apply:
   a) **Inform Occupants and Guests:** You will be responsible for informing occupants, guests, and invitees about these policies.
   b) **Stay Away from Construction Areas:** You agree to observe all warning signs and blockades. You agree to stay away from the construction areas and shall not climb on or enter onto scaffolding or other construction equipment at any time. You acknowledge there may be construction debris, trip hazards, and uneven surfaces. Construction crews may work throughout the days to complete construction.
   c) **Machinery and Equipment:** You acknowledge the construction areas will have machinery and equipment to be used by authorized personnel only and entry into those areas by you, your occupants, guests or invitees is strictly prohibited.
   d) **Minor Disturbances:** You acknowledges that the construction/renovation may cause noise, dust, and minor disturbances to the egress/ingress on or about the community and minor disturbances to the quiet and enjoyment of the apartment home.
   e) **Amenities May Be Unavailable:** You further agree that the amenities, including the clubhouse, pool, or other common areas, may be unavailable for use by you, your occupants, guests and invitees during the period of construction.
   f) **Resident Waives Right to Withhold Rent:** Except as otherwise prohibited by law, you hereby waive any right to withhold rent due to inconvenience or disturbance of quiet enjoyment of your apartment home or the inability to use the amenities or common areas or put forward such noise or construction activity as a breach of our duty pursuant to applicable law.
   g) **Move-In Date Not Guaranteed Due to Construction Delays:** You acknowledge that the move-in date cannot be guaranteed in the case of construction delays. You acknowledge that you will not be compensated for any unforeseen occupancy delays. If you terminate the Lease Contract early for any reason other than construction delays, you will be responsible for all applicable early termination charges and procedures.

## 33. Prevention of Mold

You agree not to conduct any mold or other environmental testing of your apartment without giving us at least 72 hours advance written notice to enable us to have a representative present during testing. You agree that failure to provide such notice means the testing is not admissible in any legal proceedings.

## 34. Fire/Freezing Weather/Floods/Other Emergencies

Emergency situations may occur during your residency. Please remember that you are responsible for your own safety and the safety of your occupants, guests and invitees. You should look to the proper authorities for any assistance when needs exceed your abilities. Please note the following regarding certain emergency situations.

**34.1 Fire Hazards:**
   a) Follow fire safety and fire safety regulations while in the apartment home and community.
   b) No flammable or combustible objects/substances are to be stored on patios, balconies, under stairwells, in your garage or storage space and should not be within 30 inches of an item which produces heat (water heater, furnace, stove, oven, candle, curling iron, etc.)
   c) Items which require an open flame to operate or which produce heat (e.g., Bunsen burners, sterno/canned heat, lighted candles, alcohol burners, heating elements, irons, curling irons, halogen bulbs, stove, oven) must be supervised at all times during use and should never be left unattended.
   d) Do not obstruct or use the driveways, sidewalks, entry passages, stairs, breezeways, courtyards, or halls for any purpose other than ingress or egress.
   e) Fireworks are prohibited inside the apartment home or anywhere within the community.

**34.2 Fire Alarms:** In the event residents are given procedures for fire alarms, you, your occupants, guests and invitees are required to adhere to all procedures.
   a) You and your occupants, guests, and invitees must not tamper with, interfere with, or damage any alarm equipment and/or installation.
   b) In the event the community has a fire sprinkler system, you acknowledge and hereby agree that it is important to be careful near fire sprinkler heads so as not to falsely trigger or activate them. If you trigger or activate the fire sprinkler system, you will be responsible for all damages caused by the activation.
   c) Anyone found to falsely pull a fire alarm will be subject to criminal charges, a fine, and/or a default of the Lease Contract.
   d) An extension cord must be UL approved, 16 gauges, and not exceed an un-spliced length of six feet with a polarized plug and a single outlet; it may not be placed under floor coverings or furnishings and may not be secured by penetrating the insulation.

**34.3 Freezing Weather:** You shall follow these precautions when subfreezing weather occurs.
   a) Leave the heat on 24 hours a day at a temperature setting of no less than 55 degrees. Keep all windows closed.
   b) Leave open the cabinet doors under the kitchen sink and bathroom sink to allow heat to get to the plumbing.
   c) Drip all your water faucets 24 hours a day. If severe subfreezing weather occurs, it may be necessary to run your faucets at a steady, pencil-lead stream when you are in the apartment home and when you are gone. This includes hot and cold water in your kitchen, bathroom lavatories, bathtubs, shower, wet bar sinks, etc.
   d) Leave all drains open and clear of obstacles; including lavatories, sinks and bathtubs.
   e) If you notice a water leak, icy spot or other hazardous condition on the community, notify us IMMEDIATELY.

**34.4 Floods:**
   a) If heavy rain, storms or flooding is forecast, you should follow the guidelines below. Do not put tape on the windows unless directed by us.
   b) Unplug all appliances and televisions. Do not plug appliances back in until the water completely recedes and community personnel give you permission.

## 35. Power Outage

In the event of a power outage that lasts more than 24 hours, we have the right, but not an obligation, to dispose of the contents of the refrigerator/freezer in your apartment home. You waive any claim and hold us harmless for the disposal of such contents. You agree not to seek recovery against us for interruption of power that results in disposal, loss, or spoilage of refrigerated or frozen food.

## 36. Payments

Unless otherwise allowed at your community, we only accept electronic payments. Cash, paper checks, paper money orders or other forms of payment will not be accepted. Credit and Debit Card transactions may not be allowed.

**36.1 ACH, Credit, and Debit Cards:** Automated electronic payments include ACH and Credit and Debit Card transactions. ACH refers to the nationwide network of banking institutions that have agreed to process electronic payments automatically from your bank account to our bank accounts. Virtually all banks and credit unions participate. Credit and debit card transactions refers to credit and debit card transactions, including those cards bearing the Visa, MasterCard, Discover and American Express logos. Collectively, "automated electronic payments" are paperless transactions that occur instantly and automatically without a check being hand-processed through a local bank clearinghouse or the Federal Reserve System.

**36.2 Advantages in Paying Rent via ACH:** There are advantages for you in paying your rent via automated electronic payments, including:
   a) Greater convenience since you won't have to worry each month with writing, mailing or delivering a rent check;
   b) No late charges since your rent will be paid timely, assuming there are sufficient funds in your checking account;
   c) Greater security since there is little chance that a check signed by you will fall into the wrong hands or get lost in the mail; and
   d) Proof that you've paid since your bank statement is evidence of payment according to ACH and card network rules.

**36.3 Electronic Money Orders:** We also accept electronic money orders. Details on this payment option are available at the office.

**36.4 Check Scanner:** If your community accepts paper checks and uses a check scanner, you are hereby advised that personal checks remitted for normal payments will be scanned and the funds will be electronically withdrawn from your bank account via "Automated Clearing House" (ACH). If you wish to opt out of this process, you must choose another payment method. Standard ACH bank drafts occur after one business day.

**36.5 Electronic Check Conversion:** If your community accepts paper checks, please be aware that we may use electronic check conversion. This is a process in which your check is used as a source of information (for the check number, your account number, and the number that identifies your financial institution). The information is then used to make a one-time electronic payment from your account (an electronic funds transfer). The check itself is not the method of payment. Your electronic transaction may be processed faster than a check. Be sure you have enough money in your account at

Community Policies/Master Addendum 8/1/2018
Page 6 of 8

the time you make a purchase or payment. Your financial institution will not return any checks that are converted, even if you normally receive your original checks or images of those checks with your statement. Always review your regular account statement from your financial institution. You should immediately contact your financial institution if you see a problem. You have only 60 days (from the date your statement was sent) to tell the financial institution about a problem. Depending on the circumstances, the financial institution may take up to 45 days from the time you notify it to complete its investigation. Your checking account statement will contain information about your payment, including the date, the check number, the name of the person or company you have paid, and the amount of the payment.

## 37. Data and Communication

You understand and accept that we may collect, retain, use, transfer, and disclose personal information, such as the first name, last name, email address, and phone number of you or your occupants in the unit. We may collect, retain, and use that information, or disclose that information to third parties to, among other things, (a) operate the Property; (b) provide services consistent with the Lease; (c) refer you to third parties that provide products or services that may be of interest to you or your occupants in the unit; (d) collect debts; and (e) conduct and analyze resident surveys. Please review the privacy policy of the owner's authorized agent at the time of residence for a discussion of the treatment of information during your lease. The current policy may be viewed at https://www.greystar.com/privacy.

Providing an email address or cell phone number to us enables us to send important announcements, including notices regarding an emergency water shut off, work to be done at the Property, or changes in office hours. By providing this contact information, you and your occupants consent to receive communications regarding marketing materials, promotional offers, community messages, and service reminders via e-mail, voicemail, calls and/or text.

By providing your and your occupants' phone numbers, you acknowledge and agree that we may contact you and your occupants at the phone number(s) that you and your occupants have provided, including through an automatic telephone dialing system and/or an artificial prerecorded voice, with information and notifications about the community and for other non-marketing, informational purposes, including in connection with expiration of your lease. You further warrant to us that you or your occupants are the subscriber for any wireless number that you or your occupants have provided. You agree to immediately notify us if you or your occupants are no longer the subscriber for a wireless number, or if a wireless number changes. Text messaging and data rates may apply.

You authorize us to deliver messages regarding renewal of your lease and other offers to you at the telephone number(s) that you have provided, including through the use of an automatic telephone dialing system and/or artificial or prerecorded voice. You acknowledge and agree that this authorization is made voluntarily.

The permissions and consents granted herein apply to the owner of the community and the owner's authorized agents/representatives, including its property manager, and will continue even after your lease expires, the owner of the community sells the community, or the property manager no longer manages the community.

## 38. Subletting and Replacements

**38.1 When Allowed**: Replacing a resident, subletting, assigning, or licensing a resident's rights are allowed only when we consent in writing. Residency at your community is subject to an application and/or approval by us. Occupancy is restricted to only the named residents and occupants that are identified in your Lease Contract.

**38.2 Advertising Your Apartment**: You are not allowed to advertise your apartment homes(s) without our written consent. This prohibition on advertising includes online postings, print advertising or other formats such as craigslist, Airbnb, etc.

## 39. Conduct

You agree to communicate and conduct yourself at all times in a lawful, courteous, and reasonable manner when interacting with us; our employees, agents, independent contractors, and vendors; other residents, occupants, guests or invitees; or any other person in the community. Any acts of unlawful, discourteous, or unreasonable communication or conduct by you or your occupants, guests or invitees, shall be a material breach of this Agreement and will entitle us to exercise all of our rights and remedies for default.

You agree not to engage in any abusive behavior, either verbal or physical, or any form of intimidation or aggression directed at us; our employees, agents, independent contractors, and vendors; other residents, occupants, guests or invitees; or any other person in the community. Any acts of abusive or offensive behavior whether verbal or physical by you or your occupants, guests or invitees, shall be a material breach of this Lease and will entitle us to exercise all of our rights and remedies for default.

If requested by us, you agree to conduct all further business with us in writing.

| Summary | |
|---|---|
| **Section and Description** | **Charge** |
| Additional Controlled Access Device | $ 50 |
| Damaged/Lost/Unreturned Cards/Remotes/Fobs (per device) | $ 50 |
| Duplicate/Lost/Unreturned Key | $ 5 |
| Re-keying Lock | $ 50 |
| Private Yard Maintenance Fine | $ 0 |
| Lost/Stolen/Unreturned Parking Tag/Sticker (per item) | $ 0 |
| Trash Clean-up (per bag) | $ 25 |
| Litter Fine (per incident) | $ 25 |
| Pest Control Monthly Fee | $ |

This is a binding document. Read carefully before signing.

**Resident(s) Signature(s)** *(18 years of age and over)*

_____ Date: _____

_____ Date: _____

_____ Date: _____

_____ Date: _____

_____ Date: _____

_____ Date: _____

**Owner's Representative Signature:**

_____

# FIRE SAFETY AND PROTECTION INFORMATION

This Fire Safety and Protection Information form is incorporated into the Lease Contract executed on **August 5, 2018** _____ between **Madison Summit LLC** _____ ( "We" ) and

**Christopher Berg,** ████████████ _____ ("You") of Unit No. ____ **E214**

located at **1819 23rd Ave #E214**

(street address) in _____ **Seattle, WA 98122** _____ and is in addition to all terms and conditions in the Lease Contract.

1.  The dwelling is equipped with smoke detection devices as required by RCW 43.44.110. These smoke detection devices are ☒ hard wired ☒ battery operated. The devices have been inspected and are properly operating at the commencement of the tenancy. It is the resident's responsibility to maintain the devices in proper operating condition including replacement of batteries, if necessary. A fine can be imposed for failure to comply with the provisions of RCW 43.44.110.

2.  A diagram showing the emergency evacuation routes for residents is attached as Exhibit A.

3.  The dwelling complex ☒ does ☐ does not have a fire sprinkler system.

4.  The dwelling complex ☒ does ☐ does not have a fire alarm system.

5.  The dwelling complex ☒ does ☐ does not have a smoking policy. A copy of any smoking policy is attached as Exhibit B.

6.  The dwelling complex ☐ does ☒ does not have an emergency notification plan for residents. A copy of any such plan is attached as Exhibit C.

7.  The dwelling complex ☐ does ☒ does not have an emergency relocation plan for residents. A copy of any such plan is attached as Exhibit D.

8.  The dwelling complex ☒ does ☐ does not have an emergency evacuation plan for residents. A copy of any such plan is attached as Exhibit E.

<table>
<tr><td><b>Resident or Residents</b><br><i>(All residents must sign here)</i></td><td><b>Owner or Owner's Representative</b><br><i>(signs here)</i></td></tr>
<tr><td>_____</td><td>_____</td></tr>
<tr><td>_____</td><td><b>Date of Lease Contract</b></td></tr>
<tr><td>_____</td><td><b>August 5, 2018</b></td></tr>
<tr><td>_____</td><td></td></tr>
</table>

Christopher Berg, ████████████

Benjamin Levin

DocuSign Envelope ID: E33C303B-9131-45DF-B72E-AD4CCCAADD92



NATIONAL
APARTMENT
ASSOCIATION

# ADDENDUM REGARDING MEDICAL MARIJUANA USE
## and
## LANDLORD'S COMMITMENT TO ENFORCEMENT OF CRIME FREE ADDENDUM

1. **Dwelling Unit Description.** Unit. No. **E214**,
   **1819 23rd Ave #E214** *(street address)*
   in **Seattle** *(city)*,
   Washington, **98122** *(zip code).*

2. **Lease Contract Description.**
   Lease Contract date: **August 5, 2018**
   Owner's name: **Madison Summit LLC**

   Residents *(list all residents):* **Christopher Berg,**
   ▮▮▮▮▮▮▮▮▮

   Where the terms and conditions of this Addendum vary
   from or contradict any terms or conditions set forth in the
   Lease Contract, this Addendum shall control.

3. Washington State law permits the limited use of medical and
   recreational marijuana in specific and limited circumstances.
   However, this is not the case under federal law. Under
   federal law, specifically the Federal Controlled Substances
   Act (CSA), marijuana is still categorized as a Schedule I
   substance. This means that under federal law, and U.S.

Supreme Court decisions, the manufacture, distribution,
or possession of marijuana is strictly prohibited. Because
the U.S. Department of Housing and Urban Development
is controlled by the federal government, HUD policy is
that the use of marijuana, whether prescribed for medical
reasons or not, is a criminal offense and will not be protected
under the fair housing laws or allowed in HUD funded
housing. Therefore, apartment complexes are not required
to accommodate the use of marijuana by a tenant who is a
current medical marijuana user. Disabled tenants who are
registered medical marijuana users, however, should not
feel discouraged to request reasonable accommodations if
the need arises.

4. The Premises listed above follows and complies with federal
   law regarding marijuana use and is, and will continue to
   be, a drug free community. Possession, use, manufacture
   or sale of any illegal substance, including marijuana, or any
   use of marijuana by the tenant and/or guests will result
   in immediate termination. If you have any questions or
   concerns about this policy, please speak to management.

5. By signing below, the resident acknowledges his or her
   understanding of the terms and conditions as stated above,
   and his or her agreement to comply with those terms and
   conditions.

**Resident or Residents** *(sign here)*                          **Date of Signing Addendum**

_____                    _____

_____                    _____

_____                    _____

_____                    _____

**Owner or Owner's Representative** *(signs here)*              **Date of Signing Addendum**

_____                    _____

Christopher Berg, Alexandria Johnson



# LEASE CONTRACT BUY-OUT AGREEMENT



**NATIONAL APARTMENT ASSOCIATION**

1. **Dwelling Unit Description.** Unit No. ____E214____
   __1819 23rd Ave #E214_____ *(street address)*
   in_____**Seattle**_____ *(city)*,
   Washington,_____**98122**_____ *(zip code)*.

2. **Lease Contract Description.**
   Lease Contract date: **August 5, 2018**
   Owner's name: **Madison Summit LLC**
   _____
   _____

   Residents *(list all residents):* **Christopher Berg,**
   _____
   [redacted]
   _____
   _____

3. The purpose of this Buy-Out Agreement is to give you the right to buy out of your Lease Contract early—subject to any special provisions in paragraph 9 below. In order to buy out early, your notice must be signed by all residents listed in paragraph 1 of the Lease Contract and you must comply with all provisions of this Buy-Out Agreement.

4. **Buy-Out Procedures.** You may buy out of the Lease Contract prior to the end of the lease term and cut off all liability for paying rent for the remainder of the lease term *if all of the following occur:*

   (a) you give us written notice of buy-out at least ____20____ days prior to the new termination date (i.e., your new move-out date), which *(check one)* ☐ must be the last day of a month or ☒ may be during a month (if no number is entered, then the default is 30 days notice);

   (b) you specify the new termination date in the notice, i.e., the date by which you'll move out;

   (c) you are not in default under the Lease Contract on the date you give us the notice of buy-out;

   (d) you are not in default under the Lease Contract on the new termination date (move-out date);

   (e) you move out on or before the new termination date and do not hold over;

   (f) you pay us a buy-out fee (consideration) of $ __3880.00__ ;

   (g) you pay us the amount of any concessions you received when signing the Lease Contract on the date that you give notice to buy out;

   (h) you are current in the payment of rent and all other amounts owing under the lease through the terminating date;

   (i) you comply with any special provisions in paragraph 9 below; and

   (j) if you choose to exercise the buy-out provision, and the unit re-rented at any time, you understand and agree that you are not eligible for, nor will receive any refund of any portion of the buy-out fee.

5. **When payable.** The buy-out fee in paragraph 4(f) is due and payable no later than ____0____ days after you give us your buy-out notice. If no number is written in, the default shall be seven (7) days. The total dollar amount of any concessions regarding rent

or other monetary lease obligations for the entire lease term is $ _____ and is due payable on the same day as the buy-out fee, subject to any special provisions in paragraph 9 regarding the amount, calculation method, or payment date.

6. **Showing unit to prospective residents.** After you give us notice of buy-out, the Lease Contract gives us the right to begin showing your unit to prospective residents and telling them it will be available immediately after your new termination date.

7. **Compliance essential.** Our deposit of all amounts due under paragraphs 4(f) and 4(g) constitutes our approval of the new termination date stated in your notice of buy-out. If you fail to comply with any of the procedures or requirements in this agreement after we deposit such monies, your buy-out right and this agreement will be voided automatically; and (1) any amounts you have paid under this agreement will become part of your security deposit, and (2) the lease will continue without buy-out. Then, if you move out early, you are subject to all lease remedies, including reletting fees and liability for all rents for the remainder of the original lease term.

8. **Miscellaneous.** If moving out by the new termination date becomes a problem for you, contact us. An extension may be possible if we have not already relet the dwelling unit to a successor resident. We and any successor residents who may be leasing your unit will be relying on your moving out on or before the new termination date. Therefore, you may not hold over beyond such date without our written consent—even if it means you have to make plans for temporary lodging elsewhere. "Default" as used in paragraphs 4(c) and 4(d) of this agreement means default as defined in the Lease Contract. You will continue to be liable for any damages and any sums accruing and unpaid prior to the new termination date.

9. **Special provisions.** Your right of buy-out *(check one)* ☐ is or ☒ is not limited to a particular fact situation. If limited, buy-out may be exercised only if the following facts (see below) occur and any described documents are furnished to us. Any special provisions below will supersede any conflicting provision of this printed agreement. Any false statements or documents presented to us regarding buy-out will automatically void your right to buy-out of the Lease Contract. The special provisions are:

   __The Buy Out fee is NOT a reletting fee.__
   __Buy Out fee is equal to two (2) months__
   __rent as a fee plus reimbursement of all__
   __concessions/discounts offered throughout__
   __your entire lease term. Rent must continue__
   __to be paid timely through 20 day notice__
   __period or Buy Out option will be__
   __cancelled.__
   _____
   _____
   _____
   _____
   _____
   _____
   _____

---

**Resident or Residents**
*(All residents must sign)*

_____
_____
_____

**Owner or Owner's Representative**
*(signs below)*

_____

**Date of Lease Contract**
**August 5, 2018**

© 2013, National Apartment Association, Inc. - 2/2013, Washington



# CRIME/DRUG FREE HOUSING ADDENDUM

**1. Dwelling Unit Description.** Unit. No. ___**E214**___ ,
___**1819 23rd Ave #E214**___ *(street address)*
in ___**Seattle**___ *(city)*,
Washington, ___**98122**___ *(zip code)*.

**2. Lease Contract Description.**
Lease Contract date: ___**August 5, 2018**___
Owner's name: ___**Madison Summit LLC**___
___
___
___

Residents *(list all residents)*: ___**Christopher Berg,**___
███████████████

**3. ADDENDUM APPLICABILITY.** In the event any provision in this Addendum is inconsistent with any provision(s) contained in other portions of, or attachments to, the above-mentioned Lease Contract, then the provisions of this Addendum shall control. For purposes of this Addendum, the term "Premises" shall include the dwelling unit, all common areas, all other dwelling units on the property or any common areas or other dwelling units on or about other property owned by or managed by the Owner. The parties hereby amend and supplement the Lease Contract as follows:

**4. CRIME/DRUG FREE HOUSING.** Resident, members of the Resident's household, Resident's guests, and all other persons affiliated with the Resident:

A. Shall not engage in any illegal or criminal activity on or about the premises. The phrase, "illegal or criminal activity" shall include, but is not limited to, the following:

1. Engaging in any act intended to facilitate any type of criminal activity.

2. Permitting the Premises to be used for, or facilitating any type of criminal activity or drug related activity, regardless of whether the individual engaging in such activity is a member of the household, or a guest.

3. The unlawful manufacturing, selling, using, storing, keeping, purchasing or giving of an illegal or controlled substance or paraphernalia as defined in city, county, state or federal laws, including but

not limited to the State of Washington and/or the Federal Controlled Substances Act.

4. Violation of any federal drug laws governing the use, possession, sale, manufacturing and distribution of marijuana, regardless of state or local laws. (So long as the use, possession, sale, manufacturing and distribution of marijuana remains a violation of federal law, violation of any such federal law shall constitute a material violation of this rental agreement.)

5. Engaging in, or allowing, any behavior that is associated with drug activity, including but not limited to having excessive vehicle or foot traffic associated with his or her unit.

6. Any breach of the Lease Contract that otherwise jeopardizes the health, safety, and welfare of the Owner, Owner's agents, or other Residents, or involving imminent, actual or substantial property damage.

7. Engaging in or committing any act that would be a violation of the Owner's screening criteria for criminal conduct or which would have provided Owner with a basis for denying Resident's application due to criminal conduct.

8. Engaging in any activity that constitutes waste, nuisance, or unlawful use.

B. AGREE THAT ANY VIOLATION OF THE ABOVE PROVISIONS CONSTITUTES A MATERIAL VIOLATION OF THE PARTIES' LEASE CONTRACT AND GOOD CAUSE FOR TERMINATION OF TENANCY. A single violation of any of the provisions of this Addendum shall be deemed a serious violation, and a material default, of the parties' Lease Contract. It is understood that a single violation shall be good cause for termination of the Lease Contract. Notwithstanding the foregoing comments, Owner may terminate Resident's tenancy for any lawful reason, and by any lawful method, with or without good cause.

**5. CRIMINAL CONVICTION NOT REQUIRED.** Unless otherwise provided by law, proof of violation of any criminal law shall not require a criminal conviction.

**Resident or Residents** *(sign here)*                    **Date of Signing Addendum**

___
___
___

**Owner or Owner's Representative** *(signs here)*          **Date of Signing Addendum**

___




# MIXED USE ADDENDUM

**NATIONAL APARTMENT ASSOCIATION**

1. **APARTMENT UNIT DESCRIPTION.** Unit No. **E214**, **1819 23rd Ave #E214** *(street address)* in **Seattle** *(city)*, Washington, **98122** *(zip code).*

2. **LEASE CONTRACT DESCRIPTION.**
   Lease Contract date: **August 5, 2018**
   Owner's name: **Madison Summit LLC**

   Residents *(list all residents):*
   **Christopher Berg,** ▓▓▓▓▓▓▓▓▓▓▓

   This document shall serve as an addendum ("the Addendum") to the residential lease contract (the "Lease") between Resident and Owner. **Where the terms of the Lease and this Addendum may conflict, the terms of this Addendum shall control.**

3. **PURPOSE OF ADDENDUM.** The purpose of this Addendum is to provide you with notice that the apartment is located in a mixed-use living environment. The area surrounding the apartment contains both residences and commercial businesses. These commercial entities will produce certain noises, sounds, and odors up to twenty-four (24) hours a day.

4. **RESIDENT ACKNOWLEDGEMENT.** By signing this Addendum, Resident acknowledges, understands and hereby agrees:

   The apartment is located in the immediate area of commercial businesses, including, but not limited to, bars, nightclubs, restaurants and retail stores. Certain challenges may be associated with living in immediate proximity to such commercial businesses. These challenges may include these businesses emitting, but are not limited to: lights, noises, sounds (including but not limited to music, voices and other forms of entertainment), vibrations, odors and smoke, which may penetrate the walls and floors of the apartment. Such challenges may occur up to twenty-four (24) hours a day.

5. **RESIDENT DUE DILIGENCE.** Landlord has encouraged resident to research the area around their apartment. You agree that you were given the opportunity to exercise due diligence by reading this Addendum and researching the area surrounding the apartment. You acknowledge and understand the risks disclosed herein. Having conducted your due diligence, you agree to fully assume the risks set forth in this Addendum.

6. **ASSUMPTION OF RISK / WAIVER.** You have chosen to reside at the apartment despite any inconveniences such as those disclosed herein or any other inconvenience, which may be associated with living in a mixed-use environment. You further agree: You are voluntarily assuming the risks of inconvenience and nuisance related to residing in an apartment located in a mixed-use area. You agree that any inconvenience associated with the mixed-use and / or the surrounding area, such as, but not limited to, those disclosed herein, will not be deemed to give you any offset to rent obligations, nor will they be the basis for a complaint against us for rent relief, constructive eviction, fitness and habitability, peaceful and quiet enjoyment, nuisance, or any other claim, right or remedy. We shall have no duty to evict any commercial business for any lights, sounds, vibrations, odors, etc. that may occur as a result of their commercial business. As such, you waive any and all claims against us that arise out of or are in any way related to lights, noises, sounds, vibrations, smoke, odors or any other inconvenience that may be caused by commercial businesses within the mixed-use area and / or their guests.

7. **SEVERABILITY.** If any provision of this addendum or the Lease is invalid or unenforceable under applicable law, such provision shall be ineffective to the extent of such invalidity or unenforceability only without invalidating or otherwise affecting the remainder of this addendum or the Lease.

**Resident or Residents**
*(All residents must sign)*

_____

_____

_____

_____

**Owner or Owner's Representative**
*(Signs below)*

_____

**Date of Signing Addendum**

_____


Benjamin Levin
544708BD303849F...
43013589B3F44FF...
4EBAA48E5BA0487...

DocuSign Envelope ID: E33C303B-9131-45DF-B72E-AD4CCCAADD92

# NO-SMOKING ADDENDUM



Date: **August 6, 2018**
(when this Addendum is filled out)

*All use of any tobacco product involving smoking, burning, or combustion of tobacco is prohibited in any portion of the apartment community. You are entitled to receive an original of this No-Smoking Addendum after it is fully signed. Keep it in a safe place.*

1. **Dwelling Unit Description.** Unit No. **E214** ,
**1819 23rd Ave #E214** *(street address)* in **Seattle**
*(city)*, Washington, **98122** *(zip code).*

2. **Lease Contract Description**
Lease Contract date: **August 5, 2018**
Owner's name: **Madison Summit LLC**

Residents *(list all residents)*: **Christopher Berg,**

3. **Definition of Smoking.** Smoking refers to any use or possession of a cigar, cigarette, e-cigarette, hookah, vaporizer, or pipe containing tobacco or a tobacco product while that tobacco or tobacco product is burning, lighted, vaporized, or ignited, regardless of whether the person using or possessing the product is inhaling or exhaling the smoke from such product. The term tobacco includes, but is not limited to any form, compound, or synthesis of the plant of the genus Nicotiana or the species N. tabacum which is cultivated for its leaves to be used in cigarettes, cigars, e-cigarettes, hookahs, vaporizers, or pipes. Smoking also refers to use or possession of burning, lighted, vaporized, or ignited non-tobacco products if they are noxious, offensive, unsafe, unhealthy, or irritating to other persons.

4. **Smoking Anywhere Inside Buildings of the Apartment Community is Strictly Prohibited.** All forms and use of burning, lighted, vaporized, or ignited tobacco products and smoking of tobacco products inside any dwelling, building, or interior of any portion of the apartment community is strictly prohibited. Any violation of the no-smoking policy is a material and substantial violation of this Addendum and the Lease Contract.

The prohibition on use of any burning, lighted, vaporized, or ignited tobacco products or smoking of any tobacco products extends to all residents, their occupants, guests, invitees and all others who are present on or in any portion of the apartment community. The no-smoking policy and rules extend to, but are not limited to, the management and leasing offices, building interiors and hallways, building common areas, dwellings, club house, exercise or spa facility, tennis courts, all interior areas of the apartment community, commercial shops, businesses, and spaces, work areas, and all other spaces whether in the interior of the apartment community or in the enclosed spaces on the surrounding community grounds. Smoking of non-tobacco products which are harmful to the health, safety, and welfare of other residents inside any dwelling or building is also prohibited by this Addendum and other provisions of the Lease Contract.

**Smoking Outside Buildings of the Apartment Community.** Smoking is permitted only in specially designated areas outside the buildings of the apartment community. Smoking must be at least _____ feet from the buildings in the apartment community, including administrative office buildings. If the previous field is not completed, smoking is only permitted at least 25 feet from the buildings in the apartment community, including administrative office buildings. The smoking-permissible areas are marked by signage.

Smoking on balconies, patios, and limited common areas attached to or outside of your dwelling ☐ is ☒ is not permitted.

The following outside areas of the community may be used for smoking: **EXTERIOR SIDEWALKS 25 FEET OR MORE FROM LOBBY ENTRANCES**

Even though smoking may be permitted in certain limited outside areas, we reserve the right to direct that you and your occupants, family, guests, and invitees cease and desist from smoking in those areas if smoke is entering the dwellings or buildings or if it is interfering with the health, safety, or welfare or disturbing the quiet enjoyment, or business operations of us, other residents, or guests.

5. **Your Responsibility for Damages and Cleaning.** You are responsible for payment of all costs and damages to your dwelling, other residents' dwellings, or any other portion of the apartment community for repair, replacement, or cleaning due to smoking or smoke related damage caused by you or your occupants, family, guests, or invitees, regardless of whether such use was a violation of this Addendum. Any costs or damages we incur related to repairs, replacement, and cleaning due to your smoking or due to your violation of the no-smoking provisions of the Lease Contract are in excess of normal wear and tear. Smoke related damage, including but not limited to, the smell of tobacco smoke which permeates sheetrock, carpeting, wood, insulation, or other components of the dwelling or building is in excess of normal wear and tear in our smoke free apartment community.

6. **Your Responsibility for Loss of Rental Income and Economic Damages Regarding Other Residents.** You are responsible for payment of all lost rental income or other economic and financial damages or loss to us due to smoking or smoke related damage caused by you or your occupants, family, guests, or invitees which results in or causes other residents to vacate their dwellings, results in disruption of other residents' quiet enjoyment, or adversely affects other residents' or occupants' health, safety, or welfare.

7. **Lease Contract Termination for Violation of this Addendum.** We have the right to terminate your Lease Contract or right of occupancy of the dwelling for any violation of this No-Smoking Addendum. Violation of the no-smoking provisions is a material and substantial default or violation of the Lease Contract. Despite the termination of the Lease Contract or your occupancy, you will remain liable for rent through the end of the Lease Contract term or the date on which the dwelling is re-rented to a new occupant, whichever comes first. Therefore, you may be responsible for payment of rent after you vacate the leased premises even though you are no longer living in the dwelling.

8. **Extent of Your Liability for Losses Due to Smoking.** Your responsibility for damages, cleaning, loss of rental income, and loss of other economic damages under this No-Smoking Addendum are in addition to, and not in lieu of, your responsibility for any other damages or loss under the Lease Contract or any other addendum.

9. **Your Responsibility for Conduct of Occupants, Family Members, and Guests.** You are responsible for communicating this community's no-smoking policy and for ensuring compliance with this Addendum by your occupants, family, guests, and invitees.

**10. There Is No Warranty of a Smoke Free Environment.**
Although we prohibit smoking in all interior parts of the apartment community, there is no warranty or guaranty of any kind that your dwelling or the apartment community is smoke free. Smoking in certain limited outside areas is allowed as provided above. Enforcement of our no-smoking policy is a joint responsibility which requires your cooperation in reporting incidents or suspected violations of smoking. You must report violations of our no-smoking policy before we are obligated to investigate and act, and you must thereafter cooperate with us in prosecution of such violations.

This is an important and binding legal document. By signing this Addendum you are acknowledging that a violation could lead to termination of your Lease Contract or right to continue living in the dwelling. If you or someone in your household is a smoker, you should carefully consider whether you will be able to abide by the terms of this Addendum. Before signing you must advise us whether you or anyone who will be living in your dwelling is a smoker. You must check one of the following boxes.

❑ Neither you nor anyone who will be living in the dwelling is a smoker.

❑ Someone in my household is a smoker; however, we agree to follow your no-smoking policy.

**Resident or Residents**
*(All residents must sign here)*

_____

_____

_____

_____

**Owner or Owner's Representative**
*(Sign here)*

_____

Benjamin Levin



GREYSTAR®

# LEASE ADDENDUM
# LIABILITY INSURANCE REQUIRED OF RESIDENT

1. **Addendum.** This is an addendum to the Lease Contract for Apt. No. E214 in the Summit at Madison Park Apartments in Seattle (city) WA (state). The effective date of this addendum is 08/08/2018.

2. **Acknowledgment Concerning Insurance or Damage Waiver.** You acknowledge that we do not maintain insurance to protect you against personal injury, loss or damage to your personal property or belongings, or to cover your own liability for injury, loss or damage you (or your occupants or guests) may cause others. You also acknowledge that by not maintaining your own policy of personal liability insurance, you may be responsible to others (including us) for the full cost of any injury, loss or damage caused by your actions or the actions of your occupants or guests. You understand that paragraph 8 of the Lease Contract requires You to maintain a liability insurance policy, which provides limits of liability to third parties in an amount not less than $ 100,000 per occurrence. You will ensure that the liability insurance policy identifies this apartment community, C/O Greystar, P.O. Box 115009, Carrollton, TX 75011-5009 as a "Party of Interest" or "Interested Party" (or similar language as may be available). You understand and agree to maintain at all times during the Term of the Lease Contract and any renewal periods, a policy of personal liability insurance with this limit and otherwise satisfying the requirements listed below, at your sole expense.

3. **Required Policy**. You are required to purchase and maintain personal liability insurance covering you, your occupants and guests, for personal injury and property damage any of you cause to third-parties (including damages to our property), with the minimum policy coverage amount set forth in paragraph 2 above, from a carrier with an AM Best rating of A-VII or better, authorized to issue such insurance in (state). The Carrier must provide notice to us within 30 days of any cancellation, non-renewal, or material change in your coverage. We retain the right to hold you responsible for any loss in excess of your insurance coverage.

4. **No Solicitation.** Unless otherwise acknowledged in writing, you acknowledge that we have made no solicitations, guarantees, representations, or promises whatsoever concerning any insurance or services provided by any insurance company. You were and are free to contract for the required insurance with the provider of your choosing so long as that provider comports with the requirements of paragraph 3 above.

5. **Subrogation Allowed.** You and we agree that subrogation is allowed by all parties and that this agreement supersedes any language to the contrary in the Lease Contract. Accordingly, our insurance carrier may sue you for losses it pays as a result of your negligence, and your insurance carrier may sue us for losses it pays as a result of our negligence.

6. **Your Insurance Coverage.** By signing this addendum, you acknowledge that you have purchased (or will purchase) the insurance described in paragraphs 2 and 3, and that you will provide written proof of this insurance to on-site staff prior to taking possession of the apartment. You further acknowledge that you will keep this insurance policy in-force for the entire term of the lease and provide written proof of active renter's liability coverage upon request. If any material terms of your insurance policy change, you agree to promptly provide proof of the modified policy terms to the on-site staff. For the purposes of this paragraph, either the written policy itself or the declaration page to the policy shall constitute written proof.

7. **Default.** Unless otherwise prohibited by law, any default under the terms of this Addendum shall be deemed an immediate, material and incurable default under the terms of the Lease Contract, and we shall be entitled to exercise all rights and remedies under the law. If you allow your outside policy to expire or cancel, you will be in default under the terms of your lease. If you fail to provide written proof of insurance as required by paragraph 6, we reserve the right to procure coverage to address the deficiency and you agree to reimburse us in the form of a $15.00 Lease Violation Fee for all costs and administrative expenses associated with such a purpose. The Lease Violation Fee is not prorated. In addition, you will be listed on our Blanket Renter Protection Policy and will not receive a copy of the policy, as you are not the policy holder. We may continue to charge you for such insurance coverage until such time as you provide proof of insurance pursuant to paragraph 6.

8. **Miscellaneous.** Except as specifically stated in this Addendum, all other terms and conditions of the Lease Contract shall remain unchanged. In the event of any conflict between the terms of this Addendum and the terms of the Lease Contract, the terms of this Addendum shall control.

## IMPORTANT DISCLOSURES – READ CAREFULLY BEFORE SIGNING

1. **The insurance required by the Lease Contract is not required by any law. Your obligation to provide insurance stems solely from the Lease Contract.**
2. **The insurance required by the Lease is not an attempt to limit the Owner's liability for its own negligence or your liability for your own negligence.**
3. **Owner may be receiving remuneration from insurance companies where permitted by law. CAS Insurance Agency, a licensed affiliate of the property manager, may also receive compensation on policies issued by some insurance companies for administrative or marketing support.**
4. **The insurance required by the Lease Contract is not in lieu of, or in any way a component of, the security deposit required by the Lease Contract.**
5. **You understand that every term of the agreement between you and the Owner is set forth in the Lease Contract, any addenda thereto, and in the Rules and Regulations which collectively constitute the entire agreement between you and the Owner. There are no other terms except those which may be implied by law.**
6. **You agree that you have not received any oral representations from Owner or any representative of Owner which are inconsistent with or not contained in the Lease Contract, the addenda attached to the Lease Contract, or in the Rules and Regulations. If you have received any such oral representations, you agree that you did not rely on them to decide to enter in the Lease Contract or this Addendum.**

| **Resident or Residents** *[All residents must sign here]* | **Owner or Owner's Representative** *[signs here]* |
|---|---|
| DocuSigned by: [redacted] 43013589B3F44FF... | DocuSigned by: Benjamin Levin 544708BD303849F... |
| DocuSigned by: [redacted] 4EBAA48E5BA0487... | **Date of Lease Contract** |

Revised 8/6/2018

NATIONAL
APARTMENT
ASSOCIATION

# SEATTLE - LEASE CONTRACT ADDENDUM FOR
# ENCLOSED GARAGE, CARPORT, OR STORAGE UNIT

1. **Dwelling Unit Description.** Unit No. **E214**,
   **1819 23rd Ave #E214** _(street address)_
   in **Seattle** _(city)_,
   Washington, **98122** _(zip code)._

2. **Lease Contract Description.**
   Lease Contract date: **August 5, 2018**
   Owner's name: **Madison Summit LLC**

   Residents _(list all residents):_ **Christopher Berg,**
   ▮▮▮▮▮▮▮▮▮▮

3. **Garage, carport, or storage unit.** You are entitled to exclusive possession of: _(check as applicable)_
   ☒ garage or carport attached to the dwelling;
   ☒ garage space number(s) _____ ;
   ☐ carport space number(s) _____ ; and/or
   ☐ storage unit number(s) _____
   All terms and conditions of the Lease Contract apply to the above areas unless modified by this addendum.

4. **Security Deposit.** An additional security deposit of $ _____ will be charged for the checked areas above. We will consider this additional security deposit part of the general security deposit for all purposes. The security deposit amount in Provision 4 of the Lease Contract _(check one)_ ☐ does or ☐ does not include this additional deposit amount. This deposit is a general deposit and is not limited in use to damages caused within the checked areas above, and is subject to forfeiture as a general deposit.

5. **Additional Monthly Rent.** You will pay $ **150.00** as additional monthly charges for the item(s) checked above. The monthly rent amount in Paragraph 6 of the Lease Contract does not include this additional rent.

6. **Use restrictions.** Garage or carport may be used only for storage of operable motor vehicles unless otherwise stated in our rules or community policies. Storage units may be used only for storage of personal property. No one may sleep, cook, barbeque, or live in a garage, carport, or storage unit. Persons not listed as a resident or occupant in the Lease Contract may not use the areas covered by this Addendum. No plants may be grown in such areas.

7. **No dangerous items.** Items that pose an environmental hazard or a risk to the safety or health of other residents, occupants, or neighbors in our sole judgment or that violate any government regulation may not be stored. Prohibited items include fuel (other than in a properly capped fuel tank of a vehicle or a closed briquette lighter fluid container), fireworks, rags, piles of paper, or other material that may create a fire or environmental hazard. We may remove items from such areas, without prior notice, items that we believe might constitute a fire or environmental hazard. Because of carbon monoxide risks, you may not run the motor of a vehicle inside a garage unless the garage door is open to allow fumes to escape.

8. **No smoke, fire, or carbon monoxide detectors.** No smoke, fire, or carbon monoxide detectors will be furnished by us unless required by law.

9. **Garage door opener.** If an enclosed garage is furnished, you ☒ will ☐ will not be provided with a ☒ garage door opener and/or ☐ garage key. You will be responsible for maintenance of any garage door opener, including battery replacement. Transmitter frequency settings may not be changed on the garage door or opener without our prior written consent.

10. **Security.** Always remember to lock any door of a garage or storage unit and any door between a garage and the dwelling. When leaving, be sure to lock all keyed deadbolt locks.

11. **Insurance and loss/damage to your property.** You will maintain liability and comprehensive insurance coverage for any vehicle parked or stored. We are not responsible for pest control in such areas.

12. **Compliance.** We may periodically open and enter garages and storerooms to ensure compliance with this Addendum. In the event we enter the garage or storerooms, we will comply with the notice provisions set forth in the Lease Contract.

13. **No lock changes, alterations, or improvements.** Without our prior written consent, locks on doors of garages and storage units may not be rekeyed, added, or changed, and improvements, alterations, or electrical extensions or changes to the interior or exterior of such areas are not allowed. You may not place nails, screws, bolts, or hooks into walls, ceilings, floors, or doors. Any damage not caused by us or our representatives to areas covered by this Addendum will be paid for by you.

14. **Move-out and remedies.** Any termination of tenancy shall automatically terminate any right of storage or parking without further notice required. Any items remaining after you have vacated the dwelling will be removed, sold, or otherwise disposed of according to the Lease Contract, which addresses disposition or sale of property left in an abandoned or surrendered dwelling. All remedies in the Lease Contract apply to areas covered by this addendum.

15. **Special Provisions.** The following special provisions control over conflicting provisions of this printed form:
    **20 DAY WRITTEN NOTICE PRIOR TO THE END OF THE RENTAL MONTH TO TERMINATE PARKING AND/ OR STORAGE. FAILURE TO RETURN KEYS OR PERMITS THE LAST DAY OF THE MONTH MAY RESULT IN AN ADDITIONAL MONTH'S CHARGE. RESIDENTS WITH "RESERVED" PARKING ARE AUTHORIZED BY MANAGEMENT TO TOW UNAUTHORIZED VEHICLES OUT OF THEIR STALL IF SAID STALL NUMBER IS LISTED ON THIS ADDENDUM.**

**Resident or Residents**
_(All residents must sign here)_

_____

_____

_____

**Owner or Owner's Representative**
_(signs here)_

_____

**Date of Lease Contract**

**August 5, 2018**

DocuSign Envelope ID: E33C303B-9131-45DF-B72E-AD4CCCAADD92



# Information for Tenants

### TRANSLATIONS

*For copies of this document in Amharic, Cambodian, Chinese, Korean, Laotian, Oromiffa, Russian, Somali, Spanish, Tagalog, Thai, Tigrinya and Vietnamese, visit SDCI's website at www.seattle.gov/dpd/rentinginseattle or call (206) 684-8467.*

*This summary of Washington state and City of Seattle landlord/tenant regulations must be provided to tenants by owners of residential rental property located in Seattle on at least an annual basis. Please note that City and State laws may not be identical on any particular topic; therefore, both sets of laws should be consulted. For legal advice, please consult an attorney.*

*August 2017*

## Seattle Landlord-Tenant Laws

### OBLIGATIONS OF LANDLORDS

Building owners must provide safe, clean, secure living conditions, including:

- Keeping the premises fit for human habitation and keeping common areas reasonably clean and safe
- Controlling insects, rodents and other pests
- Maintaining roof, walls and foundation and keeping the unit weather tight
- Maintaining electrical, plumbing, heating and other equipment and appliances supplied by the owner
- Providing adequate containers for garbage and arranging for garbage pickup
- When responsible for providing heat in rental units, from September through June maintaining daytime (7:00 a.m.-10:30 p.m.) temperatures at 68°F or above and nighttime temperatures at not less than 58°F
- In non-transient accommodations, providing keys to unit and building entrance doors and, in most cases, changing the lock mechanism and keys upon a change of tenants
- Installing smoke detectors and instructing tenants in their maintenance and operation

Owners are not required to make cosmetic repairs after each tenancy, such as installing new carpets or applying a fresh coat of paint.

### OBLIGATIONS OF TENANTS

Tenants must maintain rental housing in a safe, clean manner, including:

- Properly disposing of garbage
- Exercising care in use of electrical and plumbing fixtures
- Promptly repairing any damage caused by them or their guests
- Granting reasonable access for inspection, maintenance, repair and pest control
- Maintaining smoke detectors in good working order
- Refraining from storing dangerous materials on the premises

### THE JUST CAUSE EVICTION ORDINANCE

This ordinance requires landlords to have good cause in order to terminate a month-to-month tenancy. It specifies the only reasons for which a tenant in Seattle may be required to move, and requires owners to state the reason, in writing, for ending a tenancy when giving a termination notice. A property owner cannot evict a tenant if the property is not registered with the City of Seattle. Unless otherwise noted, an owner must

### Table of Contents

**Seattle Landlord-Tenant Laws**

| | |
|---|---|
| *Obligations of landlords* | *1* |
| *Obligations of tenants* | *1* |
| *The Just Cause Eviction Ordinance* | *1* |
| *Actions considered to be harassment or retaliation* | *3* |
| *The Rental Agreement Regulation Ordinance* | *4* |
| *Other City ordinances that affect tenants and landlords* | *7* |

**Washington State Law**

| | |
|---|---|
| *Rights of All Tenants* | *8* |
| *Types of Rental Agreements* | *8* |
| *Illegal Discrimination* | *8* |
| *Liability* | *9* |
| *Illegal Provisions in Rental Agreements* | *9* |
| *Privacy—Landlord's Access to the Rental* | *9* |
| *Deposits and Other Fees* | *9* |
| *Landlord's Responsibilities* | *9* |
| *Tenant's Responsibilities* | *10* |
| *Threatening Behavior by a Tenant or Landlord* | *10* |
| *Making Changes to Month-to-Month Agreement* | *10* |
| *Making Changes to Leases* | *10* |
| *How to Handle Repairs* | *11* |
| *Illegal Landlord Actions* | *11* |
| *Ending the Agreement* | *12* |
| *Return of Deposits* | *12* |
| *Evictions* | *12* |
| *Abandonment* | *13* |
| *Receipts* | *15* |
| *Copies of Documents* | *15* |
| ***Voter Registration*** | ***15*** |

**Seattle Department of Construction and Inspections**

Case 3:23-md-03071    Document 590-3    Filed 10/09/23    Page 81 of 170    PageID #: 6361
700 Fifth Ave, Suite 2000, P.O. Box 34019, Seattle, WA 98124-4019 • (206) 684-8600 • www.seattle.gov/sdci
SDCI complies with the Americans with Disabilities Act. Accommodations for people with disabilities provided on request.

give a termination notice at least 20 days before the start of the next rental period. Good causes include:

1. The tenant fails to pay rent within 3 days of receiving a notice to pay rent or vacate.

2. The owner has notified the tenant in writing of overdue rent at least 4 times in a 12-month period.

3. The tenant does not comply with a material term of a lease or rental agreement within 10 days of receiving a notice to comply or vacate.

4. The tenant does not comply with a material obligation under the *Washington State Residential Landlord-Tenant Act* within 10 days of a notice to comply or vacate.

5. The owner has notified a tenant in writing at least 3 times in a 12-month period to comply within 10 days with a material term of the lease or rental agreement.

6. The tenant seriously damages the rental unit (causes "waste"), causes a nuisance (including drug-related activity), or maintains an unlawful business and does not vacate the premises within three days of notice to do so.

7. The tenant engages in criminal activity in the building or on the premises, or in an area immediately adjacent to the building or premises. The alleged criminal activity must substantially affect the health or safety of other tenants or the owner; illegal drug-related activity is one crime specified by the ordinance. An owner who uses this reason must clearly state the facts supporting the allegation, and must send a copy of the termination of tenancy notice to the SDCI Property Owner Tenant Assistance (POTA) Unit.

8. The owner wishes to occupy the premises personally, or the owner's immediate family will occupy the unit, and no substantially equivalent unit is vacant and available in the same building, and gives the tenant written notice at least 90 days prior to the end of a rental period. Immediate family includes the owner's spouse or owner's domestic partner, and the parents, grandparents, children, brothers and sisters of the owner or owner's spouse or owner's domestic partner. SDCI may require a property owner to sign a certification of the intent to have a family member move in if a tenant has reason to believe the owner will not follow through with this reason. It is a violation if the designated person does not occupy the unit for a continuous period of 60 days out of the 90 days after the tenant vacates. A tenant whose tenancy is ended for this reason has a private right of action if he or she feels the owner has failed to comply with these requirements.

9. The owner wishes to terminate a tenant who lives in the same housing unit with the owner or the owner's agent; or the owner desires to stop sharing his or her house with a tenant living in an approved accessory dwelling unit (ADU) in an owner-occupied house.

10. The tenant's occupancy is conditioned upon employment on the property and the employment is terminated.

11. The owner plans major rehabilitation and has obtained required permits and a Tenant Relocation License. A tenant terminated for this reason has a private right of action if he or she feels the owner has failed to comply with these requirements.

12. The owner decides to convert the building to a condominium or a cooperative.

13. The owner decides to demolish a building or to convert it to non-residential use and has obtained the necessary permit and a Tenant Relocation License.

14. The owner desires to sell a single family residence (does not include condominium units) and gives the tenant written notice at least 90 days prior to the end of a rental period. The owner must list the property for sale at a reasonable price in a newspaper or with a realty agency within 30 days after the date the tenant vacates. Property owners may be required to sign a certification of the intent to sell the house if SDCI receives a complaint. There is a rebuttable presumption of a violation if the unit is not listed or advertised, or is taken off the market or re-rented within 90 days after the tenant leaves. A tenant terminated for this reason has a private right of action if he or she feels an owner has failed to comply with these requirements.

15. The owner seeks to discontinue use of a unit not authorized under the Land Use Code, after receiving a Notice of Violation. The owner must pay relocation assistance to tenants who have to move so that the owner can correct the violation. Relocation assistance for low-income tenants is $2,000; for other tenants it is an amount equal to two months' rent.

16. The owner needs to reduce the number of tenants sharing a dwelling unit in order to comply with Land Use Code restrictions (i.e., no more than 8 people per dwelling unit if any are unrelated).

17. The owner must terminate a tenancy in a house containing an approved ADU in order to comply with the development standards for ADUs, after receiving a Notice of Violation of the Land Use Code. (If the violation is that the owner has moved out of the house and has rented both units, one unit must either be reoccupied by the owner or be removed.) The owner must pay relocation assistance to displaced tenants in the amount of $2,000 for low-income tenants, or two months' rent in other cases. SDCI may require a property owner to sign a certification of his or her intent to discontinue the use of the ADU.

18. An Emergency Order to Vacate and close the property has been issued by SDCI and the tenants have failed to vacate by the deadline given in the Order.

**Failure to carry out stated cause:** If an owner terminates a tenant because of (1) the sale of a single family residence is planned, (2) the owner or a family member is to move in, (3) substantial rehabilitation is planned, (4) the number of residents must be reduced to eight, or (5) the owner is discontinuing the use of an ADU after receipt of a notice of violation, and the owner fails to carry out the stated reason for terminating the tenancy, he or she may be subject to enforcement action by the City and a civil penalty of up to $2,500.

**Private right of action for tenants:** If an owner terminates a tenant because of (1) the sale of a single family residence is planned, (2) the owner or a family member is to move in, or (3) substantial rehabilitation is planned, and if the owner fails to carry out the stated reason for terminating the tenancy, the tenant can sue the owner for up to $3,000, costs, and reasonable attorney's fees.

For additional information on the Just Cause Eviction Ordinance, call SDCI at (206) 615-0808 or visit the SDCI website at www.seattle.gov/sdci.

## ACTIONS CONSIDERED TO BE HARASSMENT OR RETALIATION

City law prohibits retaliatory actions against either a tenant or a landlord.

A landlord is prohibited from harassing or retaliating against a tenant by:

1. Changing or tampering with locks on unit doors
2. Removing doors, windows, fuse box, furniture or other fixtures
3. Discontinuing utilities supplied by the owner
4. Removing a tenant from the premises except through the formal court eviction process
5. Evicting, increasing rent or threatening a tenant for reporting code violations to SDCI or the Police Department or for exercising any legal rights arising out of the tenant's occupancy
6. Entering a tenant's unit, except in an emergency, or except at reasonable times *with the tenant's consent* after giving at least two days notice, or a one-day notice when showing units to prospective purchasers or tenants
7. Prohibiting a tenant, or a tenant's authorized agent who is accompanied by that tenant, from distributing information in the building, posting information on bulletin boards in accordance with building rules, contacting other tenants, assisting tenants to organize and holding meetings in community rooms or common areas
8. Increase the monthly housing costs without advance written notice; 30 days for a rent increase of less than 10%, 60 days for a rent increase of 10% or more
9. Increase monthly housing costs where a housing unit does not meet basic standards for habitability

In most instances the law assumes that a landlord is retaliating if the landlord takes any of these actions within 90 days after a tenant reports a violation to SDCI or to the Seattle Police Department, or within 90 days after a governmental agency action, such as making an inspection.

A tenant is prohibited from harassing or retaliating against a landlord by:

1. Changing or adding locks on unit doors
2. Removing owner-supplied fixtures, furniture, or services
3. Willfully damaging the building

For more information or to file a complaint, call SDCI at (206) 615-0808.

## DEFINITION OF TENANT

With the exception of the Tenant Relocation Assistance Ordinance, a tenant is defined as a person occupying or holding possession of a building or premises pursuant to a rental agreement. This includes residents of transient lodgings who remain in residence for one month or longer. A rental agreement may be oral or in writing.

## DEFINITION OF HOUSING COSTS

Housing costs include rent and any other periodic or monthly fees such as storage, parking, or utilities, paid to the landlord by a tenant.

## INCREASE IN HOUSING COSTS

In the City of Seattle, a landlord must give a tenant 30 days' advance written notice of an increase in housing costs (rent, parking, storage, and other fees associated with the rental) of less than 10%; 60 days' notice is required for increases of 10% or more. An increase can only begin at the beginning of rental period, typically at the beginning of the month.

A landlord cannot increase housing costs for any housing unit that does not meet the minimum habitability standards of the Residential Rental Inspection Program. (http://www.seattle.gov/dpd/cs/groups/pan/@pan/documents/web_informational/s048492.pdf)

Property owners and developers cannot increase housing costs to avoid applying for a Tenant Relocation License where a rental property is going to be demolished, rehabilitated, changed in use, or where use restrictions are going to be removed. (http://www.seattle.gov/dpd/codesrules/commonquestions/tenantrelocation/default.htm)

DocuSign Envelope ID: E33C303B-9131-45DF-B72E-AD4CCCAADD92

## THE RENTAL AGREEMENT REGULATION ORDINANCE

The City of Seattle Rental Agreement Regulation Ordinance (SMC Chapter 7.24) regulates certain aspects of residential rental agreements. It requires a landlord to provide sixty (60) days' advance written notice of an increase in housing costs of 10% or more within a twelve (12) month period; prohibits month-to-month rental agreements that require a tenant to stay a minimum period greater than one (1) month or be subject to the loss of deposits or other penalties; limits the amount of security and pet damage deposits, and move-in fees that can be charged to a tenant upon move in; allows a tenant to pay security and pet damage deposits, move-fees, and last month's rent on installment plans; requires a landlord to take and return a deposit pursuant to state law; and to distribute a summary of state and local landlord-tenant laws prepared by the City of Seattle to each prospective tenant, to each tenant upon move-in, and at the time a rental agreement is renewed. A landlord cannot retaliate against a tenant or a prospective tenant for exercising or attempting to exercise the tenant's rights under this Ordinance. The Seattle Department of Construction and Inspections enforces this ordinance. For more information call the Department's Code Compliance Division at (206) 615-0808 or follow this link: http://www.seattle.gov/dpd/codesrules/commonquestions/rentalhousingproblems/default.htm

### Rent Increases

The City of Seattle does not regulate or control rent. However, the Rental Agreement Regulation Ordinance does require a landlord to provide at least sixty (60) days' advance written notice of any increase in housing costs of 10% or more in a twelve (12) month period; increases of less than 10% require an advance written notice of at least thirty (30) days consistent with state law. These notices must include information on how the tenant can access information on the tenant's rights and responsibilities. Housing costs include rent, parking and storage fees, and other periodic fees associated with a tenancy. Failure to provide a required sixty (60) day notice is a violation of SMC 7.24.030.A and SMC 22.206.180.

### Prohibited Rental Agreement Provisions

Month-to-month rental agreements, whether verbal or in writing, cannot require a tenant to stay beyond the initial period of the agreement. A landlord cannot withhold a deposit or impose other penalties solely on the basis that a tenant moves out at the end of the initial rental period.

However, a tenant who desires to terminate a month-to-month tenancy must provide the landlord with a written notice at least twenty (20) days in advance of the end of a rental period. Landlords are not obligat-ed to pro-rate rent when a tenant moves out after the beginning of a rental period.

### Security Deposits

If a landlord wishes to collect a security deposit, the deposit and its amount must be identified in a written rental agreement. The total amount of a security deposit and move-in fees cannot exceed the amount of the first full month's rent. Additionally, the landlord must prepare and provide a tenant with a written checklist or statement describing the condition, cleanliness, and existing damage of the tenant's housing unit at the commencement of the tenancy. This statement must be signed and dated by the landlord and the tenant. The landlord must provide a copy of the checklist to the tenant for the tenant's records, and, upon request, one free replacement copy.

All security deposits must be placed in a trust account and the landlord must provide the tenant with the name, address, and location of the depository. The landlord must inform the tenant of any subsequent changes of the location of the deposit.

Security deposits must be returned in accordance with RCW 59.18.280 at the end of a tenancy.

### Pet Damage Deposits

A landlord can charge a pet damage deposit, but it cannot exceed 25% of the first full month's rent. A pet damage deposit cannot be required for an animal if it serves as an assistance animal to the tenant. However, the tenant is responsible for any damage created by the tenant's assistance animal or the assistance animal of a guest of the tenant. A pet damage deposit may be charged in addition to any security deposit.

An agreement to pay a pet damage deposit must be included in a written rental agreement or in a written addendum to the agreement, identify the amount of the deposit, and allow the tenant to pay the deposit in installments if requested by the tenant.

If the pet's occupancy begins at the commencement of the tenancy, the deposit must be identified in the rental agreement. If the pet's occupancy begins after the commencement of the tenancy, the landlord must provide a written addendum to the rental agreement.

A landlord may not retain any portion of a pet damage deposit for damages not caused by the pet for which the tenant is responsible.

Pet damage deposits must be returned in accordance with RCW 59.18.280 at the end of a tenancy.

### Pet Rent

The payment of rent to keep a pet is allowed.

## Move-in Fees

Move-in fees are by state and city definition non-refundable.

Allowable move-in fees are limited to the cost of obtaining a tenant screening report, criminal background check, or credit report and to pay to clean the rental unit upon termination of a tenancy.

The cost for obtaining a tenant screening report cannot exceed the customary cost for obtaining such a report in the City of Seattle; a Landlord cannot charge a tenant more than the report's actual cost. The landlord must provide the tenant a receipt for any fees charged for obtaining the tenant screening report. The landlord must also provide the tenant the name and address of the reporting agency that prepared the report and the prospective tenant's right to obtain a free copy of it.

If the landlord chooses to charge a non-refundable cleaning fee, the landlord may not deduct additional cleaning fees from the tenant's security deposit at the end of a tenancy.

Landlords are prohibited from charging any one-time fee at the beginning of a tenancy other than a security deposit, pet damage deposit, an authorized non-refundable move-in fee, or last month's rent.

Move-in fees cannot exceed 10% of the first full month's rent except in the case where the actual cost for obtaining a tenant screening report, criminal background check, or credit report exceeds 10%, the cost may be included in the non-refundable fee. However, the total amount of a security deposit and move-in fees cannot exceed the amount of the first full month's rent.

## Summary of Limitations on Security Deposits, Pet Damage Deposits, and Move-In Fees

The total amount of a security deposit and move-in fees cannot exceed the amount of the first full month's rent. Non-refundable move-in fees cannot exceed 10% of the first full month's rent. A pet damage deposit may not exceed 25% of the rent for the first full month.

## Installment Payments

### Security Deposits and Move-In Fees

If the total amount of a security deposit and non-refundable move-in fees exceeds 25% of the first full month's rent, a tenant may choose to pay the total amount in installments as follows:

- For tenancies that are six (6) months or longer, a tenant may elect to pay in six (6) consecutive and equal monthly installments beginning at the commencement of the tenancy.
- For tenancies between thirty (30) days and six (6)

months, a tenant may elect to pay in no more than four (4) equal installments of equal duration at the commencement of the tenancy.
- For tenancies that are month-to-month, the tenant may elect to pay in two (2) equal installments, with the first payment due at the commencement of the tenancy and the second payment due on the first day of the second monthly rental period.

A tenant may propose an alternative installment schedule to which the landlord may agree. If an alternative plan is mutually agreed to, it must be described in a written rental agreement or a written addendum to the agreement. Failure to pay an installment of the security deposit and/or non-refundable fees is a breach of the rental agreement and may subject the tenant to a 10-day comply or vacate notice issued pursuant to RCW 59.12.030(4).

A landlord cannot impose any cost on a tenant for an installment plan.

The requirement to allow an installment plan for the payment of deposits and move-in fees does not apply to tenants who rent a housing unit in a single-family house or attached accessory dwelling unit if the owner resides in the house as the owner's principal residence.

### Last Month's Rent

Tenants may choose to pay last month's rent in installments.

For tenancies that are six (6) months or longer, a tenant may elect to pay in six (6) consecutive and equal monthly installments beginning on the first month of the tenancy; tenancies between sixty (60) days and six (6) months, the tenant may elect to pay in no more than four (4) equal installments of equal duration beginning at the commencement of the tenancy.

A tenant may propose an alternative installment schedule to which the landlord may agree. If an alternative plan is mutually agreed to, it must be described in a written rental agreement or a written addendum to the agreement.

A landlord cannot impose any cost on a tenant for an installment plan.

The requirement to allow an installment plan for the payment of last month's rent does not apply to tenants who rent a housing unit in a single-family house or attached accessory dwelling unit if the owner resides in the house as the owner's principal residence.

### Pet Damage Deposits

A tenant may elect to pay a pet damage deposit in three (3) equal monthly installments beginning on the first full month the pet occupies the housing unit. A tenant may propose an alternative installment schedule to which the

landlord may agree. If an alternative plan is mutually agreed to, it must be described in a written rental agreement or a written addendum to the agreement.

If a tenant wants to pay a security deposit, move-in fees, a pet damage deposit, or last month's rent in installments, the tenant must request such a payment plan.

## Summary of Landlord and Tenant Rights

A landlord must distribute a summary of state landlord tenant law and City of Seattle rental housing codes describing the rights, obligations, and remedies of landlords and tenants under these laws. This requirement can be met by distributing the current version of the Seattle Department of Construction and Inspections Publication *Information for Tenants*. This document must be given to each prospective tenant, to a tenant at the time a rental agreement is offered, and when a rental agreement is renewed. Month-to-month tenants must receive the most current version of this document at least once a year. When a rental agreement is renewed, *Information for Tenants* maybe be distributed electronically. The current version of *Information for Tenants* can be accessed at: awww. seattle.gov/dpd/cms/groups/pan/@pan/documents/web_informational/dpdd016420.pdf

If a landlord fails to distribute the summary in accordance with these requirements, a tenant may terminate the rental agreement by written notice. In addition, the tenant may recover, in a civil action against the landlord, actual damages, attorney fees, and a penalty of up to $500. If a court determines that the landlord deliberately failed to comply with this requirement, the penalty may be up to $1,000.

## Violations

A violation of the Rental Agreement Regulation Ordinance is subject to a citation in the amount of $500 for an initial violation and $1,000 for each subsequent violation occurring within five (5) years of the first violation. Citations can be appealed to the City of Seattle Hearing Examiner. Violations also are subject to a Notice of Violation after the issuance of two (2) citations.

## Tenant's Private Right of Action

If a landlord attempts to enforce provisions of a rental agreement which are contrary to:

1. The requirement that a rental agreement contain certain specific provisions;
2. The limitations imposed on security deposits, pet damage deposits, and non-refundable move-in fees; or
3. The requirement to adopt an installment payment plan

The landlord shall be liable to the tenant for:

1. Actual damages incurred by the tenant because of the landlord's attempted enforcement;
2. Double the amount of any penalties imposed by the City of Seattle;
3. Double the amount of any security deposit unlawfully charged or withheld by the landlord;
4. Up to $3,000; and
5. Reasonable attorney fees and court costs.

## Tenant Waiver of Rights or Remedies

No residential rental agreement, whether oral or written, can waive rights or remedies under the Rental Agreement Regulation Ordinance. However, a landlord and tenant may agree to waive certain specific requirements of the Ordinance. In order to do this, the following conditions must be met:

1. The agreement must specify in writing the specific provisions to be waived;
2. The agreement cannot appear in a standard form, lease, or rental agreement;
3. There can be no substantial inequity in the bargaining positions of the landlord and tenant; and
4. The tenant must be represented by an attorney who has approved the agreement as being in compliance with the requirements of the Ordinance.

## Exceptions

The provisions of this Ordinance limiting and restricting the amount of charges for security deposits and non-refundable move-in fees, and the payment of security deposits and move-fees on an installment basis do not apply to a tenant who rents a housing unit in a single-family residence if the residence is the principal residence of the property owner.

Also, exempted from regulation are the return or retention of a security deposit, the requirement to provide a unit condition checklist, and the requirement to place a security deposit in a trust account and disclose to the tenant the location of the account. However, the Washington State Residential Landlord-Tenant Act still regulates these requirements.

DocuSign Envelope ID: E33C303B-9131-45DF-B72E-AD4CCCAADD92

## OTHER CITY ORDINANCES THAT AFFECT TENANTS AND LANDLORDS

### 1. Open Housing and Public Accommodations Ordinance

This ordinance prohibits discrimination based on race, color, creed, religion, ancestry, national origin, age, sex, marital status, parental status, sexual orientation, gender identity, political ideology, participation in the Housing Choice Vouchers Program (Section 8), or disability; requires landlords to rent a housing unit on first-come-first-served basis; and to accept subsidies and alternative sources of income to pay for the tenant's housing costs. Inquiries about this ordinance and complaints of violations should be directed to the Seattle Office for Civil Rights at (206) 684-4500.

### 2. Condominium and Cooperative Conversion Ordinances

When a residential building is being converted to condominium or cooperative units, the Condominium and Cooperative Conversion ordinances require a housing code inspection.

Additionally, in a condominium conversion, a tenant must receive a written 120-day notice of the conversion. If the tenant decides not to buy his or her unit, the tenant may be eligible to receive the equivalent of three (3) months' rent in relocation assistance if the tenant's annual income, from all sources, does not exceed 80 percent of the area median income, adjusted for household size. A household which otherwise qualifies to receive relocation benefits and which includes a member sixty-five (65) years of age or older or an individual with "special needs," as defined in the ordinance, may qualify for additional assistance.

In a cooperative conversion, a tenant must receive a 120-day notice of intention to sell the unit. If the tenant decides not to buy his or her unit, the tenant must be paid $500.00 in relocation assistance.

Relocation assistance is paid directly to the tenant by the property owner or developer. The assistance must be paid no later than the date on which a tenant vacates his or her unit.

For further information, contact SDCI Code Compliance at (206) 615-0808.

### 3. Tenant Relocation Assistance Ordinance

This ordinance applies when tenants are displaced by housing demolition, change of use, substantial rehabilitation, or by removal of use restrictions from subsidized housing. A property owner who plans development activity must obtain a tenant relocation license and a building or use permit before terminating a tenancy. All tenants must receive a 90-day notice of the activity that will require them to move. Eligible low income tenants, whose annual income cannot exceed 50% of the area median income, receive cash relocation assistance. It is a violation of this ordinance to increase housing costs for the purpose of avoiding applying for a Tenant Relocation License. Call SDCI at (206) 615-0808 for more information.

### 4. Repair and Maintenance—Housing and Building Maintenance Code

This ordinance requires owners to meet certain minimum standards and keep buildings in good repair. If an owner does not make necessary repairs, a tenant can report needed repairs by calling SDCI at (206) 615-0808. If an inspector finds code violations, the owner will be required to make needed corrections.

### 5. Third Party Billing Ordinance

This ordinance defines rules for landlords who, by themselves or through private companies, bill tenants for City provided utilities (water, sewer, garbage, electric services) separately from their rent. The ordinance applies to all residential buildings having three or more housing units.

The rules require a landlord or billing agent to provide tenants with specific information about their bills and to disclose their billing practices, either in a rental agreement or in a separate written notice. It is a violation of the ordinance if a landlord imposes a new billing practice without appropriate notice.

A tenant can dispute a third-party billing by notifying the billing agent and explaining the basis for the dispute. This must be done within 30 days of receiving a bill. The billing agent must contact the tenant to discuss the dispute within 30 days of receiving notice of the dispute. A tenant can also file a complaint with the Seattle Office of the Hearing Examiner or take the landlord to court. If the Hearing Examiner or court rules in favor of the tenant, the landlord could be required to pay a penalty.

### 6. Rental Registration and Inspection Ordinance (RRIO)

The purpose of the Rental Registration and Inspection program is to ensure that all rental housing in the City of Seattle is safe and meets basic housing maintenance requirements. Beginning in 2014 all

owners of residential housing in Seattle, with certain limited exceptions, must register their properties with the City.  A registration is good for five years.  No tenant can be evicted from a property if the property is not registered with the City.  With a few exceptions, all properties must be inspected at least once every ten years.  These inspections can be conducted by City-approved inspectors or by City housing/zoning inspectors.  Information about the RRIO Program can be obtained by calling (206) 684-4110 or going to the program website at www.seattle.gov/RRIO.

# The Washington Residential Landlord-Tenant Act

## Chapter 59.18 RCW.
### GOOD FAITH OBLIGATION

State law requires landlords and tenants to act in good faith toward one another.

Most tenants who rent a place to live come under the Washington State Residential Landlord-Tenant Act. However, certain renters are specifically excluded from the law.

Residents who are generally not covered by the Act are:

- Renters of a space in a mobile home park are usually covered by the state's Mobile Home Landlord-Tenant Act (RCW 59.20). However, renters of both a space and a mobile home are usually covered by the residential law.
- Residents in transient lodgings such as hotels and motels; residents of public or private medical, religious, educational, recreational or correctional institutions; residents of a single family dwelling which is rented as part of a lease of agricultural land; residents of housing provided for seasonal farm work.
- Tenants with an earnest money agreement to purchase the dwelling.  Tenants who lease a single family dwelling with an option to purchase, if the tenant's attorney has approved the face of the lease.  Tenants who have signed a lease option agreement but have not yet exercised that option are still covered.
- Tenants who are employed by the landlord, when their agreement specifies that they can only live in the rental unit as long as they hold the job (such as an apartment house manager).
- Tenants who are leasing a single family dwelling for one year or more, when their attorney has approved the exemption.
- Tenants who are using the property for commercial rather than residential purposes.

## RIGHTS OF ALL TENANTS

Regardless of whether they are covered by the Residential Landlord-Tenant Act, all renters have these basic rights under other state laws: the Right to a livable dwelling; Protection from unlawful discrimination; Right to hold the landlord liable for personal injury or property damage caused by the landlord's negligence; Protection against lockouts and seizure of personal property by the landlord.

## TYPES OF RENTAL AGREEMENTS

**Month-to-Month Agreement.** This agreement is for an indefinite period of time, with rent usually payable on a monthly basis or other short term period. The agreement itself can be in writing or oral, but if any type of fee or refundable deposit is collected, the agreement must be in writing. [RCW 59.18.260]

A month-to-month agreement continues until the tenant gives the landlord written notice at least 20 days before the end of the rental period.  In the situation of a conversion to a condominium or a change in the policy excluding children the landlord must provide 90 days written notice to the tenant. [RCW 59.18.200] The rent can be increased or the rules changed at any time, provided the landlord gives the tenant written notice at least 30 days before the effective date of the rent increase or rule change. [RCW 59.18.140]

**Fixed Term Lease.**  A lease requires the tenant to stay for a specific amount of time and restricts the landlord's ability to change the terms of the rental agreement.  A lease must be in writing to be valid.  During the term of the lease, the rent cannot be raised or the rules changed unless both landlord and tenant agree.  Leases for longer than one year must be notarized.

## ILLEGAL DISCRIMINATION

Federal law prohibits most landlords from refusing to rent to a person or imposing different rental terms on a person because of race, color, religion, sex, handicap, familial status (having children or seeking custody of children), or national origin. [Fair Housing Act 42 USC s. 3601 et.seq. 1988]  State law recognizes protection to the same individuals as well as for marital status, creed, the presence of sensory, mental, or physical disability.  If you think you have been denied rental housing or have been the victim of housing discrimination file a written complaint with the Washington State Human Rights Commission. You may also file a complaint with the federal Fair Housing Section of the Department of Housing and Urban Development or your local city human rights department.

## LIABILITY

Once a tenant has signed a rental agreement, the tenant must continue to pay the rent to maintain eligibility to bring actions under this act. The tenant should also understand what he or she is responsible for in the maintenance of the property. While the landlord is responsible for any damage which occurs due to the landlord's negligence, the tenant must be prepared to accept responsibility for damages he or she causes.

## ILLEGAL PROVISIONS IN RENTAL AGREEMENTS

Some provisions which may appear in rental agreements or leases are not legal and cannot be enforced under the law. [RCW 59.18.230] These include:

- A provision which waives any right given to tenants by the Landlord-Tenant Act or that surrenders tenants' right to defend themselves in court against a landlord's accusations.
- A provision stating the tenant will pay the landlord's attorney's fees under any circumstances if a dispute goes to court.
- A provision which limits the landlord's liability in situations where the landlord would normally be responsible.
- A provision which requires the tenant to agree to a particular arbitrator at the time of signing the rental agreement.
- A provision allowing the landlord to enter the rental unit without proper notice.
- A provision requiring a tenant to pay for all damage to the unit, even if it is not caused by tenants or their guests.
- A provision that allows the landlord to seize a tenant's property if the tenant falls behind in rent.

## PRIVACY—LANDLORD'S ACCESS TO THE RENTAL [RCW 59.18.150]

The landlord must give the tenant at least a two day written notice of his intent to enter at reasonable times. However, tenants must not unreasonably refuse to allow the landlord to enter the rental where the landlord has given at least one-day's notice of intent to enter at a specified time to exhibit the dwelling to prospective or actual purchasers or tenants. The law says that tenants shall not unreasonably refuse the landlord access to repair, improve, or service the dwelling. In case of an emergency, or if the property has been abandoned, the landlord can enter without notice. The landlord still must get the tenant's permission to enter, even if the required advance notice has been given.

## DEPOSITS AND OTHER FEES

### Refundable deposits

Under the Landlord-Tenant Act, the term "deposit" can only be applied to money which can be refunded to the tenant. If a refundable deposit is collected, the law requires:

- The rental agreement must be in writing. It must say what each deposit is for and what the tenant must do in order to get the money back. [RCW 59.18.260]
- The tenant must be given a written receipt for each deposit. [RCW 59.18.270]
- A checklist or statement describing the condition of the rental unit must be filled out. The landlord and the tenant must sign it, and the tenant must be given a signed copy. [RCW 59.18.260]
- The deposits must be placed in a trust account in a bank or escrow company. The tenant must be informed in writing where the deposits are being kept. Unless some other agreement has been made in writing, any interest earned by the deposit belongs to the landlord. [RCW 59.18.270]

### Non-refundable fees

These will not be returned to the tenant under any circumstances. If a non-refundable fee is being charged, the rental agreement must be in writing and must state that the fee will not be returned. A non-refundable fee cannot legally be called a "deposit." [RCW 59.18.285]

## LANDLORD'S RESPONSIBILITIES [RCW 59.18.060]

The landlord must:

- Maintain the dwelling so it does not violate state and local codes in ways which endanger tenants' health and safety
- Maintain structural components, such as roofs, floors and chimneys, in reasonably good repair.
- Maintain the dwelling in reasonably weather tight condition
- Provide reasonably adequate locks and keys.
- Provide the necessary facilities to supply heat, electricity, hot and cold water
- Provide garbage cans and arrange for removal of garbage, except in single family dwellings
- Keep common areas, such as lobbies, stairways and halls, reasonably clean and free from hazards
- Control pests before the tenant moves in. The landlord must continue to control infestations except in single family dwellings, or when the infestation was caused by the tenant
- Make repairs to keep the unit in the same condition as when the tenant moved in—except for normal wear and tear
- Keep electrical, plumbing and heating systems in

- good repair, and maintain any appliances which are provided with the rental
- Inform the tenant of the name and address of the landlord or landlord's agent
- Supply hot water as reasonably required by tenant
- Provide written notice of fire safety and protection information and ensure that the unit is equipped with working smoke detectors when a new tenant moves in. (Tenants are responsible for maintaining detectors.) Except for single family dwellings, the notice must inform the tenant on how the smoke detector is operated and about the building's fire alarm and/or sprinkler system, smoking policy, and plans for emergency notification, evacuation and relocation, if any. Multifamily units may provide this notice as a checklist disclosing the building's fire safety and protection devices and a diagram showing emergency evacuation routes.
- Provide tenants with information provided or approved by the Department of Health about the health hazards of indoor mold, including how to control mold growth to minimize health risks, when a new tenant moves in. The landlord may give written information individually to each tenant, or may post it in a visible, public location at the dwelling unit property. The information can be obtained at www.doh.wa.gov/ehp/ts/IAQ/mold-notification.htm.
- Investigate if a tenant is engaged in gang-related activity when another tenant notifies the landlord of gang-related activity by serving a written notice and investigation demand to the landlord. [RCW 59.18.180]
- Provide carbon monoxide detectors.

## TENANT'S RESPONSIBILITIES [RCW 59.18.130]

A tenant is required to:

- Pay rent, and any utilities agreed upon
- Comply with any requirements of city, county or state regulations
- Keep the rental unit clean and sanitary
- Dispose of the garbage properly
- Pay for fumigation of infestations caused by the tenant
- Properly operate plumbing, electrical and heating systems
- Not intentionally or carelessly damage the dwelling
- Not permit "waste" (substantial damage to the property) or "nuisance" (substantial interference with other tenant's use of property)
- Maintain smoke and carbon monoxide detection devices including battery replacement
- Not engage in activity at the premises that is imminently hazardous to the physical safety of

other persons on the premises and that entails a physical assault on a person or unlawful use of a firearm or other deadly weapon resulting in an arrest [RCW 59.18.352]
- When moving out, restore the dwelling to the same conditions as when the tenant moved in, except for normal wear and tear

## THREATENING BEHAVIOR BY A TENANT OR LANDLORD (RCW 59.18.352 and 354)

If one tenant threatens another with a firearm or other deadly weapon, and the threatening tenant is arrested as a result of the threat, the landlord may terminate the tenancy of the offending tenant (although the landlord is not required to take such action). If the landlord does not file an unlawful detainer action, the threatened tenant may choose to give written notice and move without further obligation under the rental agreement. If a landlord threatens a tenant under similar circumstances, the tenant may choose to give notice and move. In both cases, the threatened tenant does not have to pay rent for any day following the date of leaving, and is entitled to receive a pro-rated refund of any prepaid rent.

## MAKING CHANGES TO THE MONTH-TO-MONTH AGREEMENT

Generally speaking, if the landlord wants to change the provisions of a month-to-month rental agreement, such as raising the rent or changing rules, the tenant must be given at least 30 days notice in writing. These changes can only become effective at the beginning of a rental period (the day the rent is due). Notice which is less than 30 days will be effective for the following rental period.

If the landlord wishes to convert the unit to a condominium, the tenant must be given a 90-day notice. [RCW 59.18.200]

## MAKING CHANGES TO A FIXED LEASE TERM

Under a lease, in most cases, changes during the lease term cannot be made unless both landlord and tenant agree to the proposed change.

**If the property is sold.** The sale of the property does not automatically end a tenancy. When a rental unit is sold, tenants must be notified of the new owner's name and address, either by certified mail, or by a revised posting on the premises. All deposits paid to the original owner must be transferred to the new owner, who must put them in a trust or escrow account. The new owner must promptly notify tenants where the deposits are being held.

## HOW TO HANDLE REPAIRS

A tenant must be current in the payment of rent including all utilities that the tenant has agreed in the rental agreement to pay before exercising any statutory remedies, such as repair options.  [RCW 59.18.080]

**Required Notice** [RCW 59.18.070]  When something in the rental unit needs to be repaired, the first step is for the tenant to give written notice of the problem to the landlord or person who collects the rent.

The notice must include the address and apartment number of the rental; the name of the owner, if known; and a description of the problem.  After giving notice, the tenant must wait the required time for the landlord to begin making repairs.  Those required waiting times are:  24 hours for no hot or cold water, heat or electricity, or for a condition which is imminently hazardous to life; 72 hours for repair of refrigerator, range and oven, or a major plumbing fixture supplied by landlord; 10 days for all other repairs.

**Tenant's Options** [RCW 59.18.090] If repairs are not started within the required time and if the tenant is paid up in rent and utilities, the following options can be used:

1)  Tenant can give written notice to the landlord and move out immediately. Tenants are entitled to a pro-rated refund of their rent, as well as the deposits they would normally get back.

2)  Litigation or arbitration can be used to work out the dispute.

3)  The tenant can hire someone to make the repairs. In many cases the tenant can have the work done and then deduct the cost from the rent. [RCW 59.18.100] (This procedure cannot be used to force a landlord to provide adequate garbage cans.)

    **An Important Note:** If the repair is one that has a 10-day waiting period, the tenant cannot contract to have the work done until 10 days after the landlord receives notice, or five days after the landlord receives the estimate, whichever is later.

    To follow this procedure a tenant must: Submit a good faith estimate from a licensed or registered tradesperson, if one is required, to the landlord. After the waiting period, the tenant can contract with the lowest bidder to have the work done. After the work is completed, the tenant pays the tradesperson and deducts the cost from the rent payment.  The landlord must be given the opportunity to inspect the work.  The cost of each repair cannot exceed one month's rent; total cost cannot exceed two month's rent in any 12-month period.

    If a large repair which affects a number of tenants needs to be made, the tenants can join together, follow the proper procedure, and have the work done.  Then each can deduct a portion of the cost from their rent.

4)  The tenant can make the repairs and deduct the cost from the rent, if the work does not require a licensed or registered tradesperson.  The same procedure is followed as for (2) above.  However, the cost limit is one half of one month's rent.

5)  Rent in Escrow - After notice of defective conditions, and after appropriate government certification of defect, and waiting periods have passed, then tenants may place their monthly rent payments in an escrow account.  It is wise to consult an attorney before taking this action.

## ILLEGAL LANDLORD ACTIONS

**Lockouts.** [RCW 59.18.290]  The law prohibits landlords from changing locks, adding new locks, or otherwise making it impossible for the tenant to use the normal locks and keys.  Even if a tenant is behind in rent, such lockouts are illegal.

A tenant who is locked out can file a lawsuit to regain entry.  Some local governments also have laws against lockouts and can help a tenant who has been locked out of a rental.  For more information contact your city or county government.

**Utility shutoffs.** [RCW 59.18.300]  The landlord may not shut off utilities because the tenant is behind in rent, or to force a tenant to move out.  Utilities may only be shut off by the landlord so that repairs may be made, and only for a reasonable amount of time.  If a landlord intentionally does not pay utility bills so the service will be turned off, that could be considered an illegal shutoff.  If the utilities have been shut off by the landlord, the tenant should first check with the utility company to see if it will restore service.  If it appears the shutoff is illegal, the tenant can file a lawsuit. If the tenant wins in court, the judge can award the tenant up to $100 per day for the time without service, as well as attorney's fees.

**Taking the tenant's property.** [RCW 59.18.310]  The law allows a landlord to take a tenant's property only in the case of abandonment.  A clause in a rental agreement which allows the landlord to take a tenant's property in other situations is not valid.  If the landlord does take a tenant's property illegally, the tenant may want to contact the landlord first.  If that is unsuccessful, the police can be notified.  If the property is not returned after the landlord is given a written request, a court could order the landlord to pay the tenant up to $100 for each day the property is kept — to a total of $1,000. [RCW 59.18.230(4)]

**Renting condemned property.** [RCW 59.18.085] The landlord may not rent units which are condemned or unlawful to occupy due to existing uncorrected code violations.  The landlord can be held liable for three months rent or treble damages, whichever is greater, as well as costs and attorneys fees for knowingly renting the property.

DocuSign Envelope ID: E33C303B-9131-45DF-B72E-AD4CCCAADD92

**Retaliatory actions.** [RCW 59.18.240 -.250] If the tenant exercises rights under the law, such as complaining to a government authority or deducting for repairs, the law prohibits the landlord from taking retaliatory action. Examples of retaliatory actions are raising the rent, reducing services provided to the tenant, or evicting the tenant. The law initially assumes that these steps are retaliatory if they occur within 90 days after the tenant's action, unless the tenant was in some way violating the statute when the change was received. If the matter is taken to court and the judge finds in favor of the tenant, the landlord can be ordered to reverse the retaliatory action, as well as pay for any harm done to the tenant and pay the tenant's attorney fees.

## ENDING THE AGREEMENT

**Proper Notice to Leave for Leases.** If the tenant moves out at the expiration of a lease, in most cases it is not necessary to give the landlord a written notice. However, the lease should be consulted to be sure a formal notice is not required. If a tenant stays beyond the expiration of the lease, and the landlord accepts the next month's rent, the tenant then is assumed to be renting under a month-to-month agreement.

A tenant who leaves before a lease expires is responsible for paying the rent for the rest of the lease term. However, the landlord must make an effort to re-rent the unit at a reasonable price. If this is not done, the tenant may not be liable for rent beyond a reasonable period of time.

**Proper Notice to Leave for Leases—Armed Forces Exception.** A lease can be terminated when the tenant is a member of the armed forces (including the national guard or armed forces reserve), if the tenant receives reassignment or deployment orders, provided the tenant informs the landlord no later than seven days after the receipt of such orders. In these circumstances, the tenancy may also be terminated by the tenant's spouse or dependent.

**Proper Notice to Leave for Month-to-Month Agreements.** When a tenant wants to end a month-to-month rental agreement, written notice must be given to the landlord.

The notice must be received at least 20 days before the end of the rental period (the day before the rent is due). The day which the notice is delivered does not count. A landlord cannot require a tenant to give more than 20 days notice when moving out. When a landlord wants a month-to-month renter to move out, a 20-day notice is required. If a tenant moves out without giving proper notice, the law says the tenant is liable for rent for the lesser of: 30 days from the day the next rent is due, or 30 days from the day the landlord learns the tenant has moved out. However, the landlord has a duty to try and find a new renter. If

the dwelling is rented before the end of the 30 days, the former tenant must pay only until the new tenant begins paying rent.

**Proper Notice to Leave for Month-to-Month Agreements—Armed Forces Exception.** A month-to-month tenancy can be terminated with less than 20 days written notice when the tenant is a member of the armed forces (including the national guard or armed forces reserve), if the tenant receives reassignment or deployment orders that do not allow for a 20-day notice. In these circumstances, the tenancy may also be terminated by the tenant's spouse or dependent.

**Victim Protection.** A tenant who has given written notice to the landlord that he or she or a household member was a victim of domestic violence, sexual assault or stalking, may immediately terminate a rental agreement when a valid order for protection has been violated or the tenant has notified the appropriate law enforcement officers of the violation. A copy of the order must be made available to the landlord. The tenant must terminate the rental agreement within 90 days of the act or event leading to the protection order or report to appropriate law enforcement. [RCW 59.18.570 - 590]

## RETURN OF DEPOSITS [RCW 59.18.280]

After a tenant moves out, a landlord has 21 days in which to return a deposit, or give the tenant a written statement of why all or part of the money is being kept. It is advisable for the tenant to leave a forwarding address with the landlord when moving out.

The rental unit should be restored to the same condition as when the tenant moved in, except for normal wear and tear. Deposits cannot be used to cover normal wear and tear; or damage that existed when the tenant moved in.

The landlord is in compliance if the required payment, statement, or both, are deposited in the U.S. Mail with First Class postage paid, within 21 days. If the tenant takes the landlord to court, and it is ruled that the landlord intentionally did not give the statement or return the money, the court can award the tenant up to twice the amount of the deposit.

## EVICTIONS

**For not paying rent.** If the tenant is even one day behind in rent, the landlord can issue a three-day notice to pay or move out. If the tenant pays all the rent due within three days, the landlord must accept it and cannot evict the tenant. A landlord is not required to accept a partial payment.

Information for tenants

**For not complying with the terms of the rental agreement.** If the tenant is not complying with the rental agreement (for example, keeping a cat when the agreement specifies no pets are allowed), the landlord can give a 10-day notice to comply or move out. If the tenant satisfactorily remedies the situation within that time, the landlord cannot continue the eviction process.

**For creating a "waste or nuisance."** If a tenant destroys the landlord's property, uses the premises for unlawful activity including gang- or drug-related activities, damages the value of the property or interferes with other tenant's use of the property, the landlord can issue a three-day notice to move out. The tenant must move out after this kind of notice. There is no option to stay and correct the problem.

**For violations within drug and alcohol free housing.** If a tenant enrolled in a program of recovery in drug and alcohol free housing for less than two years uses, possesses, or shares alcohol or drugs the landlord can give a three-day notice to move out. If the tenant cures the violation within one day, the rental agreement does not terminate. If the tenant fails to remedy the violation within one day, he or she must move out and the rental agreement is terminated. If the tenant engages in substantially the same behavior within six months, the landlord can give a three-day notice to move out and the tenant has no right to cure the subsequent violation.

**Notice.** In order for a landlord to take legal action against a tenant who does not move out, notice must be given in accordance with RCW 59.12.040.

If the tenant continues to occupy the rental in violation of a notice to leave, the landlord must then go to court to begin what is called an "unlawful detainer" action. If the court rules in favor of the landlord, the sheriff will be instructed to move the tenant out of the rental if the tenant does not leave voluntarily. The only legal way for a landlord to move a tenant physically out of a unit is by going through the courts and the sheriff's office.

## DESIGNATION OF AN INDIVIDUAL TO ACT ON BEHALF OF A TENANT UPON THE DEATH OF THE TENANT (RCW 59.18.590)

A tenant who is the sole occupant of a dwelling unit can designate a person to act on the tenant's behalf upon the death of the tenant independently or at the request of a landlord. The designation must be in writing separate from any rental agreement. It must include the designated person's name, mailing address, an address used for the receipt of electronic communications, a telephone number, and a signed statement authorizing the landlord in the event of the tenant's death (when the tenant is the sole occupant of the dwelling unit) to allow the designated person to access the tenant's dwelling unit, remove the tenant's property, receive refunds of amounts due to the ten-

ant, and to dispose of the tenant's property consistent with the tenant's last will and testament and any applicable intestate succession law, and a conspicuous statement that the designation remain in effect until it is revoked in writing by the tenant or replaced with a new designation. The designated person's right to act on the behalf of the deceased tenant terminates upon the appointment of a personal representative for the deceased tenant's estate or the identification of a person reasonably claiming to be a successor of the deceased tenant pursuant to law.

## ABANDONMENT RELATED TO FAILURE TO PAY RENT [RCW 59.18.310]

Abandonment occurs when a tenant has both fallen behind in rent and has clearly indicated by words or actions an intention not to continue living in the rental.

When a rental has been abandoned, the landlord may enter the unit and remove any abandoned property. It must be stored in a reasonably secure place. A notice must be mailed to the tenant saying where the property is being stored and when it will be sold. If the landlord does not have a new address for the tenant, the notice should be mailed to the rental address, so it can be forwarded by the U.S. Postal Service.

How long a landlord must wait before selling abandoned property depends on the value of the goods. If the total value of property is less than $250, the landlord must mail a notice of the sale to the tenant and then wait seven(7) days. Family pictures, keepsakes and personal papers cannot be sold until forty-five (45) days after the landlord mails the notice of abandonment to the tenant.

If the total value of the property is more than $250, the landlord must mail a notice of the sale to the tenant and then wait forty-five (45) days. Personal papers, family pictures, and keepsakes can be sold at the same time as other property.

The money raised by the sale of the property goes to cover money owed to the landlord, such as back rent and the cost of storing and selling the goods. If there is any money left over, the landlord must keep it for the tenant for one (1) year. If it is not claimed within that time, it belongs to the landlord.

If a landlord takes a tenant's property and a court later determines there had not actually been an abandonment, the landlord could be ordered to compensate the tenant for loss of the property, as well as paying court and attorney costs.

This procedure does not apply to the disposition of property of a deceased tenant. See "Abandonment Related to the Death of a Tenant" below.

## ABANDONMENT RELATED TO EVICTION [RCW 59.18.312]

When a tenant has been served with a writ of restitution in an eviction action, the tenant will receive written notification of the landlord's responsibilities regarding storing the tenant's property that is left behind after the premises is vacant. Tenants will be provided with a form to request the landlord store the tenants's property.

A landlord is required to store the tenant's property if the tenant makes a written request for storage within three (3) days of service of the writ of restitution or if the landlord knows that the tenant is a person with a disability that prevents the tenant from making a written request and the tenant has not objected to storage. The written request for storage may be served by personal delivery, or by mailing or faxing to the landlord at the address or fax number identified on the request form provided by the landlord.

After the Writ of Restitution has been executed, the landlord may enter the premises and take possession of any of the tenant's remaining belongings. Without a written request from the tenant, the landlord may choose to store the tenant's property or deposit the tenant's property on the nearest public property. If the landlord chooses to store the tenant's property, whether requested or not, it may not be returned to the tenant until the tenant pays the actual or reasonable costs of moving and storage, whichever is less within thirty (30) days.

If the total value of the property is more than $250, the landlord must notify the tenant of the pending sale by personal delivery or mail to the tenant's last known address. After thirty (30) days from the date of the notice, the landlord may sell the property, including personal papers, family pictures, and keepsakes and dispose of any property not sold.

If the total value of the property is $250 or less, the landlord must notify the tenant of the pending sale by personal delivery or mail to the tenant's last known address. After seven (7) days from the date of the notice, the landlord may sell or dispose of the property except for personal papers, family pictures, and keepsakes.

The proceeds from the sale of the property may be applied towards any money owed to the landlord for the actual and reasonable costs of moving and storing of the property, whichever is less. The costs cannot exceed the actual or reasonable costs of moving and storage, whichever is less. If there are additional proceeds, the landlord must keep it for the tenant for one (1) year. If no claim is made by the tenant for the recovery of the additional proceeds within one (1) year, the balance will be treated as abandoned property and deposited with the Washington State Department of Revenue.

See RCW 59.18.312.

## ABANDONMENT RELATED TO THE DEATH OF A TENANT (RCW 59.18.595)

When a landlord learns of the death of a tenant who is the sole occupant of a dwelling unit, the landlord must promptly mail or personally deliver a written notice to any known personal representative, designated person, emergency contact person, or known successor to the tenant. The notice must include the name of the deceased tenant and address of the dwelling unit, the approximate date of the tenant's death, the amount of the monthly rent and the date to which it is paid. The notice must include a statement that the tenancy will terminate 15 days from the date the notice is mailed or personally delivered, or the date through which the rent has been paid, whichever is later, unless during this 15 day period a tenant representative makes arrangements with the landlord to pay rent in advance for no more than 60 days from the date of the tenant's death in order to arrange for the removal of the deceased tenant's property, and that the tenancy will be over at the end of the period for which the rent has been paid. The notice must also include a statement that failure to remove the tenant's property before the tenancy is terminated or ends will permit the landlord to enter the dwelling unit and take possession of any property found on the premises, store it in a reasonably secure place, and charge the actual or reasonable costs, whichever is less, for moving and storage of the property, and that after appropriate notice, sell or dispose of the property as provided for in law. A copy of any designation of a person to act on the deceased tenant's behalf must be attached to the notice.

The landlord must turn over possession of the tenant's property to a tenant representative upon receipt of a written request if this request is made prior to the termination or end of the tenancy, or any other date agreed to by the parties. The tenant representative must provide to the landlord an inventory of all the removed property and a signed acknowledgement that the tenant representative has been given possession and not ownership of the property.

If a tenant representative has made arrangements to pay rent in advance, the landlord must mail this second notice to any known personal representative, designated person, emergency contact person, or known successor of the tenant, and to the deceased tenant at the dwelling unit address. This second notice must include the name, address, and telephone number or contact information for the tenant representative who made arrangements to pay rent in advance, the amount of rent paid in advance, and date through which the rent is paid. The notice must include a statement that the landlord may sell or dispose of the property on or after the date through which the rent is paid or at least 45 days after the second notice is

mailed, whichever date comes later, if the tenant representative does not claim or remove the property.

If the landlord places the property in storage, the landlord must mail a second written notice (if this has not already been done) to any known personal representative, designated person, emergency contact person, or known successor of the tenant, and to the deceased tenant at the dwelling unit address. This notice must include a statement that the landlord may sell or dispose of the property on or after a specified date that is at least 45 days after the second notice is mailed, if the tenant representative does not claim and remove the property.

The landlord must turn over possession of the deceased tenant's property to the tenant representative if a written request is made in a timely manner. The tenant representative must pay the actual or reasonable costs, whichever is less, of any moving and storage of the property, and provide to the landlord an inventory of all the removed property and a signed acknowledgement that the tenant representative has been given possession and not ownership of the property.

If a tenant representative does not contact the landlord or remove the deceased person's property in a timely manner, the landlord may sell or dispose of the stored property, except for personal papers and personal photographs. If the fair market value of the property is more than $1,000, the landlord must sell the property in a commercially reasonable manner. All unsold property must be disposed of in a reasonable manner. If the value of the stored property is less than $1,000, the landlord must dispose of the property in a reasonable manner.

The personal papers and photographs that are not claimed by a tenant representative must be retained for 90 days after the sale or disposal of the deceased tenant's property and must either be destroyed or held for benefit of any successor of the deceased tenant.

No landlord or an employee of the landlord may acquire, either directly or indirectly, a deceased tenant's property that is sold or otherwise disposed of. The landlord may apply the proceeds of the sale of the deceased tenant's property toward any money owed to the landlord for the actual and reasonable cost of moving and storing the property, whichever is less. If there is excess income, it must be held by the landlord for one year. If no claim is made on the excess income before the expiration of the one year period, the balance must be deposited with the Washington State Department of Revenue as abandoned property.

The landlord must refund to the tenant representative any unearned rent and give a full and specific statement of the basis for retaining any deposit together with the payment of any refund due to the deceased tenant within 14 days after the removal of the property by the tenant representative.

If a landlord knowingly violates these abandonment provisions, the landlord can be liable to the deceased tenant's estate for actual damages. The prevailing party in any action related to these requirements may recover costs and reasonable attorneys' fees.

## RECEIPTS

A landlord must provide a receipt for any payment made in the form of cash by a tenant. Upon the request of a tenant, a landlord must provide a receipt for any payment made by the tenant in a form other than cash. This includes payment for rent, deposits, fees, parking, storage, or any other costs associated with a tenancy. See RCW 59.18.063.

## COPIES OF DOCUMENTS

If a checklist describing the physical condition of a rental unit is completed pursuant to RCW 59.18.260 and SMC 7.24.030.C, a copy signed by both the landlord and the tenant must be provided to the tenant.

When there is a written rental agreement for a premises, the landlord must provide a fully executed copy to each tenant who signs the agreement. A landlord must provide one free replacement copy of the written agreement if requested by a tenant during the tenancy. See RCW 59.18.065.

## VOTER REGISTRATION INFORMATION

Attached to this publication is information related to registering to vote, and if already registered, how to update your address when you move. For more information go to www.kingcounty.gov/depts/elections.

DocuSign Envelope ID: E33C303B-9131-45DF-B72E-AD4CCCAADD92





# Your Voice Matters!

**www.kingcounty.gov/depts/elections**

DocuSign Envelope ID: E33C303B-9131-45DF-B72E-AD4CCCAADD92

# Welcome home!

**There's a lot to do when moving to a new home. Updating your voter registration is one of those important tasks to remember.**



## Already Registered?

**Here are 5 easy ways to update your address:**

- If you have a current Washington State driver license or state ID card, go online!

- Mail the registration form included in this *Information for Tenants* packet.

- E-mail elections@kingcounty.gov with your name, date of birth, old residential and mailing address, and your new residential and mailing address.

- Call 206-296-VOTE (8683). Services are available in 120 languages.

- Go in-person to King County Elections headquarters in Renton or the Voter Registration Annex in Seattle.

Remember to change your address at least 29 days before election day. Check the Voter's Calendar.



## Need to Register?

**There are 3 ways to register to vote:**

- If you have a current Washington State driver license or state ID card, go online!

- Mail the registration form included in this *Information for Tenants* packet.

- Go in-person to King County Elections headquarters in Renton or the Voter Registration Annex in Seattle.



**Seattle** Department of Construction & Inspections

Fold and seal, or use an envelope

## Instructions

**Use this form to register to vote or update your current registration.**

Print all information clearly using black or blue pen. Mail this completed form to your county elections office (address on back).

**Deadline**
This registration will be in effect for the next election if postmarked no later than the Monday four weeks before Election Day.

**Voting**
You will receive your ballot in the mail. Contact your county elections office for accessible voting options.

**Public Information**
Your name, address, gender, and date of birth will be public information.

**Notice**
Knowingly providing false information about yourself or your qualifications for voter registration is a class C felony punishable by imprisonment for up to 5 years, a fine of up to $10,000, or both.

**Public Benefits Offices**
If you received this form from a public benefits office, where you received the form will remain confidential and will be used for voter registration purposes only.

Registering or declining to register will not affect the assistance provided to you by any public benefits office. If you decline to register, your decision will remain confidential.

If you believe someone interfered with your right to register, or your right to privacy in deciding whether to register, you may file a complaint with the Washington State Elections Division.

**Contact Information**
If you would like help with this form, contact the Washington State Elections Division.

**web**  www.vote.wa.gov
**call**  (800) 448-4881
**email**  elections@sos.wa.gov
**mail**  PO Box 40229
Olympia, WA 98504-0229

For official use:

2 / 2016

fold in half →

# Washington State Voter Registration Form

Register online at www.myvote.wa.gov.

**1  Personal Information**

last            first            middle            suffix

date of birth (mm/dd/yyyy)                    gender

residential address in Washington            apt #

city                        ZIP

mailing address, if different

city                        state and ZIP

phone number (optional)        email address (optional)

**2  Qualifications**

If you answer *no*, do not complete this form.

○ yes  ○ no  **I am a citizen of the United States of America.**

○ yes  ○ no  **I will be at least 18 years old by the next election.**

**3  Military / Overseas Status**

○ yes  ○ no  **I am currently serving in the military.**
Includes National Guard and Reserves, and spouses or dependents away from home due to service.

○ yes  ○ no  **I live outside the United States.**

**4  Identification — Washington Driver License, Permit, or ID**

If you do not have a Washington driver license, permit, or ID, you may use the last four digits of your Social Security number to register.

x x x - x x -

**5  Change of Name or Address**

This information will be used to update your current registration, if applicable.

former last name        first            middle

former residential address        city            state and ZIP

**6  Declaration**

I declare that the facts on this voter registration form are true. I am a citizen of the United States, I will have lived at this address in Washington for at least thirty days immediately before the next election at which I vote, I will be at least 18 years old when I vote, I am not disqualified from voting due to a court order, and I am not under Department of Corrections supervision for a Washington felony conviction.

sign here

date here

-

DocuSign Envelope ID: E33C303B-9131-45DF-B72E-AD4CCCAADD92



**NATIONAL APARTMENT ASSOCIATION**

# SEATTLE - LEASE ADDENDUM
# FOR REMOTE CONTROL, CARD, OR CODE ACCESS GATE

1. **Dwelling Unit Description.** Unit No. **E214** ,
**1819 23rd Ave #E214** *(street address)*
in **Seattle** *(city)*,
Washington, **98122** *(zip code)*.

2. **Lease Contract Description.**
Lease Contract date: **August 5, 2018**
Owner's name: **Madison Summit LLC**

Residents *(list all residents):* **Christopher Berg,**

To the extent any terms of this Addendum conflict with the Lease Contract, the terms of this Addendum are controlling.

3. **Remote control/cards/code for gate access.**
   ☐ **Remote control for gate access.** Each person who is listed as a resident on the lease will be given a remote control at no cost to use during his or her residency.
   ☒ **Cards for gate access.** Each person who is listed as a resident on the lease will be given a card at no cost to use during his or her residency.
   ☐ **Code for gate access.** Each resident will be given, at no cost, an access code (keypad number) for the pedestrian or vehicular access gates. It is to be used only during your residency. We may change the access code at any time and will notify you of any such changes.

4. **Damaged, lost or unreturned remote controls, cards or code changes.**
   ☐ If a remote control is lost, stolen or damaged, a $ _____ fee will be charged for a replacement. If a remote control is not returned or is returned damaged when you move out, there will be a $ _____ deduction from the security deposit.
   ☒ If a card is lost, stolen or damaged, a $ **50.00** fee will be charged for a replacement card. If a card is not returned or is returned damaged when you move out, there will be a $ **50.00** deduction from the security deposit.
   ☐ We may change the code(s) at any time and notify you accordingly.

5. **Report damage or malfunctions.** Please immediately report to the office any malfunction or damage to gates, fencing, locks or related equipment.

6. **Follow written instructions.** We ask that you and all other occupants read the written instructions that have been furnished to you regarding the access gates. This is important because if the gates are damaged by you or other occupants, guests or invitees through negligence or misuse, you are liable for the damages under your lease, and collection of damage amounts will be pursued.

7. **Personal injury and/or personal property damage.** Except as specifically required by law, we have no duty to maintain the gates and cannot guaranty against gate malfunctions. We make no representations or guarantees to you concerning security of the community. Any measures, devices,or activities taken by us are solely for the benefit of us and for the protection of our property and interests, and any benefit to you of the same is purely incidental. Anything mechanical or electronic is subject to malfunction. Fencing, gates or other devices will not prevent all crime. No security system or device is foolproof or 100 percent successful in deterring crime. Crime can still occur. Protecting residents, their families, occupants, guests and invitees from crime is the sole responsibility of residents, occupants and law enforcement agencies. You should first call 911 or other appropriate emergency police numbers if a crime occurs or is suspected. We are not liable to any resident, family member, guest, occupant or invitee for personal injury, death or damage/loss of personal property from incidents related to perimeter fencing, automobile access gates and/or pedestrian access gates. We reserve the right to modify or eliminate security systems other than those statutorily required. You will be held responsible for the actions of any persons to whom you provide access to the community.

8. **Rules in using vehicle gates.**
   • Always approach entry and exit gates with caution and at a very slow rate of speed, and wait for gate to stop moving before proceeding under it.
   • Never stop your car where the gate can hit your vehicle as the gate opens or closes.
   • Never follow another vehicle into an open gate. Always use your card to gain entry.
   • Report to management the vehicle license plate number of any vehicle that piggybacks through the gate.
   • Never force the gate open with your car.
   • Never get out of your vehicle while the gates are opening or closing.
   • If you are using the gates with a boat or trailer, please contact management for assistance. The length and width of the trailer may cause recognition problems with the safety loop detector and could cause damage.
   • Do not operate the gate if there are small children nearby who might get caught in it as it opens or closes.
   • If you lose your card, please contact the management office immediately.
   • Do not give your card or code to anyone else.
   • Do not tamper with gate or allow your occupants to tamper or play with gates.

9. **Special Provisions.** The following special provisions control over conflicting provisions of this printed form:

**REPLACEMENT OR REISSUE OF PARKING PERMIT**
**$5.00.**

**Resident or Residents**
*(All residents must sign here)*

_____

_____

_____

_____

**Owner or Owner's Representative**
*(signs here)*

_____

**Date of Lease Contract**

**August 5, 2018**

Christopher Berg, Alexandria Johnson






# ADDENDUM PROHIBITING
# SHORT-TERM SUBLETTING OR RENTAL

1. **DWELLING UNIT DESCRIPTION.** Unit No. **E214** ,
**1819 23rd Ave #E214** _(street address)_
in **Seattle** _(city)_,
Washington, **98122** _(zip code)._

2. **LEASE CONTRACT DESCRIPTION.**
Lease Contract date: **August 5, 2018**
Owner's name: **Madison Summit LLC**

Residents _(list all residents)_: **Christopher Berg,**
▮▮▮▮▮▮▮▮▮▮▮▮

This document shall serve as an addendum ("the Addendum") to the Apartment Lease Contract (the "Lease") between Resident and Owner. **Where the terms of the Lease and this Addendum may conflict, the terms of this Addendum shall control.**

3. **SHORT TERM SUBLEASE OR RENTING PROHIBITED.** Without limiting the prohibition in the Lease on subletting and assignment and without limiting any of our rights or remedies, this Addendum to the Lease further supplements and defines the requirements and prohibitions contained in the Lease Contract between you and us. You are hereby strictly prohibited from subletting or renting to any third party, or allowing occupancy by any third party, of all or any portion of the dwelling, whether for an overnight use or duration of any length, without our prior written consent in each instance. This prohibition applies to overnight stays or any other stays arranged on Airbnb.com or other similar internet sites.

4. **PROHIBITION ON LISTING OR ADVERTISING DWELLING ON OVERNIGHT SUBLETTING OR RENTING WEBSITES.** You agree not to list or advertise the dwelling as being available for short term subletting or rental or occupancy by others on Airbnb.com or similar internet websites. You agree that listing or advertising the dwelling on Airbnb.com or similar internet websites shall be a violation of this Addendum and a breach of your Lease Contract.

5. **VIOLATION OF LEASE AGREEMENT.** Your Lease Contract allows for use of your dwelling as a private residence only and strictly prohibits conducting any kind of business in, from, or involving your dwelling unless expressly permitted by law. Separately, your Lease Contract prohibits subletting or occupancy by others of the dwelling for any period of time without our prior written consent. Permitting your dwelling to be used for any subletting or rental or occupancy by others (including, without limitation, for a short term), regardless of the value of consideration received or if no consideration is received, is a violation and breach of this Addendum and your Lease Contract.

6. **REMEDY FOR VIOLATION.** Any violation of this Addendum constitutes a material violation of the Lease Contract, and as such we may exercise any default remedies permitted in the Lease Contract, including termination of your tenancy, in accordance with local law. This clause shall not be interpreted to restrict our rights to terminate your tenancy for any lawful reason, or by any lawful method.

7. **RESIDENT LIABILITY.** You are responsible for and shall be held liable for any and all losses, damages, and/or fines that we incur as a result of your violations of the terms of this Addendum or the Lease Contract. Further, you agree you are responsible for and shall be held liable for any and all actions of any person(s) who occupy your dwelling in violation of the terms of this Addendum or the Lease Contract, including, but not limited to, property damage, disturbance of other residents, and violence or attempted violence to another person. In accordance with applicable law, without limiting your liability you agree we shall have the right to collect against any renter's or liability insurance policy maintained by you for any losses or damages that we incur as the result of any violation of the terms of this Addendum.

8. **SEVERABILITY.** If any provision of this Addendum or the Lease Contract is invalid or unenforceable under applicable law, such provision shall be ineffective to the extent of such invalidity or unenforceability only without invalidating or otherwise affecting the remainder of this Addendum or the Lease Contract. The court shall interpret the lease and provisions herein in a manner such as to uphold the valid portions of this Addendum while preserving the intent of the parties.

9. **SPECIAL PROVISIONS.** The following special provisions control over conflicting provisions of this printed form:

_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

**Resident or Residents**
_(All residents must sign)_

_____

_____

_____

Christopher Berg, Alexandria Johnson

**Owner or Owner's Representative**
_(Signs below)_

_____

**Date of Signing Addendum**

_____



Benjamin Levin

43013589B3F44FF...   4EBAA48E56A0487...   544708BD303849F...

## Lease Application Agreement
## Summit at Madison Park
**Date when submitted: <u>7/12/2018</u>**

## Resident Information
| | |
|---|---|
| Name: | Christopher Berg |
| Other Residents: | |
| Site Address: | 1819 23rd Ave<br>Seattle, WA 98122 |
| Applied: | 7/12/2018 |
| Lease Move-In Date: | 8/8/2018 |
| Lease Start: | 8/8/2018 |
| Lease End: | 11/7/2019 |

## Lease Application
| | |
|---|---|
| Name: | Christopher Berg |
| Date Of Birth: | |
| SSN/ITIN: | |
| Est. Annual Income: | |
| Other Annual Income: | |
| Driver's License: | |
| Home Phone: | |
| Work Phone: | |
| Work Phone Ext: | |
| Mobile: | |
| Fax: | |
| Email: | @gmail.com |

## Emergency Contact
| | |
|---|---|
| Name: | |
| Relationship: | |
| Address: | |
| Home Phone: | |
| Work Phone: | |
| Mobile: | |
| Fax: | |
| Email: | |

In the event of serious illness, death, or other circumstances that would make you unavailable, the emergency contact can remove your property from your unit or the common areas: Yes

## Current Residence


| | |
|---|---|
| Residence/Mortgage Company: | |
| Rent/Own/NA: | |
| Address: | |
| Rent Amount: | |
| Manager/Contact: | |
| Move-In Date: | |
| Move-Out Date: | |
| Phone: | |
| Reason for leaving: | |
| Fax: | |
| Email: | |



## Current Employer

Employer Name:
Address:

Job Title:
Job Type:
Est. Annual Income:
Start Date:
End Date:
Supervisor Name:
Phone:
Fax:
Email:



## Previous Employer

Employer Name:
Address:

Job Title:
Job Type:
Est. Annual Income:
Start Date:
End Date:
Supervisor Name:
Phone:
Fax:
Email:

## Rental Criteria

In order to assist you with your decision on your new home, we are providing this list of the requirements we use to qualify applicants for residency in this community. Nothing contained in these requirements shall constitute a representation that all residents and occupants currently residing in our community have met or currently meet these guidelines. Each person age 18 or older who will live in the apartment home must submit an application and satisfy these requirements. Subject to applicable laws, our requirements include, but are not limited to, the following criteria:

**IDENTIFICATION.** Applicants must present a valid government issued photo identification card for each person age 18 or older.

**INCOME.** Applicants must collectively have verifiable income in an amount not less than 3 times the rental rate.

**CREDIT HISTORY.** We obtain a credit report on each applicant. Our credit reporting agency evaluates credit (which may include rent payment history) as an indicator of future rent payment performance. An unsatisfactory or insufficient finding will result in the requirement of an additional deposit, guarantor, or denial. Applicants are responsible for ensuring their credit history is accurate.

**GUARANTORS.** If a guarantor is needed, he/she must meet the entire qualifying criteria as presented above. All guarantors must have a verifiable source of income in an amount not less than 5 times the rental rate.



**ADULT DEPENDENT**. If there is a person age 18 or older who will reside in the apartment home but who will not be executing the lease documents, that person will need to qualify as an "Adult Dependent." In order to qualify someone as an Adult Dependent, you must execute the Adult Dependent Certification, and the proposed Adult Dependent must be approved through our regular criminal background check and credit screening process. The leaseholder(s) will be responsible for ensuring that the Adult Dependent complies with all community rules and requirements in the lease documents, but the Adult Dependent will not be financially obligated to pay rent or other amounts due under the lease documents.

**CRIMINAL HISTORY**. We obtain a criminal background check on each applicant who will reside in the apartment. It is possible your application will be denied due to criminal convictions.

**OCCUPANCY**. The following occupancy standards apply based on two persons per bedroom, plus one per apartment:

| One Bedroom | Three Persons |
|---|---|
| One Bedroom with Den | Three Persons |
| Two Bedroom | Five Persons |
| Three Bedroom | Seven Persons |
| Four Bedroom | Nine Persons |

**PETS.** The following breeds are restricted from our Greystar community. Additional Pet and Breed Restrictions may apply at this community. If you have pets, please see your leasing representative for more information. These restrictions and deposit requirements do not apply to qualified assistance animal

| Pit Bull Terriers/Staffordshire Terriers | Rottweilers |
|---|---|
| Doberman Pinschers | Chows |
| Presa Canarios | Akitas |
| Alaskan Malamutes | Wolf Hybrids |

**RENTER'S INSURANCE REQUIREMENT**. You may be required to carry a minimum of $100,000 Personal Liability Insurance coverage. To satisfy this requirement, you must provide evidence of insurance coverage at initial lease signing and maintain this coverage throughout the entire term of your residency. In addition, we may require that you add our community as an "Interested Party," "Party of Interest," or similar language. Your lease will have additional details about the insurance requirements.

**FAIR HOUSING STATEMENT.** Greystar is committed to compliance with all federal, state, and local fair housing laws. Greystar will not discriminate against any person because of race, color, religion, national origin, sex, familial status, disability, or any other specific classes protected by applicable laws. Greystar will allow any reasonable accommodation or reasonable modification based upon a disability-related need. The person requesting any reasonable modification may be responsible for the related expense.

**DATA AND COMMUNICATION.** You understand and accept that we may collect, retain, use, transfer, and disclose personal information, such as the first name, last name, email address, and phone number of you or your occupants in the unit. We may collect, retain, and use that information, or disclose that information to third parties to, among other things, (a) operate the Property; (b) provide services consistent with the Lease; (c) refer you to third parties that provide products or services that may be of interest to you or your occupants in the unit; (d) collect debts; and (e) conduct and analyze resident surveys. Please review the privacy policy of the owner's authorized agent at the time of residence for a discussion of the treatment of information during your lease. The current policy may be viewed at https://www.greystar.com/privacy.

By providing an email address or cell phone number, you consent to receive communications regarding marketing materials, promotional offers, and your application status via e-mail, voicemail, calls, text, and/or any other means. You acknowledge and agree that this authorization is made voluntarily.

The permissions and consents granted herein apply to the owner of the community and the owner's authorized agents/representatives, including its property manager, and will continue even after your lease expires, the owner of the community sells the community, or the property manager no longer manages the community.

**RENTAL RATES AND LEASE TERMS.** Original rental rate quotes will be honored for 2 business days. The rental rate quote is associated with the apartment's availability at the time of your quote, move-in date, and lease term requested. **Any changes to the time of the quote, your move-in date, or lease term may require a revised rental rate quote which may result in a different monthly rental rate.**

**FALSIFICATION OF APPLICATION**: Any false statements or false information included in an application may result in denial of the application.

**APPLICANT APPROVAL ACKNOWLEDGEMENT.** Applicant acknowledges and agrees that the criteria referenced above will be considered in the qualification process. Applicants who do not meet the requirements referenced above will be declined or be subject to additional requirements, including, but not limited to, additional fees, deposits, rent or providing a guarantor.

## Terms And Conditions
**You declare you understand the following regarding fees and deposits:**



◆     A non-refundable application fee, a non-refundable administrative fee, and an online application deposit will be necessary to hold your new apartment. Once the pre-qualification process is completed and your application is approved, the application deposit will be credited toward the required security deposit.

◆     If your application is denied, the application deposit and administrative fee will be refunded.

◆     You may not withdraw your application or application deposit. If you withdraw your application or change your mind about renting the apartment home, we'll be entitled to retain all application fees, application deposits and administrative fees as liquidated damages, and will have no further obligations to one another.

1.  **Lease Contract Information. The Lease Contract contemplated by the parties is attached or, if no Lease Contract is attached, the Lease Contract will be the current Lease Contract terms noted above. Special information and conditions must be explicitly noted within the Lease Contract or in the Contemplated Lease Information.**

2.  **Application Fee (nonrefundable). You have delivered to our representative a nonrefundable application fee in the amount indicated in paragraph 14 below, and this payment partially defrays the cost of administrative paperwork.**

3.  **Application Deposit (may or may not be refundable). In addition to any application fee, you have delivered to our representative an application deposit in the amount indicated in paragraph 14. The application deposit is not a security deposit. However, it will be credited toward the required security deposit when the Lease Contract has been signed by all parties; OR it will be refunded under paragraph 10 if you are not approved; OR it will be retained by us as liquidated damages if you fail to sign or attempt to withdraw under paragraph 6 or 7.**

4.  **Approval When Lease Contract Is Signed in Advance. If you and all co-applicants have already signed the Lease Contract when we approve the Application, our representative will notify you (or one of you if there are co-applicants) of our approval, sign the Lease Contract, and then credit the application deposit of all applicants toward the required security deposit.**

5.  **Approval When Lease Contract Isn't Yet Signed. If you and all co-applicants have not signed the Lease Contract when we approve the Application, our representative will notify you (or one of you if there are co-applicants) of the approval, sign the Lease Contract when you and all co-applicants have signed, and then credit the application deposit of all applicants toward the required security deposit.**

6.  **If You Fail to Sign Lease After Approval. Unless we authorize otherwise in writing, you and all co-applicants must sign the Lease Contract within 3 days after we give you our approval. If you fail to sign as required, we may keep the application deposit as liquidated damages, and terminate all further obligations under this Agreement.**

7.  **If You Withdraw Before Approval. You may not withdraw your Application or the application deposit. If, before signing the Lease Contract, you withdraw an Application or notify us that you've changed your mind about renting the dwelling unit, we'll be entitled to retain all application deposits as liquidated damages, and the parties will then have no further obligation to each other.**

8.  **Completed Application. An Application will not be considered "completed" and will not be processed until all of the following have been provided: a separate Application has been fully**



filled out and signed by you and each co-applicant; an application fee has been paid to us; An application deposit has been paid to us.

**9. Nonapproval in Seven Days.** We will notify you whether you've been approved within seven days after the date we receive a completed Application. Your Application will be considered "disapproved" if we fail to notify you of your approval within seven days after we have received a completed Application. You must not assume approval until you receive actual notice of approval.

**10. Refund after Nonapproval.** If you or any co-applicant is disapproved or deemed disapproved under paragraph 9, we'll refund all application deposits within 30 days of disapproval. Refund checks may be made payable to all co-applicants and mailed to one applicant.

**11. Extension of Deadlines.** If the deadline for signing, approving, or refunding falls on a Saturday, Sunday, or a state or federal holiday, the deadline will be extended to the end of the next day.

**12. Notice to or from Co-applicants.** Any notice we give you or your co-applicant is considered notice to all co-applicants; and any notice from you or your co-applicant is considered notice from all co-applicants.

**13. Keys or Access Devices.** We'll furnish keys and/or access devices only after: (1) all parties have signed the contemplated Lease Contract and other rental documents; and (2) all applicable rents and security deposits have been paid in full.

**14. Signature.** Our representative's signature is consent only to the above application agreement. It does not bind us to accept applicant or to sign the proposed Lease Contract.

## Application Authorization

By clicking the **"I Agree"** button, you agree and accept to be bound by the above lease and rental application terms and conditions.

**Lease Application Agreement**
**Summit at Madison Park**
Date when submitted: <u>7/12/2018</u>

## Resident Information

Name:
Other Residents:    Christopher Berg
Site Address:    1819 23rd Ave
   Seattle, WA 98122
Applied:    7/12/2018
Lease Move-In Date:    8/8/2018
Lease Start:    8/8/2018
Lease End:    11/7/2019

## Lease Application

Name:
Date Of Birth:
SSN/ITIN:
Est. Annual Income:
Other Annual Income:
Driver's License:
Home Phone:
Work Phone:
Work Phone Ext:
Mobile:
Fax:
Email:

## Emergency Contact

Name:    Christopher Berg
Relationship:
Address:

Home Phone:
Work Phone:
Mobile:
Fax:
Email:
In the event of serious illness, death, or other circumstances that would make you unavailable, the emergency contact can remove your property from your unit or the common areas: Yes

## Current Residence

Residence/Mortgage Company:
Rent/Own/NA:
Address:

Rent Amount:
Manager/Contact:
Move-In Date:
Move-Out Date:
Phone:
Reason for leaving:
Fax:
Email:




## Current Employer

Employer Name:
Address:





Job Title:
Job Type:
Est. Annual Income:
Start Date:
End Date:
Supervisor Name:
Phone:
Fax:
Email:

## Previous Employer

Employer Name:
Address:





Job Title:
Job Type:
Est. Annual Income:
Start Date:
End Date:
Supervisor Name:
Phone:
Fax:
Email:

## Vehicle Information

Type:              CAR
Color:             Black
Make:              Honda
License plate:     ▉▉▉▉▉
License state:     OR
Model:             Civic
Model year:        2008
Notes:

## Rental Criteria

In order to assist you with your decision on your new home, we are providing this list of the requirements we use to qualify applicants for residency in this community. Nothing contained in these requirements shall constitute a representation that all residents and occupants currently residing in our community have met or currently meet these guidelines. Each person age 18 or older who will live in the apartment home must submit an application and satisfy these requirements. Subject to applicable laws, our requirements include, but are not limited to, the following criteria:

**IDENTIFICATION.** Applicants must present a valid government issued photo identification card for each person age 18 or older.

**INCOME.** Applicants must collectively have verifiable income in an amount not less than 3 times the rental rate.

**CREDIT HISTORY.** We obtain a credit report on each applicant. Our credit reporting agency evaluates credit (which may include rent payment history) as an indicator of future rent payment performance. An unsatisfactory or insufficient finding will result in the requirement of an additional deposit, guarantor, or denial. Applicants are responsible for ensuring their credit history is accurate.

**GUARANTORS.** If a guarantor is needed, he/she must meet the entire qualifying criteria as presented above. All guarantors must have a verifiable source of income in an amount not less than 5 times the rental rate.

**ADULT DEPENDENT.** If there is a person age 18 or older who will reside in the apartment home but who will not be executing the lease documents, that person will need to qualify as an "Adult Dependent." In order to qualify someone as an Adult Dependent, you must execute the Adult Dependent Certification, and the proposed Adult Dependent must be approved through our regular criminal background check and credit screening process. The leaseholder(s) will be responsible for ensuring that the Adult Dependent complies with all community rules and requirements in the lease documents, but the Adult Dependent will not be financially obligated to pay rent or other amounts due under the lease documents.

**CRIMINAL HISTORY.** We obtain a criminal background check on each applicant who will reside in the apartment. It is possible your application will be denied due to criminal convictions.

**OCCUPANCY.** The following occupancy standards apply based on two persons per bedroom, plus one per apartment:

| | |
|---|---|
| One Bedroom | Three Persons |
| One Bedroom with Den | Three Persons |
| Two Bedroom | Five Persons |
| Three Bedroom | Seven Persons |
| Four Bedroom | Nine Persons |

**PETS.** The following breeds are restricted from our Greystar community. Additional Pet and Breed Restrictions may apply at this community. If you have pets, please see your leasing representative for more information. These restrictions and deposit requirements do not apply to qualified assistance animal

| | |
|---|---|
| Pit Bull Terriers/Staffordshire Terriers | Rottweilers |
| Doberman Pinschers | Chows |
| Presa Canarios | Akitas |
| Alaskan Malamutes | Wolf Hybrids |

**RENTER'S INSURANCE REQUIREMENT.** You may be required to carry a minimum of $100,000 Personal Liability Insurance coverage. To satisfy this requirement, you must provide evidence of insurance coverage at initial lease signing and maintain this coverage throughout the entire term of your residency. In addition, we may require that you add our community as an "Interested Party," "Party of Interest," or similar language. Your lease will have additional details about the insurance requirements.

**FAIR HOUSING STATEMENT.** Greystar is committed to compliance with all federal, state, and local fair housing laws. Greystar will not discriminate against any person because of race, color, religion, national origin, sex, familial status, disability, or any other specific classes protected by applicable laws. Greystar will allow any reasonable accommodation or reasonable modification based upon a disability-related need. The person requesting any reasonable modification may be responsible for the related expense.

**DATA AND COMMUNICATION.** You understand and accept that we may collect, retain, use, transfer, and disclose personal information, such as the first name, last name, email address, and phone number of you or your occupants in the unit. We may collect, retain, and use that information, or disclose that information to third parties to, among other things, (a) operate the Property; (b) provide services consistent with the Lease; (c) refer you to third parties that provide products or services that may be of interest to you or your occupants in the unit; (d) collect debts; and (e) conduct and analyze resident surveys. Please review the privacy policy of the owner's authorized agent at the time of residence for a discussion of the treatment of information during your lease. The current policy may be viewed at https://www.greystar.com/privacy.

By providing an email address or cell phone number, you consent to receive communications regarding marketing materials, promotional offers, and your application status via e-mail, voicemail, calls, text, and/or any other means. You acknowledge and agree that this authorization is made voluntarily.

The permissions and consents granted herein apply to the owner of the community and the owner's authorized agents/representatives, including its property manager, and will continue even after your lease expires, the owner of the community sells the community, or the property manager no longer manages the community.

**RENTAL RATES AND LEASE TERMS.** Original rental rate quotes will be honored for 2 business days. The rental rate quote is associated with the apartment's availability at the time of your quote, move-in date, and lease term requested. **Any changes to the time of the quote, your move-in date, or lease term may require a revised rental rate quote which may result in a different monthly rental rate.**

**FALSIFICATION OF APPLICATION:** Any false statements or false information included in an application may result in denial of the application.



**APPLICANT APPROVAL ACKNOWLEDGEMENT.** Applicant acknowledges and agrees that the criteria referenced above will be considered in the qualification process. Applicants who do not meet the requirements referenced above will be declined or be subject to additional requirements, including, but not limited to, additional fees, deposits, rent or providing a guarantor.

## Terms And Conditions

**You declare you understand the following regarding fees and deposits:**

◆ **A non-refundable application fee, a non-refundable administrative fee, and an online application deposit will be necessary to hold your new apartment. Once the pre-qualification process is completed and your application is approved, the application deposit will be credited toward the required security deposit.**

◆ **If your application is denied, the application deposit and administrative fee will be refunded.**

◆ **You may not withdraw your application or application deposit. If you withdraw your application or change your mind about renting the apartment home, we'll be entitled to retain all application fees, application deposits and administrative fees as liquidated damages, and will have no further obligations to one another.**

**1. Lease Contract Information. The Lease Contract contemplated by the parties is attached or, if no Lease Contract is attached, the Lease Contract will be the current Lease Contract terms noted above. Special information and conditions must be explicitly noted within the Lease Contract or in the Contemplated Lease Information.**

**2. Application Fee (nonrefundable). You have delivered to our representative a nonrefundable application fee in the amount indicated in paragraph 14 below, and this payment partially defrays the cost of administrative paperwork.**

**3. Application Deposit (may or may not be refundable). In addition to any application fee, you have delivered to our representative an application deposit in the amount indicated in paragraph 14. The application deposit is not a security deposit. However, it will be credited toward the required security deposit when the Lease Contract has been signed by all parties; OR it will be refunded under paragraph 10 if you are not approved; OR it will be retained by us as liquidated damages if you fail to sign or attempt to withdraw under paragraph 6 or 7.**

**4. Approval When Lease Contract Is Signed in Advance. If you and all co-applicants have already signed the Lease Contract when we approve the Application, our representative will notify you (or one of you if there are co-applicants) of our approval, sign the Lease Contract, and then credit the application deposit of all applicants toward the required security deposit.**

**5. Approval When Lease Contract Isn't Yet Signed. If you and all co-applicants have not signed the Lease Contract when we approve the Application, our representative will notify you (or one of you if there are co-applicants) of the approval, sign the Lease Contract when you and all co-applicants have signed, and then credit the application deposit of all applicants toward the required security deposit.**

**6. If You Fail to Sign Lease After Approval. Unless we authorize otherwise in writing, you and all co-applicants must sign the Lease Contract within 3 days after we give you our approval. If you fail to sign as required, we may keep the application deposit as liquidated damages, and terminate all further obligations under this Agreement.**

**7. If You Withdraw Before Approval. You may not withdraw your Application or the application deposit. If, before signing the Lease Contract, you withdraw an Application or notify us that you've changed your mind about renting the dwelling unit, we'll be entitled to retain all application deposits as liquidated damages, and the parties will then have no further obligation to each other.**

**8. Completed Application. An Application will not be considered "completed" and will not be processed until all of the following have been provided: a separate Application has been fully filled out and signed by you and each co-applicant; an application fee has been paid to us; An application deposit has been paid to us.**

**9. Nonapproval in Seven Days. We will notify you whether you've been approved within seven days after the date we receive a completed Application. Your Application will be considered "disapproved" if we fail to notify you of your approval within seven days after we have received a completed Application. You must not assume approval until you receive actual notice of approval.**

**10. Refund after Nonapproval. If you or any co-applicant is disapproved or deemed disapproved under paragraph 9, we'll refund all application deposits within 30 days of disapproval. Refund checks may be made payable to all co-applicants and mailed to one applicant.**

**11. Extension of Deadlines. If the deadline for signing, approving, or refunding falls on a Saturday, Sunday, or a state or federal holiday, the deadline will be extended to the end of the next day.**

**12. Notice to or from Co-applicants. Any notice we give you or your co-applicant is considered notice to all co-applicants; and any notice from you or your co-applicant is considered notice from all co-applicants.**

**13. Keys or Access Devices. We'll furnish keys and/or access devices only after: (1) all parties have signed the contemplated Lease Contract and other rental documents; and (2) all applicable rents and security deposits have been paid in full.**

**14. Signature. Our representative's signature is consent only to the above application agreement. It does not bind us to accept applicant or to sign the proposed Lease Contract.**

## Application Authorization

By clicking the **"I Agree"** button, you agree and accept to be bound by the above lease and rental application terms and conditions.

DocuSign Envelope ID: E33C303B-9131-45DF-B72E-AD4CCCAADD92



NATIONAL
APARTMENT
ASSOCIATION

# Inventory and Condition Form

**DWELLING UNIT DESCRIPTION.** Unit No. **E214** , **1819 23rd Ave #E214**
*(street address)* in
**Seattle** *(city)*, Washington, **98122** *(zip code).*

**LEASE CONTRACT DESCRIPTION.** Lease Contract date: **August 5, 2018** Owner's name: **Madison Summit LLC**

Residents *(list all residents):*

**Christopher Berg,** ▭

You must note on this form all defects, damage, or uncleanliness and return it to our representative. Otherwise, everything will be considered to be in a clean, safe, and good working condition. Please mark through items listed below if they don't exist. This form protects both you (the resident) and us (the owner). We'll use it in determining what should and should not be considered your responsibility upon move-out. We may not deduct from your security deposit for damages or cleaning unless (1) the form is dated and signed by you and us, (2) the form specifically describes the condition and cleanliness of or existing damages to the apartment and contents at the time of move-in, and (3) we give you a copy of the completed form.

Resident's Name: **Christopher Berg**    Home Phone: (_____) _____ Work Phone: (_____) _____
Resident's Name: ▭ Home Phone: (_____) _____ Work Phone: (_____) _____
Resident's Name: _____ Home Phone: (_____) _____ Work Phone: (_____) _____
Resident's Name: _____ Home Phone: (_____) _____ Work Phone: (_____) _____

☐ **Move-In** or ☐ **Move-Out Condition** *(Check one)*

## Living Room
Walls _____
_____
Wallpaper _____
Plugs, Switches, A/C Vents _____
Woodwork/Baseboards _____
Ceiling _____
Light Fixtures, Bulbs _____
Floor/Carpet _____
_____
Doors, Stops, Locks _____
Windows, Latches, Screens _____
Window Coverings _____
Closets, Rods, Shelves _____
Closet Lights, Fixtures _____
Lamps, Bulbs _____
Other _____

## Kitchen
Walls _____
_____
Wallpaper _____
Plugs, Switches, A/C Vents _____
Woodwork/Baseboards _____
Ceiling _____
Light Fixtures, Bulbs _____
Floor/Carpet _____
_____
Doors, Stops, Locks _____
Windows, Latches, Screens _____
Window Coverings _____
Cabinets, Drawers, Handles _____
Countertops _____
Stove/Oven, Trays, Pans, Shelves _____
Vent Hood _____
Refrigerator, Trays, Shelves _____
Refrigerator Light, Crisper _____
Dishwasher, Dispensers, Racks _____
Sink/Disposal _____
Microwave _____
Other _____

## General Items
Thermostat _____
Cable TV or Master Antenna _____
A/C Filter _____
Washer/Dryer _____
Garage Door _____
Ceiling Fans _____
Exterior Doors, Screens/Screen Doors, Doorbell _____
Fireplace _____
Other _____
_____

## Dining Room
Walls _____
_____
Wallpaper _____
Plugs, Switches, A/C Vents _____
Woodwork/Baseboards _____
Ceiling _____
Light Fixtures, Bulbs _____
Floor/Carpet _____
_____
Doors, Stops, Locks _____
Windows, Latches, Screens _____
Window Coverings _____
Closets, Rods, Shelves _____
Closet Lights, Fixtures _____
Other _____

## Halls
Walls _____
_____
_____
Wallpaper _____
Plugs, Switches, A/C Vents _____
Woodwork/Baseboards _____
Ceiling _____
Light Fixtures, Bulbs _____
Floor/Carpet _____
_____
Doors, Stops, Locks _____
Closets, Rods, Shelves _____
Closet Lights, Fixtures _____
Other _____

## Exterior *(if applicable)*
Patio/Yard _____
Fences/Gates/Gate Latches or Locks _____
Faucets _____
Balconies _____
Other _____

## Bedroom *(describe which one)*
Walls _____
_____
Wallpaper _____
Plugs, Switches, A/C Vents _____
Woodwork/Baseboards _____
Ceiling _____
Light Fixtures, Bulbs _____
Floor/Carpet _____
_____
Doors, Stops, Locks _____
Windows, Latches, Screens _____
Window Coverings _____
Closets, Rods, Shelves _____
Closet Lights, Fixtures _____
Other _____

**Bedroom** (describe which one): _____

Walls _____

Wallpaper _____
Plugs, Switches, A/C Vents _____
Woodwork/Baseboards _____
Ceiling _____
Light Fixtures, Bulbs _____
Floor/Carpet _____

Doors, Stops, Locks _____
Windows, Latches, Screens _____
Window Coverings _____
Closets, Rods, Shelves _____
Closet Lights, Fixtures _____
Other _____
_____

**Bath** (describe which one): _____

Walls _____

Wallpaper _____
Plugs, Switches, A/C Vents _____
Woodwork/Baseboards _____
Ceiling _____
Light Fixtures, Bulbs _____
Exhaust Fan/Heater _____
Floor/Carpet _____

Doors, Stops, Locks _____
Windows, Latches, Screens _____
Window Coverings _____
Sink, Faucet, Handles, Stopper _____
Countertops _____
Mirror _____
Cabinets, Drawers, Handles _____
Toilet, Paper Holder _____
Bathtub, Enclosure, Stopper _____
Shower, Doors, Rods _____
Tile _____
Other _____
_____

**Half Bath**

Walls _____

Wallpaper _____
Plugs, Switches, A/C Vents _____
Woodwork/Baseboards _____
Ceiling _____
Light Fixtures, Bulbs _____
Exhaust Fan/Heater _____
Floor/Carpet _____

Doors, Stops, Locks _____
Windows, Latches, Screens _____
Window Coverings _____
Sink, Faucet, Handles, Stopper _____
Countertops _____
Mirror _____
Cabinets, Drawers, Handles _____
Toilet, Paper Holder _____
Tile _____
Other _____
_____

**Bedroom** (describe which one): _____

Walls _____

Wallpaper _____
Plugs, Switches, A/C Vents _____
Woodwork/Baseboards _____
Ceiling _____
Light Fixtures, Bulbs _____
Floor/Carpet _____

Doors, Stops, Locks _____
Windows, Latches, Screens _____
Window Coverings _____
Closets, Rods, Shelves _____
Closet Lights, Fixtures _____
Other _____
_____

**Bath** (describe which one): _____

Walls _____

Wallpaper _____
Plugs, Switches, A/C Vents _____
Woodwork/Baseboards _____
Ceiling _____
Light Fixtures, Bulbs _____
Exhaust Fan/Heater _____
Floor/Carpet _____

Doors, Stops, Locks _____
Windows, Latches, Screens _____
Window Coverings _____
Sink, Faucet, Handles, Stopper _____
Countertops _____
Mirror _____
Cabinets, Drawers, Handles _____
Toilet, Paper Holder _____
Bathtub, Enclosure, Stopper _____
Shower, Doors, Rods _____
Tile _____
Other _____
_____

**Safety-Related Items (Put "N/A" if not applicable)**

Door Knob Locks _____
Keyed Deadbolt Locks _____
_____
Keyless Deadbolts _____
_____
Sliding Door Pin Locks _____
Sliding Door Latches _____
Sliding Door Security Bars _____
Doorviewers _____
Window Latches _____
Porch and Patio Lights _____
Smoke Detectors _____
Alarm System _____
Fire Extinguishers (look at charge level BUT DON'T TEST!) _____
Garage Door Opener _____
Gate Access Card(s) _____
Other _____
_____
_____

Date of Move-In: _____
or
Date of Move-Out: _____

**Furniture:** If the apartment is rented with furniture, a list of all furniture and any existing damage to the furniture is attached to this inventory.

**Acknowledgment.** You acknowledge that you have inspected and tested all of the safety-related items (if in the dwelling) and that they are working, except as noted above. All items will be assumed to be in good condition unless otherwise noted on this form. You acknowledge receiving written operating instructions on the alarm system and gate access entry systems (if there are any). You acknowledge testing the smoke/carbon monoxide detector(s) and verifying that they are working. You acknowledge that you and management have inspected the dwelling unit and that no signs of bedbugs or other pests are present. This unit is in a decent, safe and sanitary condition.

*In signing below, you accept this inventory as part of the Lease Contract and agree that it specifically reflects the condition and cleanliness of or existing damages to the premises and contents for purposes of determining any refund due to you when you move out, and that you have received a copy of this form.*

Resident or Resident's Agent: _____ Date of Signing: _____

Owner or Owner's Representative: _____ Date of Signing: _____

© 2021, National Apartment Association, Inc. - 3/2021, Washington/Maryland/Virginia Apartment Association - Dwelling Unit Inventory - Page 2 of 2

# PACKAGE ACCEPTANCE ADDENDUM

NATIONAL APARTMENT ASSOCIATION

1. **DWELLING UNIT DESCRIPTION.** Unit No. E214, 1819 23rd Ave #E214 *(street address)* in Seattle *(city)*, Washington, 98122 *(zip code)*.

2. **LEASE CONTRACT DESCRIPTION.**
Lease Contract date: August 5, 2018
Owner's name: Madison Summit LLC

Residents *(list all residents)*: Christopher Berg, [redacted]

This document shall serve as an addendum ("the Addendum") that is hereby incorporated into and made part of the Apartment Lease Contract (the "Lease") between Resident and Owner. **Where the terms of the Lease and this Addendum may conflict, the terms of this Addendum shall control.**

3. **PURPOSE OF ADDENDUM.** By signing this Addendum, you wish for us to sign for, and to accept, U.S. mail and privately-delivered packages or other items on your behalf, subject to the terms and conditions set forth herein.

4. **PACKAGE ACCEPTANCE.**

A. **Generally.** You hereby authorize us and our agent to accept, on your behalf, any package or item delivered to our on-site management office during disclosed business hours, including but not limited to any package delivered by the U.S. Postal Service or by any private courier service or individual. You also specifically authorize us to sign on your behalf if the person or entity delivering said package or item requires an adult signature prior to delivery, including but not limited to the delivery of certified or registered mail. A photo I.D. is required before any packages will be released. Packages will only be released to verified Residents or approved representatives.

B. **Limitations.** You understand and agree that we may refuse to accept any package for any reason or no reason at all.

5. **TIME LIMITATION.** Due to limited storage space, we must ask that you pick up your package as soon as possible. You also agree that we shall have no duty whatsoever to hold or store any package for more than 3 days after receipt (accordingly, you should notify the management office if you are going to be away from the apartment home and expect to be receiving a package(s)). After said time, you agree that any such package is deemed abandoned and you authorize us to return the package to its original sender.

6. **DUTY OF CARE, INDEMNIFICATION, ASSUMPTION OF RISKS AND WAIVER.** As to any package for which we sign and/or receive on your behalf, you understand and agree that we have no duty to notify you of our receipt of such package, nor do we have any duty to maintain, protect, or deliver said package to you, nor do we have any duty to make said package available to you outside disclosed business hours. Any packages or personal property delivered to us or stored by us shall be at your sole risk, and you assume all risks whatsoever associated with any loss or damage to your packages and personal property. To the greatest extent allowed by Washington law, you, your guests, family, invitees, and agents hereby waive any and all claims against us or our agents of any nature regarding or relating to any package or item received by us, including but not limited to, claims for theft, misplacing or damaging any such package, except in the event of our or our agent's gross negligence or willful misconduct. To the greatest extent allowed by Washington law, you also agree to defend and indemnify us and our agents and hold us both harmless from any and all claims that may be brought by any third party relating to any injury sustained relating to or arising from any package that we received on your behalf. To the greatest extent allowed by Washington law, you also agree to indemnify us and our agents and hold us harmless from any damage caused to us or our agents by any package received by us for you. You also authorize us to throw away or otherwise dispose of any package that we, in our sole discretion, deem to be dangerous, noxious, or in the case of packaged food, spoiled, and waive any claim whatsoever resulting from such disposal.

7. **SEVERABILITY.** If any provision of this Addendum or the Lease Contract is illegal, invalid or unenforceable under any applicable law, then it is the intention of the parties that (a) such provision shall be ineffective to the extent of such invalidity or unenforceability only without invalidating or otherwise affecting the remainder of this Addendum or the Lease, (b) the remainder of this Addendum shall not be affected thereby, and (c) it is also the intention of the parties to this Addendum that in lieu of each clause or provision that is illegal, invalid or unenforceable, there be added as a part of this Addendum a clause or provision similar in terms to such illegal, invalid or unenforceable clause or provision as may be possible and be legal, valid and enforceable.

8. **SPECIAL PROVISIONS.** The following special provisions control over conflicting provisions of this printed form:

**Resident or Residents**
*(All residents must sign)*

**Owner or Owner's Representative**
*(Signs below)*

**Date of Signing Addendum**

DocuSigned by: [redacted] 43013589B3F44FF...

DocuSigned by: 4EBAA48E5BA0487...

DocuSigned by: Benjamin Levin 544708BD303849F...

©2017, National Apartment Association, Inc. - 3/2017, Washington

**EXHIBIT 5-B**

**Cherry Lease
Renewal**



# SEATTLE - APARTMENT LEASE CONTRACT

Date of Lease Contract: **November 1, 2019**
(when the Lease Contract is filled out)

*This is a binding document. Read carefully before signing.*

## Moving In — General Information

**1. PARTIES.** This Lease Contract (sometimes referred to as the "lease") is between *you*, the resident(s) *(list all people signing the Lease Contract):*

**Christopher Berg,** ▮▮▮▮▮▮▮▮▮▮

and *us*, the owner: **Madison Summit LLC**

*(name of apartment community or title holder).* You've agreed to rent Apartment No. **E214** , at **1819 23rd Ave #E214**

_____ *(street address)* in
**Seattle** *(city),*
Washington, **98122** *(zip code)* for use as a private residence only. The terms "you" and "your" refer to all residents listed above. The terms "we," "us," and "our" refer to the owner listed above (or any of owner's successors' in interest or assigns). Written notice to or from our managers constitutes notice to or from us. If anyone else has guaranteed performance of this Lease Contract, a separate Lease Contract Guaranty for each guarantor is attached.

**2. OCCUPANTS.** The apartment will be occupied only by you and *(list all other occupants not signing the Lease Contract):*

No one else may occupy the apartment. Persons not listed above must not stay in the apartment for more than **7** consecutive days without our prior written consent, and no more than twice that many days in any twelve month period. If the previous space isn't filled in, two days per month is the limit. Receipt of mail at the apartment by any person not listed on this agreement shall be deemed to be proof of occupancy by that person. Any person in the unit, with or without the Resident's knowledge, including but not limited to invitees of guests or other invitees, shall be deemed to be guests for purposes of this agreement.

**3. LEASE TERM.** *(Check one):*

1. ☐ This tenancy is a month to month tenancy commencing on _____ .

2. ☒ This tenancy is a lease for **9** months that commences on **November 8th** , **2019** and ends at 11:59 p.m. on **August 7th** , **2020** .

If box 1 is checked above, at least 20 days notice to terminate is required before the end of the monthly rental period.

If box 2 is checked above:

3. ☒ The tenancy shall automatically revert to a month to month tenancy unless either party gives written notice to terminate at least 20 days prior to the last day of the lease.

4. ☐ The lease shall terminate automatically by operation of law with no notice and no right of holdover.

If neither box 3 or 4 is checked, then the default shall be box _____.

**4. SECURITY DEPOSIT.** Unless modified by addenda, the total security deposit at the time of execution of this Lease Contract for all residents in the apartment is $ **485.00** , due on or before the date this Lease Contract is signed. **Your security deposit will be held in an escrow company or bank escrow account located in Washington until disposition.** See paragraphs 40 (Security Deposit Deductions and Other Charges), and 41 (Deposit Return, Surrender, and Abandonment) for security deposit return information. Any nonrefundable fees will be described in paragraph 10 (Special Provisions) or on addendums to this lease. If we sell the apartments, we will transfer your security deposit to the new owner who will give you any required statutory notices. In the case of multiple residents, the security deposit shall not be returned until the final Resident on the agreement has vacated and Owner reserves the right to issue any refund check in the name of all Residents or only in the name of the final remaining Resident. It is the Residents' sole responsibility to allocate any refunded amount between themselves.

Your security deposit will be kept in a account at (name and address of financial institution):

**BANK OF AMERICA**
**800 FIRST AVENUE, 24TH FLOOR**
**SEATTLE, WA 98104**

**5. KEYS AND FURNITURE.** You will be provided **2** apartment key(s), **2** mailbox key(s), and **2** other access devices for **Key Fobs** . Your apartment will be *[check one]:* ☐ furnished or ☒ unfurnished.

**6. RENT AND CHARGES.** Unless modified by addenda, you will pay $ **2000.00** per month for rent, payable in advance and without demand:

☐ at the on-site manager's office, or
☒ at our online payment site, or
☐ at _____

Prorated rent of $ **1533.33** is due for the remainder of the *[check one]:* ☒ 1st month or ☐ 2nd month, on **November 8** , **2019** .

Otherwise, you must pay your rent, in advance, on or before the 1st day of each month (due date) with no grace period. All move in costs, including the first month's rent, deposit, and non-refundable fee, if applicable, shall be paid only by certified check or cashier's check —not by personal check. Any amount paid after the first day of the month shall be paid only by money order, certified check or cashier's check. Cash is unacceptable for any amount due under this Agreement, without our prior written permission. You must not withhold or offset rent unless authorized by statute. We may, at our option, require at any time that you pay all rent and other sums in cash, certified or cashier's check, money order, or one monthly check rather than multiple checks. At our discretion, we may convert any and all checks via the Automated Clearing House (ACH) system for the purposes of collecting payment. Rent is not considered accepted, if the payment/ACH is rejected, does not clear, or is stopped for any reason. If you don't pay all rent on or before the **5th** day of the month, you'll pay an initial late charge of $ **150.00** plus a late charge of $ **5.00** per day after that date until paid in full. Resident understands and agrees that the rent is due on or before the first day of the month, and any grace period before late fees accrue shall not change the rent due date. If you pay your rent after the late date specified in this paragraph or after the issuance of a 14 day notice, payments must be by certified check, cashier's check or money order. You'll also pay a charge of $ **50.00** for each returned check or rejected electronic payment, plus initial and daily late charges from due date until we receive acceptable payment. After **2** checks are returned by your bank for any reason, all future payments due during the remainder of your tenancy, notwithstanding the signing of any new lease agreements, must be by cashier's check, certified check or money order only. If you don't pay rent on time, you'll be delinquent and all remedies under this Lease Contract will be authorized. We'll also have all other remedies for such violation. If this community has a drop box, it is provided only as a convenience to the Residents. Use of the drop

©2019, National Apartment Association, Inc. - 9/2019, Washington

Page 1 of 8

box for payment of rent or any other amount and for providing notices to the Owner are at the sole risk of loss or theft of the Resident. If any payment is lost prior to receipt by the Owner, Resident agrees to immediately replace the payment at their sole cost. Resident is strongly encouraged to make all payments directly to the Owner and to obtain a receipt for all payments. All payment obligations under this Lease Contract shall constitute rent under this Lease Contract.

**7. UTILITIES.** We'll pay for the following items, if checked:

☐ water ☐ gas ☐ electricity ☐ master antenna
☐ wastewater ☐ trash ☐ cable TV
☐ other _____

You'll pay in full as billed for all other utilities, related deposits, and any charges, fees, or services on such utilities. You must not allow utilities to be disconnected—including disconnection for not paying your bills—until the lease term or renewal period ends. Cable channels that are provided may be changed during the lease term if the change applies to all residents. Utilities may be used only for normal household purposes and must not be wasted. If your electricity is ever interrupted, you must use only battery-operated lighting. If any utilities are sub-metered for the apartment, or prorated by an allocation formula, we will attach an addendum to this Lease Contract in compliance with state agency rules or city ordinance. If recycling is mandated by law, the Residents will be equally charged if the community is assessed any recycling related fees.

**8. INSURANCE.** We do not maintain insurance to cover your personal property or personal injury. We are not responsible to any resident, guest, or occupant for damage or loss of personal property or personal injury from (including but not limited to) fire, smoke, rain, flood, water and pipe leaks, hail, ice, snow, lightning, wind, explosions, earthquake, interruption of utilities, theft, hurricane, negligence of other residents, occupants, or invited/uninvited guests or vandalism unless otherwise required by law.

In addition, we urge all Tenants, and particularly those residing in coastal areas, areas near rivers, and areas prone to flooding, to obtain flood insurance. Renter's insurance may not cover damage to your property due to flooding. A flood insurance resource which may be available includes the National Flood Insurance Program managed by the Federal Emergency Management Agency (FEMA).

We urge you to get your own insurance for losses to your personal property or injuries due to theft, fire, water damage, pipe leaks and the like.

Additionally, you are *[check one]* ☒ required to purchase personal liability insurance ☐ not required to purchase personal liability insurance. If no box is checked, personal liability insurance is not required. If required, failure to maintain personal liability insurance throughout your tenancy, including any renewal periods and/or lease extensions, may be an incurable breach of this Lease Contract and may result in the termination of tenancy and eviction and/or any other remedies as provided by this Lease Contract or state law. If personal liability insurance is required, you are required to provide proof of insurance upon commencement of the tenancy and upon written request.

You acknowledge that no portion of the rent paid by you under this agreement will be applied to the owner's structural fire insurance and that you are in no way a co-insured under any such policy.

**9. LOCKS AND LATCHES.** Keyed lock(s) will be rekeyed after the prior resident moves out. The rekeying will be done before you move into your apartment.

You may at any time ask us to change or rekey locks or latches during the Lease Term. We must comply with those requests, but you must pay for them, unless otherwise provided by law.

**Payment for Rekeying, Repairs, Etc.** You must pay for all repairs or replacements arising from misuse or damage to devices by you or your occupants, or guests during your occupancy. You may be required to pay in advance if we notify you within a reasonable time after your request that you are more than 30 days delinquent in reimbursing us for repairing or replacing a device which was misused or damaged by you, your guest or an occupant; or if you have requested that we repair or change or rekey the same device during the 30 days preceding your request and we have complied with your request. Otherwise, you must pay immediately after the work is completed.

## Special Provisions and "What If" Clauses

**10. SPECIAL PROVISIONS.** The following special provisions and any addenda or written rules furnished to you at or before signing will become a part of this Lease Contract and will supersede any conflicting provisions of this printed lease form.

**See special provisions on the last page**
_____
_____
_____
_____
_____

See any additional special provisions.

**11. EARLY MOVE-OUT.** You'll be liable to us for a reletting charge *[check one]* ☐ $ _1700.00_ or ☐ _100_ % of the rent (not to exceed 100% of the highest monthly rent during the Lease Contract term) if you:

(1) fail to give written move-out notice as required in paragraphs 23 (Military Personnel Clause) or 36 (Move-Out Notice); or
(2) move out without paying rent in full for the entire lease term or renewal period; or
(3) move out at our demand because of your default; or
(4) are judicially evicted.

The reletting charge is not a cancellation fee and does not release you from your obligations under this Lease Contract.

**Not a Release.** The reletting charge is not a lease cancellation fee or buyout fee. It is an agreed-to liquidated amount covering only part of our damages, that is, our time, effort, and expense in finding and processing a replacement. These damages are uncertain and difficult to ascertain—particularly those relating to inconvenience, paperwork, advertising, showing apartments, utilities for showing, checking prospects, office overhead, marketing costs, and locator-service fees. You agree that the reletting charge is a reasonable estimate of such damages and that the charge is due whether or not our reletting attempts succeed. If no amount is stipulated, you must pay our actual reletting costs so far as they can be determined. The reletting charge does not release you from continued liability for: future or past-due rent; charges for cleaning, repairing, repainting, or unreturned keys; or other sums due.

**Lease Buy Out.** If you desire to buy out your Lease Contract early please refer to your Lease Buy Out Agreement. If you have not been provided with a Lease Buy Out Agreement you must contact us regarding such an agreement. A lease buy out may not be available in all cases. Other than as required by law or otherwise stated in this Lease Contract the Lease Buy Out Agreement shall govern the means by which you may terminate your tenancy before the end of its term.

**12. REIMBURSEMENT.** You must promptly reimburse us for loss, damage, government fines, or cost of repairs or service in the apartment community due to a violation of the Lease Contract or rules, improper use, or negligence, by you or your guests or occupants. In addition, unless the damage or wastewater stoppage is due to our negligence, we're not liable for --and you must pay for --repairs, replacement costs, and damage to the following that result from you or your invitees, guests, or occupants' negligence or intentional acts: (1) damage to doors, windows, or screens; (2) damage from windows or doors left open; and (3) damage from wastewater stoppages caused by improper objects in lines exclusively serving your apartment. We may require payment at any time, including advance payment of repairs for which you're liable. Delay in demanding sums you owe is not a waiver.

**13. PROPERTY LEFT IN APARTMENT.**
**Removal After Surrender, Abandonment, or Eviction.** We or law officers may remove and/or store all property remaining in the apartment or in common areas (including any vehicles you or any occupant or guest owns or uses) if you are judicially evicted or if you surrender or abandon the apartment (see definitions in paragraph 41 - Deposit Return, Surrender, and Abandonment).

**Storage.** We may store, but **other than as may be required by law** have no duty to store, property removed after judicial eviction, surrender, or abandonment of the apartment. We're not liable for casualty loss, damage, or theft unless otherwise provided by law. You must pay reasonable charges for our packing, removing, storing, and selling any property.

©2019, National Apartment Association, Inc. - 9/2019, Washington

Page 2 of 8

**Redemption.** If we've seized and stored property as authorized by the state statute, you may redeem the property by paying all reasonable moving and storage fees if you make written request for the return of the property before we have sold or disposed of it. We may return redeemed property at the place of storage, the management office, or the apartment (at our option). We may require payment by cash, money order, or certified check.

**Disposition or Sale.** We may throw away or give to a charitable organization all items of personal property that are: (1) left in the apartment after surrender or abandonment; or (2) left outside more than 1 day after a writ of restitution is executed, following a judicial eviction.

Animals removed after surrender, abandonment, or eviction may be kenneled or turned over to local authorities or humane societies. Property described in (1) and (2) above not thrown away or given to charity may be disposed of only by sale, which must be held no sooner than 45 days after written notice to you. Our notice may be sent to you first class mail to your last known address or to any other addresses you provided us in writing or any other address known to us for you. Our notice will include (1) our name and the address where we may be contacted, (2) the place where your property is stored, (3) a statement informing you that a sale or disposition of your property will take place in accordance with state law, (4) the date of the sale or disposal (which may be no sooner than 45 days from the date of notice), and (5) a statement informing you of your right (upon payment of storage charges) to have the property returned prior to its sale or disposition. Sale may be public or private, is subject to any third-party ownership or lien claims, must be to the highest cash bidder, and may be in bulk, in batches, or item-by-item. We'll hold any excess proceeds from the sale for you for one year from the date of sale. If no claim is made to the proceeds in that year, we may retain the proceeds.

However, if your property that we are storing has a cumulative value of $250 or less, we may sell or dispose of your property (except for personal papers, family pictures, and keepsakes) after 7 days from the date that we mailed notice to you of the prospective sale or disposal. We'll send you a 45 day notice before we dispose of any personal papers, family pictures, and keepsakes.

After writ of restitution is issued, if we receive timely notice from you or your representative that you want us to store your personal property, we will do so in accordance with the requirements of RCW 59.18.312.

**14. FAILING TO PAY FIRST MONTH'S RENT.** If you don't pay the first month's rent when or before the Lease Contract begins, or your failure to pay any subsequent rent or other charges owing under this Lease Contract, all future rent will be automatically accelerated without notice and immediately due. We also may end your right of occupancy and recover damages, future rent, reletting charges,

attorney's fees, court costs, and other lawful charges. Our rights and remedies under paragraphs 11 (Early Move-Out) and 32 (Default by Resident) apply to acceleration under this paragraph.

**15. RENT INCREASES AND LEASE CONTRACT CHANGES.** No rent increases or Lease Contract changes are allowed before the initial Lease Contract term ends, except for changes allowed by any special provisions in paragraph 10 (Special Provisions), by a written addendum or amendment signed by you and us, or by reasonable changes of apartment rules allowed under paragraph 18 (Community Policies or Rules/Facilities). If we give you at least 60 days written notice of rent increases or lease changes effective when the Lease term or renewal period ends, this Lease Contract will automatically continue month-to-month with the increased rent or lease changes. The new modified Lease Contract will begin on the date stated in the notice (without necessity of your signature) unless you give us written move-out notice under paragraph 36 (Move-Out Notice).

**16. DELAY OF OCCUPANCY.** If occupancy is or will be delayed for construction, repairs, cleaning, or a previous resident's holding over, we're not responsible for the delay. The lease will remain in force subject to: (1) abatement of rent on a daily basis during delay; and (2) your right to terminate as set forth below. Termination notice must be in writing. After termination, you are entitled only to refund of deposit(s) and any rent paid. Rent abatement or lease termination does not apply if delay is for cleaning or repairs that don't prevent you from occupying the apartment.

If there is a delay and we haven't given notice of delay as set forth immediately below, you may terminate up to the date when the apartment is ready for occupancy, but not later.

(1) If we give written notice to any of you when or after the initial term as set forth in paragraph 3 (Lease Term)—and the notice states that occupancy has been delayed because of construction or a previous resident's holding over, and that the apartment will be ready on a specific date—you may terminate the Lease Contract within 3 days of your receiving the notice, but not later.

(2) If we give written notice to any of you before the initial term as set forth in paragraph 3 (Lease Term) and the notice states that construction delay is expected and that the apartment will be ready for you to occupy on a specific date, you may terminate the Lease Contract within 7 days after any of you receives written notice, but not later. The readiness date is considered the new initial term as set forth in paragraph 3 (Lease Term) for all purposes. This new date may not be moved to an earlier date unless we and you agree.

**17. DISCLOSURE RIGHTS.** If someone requests information on you or your rental history for law-enforcement, governmental, or business purposes, we may provide it without prior notice to you.

## While You're Living in the Apartment

**18. COMMUNITY POLICIES OR RULES/FACILITIES.** You and all guests and occupants must comply with any written apartment rules and community policies, including instructions for care of our property. After 30 days written notice, we may make changes to written rules, effective on completion of your lease term, or in a month-to-month tenancy, effective at the end of the next calendar month. You understand and agree that any and all facilities provided by us are provided as a gratuity and their use is not part of the rent that you pay. We reserve the right to change or limit the hours of any such facilities, or to eliminate them completely without prior notice to you or any other residents, and that any such action shall not constitute any claim by you for diminished rental value or a claim of default under the terms of this agreement by us.

**19. LIMITATIONS ON CONDUCT.** The apartment and other areas reserved for your private use must be kept clean and free of trash, garbage, and other debris. Trash must be disposed of at least weekly in appropriate receptacles in accordance with local ordinances. Passageways may be used only for entry or exit. You agree to keep all passageways and common areas free of obstructions such as trash, storage items, and all forms of personal property. No person shall ride or allow bikes, skateboards, or other similar objects in the passageways. Any swimming pools, saunas, spas, tanning beds, exercise rooms, storerooms, laundry rooms, and similar areas must be used with care in accordance with apartment rules and posted signs. Glass containers are prohibited in all common areas. You, your occupants, or guests may not anywhere in the apartment community: use candles or use kerosene lamps or kerosene heaters without our prior written approval; cook on balconies or outside; or solicit business or contributions. Conducting any kind of business in your apartment or in the apartment community is prohibited—

except that any lawful business conducted "at home" by computer, mail, or telephone is permissible if customers, clients, patients, or other business associates do not come to your apartment for business purposes. We may regulate: (1) the use of patios, balconies, and porches; (2) the conduct of furniture movers and delivery persons; and (3) recreational activities in common areas. You'll be liable to us for damage caused by you or any guests or occupants.

We may exclude from the apartment community guests or others who, in our judgment, have been violating the law, violating this Lease Contract or any apartment rules, or disturbing other residents, neighbors, visitors, or owner representatives. We may also exclude from any outside area or common area a person who refuses to show photo identification or refuses to identify himself or herself as a resident, occupant, or guest of a specific resident in the community.

You agree to notify us if you or any occupants are convicted of any felony, or misdemeanor involving a controlled substance, violence to another person or destruction of property. You also agree to notify us if you or any occupant registers as a sex offender in any state. Informing us of criminal convictions or sex offender registry does not waive our right to evict you.

**20. PROHIBITED CONDUCT.** You, your occupants or guests, or the guests of any occupants, may not engage in the following: criminal activities, behaving in a loud or obnoxious manner; disturbing or threatening the rights, comfort, health, safety, or convenience of others (including our agents and employees) in or near the apartment community; disrupting our business operations; manufacturing, delivering, possessing with intent to deliver, or otherwise possessing a controlled substance or drug paraphernalia (as defined by

©2019, National Apartment Association, Inc. - 9/2019, Washington

Page 3 of 8

Washington State or Federal Law, including marijuana); engaging in or threatening violence; possessing a weapon prohibited by state law; discharging a firearm in the apartment community; displaying or possessing a gun, knife, or other weapon in the common area in a way that may alarm others; storing anything in closets having gas appliances, or anything that may increase our insurance costs; tampering with utilities or telecommunications; bringing hazardous materials into the apartment community; or injuring our reputation by making bad faith allegations against us to others.

21. **PARKING.** We may regulate the time, manner, and place of parking cars, trucks, motorcycles, bicycles, boats, trailers, and recreational vehicles by anyone. We may have unauthorized or illegally parked vehicles towed. A vehicle is unauthorized or illegally parked in the apartment community if it:

(1) has a flat tire or other condition rendering it inoperable; or
(2) is on jacks, blocks or has wheel(s) missing; or
(3) has no current license plate or no current registration and/or inspection sticker; or
(4) takes up more than one parking space; or
(5) belongs to a resident or occupant who has surrendered or abandoned the apartment; or
(6) is parked in a marked handicap space without the legally required handicap insignia; or
(7) is parked in a space marked for manager, staff, or guest at the office; or
(8) blocks another vehicle from exiting; or
(9) is parked in a fire lane or designated "no parking" area; or
(10) is parked in a space marked for other resident(s) or unit(s); or
(11) is parked on the grass, sidewalk, or patio; or
(12) blocks garbage trucks from access to a dumpster; or
(13) belongs to a resident and is parked in a visitor or retail parking space; or
(14) Parking spaces may not be used for storage of vehicles. Your vehicle(s) must be moved every _____ days, including vehicles parked in all guest or handicapped spaces. If you have a reserved parking space, or a garage, you are required to use that space, or your garage, first.

22. **RELEASE OF RESIDENT.** Unless you're entitled to terminate your tenancy under paragraphs 10 (Special Provisions), 16 (Delay of Occupancy), 23 (Military Personnel Clause), 31 (Responsibilities of Owner), or 36 (Move-Out Notice), you won't be released from this Lease Contract for any reason—including but not limited to voluntary or involuntary school withdrawal or transfer, voluntary or involuntary job transfer, marriage, separation, divorce, reconciliation, loss of co-residents, loss of employment, or bad health.

23. **MILITARY PERSONNEL CLAUSE.** You agree to comply with any federal law, including but not limited to the ServiceMember's Civil Relief Act, or any applicable state law, if you are seeking to terminate a lease or month to month rental agreement under the rights granted by such laws.

24. **RESIDENT SAFETY AND PROPERTY LOSS.** You and all occupants and guests must exercise due care for your own and others' safety and security, especially in the use of smoke and carbon monoxide detectors, keyed deadbolt locks, keyless bolting devices, window latches, and other access control devices.

**Statutory Notice Regarding Smoke Detectors and Carbon Monoxide Detectors.** We'll furnish a smoke detector and carbon monoxide detector in the apartment as required by statute. We'll test the smoke detector and carbon monoxide detector and provide working batteries (if applicable) when you first take possession. After that, you must maintain the smoke detector and carbon monoxide detector and replace any batteries as needed, at your expense. We may replace dead or missing batteries at your expense, without prior notice to you. You must immediately report smoke-detector and carbon monoxide detector malfunctions to us. Neither you nor others may disable, remove, or damage smoke detectors or carbon monoxide detectors. If the foregoing is violated or you fail to replace a dead battery or report malfunctions to us, you will be liable to us and others for any loss, damage, or fines from fire, smoke, or water. You acknowledge that we have advised you: (i) that the apartment is equipped with a smoke detector and carbon monoxide detector, (ii) that it's your responsibility to maintain the smoke detector and carbon monoxide detector in proper working condition, and (iii) that you may be subject to fines of up to $200 or other penalties for your failure to comply with the provisions of RCW 43.44.110. You confirm that the smoke detector and carbon monoxide detector was operational as of the date of your inspection, and (iv) following the commencement of the lease term, you will pay for and replace the smoke detector and carbon monoxide detector batteries, if any, as needed. You must not permit or cause the removal,

disconnection, or disabling of the smoke detector or carbon monoxide detector.

**Casualty Loss.** We're not liable to any resident, guest, or occupant for personal injury or damage or loss of personal property from any cause, including but not limited to: fire, smoke, rain, flood, water and pipe leaks, hail, ice, snow, lightning, wind, explosions, earthquake, interruption of utilities, theft, or vandalism unless otherwise required by law. During freezing weather, you must ensure that the temperature in the apartment is sufficient to make sure that the pipes do not freeze (we suggest at least 50 degrees). If the pipes freeze or any other damage is caused by your failure to properly maintain the heat in your apartment, you'll be liable for damage to our and other's property. If you ask our representatives to perform services not contemplated in this Lease Contract, you will indemnify us and hold us harmless from all liability for those services.

**Crime or Emergency.** Dial 911 or immediately call local medical emergency, fire, or police personnel in case of accident, fire, smoke, or suspected criminal activity, or other emergency involving imminent harm. You should then contact our representative. Unless otherwise provided by law, we're not liable to you or any guests or occupants for injury, damage, or loss to person or property caused by criminal conduct of other persons, including theft, burglary, assault, vandalism, or other crimes. We're not obliged to furnish security personnel, security lighting, security gates or fences, or other forms of security unless required by statute. If we provide any access control devices or security measures upon the property, they are not a guarantee to prevent crime or to reduce the risk of crime on the property. You agree that no access control or security measures can eliminate all crime and that you will not rely upon any provided access control or security measures as a warranty or guarantee of any kind. We're not responsible for obtaining criminal-history checks on any residents, occupants, guests, or contractors in the apartment community. If you or any occupant or guest is affected by a crime, you must make a written report to our representative and to the appropriate local law-enforcement agency. You must also furnish us with the law-enforcement agency's incident report number upon request.

25. **CONDITION OF THE PREMISES AND ALTERATIONS.** You accept the apartment, fixtures, and furniture as is, except for conditions materially affecting the health or safety of ordinary persons. To the extent allowed by law, we disclaim all implied warranties. You'll be given an Inventory and Condition form on or before move-in which must be completed by you and returned to us. Unless otherwise noted on the form, everything will be considered to be in a clean, safe, and good working condition upon move-in. You understand that items noted on a move in inspection form do not indicate an agreement by us to clean, repair or replace that noted item. All maintenance requests must be in writing and on a separate maintenance request form.

You must use customary diligence in maintaining the apartment and not damaging or littering the common areas. Unless authorized by statute or by us in writing, you must not perform any repairs, painting, wallpapering, carpeting, electrical changes, or otherwise alter our property. No holes or stickers are allowed inside or outside the apartment. But we'll permit a reasonable number of small nail holes for hanging pictures on sheetrock walls and in grooves of wood-paneled walls, unless our rules state otherwise. No water furniture, washing machines, additional phone or TV-cable outlets, alarm systems, or lock changes, additions, or rekeying is permitted unless statutorily allowed or we've consented in writing. You may install a satellite dish or antenna provided you sign our satellite dish or antenna lease addendum which complies with reasonable restrictions allowed by federal law. You agree not to alter, damage, or remove our property, including alarm systems, smoke detectors and carbon monoxide detectors, furniture, telephone and cable TV wiring, screens, locks, and access control devices. When you move in, we'll supply light bulbs for fixtures we furnish, including exterior fixtures operated from inside the apartment; after that, you'll replace them at your expense with bulbs of the same type and wattage. Your improvements to the apartment (whether or not we consent) become ours unless we agree otherwise in writing.

26. **REQUESTS, REPAIRS, AND MALFUNCTIONS.** IF YOU OR ANY OCCUPANT NEEDS TO SEND A NOTICE OR REQUEST—FOR EXAMPLE, FOR REPAIRS, INSTALLATIONS, SERVICES, OR SECURITY RELATED MATTERS—IT MUST BE SUBMITTED THROUGH EITHER THE ONLINE TENANT/MAINTENANCE PORTAL, OR SIGNED AND IN WRITING AND DELIVERED TO OUR DESIGNATED REPRESENTATIVE. (except in case of fire, smoke, gas, explosion, overflowing sewage, uncontrollable running water, electrical shorts, or crime in progress). Our written notes on your oral request do not constitute a written request from you.

©2019, National Apartment Association, Inc. - 9/2019, Washington

Page 4 of 8

Our complying with or responding to any oral request regarding security or non-security matters doesn't waive the strict requirement for written notices under this Lease Contract. You must promptly notify us in writing of: water leaks; broken windows, wet areas on floors, walls or ceilings; electrical problems; malfunctioning lights; broken or missing locks or latches, toilets or faucets; and other conditions that pose a hazard to property, health, or safety. We may change or install utility lines or equipment serving the apartment if the work is done reasonably without substantially increasing your utility costs. We may turn off equipment and interrupt utilities as needed to avoid property damage or to perform work. If utilities malfunction or are damaged by fire, water, or similar cause, you must notify our representative immediately. Air conditioning problems are not emergencies. If air conditioning or other equipment malfunctions, you must notify our representative as soon as possible on a business day. We'll act with customary diligence to make repairs and reconnections. Rent will not abate in whole or in part.

If we believe that fire or catastrophic damage is substantial, or that performance of needed repairs poses a danger to you, we may terminate your tenancy within a reasonable time by giving you written notice. If your tenancy is so terminated, we'll refund prorated rent and all deposits, less lawful deductions.

27. **ANIMALS.** No animals (including mammals, reptiles, birds, fish, rodents and insects) are allowed, even temporarily, anywhere in the apartment or apartment community unless we've so authorized in writing. If we allow an animal, you must sign a separate animal addendum. You must remove an unauthorized animal within 24 hours of notice from us, or you will be considered in default of this Lease Contact. We will authorize support and/or service animals for you, your guests, and occupants pursuant to the parameters and guidelines established by the Fair Housing Act and the HUD regulatory guidelines. We may require a written statement from a qualified professional verifying the need for the support and/or service animal. You must not feed stray or wild animals. No pets will be allowed to visit the property and no "pet-sitting" shall be allowed. If a pet becomes a problem in our sole opinion, we reserve the right to require that the pet be removed from the property. Once a pet has been removed from the property, the pet deposit for that pet shall not be returned during the tenancy even though the animal is no longer on the property. If you have pets, companion or service animals, they must be secured during maintenance work. If they are not secured and pose any type of danger to Maintenance, in our sole opinion, Maintenance shall be entitled to leave the unit prior to the completion of the work and it shall be your sole responsibility to schedule a return by Maintenance for the completion of the work after the animal has been secured.

If you or any guest or occupant violates animal restrictions (with or without your knowledge), you'll be subject to charges, damages, eviction, and other remedies provided in this Lease Contract. If an animal has been in the apartment at any time during your term of occupancy (with or without our consent), we'll charge you for defleaing, deodorizing, and shampooing. Initial and daily animal-violation charges and animal-removal charges are liquidated damages for our time, inconvenience, and overhead (except for attorney's fees and litigation costs) in enforcing animal restrictions and rules. We may kennel the animal or contact a humane society

or local authority for pick up. When kenneling an animal, we won't be liable for loss, harm, sickness, or death of the animal unless due to our negligence. We'll return the animal to you upon request if it has not already been turned over to a humane society or local authority. You must pay for the animal's reasonable care and kenneling charges. We have no lien on the animal for any purpose.

28. **WHEN WE MAY ENTER.** If you or any guest or occupant is present and gives permission to enter, then repairers, servicers, contractors, our representatives or other persons listed in (2) below. Otherwise, the persons listed in (2) below may enter peacefully and at reasonable times by duplicate or master key (or by breaking a window or other means when necessary) if:

(1) written notice of the entry is hand delivered to someone in the apartment or is left in a conspicuous place in the apartment at least 48 hours before entry (or 24 hours before entry if entry is to show the apartment to prospective residents or purchasers at a specified time). No prior notice is needed in emergencies or situations when prior notice is impractical; and

(2) entry is for: responding to your request; making repairs or replacements; estimating repair or refurbishing costs; performing pest control; doing preventive maintenance; changing filters; testing or replacing smoke-detector or carbon monoxide detector batteries; retrieving unreturned tools, equipment or appliances; preventing waste of utilities; exercising our contractual lien; leaving notices; delivering, installing, reconnecting, or replacing appliances, furniture, equipment, or access control devices; removing or rekeying unauthorized access control devices; removing unauthorized window coverings; stopping excessive noise; removing health or safety hazards (including hazardous materials), or items prohibited under our rules; removing perishable foodstuffs if your electricity is disconnected; retrieving property owned or leased by former residents; inspecting when immediate danger to person or property is reasonably suspected; allowing persons to enter as you authorized in your rental application (if you die, are incarcerated, etc.); allowing entry by a law officer with a search or arrest warrant, or in hot pursuit; showing apartment to prospective residents (after move-out or vacate notice has been given); or showing apartment to government inspectors for the limited purpose of determining housing and fire ordinance compliance by us and to lenders, appraisers, contractors, prospective buyers, or insurance agents. We reserve the right to refuse maintenance work if only a person under age 18 is present at the time of the scheduled work. Refusal to allow us or our agents or vendors to enter the unit after proper notice, if required, shall be a material violation of this agreement.

29. **JOINT AND SEVERAL RESPONSIBILITY.** Each resident is jointly and severally liable for all lease obligations. If you or any guest or occupant violates the Lease Contract or rules, all residents are considered to have violated the Lease Contract. Our requests and notices (including sale notices) to any resident constitute notice to all residents and occupants. In eviction suits, each resident is considered the agent of all other residents in the apartment for service of process. Security-deposit refunds and deduction itemizations of multiple residents will comply with paragraph 41 (Deposit Return, Surrender and Abandonment).

## Replacements

30. **REPLACEMENTS AND SUBLETTING.** Replacing a resident, sub-letting, assignment or granting a right or license to occupy is allowed only when we expressly consent in writing. If departing or remaining residents find a replacement resident acceptable to us before moving out and we expressly consent, in writing, to the replacement, subletting, assignment, or granting a right or any license to occupy, then:

(1) a reletting charge will not be due;
(2) a reasonable administrative (paperwork) fee will be due, and a rekeying fee will be due if rekeying is requested or required; and
(3) the departing and remaining residents will remain liable for all lease obligations for the rest of the original lease term.

**Procedures for Replacement.** If we approve a replacement resident, then, at our option: (1) the replacement resident must sign this Lease Contract with or without an increase in the total security deposit; or (2) the remaining and replacement residents must sign an entirely new Lease Contract. Unless we agree otherwise in writing, your security deposit will automatically transfer to the replacement resident as of the date we approve. The departing resident will no longer have a right to occupancy or a security deposit refund, but will remain liable for the remainder of the original lease term unless we agree otherwise in writing—even if a new Lease Contract is signed.

## Responsibilities of Owner and Resident

31. **RESPONSIBILITIES OF OWNER.** We'll act with customary diligence to:

(1) keep common areas reasonably clean, subject to paragraph 25 (Condition of the Premises and Alterations);
(2) maintain fixtures, furniture, hot water, heating and A/C equipment;
(3) comply with applicable federal, state, and local laws regarding safety, sanitation and fair housing;

(4) make all reasonable repairs, subject to your obligation to pay for damages for which you are liable.
(5) commence steps, within 24 hours after our receipt of written notice from you (except where circumstances are beyond our control), to restore hot or cold water, heat, electricity or to remedy situations imminently hazardous to life;

(6) commence steps, within 72 hours after our receipt of written notice from you (except where circumstances are beyond our control), to remove or remedy a condition that deprives you of the use of a refrigerator, range and oven, or major plumbing fixture supplied by us; and

(7) commence steps, within 10 days after our receipt of written notice from you (except where circumstances are beyond our control), to repair or remedy all other items for which we are responsible that are not described in (5) or (6) above.

We have no duty to repair if the defective condition was caused by you, your guests, or others acting under your control, or if you unreasonably fail to allow us access to the apartment to make such repairs.

You may not repair items yourself and deduct the cost of repairs from your rent unless you have fully complied with the statutory requirements for doing so. Under state statute, you must be current in your payment of rent (including utilities) before exercising any statutory or Lease Contract remedy.

**32. DEFAULT BY RESIDENT.** You'll be in default if you or any guest or occupant violates any terms of this Lease Contract including but not limited to the following violations: (1) you don't pay rent or other amounts that you owe when due; (2) you or any guest or occupant violates the apartment rules, or fire, safety, health, or criminal laws, regardless of whether or where arrest or conviction occurs; (3) you abandon the apartment; (4) you give incorrect or false answers in a rental application; (5) you or any occupant is arrested, in bad faith, makes an invalid habitability complaint to an official or employee of a utility company or the government; (6) you or any occupant is arrested, convicted, or given deferred adjudication for a felony offense involving actual or potential physical harm to a person, or involving possession, manufacture, or delivery of a controlled substance, marijuana, or drug paraphernalia under state statute; (7) you or any guest or occupant engages in any of the prohibited conduct described in paragraph 20 (Prohibited Conduct); or (8) any illegal drugs or paraphernalia are found in your apartment or illegal drugs are used in your apartment.

**Lease Renewal When a Breach or Default Has Occurred.** In the event that you enter into a subsequent Lease prior to the expiration of this Lease and you breach or otherwise commit a default under this Lease, we may, at our sole and absolute discretion, terminate the subsequent Lease, even if the subsequent Lease term has yet to commence. We may terminate said subsequent Lease by sending you written notice of our desire to terminate said subsequent Lease.

**Eviction —Nonpayment of Rent.** If you default in rent payment we may end your right of occupancy by giving you 14 days written notice to vacate. The notice will state that you are required to either pay rent in full within 14 days or vacate. Notice may be by: (1) personal delivery to any resident; (2) if a resident is unavailable, personal delivery at the apartment to any occupant of suitable age and discretion in addition to regular mail delivery to a resident; or (3) if no one of suitable age and discretion is home, by leaving a copy of the notice in a conspicuous place in the unit or on the door, delivering a copy to any person in the apartment (if one can be found), and mailing notice to a resident. Termination of your possession rights or subsequent reletting doesn't release you from liability for future rent or other lease obligations. After giving notice to vacate or filing an eviction suit, we may still accept rent or other sums due; the filing or acceptance doesn't waive or diminish our right of eviction, or any other contractual or statutory right. Accepting money at any time doesn't waive our right to damages; or to past or future rent or other sums; or to continue with eviction proceedings.

**Eviction—All Other Violations.** If you default other than by nonpayment of rent, as defined by Washington state law, we may end your right of occupancy by giving you 10 day notice, and this notice will state that you must either remedy your breach or vacate the apartment within the 10 day period. Notice may be given in the same manner as the nonpayment of rent notice described above. However, if you permit waste on the premises, operate an unlawful business, or if conduct by you or your guests constitutes a nuisance, or if you are occupying the unit without color of title or the permission of the owner, we may give you 14 days notice to vacate. If you fail to vacate the apartment after service of a termination notice made 20 days or more before the end of the monthly rental period, we are not required to give you any additional notice. Resident understand that if Resident is given a notice to pay or comply or vacate and chooses to vacate the unit during the period of the notice, that the Resident shall remain liable for the rent through the end of the lease term or the next month in the case of a month-to-month tenancy.

**Acceleration.** All monthly rent for the rest of the lease term or renewal period will be accelerated automatically without notice or demand (before or after acceleration) and will be immediately due and delinquent if, without our written consent: (1) you move out, remove property in preparing to move out, or give oral or written notice (by you or any occupant) of intent to move out before the lease term or renewal period ends; and (2) you've not paid all rent for the entire lease term or renewal period. Such conduct is considered a default for which we need not give you notice. Remaining rent also will be accelerated if you're judicially evicted or move out when we demand because you've defaulted. Acceleration is subject to our mitigation obligations below.

**Holdover.** You or any occupant, invitee, or guest must not hold over beyond the date contained in your move-out notice or our notice to vacate (or beyond a different move-out date agreed to by the parties in writing). If a holdover occurs, then: (1) holdover rent is due in advance on a daily basis and may become delinquent without notice or demand; (2) rent for the holdover period will be increased by 25% over the then-existing rent, without notice; (3) subject to our mitigation duties, you'll be liable to us for all rent for the full term of the previously signed Lease Contract of a new resident who can't occupy because of the holdover; and (4) at our option, we may extend the lease term—for up to one month from the date of notice of lease extension—by delivering written notice to you or your apartment while you continue to hold over.

**Remedies Cumulative.** Any remedies set forth herein shall be cumulative, in addition to, and not in limitation of, any other remedies available to Landlord under any applicable law.

**Other Remedies.** We may report unpaid amounts to credit agencies. If you default and move out early, you will pay us any amounts stated to be rental discounts in paragraph 10 (Special Provisions), in addition to other sums due. Upon your default, we have all other legal remedies, including tenancy termination. Unless a party is seeking exemplary, punitive, sentimental or personal-injury damages, the prevailing party may recover from the non-prevailing party reasonable attorney's fees and all other litigation costs. The Owner shall be deemed to be the prevailing party if the action voluntarily is halted by the Owner prior to judgment, or if the case is not filed, prior to filing, on the basis that the Owner accepted from the Resident all or part of the amounts alleged to be owing, or on the basis that the Resident vacated the rental unit. Late charges are liquidated damages for our time, inconvenience, and overhead in collecting late rent (but are not for attorney's fees and litigation costs). All unpaid amounts bear 12% interest per year from due date, compounded annually. You must pay all collection-agency fees if you fail to pay all sums due within 10 days after we mail you a letter demanding payment and stating that collection agency fees will be added if you don't pay all sums by that deadline.

**Mitigation of Damages.** If you move out early, you will be subject to paragraph 11 (Early Move-Out) and all other remedies. We'll make a reasonable effort to relet and mitigate damages after we learn of your early move out or abandonment. We'll credit all subsequent rent that we actually receive from subsequent residents against your liability for past-due and future rent and other sums due.

---

## General Clauses

**33. MISCELLANEOUS.** Neither we nor any of our representatives have made any oral promises, representations, or agreements. This Lease Contract is the entire agreement between you and us notwithstanding the contents of any prior agreement, assumptions, advertisements, warranties or representations by any person or entity. Our representatives (including management personnel, employees, and agents) have no authority to waive, amend, or terminate this Lease Contract or any part of it, unless in writing, and no authority to make promises, representations, or agreements that impose security duties or other obligations on us or our representatives unless in writing. No verbal agreements, advertisements, warranties or representations have been made or relied upon by either party or

any agent or employee of either party, and neither party. No action or omission of our representative will be considered a waiver of any subsequent violation, default, or time or place of performance. Our not enforcing or belatedly enforcing written-notice requirements, rental due dates, acceleration, liens, or other rights, or our acceptance of rent after a notice of non-compliance or non-payment isn't a waiver under any circumstances. Except when notice or demand is required by statute, you waive any notice and demand for performance from us if you default. Written notice to or from our managers constitutes notice to or from us. Any person giving a notice under this Lease Contract should retain a copy of the memo, letter or fax that was given. Fax signatures are binding. All notices must be signed.

©2019, National Apartment Association, Inc.- 9/2019, Washington

Page 6 of 8

Exercising one remedy won't constitute an election or waiver of other remedies. Unless prohibited by law or the respective insurance policies, insurance subrogation is waived by all parties. All remedies are cumulative. No employee, agent, or management company is personally liable for any of our contractual, statutory, or other obligations merely by virtue of acting on our behalf. This Lease Contract binds subsequent owners. Neither an invalid clause nor the omission of initials on any page invalidates this Lease Contract. All notices and documents may be in English and, at our option, in any language that you read or speak. All provisions regarding our non-liability and non-duty apply to our employees, agents, and management companies. This Lease Contract is subordinate or superior to existing and future recorded mortgages, at lender's option. All lease obligations must be performed in the county where the apartment is located.

Resident has completed an application in connection with executing this Lease. Owner has relied upon the statements set forth in said application in deciding to rent the Premises to Resident. It is agreed that should Owner subsequently discover any misstatements of fact in the Resident's application, such misstatements shall be deemed a material and incurable breach of this Lease and shall entitle Owner to serve Resident with a three-day notice terminating the tenancy under RCW 59.12.030(6).

All discretionary rights reserved for us within this Lease Contract or any accompanying addenda are at our sole and absolute discretion.

**Obligation to Vacate.** If we provide you with a notice to vacate, or if you provide us with a written notice to vacate or intent to move-out in accordance with the Lease Terms paragraph, and we accept such written notice, then you are required to vacate the Apartment and remove all of your personal property therefrom at the expiration of the Lease term, or by the date set forth in the notice to vacate, whichever date is earlier, without further notice or demand from us.

**Consent to Solicitation.** You hereby expressly authorize us, our representative(s), and any collection agency or debt collector (hereinafter collectively referred to as the "Authorized Entities") to communicate with you. The communication may be made through any method for any reason related to amounts due and owing under this Lease. You authorize any and all of the communication methods even if you will incur a fee or a cost to receive such communications. You further promise to immediately notify the Authorized Entities if any telephone number or email address or other unique electronic identifier or mode that you provided to any Authorized Entity changes or is no longer used by you.

**FORCE MAJEURE.** If we are prevented from completing performances of any obligations hereunder by an act of God, strikes, epidemics, war, acts of terrorism, riots, flood, fire, hurricane, tornado, sabotage, or other occurrence which is beyond the control of the parties, then we shall be excused from any further performance of obligations and undertakings hereunder, to the full extent allowed under applicable law.

Furthermore, if such an event damages the property to materially affect its habitability by some or all residents, we reserve the right to vacate any and all leases and you agree to excuse us from any further performance of obligations and undertakings hereunder, to the full extent allowed under applicable law.

34. **PAYMENTS.** Payment of all sums is an independent covenant. All sums other than rent are due upon our demand. After the due date, we do not have to accept the rent or any other payments.

35. **ASSOCIATION MEMBERSHIP.** We represent that either: (1) we or; (2) the management company that represents us, is at the time of signing this Lease Contract or a renewal of this Lease Contract, a member of both the National Apartment Association and any affiliated state and local apartment (multi-housing) associations for the area where the apartment is located.

## When Moving Out

36. **MOVE-OUT NOTICE.** Unless this lease terminates automatically by operation of law with no notice and no right of holdover (see paragraph 3 Lease Term), you must give our representative advance written move-out notice as provided below. Your move-out notice will not release you from liability for the full term of the Lease Contract or renewal term. You will still be liable for the entire lease term if you move out early (paragraph 22 - Release of Resident) except under the military clause (paragraph 23 - Military Personnel Clause). YOUR MOVE-OUT NOTICE MUST COMPLY WITH EACH OF THE FOLLOWING:

- We must receive advance written notice of your move-out date. The advance notice must be at least the number of days of notice required in paragraph 3 (Lease Term). Oral move-out notice will not be accepted and will not terminate your Lease Contract.
- Your move-out notice must not terminate the Lease Contract sooner than the end of the lease term or renewal period.

YOUR NOTICE IS NOT ACCEPTABLE IF IT DOES NOT COMPLY WITH ALL OF THE ABOVE. Please use our written move-out form. You must obtain from our representative written acknowledgment that we received your move-out notice. If we terminate the Lease Contract, we must give you the same advance notice—unless you are in default.

37. **MOVE-OUT PROCEDURES.** The move-out date can't be changed unless we and you both agree in writing. You won't move out before the lease term or renewal period ends unless all rent for the entire lease term or renewal period is paid in full. Early move-out may result in reletting charges and acceleration of future rent under paragraphs 11 (Early Move-Out) and 32 (Default by Resident). You're prohibited by law from applying any security deposit to rent. You won't stay beyond the date you are supposed to move out. All residents, guests, and occupants must vacate the apartment before the 21-day period or as amended by Washington state law for deposit refund begins. You must give us and the U.S. Postal Service, in writing, each resident's forwarding address.

38. **CLEANING.** You must thoroughly clean the apartment, including doors, windows, furniture, bathrooms, kitchen appliances, patios, balconies, garages, carports, and storage rooms. Carpets must be professionally cleaned by a third party truck style cleaner. You must follow move-out cleaning instructions if they have been provided. If you don't clean adequately, you'll be liable for reasonable cleaning charges. In lieu of liability for cleaning charges, we may charge you a non-refundable cleaning fee which will be described in paragraph 10 (Special Provisions) or an addendum to this Lease Contract and will not be construed as part of any security deposit.

39. **MOVE-OUT INSPECTION.** You should meet with our representative for a move-out inspection, but the move out inspection will not be delayed to accommodate your schedule. Our representative has no authority to bind or limit us regarding deductions for repairs, damages, or charges. Any statements or estimates by us or our representative are subject to our correction, modification, or disapproval before final refunding or accounting.

If a pre-move out inspection is held, the final charges for move out damages will be determined at the inspection after you have vacated the unit. No statements made by us during any pre-move out inspection shall limit those charges.

40. **SECURITY DEPOSIT DEDUCTIONS AND OTHER CHARGES.** You'll be liable for the following charges, if applicable, which may be withheld from your security deposit upon expiration of the Lease Contract (this list is not meant to exclude charges for damages not specifically listed): unpaid rent; unpaid utilities; unreimbursed service charges; repairs or damages caused by negligence, carelessness, accident, or abuse, including stickers, scratches, tears, burns, stains, or unapproved holes; replacement cost of our property that was in or attached to the apartment and is missing; replacing dead or missing smoke-detector or carbon monoxide detector batteries; utilities for repairs or cleaning; trips to let in company representatives to remove your telephone or TV cable services or rental items (if you so request or have moved out); trips to open the apartment when you or any guest or occupant is missing a key; unreturned keys; missing or burned-out light bulbs; removing or rekeying unauthorized access control devices or alarm systems; agreed reletting charges; packing, removing, or storing property removed or stored under paragraph 13 (Property Left in Apartment); removing illegally parked vehicles; special trips for trash removal caused by parked vehicles blocking dumpsters; false security-alarm charges unless due to our negligence; animal-related charges; government fees or fines against us for violation (by you, your occupants, or guests) of local ordinances relating to smoke detectors and carbon monoxide detectors, false alarms, recycling, or other matters; late-payment and returned-check charges; a charge (not to exceed $100) for owner/manager's time and inconvenience in our lawful removal of an animal or in any valid eviction proceeding against you, plus attorney's fees, court costs, and filing fees actually paid; and other sums due under this Lease Contract.

You acknowledge and agree that any cleaning or damages due to smoke damage from any source, including but not limited to cigarettes, cigars, pipes, candles or incense, shall not be considered to be normal wear and tear and that you will be charged for all such cleaning, repair or replacement costs.

©2019, National Apartment Association, Inc. - 9/2019, Washington

Page 7 of 8

You'll be liable to us for: (1) charges for replacing all keys and access devices referenced in paragraph 5 if you fail to return them on or before your actual move-out date; (2) accelerated rent if you have violated paragraph 32 (Default by Resident); and (3) a reletting fee if you have violated paragraph 11 (Early Move-Out).

**41. DEPOSIT RETURN, SURRENDER, AND ABANDONMENT. Deposit Return and Forwarding Address.** You are required to provide us written notice of your forwarding address, on or before termination of this Lease Contract. We'll mail you your security deposit refund (less lawful deductions) and an itemized accounting of any deductions no later than 21 days or as amended by Washington state law after the lease is terminated, and you surrender the apartment, or 21 days or as amended by Washington state law after we learn of your abandonment. We reserve the right to amend the charges listed due to later-discovered damages, or if only an estimate was available during the 21 day or as amended by Washington state law period and the actual amount differs from the estimated charges.

**Surrender.** You have surrendered the apartment when: (1) the move-out date has passed and no one is living in the apartment in our reasonable judgment; or (2) all apartment keys and access devices listed in paragraph 5 (Keys and Furniture) have been turned in where rent is paid—whichever date occurs first.

**Abandonment.** You have abandoned the apartment when all of the following have occurred: (1) you are in default for nonpayment of rent, and (2) you have either told us you do not intend to continue tenancy or evidence indicates this intention. Evidence of this intention includes without limitation your removal of some or all of your clothes, furniture, or personal belongings or the disconnection of utilities to your unit that are not in our name.

Surrender, abandonment, or judicial eviction end your right of possession for all purposes and gives us the immediate right to: clean up, make repairs in, and relet the apartment; determine any security deposit deductions; and remove property left in the apartment. Surrender, abandonment, and judicial eviction affect your rights to property left in the apartment (paragraph 13 - Property Left in Apartment), but do not affect our mitigation obligations (paragraph 32 - Default by Resident).

## Severability, Originals and Attachments, and Signatures

**42. SEVERABILITY.** If any provision of this Lease Contract is invalid or unenforceable under applicable law, such provision shall be ineffective to the extent of such invalidity or unenforceability only without invalidating or otherwise affecting the remainder of this Lease Contract. The court shall interpret the lease and provisions herein in a manner such as to uphold the valid portions of this Lease Contract while preserving the intent of the parties.

**43. ORIGINALS AND ATTACHMENTS.** This Lease Contract has been executed in multiple originals, with original signatures. We will provide you with a copy of the Lease Contract. Your copy of the Lease Contract may be in paper format, in an electronic format at your request, or sent via e-mail if we have communicated by e-mail about this Lease. Our rules and community policies, if any, will be attached to the Lease Contract and provided to you at signing. When an Inventory and Condition form is completed, you should retain a copy, and we should retain a copy. Any addenda or amendments you sign as a part of executing this Lease Contract are binding and hereby incorporated into and made part of the Lease Contract between you and us. This lease is the entire agreement between you and us. You acknowledge that you are NOT relying on any oral representations.

**Name, address and phone number of owner or owner's representative for notice and process purposes (include name of county in State of Washington)**

Summit at Madison Park Manager
1819 23RD AVENUE, SUITE 101

SEATTLE WA 98122
KING
(206) 720-5553

**Your security deposit will be deposited in:**

Escrow Company or Bank Name: BANK OF AMERICA

Address:
800 FIRST AVENUE, 24TH FLOOR
SEATTLE, WA 98104
Your cancelled check will be your deposit receipt.

> **You are legally bound by this document.**
> **Read it carefully before signing.**

**Resident or Residents** *(all sign below)*

**Owner or Owner's Representative** *(signing on behalf of owner)*

**Name and address of locator service** (if applicable)

**Date form is filled out** *(same as on top of page 1)*
11/01/2019

State of Washington
County of _____

I certify that I know or have satisfactory evidence that _____

is/are the person(s) who appeared before me and acknowledged that he/she/they signed this instrument, and acknowledged it to be his/her/their free and voluntary act for the uses and purposes mentioned in the instrument.

Dated _____      My Commission Expires

Printed Name of Notary Public

Signature of Notary Public
*Note: Signature of owner must be notarized if lease is for more than one year.*

*(Use above space for notary stamp/seal)*

SPECIAL PROVISIONS (CONTINUED FROM PAGE 2). **Please refer to the Additional Special Provisions Addendum for important information regarding required Personal Liability Insurance. ONLINE PAYMENTS SUBMITTED AFTER 12:00 AM CST WILL BE POSTED THE FOLLOWING DAY. KEYS MUST BE RETURNED BY 12:00 PM UPON MOVE OUT.**

© 2019, National Apartment Association, Inc. - 9/2019, Washington/National Apartment Association Official Form, September 2019     Page 8 of 8



# UTILITY AND SERVICES ADDENDUM

This Utility Addendum is incorporated into the Lease Contract (referred to in this addendum as "Lease Contract" or "Lease") dated _____November 1, 2019_____ between __Madison Summit LLC__

("We" and/or "we" and/or "us") and __Christopher Berg,__ ████████████████████

"You" and/or "you") of Apt. No. _____E214_____ located at __1819 23rd Ave #E214__

(street address) in _____Seattle, WA 98122_____ and is in addition to all terms and conditions in the Lease. This Addendum constitutes an Addendum to the above described Lease Contract for the above described premises, and is hereby incorporated into and made a part of such Lease Contract. Where the terms or conditions found in this Addendum vary or contradict any terms or conditions found in the Lease Contract, this Addendum shall control.

1.  Responsibility for payment of utilities, and the method of metering or otherwise measuring the cost of the utility, will be as indicated below.
    a) **Water** service to your dwelling will be paid by you either:
        ❏ directly to the utility service provider; or
        ☒ water bills will be billed by the service provider to us and then allocated to you based on the following formula: __2/3__
            ❏ If flat rate is selected, the current flat rate is $ _____ per month.
            ☒ 3rd party billing company if applicable __Conserve__
    b) **Sewer** service to your dwelling will be paid by you either:
        ❏ directly to the utility service provider; or
        ☒ sewer bills will be billed by the service provider to us and then allocated to you based on the following formula: __1__
            ❏ If flat rate is selected, the current flat rate is $ _____ per month.
            ☒ 3rd party billing company if applicable __Conserve__
    c) **Gas** service to your dwelling will be paid by you either:
        ❏ directly to the utility service provider; or
        ☒ gas bills will be billed by the service provider to us and then allocated to you based on the following formula: __6__
            ❏ If flat rate is selected, the current flat rate is $ _____ per month.
            ☒ 3rd party billing company if applicable __Conserve__
    d) **Trash** service to your dwelling will be paid by you either:
        ❏ directly to the utility service provider; or
        ☒ trash bills will be billed by the service provider to us and then allocated to you based on the following formula: __6__
            ❏ If flat rate is selected, the current flat rate is $ _____ per month.
            ☒ 3rd party billing company if applicable __Conserve__
    e) **Electric** service to your dwelling will be paid by you either:
        ☒ directly to the utility service provider; or
        ❏ electric bills will be billed by the service provider to us and then allocated to you based on the following formula: _____
            ❏ If flat rate is selected, the current flat rate is $ _____ per month.
            ❏ 3rd party billing company if applicable
    f) **Stormwater** service to your dwelling will be paid by you either:
        ❏ directly to the utility service provider; or
        ❏ stormwater bills will be billed by the service provider to us and then allocated to you based on the following formula: _____
            ❏ If flat rate is selected, the current flat rate is $ _____ per month.
            ❏ 3rd party billing company if applicable
    g) **Cable TV** service to your dwelling will be paid by you either:
        ☒ directly to the utility service provider; or
        ❏ cable TV bills will be billed by the service provider to us and then allocated to you based on the following formula: _____
            ❏ If flat rate is selected, the current flat rate is $ _____ per month.
            ❏ 3rd party billing company if applicable
    h) **Master Antenna** service to your dwelling will be paid by you either:
        ❏ directly to the utility service provider; or
        ❏ master antenna bills will be billed by the service provider to us and then allocated to you based on the following formula: _____
            ❏ If flat rate is selected, the current flat rate is $ _____ per month.
            ❏ 3rd party billing company if applicable
    i) **Internet** service to your dwelling will be paid by you either:
        ☒ directly to the utility service provider; or
        ❏ internet bills will be billed by the service provider to us and then allocated to you based on the following formula: _____
            ❏ If flat rate is selected, the current flat rate is $ _____ per month.
            ❏ 3rd party billing company if applicable
    j) (Other) _____ service to your dwelling will be paid by you either:
        ❏ directly to the utility service provider; or
        ❏ bills will be billed by the service provider to us and then allocated to you based on the following formula: _____
            ❏ If flat rate is selected, the current flat rate is $ _____ per month.
            ❏ 3rd party billing company if applicable
    k) (Other) _____ service to your dwelling will be paid by you either:
        ❏ directly to the utility service provider; or
        ❏ bills will be billed by the service provider to us and then allocated to you based on the following formula: _____
            ❏ If flat rate is selected, the current flat rate is $ _____ per month.
            ❏ 3rd party billing company if applicable

METERING/ALLOCATION METHOD KEY
"1"  - Sub-metering of all of your water/gas/electric use
"2"  - Calculation of your total water use based on sub-metering of hot water
"3"  - Calculation of your total water use based on sub-metering of cold water
"4"  - Flat rate per month
"5"  - Allocation based on the number of persons residing in your dwelling unit
"6"  - Allocation based on the number of persons residing in your dwelling unit using a ratio occupancy formula
"7"  - Allocation based on square footage of your dwelling unit
"8"  - Allocation based on a combination of square footage of your dwelling unit and the number of persons residing in your dwelling unit
"9"  - Allocation based on the number of bedrooms in your dwelling unit
"10" - Allocation based on a lawful formula not listed here
        (Note: if method "10" is selected, a separate sheet will be attached describing the formula used)

© 2018, National Apartment Association, Inc. - 9/2018, Washington

2.  If an allocation method is used, we or our billing company will calculate your allocated share of the utilities and services provided and all costs in accordance with state and local statutes. Under any allocation method, Resident may be paying for part of the utility usage in common areas or in other residential units as well as administrative fees. Both Resident and Owner agree that using a calculation or allocation formula as a basis for estimating total utility consumption is fair and reasonable, while recognizing that the allocation method may or may not accurately reflect actual total utility consumption for Resident. Where lawful, we may change the above methods of determining your allocated share of utilities and services and all other billing methods, in our sole discretion, and after providing written notice to you. More detailed descriptions of billing methods, calculations and allocation formulas will be provided upon request.

    If a flat fee method for trash or other utility service is used, Resident and Owner agree that the charges indicated in this Agreement (as may be amended with written notice as specified above) represent a fair and reasonable amount for the service(s) provided and that the amount billed is not based on a monthly per unit cost.

3.  When billed by us directly or through our billing company, you must pay utility bills within _____ days of the date when the utility bill is issued at the place indicated on your bill, or the payment will be late. If a payment is late, you will be responsible for a late fee as indicated below. The late payment of a bill or failure to pay any utility bill is a material and substantial breach of the Lease and we will exercise all remedies available under the Lease, up to and including eviction for nonpayment. To the extent there are any new account, monthly, administrative, late or final bill fees, you shall pay such fees as indicated below.

    | | | | |
    |---|---|---|---|
    | New Account Fee: | $ _____0.00_____ | (not to exceed $ _____0.00_____ ) |
    | Monthly Administrative Billing Fee: | $ _____5.00_____ | (not to exceed $ _____5.03_____ ) |
    | Late Fee: | $ _____5.00_____ | (not to exceed $ _____5.00_____ ) |
    | Final Bill Fee: | $ _____ | (not to exceed $ _____ ) |

    If allowed by state law, we at our sole discretion may amend these fees, with written notice to you.

4.  You will be charged for the full period of time that you were living in, occupying, or responsible for payment of rent or utility charges on the dwelling. If you breach the Lease, you will be responsible for utility charges for the time period you were obliged to pay the charges under the Lease, subject to our mitigation of damages. In the event you fail to timely establish utility services, we may charge you for any utility service billed to us for your dwelling and may charge a reasonable administration fee for billing for the utility service in the amount of $ _____50.00_____.

5.  When you move out, you will receive a final bill which may be estimated based on your prior utility usage. This bill must be paid at the time you move out or it will be deducted from the security deposit.

6.  We are not liable for any losses or damages you incur as a result of outages, interruptions, or fluctuations in utility services provided to the dwelling unless such loss or damage was the direct result of negligence by us or our employees. You release us from any and all such claims and waive any claims for offset or reduction of rent or diminished rental value of the dwelling due to such outages, interruptions, or fluctuations.

7.  You agree not to tamper with, adjust, or disconnect any utility sub-metering system or device. Violation of this provision is a material breach of your Lease and may subject you to eviction or other remedies available to us under your Lease, this Utility Addendum and at law.

8.  Where lawful, all utilities, charges and fees of any kind under this Lease shall be considered additional rent, and if partial or full payments are accepted by the Owner, they will be allocated first to non-rent charges and to rent last.

9.  You represent that all occupants that will be residing in the Unit are accurately identified in the Lease. You agree to promptly notify in writing Owner of any change in such number of occupants.

10. You agree that you may, upon thirty (30) days prior written notice from Owner to you, begin receiving a bill for additional utilities and services, at which time such additional utilities and services shall for all purposes be included in the term Utilities.

11. This Addendum is designed for use in multiple jurisdictions, and no billing method, charge, or fee mentioned herein will be used in any jurisdiction where such use would be unlawful. If any provision of this Addendum or the Lease is invalid or unenforceable under applicable law, such provision shall be ineffective to the extent of such invalidity or unenforceability only without invalidating or otherwise affecting the remainder of this Addendum or the Lease. Except as specifically stated herein, all other terms and conditions of the Lease shall remain unchanged. In the event of any conflict between the terms of this Addendum and the terms of the Lease, the terms of this Addendum shall control.

12. The following special provisions and any addenda or written rules furnished to you at or before signing will become a part of this Utility Addendum and will supersede any conflicting provisions of this printed Utility Addendum and/or the Lease Contract.

_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

Resident Signature _____   Date _____
Resident Signature _____   Date _____
Resident Signature _____   Date _____
Resident Signature _____   Date _____
Resident Signature _____   Date _____
Resident Signature _____   Date _____
Management _____   Date _____

© 2018, National Apartment Association, Inc. - 9/2018, Washington/National Apartment Association Official Form, September 2018                Page 2 of 2

# MOLD INFORMATION AND PREVENTION ADDENDUM



*Please note: It is our goal to maintain a quality living environment for our residents. To help achieve this goal, it is important to work together to minimize any mold growth in your dwelling. That is why this addendum contains important information for you, and responsibilities for both you and us.*

### 1. DWELLING UNIT DESCRIPTION.

Unit No. **E214** , **1819 23rd Ave**
**#E214**
_____ *(street address)* in
**Seattle**
*(city)*, Washington, **98122** *(zip code)*.

### 2. LEASE CONTRACT DESCRIPTION.

Lease Contract Date: **November 1, 2019**
Owner's name: **Madison Summit LLC**
_____
_____
_____
_____

Residents *(list all residents)*:
**Christopher Berg,** ▮▮▮▮▮▮▮▮▮▮▮
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

This Addendum constitutes an Addendum to the above described Lease Contract for the above described premises, and is hereby incorporated into and made a part of such Lease Contract. Where the terms or conditions found in this Addendum vary or contradict any terms or conditions found in the Lease Contract, this Addendum shall control.

### 3. ABOUT MOLD.
Mold is found virtually everywhere in our environment—both indoors and outdoors and in both new and old structures. Molds are naturally occurring microscopic organisms which reproduce by spores and have existed practically from the beginning of time. All of us have lived with mold spores all our lives. Without molds we would all be struggling with large amounts of dead organic matter.

Mold breaks down organic matter in the environment and uses the end product for its food. Mold spores (like plant pollen) spread through the air and are commonly transported by shoes, clothing and other materials. When excess moisture is present inside a dwelling, mold can grow. A 2004 Federal Centers for Disease Control and Prevention study found that there is currently no scientific evidence that the accumulation of mold causes any significant health risks for person with normally functioning immune systems. Nonetheless, appropriate precautions need to be taken.

### 4. PREVENTING MOLD BEGINS WITH YOU.
In order to minimize the potential for mold growth in your dwelling, you must do the following:

- Keep your dwelling clean—particularly the kitchen, the bathroom(s), carpets and floors. Regular vacuuming, mopping and using a household cleaner to clean hard surfaces is important to remove the household dirt and debris that harbor mold or food for mold. Immediately throw away moldy food.

- Remove visible moisture accumulation on windows, walls, ceilings, floors and other surfaces as soon as reasonably possible. Look for leaks in washing machine hoses and discharge lines—especially if the leak is large enough for water to infiltrate nearby walls. Turn on any exhaust fans in the bathroom and kitchen *before* you start showering

or cooking with open pots. When showering, be sure to keep the shower curtain *inside* the tub or fully close the shower doors. Also, the experts recommend that after taking a shower or bath, you: (1) wipe moisture off of shower walls, shower doors, the bathtub and the bathroom floor; (2) leave the bathroom door open until all moisture on the mirrors and bathroom walls and tile surfaces has dissipated; and (3) hang up your towels and bath mats so they will completely dry out.

- Promptly notify us in writing about any air conditioning or heating system problems you discover. Follow our rules, if any, regarding replacement of air filters. Also, it is recommended that you periodically open windows and doors on days when the outdoor weather is dry (i.e., humidity is below 50 percent) to help humid areas of your dwelling dry out.

- Promptly notify us in writing about any signs of water leaks, water infiltration or mold. We will respond in accordance with state law and the Lease Contract to repair or remedy the situation, as necessary.

- Keep the thermostat set to automatically circulate air in the event temperatures rise to or above 80 degrees Fahrenheit.

### 5. IN ORDER TO AVOID MOLD GROWTH, it is important to prevent excessive moisture buildup in your dwelling. Failure to promptly pay attention to leaks and moisture that might accumulate on dwelling surfaces or that might get inside walls or ceilings can encourage mold growth. Prolonged moisture can result from a wide variety of sources, such as:

- rainwater leaking from roofs, windows, doors and outside walls, as well as flood waters rising above floor level;

- overflows from showers, bathtubs, toilets, lavatories, sinks, washing machines, dehumidifiers, refrigerator or A/C drip pans or clogged up A/C condensation lines;

- leaks from plumbing lines or fixtures, and leaks into walls from bad or missing grouting/caulking around showers, tubs or sinks;

- washing machine hose leaks, plant watering overflows, pet urine, cooking spills, beverage spills and steam from excessive open-pot cooking;

- leaks from clothes dryer discharge vents (which can put lots of moisture into the air); and

- insufficient drying of carpets, carpet pads, shower walls and bathroom floors.

### 6. IF SMALL AREAS OF MOLD HAVE ALREADY OCCURRED ON *NON-POROUS* SURFACES (such as ceramic tile, formica, vinyl flooring, metal, wood or plastic), the federal Environmental Protection Agency (EPA) recommends that you first clean the areas with soap (or detergent) and water, let the surface dry, and then within 24 hours apply a pre-mixed, spray-on-type household biocide, such as Lysol Disinfectant®, Pine-Sol Disinfectant® (original pine-scented), Tilex Mildew Remover® or Clorox Cleanup®. (Note: Only a few of the common household cleaners will actually kill mold). Tilex® and Clorox® contain bleach which can discolor or stain. **Be sure to follow the instructions on the container.** Applying biocides without first cleaning away the dirt and oils from the surface is like painting over old paint without first cleaning and preparing the surface.

Always clean and apply a biocide to an area 5 or 6 times larger than any visible mold because mold may be adjacent in quantities not yet visible to the naked eye. A vacuum cleaner with a high-efficiency particulate air (HEPA) filter can be

©2018, National Apartment Association, Inc. - 9/2018, Washington

Page 1 of 2

DocuSign Envelope ID: D15C9337-7050-4BF8-A2CE-DF5E809BDB19

used to help remove non-visible mold products from porous items, such as fibers in sofas, chairs, drapes and carpets—provided the fibers are completely dry. Machine washing or dry cleaning will remove mold from clothes.

**7. DO NOT CLEAN OR APPLY BIOCIDES TO:** (1) visible mold on *porous surfaces*, such as sheetrock walls or ceilings, or (2) *large areas* of visible mold on *non-porous* surfaces. Instead, notify us in writing, and we will take appropriate action.

**8. COMPLIANCE.** Complying with this addendum will help prevent mold growth in your dwelling, and both you and we will be able to respond correctly if problems develop that could lead to mold growth. If you have questions regarding this addendum, please contact us at the management office or at the phone number shown in your Lease Contract.

**If you fail to comply with this Addendum, you can be held responsible for property damage to the dwelling and any health problems that may result. We can't fix problems in your dwelling unless we know about them.**

**9. SPECIAL PROVISIONS.** The following special provisions control over conflicting provisions of this printed form:

_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

**Resident or Residents**
*(All residents must sign here)*

_____
_____
_____
_____
_____

**Owner or Owner's Representative**
*(Signs here)*

_____

**Date of Lease Contract**

**November 1, 2019**

© 2018, National Apartment Association, Inc. - 7/2018, Tennessee
Washington/National Apartment Association Official Form, September 2018.

# BED BUG ADDENDUM



**NATIONAL APARTMENT ASSOCIATION**
We Lead the Way Home

Date: **November 3, 2019**

*(when this Addendum is filled out)*

> *Please note: It is our goal to maintain a quality living environment for our residents. To help achieve this goal, it is important to work together to minimize the potential for any bed bugs in your dwelling or surrounding dwellings. This Addendum contains important information that outlines your responsibility and potential liability with regard to bed bugs.*

**1. DWELLING UNIT DESCRIPTION.**
Unit No. **E214** , **1819 23rd Ave**
**#E214**
_____ *(street address)* in
**Seattle**
*(city)*, Washington, **98122** *(zip code)*.

**2. LEASE CONTRACT DESCRIPTION.**
Lease Contract Date: **November 1, 2019**
Owner's name: **Madison Summit LLC**
_____
_____
_____
_____

Residents *(list all residents)*:
**Christopher Berg,** ▮▮▮▮▮▮▮▮▮▮▮▮▮
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

This Addendum constitutes an Addendum to the above described Lease Contract for the above described premises, and is hereby incorporated into and made a part of such Lease Contract. Where the terms or conditions found in this Addendum vary or contradict any terms or conditions found in the Lease Contract, this Addendum shall control.

**3. PURPOSE.** This Addendum modifies the Lease Contract and addresses situations related to bed bugs *(cimex lectularius)* which may be discovered infesting the dwelling or personal property in the dwelling. You understand that we relied on your representations to us in this Addendum.

**4. INSPECTION.** You agree that you: *(Check one)*
- ❑ have inspected the dwelling prior to move-in and that you did not observe any evidence of bed bugs or bed bug infestation; OR
- ☒ will inspect the dwelling within 48 hours after move-in/ renewal and notify us in writing of any bed bugs or bed bug infestation.

**5. INFESTATIONS.**
You agree that you have read all of the information on this Addendum about bed bugs and: *(Check one)*
- ☒ you are not aware of any infestation or presence of bed bugs in your current or previous apartments, home or dwelling. You agree that you are not aware of any bed bug infestation or presence in any of your furniture, clothing, personal property or possessions. You agree that you have not been subjected to conditions in which there was any bed bug infestation or presence. OR
- ❑ you agree that if you previously lived anywhere that had a bed bug infestation that all of your personal property (including furniture, clothing and other belongings) has been treated by a licensed pest control professional, and remained free of bedbugs for the duration of your previous tenancy. You agree that such items are free of further infestation. If you disclose a previous experience of bed bug infestation, we can review documentation of the treatment and inspect your personal property and possessions to confirm the absence of bed bugs. You agree that any previous bed bug infestation which you may have experienced is disclosed here:

**NA**
_____
_____
_____
_____
_____

**6. ACCESS FOR INSPECTION AND PEST TREATMENT.** You must allow us and our pest control agents access to the dwelling at reasonable times to inspect for or treat bed bugs as allowed by law. You and your family members, occupants, guests, and invitees must cooperate and will not interfere with inspections or treatments. We have the right to select any licensed pest control professional to treat the dwelling and building. We can select the model of treating the dwelling, building and common areas for bed bugs. We can also inspect and treat adjacent or neighboring dwellings to the infestation even if those dwellings are not the source or cause of the known infestation. You are responsible for and must, at your own expense, have your own personal property, furniture, clothing and possessions treated according to accepted treatment methods established by a licensed pest control firm that we approve. You must do so as close as possible to the time we treated the dwelling. If you fail to do so, you will be in default, and we will have the right to terminate your right of occupancy and exercise all rights and remedies under the Lease Contract. You agree not to treat the dwelling for a bed bug infestation on your own.

**7. NOTIFICATION.** You must promptly notify us in writing:
- of any known or suspected bed bug infestation or presence in the dwelling, or in any of your clothing, furniture or personal property.
- of any recurring or unexplained bites, stings, irritations, or sores of the skin or body which you believe is caused by bed bugs, or by any condition or pest you believe is in the dwelling.
- if you discover any condition or evidence that might indicate the presence or infestation of bed bugs, or of any confirmation of bed bug presence by a licensed pest control professional or other authoritative source.

**8. COOPERATION.** If we confirm the presence or infestation of bed bugs, you must cooperate and coordinate with us and our pest control agents to treat and eliminate the bed bugs. You must follow all directions from us or our agents to clean and treat the dwelling and building that are infested. You must remove or destroy personal property that cannot be treated or cleaned as close as possible to the time we treated the dwelling. Any items you remove from the dwelling must be disposed of off-site and not in the property's trash receptacles. If we confirm the presence or infestation of bed bugs in your dwelling, we have the right to require you to temporarily vacate the dwelling and remove all furniture, clothing and personal belongings in order for us to perform pest control services. If you fail to cooperate with us, you will be in default, and we will have the right to terminate your right of occupancy and exercise all rights and remedies under the Lease Contract.

**9. RESPONSIBILITIES.** You may be required to pay all reasonable costs of cleaning and pest control treatments incurred by us to treat your dwelling unit, other dwelling units, or common areas for bed bugs. If we confirm the presence or infestation of bed bugs after you vacate your dwelling, you may be responsible for the cost of cleaning and pest control treatments. If we must move other residents in order to treat adjoining or neighboring dwellings to your dwelling unit, you may be liable for payment of any lost rental income and other expenses incurred by us to relocate the neighboring residents and to clean and perform pest control

©2018, National Apartment Association, Inc. - 9/2018, Washington

Page 1 of 3

treatments to eradicate infestations in other dwellings. If you fail to pay us for any costs you are liable for, you will be in default, and we will have the right to terminate your right of occupancy and exercise all rights and remedies under the Lease Contract, and obtain immediate possession of the dwelling. If you fail to move out after your right of occupancy has been terminated, you will be liable for holdover rent under the Lease Contract.

**10. TRANSFERS.** If we allow you to transfer to another dwelling in the community because of the presence of bed bugs, you must have your personal property and possessions treated according to accepted treatment methods or procedures established by a licensed pest control professional. You must provide proof of such cleaning and treatment to our satisfaction.

**11. SPECIAL PROVISIONS.** The following special provisions control over conflicting provisions of this printed form:

_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

## BED BUGS — A Guide for Rental Housing Residents

Bed bugs, with a typical lifespan of 6 to 12 months, are wingless, flat, broadly oval-shaped insects. Capable of reaching the size of an apple seed at full growth, bed bugs are distinguishable by their reddish-brown color, although after feeding on the blood of humans and warm-blooded animals—their sole food source—the bugs assume a distinctly blood-red hue until digestion is complete.

### Bed bugs don't discriminate
Bed bugs increased presence across the United States in recent decades can be attributed largely to a surge in international travel and trade. It's no surprise then that bed bugs have been found time and time again to have taken up residence in some of the fanciest hotels and apartment buildings in some of the nation's most expensive neighborhoods.

Nonetheless, false claims that associate bed bugs presence with poor hygiene and uncleanliness have caused rental housing residents, out of shame, to avoid notifying owners of their presence. This serves only to enable the spread of bed bugs.

While bed bugs are, by their very nature, more attracted to clutter, they're certainly not discouraged by cleanliness.
Bottom line: bed bugs know no social and economic bounds; claims to the contrary are false.

### Bed bugs don't transmit disease
There exists no scientific evidence that bed bugs transmit disease. In fact, federal agencies tasked with addressing pest of public health concern, namely the U.S. Environmental Protection Agency and the Centers for Disease Control and Prevention, have refused to elevate bed bugs to the threat level posed by disease transmitting pests. Again, claims associating bed bugs with disease are false.

### Identifying bed bugs
*Bed bugs can often be found in, around and between:*
• Bedding
• Bed frames
• Mattress seams
• Upholstered furniture, especially under cushions and along seams
• Around, behind and under wood furniture, especially along areas where drawers slide
• Curtains and draperies
• Along window and door frames
• Ceiling and wall junctions
• Crown moldings
• Behind and around wall hangings and loose wallpaper
• Between carpeting and walls (carpet can be pulled away from the wall and tack strip)
• Cracks and crevices in walls and floors
• Inside electronic devices, such as smoke and carbon monoxide detectors

• Because bed bugs leave some persons with itchy welts strikingly similar to those caused by fleas and mosquitoes, the origination of such markings often go misdiagnosed. However, welts caused by bed bugs often times appear in succession and on exposed areas of skin, such as the face, neck and arms. In some cases, an individual may not experience any visible reaction resulting from direct contact with bed bugs.
• While bed bugs typically prefer to act at night, they often do not succeed in returning to their hiding spots without leaving traces of their presence through fecal markings of a red to dark brown color, visible on or near beds. Blood stains tend also to appear when the bugs have been squashed, usually by an unsuspecting host in their sleep. And, because they shed, it's not uncommon for skin casts to be left behind in areas typically frequented by bed bugs.

### Preventing bed bug encounters when traveling
Because humans serve as bed bugs' main mode of transportation, it is extremely important to be mindful of bed bugs when away from home. Experts agree that the spread of bed bugs across all regions of the United States is largely attributed to an increase in international travel and trade. Travelers are therefore encouraged to take a few minutes upon arriving to their temporary destination to thoroughly inspect their accommodations, so as to ensure that any uninvited guests are detected before the decision is made to unpack.

Because bed bugs can easily travel from one room to another, it is also recommended that travelers thoroughly inspect their luggage and belongings for bed bugs before departing for home.

### Bed bug do's and don'ts
• **Do not bring used furniture from unknown sources into your dwelling.** Countless bed bug infestations have stemmed directly from the introduction to a resident's unit of second-hand and abandoned furniture. Unless the determination can be made with absolute certainty that a piece of second-hand furniture is bed bug-free, residents should assume that the reason a seemingly nice looking leather couch, for example, is sitting curbside, waiting to be hauled off to the landfill, may very well be due to the fact that it's teeming with bed bugs.

• **Do address bed bug sightings immediately.** Rental housing residents who suspect the presence of bed bugs in their unit must immediately notify the owner.

• **Do not attempt to treat bed bug infestations.** Under no circumstance should you attempt to eradicate bed bugs. Health hazards associated with the misapplication of traditional and non-traditional, chemical-based insecticides and pesticides poses too great a risk to you and your neighbors.

• **Do comply with eradication protocol.** If the determination is made that your unit is indeed playing host to bed bugs, you must comply with the bed bug eradication protocol set forth by both your owner and their designated pest management

©2018, National Apartment Association, Inc. - 9/2018, Washington

Page 2 of 3

DocuSign Envelope ID: D15C9337-7050-4BF8-A2CE-DF5E809BDB19

**You are legally bound by this document. Please read it carefully.**

| **Resident or Residents**<br>*(All residents must sign)* | **Owner or Owner's Representative**<br>*(Signs below)* |
|---|---|
| | |
| | **Date of Signing Addendum** |
| | |

*You are entitled to receive an original of this Addendum after it is fully signed. Keep it in a safe place.*

Washington/Oregon Apartment Association Official Form, Copyright 2021<br>© 2018, National Apartment Association, Inc.

DocuSign Envelope ID: D15C9337-7050-4BF8-A2CE-DF5E809BDB19

# Community Policies/Master Lease Addendum

## 1. Preface

This Master Lease Addendum contains community rules, regulations, and/or policies that are incorporated into and part of your Lease Contract. They apply to you and your occupants, guests, and invitees. Use of "we", "us", and "our" in this Addendum refers collectively to the owner of the community and the owner's authorized agents/representatives. Violation of any provision of this Addendum may result in termination of your right of possession and/or your Lease Contract. The community rules, regulations, and/or policies in this Addendum may be added, amended or repealed at any time in accordance with your Lease Contract. This Addendum is intended to supplement your Lease Contract. To the extent there is any inconsistency between this Addendum and the Lease Contract, the provisions of the Lease Contract control.

## 2. No Reliance on Security Devices or Measures

You acknowledge that cameras may be installed at some or all of the gates and in various common areas throughout the community. If cameras are installed, these areas may be recorded. Cameras, if installed, are for the sole purpose of protecting our real and personal property. Such cameras are not intended to protect, monitor, provide security for, or give a sense of security to you or any occupant or guest. You acknowledge that, given the limited purpose for which cameras may be installed or used, we have no obligation to cause such cameras to be monitored. We have no obligation to preserve or make available the contents of any recordings to you or others.

## 3. Entry Devices

In the event your community requires an entry device, the following policies apply.
a)  **Access Card, Remote or Key Fob:**  You and each occupant if you request, will receive one controlled access device of our choice. Additional devices may be available for an additional charge of $_____50_____.
b)  **Damaged, Lost or Unreturned Cards, Remotes, or Fobs:**  If a controlled access device is lost, misplaced, stolen damaged, or not returned at termination of this Agreement, a fee of $_____50_____ will be charged for each device replacement.
c)  **Duplicate, Lost or Unreturned Keys:**  A charge of $_____5_____ will be owed for each duplicate, lost or unreturned key.
d)  **Re-keying Lock:**  If you wish to have your apartment home, storage, mailbox, and/or garage lock(s) re-keyed because you have lost your key or for any other reason you agree to pay a re-keying fee of $_____50_____ which is due prior to changing your locks.
e)  **After Hours Lock Outs:**  After office hours, you must contact and pay for a locksmith if you have locked yourself out.
f)  **Lock Outs During Office Hours:**  If you are locked out of your apartment home during business hours, contact us.  A picture I.D. may be required to gain access to your apartment home.

## 4. Patios / Balconies / Private Yards

In the event your community has patios, balconies, or private yards, the following policies apply.

**Items Prohibited**

| | | |
|---|---|---|
| Combustible Materials | Flags | Furniture designed for Indoor Use |
| Firewood | Charcoal & Gas Grills | Bicycles hung from ceilings or walls |
| Unsightly or Heavy Items | Propane Tanks | Laundry |
| Motorcycles | Automobile Tires, Parts, Equipment | Signs |

a)  **Resident Responsible for Private Yard:**  In the event your apartment home has a private yard and you are responsible for maintenance of the yard, maintenance will include, but not be limited to, mowing, edging, shrub trimming, watering, debris removal, weeding, etc.  You agree to maintain the landscaping in a healthy condition (free of weeds, holes, fungus/parasites, pet feces, trash, debris and consistent color in sod, etc.). If your private yard is not maintained to the community standards, we have the right to maintain it and charge our actual cost each time maintenance is required.  Upon move-out, we can deduct any amounts owed for damage to the private yard which exceed ordinary wear and tear from the security deposit as allowable under the Lease Contract.
b)  **Community Landscaper Utilized for Private Yard:**  In the event your apartment home has a private yard and your community landscaper maintains the private yard, there may be an additional monthly fee of $_____0_____ required.  You are still responsible for maintaining the landscaping in a healthy condition (free of weeds, holes, fungus/parasites, pet feces, trash, and consistent color in sod, regular watering, etc.).  You agree to provide access so that routine yard management maintenance can occur.  If your private yard is not maintained to the community standards, we have the right to maintain it and charge our actual cost each time maintenance is required.  Upon move-out, we can deduct any amounts owed for damage to the private yard which exceed ordinary wear and tear from the security deposit paid as allowable under the Lease Contract.

## 5. Gardens

In the event your community has a garden for the enjoyment of all residents, the following policies apply.
a)  Unless otherwise posted, the hours are from dawn to dusk.
b)  Use at your own risk. In case of emergency, call 911.
c)  You agree to plant the garden plot within two weeks of being assigned a designated area.
d)  You agree to maintain the designated plot and to keep plants within the assigned/designated area.
e)  We encourage an organic gardening program.  Use of pesticides, herbicides, and insecticides made from synthetic materials as well as use of chemical fertilizers are not advisable.  Slug bait is permitted only when used in enclosed containers, which must be removed from the site after use.  Use of raw human and/or animal waste is not allowed due to environmental and health concerns.  Fully composted manures, such as steer and chicken manure, are allowed.
f)  No illegal plants may be grown, including but not limited to any plant listed by the state agencies and weed control board as noxious weeds.
g)  Only water your assigned garden plot.
h)  Maintain healthy plants and remove dead plants in a timely manner (not to exceed one week duration).
i)  Materials other than plants are prohibited, except items that assist in growth.
j)  All tools provided by us remain in designated areas.  We are not responsible for injuries due to the use of tools.  If you need any additional tools, they are your responsibility.
k)  Debris after planting, any remaining soil, fertilizer, etc. must be swept immediately.
l)  Garden plots will expire with your lease, and may be renewed at the time of lease renewal.  If you decide not to renew usage, the plot must be cleaned out and left in the original condition.  Renewal is not guaranteed.
m)  We are not responsible for lost, stolen, or damaged plants or other items.
n)  Please be respectful of the neighbors who live around the gardens.  No smoking, noise disturbances, or horseplay is allowed.
o)  Animals are not allowed in the garden plot areas, except assistance animals.

## 6. Inside or Near the Apartment Home

**6.1 Windows and Doors:**  Any window treatment installed by you shall present a uniform appearance with the exterior of the building.  The use of foil and other similar materials, on windows is strictly prohibited.  You will not obstruct any windows or doors.

**6.2 Welcome Mats and Heavy Items:**  You may place a welcome mat in front of your entry door subject to our approval.  Rugs or carpet remnants are not permitted.  You shall not place any unusually heavy objects on the floor of the Premises, such as pool tables, waterbeds, etc. without our prior written permission.  You will not obstruct any doorways, stairs, entry passages, breezeways, courtyards, or halls of the community.

**6.3 Soliciting:**  Soliciting is not permitted in the community.  Unless allowed by law or following our prior written permission, you shall not distribute, post, or hang any signs, flyers, advertisements, or notices in any portion of the community.

**6.4 Fireplace:** In the event your apartment home has a fireplace, you agree to use the fireplace for the intended purpose and at your own risk. Never use flammable liquids to start fires and never burn anything other than seasoned firewood. Clean your hearth of any flammable materials. Do not attempt to clean the inside of the chimney. Report maintenance needs to us immediately. Use a mesh screen and leave glass doors open when burning fires. If applicable, open the flue/damper before lighting a fire. Close the flue/damper only when the fire is completely out, the smoke has ceased to rise, and the wood is cool. Never leave a fire unattended. Put all fires out completely before going to bed or leaving the apartment home.

**6.5 Furniture, Televisions, Appliances:** In the event your apartment home has furniture, televisions, and/or appliances included, you agree to maintain them in a clean condition, reasonable wear and tear excepted. Removal of these items is not allowed. Upon move-out, these items must be placed in the same location they were upon move-in. You will pay the cost to repair, replace, or clean the furniture, televisions, and/or appliances.

**6.6 Wires and Personal Items Outside the Home:** No radio, television other wires are permitted on any part of the apartment home. You shall not store personal items in the outside walkways, breezeways or under stairs.

## 7. Odors

You, your occupants, guests, and invitees acknowledge that we cannot prevent odors in and around your apartment home and community.

**7.1 Resident Responsibilities:** If you create odors, you shall provide proper ventilation so you do not disturb or cause inconvenience to others.

**7.2 Removal of Odors:** If the carpet, walls, A/C ducts, or other items in the apartment home retain odors due to your use or surrounding residents complain about the odors, you will be responsible for the cost for removing unwanted smells and odors.

## 8. Parking and Vehicles

In the event your community has parking for residents, the following policies apply. Guests must park in guest parking only.
  a) **Speed Limit:** Unless otherwise posted, the speed limit is ten (10) miles per hour.
  b) **Posted Signs:** You are responsible for following all posted signs including height restrictions, mounted mirrors, and traffic control devices.
  c) **Unassigned Parking:** In the event parking at your community is unassigned, you can park on a first-come, first-serve basis, except in designated areas. Parking spaces are not guaranteed.
  d) **Assigned Parking:** In the event parking at your community is assigned, you must park only in your assigned space.
  e) **Limitation of Vehicles:** We will advise you if your community has a limitation on the number of vehicles allowed.
  f) **Restricted Vehicles:** Unless specifically allowed in designated areas, including carports and/or garages, the following are not allowed: campers, trailers, boats, buses, large trucks, commercial vehicles, mobile homes, trailers, recreational vehicles and equipment. Violators will be towed away without notice at the vehicle/equipment owner's expense.
  g) **No Vehicle Repairs:** Automobile repair work is not allowed on the community. Washing vehicles is not allowed unless there is a designated car care facility.
  h) **Vehicle Insurance:** All vehicles will be parked at your own or the vehicle's owner's risk, and you will maintain proper insurance on your vehicles.
  i) **No Loitering or Recreational Activities:** You, your occupants, guests, and invitees may not engage in the following activities in parking areas: loitering (standing or waiting around), recreational activities, or disrupting the flow of traffic.
  j) Improperly parked, non-operable, abandoned, or unauthorized vehicles or equipment are not permitted in the community and may be removed by us at your expense or the expense of any other person owning same, for storage or public or private sale, at our option with no right of recourse against us. The definition of improperly parked, non-operable, abandoned, or unauthorized vehicle or equipment shall be liberally construed in our favor. In addition, but not limited to their generally accepted definitions, "improperly parked", "non-operable", "abandoned", and "unauthorized" shall also mean vehicles or equipment which: (1) Are noxious, offensive, unsightly, unpleasant or unkempt such as could reasonably affect the appearance or rental marketability of the community or such as could reasonably cause embarrassment, discomfort, annoyance, or nuisance to us or other residents; (2) Are not displaying any required hangtag, decal, or other identifier provided by us; (3) Are left unattended for a period of not less than thirty (30) days without anyone having claimed ownership of it.

## 9. Parking Tags/Stickers

In the event your community requires parking tags/stickers, the parking tag/sticker must be visibly displayed either on the rear-view mirror or taped next to the vehicle registration. We are not responsible for damage to tint or glass due to the sticker. The vehicle can be towed without notice at the vehicle owner's expense in accordance with state law.
  a) You agree to advise your guests and invitees to park in the designated guest parking spaces only.
  b) If your sticker/tag is lost, stolen, damaged, or not returned upon move-out, a replacement fee of $_____0_____ will be assessed to your account.

## 10. Animals

**10.1 Assistance Animals:** Assistance animals required pursuant to a disability-related need are welcome. Assistance animals must be disclosed to and approved by us. The appropriate reasonable accommodation process will apply.

**10.2 Pet Policies:** No animals of any kind are permitted in your apartment or the community without our prior written consent. In the event your community allows pets, the following policies apply.
  a) **No More Than Two Pets:** A maximum of two pets per apartment home is permitted.
  b) **Weight Limits:** Pets shall not exceed your community's weight limit.
  c) **Restricted Breeds and Prohibited Dogs:** The following breeds are not permitted on the community: Rottweiler, Doberman Pinscher, Pit Bull Terrier/Staffordshire Terrier, Chow, Presa Canarios, Akita, Alaskan Malamutes, Wolf-Hybrid, or any mix thereof. Specific communities may have additional breed restrictions. In addition, we prohibit any dog with a history of biting, injuring any person or animal, or damaging property.
  d) **Determination of Breed:** Regardless of your representation as to the breed or classification of any animal, you agree that we shall make the final determination as to the breed or classification of your pet or animal in our sole and absolute discretion. Restricted Breeds shall have the broadest possible meaning, and includes, but is not limited to, any animal displaying physical traits or characteristics of any restricted breed animal, whether by observation or by standards established by the American Kennel Club, or other applicable association, or defined by any law, statute, or ordinance. If applicable, a canine DNA test may be requested at your expense.
  e) **Cats:** Cats must be spayed or neutered.
  f) **Animals Not Allowed in Amenities:** Animals, except Assistance Animals, are not permitted in the pool, pool area, or community amenity areas such as the business and fitness centers. No animals will be allowed in the pool or spa water.
  g) **No Staking Animals:** Animals may not be tied to any fixed object anywhere outside the dwelling units, except in fenced yards (if any) for your exclusive use.
  h) **Aquariums:** Aquariums up to 20 gallons are allowed without a pet deposit or fee. Aquariums over 20 gallons may require a pet deposit or fee in addition to proof of renter's insurance.
  i) **Secure Animals During Service Requests:** Remove animals or place them in a room behind a closed door or kennel/crate with notification to us.

## 11. Trash Removal and Disposal

  a) **Curbside Pick Up:** In the event your community offers curbside trash pick-up, contact us for the scheduled days and times of pick-up. You agree not to leave any trash out on days that are not scheduled for pick-up. We reserve the right to remove curbside trash pick-up service upon written notice to you of the change.
  b) **No Curbside Pick Up:** In the event your community does not offer curbside trash pick-up, you shall dispose of your bagged and tied trash inside the compactor/dumpster facility as instructed by us or by the sign near the compactor/dumpster.
  c) **Trash Chutes:** In the event your community has trash chutes, contact us for the scheduled hours of operation. Securely tied, kitchen-sized bags are required. No loose items can be put in the trash chute. Do not use the chute for recycling. No boxes or large trash can be placed in the chutes. Contact us for details or questions regarding the use of the trash chute.
  d) **Recycling:** In the event recycling is offered at your community, you are responsible for complying with all recycling regulations.
  e) **Potential Charges:** You may be charged $25 per bag for any trash left outside your apartment home or in breezeways. Please contact us if you require further instruction regarding proper disposal of garbage with the compactors, dumpsters, or chutes.

f) **No Litter:** Do not leave cigarette butts or other trash near or around patios/balconies, under windows, or near entry doors. We reserve the right to assess a fine of $25 per incident.
g) **No Furniture as Trash:** No furniture may be left for trash removal.
h) **Dumpster Use for Residents Only:** Only you and your occupants are permitted to use the dumpster/compactor.
i) **No Dumpster Diving:** Do not retrieve items from the dumpster. Digging or scavenging is prohibited.
j) **General:** Please break down empty boxes. Keep the area clean and litter free. If applicable, close the lid after use.
k) **No Parking in Front of Dumpster:** Parking in front of the dumpster/compactor is not allowed.
l) **Prohibited Items:** You understand that you cannot place the following items in or around the trash dumpster or compactor: propane tanks, flammable or toxic materials, furniture, bedding, appliances, auto batteries, tires, and oil/petroleum products.

## 12. Pest Control

**12.1 Extermination:** Unless prohibited by statute or otherwise stated in your Lease Contract, we may have extermination operations conducted in the apartment home several times a year and as needed to prevent insect infestation. If pest control services are provided, you shall pay the amount of $_____ on or before the first day of each month to reimburse us for extermination services to the apartment home. You shall pay such fee in the same time and manner as you pay rent pursuant to your Lease Contract. You must request in writing extermination treatments in addition to those regularly provided by us.

**12.2 Preparations for Extermination:** If the apartment home is not prepared for a scheduled treatment date, we will reschedule treatment at your expense. You agree to perform the tasks necessary to prepare the apartment home for extermination, including:
a) removing people sensitive to the extermination treatment from the apartment home;
b) removing animals or placing them in bedrooms with notification to us;
c) removing animal food bowls;
d) removing all food, utensils, glasses, and dishes and food containers from countertops and floors;
e) removing chain locks or other obstructions on the day of service;
f) removing contents from shelves, cabinets, and floors where pests have been seen;
g) cleaning all cabinets, drawers, and closets in kitchen and pantry; and
h) refraining from wiping out cabinets after the treatment.

**12.3 Notify Us of Health Issues:** You are solely responsible for notifying us in writing prior to extermination of any anticipated health or other concerns related to extermination and the use of pesticides.

**12.4 Your Responsibilities:** To reduce the possibility of pests, you shall: (a) store all food in sealed containers; (b) not leave food or dirty dishes out; (c) empty all cans and bottles and rinse them with water; (d) immediately dispose of unused paper grocery sacks; (e) sweep and mop the kitchen regularly; (vi) vacuum carpets frequently to remove crumbs and other food particles; (f) remove trash immediately; (g) not put wet garbage in the trash; (h) use the garbage disposal if available; (i) not leave windows or doors open allowing pests to enter; and (j) comply with any instructions/protocol from the extermination company.

## 13. Packages / Deliveries

In the event our community accepts packages for residents we do so in our sole discretion and the following policies apply:
a) We will only accept packages from a commercial delivery service (UPS, Federal Express, etc.) and United States Postal Service. We will not accept any package shipped COD or having postage due.
b) In the event our community offers a package locker system, couriers will make all deliveries exclusively through the locker system. Refer to your community for the locker location name to be placed on address delivery label(s), which will instruct couriers of proper delivery.
c) We will not be responsible or liable for any lost or stolen deliveries which we sign for or accept. While your deliveries are in our possession, both during and after office hours, your deliveries are not secured.
d) Pick up your deliveries within 48 hours. If you do not pick up your delivery within 48 hours, we reserve the right to return to sender.
e) Occasionally the number of deliveries may become too great or too cumbersome; therefore, we reserve the right at all times to refuse deliveries.
f) We have no obligation to contact you when accepting packages. This is your and the deliverer's responsibility.
g) Deliveries or service requiring entrance into your apartment home by anyone other than us will be allowed only with your prior written permission.
h) We are not responsible for articles or parcels left at your door or in the office by delivery services.
i) We will not be available after hours to allow you access to your deliveries. You must pick up your packages during regular office hours.
j) You shall not have perishable goods delivered to the office unless your community has approved such delivery in advance or offers refrigerated lockers.
k) We may not accept packages that are over 25 pounds or larger than 2'x2'x2'.
l) You may be required to present a photo ID and/or signature when picking up a package.

## 14. Maintenance Emergencies

Service requests will be handled after office hours if they are emergencies. We define emergencies as the following:
a) Electrical or gas failure of any nature
b) Broken or non-working exterior doors, locks, windows
c) Malfunctioning access gates that are locked and will not open
d) No heat (when outside temperature is below 60 degrees)
e) No air conditioning (when outside temperature is above 85 degrees)
f) No water
g) Overflowing toilet
h) Flooding
i) Broken pipes
j) Fire (call 911 immediately)
k) After business hours, emergency service requests can be reported by calling the office. The on-duty service technician will be notified and will respond as quickly as possible.

## 15. Apartment Home Transfers

When transferring to another apartment home within the community:
a) You shall not replace or transfer your interest in the Lease Contract, or any part hereof, without our prior written consent. If you are in violation of the Lease Contract, you will not be approved for a transfer.
b) You must sign a Transfer form.
c) The criteria for qualifications of credit, income and employment, residence, and criminal must be met for residents that transfer within the lease term or at the end of the lease term.
d) You must fulfill at least 3 months of your current lease term before you will be eligible to transfer to a new apartment home.
e) If applicable, a transfer fee must be paid prior to transferring. A new security deposit may be required to secure the new apartment home. In addition, market rent, new pet deposit/fees (if applicable) and other applicable fees must be paid.
f) You are required to provide a written move-out notice according to your Lease Contract from the current apartment home. The vacated apartment home must be left in the condition described in the move-out cleaning instructions. We will inspect the apartment home and forward statements and deposit refunds to your new address.
g) If you cancel the transfer after the new apartment home has been assigned and taken off the market, you will be responsible for any economic loss sustained resulting from your failure to rent the new apartment home.
h) You shall be responsible for all moving costs including those associated with switching utilities and services to the new apartment home if a transfer is approved.

## 16. Amenities / Facilities

| | | | | |
|---|---|---|---|---|
| Swimming Pool | BBQ Grill/Fire Pit | Spa or Hot Tub | Club Room | Dog Park/Spa |
| Sports Court | Car Cleaning Facility | Game Room/Theater | Laundry Room | |
| Tanning Facilities | Sauna | Business Center | Fitness Facilities | |
| Video Library | Nature/Hiking Trail | Playground | Roof Top Deck | |

In the event that your community hosts any of the above or other amenities, the following apply:

- In an emergency, call 911
- Attendants are not provided
- Use amenities at your own risk
- Comply with posted signs
- Use equipment in the manner it is intended
- Do not destroy any equipment/amenity
- Report any equipment needing repair or vandalism
- Do not remove any equipment
- Wear appropriate attire
- Be mindful of others when using amenities and limit time as necessary
- Only two guests are allowed and must be accompanied by you
- We are not responsible for accidents, injuries, or lost, stolen, damaged, or misplaced items
- You agree to hold us harmless from any and all claims, damages, or expenses related to the use of amenities

## 17. Amenity / Facility Safety-Related Restrictions

**17.1 Safety-Related Restrictions:** Our community contains amenities/facilities that are intended to enhance the living experience for you and your occupants. You agree that, for safety-related reasons, certain amenities/facilities may require restrictions on use. You agree to abide by posted signs. You further agree that you, your occupants or guests will be supervised, as needed, by someone possessing the proper skills to supervise the particular activity at the amenities/facilities.

**17.2 Residents Shall Exercise Their Own Prudent Judgment:** You, occupants and guests are advised to exercise their own prudent judgment with respect to the unsupervised use of the facilities located throughout the community. By establishing safety-related use restrictions, we are not in any manner representing, guaranteeing or ensuring the safety of any persons when participating in the activities or using the facilities of the community with or without supervision.

## 18. Swimming Pool and Spa / Hot Tub

In the event your community has a pool and/or hot tub for the enjoyment of all residents, the following policies apply. Please follow posted signage.
- a) We do not provide, at any time, safety or supervisory personnel at the pools, hot tubs, spas, or any other common area. LIFEGUARDS ARE NOT PROVIDED. SWIM AT YOUR OWN RISK. FOR YOUR SAFETY, DO NOT SWIM ALONE.
- b) No diving. Diving may result in injury or death.
- c) We cannot and do not assure, guarantee or warrant your safety.
- d) Assistance animals are allowed in the pool area if necessary due to a disability-related need; however, no animals will be allowed in the pool or spa water.
- e) We are not responsible for accidents, injuries, or lost, stolen, damaged or misplaced items.
- f) No jumping into the pool from balconies, patios, fountains, or other structures near the pool.
- g) Keep gates closed at all times.
- h) Respect others by covering pool furniture with a towel. Do not remove pool furniture from pool areas. Dispose of trash properly.
- i) Overexposure to hot water may cause dizziness, nausea, and fainting. Hot water exposure limitations vary from person to person.
- j) Check the hot tub temperature before entering the hot tub. Do not use the hot tub if the temperature is above 104 degrees. Do not operate the hot tub if the suction outlet cover is missing, broken, or loose.
- k) Do not place electrical appliances (telephone, radio, TV, etc.) within five feet of the pool or hot tub.
- l) Appropriate swimwear is required at all times as determined by us. Diapers are not allowed unless they are swim diapers.
- m) You are limited to 2 guests to any pool/hot tub area, and you must accompany your guests at all times.

## 19. Sports Courts (Tennis, Volleyball, Basketball, etc.)

In the event your community has sports courts (tennis, volleyball, basketball, etc.) for the enjoyment of all residents, the following policies apply.
- a) Motorcycles, bicycles, tricycles, roller blades, skateboards and skates are not permitted on the court surface.
- b) Do not sit or lean on the net. Do not hang from or climb on the goal or nets.
- c) Proper athletic shoes with rubber soles are required.

## 20. Club Room / Game Room / Theater

In the event that your community provides a club room, game room, and/or theater for the enjoyment of all residents, the following policies apply.
- a) No wet clothing permitted.
- b) Clubroom hours are determined by us.
- c) All items must be returned, in the condition in which they were received prior to leaving.
- d) Use the facility at your own risk. Use the equipment only in the manner intended by manufacturer.
- e) Do not remove or damage equipment and supplies.

## 21. Tanning Bed, Tanning Dome, or Spray Tan Booth

In the event a tanning device(s) is provided for the enjoyment of all residents, the following policies apply:
- a) Failure to use the eye protection may result in permanent damage to your eyes.
- b) Overexposure to ultraviolet light (whether from natural or artificial sources) causes burns.
- c) Repeated exposure to ultraviolet light (whether from natural or artificial sources) may result in premature aging of the skin and skin cancer.
- d) Abnormal skin sensitivity or burning may be caused by reactions of ultraviolet light to certain food, cosmetics, and medications.

## 22. Video / DVD Library

In the event your community provides a video/DVD library, the following policies apply.
- a) You acknowledge and agree to be fully responsible for any and all videos/DVDs borrowed by self or other occupants while using the video services provided.
- b) All videos/DVDs must be returned in good working condition (except reasonable wear and tear) within 48 hours.
- c) We are not responsible for persons borrowing videos/DVDs that may not be suitable for themselves or others.
- d) We may charge your account the total amount owed including late charges and/or market value of all items not returned in good working condition.

## 23. Business / Computer Center

In the event your community has a business center for the enjoyment of all residents, the following policies apply:
- a) The center is for use by you and occupants only.
- b) We are not responsible for lost, stolen or damaged items, content viewed, viruses or loss of information.

    c)  Smoking, food and drinks are prohibited.
    d)  Please be considerate of others.  Limit computer use to 30 minutes when others are waiting.
    e)  You must provide their own document/data storage.  Do not install or download any program, file or software on the business center equipment. Data created, stored or saved on the business center equipment will not be private, may be used by us for any purpose and will likely be deleted. *Incoming faxes are prohibited.*
    f)  We reserve the right to monitor, intercept, review, and erase, without further notice, all content created on, transmitted to, received or printed from, or stored or recorded on the courtesy devices.
    g)  Users should not use the courtesy device to transmit or store personal information, including user names, passwords, addresses, driver's license numbers, social security numbers, bank information, or credit card information.
    h)  The courtesy device and associated access to the internet may not be used to (a) violate United States, state, or foreign laws; (b) transmit or receive material that is threatening, obscene, harassing, discriminatory, defamatory, illicit, or pornographic; or (c) interfere with or disrupt network users, services, or equipment.
    i)  Attempts to remove equipment from the business center will engage the alarm system.
    j)  Users may not alter or damage existing hardware or software.  Do not modify screensavers or background images on business center equipment.
    k)  Violation of any or all of the above stated rules may result in termination of business center use or other remedies under the lease.

## 24. Barbecue Grill / Outdoor Kitchen / Fire Pit / Fire Place

In the event your community has barbeque grills, outdoor kitchens, fire pits, or fire places for the enjoyment of all residents, the following policies apply.
    a)  Barbecue grill instructions may be posted at each location or are available from us.  Please contact us before attempting to use these grills.
    b)  Keep pets and persons requiring supervision away from open flames.
    c)  Your community may require a deposit or fee to use the facility.  Contact us for further details.
    d)  Never leave a fire unattended.  Do not leave until the fire is completely out.
    e)  Keep flammable materials away from the fire.

## 25. Laundry Room

In the event your community has laundry rooms, the following policies apply.
    a)  Use appropriate settings on washers and dryers.  Any loss or damage to clothing is not our responsibility.
    b)  No dying of clothes is permitted.
    c)  Do not wash or dry oversized items.
    d)  Remove lint from dryer before and after each use.  Wipe down after use.  Please leave machines clean.
    e)  Facilities are for use by you and occupants only.

## 26. Dog Park/Spa

In the event your community has a Dog Park or Spa for the enjoyment of all residents, the following policies apply.
    a)  Animal owners are responsible their animal's behavior, for damage or injury inflicted to or by their animal(s). Animal owners must remain with dogs in fenced area at all times.
    b)  You are limited to 2 animals per person in the Dog Park or Spa
    c)  Dogs must be leashed when entering and exiting the park and must be leashed in the transition corridor, if applicable.  You must have a visible leash for each dog at all times.
    d)  Animals with a known history of dangerous or aggressive behavior are prohibited. Immediately leash your dog(s) and leave the Dog Park if your dog behaves aggressively.
    e)  Puppies under 6 months of age and female dogs in heat are not allowed in the Dog Park.

## 27. Roof Top Deck

In the event your community has a roof top deck for the enjoyment of all residents, the following policies apply.
    a)  You, your occupants and guests shall not walk in any areas on the roof other than the designated walkway and roof top deck itself.
    b)  Nothing shall be thrown or intentionally dropped over the edge of the roof.  You, upon the first infraction of this policy by you, your occupants or guests, may have use privileges revoked and/or residency terminated.

## 28. Photographs, Digital Images, Video

All residents, occupants, visitors and guests, while in common areas, give Owner, management company, their employees, agents, subsidiaries and authorized vendors the right to record their image and/or voice, and grant Owner and management company all rights to use these sound, still, or moving images in any and all media, now or hereafter known, and for any purpose whatsoever.

A release to Owner, management company, their employees, agents, subsidiaries and authorized vendors is granted for all rights to exhibit this work in all media, including electronic form, publicly or privately. The rights, claims or interest controlling the use of identity or likeness in the sound, still or moving images is waived and any uses described herein may be made without compensation or consideration.

## 29. Wildlife

**29.1 Definition of Wildlife:**  Wildlife can include the presence of alligators, bears, crocodiles, snakes, opossums, raccoons, or other non-domesticated animals.  In the event wildlife is found on the community, you agree to the following.

**29.2 Resident Acknowledgements:**  You assume the risk with respect to having wildlife near your apartment home and acknowledge that we are not liable for any injuries, damages or losses to persons or property caused by or related to the wildlife.

**29.3 Resident Responsibilities:**  You will be responsible for informing occupants, guests and invitees about the wildlife and enforcing their compliance with the following:
    You, your occupants and guests will not:
    a)  feed, get close to, or attempt to catch the wildlife;
    b)  swim, wade or play near the wildlife;
    c)  dispose of garbage of scraps near a water source, pond, lake, or other area that may contain wildlife.

## 30. Body of Water (Lake, Pond, Water Features)

You will be responsible for informing occupants, guests and invitees about the bodies of water and enforcing their compliance with the following:
No one will
    a)  swim or wade in any body of water that is not designated as a swimming pool;
    b)  boat on any body of water unless approved by us;
    c)  ice skate or conduct any other type of water sport in or on the bodies of water.

## 31. Elevators

In the event your community has an elevator (s) for the enjoyment of all residents, the following policies apply.
    a)  Do not attempt to maneuver or stop closing doors.  Wait for the next elevator car.
    b)  In the event of a fire or other situation that could lead to a disruption in electrical services, take the stairs.
    c)  When entering and exiting the elevator, watch your step as the elevator car may not be perfectly level with the floor.
    d)  Do not climb out of a stalled elevator.  Use the alarm, help, or telephone button to call for assistance.

## 32. Construction or Renovation

In the event your community is under construction or renovation, the following policies apply:
  a) **Inform Occupants and Guests:**  You will be responsible for informing occupants, guests, and invitees about these policies.
  b) **Stay Away from Construction Areas:**  You agree to observe all warning signs and blockades.  You agree to stay away from the construction areas and shall not climb on or enter onto scaffolding or other construction equipment at any time.  You acknowledge there may be construction debris, trip hazards, and uneven surfaces.  Construction crews may work throughout the days to complete construction.
  c) **Machinery and Equipment:**  You acknowledge the construction areas will have machinery and equipment to be used by authorized personnel only and entry into those areas by you, your occupants, guests or invitees is strictly prohibited.
  d) **Minor Disturbances:**  You acknowledges that the construction/renovation may cause noise, dust, and minor disturbances to the egress/ingress on or about the community and minor disturbances to the quiet and enjoyment of the apartment home.
  e) **Amenities May Be Unavailable:**  You further agree that the amenities, including the clubhouse, pool, or other common areas, may be unavailable for use by you, your occupants, guests and invitees during the period of construction.
  f) **Resident Waives Right to Withhold Rent:**  Except as otherwise prohibited by law, you hereby waive any right to withhold rent due to inconvenience or disturbance of quiet enjoyment of your apartment home or the inability to use the amenities or common areas or put forward such noise or construction activity as a breach of our duty pursuant to applicable law.
  g) **Move-In Date Not Guaranteed Due to Construction Delays:**  You acknowledge that the move-in date cannot be guaranteed in the case of unforeseen construction delays.  You acknowledge that you will not be compensated for any unforeseen occupancy delays.  If you terminate the Lease Contract early for any reason other than construction delays, you will be responsible for all applicable early termination charges and procedures.

## 33.  Prevention of Mold

You agree not to conduct any mold or other environmental testing of your apartment without giving us at least 72 hours advance written notice to enable us to have a representative present during testing.  You agree that failure to provide such notice means the testing is not admissible in any legal proceedings.

## 34.  Fire/Freezing Weather/Floods/Other Emergencies

Emergency situations may occur during your residency.  Please remember that you are responsible for your own safety and the safety of your occupants, guests and invitees.  You should look to the proper authorities for any assistance when needs exceed your abilities.  Please note the following regarding certain emergency situations.

**34.1 Fire Hazards:**
  a)  Follow fire safety and fire safety regulations while in the apartment home and community.
  b)  No flammable or combustible objects/substances are to be stored on patios, balconies, under stairwells, in your garage or storage space and should not be within 30 inches of an item which produces heat (water heater, furnace, stove, oven, candle, curling iron, etc.)
  c)  Items which require an open flame to operate or which produce heat (e.g., Bunsen burners, sterno/canned heat, lighted candles, alcohol burners, heating elements, irons, curling irons, halogen bulbs, stove, oven) must be supervised at all times during use and should never be left unattended.
  d)  Do not obstruct or use the driveways, sidewalks, entry passages, stairs, breezeways, courtyards, or halls for any purpose other than ingress or egress.
  e)  Fireworks are prohibited inside the apartment home or anywhere within the community.

**34.2 Fire Alarms:**  In the event residents are given procedures for fire alarms, you, your occupants, guests and invitees are required to adhere to all procedures.
  a)   You and your occupants, guests, and invitees must not tamper with, interfere with, or damage any alarm equipment and/or installation.
  b)  In the event the community has a fire sprinkler system, you acknowledge and hereby agree that it is important to be careful near fire sprinkler heads so as not to falsely trigger or activate them.  If you trigger or activate the fire sprinkler system, you will be responsible for all damages caused by the activation.
  c)  Anyone found to falsely pull a fire alarm will be subject to criminal charges, a fine, and/or a default of the Lease Contract.
  d)  An extension cord must be UL approved, 16 gauges, and not exceed an un-spliced length of six feet with a polarized plug and a single outlet; it may not be placed under floor coverings or furnishings and may not be secured by penetrating the insulation.

**34.3 Freezing Weather:**  You shall follow these precautions when subfreezing weather occurs.
  a)  Leave the heat on 24 hours a day at a temperature setting of no less than 55 degrees.  Keep all windows closed.
  b)  Leave open the cabinet doors under the kitchen sink and bathroom sink to allow heat to get to the plumbing.
  c)  Drip all your water faucets 24 hours a day.  If severe subfreezing weather occurs, it may be necessary to run your faucets at a steady, pencil-lead stream when you are in the apartment home and when you are gone.  This includes hot and cold water in your kitchen, bathroom lavatories, bathtubs, shower, wet bar sinks, etc.
  d)  Leave all drains open and clear of obstacles; including lavatories, sinks and bathtubs.
  e)  If you notice a water leak, icy spot or other hazardous condition on the community, notify us IMMEDIATELY.

**34.4 Floods:**
  a)  If heavy rain, storms or flooding is forecast, you should follow the guidelines below.  Do not put tape on the windows unless directed by us.
  b)  Unplug all appliances and televisions. Do not plug appliances back in until the water completely recedes and community personnel give you permission.

## 35.  Power Outage

In the event of a power outage that lasts more than 24 hours, we have the right, but not an obligation, to dispose of the contents of the refrigerator/freezer in your apartment home. You waive any claim and hold us harmless for the disposal of such contents. You agree not to seek recovery against us for interruption of power that results in disposal, loss, or spoilage of refrigerated or frozen food.

## 36.  Payments

Unless otherwise allowed at your community, we only accept electronic payments.  Cash, paper checks, paper money orders or other forms of payment will not be accepted. Credit and Debit Card transactions may not be allowed.

**36.1 ACH, Credit, and Debit Cards:**  Automated electronic payments include ACH and Credit and Debit Card transactions.  ACH refers to the nationwide network of banking institutions that have agreed to process electronic payments automatically from your bank account to our bank accounts.  Virtually all banks and credit unions participate.  Credit and debit card transactions refers to credit and debit card transactions, including those cards bearing the Visa, MasterCard, Discover and American Express logos.  Collectively, "automated electronic payments" are paperless transactions that occur instantly and automatically without a check being hand-processed through a local bank clearinghouse or the Federal Reserve System.

**36.2 Advantages in Paying Rent via ACH:**  There are advantages for you in paying your rent via automated electronic payments, including:
  a)  Greater convenience since you won't have to worry each month with writing, mailing or delivering a rent check;
  b)  No late charges since your rent will be paid timely, assuming there are sufficient funds in your checking account;
  c)  Greater security since there is little chance that a check signed by you will fall into the wrong hands or get lost in the mail; and
  d)  Proof that you've paid since your bank statement is evidence of payment according to ACH and card network rules.

**36.3 Electronic Money Orders:**  We also accept electronic money orders.  Details on this payment option are available at the office.

**36.4 Check Scanner:**  If your community accepts paper checks and uses a check scanner, you are hereby advised that personal checks remitted for normal payments will be scanned and the funds will be electronically withdrawn from your bank account via "Automated Clearing House" (ACH).  If you wish to opt out of this process, you must choose another payment method.  Standard ACH bank drafts occur after one business day.

**36.5 Electronic Check Conversion:**  If your community accepts paper checks, please be aware that we may use electronic check conversion.  This is a process in which your check is used as a source of information (for the check number, your account number, and the number that identifies your financial institution).  The information is then used to make a one-time electronic payment from your account (an electronic fund transfer).  The check itself is not the method of payment.  Your electronic transaction may be processed faster than a check.  Be sure you have enough money in your account at

the time you make a purchase or payment. Your financial institution will not return any checks that are converted, even if you normally receive your original checks or images of those checks with your statement. Always review your regular account statement from your financial institution. You should immediately contact your financial institution if you see a problem. You have only 60 days (from the date your statement was sent) to tell the financial institution about a problem. Depending on the circumstances, the financial institution may take up to 45 days from the time you notify it to complete its investigation. Your checking account statement will contain information about your payment, including the date, the check number, the name of the person or company you have paid, and the amount of the payment.

## 37. Data and Communication

You understand and accept that we may collect, retain, use, transfer, and disclose personal information, such as the first name, last name, email address, and phone number of you or your occupants in the unit. We may collect, retain, and use that information, or disclose that information to third parties to, among other things, (a) operate the Property; (b) provide services consistent with the Lease; (c) refer you to third parties that provide products or services that may be of interest to you or your occupants in the unit; (d) collect debts; and (e) conduct and analyze resident surveys. Please review the privacy policy of the owner's authorized agent at the time of residence for a discussion of the treatment of information during your lease. The current policy may be viewed at https://www.greystar.com/privacy.

Providing an email address or cell phone number to us enables us to send important announcements, including notices regarding an emergency water shut off, work to be done at the Property, or changes in office hours. By providing this contact information, you and your occupants consent to receive communications regarding marketing materials, promotional offers, community messages, and service reminders via e-mail, voicemail, calls and/or text.

By providing your and your occupants' phone numbers, you acknowledge and agree that we may contact you and your occupants at the phone number(s) that you and your occupants have provided, including through an automatic telephone dialing system and/or an artificial prerecorded voice, with information and notifications about the community and for other non-marketing, informational purposes, including in connection with expiration of your lease. You further warrant to us that you or your occupants are the subscriber for any wireless number that you or your occupants have provided. You agree to immediately notify us if you or your occupants are no longer the subscriber for a wireless number, or if a wireless number changes. Text messaging and data rates may apply.

You authorize us to deliver messages regarding renewal of your lease and other offers to you at the telephone number(s) that you have provided, including through the use of an automatic telephone dialing system and/or artificial or prerecorded voice. You acknowledge and agree that this authorization is made voluntarily.

The permissions and consents granted herein apply to the owner of the community and the owner's authorized agents/representatives, including its property manager, and will continue even after your lease expires, the owner of the community sells the community, or the property manager no longer manages the community.

## 38. Subletting and Replacements

**38.1 When Allowed**: Replacing a resident, subletting, assigning, or licensing a resident's rights are allowed only when we consent in writing. Residency at your community is subject to an application and/or approval by us. Occupancy is restricted to only the named residents and occupants that are identified in your Lease Contract.

**38.2 Advertising Your Apartment**: You are not allowed to advertise your apartment homes(s) without our written consent. This prohibition on advertising includes online postings, print advertising or other formats such as craigslist, Airbnb, etc.

## 39. Conduct

You agree to communicate and conduct yourself at all times in a lawful, courteous, and reasonable manner when interacting with us; our employees, agents, independent contractors, and vendors; other residents, occupants, guests or invitees; or any other person in the community. Any acts of unlawful, discourteous, or unreasonable communication or conduct by you or your occupants, guests or invitees, shall be a material breach of this Agreement and will entitle us to exercise all of our rights and remedies for default.

You agree not to engage in any abusive behavior, either verbal or physical, or any form of intimidation or aggression directed at us; our employees, agents, independent contractors, and vendors; other residents, occupants, guests or invitees; or any other person in the community. Any acts of abusive or offensive behavior whether verbal or physical by you or your occupants, guests or invitees, shall be a material breach of this Lease and will entitle us to exercise all of our rights and remedies for default.

If requested by us, you agree to conduct all further business with us in writing.

| Summary | |
|---|---|
| **Section and Description** | **Charge** |
| Additional Controlled Access Device | $ 50 |
| Damaged/Lost/Unreturned Cards/Remotes/Fobs (per device) | $ 50 |
| Duplicate/Lost/Unreturned Key | $ 5 |
| Re-keying Lock | $ 50 |
| Private Yard Maintenance Fine | $ 0 |
| Lost/Stolen/Unreturned Parking Tag/Sticker (per item) | $ 0 |
| Trash Clean-up (per bag) | $ 25 |
| Litter Fine (per incident) | $ 25 |
| Pest Control Monthly Fee | $ |

This is a binding document. Read carefully before signing.

**Resident(s) Signature(s)** *(18 years of age and over)*

_____ Date: _____

_____ Date: _____

_____ Date: _____

_____ Date: _____

_____ Date: _____

_____ Date: _____

**Owner's Representative Signature:**

_____

DocuSign Envelope ID: D15C9337-7050-4BF8-A2CE-DF5E809BDB19

# FIRE SAFETY AND PROTECTION INFORMATION

This Fire Safety and Protection Information form is incorporated into the Lease Contract executed on **November 1, 2019** between **Madison Summit LLC**

( "We" ) and

**Christopher Berg,** ▬▬▬▬

("You") of Unit No. **E214** located at **1819 23rd Ave #E214**
(street address) in **Seattle, WA 98122**
and is in addition to all terms and conditions in the Lease Contract.

1. The dwelling is equipped with smoke detection devices as required by RCW 43.44.110. These smoke detection devices are ☒ hard wired ☒ battery operated. The devices have been inspected and are properly operating at the commencement of the tenancy. It is the resident's responsibility to maintain the devices in proper operating condition including replacement of batteries, if necessary. A fine can be imposed for failure to comply with the provisions of RCW 43.44.110.

2. A diagram showing the emergency evacuation routes for residents is attached as Exhibit A.

3. The dwelling complex ☒ does ☐ does not have a fire sprinkler system.

4. The dwelling complex ☒ does ☐ does not have a fire alarm system.

5. The dwelling complex ☒ does ☐ does not have a smoking policy. A copy of any smoking policy is attached as Exhibit B.

6. The dwelling complex ☐ does ☒ does not have an emergency notification plan for residents. A copy of any such plan is attached as Exhibit C.

7. The dwelling complex ☐ does ☒ does not have an emergency relocation plan for residents. A copy of any such plan is attached as Exhibit D.

8. The dwelling complex ☒ does ☐ does not have an emergency evacuation plan for residents. A copy of any such plan is attached as Exhibit E.

|  |  |
|---|---|
| **Resident or Residents** | **Owner or Owner's Representative** |
| *(All residents must sign here)* | *(signs here)* |

**Date of Lease Contract**

**November 1, 2019**





# ADDENDUM REGARDING RECREATIONAL and MEDICAL MARIJUANA
## and LANDLORD'S COMMITMENT TO ENFORCEMENT
## OF CRIME FREE ADDENDUM

**1. DWELLING UNIT DESCRIPTION.**
Unit No. **E214** , **1819 23rd Ave**
**#E214**
_____ *(street address)* in
**Seattle**
*(city)*, Washington, **98122** *(zip code).*

**2. LEASE CONTRACT DESCRIPTION.**
Lease Contract Date: **November 1, 2019**
Owner's name: **Madison Summit LLC**
_____
_____
_____

Residents *(list all residents)*:
**Christopher Berg,** ████████████████

This Addendum constitutes an Addendum to the above described Lease Contract for the above described premises, and is hereby incorporated into and made a part of such Lease Contract. Where the terms or conditions found in this Addendum vary or contradict any terms or conditions found in the Lease Contract, this Addendum shall control.

**3.** Washington State law permits the limited use of medical and recreational marijuana in specific and limited circumstances. However, this is not the case under federal law. Under federal law, specifically the Federal Controlled Substances Act (CSA), marijuana is still categorized as a Schedule I substance. This means that under federal law, and U.S. Supreme Court decisions, the manufacture, distribution, or possession of marijuana is strictly prohibited. Because the U.S. Department of Housing and Urban Development is controlled by the federal government, HUD policy is that the use of marijuana, whether prescribed for medical reasons or not, is a criminal offense and will not be protected under the fair housing laws or allowed in HUD funded housing. Therefore, apartment complexes are not required to accommodate the use of marijuana by a tenant who is a current medical marijuana user. Disabled tenants who are registered medical marijuana users, however, should not feel discouraged to request reasonable accommodations if the need arises.

**4.** The Premises listed above follows and complies with federal law regarding marijuana use and is, and will continue to be, a drug free community. Possession, use, manufacture or sale of any illegal substance, including marijuana, or any use of marijuana by the tenant and/or guests will result in immediate termination. If you have any questions or concerns about this policy, please speak to management.

**5.** By signing below, the resident acknowledges his or her understanding of the terms and conditions as stated above, and his or her agreement to comply with those terms and conditions.

**6. SPECIAL PROVISIONS.** The following special provisions control over conflicting provisions of this printed form:
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

**Resident or Residents** *(sign here)*          **Date of Signing Addendum**

**Owner or Owner's Representative** *(signs here)*          **Date of Signing Addendum**

© 2019, National Apartment Association, Inc. - 8/2019, Washington

*James Lillie*

# CRIME/DRUG FREE HOUSING ADDENDUM



**1. DWELLING UNIT DESCRIPTION.**
Unit No. _____ E214 _____, 1819 23rd Ave
#E214 _____
_____ (street address) in
_____ Seattle _____
(city), Washington, __ 98122 __ (zip code).

**2. LEASE CONTRACT DESCRIPTION.**
Lease Contract Date: **November 1, 2019**
Owner's name: **Madison Summit LLC**
_____
_____
_____

Residents (list all residents):
**Christopher Berg,** ▮▮▮▮▮▮▮▮▮▮
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

**3. ADDENDUM APPLICABILITY.** In the event any provision in this Addendum is inconsistent with any provision(s) contained in other portions of, or attachments to, the above-mentioned Lease Contract, then the provisions of this Addendum shall control. For purposes of this Addendum, the term "Premises" shall include the dwelling unit, all common areas, all other dwelling units on the property or any common areas or other dwelling units on or about other property owned by or managed by the Owner. The parties hereby amend and supplement the Lease Contract as follows:

**4. CRIME/DRUG FREE HOUSING.** Resident, members of the Resident's household, Resident's guests, and all other persons affiliated with the Resident:

A. Shall not engage in any illegal or criminal activity on or about the premises. The phrase, "illegal or criminal activity" shall include, but is not limited to, the following:

1. Engaging in any act intended to facilitate any type of criminal activity.

2. Permitting the Premises to be used for, or facilitating any type of criminal activity or drug related activity, regardless of whether the individual engaging in such activity is a member of the household, or a guest.

3. The unlawful manufacturing, selling, using, storing, keeping, purchasing or giving of an illegal or controlled substance or paraphernalia as defined in city, county, state or federal laws, including but not limited to the State of Washington and/or the Federal Controlled Substances Act.

4. Violation of any federal drug laws governing the use, possession, sale, manufacturing and distribution of

marijuana, regardless of state or local laws. (So long as the use, possession, sale, manufacturing and distribution of marijuana remains a violation of federal law, violation of any such federal law shall constitute a material violation of this rental agreement.)

5. Engaging in, or allowing, any behavior that is associated with drug activity, including but not limited to having excessive vehicle or foot traffic associated with his or her unit.

6. Any breach of the Lease Contract that otherwise jeopardizes the health, safety, and welfare of the Owner, Owner's agents, or other Residents, or involving imminent, actual or substantial property damage.

7. Engaging in or committing any act that would be a violation of the Owner's screening criteria for criminal conduct or which would have provided Owner with a basis for denying Resident's application due to criminal conduct.

8. Engaging in any activity that constitutes waste, nuisance, or unlawful use.

B. AGREE THAT ANY VIOLATION OF THE ABOVE PROVISIONS CONSTITUTES A MATERIAL VIOLATION OF THE PARTIES' LEASE CONTRACT AND GOOD CAUSE FOR TERMINATION OF TENANCY. A single violation of any of the provisions of this Addendum shall be deemed a serious violation, and a material default, of the parties' Lease Contract. It is understood that a single violation shall be good cause for termination of the Lease Contract. Notwithstanding the foregoing comments, Owner may terminate Resident's tenancy for any lawful reason, and by any lawful method, with or without good cause.

**5. CRIMINAL CONVICTION NOT REQUIRED.** Unless otherwise provided by law, proof of violation of any criminal law shall not require a criminal conviction.

**6. SPECIAL PROVISIONS.** The following special provisions control over conflicting provisions of this printed form:
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

**Resident or Residents (sign here)**                    **Date of Signing Addendum**

_____                    _____
_____                    _____
_____                    _____
_____                    _____

**Owner or Owner's Representative (signs here)**          **Date of Signing Addendum**

© 2018, National Apartment Association, Inc. - 9/2018, Washington

DocuSign Envelope ID: D15C9337-7050-4BF8-A2CE-DF5E809BDB19

# NO-SMOKING ADDENDUM

Date: **November 3, 2019**
(when this Addendum is filled out)



*All use of any tobacco product involving smoking, burning, or combustion of tobacco is prohibited in any portion of the apartment community. You are entitled to receive an original of this No-Smoking Addendum after it is fully signed. Keep it in a safe place.*

1. **DWELLING UNIT DESCRIPTION.**
Unit No. **E214**, **1819 23rd Ave #E214**
_____ *(street address)* in
**Seattle**
*(city)*, Washington, **98122** *(zip code)*.

2. **LEASE CONTRACT DESCRIPTION.**
Lease Contract Date: **November 1, 2019**
Owner's name: **Madison Summit LLC**
_____
_____
_____
_____

Residents *(list all residents)*:
**Christopher Berg,** ▮▮▮▮▮▮▮▮▮▮
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

This Addendum constitutes an Addendum to the above described Lease Contract for the above described premises, and is hereby incorporated into and made a part of such Lease Contract. Where the terms or conditions found in this Addendum vary or contradict any terms or conditions found in the Lease Contract, this Addendum shall control.

3. **DEFINITION OF SMOKING.** Smoking refers to any use or possession of a cigar, cigarette, e-cigarette, hookah, vaporizer, or pipe containing tobacco or a tobacco product while that tobacco or tobacco product is burning, lighted, vaporized, or ignited, regardless of whether the person using or possessing the product is inhaling or exhaling the smoke from such product. The term tobacco includes, but is not limited to any form, compound, or synthesis of the plant of the genus Nicotiana or the species N. tabacum which is cultivated for its leaves to be used in cigarettes, cigars, e-cigarettes, hookahs, vaporizers, or pipes. Smoking also refers to use or possession of burning, lighted, vaporized, or ignited non-tobacco products if they are noxious, offensive, unsafe, unhealthy, or irritating to other persons.

4. **SMOKING ANYWHERE INSIDE BUILDINGS OF THE APARTMENT COMMUNITY IS STRICTLY PROHIBITED.** All forms and use of burning, lighted, vaporized, or ignited tobacco products and smoking of tobacco products inside any dwelling, building, or interior of any portion of the apartment community is strictly prohibited**.** Any violation of the no-smoking policy is a material and substantial violation of this Addendum and the Lease Contract.

The prohibition on use of any burning, lighted, vaporized, or ignited tobacco products or smoking of any tobacco products extends to all residents, their occupants, guests, invitees and all others who are present on or in any portion of the apartment community. The no-smoking policy and rules extend to, but are not limited to, the management and leasing offices, building interiors and hallways, building common areas, dwellings, club house, exercise or spa facility, tennis courts, all interior areas of the apartment community, commercial shops, businesses, and spaces, work areas, and all other spaces whether in the interior of the apartment community or in the enclosed spaces on the surrounding community grounds.

Smoking of non-tobacco products which are harmful to the health, safety, and welfare of other residents inside any dwelling or building is also prohibited by this Addendum and other provisions of the Lease Contract**.**

5. **SMOKING OUTSIDE BUILDINGS OF THE APARTMENT COMMUNITY.** Smoking is permitted only in specially designated areas outside the buildings of the apartment community. Smoking must be at least _____ feet from the buildings in the apartment community, including administrative office buildings. If the previous field is not completed, smoking is only permitted at least 25 feet from the buildings in the apartment community, including administrative office buildings. The smoking-permissible areas are marked by signage.

Smoking on balconies, patios, and limited common areas attached to or outside of your dwelling ☐ is ☒ is not permitted.

The following outside areas of the community may be used for smoking: **EXTERIOR SIDEWALKS 25 FEET OR MORE FROM LOBBY ENTRANCES**
_____
_____

Even though smoking may be permitted in certain limited outside areas, we reserve the right to direct that you and your occupants, family, guests, and invitees cease and desist from smoking in those areas if smoke is entering the dwellings or buildings or if it is interfering with the health, safety, or welfare or disturbing the quiet enjoyment, or business operations of us, other residents, or guests.

6. **YOUR RESPONSIBILITY FOR DAMAGES AND CLEANING.** You are responsible for payment of all costs and damages to your dwelling, other residents' dwellings, or any other portion of the apartment community for repair, replacement, or cleaning due to smoking or smoke related damage caused by you or your occupants, family, guests, or invitees, regardless of whether such use was a violation of this Addendum. Any costs or damages we incur related to repairs, replacement, and cleaning due to your smoking or due to your violation of the no-smoking provisions of the Lease Contract are in excess of normal wear and tear. Smoke related damage, including but not limited to, the smell of tobacco smoke which permeates sheetrock, carpeting, wood, insulation, or other components of the dwelling or building is in excess of normal wear and tear in our smoke free apartment community.

7. **YOUR RESPONSIBILITY FOR LOSS OF RENTAL INCOME AND ECONOMIC DAMAGES REGARDING OTHER RESIDENTS.** You are responsible for payment of all lost rental income or other economic and financial damages or loss to us due to smoking or smoke related damage caused by you or your occupants, family, guests, or invitees which results in or causes other residents to vacate their dwellings, results in disruption of other residents' quiet enjoyment, or adversely affects other residents' or occupants' health, safety, or welfare.

8. **LEASE CONTRACT TERMINATION FOR VIOLATION OF THIS ADDENDUM.** We have the right to terminate your Lease Contract or right of occupancy of the dwelling for any violation of this No-Smoking Addendum**.** Violation of the no-smoking provisions is a material and substantial default or violation of the Lease Contract. Despite the termination of the Lease Contract or your occupancy, you will remain liable for rent through the end of the Lease Contract term or the date on which the dwelling is re-rented to a new occupant, whichever comes first. Therefore, you may be responsible for payment of rent after you vacate the leased premises even though you are no longer living in the dwelling.

©2018, National Apartment Association, Inc. - 10/2018, Washington

Page 1 of 2

**9. EXTENT OF YOUR LIABILITY FOR LOSSES DUE TO SMOKING.** Your responsibility for damages, cleaning, loss of rental income, and loss of other economic damages under this No-Smoking Addendum are in addition to, and not in lieu of, your responsibility for any other damages or loss under the Lease Contract or any other addendum.

**10. YOUR RESPONSIBILITY FOR CONDUCT OF OCCUPANTS, FAMILY MEMBERS, AND GUESTS.** You are responsible for communicating this community's no-smoking policy and for ensuring compliance with this Addendum by your occupants, family, guests, and invitees.

**11. THERE IS NO WARRANTY OF A SMOKE FREE ENVIRONMENT.** Although we prohibit smoking in all interior parts of the apartment community, there is no warranty or guaranty of any kind that your dwelling or the apartment community is smoke free. Smoking in certain limited outside areas is allowed as provided above. Enforcement of our no-smoking policy is a joint responsibility which requires your cooperation in reporting incidents or suspected violations of smoking. You must report violations of our no-smoking policy before we are obligated to investigate and act, and you must thereafter cooperate with us in prosecution of such violations.

This is an important and binding legal document. By signing this Addendum you are agreeing to follow our no-smoking policy and you are acknowledging that a violation could lead to termination of your Lease Contract or right to continue living in the dwelling. If you or someone in your household is a smoker, you should carefully consider whether you will be able to abide by the terms of this Addendum.

**12. SPECIAL PROVISIONS.** The following special provisions control over conflicting provisions of this printed form:

_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

**Resident or Residents**
*(All residents must sign here)*

_____
_____
_____
_____
_____
_____

**Owner or Owner's Representative**
*(Signs here)*

_____

© 2018, National Apartment Association, Inc.
Washington/National Apartment Association Official Form, October 2018, Page 2 of 2





# GREYSTAR®

**LEASE ADDENDUM**
**LIABILITY INSURANCE REQUIRED OF RESIDENT**

1. **Addendum.** This is an addendum to the Lease Contract for Apt. No. E214 in the Summit at Madison Park Apartments in Seattle (city) WA (state). The effective date of this addendum is 11/08/2019.

2. **Acknowledgment Concerning Insurance or Damage Waiver.** You acknowledge that we do not maintain insurance to protect you against personal injury, loss or damage to your personal property or belongings, or to cover your own liability for injury, loss or damage you (or your occupants or guests) may cause others. You also acknowledge that by not maintaining your own policy of personal liability insurance, you may be responsible to others (including us) for the full cost of any injury, loss or damage caused by your actions or the actions of your occupants or guests. You understand that paragraph 8 of the Lease Contract requires You to maintain a liability insurance policy, which provides limits of liability to third parties in an amount not less than $ 100,000 per occurrence. You will ensure that the liability insurance policy identifies this apartment community, C/O Greystar, P.O. Box 115009, Carrollton, TX 75011-5009 as a "Party of Interest" or "Interested Party" (or similar language as may be available). You understand and agree to maintain at all times during the Term of the Lease Contract and any renewal periods, a policy of personal liability insurance with this limit and otherwise satisfying the requirements listed below, at your sole expense.

3. **Required Policy.** You are required to purchase and maintain personal liability insurance covering you, your occupants and guests, for personal injury and property damage any of you cause to third-parties (including damages to our property), with the minimum policy coverage amount set forth in paragraph 2 above, from a carrier with an AM Best rating of A-VII or better, authorized to issue such insurance in (state). The Carrier must provide notice to us within 30 days of any cancellation, non-renewal, or material change in your coverage. We retain the right to hold you responsible for any loss in excess of your insurance coverage.

4. **No Solicitation.** Unless otherwise acknowledged in writing, you acknowledge that we have made no solicitations, guarantees, representations, or promises whatsoever concerning any insurance or services provided by any insurance company. You were and are free to contract for the required insurance with the provider of your choosing so long as that provider comports with the requirements of paragraph 3 above.

5. **Subrogation Allowed.** You and we agree that subrogation is allowed by all parties and that this agreement supersedes any language to the contrary in the Lease Contract. Accordingly, our insurance carrier may sue you for losses it pays as a result of your negligence, and your insurance carrier may sue us for losses it pays as a result of our negligence.

6. **Your Insurance Coverage.** By signing this addendum, you acknowledge that you have purchased (or will purchase) the insurance described in paragraphs 2 and 3, and that you will provide written proof of this insurance to on-site staff prior to taking possession of the apartment. You further acknowledge that you will keep this insurance policy in-force for the entire term of the lease and provide written proof of active renter's liability coverage upon request. If any material terms of your insurance policy change, you agree to promptly provide proof of the modified policy terms to the on-site staff. For the purposes of this paragraph, either the written policy itself or the declaration page to the policy shall constitute written proof.

7. **Default.** Unless otherwise prohibited by law, any default under the terms of this Addendum shall be deemed an immediate, material and incurable default under the terms of the Lease Contract, and we shall be entitled to exercise all rights and remedies under the law. If you allow your outside policy to expire or cancel, you will be in default under the terms of your lease. If you fail to provide written proof of insurance as required by paragraph 6, we reserve the right to procure coverage to address the deficiency and you agree to reimburse us in the form of a $15.00 Lease Violation Fee for all costs and administrative expenses associated with such a purpose. The Lease Violation Fee is not prorated. In addition, you will be listed on our Blanket Renter Protection Policy and will not receive a copy of the policy, as you are not the policy holder. You continue to charge you for such insurance coverage until such time as you provide proof of insurance pursuant to paragraph 6.

8. **Miscellaneous.** Except as specifically stated in this Addendum, all other terms and conditions of the Lease Contract shall remain unchanged. In the event of any conflict between the terms of this Addendum and the terms of the Lease Contract, the terms of this Addendum shall control.

**IMPORTANT DISCLOSURES – READ CAREFULLY BEFORE SIGNING**

1. The insurance required by the Lease Contract is not required by any law. Your obligation to provide insurance stems solely from the Lease Contract.
2. The insurance required by the Lease is not an attempt to limit the Owner's liability for its own negligence or your liability for your own negligence.
3. Owner may be receiving remuneration from insurance companies where permitted by law. CAS Insurance Agency, a licensed affiliate of the property manager, may also receive compensation on policies issued by some insurance companies for administrative or marketing support.
4. The insurance required by the Lease Contract is not in lieu of, or in any way a component of, the security deposit required by the Lease Contract.
5. You understand that every term of the agreement between you and the Owner is set forth in the Lease Contract, any addenda thereto, and in the Rules and Regulations which collectively constitute the entire agreement between you and the Owner. There are no other terms except those which may be implied by law.
6. You agree that you have not received any oral representations from Owner or any representative of Owner which are inconsistent with or not contained in the Lease Contract, the addenda attached to the Lease Contract, or in the Rules and Regulations. If you have received any such oral representations, you agree that you did not rely on them to decide to enter in the Lease Contract or this Addendum.

Resident or Residents
*[All residents must sign here]*

_____

_____

_____

Owner or Owner's Representative
*[signs here]*

_____

**Date of Lease Contract**




DocuSign Envelope ID: D15C9337-7050-4BF8-A2CE-DF5E809BDB19



# SEATTLE - LEASE CONTRACT ADDENDUM FOR ENCLOSED GARAGE, CARPORT, OR STORAGE UNIT

**1. DWELLING UNIT DESCRIPTION.**
Unit No. **E214** , **1819 23rd Ave**
**#E214**
_____ (street address) in
**Seattle**
(city), Washington, **98122** (zip code).

**2. LEASE CONTRACT DESCRIPTION.**
Lease Contract Date: **November 1, 2019**
Owner's name: **Madison Summit LLC**
_____
_____
_____
_____

Residents (list all residents):
**Christopher Berg,** ▮▮▮▮▮▮▮▮▮▮
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

This Addendum constitutes an Addendum to the above described Lease Contract for the above described premises, and is hereby incorporated into and made a part of such Lease Contract. Where the terms or conditions found in this Addendum vary or contradict any terms or conditions found in the Lease Contract, this Addendum shall control.

**3. GARAGE, CARPORT, OR STORAGE UNIT.** You are entitled to exclusive possession of: (check as applicable)
☒ garage or carport attached to the dwelling;
☒ garage space number(s) _____ ;
☐ carport space number(s) _____ ; and/or
☐ storage unit number(s) _____ .
All terms and conditions of the Lease Contract apply to the above areas unless modified by this addendum.

**4. SECURITY DEPOSIT.** An additional security deposit of $ _____ will be charged for the checked areas above. We will consider this additional security deposit part of the general security deposit for all purposes. The security deposit amount in the Security Deposit paragraph of the Lease Contract (check one) ☐ does or ☐ does not include this additional deposit amount. This deposit is a general deposit and is not limited in use to damages caused within the checked areas above, and is subject to forfeiture as a general deposit.

**5. ADDITIONAL MONTHLY RENT.**
You will pay $ **150.00** as additional monthly charges for the item(s) checked above. The monthly rent amount in the Rent and Charges paragraph of the Lease Contract does not include this additional rent.

**6. USE RESTRICTIONS.** Garage or carport may be used only for storage of operable motor vehicles unless otherwise stated in our rules or community policies. Storage units may be used only for storage of personal property. No one may sleep, cook, barbeque, or live in a garage, carport, or storage unit. Persons not listed as a resident or occupant in the Lease Contract may not use the areas covered by this Addendum. No plants may be grown in such areas.

**7. NO DANGEROUS ITEMS.** Items that pose an environmental hazard or a risk to the safety or health of other residents, occupants, or neighbors in our sole judgment or that violate any government regulation may not be stored. Prohibited items include fuel (other than in a properly capped fuel tank of a vehicle or a closed briquette lighter fluid container), fireworks, rags, piles of paper, or other material that may

create a fire or environmental hazard. We may remove from such areas, without prior notice, items that we believe might constitute a fire or environmental hazard. Because of carbon monoxide risks, you may not run the motor of a vehicle inside a garage unless the garage door is open to allow fumes to escape.

**8. NO SMOKE, FIRE, OR CARBON MONOXIDE DETECTORS.** No smoke, fire, or carbon monoxide detectors will be furnished by us unless required by law.

**9. GARAGE DOOR OPENER.** If an enclosed garage is furnished, you ☒ will ☐ will not be provided with a ☒ garage door opener and/or ☐ garage key. You will be responsible for maintenance of any garage door opener, including battery replacement. Transmitter frequency settings may not be changed on the garage door or opener without our prior written consent.

**10. SECURITY.** Always remember to lock any door of a garage or storage unit and any door between a garage and the dwelling. When leaving, be sure to lock all keyed deadbolt locks.

**11. INSURANCE AND LOSS/DAMAGE TO YOUR PROPERTY.** You will maintain liability and comprehensive insurance coverage for any vehicle parked or stored. We are not responsible for pest control in such areas.

**12. COMPLIANCE.** As allowed by law, we may periodically open and enter garages and storerooms to ensure compliance with this Addendum. In the event we enter the garage or storerooms, we will comply with the notice provisions set forth in the Lease Contract.

**13. NO LOCK CHANGES, ALTERATIONS, OR IMPROVEMENTS.** Without our prior written consent, locks on doors of garages and storage units may not be rekeyed, added, or changed, and improvements, alterations, or electrical extensions or changes to the interior or exterior of such areas are not allowed. You may not place nails, screws, bolts, or hooks into walls, ceilings, floors, or doors. Any damage not caused by us or our representatives to areas covered by this Addendum will be paid for by you.

**14. MOVE-OUT AND REMEDIES.** Any termination of tenancy shall automatically terminate any right of storage or parking without further notice required. Any items remaining after you have vacated the dwelling will be removed, sold, or otherwise disposed of according to the Lease Contract, which addresses disposition or sale of property left in an abandoned or surrendered dwelling. All remedies in the Lease Contract apply to areas covered by this addendum.

**15. SPECIAL PROVISIONS.** The following special provisions control over conflicting provisions of this printed form:
**20 DAY WRITTEN NOTICE PRIOR TO THE END OF THE RENTAL MONTH TO TERMINATE PARKING AND/ OR STORAGE. FAILURE TO RETURN KEYS OR PERMITS THE LAST DAY OF THE MONTH MAY RESULT IN AN ADDITIONAL MONTH'S CHARGE. RESIDENTS WITH "RESERVED" PARKING ARE AUTHORIZED BY MANAGEMENT TO TOW UNAUTHORIZED VEHICLES OUT OF THEIR STALL IF SAID STALL NUMBER IS LISTED ON THIS ADDENDUM.**
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

©2018, National Apartment Association, Inc.• 9/2018, Washington

Page 1 of 2

DocuSign Envelope ID: D15C9337-7050-4BF8-A2CE-DF5E809BDB19

**Resident or Residents**
*(All residents must sign here)*

**Owner or Owner's Representative**
*(Signs here)*

_____

_____

_____                    **Date of Lease Contract**

_____                    November 1, 2019

_____                    _____

_____

© 2018, National Apartment Association, Inc. 10/2018, Washington
Washington/National Apartment Association Official Form, September 2018,



# Information for Tenants

**Seattle** Department of
Construction & Inspections

### TRANSLATIONS

*For copies of this document in Amharic, Cambodian, Chinese, Korean, Laotian, Oromiffa, Russian, Somali, Spanish, Tagalog, Thai, Tigrinya and Vietnamese, visit SDCI's website at www.seattle.gov/dpd/rentinginseattle or call (206) 684-8467.*

*This summary of Washington state and City of Seattle landlord/tenant regulations must be provided to tenants by owners of residential rental property located in Seattle on at least an annual basis. Please note that City and State laws may not be identical on any particular topic; therefore, both sets of laws should be consulted. For legal advice, please consult an attorney.*

*October 2018*

## Seattle Landlord-Tenant Laws

## OBLIGATIONS OF LANDLORDS

Building owners must provide safe, clean, secure living conditions, including:

- Keeping the premises fit for human habitation and keeping common areas reasonably clean and safe
- Controlling insects, rodents and other pests
- Maintaining roof, walls and foundation and keeping the unit weather tight
- Maintaining electrical, plumbing, heating and other equipment and appliances supplied by the owner
- Providing adequate containers for garbage and arranging for garbage pickup
- When responsible for providing heat in rental units, from September through June maintaining daytime (7:00 a.m.-10:30 p.m.) temperatures at 68°F or above and nighttime temperatures at not less than 58°F
- In non-transient accommodations, providing keys to unit and building entrance doors and, in most cases, changing the lock mechanism and keys upon a change of tenants
- Installing smoke detectors and instructing tenants in their maintenance and operation

Owners are not required to make cosmetic repairs after each tenancy, such as installing new carpets or applying a fresh coat of paint.

## OBLIGATIONS OF TENANTS

Tenants must maintain rental housing in a safe, clean manner, including:

- Properly disposing of garbage
- Exercising care in use of electrical and plumbing fixtures
- Promptly repairing any damage caused by them or their guests
- Granting reasonable access for inspection, maintenance, repair and pest control
- Maintaining smoke detectors in good working order
- Refraining from storing dangerous materials on the premises

## THE JUST CAUSE EVICTION ORDINANCE

This ordinance requires landlords to have good cause in order to terminate a month-to-month tenancy. It specifies the <u>only reasons</u> for which a tenant in Seattle may be required to move, and requires owners to state the reason, in writing, for ending a tenancy when giving a termination notice. A property owner cannot evict a tenant if the property is not registered with the City of Seattle. Unless otherwise noted, an owner must

### Table of Contents

**Seattle Landlord-Tenant Laws**

*Obligations of landlords* ...................................................... 1
*Obligations of tenants* ........................................................ 1
*The Just Cause Eviction Ordinance* ................................ 1
*Actions considered to be harassment or retaliation* ........... 3
*The Rental Agreement Regulation Ordinance* .................... 4
*Other City ordinances that affect tenants and landlords* ...................................................................... 7

**Washington State Law**

*Rights of All Tenants* ......................................................... 8
*Types of Rental Agreements* ............................................ 8
*Illegal Discrimination* ....................................................... 8
*Liability* ............................................................................. 9
*Illegal Provisions in Rental Agreements* ........................... 9
*Privacy—Landlord's Access to the Rental* ....................... 9
*Deposits and Other Fees* .................................................. 9
*Landlord's Responsibilities* .............................................. 9
*Tenant's Responsibilities* ................................................ 10
*Threatening Behavior by a Tenant or Landlord* .............. 10
*Making Changes to Month-to-Month Agreement* ............ 10
*Making Changes to Leases* ............................................. 10
*How to Handle Repairs* ................................................... 11
*Illegal Landlord Actions* .................................................. 11
*Ending the Agreement* .................................................... 12
*Return of Deposits* ......................................................... 12
*Evictions* ........................................................................ 13
*Abandonment* ................................................................. 13
*Receipts* ......................................................................... 15
*Copies of Documents* ..................................................... 15
***Voter Registration*** ........................................................ **15**

**Seattle Department of Construction and Inspections**
Seattle Municipal Tower, 700 Fifth Avenue, Suite 2000, P.O. Box 34019, Seattle, WA 98124-4019 · (206) 684-8600 · www.seattle.gov/sdci
SDCI complies with the Americans with Disabilities Act. Accessible materials available for people with disabilities provided on request.

Case 2:23-md-03073   Document 590-3   Filed 10/09/23   Page 146 of 170   PageID #: 6426

give a termination notice at least 20 days before the start of the next rental period. Good causes include:

1. The tenant fails to pay rent within 3 days of receiving a notice to pay rent or vacate.

2. The owner has notified the tenant in writing of overdue rent at least 4 times in a 12-month period.

3. The tenant does not comply with a material term of a lease or rental agreement within 10 days of receiving a notice to comply or vacate.

4. The tenant does not comply with a material obligation under the *Washington State Residential Landlord-Tenant Act* within 10 days of a notice to comply or vacate.

5. The owner has notified a tenant in writing at least 3 times in a 12-month period to comply within 10 days with a material term of the lease or rental agreement.

6. The tenant seriously damages the rental unit (causes "waste"), causes a nuisance (including drug-related activity), or maintains an unlawful business and does not vacate the premises within three days of notice to do so.

7. The tenant engages in criminal activity in the building or on the premises, or in an area immediately adjacent to the building or premises. The alleged criminal activity must substantially affect the health or safety of other tenants or the owner; illegal drug-related activity is one crime specified by the ordinance. An owner who uses this reason must clearly state the facts supporting the allegation, and must send a copy of the termination of tenancy notice to the SDCI Property Owner Tenant Assistance (POTA) Unit.

8. The owner wishes to occupy the premises personally, or the owner's immediate family will occupy the unit, and no substantially equivalent unit is vacant and available in the same building, and gives the tenant written notice at least 90 days prior to the end of a rental period. Immediate family includes the owner's spouse or owner's domestic partner, and the parents, grandparents, children, brothers and sisters of the owner or owner's spouse or owner's domestic partner. SDCI may require a property owner to sign a certification of the intent to have a family member move in if a tenant has reason to believe the owner will not follow through with this reason. It is a violation if the designated person does not occupy the unit for a continuous period of 60 days out of the 90 days after the tenant vacates. A tenant whose tenancy is ended for this reason has a private right of action if he or she feels the owner has failed to comply with these requirements.

9. The owner wishes to terminate a tenant who lives in the same housing unit with the owner or the owner's agent; or the owner desires to stop sharing his or her house with a tenant living in an approved accessory dwelling unit (ADU) in an owner-occupied house.

10. The tenant's occupancy is conditioned upon employment on the property and the employment is terminated.

11. The owner plans major rehabilitation and has obtained required permits and a Tenant Relocation License. A tenant terminated for this reason has a private right of action if he or she feels the owner has failed to comply with these requirements.

12. The owner decides to convert the building to a condominium or a cooperative.

13. The owner decides to demolish a building or to convert it to non-residential use and has obtained the necessary permit and a Tenant Relocation License.

14. The owner desires to sell a single family residence (does not include condominium units) and gives the tenant written notice at least 90 days prior to the end of a rental period. The owner must list the property for sale at a reasonable price in a newspaper or with a realty agency within 30 days after the date the tenant vacates. Property owners may be required to sign a certification of the intent to sell the house if SDCI receives a complaint. There is a rebuttable presumption of a violation if the unit is not listed or advertised, or is taken off the market or re-rented within 90 days after the tenant leaves. A tenant terminated for this reason has a private right of action if he or she feels an owner has failed to comply with these requirements.

15. The owner seeks to discontinue use of a unit not authorized under the Land Use Code, after receiving a Notice of Violation. The owner must pay relocation assistance to tenants who have to move so that the owner can correct the violation. Relocation assistance for low-income tenants is $2,000; for other tenants it is an amount equal to two months' rent.

16. The owner needs to reduce the number of tenants sharing a dwelling unit in order to comply with Land Use Code restrictions (i.e., no more than 8 people per dwelling unit if any are unrelated).

17. The owner must terminate a tenancy in a house containing an approved ADU in order to comply with the development standards for ADUs, after receiving a Notice of Violation of the Land Use Code. (If the violation is that the owner has moved out of the house and has rented both units, one unit must either be reoccupied by the owner or be removed.) The owner must pay relocation assistance to displaced tenants in the amount of $2,000 for low-income tenants, or two months' rent in other cases. SDCI may require a property owner to sign a certification of his or her intent to discontinue the use of the ADU.

18. An Emergency Order to Vacate and close the property has been issued by SDCI and the tenants have failed to vacate by the deadline given in the Order.

**Failure to carry out stated cause:** If an owner terminates a tenant because of (1) the sale of a single family residence is planned, (2) the owner or a family member is to move in, (3) substantial rehabilitation is planned, (4) the number of residents must be reduced to eight, or (5) the owner is discontinuing the use of an ADU after receipt of a notice of violation, and the owner fails to carry out the stated reason for terminating the tenancy, he or she may be subject to enforcement action by the City and a civil penalty of up to $2,500.

**Private right of action for tenants:** If an owner terminates a tenant because of (1) the sale of a single family residence is planned, (2) the owner or a family member is to move in, or (3) substantial rehabilitation is planned, and if the owner fails to carry out the stated reason for terminating the tenancy, the tenant can sue the owner for up to $3,000, costs, and reasonable attorney's fees.

For additional information on the Just Cause Eviction Ordinance, call SDCI at (206) 615-0808 or visit the SDCI website at www.seattle.gov/sdci.

## ACTIONS CONSIDERED TO BE HARASSMENT OR RETALIATION

City law prohibits retaliatory actions against either a tenant or a landlord.

A landlord is prohibited from harassing or retaliating against a tenant by:

1. Changing or tampering with locks on unit doors
2. Removing doors, windows, fuse box, furniture or other fixtures
3. Discontinuing utilities supplied by the owner
4. Removing a tenant from the premises except through the formal court eviction process
5. Evicting, increasing rent or threatening a tenant for reporting code violations to SDCI or the Police Department or for exercising any legal rights arising out of the tenant's occupancy
6. Entering a tenant's unit, except in an emergency, or except at reasonable times after giving at least two days notice, or a one-day notice when showing units to prospective purchasers or tenants
7. Prohibiting a tenant, or a tenant's authorized agent who is accompanied by that tenant, from distributing information in the building, posting information on bulletin boards in accordance with building rules, contacting other tenants, assisting tenants to organize and holding meetings in community rooms or common areas
8. Increase the monthly housing costs without advance written notice; 30 days for a rent increase of less than 10%, 60 days for a rent increase of 10% or more
9. Increase monthly housing costs where a housing unit does not meet basic standards for habitability

In most instances the law assumes that a landlord is

retaliating if the landlord takes any of these actions within 90 days after a tenant reports a violation to SDCI or to the Seattle Police Department, or within 90 days after a governmental agency action, such as making an inspection.

A tenant is prohibited from harassing or retaliating against a landlord by:

1. Changing or adding locks on unit doors
2. Removing owner-supplied fixtures, furniture, or services
3. Willfully damaging the building

For more information or to file a complaint, call SDCI at (206) 615-0808.

## DEFINITION OF TENANT

With the exception of the Tenant Relocation Assistance Ordinance, a tenant is defined as a person occupying or holding possession of a building or premises pursuant to a rental agreement. This includes residents of transient lodgings who remain in residence for one month or longer. A rental agreement may be oral or in writing.

## DEFINITION OF HOUSING COSTS

Housing costs include rent and any other periodic or monthly fees such as storage, parking, or utilities, paid to the landlord by a tenant.

## INCREASE IN HOUSING COSTS

In the City of Seattle, a landlord must give a tenant 30 days' advance written notice of an increase in housing costs (rent, parking, storage, and other fees associated with the rental) of less than 10%; 60 days' notice is required for increases of 10% or more. An increase can only begin at the beginning of rental period, typically at the beginning of the month. These notices must include information about how the tenant can access information about their rights and responsibilities

A landlord cannot increase housing costs for any housing unit that does not meet the minimum habitability standards of the Residential Rental Inspection Program. (http://www.seattle.gov/dpd/cs/groups/pan/@pan/documents/web_informational/s048492.pdf)

Property owners and developers cannot increase housing costs to avoid applying for a Tenant Relocation License when a rental property is going to be demolished, rehabilitated, changed in use, or where use restrictions are going to be removed. (http://www.seattle.gov/dpd/codesrules/commonquestions/tenantrelocation/default.htm)

## THE RENTAL AGREEMENT REGULATION ORDINANCE

The City of Seattle Rental Agreement Regulation Ordinance (SMC Chapter 7.24) regulates certain aspects of residential rental agreements.  It requires a landlord to provide sixty (60) days' advance written notice of an increase in housing costs of 10% or more within a twelve (12) month period;  prohibits month-to-month rental agreements that require a tenant to stay a minimum period greater than one (1) month or be subject to the loss of deposits or other penalties; limits the amount of security and pet damage deposits, and move-in fees that can be charged to a tenant upon move in; allows a tenant to pay security and pet damage deposits, move-fees, and last month's rent on installment plans; requires a landlord to take and return a deposit pursuant to state law; and to distribute a summary of state and local landlord-tenant laws prepared by the City of Seattle to each prospective tenant, to each tenant upon move-in, and at the time a rental agreement is renewed.  A landlord cannot retaliate against a tenant or a prospective tenant for exercising or attempting to exercise the tenant's rights under this Ordinance.  The Seattle Department of Construction and Inspections enforces this ordinance.  For more information call the Department's Code Compliance Division at (206) 615-0808 or follow this link:  http://www.seattle.gov/dpd/codesrules/commonquestions/rentalhousingproblems/default.htm

### Rent Increases

The City of Seattle does not regulate or control rent. However, the Rental Agreement Regulation Ordinance does require a landlord to provide at least sixty (60) days' advance written notice of any increase in housing costs of 10% or more in a twelve (12) month period; increases of less than 10% require an advance written notice of at least thirty (30) days consistent with state law.  These notices must include information on how the tenant can access information on the tenant's rights and responsibilities.  Housing costs include rent, parking and storage fees, and other periodic fees associated with a tenancy.  Failure to provide a required sixty (60) day notice is a violation of SMC 7.24.030.A and SMC 22.206.180.

### Prohibited Rental Agreement Provisions

Month-to-month rental agreements, whether verbal or in writing, cannot require a tenant to stay beyond the initial period of the agreement.  A landlord cannot withhold a deposit or impose other penalties solely on the basis that a tenant moves out at the end of the initial rental period.

However, a tenant who desires to terminate a month-to-month tenancy must provide the landlord with a written notice at least twenty (20) days in advance of the end of a rental period.  Landlords are not obligated to pro-rate rent when a tenant moves out after the beginning of a rental period.

### Security Deposits

If a landlord wishes to collect a security deposit, the deposit and its amount must be identified in a written rental agreement.  The total amount of a security deposit and move-in fees cannot exceed the amount of the first full month's rent.  Additionally, the landlord must prepare and provide a tenant with a written checklist or statement describing the condition, cleanliness, and existing damage of the tenant's housing unit at the commencement of the tenancy.  This statement must be signed and dated by the landlord and the tenant.  The landlord must provide a copy of the checklist to the tenant for the tenant's records, and, upon request, one free replacement copy.

All security deposits must be placed in a trust account and the landlord must provide the tenant with the name, address, and location of the depository.  The landlord must inform the tenant of any subsequent changes of the location of the deposit.

Security deposits must be returned in accordance with RCW 59.18.280 at the end of a tenancy.

### Pet Damage Deposits

A landlord can charge a pet damage deposit, but it cannot exceed 25% of the first full month's rent. A pet damage deposit cannot be required for an animal if it serves as an assistance animal to the tenant.  However, the tenant is responsible for any damage created by the tenant's assistance animal or the assistance animal of a guest of the tenant.  A pet damage deposit may be charged in addition to any security deposit.

An agreement to pay a pet damage deposit must be included in a written rental agreement or in a written addendum to the agreement, identify the amount of the deposit, and allow the tenant to pay the deposit in installments if requested by the tenant.

If the pet's occupancy begins at the commencement of the tenancy, the deposit must be identified in the rental agreement.  If the pet's occupancy begins after the commencement of the tenancy, the landlord must provide a written addendum to the rental agreement.

A landlord may not retain any portion of a pet damage deposit for damages not caused by the pet for which the tenant is responsible.

Pet damage deposits must be returned in accordance with RCW 59.18.280 at the end of a tenancy.

### Pet Rent

The payment of rent to keep a pet is allowed.

**Parking Unbundling**

Landlords must specify the amount of any parking fee in a separate parking agreement or in a rental agreement addendum.

**Move-in Fees**

Move-in fees are by state and city definition non-refundable.

Allowable move-in fees are limited to the cost of obtaining a tenant screening report, criminal background check, or credit report and to pay to clean the rental unit upon termination of a tenancy.

The cost for obtaining a tenant screening report cannot exceed the customary cost for obtaining such a report in the City of Seattle; a Landlord cannot charge a tenant more than the report's actual cost.   The landlord must provide the tenant a receipt for any fees charged for obtaining the tenant screening report. The landlord must also provide the tenant the name and address of the reporting agency that prepared the report and the prospective tenant's right to obtain a free copy of it.

If the landlord chooses to charge a non-refundable cleaning fee, the landlord may not deduct additional cleaning fees from the tenant's security deposit at the end of a tenancy.

Landlords are prohibited from charging any one-time fee at the beginning of a tenancy other than a security deposit, pet damage deposit, an authorized non-refundable move-in fee, or last month's rent.

Move-in fees cannot exceed 10% of the first full month's rent except in the case where the actual cost for obtaining a tenant screening report, criminal background check, or credit report exceeds 10%, the cost may be included in the non-refundable fee.  However, the total amount of a security deposit and move-in fees cannot exceed the amount of the first full month's rent.

**Summary of Limitations on Security Deposits, Pet Damage Deposits, and Move-In Fees**

The total amount of a security deposit and move-in fees cannot exceed the amount of the first full month's rent. Non-refundable move-in fees cannot exceed 10% of the first full month's rent.   A pet damage deposit may not exceed 25% of the rent for the first full month. Limits on the amount of charges for security deposits and non-refundable move-in fees does not apply to a tenant who rents a housing unit in a single family residence if the residence is the principal residence of the landlord.

**Installment Payments**

*Security Deposits and Move-In Fees*

If the total amount of a security deposit and non-refundable move-in fees exceeds 25% of the first full month's rent, a tenant may choose to pay the total amount in installments as follows:

- For tenancies that are six (6) months or longer, a tenant may elect to pay in six (6) consecutive and equal monthly installments beginning at the commencement of the tenancy.
- For tenancies between thirty (30) days and six (6) months, a tenant may elect to pay in no more than four (4) equal installments of equal duration at the commencement of the tenancy.
- For tenancies that are month-to-month, the tenant may elect to pay in two (2) equal installments, with the first payment due at the commencement of the tenancy and the second payment due on the first day of the second monthly rental period.

A tenant may propose an alternative installment schedule to which the landlord may agree.  If an alternative plan is mutually agreed to, it must be described in a written rental agreement or a written addendum to the agreement.  Failure to pay an installment of the security deposit and/or non-refundable fees is a breach of the rental agreement and may subject the tenant to a 10-day comply or vacate notice issued pursuant to RCW 59.12.030(4).

A landlord cannot impose any cost on a tenant for an installment plan.

The requirement to allow an installment plan for the payment of deposits and move-in fees does not apply to tenants who rent a housing unit in a single-family house or attached accessory dwelling unit if the owner resides in the house as the owner's principal residence.

*Last Month's Rent*

Tenants may choose to pay last month's rent in installments.

For tenancies that are six (6) months or longer, a tenant may elect to pay in six (6) consecutive and equal monthly installments beginning on the first month of the tenancy; tenancies between sixty (60) days and six (6) months, the tenant may elect to pay in no more than four (4) equal installments of equal duration beginning at the commencement of the tenancy.

A tenant may propose an alternative installment schedule to which the landlord may agree.  If an alternative plan is mutually agreed to, it must be described in a written rental agreement or a written addendum to the agreement.

A landlord cannot impose any cost on a tenant for an installment plan.

The requirement to allow an installment plan for the

DocuSign Envelope ID: D15C9337-7050-4BF8-A2CE-DF5E809BDB19

payment of last month's rent does not apply to tenants who rent a housing unit in a single-family house or attached accessory dwelling unit if the owner resides in the house as the owner's principal residence.

*Pet Damage Deposits*

A tenant may elect to pay a pet damage deposit in three (3) equal monthly installments beginning on the first full month the pet occupies the housing unit. A tenant may propose an alternative installment schedule to which the landlord may agree. If an alternative plan is mutually agreed to, it must be described in a written rental agreement or a written addendum to the agreement.

If a tenant wants to pay a security deposit, move-in fees, a pet damage deposit, or last month's rent in installments, the tenant must request such a payment plan.

## Summary of Landlord and Tenant Rights

A landlord must distribute a summary of state landlord tenant law and City of Seattle rental housing codes describing the rights, obligations, and remedies of landlords and tenants under these laws. This requirement can be met by distributing the current version of the Seattle Department of Construction and Inspections Publication *Information for Tenants*. This document must be given to each prospective tenant, to a tenant at the time a rental agreement is offered, and when a rental agreement is renewed. Month-to-month tenants must receive the most current version of this document at least once a year. When a rental agreement is renewed, *Information for Tenants* maybe be distributed electronically. The current version of *Information for Tenants* can be accessed at: awww.seattle.gov/dpd/cms/groups/pan/@pan/documents/web_informational/dpdd016420.pdf

If a landlord fails to distribute the summary in accordance with these requirements, a tenant may terminate the rental agreement by written notice. In addition, the tenant may recover, in a civil action against the landlord, actual damages, attorney fees, and a penalty of up to $500. If a court determines that the landlord deliberately failed to comply with this requirement, the penalty may be up to $1,000.

## Violations

A violation of the Rental Agreement Regulation Ordinance is subject to a citation in the amount of $500 for an initial violation and $1,000 for each subsequent violation occurring within five (5) years of the first violation. Citations can be appealed to the City of Seattle Hearing Examiner. Violations also are subject to a Notice of Violation after the issuance of two (2) citations.

## Tenant's Private Right of Action

If a landlord attempts to enforce provisions of a rental agreement which are contrary to:

1. The requirement that a rental agreement contain certain specific provisions;

2. The limitations imposed on security deposits, pet damage deposits, and non-refundable move-in fees; or

3. The requirement to adopt an installment payment plan

The landlord shall be liable to the tenant for:

1. Actual damages incurred by the tenant because of the landlord's attempted enforcement;

2. Double the amount of any penalties imposed by the City of Seattle;

3. Double the amount of any security deposit unlawfully charged or withheld by the landlord;

4. Up to $3,000; and

5. Reasonable attorney fees and court costs.

## Tenant Waiver of Rights or Remedies

No residential rental agreement, whether oral or written, can waive rights or remedies under the Rental Agreement Regulation Ordinance. However, a landlord and tenant may agree to waive certain specific requirements of the Ordinance. In order to do this, the following conditions must be met:

1. The agreement must specify in writing the specific provisions to be waived;

2. The agreement cannot appear in a standard form, lease, or rental agreement;

3. There can be no substantial inequity in the bargaining positions of the landlord and tenant; and

4. The tenant must be represented by an attorney who has approved the agreement as being in compliance with the requirements of the Ordinance.

## Exceptions

The provisions of this Ordinance limiting and restricting the amount of charges for security deposits and non-refundable move-in fees, and the payment of security deposits and move-fees on an installment basis do not apply to a tenant who rents a housing unit in a single-family residence if the residence is the principal

residence of the property owner.

Also, exempted from regulation are the return or retention of a security deposit, the requirement to provide a unit condition checklist, and the requirement to place a security deposit in a trust account and disclose to the tenant the location of the account. However, the Washington State Residential Landlord-Tenant Act still regulates these requirements.

## OTHER CITY ORDINANCES THAT AFFECT TENANTS AND LANDLORDS

### 1. Open Housing and Public Accommodations Ordinance

This ordinance prohibits discrimination based on race, color, creed, religion, ancestry, national origin, age, sex, marital status, parental status, sexual orientation, gender identity, political ideology, participation in the Housing Choice Vouchers Program (Section 8), or disability; requires landlords to rent a housing unit on first-come-first-served basis; and to accept subsidies and alternative sources of income to pay for the tenant's housing costs. Inquiries about this ordinance and complaints of violations should be directed to the Seattle Office for Civil Rights at (206) 684-4500.

### 2. Condominium and Cooperative Conversion Ordinances

When a residential building is being converted to condominium or cooperative units, the Condominium and Cooperative Conversion ordinances require a housing code inspection.

Additionally, in a condominium conversion, a tenant must receive a written 120-day notice of the conversion. If the tenant decides not to buy his or her unit, the tenant may be eligible to receive the equivalent of three (3) months' rent in relocation assistance if the tenant's annual income, from all sources, does not exceed 80 percent of the area median income, adjusted for household size. A household which otherwise qualifies to receive relocation benefits and which includes a member sixty-five (65) years of age or older or an individual with "special needs," as defined in the ordinance, may qualify for additional assistance.

In a cooperative conversion, a tenant must receive a 120-day notice of intention to sell the unit. If the

tenant decides not to buy his or her unit, the tenant must be paid $500.00 in relocation assistance.

Relocation assistance is paid directly to the tenant by the property owner or developer. The assistance must be paid no later than the date on which a tenant vacates his or her unit.

For further information, contact SDCI Code Compliance at (206) 615-0808.

### 3. Tenant Relocation Assistance Ordinance

This ordinance applies when tenants are displaced by housing demolition, change of use, substantial rehabilitation, or by removal of use restrictions from subsidized housing. A property owner who plans development activity must obtain a tenant relocation license and a building or use permit before terminating a tenancy. All tenants must receive a 90-day notice of the activity that will require them to move. Eligible low income tenants, whose annual income cannot exceed 50% of the area median income, receive cash relocation assistance. It is a violation of this ordinance to increase housing costs for the purpose of avoiding applying for a Tenant Relocation License. Call SDCI at (206) 615-0808 for more information.

### 4. Repair and Maintenance—Housing and Building Maintenance Code

This ordinance requires owners to meet certain minimum standards and keep buildings in good repair. If an owner does not make necessary repairs, a tenant can report needed repairs by calling SDCI at (206) 615-0808. If an inspector finds code violations, the owner will be required to make needed corrections.

### 5. Third Party Billing Ordinance

This ordinance defines rules for landlords who, by themselves or through private companies, bill tenants for City provided utilities (water, sewer, garbage, electric services) separately from their rent. The ordinance applies to all residential buildings having three or more housing units.

The rules require a landlord or billing agent to provide tenants with specific information about their bills and to disclose their billing practices, either in a rental agreement or in a separate written notice. It is a violation of the ordinance if a landlord imposes a new billing practice without appropriate notice.

A tenant can dispute a third-party billing by notifying the billing agent and explaining the basis for the dispute. This must be done within 30 days of receiving a bill. The billing agent must contact the tenant to discuss the dispute within 30 days of receiving notice of the dispute. A tenant can also file a complaint with the Seattle Office of the Hearing Examiner or take the

landlord to court. If the Hearing Examiner or court rules in favor of the tenant, the landlord could be required to pay a penalty.

**6. Rental Registration and Inspection Ordinance (RRIO)**

The purpose of the Rental Registration and Inspection program is to ensure that all rental housing in the City of Seattle is safe and meets basic housing maintenance requirements. Beginning in 2014 all owners of residential housing in Seattle, with certain limited exceptions, must register their properties with the City. A registration is good for five years. No tenant can be evicted from a property if the property is not registered with the City. With a few exceptions, all properties must be inspected at least once every ten years. These inspections can be conducted by City-approved inspectors or by City housing/zoning inspectors. Information about the RRIO Program can be obtained by calling (206) 684-4110 or going to the program website at www.seattle.gov/RRIO.

# The Washington Residential Landlord-Tenant Act

## Chapter 59.18 RCW.
### GOOD FAITH OBLIGATION

State law requires landlords and tenants to act in good faith toward one another.

Most tenants who rent a place to live come under the Washington State Residential Landlord-Tenant Act. However, certain renters are specifically excluded from the law.

Residents who are generally not covered by the Act are:

- Renters of a space in a mobile home park are usually covered by the state's Mobile Home Land-lord-Tenant Act (RCW 59.20). However, renters of both a space and a mobile home are usually covered by the residential law.
- Residents in transient lodgings such as hotels and motels; residents of public or private medical, religious, educational, recreational or correctional institutions; residents of a single family dwelling which is rented as part of a lease of agricultural land; residents of housing provided for seasonal farm work.
- Tenants with an earnest money agreement to purchase the dwelling. Tenants who lease a single family dwelling with an option to purchase, if the tenant's attorney has approved the face of the lease. Tenants who have signed a lease option agreement but have not yet exercised that option are still covered.

- Tenants who are employed by the landlord, when their agreement specifies that they can only live in the rental unit as long as they hold the job (such as an apartment house manager).
- Tenants who are leasing a single family dwelling for one year or more, when their attorney has approved the exemption.
- Tenants who are using the property for commercial rather than residential purposes.

## RIGHTS OF ALL TENANTS

Regardless of whether they are covered by the Residential Landlord-Tenant Act, all renters have these basic rights under other state laws: the Right to a livable dwelling; Protection from unlawful discrimination; Right to hold the landlord liable for personal injury or property damage caused by the landlord's negligence; Protection against lockouts and seizure of personal property by the landlord.

## TYPES OF RENTAL AGREEMENTS

**Month-to-Month Agreement.** This agreement is for an indefinite period of time, with rent usually payable on a monthly basis or other short term period. The agreement itself can be in writing or oral, but if any type of fee or refundable deposit is collected, the agreement must be in writing. [RCW 59.18.260]

A month-to-month agreement continues until the tenant gives the landlord written notice at least 20 days before the end of the rental period. In the situation of a conversion to a condominium or a change in the policy excluding children the landlord must provide 90 days written notice to the tenant. [RCW 59.18.200] The rent can be increased or the rules changed at any time, provided the landlord gives the tenant written notice at least 30 days before the effective date of the rent increase or rule change. [RCW 59.18.140]

**Fixed Term Lease.** A lease requires the tenant to stay for a specific amount of time and restricts the landlord's ability to change the terms of the rental agreement. A lease must be in writing to be valid. During the term of the lease, the rent cannot be raised or the rules changed unless both landlord and tenant agree. Leases for longer than one year must be notarized.

## ILLEGAL DISCRIMINATION

Federal law prohibits most landlords from refusing to rent to a person or imposing different rental terms on a person because of race, color, religion, sex, handicap, familial status (having children or seeking custody of children), or national origin. [Fair Housing Act 42 USC s. 3601 et.seq. 1988] State law recog-

nizes protection to the same individuals as well as for marital status, creed, the presence of sensory, mental, or physical disability. If you think you have been denied rental housing or have been the victim of housing discrimination file a written complaint with the Washington State Human Rights Commission. You may also file a complaint with the federal Fair Housing Section of the Department of Housing and Urban Development or your local city human rights department.

## LIABILITY

Once a tenant has signed a rental agreement, the tenant must continue to pay the rent to maintain eligibility to bring actions under this act. The tenant should also understand what he or she is responsible for in the maintenance of the property. While the landlord is responsible for any damage which occurs due to the landlord's negligence, the tenant must be prepared to accept responsibility for damages he or she causes. [RCW 59.18.060]

## ILLEGAL PROVISIONS IN RENTAL AGREEMENTS

Some provisions which may appear in rental agreements or leases are not legal and cannot be enforced under the law. [RCW 59.18.230] These include:

- A provision which waives any right given to tenants by the Landlord-Tenant Act or that surrenders tenants' right to defend themselves in court against a landlord's accusations.
- A provision stating the tenant will pay the landlord's attorney's fees under any circumstances if a dispute goes to court.
- A provision which limits the landlord's liability in situations where the landlord would normally be responsible.
- A provision which requires the tenant to agree to a particular arbitrator at the time of signing the rental agreement.
- A provision allowing the landlord to enter the rental unit without proper notice.
- A provision requiring a tenant to pay for all damage to the unit, even if it is not caused by tenants or their guests.
- A provision that allows the landlord to seize a tenant's property if the tenant falls behind in rent.

## PRIVACY—LANDLORD'S ACCESS TO THE RENTAL [RCW 59.18.150]

The landlord must give the tenant at least a two day written notice of their intent to enter at reasonable times. However, tenants must not unreasonably refuse to allow the landlord to enter the rental where

the landlord has given at least one-day's notice of intent to enter at a specified time to exhibit the dwelling to prospective or actual purchasers or tenants. The law says that tenants shall not unreasonably refuse the landlord access to repair, improve, or service the dwelling. In case of an emergency, or if the property has been abandoned, the landlord can enter without notice.

## DEPOSITS AND OTHER FEES

### Refundable deposits

Under the Landlord-Tenant Act, the term "deposit" can only be applied to money which can be refunded to the tenant. If a refundable deposit is collected, the law requires:

- The rental agreement must be in writing. It must say what each deposit is for and what the tenant must do in order to get the money back. [RCW 59.18.260]
- The tenant must be given a written receipt for each deposit. [RCW 59.18.270]
- A checklist or statement describing the condition of the rental unit must be filled out. The landlord and the tenant must sign it, and the tenant must be given a signed copy. [RCW 59.18.260]
- The deposits must be placed in a trust account in a bank or escrow company. The tenant must be informed in writing where the deposits are being kept. Unless some other agreement has been made in writing, any interest earned by the deposit belongs to the landlord. [RCW 59.18.270]

### Non-refundable fees

These will not be returned to the tenant under any circumstances. If a non-refundable fee is being charged, the rental agreement must be in writing and must state that the fee will not be returned. A non-refundable fee cannot legally be called a "deposit." [RCW 59.18.285]

## LANDLORD'S RESPONSIBILITIES [RCW 59.18.060]

The landlord must:

- Maintain the dwelling so it does not violate state and local codes in ways which endanger tenants' health and safety
- Maintain structural components, such as roofs, floors and chimneys, in reasonably good repair.
- Maintain the dwelling in reasonably weather tight condition
- Provide reasonably adequate locks and keys.
- Provide the necessary facilities to supply heat, electricity, hot and cold water
- Provide garbage cans and arrange for removal of garbage, except in single family dwellings
- Keep common areas, such as lobbies, stairways

and halls, reasonably clean and free from hazards
- Control pests before the tenant moves in. The landlord must continue to control infestations except in single family dwellings, or when the infestation was caused by the tenant
- Make repairs to keep the unit in the same condition as when the tenant moved in—except for normal wear and tear
- Keep electrical, plumbing and heating systems in good repair, and maintain any appliances which are provided with the rental
- Inform the tenant of the name and address of the landlord or landlord's agent
- Supply hot water as reasonably required by tenant
- Provide written notice of fire safety and protection information and ensure that the unit is equipped with working smoke detectors when a new tenant moves in. (Tenants are responsible for maintaining detectors.) Except for single family dwellings, the notice must inform the tenant on how the smoke detector is operated and about the building's fire alarm and/or sprinkler system, smoking policy, and plans for emergency notification, evacuation and relocation, if any. Multifamily units may provide this notice as a checklist disclosing the building's fire safety and protection devices and a diagram showing emergency evacuation routes.
- Provide tenants with information provided or approved by the Department of Health about the health hazards of indoor mold, including how to control mold growth to minimize health risks, when a new tenant moves in. The landlord may give written information individually to each tenant, or may post it in a visible, public location at the dwelling unit property. The information can be obtained at www.doh.wa.gov/ehp/ts/IAQ/mold-notification.htm.
- Investigate if a tenant is engaged in gang-related activity when another tenant notifies the landlord of gang-related activity by serving a written notice and investigation demand to the landlord. [RCW 59.18.180]
- Provide carbon monoxide detectors.

## TENANT'S RESPONSIBILITIES [RCW 59.18.130]

A tenant is required to:

- Pay rent, and any utilities agreed upon
- Comply with any requirements of city, county or state regulations
- Keep the rental unit clean and sanitary
- Dispose of the garbage properly
- Pay for fumigation of infestations caused by the tenant
- Properly operate plumbing, electrical and heating systems
- Not intentionally or carelessly damage the dwelling
- Not permit "waste" (substantial damage to the property) or "nuisance" (substantial interference with other tenant's use of property)
- Maintain smoke and carbon monoxide detection devices including battery replacement
- Not engage in activity at the premises that is imminently hazardous to the physical safety of other persons on the premises and that entails a physical assault on a person or unlawful use of a firearm or other deadly weapon resulting in an arrest [RCW 59.18.352]
- When moving out, restore the dwelling to the same conditions as when the tenant moved in, except for normal wear and tear

## THREATENING BEHAVIOR BY A TENANT OR LANDLORD  (RCW 59.18.352 and 354)

If one tenant threatens another with a firearm or other deadly weapon, and the threatening tenant is arrested as a result of the threat, the landlord may terminate the tenancy of the offending tenant  (although the landlord is not required to take such action).  If the landlord does not file an unlawful detainer action, the threatened tenant may choose to give written notice and move without further obligation under the rental agreement.  If a landlord threatens a tenant under similar circumstances, the tenant may choose to give notice and move.  In both cases, the threatened tenant does not have to pay rent for any day following the date of leaving, and is entitled to receive a pro-rated refund of any prepaid rent.

## MAKING CHANGES TO THE MONTH-TO-MONTH AGREEMENT

Generally speaking, if the landlord wants to change the provisions of a month-to-month rental agreement, such as raising the rent or changing rules, the tenant must be given at least 30 days notice in writing. These changes can only become effective at the beginning of a rental period (the day the rent is due). Notice which is less than 30 days will be effective for the following rental period.

If the landlord wishes to convert the unit to a condominium, the tenant must be given a 120-day notice. [RCW 59.18.200]

## MAKING CHANGES TO A FIXED LEASE TERM

Under a lease, in most cases, changes during the lease term cannot be made unless both landlord and tenant agree to the proposed change.

**If the property is sold.**  The sale of the property does

not automatically end a tenancy. When a rental unit is sold, tenants must be notified of the new owner's name and address, either by certified mail, or by a revised posting on the premises. All deposits paid to the original owner must be transferred to the new owner, who must put them in a trust or escrow account. The new owner must promptly notify tenants where the deposits are being held.

## HOW TO HANDLE REPAIRS

A tenant must be current in the payment of rent including all utilities to which the tenant has agreed in the rental agreement to pay before exercising any statutory remedies, such as repair options. [RCW 59.18.080]

**Required Notice** [RCW 59.18.070] When something in the rental unit needs to be repaired, the first step is for the tenant to give written notice of the problem to the landlord or person who collects the rent.

The notice must include the address and apartment number of the rental; the name of the owner, if known; and a description of the problem. After giving notice, the tenant must wait the required time for the landlord to begin making repairs. Those required waiting times are: 24 hours for no hot or cold water, heat or electricity, or for a condition which is imminently hazardous to life; 72 hours for repair of refrigerator, range and oven, or a major plumbing fixture supplied by landlord; 10 days for all other repairs.

**Tenant's Options** [RCW 59.18.090] If repairs are not started within the required time and if the tenant is paid up in rent and utilities, the following options can be used:

1) Tenant can give written notice to the landlord and move out immediately. Tenants are entitled to a pro-rated refund of their rent, as well as the deposits they would normally get back.
2) Litigation or arbitration can be used to work out the dispute.
3) The tenant can hire someone to make the repairs. In many cases the tenant can have the work done and then deduct the cost from the rent. [RCW 59.18.100] (This procedure cannot be used to force a landlord to provide adequate garbage cans.)

     **An Important Note:** If the repair is one that has a 10-day waiting period, the tenant cannot contract to have the work done until 10 days after the landlord receives notice, or five days after the landlord receives the estimate, whichever is later.

     To follow this procedure a tenant must: Submit a good faith estimate from a licensed or registered tradesperson, if one is required, to the landlord. After the waiting period, the tenant can contract with the lowest bidder to have the work done. After the work is completed, the tenant pays the tradesperson and deducts the cost from the rent

payment. The landlord must be given the opportunity to inspect the work. The cost of each repair cannot exceed one month's rent; total cost cannot exceed two month's rent in any 12-month period.

If a large repair which affects a number of tenants needs to be made, the tenants can join together, follow the proper procedure, and have the work done. Then each can deduct a portion of the cost from their rent.

4) The tenant can make the repairs and deduct the cost from the rent, if the work does not require a licensed or registered tradesperson. The same procedure is followed as for (2) above. However, the cost limit is one half of one month's rent.
5) Rent in Escrow - After notice of defective conditions, and after appropriate government certification of defect, and waiting periods have passed, then tenants may place their monthly rent payments in an escrow account. It is wise to consult an attorney before taking this action.

## ILLEGAL LANDLORD ACTIONS

**Lockouts.** [RCW 59.18.290] The law prohibits landlords from changing locks, adding new locks, or otherwise making it impossible for the tenant to use the normal locks and keys. Even if a tenant is behind in rent, such lockouts are illegal.

A tenant who is locked out can file a lawsuit to regain entry. Some local governments also have laws against lockouts and can help a tenant who has been locked out of a rental. For more information contact your city or county government.

**Utility shutoffs.** [RCW 59.18.300] The landlord may not shut off utilities because the tenant is behind in rent, or to force a tenant to move out. Utilities may only be shut off by the landlord so that repairs may be made, and only for a reasonable amount of time. If a landlord intentionally does not pay utility bills so the service will be turned off, that could be considered an illegal shutoff. If the utilities have been shut off by the landlord, the tenant should first check with the utility company to see if it will restore service. If it appears the shutoff is illegal, the tenant can file a lawsuit. If the tenant wins in court, the judge can award the tenant up to $100 per day for the time without service, as well as attorney's fees.

**Taking the tenant's property.** [RCW 59.18.310] The law allows a landlord to take a tenant's property only in the case of abandonment. A clause in a rental agreement which allows the landlord to take a tenant's property in other situations is not valid. If the landlord does take a tenant's property illegally, the tenant may want to contact the landlord first. If that is unsuccessful, the police can be notified. If the property is not returned after the landlord is given a written request, a court could order the landlord to pay the tenant up to $100 for each day the property is kept — to a total of

$1,000. [RCW 59.18.230(4)]

**Renting condemned property.** [RCW 59.18.085] The landlord may not rent units which are condemned or unlawful to occupy due to existing uncorrected code violations. The landlord can be held liable for three months rent or treble damages, whichever is greater, as well as costs and attorneys fees for knowingly renting the property.

**Retaliatory actions.** [RCW 59.18.240 -.250] If the tenant exercises rights under the law, such as complaining to a government authority or deducting for repairs, the law prohibits the landlord from taking retaliatory action. Examples of retaliatory actions are raising the rent, reducing services provided to the tenant, or evicting the tenant. The law initially assumes that these steps are retaliatory if they occur within 90 days after the tenant's action, unless the tenant was in some way violating the statute when the change was received. If the matter is taken to court and the judge finds in favor of the tenant, the landlord can be ordered to reverse the retaliatory action, as well as pay for any harm done to the tenant and pay the tenant's attorney fees.

## ENDING THE AGREEMENT

**Proper Notice to Leave for Leases.** If the tenant moves out at the expiration of a lease, in most cases it is not necessary to give the landlord a written notice. However, the lease should be consulted to be sure a formal notice is not required. If a tenant stays beyond the expiration of the lease, and the landlord accepts the next month's rent, the tenant then is assumed to be renting under a month-to-month agreement.

A tenant who leaves before a lease expires is responsible for paying the rent for the rest of the lease term. However, the landlord must make an effort to re-rent the unit at a reasonable price. If this is not done, the tenant may not be liable for rent beyond a reasonable period of time. [RCW 59.18.310(1)]

**Proper Notice to Leave for Leases—Armed Forces Exception.** A lease can be terminated when the tenant is a member of the armed forces (including the national guard or armed forces reserve), if the tenant receives reassignment or deployment orders, provided the tenant informs the landlord no later than seven days after the receipt of such orders. In these circumstances, the tenancy may also be terminated by the tenant's spouse or dependent. [RCW 59.18.220]

**Proper Notice to Leave for Month-to-Month Agreements.** When a tenant wants to end a month-to-month rental agreement, written notice must be given to the landlord.

The notice must be received at least 20 days before the end of the rental period (the day before the rent is due). The day which the notice is delivered does not count. A landlord cannot require a tenant to give more than 20 days notice when moving out. When a landlord wants a month-to-month renter to move out, a 20-day notice is required (only outside of Seattle). If a tenant moves out without giving proper notice, the law says the tenant is liable for rent for the lesser of: 30 days from the day the next rent is due, or 30 days from the day the landlord learns the tenant has moved out. However, the landlord has a duty to try and find a new renter. If the dwelling is rented before the end of the 30 days, the former tenant must pay only until the new tenant begins paying rent.

**Proper Notice to Leave for Month-to-Month Agreements—Armed Forces Exception.** A month-to-month tenancy can be terminated with less than 20 days written notice when the tenant is a member of the armed forces (including the national guard or armed forces reserve), if the tenant receives reassignment or deployment orders that do not allow for a 20-day notice. In these circumstances, the tenancy may also be terminated by the tenant's spouse or dependent. [RCW 59.18.200]

**Domestic Violence Protection.** If a tenant or a household member is a victim of an incident of domestic violence, sexual assault, unlawful harassment, or stalking, the tenant may terminate their rental agreement without penalty, change the locks on their unit at their own expense, or both. The tenant must notify the landlord in writing that they or a household member were a victim of one of the above crimes and either provide a copy of a valid order for protection or a report of the incident from a qualified third party to the landlord. Qualified third parties include law enforcement officers, court officials, licensed mental health professionals, doctors, and victim advocates. The tenant must terminate the rental agreement within 90 days of the incident leading to the protection order or report to a qualified third party. The protection order or third party's report must be made available to the landlord within 7 days of the tenant moving out of the unit or at the same time the tenant gives notice to the landlord that the locks have been changed. [RCW 59.18.570 - 585]

## RETURN OF DEPOSITS [RCW 59.18.280]

After a tenant moves out, a landlord has 21 days in which to return a deposit, or give the tenant a written statement of why all or part of the money is being kept. It is advisable for the tenant to leave a forwarding address with the landlord when moving out.

The rental unit should be restored to the same condition as when the tenant moved in, except for normal wear and tear. Deposits cannot be used to cover normal wear and tear; or damage that existed when the tenant moved in.

The landlord is in compliance if the required payment, statement, or both, are deposited in the U.S. Mail with First Class postage paid, within 21 days. If the tenant takes the landlord to court, and it is ruled that the landlord intentionally did not give the statement or return the money, the court can award the tenant up to twice the amount of the deposit.

## EVICTIONS

**For not paying rent.** If the tenant is even one day behind in rent, the landlord can issue a three-day notice to pay or move out. If the tenant pays all the rent due within three days, the landlord must accept it and cannot evict the tenant. A landlord is not required to accept a partial payment.

**For not complying with the terms of the rental agreement.** If the tenant is not complying with the rental agreement (for example, keeping a cat when the agreement specifies no pets are allowed), the landlord can give a 10-day notice to comply or move out. If the tenant satisfactorily remedies the situation within that time, the landlord cannot continue the eviction process.

**For creating a "waste or nuisance."** If a tenant destroys the landlord's property, uses the premises for unlawful activity including gang- or drug-related activities, damages the value of the property or interferes with other tenant's use of the property, the landlord can issue a three-day notice to move out. The tenant must move out after this kind of notice. There is no option to stay and correct the problem.

**For violations within drug and alcohol free housing.** If a tenant enrolled in a program of recovery in drug and alcohol free housing for less than two years uses, possesses, or shares alcohol or drugs the landlord can give a three-day notice to move out. If the tenant cures the violation within one day, the rental agreement does not terminate. If the tenant fails to remedy the violation within one day, he or she must move out and the rental agreement is terminated. If the tenant engages in substantially the same behavior within six months, the landlord can give a three-day notice to move out and the tenant has no right to cure the subsequent violation.

**Notice.** In order for a landlord to take legal action against a tenant who does not move out, notice must be given in accordance with RCW 59.12.040.

If the tenant continues to occupy the rental in violation of a notice to leave, the landlord must then go to court to begin what is called an "unlawful detainer" action. If the court rules in favor of the landlord, the sheriff will be instructed to move the tenant out of the rental if the tenant does not leave voluntarily. The only legal way for a landlord to move a tenant physically out of a unit is by going through the courts and the sheriff's office.

## DESIGNATION OF AN INDIVIDUAL TO ACT ON BEHALF OF A TENANT UPON THE DEATH OF THE TENANT (RCW 59.18.590)

A tenant who is the sole occupant of a dwelling unit can designate a person to act on the tenant's behalf upon the death of the tenant independently or at the request of a landlord. The designation must be in writing separate from any rental agreement. It must include the designated person's name, mailing address, an address used for the receipt of electronic communications, a telephone number, and a signed statement authorizing the landlord in the event of the tenant's death (when the tenant is the sole occupant of the dwelling unit) to allow the designated person to access the tenant's dwelling unit, remove the tenant's property, receive refunds of amounts due to the tenant, and to dispose of the tenant's property consistent with the tenant's last will and testament and any applicable intestate succession law, and a conspicuous statement that the designation remain in effect until it is revoked in writing by the tenant or replaced with a new designation. The designated person's right to act on the behalf of the deceased tenant terminates upon the appointment of a personal representative for the deceased tenant's estate or the identification of a person reasonably claiming to be a successor of the deceased tenant pursuant to law.

## ABANDONMENT RELATED TO FAILURE TO PAY RENT [RCW 59.18.310]

Abandonment occurs when a tenant has both fallen behind in rent and has clearly indicated by words or actions an intention not to continue living in the rental.

When a rental has been abandoned, the landlord may enter the unit and remove any abandoned property. It must be stored in a reasonably secure place. A notice must be mailed to the tenant saying where the property is being stored and when it will be sold. If the landlord does not have a new address for the tenant, the notice should be mailed to the rental address, so it can be forwarded by the U.S. Postal Service.

How long a landlord must wait before selling abandoned property depends on the value of the goods. If the total value of property is less than $250, the landlord must mail a notice of the sale to the tenant and then wait seven(7) days. Family pictures, keepsakes and personal papers cannot be sold until forty-five (45) days after the landlord mails the notice of abandonment to the tenant.

If the total value of the property is more than $250, the landlord must mail a notice of the sale to the tenant and then wait forty-five (45) days. Personal papers, family pictures, and keepsakes can be sold at the same time as other property.

The money raised by the sale of the property goes to

cover money owed to the landlord, such as back rent and the cost of storing and selling the goods. If there is any money left over, the landlord must keep it for the tenant for one (1) year. If it is not claimed within that time, it belongs to the landlord.

If a landlord takes a tenant's property and a court later determines there had not actually been an abandonment, the landlord could be ordered to compensate the tenant for loss of the property, as well as paying court and attorney costs.

This procedure does not apply to the disposition of property of a deceased tenant. See "Abandonment Related to the Death of a Tenant" below.

## ABANDONMENT RELATED TO EVICTION [RCW 59.18.312]

When a tenant has been served with a writ of restitution in an eviction action, the tenant will receive written notification of the landlord's responsibilities regarding storing the tenant's property that is left behind after the premises is vacant. Tenants will be provided with a form to request the landlord store the tenant's property.

A landlord is required to store the tenant's property if the tenant makes a written request for storage within three (3) days of service of the writ of restitution or if the landlord knows that the tenant is a person with a disability that prevents the tenant from making a written request and the tenant has not objected to storage. The written request for storage may be served by personal delivery, or by mailing or faxing to the landlord at the address or fax number identified on the request form provided by the landlord.

After the Writ of Restitution has been executed, the landlord may enter the premises and take possession of any of the tenant's remaining belongings. Without a written request from the tenant, the landlord may choose to store the tenant's property or deposit the tenant's property on the nearest public property. If the landlord chooses to store the tenant's property, whether requested or not, it may not be returned to the tenant until the tenant pays the actual or reasonable costs of moving and storage, whichever is less within thirty (30) days.

If the total value of the property is more than $250, the landlord must notify the tenant of the pending sale by personal delivery or mail to the tenant's last known address. After thirty (30) days from the date of the notice, the landlord may sell the property, including personal papers, family pictures, and keepsakes and dispose of any property not sold.

If the total value of the property is $250 or less, the landlord must notify the tenant of the pending sale by personal delivery or mail to the tenant's last known address. After seven (7) days from the date of the notice,

the landlord may sell or dispose of the property except for personal papers, family pictures, and keepsakes.

The proceeds from the sale of the property may be applied towards any money owed to the landlord for the actual and reasonable costs of moving and storing of the property, whichever is less. The costs cannot exceed the actual or reasonable costs of moving and storage, whichever is less. If there are additional proceeds, the landlord must keep it for the tenant for one (1) year. If no claim is made by the tenant for the recovery of the additional proceeds within one (1) year, the balance will be treated as abandoned property and deposited with the Washington State Department of Revenue.

See RCW 59.18.312.

## ABANDONMENT RELATED TO THE DEATH OF A TENANT (RCW 59.18.595)

When a landlord learns of the death of a tenant who is the sole occupant of a dwelling unit, the landlord must promptly mail or personally deliver a written notice to any known personal representative, designated person, emergency contact person, or known successor to the tenant. The notice must include the name of the deceased tenant and address of the dwelling unit, the approximate date of the tenant's death, the amount of the monthly rent and the date to which it is paid. The notice must include a statement that the tenancy will terminate 15 days from the date the notice is mailed or personally delivered, or the date through which the rent has been paid, whichever is later, unless during this 15 day period a tenant representative makes arrangements with the landlord to pay rent in advance for no more than 60 days from the date of the tenant's death in order to arrange for the removal of the deceased tenant's property, and that the tenancy will be over at the end of the period for which the rent has been paid. The notice must also include a statement that failure to remove the tenant's property before the tenancy is terminated or ends will permit the landlord to enter the dwelling unit and take possession of any property found on the premises, store it in a reasonably secure place, and charge the actual or reasonable costs, whichever is less, for moving and storage of the property, and that after appropriate notice, sell or dispose of the property as provided for in law. A copy of any designation of a person to act on the deceased tenant's behalf must be attached to the notice.

The landlord must turn over possession of the tenant's property to a tenant representative upon receipt of a written request if this request is made prior to the termination or end of the tenancy, or any other date agreed to by the parties. The tenant representative must provide to the landlord an inventory of all the removed property and a signed acknowledgement that the tenant representative has been given possession

and not ownership of the property.

If a tenant representative has made arrangements to pay rent in advance, the landlord must mail this second notice to any known personal representative, designated person, emergency contact person, or known successor of the tenant, and to the deceased tenant at the dwelling unit address. This second notice must include the name, address, and telephone number or contact information for the tenant representative who made arrangements to pay rent in advance, the amount of rent paid in advance, and date through which the rent is paid. The notice must include a statement that the landlord may sell or dispose of the property on or after the date through which the rent is paid or at least 45 days after the second notice is mailed, whichever date comes later, if the tenant representative does not claim or remove the property.

If the landlord places the property in storage, the landlord must mail a second written notice (if this has not already been done) to any known personal representative, designated person, emergency contact person, or known successor of the tenant, and to the deceased tenant at the dwelling unit address. This notice must include a statement that the landlord may sell or dispose of the property on or after a specified date that is at least 45 days after the second notice is mailed, if the tenant representative does not claim and remove the property.

The landlord must turn over possession of the deceased tenant's property to the tenant representative if a written request is made in a timely manner. The tenant representative must pay the actual or reasonable costs, whichever is less, of any moving and storage of the property, and provide to the landlord an inventory of all the removed property and a signed acknowledgement that the tenant representative has been given possession and not ownership of the property.

If a tenant representative does not contact the landlord or remove the deceased person's property in a timely manner, the landlord may sell or dispose of the stored property, except for personal papers and personal photographs. If the fair market value of the property is more than $1,000, the landlord must sell the property in a commercially reasonable manner. All unsold property must be disposed of in a reasonable manner. If the value of the stored property is less than $1,000, the landlord must dispose of the property in a reasonable manner.

The personal papers and photographs that are not claimed by a tenant representative must be retained for 90 days after the sale or disposal of the deceased tenant's property and must either be destroyed or held for benefit of any successor of the deceased tenant.

No landlord or an employee of the landlord may acquire, either directly or indirectly, a deceased tenant's property that is sold or otherwise disposed of. The landlord may apply the proceeds of the sale of the deceased tenant's property toward any money owed to the landlord for the actual and reasonable cost of moving and storing the property, whichever is less. If there is excess income, it must be held by the landlord for one year. If no claim is made on the excess income before the expiration of the one year period, the balance must be deposited with the Washington State Department of Revenue as abandoned property.

The landlord must refund to the tenant representative any unearned rent and give a full and specific statement of the basis for retaining any deposit together with the payment of any refund due to the deceased tenant within 14 days after the removal of the property by the tenant representative.

If a landlord knowingly violates these abandonment provisions, the landlord can be liable to the deceased tenant's estate for actual damages. The prevailing party in any action related to these requirements may recover costs and reasonable attorneys' fees.

## RECEIPTS

A landlord must provide a receipt for any payment made in the form of cash by a tenant. Upon the request of a tenant, a landlord must provide a receipt for any payment made by the tenant in a form other than cash. This includes payment for rent, deposits, fees, parking, storage, or any other costs associated with a tenancy. See RCW 59.18.063.

## COPIES OF DOCUMENTS

If a checklist describing the physical condition of a rental unit is completed pursuant to RCW 59.18.260 and SMC 7.24.030.C, a copy signed by both the landlord and the tenant must be provided to the tenant.

When there is a written rental agreement for a premises, the landlord must provide a fully executed copy to each tenant who signs the agreement. A landlord must provide one free replacement copy of the written agreement if requested by a tenant during the tenancy. See RCW 59.18.065.

## VOTER REGISTRATION INFORMATION

Attached to this publication is information related to registering to vote, and if already registered, how to update your address when you move. For more information go to www.kingcounty.gov/depts/elections.

DocuSign Envelope ID: D15C9337-7050-4BF8-A2CE-DF5E809BDB19





DocuSign Envelope ID: D15C9337-7050-4BF8-A2CE-DF5E809BDB19

# Welcome home!

**There's a lot to do when moving to a new home. Updating your voter registration is one of those important tasks to remember.**



## Already Registered?

**Here are 5 easy ways to update your address:**

- If you have a current Washington State driver license or state ID card, go online!

- Mail the registration form included in this *Information for Tenants* packet.

- E-mail elections@kingcounty.gov with your name, date of birth, old residential and mailing address, and your new residential and mailing address.

- Call 206-296-VOTE (8683). Services are available in 120 languages.

- Go in-person to King County Elections headquarters in Renton or the Voter Registration Annex in Seattle.

Remember to change your address at least 29 days before election day. Check the Voter's Calendar.



## Need to Register?

**There are 3 ways to register to vote:**

- If you have a current Washington State driver license or state ID card, go online!

- Mail the registration form included in this *Information for Tenants* packet.

- Go in-person to King County Elections headquarters in Renton or the Voter Registration Annex in Seattle.

Seattle Department of Construction & Inspections

Fold and seal, or use an envelope

## Instructions

**Use this form to register to vote or update your current registration.**

Print all information clearly using black or blue pen. Mail this completed form to your county elections office (address on back).

**Deadline**
This registration will be in effect for the next election if postmarked no later than the Monday four weeks before Election Day.

**Voting**
You will receive your ballot in the mail. Contact your county elections office for accessible voting options.

**Public Information**
Your name, address, gender, and date of birth will be public information.

**Notice**
Knowingly providing false information about yourself or your qualifications for voter registration is a class C felony punishable by imprisonment for up to 5 years, a fine of up to $10,000, or both.

**Public Benefits Offices**
If you received this form from a public benefits office, where you received the form will remain confidential and will be used for voter registration purposes only.

Registering or declining to register will not affect the assistance provided to you by any public benefits office. If you decline to register, your decision will remain confidential.

If you believe someone interfered with your right to register, or your right to privacy in deciding whether to register, you may file a complaint with the Washington State Elections Division.

**Contact Information**
If you would like help with this form, contact the Washington State Elections Division.

**web**   www.vote.wa.gov
**call**   (800) 448-4881
**email**   elections@sos.wa.gov
**mail**   PO Box 40229
Olympia, WA 98504-0229

For official use:

fold in half ⟶

2 / 2016

# Washington State Voter Registration Form

Register online at www.myvote.wa.gov.

**1   Personal Information**

last                first                middle                suffix

date of birth (mm/dd/yyyy)                gender

residential address in Washington                apt #

city                ZIP

mailing address, if different

city                state and ZIP

phone number (optional)                email address (optional)

**2   Qualifications**

If you answer *no*, do not complete this form.

○ yes   ○ no   **I am a citizen of the United States of America.**

○ yes   ○ no   **I will be at least 18 years old by the next election.**

**3   Military / Overseas Status**

○ yes   ○ no   **I am currently serving in the military.**
Includes National Guard and Reserves, and spouses or dependents away from home due to service.

○ yes   ○ no   **I live outside the United States.**

**4   Identification — Washington Driver License, Permit, or ID**

If you do not have a Washington driver license, permit, or ID, you may use the last four digits of your Social Security number to register.

x x x - x x -

**5   Change of Name or Address**

This information will be used to update your current registration, if applicable.

former last name                first                middle

former residential address                city                state and ZIP

**6   Declaration**

I declare that the facts on this voter registration form are true. I am a citizen of the United States, I will have lived at this address in Washington for at least thirty days immediately before the next election at which I vote, I will be at least 18 years old when I vote, I am not disqualified from voting due to a court order, and I am not under Department of Corrections supervision for a Washington felony conviction.

sign here

date here

return address:
PO Box 40229, Olympia, WA 98504-0229



**Office of the Secretary of State**
PO Box 40229
Olympia, WA 98504-0229

<div style="text-align:right">

first class
postage
required

</div>



Please write your county elections office address below:

fold in half

**Adams County**
210 W Broadway, Ste 200
Ritzville, WA 99169
(509) 659-3249

**Asotin County**
PO Box 129
Asotin, WA 99402
(509) 243-2084

**Benton County**
PO Box 470
Prosser, WA 99350
(509) 736-3085

**Chelan County**
350 Orondo Ave Ste. 306
Wenatchee, WA 98801-2885
(509) 667-6808

**Clallam County**
223 E 4th St, Ste 1
Port Angeles, WA 98362
(360) 417-2221

**Clark County**
PO Box 8815
Vancouver, WA 98666-8815
(360) 397-2345

**Columbia County**
341 E Main St, Ste 3
Dayton, WA 99328
(360) 382-4541

**Cowlitz County**
207 4th Ave N, Rm 107
Kelso, WA 98626

**Douglas County**
PO Box 456
Waterville, WA 98858
(509) 745-8527 ext 6407

**Ferry County**
350 E Delaware Ave, Ste 2
Republic, WA 99166
(509) 775-5200

**Franklin County**
PO Box 1451
Pasco, WA 99301
(509) 545-3538

**Garfield County**
PO Box 278
Pomeroy, WA 99347-0278
(509) 843-1411

**Grant County**
PO Box 37
Ephrata, WA 98823
(509) 754-2011 ext. 2793

**Grays Harbor County**
100 W Broadway, Ste 2
Montesano, WA 98563
(360) 964-1556

**Island County**
PO Box 1410
Coupeville, WA 98239
(360) 679-7366

**Jefferson County**
PO Box 563
(360) 385-9119

**King County**
919 SW Grady Way
Renton, WA 98057
(206) 296-8683

**Kitsap County**
614 Division St, MS 31
Port Orchard, WA 98366
(360) 337-7128

**Kittitas County**
205 W 5th Ave, Ste 105
Ellensburg, WA 98926-2891
(509) 962-7503

**Klickitat County**
205 S Columbus, Stop 2
Goldendale, WA 98620
(509) 773-4001

**Lewis County**
PO Box 29
Chehalis, WA 98532-0029
(360) 740-1278

**Lincoln County**
PO Box 28
Davenport, WA 99122-0028
(509) 725-4971

**Mason County**
PO Box 400
Shelton, WA 98584
(360) 427-9670 ext 469

**Okanogan County**
PO Box 1010
(509) 422-7350

**Pacific County**
PO Box 97
South Bend, WA 98586-0097
(360) 875-9317

**Pend Oreille County**
PO Box 5015
Newport, WA 99156
(509) 447-6472

**Pierce County**
2501 S 35th St, Ste C
Tacoma, WA 98409
(253) 798-VOTE

**San Juan County**
PO Box 638
Friday Harbor, WA 98250-0638
(360) 378-3357

**Skagit County**
PO Box 1306
Mount Vernon, WA 98273-1306
(360) 416-1702

**Skamania County**
PO Box 790, Elections Dept
Stevenson, WA 98648-0790
(509) 427-3730

**Snohomish County**
3000 Rockefeller Ave, MS 505
Everett, WA 98201-4060
(425) 388-3444

**Spokane County**
1033 W Gardner Ave
Spokane, WA

**Stevens County**
215 S Oak St, Rm 106
Colville, WA 99114-2836
(509) 684-7514

**Thurston County**
2000 Lakeridge Dr SW
Olympia, WA 98502-6090
(360) 786-5408

**Wahkiakum County**
PO Box 543
Cathlamet, WA 98612
(360) 795-3219

**Walla Walla County**
PO Box 2176
Walla Walla, WA 99362-0356
(509) 524-2530

**Whatcom County**
PO Box 369
Bellingham, WA 98227-0369
(360) 778-5102

**Whitman County**
PO Box 191
Colfax, WA 99111
(509) 397-5284

**Yakima County**
PO Box 12570
Yakima, WA 98909-2570
(509) 574-1340

**WA State Elections Division**
PO Box 40229
Olympia, WA 98504-0229
(800) 448-4881



## SEATTLE - LEASE ADDENDUM
## FOR REMOTE CONTROL, CARD, OR CODE ACCESS GATE

**1. DWELLING UNIT DESCRIPTION.**
Unit No. **E214** , **1819 23rd Ave**
**#E214**
_____ *(street address)* in
**Seattle**
*(city)*, Washington, **98122** *(zip code).*

**2. LEASE CONTRACT DESCRIPTION.**
Lease Contract Date: **November 1, 2019**
Owner's name: **Madison Summit LLC**
_____
_____
_____

Residents *(list all residents):*
**Christopher Berg,** ███████████████
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

This Addendum constitutes an Addendum to the above described Lease Contract for the above described premises, and is hereby incorporated into and made a part of such Lease Contract. Where the terms or conditions found in this Addendum vary or contradict any terms or conditions found in the Lease Contract, this Addendum shall control.

**3. REMOTE CONTROL/CARDS/CODE FOR GATE ACCESS.**
- ❏ **Remote control for gate access.** Each person who is listed as a resident on the lease will be given a remote control at no cost to use during his or her residency.
- ☒ **Cards for gate access.** Each person who is listed as a resident on the lease will be given a card at no cost to use during his or her residency.
- ❏ **Code for gate access.** Each resident will be given, at no cost, an access code (keypad number) for the pedestrian or vehicular access gates. It is to be used only during your residency. We may change the access code at any time and will notify you of any such changes.

**4. DAMAGED, LOST OR UNRETURNED REMOTE CONTROLS, CARDS OR CODE CHANGES.**
- ❏ If a remote control is lost, stolen or damaged, a $ _____ fee will be charged for a replacement. If a remote control is not returned or is returned damaged when you move out, there will be a $ _____ deduction from the security deposit.
- ☒ If a card is lost, stolen or damaged, a $ **50.00** fee will be charged for a replacement card. If a card is not returned or is returned damaged when you move out, there will be a $ **50.00** deduction from the security deposit.
- ❏ We may change the code(s) at any time and notify you accordingly.

**5. REPORT DAMAGE OR MALFUNCTIONS.** Please immediately report to the office any malfunction or damage to gates, fencing, locks or related equipment.

**6. FOLLOW WRITTEN INSTRUCTIONS.** We ask that you and all other occupants read the written instructions that have been furnished to you regarding the access gates. This is important because if the gates are damaged by you or other occupants, guests or invitees through negligence or misuse, you are liable for the damages under your lease, and collection of damage amounts will be pursued.

**7. PERSONAL INJURY AND/OR PERSONAL PROPERTY DAMAGE.** Except as specifically required by law, we have no duty to maintain the gates and cannot guaranty against gate malfunctions. We make no representations or guarantees to you concerning security of the community. Any measures, devices,or activities taken by us are solely for the benefit of us and for the protection of our property and interests, and any benefit to you of the same is purely incidental. Anything mechanical or electronic is subject to malfunction. Fencing, gates or other devices will not prevent all crime. No security system or device is foolproof or 100 percent successful in deterring crime. Crime can still occur. Protecting residents, their families, occupants, guests and invitees from crime is the sole responsibility of residents, occupants and law enforcement agencies. You should first call 911 or other appropriate emergency police numbers if a crime occurs or is suspected. We are not liable to any resident, family member, guest, occupant or invitee for personal injury, death or damage/loss of personal property from incidents related to perimeter fencing, automobile access gates and/or pedestrian access gates. We reserve the right to modify or eliminate security systems other than those statutorily required. You will be held responsible for the actions of any persons to whom you provide access to the community.

**8. RULES IN USING VEHICLE GATES.**
- Always approach entry and exit gates with caution and at a very slow rate of speed, and wait for gate to stop moving before proceeding under it.
- Never stop your car where the gate can hit your vehicle as the gate opens or closes.
- Never follow another vehicle into an open gate. Always use your card to gain entry.
- Report to management the vehicle license plate number of any vehicle that piggybacks through the gate.
- Never force the gate open with your car.
- Never get out of your vehicle while the gates are opening or closing.
- If you are using the gates with a boat or trailer, please contact management for assistance. The length and width of the trailer may cause recognition problems with the safety loop detector and could cause damage.
- Do not operate the gate if there are small children nearby who might get caught in it as it opens or closes.
- If you lose your card, please contact the management office immediately.
- Do not give your card or code to anyone else.
- Do not tamper with gate or allow your occupants to tamper or play with gates.

©2018, National Apartment Association, Inc. - 9/2018, Washington

Page 1 of 2

**9. SPECIAL PROVISIONS.** The following special provisions control over conflicting provisions of this printed form:

<u>REPLACEMENT OR REISSUE OF PARKING PERMIT</u>

<u>$5.00.</u>

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

**Resident or Residents**

*(All residents must sign here)*

_____

_____

_____

_____

_____

_____

**Owner or Owner's Representative**

*(Signs here)*

_____

**Date of Lease Contract**

November 1, 2019

_____

© 2018, Texas Apartment Association, Inc.
Washington/National Apartment Association Official Form, September 2018,

NATIONAL APARTMENT ASSOCIATION
We Lead the Way Home

# ADDENDUM PROHIBITING SHORT-TERM SUBLETTING OR RENTAL

**1. DWELLING UNIT DESCRIPTION.**
Unit No. E214, 1819 23rd Ave #E214 *(street address)* in Seattle *(city)*, Washington, 98122 *(zip code)*.

**2. LEASE CONTRACT DESCRIPTION.**
Lease Contract Date: November 1, 2019
Owner's name: Madison Summit LLC

Residents *(list all residents)*:
Christopher Berg, [redacted]

This Addendum constitutes an Addendum to the above described Lease Contract for the above described premises, and is hereby incorporated into and made a part of such Lease Contract. Where the terms or conditions found in this Addendum vary or contradict any terms or conditions found in the Lease Contract, this Addendum shall control.

**3. SHORT TERM SUBLEASE OR RENTING PROHIBITED.** Without limiting the prohibition in the Lease on subletting, assignment, and licensing, and without limiting any of our rights or remedies, this Addendum to the Lease further supplements and defines the requirements and prohibitions contained in the Lease Contract between you and us. You are hereby strictly prohibited from subletting, and licensing, or renting to any third party, or allowing occupancy by any third party, of all or any portion of the dwelling, whether for an overnight use or duration of any length, without our prior written consent in each instance. This prohibition applies to overnight stays or any other stays arranged on Airbnb.com or other similar internet sites.

**4. PROHIBITION ON LISTING OR ADVERTISING DWELLING ON OVERNIGHT SUBLETTING OR RENTING WEBSITES.** You agree not to list or advertise the dwelling as being available for short term subletting or rental or occupancy by others on Airbnb.com or similar internet websites. You agree that listing or advertising the dwelling on Airbnb.com or similar internet websites shall be a violation of this Addendum and a breach of your Lease Contract.

**5. VIOLATION OF LEASE AGREEMENT.** Your Lease Contract allows for use of your dwelling as a private residence only and strictly prohibits conducting any kind of business in, from, or involving your dwelling unless expressly permitted by law. Separately, your Lease Contract prohibits subletting or occupancy by others of the dwelling for any period of time without our prior written consent. Permitting your dwelling to be used for any subletting or rental or occupancy by others (including, without limitation, for a short term), regardless of the value of consideration received or if no consideration is received, is a violation and breach of this Addendum and your Lease Contract.

**6. REMEDY FOR VIOLATION.** Any violation of this Addendum constitutes a material violation of the Lease Contract, and as such we may exercise any default remedies permitted in the Lease Contract, including termination of your tenancy, in accordance with local law. This clause shall not be interpreted to restrict our rights to terminate your tenancy for any lawful reason, or by any lawful method.

**7. RESIDENT LIABILITY.** You are responsible for and shall be held liable for any and all losses, damages, and/or fines that we incur as a result of your violations of the terms of this Addendum or the Lease Contract. Further, you agree you are responsible for and shall be held liable for any and all actions of any person(s) who occupy your dwelling in violation of the terms of this Addendum or the Lease Contract, including, but not limited to, property damage, disturbance of other residents, and violence or attempted violence to another person. In accordance with applicable law, without limiting your liability you agree we shall have the right to collect against any renter's or liability insurance policy maintained by you for any losses or damages that we incur as the result of any violation of the terms of this Addendum.

**8. SEVERABILITY.** If any provision of this Addendum or the Lease Contract is invalid or unenforceable under applicable law, such provision shall be ineffective to the extent of such invalidity or unenforceability only without invalidating or otherwise affecting the remainder of this Addendum or the Lease Contract. The court shall interpret the lease and provisions herein in a manner such as to uphold the valid portions of this Addendum while preserving the intent of the parties.

**9. SPECIAL PROVISIONS.** The following special provisions control over conflicting provisions of this printed form:

**Resident or Residents**
*(All residents must sign)*

DocuSigned by:
[redacted]
43013589B3F44FF...

DocuSigned by:
4EBAA48E5BA0487...

**Owner or Owner's Representative**
*(Signs below)*

DocuSigned by:
James Lillie
B6BEC8566B2E4DE...

**Date of Signing Addendum**

© 2018, National Apartment Association, Inc. - 9/2018, Washington

# PACKAGE ACCEPTANCE ADDENDUM



**1. DWELLING UNIT DESCRIPTION.**
Unit No. _____ **E214** _____, **1819 23rd Ave**
**#E214** _____
_____ *(street address)* in
_____ **Seattle** _____
*(city)*, Washington, _____ **98122** _____ *(zip code)*.

**2. LEASE CONTRACT DESCRIPTION.**
Lease Contract Date: **November 1, 2019**
Owner's name: **Madison Summit LLC**
_____
_____
_____

Residents *(list all residents)*:
**Christopher Berg,** ▇▇▇▇▇▇▇▇▇▇▇
_____
_____
_____
_____
_____
_____
_____
_____
_____

This Addendum constitutes an Addendum to the above described Lease Contract for the above described premises, and is hereby incorporated into and made a part of such Lease Contract. Where the terms or conditions found in this Addendum vary or contradict any terms or conditions found in the Lease Contract, this Addendum shall control.

**3. PURPOSE OF ADDENDUM.** By signing this Addendum, you wish for us to sign for, and to accept, U.S. mail and privately-delivered packages or other items on your behalf, subject to the terms and conditions set forth herein.

**4. PACKAGE ACCEPTANCE.**
**A. Generally.** You hereby authorize us and our agent to accept, on your behalf, any package or item delivered to our on-site management office during disclosed business hours, including but not limited to a package delivered by the U.S. Postal Service or by any private courier service or individual. You also specifically authorize us to sign on your behalf if the person or entity delivering said package or item requires an adult signature prior to delivery, including but not limited to the delivery of certified or registered mail. A photo I.D. is required before any packages will be released. Packages will only be released to verified Residents or approved representatives.

**B. Limitations.** You understand and agree that we may refuse to accept any package for any reason or no reason at all.

**5. TIME LIMITATION.** Due to limited storage space, we must ask that you pick up your package as soon as possible. You also agree that we shall have no duty whatsoever to hold or store any package for more than _____ **3** _____ days after receipt (if blank, the default period of time is 10 days after receipt of package. Accordingly, you should notify the management office if you are going to be away from the apartment home and expect to be receiving a package(s)). After said time, you agree that any such package is deemed abandoned and you authorize us to return the package to its original sender.

**6. DUTY OF CARE, INDEMNIFICATION, ASSUMPTION OF RISKS AND WAIVER.** As to any package for which we sign and/or receive on your behalf, you understand and agree that we have no duty to notify you of our receipt of such package, nor do we have any duty to maintain, protect, or deliver said package to you, nor do we have any duty to make said package available to you outside disclosed business hours. Any packages or personal property delivered to us or stored by us shall be at your sole risk, and you assume all risks whatsoever associated with any loss or damage to your packages and personal property. To the greatest extent allowed by Washington law, you, your guests, family, invitees, and agents hereby waive any and all claims against us or our agents of any nature regarding or relating to any package or item received by us, including but not limited to, claims for theft, misplacing or damaging any such package, except in the event of our or our agent's gross negligence or willful misconduct. To the greatest extent allowed by Washington law, you also agree to defend and indemnify us and our agents and hold us both harmless from any and all claims that may be brought by any third party relating to any injury sustained relating to or arising from any package that we received on your behalf. To the greatest extent allowed by Washington law, you also agree to indemnify us and our agents and hold us harmless from any damage caused to us or our agents by any package received by us for you. You also authorize us to throw away or otherwise dispose of any package that we, in our sole discretion, deem to be dangerous, noxious, or in the case of packaged food, spoiled, and waive any claim whatsoever resulting from such disposal.

**7. SEVERABILITY.** If any provision of this Addendum or the Lease Contract is illegal, invalid or unenforceable under any applicable law, then it is the intention of the parties that (a) such provision shall be ineffective to the extent of such invalidity or unenforceability only without invalidating or otherwise affecting the remainder of this Addendum or the Lease, (b) the remainder of this Addendum shall not be affected thereby, and (c) it is also the intention of the parties to this Addendum that in lieu of each clause or provision that is illegal, invalid or unenforceable, there be added as a part of this Addendum a clause or provision similar in terms to such illegal, invalid or unenforceable clause or provision as may be possible and be legal, valid and enforceable.

**8. SPECIAL PROVISIONS.** The following special provisions control over conflicting provisions of this printed form:
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

**Resident or Residents**
*(All residents must sign)*

_____
_____
_____
_____

**Owner or Owner's Representative**
*(Signs below)*

_____

**Date of Signing Addendum**

_____

National Apartment Association, Inc. 9/2013, Washington

DocuSign Envelope ID: D15C9337-7050-4BF8-A2CE-DF5E809BDB19

# CLASS ACTION WAIVER ADDENDUM



1. **DWELLING UNIT DESCRIPTION.**
Unit No. _____ E214 _____, 1819 23rd Ave
#E214 _____
_____ *(street address)* in
_____ Seattle _____
*(city)*, Washington, ___ 98122 ___ *(zip code)*.

2. **LEASE CONTRACT DESCRIPTION.**
Lease Contract Date: **November 1, 2019**
Owner's name: **Madison Summit LLC**
_____
_____
_____
_____

Residents *(list all residents)*:
**Christopher Berg,** █████████████████
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

3. **ADDENDUM.** This Addendum constitutes an Addendum to the above described Lease Contract for the above described premises. Where the terms or conditions found in this Addendum vary or contradict any terms or conditions found in the Lease Contract, this Addendum shall control.

4. **CLASS ACTION WAIVER.** You agree that you hereby waive your ability to participate either as a class representative or member of any class action claim(s) against us or our agents. While you are not waiving any right(s) to pursue claims against us related to your tenancy, you hereby agree to file any claim(s) against us in your individual capacity, and you may not be a class action plaintiff, class representative, or member in any purported class action lawsuit ("Class Action"). Accordingly, **you expressly waive any right and/or ability to bring, represent, join, or otherwise maintain a Class Action or similar proceeding against us or our agents in any forum.**

Any claim that all or any part of this Class Action waiver provision is unenforceable, unconscionable, void, or voidable shall be determined solely by a court of competent jurisdiction.

YOU UNDERSTAND THAT, WITHOUT THIS WAIVER, YOU MAY HAVE POSSESSED THE ABILITY TO BE A PARTY TO A CLASS ACTION LAWSUIT. BY SIGNING THIS AGREEMENT, YOU UNDERSTAND AND CHOOSE TO WAIVE SUCH ABILITY AND CHOOSE TO HAVE ANY CLAIMS DECIDED INDIVIDUALLY. THIS CLASS ACTION WAIVER SHALL SURVIVE THE TERMINATION OR EXPIRATION OF THIS LEASE CONTRACT.

5. **SEVERABILITY.** If any clause or provision of this Addendum is illegal, invalid or unenforceable under any present or future laws, then it is the intention of the parties hereto that the remainder of this Addendum shall not be affected thereby.

6. **SPECIAL PROVISIONS.** The following special provisions control over conflicting provisions of this printed form:
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

**Resident's Acknowledgment**

_____
_____
_____
_____
_____

**Landlord (or Landlord Agent) Acknowledgment**

_____

**Date of Signing Addendum**

_____
_____
_____
_____

**Date of Signing Addendum**

_____





**Seattle** Department of
Construction & Inspections

# RRIO Certificate of
# Property Registration

**Property Information**

Property Name:          Summit at Madison Park
Address:                1819 23rd Ave Ste 101 Seattle, WA 98122-3099

Parcel:

**Tenant's Contact for Repairs**
Contact Name:           Summit at Madison Park

Address:                1819 23rd Ave Ste 101 Seattle, WA 98122-3099

Phone:                  (206) 720-5553

Registration Date:

Registration Expires:

This RRIO Certificate of Property Registration indicates that the property listed above has registered rental housing units at this location which meet the requirements of the City of Seattle's Rental Registration and Inspection Ordinance (RRIO) program as required by Seattle Municipal Code Chapter 22.214. Issuance of this certificate indicates that all rental housing units on this property either meet basic housing standards or will meet such standards prior to rental. For more information regarding these standards please see www.seattle.gov/RRIO.

**Owner Responsibilities: Within 30 days after the Seattle DCI RRIO program issues a RRIO Certificate of Property Registration, a copy shall be delivered to the tenants in each rental housing unit or shall be posted and remain posted in one or more places readily visible to all tenants. A copy of the current RRIO Certificate of Property Registration shall be provided to all new tenants at or before the time they take possession of the rental housing unit.**

# www.seattle.gov/RRIO

DocuSigned by:

DocuSigned by:

DocuSigned by:
*James Lillie*
B6BEC8566B2E4DE...
4EBAA48E5BA0487...
4301358DB3F44FF...