# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | |
|---|---|
| IN RE: REALPAGE, INC., RENTAL SOFTWARE ANTITRUST LITIGATION (NO. II) | **Case No. 3:23-MD-3071**<br>**MDL No. 3071**<br><br>**Chief Judge Waverly D. Crenshaw, Jr.**<br><br>**This Document Relates to:** |

| | |
|---|---|
| **3:23-cv-00330** | **3:23-cv-00380** |
| **3:23-cv-00331** | **3:23-cv-00979** |
| **3:23-cv-00332** | **3:23-cv-00381** |
| **3:23-cv-00326** | **3:23-cv-00387** |
| **3:23-cv-00333** | **3:23-cv-00388** |
| **3:23-cv-00334** | **3:23-cv-00389** |
| **3:23-cv-00335** | **3:23-cv-00390** |
| **3:23-cv-00336** | **3:23-cv-00391** |
| **3:23-cv-00337** | **3:23-cv-00410** |
| **3:23-cv-00338** | **3:23-cv-00411** |
| **3:23-cv-00339** | **3:23-cv-00419** |
| **3:23-cv-00344** | **3:23-cv-00413** |
| **3:23-cv-00345** | **3:23-cv-00412** |
| **3:23-cv-00356** | **3:23-cv-00414** |
| **3:23-cv-00357** | **3:23-cv-00416** |
| **3:23-cv-00358** | **3:23-cv-00415** |
| **3:23-cv-00377** | **3:23-cv-00440** |
| **3:23-cv-00378** | **3:23-cv-00445** |
| **3:23-cv-00379** | **3:23-cv-00552** |
| **3:22-cv-01082** | **3:23-cv-00742** |

## DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS MULTIFAMILY PLAINTIFFS' SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

# TABLE OF CONTENTS

I.      INTRODUCTION .................................................................................................. 1

II.     SUMMARY OF PLAINTIFFS' ALLEGATIONS ............................................... 3

     A.     RealPage Revenue Management Products............................................ 3

     B.     The Alleged Conspiracy ..................................................................... 6

III.    LEGAL STANDARD................................................................................... 7

IV.    ARGUMENT ............................................................................................... 8

     A.     Plaintiffs Do Not Plausibly Allege a Sherman Act Section 1 *Per Se* Violation ............................................................................................... 8

           i.     Plaintiffs' Group Pleading Is Improper and Insufficient ........................... 9

           ii.    Plaintiffs Allege No Plausible Direct or Circumstantial Evidence of Conspiracy ...................................................................... 13

                a)     Plaintiffs Fail to Allege "Parallel Conduct"................................. 14

                b)     Plaintiffs Fail to Allege the Requisite "Plus Factors".................. 17

           iii.   Plaintiffs' Allegations That RealPage Facilitated and Enforced the Horizontal Conspiracy Also Fail ............................................................. 23

           iv.   The Alleged Conspiracy Is Implausible on Its Face ................................ 26

     B.     Plaintiffs' Section 1 Claims Also Fail Under the Rule of Reason ...................... 27

           i.     Plaintiffs Do Not Define Plausible Relevant Markets. ........................... 29

                a)     Regional MSAs Are Not Plausible Relevant Markets................ 30

           ii.    Plaintiffs Have Not Pleaded Anticompetitive Effects ............................ 32

     C.     Plaintiffs Fail to Establish Antitrust Standing ................................... 37

     D.     Plaintiffs' State-Law Antitrust Claims Fail ....................................... 38

V.     CONCLUSION............................................................................................ 40

# TABLE OF AUTHORITIES

**Page**

### Cases

*42nd Parallel N. v. E Street Denim Co.*,
  286 F.3d 401 (7th Cir. 2002) ..............................................................33

*Aladdins Lights Inc. v. Eye Lighting Int'l*,
  96 N.E.3d 864 (Ohio Ct. App. 2017)....................................................38

*In re Amazon.com, Inc. eBook Antitrust Litig.*,
  2023 WL 6006525 (S.D.N.Y. July 31, 2023) ........................................34

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)........................................................................7, 8

*Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*,
  459 U.S. 519 (1983)............................................................................37

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007)......................................................7, 8, 10, 11, 17, 22

*Bennett v. Visa U.S.A. Inc.*,
  198 S.W.3d 747 (Tenn. Ct. App. 2006) ................................................39

*Big River Indus. v. Headwaters Res., Inc.*,
  971 F. Supp. 2d 609 (M.D. La. 2013) ..................................................39

*Blankenship v. City of Crossville*,
  2017 WL 4641799 (M.D. Tenn. Oct. 17, 2017) ...................................36

*Blewett v. Abbott Labs*,
  86 938 P.2d 842 782 (Wash. Ct. App. 1997) .......................................39

*Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*,
  509 U.S. 209 (1993)............................................................................33

*Brown Shoe Co. v. United States*,
  370 U.S. 294 (1962)............................................................................30

*Brunson Commc'ns, Inc. v. Arbitron, Inc.*,
  239 F. Supp. 2d 550 (E.D. Pa. 2002) ..................................................27

*C.S. Sewell, M.D. P.C. v. Amerigroup Tenn., Inc.*,
  2018 WL 6591429 (M.D. Tenn. Dec. 14, 2018).................................14

*Cal. Dental Ass'n v. FTC*,
  526 U.S. 756 (1999)............................................................................29

*Care Heating & Cooling, Inc. v. Am. Standard, Inc.*,
  427 F.3d 1008 (6th Cir. 2005) ............................................................28

*CBC Cos. v. Equifax, Inc.*,
  561 F.3d 569 (6th Cir. 2009) ..............................................................37

# TABLE OF AUTHORITIES
(continued)

**Page**

*In re Cedar Shakes & Shingles Antitrust Litig.*,
2020 WL 832324 (W.D. Wash. Feb. 20, 2020) ................................................... 15

*Cty. of Tuolumne v. Sonora Cmty. Hosp.*,
236 F.3d 1148 (9th Cir. 2001) ........................................................................ 38

*Conley Publ'g Grp., Ltd. v. Journal Commc'ns, Inc.*,
665 N.W.2d 879 (Wis. 2003) .......................................................................... 39

*Cont'l Cablevision of Ohio, Inc. v. Am. Elec. Power Co.*,
715 F.2d 1115 (6th Cir. 1983) ....................................................................... 22

*Cupp v. Alberto-Culver USA, Inc.*,
310 F. Supp. 2d 963 (W.D. Tenn. 2004) .......................................................... 32

*DaimlerChrysler Corp. v. Cuno*,
547 U.S. 332 (2006) ....................................................................................... 40

*In re Dairy Farmers of Am., Inc. Cheese Antitrust Litig.*,
2015 WL 3988488 (N.D. Ill. June 29, 2015) .................................................... 38

*Deich-Keibler v. Bank One*,
243 F. App'x 164 (7th Cir. 2007) .................................................................... 38

*Dickson v. Microsoft Corp.*,
309 F.3d 193 (4th Cir. 2002) ......................................................................... 34

*Drs. Steuer & Latham, P.A. v. Nat'l Med. Enters.*,
672 F. Supp. 1489 (D.S.C. 1987), *aff'd*, 846 F.2d 70 (4th Cir. 1988) .................. 38

*Drug Emporium, Inc. v. Blue Cross of Western New York, Inc.*,
104 F. Supp. 2d 184 (W.D.N.Y. 2000) ............................................................. 34

*In re Dynamic Random Access Memory (DRAM) Indirect Purchaser Antitrust
Litig.*,
28 F.4th 42 (9th Cir. 2022) ............................................................... 17, 19, 23

*In re Elec. Books Antitrust Litig.*,
2014 WL 2535112 (S.D.N.Y. June 5, 2014) ..................................................... 38

*Entrialgo v. Twin City Dodge, Inc.*,
333 N.E.2d 202 (Mass. 1975) ......................................................................... 39

*Erie Cty. v. Morton Salt, Inc.*,
702 F.3d 860 (6th Cir. 2012) .................................................................... 23, 26

*Expert Masonry, Inc. v. Boone Cty.*,
440 F.3d 336 (6th Cir. 2006) ......................................................................... 28

*Felder's Collision Parts, Inc v. All Star Advert. Agency, Inc.*,
777 F.3d 756 (5th Cir. 2015) ......................................................................... 38

iii

*Finley v. Kelly*,
384 F. Supp. 3d 898 (M.D. Tenn. 2019) ................................................................5

*Fox v. Saginaw Cnty.*,
67 F.4th 284 (6th Cir. 2023) ...............................................................................40

*In re German Auto. Mfrs. Antitrust Litig.*,
612 F. Supp. 3d 967 (N.D. Cal. 2020) .................................................................23

*Gibson v. Miami Valley Milk Producers, Inc.*,
299 N.E.2d 631 (Ind. Ct. App. 1973) ..................................................................39

*Hobart-Mayfield, Inc. v. Nat'l Operating Comm. on Standards for Athletic Equip.*,
48 F.4th 656 (6th Cir. 2022) ...................................................................8, 14, 18

*Hobart-Mayfield, Inc. v. Nat'l Operating Comm. on Standards for Athletic Equip.*,
535 F. Supp. 3d 638 (E.D. Mich. 2021) .................................................................9

*Hogan v. Pilgrim's Pride Corp.*,
2018 WL 1316979 (D. Colo. Mar. 14, 2018) ......................................................16

*Hyland v. Homeservices of Am., Inc.*,
771 F.3d 310 (6th Cir. 2014) .......................................................................13, 18

*In re ICE LIBOR Antitrust Litig.*,
2020 WL 1467354 (S.D.N.Y. Mar. 26, 2020) .....................................................19

*In re Ins. Brokerage Antitrust Litig.*,
618 F.3d 300 (3d Cir. 2010) ................................................................12, 18, 21

*In re Interest Rate Swaps Antitrust Litig.*,
261 F. Supp. 3d 430 (S.D.N.Y. 2017) ...........................................................19, 38

*Interstate Circuit, Inc. v. United States*,
306 U.S. 208 (1939) ...........................................................................12, 13, 14

*Island Tobacco Co. v. R. J. Reynolds Indus.*,
513 F. Supp. 726 (D. Haw. 1981) ........................................................................38

*Jones v. Micron Tech. Inc.*,
400 F. Supp. 3d 897 (N.D. Cal. 2019) .................................................................23

*K&S Assocs., Inc. v. Am. Ass'n of Physicists in Med.*,
2012 WL 3061850 (M.D. Tenn. July 26, 2012) ...................................................22

*In re K-Dur Antitrust Litig.*,
2008 WL 2660780 (D.N.J. Feb. 28, 2008) ..........................................................39

*Kendall v. Visa U.S.A., Inc.*,
518 F.3d 1042 (9th Cir. 2008) ..............................................................................9

Page

*Kleen Prods., LLC v. Int'l Paper*,
276 F. Supp. 3d 811 (N.D. Ill. 2017), *aff'd*, 910 F.3d 927 (7th Cir. 2018) ............................25

*Krause Marine Towing Corp. v. Ass'n of Md. Pilots*,
44 A.3d 1043 (Md. Ct. Spec. App. 2012) ................................................................................38

*State ex rel. Leech v. Levi Strauss & Co.*,
1980 WL 4696 (Tenn. Ch. Ct. Sept. 25, 1980) .......................................................................39

*Lifeline Ltd. No. II v. Conn. Gen. Life Ins. Co.*,
821 F. Supp. 1201 (E.D. Mich. 1993) ..............................................................................26, 27

*In re Linerboard Antitrust Litig.*,
223 F.R.D. 335 (E.D. Pa. 2004) ..............................................................................................39

*Llacua v. W. Range Ass'n*,
930 F.3d 1161 (10th Cir. 2019) ...............................................................................................25

*In re Local TV Advert. Antitrust Litig.*,
2022 WL 3716202 (N.D. Ill. Aug. 29, 2022) ....................................................................20, 26

*Lorix v. Crompton Corp.*,
736 N.W.2d 619 (Minn. 2007) .................................................................................................38

*Maris Distrib. Co. v. Anheuser-Busch, Inc.*,
302 F.3d 1207 (11th Cir. 2002) ...............................................................................................34

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
475 U.S. 574 (1986) .................................................................................................................27

*Med. Ctr. at Elizabeth Place, LLC v. Atrium Health Sys.*,
922 F.3d 713 (6th Cir. 2019) ...................................................................................................28

*Mich. Div.-Monument Builders of N. Am. v. Mich. Cemetery Ass'n*,
524 F.3d 726 (6th Cir. 2008) .............................................................................................30, 34

*Midwest Auto Auction, Inc. v. McNeal*,
2012 WL 3478647 (E.D. Mich. Aug. 14, 2012) ......................................................................19

*Minn. Ass'n of Nurse Anesthetists v. Unity Hosp.*,
5 F. Supp. 2d 694 (D. Minn. 1998) ....................................................................................34, 35

*Mosaic Health Inc. v. Sanofi-Aventis U.S., LLC*,
2022 WL 4017895 (W.D.N.Y. Sept. 2, 2022) .........................................................................15

*In re Musical Instruments & Equip. Antitrust Litig.*,
798 F.3d 1186 (9th Cir. 2015) .............................................................14, 16, 19, 23, 33

*NAACP v. Claiborne Hardware Co.*,
393 So.2d 1290 (Miss. 1980), *rev'd on other grounds*, 458 U.S. 886 (1982) .........................38

*Nat'l Hockey League Players Ass'n v. Plymouth Whalers Hockey Club*,
419 F.3d 462 (6th Cir. 2005) .................................................................30

*New Orleans Ass'n of Cemetery Tour Guides & Cos. v. New Orleans*
*Archdiocesan Cemeteries*,
56 F.4th 1026 (5th Cir. 2023) .................................................................30

*In re Niaspan Antitrust Litig.*,
42 F. Supp. 3d 735 (E.D. Pa. 2014) .................................................................40

*NicSand, Inc. v. 3M Co.*,
507 F.3d 442 (6th Cir. 2007) .................................................................37

*Odom v. Fairbanks Mem'l Hosp.*,
999 P.2d 123 (Alaska 2000) .................................................................38

*Ogden v. Little Caesar Enters.*,
393 F. Supp. 3d 622 (E.D. Mich. 2019).................................................................28

*Ohio v. Am. Express Co.*,
138 S. Ct. 2274 (2018).................................................................32, 34, 36

*In re Omnicare, Inc. Sec. Litig.*,
769 F.3d 455 (6th Cir. 2014) .................................................................5

*Or. Laborers-Emp'rs. Health & Welfare Tr. Fund v. Philip Morris Inc.*,
185 F.3d 957 (9th Cir. 1999) .................................................................38

*Palmer v. Atl. Ice & Coal Co.*,
173 S.E. 424, 428–30 (Ga. 1934).................................................................39

*Par v. Wolfe Clinic, P.C.*,
70 F.4th 441 (8th Cir. 2023) .................................................................30

*Park Irmat Drug Corp. v. Express Scripts Holding Co.*,
911 F.3d 505 (8th Cir. 2018) .................................................................14

*PSI Repair Servs., Inc. v. Honeywell, Inc.*,
104 F.3d 811 (6th Cir. 1997) .................................................................34

*Reveal Chat Holdco, LLC v. Facebook, Inc.*,
471 F. Supp. 3d 981 (N.D. Cal. 2020) .................................................................21

*In re Se. Milk Antitrust Litig.*,
739 F.3d 262 (6th Cir. 2014).................................................................9, 29

*Sec'y of Labor v. Macy's, Inc.*,
2021 WL 5359769 (S.D. Ohio Nov. 17, 2021).................................................................24

*Semertzides v. Bethesda N. Hosp.*,
2014 WL 2573073 (S.D. Ohio June 9, 2014), *aff'd*, 608 F. App'x 378 (6th Cir.
2015) .................................................................30

Page

*State of N.Y. by Abrams v. Anheuser-Busch, Inc.,*
811 F. Supp. 848 (E.D.N.Y. 1993) ...................................................................35

*In re Sulfuric Acid Antitrust Litig.,*
703 F.3d 1004 (7th Cir. 2012) .........................................................................28

*Tampa Elec. Co. v. Nashville Coal Co.,*
365 U.S. 320 (1961).........................................................................................30

*Tennessean Truckstop, Inc. v. NTS, Inc.,*
875 F.2d 86 (6th Cir. 1989) .............................................................................37

*Total Benefits Planning Agency, Inc. v. Anthem Blue Cross & Blue Shield,*
552 F.3d 430 (6th Cir. 2008) ..............................................9, 10, 12, 28, 29

