**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | |
|---|---|
| IN RE: REALPAGE, INC., RENTAL SOFTWARE ANTITRUST LITIGATION (NO. II) | Case No. 3:23-md-3071<br>MDL No. 3071<br><br>**JURY DEMAND**<br><br>Chief Judge Waverly D. Crenshaw, Jr.<br><br>**This Document Relates to:**<br>**3:23-md-3071**<br>**3:23-cv-440** |

# PLAINTIFFS' MEMORANDUM OF LAW
# IN OPPOSITION TO BELL PARTNERS INC.'S MOTION
# TO DISMISS PLAINTIFF NANCY ALEXANDER AND RELATED CLAIMS

## I. INTRODUCTION AND PLEADING STANDARD

Defendant Bell Partners Inc.'s ("Bell") motion to dismiss Plaintiff Nancy Alexander's ("Alexander") claims against Bell—and ***only*** Alexander's claims—is an exercise in futility. Bell's individual motion to dismiss does not contest the plausibility of the claims against it arising from conduct in eighteen different submarkets,[1] instead taking issue only with the plausibility of the claims against it arising from conduct in the Asheville, NC submarket. Mot. at 1. This means that even if Bell's motion were granted, Bell would remain as a live defendant as to every other named plaintiff in this multidistrict litigation and Alexander would remain a named plaintiff as to every other defendant. More to the point, however, is that Bell's motion is predicated on a misreading of the operative complaint and a misunderstanding of the pleading standards in antitrust cases.

Plaintiffs' burden at the pleading stage is merely to draft "a complaint with enough factual matter (taken as true) to suggest that" a violation of the Sherman Act occurred. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556 (2007); *id.* at 570 (Rule 12(b)(6) does "not require heightened fact pleading of specifics"). Contrary to the premise of Bell's motion, "there simply is no requirement that an antitrust plaintiff draw the boundaries of the alleged conspiracy (or conspiracies) in a complaint with the precision of a diamond cutter." *In re Capacitors Antitrust Litig.*, 106 F. Supp. 3d 1051, 1066 (N.D. Cal. 2015). Instead, fact-bound questions pertaining to the scope and efficacy of an alleged cartel are ones "that require[] analysis of complex economic theories and data" and as such are improper to resolve at the pleading stage. *In re Broiler Chicken Antitrust Litig.*, 290 F. Supp. 3d 772, 804-05 (N.D. Ill. 2017); *In re Se. Milk Antitrust Litig.*, 555 F. Supp. 2d 934, 943 (E.D. Tenn. 2008) (complaint need not answer "all specific questions about '*who,* what, when *and*

---

[1] The unchallenged submarkets include Atlanta, Austin, Baltimore, Boston, Charlotte, Dallas-Fort Worth, Denver, Jacksonville, Los Angeles, Orlando, Raleigh, San Antonio, San Diego, San Francisco, Seattle, Tampa, Washington, and Wilmington. ¶ 76.

*where*'") (emphases added); *In re Packaged Ice Antitrust Litig.*, 723 F. Supp. 2d 987, 1008 (E.D. Mich. 2010) (denying motion to dismiss over Defendants' repeated "refrain throughout their briefs" that the complaint omitted "*the who*, what, when *and where*" of the conspiracy) (emphases added). Bell's motion begs this Court to engage in premature adjudications concerning, *inter alia*, the specifics of the geographic scope and complete membership of the alleged cartel before discovery has commenced. That exercise is simply improper at the pleading stage of this case.

Nonetheless, while Plaintiffs explain below how each of Bell's arguments are incorrect, Plaintiffs will soon be filing a notice of voluntary dismissal without prejudice of Alexander's claims against Bell only.[2] Plaintiffs do so only to streamline the pleading stage of this case, and reserve for summary judgment—where the parties and the Court will have the benefit of fact and expert discovery—all questions about the scope of the alleged cartel and its efficacy.

