# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF TENNESSEE
# NASHVILLE DIVISION

| | |
|---|---|
| IN RE: REALPAGE, INC., RENTAL SOFTWARE ANTITRUST LITIGATION (NO. II) | Case No. 3:23-md-3071<br>MDL No. 3071<br><br>JURY DEMAND<br><br>Chief Judge Waverly D. Crenshaw, Jr.<br><br>This Document Relates to:<br>ALL CASES |

# PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO CERTAIN DEFENDANTS' MOTION TO DISMISS FOR FAILURE TO PLEAD AGENCY LIABILITY

## I. INTRODUCTION

The Property Management Defendants ("PMDs")[1] are large, sophisticated companies, each managing between 24,000 and 200,000 apartment units nationwide, and are alleged to have done far more than passively use software at the bidding of property owners. The PMDs' contention that they are mere innocent agents cannot be squared with the factual allegations in Plaintiffs' Second Amended Consolidated Class Action Complaint.[2]

The Complaint explicitly delineates how each type of Defendant (whether Manager, Owner, Owner-Operator, or RealPage)[3] participated in the price-fixing cartel. It is irrelevant that some property owners, rather than PMDs, have the ultimate decision-making authority regarding the use of RealPage's Revenue Management Solutions ("RMS"). Even where they do not decide to use RMS, PMDs still joined and knowingly acted in furtherance of the cartel. As the AC explains, the "Managing Defendants act as agents for the property owners and knowingly used RMS to coordinate and agree upon rental housing supply." ¶ 3; *see also* ¶¶ 6, 8-9, 12, 15, 17, 21, 43, 72, 74, 83, 118, 121, 154, 163, 193, 197-99, 227, 380. Each PMD entered into contracts with RealPage directly and paid RealPage for the use of RMS, knowing that doing so required it to share confidential, competitively sensitive lease information for the units it managed with competitors. ¶¶ 21, 43, 72, 74, 83, 118, 121, 154, 163, 193. The PMDs themselves directly and

---

[1] The Complaint names 11 "Managing Defendants." However, only eight of those Defendants brought this Motion: Apartment Management Consultants, LLC ("AMC"), Avenue5 Residential, LLC ("Avenue5"), Bozzuto Management Company ("BMC"), First Communities Management, Inc. ("FCM"), FPI Management, Inc. ("FPI"), Pinnacle Property Management Services, LLC ("Pinnacle"), Rose Associates, Inc. ("Rose"), and ZRS Management, LLC ("ZRS"). The other three—Highmark Residential, LLC ("Highmark"), Mission Rock Residential ("Mission Rock"), and Thrive Communities Management, LLC ("Thrive")—did not join the Motion.

[2] Unless specified otherwise, all references to "¶" or "¶¶" are to paragraphs from the Second Amended Consolidated Class Action Complaint (the "AC" or "Complaint").

[3] Unless otherwise defined herein, all terms are used as defined in the Complaint.

affirmatively provided such proprietary information to RealPage, including actual rents paid, occupancy rates, room and building characteristics, and other lease transaction data, to feed into RMS for the benefit of all cartel members. ¶¶ 15, 17, 227, 380. The PMDs also pursued direct contacts and meetings with non-RealPage cartel members—Owners, Owner-Operators, and other Managing Defendants—to discuss their use of RMS and facilitate price coordination through RealPage-facilitated forums and other industry events. ¶¶ 5, 37, 40, 382-91. And finally, to ensure the scheme's success, the PMDs enforced the internal adoption of RealPage's pricing, including hiring dedicated Pricing Advisors trained by RealPage to monitor compliance with pricing decisions, tying compensation to compliance, and conducting performance reviews directly with RealPage to manage acceptance rates. ¶¶ 11, 20, 269-70, 277, 304. These allegations, taken together, are more than enough to plead the PMDs' conscious commitment to a common scheme to fix the prices of multifamily rental housing. Accordingly, the PMDs' Motion is without merit.

