# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | |
|---|---|
| IN RE: REALPAGE, INC., RENTAL SOFTWARE ANTITRUST LITIGATION (NO. II) | Case No. 3:23-MD-3071, MDL No. 3071<br><br>Chief Judge Waverly D. Crenshaw, Jr.<br><br>This Document Relates to:<br>3:23-cv-00757 (M.D. Tenn.)<br>3:23-cv-00792 (M.D. Tenn.)<br><br>JURY TRIAL DEMANDED |

**STUDENT PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS STUDENT PLAINTIFFS' FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT**

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................... 1

STATEMENT OF FACTS ....................................................................................... 2

LEGAL STANDARD .............................................................................................. 3

ARGUMENT ........................................................................................................... 5

    I.    Plaintiffs Have Plausibly Alleged Parallel Conduct and Plus Factors Indicative of Agreement. ............................................................... 5

        A.    Plaintiffs sufficiently allege parallel conduct by each Defendant such that Defendants are on notice of the claims against them. ................ 5

        B.    The plus factors here, taken in combination, are strongly indicative of an agreement. ...................................................... 10

            1.    The stated anticompetitive purpose of RealPage's information exchange supports the plausibility of agreement. ................................................................ 10

            2.    Lessor Defendants' acceptance of RealPage's invitation to participate in anticompetitive conduct creates an inference of agreement to do so. .................................. 11

            3.    Lessor Defendants' exchange of current and competitively sensitive information through RealPage supports the plausibility of agreement. ......................... 12

            4.    Lessor Defendants' abrupt change in pricing behavior supports the plausibility of collusion. ......................... 16

            5.    Exchanging sensitive data, and increasing student rental prices above market, would be against each Lessor Defendant's independent interest absent agreement. ................... 17

            6.    RealPage's use of policing mechanisms typical of cartels also supports the plausibility of agreement. ................................ 19

            7.    The student housing market is conducive to collusion. ............... 20

            8.    Besides daily opportunities to collude by following RealPage's pricing recommendations, Lessor Defendants were encouraged to communicate directly on price and

attended industry conferences where they had additional
opportunities to do so. .................................................................. 22

9.    Government investigation into and enforcement action
regarding RealPage's pricing platform also support the
plausibility of collusion. ............................................... 22

10.    RealPage's mastermind previously organized a cartel in
the airline industry, which also supports the plausibility
of a cartel here. ............................................................ 24

C.    Defendants' alternative explanations do not establish the
agreement is implausible. ....................................................... 24

II.    Plaintiffs Have Plausibly Alleged *Per Se* and Rule of Reason Claims. ............... 27

A.    Plaintiffs' horizontal price-fixing claim is subject to a *per se*
analysis that does not require examination of the relevant market. ......... 27

B.    Plaintiffs have sufficiently pled both of their claims under the
rule of reason analysis. .......................................................... 28

1.    Plaintiffs have directly pled anticompetitive effects. .................... 29

2.    Plaintiffs have indirectly pled anticompetitive effects. ................ 30

(a)    Plaintiffs plead a plausible relevant market. ..................... 31

(b)    Defendants exercised market power in a properly
defined market. ................................................. 33

III.    Plaintiffs Have Antitrust Standing. ........................................................ 33

IV.    Plaintiffs Allege Viable State Law Claims. ........................................... 34

V.    Plaintiffs Sufficiently Plead Fraudulent Concealment to Permit Damages
Beyond Four Years Back From Filing. ................................................. 36

A.    Plaintiffs allege Defendants committed affirmative, self-
concealing acts in furtherance of the conspiracy. ..................... 37

B.    Plaintiffs adequately allege they were unaware of the operative
facts. .............................................................................. 38

C.    Plaintiffs adequately allege their reasonable diligence until
discovery of the facts underlying the conspiracy. ..................... 39

CONCLUSION ....................................................................................... 40

# TABLE OF AUTHORITIES

*Am. Column & Lumber Co. v. U.S.*,
  257 U.S. 377 (1921)....................................................................................................13

*In re Auto. Parts Antitrust Litig.*,
  29 F. Supp. 3d 982 (E.D. Mich. 2014).................................................................21, 22

*In re Auto. Parts Antitrust Litig.*,
  50 F. Supp. 3d 869 (E.D. Mich. 2014).......................................................................21

*In re Auto. Parts Antitrust Litig.*,
  2018 WL 2181100 (E.D. Mich. Jan. 31, 2018)....................................................12, 20

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007)......................................................................................2, 3, 4, 8, 18

*Branch v. F.T.C.*,
  141 F.2d 31 (7th Cir. 1944) ........................................................................................35

*In re Broiler Chicken Antitrust Litig.*,
  290 F. Supp. 3d 772 (N.D. Ill. 2017) .........................................1, 4, 5, 8, 14, 19, 25

*In re Broiler Chicken Antitrust Litig.*,
  2023 WL 4303476 (N.D. Ill. June 30, 2023)..............................................................26

*Brown v. JBS USA Food Co.*,
  2023 WL 6294161 (D. Colo. Sept. 27, 2023).......................................................10, 30

*Budicak, Inc. v. Lansing Trade Grp.*,
  452 F. Supp. 3d 1029 (D. Kan. 2020).........................................................................29

*C.S. Sewell v. Amerigroup Tenn., Inc.*,
  2018 WL 6591429 (M.D. Tenn. Dec. 14, 2018)...........................................................4

*In re Cardizem CD Antitrust Litig.*,
  105 F. Supp. 2d 618 (E.D. Mich. 2000).................................................................2, 27

*In re Cardizem CD Antitrust Litig.*,
  332 F.3d 896 (6th Cir. 2003) .................................................................................33, 34

*Carrier Corp. v. Outokumpu Ojy.*,
  673 F.3d 430 (6th Cir. 2012) .........................................................................36, 37, 38, 39

*In re Cast Iron Soil Pipe & Fittings Antitrust Litig.*,
  2015 WL 5166014 (E.D. Tenn. June 24, 2015).......................................................5, 40

*CBC Cos., Inc. v. Equifax, Inc*,
    561 F.3d 569 (6th Cir. 2009) ...................................................................34

*In re Cedar Shakes & Shingles Antitrust Litig.*,
    2020 WL 832324 (W.D. Wash. Feb. 20, 2020)...................................................9, 10

*City of Philadelphia v. Bank of Am.*,
    498 F. Supp. 3d 516 (S.D.N.Y. 2020).........................................................9

*Cont'l Cablevision v. Am. Elec. Power Co.*,
    715 F.2d 1115 (6th Cir. 1983) .................................................................15

*Cont'l Ore Co. v. Union Carbide & Carbon*,
    370 U.S. 690 (1962)............................................................................4, 10

*Craftsmen Limousine, Inc. v. Ford Motor Co.*,
    363 F.3d 761 (8th Cir. 2004) ................................................................4

*In re Currency Conversion Fee Antitrust Litig.*,
    264 F.R.D. 100 (S.D.N.Y. 2010) ............................................................8

*Dayco Corp. v. Goodyear Tire & Rubber Co.*,
    523 F.2d 389 (6th Cir. 1975) .................................................................39

*In re Domestic Airline Travel Antitrust Litig.*,
    221 F. Supp. 3d 46 (D.D.C. 2016).........................................................8

*Dover v. British Airways, PLC (UK)*,
    2014 WL 317845 (E.D.N.Y. Jan. 24, 2014) ..........................................9

*In re Dynamic Random Access Memory (DRAM)*
    *Indirect Purchaser Antitrust Litig.*,
    28 F.4th 42 (9th Cir. 2022) ....................................................................19

*In re Elec. Books Antitrust Litig.*,
    859 F. Supp. 2d 671 (S.D.N.Y. 2012)....................................................18

*Erie Cnty., Ohio v. Morton Salt, Inc.*,
    702 F.3d 860 (6th Cir. 2012) ................................................................20

*Fallick v. Nationwide Mut. Ins. Co.*,
    162 F.3d 410 (6th Cir. 1998) ................................................................36

*Fox v. Saginaw Cnty.*,
    67 F.4th 284 (6th Cir. 2023) .................................................................36

*Goff v. Nationwide Mut. Ins. Co.*,
    2019 WL 7604826 (S.D. Ohio Sept. 30, 2019) ....................................40

*Haff Poultry v. Tyson Foods, Inc.*,
    2020 WL 4001175 (E.D. Okla. Jan. 6, 2020) ........................................................14

*Hobart-Mayfield, Inc. v. Nat'l Operating*
    *Comm. on Standards for Athletic Equip.*,
    48 F.4th 656 (6th Cir. 2022) .........................................................3, 4, 11, 12, 13, 17

*Hosp. Auth. of Metro. Gov't of Nashville v.*
    *Momenta Pharms., Inc.*,
    353 F. Supp. 3d 678 (M.D. Tenn. 2018)............................................................36

*Hosp. Auth. of Metro. Gov't of Nashville v.*
    *Momenta Pharms., Inc.*,
    333 F.R.D. 390 (M.D. Tenn. 2019) ..............................................................35, 36

*Hyland v. Homeservices of Am., Inc.*,
    2007 WL 2407233 (W.D. Ky. Aug. 17, 2007) .......................................13, 22, 23

*In re Ins. Brokerage Antitrust Litig.*,
    618 F.3d 300 (3d Cir. 2010)..............................................................................16

*In re Interest Rate Swaps Antitrust Litig.*,
    261 F. Supp. 3d 430 (S.D.N.Y. 2017).............................................................8, 40

*Interstate Cir. v. U.S.*,
    306 U.S. 208 (1939)...................................................1, 8, 11, 12, 18, 25

*Jein v. Perdue Farms, Inc.*,
    2020 WL 5544183 (D. Md. Sep. 16, 2020) .........................................................32

*Kendall v. Visa U.S.A., Inc.*,
    518 F.3d 1042 (9th Cir. 2008) ............................................................................5

*Kleen Prods. v. Georgia-Pacific*,
    910 F.3d 927 (7th Cir. 2018) .......................................................................16, 19

*Kleen Prods. v. Packaging Corp. of Am.*,
    775 F. Supp. 2d 1071 (N.D. Ill. 2011) ...................................................8, 16, 19, 21

*Llacua v. Western Range Ass'n*,
    930 F.3d 1179 (10th Cir. 2019) .........................................................................20

*In re Loc. TV Advert. Antitrust Litig.*,
    2020 WL 6557665 (N.D. Ill. Nov. 6, 2020) .........................................................21

*In re Loc. TV Advert. Antitrust Litig.*,
    2022 WL 3716202 (N.D. Ill. Aug. 29, 2022) .......................................................15

*Meyer v. Kalanick,*
    174 F. Supp. 3d 817 (S.D.N.Y. 2016).....................................................1, 11, 12, 18

*Mich. Div.-Monument Builders of N. Am.*
    *v. Mich. Cemetery Ass'n,*
    524 F.3d 726 (6th Cir. 2008) ......................................................................30

*In re Mushroom Direct Purchaser Antitrust Litig.,*
    2015 WL 5767415 (E.D. Pa. July 29, 2015)...........................................32

*In re Musical Instruments & Equip. Antitrust Litig.,*
    798 F.3d 1186 (9th Cir. 2015) .............................................................10, 24

*Nat'l Hockey League Players Ass'n v.*
    *Plymouth Whalers Hockey Club,*
    419 F.3d 462 (6th Cir. 2005) ......................................................................32

*In re Nexium (Esomeprazole) Antitrust Litig.,*
    42 F. Supp. 3d 231 (D. Mass. 2014) ....................................................11, 12

*In re Nw. Airlines Corp. Antitrust Litig.,*
    208 F.R.D. 174 (E.D. Mich. 2002) .............................................................10

*In re Packaged Ice Antitrust Litig.,*
    723 F. Supp. 2d 987 (E.D. Mich. 2010)....................................4, 5, 10, 18, 21, 22, 23

*In re Papa John's Emp. & Franchisee Emp. Antitrust Litig.,*
    2019 WL 5386484 (W.D. Ky. Oct. 21, 2019) .........................................40

*Pinney Dock & Transp. Co. v. Penn Cent. Corp.,*
    600 F. Supp. 859 (N.D. Ohio 1983)...........................................................37

*Pinney Dock & Transp. v. Penn Cent. Corp.,*
    838 F.2d 1445 (6th Cir. 1988) ....................................................................37

*In re Plasma-Derivative Protein Therapies Antitrust Litig.,*
    764 F. Supp. 2d 991 (N.D. Ill. 2011) ...........................................................8

*PLS.Com, LLC v. Nat'l Ass'n of Realtors,*
    32 F.4th 824 (9th Cir. 2022) .......................................................................11

*In re Polyurethane Foam Antitrust Litig.,*
    799 F. Supp. 2d 777 (N.D. Ohio 2011)........................................................5

*In re Polyurethane Foam Antitrust Litig.,*
    152 F. Supp. 3d 968 (N.D. Ohio 2015)..................................................17, 18

*In re Pork Antitrust Litig.*,
2019 WL 3752497 (D. Minn. Aug. 8, 2019) .......................................................1, 14, 25, 26

*In re Processed Egg Antitrust Litig.*,
902 F. Supp. 2d 704 (E.D. Pa. 2012) ...............................................................................5

*In re Processed Egg Prods. Antitrust Litig.*,
2012 WL 6645533 (E.D. Pa. 2012) .................................................................................37

*Realcomp II, Ltd. v. F.T.C.*,
635 F.3d 815 (6th Cir. 2011) ...............................................................................2, 28, 29

*In re Refrigerant Compressors Antitrust Litig.*,
795 F. Supp. 2d 647 (E.D. Mich. 2011).........................................................................38

*Ruth v. Unifund CCR Partners*,
604 F.3d 908 (6th Cir. 2010) .........................................................................................39

