# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

|  |  |  |
|---|---|---|
| IN RE: REALPAGE, INC., RENTAL SOFTWARE ANTITRUST LITIGATION (NO. II) | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | Case No. 3:23-md-3071 MDL No. 3071 JURY DEMAND Chief Judge Waverly D. Crenshaw, Jr. This Document Relates to: 3:22-cv-01082 3:22-cv-00357 3:22-cv-00332 3:22-cv-00410 3:22-cv-00742 |

### PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO ENFORCE CLASS ACTION WAIVERS

## I. INTRODUCTION

Every Plaintiff but one named in the Second Amended Consolidated Class Action Complaint[1] entered into a lease with a Defendant that did not restrict their ability to bring class actions in any way—including antitrust class actions.[2] Further, not a single lease signed by any Plaintiff prohibits that individual from bringing suit against Defendants' co-conspirators. Despite these facts, Defendants argue that each Responding Plaintiff entered into a lease with a class action waiver agreement that precludes them from bringing a lawsuit not just against the owner or manager with whom they signed the lease, but also against their co-conspirators—all other Defendants in this litigation.

Defendants' Motion cannot succeed. First, four Responding Plaintiffs (Watters, Weaver, Kabisch, and Cherry) leased from two different Defendants over the course of the Class Period. For each, one of their two leases did not contain any class action waiver—entitling them to serve as a class representative for claims arising under those leases against both the lessor and the other cartel members.

Second, Defendants who did not sign class waiver leases are not beneficiaries of those leases. They cannot claim any benefits of the lease signatories. Even if the law somehow considered them intended third-party beneficiaries, the explicit waiver language limits each to only the contracting property owner or manager and its agents—not to their would-be competitors or co-conspirators. Thus, each Responding Plaintiff is free to pursue class claims against other Defendants.

---

[1] All references to "¶" or "¶¶" are to paragraphs from the Second Amended Consolidated Class Action Complaint (Dkt. 530) (the "AC"). Unless otherwise indicated, internal citations are omitted and emphases added.

[2] Defendants have moved to strike certain class allegations from the AC related to five Plaintiffs: Brandon Watters ("Watters"), Jeffrey Weaver ("Weaver"), Joshua Kabisch ("Kabisch"), Meghan Cherry ("Cherry"), and Selena Vincin ("Vincin") (collectively, "Responding Plaintiffs").

Third, contrary to Defendants' assertion, the doctrine of equitable estoppel has no application here. No caselaw supports Defendants' argument in this context.

Fourth, the class waiver provisions for three Responding Plaintiffs (Watters, Weaver, and Vincin) do not apply to this dispute. The "true and correct" copy of Watters's lease with Defendant Lincoln Property Company ("Lincoln") shows that the class waiver addendum was not executed by the parties, which is required by its terms to be incorporated and enforceable. Weaver's and Vincin's are limited by their contractual terms or otherwise do not apply to antitrust cases.

Fifth, each of the class action waivers appear unconscionable under their applicable state law. At any rate, Colorado, Tennessee, Washington, and Texas determine unconscionability as a factual matter, which cannot be resolved on a motion to dismiss, before discovery. For all these reasons, Defendants' Motion should be denied.

## II.    FACTUAL BACKGROUND

During the Class Period, Responding Plaintiffs leased apartments from many owners and managers named as Defendants in this action. ¶¶ 1-2, 51, 54, 57-59.

*Brandon Watters*: Watters leased a Nashville, Tennessee, apartment from Defendant UDR, Inc. ("UDR") from 2019 to 2021. ¶ 54. After leaving that property, Watters rented another Nashville apartment in a building managed by Lincoln from 2021 to 2022. ¶ 54; Dkt. 590-1 at 6-50. The Lincoln lease contains a class action waiver; the UDR lease does not.

*Jeffrey Weaver*: Weaver leased a Denver, Colorado, apartment from Defendant Camden Property Trust ("Camden") from 2017 to 2020. ¶ 51; Dkt. 590-2 at 4-178. He subsequently leased another Denver apartment from Defendant Bell Partners ("Bell") from 2021 through the present. ¶ 51. The Camden leases contain a class action waiver; the Bell leases do not.

*Joshua Kabisch*: Kabisch leased a Chicago, Illinois, apartment managed by Defendant Bozzuto Management Company ("Bozzuto") from 2019 to 2020. ¶ 57. After moving to Nashville,

2

he rented an apartment from non-Defendant Gulch, LLC from 2022 to 2023, and that apartment was managed by Defendant Greystar Management Services, LLC ("Greystar"). ¶ 57; Dkt. 590-3 at 6-51. The Greystar lease contains a class action waiver; the Bozzuto lease does not.

*Meghan Cherry*: Cherry leased a Seattle, Washington, apartment from non-Defendant Madison Summit LLC from 2019 to 2020, and that apartment was managed by Greystar. ¶ 58; Dkt. 590-3 at 52-170. At the expiration of that lease, she signed a lease for another apartment in Seattle with Defendant Essex Property Trust Inc. ("Essex"), which ran from 2020 to 2021. ¶ 58. The Greystar lease contains a class action waiver; the Essex lease does not.

*Selena Vincin:* Vincin leased a Plano, Texas, apartment from a non-Defendant. ¶ 59. In 2018, Defendant CONTI Texas Organization, Inc., d/b/a CONTI Capital ("CONTI") acquired her apartment building. Vincin continued to rent the same apartment, renewing her lease three times until she moved out in 2020. *Id.*; Dkt. 590-4 at 7-30. The CONTI leases contain class action waivers.

## III.    LEGAL STANDARD

"[S]triking a plaintiff's class allegations prior to discovery and a motion for class certification is a rare remedy." *Nixon v. Anthem, Inc.*, 2021 WL 4037824, at *2 (E.D. Ky. Sept. 3, 2021).[3] This is because such issues require fact-specific inquiries. *See Lammert v. Auto-Owners (Mut.) Ins. Co.*, 415 F. Supp. 3d 807, 812 (M.D. Tenn. 2019) (Crenshaw, C.J.) (denying motions to dismiss and strike class allegations). As such, it is improper at this early stage of litigation to determine whether class action waiver agreements are enforceable, given the fact-specific inquiries

---

[3] "[I]t is seldom, if ever, possible to resolve class representation question[s] from the pleadings alone." *Id.*

of examining the specific language and circumstances of the contracts at issue.[4] *See Francis v. AT&T Mobility LLC*, 2009 WL 416063, at *1, 10 (E.D. Mich. Feb. 18, 2009); *see also All Com. Floors, Inc. v. Com. Floor Prods., LLC*, 2019 WL 330880 at *6 (M.D. Tenn. Jan. 25, 2019) (Crenshaw, C.J.) ("[R]esolving Plaintiffs' . . . Lease claims requires fact-intensive findings and analysis ill-suited for determination in a Rule 12[] motion.").[5]

## IV.    ARGUMENT

### A.    Weaver, Watters, Kabisch, and Cherry Each Signed a Lease With a Defendant That Does Not Contain a Class Waiver, Allowing Them to Serve As a Class Representative.

Weaver, Watters, Kabisch, and Cherry each rented from two different Defendants during the Class Period. For each, one of their two leases did not include any class waiver provision: (1) Weaver's leases with Bell; (2) Watters's lease with UDR; (3) Kabisch's lease with Bozzuto; and (4) Cherry's lease with Essex.[6] Weaver, Watters, Kabisch, and Cherry are unquestionably entitled to serve as class representatives for claims arising under those No Waiver Leases.