*Total Benefits Planning Agency Inc. v. Anthem Blue Cross & Blue Shield,*
630 F. Supp. 2d 842 (S.D. Ohio 2007), *aff'd,* 552 F.3d 430 (6th Cir. 2008)...........................35

*Toys "R" Us, Inc. v. FTC,*
221 F.3d 928 (7th Cir. 2000) .....................................................................12, 13

*Trails End Campground, LLC v. Brimstone Recreation, LLC,*
2015 WL 388313 (Tenn. Ct. App. Jan. 29, 2015) ...........................................39

*Trans Union LLC v. Ramirez,*
141 S. Ct. 2190 (2021).....................................................................................40

*In re Travel Agent Comm'n Antitrust Litig.,*
2007 WL 3171675 (N.D. Ohio Oct. 29, 2007), *aff'd,* 583 F.3d 896 (6th Cir. 2009) .....................18, 22

*In re Travel Agent Comm'n Antitrust Litig.,*
583 F.3d 896 (6th Cir. 2009) .........................................8, 10, 14, 17, 19

*Tri-State Rubbish, Inc. v. Waste Mgmt., Inc.,*
875 F. Supp. 8 (D. Me. 1994) ..........................................................................38

*United States v. U.S. Gypsum Co.,*
438 U.S. 422 (1978).........................................................................................29

*United States v. Apple, Inc.,*
791 F.3d 290 (2d Cir. 2015).......................................................................12, 13

*United States v. Conn. Nat'l Bank,*
418 U.S. 656 (1974)....................................................................................30, 31

*Wallace v. Bank of Bartlett,*
55 F.3d 1166 (6th Cir. 1995) ...........................................................................29

*White & White, Inc. v. American Hosp. Supply Corp.,*
723 F.2d 495 (6th Cir. 1983) ...........................................................................31

Case 3:23-md-03071    Document 593    Filed 10/09/23    Page 8 of 67 PageID #: 6553

Page

*White v. R.M. Packer Co.*,
635 F.3d 571 (1st Cir. 2011) ............................................................. 23

*Winn-Dixie Stores, Inc. v. E. Mushroom Mktg. Coop., Inc.*,
2023 WL 5521221 (3d Cir. Aug. 28, 2023) ....................................... 29

**Statutes**

Ala. Code § 6-2-38(l) ............................................................................ 39

Ariz. Stat. § 44-1412 ............................................................................ 38

D.C. Code § 28-4515 ............................................................................ 38

Fla. Stat. § 542.32 ................................................................................ 38

Idaho Code § 48-102(3) ........................................................................ 38

Ill. Comp. Stat. 10/11 ........................................................................... 38

Ind. Code § 24-1-1-1 ............................................................................ 39

Ind. Code § 24-1-3-1 ............................................................................ 39

Iowa Code § 553.2 ................................................................................ 38

Kan. Stat. § 50-163(b) .......................................................................... 38

Kan. Stat. § 60-512(2) .......................................................................... 39

Mass. Gen. Laws ch. 93 § 1 ................................................................. 38

Mich. Comp. Laws § 445.784(2) .......................................................... 38

Mo. Rev. Stat. § 416.141 ...................................................................... 38

N.H. Rev. Stat. § 356:14 ...................................................................... 38

N.J. Rev. Stat. § 56:9-18 ...................................................................... 38

N.M. Stat. § 57-1-15 ............................................................................ 38

Neb. Rev. St. § 59-829 ......................................................................... 38

Okla. Stat. § 212 ................................................................................... 38

S.C. Code § 39-3-30 ............................................................................. 39

S.D. Codified Laws § 37-1-22 .............................................................. 39

Va. Code § 59.1-9.17 ............................................................................ 39

**TABLE OF AUTHORITIES**

(continued)

**Page**

W. Va. Code § 47-18-16 ............................................................................39

**Other Authorities**

ABA, Antitrust Law Developments 71–72 (9th ed. 2022) ...........................34

U.S. Census Bureau, https://data.census.gov/table?q= B25032:+TENURE+
BY+UNITS+IN+STRUCTURE&g=010XX00US$3100000 ...................................4

**Rules**

Fed. R. Civ. P. 12(b)(6) ..............................................................................7

# I.    INTRODUCTION

Plaintiffs' Second Amended Complaint ("SAMC") again attempts to advance an implausible theory: that *any* company that licenses *any* RealPage revenue management software ("RMS"), including the 49 defendants who own, operate, or manage multifamily rental housing in different parts of the country (collectively, the "Lessor Defendants"), without doing anything more, has entered into an agreement to fix rental prices that constitutes a *per se* violation of the antitrust laws. *See* SAMC ¶ 6. Despite multiple opportunities to amend, Plaintiffs still do not allege facts plausibly supporting this theory.

*First*, the Complaint fails to allege facts that, even if true, plausibly suggest that the Lessor Defendants entered into any agreement whatsoever with each other. As with the prior complaint, this Complaint lacks any factual allegations about the vast majority of Lessor Defendants beyond the assertion that they each used an RMS product offered by RealPage. While Plaintiffs have now scattered more references to individual Lessor Defendants throughout the complaint, these are merely window dressing; none of the new allegations shed any light on what each Lessor Defendant allegedly did to join the conspiracy. This generic, "group pleading" will not suffice. Plaintiffs have the burden to allege that each Defendant made a "conscious commitment" to enter into the alleged agreement. Despite multiple amendments, they cannot do so.

*Second*, the Complaint fails to allege either the direct or circumstantial facts required to support a conspiracy claim. Despite purportedly gathering information from more than ten confidential "witnesses,"[1] Plaintiffs do not even claim to have direct evidence of a conspiratorial agreement: no recorded phone calls or "smoking gun" documents that establish the existence of

---

[1] The identities of two new confidential "witnesses" in the SAMC have still not been disclosed to Defendants or the Court.

an agreement. Nor have Plaintiffs met their burden to allege circumstantial evidence—parallel conduct and "plus factors"—that, taken as true, tend to exclude the possibility of independent conduct by the Lessor Defendants. Instead, Plaintiffs broadly allege that all Lessor Defendants used a RealPage RMS product, but never allege that Lessor Defendants used the same software at the same time, much less that Lessor Defendants accepted the same or even similar pricing recommendations generated by the software at the same or similar times. Nor do Plaintiffs allege how Lessor Defendants did anything more or differently than the many other non-defendants who also use RealPage RMS. And although Plaintiffs cite average pricing by the Lessor Defendants, to the extent this *yearly* average data reveals anything about rental unit pricing that is set *daily*, it reflects only substantial *variation*—with some average pricing even going down—which is the opposite of parallelism.

Plaintiffs' "plus factor" allegations similarly fail to exclude the possibility that Lessor Defendants acted independently. Most of the "plus factor" allegations merely recite market characteristics that are not indicative of collusion, and all are at least as consistent with rational, *independent* business behavior as with an unlawful agreement. Plaintiffs acknowledge the many legitimate reasons why adoption of RealPage software would be in a Lessor Defendant's *unilateral* interest—including its advertised ability to increase revenue, reduce vacancies, and maximize asset value. And by Plaintiffs' own allegations, these benefits were being realized by users for years *before the conspiracy is alleged to have begun.*

*Third*, the conspiracy Plaintiffs allege is implausible. Plaintiffs acknowledge that an agreement to use RealPage RMS to set artificially high prices could work only if the Lessor Defendants "know that their competitors are setting rental prices using RealPage's RMS and thus would not attempt to undercut them." *Id.* ¶ 31. But Plaintiffs' Complaint alleges that, at most,

2

RealPage RMS is used for only *18% of multifamily units in the country.* Thus, no Lessor Defendant could "know" that all of their competitors were adopting RealPage RMS pricing, and by Plaintiffs' own admission the conspiracy could not work.

In sum, Plaintiffs have not alleged a plausible horizontal price-fixing conspiracy. At best, they allege that Lessor Defendants each agreed individually with RealPage to use a software tool that they believed was in their unilateral interest, with the knowledge that other Lessor Defendants were also using that same tool, and then used it to varying degrees. But such agreements would not be a *per se* violation, as Plaintiffs claim, because they are not among the narrow categories of agreement that courts have deemed to be "unquestionably" anticompetitive. Instead, Plaintiffs' claims would be subject to the default rule of reason standard. And their claims are equally deficient under the rule of reason because Plaintiffs do not carry their burden of plausibly alleging anticompetitive effects in a plausibly defined relevant market.

Plaintiffs do not allege actionable claims under the Sherman Act—nor corresponding state law—and so the Court should dismiss them. Having already given the Plaintiffs a "last and forever opportunity to amend their complaints" (ECF 499 at 14:20–22), the Court should now dismiss with prejudice.

## II. SUMMARY OF PLAINTIFFS' ALLEGATIONS

### A. RealPage Revenue Management Products

RealPage provides a "comprehensive platform of data analytics and on demand software solutions and services for the rental real estate industry." SAMC ¶ 208. This includes both the RMS at issue in this case and other types of software—such as property management software and tenant screening software—unrelated to the pricing of multifamily units. *See id.* ¶ 224. Altogether, Plaintiffs allege that RealPage has "over 31,700" clients who use some form of

RealPage software at "approximately 19.7 million rental real estate units." *Id.* The 49 Lessor Defendants named here comprise a small fraction of that client base.

RealPage is alleged to offer three different RMS products for multifamily housing: YieldStar, AI Revenue Management ("AIRM"), and Lease Rent Options ("LRO"), the last of which RealPage acquired in 2017. *Id.* ¶¶ 2, 26. YieldStar has allegedly been available since at least 2006. *Id.* ¶ 252. The other Defendants[2] include property owners and property management companies, that allegedly use RealPage's RMS. *Id.* ¶ 3. Plaintiffs also name as Defendants various Thoma Bravo entities, which they allege acquired RealPage in April 2021. *Id.* ¶ 62.

Plaintiffs allege that, by the end of 2022, RealPage RMS was used to "set the price for more than four million rental units" in the United States. *Id.* ¶ 224. The Lessor Defendants here allegedly account for approximately 3.2 million of those units.[3] By contrast, Plaintiffs allege that there are at least 22 million "investment-grade" multifamily units in the country.[4] *Id.* ¶ 368. In other words, at most, 18% of the multifamily units in the country are even potentially affected by the use of RealPage RMS (even if limited solely to "investment-grade" properties), and the Lessor Defendants here represent an even smaller share: approximately 15%.

RealPage's RMS products allegedly analyze data to generate a recommended price "daily for each [of a client's] available units." *Id.* ¶ 13. The RMS will recommend price increases *or decreases* based on a Lessor Defendants' particular situation. *See* Whittaker Decl. Ex. A at 3–4

---

[2] Certain Defendants filed motions challenging personal jurisdiction and other deficiencies in the Complaint. Those Defendants join this Motion without waiver of those other motions.

[3] *See generally* SAMC ¶¶ 67–193 (alleging total units owned, operated, or managed for almost every Lessor Defendant).

[4] This vastly understates the total number of multifamily units. The U.S. Census Bureau's most recent estimate (from 2021, which necessarily omits new construction since then) is that there were 42.5 million occupied multifamily units in the country. https://data.census.gov/table?q=B25032:+TENURE+BY+UNITS+IN+STRUCTURE&g=010XX00US$3100000.

(depicting recommended rent decreases).[5] The RMS analyzes a customer's internal data, and it may also analyze competitor rent data. SAMC ¶¶ 13. The Complaint concedes that any competitor data used by the RMS is "aggregated." *Id.* ¶¶ 223, 226, 247 n.143. *Plaintiffs do not allege that RealPage discloses a particular Lessor Defendant's non-aggregated or non-anonymized pricing or other data to any other Lessor Defendant (or any other party).*

Plaintiffs concede that the pricing recommendation for a unit suggested by the RealPage software can be accepted or rejected. *Id.* ¶ 258. Though Plaintiffs attempt to create the false impression that users must obtain approval from RealPage before rejecting the software's recommendations (*id.* ¶ 18), Plaintiffs directly contradict this assertion elsewhere. For starters, in their prior complaint, Plaintiffs cited repeatedly to a RealPage FAQ document that directly undermined this assertion. *See* ECF 342-1 at 2 ("[T]he pricing recommendation output from RealPage Revenue Management may be followed, modified, or ignored by an apartment provider in any particular case. Ultimately, it is up to each apartment provider to execute a pricing strategy that it determines to be appropriate for its property."). Though Plaintiffs' current Complaint drops any reference to the FAQ, it continues to acknowledge that Lessor Defendants are not required to accept pricing recommendations, alleging that they do so only "*up to* 80–90% of the time" (SAMC ¶ 15 (emphasis added)), which concedes that, *at a minimum*, Lessor Defendants reject the software's recommendation *at least* 10–20% of the time. The Complaint further concedes that some RealPage RMS users "had a low acceptance rate." *Id.* ¶ 286; *see also id.* ¶ 270. Further, contrary to the claim that only RealPage can approve "deviations" from its price recommendations,

---

[5] Plaintiffs cite this RealPage presentation at SAMC ¶ 17 n.19. The Court may consider external documents cited in the complaint. *See In re Omnicare, Inc. Sec. Litig.*, 769 F.3d 455, 466 (6th Cir. 2014); *see also Finley v. Kelly*, 384 F. Supp. 3d 898, 908 (M.D. Tenn. 2019) (Crenshaw, J.) ("[A] court may consider a document not formally incorporated by reference in a complaint when the complaint refers to the document and the document is central to the claims.").

the current Complaint now acknowledges that Lessor Defendants decide whether to reject the software's recommendations. *Id.* ¶ 18 (alleging that Lessor Defendants' revenue managers or senior management can approve "modifications" to "RMS recommended pricing").

## B. The Alleged Conspiracy

Plaintiffs allege the Defendants entered into a "single unlawful conspiracy to fix, raise, stabilize, or maintain at artificially high levels" lease prices in specific Metropolitan Statistical Areas ("MSAs"). *See id.* ¶¶ 392, 405–06. Plaintiffs allege this conspiracy began in 2016. *Id.* ¶ 1. Yet they acknowledge that Lessor Defendants began using RealPage's RMS long before 2016 (and at different times). *See, e.g., id.* ¶ 252 (Lessor Defendant alleged to have used YieldStar since 2006); *id.* ¶ 295 (citing 2007 comments from Lessor Defendant allegedly regarding RealPage RMS (*see* n.160 & 165)); *id.* ¶ 298 & n.170 (citing 2009 comments from Lessor Defendant regarding LRO, before RealPage owned it); *id.* ¶ 296 & n.166 (citing 2012 comments from Lessor Defendant regarding RealPage RMS). Before 2016, Plaintiffs allege that lessors used RealPage RMS as a legitimate "advisory product." *Id.* ¶ 212. After 2016, they say, the "RealPage pricing platform became more sophisticated and gained user confidence and additional data inputs," such that lessors thereafter "used [it] less as an advisory product and more as a rent-setting software." *Id.*

Plaintiffs' SAMC adds few, if any, factual allegations about individual Lessor Defendants' supposed participation in the alleged conspiracy, relying instead on conclusory assertions lodged verbatim against all Lessor Defendants. *Id.* ¶¶ 67−193. Critically, Plaintiffs make no allegations about how individual Lessor Defendants agreed with each other to use the software to fix or inflate prices. Other than identifying some Lessor Defendants who used the software before the conspiracy allegedly was formed, Plaintiffs do not even say when each Lessor Defendant adopted the software or joined the conspiracy. Nor do they include any allegations differentiating the

decision of the Lessor Defendants from the decisions made by the many other RealPage RMS users who are not defendants. Similarly, Plaintiffs fail to explain how the Lessor Defendants switched from using the software as a legitimate "advisory product" to supposed illegitimate "rent-setting software" after 2016. *Id.* ¶ 212.

Further, far from plausibly alleging that the Lessor Defendants' adoption of the software is inconsistent with independent conduct, Plaintiffs acknowledge that, both *before* and after 2016, Lessor Defendants had unilateral, procompetitive reasons for using the software: Plaintiffs concede that the software's benefits include increasing revenue (*e.g.*, *id.* ¶ 252), reducing vacancies and maximizing "asset value" (*id.* ¶ 300), managing move-out dates so they do not all occur at once (*id.* ¶¶ 35–36), and eliminating time-consuming manual tasks (*id.* ¶ 299). Having acknowledged these benefits existed without any conspiracy whatsoever, Plaintiffs' foundational claim—that the use of the RMS is only in a Lessor Defendant's interest if it is undertaken as part of a conspiracy to fix prices—is plainly implausible.