## II. FACTUAL BACKGROUND

Ms. Alexander is formerly a resident of Asheville, North Carolina, where she leased a multifamily unit from Bell. ¶ 53. The Complaint[3] alleges that, as a result of the conspiracy, Ms. Alexander paid higher rental prices than she otherwise would have. *Id.*[4]

With respect to the alleged conspiracy, the Complaint explains how Bell participated:

> During the Conspiracy Period, Bell Partners entered a written contract, paid for, and used at least two RealPage RMS—YieldStar and LRO—to manage some or all of its approximately 69,000 multifamily rental units nationwide, knowing that doing so required it to share confidential, competitively sensitive pricing and lease information with its horizontal competitors in order to allow them to adjust their rental prices, and in turn, to allow Bell Partners to benefit from its horizontal competitors' sensitive pricing and lease information before it set or adjusted its own rental prices . . . . By agreeing to regularly share confidential, competitively sensitive pricing and lease

---

[2] Plaintiff Alexander will not dismiss the other Defendants named in her suit. Those Defendants did not join Bell's present motion.
[3] Unless otherwise noted, references to "¶" or "¶¶" are to paragraphs from the Plaintiffs' Second Amended Consolidated Class Action Complaint, Dkt. 530 ("Complaint").
[4] Another named Plaintiff, Jeffrey Weaver, also rented from Bell, in Denver, Colorado, and similarly alleges that he paid higher rental prices to Bell as a result of the conspiracy. ¶ 51.

information with horizontal competitors in order to allow them to adjust prices, Bell Partners agreed to join a cartel with those horizontal competitors. The conspiracy resulted in higher prices for multifamily residential leases across the nation and in each submarket in which Bell Partners operates.

(¶¶ 77-78.). Crucially, the Complaint identifies Bell's horizontal competitors: "From among the named Defendants in this litigation, Bell Partner's horizontal competitors and their agents include each 'Owner,' 'Owner-Operator,' and 'Managing Defendant' that operates in the same regional submarkets as Bell Partners." ¶ 76. The Complaint also includes admissions directly from Bell that its use of RealPage's RMS caused it to inflate overall rents by 2-5% overall:

> An article published by the NAA and written by Hale McNinch, the former Vice President of Revenue Management for [Bell], highlights this. McNinch touts how "Bell Partner continues to optimize its rents through revenue management technology." In fact, Bell had "seen a 2 percent to 5 percent revenue lift as a result of the technology. Knowing this, it's surprising that many operators still don't use the technology to enhance their revenue."

¶ 39. While the Complaint includes an illustrative example of 45 Metropolitan Statistical Areas ("MSAs") that felt anticompetitive effects from this scheme, ¶¶ 406, 680, the Complaint does not limit the cartel's boundaries to those MSAs, and instead alleges a nationwide conspiracy, on behalf of a nationwide class, seeking to recover from known (and some unknown) co-conspirators. ¶ 405.[5]

## III. ARGUMENT

### A. Alexander Alleges a *Per Se* Unlawful Horizontal Conspiracy Including Bell.

Bell first argues that Ms. Alexander's *per se* claim must fail because the Complaint does not allege any agreement between Bell Partners and any horizontal competitor. Mot. at 4. This is incorrect. As to Bell, the Complaint describes its participation in the conspiracy (¶¶ 77-78) and

---

[5] *E.g.*, ¶ 679 ("While Plaintiffs have identified the foregoing distinct geographic sub-markets, Plaintiffs anticipate that additional submarkets and co-conspirators will be uncovered in the course of discovery and upon expert analysis of the data produced, given that Defendants operate nationwide. Additional sub-markets will be included as appropriate, after sufficient discovery.").

identifies Bell's horizontal competitors (¶ 76). These allegations provide notice of the claims alleged by Plaintiffs (including Alexander). *Se. Milk*, 555 F. Supp. 2d at 943 (A complaint must simply "put defendants on notice concerning the basic nature of [plaintiff's] complaints against the defendants and the grounds upon which their claims exist."). The Complaint lays out how Defendants, including Bell, have a "common understanding" or "unity of purpose" to fix prices for multifamily residential leases, with those effects being felt throughout the United States. *Hyland v. HomeServices of Am., Inc.*, 771 F.3d 310, 318 (6th Cir. 2014). Nothing more is required.