## II. LEGAL STANDARD

In analyzing a motion to dismiss, courts "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." *In re Travel Agent Comm'n Antitrust Litig.*, 583 F.3d 896, 903 (6th Cir. 2009). While *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544 (2007) requires a complaint to "contain factual matter sufficient to identify which allegations pertain to which defendant," *City of Pontiac Police & Fire Ret. Sys. v. Jamison*, 2022 WL 884618, at *9 n.12 (M.D. Tenn. Mar. 24, 2022), "[d]ismissal is not required merely because Plaintiffs did not name each Defendant in the allegations pleaded in support of their Sherman Act claim." *In re Auto. Parts Antitrust Litig.*, 2017 WL 7689654, at *7 (E.D. Mich. May 5, 2017) (citations omitted). "'[L]ump'[ing] Defendants together at [] points in the Complaint" where the allegations apply generally to all Defendants "does not negate or

2

undermine" the validity of the complaint. *Rodriguez v. Providence Cmty. Corr., Inc.*, 191 F. Supp. 3d 758, 772-73 (M.D. Tenn. 2016).

### III. ARGUMENT

#### A. Plaintiffs Sufficiently Allege the Property Management Defendants' Direct Participation in the Antitrust Cartel.

The AC details numerous allegations illustrating the PMDs' direct participation in the antitrust cartel. The PMDs do not dispute that the AC alleges that they each used RealPage's RMS software in connection with its management of multifamily rental properties. ¶¶ 21, 43, 72, 74, 83, 118, 121, 154, 163, 193. In fact, they did more than just passively "use" RealPage's RMS. Each PMD entered into contracts and paid for the use of RMS, knowing that doing so required it to share confidential, competitively sensitive pricing and lease information with competitors. *Id.* The PMDs agreed with Owners, Owner-Operators, and other Managers "to make key competitive decisions regarding the price and supply of multifamily apartments, collectively," including agreeing to adopt RealPage's RMS pricing up to 80-90% of the time. ¶¶ 9, 15. To fulfill this agreement, the PMDs had direct and substantial roles in adopting and enforcing the use of RealPage's pricing at supracompetitive levels, manipulating other lease terms, and sharing non-public proprietary information for the benefit of all other cartel members (including other Managing Defendants who did not join in this Motion). For example:

- PMDs, along with Owners and Owner-Operators, "outsource[d] lease pricing decisions to RealPage's RMS," and "accept[ed] RealPage's pricing 'recommendations.'" ¶¶ 227, 232, 255, 268. Notably, "[t]he price acceptance process begins with the Community Manager[s]," who are "individuals who work for the property management company," and are "responsible for reviewing RealPage's daily pricing recommendations." ¶ 257 n.149.

- In at least one instance, PMD Pinnacle used RealPage to "avoid a situation where there were

- a significant number of units renewing at the same time," by adopting RealPage's recommendations regarding the staggering of lease expirations. ¶ 36. At RealPage's recommendation, Pinnacle also raised rental prices during the COVID-19 pandemic by several hundreds of dollars each month per individual unit. ¶¶ 23, 297.

- PMDs communicated directly and frequently with RealPage by interfacing directly with RealPage Pricing Advisors "to [receive] training and guidance on RealPage's (RMS) and to discuss specific aspects of the system and its processes." ¶¶ 237 n.140, 278. PMDs' on-site managers, regional managers, and even "senior ranking executives from the property management companies," including Vice Presidents and Asset Managers, routinely interfaced with RealPage on a periodic (such as quarterly) basis. *Id.*

- PMDs directly supplied confidential, proprietary data to RealPage. Like the Owners and Owner-Operators, PMDs "input data on actual rents paid and occupancy rates, along with records of lease transactions" to feed into RealPage's RMS algorithms. ¶¶ 15, 380. "This data, which would normally be kept private . . . set coordinated rents among competing property owners and managers." ¶ 380. The PMDs provided this information knowing that it would be used to assist their competitors in pricing their own units. ¶¶ 15, 17, 227, 380.