*In re Scrap Metal Antitrust Litig.*,
527 F.3d 517 (6th Cir. 2008) .........................................................................................37

*SD3 LLC v. Black & Decker*,
801 F.3d 412 (4th Cir. 2015) ...........................................................................................8

*In re Se. Milk Antitrust Litig.*,
555 F. Supp. 2d 934 (E.D. Tenn. 2008)..............................................2, 4, 5, 10, 24, 27, 31, 34

*In re Se. Milk Antitrust Litig.*,
739 F.3d 262 (6th Cir. 2014) .............................................................27, 30, 31, 33, 34

*Sheet Metal Workers Loc. 441 Health & Welfare
Plan v. GlaxoSmithKline*,
737 F. Supp. 2d 380 (E.D. Pa. 2010) .............................................................................35

*Sitzer v. Nat'l Ass'n of Realtors*,
420 F. Supp. 3d 903 (W.D. Mo. 2019) ...........................................................................11

*In re Skelaxin (Metaxalone) Antitrust Litig.*,
2013 WL 2181185 (E.D. Tenn. May 20, 2013)...............................................................37

*Standard Iron Works v. Arcelormittal*,
639 F. Supp. 2d 877 (N.D. Ill. 2009) .............................................................................18

*Starr v. Sony BMG Music Ent.*,
592 F.3d 314 (2d Cir. 2010)......................................................................................18, 22

*State of N.Y. v. Hendrickson Bros.*,
840 F.2d 1065 (2d Cir. 1988)........................................................................................37

*Superior Prod. P'ship v. Gordon Auto Body Parts Co.*,
    784 F.3d 311 (6th Cir. 2015) ....................................................20

*Texas Indus., Inc. v. Radcliff Materials, Inc.*,
    451 U.S. 630 (1981)...............................................................36

*In re Text Messaging Antitrust Litig.*,
    630 F.3d 622 (7th Cir. 2010) ...........................................13, 20

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
    586 F. Supp. 2d 1109 (N.D. Cal. 2008) ...................................39

*Todd v. Exxon Corp.*,
    275 F.3d 191 (2d Cir. 2001)...........................................1, 13, 14, 30

*Total Benefits Planning Agency Inc. v.*
*Anthem Blue Cross & Blue Shield*,
    552 F.3d 430 (6th Cir. 2008) .....................................................6

*Toys "R" Us v. F.T.C.*,
    221 F.3d 928 (7th Cir. 2000) .........................................1, 19, 25

*In re Travel Agent Comm'n Antitrust Litig.*,
    2007 WL 3171675 (N.D. Ohio Oct. 29, 2007) .........................19

*In re Travel Agent Comm'n Antitrust Litig.*,
    583 F.3d 896 (6th Cir. 2009) .....................................................6

*In re Turkey Antitrust Litig.*,
    642 F. Supp. 3d 711 (N.D. Ill. 2022) ............................1, 14, 24, 25, 26

*In re Urethane Antitrust Litig.*,
    768 F.3d 1245 (10th Cir. 2014) ...............................................17

*U.S. Anchor Mfg., Inc. v. Rule Indus., Inc.*,
    7 F.3d 986 (11th Cir. 1993) .....................................................35

*U.S. v. Agri Stats, Inc.*,
    2023 WL 7037629 (D. Minn. Sept. 28, 2023) .........................15

*U.S. v. Apple, Inc.*,
    791 F.3d 290 (2d Cir. 2015).........................................1, 18, 25, 28

*U.S. v. True*,
    250 F.3d 410 (6th Cir. 2001) ...................................................15

*U.S. v. U.S. Gypsum Co.*,
    438 U.S. 422 (1978)...............................................................13

*Venture Glob. Eng'g v. Satyam Comput. Servs.*,
    2012 WL 12897904 (E.D. Mich. Mar. 30, 2012) .................................................39

*Venture Glob. Eng'g, LLC v. Satyam Comput. Servs.*,
    730 F.3d 580 (6th Cir. 2013) ...........................................................................38, 40

*Watson Carpet & Floor Covering, Inc. v.
    Mohawk Indus., Inc.*,
    648 F.3d 452 (6th Cir. 2011) .........................................................2, 3, 4, 24, 26, 31

*Woori Bank v. Merrill Lynch*,
    923 F. Supp. 2d 491 (S.D.N.Y. 2013)....................................................................40

**Statutes**

15 U.S.C. § 1 ....................................................................................10, 11, 18, 23, 24

Ga. Code § 13-8-2.1 .....................................................................................................35

Mass. Gen. Laws ch. 93A § 1 *et seq.* .......................................................................35

Pa. Stat. § 201–1 *et seq.* ...........................................................................................35

**Other Authorities**

Philip E. Areeda & Herbert Hovenkamp, *Antitrust
    Law: An Analysis of Antitrust Principles and Their
    Application* (4th ed. 2021) .........................................................10, 16, 17, 24, 28

# TABLE OF ABBREVIATIONS

| Short Cite Used | Full Citation |
|---|---|
| Student FAC | First Amended Consolidated Class Action Complaint, Dkt. 527 (Sept. 07, 2023). All complaint or "¶ __" references herein are to the Student FAC. |
| Multifamily SAC | Second Amended Consolidated Class Action Complaint, Dkt. 530 (Sept. 07, 2023). |
| Student Mot. | Defendants' Memorandum of Law in Support of Motion to Dismiss Student Plaintiffs' First Amended Consolidated Class Action Complaint, ECF 588 (Oct. 9, 2023). |
| Ex. | All exhibit references are to the Declaration of Steve W. Berman in Support of Student Lessor Plaintiffs' Opposition to Motion to Dismiss, concurrently filed herewith. |
| Defendants | RealPage; Thoma Bravo; Greystar; BH Management; Campus Advantage; Cardinal Group; CA Student; TREV; B.Hom (as defined below). |
| Lessor Defendants | Greystar; BH Management; Campus Advantage; Cardinal Group; CA Student; TREV; B.Hom (as defined below). |

| Short Cite Used | Full Defendant Names |
|---|---|
| RealPage | RealPage, Inc. |
| Thoma Bravo | Thoma Bravo Fund XIII, L.P.; Thoma Bravo Fund XIV, L.P.; Thoma Bravo L.P. |
| Greystar | Greystar Management Services, LLC |
| B.H. Management | BH Management Services, LLC |
| Campus Advantage | Campus Advantage, Inc. |
| Cardinal Group | Cardinal Group Holdings LLC |
| CA Student | CA Student Living Operating Company, LLC |
| TREV | Timberline Real Estate Ventures LLC |
| B.Hom | B.Hom Student Living LLC |

# INTRODUCTION

Plaintiffs allege a price-fixing cartel orchestrated by RealPage where each Lessor Defendant participated by sharing leasing data and delegating to RealPage's algorithmic software responsibility for setting student housing prices. *See* section I.A. Such parallel conduct, in conjunction with various plus factors, plausibly alleges collusion.

First, RealPage's stated anticompetitive purpose was to outperform the forces of a competitive market by centralizing pricing decisions. *See* section I.B.1. And Lessor Defendants' acquiescence to a plan that necessarily resulted in a restraint of trade by eliminating price competition supports the plausibility of an agreement, under the Supreme Court's decision in *Interstate Cir.* and more recent decisions such as *Meyers*. *See* section I.B.2. Moreover, Lessor Defendants' provision of current and competitively sensitive leasing data to RealPage, with the understanding that they would receive above-market pricing determinations, based on similar information from their competitors, also supports the plausibility of agreement, according to seminal cases such as *Todd* and recent cases such as *In re Broilers*, *In re Pork*, and *In re Turkey*. *See* section I.B.3. Further, RealPage acknowledges the "fundamental shift" that its pricing algorithm brought about as Lessor Defendants no longer had to compete on price. *See* section I.B.4. And, significantly, offering student housing at prices above market would be against the individual interest of Lessor Defendants in the absence of agreement, as in *Apple* and *Toys "R" Us*, because competitors could undercut one another—but there was no such concern here due to the horizontal agreement to let RealPage set prices above market for each. *See* section I.B.5. Indeed, the algorithmic prices were used as a default that should "always" be followed, with objective rationale required for deviation and compliance tracked by RealPage. Defendants' use of such policing mechanisms typical of cartels also supports the plausibility of agreement here. *See* section I.B.6. Additionally, the student housing market itself is conducive to collusion;

Defendants shared many opportunities to collude; and government investigations into RealPage are also underway. *See* section I.B.7-10. All of this—viewed holistically—more than nudges Plaintiffs' claims across the line from conceivable to plausible, as required by *Twombly*. And the Sixth Circuit made clear in *Watson* that the district court is not to weigh competing "innocent" explanations offered by Defendants. *See* section I.C.

Finally, Plaintiffs allege a horizontal price-fixing agreement subject to *per se* condemnation under *In re Se. Milk*. *See* section II.A. Plaintiffs' information exchange claim is viable under the rule of reason, because they plead anticompetitive effects either directly or indirectly, under *Realcomp*—the latter based on allegations of a plausible relevant market. *See* section II.B. Moreover, Plaintiffs allege antitrust standing under *Cardizem*, because the price-fixing alleged here is exactly the type of conduct that the antitrust laws were meant to prevent. *See* section III. Lastly, Plaintiffs properly allege state law claims and sufficiently plead fraudulent concealment to permit damages beyond four years back from filing. *See* sections IV-V.

## STATEMENT OF FACTS

Lessor Defendants are large property managers of student housing properties near many college campuses across the United States. ¶¶ 162-191. In the formerly competitive market, these companies used to compete with one another to attract student renters and maximize occupancy of their properties, with Lessor Defendants making independent pricing and supply decisions. ¶¶ 3, 61-62. But with the introduction of RealPage, which was a "fundamental shift" in the industry, this is no longer the case. ¶¶ 4, 23, 63-65, 71-75.

RealPage is a company that collects real-time pricing and supply information from its participants. Each month, participants give RealPage data covering "literally hundreds of variables" and RealPage compiles it into a common algorithm that sends the participants forward-looking, unit-specific pricing and supply recommendations. ¶¶ 5, 9, 42-44, 50-52, 68-69. Lessor

Defendants agreed to follow these determinations, on the mutual understanding their competitors would do the same. ¶¶ 6, 67. Indeed, RealPage closely monitors compliance—going so far as to have leasing managers justify, in writing, deviations from RealPage's recommended pricing. ¶¶ 6, 84-92. A witness who worked for a Lessor Defendant stated that it "always wanted" her and other property managers to accept RealPage's pricing determinations and that she did so "98 to 99% of the time." ¶¶ 56, 70. Moreover, RealPage created trainings for Lessor Defendants to help them conceal this collusion from student lessees. For example, the trainings taught leasing managers not to mention the use of pricing software and instead to tell tenants that units were being "priced individually"—which was patently false. ¶¶ 197-200.

As a result of Lessor Defendants' exchange of competitive data and reliance on RealPage's algorithmic pricing determinations, rent for student housing properties was higher among Lessor Defendants' properties. ¶¶ 10, 141. Indeed, RealPage acknowledges that its purpose and effect was to raise rents "above market" and to "outperform the market," ¶¶ 15, 41, 47-48, 66, 77, 80-82, 142, and Lessor Defendants have attributed their own market outperformance to relying on RealPage's pricing determinations. ¶¶ 15, 57-58, 66, 77, 81-82, 142.

## LEGAL STANDARD

To survive a motion to dismiss, Plaintiffs' complaint need only include enough facts to state a plausible claim.[1] As the Supreme Court instructs, "[a]sking for plausible grounds to infer an agreement does not impose a probability requirement at the pleading stage."[2] So when "defendants' conduct has several plausible explanations," the Sixth Circuit admonishes that

---

[1] *Hobart-Mayfield, Inc. v. Nat'l Operating Comm. on Standards for Athletic Equip.*, 48 F.4th 656, 663 (6th Cir. 2022). Internal citations and quotations omitted and emphasis added throughout, unless otherwise indicated.

[2] *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007); *see also Watson Carpet & Floor Covering, Inc. v. Mohawk Indus., Inc.*, 648 F.3d 452, 458 (6th Cir. 2011).

"[f]erreting out the most likely reason for the defendants' actions is not appropriate."[3] In other words, the plausibility of Defendants' proffered explanations "does not render all other reasons implausible."[4] Rather, Plaintiffs must simply "raise a right to relief above the speculative level," such that they have "nudged their claims across the line from conceivable to plausible."[5]

To plead an unlawful agreement, plaintiffs may allege "sufficient circumstantial evidence tending to exclude the possibility of independent conduct."[6] Plaintiffs can (and almost always do) allege antitrust conspiracies without the smoking gun of direct evidence, because defendants "typically cannot be relied on to confess that they have entered into an unlawful agreement."[7] "Parallel behavior" of competitors following the same course of conduct "can be circumstantial evidence of an agreement not to compete."[8] Allegations of parallel conduct, however, must be accompanied by "further circumstance pointing toward a meeting of the minds," or "so-called 'plus factors.'"[9] Thus, Plaintiffs here plead an antitrust agreement by alleging parallel conduct along with plus factors that "plausibly suggest an agreement to restrain trade."[10] Finally, as the Supreme Court instructs, the "character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole."[11]

---

[3] *Watson*, 648 F.3d at 458.

[4] *Id.*

[5] *Twombly*, 550 U.S. at 555, 570.

[6] *Hobart-Mayfield*, 48 F.4th at 664; *Watson*, 648 F.3d at 457.

[7] *Craftsmen Limousine, Inc. v. Ford Motor Co.*, 363 F.3d 761, 771 (8th Cir. 2004).