---

[4] The cases relied on by Defendants are distinguishable. While the court in *Pilgrim v. Univ. Health Card, LLC*, affirmed the lower court's striking of class allegations prior to discovery, its determination was based on circumstances not present here. First, unlike the different state consumer-protection laws at issue in *Pilgrim*, the contract laws at issue here do not "vary in material ways." Indeed, the legal concepts described *infra* are generally applicable. Second, unlike the plaintiffs in *Pilgrim*, Plaintiffs here are not claiming "distinct injuries." 660 F.3d 943, 947-48 (6th Cir. 2011); *see also Bearden v. Honeywell Int'l, Inc.*, 2010 WL 1223936, at *10 (M.D. Tenn. Mar. 24, 2010) (striking class allegations for unjust enrichment claim because only plaintiff, and not the putative class, had suffered physical injuries). Here, in contrast, all Plaintiffs have suffered the same injury.

[5] Moreover, courts are often disinclined to enforce class action waivers in complex and expensive actions. *Knudtson v. AT&T, Inc.*, 2010 WL 11682487, at *2-4 (W.D. Wash. Mar. 1, 2010); *Howard v. Wells Fargo Minn., N.A.,* 2007 WL 2778664, at *5 (N.D. Ohio Sept. 21, 2007). Under Fed. R. Civ. P. 23, "the ultimate governing standard is furtherance of efficient judicial administration, which leaves no room for enforceability of private agreements among litigants to forego the efficiencies" of class-wide adjudication. *Martrano v. Quizno's Franchise Co., L.L.C.*, 2009 WL 1704469, at *21 (W.D. Pa. June 15, 2009).

[6] For clarity, Responding Plaintiffs' leases that do not contain class action waivers are referred to as "No Waiver Leases." Their leases that contain class action waivers are "Waiver Leases."

4

Each alleges that they paid supracompetitive rent during the period of their No Waiver Lease, in violation of the Sherman Act, due to Defendants' manipulation. ¶¶ 51, 54, 57-58, 59, 691-93, 704-07. Under the Sherman Act, all members of a cartel are jointly and severally liable for harm caused by their unlawful agreement.[7] ¶¶ 704-07. Accordingly, Responding Plaintiffs are entitled to seek redress from *all* Defendants on a class-wide basis for manipulating their No Waiver Leases. Thus, even if there were enforceable class action waivers *in other leases*—which there are not, *see infra*—those waivers do not affect Plaintiffs' ability to pursue their price-fixing claims on a class-wide basis.

### B. Defendants Cannot Claim the Benefits of Class Waiver Agreements to Which They Are Not a Party.

Only Lincoln, Greystar, and CONTI are parties to any of the Waiver Leases. None of their co-Defendants is either (a) party to their contracts with the Responding Plaintiffs; or (b) otherwise intended to be a third-party beneficiary of those contracts. Indeed, it would be highly suspect if a lease with one company was intended to benefit that company's purported competitors. The language of each Waiver Lease forecloses the argument that it extends rights either to Defendant RealPage or to any third-party owners or property managers that purported to compete with the executing Defendant. Each class waiver provision expressly limits the release to *only* the owner-operator itself and that company's agents:

- The *unsigned* Waiver Lease that Lincoln argues binds Watters is limited to "any class action claim(s) against *us or our agents*." Dkt. 590-1 at 45. "Us" is defined as the owner, "DRI/CA Nashville, LLC," *id.* at 7, while "agent" is used throughout the lease to connote the agents of DRI/CA Nashville who provide services under the lease.

---

[7] *See generally Tex. Indus., Inc. v. Radcliff Materials, Inc.*, 451 U.S. 630, 646 (1981) (contribution not available in Sherman Act cases; defendants jointly and severally liable).

5

- The Waiver Leases between Camden and Weaver are explicitly limited to "claim[s] against the *Owner or the Owner's managing agents*." Dkt. 590-2 at 56, 98, 142. "Owner" is defined as "Camden Belleview Station," and Camden Development, Inc. is stated to be the "Owner's managing agent." Dkt. 590-2 at 45, 87, 131.

- The Waiver Lease between Greystar and Kabisch is similarly limited to "any class action claim(s) against *us or our agents*." Dkt. 590-3 at 38. "Us" is defined as the owner, "Gulch, LLC," *id*. at 7, while "agent" is used throughout the lease to connote the agents of Gulch, LLC who provide services under the lease.

- The Waiver Lease between Greystar and Cherry is limited to "any class action claim(s) against *us or our agents*." Dkt. 590-3 at 169. "Us" is defined as the owner, "Madison Summit LLC," *id.* at 116, while "agent" is used throughout the lease to connote the agents of Madison Summit LLC who provide services under the lease.

- The Waiver Leases between CONTI and Vincin are limited to "class actions . . . against us or our representatives." Dkt. 590-4 at 15, 24, 27. "[U]s" is defined as the owner, "Creekside Village." *Id.* at 8, 17, 26.

In construing these agreements, the Court applies their plain terms to effectuate the contracting parties' intent.[8] Here, the waiver provisions in these agreements are unambiguous, and

---

[8] *See Rogers v. First Tenn. Bank Nat'l Ass'n*, 738 S.W.2d 635, 637 (Tenn. Ct. App. 1987) ("Courts must determine and effectuate the intention of the parties to a contract as expressed in the four corners of the contract."); *Fort Lyon Canal Co.*, 167 P.3d 726, 728 (Colo. 2007) (*en banc*) ("A contract must be construed to ascertain and effectuate the intent of the parties, as expressed in the contract itself."); *In re Estate of Catto.*, 944 P.2d 1052, 1055 (Wash. Ct. App. 1997) ("The goal of construing a contract is to effectuate the parties' mutual intent."); *Exxon Mobil Corp. v. Ins. Co. of State*, 568 S.W.3d 650, 656-57 (Tex. 2019) ("As in all contract-construction cases, a contract's meaning depends on the contract's language. Our fundamental objective is to effectuate the parties' intent as expressed by the words chosen to memorialize their agreement[.]").

apply only to the owner of each property and its agents.[9] The only agents named as Defendants are Lincoln, Greystar, and CONTI. No language indicates that these waivers intended to benefit any other Defendants—who were at least nominally competitors when the Waiver Leases were signed.

Camden's class waiver provision is instructive. It protects only Camden Belleview Station and Camden Development, Inc. Dkt. 590-2 at 45, 87, 131. Indeed, at this time, no other Defendant seeks to enforce Camden's class waiver provision. *See* Dkt. 591 ("Mot.") at 14 n.14. But that language is virtually identical to the language in each of the other Responding Plaintiffs' leases, which limits the scope to a named owner and its agents. Defendants offer no basis to distinguish them and the Court should properly recognize that no such distinction exists. The leases mean what they say—only counterparties and their agents can enforce them, leaving Responding Plaintiffs free to serve as class representatives against all other Defendants.

Even if the Waiver Leases were not explicit in their limited scope, nothing in the plain language of those waiver provisions indicates an intent to benefit third parties. As such, the co-Defendants of Lincoln, Greystar, and CONTI are not third-party beneficiaries under the laws of Tennessee, Texas, or Washington.[10] Indeed, it would be utterly bizarre for a lease between a

---

[9] Moreover, even if there were ambiguity, these agreements would be strictly construed against the drafter. *See Fellers-Schoonmaker Homes, Inc. v. Five Star Homes & Real Estate, Inc.*, 405 P.2d 677, 682 (Colo. 1965) ("Both of these contracts, incidentally, were prepared by Fellers or under its direction, and accordingly must be strictly construed against it."); *Vargo v. Lincoln Brass Works, Inc.*, 115 S.W.3d 487, 492 (Tenn. Ct. App. 2003) ("Contracts of adhesion are construed against their drafters."); *Williams v. State*, 502 S.W.3d 168, 171 (Tex. Ct. Crim. App. 2016) ("Where an ambiguity exists in a contract, the contract language will be construed against the party who drafted it, 'since the drafter is responsible for the language used.'"); *Universal/Land Constr. Co. v. City of Spokane*, 745 P.2d 53, 55 (Wash. Ct. App. 1987) ("Contract language is to be interpreted most strongly against the party who drafted the contract.").