## III. LEGAL STANDARD

To survive a motion to dismiss under Rule 12(b)(6), Plaintiffs must plead "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).[6] This requires more than "labels and conclusions," or a "formulaic recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 555. Instead, the allegations in a complaint "must be enough to raise a right to relief above the speculative level." *Id.*

*Twombly*, itself an antitrust conspiracy case, held that Section 1 of the Sherman Act prohibits only agreements to restrain trade; it does not reach unilateral conduct or independent

---

[6] Unless otherwise noted, all internal quotation marks and citations are omitted.

decision-making (even copycat decisions), regardless of any anticompetitive effect. *See id.* at 553–54. Thus, "[t]he crucial question" in assessing Section 1 claims "is whether the challenged anticompetitive conduct stem[s] from independent decision or from an agreement." *Id.* at 553. Antitrust law has long "hedged against [the] false inferences" of conspiracy that arise from ambiguous or "parallel conduct"—*i.e.*, uniform business conduct that is equally consistent with independent decisions "prompted by common perceptions of the market." *Id.* at 554. Drawing on that history, the *Twombly* Court held that a complaint alleging violations under Section 1 of the Sherman Act cannot survive a motion to dismiss unless it avers facts that "plausibly suggest an unlawful agreement," as opposed to conduct that is equally consistent with rational, unilateral behavior. *See Iqbal*, 556 U.S. at 680 (discussing *Twombly*); *accord In re Travel Agent Comm'n Antitrust Litig.*, 583 F.3d 896, 904 (6th Cir. 2009) (the *Twombly* standard "safeguard[s] against the risk of false inferences from identical behavior at an earlier stage of the trial sequence—the pleading stage"). Thus, to plead an antitrust conspiracy, the allegations must plausibly "tend[] to exclude the possibility of independent conduct." *Hobart-Mayfield, Inc. v. Nat'l Operating Comm. on Standards for Athletic Equip.*, 48 F.4th 656, 664 (6th Cir. 2022).

## IV.   ARGUMENT

### A.   Plaintiffs Do Not Plausibly Allege a Sherman Act Section 1 *Per Se* Violation

Plaintiffs allege that Defendants entered into a horizontal agreement that constitutes a *per se* violation of Section 1 of the Sherman Act. To state a claim for a *per se* violation, Plaintiffs must identify an agreement that is both *horizontal*—i.e., between *competitors* at the same level of the market—and that "clearly and unquestionably" falls into "one of the handful of categories that have been collectively deemed" anticompetitive, such as bid rigging or price fixing between competitors. *See In re Se. Milk Antitrust Litig.*, 739 F.3d 262, 273 (6th Cir. 2014). But Plaintiffs'

Complaint fails at the first step because it does not plausibly allege that the horizontal competitors here—the Lessor Defendants—agreed with each other to do *anything*. Instead, Plaintiffs' theory depends on each Lessor Defendant's agreements *with RealPage* to use RealPage's RMS, which are vertical agreements subject to the rule of reason. *Total Benefits Planning Agency, Inc. v. Anthem Blue Cross & Blue Shield*, 552 F.3d 430, 435 (6th Cir. 2008).

### i. Plaintiffs' Group Pleading Is Improper and Insufficient

Plaintiffs' *per se* claim fails because the Complaint fails to allege facts showing that *each Defendant* made a "conscious commitment" to enter into a horizontal agreement to fix prices—as opposed to simply agreeing (individually and vertically) with RealPage to use its products. *Hobart-Mayfield, Inc. v. Nat'l Operating Comm. on Standards for Athletic Equip.*, 535 F. Supp. 3d 638, 646 (E.D. Mich. 2021).

Plaintiffs invoke a "hub and spoke" theory, which requires proof of both (i) vertical agreements between a hub (RealPage) and the spokes (Lessor Defendants), *and* (ii) a horizontal "rim" agreement *among and between* the spokes. "[T]he critical issue for establishing a *per se* violation with the hub and spoke system is how the spokes are connected to each other." *See Total Benefits*, 552 F.3d at 436. To establish this necessary connection between the spokes, Plaintiffs must answer "basic questions" about each Defendant's participation in the alleged conspiracy: "who, did what, to whom (or with whom), where, and when?" *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1048 (9th Cir. 2008).

The new allegations in Plaintiffs' SAMC fall far short of filling the fatal gaps in Plaintiffs' theory that Defendants identified in their prior Motion to Dismiss. ECF 341 at 10–13. For starters, as in their prior complaint, Plaintiffs say virtually nothing about many Lessor Defendants, and for the few they discuss, there are no factual allegations showing any alleged horizontal price-fixing

agreement. The new allegations are limited to discussing a few Lessor Defendants' internal decision-making processes and perceptions that RMS might benefit them (*see, e.g.*, SAMC ¶¶ 9–10, 20, 266–67, 294–97), as well as the unsurprising realization that RealPage had other customers for its RMS products (*see, e.g.*, *id.* ¶¶ 11–12, 31, 289). Importantly, Plaintiffs still do not allege when any Lessor Defendant began using RealPage's RMS products, much less when each Defendant purportedly entered into a massive scheme to fix prices with dozens of their competitors from across the country. Plaintiffs also do not identify any individual who entered into this horizontal price-fixing agreement on behalf of any Lessor Defendant. Plaintiffs' vague references to individuals who were involved in "implementing RealPage's RMS" (*see, e.g.*, SAMC ¶ 70), fail to plug this hole because these say nothing about knowing agreement by anyone to fix prices using that software, much less when or where or how that purportedly happened. *See Twombly*, 550 U.S. at 565 n.10 (dismissal warranted where complaint "furnishes no clue as to which of the four [defendants] (much less which of their employees) supposedly agreed, or when and where the illicit agreement took place"); *Total Benefits*, 552 F.3d at 436 (affirming dismissal where plaintiffs did not allege "when Defendants joined the [] conspiracy, where or how this was accomplished").

Devoid of facts connecting each Defendant to the alleged horizontal price-fixing agreement, Plaintiffs retreat to a boilerplate assertion that each Lessor Defendant "entered a written contract" with RealPage to use its RMS. *See, e.g.*, SAMC ¶¶ 68, 70, 72, 74. This fails as a matter of law. First, repeating the same "[g]eneric pleading" allegations for each Lessor Defendant is still improper group pleading. *Total Benefits*, 552 F.3d at 436. The Sixth Circuit squarely rejected this tactic in *Travel Agent*, holding that trying to "implicate [each defendant] in the purported conspiracy by relying on several vague allegations . . . that refer to 'defendants' or 'defendants' executives'" "represent[s] precisely the type of naked conspiratorial allegations rejected by the

Supreme Court in *Twombly*." 583 F.3d at 905 (citing *Twombly*, 550 U.S. at 565 n.10). The Sixth Circuit affirmed dismissal where the plaintiffs did not "mention[] [the individual defendants] in the body of the [complaint]" or "specify how these defendants are involved in the alleged conspiracy." *Id.* The same holds true here, where Plaintiffs still rely on vague group pleading. SAMC ¶ 8 ("Defendants accepted RealPage's invitation to participate in the scheme.").

Further, Plaintiffs concede that agreeing to use RealPage's RMS is not the same as agreeing to fix prices. Plaintiffs acknowledge—as they must—that some Lessor Defendants began using RMS before the seven-year "Conspiracy Period," thus demonstrating that such use is independently and economically rational in the absence of any purported conspiracy. *See, e.g.*, *id.* ¶ 235 n.137. They concede the software was used as a legitimate "advisory product" before 2016, and that it continues to be used as such post-2016. *Id.* ¶ 212 (alleging RMS was used "*less* as an advisory product" after early 2016) (emphasis added). Plaintiffs also admit that Lessor Defendants reject the RealPage RMS price recommendations *at least* 10–20% of the time. *Id.* ¶ 15 (alleging "Defendants agree[d] to adopt RealPage RMS pricing *up to* 80%–90% of the time") (emphasis added). And Plaintiffs acknowledge the software recommends price *decreases*. Whittaker Decl. Ex. A at 3–4. A price-fixing conspiracy where the members have discretion to depart from the purportedly conspiratorial, supracompetitive prices whenever they choose and where the mechanism for setting those prices can recommend price *decreases* is simply not plausible. Plaintiffs recognize a conspiracy could not succeed under these conditions. SAMC ¶ 205 (admitting that Lessor Defendants could not fix prices where competitors were free to charge lower rates).

Unable to allege "how the spokes are connected to each other" among the Lessor Defendants here (*Total Benefits*, 552 F.3d at 436), Plaintiffs seek refuge in *Interstate Circuit*, *Inc.*

*v. United States*, 306 U.S. 208 (1939). SAMC ¶ 8. But this case is nothing like *Interstate Circuit* or its progeny, *Toys "R" Us, Inc. v. FTC* ("*TRU*"), 221 F.3d 928 (7th Cir. 2000), and *United States v. Apple, Inc.*, 791 F.3d 290 (2d Cir. 2015), where "each firm's motivation to enter into the vertical agreement was contingent on *all* of its competitors' [sic] doing the same." *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 333 n.30 (3d Cir. 2010) (emphasis added). In those cases, the alleged conspiracies brought together virtually all the (few) competitors in a particular relevant market—eight film distributors in *Interstate Circuit*, seven toy manufacturers in *TRU*, and five publishers in *Apple*—coupled with purported "ringmaster" hubs who allegedly organized and policed the conspiracy by either threatening to impose or offering to solve looming "mortal threats." *TRU*, 221 F.3d at 930–31, 934; *Apple*, 791 F.3d at 317 n.16; *Interstate Circuit*, 306 U.S. at 215–17 & n.3. RealPage has no such power (*see* Section II.A, *supra*) and, regardless, could hardly enlist and control "all" or virtually all of its RMS customers, much less the majority of lessors in every MSA that do not even use RealPage RMS.

Moreover, "[k]ey to *Interstate Circuit*'s conspiracy finding was its determination that each distributor's decision to accede to Interstate's demands would have been economically self-defeating unless the other distributors did the same: Each was aware that without substantially unanimous action there was risk of a substantial loss of the business and good will…." *Ins. Brokerage*, 618 F.3d at 331–32. But here, Plaintiffs concede several procompetitive reasons why every Lessor Defendant would independently decide to use RealPage's RMS and why it would be profitable to do so in the absence of a conspiracy, including that it serves as an "advisory product" that can help users "maximize asset value" and "reduce vacancy" (SAMC ¶¶ 212, 300); eliminates manual research into market conditions and other manual tasks (*id.* ¶¶ 225–26, 299); and manages inventory to avoid large numbers of residents moving in or out of a property at the same time (*id.*

35–36, 253). Plaintiffs acknowledge these benefits of using the RMS existed before any alleged conspiracy began. *See, e.g.*, *id.* ¶ 252 (alleging revenue growth in 2006 for one Defendant); *id.* ¶ 212 (software used as a legitimate advisory product both before and after 2016).[7]

### ii.     Plaintiffs Allege No Plausible Direct or Circumstantial Evidence of Conspiracy

Given the Complaint's improper group pleading, it is no surprise that Plaintiffs fail to allege specific facts showing directly that Lessor Defendants conspired with each other. "[D]irect evidence is tantamount to an acknowledgment of guilt." *Hyland v. HomeServices of Am., Inc.*, 771 F.3d 310, 318 (6th Cir. 2014). It must be "explicit and require[] no inferences to establish the proposition or conclusion being asserted." *Id.* Plaintiffs allege nothing of the sort. They do not allege any "acknowledgement" by any Lessor Defendants that they entered into a horizontal agreement with any others. Further, while Plaintiffs rely on statements from unnamed witnesses— including alleged former employees of a few Defendants—none is alleged to have any knowledge of a price-fixing agreement.

Without direct evidence of a conspiracy, Plaintiffs' only recourse is to allege facts that amount to circumstantial evidence of a conspiracy. To meet this burden, Plaintiffs must allege parallel conduct and "plus factors" that plausibly "tend[] to exclude the possibility of independent conduct." *Hobart-Mayfield*, 48 F.4th at 664. Plaintiffs' allegations must "negate the likelihood

---

[7] *Interstate Circuit* and its progeny involved other factual circumstances—not alleged here— supporting an inference of conspiracy. In *Interstate Circuit*, the hub sent an offer letter to each competing distributor that listed all other recipients of the letter, and each then accepted the offer in "substantial unanimity." 306 U.S. at 223. In *Toys "R" Us*, the vertical agreements between the hub and spokes to restrict output were executed "on the condition that other [spokes] would do the same." 221 F.3d at 930. And in *Apple*, the spokes were "in constant communication regarding their negotiations" with the hub, and all shifted their pricing model at the same time. 791 F.3d at 318. Plaintiffs have no such allegations here.

of independent action and raise an inference of coordination." *C.S. Sewell, M.D. P.C. v. Amerigroup Tenn., Inc*., 2018 WL 6591429, at *4 (M.D. Tenn. Dec. 14, 2018) (Crenshaw, J.) (dismissing complaint). Plaintiffs fail here too.

### a) Plaintiffs Fail to Allege "Parallel Conduct"

To begin, the SAMC still does not identify any "uniform business conduct." *See, e.g.*, *Travel Agent*, 583 F.3d at 903 (observing that "[a]llegations of concerted action by competitors are frequently based on a pattern of uniform business conduct").

*First*, Plaintiffs do not even allege parallel conduct regarding adoption and use of RealPage's RMS products. They claim each Lessor Defendant "entered into a written contract, paid for, and used" one of three, distinct RealPage RMS products (SAMC ¶¶ 67–190), but they are largely silent on when each Lessor Defendant entered such a contract with RealPage. Where they do specify a time for a particular Defendants' usage, they admit it began long *before* any alleged conspiracy. *See id.* ¶¶ 39, 215, 252, 292, 296. And while Plaintiffs cite general marketing materials from RealPage spanning several years (*id.* ¶¶ 7, 35), they do not allege any facts showing that any two or more Lessor Defendants responded to any offer from RealPage at or around the same time. *See Interstate Circuit*, 306 U.S. at 221–22 (defendants imposed a boycott and minimum price after receiving same letter from supplier demanding both). As in the prior complaint, Plaintiffs fail to allege any temporal proximity between any Lessor Defendants' adoption of any RMS. *See Park Irmat Drug Corp. v. Express Scripts Holding Co.*, 911 F.3d 505, 516–17 (8th Cir. 2018) (actions six months apart under dissimilar circumstances were not parallel); *In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1193 (9th Cir. 2015) (parallel conduct means "competitors adopting *similar* policies around the *same* time" (emphases added)).

Further, Plaintiffs allege significant variation in Defendants' behavior, including that

(1) Lessor Defendants use different RMS products; (2) some Lessor Defendants use "Pricing Advisors" and others do not (*see* Section IV.A.iii, *infra*); and (3) some Lessor Defendants frequently reject RealPage's pricing recommendations, *i.e.*, had "low acceptance rate[s]" (SAMC ¶ 286), while others adopted the software's pricing recommendations at varying levels "up to 80–90% of the time" (*id.* ¶ 15). *See Mosaic Health Inc. v. Sanofi-Aventis U.S., LLC*, 2022 WL 4017895, at *6 (W.D.N.Y. Sept. 2, 2022) (policies that were "different in their particulars, their timing, and their outcomes" were not parallel). In short, Plaintiffs allege only that over the last two decades, Lessor Defendants began using different RealPage RMS products at different times, and that those products offer a wide variety of pricing recommendations—including to *reduce* prices—that Lessor Defendants accepted or rejected to different degrees. This is not parallel conduct.

*Second*, Plaintiffs still do not allege any parallel pricing by Defendants. Plaintiffs claim that Lessor Defendants engaged in "perfectly coordinated price increases" (SAMC ¶ 337), but Plaintiffs' analyses merely show *annualized average* "asking" rents over a ten-year period across various MSAs. *Id.* ¶¶ 338–48l; Table B-2. Plaintiffs acknowledge that RealPage disseminates pricing recommendations daily, that rental rates change frequently, and that *executed* rents differ from publicly available or "asking" rents. *Id.* ¶¶ 13, 205, 225, 271 ("Lease Compliance Reports" show "whether a property management company actually charged the renter the price RealPage's RMS recommended."). Plaintiffs' pricing analyses—which reduce hundreds (if not thousands) of daily asking rents across multiple properties to a single annual average—are meaningless since they mask substantial pricing variation. *See In re Cedar Shakes & Shingles Antitrust Litig.*, 2020 WL 832324, at *10 (W.D. Wash. Feb. 20, 2020) (dismissing claims based on "[g]eneric price increase data"). Tellingly, Plaintiffs do not identify any specific price increases by each Lessor

Defendant at any point in time, much less repeatedly over the seven-year Conspiracy Period.