Indeed, while Bell complains about the lack of specifics pertaining to an Asheville geographic market, Mot. at 5, such allegations (whether for Asheville or any other MSA) are unnecessary in the context of *per se* unlawful price-fixing scheme among horizontal competitors.[6] None of the cases cited by Bell support its argument to the contrary. Two of Bell's cases concern the inapposite *Copperweld* doctrine which governs when entities within the same corporate family have the capacity to conspire with one another. *American Needle, Inc. v. National Football League*, 560 U.S. 183, 190 (2010); *Nurse Midwifery Assocs. v. Hibbett*, 689 F. Supp. 799, 803 (M.D. Tenn. 1988). *Total Benefits* also involved the *Copperweld* doctrine, and only after concluding that defendants were related entities in a vertical (not horizontal) relationship lacking the capacity to conspire with one another did the Sixth Circuit dismiss because of the plaintiff's failure to *even attempt* to plead a relevant product and geographic market. *Total Benefits Planning Agency, Inc. v. Anthem Blue Cross Blue Sheild*, 552 F.3d 430, 435, 437 (6th Cir. 2008). Here, Bell does not contest that it is implicated in a restraint of trade among horizontal competitors covering *at least* 18 MSAs. ¶ 76. And in *Caudill*, the plaintiff did not bring horizontal price-fixing claims either, but instead challenged *unilateral*

---

[6] *NCAA v. Board of Regents of the Univ. of Okla.*, 468 U.S. 85, 109–10 (1984); *U.S. v. Apple, Inc.*, 791 F.3d 290, 328 (2nd Cir. 2015) ("[W]hen the agreement at issue involves price fixing, the Supreme Court has consistently held that courts need not even conduct an extensive analysis of "market power" or a "detailed market analysis" to demonstrate its anticompetitive character.").

*conduct by a single firm* imposing a non-compete agreement on its employees. Without any allegations of concerted action, the ordinary rule "that covenants not to compete" in "employment relationships" were "subject to the rule of reason." *Caudill v. Lancaster Bingo Co.*, 2005 WL 2738930, at *4 (S.D. Ohio Oct. 24, 2005). Bell's cases simply do not support its argument.

**B.     Alexander's Claim against Bell Also Survives Under the Rule of Reason.**

Even if the Court were to examine Bell's conduct under a Rule of Reason analysis, her claim would survive. First, Plaintiffs have plausibly alleged anticompetitive effects nationwide, including from Bell's own admissions. Given this evidence of direct anticompetitive effects, there is no need to conduct any further market analysis. *See, e.g.*, *FTC v. Ind. Fed'n of Dentists*, 476 U.S. 447, 460-61 (1986) ("Since the purpose of the inquiries into market definition and market power is to determine whether an arrangement has the potential for genuine adverse effects on competition, 'proof of actual detrimental effects, such as a reduction of output,' can obviate the need for an inquiry into market power, which is but a 'surrogate for detrimental effects.'") (internal citation omitted).

Second, Plaintiffs have plausibly alleged Bell's participation in the alleged restraint in at least 18 MSAs. Bell contests that market definition. MTD at 6-7. As an initial matter, "[b]ecause market definition is a deeply fact-intensive inquiry, courts hesitate to grant motions to dismiss for failure to plead a relevant [] market." *Todd v. Exxon Corp.*, 275 F.3d 191, 199–200 (2d Cir. 2001) (Sotomayor, J.) (collecting cases). At the motion to dismiss stage, a plaintiff must plead a market that is "plausible" and "rational." *Id*. (citations omitted). "The geographic market analysis is fact specific and may require additional support at later phases of litigation." *Jones v. Varsity Brands, LLC*, 618 F. Supp. 3d 725, 754 (W.D. Tenn. 2022), *on reconsideration,* 2023 WL 5662590 (W.D. Tenn. Aug. 31, 2023) (internal citations omitted).

Here, Plaintiffs have plausibly defined relevant regional submarkets, and include specific allegations as to 45 illustrative MSAs, 18 of which implicate Bell. *See, e.g.*, ¶ 679 ("Plaintiffs allege that Defendants' scheme harmed competition in **at least** the following MSAs . . ."). The Complaint provides notice that "Plaintiffs anticipate that additional submarkets . . . will be uncovered in the course of discovery . . . given that Defendants operate nationwide" and that "[a]dditional sub-markets will be included as appropriate, after sufficient discovery." Bell is reasonably on notice that it is liable for its conduct within all of the submarkets in which it operates.