- At RealPage's encouragement, PMDs pursued direct contacts and meetings with Owners, Owner-Operators, and other Managing Defendants to discuss their use of RMS and exchange confidential, competitively sensitive information. ¶¶ 5, 37, 40. PMDs attended RealPage and other industry and trade events to facilitate information exchanges and coordinate on pricing. ¶¶ 9-11, 37, 382-91. PMDs AMC, Avenue5, Bozzuto, First Communities, FPI, and ZRS, for example, attended events by the National Multifamily Housing Council, and at least Bozzuto and ZRS have been involved with the National Apartment Association, which hosted a

4

RealPage event on the "intangible benefits" of revenue management for "[b]etter, more consistent insight into the competitive market space." ¶¶ 386-88.

- PMDs directly enforced compliance with RealPage's determinations. "RealPage's largest property management clients . . . utiliz[e] RealPage to train their own internal revenue managers" "to monitor the client[]s' compliance with RMS pricing." ¶ 11. "Executives from Owner Defendants, Owner-Operators, and Managing Defendants' companies placed pressure on their leasing managers to implement RealPage's prices," including tying "compensation for certain property management personnel . . . to compliance with RealPage's pricing recommendations." ¶¶ 20, 277, 304. And beginning in late 2019, "property management companies monitor[ed] acceptance rates more closely within their own ranks" using RealPage's Price Optimization 2 product that "Regional Managers or Vice Presidents from the property management company" reviewed with RealPage Pricing Advisors. ¶¶ 269-70.

These allegations, taken as true and evaluated holistically, are sufficient to plead "specific misconduct attributable" to each of the PMDs to support their liability as direct contributors to the cartel. *Prodanova v. H.C. Wainwright & Co., LLC*, 2018 WL 8017791, at *10 (C.D. Cal. Dec. 11, 2018). There is no requirement that a PMD have ultimate decision-making authority (*see* Dkt. 584 ("Br.") at 2, 4-5, 8), given that at a minimum, they knowingly implemented the cartel. *See In re Domestic Airline Travel Antitrust Litig.*, 221 F. Supp. 3d 46, 73 (D.D.C. 2016) ("It is not necessary to plead that each defendant had a role in 'every detail in the execution of the conspiracy . . . , for each conspirator may be performing different tasks to bring about the desired result.'"). Consequently, the PMDs cannot point to their status as "mere" agents of decision-making property owners to escape liability. *See infra* § III. B.

That Plaintiffs purportedly "'lump' Defendants together at [certain] points in the Complaint does not negate or undermine" allegations merely because each Defendant acted in a similar fashion. *Rodriguez*, 191 F. Supp. 3d at 773 ("Plaintiffs allege an overarching conspiracy that unites the Defendants . . . [O]ne might read Plaintiffs' decision to distinguish between the Defendants at various points in the Complaint but not at others to indicate that when they do use the term 'Defendants,' they intend to impute that allegation to all Defendants.").[4] Group pleading does not exist where, as here, the Complaint "specifically alleges that each Defendant agreed to participate in the conspiracy." *Iowa Pub. Employees' Ret. Sys. v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 340 F. Supp. 3d 285, 317 (S.D.N.Y. 2018).

The PMDs cite several cases that rejected group pleading allegations, none of which are applicable to the Complaint here. For example, in *Total Benefits Planning Agency, Inc. v. Anthem Blue Cross & Blue Shield*, the bare-bones 11-page complaint "merely allege[d] that the Anthem Defendants and the other Defendants had agreement and common understanding regarding price[s]," with no allegations for inferring such an agreement beyond the defendants "acting in a similar fashion." 630 F. Supp. 2d 842, 851 (S.D. Ohio 2007), *aff'd*, 552 F.3d 430 (6th Cir. 2008).[5] In contrast, Plaintiffs' AC specifically links the PMDs to the cartel, including allegations of particular activities undertaken by particular Defendants. These activities include, among others,

---

[4] *See also PFS HR Sols., LLC v. Black Wolf Consulting, Inc.*, 2018 WL 5263031, at *2 (E.D. Tenn. June 28, 2018); *In re Auto. Parts Antitrust Litig.*, 2017 WL 7689654, at *7 ("Dismissal is not required merely because Plaintiffs did not name each Defendant in the allegations pleaded in support of their Sherman Act claim.").