[8] *In re Broiler Chicken Antitrust Litig.*, 290 F. Supp. 3d 772, 789 (N.D. Ill. 2017) (*In re Broiler I*) (citing *Twombly*, 550 U.S. at 553).

[9] *Hobart-Mayfield*, 48 F.4th at 665; *In re Packaged Ice Antitrust Litig.*, 723 F. Supp. 2d 987, 1004 (E.D. Mich. 2010) ("If the Court can discern some 'factual enhancement' pointing toward, or suggesting a basis for inferring, an illegal agreement, the motion to dismiss must be denied.").

[10] *Hobart-Mayfield*, 48 F.4th at 665; *see also C.S. Sewell, M.D.P.C. v. Amerigroup Tenn., Inc.*, 2018 WL 6591429, *3 (M.D. Tenn. Dec. 14, 2018).

[11] *Cont'l Ore Co. v. Union Carbide & Carbon*, 370 U.S. 690, 699 (1962); *see also In re Se. Milk Antitrust Litig.*, 555 F. Supp. 2d 934, 943 (E.D. Tenn. 2008) (rejecting the defendants' "attempt to

## ARGUMENT

### I. Plaintiffs Have Plausibly Alleged Parallel Conduct and Plus Factors Indicative of Agreement.

#### A. Plaintiffs sufficiently allege parallel conduct by each Defendant such that Defendants are on notice of the claims against them.

Relying on a case from outside the Sixth Circuit, Defendants incorrectly argue that Plaintiffs must answer the "who, did what, to whom (or with whom), where, and when" as to each Defendant's participation in the cartel.[12] But when alleging parallel conduct and plus factors, as here, the complaint need only "put defendants on notice concerning the basic nature of their complaints against the defendants and the grounds upon which their claims exist."[13] As the district court in *In re Polyurethane Foam Antitrust Litig.* put it, "the plausibility pleading standard does not require a court to construct a mandatory checklist of the 'who, what, where, when, and how' of an antitrust agreement for each defendant."[14] Indeed, "[p]articipation by each conspirator in every detail in the execution of the conspiracy is unnecessary to establish liability, for each conspirator may be performing different tasks to bring about the desired result."[15] Instead, it is sufficient for a complaint, taken as a whole, to "allege that each individual defendant joined the conspiracy and played *some* role in it."[16]

---

parse and dismember the complaints"); *In re Packaged Ice*, 723 F. Supp. 2d at 1004 (same).

[12] Student Mot. at 8 (citing *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042 (9th Cir. 2008)).

[13] *In re Se. Milk*, 555 F. Supp. 2d at 943; *see also In re Cast Iron Soil Pipe & Fittings Antitrust Litig.*, 2015 WL 5166014, at *11 (E.D. Tenn. June 24, 2015) ("[T]he Court is cognizant that the issue before it does not fall under a heightened pleading standard and is not presented at the summary judgment stage of this litigation.").

[14] 799 F. Supp. 2d 777, 795 (N.D. Ohio 2011), *reconsideration denied,* 2011 WL 13133853, *1 (N.D. Ohio July 27, 2011) ("use of a supposedly 'general' pleading device is improper only if the allegations fail to provide Defendants sufficient notice of the claims asserted against them").

[15] *In re Broiler I*, 290 F. Supp. 3d at 803.

[16] *In re Processed Egg Antitrust Litig.*, 902 F. Supp. 2d 704, 715 n.11 (E.D. Pa. 2012) (emphasis in original).

As alleged in the complaint, throughout the class period, Defendants provided RealPage with competitively sensitive business data and, in exchange, received from RealPage above-market rental pricing determinations based on that data, which in fact drove above-market prices. First, Plaintiffs allege that "RealPage is a company that collects real-time pricing and supply levels from its participants," which RealPage compiles "into a common algorithm that sends the participants forward-looking, unit-specific pricing and supply recommendations based on their shared data" to achieve "above market" student rents. ¶¶ 5, 15, 140, 142. Plaintiffs allege that "[e]ach of the Lessor Defendants participated in RealPage's scheme to artificially inflate the price of student housing rent during the class period."[17]

- For example, **Greystar** serves more than 80 universities and manages $17.3 billion in student housing assets. ¶ 25. Plaintiffs allege that Greystar uses RealPage's software to set prices for student housing above competitive rates. ¶ 56. Greystar used RealPage to set prices at a 290-apartment student living property in Austin, Texas, telling its property managers that it "always wanted" them to accept RealPage's pricing recommendations, which they did approximately 98 to 99% of the time. *Id.*

- **BH Management**, which later formed B.HOM Student Living, manages over 30,000 beds across 40-plus universities. ¶ 26; *see also* ¶¶ 30-31. Plaintiffs allege that BH Management uses RealPage's software to set prices for student housing above competitive rates. ¶ 57. BH Management manages a property located in Denver, Colorado, and RealPage has created a special private website for BH Management called "BH Corporate University,"

---

[17] ¶ 54. These allegations distinguish *In re Travel Agent Comm'n Antitrust Litig.*, where "Plaintiffs attempt[ed] to implicate [certain] defendants in the purported conspiracy by relying on several vague allegations . . . that refer to 'defendants' or 'defendants' executives.'" 583 F.3d 896, 905 (6th Cir. 2009); *see also Total Benefits Planning Agency Inc. v. Anthem Blue Cross & Blue Shield*, 552 F.3d 430, 436 (6th Cir. 2008). *See* Student Mot. at 8-9.

which it uses to train BH Management on how to use the RealPage software. *Id.* And Sierra Garza, a Senior Revenue Manager for BH Management, credits RealPage for providing data that "yields a better performance." *Id.*

- **Campus Advantage** specializes in property management for student housing communities and has over 250 communities in 18 states. ¶ 27. Plaintiffs allege that Campus Advantage uses RealPage's software to set prices for student housing above competitive rates. ¶ 58. RealPage's "pricing recommendations would be implemented automatically unless they were specifically overridden by Campus Advantage employees," who "would have to enter reasons . . . if it chose not to accept them." Campus Advantage has credited RealPage's software with increasing student rent by more than 5% and as much as 11.1% for student housing properties near the University of Missouri. *Id.*

- **Cardinal Group** provides property management services for on-and-off campus student housing. ¶ 28. Plaintiffs allege that Cardinal Group uses RealPage's software to set prices for student housing above competitive rates. ¶ 59. Cardinal Group would "receive rent recommendations on a weekly basis" and during student leasing season would "meet each week with RealPage account executives over Zoom to discuss rent recommendations." *Id.* If Cardinal Group declined the rent recommendation, then Cardinal Group would have to provide reasons. *Id.*

- **CA Student** manages about 30,000 beds in more than 60 university markets. ¶ 29. Plaintiffs allege that CA Student uses RealPage's software to set prices for student housing above competitive rates. ¶ 60. Employees at CA Student with national and regional responsibilities "met with RealPage representatives on a regular basis" regarding CA Student's revenue goals. *Id.* Individual property managers at CA Student would then "have

phone calls with RealPage representatives on a weekly basis" during the pre-leasing season where RealPage would "discuss the actions of competitor buildings" and review software "recommendations on raising rents." *Id.*

Defendants then argue that this does not constitute parallel conduct due to variation in "temporal proximity" of Lessor Defendants' adoption of RealPage and in their usage of it.[18] But the "Supreme Court has long held that simultaneous action is not a requirement to demonstrate parallel conduct."[19] Rather, allegations of sequential conduct are "common" to establish parallelism,[20] because "*Twombly* does not require that a complaint include allegations of [] unnatural coincidence in the management of competitors' businesses."[21] Instead, "it is well settled that the law does not require every defendant to participate in the conspiracy by identical means."[22] What matters here is that each Lessor Defendant was alleged to have shared its competitively-sensitive business data with RealPage and received above-market rental pricing determinations based on aggregation of that data. And this they have done at the same time on an ongoing basis.

Moreover, as a result of these exchanges of student pricing data and RealPage's algorithmic determinations, rent for student housing properties was higher among Lessor Defendants'

---

[18] Student Mot. at 12-13.

[19] *In re Broiler I*, 290 F. Supp. 3d at 791 (citing *Interstate Cir. v. U.S.*, 306 U.S. 208, 227 (1939)).

[20] *Kleen Prods. v. Packaging Corp. of Am.*, 775 F. Supp. 2d 1071, 1077 nn.5, 9 (N.D. Ill. 2011).

[21] *In re Plasma-Derivative Protein Therapies Antitrust Litig.*, 764 F. Supp. 2d 991, 1000 (N.D. Ill. 2011); *see also In re Interest Rate Swaps Antitrust Litig.*, 261 F. Supp. 3d 430, 479 (S.D.N.Y. 2017) ("Unanimity of action . . . is not required."); *SD3 LLC v. Black & Decker*, 801 F.3d 412, 428-29 (4th Cir. 2015) (rejecting the argument that parallel conduct requires that "defendants move in relative lockstep, achieving their common anticompetitive ends (exclusion) only by substantially identical means," because "[s]o far as we can tell, this standard finds no support in any existing authority").

[22] *In re Currency Conversion Fee Antitrust Litig.*, 264 F.R.D. 100, 114 (S.D.N.Y. 2010); *see also In re Domestic Airline Travel Antitrust Litig.*, 221 F. Supp. 3d 46, 69 (D.D.C. 2016) ("Plaintiffs do not need to demonstrate that Defendants [acted] in exactly the same way in order to adequately allege parallel conduct.").

properties compared to non-defendant properties, according to a regression analysis performed by Plaintiffs using publicly-available pricing data for Auburn, Baton Rouge, Tallahassee, and Eugene. ¶¶ 10, 141. Indeed, in a press release, RealPage admitted that its revenue management software "yielded a 2% to 7% revenue outperformance in the market." ¶¶ 15, 47; *see also* ¶ 48.

Defendants make various factual challenges to Plaintiffs' empirical analysis. But Plaintiffs' "statistical analysis is not a conclusory assertion; it is a factual allegation that the Court must credit."[23] So, "[a]t this stage, a statistical analysis, like any other allegation, need only be plausible" and "[m]erely pointing out that there are problems with the analysis, or that a better method is available, will not suffice."[24]

Further, even if considered, Defendants' challenges fail.[25] First, Defendants inexplicably argue that "Plaintiffs do not allege there were purported price increases based on a recommendation from RealPage." But Campus Advantage, for instance, has also credited RealPage's software with increasing student rent by "more than 5 percent." ¶ 58; *see also* ¶¶ 15, 66, 142. Second, Defendants claim that RealPage made determinations to *reduce* prices. But Defendants do not, and cannot, provide a citation to the complaint for this assertion. And the exhibits Defendants cite simply suggest that this "might" occur,[26] whereas RealPage's own promotions show that the purpose and effect of its software was to achieve "above market" pricing.[27] Third, Defendants claim that Plaintiffs' regression "does not show any price movement at all." But this ignores that it shows higher prices among Lessor Defendants' properties.[28] Finally,

---

[23] *Dover v. British Airways*, 2014 WL 317845, at *2 (E.D.N.Y. Jan. 24, 2014).

[24] *City of Philadelphia v. Bank of Am.*, 498 F. Supp. 3d 516, 528 (S.D.N.Y. 2020).

[25] Student Mot. at 13-14.

[26] Student Mot. at 4 (citing Decl. of Stephen J. McIntyre ISO Mot. to Dismiss Student Pls.' First Am. Consol. Class Action Compl., Exs. B & C).

[27] *See also* Statement of Facts, above.

[28] ¶ 141. Defendants mistakenly cite *In re Cedar Shakes & Shingles Antitrust Litig.* as supporting

Defendants then argue that the "asking rents" reflected in the regression do not reflect "actual rental prices." But this was the best data publicly available to Plaintiffs and, given the allegations that Lessor Defendants implementing RealPage pricing were *less* likely to provide concessions, ¶¶ 61, 74, 82, the regression overcharge estimates are, if anything, conservative.

### B. The plus factors here, taken in combination, are strongly indicative of an agreement.

Plus factors are factual context "pointing toward, or suggesting a basis for inferring, an illegal agreement."[29] The complaint details numerous plus factors that courts recognize as supporting an inference of an agreement.[30] Evaluated holistically, as the Supreme Court requires, these plus factors strongly support the plausibility of the alleged agreement.[31]

#### 1. The stated anticompetitive purpose of RealPage's information exchange supports the plausibility of agreement.

A conspiracy is "readily inferred when the acts have no business function other than to inform rivals."[32] Here it is more dire. RealPage explicitly states that the business function of its

---

a lack of parallel pricing here, *see* Student Mot. at 14, but that case accepted "the pricing data as adequately establishing" parallel conduct, though finding it too generic to act as a plus factor in reliance on the Ninth Circuit's decision in *Musical Instruments*, which faulted the plaintiffs for—unlike here—alleging "an increase in the average retail price of *all* guitars and guitar amplifiers sold" and not just those "manufactured by *defendants*." 2020 WL 832324, at *7, *9 (W.D. Wash. Feb. 20, 2020) (quoting *In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1197 (9th Cir. 2015)) (emphasis in original).

[29] *In re Packaged Ice*, 723 F. Supp. 2d at 1004.

[30] *See generally In re Nw. Airlines Corp. Antitrust Litig.*, 208 F.R.D. 174, 202 (E.D. Mich. 2002) ("the Court finds that the two plus factors put forward by Plaintiffs are sufficient to withstand a judgment against them as a matter of law on their § 1 claim"); *Brown v. JBS USA Food Co.*, 2023 WL 6294161, at *12 (D. Colo. Sept. 27, 2023) (*Red Meat Wages*) ("Plaintiffs have sufficiently plead[ed] at least two plus factors, information exchanges and high-level interfirm communications, sufficient to nudge their claim across the line from conceivable to plausible and to permit an inference of an unlawful agreement.").