[10] *See Owner-Operator Indep. Drivers Ass'n, Inc. v. Concord EFS, Inc.*, 59 S.W.3d 63, 68-69 (Tenn. 2001) (contract(s) must have "the clear intent to . . . operate for the benefit of a third party"

landlord and a renter to display a clear intent to benefit *other* landlords operating competing properties. Accordingly, even if the waivers were valid, no Defendants other than Lincoln, Greystar, CONTI, and Camden could enforce the waivers, and Lincoln, Greystar, and CONTI could do so only against their respective lease counterparties.

### C. The Doctrine of Equitable Estoppel Does Not Apply Here.

#### 1. Applicable State Law Does Not Support Defendants' Invocation of Equitable Estoppel.

Lacking privity and any textual basis for invoking the class action waivers, Defendants half-heartedly argue, in a single footnote, that their status as co-Defendants should equitably allow them to enforce the waivers. Mot. at 14 n.14.[11] Courts in Tennessee (Watters, Kabisch), Texas (Vincin), and Washington (Cherry) have not adopted Defendants' liberal application of equitable estoppel.[12]

Indeed, the Tennessee Court of Appeals criticized attempts to use equitable estoppel to confer "virtually the same rights to non-signatories as they have to signatories." *Blue Water Bay at Ctr. Hill v. Hasty*, 2017 WL 5665410, at *14 (Tenn. Ct. App. Nov. 27, 2017). Thus, non-signatories under Tennessee law can *only* invoke equitable estoppel in situations where a signatory to the contract "attempts to hold the nonsignatory liable pursuant to the underlying agreement." *Id.* Defendants do not meet this test, as Watters's and Kabisch's claims arise from Defendants' collective breach of the Sherman Act, not their breach of the Lincoln and Greystar leases, to which

_____

and the benefit must not be "merely incidental"); *MCI Telecomms. Corp. v. Tex. Utils. Elec. Co.*, 995 S.W.2d 647, 651 (Tex. 1999) ("The intention to contract or confer a direct benefit to a third party must be clearly and fully spelled out or enforcement by the third party must be denied."); *Donald B. Murphy Contractors, Inc. v. King Cnty.*, 49 P.3d 912, 914 (Wash. Ct. App. 2002) ("The test of intent is an objective one: whether performance under the contract would necessarily and directly benefit the third party.").

[11] At this time, only Camden seeks to enforce its class action waiver. *Id.*

[12] The application of equitable estoppel is governed by the state law governing the contract.

they are strangers (other than Lincoln and Greystar, of course).[13] Texas law similarly precludes co-Defendants from invoking equitable estoppel. *Jody James Farms, JV v. Altman Grp., Inc.*, 547 S.W.3d 624, 635, 640 (Tex. 2018).[14] Here, nothing suggests that Vincin or CONTI intended to secure a benefit to any third party, let alone for the benefit of their purported competitors. Finally, in Washington, "[i]t is well-established that nonsignatories to a contract are not bound by an arbitration clause." *Townsend v. Quadrant Corp.*, 268 P.3d 917, 923 (Wash. 2012).[15] Although

---

[13] Defendants' cited cases do not counsel otherwise. *See Green v. Mission Health Cmtys., LLC*, 2020 WL 6702866, at *9 (M.D. Tenn. Nov. 13, 2020) (third party seeking to enforce contract terms was plaintiff's joint employer, and the contract itself related to plaintiff's employment, such that the Court found plaintiff's claims against joint employer were so intertwined with the contract that plaintiff was estopped from denying application of the contract's arbitration provision); *Ordosgoitti v. Werner Enters., Inc.*, 2022 WL 874600, at *9 (D. Neb. Mar. 24, 2022) (addressing the limited circumstances under Nebraska law where estoppel may apply: "This is not a situation, then, where the nonsignatory co-conspirator 'is a complete stranger to the plaintiffs' . . . agreements[,] . . . did not sign them, . . . is not mentioned in them, and . . . performs no function whatsoever relating to their operation."); *Naranjo v. Nick's Mgmt., Inc.*, 2023 WL 416313, at *10-11 (N.D. Tex. Jan. 25, 2023) (defendant invoking Texas equitable estoppel law was part of the corporate group involved in the employment dispute; thus it was no stranger to the plaintiff). Importantly, in *Green*, even in finding estoppel, the Court stressed that the Tennessee Supreme Court is "skeptic[al] of a broadly applied 'intertwinement test' for extending the estoppel doctrine." 2020 WL 6702866 at *9. Here, the other Defendants have no relationship at all with the relevant Plaintiffs. The court in *In re Titanium Dioxide Antitrust Litig.*, an outlier decision, assumed that Fourth Circuit law was the same as in Ohio, Delaware, and New York, recognized that other courts require a stronger showing than it did to invoke equitable estoppel, and gave great weight to the fact that the Federal Arbitration Act ("FAA") establishes that "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." 962 F. Supp. 2d 840, 850-54 (D. Md. 2013). But the FAA does not apply to class action waivers.

[14] "Like other contracts, arbitration agreements may also be enforced by third-party beneficiaries, so long as 'the parties to the contract intended to secure a benefit to that third party and entered into the contract directly for the third party's benefit.' The benefit must be more than incidental, and the contracting parties' intent to 'confer a direct benefit to a third party must be clearly and fully spelled out or enforcement by the third party must be denied.'" *Id.*

[15] *Townsend* involved both: (1) contract claims against a homebuilder by the homeowners; and (2) tort claims against the homebuilder by third parties to the contract at issue, but who resided in the home. *Id.* The Washington Supreme Court ruled that the homebuilder could compel arbitration with the homeowners, but not the residents, who had not signed the contract. *Id.* at 924 ("no sufficient factual basis for applying equitable estoppel" against the residents; rather, "nonsignatories to a contract are not bound by the contract's arbitration clause").

9

Washington courts have not explicitly addressed this application to class action waiver clauses, there is no basis to infer that Washington courts would craft a more lenient rule. The Court should reject Defendants' equitable estoppel arguments under each governing state law.

### 2. Antitrust Jurisprudence Also Cautions Against Allowing Defendants to Claim Equitable Estoppel to Escape Liability.

Courts are widely reluctant to apply equitable estoppel to allow non-party Sherman Act conspirators to enforce the terms of a contract to which they are not party, because under normal circumstances, purchasers have a right to assume that purported competitors are, in fact, competing. Thus, they are not expected to understand or intend that any such waiver would extend to co-conspirators. For example, in *In re TFT-LCD*, the court stressed that "[f]orcing [a plaintiff] to arbitrate" claims against co-conspirators that are non-signatories to that arbitration clause "because defendants entered into a complex, interdependent conspiracy would not only exceed the scope of [that] arbitration clause, it would also impede the enforceability of the antitrust laws." 2011 WL 4017961, at *5 (N.D. Cal. Sept. 9, 2011).[16] This makes sense for class waivers as well. No consumer would understand or intend a class waiver to extend to unknown, unrelated entities that are only connected to the consumer's contract counterparty through an illegal conspiracy.

### D. Three of the Five Class Waiver Provisions Are Facially Inapplicable to the Present Litigation.

Three of the class waiver provisions Defendants point to in their Motion are simply inapplicable. Lincoln relies on a purported Waiver Lease with Watters that was never executed, as required by its terms. It therefore cannot be enforced here. Weaver's Waiver Leases with Camden

---

[16] "To rule otherwise would allow defendants to bootstrap their way into arbitration based on nothing more than the very conduct which constituted a violation of the antitrust laws in the first place." *Id.*; *see also Laumann v. Nat'l Hockey League*, 2013 WL 837640, at *2 n.25 (S.D.N.Y. Mar. 6, 2013) (in an antitrust case, a "non-signatory to an arbitration agreement cannot enforce an arbitration clause where its only relationship to the signatories is as a co-conspirator"); *Ross v. Am. Express, Co.*, 547 F.3d 137, 147-48 (2d Cir. 2008) (similar).

and Vincin's Waiver Leases with CONTI similarly cannot be enforced here. The scope of the class waiver provision in each is explicitly limited or does not apply to antitrust litigation.