If anything, Plaintiffs' pricing analyses highlight the implausibility of their theory. For example, the analyses show: (1) increases in average prices in most MSAs beginning as early as 2013, three years before the Conspiracy Period (SAMC ¶¶ 339 fig.11, 340 fig.12, 341 fig.13, 342 fig.14); (2) gross differences in the average rates charged by Lessor Defendants in any given MSA in each year (*see, e.g.*, *id.* ¶ 344 fig.16 (depicting $2,500 variation between highest and lowest one-bedroom average rent in D.C.)); and (3) significant variation in the direction of average pricing year-over-year, with some average prices going *down* substantially while others went up (s*ee, e.g.*, *id.* ¶¶ 343 fig.15, 344 fig.16, 346 fig.18, 347 fig.19). Rather than paint a picture of "coordinated price hikes" (*id.* ¶ 350), Plaintiffs' allegations at most show gradual average rental increases by *some* Defendants in *certain* areas. This is not sufficient. Even where prices increase, "[a]ny manner of economic variables may . . . contribute[] to . . . fluctuations in prices and sales, from external market pressures to permissible conscious parallelism," such that increases alone are insufficient to allege a conspiracy. *Musical Instruments*, 798 F.3d at 1197 n.13.

Worse, Plaintiffs do not allege any facts connecting Lessor Defendants' use of RealPage RMS to any supposedly collusive pricing decision. *See id.* at 1198 ("Plaintiffs do not allege any facts connecting the purported price increase to an illegal agreement among competitors."). Plaintiffs do not allege which of the purported price increases were based on a recommendation from RealPage, nor do they allege that any two of RealPage's price recommendations for competing properties were the same or even similar (and an increase rather than a *decrease*) or that those competing properties each adopted the recommendations. *See Hogan v. Pilgrim's Pride Corp.*, 2018 WL 1316979, at *7 (D. Colo. Mar. 14, 2018) (dismissal granted where plaintiff failed to allege "how [a defendant's] actions compared with those of its co- conspirators").

### b) Plaintiffs Fail to Allege the Requisite "Plus Factors"

Even if Plaintiffs had plausibly alleged parallel conduct, that conduct "without more" is not sufficient. *Travel Agent*, 583 F.3d at 903. Plaintiffs must also allege "plus factors" that place any alleged parallel conduct "in a context that raises a suggestion of a preceding agreement." *Twombly*, 550 U.S. at 557. Plaintiffs do not do so. To the contrary, Plaintiffs' plus-factor allegations are "in line with a wide swath of rational and competitive business strategy unilaterally prompted by common perceptions of the market." *Travel Agent*, 583 F.3d at 903.

**Actions Against Self-Interest.** Plaintiffs assert that Lessor Defendants "restrict[ed] supply"—*i.e.*, allowed units to remain vacant—"while maintaining higher rental prices," which is supposedly "irrational" absent collusion. SAMC ¶¶ 31, 244. To begin, the Complaint's allegations do not support this theory. Though the Complaint suggests that vacancy rates for *some* Lessors in *some* locations increased at *some* times, it expressly acknowledges that one goal of RealPage's RMS is to "consistently *reduce* vacancy *and* maximize rent." *Id.* ¶ 300 (emphasis added). And Plaintiffs' acknowledgement that RealPage software is used for less than 20% of the multifamily units in the country renders Plaintiffs' allegation wholly implausible; any attempt by Lessor Defendants to hold units vacant and charge higher prices would be undercut by the non-RealPage users who make up the vast majority of lessors, as Plaintiffs acknowledge. *See* Section IV.A.iv *infra*.

Of course, even assuming *arguendo* that Plaintiffs adequately pleaded a supply restriction, that conduct, without more, is independently rational and lawful. *See In re Dynamic Random Access Memory (DRAM) Indirect Purchaser Antitrust Litig.*, 28 F.4th 42, 49–50 (9th Cir. 2022) (it is "economically rational" to "focus on profitability" over "market share"; affirming dismissal). Plaintiffs assert it is "only rational if Defendants know that their competitors are setting rental

prices using RealPage's RMS and thus would not attempt to undercut them." SAMC ¶ 31. But Lessors' use of RealPage's RMS to "increas[e] overall revenue" by allegedly focusing on price over volume (*id.* ¶ 235) is not "so unusual" that "no reasonable firm" would have done it absent conspiracy. *See In re Travel Agent Comm'n Antitrust Litig.*, 2007 WL 3171675, at *11 (N.D. Ohio Oct. 29, 2007), *aff'd*, 583 F.3d 896 (6th Cir. 2009); *see also Hobart-Mayfield*, 48 F.4th at 667 (conduct is not a "plus factor" where it was consistent with defendants' "vested interest[s]" and it was "not inconceivable that it would be prudent" absent collusion).

**Motive to Conspire.** Plaintiffs insist Lessor Defendants had a "motive to conspire" because RealPage's advertising and marketing materials promised RMS users could "outperform the market" and "increase revenue." SAMC ¶¶ 21, 381. But the "motive to maximize profits cannot support an inference of conspiracy," since "all businesses" have that motive. *Hyland*, 771 F.3d at 321 (affirming summary judgment); *see Hobart-Mayfield*, 48 F.4th at 668 (rejecting "motive" and "strong incentives to collude" plus factors). If certain Lessor Defendants believed that RealPage RMS would assist them in optimizing rents based on supply and demand, that is a motive to *use RMS*, not a motive to enter into a conspiracy. Further, to the extent that a particular Lessor Defendant believed that using RMS would provide a competitive advantage over a rival that was not using the product, that is the opposite of a conspiracy.

The fact that other Lessor Defendants allegedly used RealPage's RMS because they "knew [their] competitors were[] likewise[] using" it (*e.g.*, SAMC ¶ 68) does not imply conspiracy either. *See Ins. Brokerage*, 618 F.3d at 330–31 ("Nor would an inference of horizontal conspiracy arise from the fact that each distributor knows which of its competitors have purchased the remaining portions of the manufacturer's product.").

**Opportunity to Conspire.** Plaintiffs' conjecture that Defendants could have conspired

through intermittent meetings, committees, online user groups, and trade associations (SAMC ¶¶ 382–91) does not imply collusion. Even alleged "'[n]umerous opportunities' [to collude] are not sufficient" to support an inference of conspiracy. *Midwest Auto Auction, Inc. v. McNeal*, 2012 WL 3478647, at *10 (E.D. Mich. Aug. 14, 2012). Plaintiffs' allegations are "based wholly in speculation and wishful thinking as to what Defendants *might* have done." *In re ICE LIBOR Antitrust Litig.*, 2020 WL 1467354, at *4 (S.D.N.Y. Mar. 26, 2020) (dismissing claims). Since industry groups "often serve legitimate functions" (*DRAM*, 28 F.4th at 52), parties "gather[ing] at industry trade association meetings" does not suggest "an illegal agreement," but is "more likely explained by their lawful, free-market behavior." *Travel Agent*, 583 F.3d at 910–11; *see Musical Instruments*, 798 F.3d at 1196 ("[M]ere participation in trade-organization meetings where information is exchanged and strategies are advocated does not suggest [conspiracy].")[8]

**Information Sharing.** Plaintiffs' information-sharing allegations do not support an inference of any horizontal agreement either, much less a *per se* conspiracy to fix rents.

*First*, Plaintiffs do not allege that Lessor Defendants shared competitively sensitive information *with each other*. Instead, Plaintiffs allege that Lessor Defendants submit information to RealPage (*see, e.g.*, SAMC ¶¶ 209, 227, 380), which RealPage then "aggregates" and

---

[8] Nor does Plaintiffs' allegation that some Lessor Defendants used "standardized lease form[s]" published by trade organizations (SAMC ¶¶ 313–31) raise an inference of conspiracy. Plaintiffs do not identify any connection between these form leases and an alleged conspiracy to use RealPage software, and they identify only one Lessor Defendant who used the form (SAMC ¶ 329). And Plaintiffs concede the forms were initially developed "before" the alleged conspiracy. SMC ¶ 313, 315 (beginning in "approximately 1970"). *See In re Interest Rate Swaps Antitrust Litig.*, 261 F. Supp. 3d 430, 470 (S.D.N.Y. 2017) (allegation of "forum for inter-Dealer communication" founded "seven years before the start of the alleged conspiracy" was "not evidence of the alleged conspiracy"; dismissing claims). In any event, standardization of agreements can have procompetitive effects. *See, e.g.*, U.S. Dep't of Justice, Antitrust Div., Opinion Letter (Aug. 10, 2006) (opining that standard contracts in the shipping industry can "have procompetitive effects by improving the efficiency of contract negotiations, potentially reducing shipping rates").

19

"crunches" in the process of generating price recommendations. *Id.* ¶¶ 225–26. These allegations cannot support an inference of conspiracy. *In re Local TV Advertising Antitrust Litigation*, 2022 WL 3716202 (N.D. Ill. Aug. 29, 2022), is instructive. The plaintiffs there alleged that a data-aggregating intermediary, ShareBuilders—which "provide[d] yield management solutions" to "increase[] [clients'] revenue"—"facilitated the reciprocal exchange of competitively sensitive market information among" TV broadcasters by collecting detailed pricing information from clients and then providing market data, along with pricing recommendations, for clients' specific products. *Id.* at *2–3. The court dismissed the plaintiffs' claims against ShareBuilders, explaining that "to plausibly infer that a [data-aggregating intermediary] *facilitated* a conspiracy, plaintiffs must allege facts showing that the conduit's circulation of information enabled co-conspirators to tacitly communicate with one another," which requires "concrete allegations that the conduit-defendant compromised the ostensible anonymity of competitively sensitive information." *Id.* at *6 (collecting cases). As the data provided by ShareBuilders was "aggregate[d from] tens if not hundreds of . . . companies," it gave "a picture of what [was] happening in the market as a whole," but did not include "so much specificity that [defendants] could use [it] to police a secret or tacit conspiracy to fix prices." *Id.* at *6–8 (cleaned up).

In their current Complaint, Plaintiffs again concede that RealPage aggregates and anonymizes any competitor information it uses in providing pricing recommendations to Lessors.[9] For example, Plaintiffs allege that RealPage "crunches" customer data (SAMC ¶ 225) and then provides "aggregate[d]" market data to lessors (*id.* ¶ 226). Similarly, Plaintiffs concede that the RealPage Pricing Advisors' meetings—in which many Lessor Defendants did not even participate

---

[9] The Complaint includes purported quotes from certain Lessor Defendants suggesting RealPage provides "transaction-level data." SAMC ¶¶ 10–11, 303. But Plaintiffs elsewhere explain that "transactional data" is "blended" or "pooled" before dissemination to users. SAMC ¶¶ 247, 290.

(*see* Section IV.A.iii *infra*)—provided only "pooled" and "blended" market data. *Id.* ¶¶ 237, 239, 247. And Plaintiffs acknowledge the obvious, non-conspiratorial reason that RealPage shares blended information with lessors: to help lessors assess "overall market performance." *Id.* ¶ 239; *cf. Ins. Brokerage*, 618 F.3d at 329 (allegations that broker "hub" shared with insurer "spokes" the details of its commission deals with other insurers did not support inference of conspiracy where there were "obvious reasons" for the broker to share such details); *see also Reveal Chat Holdco, LLC v. Facebook, Inc.*, 471 F. Supp. 3d 981, 988–89, 1003 (N.D. Cal. 2020) (data-sharing agreements between Facebook and developers did not imply conspiracy among developers).

Having conceded that the data is aggregated and anonymized, the best Plaintiffs can do is allege that "RealPage maintains a 'peer list' of [Lessor Defendants'] competitors within a specific distance and whose transaction data will be used as an input." SAMC ¶¶ 31. This peer list, Plaintiffs assert, allows Lessor Defendants to "ascertain the identity of competitors that were using RealPage's RMS," and this purportedly provides a "view into their competitors' compliance with the scheme." *Id.* ¶¶ 31, 245, 289. But, as discussed, the mere fact that a Lessor Defendant allegedly knows who else is using RealPage RMS does not raise an inference of conspiracy. *See Ins. Brokerage*, 618 F.3d at 330–31. And Plaintiffs offer no explanation of how merely knowing which other competitors are using the software would allow a Lessor Defendant to assess those competitors' "compliance" with the scheme. Plaintiffs do not allege that the peer list reveals what price recommendations a competitor has accepted or rejected, for example.

*Second*, Plaintiffs' only suggestion of direct lessor-to-lessor information-sharing is that RealPage encourages Lessor Defendants to "[b]e knowledgeable" about others' "pricing, specials, and product" by "communicat[ing] directly with one another to exchange pricing information," and that RealPage has provided a form to reference when doing so. SAMC ¶¶ 40–41. This

allegation makes little sense in the context of the software-based conspiracy Plaintiffs attempt to allege here—if the software purportedly allows Lessor Defendants to "function as if they were one company setting prices at the monopoly level" (*id.* ¶ 291), there would be no reason for Defendants to make telephone calls, check websites, or use forms to collect data. In any event, it is standard practice—not collusive—to consider "rates charged by similar companies" when making pricing decisions. *See, e.g.*, *Cont'l Cablevision of Ohio, Inc. v. Am. Elec. Power Co.*, 715 F.2d 1115, 1119 (6th Cir. 1983); *see also Travel Agent*, 2007 WL 3171675, at *11 ("availability of Defendants' commission rates" is not "evidence of a conspiracy"; dismissing complaint); *see also* SAMC ¶ 234 (acknowledging that, before any alleged conspiracy formed, lessors would "sit and look at all the comps" to decide prices).

**Market Structure.** Plaintiffs further assert that a price-fixing conspiracy between Defendants is plausible because the "market for multifamily rental housing" is "conducive to collusion." SAMC ¶ 366. Specifically, Plaintiffs claim that (1) the alleged markets are "concentrated" (*id.* ¶ 368) (a facially implausible allegation, given the number of defendants named here and the other lessors operating in a given alleged market[10]), (2) there are high entry barriers (*id.* ¶¶ 369–70), (3) renters face "high switching costs" (*id.* ¶¶ 372–74), (4) demand is inelastic (*id.* ¶¶ 375–76), and (5) rental units are fungible (*id.* ¶¶ 377–79). None of these allegations get Plaintiffs any closer to "the line between possibility and plausibility." *Twombly*, 550 U.S. at 557.

As a threshold matter, Plaintiffs do not allege that any one of the alleged relevant submarkets has these characteristics. *See* SAMC ¶¶ 410–680. More problematically, even if they

---

[10] *Cf. K&S Assocs., Inc. v. Am. Ass'n of Physicists in Med.*, 2012 WL 3061850, at * 8 (M.D. Tenn. July 26, 2012) (market with three competitors was "highly concentrated").

were alleged here, market structure allegations are "no more consistent with an illegal agreement than with rational and competitive business strategies, independently adopted by firms acting within an independent market." *Musical Instruments*, 798 F.3d at 1189. The allegations "are simply descriptions of the market, not allegations of anything the defendants did." *Erie Cty. v. Morton Salt, Inc.*, 702 F.3d 860, 870 (6th Cir. 2012) (holding that market-characteristic allegations "d[id] not give rise to an inference of unlawful agreement"; affirming dismissal); *see Jones v. Micron Tech. Inc.*, 400 F. Supp. 3d 897, 917 (N.D. Cal. 2019) ("[M]arket characteristics are . . . neutral facts."). That is why courts routinely hold that the very market characteristics Plaintiffs allege do not imply collusion without more. *See, e.g.*, *DRAM*, 28 F.4th at 52 (affirming dismissal despite allegations of "extreme market concentration"); *White v. R.M. Packer Co.*, 635 F.3d 571, 582 (1st Cir. 2011) (allegations of "[h]igh barriers to entry and inelastic demand" do not "help[] to distinguish between agreement and mere conscious parallelism"); *In re German Auto. Mfrs. Antitrust Litig.*, 612 F. Supp. 3d 967, 983 (N.D. Cal. 2020) (noting that allegations that market was "susceptible to collusion" are "of little help in pleading an antitrust conspiracy").

### iii. Plaintiffs' Allegations That RealPage Facilitated and Enforced the Horizontal Conspiracy Also Fail

Plaintiffs allege that RealPage "facilitate[s]" the alleged horizontal conspiracy by recommending and enforcing adherence to cartel-level pricing, and by serving as a "conduit" for information sharing. SAMC ¶¶ 29, 37, 230, 392. These allegations fail to support any inference of a horizontal price-fixing conspiracy.