Bell argues that a national market cannot be sustained. Mot. at 6. This argument is a strawman. Plaintiffs plead nationwide effects, but not a nationwide geographic market. Bell cites no authority supporting its claim that at the pleading stage and without discovery, Plaintiffs must plead with particularity the precise boundaries of the alleged cartel. Bell's only cited case, *Semertzides v. Bethesda N. Hosp.*, 2014 WL 2573073 (S.D. Ohio June 9, 2014), *aff'd*, 608 F. App'x 378 (6th Cir. 2015), is easily distinguished. There, the plaintiff pled multiple definitions for a *single* geographic market identifying the "Tri-State area" but also "Ohio, Kentucky, Indiana and beyond" as the sole relevant market. *Id.* at *4. Here, Plaintiffs are alleging submarkets, none of which overlap, not two conflicting or overlapping relevant geographic markets.

Bell appears to go on to claim that Plaintiffs (including Alexander) have not alleged any anticompetitive harm in the Asheville market specifically. Mot. at 7. This is not required, but it is also not correct. Contrary to Bell's representations, the Complaint's allegations of anticompetitive harm are not limited to the 45 illustrative MSAs enumerated in the complaint. Instead, Plaintiffs, including Alexander, have plausibly alleged that Bell and its co-conspirators' anticompetitive harm was nationwide in scope. ¶ 405 ("RealPage's RMS operate throughout the country in the same way, accounting for any regional variations in rental market conditions. Tenants across the

6

country are impacted by the conspiracy facilitated by RealPage, as nationwide rental prices increase and output declines."). This argument fails as well.

    C.    **Ms. Alexander Alleges Antitrust Injury.**

Finally, Bell says in several places in its brief that Alexander cannot allege antitrust injury, but it provides no actual argument or citation to authority supporting that conclusion. An antitrust plaintiff plausibly alleges antitrust injury where the "allegations as a whole fall within the type of injury that the antitrust laws were designed to prevent" and Plaintiffs allege a causal connection between Defendants' conduct and that injury. *In re Skelaxin (Metaxalone) Antitrust Litig.*, 2013 WL 2181185, at *13 (E.D. Tenn. May 20, 2013).

Alexander alleges that she paid higher prices as a result of the alleged cartel, ¶ 53, and Bell admits that it was able to increase prices as a result of the alleged cartel, ¶ 39. "Overcharges to consumers resulting from a defendant's anticompetitive conduct" are the "type of injury that the antitrust laws were designed to prevent." *Skelaxin*, 2013 WL 2181185, at *13.

**IV.    CONCLUSION**

For the foregoing reasons, Bell's motion fails substantively on its merits; however, in light of the forthcoming notice of voluntary dismissal without prejudice of Alexander's claims against Bell, Bell's arguments are procedurally mooted and such arguments concerning the scope and efficacy of the alleged cartel are properly reserved for consideration at the merits stage of the case, where they can be decided in the context of fact and expert discovery.

Dated: November 8, 2023        */s/ Tricia R. Herzfeld*
                                              Tricia R. Herzfeld (#26014)
                                              Anthony A. Orlandi (#33988)
                                              **HERZFELD SUETHOLZ GASTEL LENISKI AND WALL, PLLC**
                                              223 Rosa L. Parks Avenue, Suite 300
                                              Nashville, TN 37203

Telephone: (615) 800-6225
tricia@hsglawgroup.com
tony@hsglawgroup.com

*Liaison Counsel*

Patrick J. Coughlin
Carmen A. Medici
Fatima Brizuela
**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
600 West Broadway, Suite 3300
San Diego, CA 92101
Telephone: (619) 798-5325
Facsimile: (619) 233-0508
pcoughlin@scott-scott.com
cmedici@scott-scott.com
fbrizuela@scott-scott.com


Patrick McGahan
Amanda F. Lawrence
Michael Srodoski
G. Dustin Foster
Isabella De Lisi
**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
156 South Main Street
P.O. Box 192
Colchester, CT 06145
Telephone: (860) 537-5537
Facsimile:  (860) 537-4432
pmcgahan@scott-scott.com
alawrence@scott-scott.com
msrodoski@scott-scott.com
gfoster@scott-scott.com
idelisi@scott-scott.com

Stacey Slaughter
Thomas J. Undlin
Geoffrey H. Kozen
Stephanie A. Chen
J. Austin Hurt
**ROBINS KAPLAN LLP**
800 LaSalle Avenue, Suite 2800
Minneapolis, MN 55402
Telephone:  (612) 349-8500
Facsimile:  (612) 339-4181

sslaughter@robinskaplan.com
tundlin@robinskaplan.com
gkozen@robinskaplan.com
schen@robinskaplan.com
ahurt@robinskaplan.com