[5] The PMDs' other cited cases are similarly distinguishable. *See In re Travel Agent Comm'n Antitrust Litig.*, 2007 WL 3171675, at *3-4, *9 (N.D. Ohio, Oct. 29, 2007) (no allegations tying defendants to any common understanding) *aff'd*, 583 F.3d 896 (6th Cir. 2009); *In re Elevator Antitrust Litig.*, 502 F.3d 47, 50-51 (2d Cir. 2007) (list of "every type of conspiratorial activity" with no specification of any defendant is insufficient); *In re Zinc Antitrust Litig.*, 155 F. Supp. 3d 337, 384 (S.D.N.Y. 2016) (mere generalizations as to corporate affiliation are insufficient); *SD3, LLC v. Black & Decker (U.S.), Inc.*, 801 F.3d 412, 423 (4th Cir. 2015) (same).

entering into written contracts directly with RealPage to use RMS, providing confidential lease transaction data, and hiring dedicated revenue managers to enforce compliance.

Similarly, "[i]t is irrelevant if allegations are 'cut and paste' . . . as long as the allegations are properly alleged in [each] case." *Dillon v. Clackamas Cnty.*, 2014 WL 6809772, at *2 (D. Ore. Dec. 2, 2014). Here, the non-RealPage Defendants are competitors at the same level of market structure, and all collectively participated in the same cartel agreement. Accordingly, it makes sense that certain allegations regarding their involvement—such as their use of (and motive to use) RealPage's RMS, their agreement to share confidential pricing and lease information, their knowledge of their competitors' use of RMS—are applicable to many of the Defendants. That is true regardless of whether they are Managers, Owners, or Owner-Operators. The PMDs cannot have it both ways by criticizing Plaintiffs for "lump[ing]" them together, while simultaneously criticizing Plaintiffs for including allegations for each individual Defendant. *See* Br. at 4.

Faced with these allegations highlighting their participation in the cartel, the PMDs attempt to "dismember" those allegations to refute discrete parts. To that end, the PMDs claim that certain statements made by Defendant Pinnacle's employees regarding RMS "are equally consistent with" "legitimate non-conspiratorial reasons for using RealPage's software." Br. at 6-8. Asking this Court to draw that inference in the PMDs' favor is improper under Rule 12. *See In re Packaged Ice Antitrust Litig.*, 723 F. Supp. 2d 987, 1006 (E.D. Mich. 2010) ("[T]he character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts."); *Budicak, Inc. v. Lansing Trade Grp., LLC*, 452 F. Supp. 3d 1029, 1047 (D. Kan. 2020) ("At best, Lansing identifies a competing inference that may be weighed by a fact-finder at later stages of the proceeding."); *In re Broiler Chicken Antitrust Litig.*, 290 F. Supp. 3d 772, 788, 802 (N.D. Ill. 2017) (improper for the Court to "weigh alternative[] [explanations for Defendants' conduct] and

[decide] which is more plausible."). "Whether the acts committed by the defendants are simple, benign business decisions made by these individual defendants or whether they represent concerted effort in violation of the Sherman Act are issues of fact which this Court cannot decide on the pleadings." *In re Se. Milk Antitrust Litig.*, 555 F. Supp. 2d at 944.

The PMDs also contend that Pinnacle's statement about RealPage allowing it to "outperform" the market undermines the existence of a conspiracy (Br. at 6-7), but again the PMDs improperly offer their own self-serving interpretation of the allegations. *Gym Door Repairs, Inc. v. New York City Dep't of Educ.*, 2015 WL 3883243, at *5 (S.D.N.Y. June 23, 2015). The PMDs also omit the rest of the statement, which as alleged in the AC, compares Pinnacle's "outperformance" to that of competing "owner/operators *without* RealPage" (*i.e.*, those not part of the cartel). ¶ 24 (emphasis added). For Rule 12 purposes, PMDs cannot ask the Court to favor their own perception of the relevant events over the narrative offered by the Complaint. *Brown v. Montgomery Cnty. Bd. of Comm'rs*, 2023 WL 2586448, at *3 (S.D. Ohio Mar. 21, 2023).