[31] *In re Se. Milk*, 555 F. Supp. 2d at 943 (citing *Cont'l Ore Co.*, 370 U.S. at 699 (cautioning courts against "compartmentalizing the various factual components" of an antitrust suit)).

[32] Philip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application*, § 1435g (4th ed. 2021).

information exchange is to collect and analyze competitor rents in order to raise prices "above market." ¶¶ 15, 140, 142. Any Lessor Defendant signing up with RealPage therefore can be inferred to share that stated anticompetitive intent. And a "common motive to conspire" is of course a plus factor.[33]

Defendants argue that the "motive to maximize profits cannot support an inference of conspiracy," because "all businesses" have that motive.[34] But a motive to share competitively sensitive information in order to raise prices above market is a different beast. Plaintiffs allege that RealPage touts its software as providing Lessor Defendants with the unprecedented ability to "track your competition's rent with precision." ¶ 9. RealPage explains that its software "utilizes the competitive data" by "[c]omparing the effective rent you achieve to the top and bottom of the competitive range for your selected competitors." ¶¶ 11, 42. And, for each property manager, RealPage "[d]ynamically calibrates elasticity for each bedroom type" and "assigns a price position for each lease." ¶¶ 68-69. As RealPage puts it, this allows Lessor Defendants to "outperform[] the market 2%-5%." ¶ 48; *see also* ¶ 142. This is plainly an anticompetitive motive.

### 2. Lessor Defendants' acceptance of RealPage's invitation to participate in anticompetitive conduct creates an inference of agreement to do so.

As the Supreme Court stated in *Interstate Cir.*, "[a]cceptance by competitors, without previous agreement, of an invitation to participate in a plan, the necessary consequence of which, if carried out, is restraint of interstate commerce, is sufficient to establish an unlawful conspiracy under the Sherman Act."[35] For example, in *Meyer v. Kalanick*, the court denied Uber's motion to

---

[33] *Hobart-Mayfield*, 48 F.4th at 665-66.

[34] Student Mot. at 15-16.

[35] *PLS.Com, LLC v. Nat'l Ass'n of Realtors*, 32 F.4th 824, 843 (9th Cir. 2022), *cert. denied,* 143 S. Ct. 567 (2023) (quoting *Interstate Cir.*, 306 U.S. at 227); *Sitzer v. Nat'l Ass'n of Realtors*, 420 F. Supp. 3d 903, 912-13 (W.D. Mo. 2019) (same); *In re Nexium (Esomeprazole) Antitrust Litig.*, 42 F. Supp. 3d 231, 252 (D. Mass. 2014) (same), *aff'd,* 842 F.3d 34 (1st Cir. 2016).

dismiss claims that it had orchestrated a horizontal price-fixing agreement with its drivers, where the plaintiffs had "plausibly alleged a conspiracy in which drivers sign up for Uber precisely on the understanding that the other drivers were agreeing to the same pricing algorithm."[36]

Here, RealPage invited Lessor Defendants to provide competitively sensitive data to it in return for providing supra-competitive student rental pricing determinations, which Lessor Defendants then implemented. ¶¶ 5, 15, 140, 142. As Plaintiffs allege, "RealPage and Lessor Defendants have effectuated their anticompetitive agreement to hike prices by agreeing generally to set prices using RealPage's coordinated algorithmic pricing"—knowing that the purpose of the algorithmic pricing was to achieve supracompetitive student rents.[37] For example, RealPage prominently advertises its relationship with large student housing operators by way of press releases and promotional videos, emphasizing how the use of RealPage's software has allowed companies to price "above market." ¶¶ 15, 140, 142. As stated in *In re Auto. Parts*, "the existence of an agreement can be revealed by a course of dealings."[38]

Indeed, the DOJ recently stated that "competitors adopt[ing] the same pricing algorithms" can "lead to tacit or express collusion in the marketplace, potentially resulting in higher prices." ¶ 146. As the district court in *In re Nexium* put it, "courts do treat separate bilateral agreements as evidence of a single conspiracy when the agreements are sufficiently interdependent and made in the context of other plus factors suggesting coordination."[39]

### 3. Lessor Defendants' exchange of current and competitively sensitive information through RealPage supports the plausibility of agreement.

In *Hobart-Mayfield,* the Sixth Circuit recognized that "whether defendants have exchanged

---

[36] 174 F. Supp. 3d 817, 823-24 (S.D.N.Y. 2016) (citing *Interstate Cir.*, 306 U.S. at 226-27).

[37] ¶ 67; section I.B.1, above.

[38] *In re Auto. Parts Antitrust Litig.*, 2018 WL 2181100, at *3 (E.D. Mich. Jan. 31, 2018).

[39] 42 F. Supp. 3d at 252.

or have had the opportunity to exchange information relative to the alleged conspiracy" is a plus factor.[40] In *In re Text Messaging Antitrust Litig.*, the Seventh Circuit likewise described the exchange of price information as "a practice, not illegal in itself, that facilitates price fixing."[41] In *Todd*, the Second Circuit explained that "[i]nformation exchange is an example of a facilitating practice that can help support an inference of a price-fixing agreement."[42] And the district court in *Hyland* held that "an exchange of price-information" among the parties was a factual circumstance supporting the plausibility of agreement.[43]

Plaintiffs allege that the Lessor Defendants, using RealPage as a conduit, share "competitively sensitive" data on their student housing real estate leases. ¶¶ 67, 131. Plaintiffs allege that the "current" and "real-time data" that RealPage describes "as fine and granular as bits of sand" allowed it to "calculate and recommend supracompetitive unit-by-unit, or bed-by-bed, pricing on a daily basis," ¶¶ 9, 48, 50, 229, and that the "real-time accessibility of this data" to Lessor Defendants was "critical to widening the margins for above market performance." ¶¶ 15, 66. But, as the Supreme Court stated in *Am. Column*, "[g]enuine competitors do not make daily, weekly and monthly reports of the minutest details of their business to their rivals"[44] and, as it stated in *Gypsum*, "[e]xchanges of current price information, of course, have the greatest potential for generating anticompetitive effects."[45] Moreover, Plaintiffs allege that the data shared among

---

[40] 48 F.4th at 665-66.

[41] 630 F.3d 622, 628 (7th Cir. 2010); *see also Todd v. Exxon Corp.*, 275 F.3d 191, 198 (2d Cir. 2001) ("Information exchange is an example of a facilitating practice that can help support an inference of a price-fixing agreement.").

[42] 275 F.3d at 213.

[43] *Hyland v. Homeservices of Am., Inc.*, 2007 WL 2407233, at *3 (W.D. Ky. Aug. 17, 2007).

[44] *Am. Column & Lumber Co. v. U.S.*, 257 U.S. 377, 410 (1921).

[45] *U.S. v. U.S. Gypsum Co.*, 438 U.S. 422, 441 n.16 (1978); *see also Todd*, 275 F.3d at 211 ("current data have greater potential to affect future prices and facilitate price conspiracies") (citing *Am. Column*, 257 U.S. at 398-399, and *Gypsum*, 438 U.S. at 441 n.16).

the Defendants was nonpublic and used asymmetrically against student lessees.[46] But the Second Circuit in *Todd* recognized that such characteristics of the data exchange were "precisely those that arouse suspicion of anticompetitive activity."[47]

Moreover, recent price-fixing cases involving Agri Stats—the protein industry's RealPage—were permitted to proceed past motion to dismiss in part due to the information sharing Agri Stats facilitated. *In re Broiler I* held that the "the extent of information sharing through Agri Stats [wa]s unusual and plausibly amounts to a method of communication."[48] *In re Pork* likewise pointed to the "central role that Agri Stats played in the alleged conspiracy" as an "undoubtedly strong" plus factor.[49] *In re Turkey* agreed that Agri Stats's provision of "access to otherwise private information on the production and prices of other Defendants" was a plus Factor supporting "an inference of a price-fixing conspiracy."[50] And *Haff Poultry v. Tyson Foods* found that the defendant poultry processors plausibly engaged in a "reciprocal horizontal agreement" to exchange information by "provid[ing] information to Agri-Stats knowing it would be disseminated and that, in return, they would receive similar information."[51] Indeed, the DOJ recently filed suit against Agri Stats—since joined by the states of California, Minnesota, North Carolina, and Tennessee[52]—for its anticompetitive exchange of current, competitively sensitive information that was detailed enough for processors "to see how their sales compare[d] to market prices" and asymmetrical

---

[46] ¶¶ 67, 54 ("To participate in RealPage's pricing algorithm (and thus see how the program is being used), a user must own property . . . .").

[47] 275 F.3d at 213; *see also id.* ("Public dissemination is a primary way for data exchange to realize its procompetitive potential.").

[48] 290 F. Supp. 3d at 788.

[49] *In re Pork Antitrust Litig.*, 2019 WL 3752497, at *7 (D. Minn. Aug. 8, 2019).

[50] *In re Turkey Antitrust Litig.*, 642 F. Supp. 3d 711, 727-28 (N.D. Ill. 2022).

[51] Tr. of Mot. Hearing, 2020 WL 4001175 (E.D. Okla. Jan. 6, 2020).

[52] U.S. Dep't of Justice (Nov. 6, 2023), https://www.justice.gov/opa/pr/four-states-join-justice-departments-suit-against-agri-stats-organizing-and-managing (last visited Nov. 6, 2023).

because only processors could purchase it.[53] And while Lessor Defendants here are not receiving the volume of underlying data that the processors received in the Agri Stats cases, Lessor Defendants are receiving price elasticities and determinations—based on their data exchange—that become the default unless overridden. So the underlying data need not be exchanged here, because RealPage has already taken the work of analyzing and exploiting it to the finish line.

The cases that Defendants rely on either support Plaintiffs or are distinguishable.[54] In *Cont'l Cablevision v. Am. Elec. Power Co.*, the Sixth Circuit unremarkably stated that a company may "examin[e] rates charged by similar companies in the industry and in the exercise of business judgment, consider[] such rates in the establishment of its own rate"—but only "in the absence of an unlawful purpose or anticompetitive result."[55] Here we have both, so this case supports Plaintiffs.[56] Likewise, in *U.S. v. True*, the Sixth Circuit distinguished "after-the-fact, price verifications" from times when the "conspirators discussed pricing increases prior to making announcements," as Lessor Defendants effectively do here with RealPage as their conduit.[57] In *In re Loc. TV Advert. Antitrust Litig.*, the district court found that the hub's analytics were not "presented with so much specificity that the Broadcaster Defendants could use them to police a secret or tacit conspiracy to fix prices," unlike in cases involving Agri Stats where disaggregated, defendant-specific data could be deanonymized.[58] But here the data is aggregated precisely for the purpose of producing algorithmic pricing determinations—and RealPage (the enforcer here) "tracks the rate at which its recommended prices are accepted, which it expresses as a 'lease

---

[53] Complaint, *U.S. v. Agri Stats, Inc.*, 2023 WL 7037629, at ¶ 109 (D. Minn. Sept. 28, 2023).

[54] Student Mot. at 17-19.

[55] 715 F.2d 1115, 1119 (6th Cir. 1983).

[56] *See* sections I.B.1. & II.B.1.

[57] 250 F.3d 410, 423 (6th Cir. 2001).

[58] 2022 WL 3716202, *6 (N.D. Ill. Aug. 29, 2022).

compliance' rate in internal dashboards."[59] And in *In re Ins. Brokerage Antitrust Litig.*, there were "no allegations that any insurer ever horizontally disclosed to its competitors the details of its vertical agreement with a broker," while there were instances in which a "broker communicated the details of its contingent commission agreement with one insurer-partner to other insurer-partners, in violation of confidentiality provisions forbidding such disclosures."[60] But here the information sharing (of rental pricing elasticities with pricing determinations based thereon) is the norm—and Lessor Defendant went into the arrangement with RealPage knowing their information would be shared with other Lessor Defendants, as opposed to it being against the rules.

### 4. Lessor Defendants' abrupt change in pricing behavior supports the plausibility of collusion.

As the Seventh Circuit stated in *Kleen*, "an abrupt change in business practices" reflecting a "shift in firm behavior" can "support an inference of conspiracy."[61] Areeda and Hovenkamp's *Antitrust Law* treatise likewise states that "conspiracy may be inferred from parallel conduct that deviates from normal business practice."[62] So too here.

Plaintiffs allege that "before implementing any of Defendant RealPage's 'Revenue Management Solutions' software, competing lessors would try to maximize occupancy by keeping rent competitive and/or offering concessions (*e.g.*, a free month of rent) and giveaways (*e.g.*, raffle prizes or gift cards)." ¶ 3. Lessor Defendants had only a short time period to set rent prices and ensure "heads in beds" at the beginning of a new school term. ¶ 61. RealPage called the status quo—in which competitors actually competed—"leaving money on the table." ¶ 63. Instead of offering price reductions and discounts to entice customers, RealPage enabled property managers

---

[59] ¶ 86; *see also* ¶¶ 84-93. *See also* section I.B.6, below.
[60] 618 F.3d 300, 329 (3d Cir. 2010).
[61] *Kleen Prods. v. Georgia-Pacific*, 910 F.3d 927, 936-37 (7th Cir. 2018).
[62] Areeda and Hovenkamp, § 308.

to set "top tier prices," and participation in the cartel allowed property managers to "feel confident that [they] won't end up with empty beds at the time the semester starts." *Id*. RealPage advised its potential co-conspirators: "If you want to outperform the market term after term, focus less on occupancy and more on strategic lease pricing." ¶¶ 15, 66, 142.