### 1. Watters's Contract With Lincoln Was Not Executed.

Lincoln attaches to its declaration what it claims to be a true and correct copy of Watters's 2021 lease. Dkt. 590-1 at 4, 6.[17] That lease contains a heading: "Severability, Originals and Attachments, and Signatures." Clause 52 under that heading specifically requires that the parties sign addenda to make them binding: "Any addenda or amendments you sign as a part of executing this Lease Contract are binding and hereby incorporated into and made part of the Lease Contract between you and us." Dkt. 590-1 at 13. After the Lease Contract, there is an inventory form and 15 distinct "addenda," each with their own signature block. *Id*. at 18-49.

Despite Clause 52's requirement that the parties manifest assent to its terms by signing in the dedicated signature block provided, Watters' lease only evidences a single electronic signature by Watters, which appears in the signature block associated with the "Construction Addendum." *Id*. at 49. Watters's signature is not on the "Class Action Waiver Addendum." *Id*. at 45; ¶ 330. Nor is the signature of any Lincoln representative. Dkt. 590-1 at 45. By the lease's own terms, it was not incorporated and is not binding because the "Class Action Waiver Addendum" was not executed.

Defendants argue that Watters "nevertheless is bound by the entire lease" because of his signature at the end of the lease and because he lived in and paid rent for the unit according to the lease terms.[18] Mot. at 8 n.6. But that is a factual claim that relies on information outside the AC

---

[17] Plaintiffs accept as true and correct, only for the purposes of this Motion, all the leases at issue that Defendants attach to their supporting declarations.

[18] To the extent Lincoln argues that all its tenants only ever electronically sign the final page of the agreement, that is inconsistent with: (1) the express terms of Clause 52; (2) the parties explicitly signing and incorporating the "Construction Addendum," Dkt. 590-1 at 49; and (3) Lincoln's

and the lease. The Court cannot determine at this stage of litigation, absent discovery, anything about the parties' course of conduct and what it revealed. *Cf.* Mot. at 7-8; *see Solo v. United Parcel Serv. Co.*, 819 F.3d 788, 796 (6th Cir. 2016).[19] It is for that reason Defendants' reliance upon *Howard-Hill v. Spence* is misplaced; it was decided at summary judgment on a highly fact-specific basis informed by discovery. 2017 WL 4544599, at *7-8 (E.D. Tenn. Oct. 11, 2017).[20] Accordingly, because Watters and Lincoln never signed the Class Waiver Addendum, the Court must deny Defendants' Motion.

> **2. The Most Logical Interpretation of Weaver's Class Waiver Is That It Does Not Apply To the Entire Contract, Leaving the Scope of the Waiver a Question of Fact.**

"The primary goal of contract interpretation is to give effect to the intent of the parties." *Draper v. DeFrenchi-Gordineer*, 282 P.3d 489, 494 (Colo. App. 2011). "When a contract is organized into separate parts, a provision or definition found in one part or section of the contract is not necessarily intended to apply to other parts." *Allstate Ins. Co. v. Huizar*, 52 P.32 816, 819-20 (Colo. 2002) (*en banc*).

Under that standard, the most logical interpretation of Weaver's Class Waiver is that, based on its content and placement in Weaver's leases, the parties did not intend for the waiver to apply to situations beyond Camden's default under the leases. The waiver provision in Weaver's leases

---

declaration, which admits its electronic forms permit multiple "electronic signature field(s)," Dkt. 590-1 at 3. It is also a factual assertion Plaintiffs are entitled to test in discovery.

[19] Lincoln's untested and self-serving declaration cannot plug these gaps. The Court should disregard the portions of Defendants' declarations that go beyond exhibiting the leases, as these introduce facts not incorporated by reference or central to Plaintiffs' claims. *Finley v. Kelly*, 384 F. Supp. 3d 898, 908 (M.D. Tenn. 2019).

[20] *McCray v. Univ. Health Servs.*, 2020 WL 4207648, at *6 (M.D. Tenn. July 22, 2020), is also distinguishable. In *McCray*, it was *undisputed* that the defendant company intended to be bound by the arbitration agreement at issue, and manifested that intent by, among other things, printing its name under the word "AGREED" in the agreement. *Id.* at *6. The Court therefore found a binding contract between the parties, even though the defendant had not technically signed.

is conspicuously included under the heading "Default by Owner," and follows a discussion of Weaver's rights to make repair requests and seek rental abatement:

> *Default by Owner*. Owner agrees to abide by applicable law regarding repairs and performance under this Lease. ALL REQUESTS FOR REPAIRS MUST BE IN WRITING. Unless exercising a right specifically granted by applicable law, Resident shall not be entitled to any abatement of Rent for any inconvenience or annoyance in connection with Owner's repairs or maintenance and may not withhold Rent under any circumstances, regardless of any alleged failure by Owner to repair or maintain, unless otherwise provided by applicable law. *To the extent allowed by applicable law, Resident waives any ability or right to serve as a representative party for others similarly situated or participate in a class action suit or claim against the Owner or the Owner's managing agents. Resident acknowledges that this waiver does not, in any way, affect Resident's right to pursue any rights or remedies Resident may have against Owner as a result of Owner's default. This waiver only restricts Resident's ability to serve as a representative party or participate in a class action suit or claim against Owner or Owner's managing agents.*

Dkt. 590-2 at 56, 98, 142.

Indeed, the purported waiver was tacked onto the pre-existing "Default by Owner" clause contained in Weaver's 2017 lease at the time he renewed his lease in 2018. *See id*. at 14-56. If the parties intended a waiver with a larger scope, then they would have used broader language or placed the waiver in a stand-alone clause (*i.e.*, not under the "Default by Owner" heading next to a provision on repair rights). *See Allstate Ins.*, 52 P.3d at 819-20. Such a clause could have been inserted alongside the leases' separate "Applicable Law" clause, Dkt. 590-2 at 17, and referred to "any disputes," but it did not. Thus, the class waiver's scope is ambiguous, *see E. Ridge of Fort Collins, LLC v. Larimer & Weld Irr. Co.*, 109 P.3d 969, 974 (Colo. 2005) (*en banc*), and presents a fact issue unsuitable for determination at this stage of litigation.[21] *Draper*, 282 P.3d at 494.

---

[21] Weaver's Waiver Leases should be construed against Camden because they are ambiguous. *See Green Shoe Mfg. Co. v. Farber*, 712 P.2d 1014, 1016 (Colo. 1986) ("Where the terms of a contract are ambiguous, they must be strictly construed against the party drafting the instrument.").

### 3. The Most Logical Interpretation of Vincin's Class Waiver Is That It Does Not Apply to CONTI, Leaving the Waiver's Application a Question of Fact.