*First*, Plaintiffs attempt to create the impression that RealPage has the ability to police Lessor Defendants or force them to accept pricing. But other allegations in the Complaint directly refute these claims, and the Court need not "and indeed cannot" accept as true allegations of fact

that are contradicted by other allegations in the Complaint.  *See Sec'y of Labor v. Macy's, Inc.*, 2021 WL 5359769, at *5 (S.D. Ohio Nov. 17, 2021).

Plaintiffs allege that users can accept or reject each RealPage pricing recommendation. SAMC ¶ 258.  While Plaintiffs allege that Defendants accept pricing recommendations "*up to*" 80–90% of the time (*id.* ¶ 15), the use of "up to" renders this allegation meaningless—any given Lessor Defendant could accept pricing recommendations 50% of the time, or even 10%.  And Plaintiffs acknowledge that some of the Lessor Defendants have "low acceptance rate[s]."  *Id.* ¶ 286.  Indeed, Plaintiffs previously cited an FAQ document that made clear that a pricing recommendation "may be followed, modified, or ignored by an apartment provider in any particular case" and that it is "it is up to each apartment provider to execute a pricing strategy that it determines to be appropriate for its property."  *See* ECF 342-1 at 2.

Plaintiffs also allege that RealPage "Pricing Advisors" "monitor the client's compliance with RMS pricing."  SAMC ¶ 17.  But Plaintiffs acknowledge that only some RealPage users subscribe to Pricing Advisor services.  *Id.* ¶¶ 17, 285.  Further, Plaintiffs allege that "once a property management company manages twenty thousand or more units," it typically uses internal personnel as opposed to a RealPage Pricing Advisor.  *Id.* ¶ 285.  By Plaintiffs' own allegations, nearly every one of the Lessor Defendants in this case exceeds that threshold.  *See id.* ¶¶ 68–193 (alleging number of units managed by each Defendant).

Regardless, even for the customers who subscribe to the service, the Complaint acknowledges that Pricing Advisors *recommend*—they do not and cannot require—adoption of RealPage pricing recommendations.  For example, Plaintiffs allege that Pricing Advisors "persuade[] clients that it was in their best interest to . . . accept all or substantially all of RealPage's pricing recommendations" (*id.* ¶ 275), "assist clients in understanding the methodology behind

RealPage's RMS so that clients would more closely adhere to [RealPage's pricing recommendations]" (*id.* ¶ 278), and notify clients when they are "succeeding in 'embracing the algorithm,' or if the property was underperforming" (*id.* ¶ 270). It is not surprising that RealPage, in the business of providing software that recommends prices that better match supply and demand, encourages customers to implement those recommendations. But such encouragement would be unnecessary if RealPage had control over Lessor Defendants' pricing decisions. Indeed, while Plaintiffs allege—as they did previously—that "at least some" Pricing Advisors told customers "they were without discretion to override [pricing recommendations]," in the very same paragraph Plaintiffs now concede that Lessor Defendants' employees *can approve* deviations from pricing recommendations. *Id.* ¶ 18 ("no modifications can be made to RMS recommended pricing without prior approval *from either RealPage or the Owners, Owner-Operators, and/or Managing Defendants' senior management*") (emphasis added).

Despite conclusory allegations that RealPage is "enforcing price discipline" among Lessor Defendants (*id.* ¶ 303)—or that they "likely have their own internal measures in place to enforce price discipline" (*id.* ¶ 304)—Plaintiffs allege no mechanism to prevent or punish Lessor Defendants' "cheating." *See Llacua v. W. Range Ass'n*, 930 F.3d 1161, 1180 & n.30 (10th Cir. 2019) (affirming dismissal where plaintiffs failed to allege a "key factor": "an enforcement mechanism, binding on all members" of the alleged conspiracy); *Kleen Prods., LLC v. Int'l Paper*, 276 F. Supp. 3d 811, 842 (N.D. Ill. 2017) ("With no punishment, or even a mechanism to punish, the inference tends toward no agreement."), *aff'd*, 910 F.3d 927 (7th Cir. 2018).

*Second*, with respect to information sharing, as noted above, Plaintiffs allege that RealPage provides only "'blended'" and "'aggregate[d]'" data to capture "'overall market performance within the applicable region.'" *Supra* at IV.A.ii.b. Such data, however, is far too generalized to

permit Lessor Defendants "'to police a secret or tacit conspiracy to fix prices.'" *See Local TV*, 2022 WL 3716202, at *6. Plaintiffs' conduit theory thus fails.

### iv. The Alleged Conspiracy Is Implausible on Its Face

Plaintiffs' horizontal conspiracy claim also fails because the alleged conspiracy is "practically and economically implausible." *Lifeline Ltd. No. II v. Conn. Gen. Life Ins. Co.*, 821 F. Supp. 1201, 1205 (E.D. Mich. 1993) (dismissing antitrust claims).

According to Plaintiffs, it is "rational" for Lessor Defendants to "artificially restrict[] supply" and set "higher rental prices" using RealPage's software *only* if they "know that their competitors are setting rental prices using RealPage's RMS and thus would not attempt to undercut them." SAMC ¶ 31. But Plaintiffs *admit* that as of 2022, RealPage's RMS is not used for the vast majority of "investment-grade units"—over 80%. *Compare id.* ¶ 224, *with* ¶ 368. As Plaintiffs acknowledge, a conspiracy could not succeed under these conditions: a property manager who "raise[d] rents above market rates" would "lose tenants to its competitors who offered rental units at market rates, earning those competitors a higher share of the available profits." *Id.* ¶ 205. The conspiracy as alleged would thus be an "exercise in futility." *Morton Salt*, 702 F.3d at 872 (affirming dismissal where alleged "sham bidding" conspiracy would be an "exercise in futility").

Plaintiffs' new allegations of higher percentage shares in certain alleged markets only underscore the issue. For example, with respect to Nashville, Plaintiffs allege the Lessor Defendants—along with unspecified "co-conspirators" not named here—"account for over 48% of the multifamily rental market." SAMC ¶ 412. Even if that allegation were plausible—it is not, as explained in Section IV.B.ii *infra*—*over half* of the multifamily units in Nashville would be controlled by competitors who are *not* using RealPage software and thus not receiving alleged supracompetitive pricing recommendations. Thus, the Lessor Defendants operating there would

be exposed to the undercutting that Plaintiffs admit would defeat any supracompetitive prices.

Further, many Lessor Defendants—despite allegedly joining "a single unlawful conspiracy" to fix multifamily housing prices (*id.* ¶ 392)—are not alleged to compete with other Lessor Defendants in the same alleged relevant markets. For example, Defendant Rose Associates, Inc. ("Rose Associates") is alleged to operate *only* in the New York submarket. *Id.* App. C. Thirty of the Lessor Defendants are not alleged to have any presence in New York. *Id.* Yet Plaintiffs contend that Rose Associates conspired with those 30 Lessor Defendants to raise prices in *other submarkets* where Rose Associates does not own any properties. Rose Associates would have no plausible motive to enter into such an agreement. Numerous other Lessor Defendants are in the same boat. *See, e.g.*, *id.* (Defendant Thrive Communities Management only alleged to compete in Portland and Seattle, meaning it does not compete with 23 of the Lessor Defendants). Plaintiffs thus fail to provide any plausible allegation that Lessor Defendants have any motive to enter into a "single unlawful conspiracy" together. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 596–97 (1986) (where there is no "plausible motive to engage in the conduct charged" that conduct "does not give rise to an inference of conspiracy")[11]; *Lifeline*, 821 F. Supp. at 1205 (in circumstantial evidence case, "the question of whether engaging in the conspiracy makes economic sense for the defendant must be considered by the court").

## B. Plaintiffs' Section 1 Claims Also Fail Under the Rule of Reason

For all the reasons described above, Plaintiffs have not plausibly alleged *any* agreement

---

[11] Although *Matsushita* arises procedurally in the context of a motion for summary judgment and substantively in a case alleging predatory pricing, its holding regarding economic rationality has regularly been extended to motions to dismiss and other areas of antitrust. *See Brunson Commc'ns, Inc. v. Arbitron, Inc.*, 239 F. Supp. 2d 550, 563–64, & n.5 (E.D. Pa. 2002) (collecting cases and dismissing a conspiracy claim that did not make economic sense based on the holding in *Matsushita*).

among the Lessor Defendants, and Plaintiffs' claim thus fails. But even if Plaintiffs had alleged an agreement, the rule of reason would apply.

At bottom, Plaintiffs' theory depends on Lessor Defendants' *individual* agreements with RealPage to use its RMS. Notwithstanding Plaintiffs' repeated and conclusory use of the term "horizontal," these agreements are *vertical* in nature and must be analyzed under the rule of reason. *Care Heating & Cooling, Inc. v. Am. Standard, Inc.*, 427 F.3d 1008, 1012–13 (6th Cir. 2005); *Total Benefits*, 552 F.3d at 435 ("[A]ll vertical price restraints are to be judged under the rule-of-reason standard."). But even if Plaintiffs' allegations about each Lessor Defendants' individual, vertical agreements to use the software could somehow be transmuted into a horizontal agreement, that too would be subject to the rule of reason.

Because it "is a bad idea to subject a novel way of doing business[,] or an old way in a new and previously unexamined context[,] . . . to per se treatment" (*In re Sulfuric Acid Antitrust Litig.*, 703 F.3d 1004, 1011 (7th Cir. 2012)), the Sixth Circuit "refuse[s] to apply the per se rule in the absence of judicial experience with the challenged restraint." *Med. Ctr. at Elizabeth Place, LLC v. Atrium Health Sys.*, 922 F.3d 713, 731 (6th Cir. 2019). Courts have little to no experience evaluating whether use of revenue management software is unlawful under Section 1. Such software is used in many industries and summary condemnation would risk substantial disruptions and unpredictable economic consequences. The use of such software does not "clearly and unquestionably fall[] within one of the handful of categories that have been collectively deemed per se anticompetitive" (*Expert Masonry, Inc. v. Boone Cty.*, 440 F.3d 336, 343–44 (6th Cir. 2006)), such as "naked, horizontal restraints pertaining to prices or territories." *Ogden v. Little Caesar Enters.*, 393 F. Supp. 3d 622, 632 (E.D. Mich. 2019). To the contrary, Plaintiffs acknowledge the efficiency-enhancing benefits of the software. *See* Section II.B *supra*. Thus, the

rule of reason applies.[12]  *See In re Se. Milk*, 739 F.3d at 273 ("[E]ven if the agreement is horizontal in the way Plaintiffs now claim, applying the rule of reason is the default position and can be applied to horizontal restraints as well if they do not fit into existing categories of per se violations.").

To state a rule-of-reason[13] claim, a plaintiff must plead a relevant market in which defendants' conduct caused "adverse, anticompetitive effects."  *Total Benefits*, 552 F.3d at 436.  Plaintiffs fail to do either.

### i. Plaintiffs Do Not Define Plausible Relevant Markets.

Plaintiffs fail to sufficiently allege any plausible relevant market.  Plaintiffs must plead factual allegations that allow the court to determine "the boundaries of the relevant . . . market."  *Id.* at 437 (affirming dismissal for failure to plead relevant market).  The Sixth Circuit routinely affirms dismissals at the pleading stage "on the basis of an insufficiently pled or totally unsupportable proposed market."  *Mich. Div.-Monument Builders of N. Am. v. Mich. Cemetery Ass'n*, 524 F.3d 726, 733 (6th Cir. 2008); *see Nat'l Hockey League Players Ass'n v. Plymouth*

---

[12] Any claim that Defendants entered into an agreement to share competitively sensitive information through RealPage's software, even if it were well-pleaded, would also be subject to the rule of reason.  The Supreme Court has stressed that "[t]he exchange of price data and other information among competitors . . . do[es] not constitute a per se violation of the Sherman Act," since information sharing can "render markets more, rather than less, competitive."  *United States v. U.S. Gypsum Co.*, 438 U.S. 422, 443 n.16 (1978); *see Wallace v. Bank of Bartlett*, 55 F.3d 1166, 1169 (6th Cir. 1995) (same).

[13] Plaintiffs' alternative argument that the Court should apply the "quick-look" standard—an abbreviated form of the rule of reason—fails.  *See* SAMC ¶¶ 393, 706.  "Quick-look" analysis is appropriate only when "an observer with even a rudimentary understanding of economics could conclude that the arrangements in question would have an anticompetitive effect on customers and markets."  *Cal. Dental Ass'n v. FTC*, 526 U.S. 756, 770 (1999).  For all the reasons discussed above, "quick look" treatment is inappropriate here.  *See Winn-Dixie Stores, Inc. v. E. Mushroom Mktg. Coop., Inc.*, 2023 WL 5521221, at *7 (3d Cir. Aug. 28, 2023) (when court has not "amassed considerable experience" with arrangement at issue, "quick-look or per se condemnation is simply not appropriate").

29

*Whalers Hockey Club*, 419 F.3d 462, 473 (6th Cir. 2005) (affirming dismissal because "the alternative markets proposed by Plaintiffs must fail"); *see also New Orleans Ass'n of Cemetery Tour Guides & Cos. v. New Orleans Archdiocesan Cemeteries*, 56 F.4th 1026, 1039 (5th Cir. 2023); *Par v. Wolfe Clinic, P.C.*, 70 F.4th 441, 448–49 (8th Cir. 2023).

The geographic market is the "area of effective competition," or the "area in which the seller operates, and to which the purchaser can practicably turn for supplies." *Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 327 (1961). It must "both correspond to the commercial realities of the industry and be economically significant." *Brown Shoe Co. v. United States*, 370 U.S. 294, 336–37 (1962).

### a) Regional MSAs Are Not Plausible Relevant Markets

Plaintiffs allege that certain "Metropolitan Statistical Areas" or "MSAs"—which are established by the Census Bureau and defined as an area that has "at least one core urbanized area of 50,000 or more population, plus adjacent territory that has a high degree of social and economic integration with the core as measured by commuting ties" (SAMC ¶ 407)—constitute relevant geographic markets.[14] These allegations fail. First, the use in antitrust cases of MSAs—which are developed for purposes other than market definition—requires more than the perfunctory allegations that Plaintiffs offer in their complaint. *See United States v. Conn. Nat'l Bank*, 418 U.S. 656, 670 (1974) (the plaintiff "cannot rely, without more, on Standard Metropolitan Statistical Areas (SMSA's) as defining the geographic markets"). Given the manifestly local nature of

---

[14] Although the SAMC still contains a general reference to a "nationwide multifamily real estate market" (*see, e.g.*, SAMC ¶ 400), Plaintiffs do not set forth any allegations to support a nationwide market, and, even if they did, such allegations would contradict Plaintiffs' own allegations that "**housing markets are regional**." SAMC ¶ 406 (emphasis added); *see Semertzides v. Bethesda N. Hosp.*, 2014 WL 2573073, at *4 (S.D. Ohio June 9, 2014), *aff'd*, 608 F. App'x 378 (6th Cir. 2015) (dismissing complaint because it contained inconsistent allegations concerning the relevant geographic market).

markets for residential housing, "the geographic market must be delineated in a way that takes into account the local nature of the demand" and "'must be charted by careful selection of the market area in which the seller operates, and to which the purchaser can practicably turn for [alternatives] . . . .'" *Id*. at 668. "Exclusive reliance on SMSA's here may lead to inaccuracies" since they may not be "sufficiently refined in terms of realistic . . . markets." *Id*. at 670 (plaintiff "must demonstrate more accurately than is possible solely with SMSA's the localized . . . markets"). It is no excuse that Plaintiffs denominate their geographic markets as "submarkets." As the Sixth Circuit held in reversing the use of MSAs as alleged geographic submarkets, it was "fundamental error" to accept "the mistaken premise that standard market tests may be abandoned or ignored and replaced with a less demanding 'submarket test.'" *White & White, Inc. v. American Hosp. Supply Corp.*, 723 F.2d 495, 502–04 (6th Cir. 1983) ("As the district court itself concluded, the evidence of actual sales by the plaintiffs did not support a finding 'that each SMSA constitutes a separate geographic market.'").