Swathi Bojedla
Mandy Boltax
**HAUSFELD LLP**
888 16th Street, N.W., Suite 300
Washington, DC 20006
Telephone: (202) 540-7200
sbojedla@hausfeld.com
mboltax@hausfeld.com

Gary I. Smith, Jr.
**HAUSFELD LLP**
600 Montgomery Street, Suite 3200
San Francisco, CA 94111
Tel: (415) 633-1908
gsmith@hausfeld.com

Katie R. Beran
**HAUSFELD LLP**
325 Chestnut Street, Suite 900
Philadelphia, PA 19106
Telephone: 1 215 985 3270
kberan@hausfeld.com

*Interim Co-Lead Counsel*

Eric L. Cramer
Michaela L. Wallin
**BERGER MONTAGUE PC**
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Telephone: (215) 875-3000
ecramer@bm.net
mwallin@bm.net

Daniel J. Walker
**BERGER MONTAGUE PC**
2001 Pennsylvania Avenue, NW, Suite 300
Washington, DC 20006
Telephone: (202) 559-9745
dwalker@bm.net

Brendan P. Glackin
Dean M. Harvey
**LIEFF CABRASER HEIMANN & BERNSTEIN, LLP**
275 Battery Street, Suite 2900
San Francisco, CA 94111
Telephone: 415-956-1000
bglackin@lchb.com
dharvey@lchb.com

Mark P. Chalos
Hannah R. Lazarz
Kenneth S. Byrd
**LIEFF CABRASER HEIMANN & BERNSTEIN, LLP**
222 2nd Avenue South, Ste. 1640
Nashville, TN 37201
(615) 313-9000
mchalos@lchb.com
hlazarz@lchb.com
kbyrd@lchb.com

Steve W. Berman
Breanna Van Engelen
**HAGENS BERMAN SOBOL SHAPIRO LLP**
1301 Second Avenue, Suite 2000
Seattle, Washington 98101
Telephone: (206) 623-7292

Christian P. Levis
Vincent Briganti
Peter Demato
Radhika Gupta
**LOWEY DANNENBERG, P.C.**
44 South Broadway, Suite 1100
White Plains, NY 10601
Telephone: (914) 997-0500
Facsimile: (914) 997-0035
vbriganti@lowey.com
clevis@lowey.com
pdemato@lowey.com
rgupta@lowey.com

Christopher M. Burke
Walter W. Noss
Yifan (Kate) Lv
**KOREIN TILLERY P.C.**
707 Broadway, Suite 1410
San Diego, CA 92101
Telephone: (619) 625-5621
Facsimile (314) 241-3525
cburke@koreintillery.com
wnoss@koreintillery.com
klv@koreintillery.com

Joseph R. Saveri
Steven N. Williams
Cadio Zirpoli
Kevin E. Rayhill
**JOSEPH SAVERI LAW FIRM, LLP**
601 California Street, Suite 1000
San Francisco, CA 94108
Telephone: (415) 500-6800
jsaveri@saverilawfirm.com
swilliams@saverilawfirm.com
czirpoli@saverilawfirm.com
krayhill@saverilawfirm.com

Jennifer W. Sprengel
Daniel O. Herrera
Alexander Sweatman
**CAFFERTY CLOBES MERIWETHER & SPRENGEL LLP**
135 S. LaSalle, Suite 3210
Chicago, IL 60603

10

Facsimile: (206) 623-0594
steve@hbsslaw.com
breannav@hbsslaw.com

Benjamin J. Widlanski
Javier A. Lopez
**KOZYAK TROPIN & THROCKMORTON LLP**
2525 Ponce de Leon Blvd., 9th Floor
Coral Gables, Florida 33134
Telephone: (305) 372-1800
bwidlanski@kttlaw.com
jal@kttlaw.com

Telephone: 312-782-4880
Facsimile: 312-782-4485
jsprengel@caffertyclobes.com
dherrera@caffertyclobes.com
asweatman@caffertyclobes.com

*Plaintiffs' Steering Committee Counsel for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that on November 8, 2023, I caused the foregoing to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the email addresses denoted on the Electronic Mail Notice List.

*/s/ Tricia R. Herzfeld*
Tricia R. Herzfeld