Finally, the PMDs criticize allegations about a Pinnacle employee speaking on a RealPage industry panel, arguing that participation in industry events is legitimate and does not suggest a conspiracy. Br. at 5-6. But they point only to *In re Graphics Processing Units Antitrust Litig.*, 527 F. Supp. 2d 1011, 1023 (N.D. Cal. 2007), which discussed participation in industry events *standing alone*. Coupled with other evidence, opportunity to collude is a plus factor constituting circumstantial evidence of a price-fixing agreement. *Re/Max Int'l, Inc. v. Realty One, Inc.*, 173 F.3d 995, 1009 (6th Cir. 1999).[6] As explained above and in Plaintiffs' Opposition to Defendants' Motion to Dismiss the Multifamily Consolidated Amended Complaint, Plaintiffs allege various

---

[6] *See also SD3*, 801 F.3d at 432 ("Allegations of communications and meetings among conspirators can support an inference of agreement").

opportunities by Defendants to collude. This includes participation in industry trade events (such as speaking on RealPage-led panels), meetings, and online user groups—opportunities that facilitated the exchange of confidential, proprietary information among the PMDs, Owners, and Owner-Operator Defendants to artificially inflate rental prices. ¶¶ 382-91.

### B. Plaintiffs Sufficiently Plead the Property Management Defendants' Liability as Agents.

Not only do the PMDs ignore well-pleaded allegations about their own involvement in the cartel, but they also rely on an agency theory to claim they cannot be liable for the conduct of the owners of the properties they manage. However, "if an agent commits a tort in the course of his agency, 'the fact of agency will not relieve him of liability, . . . even though the principal may be liable also.'" *Lambert v. Kazinetz*, 250 F. Supp. 2d 908, 915 (S.D. Ohio 2003).[7]

As the PMDs recognize, agency law applies "with full force" in the context of an alleged antitrust cartel. Br. at 8. "[O]ne's status as an 'agent' for some purposes does not mean that he lacks conspiratorial capacity with its principal in other respects." Areeda & Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles & Their Application*, ¶ 1473d2 (2021); *see also C & W Constr. Co. v. Bhd. of Carpenters & Joiners of Am. Local 745, AFL-CIO*, 687 F. Supp. 1453, 1464-65 (D. Haw. 1988) (rejecting "claim that [agents] cannot be held liable under the antitrust laws because they were acting entirely within the scope of their authority as agents" because "[t]his argument ignores basic precepts of agency law").[8] An agent may be liable for the acts of its

---

[7] *See also Brown v. Donco Enters., Inc.*, 783 F.2d 644, 646 (6th Cir. 1986) (*per curiam*) ("It is undisputed that a corporation's officers and agents may be held individually liable for corporate actions that violate the antitrust laws if they authorize or participate in the unlawful acts."); *B&L Mgmt. Grp., LLC v. Adair*, 2019 WL 3459244, at *7 (W.D. Tenn. July 31, 2019).

[8] Moreover, the agency exception to antitrust liability that PMDs appear to invoke does not apply to horizontal restraints of trade involving competitors at the same level in an industry, like here where the PMDs compete with property owners in leasing multifamily housing units (¶ 6). *See*

principal in an antitrust cartel if the agent: (1) had knowledge of the principal's unlawful objective to restrain trade (*e.g.*, ¶¶ 3, 8-9, 12, 31, 227, 287, 293); (2) intended to restrain trade rather than simply earn its usual and customary commission (*e.g.*, ¶¶ 15, 293); and (3) contributed materially to the restraint (*e.g.*, ¶¶ 15, 17, 20-21, 36, 43, 21, 43, 72, 74, 83, 118, 121, 154, 163, 193, 227, 232, 237, 255, 268-70, 272-78, 304, 380). *In re Fresh & Process Potatoes Antitrust Litig.*, 834 F. Supp. 2d 1141, 1170 (D. Idaho 2011); *Marion Diagnostic Ctr., LLC v. Becton Dickinson & Co.*, 29 F.4th 337, 350 (7th Cir. 2022);[9] *see also In re Se. Milk Antitrust Litig.*, 555 F. Supp. 2d at 949 ("The Sixth Circuit unequivocally held that corporate 'officers and agents may be held individually liable for corporate actions that violate the antitrust laws if they authorize or participate in the unlawful acts.'"); *Northstar Energy LLC v. Encana Corp.*, 2014 WL 5343423, at *13 (W.D. Mich. Mar. 10, 2014) ("Agents of a corporation can be held liable for violating antitrust laws if they are 'actively and knowingly engaged in a scheme designed to achieve anticompetitive ends.'").[10]