Following widespread adoption of RealPage, Lessor Defendants swiftly and concertedly shifted from the previous competitive "market share over price" strategy to a new collusive "price over volume" strategy. ¶ 63; *see also* ¶ 71. Contrary to Defendants' argument, this shift in strategy does not mean that vacancy rates necessarily increased.[63] But it does mean, as RealPage put it, that "[r]ather than lease to a target occupancy . . . you're leasing to achieve maximum revenue." ¶ 63; *see also* ¶ 74. In *In re Urethane Antitrust Litig.*, the Tenth Circuit recognized that a "price over volume strategy" was itself a plus factor, as competitors would otherwise risk loss of market share.[64] And Thoma Bravo admits that use of RealPage software was a "fundamental shift" in the industry. ¶ 23. In sum, this abrupt change in business practices is a plus factor tending to exclude the inference that Defendants were acting independently.

### 5. Exchanging sensitive data, and increasing student rental prices above market, would be against each Lessor Defendant's independent interest absent agreement.

As the Sixth Circuit stated in *Hobart-Mayfield*, plus factors include "whether the defendants' actions, if taken independently, would be contrary to their economic self-interest."[65] For example, in *In re Polyurethane Foam Antitrust Litig.*, the district court denied *summary judgment* to the defendants on the plaintiffs' price-fixing claims where it was "risky for Defendants to privately exchange such information because their prices could be undercut *but-for an*

---

[63] Student Mot. at 14-15.
[64] 768 F.3d 1245, 1265 (10th Cir. 2014). *See also* section I.B.5.
[65] 48 F.4th at 665-66.

*understanding to use the information to coordinate rather than to compete*."[66] The district court determined that a "jury could reasonably conclude that Defendants shared such information with each other because there existed a common understanding of how the information would be used— not to compete, but to collude."[67] In short, "[w]here plaintiffs allege behavior that would plausibly contravene each defendant's self-interest in the absence of similar behavior by rivals, a § 1 claim is stated under *Twombly*."[68] So too here.

As discussed above, Lessor Defendants engaged in an "fundamental" shift in strategy to maximizing price over occupancy.[69] This would have been against the interest of any single Lessor Defendant acting in isolation, because others—if actually competing—would have stolen market share and left the units priced above market empty. ¶ 64. But Lessor Defendants—acting with an agreement not to compete on price—did not have to worry about their competitors offering a better deal. *Id*. Instead, Lessor Defendants agreed to follow RealPage's pricing determinations with the mutual understanding that their competitors would do the same. ¶¶ 6, 9, 64, 140, 142. This supports a horizontal agreement to fix prices, as such proof ultimately carries the day. *See Interstate Cir.*, 306 U.S. at 222 (affirming finding of horizontal conspiracy where absent agreement "there was risk of a substantial loss of the business"); *U.S. v. Apple*, 791 F.3d 290, 320 (2d Cir. 2015)

---

[66] 152 F. Supp. 3d 968, 989-90 (N.D. Ohio 2015).

[67] *Id.* at 991; *see also In re Packaged Ice*, 723 F. Supp. 2d at 1016 (citing *Standard Iron Works v. Arcelormittal*, 639 F. Supp. 2d 877, 896 (N.D. Ill. 2009) ("defendant's actions against self-interest constitute widely recognized plus factor suggestive of concerted action")).

[68] 723 F. Supp. 2d at 1016 (citing *Starr v. Sony BMG Music Ent.*, 592 F.3d 314, 327 (2d Cir. 2010)). *See also Meyer*, 174 F. Supp. 3d at 823-24 (finding horizontal agreement plausible where "drivers' agreements with Uber would be against their own interests were they acting independently"); *In re Elec. Books Antitrust Litig.*, 859 F. Supp. 2d 671, 683-84 (S.D.N.Y. 2012) (finding horizontal agreement plausible where each publisher defendant's agreement with Apple would have "contravened that defendant's self-interest in the absence of similar behavior by its rivals," because the "publisher would be selling its eBooks at a higher price than its competitors and would therefore be losing market share").

[69] *See* section I.B.4.

(affirming finding of horizontal cartel where vertical agreements "were only attractive to the Publisher Defendants to the extent they acted collectively"); *Toys "R" Us v. F.T.C.*, 221 F.3d 928, 936 (7th Cir. 2000) (affirming finding of horizontal agreement where "each manufacturer was afraid to curb its sales to the warehouse clubs alone, because it was afraid its rivals would cheat").[70]

### 6. RealPage's use of policing mechanisms typical of cartels also supports the plausibility of agreement.

The Seventh Circuit in *Kleen* explained that evidence of enforcement mechanisms may "dissipate the inference of independent behavior."[71] And, as the district court in *In re Broiler I* recognized in denying Defendants' motion to dismiss, Plaintiffs alleged that "Defendants knew that they were all in agreement because Agri Stats . . . served as a mechanism to monitor each other[]."[72] Here, RealPage provides that mechanism.

Plaintiffs allege that RealPage pressures Lessor Defendants to "accept its recommended prices, and closely monitors compliance—going so far as to have housing managers justify, in writing, deviations from RealPage's recommended pricing." ¶¶ 6, 58. Trainings captured from RealPage's website demonstrate that Lessor Defendants must manually override the pricing provided by RealPage, and Lessor Defendants are instructed to provide "objective facts, not subjective reasoning" to enact the override. *Id*. Moreover, RealPage employs "pricing advisors," who oversee and closely monitor Lessor Defendants' compliance with RealPage's recommended

---

[70] Defendants' reliance on *DRAM* is misplaced as that case involved an oligopoly where it was "rational for the two smaller manufacturers to follow Samsung's lead and focus on profitability." *In re Dynamic Random Access Memory (DRAM) Indirect Purchaser Antitrust Litig.*, 28 F.4th 42, 49 (9th Cir. 2022); *see also* Student Mot. at 15 (citing *In re Travel Agent Comm'n Antitrust Litig.*, 2007 WL 3171675, at *10 (N.D. Ohio Oct. 29, 2007) (discussing testimony regarding follow-the-leader commission cuts)). Defendants do not point to similar facts here—much less facts compelling enough to render Plaintiffs' theory implausible.

[71] 910 F.3d at 937. *See* Student Mot. at 20-21.

[72] 290 F. Supp. 3d at 798.

rates. ¶¶ 7, 89-92, 140. Indeed, RealPage employees meet with Lessor Defendants regularly—often once a week or more—to ensure that Lessor Defendants comply with the program. ¶ 8.

Ultimately, RealPage's determinations were widely accepted. ¶ 86. Contrary to Defendants' assertion that "Student Plaintiffs do not allege any purported general acceptance rate by Student Lessors,"[73] Plaintiffs allege that Greystar accepted RealPage's pricing determinations "98 to 99%" of the time and "always wanted" property managers to accept RealPage's pricing determinations. ¶ 86. Indeed RealPage made sure of this with "push back" on prices that "were lower than what RealPage recommended." ¶ 88. Moreover, RealPage tracks the rate at which its recommended prices are accepted, which it expresses as a "lease compliance" rate in internal dashboards, with 100% meaning "no compliance variances."[74] Such policing indicates a cartel.

### 7. The student housing market is conducive to collusion.

In *Erie Cnty., Ohio v. Morton Salt, Inc.*, the Sixth Circuit acknowledged that while "[s]tanding alone" descriptions of the market do not give rise to an inference of unlawful agreement, "they might, when combined with the other factors, strengthen the plausibility of such an inference."[75] Likewise, in *Text Messaging*, the Seventh Circuit explained that "industry structure that facilitates collusion constitutes supporting evidence of collusion."[76] For example, in *In re Auto. Parts Antitrust Litig.*, the district court found that market conditions were "conducive to the initiation and continuation of an antitrust conspiracy" where "the structure of the market

---

[73] Student Mot. at 21.

[74] ¶ 86. *Llacua* is inapposite. *See* Student Mot. at 20 (citing *Llacua v. Western Range Ass'n*, 930 F.3d 1179, 1181 (10th Cir. 2019)). There, the Tenth Circuit found the alleged conspiracy to keep wages low for shepherds implausible, because the "federal government sets the lowest wage that may be offered to H-2A shepherds," so "no rancher would be logically inclined to offer more." *Id.* at 1181. *See generally Superior Prod. P'ship v. Gordon Auto Body Parts Co.*, 784 F.3d 311, 319-20 (6th Cir. 2015) ("More evidence is required the less plausible the charge of collusive conduct.").

[75] 702 F.3d 860, 870 (6th Cir. 2012). *See* Student Mot. at 19-20.

[76] 630 F.3d at 627-28.

[wa]s highly concentrated, with high barriers to entry," and "no close substitutes" meant "inelastic demand" allowing for "supracompetitive prices."[77] And *In re Packaged Ice* likewise found that market concentration, substantial barriers to entry, and sale of a fungible product constituted a "market structure [that] plausibly suggests collusive behavior."[78] So too here.

*First*, student housing property owners and operators face significant entry barriers, including the high cost of acquiring property, establishing a property management infrastructure, and ongoing costs of building maintenance and regulatory compliance. ¶¶ 119-120. So new entrants into the student rental market to discipline cartel pricing are unlikely. *Second*, renters face high exit barriers, because renters typically incur substantial cost and inconvenience when moving. ¶ 121. So student renters cannot easily turn to alternatives. *Third*, the demand for student rentals is relatively inelastic, particularly in so-called "college towns," because students prefer to live near school and buying may be financially prohibitive or impractical for those planning to move in four years. ¶ 123. So there are no reasonable substitutes. *Fourth*, the market for student housing rentals is highly concentrated, with many college towns dominated by relatively few sellers and Lessor Defendants' properties often clustered in these places. ¶ 125; *see also* ¶¶ 126-129. *Finally*, the residential real estate properties used for student housing are relatively fungible, particularly within classes of properties.[79] So no individual Lessor Defendant could have unilaterally (and successfully) engaged in supracompetitive pricing—giving each an incentive to collude.

---

[77] 29 F. Supp. 3d 982, 996 (E.D. Mich. 2014) (denying motion to dismiss); *see also In re Auto. Parts Antitrust Litig.*, 50 F. Supp. 3d 869, 881 (E.D. Mich. 2014) (denying motion to dismiss).

[78] 723 F. Supp. 2d at 1014 (denying motion to dismiss). *See also In re Loc. TV Advert. Antitrust Litig.*, 2020 WL 6557665, at *9-10 (N.D. Ill. Nov. 6, 2020) (denying motion to dismiss where "market concentration" and "high barriers to entry" are characteristics of a market structure that "supports an inference of a price fixing conspiracy"); *Kleen*, 775 F. Supp. at 1081 (denying motion to dismiss where barriers to entry, inelasticity of demand, and commodity-like products provide "additional contextual support for the plausibility of a conspiracy").

[79] ¶ 130. Defendants ignore this caveat. *See* Student Mot. at 29 n.11.

8.      **Besides daily opportunities to collude by following RealPage's pricing recommendations, Lessor Defendants were encouraged to communicate directly on price and attended industry conferences where they had additional opportunities to do so.**

As the district court stated in *In re Packaged Ice*, "[a]llegations of opportunities to collude bolster the plausibility analysis."[80] Here, Lessor Defendants had ongoing opportunities to collude by using the RealPage platform to set prices.[81] Moreover, RealPage encourages Lessor Defendants to engage in direct communications with one another to obtain pricing data, exhorting them to "shop your competitors over the phone." ¶ 132. Further, the industry was known for being close-knit. As one former RealPage employee observed: "We would go to conferences and they were all talking. They could be the biggest competitors to each other and they're talking to each other." *Id*. Indeed, RealPage itself would host "Student Summits" for student housing operators and speak at other student housing-specific industry conferences "where more than 1,000 industry professionals gathered to discuss the state of the student housing industry." ¶¶ 137, 139. And, unlike Defendants' cases involving "mere opportunities" to collude,[82] a RealPage press release confirms that these summits included discussion of its pricing platform. ¶ 137.

9.      **Government investigation into and enforcement action regarding RealPage's pricing platform also support the plausibility of collusion.**

Many courts have held that government investigations "support the plausibility of a nationwide conspiracy."[83] Here, members of Congress "opened an investigation of [RealPage's]

---

[80] 723 F. Supp. 2d at 1017 (finding conspiracy adequately alleged based on plus factors including actions against self-interest in absence of collusion, market structure conducive to collusion, opportunities to conspire, and government investigations); *see also In re Auto. Parts*, 29 F. Supp. 3d at 995-96 (finding conspiracy adequately alleged based on plus factors including market structure conducive to collusion, opportunities to conspire, and government investigations).

[81] *See* section I.B.3, above.

[82] Student Mot. at 16-17.

[83] *In re Packaged Ice*, 723 F. Supp. 2d at 1008 (citing *Starr*, 592 F.3d at 324); *see also In re Auto. Parts*, 29 F. Supp. 3d at 995-996; *Hyland*, 2007 WL 2407233, at *3 (factual circumstances

YieldStar in November 2022, requesting information on how this rent-setting software has affected the rental housing market."[84] These Congressional members were concerned that the rise of "rent-setting algorithms have weakened competition" and resulted in "unnecessarily high housing costs for American families."[85] The investigation highlighted that the "algorithm's consideration of non-public pricing information when calculating rent recommendations has effectively created a 'cartel' of landlords that is able to take advantage of non-public information to fix rents."[86] So the Congressional members requested the DOJ to "review rent-setting algorithms like YieldStar" and pointed out that President Biden had already "tasked the [DOJ] with addressing anti-competitive information sharing practices in the housing market."[87] On October 12, 2023, the DOJ indicated that it was considering filing a Statement of Interest in this case due to the government's "substantial interest in addressing the proper application of Section 1 of the Sherman Act, 15 U.S.C. § 1, to the use of algorithms by competitors to help set pricing."[88] This government activity also supports the plausibility of actionable collusion here, as does the recent price-fixing lawsuit filed against RealPage by the District of Columbia on November 1, 2023.[89]

---

supporting plausibility of agreement included "enforcement actions brought by the Department of Justice" and "an exchange of price-information and catalogues between the parties").