Under Texas law, "[t]he goal of contract interpretation is to ascertain the parties' true intent as expressed by the plain language they used." *Great Am. Ins. Co. v. Primo*, 512 S.W.3d 890, 893 (Tex. 2017). The most logical interpretation of Vincin's class action waiver is that it applies only to non-Defendant Creekside Village, and not CONTI. The relevant portion of the leases state:

> *Class Action Waiver.* You agree that you will not participate in any class action claims against us or our representatives. You must file any claim *against us* individually, and *you expressly waive your ability to bring, represent, join or otherwise maintain a class action, collective action or similar proceeding against us in any forum.*

Dkt. 590-4 at 4, 15, 24, 27 (italics added). "Us" is defined as "Creekside Village." *Id.* at 8, 17, 26.[22] Thus, the class waiver's scope is ambiguous at best,[23] and presents a fact issue unsuitable for determination at the pleading stage. *See NuStar Energy, L.P. v. Diamon Offshore Co.*, 402 S.W.3d 461, 466 (Tex. App. 2013) ("If the contract is subject to more than one reasonable interpretation after applying the pertinent rules of contract construction, then the contract is ambiguous and there is a fact issue regarding the parties' intent.").

### E. Even If the Class Action Waiver Provisions Apply, Discovery Is Required to Determine If They Are Unconscionable or Contrary to Public Policy.

Even if the Court disagrees with all of Responding Plaintiffs' points of law above, the Court should still deny this Motion. These class action waivers are unconscionable. When Plaintiffs commence discovery, it will include the allegations that Defendants like Lincoln,

---

[22] Furthermore, the class waiver on its clear terms does not apply to non-signatory Defendants. As stated *supra*, this is also true of the other Responding Plaintiffs' Waiver Leases. Defendants not parties to the Waiver Leases cannot claim the benefits of the leases, including the class waivers.

[23] Because they are ambiguous, Vincin's leases should be construed against CONTI. *See Liberty Surplus Ins. Corp. v. Exxon Mobil Corp.*, 483 S.W.3d 96, 101 (Tex. App. 2015) ("An ambiguous contract is construed against the drafter," and "[w]hether a contract is ambiguous is a question of law for the court.").

14

Camden, Greystar, and CONTI used trade associations such as the Texas Apartment Association ("TAA") and the National Apartment Association ("NAA") to collusively set common lease terms with class action waiver provisions as tools in their anticompetitive scheme to extract supracompetitive rents from tenants and foreclose their access to remedies. ¶¶ 313-31. This discovery may also resolve Defendants' wider contention that absent class members have class action waivers, jury waivers, and arbitration agreements that not only prevent them from serving as named representatives, but also potentially as class members. Mot. at 1 n.1. Because the parties will need discovery to resolve Defendants' purported defenses, there is no efficiency gained here by deciding this issue now as it relates specifically to the Responding Plaintiffs.

### 1. Discovery Will Show the Class Action Waivers Are Unconscionable.

In complex actions, such as the antitrust action here, courts are often not inclined to enforce class action waivers, recognizing that such agreements serve to protect defendants at the disadvantage of consumers, especially where pursuing claims on an individual basis would be inefficient and costly. *Knudtson*, 2010 WL 11682487, at *2-4; *see also Martrano*, 2009 WL 1704469, at *21 (Rule 23 "leaves no room for enforceability of private agreements among litigants to forego the efficiencies" of class-wide adjudication); *Howard,* 2007 WL 2778664, at *5.[24]

Here, Plaintiffs offer several observations highlighting each of the waiver's procedural unconscionability—warranting further discovery to make such fact-specific determinations. *Francis,* 2009 WL 416063, at *10; *Nixon*, 2021 WL 4037824, at *2. Further, the broad language of these waiver provisions that preclude Plaintiffs from any form of participation in a class action (even as absent class members) highlight their substantive unconscionability.

---

[24] Indeed, as alleged in the AC, Defendants' intent of adopting class waiver provisions across all their leases "is to prohibit redress by tenants whose individual losses are too small to justify bringing an individual action. In this way, landlords, including Defendants, can avoid liability for wrongdoing by making class actions more difficult to bring." ¶ 324.

### a. Weaver's Waivers Are Unconscionable Under Colorado Law.

The Colorado Supreme Court has adopted a fact-specific test to determine whether a contract provision is unconscionable, evaluating whether there is: (1) a standardized agreement executed by parties of unequal bargaining strength; (2) lack of opportunity to read or become familiar with the document before signing; (3) use of fine print in the portion of the contract containing the provision; (4) absence of evidence that the provision was commercially reasonable or should reasonably have been anticipated; (5) the terms of the contract, including substantive unfairness; (6) the relationship of the parties, including factors of assent, unfair surprise, and notice; and (7) all the circumstances surrounding the formation of the contract, including its commercial setting, purpose, and effect. *Davis v. M.L.G. Corp.,* 712 P.2d 985, 991 (Colo. 1986). Though discovery has not yet occurred, even a preliminary evaluation of Weaver's class action waivers with Camden indicate they are unconscionable:

- Camden's lease is a standardized form that it presents to renters on a take-it-or-leave-it basis, which it can do because of its significantly higher bargaining power. Dkt. 590-2 at 45. Indeed, Defendants refer to the lease as a "contract of adhesion." Mot. at 8.[25]

- Weaver's 2018 lease with Camden is identical to his 2017 lease, except for the insertion of the waiver language at the end of clause 27. *Cf.* Dkt. 590-2 at 5-42; *id.* at 45-84. The cover letter Camden sent Weaver with the 2018 lease does not highlight this change. *Id.* at 43.

- The waiver clause in Weaver's leases is buried in a provision addressing the effects of a default by the owner. Indeed, the waiver is so buried that Camden's attorneys failed to

---

[25] The Tenth Circuit and Colorado define a contract of adhesion as "not bargained for, but imposed on the public for a necessary service on a take it or leave it basis." *Bauer v. Aspen Highlands Skiing Corp.*, 788 F. Supp. 472, 474 (D. Colo. 1992).

16

identify them until days before their first motion to enforce class actions waivers was due, despite being ordered to identify them by the Court on May 31, 2023. *Cf.* Dkt. 338 at 1 n.1.

In addition to the above indicators of procedural unconscionability, if interpreted to apply to more than default by the owner, the class action waivers are also substantively unconscionable. The language in Camden's waivers is broadly drafted, as it prohibits residents including Weaver from exercising "*any* ability or right" to serve as a class representative, or even participate in a class action as an absent class member. Dkt. 590-2 at 56. Such agreements are unconscionable as against Colorado public policy. Indeed, on June 5, 2023, Colorado passed legislation prohibiting class action waivers in rental agreements, a factor that would drive a Colorado court's decision in evaluating Camden's waivers. *See* H.B. 23-1095;[26] *see also Mason v. Orthodontic Ctrs. of Colo., Inc.,* 516 F. Supp. 2d 1205, 1210 (D. Colo. 2007) (public policy analysis focused on whether "the Agreement violates public policies as embodied in current statutory law"). Consequently, even before discovery, these factors suggest a court applying Colorado law would find unconscionable the class waiver provision in Weaver's leases here.

### b. Watters's and Kabisch's Waivers Are Unconscionable Under Tennessee Law.

Tennessee courts recognize that "a lack of a meaningful choice on the part of one party," "contract terms that are unreasonably harsh," standardization of an agreement, and unequal bargaining power are indicative of unconscionability. *See Rubio v. Carreca Enters., Inc.*, 490 F. Supp. 3d 1277, 1289 (M.D. Tenn. 2020). Like with Colorado courts, Tennessee courts undertake a fact-intensive inquiry to make a final determination. *All Com. Floors, Inc.*, 2019 WL 330880, at

---

[26] Colo. Rev. Stat. Ann. § 38-12-801 (3)(a)(B) (2023).

*6.[27] Because the inquiry is fact-intensive, discovery is required before the Court can resolve the unconscionability analysis for Lincoln's and Greystar's class waiver clauses.