At a minimum, Plaintiffs' markets are too broadly defined because Plaintiffs do not and cannot plausibly allege that renters consider all residential leases in their *own* MSAs to be adequate substitutes. For instance, Plaintiffs allege that the Nashville submarket "corresponds to the Census Bureau's Nashville-Davidson-Murfreesboro-Franklin MSA and includes Davidson and 12 other Tennessee counties." *Id.* ¶ 410. Yet Plaintiffs acknowledge that commuting distance is a significant geographic constraint on where people choose to live (*see id.* ¶ 406), and they do not and cannot allege that renters in Robertson County would view an apartment 85 miles away in Maury County to be a reasonable substitute. *See id.* ¶ 410. Similarly, Plaintiffs allege that the New York, NY regional submarket "corresponds to the Census Bureau's New York-Newark-Jersey City MSA, and spans parts of New York, New Jersey, and Pennsylvania." *Id.* ¶ 522. It

defies credulity for Plaintiffs to allege that a renter who lives and works in New York City's Financial District, who walks to work and does not own a car, would consider any apartment in Pennsylvania to be a reasonable substitute. *See Cupp v. Alberto-Culver USA, Inc.*, 310 F. Supp. 2d 963, 970 (W.D. Tenn. 2004) (noting that the "disconnect between a strictly local or exclusive geographic area and some Defendants' global reach [left] the Court without any ability to formulate a relevant geographic market"). And Plaintiffs' maps of their purported relevant markets further illustrate their implausibility. For instance, Plaintiffs' map of the "Washington D.C. Submarket" nonsensically suggests that properties in downtown Washington, D.C. are in the same housing market as properties over 96 miles away in Elkton, Maryland. *See id.* ¶ 607.

### ii. Plaintiffs Have Not Pleaded Anticompetitive Effects

Plaintiffs' Complaint must also plausibly allege "that the challenged restraint has a substantial anticompetitive effect that harms consumers in the relevant market." *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2284 (2018). Plaintiffs must allege such an effect either "directly or indirectly." *Id.* Direct allegations of anticompetitive effects must establish that Lessor Defendants could and did charge prices "above a competitive price." *Id.* at 2288. Indirect allegations must plead "market power plus some evidence that the challenged restraint harms competition." *Id.* at 2284. Plaintiffs' allegations fail to satisfy either requirement.

**Plaintiffs Do Not Allege Direct Evidence of Anticompetitive Effects.** Plaintiffs include no plausible factual allegations showing that Defendants have the ability to charge, much less *have* charged, *supracompetitive* prices.

Plaintiffs include new charts purportedly showing that in select alleged submarkets, certain Lessor Defendants' average prices increased between 2013 and 2023. As a threshold matter, Plaintiffs' charts show different Lessor Defendants' average prices moving *in different directions*,

with many Lessor Defendants' average prices going *down* after 2016 when the conspiracy supposedly began. *See, e.g.*, SAMC ¶ 339 Fig. 11, ¶ 348 Fig. 20, ¶ 348 Fig. 21. In any event, merely alleging that average prices increased over a ten-year period does not show that those prices were *supracompetitive*.[15] *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 237 (1993) (the mere "occurrence of a price increase does not in itself permit a rational inference of . . . supracompetitive pricing"). Indeed, Plaintiffs fail to provide any comparison of Lessor Defendants' alleged prices with prices offered by other supposed non-conspirators in any alleged market. And Plaintiffs acknowledge that Lessor Defendants *could not* successfully charge supracompetitive prices in a world where *non-RealPage RMS users* have more than 80% of the multifamily units for rent in the United States.

Plaintiffs' allegations regarding an increase in *average*, market-wide prices in certain areas over time fare no better. *See* SAMC ¶¶ 21 Fig. 1, 351–65. These analyses do not even attempt to differentiate between pricing offered by Lessor Defendants and prices offered by non-Defendants, and thus they provide no plausible basis to infer that Lessor Defendants were able to charge a supracompetitive price. *Cf. Musical Instruments*, 798 F.3d at 1197 (allegations that prices rose while sales dropped were insufficient because plaintiffs relied on "average retail price of *all* guitars and guitar amplifiers sold" rather than "the average retail price of guitars and amplifiers manufactured *by defendants*" and thus failed to "allege any facts connecting the purported price increase to an illegal agreement among competitors").

Nor do Plaintiffs' allegations that RealPage users can increase revenue suffice. SAMC

---

[15] Plaintiffs also ignore the recent, record-high inflation in the United States. "In considering a motion to dismiss, the court is not required to don blinders and to ignore commercial reality." *42nd Parallel N. v. E St. Denim Co.*, 286 F.3d 401, 406 (7th Cir. 2002).

¶¶ 24, 381.  Revenue is not price, and the software can increase revenue by, for example, reducing vacancy (which can involve *reducing* prices).  *Id.* ¶ 300.  Merely alleging that a Lessor Defendant was able to increase revenue (or, for that matter, prices) indicates nothing about whether that Lessor Defendant was able to charge more than the competitive price in a given market.

**Plaintiffs Do Not Allege Indirect Evidence of Anticompetitive Effects.**  Plaintiffs have similarly failed to allege the requisite "market power plus some evidence that the challenged restraint harms competition" in the alleged relevant markets.  *Am. Express Co*., 138 S. Ct. 2284. In the Sixth Circuit, "market power is normally established by controlling a substantial share of the market."  *Mich. Cemetery*, 524 F.3d at 732.  "Since [the Supreme Court's 1984 decision in] *Jefferson Parish*, no court has inferred the requisite market power from a market share below 30 percent."[16]  ABA, Antitrust Law Developments 71–72 (9th ed. 2022); *see PSI Repair Servs., Inc. v. Honeywell, Inc*., 104 F.3d 811, 818 (6th Cir. 1997) ("A thirty-percent share of the market, standing alone, provides an insufficient basis from which to infer market power.").  "[C]ourts have rejected even higher market shares between 30 and 40 percent as inadequate to demonstrate market power."  *Drug Emporium, Inc. v. Blue Cross of W. N.Y., Inc.*, 104 F. Supp. 2d 184, 189 (W.D.N.Y. 2000) (collecting cases); *see also Minn. Ass'n of Nurse Anesthetists v. Unity Hosp.*, 5 F. Supp. 2d 694, 710 (D. Minn. 1998) (34.6% market share insufficient); *State of New York by Abrams v. Anheuser-Busch, Inc.*, 811 F. Supp. 848, 873 (E.D.N.Y. 1993) (finding "a 39% market share below

---

[16] Where a Section 1 claim relates to a vertical agreement, the *individual* market power of each defendant must be assessed; aggregation of the various defendants' market power is not permitted. *See Dickson v. Microsoft Corp.*, 309 F.3d 193, 210–11 (4th Cir. 2002); *Maris Distrib. Co. v. Anheuser-Busch, Inc*., 302 F.3d 1207, 1218 (11th Cir. 2002); *In re Amazon.com, Inc. eBook Antitrust Litig.*, 2023 WL 6006525, at *25 (S.D.N.Y. July 31, 2023) (rejecting aggregation where plaintiff's theory was based purely on vertical agreements between spokes and the hub and there was no plausible horizontal conspiracy).  As explained above, Plaintiffs have failed to allege *any* plausible horizontal agreement among the Lessor Defendants.  As a result, Plaintiffs must allege that *each* Defendant individually has market power.  They have not.

that which has been deemed sufficient to confer market power").

For some submarkets, Plaintiffs allege no share and instead claim only that "discovery will demonstrate that property owners and managers who use revenue management software account for a significant portion of all multifamily units." *See* SAMC ¶¶ 621–74. For other submarkets, Plaintiffs allege a market share of less than 30%. *Id.* ¶¶ 469, 500, 512, 549, 590. The Court should dismiss Plaintiffs' claims with respect to these submarkets. *See Total Benefits Planning Agency Inc. v. Anthem Blue Cross & Blue Shield*, 630 F. Supp. 2d 842, 852 (S.D. Ohio 2007) ("[U]nless an antitrust plaintiff alleges the existence of market power, the complaint may be dismissed for failure to state a claim upon which relief can be granted."), *aff'd*, 552 F.3d 430 (6th Cir. 2008).

For certain of the alleged submarkets, Plaintiffs allege that "Managing Defendants, and Owner-Operators, along with co-conspirators who use RealPage's RMS"—*i.e.*, some combination of the Lessor Defendants and other, unnamed alleged users of RealPage products—have between 31% and 53% of the multifamily units for rent. For example, Plaintiffs allege that Lessor Defendants and "their co-conspirators" account for "over 48% of the multifamily rental market in the Nashville Submarket." SAMC ¶ 412. They arrive at this figure using two alleged metrics: (i) "Property management companies and owners who use revenue management software account for approximately 73% of all multifamily rental units in the Nashville Submarket" and (ii) "RealPage's RMS accounts for over two-thirds of revenue management software used in the U.S. multifamily rental housing industry." *Id.* Plaintiffs' calculation is implausible because even if RealPage had a two-thirds share of RMS *nationally*, that does not mean RealPage has a comparable share in the specific *regional* markets Plaintiffs allege. Regardless, Plaintiffs' two-thirds statistic is undermined by the very document Plaintiffs rely on to support it.

Plaintiffs cite an investor conference transcript from 2017 for the proposition that, post-

LRO acquisition, "RealPage's RMS would account for over two thirds of all revenue management usage, with its next competitor, Yardi, at a distant second place." *Id.* ¶ 218 & n.113. That is not what the transcript says. Instead, RealPage's then-CEO explained: "RealPage has about 1,500,000 units on our product, and LRO has about the same number. And Yardi has a little less, but they've got a sizable footprint. And the point, the 3 of us, we only represent 70—a little north of 70— **30% of the market. The rest of the market is using proprietary software systems**." Whittaker Decl. Ex. B at 6. In other words, RealPage's CEO first used a "70%" figure and then corrected it to a "30%" share of RMS users held by RealPage, LRO, *and a competitor* (Yardi). The other 70% of RMS usage is accounted for by companies using proprietary RMS systems. There simply is no arithmetic that can convert those figures into a *66% share* for RealPage and LRO combined.[17] And the Court is not "bound to accept . . . unwarranted inferences, including allegedly inferable 'facts' or conclusions which contradict documentary evidence appended to, or referenced within, the plaintiff's complaint." *Blankenship v. City of Crossville*, 2017 WL 4641799, at *2 (M.D. Tenn. Oct. 17, 2017) (Crenshaw, J.). At most, the transcript indicates that RealPage and LRO combined had a 20–25% share of RMS in 2017. And using that metric, Plaintiffs cannot allege that RealPage users control more than 30% of the units in any given submarket, even if 100% of the lessors therein used some form of RMS.

Finally, even if Plaintiffs' alleged market shares were plausible, they nevertheless fail to allege "that the challenged restraint harms competition." *Am. Express*, 138 S. Ct. at 2284. While Plaintiffs make the bald claim that the software allowed users to hold units vacant and charge higher prices, they elsewhere acknowledge that the purpose of the software is to *reduce vacancies*

---

[17] Even if RealPage, LRO, and Yardi had a combined 70%, Plaintiffs cannot distort that into RealPage having 66% and Yardi having 4%. RealPage's CEO made clear that RealPage and LRO had equal shares and Yardi had a "little less." Whittaker Decl. Ex. B at 6.

(SAMC ¶ 300), and that it also recommends price *decreases*. Whittaker Decl. Ex. A at 3–4.

Similarly, Plaintiffs' general statistics about average vacancy rates increasing in certain

geographies (SAMC ¶¶ 355–64) do nothing to show that *the software* caused vacancy rates to

increase; Plaintiffs offer no comparison, for example, between the vacancy rates of Defendants

and non-defendants. And, as explained *supra*, none of Plaintiffs' generalized allegations about

average price increases over a ten-year period show that any Lessor Defendant did or was able to

charge more than a competitive price.

### C.  Plaintiffs Fail to Establish Antitrust Standing

Plaintiffs lack antitrust standing, which "is a threshold, pleading-stage inquiry and when a

complaint by its terms fails to establish this requirement [a court] must dismiss it as a matter of

law[.]"  *NicSand, Inc. v. 3M Co.*, 507 F.3d 442, 450 (6th Cir. 2007); *see also Tennessean

Truckstop, Inc. v. NTS, Inc*., 875 F.2d 86, 91 (6th Cir. 1989) (noting "it is better to cut the string

before the substantial costs of litigating an antitrust case have been incurred" when a complaint

fails to allege antitrust injury).  Plaintiffs continue to make only vague, conclusory allegations that

they paid "higher" rental prices (*see, e.g.*, SAMC ¶ 50).  They do not allege specific facts causally

connecting any of those "higher" prices to the purported critical mechanism of the alleged

conspiracy: RealPage RMS.  Plaintiffs must offer more than "allegations of consequential harm

resulting from a violation of the antitrust laws."  *Associated Gen. Contractors of Cal., Inc. v. Cal.

State Council of Carpenters*, 459 U.S. 519, 545 (1983).  They must allege standing with specificity.

*CBC Cos., Inc. v. Equifax, Inc*., 561 F.3d 569, 571 (6th Cir. 2009).  Plaintiffs, however, do not

allege that any RealPage RMS was used to set their individual rents at all, much less increase them

collusively.[18]  And Plaintiffs admit that Lessor Defendants do not accept RealPage's suggested pricing *at least* 10–20% of the time (*id.* ¶ 15), which very well could have included all Plaintiffs' own rents on the face of the Complaint.  That Plaintiffs allegedly paid "higher" rental prices—during a time of extraordinary inflation, no less—does not establish antitrust injury (or causality).  It is conclusory and disconnected from the mechanism of the alleged conspiracy.

### D.    Plaintiffs' State-Law Antitrust Claims Fail

On top of their Sherman Act claims, Plaintiffs sued under the antitrust laws or consumer protection laws of 42 states and the District of Columbia.  *Id.* ¶¶ 715–57.  Plaintiffs' state antitrust claims fail for the same reasons their Sherman Act claims do.[19]

---

[18] Similarly, Plaintiffs allege that "many Defendants in this action are members of the [Texas Apartment Association ('TAA')], which drafts and revises standard leases for use by Texas landlords" (SAMC ¶ 231) and that "the standardization of leases and lease terms by the National Apartment Association . . . and [its] local and state affiliates. . . constitutes overt coordination in violation of the Sherman Act" (*id.* ¶ 313).  However, none of the Plaintiffs alleges any injury stemming from these lease terms or even that their leases used these allegedly standardized terms.