---

Areeda & Hovenkamp ¶ 1473f (noting "the importance of distinguishing vertical and horizontal restraints when considering agency," "exclud[ing]" horizontal agreements from the agency exception); *see also id.* ¶ 1473f ("[N]one of [the policy justifications for an agency exception] make[] any difference in the case of a horizontal agreement"). For example, in *In re Sulfuric Acid Antitrust Litig.*, the court rejected the "broad proposition" "that companies in an agency relationship cannot conspire to commit violations of § 1 of the Sherman Act," where, as here, the defendant's "role as [a] sales agent [for a principal] *merely streamlined the process* by which the. . . companies [aided the principal's] co-conspirators" in a horizontal cartel." 743 F. Supp. 2d 827, 886 (N.D. Ill. 2010) (emphasis added). Because the agent assisted its principal's participation in a horizontal restraint, "the agency relationship d[id] not insulate [the agent] from liability under the Sherman Act." *Id.* The same is true here.

[9] The PMDs' reliance on these cases is misplaced. In *Marion Diagnostic Center*, there were no allegations about the distributor agents' knowledge of the antitrust cartel. 29 F.4th at 350. Similarly, in *In re Fresh & Process Potatoes*, the plaintiffs asked the court to infer the marketing agents' knowledge despite not alleging any facts supporting that knowledge. 843 F. Supp. 2d at 1170. Nonetheless, these cases stand for the proposition that an agent cannot escape liability for an antitrust cartel once the requisite circumstances have been pleaded.

[10] *See also Reifert v. S. Cent. Wisc. MLS Corp.*, 368 F. Supp. 2d 912, 913 (W.D. Wis. 2005) (holding liability extends to those who "knowingly participate[] in effecting the illegal contract, combination, or conspiracy . . . regardless of whether he is acting in a representative capacity.").

Plaintiffs allege all requisite elements to establish the PMDs' liability as agents. Plaintiffs allege that the PMDs each knew about the unlawful objective of the cartel facilitated by RealPage and intended to accomplish its end, namely, to artificially inflate rental prices and diminish the supply of multifamily rental units through its use of RMS: "Managing Defendants act as agents for the property owners and knowingly used RMS to coordinate and agree upon rental housing and supply." ¶ 3; *see also* ¶¶ 6, 8-9, 12, 15, 17, 21, 43, 72, 74, 83, 118, 121, 154, 163, 193, 197-99, 227, 380. "Each Defendant knew that the plan, if carried out, would result in increased rents while restricting demand, and with this knowledge—each Owner, Owner-Operator, and Managing Defendant participated in the plan." ¶ 12. Plaintiffs further allege that "[p]roperty owners *and managers* who use Defendant RealPage's RMS do so *with the explicit and common goal* of increasing rents for all members of the cartel by using coordinated algorithmic pricing." ¶ 293 (emphases added); *see also* ¶¶ 237 n.140, 241 (former RealPage Pricing Advisor who worked daily with property management companies confirming RealPage pushed them to accept its "price and term recommendations at least 80% of the time.").[11]

As detailed above, Plaintiffs also allege the PMDs were integral to the cartel's success. Each PMD "outsource[d] lease pricing decisions to RealPage's RMS," "accept[ed] RealPage's pricing 'recommendations,'" and relied on RealPage for other lease terms. *See, e.g.*, ¶¶ 227, 232, 256, 268. The PMDs communicated frequently with RealPage and other Managers, Owners, and Owner-Operators to exchange confidential information. ¶¶ 5, 15, 37, 40, 237 n.140, 278, 380, 386-88. The PMDs also directly enforced the adoption of RealPage's determinations. ¶¶ 11, 20, 269-

---

[11] The PMDs' liability as agents is further supported by their own cited case, *Ago v. Begg, Inc.*, which held that "the law of agency" "sensibly does not hold agents responsible for knowledge *known only by the principal*." 705 F. Supp. 613, 617-18 (D.D.C. 1988) (emphasis added). Here, in contrast, the AC alleges the extent of the PMDs' knowledge and active engagement in the cartel.