[84] Letter from Elizabeth Warren, Sen. Mass., *et al*, to Jonathan Kanter, Asst. Att'y Gen., U.S. Dept. of Justice (Mar. 2, 2023), p.3, available at https://www.warren.senate.gov/imo/media/doc/2023.03.02%20Letter%20to%20DOJ%20re%20 YieldStar%20(RealPage).pdf (last visited Oct. 23, 2023) (Congressional Letter). *See also* Multifamily SAC, ¶ 42; *In re Packaged Ice*, 723 F. Supp. 2d at 997 n.2 ("In analyzing the allegations of Plaintiffs' CAC for purposes of this motion to dismiss, the Court takes judicial notice of, and at times refers to, allegations made in the Complaints filed in this Court in two related actions.").

[85] Congressional Letter, p. 1.

[86] *Id.* at p. 2.

[87] *Id.* at pp. 1, 4.

[88] U.S. Not. of Potential Participation, Dkt. 599 (Oct. 12, 2023).

[89] Complaint, *District of Columbia v. RealPage, Inc.* (D.C. Super. Ct. Nov. 1, 2023), available at https://oag.dc.gov/sites/default/files/2023-11/DC%20OAG%20RealPage%20Complaint%20-

### 10. RealPage's mastermind previously organized a cartel in the airline industry, which also supports the plausibility of a cartel here.

Finally, "if there is other evidence of a present conspiracy," as here, "the defendants' sins elsewhere may cast doubt on the truthfulness of their innocent explanations."[90] RealPage's pricing software was built by an individual who previously was involved in price-fixing. ¶¶ 39, 83. Jeffrey Roper, one of the main architects of RealPage's software, was the former Director of Revenue Management at Alaska Airlines when it and other airlines began using common software to share nonpublic planned routes and prices with each other in the 1980s. *Id*. The DOJ estimated that the agreement cost customers over a billion dollars, and it reached settlements or consent decrees for price-fixing violations with eight airlines, including Alaska Airlines. *Id*. Roper said, "We all got called up before the Department of Justice in the early 1980s because we were colluding . . . . We had no idea." *Id*. But less than a decade later, Roper turned to the housing rental industry to begin building a "master data warehouse" of client data—just as he had before. *Id*.

### C. Defendants' alternative explanations do not establish the agreement is implausible.

As stated in *In re Turkey*, "[w]hile Defendants present alternative explanations for the plus factors outlined, Plaintiffs are only required to allege plausibility at this point in the proceedings."[91] Indeed, the Sixth Circuit instructed in *Watson* that courts are not to "ferret[] out" the most likely of "several plausible explanations."[92] Because Defendants' "innocent" explanations here are far from rendering Plaintiffs' allegations implausible, the motion to dismiss should be denied.[93]

---

%20Filed.pdf.

[90] Areeda & Hovenkamp, § 1421a.

[91] 642 F. Supp. 3d at 727-28. *See also* Legal Standard, above.

[92] *Watson*, 648 F.3d at 458; *see also In re Se. Milk*, 555 F. Supp. 2d at 944.

[93] *Cf. In re Musical Instruments*, 798 F.3d at 1195 (dismissing case where "*the complaint concede[d]* that each manufacturer responded to Guitar Center's pressure and coercion by adopting [Minimum Advertised Price] policies in exchange for Guitar Center's agreement to

Defendants claim that they have "numerous unilateral, procompetitive reasons for using the software," including to "better understand supply and demand in their markets," to "maximize asset value," to "improve user revenues," and to see "a more complete picture of the market."[94] But these explanations all boil down to a spin on their mutual anticompetitive motive to share sensitive pricing data in order to raise price above market.[95] They do not render Plaintiffs' allegations implausible. And Defendants do not explain why reasons such as "managing fluid inventory" and "reducing vacancies" required Lessor Defendants to receive above-market pricing determinations from RealPage.[96] So Plaintiffs emphatically do not—contrary to Defendants' repeated mischaracterization[97]—"concede that there are numerous reasons" for Lessor Defendants to independently and procompetitively choose to use RealPage.

Defendants also argue that a conspiracy here is implausible under the trio of *Interstate Cir.*, *Toys "R" Us*, and *Apple*, because in those cases a "powerful" ringmaster "brought together virtually all of the few competitors in the relevant market."[98] But—just as in *Meyer* where the Plaintiff alleged that "through the Uber app, Kalanick's direct competitors thus empowered him to set his and their fares"[99]—here, through the RealPage platform, Lessor Defendants empowered it to recommend "above market" prices from which they are alleged not to have deviated. ¶ 86. Moreover, the recent information exchange cases with Agri Stats as ringmaster—*In re Broiler*, *In re Pork*, and *In re Turkey*—involved twenty-one, nine, and ten defendant groups respectively, in

---

purchase large volumes of the manufacturer's product stock").

[94] Student Mot. at 5.

[95] *See* section I.B.1, above.

[96] Student Mot. at 5.

[97] *Id.* at 10; *see also id.* at 5, 24.

[98] *Id.* at 10.

[99] First Am. Compl., 2016 WL 950376 (S.D.N.Y. Jan. 29, 2016).

addition to other co-conspirators named in the complaints.[100] And *Meyer* involved thousands of unnamed co-conspirator Uber drivers, for that matter. Moreover, Defendants argue that the trio of cases involved "other factual circumstances."[101] But so does this one: notably, the centralized pricing based on the ongoing exchange of competitively sensitive data (which is made possible precisely due to its aggregation).[102]

Defendants also assert various other flawed reasons why agreement here is implausible. They argue it covers too long a period.[103] But the Sixth Circuit has stated that "it is not uncommon—and therefore not implausible—for antitrust conspiracies to last many years."[104] They also suggest that the anticompetitive effects are due to inflation.[105] But this explanation is itself implausible: a variable affecting all market participants cannot explain away a regression analysis showing higher prices for Lessor Defendants compared to other market participants. ¶ 141. And Defendants have already admitted that their "above market" pricing was due to RealPage's pricing determinations. ¶¶ 15, 47, 48, 66, 77, 142, 161.

Moreover, Defendants argue that "Plaintiffs do not allege that RealPage RMS is used to price enough rental units in any regional submarket" to feel assured that prices would not be undercut by competitors.[106] But for this Defendants rely on a table of "implied market share" that they have constructed; this is wholly inappropriate at the motion to dismiss stage and Exhibit D

---

[100] *In re Broiler Chicken Antitrust Litig.*, 2023 WL 4303476, at *1 n.ii (N.D. Ill. June 30, 2023); *In re Pork*, 2019 WL 3752497, at *1 n.1; *In re Turkey*, 642 F. Supp. 3d at 715 n.2.

[101] Student Mot. at 11.

[102] *See* section I.B.3, above.

[103] Student Mot. at 5.

[104] *Watson*, 648 F.3d at 459.

[105] Student Mot. at 28, 32.

[106] Student Mot. at 22; *see also id.* at 30-31.

should be stricken.[107] In any event, this constructed data ignores—and contradicts—allegations of the complaint. Plaintiffs allege that it was "Defendants and their co-conspirators" who formed the price-fixing and information exchange cartels. ¶¶ 219, 224, 237. And Plaintiffs allege that these co-conspirators are unknown to Plaintiffs, because the "full list of RealPage participants is hidden from the public." ¶¶ 32, 54. Moreover, the allegations of Defendants having acknowledged their ability to price above market suggests that these additional participants in the cartel are numerous enough to ensure its success. ¶¶ 15, 47, 48, 66, 77, 142, 161.

## II.     Plaintiffs Have Plausibly Alleged *Per Se* and Rule of Reason Claims.

### A.     Plaintiffs' horizontal price-fixing claim is subject to a *per se* analysis that does not require examination of the relevant market.

As the Sixth Circuit explains in *In re Se. Milk*, whether a restraint is "unreasonable" is determined under one of two main approaches: the *per se* rule or the "rule of reason."[108] "[C]ertain agreements, such as horizontal price fixing [], are thought so inherently anti-competitive that each is illegal *per se* without inquiry into the harm it has actually caused."[109] Conversely, for vertical agreements analyzed under the rule of reason, "plaintiffs must additionally show that the restraint produced anticompetitive effects within the relevant product and geographic markets."[110]

---

[107] McIntyre Decl., Ex. D.

[108] 739 F.3d 262, 270 (6th Cir. 2014). The Sixth Circuit has "characterized 'quick look' analysis as a third type of category arising from the blurring of the line between per se and rule of reason cases." *Id.* at 274. This is an "abbreviated form of the rule of reason analysis used for situations" where "an observer with even a rudimentary understanding of economics could conclude that the arrangements in question would have an anticompetitive effect on customers and markets." *Id.* In such cases, plaintiffs can meet their burden "without detailed market analysis." *Id.* at 275. So, "[u]nder a quick-look analysis, the Plaintiffs do not necessarily need to establish either product or geographic market evidence in order to defeat summary judgment." *Id.* at 275-76. Plaintiffs have also met their burden at the pleading stage under the quick look standard.

[109] *In re Cardizem CD Antitrust Litig.*, 105 F. Supp. 2d 618, 676 (E.D. Mich. 2000); *see also id.* at 681 ("Plaintiffs have sufficiently alleged facts that allow their antitrust claims to be analyzed under a per se rule.").

[110] *In re Se. Milk*, 739 F.3d at 270.

Here, Plaintiffs allege a horizontal price-fixing agreement subject to *per se* analysis. ¶ 1. Defendants instead contend that the "vertical supplier-customer agreements between RealPage and Student Lessors" should be analyzed under the rule of reason.[111] As a general matter, "the decision about which rule is to be employed will await facts that are developed only in discovery."[112]  But, in any event, this argument was rejected in *Apple*. The Second Circuit held that the "relevant agreement in restraint of trade" was "not Apple's vertical Contracts with the Publisher Defendants," but "the horizontal agreement that Apple organized among the Publisher Defendants to raise ebook prices."[113] So too here. Defendants then contend that *per se* rules should not apply to Plaintiffs' "novel" claims.[114] But horizontal price-fixing is not novel, and "the precise machinery employed . . . is immaterial."[115] So it is rightly condemned under *per se* analysis.

### B.     Plaintiffs have sufficiently pled both of their claims under the rule of reason analysis.

For both claims, Plaintiffs can plead anticompetitive effects within the relevant product and geographic markets either directly or indirectly. As the Sixth Circuit explained in *Realcomp*, "the purpose of the inquiries into market definition and market power is to determine whether an arrangement has the *potential* for genuine adverse effects on competition," because "actual anticompetitive effects may be difficult to demonstrate."[116] "Market power and the anticompetitive nature of the restraint are sufficient to show the potential for anticompetitive effects under a rule-of-reason analysis," as "an inquiry into market power is a surrogate for detrimental effects."[117]

---

[111] Student Mot. at 2, 23.

[112] Areeda & Hovenkamp, § 305 (5th ed. Supp. 2022).

[113] 791 F.3d at 323.

[114] Student Mot. at 24.

[115] *Apple*, 791 F.3d at 327.

[116] *Realcomp II, Ltd. v. F.T.C.*, 635 F.3d 815, 828 (6th Cir. 2011).

[117] *Id.* at 827.

Conversely, "[i]f adverse effects are clear, inquiry into market power is unnecessary."[118] Thus, to "directly establish anticompetitive effects, a plaintiff provides direct evidence of how the defendant's conduct has impacted the market, such as a reduction in output or raised prices."[119]

### 1. Plaintiffs have directly pled anticompetitive effects.

Besides alleging Defendants' admissions that they have achieved "above market" using RealPage's pricing, ¶¶ 15, 47, 48, 66, 77, 142, 161, Plaintiffs also allege that a "preliminary econometric regression indicates that usage of YieldStar Student leads to supracompetitive prices for student housing properties that use the software." ¶ 141. Publicly available rental prices for student housing were collected for Auburn, Baton Rouge, Tallahassee, and Eugene in August 2023. The regression analysis compared prices for properties owned or managed by Lessor Defendants versus student housing owned or managed by non-defendants. Controlling for various factors, the regression estimated direct effects, with an average overcharge of 10.9% on properties that were priced using RealPage's YieldStar Student, as compared to the benchmark properties:



---

[118] *Id.*; *see also id.* at 828 ("Under either inquiry, substantial evidence supports the Commission's findings.").

[119] *Budicak, Inc. v. Lansing Trade Grp.*, 452 F. Supp. 3d 1029, 1055 (D. Kan. 2020); *see also id.* ("To indirectly establish anticompetitive effects, the plaintiff defines a relevant product and geographic market and shows the defendant possessed market power in that market.").

Defendants incorrectly attempt to attribute these results to market growth or inflation.[120] But a regression showing comparatively higher prices for Defendants' properties as compared to non-Defendant properties cannot be explained away by factors that affect the entire market. And, again, Defendants themselves admit that RealPage's software allowed them to "outperform[] the market." ¶¶ 15, 47, 48, 66, 77, 142, 161.

Defendants then argue that the data only covers a single month in four cites.[121] But the district court in *Red Meat Wages* recently rejected a very similar argument there that the plaintiffs "fail[ed] to show direct evidence of anticompetitive effects" by only showing an "increase in base wages at certain plants."[122] As the court explained, the "moving defendants ask the Court to ignore plaintiffs' broad allegations of depressed wages across companies because plaintiffs do not allege enough specific examples."[123] But no more was required "at the motion to dismiss stage."[124] Instead, the "plaintiffs' allegations of specific wage suppression provide sufficient support at the pleading stage for plaintiffs' broader claims of industry-wide wage suppression."[125] So too here.