The pleadings reflect numerous facts that require development before the Court can conclude whether the Tennessee class waiver provision is unconscionable. For example, in putting together a lease for Watters, Lincoln appears to have insisted on the NAA standard form lease, which it presented to renters on a take-it-or-leave-it basis. *See Trigg v. Little Six Corp.*, 457 S.W.3d 906, 912 ("[C]ourts apply a higher degree of scrutiny to contracts of adhesion, defined by the Supreme Court as a standardized contract form offered to consumers of goods and services on essentially a 'take it or leave it' basis"). Even if Watters had signed it, the class waiver is buried among over 15 addenda, and alongside several other extremely one-sided provisions. *See, e.g.*, Dkt. 590-1 at 43 (granting Lincoln free license to use its tenants' likenesses). Critically, the NAA class action waiver addenda in Lincoln's lease appears to be the result of the collusive model lease setting process challenged by Plaintiffs. ¶¶ 313-31.[28] Specifically: (1) the NAA model lease set by Defendants was modeled upon the TAA model lease developed by Defendants, ¶¶ 314, 316, 320-323; (2) the TAA first introduced a class action waiver into its model around 2017, ¶ 318; (3) the NAA first introduced the class action waiver addenda to its form lease in 2018, ¶ 323; and (4) in

---

[27] *See also* T.C.A. § 66-28-204 (2)(b) (if a party raises unconscionability "the parties shall be afforded a reasonable opportunity to present evidence as to the setting, purpose, and effect of the rental agreement or settlement to aid the court in making the determination").

[28] Again, Defendants' efforts to jointly insert class action waivers appear directed at avoiding suits such as this, in which the quantum of the individual's losses are too little to bring an individual claim in light of the complexities and expenses involved with such claim (*e.g.*, discovery costs and expert evidence). *See In re Currency Conversion Fee Antitrust Litig.*, 2012 WL 401113, *7-9 (S.D.N.Y. Feb. 8, 2012) (finding Section 1 violation for banks to agree to include mandatory arbitration clauses in their respective agreements). In this manner, the class action waiver can be seen to contradict the Tennessee legislature's strong "public policy against exculpatory clauses in landlord-tenant contracts," epitomized by their prohibition in T.C.A. § 66-28-203(a). *Cole v. Wyndchase Aspen Grove Acquisition Corp.*, 2006 WL 2827452, at *7 (M.D. Tenn. Sept. 28, 2006).

18

response to reports that tenants did not wish to sign class action waivers in model leases, in spring 2018, TAA counsel advised landlords to make the tenants sign the waiver (along with all other terms) or "tell them they will have to live elsewhere." ¶ 319. Kabisch's lease with Greystar presents these same issues, as Greystar also presented the lease using the NAA standard form with nearly identical, one-sided provisions, buried among a number of addenda. Discovery into these facts about the formation and implementation of this provision in Watters's lease with Lincoln and Kabisch's lease with Greystar would support a finding of procedural unconscionability.[29]

Moreover, these waiver provisions are substantively unconscionable, given the breadth of their language. The relevant provision in the Lincoln lease provides:

> *CLASS ACTION WAIVER.* You agree that you hereby waive your ability to participate either as a class representative or member of any class action claim(s) against us or our agents. While you are not waiving any right(s) to pursue claims against us related to your tenancy, you hereby agree to file any claim(s) against us in your individual capacity, and you may not be a class action plaintiff, class representative, or member in any purported class action lawsuit ("Class Action"). *Accordingly, you expressly waive any right and/or ability to bring, represent, join, or otherwise maintain a Class Action or similar proceeding against us or our agents in any forum.*

Dkt. 590-1 at 45. This language is broad. It prohibits residents, including Watters, from "*any* right and/or ability" to "bring, represent, join, or otherwise maintain a Class Action." *Id.* And unsurprisingly, Greystar's Tennessee lease contains the same broad prohibition:

> *CLASS ACTION WAIVER.* You agree that you hereby waive your ability to participate either as a class representative or member of any class action claim(s) against us or our agents. While you are not waiving any right(s) to pursue claims against us related to your tenancy, you hereby agree to file any claim(s) in your individual capacity, and you may not

---

[29] Defendants rely upon caselaw declining to find contractual provisions unconscionable where the provisions were in bold and capitalized lettering. *See* Mot. at 16. But the fact that a contractual provision is presented in such format is not dispositive of its enforceability because unconscionability is a fact-specific inquiry taking into account *all* the circumstances of the contract and the disputed provision. *All Com. Floors, Inc.*, 2019 WL 330880, at *6. Here, the class waiver provisions are buried in various other addenda (all with different iterations of bolded, emphasized lettering), not to mention that the provisions are presented on a take-it-or-leave-it basis as a result of Defendants' alleged collusive conduct to disadvantage tenants.

be a class action plaintiff, class representative, or member in any purported class action lawsuit ("Class Action"). *Accordingly, you expressly waive any right and/or ability to bring, represent, join, or otherwise maintain a Class Action or similar proceeding against us or our agents in any forum.*

Dkt. 590-3 at 3, 38. At minimum, the Court should deny Defendants' Motion and permit Plaintiff to proceed with discovery.

### c.     Cherry's Waiver Is Unconscionable Under Washington Law.

Contrary to Defendants' assertions, the class action waiver in Cherry's lease renewal is unenforceable due to unconscionability. "Substantive unconscionability alone is sufficient to support a finding of unconscionability." *McKee v. AT&T Corp.*, 191 P.3d 845, 857 (Wash. 2008). In Washington, class action waivers are often found substantively unconscionable because "when wrongs are small but widespread, class actions are often the only effective way to address them." *Id.*

Indeed, Washington courts have found class action waivers unconscionable and unenforceable on that basis. *See*, *e.g.*, *Oakley v. Domino's Pizza LLC*, 516 P.3d 1237, 1246 (Wash. Ct. App. 2022) (class action waiver unenforceable because plaintiff would not have been able to pay a lawyer to bring suit on an individual basis); *see also Dix v. ICT Grp., Inc.*, 161 P.3d 1016, 1024-25 (Wash. 2007) (finding clause barring class actions for certain consumer protection lawsuits unenforceable in cases where the lack of class action procedure would leave the plaintiff with no feasible avenue to seek relief).[30] Here, the broad language of the class action waiver in Cherry's lease renewal is substantively unconscionable as it serves to exculpate Greystar from potentially widespread misconduct. *See Oakley*, 516 P.3d at 1246; *Dix*, 161 P.3d at 1024-25.

---

[30] Defendants' reliance on *Carter v. Rent-A-Center, Inc.*, is improper because its holding—foreclosing any argument that a class action waiver by itself is unconscionable—is limited to class waivers occurring alongside arbitration agreements. 718 F. App'x 502, 504 (9th Cir. 2017). The FAA protects class waivers in such circumstances, and as discussed *infra*, is inapplicable here. *See Killion v. KeHE Distribs., LLC*, 761 F.3d 574, 592 (6th Cir. 2014).

Second, Cherry's class action waiver is also procedurally unconscionable. Procedural unconscionability is considered the "lack of a meaningful choice, considering all the circumstances surrounding the transaction." *Nelson v. McGoldrick*, 896 P.2d 1258, 1262 (Wash. 1995). Here, Cherry was presented with the NAA standard form agreement and class action waiver. Dkt. 590-3 at 116, 169. The waiver was therefore procedurally unconscionable: it was presented on a take-it-or-leave-it basis through a standard form contract by the widespread NAA. *See In re Currency Conversion Fee Antitrust Litig.*, 2012 WL 401113, at *7-9. That the waiver was capitalized and bolded in the document Cherry had no meaningful opportunity to negotiate, rather than buried in fine print, is irrelevant. *See* Mot. at 20-21. At a minimum, the Court should allow Cherry to pursue discovery into whether she had the ability to bargain in a meaningful sense and other facts relevant to the enforceability of the class action waiver.