[19] *See, e.g.*, *Odom v. Fairbanks Mem'l Hosp.*, 999 P.2d 123, 128 (Alaska 2000) ("We look to federal precedent when analyzing a [state law] antitrust claim"); Ariz. Stat. § 44-1412; *Cty. of Tuolumne v. Sonora Cmty. Hosp.*, 236 F.3d 1148, 1160 (9th Cir. 2001) (California); D.C. Code § 28-4515; Fla. Stat. § 542.32; *Island Tobacco Co. v. R. J. Reynolds Indus.*, 513 F. Supp. 726, 738 (D. Haw. 1981) (Hawaii); Idaho Code § 48-102(3); 740 Ill. Comp. Stat. 10/11; *Deich-Keibler v. Bank One*, 243 F. App'x 164, 168 (7th Cir. 2007) (Indiana); Iowa Code § 553.2; Kan. Stat. § 50-163(b); *Felder's Collision Parts, Inc v. All Star Advert. Agency, Inc.*, 777 F.3d 756, 759 (5th Cir. 2015) (Louisiana); *Tri-State Rubbish, Inc. v. Waste Mgmt., Inc.*, 875 F. Supp. 8, 14 (D. Me. 1994) (Maine); *Krause Marine Towing Corp. v. Ass'n of Md. Pilots*, 44 A.3d 1043, 1052–53 (Md. Ct. Spec. App. 2012); Mass. Gen. Laws ch. 93 § 1; Mich. Comp. Laws § 445.784(2); *Lorix v. Crompton Corp.*, 736 N.W.2d 619, 627–29 (Minn. 2007); *NAACP v. Claiborne Hardware Co.*, 393 So.2d 1290, 1301 (Miss. 1980), *rev'd on other grounds*, 458 U.S. 886 (1982); Mo. Rev. Stat. § 416.141; Neb. Rev. St. § 59-829; N.H. Rev. Stat. § 356:14; N.J. Rev. Stat. § 56:9-18; N.M. Stat. § 57-1-15; *In re Interest Rate Swaps Antitrust Litig.*, 261 F. Supp. 3d 430, 498–99 (S.D.N.Y. 2017) (New York); *In re Elec. Books Antitrust Litig.*, 2014 WL 2535112, at *15 (S.D.N.Y. June 5, 2014) (North Dakota); *Aladdins Lights Inc. v. Eye Lighting Int'l*, 96 N.E.3d 864, 867–868 (Ohio Ct. App. 2017); 79 Okla. Stat. § 212; *Or. Laborers-Emp'rs. Health & Welfare Tr. Fund v. Philip Morris Inc.*, 185 F.3d 957, 963 n.4 (9th Cir. 1999) (Oregon); *In re Dairy Farmers of Am., Inc. Cheese Antitrust Litig.*, 2015 WL 3988488, at *14 (N.D. Ill. June 29, 2015) (North Carolina); *Drs. Steuer & Latham, P.A. v. Nat'l Med. Enters., Inc.*, 672 F. Supp. 1489, 1521 (D.S.C. 1987), *aff'd*, 846 F.2d

And many of Plaintiffs' state-law claims fail for additional, independent reasons. Tennessee's and South Carolina's statutes apply only to goods. *Bennett v. Visa U.S.A. Inc.*, 198 S.W.3d 747, 751 (Tenn. Ct. App. 2006); *Trails End Campground, LLC v. Brimstone Recreation, LLC*, 2015 WL 388313, at *11 (Tenn. Ct. App. Jan. 29, 2015) (lease of property is not a tangible good under TTPA); S.C. Code § 39-3-30. Georgia and Pennsylvania do not allow private antitrust claims.[20] SAMC ¶ 721; *In re K-Dur Antitrust Litig.*, 2008 WL 2660780, at *4 (D.N.J. Feb. 28, 2008) ("Pennsylvania has no general antitrust statute and no statute that creates a private right of action against restraints of trade or monopolization. . . ."). Plaintiffs have not sent a pre-suit demand letter as required by Massachusetts's unfair and deceptive practices statute "which is a bar to suit." *Entrialgo v. Twin City Dodge, Inc.*, 333 N.E.2d 202, 204 (Mass. 1975). Indiana's antitrust statute does not apply to transactions involving real property. *See* Ind. Code §§ 24-1-1-1, 24-1-3-1. Some states have shorter limitations periods than the Sherman Act's four years. *Big River Indus. v. Headwaters Res., Inc.*, 971 F. Supp. 2d 609, 623 (M.D. La. 2013) (one year under Louisiana law); Ala. Code § 6-2-38(l) (2 years); *Gibson v. Miami Valley Milk Producers, Inc.*, 299 N.E.2d 631, 637 (Ind. Ct. App. 1973) (2 years); Kan. Stat. § 60-512(2) (3 years); *In re Linerboard Antitrust Litig.*, 223 F.R.D. 335, 343 (E.D. Pa. 2004) (three years under South Carolina law).

Many of these claims must also be dismissed because they require a plaintiff to show harm *in* the particular state and "a plaintiff must show standing for each claim he seeks to press."

---

70 (4th Cir. 1988) (South Carolina); S.D. Codified Laws § 37-1-22; *State ex rel. Leech v. Levi Strauss & Co.*, 1980 WL 4696, at *2 n.2 (Tenn. Ch. Ct. Sept. 25, 1980); Utah St. § 76-10-3118; Va. Code § 59.1-9.17; *Blewett v. Abbott Labs*, 938 P.2d 842, 845–46 (Wash. Ct. App. 1997); W. Va. Code §47-18-16; *Conley Publ'g Grp., Ltd. v. Journal Commc'ns, Inc.*, 665 N.W.2d 879, 885–86 (Wis. 2003).

[20] Nor does a "common-law tort for restraint of trade" exist in Georgia for non-competitors. *See* SAMC ¶ 721; *Palmer v. Atl. Ice & Coal Co.*, 173 S.E. 424, 428–30 (Ga. 1934).

*DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006); *Trans Union LLC v. Ramirez*, 141 S. Ct. 2190, 2208 (2021) ("[S]tanding is not dispensed in gross; rather, plaintiffs must demonstrate standing for each claim that they press and for each form of relief that they seek.").[21]  Named Plaintiffs have lived in only some of the 43 states whose laws they invoke—Colorado, D.C., Georgia, Florida, Illinois, Massachusetts, North Carolina, Tennessee, and Washington.  SAMC ¶¶ 50–60.  They have not alleged that *they* were injured in 34 of the states whose laws they invoke.[22]  Named Plaintiffs claims under those states' laws should be dismissed.  *Fox*, 67 F.4th at 293; *In re Niaspan Antitrust Litig.*, 42 F. Supp. 3d 735, 758 (E.D. Pa. 2014) ("Because standing must be resolved on a claim-by-claim basis . . . the named plaintiffs lack standing to assert claims under the laws of the states in which they do not reside or in which they suffered no injury.").

## V.    CONCLUSION

The Court should dismiss Plaintiffs' claims with prejudice.  After Defendants' prior motion to dismiss was fully briefed, the Court gave Plaintiffs a "last and forever opportunity to amend their complaints."  ECF 499 at 14:20–22.  Notwithstanding that opportunity, Plaintiffs have not been able to address the many flaws in their complaint.  Further amendments would be futile, and dismissal should be with prejudice.

---

[21] The Sixth Circuit recently reaffirmed these principles in *Fox v. Saginaw County*, where it held that a landowner who suffered a taking by one county *did not* have standing to sue on behalf of a class of landowners in 26 *other* counties for similar takings.  Even though the plaintiff had standing for his individual claim, that did not mean that he had "a license to sue anyone over anything." *Fox v. Saginaw Cty.*, 67 F.4th 284, 293 (6th Cir. 2023).  The Sixth Circuit also found that the district court erred in *deferring* its consideration of the named plaintiff's standing to represent landowners in other counties *until* class certification because he "undisputedly lacked standing as to the 26-non-Gratiot Counties when he sued."  *Id.* at 295.  And because when he sued the court had not yet certified a class, that meant that the district court "could not rely on the class members' injuries" for standing "*because they were not parties*."  *Id.* (emphasis added).

[22] Nor have Plaintiffs alleged markets in 14 states: Alaska, Hawaii, Idaho, Iowa, Maine, Montana, Nebraska, New Hampshire, New Mexico, South Dakota, North Dakota, Vermont, West Virginia, and Wyoming.

DATED:  October 9, 2023

Respectfully submitted,

/s/ Jay Srinivasan

Jay Srinivasan (admitted *pro hac vice*)
jsrinivasan@gibsondunn.com
Daniel G. Swanson (admitted *pro hac vice*)
dswanson@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071
Telephone: (213) 229-7430

Stephen Weissman (admitted *pro hac vice*)
sweissman@gibsondunn.com
Michael J. Perry (admitted *pro hac vice*)
mjperry@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, NW
Washington, DC 20036
Telephone: (202) 955-8678

Stephen C. Whittaker (admitted *pro hac vice*)
cwhittaker@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
1361 Michelson Drive
Irvine, CA 92612
Telephone: (212) 351-2671

Ben A. Sherwood (admitted *pro hac vice*)
bsherwood@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166
Telephone: (212) 351-2671

Thomas H. Dundon (SBN: 004539)
tdundon@nealharwell.com
Neal & Harwell, PLC
1201 Demonbreun Street, Suite 1000
Nashville, TN 37203
Telephone: (615) 244-1713

*Counsel for Defendant RealPage, Inc.*

/s/ Edwin Buffmire

Edwin Buffmire
ebuffmire@jw.com
Michael Moran
mmoran@jw.com
JACKSON WALKER LLP
2323 Ross Ave., Suite 600
Dallas, TX 75201
Telephone: (214) 953-6000

Kevin Fulton
kevin@fultonlg.com
THE FULTON LAW GROUP PLLC
7676 Hillmont St., Suite 191
Houston, TX 77040
Telephone: (713) 589-6964

*Counsel for Defendant Allied Orion Group,
LLC*

/s/ Katie A. Reilly

Katie A. Reilly
reilly@wtotrial.com
Michael T. Williams
williams@wtotrial.com
Judith P. Youngman
youngman@wtotrial.com
WHEELER TRIGG O'DONNELL LLP
370 Seventeenth Street, Suite 4500
Denver, CO 80202
Telephone: (303) 244-1800

Mark Bell
Mark.Bell@hklaw.com
HOLLAND & KNIGHT LLP
Nashville City Center
511 Union Street, Suite 2700
Nashville, TN 37219
Telephone: (615) 850-8850

*Counsel for Defendant Apartment Income REIT
Corp., d/b/a AIR Communities*

41

/s/ Danny David
Danny David
danny.david@bakerbotts.com
BAKER BOTTS LLP
910 Louisiana Street
Houston, TX 77002
Telephone: (713) 229-4055

James Kress (*pro hac vice* forthcoming)
james.kress@bakerbotts.com
Paul Cuomo (*pro hac vice* forthcoming)
paul.cuomo@bakerbotts.com
BAKER BOTTS LLP
700 K. Street, NW
Washington, DC 20001
Telephone: (202) 639-7884

John R. Jacobson (#14365)
jjacobson@rjfirm.com
Milton S. McGee, III (#24150)
tmcgee@rjfirm.com
RILEY & JACOBSON, PLC
1906 West End Avenue
Nashville, TN 37203
Telephone: (615) 320-3700

*Counsel for Defendant Avenue5 Residential,
LLC*

/s/ Ian Simmons
Ian Simmons
isimmons@omm.com
O'MELVENY & MYERS LLP
1625 Eye Street, NW
Washington, DC 20006
Telephone: (202) 383-5196

Stephen McIntyre
smcintyre@omm.com
O'MELVENY & MYERS LLP
400 South Hope Street, 18th Floor
Los Angeles, CA 90071
Telephone: (213) 430-6000

*Counsel for Defendants BH Management
Services, LLC and B.HOM Student Living LLC*

/s/ *Marguerite Willis*

Marguerite Willis (admitted *pro hac vice*)
mwillis@maynardnexsen.com
MAYNARD NEXSEN PC
104 South Main Street
Greenville, SC 29601
Telephone: (864) 370-2211

Michael A. Parente (admitted *pro hac vice*)
mparente@maynardnexsen.com
MAYNARD NEXSEN PC
1230 Main Street, Suite 700
Columbia, SC 29201
Telephone: (803) 771-8900

Margaret M. Siller (BPR No. 039058)
msiller@maynardnexsen.com
MAYNARD NEXSEN PC
1131 4th Avenue South, Suite 320
Nashville, Tennessee 37210
Telephone: (629) 258-2253

*Counsel for Defendant Bell Partners, Inc.*

/s/ *Edwin Buffmire*

Edwin Buffmire
ebuffmire@jw.com
Michael Moran
mmoran@jw.com
JACKSON WALKER LLP
2323 Ross Ave., Suite 600
Dallas, TX 75201
Telephone: (214) 953-6000

*Counsel for Defendants Trammell Crow
Residential Company and Crow Holdings, LP*

/s/ James D. Bragdon

James D. Bragdon
jbragdon@gejlaw.com
Sam Cowin
scowin@gejlaw.com
GALLAGHER EVELIUS & JONES LLP
218 N. Charles St., Suite 400
Baltimore, MD 21201
Telephone: (410) 727-7702

Philip A. Giordano (admitted *pro hac vice*)
philip.giordano@hugheshubbard.com
HUGHES HUBBARD & REED LLP
1775 I Street NW
Washington, DC 20007
Telephone: (202) 721-4776

Charles E. Elder, BPR # 038250
celder@bradley.com
BRADLEY ARANTBOULT CUMMINGS LLP
1600 Division Street, Suite 700
Nashville, Tennessee 37203
P: 615.252.3597

*Counsel for Defendant*
*Bozzuto Management Company*

/s/ Yehudah L. Buchweitz

Yehudah L. Buchweitz
yehudah.buchweitz@weil.com
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, NY 10153
Telephone: (212) 310-8256

Jeff L. White
jeff.white@weil.com
WEIL, GOTSHAL & MANGES LLP
2001 M Street, NW
Washington, DC 20036
Telephone: (202) 682-7059

R. Dale Grimes, BPR #006223
dgrimes@bassberry.com
BASS, BERRY & SIMS PLC
150 Third Avenue South, Suite 2800
Nashville, TN 37201
Telephone: (615) 742-6244

*Counsel for Defendant Brookfield Properties*
*Multifamily LLC*

/s/ Danielle R. Foley
Danielle R. Foley (admitted *pro hac vice*)
drfoley@venable.com
Andrew B. Dickson (admitted *pro hac vice*)
abdickson@venable.com
Victoria L. Glover (admitted *pro hac vice*)
VENABLE LLP
600 Massachusetts Avenue, NW
Washington, D.C. 20001
(202) 344-4300

*Counsel for Defendant CH Real Estate Services, LLC*

/s/ Benjamin R. Nagin
Benjamin R. Nagin
bnagin@sidley.com
SIDLEY AUSTIN LLP
787 Seventh Avenue
New York, NY 10019
Telephone: (212) 839-5300

*Counsel for Defendant ConAm Management Corporation*

/s/ Lynn H. Murray
Lynn H. Murray
lhmurray@shb.com
Maveric Ray Searle
msearle@shb.com
SHOOK, HARDY & BACON L.L.P.
111 S. Wacker Dr., Suite 4700
Chicago, IL 60606
Telephone: (312) 704-7766

Ryan Sandrock
rsandrock@shb.com
Shook, Hardy & Bacon L.L.P.
555 Mission Street, Suite 2300
San Francisco, CA 94105
Telephone: (415) 544-1944

Laurie A. Novion
lnovion@shb.com
SHOOK, HARDY & BACON L.L.P.
2555 Grand Blvd.
Kansas City, MO 64108
Telephone: (816) 559-2352

*Counsel for Defendant Camden Property Trust*

45

/s/ Ronald W. Breaux
Ronald W. Breaux
Ron.Breaux@haynesboone.com
Bradley W. Foster
Brad.Foster@haynesboone.com
HAYNES AND BOONE LLP
2801 N. Harwood Street, Suite 2300
Dallas, TX 75201
Telephone: (214) 651-5000
Fax: (214) 200-0376

*Counsel for Defendant CONTI Texas
Organization, Inc. d/b/a CONTI Capital*

/s/ Kenneth Reinker
Kenneth Reinker
kreinker@cgsh.com
CLEARY GOTTLIEB STEEN & HAMILTON LLP
2112 Pennsylvania Avenue, NW
Washington, DC 20037
Telephone: (202) 974-1522

Joseph M. Kay
jkay@cgsh.com
CLEARY GOTTLIEB STEEN & HAMILTON LLP
One Liberty Plaza
New York, NY 10006
Telephone: (212) 225-2745

*Counsel for Defendant Pinnacle Property
Management Services, LLC*

/s/ Todd R. Seelman
Todd R. Seelman
todd.seelman@lewisbrisbois.com
Thomas L. Dyer
thomas.dyer@lewisbrisbois.com
LEWIS BRISBOIS BISGAARD & SMITH LLP
1700 Lincoln Street, Suite 4000
Denver, CO 80203
Telephone: (720) 292-2002

*Counsel for Defendant Cortland Management,
LLC*

/s/ Ann MacDonald
Ann MacDonald
Ann.macdonald@afslaw.com
Barry Hyman
Barry.hyman@afslaw.com
ARENTFOX SCHIFF LLP
233 South Wacker Drive, Suite 7100
Chicago, IL 60606
Telephone: (312) 258-5500

*Counsel for Defendant CWS Apartment Homes,
LLC*

/s/ Bradley C. Weber
Bradley C. Weber (admitted *pro hac vice*)
bweber@lockelord.com
LOCKE LORD LLP
2200 Ross Avenue, Suite 2800
Dallas, TX 75201
Telephone:  (214) 740-8497

*Counsel for Defendant Dayrise Residential,
LLC*

*/s/ Charles H. Samel*
Charles H. Samel
charles.samel@stoel.com
Edward C. Duckers
ed.duckers@stoel.com
STOEL RIVES LLP
1 Montgomery Street, Suite 3230
San Francisco, CA 94104
Telephone: (415) 617-8900

George A. Guthrie
gguthrie@wilkefleury.com
WILKE FLEURY LLP
621 Capitol Mall, Suite 900
Sacramento, CA 95814
Telephone: (916) 441-2430

*Counsel for Defendant FPI Management, Inc.*

.