70, 277, 304. These allegations demonstrate the PMDs "actively and knowingly engaged" in an agreed-upon scheme to do more than just use RMS. *Northstar Energy*, 2014 WL 5343423, at *13.

Finally, the PMDs argue that Plaintiffs' purported failure to allege economic incentive to conspire bears directly on the plausibility of their involvement. That is incorrect; economic incentive is not necessary to state a claim. *See Academy of Allergy & Asthma in Primary Care v. Superior Healthplan,, Inc.*, 2020 WL 10051766, at *14 (W.D. Tex. May 4, 2020). Regardless, Plaintiffs allege that each PMD had a strong motive to conspire, as each could (and did) increase its profits significantly as it increased revenues and profits for building owners. ¶¶ 21, 33-34, 381. Defendants improperly rely on caselaw evaluating economic motive at the summary judgment or trial stages (Br. at 10)—which are decided under different standards than at the pleading stage.[12] In any event, it is fair for the court to infer that increasing profits for owners is good for PMDs.

## IV. CONCLUSION

Plaintiffs have plausibly alleged that the PMDs were not only knowing participants in the cartel, but also integral to its success. For the foregoing reasons, Plaintiffs respectfully request that the Court deny the PMD's Motion.

---

[12] *See, e.g.*, *Riverview Invs., Inc. v. Ottawa Cmty. Improvement Corp.*, 899 F.2d 474, 483-84 (6th Cir. 1990) (affirming judgment notwithstanding the verdict where plaintiffs failed to establish motive to conspire due to the ambiguous evidence at trial); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 575 (1986) (reversing summary judgment where lower court failed to consider the absence of a plausible motive to engage in predatory pricing); *Anderson News, L.L.C. v. Am. Media, Inc.*, 899 F.3d 87, 112-13 (2d Cir. 2018) (affirming summary judgment where plaintiff presented insufficient evidence of common motive to conspire). Indeed, even at summary judgment, when "evaluating direct evidence of an agreement," as here, the court "need not worry whether such an agreement would have been a rational one to enter into." *Champagne Metals v. Ken-Mac Metals, Inc.*, 458 F.3d 1073, 1085 (10th Cir. 2006).

Dated: November 8, 2023

/s/ Tricia R. Herzfeld
Tricia R. Herzfeld (#26014)
Anthony A. Orlandi (#33988)
**HERZFELD SUETHOLZ GASTEL LENISKI AND WALL, PLLC**
223 Rosa L. Parks Avenue, Suite 300
Nashville, TN 37203
Telephone: (615) 800-6225
tricia@hsglawgroup.com
tony@hsglawgroup.com

*Liaison Counsel*

Patrick J. Coughlin
Carmen A. Medici
Fatima Brizuela
**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
600 West Broadway, Suite 3300
San Diego, CA 92101
Telephone: (619) 798-5325
Facsimile: (619) 233-0508
pcoughlin@scott-scott.com
cmedici@scott-scott.com
fbrizuela@scott-scott.com

Patrick McGahan
Amanda F. Lawrence
Michael Srodoski
G. Dustin Foster
Isabella De Lisi
**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
156 South Main Street
P.O. Box 192
Colchester, CT 06145
Telephone: (860) 537-5537
Facsimile: (860) 537-4432
pmcgahan@scott-scott.com
alawrence@scott-scott.com
msrodoski@scott-scott.com
gfoster@scott-scott.com
idelisi@scott-scott.com

Stacey Slaughter
Thomas J. Undlin

Geoffrey H. Kozen
Stephanie A. Chen
J. Austin Hurt
**ROBINS KAPLAN LLP**
800 LaSalle Avenue, Suite 2800
Minneapolis, MN 55402
Telephone: (612) 349-8500
Facsimile: (612) 339-4181
sslaughter@robinskaplan.com
tundlin@robinskaplan.com
gkozen@robinskaplan.com
schen@robinskaplan.com
ahurt@robinskaplan.com