### 2. Plaintiffs have indirectly pled anticompetitive effects.

To allege a relevant market, Plaintiffs must define both a geographic market and a product market.[126] In so doing, the Sixth Circuit cautions that "market definition is a highly fact-based analysis that generally requires discovery."[127] Moreover, the court does not decide between

---

[120] Student Mot. at 28.

[121] Student Mot. at 28-29.

[122] 2023 WL 6294161, at *9, *14.

[123] *Id.* at *10.

[124] *Id.*

[125] *Id.* at *14.

[126] *In re Se. Milk*, 739 F.3d at 270.

[127] *Mich. Div.-Monument Builders of N. Am. v. Mich. Cemetery Ass'n*, 524 F.3d 726, 733 (6th Cir. 2008); *see also Todd*, 275 F.3d at 199-200.

plausible alternative relevant markets at the motion to dismiss stage.[128] So the "fact that defendants suggest . . . that other relevant markets may likewise exist is of no consequence."[129]

### (a) Plaintiffs plead a plausible relevant market.

Plaintiffs allege that the relevant geographic market is the United States.[130] To the extent it is necessary to plead them, Plaintiffs have identified at least twenty-seven regional submarkets near college campuses across the United States. ¶¶ 158, 162, 164-191. In *In re Se. Milk*, the Sixth Circuit defined "[g]eographic market" as "the region in which the seller operates, and to which the purchaser can practicably turn for supplies."[131] This process is "fact-intensive and focused on the commercial realities of the industry," including "considerations of areas where products are marketed, or where the defendant perceives that it is competing," with the fact finder looking to "where customers might realistically look to buy the product."[132] Here, Plaintiffs allege that "because students live near the institutions they attend, markets for student housing are tied to those institutions," with student housing elsewhere considered an inadequate substitute. ¶ 163. So Plaintiffs plead a plausible geographic market with regional submarkets.

Defendants first dispute that the United States is an appropriate geographic market, saying it "belies common sense."[133] But in so arguing they ignore Plaintiffs' submarket allegations, ¶¶ 165-191, as well as the allegation that "both Lessor Defendants and John Doe Defendants" have increased rent above competitive levels in additional submarkets "currently unknown to Plaintiffs." ¶ 164 n.179. Common sense requires pleading a national geographic market in such

---

[128] *See Watson*, 648 F.3d at 458 ("The plausibility standard is not akin to a probability requirement.").

[129] *In re Se. Milk*, 555 F. Supp. 2d at 946.

[130] Defendants do not dispute that Plaintiffs have alleged a plausible product market.

[131] 739 F.3d at 277.

[132] *Id.*

[133] Student Mot. at 25-26.

circumstances as consistent with the *per se* claim—which does not require market allegations—and to give Defendants notice of the potential scope of the submarkets under rule of reason analysis, to the extent it is required.

Defendants then criticize the submarkets themselves, arguing that they are too broad.[134] As *Poultry Wages* explained, however, "Plaintiffs must outline a relevant market so that they can then allege that Defendants have sufficient market power within the market [] to restrain competition."[135] So it is "problematic to allege too *narrow* a geographic market, because it could create the illusion of market power where no market power exists."[136] But if the "geographic [m]arket definition is too large, that would only understate market power in the relevant market."[137]

Finally, Defendants' example of the alleged San Antonio submarket containing campuses 15 miles from each other is a cherry-picked outlier from the rest of the alleged submarkets—13 of which list only one campus. ¶¶ 168, 170, 174, 175, 176, 178, 182, 184, 185, 186, 188, 190, 191. The other 13 contain groups of campuses that are generally about 5 or fewer miles apart, ¶¶ 165, 166, 169, 171, 172, 173, 179, 181, 183, 187, 189, with only a couple having campuses separated by about 7 to 8 miles. ¶¶ 167, 177. So Defendants' argument serves only to highlight that disposition of relevant market is inappropriate at the pleading stage.

---

[134] *Id.* at 26-27.

[135] *Jein v. Perdue Farms, Inc.*, 2020 WL 5544183, at *10 (D. Md. Sep. 16, 2020).

[136] *Id.* (emphasis in original).

[137] *Id.* (citing *In re Mushroom Direct Purchaser Antitrust Litig.*, 2015 WL 5767415, at *19 (E.D. Pa. July 29, 2015)). *See generally Nat'l Hockey League Players Ass'n v. Plymouth Whalers Hockey Club*, 419 F.3d 462, 473 (6th Cir. 2005) (determining that the relevant market was broader than the one defined by the plaintiffs). Student Mot. at 25.

> **(b)** **Defendants exercised market power in a properly defined market.**

As stated by the Sixth Circuit, the "purpose of defining a [] market is to reveal whether, or to what extent, market power exists."[138] Market power is defined as the ability to charge a supracompetitive price.[139] The related SSNIP test asks whether a hypothetical monopolist in a proffered market could profitably impose a small but significant, non-transitory increase in price (a "SSNIP"), without causing a sufficient number of customers to switch to other products or services such that the SSNIP would be unprofitable to the monopolist. ¶ 160. "Typically, the increase that is posited is five percent."[140] Here, the SSNIP test is satisfied, because pursuant to the Lessor Defendants' agreement not to compete on price, Lessor Defendants are able to increase "2% to 7% revenue outperformance" in the student housing market yet those increases have not driven enough renters out of the market such that the SSNIP has become unprofitable to Lessor Defendants. ¶ 161. The market is well defined. And, as discussed above in section II.B.1, Defendants' admissions of above-market pricing, along with the regression analysis alleged in the complaint, are sufficient to allege market power directly.

## III.   Plaintiffs Have Antitrust Standing.

As the Sixth Circuit stated in *In re Cardizem CD Antitrust Litig.*, "in addition to having to show injury-in-fact and proximate cause," a private antitrust plaintiff "must allege, and eventually prove, 'antitrust injury.'"[141] In *Cardizem*, the Sixth Circuit held that the "plaintiffs' allegations fall easily" within antitrust standing requirements, because paying for a "higher-priced brand name product" due to a "horizontal market restraint" is the "type of injury the antitrust laws were meant

---

[138] *In re Se. Milk*, 739 F.3d at 277; *see also id.* at 276 n.1.

[139] *Id.*

[140] *In re Se. Milk*, 739 F.3d at 277.

[141] 332 F.3d 896, 909-10 (6th Cir. 2003).

to prevent."[142] And there was "no question that the alleged injury—paying higher prices for a product due to a lack of competition in the market—is the type of injury that can, and the plaintiffs have alleged did, flow from the anticompetitive effects of the Agreement."[143] Likewise, in *In re Se. Milk*, the Sixth Circuit made clear that "when competition is limited pursuant to an agreement and customers are punished through higher prices, the injury clearly results from anticompetitive conduct."[144] Plaintiffs plainly allege antitrust injury.[145]

Defendants argue that it is possible that Plaintiffs could have been in the small percentage of tenants where Lessor Defendants did not accept RealPage's pricing determinations.[146] But the complaint alleges that each of the named Plaintiffs "paid higher rent" as a result of Defendants' agreement. ¶¶ 17-20. And Defendants' argument is completely speculative and highly unlikely given Plaintiffs' allegation that Lessor Defendants accepted the vast majority of RealPage's pricing determinations—for example, for 98 to 99% of student tenants at Greystar. ¶ 86. Indeed, the Sixth Circuit explicitly stated in *Cardizem* that "dismissal would be appropriate only if the plaintiffs' allegations, taken as true and construed in their favor, somehow *precluded the possibility* that their injury flowed from the anticompetitive effects."[147] That clearly cannot be said here.

## IV. Plaintiffs Allege Viable State Law Claims.

Defendants contend that Plaintiffs' claims in seven of 42 states fail for various flawed

---

[142] *Id.* at 910.

[143] *Id.* at 911.

[144] 739 F.3d at 285-86.

[145] *E.g.*, ¶¶ 1, 5-10, 15; *see also* section II.B.1, above.

[146] Student Mot. at 32.

[147] 332 F.3d at 911. *CBC Cos., Inc. v. Equifax, Inc.*, is inapposite because the "complaint contain[ed] only conclusory allegations, and not facts sufficient to support more than a speculative injury to competition." 561 F.3d 569, 572 (6th Cir. 2009). *See* Student Mot. at 32.

reasons.[148] First, contrary to Defendant' contention that neither Pennsylvania nor Georgia law allows private antitrust claims, in *Sheet Metal Workers Loc. 441 Health & Welfare Plan v. GlaxoSmithKline*, a district court in the Eastern District of Pennsylvania permitted plaintiffs seeking damages for monopolization to plead a claim under 73 Pa. Stat. § 201–1 *et seq.*, based on the "Pennsylvania Supreme Court's broad construction of the PUTPCPL as a remedial law designed to address both fraudulent and unfair business practices."[149] Similarly, while Ga. Code § 13-8-2.1 lacks a private right of action, "Georgia recognizes a common law tort action in favor of third parties who are injured by a conspiracy in restraint of trade," encompassing the rights protected by that statute.[150] Second, "merchandise" has long been defined broadly as the "objects of commerce; whatever is usually bought or sold in trade."[151] And Mass. Gen. Laws ch. 93A § 1 *et seq.* does not explicitly exclude real property—as opposed to ch. 93 (and Defendants are on notice of this claim by virtue of the correction in the Multifamily SAC). Third, the allegations of submarkets contained wholly within Alabama satisfy its intrastate requirement. ¶ 170 (Auburn, AL); ¶177 (Tuscaloosa, AL).

 Finally, Defendants argue that state-law claims must be dismissed to the extent that named Plaintiffs do not claim to have suffered an injury in certain states.[152] But this Court has previously rejected this very argument. In *Hosp. Auth. of Metro. Gov't of Nashville & Davidson Cnty., Tenn. v. Momenta Pharms., Inc.*, the Court explained that that the "Sixth Circuit has made clear" that "once an individual has alleged a distinct and palpable injury to himself he has standing to

---

[148] Student Mot. at 32-33.

[149] 737 F. Supp. 2d 380, 421 (E.D. Pa. 2010).

[150] *U.S. Anchor Mfg., Inc. v. Rule Indus., Inc.*, 7 F.3d 986, 1002 (11th Cir. 1993).

[151] *Branch v. F.T.C.*, 141 F.2d 31, 36 (7th Cir. 1944).

[152] Student Mot. at 34.

challenge a practice even if the injury is of a sort shared by a large class of possible litigants."[153] At that point, "whether a plaintiff will be able to represent the putative class, including absent class members, depends solely on whether he is able to meet the additional criteria encompassed in Rule 23."[154] And *Fox* is inapposite, because there the plaintiffs did not "demonstrate individual standing vis-as-vis the defendant," as this Court earlier put it in *Hosp. Auth.*[155] Here, conversely, Plaintiffs allege conspiracy claims against Defendants who are jointly and severally liable,[156] such that Plaintiffs presently have standing as to each, as required by *Fox*.

## V. Plaintiffs Sufficiently Plead Fraudulent Concealment to Permit Damages Beyond Four Years Back From Filing.

Defendants do not dispute that Plaintiffs have sufficiently pled a continuing violation during the four-year statute of limitations period.[157] Instead, Defendants argue that Plaintiffs have not sufficiently pled fraudulent concealment of the cartel for the prior period. But Defendants' myopic focus on a subset of allegations ignores those showing that RealPage orchestrated a pricing-fixing conspiracy that no renter could reasonably discover. Pleading fraudulent concealment requires only three elements: (1) wrongful concealment of Defendants' actions; (2) a failure of Plaintiffs to discover the operative facts that are the basis of their cause of action within the limitations period; and (3) Plaintiffs' reasonable diligence until discovery of the facts.[158] Plaintiffs have specifically alleged each under Rule 9(b).

---

[153] 333 F.R.D. 390, 413 (M.D. Tenn. 2019).

[154] *Id.* (citing *Fallick v. Nationwide Mut. Ins. Co.*, 162 F.3d 410, 423 (6th Cir. 1998)).

[155] *Id.*; *Fox v. Saginaw Cnty.*, 67 F.4th 284, 293 (6th Cir. 2023) ("Fox can trace his injury only to Gratiot County; he does not attempt to connect it to the other Counties.").

[156] *Texas Indus., Inc. v. Radcliff Materials, Inc.*, 451 U.S. 630, 646 (1981). *See also* Student Mot. at 32-33 n.14.

[157] *See generally Hosp. Auth. of Metro. Gov't of Nashville v. Momenta Pharms., Inc.*, 353 F. Supp. 3d 678, 692-94 (M.D. Tenn. 2018).

[158] *Carrier Corp. v. Outokumpu Ojy.*, 673 F.3d 430, 446 (6th Cir. 2012).

## A. Plaintiffs allege Defendants committed affirmative, self-concealing acts in furtherance of the conspiracy.

Affirmative acts in furtherance of a conspiracy can be self-concealing if the acts "by their nature, defy detection"[159] and "may be established through the acts of co-conspirators."[160] A self-concealing act, for example, may involve "a collusive bid purported to reflect genuine competition."[161] This is exactly the case here.