### d. Vincin's Waiver Is Unconscionable Under Texas Law.

Finally, the class action waiver provision in Vincin's leases with CONTI should be found unconscionable under Texas law. In Texas, "the term 'unconscionability' describes a contract that is unfair because of its overall one-sidedness or the gross one-sidedness of its terms." *Kendziorski v. Saunders*, 191 S.W.3d 395, 406 (Tex. App. 2006) (citing *Arthur's Garage, Inc. v. Racal–Chubb Sec. Sys., Inc.*, 997 S.W.2d 803, 816 (Tex. App. 1999)). "Texas recognizes both procedural and substantive[] unconscionability as defense against contract enforcement. . . . In assessing whether a contract is unconscionable under the totality of the circumstances, [Texas] consider[s]: (1) the entire atmosphere in which the agreement was made; (2) the alternatives, if any, available to the parties at the time the contract was made; (3) the non-bargaining ability of one party; (4) whether the contract was illegal or against public policy; and (5) whether the contract is oppressive or unreasonable." *Hogg v. Lynch, Chappell & Alsup, P.C.*, 553 S.W.3d 55, 73 (Tex. App. 2018).

21

CONTI's class action waiver provision was presented to Vincin on a one-sided, take-it-or-leave-it basis, with the following language: "You understand that, without this waiver, you could be a party in a class action lawsuit. By signing this lease, you accept this waiver and choose to have any claims decided individually." Dkt. 590-4 at 15. The leases are standardized TAA forms, which are used by the overwhelming majority of Texas lessors,[31] and the waiver is directly in the leases themselves—literally requiring the prospective tenant to accept it in order to rent an apartment unit. There is a high likelihood discovery will further reveal that Vincin had no power to reject the class action waiver if she wanted to lease an apartment anywhere in Texas. Moreover, Vincin had already been living in her apartment unit for at least three years when CONTI acquired the building and imposed the class waiver provision. ¶ 59. To reject the waiver provision would have meant an additional burden and costs for Vincin, who would have been displaced from her home and made to search for another Texas apartment that somehow did not use the TAA lease.[32]

The waiver is also substantively unconscionable. Again, the breadth of its language baring residents like Vincin from their "ability to bring, represent, join, or otherwise maintain a class action . . . in any forum," Dkt. 590-4 at 4, 15, 24, 27, effectively precludes any form of participation in a class action to resolve disputes.

---

[31] The TAA "form lease is used by '90 percent of [TAA members] or 95 percent perhaps." ¶ 315.

[32] Defendants cite to a 2002 case for the proposition that the only Texas cases that have found an agreement procedurally unconscionable are where a party appears incapable of understanding the agreement. *See* Mot. at 18-19. But since then, Texas courts have found instances of unconscionability outside of that context. For example, the Texas Supreme Court affirmed a finding that a cost-splitting provision in employment contracts is unconscionable given public policy concerns of deterring potential litigants from vindicating their statutory rights. *See In re Poly-Am., L.P.*, 262 S.W.3d 337, 355-56 (Tex. 2008). Similarly, here, given the circumstances of CONTI's TAA leases that were imposed upon Vincin, public policy considerations weigh in favor of finding the class action provision unconscionable. At any rate, the issue of whether Vincin was capable of understanding the class action waiver requires discovery.

22

## 2. The Federal Arbitration Act Does Not Apply to Class Action Waivers.

Many of Defendants' authorities address situations where a class action waiver is included alongside a binding arbitration agreement. *See* Mot. at 11-13. These cases are inapposite. Valid arbitration clauses are enforceable by the FAA, which establishes a federal policy in favor of arbitration and does not apply here. *See Volt Info. Scis., Inc. v. Bd. of Trustees of Leland Stanford Junior Univ.*, 489 U.S. 468, 476 (1989).

In contrast, there is no "Federal Class Action Waiver Act," nor any such federal policy favoring waiver of the right to bring class action suits. Indeed, to the extent a federal policy is discernable, it is in favor of class litigation. *Cf.* Fed. R. Civ. P. 23; 28 U.S.C. §§ 1332(d), 1453, 1711-15 (expanding federal subject-matter jurisdiction over class actions). It is, therefore, unsurprising that courts refuse to apply arbitration precedent to contracts that include class waiver clauses but do not include arbitration clauses. "When unaffected by the case law emanating from the FAA, contractual provisions that dismantle or disable important procedures and due process rights provided in our . . . rules should not be enforced." *Pace v. Hamilton Cove*, 2023 WL 3521797, at *5 (N.J. Super. Ct. App. Div. May 18, 2023). Indeed, the Sixth Circuit has explicitly held that FAA caselaw does not control the validity of straight class action waivers. *Killion,* 761 F.3d at 592. In finding that collective action waivers in employees' separation agreements did not validly waive their rights to participate in collective actions, the court noted that "the considerations change when an arbitration clause is involved." *Id.* at 590-91 (citing *Boaz v. FedEx Customer Info. Servs., Inc.,* 725 F.3d 603, 606-07 (6th Cir. 2013)).

Defendants incorrectly assert that *Killion* has been overruled by the Supreme Court by mischaracterizing *Gaffers v. Kelly Servs., Inc.*, 900 F.3d 293, 297 (6th Cir. 2018) as recognizing *Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612 (2018) overturning *Killion*. Mot. at 13. But *Gaffers* does nothing of the sort. Immediately following Defendants' quoted text, the court went on to explain

23

how *Epic* does not affect the holding in *Killion* because "the [Fair Labor Standards Act ("FLSA")] waiver in those agreements did not include any provision for arbitration at all. We even noted 'considerations change when an arbitration clause is involved.'" *Gaffers*, 900 F.3d at 297.[33, 34]

Nor can Defendants properly distinguish *Killion* merely because it pertains to an FLSA action where plaintiffs "should have the opportunity to proceed collectively." *See* Mot. at 13.[35] That same concept applies in class actions outside of the FLSA context. *See Martrano*, 2009 WL 1704469, at *21 (Rule 23 "leaves no room for enforceability of private agreements among litigants to forego the efficiencies" of class-wide adjudication). In any event, courts in the Sixth Circuit have held that antitrust actions similarly raise an inference that plaintiffs should be permitted to proceed collectively. *Howard*, 2007 WL 2778664, at *5.[36]

Faced with *Killion*'s binding precedent, Defendants resort to a footnote of out-of-circuit cases that purportedly enforce class action waivers without an arbitration agreement. *See* Mot. at 12-13 n.11. But most of those cases were decided later in litigation,[37] after the parties had a meaningful opportunity to conduct discovery into the waivers' enforceability.[38] If the Court does

---

[33] The Sixth Circuit also explained that *Epic* pertained to whether the National Labor Relations Act displaces the FAA. *Id.* at 295-96. This issue has no bearing here.

[34] Other courts in this Circuit have properly recognized that the holding of *Gaffers* is precisely the opposite of what Defendants argue here. *See Abner v. Convergys Corp.*, 2019 WL 13196599, at *2 (S.D. Ohio May 21, 2019) ("*Gaffers* establishes that *Epic* did not overturn *Killion*.").

[35] Ironically, many of Defendants' cited cases are FLSA cases. *See, e.g.*, Mot. at 12-13 n.11.

[36] *American Express Co. v. Italian Colors Restaurant*, 570 U.S. 228 (2013), is also inapplicable, as it does not "speak to the validity of a collective-action waiver outside of the arbitration context." *Killion*, 761 F.3d at 592.

[37] Many of Defendants' other out-of-circuit cases explicitly declined to follow the Sixth Circuit's decision in *Killion* because of their differing jurisdictional precedent.