*/s/ Carl W. Hittinger*
Carl W. Hittinger
chittinger@bakerlaw.com
Alyse F. Stach
astach@bakerlaw.com
Tyson Y. Herrold
therrold@bakerlaw.com
BAKER & HOSTETLER LLP
1735 Market Street, Suite 3300
Philadelphia, PA 19103-7501
Telephone: (215) 568-3100

Stephen J. Zralek, BPR #018971
szralek@spencerfane.com
S. Chase Fann, BPR #036794
cfann@spencerfane.com
SPENCER FANE LLP
511 Union Street, Suite 1000
Nashville, TN 37219
Telephone: (615) 238-6300

*Counsel for Defendant Equity Residential*

*/s/ Leo D. Caseria*
Leo D. Caseria
lcaseria@sheppardmullin.com
Helen C. Eckert
heckert@sheppardmullin.com
SHEPPARD MULLIN RICHTER & HAMPTON LLP
2099 Pennsylvania Avenue, NW, Suite 100
Washington, DC, 20006
Telephone: (202) 747-1925

Arman Oruc
aoruc@goodwinlaw.com
GOODWIN PROCTER, LLP
1900 N Street, NW
Washington, DC 20036
Telephone: (202) 346-4000

*Counsel for Defendant Essex Property Trust, Inc.*

/s/ *Michael D. Bonanno*
Michael D. Bonanno (admitted *pro hac vice*)
mikebonanno@quinnemanuel.com
QUINN EMANUEL URQUHART & SULLIVAN LLP
1300 I St. NW, Suite 900
Washington, DC 20005
Telephone: (202) 538-8225

Christopher Daniel Kercher (admitted *pro hac vice*)
christopherkercher@quinnemanuel.com
QUINN EMANUEL URQUHART & SULLIVAN LLP
51 Madison Avenue, 22nd Floor,
New York, New York 10010
Telephone: (212) 849-7000

Andrew Gardella, Esq. (TN Bar #027247)
agardella@martintate.com
MARTIN, TATE, MORROW & MARSTON P.C.
315 Deaderick Street, Suite 1550
Nashville, TN 37238
Telephone: (615) 627-0668

*Counsel for Defendant Highmark Residential, LLC*

/s/ *Cliff A. Wade*
Cliff A. Wade
cliff.wade@bakerlopez.com
Chelsea L. Futrell
chelsea.futrell@bakerlopez.com
BAKER LOPEZ PLLC
5728 LBJ Freeway, Suite 150
Dallas, Texas 75240
Telephone: (469) 206-9384

*Counsel for Defendant Knightvest Residential*

/s/ *Michael M. Maddigan*
Michael M. Maddigan
michael.maddigan@hoganlovells.com
HOGAN LOVELLS US LLP
1999 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067
Telephone: (310) 785-4727

William L. Monts, III
william.monts@hoganlovells.com
Benjamin F. Holt
benjamin.holt@hoganlovells.com
HOGAN LOVELLS US LLP
555 Thirteenth Street, NW
Washington, DC 20004
Telephone: (202) 637-6440

Joshua C. Cumby (BPR No. 37949)
joshua.cumby@arlaw.com
F. Laurens Brock (BPR No. 17666)
larry.brock@arlaw.com
Rocklan W. King, III (BPR No. 30643)
rocky.king@arlaw.com
ADAMS AND REESE LLP
1600 West End Avenue, Suite 1400
Nashville, Tennessee 37203
Telephone: (615) 259-1450

*Counsel for Defendant Greystar Management Services, LLC*

48

/s/ Gregory J. Casas
Gregory J. Casas (admitted *pro hac vice*)
casasg@gtlaw.com
Emily W. Collins (admitted *pro hac vice*)
Emily.Collins@gtlaw.com
GREENBERG TRAURIG, LLP
300 West 6th Street, Suite 2050
Austin, TX 78701-4052
Telephone: (512) 320-7200

Robert J. Herrington (admitted *pro hac vice*)
Robert.Herrington@gtlaw.com
GREENBERG TRAURIG, LLP
1840 Century Park East, Suite 1900
Los Angeles, CA 90067
Telephone: (310) 586-7700

Becky L. Caruso (admitted *pro hac vice*)
Becky.Caruso@gtlaw.com
GREENBERG TRAURIG, LLP
500 Campus Drive, Suite 400
Florham Park, NJ 07932
Telephone: (973) 443-3252

/s/ Ryan T. Holt
Ryan T. Holt (No. 30191)
rholt@srvhlaw.com
Mark Alexander Carver (No. 36754)
acarver@srvhlaw.com
SHERRARD ROE VOIGT & HARBISON, PLC
150 Third Avenue South, Suite 1100
Nashville, Tennessee 37201
Tel. (615) 742-4200

*Counsel for Defendant Lincoln Property
Company*

/s/ John J. Sullivan
John J. Sullivan (admitted *pro hac vice*)
jsullivan@cozen.com
COZEN O'CONNOR P.C.
3 WTC, 175 Greenwich St., 55th Floor
New York, NY 10007
Telephone: (212) 453-3729

Molly Rucki (admitted *pro hac vice*)
mrucki@cozen.com
COZEN O'CONNOR P.C.
1200 19th St. NW, Suite 300
Washington, DC 20036
Telephone: (202) 912-4884

*Counsel for Defendant Independence Realty
Trust, Inc.*

/s/ Eliot Turner
Eliot Turner
eliot.turner@nortonrosefulbright.com
NORTON ROSE FULBRIGHT US LLP
1301 McKinney, Suite 5100,
Houston, Texas 77010
Telephone: (713) 651-5151

*Counsel for Defendant Kairoi Management,
LLC*

/s/ Michael W. Scarborough
Michael W. Scarborough (admitted *pro hac vice*)
mscarborough@velaw.com
Dylan I. Ballard (admitted *pro hac vice*)
dballard@velaw.com
VINSON & ELKINS LLP
555 Mission Street, Suite 2000
San Francisco, CA 94105
Telephone: (415) 979-6900

*Counsel for Defendant Lantower Luxury Living, LLC*

/s/ Britt M. Miller
Britt M. Miller (admitted *pro hac vice*)
bmiller@mayerbrown.com
Daniel T. Fenske (admitted *pro hac vice*)
dfenske@mayerbrown.com
Matthew D. Provance (admitted *pro hac vice*)
mprovance@mayerbrown.com
MAYER BROWN LLP
71 South Wacker Drive
Chicago, IL 6006
Telephone: (312) 701-8663

Scott D. Carey (#15406)
scarey@bakerdonelson.com
Ryan P. Loofbourrow (#33414)
rloofbourrow@bakerdonelson.com
BAKER, DONELSON, BEARMAN, CALDWELL & BERKOWITZ, P.C.
1600 West End Avenue, Suite 2000
Nashville, TN 37203
Telephone: (615) 726-5600

*Counsel for Defendants Mid-America Apartment Communities, Inc. and Mid-America Apartments, L.P.*

/s/ Judith A. Zahid
Judith A. Zahid (admitted *pro hac vice*)
jzahid@zellelaw.com
Heather T. Rankie (admitted *pro hac vice*)
hrankie@zellelaw.com
ZELLE LLP
555 12th Street, Suite 1230
Oakland, CA 94607
Telephone: (415) 633-1916

*Counsel for Defendant Prometheus Real Estate Group, Inc.*

50

/s/ Jeffrey C. Bank

Jeffrey C. Bank
jbank@wsgr.com
WILSON SONSINI GOODRICH & ROSATI PC
1700 K Street NW, Fifth Floor
Washington, DC 20006
Telephone: (202) 973-8800

*Counsel for Defendant Morgan Properties*
*Management Company, LLC*

/s/ Richard P. Sybert

Richard P. Sybert (WSBA No. 8357)
rsybert@grsm.com
GORDON REES SCULLY MANSUKHANI
701 Fifth Avenue, Suite 2100
Seattle, WA 98104
Telephone: (206) 321-5222

*Counsel for Defendant Rose Associates Inc.*
*and First Communities Management, Inc.*

/s/ Valentine Hoy
Valentine Hoy
vhoy@allenmatkins.com
Scott Perlin
sperlin@allenmatkins.com
ALLEN MATKINS LECK GAMBLE MALLORY &
NATSIS
600 West Broadway, 27th Floor
San Diego, CA 92101
Telephone: (619) 233-1155

Patrick E. Breen
pbreen@allenmatkins.com
ALLEN MATKINS LECK GAMBLE MALLORY &
NATSIS
865 South Figueroa Street, Suite 2800
Los Angeles, CA 90017
Telephone: (213) 622-5555

*Counsel for Defendant Sares Regis Group Commercial, Inc.*

/s/ Jose Dino Vasquez
Jose Dino Vasquez
dvasquez@karrtuttle.com
Jason Hoeft
jhoeft@karrtuttle.com
KARR TUTTLE CAMPBELL
701 Fifth Avenue, Suite 3300
Seattle, WA 98104
Telephone: (206) 223-1313

*Counsel for Defendant Security Properties Residential, LLC*

/s/ David A. Walton
David A. Walton
dwalton@bellnunnally.com
Troy Lee (T.J.) Hales
thales@bellnunnally.com
BELL NUNNALLY & MARTIN, LLP
2323 Ross Avenue, Suite 1900
Dallas, TX 75201

*Counsel for Defendant RPM Living, LLC*

/s/ Diane R. Hazel
Diane R. Hazel
dhazel@foley.com
FOLEY & LARDNER LLP
1400 16th Street, Suite 200
Denver, CO 80202
Telephone: (720) 437-2000

Elizabeth A. N. Haas (admitted *pro hac vice*)
ehaas@foley.com
Ian Hampton (admitted *pro hac vice*)
ihampton@foley.com
FOLEY & LARDNER LLP
777 East Wisconsin Avenue
Milwaukee, WI 53202
Telephone: (414) 271-2400

Tara L. Swafford, BPR #17577
tara@swaffordlawfirm.com
Dylan Harper, BPR #36820
dylan@swaffordlawfirm.com
THE SWAFFORD LAW FIRM, PLLC
321 Billingsly Court, Suite 19
Franklin, Tennessee 37067
Telephone: (615) 599-8406

*Counsel for Defendant Sherman Associates, Inc.*

/s/ Brent Justus
Brent Justus
bjustus@mcguirewoods.com
Nick Giles
ngiles@mcguirewoods.com
MCGUIREWOODS LLP
800 East Canal Street
Richmond, VA 23219-3916
Telephone: (804) 775-1000

*Counsel for Defendant Simpson Property Group, LLC*

/s/ Andrew Harris
Andrew Harris
Andrew.Harris@Levittboccio.com
LEVITT & BOCCIO, LLP
423 West 55th Street
New York, NY 10019
Telephone: (212) 801-1104

/s/ Nicholas A. Gravante, Jr.
Nicholas A. Gravante, Jr. (admitted *pro hac vice*)
nicholas.gravante@cwt.com
Philip J. Iovieno (admitted *pro hac vice*)
philp.iovieno@cwt.com
CADWALADER, WICKERSHAM & TAFT LLP
200 Liberty Street
New York, NY 10281
Telephone: (212) 504-6000

*Counsel for Defendants The Related Companies, L.P. and Related Management Company, L.P.*

/s/ Yonaton Rosenzweig
Yonaton Rosenzweig
yonirosenzweig@dwt.com
DAVIS WRIGHT TREMAINE LLP
865 S. Figueroa Street, Suite 2400
Los Angeles, CA 90017

Fred B. Burnside
fredburnside@dwt.com
MaryAnn T. Almeida
maryannalmeida@dwt.com
DAVIS WRIGHT TREMAINE LLP
920 Fifth Avenue, Suite 3300
Seattle, WA 98104
Telephone: (206) 757-8016

*Counsel for Defendant Mission Rock Residential, LLC*

/s/ Benjamin I. VandenBerghe
Benjamin I. VandenBerghe
biv@montgomerypurdue.com
Kaya R. Lurie
klurie@montgomerypurdue.com
MONTGOMERY PURDUE PLLC
701 Fifth Avenue, Suite 5500
Seattle, Washington 98104-7096

*Counsel for Defendant Thrive Communities Management, LLC*

*/s/ David D. Cross*

David D. Cross (admitted *pro hac vice*)
dcross@mofo.com
Jeffrey A. Jaeckel (admitted *pro hac vice*)
jjaeckel@mofo.com
Robert W. Manoso (admitted *pro hac vice*)
rmanoso@mofo.com
MORRISON & FOERSTER LLP
2100 L Street, NW, Suite 900
Washington, D.C., 20037
Telephone: (202) 887-1500

Eliot A. Adelson (admitted *pro hac vice*)
eadelson@mofo.com
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, CA 94105
Telephone: (415) 268-7000

Mika M. Fitzgerald (admitted *pro hac vice*)
mfitzgerald@mofo.com
MORRISON & FOERSTER LLP
250 W 55th Street
New York, NY 10019
Telephone: (212) 468-8000

*/s/ Joshua L. Burgener*

Joshua L. Burgener
jburgener@dickinsonwright.com
DICKINSON WRIGHT PLLC
424 Church Street, Suite 800
Nashville, TN 37219
Telephone: (615) 620-1757

*Counsel for Defendant UDR, Inc.*

*/s/ Craig Seebald*

Jessalyn H. Zeigler
jzeigler@bassberry.com
BASS, BERRY & SIMS, PLC
150 Third Avenue South
Suite 2800
Nashville, TN 37201
Telephone: (615) 742-6200

Craig P. Seebald (admitted *pro hac vice*)
cseebald@velaw.com
Stephen M. Medlock (admitted *pro hac vice*)
smedlock@velaw.com
Molly McDonald
mmcdonald@velaw.com
VINSON & ELKINS LLP
2200 Pennsylvania Ave., N.W.
Suite 500 West
Washington, D.C. 20037
Telephone: (202) 639-6500

Christopher W. James (admitted *pro hac vice*)
cjames@velaw.com
VINSON & ELKINS LLP
555 Mission Street
Suite 2000
San Francisco, CA 94105
Telephone: (415) 979-6900

*Counsel for Defendant Windsor Property Management Company*

/s/ Evan Fray-Witzer
Evan Fray-Witzer
Evan@CFWLegal.com
CIAMPA FRAY-WITZER, LLP
20 Park Plaza, Suite 505
Boston, MA 02116
Telephone: 617-426-0000

*Counsel for Defendants WinnCompanies LLC, and WinnResidential Manager Corp.*

/s/ Ferdose al-Taie
Ferdose al-Taie (admitted *pro hac vice*)
faltaie@bakerdonelson.com
BAKER, DONELSON, BEARMAN CALDWELL &
BERKOWITZ, P.C.
956 Sherry Lane, 20th Floor
Dallas, TX 75225
Telephone: (214) 391-7210

Christopher E. Thorsen (BPR # 21049)
cthorsen@bakerdonelson.com
BAKER, DONELSON, BEARMAN CALDWELL &
BERKOWITZ, P.C.
Baker Donelson Center, Suite 800
211 Commerce Street
Nashville, TN 37201
Telephone: (615) 726-5600

*Counsel for Defendant ZRS Management, LLC*

/s/ James H. Mutchnik
James H. Mutchnik
james.mutchnik@kirkland.com
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, IL 60654
Telephone: (312) 862-2000

*Counsel for Defendants Thoma Bravo L.P., Thoma Bravo Fund XIII, L.P., and Thoma Bravo Fund XIV, L.P.*

/s/ Jeffrey S. Cashdan
Jeffrey S. Cashdan (admitted *pro hac vice*)
jcashdan@kslaw.com
Emily S. Newton (admitted *pro hac vice*)
enewton@kslaw.com
Lohr A. Beck (admitted *pro hac vice*)
lohr.beck@kslaw.com
Carley H. Thompson (admitted *pro hac vice*)
chthompson@kslaw.com
KING & SPALDING LLP
1180 Peachtree Street, NE, Suite 1600
Atlanta, Georgia 30309
Telephone: (404) 572-4600

*Counsel for Defendant ECI Group, Inc.*

/s/ *Sarah B. Miller*
Sarah B. Miller (TN#33441)
smiller@bassberry.com
BASS, BERRY & SIMS PLC
150 Third Ave. South #2800
Nashville, TN 37201
Telephone: (615) 742-6200

Amy F. Sorenson (*pro hac vice* forthcoming)
asorenson@swlaw.com
SNELL & WILMER, L.L.P
15 West South Temple, Ste. 1200
Salt Lake City, UT 84101
Telephone: (801) 257-1900

Colin P. Ahler (*pro hac vice* forthcoming)
cahler@swlaw.com
SNELL & WILMER, L.L.P
One East Washington St., Ste. 2700
Phoenix, AZ 85004
Telephone: (602) 382-6000

*Counsel for Defendant Apartment Management Consultants, LLC*

**CERTIFICATE OF SERVICE**

I hereby certify that on October 9, 2023, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all attorneys of record registered on the CM/ECF system.

DATED this 9th day of October, 2023.


_____ /s/ *Jay Srinivasan* _____
Jay Srinivasan