Swathi Bojedla
Mandy Boltax
**HAUSFELD LLP**
888 16th Street, N.W., Suite 300
Washington, DC 20006
Telephone: (202) 540-7200
sbojedla@hausfeld.com
mboltax@hausfeld.com

Gary I. Smith, Jr.
**HAUSFELD LLP**
600 Montgomery Street, Suite 3200
San Francisco, CA 94111
Tel: (415) 633-1908
gsmith@hausfeld.com

Katie R. Beran
**HAUSFELD LLP**
325 Chestnut Street, Suite 900
Philadelphia, PA 19106
Telephone: 1 215 985 3270
kberan@hausfeld.com

*Interim Co-Lead Counsel*

Eric L. Cramer
Michaela L. Wallin
**BERGER MONTAGUE PC**
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Telephone: (215) 875-3000
ecramer@bm.net
mwallin@bm.net

Daniel J. Walker
**BERGER MONTAGUE PC**
2001 Pennsylvania Avenue, NW, Suite 300
Washington, DC 20006
Telephone: (202) 559-9745
dwalker@bm.net

Brendan P. Glackin
Dean M. Harvey
**LIEFF CABRASER HEIMANN & BERNSTEIN, LLP**
275 Battery Street, Suite 2900
San Francisco, CA 94111
Telephone: 415-956-1000
bglackin@lchb.com
dharvey@lchb.com

Mark P. Chalos
Hannah R. Lazarz
Kenneth S. Byrd
**LIEFF CABRASER HEIMANN & BERNSTEIN, LLP**
222 2nd Avenue South, Ste. 1640
Nashville, TN 37201
(615) 313-9000
mchalos@lchb.com
hlazarz@lchb.com
kbyrd@lchb.com

Steve W. Berman
Breanna Van Engelen
**HAGENS BERMAN SOBOL SHAPIRO LLP**
1301 Second Avenue, Suite 2000
Seattle, Washington 98101
Telephone: (206) 623-7292

Christian P. Levis
Vincent Briganti
Peter Demato
Radhika Gupta
**LOWEY DANNENBERG, P.C.**
44 South Broadway, Suite 1100
White Plains, NY 10601
Telephone: (914) 997-0500
Facsimile: (914) 997-0035
vbriganti@lowey.com
clevis@lowey.com
pdemato@lowey.com
rgupta@lowey.com

Christopher M. Burke
Walter W. Noss
Yifan (Kate) Lv
**KOREIN TILLERY P.C.**
707 Broadway, Suite 1410
San Diego, CA 92101
Telephone: (619) 625-5621
Facsimile (314) 241-3525
cburke@koreintillery.com
wnoss@koreintillery.com
klv@koreintillery.com

Joseph R. Saveri
Steven N. Williams
Cadio Zirpoli
Kevin E. Rayhill
**JOSEPH SAVERI LAW FIRM, LLP**
601 California Street, Suite 1000
San Francisco, CA 94108
Telephone: (415) 500-6800
jsaveri@saverilawfirm.com
swilliams@saverilawfirm.com
czirpoli@saverilawfirm.com
krayhill@saverilawfirm.com

Jennifer W. Sprengel
Daniel O. Herrera
Alexander Sweatman
**CAFFERTY CLOBES MERIWETHER & SPRENGEL LLP**
135 S. LaSalle, Suite 3210
Chicago, IL 60603

Facsimile: (206) 623-0594
steve@hbsslaw.com
breannav@hbsslaw.com

Benjamin J. Widlanski
Javier A. Lopez
**KOZYAK TROPIN & THROCKMORTON LLP**
2525 Ponce de Leon Blvd., 9th Floor
Coral Gables, Florida 33134
Telephone: (305) 372-1800
bwidlanski@kttlaw.com
jal@kttlaw.com

Telephone: 312-782-4880
Facsimile: 312-782-4485
jsprengel@caffertyclobes.com
dherrera@caffertyclobes.com
asweatman@caffertyclobes.com

*Plaintiffs' Steering Committee Counsel for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that on November 8, 2023, I caused the foregoing to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the email addresses denoted on the Electronic Mail Notice List.

/s/ Tricia R. Herzfeld
Tricia R. Herzfeld