RealPage and its co-conspirators took affirmative steps that far exceeded comments about "competitive rent" in order to hide Plaintiffs' injury in fact.[162] Plaintiffs allege RealPage disseminated password-protected trainings, the content of which appears in actual screenshots in the complaint, ¶¶ 197-200, as "trick[s] or contrivance[s] intended to exclude suspicion and prevent inquiry."[163] Plaintiffs allege RealPage disseminated the trainings to teach lessors "how to sidestep tenant questions" on changing rates "and provid[ed] Lessor Defendants with scripts on how to explain these pricing differences without mentioning RealPage." ¶ 197. This is active misdirection. It makes no difference that Plaintiffs have not alleged which lessors utilized the trainings, because RealPage affirmatively concealed the anticompetitive activity.[164]

---

[159] *Pinney Dock & Transp. v. Penn Cent. Corp.*, 838 F.2d 1445, 1466-1471 (6th Cir. 1988). Contrary to Defendants' characterization, this was an appeal of a summary judgment motion and the Sixth Circuit thus discussed facts adduced in a long-running case. *See id.* at 1465-80; *Pinney Dock & Transp. Co. v. Penn Cent. Corp.*, 600 F. Supp. 859, 862 (N.D. Ohio 1983).

[160] *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 538 (6th Cir. 2008); *see also Carrier Corp.*, 673 F.3d at 447 n.8 (a specific defendant's affirmative act are "irrelevant" because affirmative acts are imputed to other co-conspirators).

[161] *State of N.Y. v. Hendrickson Bros.*, 840 F.2d 1065, 1083 (2d Cir. 1988).

[162] ¶¶ 194-96. Defendant's citation to *In re Processed Egg Prods. Antitrust Litig.*, 2012 WL 6645533, at *11 (E.D. Pa. 2012), is inapt. That case read a causation element into the first two fraudulent concealment elements. This is not the law in the Sixth Circuit. *Carrier Corp.*, 673 F.3d at 447.

[163] *See In re Skelaxin (Metaxalone) Antitrust Litig.*, 2013 WL 2181185, *30 (E.D. Tenn. May 20, 2013); *Carrier Corp.*, 673 F.3d at 447 ("taking active steps to hide evidence, as opposed to simply meeting in secret," are affirmative acts).

[164] *See In re Scrap Metal*, 527 F.3d at 538; *Carrier Corp.*, 673 F.3d at 447 n.8.

RealPage and Lessor Defendants also concealed that they used RealPage's algorithms to *determine* their rates through active enforcement of the cartel pricing. ¶¶ 40-53, 61-65, 80. Property managers like Witness 1 were affirmatively dissuaded from deviating from RealPage's rates by instruction and the institution of barriers to deviation, ensuring the conspiracy continued undetected. ¶¶ 50, 80, 84-89. So Defendants' citations to insufficient allegations of "secret meetings" are inapposite, because they do not relate to concerted, affirmative steps to control employees tasked with communicating rates to renters.

For these reasons, Defendants' reliance on *In re Refrigerant Compressors Antitrust Litig.* is misplaced.[165] That court found "allegations that defendants made representations that their pricing activities were based on market forces" failed only because they were "not pleaded with the required particularity." *Id.* at 665. In contrast, Plaintiffs allege that RealPage disseminated trainings designed to misdirect renters, ¶¶ 198-99, and that these trainings "taught leasing managers not to mention the use of 'AI Revenue Management software.'" ¶ 199. And Plaintiffs specifically plead that Witness 1, a property manager, was subjected to the cartel's enforcement scheme when she tried to offer rents lower than the algorithm recommended. ¶ 88. In this affirmative manner, Defendants kept their price-fixing conspiracy hidden from the public.

### B. Plaintiffs adequately allege they were unaware of the operative facts.

As an initial matter, Defendants misapprehend the second element of fraudulent conspiracy, which requires only pleading a "failure of the plaintiff to discover the operative facts that are the basis of his cause of action within the limitations period."[166] An inability to know an operative fact easily satisfies this element.[167] Plaintiffs have sufficiently alleged that they were

---

[165] *See* Student Mot. at 36 (citing 795 F. Supp. 2d 647, 663-66 (E.D. Mich. 2011)).

[166] *Carrier Corp.*, 673 F.3d at 446.

[167] *Venture Glob. Eng'g v. Satyam Comput. Servs.*, 730 F.3d 580, 587 (6th Cir. 2013) ("plaintiffs

unaware of operative facts. ¶ 201. Plaintiffs plead they did now know the extent to which RealPage's algorithms were used by Defendants or how RealPage trained its co-conspirators to hide the conspiracy. Confidential informants, which Plaintiffs did not know, only recently elucidated the conspiracy. Plaintiffs also adequately plead the date of discovery. Plaintiffs allege that "not until recently [were] . . . the actions of RealPage[] widely known or reported" and specify the term "recently" by citing an October 2022 article from ProPublica, ¶ 203, satisfying rule 9(b).

### C. Plaintiffs adequately allege their reasonable diligence until discovery of the facts underlying the conspiracy.

"Actions such as would deceive a reasonably diligent plaintiff will toll the statute."[168] Although a "fact that should excite [a plaintiff's] suspicion is the same as actual knowledge of his entire claim,"[169] the Sixth Circuit has specifically recognized that "the mere availability of open and readily accessible public records may not suffice by itself to defeat a fraudulent-concealment claim."[170] This inquiry is fact-intensive and generally not properly adjudicated at the motion to dismiss stage, "particularly when the proof relating to the extent of the fraudulent concealment is alleged to be largely in the hands of the alleged conspirators."[171] For example, *In re TFT-LCD* held that direct and indirect purchasers alleged reasonable diligence because the plaintiffs alleged pretextual reasons for inflated prices, a lack of awareness until a public investigation, and a secret conspiracy in which the conspirators agreed not to publicly share information.[172] Plaintiffs' allegations meet that standard. ¶¶ 54, 197-201, 203.

---

allege that they, along with the rest of the world, did not discover [defendant's] fraud until" it was publicly disclosed, and "[t]hat is sufficient" for the second prong).

[168] *Carrier Corp.*, 673 F.3d at 447.

[169] *Dayco Corp. v. Goodyear Tire & Rubber Co.*, 523 F.2d 389, 394 (6th Cir. 1975).

[170] *Ruth v. Unifund CCR Partners*, 604 F.3d 908, 911 (6th Cir. 2010).

[171] *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 586 F. Supp. 2d 1109, 1119-20, 1132 (N.D. Cal. 2008).

[172] *Id.* at 1120. *Venture Glob. Eng'g v. Satyam Comput. Servs.*, 2012 WL 12897904, at *10 (E.D.

Defendants' cases involving sophisticated entities are inapposite. While certain public documents may "excite suspicion" for sophisticated plaintiffs,[173] student lessees would not be put on inquiry notice by the same.[174] That information may have existed *somewhere* on RealPage's website, industry publications, or at industry conferences does not establish that Plaintiffs in this case should have known it—especially at the pleading stage.[175]

## CONCLUSION

Plaintiffs respectfully request that the Court deny Defendants' motion to dismiss.

DATED: November 8, 2023

Respectfully submitted,

/s/ *Steve W. Berman*
Steve W. Berman
Breanna Van Engelen
**HAGENS BERMAN SOBOL SHAPIRO LLP**
1301 Second Avenue, Suite 2000
Seattle, WA 98101
(206) 623-7292
steve@hbsslaw.com
breannav@hbsslaw.com

Rio S. Pierce
**HAGENS BERMAN SOBOL SHAPIRO LLP**
715 Hearst Avenue, Suite 300
Berkeley, CA 94710
(510) 725-3000
riop@hbsslaw.com

---

Mich. Mar. 30, 2012), *see* Student Mot. at 39, was overturned on appeal. 730 F.3d at 582.

[173] *Woori Bank v. Merrill Lynch*, 923 F. Supp. 2d 491, 495-96 (S.D.N.Y. 2013) (plaintiff was a corporate investment bank that should have undertaken due diligence); *In re Interest Rate Swaps*, 261 F. Supp. 3d 430, 441, 488 (plaintiffs were sophisticated investors and the defendant's platform was "visible [in] nature").

[174] *Goff v. Nationwide Mut. Ins. Co.*, 2019 WL 7604826, at *11 (S.D. Ohio Sept. 30, 2019), is not applicable, because the plaintiffs made no allegations of reasonable diligence. *Id.* at *1-2.

[175] *See In re Papa John's Emp. & Franchisee Emp. Antitrust Litig.*, 2019 WL 5386484, at *11 (W.D. Ky. Oct. 21, 2019) ("Based on the obscurity of [publicly available documents], the Court does not believe facts exist at this stage to conclude that a reasonable person's interest would be piqued."); *In re Cast Iron*, 2015 WL 5166014, at *14 (affirmative misrepresentations "with a veil of credible justification" rendered it unlikely that a "reasonable purchaser . . . would discern that they might have a cause of action").

Elaine T. Byszewski
**HAGENS BERMAN SOBOL SHAPIRO LLP**
301 N. Lake Avenue, Suite 920
Pasadena, CA 91101
(213) 330-7150
elaine@hbsslaw.com

*Member of Plaintiffs' Steering Committee and*
*Counsel for Plaintiffs Rachel Meredith, Benjamin*
*Dempsey, and Ivonne Arriola Medieta*

Tricia R. Herzfeld (#26014)
Anthony A. Orlandi (#33988)
**HERZFELD SUETHOLZ GASTEL LENISKI**
**AND WALL, PLLC**
223 Rosa L. Parks Avenue, Suite 300
Nashville, TN 37203
Telephone: (615) 800-6225
tricia@hsglawgroup.com
tony@hsglawgroup.com

*Liaison Counsel*

Patrick J. Coughlin
Carmen A. Medici
Fatima Brizuela
**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
600 West Broadway, Suite 3300
San Diego, CA 92101
Telephone: (619) 798-5325
pcoughlin@scott-scott.com
cmedici@scott-scott.com
fbrizuela@scott-scott.com

David R. Scott
Amanda Lawrence
Patrick McGahan
Michael Srodoski
G. Dustin Foster
**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
156 South Main Street
P.O. Box 192
Colchester, CT 06145
Telephone: (860) 537-5537
david.scott@scott-scott.com
alawrence@scott-scott.com
pmcgahan@scott-scott.com
msrodoski@scott-scott.com
gfoster@scott-scott.com

Stacey Slaughter
Thomas J. Undlin
Geoffrey H. Kozen
J. Austin Hurt
**ROBINS KAPLAN LLP**
800 LaSalle Avenue, Suite 2800
Minneapolis, MN 55402
Telephone: (612) 349-8500
sslaughter@robinskaplan.com
undlin@robinskaplan.com
kozen@robinskaplan.com
ahurt@robinskaplan.com

Swathi Bojedla
Mandy Boltax
**HAUSFELD LLP**
888 16th Street, N.W., Suite 300
Washington, DC 20006
Telephone: (202) 540-7200
sbojedla@hausfeld.com
mboltax@hausfeld.com

Gary I. Smith, Jr.
**HAUSFELD LLP**
600 Montgomery Street, Suite 3200
San Francisco, CA 94111
Telephone: (415) 633-1908
gsmith@hausfeld.com

Katie R. Beran
**HAUSFELD LLP**
325 Chestnut Street, Suite 900
Philadelphia, PA 19106
Telephone: (215) 985-3270
kberan@hausfeld.com

*Interim Co-Lead Counsel*

Eric L. Cramer
Michaela L. Wallin
**BERGER MONTAGUE PC**
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Telephone: (215) 875-3000
ecramer@bm.net
mwallin@bm.net

Daniel J. Walker
**BERGER MONTAGUE PC**
2001 Pennsylvania Avenue, NW, Suite 300
Washington, DC 20006
Telephone: (202) 559-9745
dwalker@bm.net

Brendan P. Glackin
Dean M. Harvey
**LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP**
275 Battery Street, Suite 2900
San Francisco, CA 94111
Telephone: 415-956-1000
bglackin@lchb.com
dharvey@lchb.com

Christian P. Levis
Vincent Briganti
Peter Demato
Radhika Gupta
**LOWEY DANNENBERG, P.C.**
44 South Broadway, Suite 1100
White Plains, NY 10601
Telephone: (914) 997-0500
vbriganti@lowey.com
clevis@lowey.com
pdemato@lowey.com
rgupta@lowey.com

Christopher M. Burke
Walter W. Noss
Yifan (Kate) Lv
**KOREIN TILLERY P.C.**
707 Broadway, Suite 1410
San Diego, CA 92101
Telephone: (619) 625-5621
cburke@koreintillery.com
wnoss@koreintillery.com
klv@koreintillery.com

Joseph R. Saveri
Steven N. Williams
Cadio Zirpoli
Kevin E. Rayhill
**JOSEPH SAVERI LAW FIRM, LLP**
601 California Street, Suite 1000
San Francisco, CA 94108
Telephone: (415) 500-6800
jsaveri@saverilawfirm.com
swilliams@saverilawfirm.com
czirpoli@saverilawfirm.com
krayhill@saverilawfirm.com

Benjamin J. Widlanski
Javier A. Lopez
**KOZYAK TROPIN & THROCKMORTON LLP**
2525 Ponce de Leon Blvd., 9th Floor
Coral Gables, Florida 33134
Telephone: (305) 372-1800
bwidlanski@kttlaw.com
jal@kttlaw.com

Jennifer W. Sprengel
Daniel O. Herrera
Alexander Sweatman
**CAFFERTY CLOBES MERIWETHER &
SPRENGEL LLP**
135 S. LaSalle, Suite 3210
Chicago, IL 60603
Telephone: 312-782-4880
jsprengel@caffertyclobes.com
dherrera@caffertyclobes.com
asweatman@caffertyclobes.com

*Plaintiffs' Steering Committee Counsel*

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on this 8th day of November, 2023, pursuant to paragraph 9 of the Court's Practice and Procedures Notice entered April 19, 2023 (Dkt. 2), the foregoing document was electronically filed with the Clerk of Court and served by operation of the Court's electronic filing system upon all parties of record.

/s/ Steve *W. Berman*
Steve W. Berman