[38] *See, e.g., Flores-Mendez v. Zoosk, Inc.*, 2022 WL 2967237, at *2 (N.D. Cal. July 27, 2022) (finding, at class certification, that plaintiff had meaningful alternatives to defendant such that class action waiver was not procedurally unconscionable, and defendant's terms of use were not so one-sided as to be substantively unconscionable); *Korea Week, Inc. v. Got Capital, LLC*, 2016 WL 3049490, at *9 (E.D. Pa. May 27, 2016) (finding, at class certification, that class action

24

not find the class action waivers inapplicable or unenforceable on any of the other grounds stated above, the Court should nonetheless allow discovery into issues of unconscionability before determining whether to preclude Responding Plaintiffs' ability to serve as class representatives.

## V.    CONCLUSION

For the foregoing reasons and as demonstrated by the chart below, Responding Plaintiffs can maintain their class claims. Plaintiffs respectfully request that Defendants' Motion be denied.

| | Plaintiff Watters & Defendant Lincoln | Plaintiff Weaver & Defendant Camden | Plaintiff Kabisch & Defendant Greystar | Plaintiff Cherry & Defendant Greystar | Plaintiff Vincin & Defendant CONTI |
|---|---|---|---|---|---|
| **Plaintiff entered lease with another Defendant with no class waiver.** | X | X | X | X | |
| **Class waiver does not contain third-party beneficiary language for competitors.** | X | X | X | X | X |
| **Equitable estoppel does not apply.** | X | X | X | X | X |
| **Class waiver is unsigned.** | X | | | | |
| **Class waiver scope is limited by contractual terms and/or does not apply to antitrust lawsuits.** | | X | | | X |
| **Class waiver is unconscionable.** | X | X | X | X | X |

---

waivers were enforceable after conducting in-depth evaluation, including deposition testimony); *Bonanno v. Quizno's Franchise Co., LLC*, 2009 WL 1068744, at \*18-23 (D. Colo. Apr. 20, 2009) (similar); *Hancock v. Jackson Hewitt Tax Serv., Inc.*, 2020 WL 2487562, at \*3 (W.D. Tex. May 14, 2020) (noting "[b]oth parties have filed evidence in support of their position, and neither suggest how further discovery would assist the Court to resolve this narrow issue.").

Dated: November 8, 2023

/s/ Tricia R. Herzfeld
Tricia R. Herzfeld (#26014)
Anthony A. Orlandi (#33988)
**HERZFELD SUETHOLZ GASTEL LENISKI
AND WALL, PLLC**
223 Rosa L. Parks Avenue, Suite 300
Nashville, TN 37203
Telephone: (615) 800-6225
tricia@hsglawgroup.com
tony@hsglawgroup.com

*Liaison Counsel*

Patrick J. Coughlin
Carmen A. Medici
Fatima Brizuela
**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
600 West Broadway, Suite 3300
San Diego, CA 92101
Telephone: (619) 798-5325
Facsimile: (619) 233-0508
pcoughlin@scott-scott.com
cmedici@scott-scott.com
fbrizuela@scott-scott.com

Patrick McGahan
Amanda F. Lawrence
Michael Srodoski
G. Dustin Foster
Isabella De Lisi
**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
156 South Main Street
P.O. Box 192
Colchester, CT 06145
Telephone: (860) 537-5537
Facsimile:  (860) 537-4432
pmcgahan@scott-scott.com
alawrence@scott-scott.com
msrodoski@scott-scott.com
gfoster@scott-scott.com
idelisi@scott-scott.com

Stacey Slaughter
Thomas J. Undlin
Geoffrey H. Kozen

26

Stephanie A. Chen
J. Austin Hurt
**ROBINS KAPLAN LLP**
800 LaSalle Avenue, Suite 2800
Minneapolis, MN 55402
Telephone:  (612) 349-8500
Facsimile:  (612) 339-4181
sslaughter@robinskaplan.com
tundlin@robinskaplan.com
gkozen@robinskaplan.com
schen@robinskaplan.com
ahurt@robinskaplan.com

Swathi Bojedla
Mandy Boltax
**HAUSFELD LLP**
888 16th Street, N.W., Suite 300
Washington, DC 20006
Telephone: (202) 540-7200
sbojedla@hausfeld.com
mboltax@hausfeld.com

Gary I. Smith, Jr.
**HAUSFELD LLP**
600 Montgomery Street, Suite 3200
San Francisco, CA 94111
Tel: (415) 633-1908
gsmith@hausfeld.com

Katie R. Beran
**HAUSFELD LLP**
325 Chestnut Street, Suite 900
Philadelphia, PA 19106
Telephone: 1 215 985 3270
kberan@hausfeld.com

*Interim Co-Lead Counsel*

Eric L. Cramer
Michaela L. Wallin
**BERGER MONTAGUE PC**
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Telephone: (215) 875-3000
ecramer@bm.net
mwallin@bm.net

Daniel J. Walker
**BERGER MONTAGUE PC**
2001 Pennsylvania Avenue, NW, Suite
300
Washington, DC 20006
Telephone: (202) 559-9745
dwalker@bm.net

Brendan P. Glackin
Dean M. Harvey
**LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP**
275 Battery Street, Suite 2900
San Francisco, CA 94111
Telephone: 415-956-1000
bglackin@lchb.com
dharvey@lchb.com

Mark P. Chalos
Hannah R. Lazarz
Kenneth S. Byrd
**LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP**
222 2nd Avenue South, Ste. 1640
Nashville, TN 37201
(615) 313-9000
mchalos@lchb.com
hlazarz@lchb.com
kbyrd@lchb.com

Steve W. Berman
Breanna Van Engelen
**HAGENS BERMAN SOBOL
SHAPIRO LLP**
1301 Second Avenue, Suite 2000
Seattle, Washington 98101
Telephone: (206) 623-7292

Christian P. Levis
Vincent Briganti
Peter Demato
Radhika Gupta
**LOWEY DANNENBERG, P.C.**
44 South Broadway, Suite 1100
White Plains, NY 10601
Telephone: (914) 997-0500
Facsimile: (914) 997-0035
vbriganti@lowey.com
clevis@lowey.com
pdemato@lowey.com
rgupta@lowey.com

Christopher M. Burke
Walter W. Noss
Yifan (Kate) Lv
**KOREIN TILLERY P.C.**
707 Broadway, Suite 1410
San Diego, CA 92101
Telephone: (619) 625-5621
Facsimile (314) 241-3525
cburke@koreintillery.com
wnoss@koreintillery.com
klv@koreintillery.com

Joseph R. Saveri
Steven N. Williams
Cadio Zirpoli
Kevin E. Rayhill
**JOSEPH SAVERI LAW FIRM, LLP**
601 California Street, Suite 1000
San Francisco, CA 94108
Telephone: (415) 500-6800
jsaveri@saverilawfirm.com
swilliams@saverilawfirm.com
czirpoli@saverilawfirm.com
krayhill@saverilawfirm.com

Jennifer W. Sprengel
Daniel O. Herrera
Alexander Sweatman
**CAFFERTY CLOBES MERIWETHER &
SPRENGEL LLP**
135 S. LaSalle, Suite 3210
Chicago, IL 60603

28

Facsimile: (206) 623-0594
steve@hbsslaw.com
breannav@hbsslaw.com

Benjamin J. Widlanski
Javier A. Lopez
**KOZYAK TROPIN &
THROCKMORTON LLP**
2525 Ponce de Leon Blvd., 9th Floor
Coral Gables, Florida 33134
Telephone: (305) 372-1800
bwidlanski@kttlaw.com
jal@kttlaw.com

Telephone:  312-782-4880
Facsimile: 312-782-4485
jsprengel@caffertyclobes.com
dherrera@caffertyclobes.com
asweatman@caffertyclobes.com

*Plaintiffs' Steering Committee Counsel for Plaintiffs*

29

**CERTIFICATE OF SERVICE**

I hereby certify that on November 8, 2023, I caused the foregoing to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the email addresses denoted on the Electronic Mail Notice List.

*/s/ Tricia R. Herzfeld*
Tricia R. Herzfeld
