UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| IN RE: REALPAGE, INC., RENTAL SOFTWARE ANTITRUST LITIGATION (NO. II) | Case No. 3:23-md-3071<br>MDL No. 3071<br><br>Chief Judge Waverly D. Crenshaw, Jr.<br><br>JURY DEMAND<br><br>This Document Relates to:<br>3:23-cv-00742<br>3:23-cv-00979 |

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANT APARTMENT INCOME REIT CORP.'S MOTION TO DISMISS**

## TABLE OF CONTENTS

I. INTRODUCTION ........................................................................................................... 1
II. FACTUAL BACKGROUND ........................................................................................ 1
   A. Defendant AIR Used RealPage RMS to Inflate Rental Prices. ........................... 1
   B. Plaintiffs' Limited Withdrawn Factual Allegations ............................................. 2
III. THE PLEADING STANDARD .................................................................................... 3
IV. ARGUMENT .................................................................................................................. 4
   A. The Complaint Adequately Alleges AIR's Participation in the Cartel. ............... 4
   B. AIR's Arguments to the Contrary Fail ................................................................. 6
V. CONCLUSION ............................................................................................................. 10

## I. INTRODUCTION

Plaintiffs' Second Amended Complaint ("AC")[1] articulates how RealPage used the confidential pricing information of some of the largest property owners and managers of apartment buildings in the United States to facilitate a cartel that artificially inflated rental prices above competitive levels. Plaintiffs' allegations against Defendant Apartment Income REIT Corp. d/b/a Air Communities ("AIR") support this very fact: that AIR's use of RealPage's Revenue Management Solutions software ("RMS") enabled it to benefit from the commercially sensitive pricing and occupancy information of its horizontal competitors and enabled AIR to interfere with free market setting of rents in its multifamily housing units across the United States.

Nothing in AIR's Motion to Dismiss, Dkt. 569 ("AIR MTD"), contradicts that it was able to anticompetitively inflate rental prices by removing itself as an independent actor and delegating pricing authority to RealPage—a common decision maker. The AC alleges that RealPage allowed AIR to "work together" with its competitors, to "work with a community in pricing strategies, not work separately." ¶ 9. RealPage facilitated outcomes for its clients, including AIR, that could not have come about independently. ¶ 294 (Defendants would not have "had the courage to push [their pricing] as aggressively as this [RealPage] program has"). And the AC alleges that AIR participated in this common scheme knowing that its competitors were doing the same. Accordingly, Defendant AIR's Motion to Dismiss should be denied.

## II. FACTUAL BACKGROUND

### A. Defendant AIR Used RealPage's RMS to Inflate Rental Prices.

From *at least* January 2016 through the present, Defendants—including AIR— engaged in a nationwide conspiracy to fix and inflate the price of multifamily rental housing across the

---

[1] Unless specified otherwise, all references to "¶" or "¶¶" are to paragraphs from the AC, Dkt. 530.

country. ¶ 1. AIR entered a written contract, paid for, and used at least one RealPage RMS—YieldStar—to manage some or all of its more than 25,000 multifamily rental units nationwide. ¶ 68. AIR did this knowing that doing so would allow it to benefit from RealPage's price-setting function, informed by AIR's horizontal competitors' sensitive pricing and lease information. ¶¶ 68, 227, 230, 292. The benefit to AIR derived from the stated purpose of RealPage's RMS: to set and raise the price of its clients' units, including AIR's. ¶¶ 7, 14. As Plaintiffs' AC makes clear, it is this "price-setting function of RealPage" that is the central feature of Defendants' conspiracy and is a feature for which Defendants—including AIR—pay handsomely. ¶ 14.

Using RealPage's RMS enabled AIR to realize this two-fold purpose to: (1) outsource pricing decisions to RealPage, which would set the price of AIR's units based on competitively sensitive information RealPage collected from AIR's horizontal competitors, and (2) push the prices of AIR's rents higher and beyond competitive levels. *E.g.,* ¶¶ 1, 13, 14.

B.     **Plaintiffs' Limited Withdrawn Factual Allegations**

The AIR MTD rests on two mistaken factual pillars: (1) that Plaintiffs' withdrawal of one allegation specific to AIR amounts to an admission that AIR was somehow not a participant in the conspiracy, and (2) that Plaintiffs' remaining allegations against AIR amount to improper "group pleadings." On both counts, AIR is incorrect.

First, AIR grossly exaggerates the breadth of Plaintiffs' withdrawal of any allegations relating to AIR. AIR MTD at 1-2. Contrary to AIR's misleading statements in its Motion, Plaintiffs did not withdraw allegations that AIR received and "benefit[ed] from its horizontal competitors' sensitive pricing and lease information before it set or adjusted its own rental prices." *Id.* at 2 (highlighting this section of the allegations as withdrawn). Rather, after conferring with AIR, Plaintiffs only agreed to "withdraw portions of the allegations in paragraph 68 of the Second Amended Consolidated Class Action Complaint that indicate that AIR Communities was

contractually required to *share* confidential, competitively sensitive pricing and lease information with its horizontal competitors in order to allow them to adjust their rental prices." Decl. of Swathi Bojedla Ex. 1 (9/19/2023 Email from S. Bojedla to J. Youngman) (emphasis added). Plaintiffs further made clear in response to receiving AIR's notice of its intended motion to dismiss: "[O]ur withdrawal of allegations relates only to AIR's sharing of its own information. Our allegations that AIR contracted with RealPage to receive confidential pricing information from its competitors remains in effect." *Id.* Ex. 2 (9/25/2023 Email from S. Bojedla to J. Youngman).

All other allegations regarding AIR's actions remain in effect, including allegations that AIR received and "benefit[ed] from its horizontal competitors' sensitive pricing and lease information before it set or adjusted its own rental prices." ¶ 68. The AC still affirmatively alleges AIR's participation in the core of this price fixing conspiracy: its use of RealPage's RMS price-setting function to charge supracompetitive rents, knowing that its competitors were doing the same. ¶¶ 1, 6-9, 11-12, 14, 25, 30, 204, 244-45, 309, 311-12.

## III. THE PLEADING STANDARD

In analyzing a motion to dismiss, courts "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." *In re Travel Agent Comm'n Antitrust Litig.*, 583 F.3d 896, 903 (6th Cir. 2009). *Bell Atlantic Corp. v. Twombly* calls for "a complaint with enough factual matter (taken as true) to suggest that" a violation of the Sherman Act occurred. 550 U.S. 544, 556 (2007).

*Twombly* imposes neither "a probability requirement at the pleading stage[,]" *id.*, nor a heightened pleading standard. *In re Cast Iron Soil Pipe And Fittings Antitrust Litig.*, 2015 WL 5166014, at *11 (E.D. Tenn. June 24, 2015). A complaint must simply "put defendants on notice concerning the basic nature of [plaintiff's] complaints against the defendants and the grounds upon which their claims exist." *In re Se. Milk Antitrust Litig.*, 555 F. Supp. 2d 934, 943 (E.D. Tenn.

2008). *Twombly* does "not require heightened fact pleading of specifics," and instead only requires facts that "nudge[] the[] claim across the line from conceivable to plausible[.]" 550 U.S. at 570.

IV. **ARGUMENT**

A. **The Complaint Adequately Alleges AIR's Participation in the Cartel.**

In the Sixth Circuit, alleging participation in a cartel does not require pleading specific acts of each defendant, but rather asks whether in "a view of the complaint[] in [its] entirety," do the "allegations advance a claim against [defendant] that it participated in a conspiracy." *In re Auto. Parts Antitrust Litig.,* 2013 WL 2456586, at *3 (E.D. Mich. June 6, 2013). Generally, "detailed defendant by defendant allegations are not necessary." *In re Capacitors Antitrust Litig.*, 106 F. Supp. 3d 1051, 1066 (N.D. Cal. 2015) (internal quotations and citations omitted); *In re Processed Egg Prod. Antitrust Litig.*, 902 F. Supp. 2d 704, 710 (E.D. Pa. 2012). Nor is there any "particularity requirement akin to Rule 9(b) to explain each defendant's own, unique role" in the conspiracy. *Capacitors*, 106 F. Supp. 3d at 1066. As one district court explained,

> [T]he Supreme Court has [] recognized that Congress drafted the antitrust laws with the express purpose of encouraging private enforcement. If private plaintiffs, who do not have access to *inside information*, are to pursue violations of the law, the pleading standard must take into account the fact that a complaint will ordinarily be limited to allegations pieced together *from publicly available data*.

*In re Plasma-Derivative Protein Therapies Antitrust Litig.*, 764 F. Supp. 2d 991, 1003 n.10 (N.D. Ill. 2011) (internal citation omitted) (emphases added) *see also In re Broiler Chicken Antitrust Litig.*, 290 F. Supp. 3d 772, 804 (N.D. Ill. 2017) ("A price fixing conspiracy would be expected to leave little publicly available evidence of its existence" and is "therefore often inferred from context.").

Here, Plaintiffs plead specific information concerning the existence of a price-fixing cartel and AIR's participation in it. Plaintiffs' AC details explicitly how AIR allowed RealPage to oversee setting prices for its rental units at supracompetitive levels, that AIR knew that RealPage

used AIR's competitors' data to accomplish this end, and that those competitors were following suit. ¶¶ 1, 6–7, 9, 11, 14, 21, 68, 225, 336, 349-50. Those allegations establish the existence of a conspiracy and "unity of purpose" to raise multifamily residential lease prices. *In re Polyurethane Foam Antitrust Litig.*, 152 F. Supp. 3d 968, 978 (N.D. Ohio 2015) (antitrust agreement found where evidence supports that "the conspirators had a unity of purpose") (quoting *Am. Tobacco Co. v. United States*, 328 U.S. 781, 809–10 (1946)).

While not required at this stage[2], Plaintiffs do plead specific facts about AIR—allegations which, taken *as a whole*, support a reasonable inference that AIR participated in the cartel. The AC alleges: (1) the "who," AIR, (2) the "how," that AIR "entered a written contract, paid for, and used at least one RealPage RMS—YieldStar—to manage some or all of its more than 25,000 multifamily rental units nationwide," (3) the "where," in the regional submarkets "Atlanta, Boston, Chicago, Denver, Los Angeles, Miami, Minneapolis, Nashville, New York, Philadelphia, Providence, Raleigh, San Diego, San Francisco, San Jose, and Washington" (among other metro areas), (4) the "when," from at least 2016 through the present, and (5) the "what" and the "why," to effectuate a cartel of multifamily property owners and managers who sought to charge supracompetitive rental prices for their units. ¶¶ 7, 21-25, 29, 33-35, 67-68, 300, 333-36. AIR knew that its use of RealPage's RMS would "allow AIR to benefit from its horizontal competitors' sensitive pricing and lease information before it set or adjusted its own rental prices," and that "its competitors were, likewise, using RealPage RMS to set their rental prices in the submarkets in which [AIR] operated." ¶ 68. The AC also alleges various plus factors that support the plausible

---

[2] *In re Se. Milk Antitrust Litig.*, 555 F. Supp. 2d at 943 (complaints need not answer "all specific questions about 'who, what, when and where'"); *In re Packaged Ice Antitrust Litig.*, 723 F. Supp. 2d 987, 1008 (E.D. Mich. 2010) (denying motion to dismiss over Defendants' repeated "refrain throughout their briefs" that the complaint omitted "the who, what, when and where" of the alleged conspiracy).

inference of an antitrust conspiracy, involving Defendant AIR. Among others, Plaintiffs allege that Defendant AIR attended National Multifamily Housing Council events that "facilitate opportunities to conspire and exchange information" with competitors. ¶ 386; *Re/Max Int'l, Inc. v. Realty One, Inc.*, 173 F.3d 995, 1009 (6th Cir. 1999) ("opportunity to exchange information relative to the alleged conspiracy" is a plus factor supporting existence of a conspiracy).[3]

Accordingly, AIR is included among the "Owner, Owner-Operator, and Managing Defendant[s]" who "delegate their rental price and supply decisions to a common decision maker, RealPage," and who, "knowing that cooperation was essential to the successful operation of the scheme . . . would abide by RealPage's price and supply decisions generated by RMS." ¶ 6. This is more than enough to notify AIR of the claims against it and the grounds for these claims.

### B. AIR's Arguments to the Contrary Fail.

Defendant AIR's demand for more "allegations applicable to AIR, specifically," (AIR MTD at 9), goes beyond the pleading standard. *Auto. Parts,* 2013 WL 2456586, at *3 ("Dismissal is not required merely because Plaintiffs did not name each Defendant in the allegations pleaded in support of their Sherman Act claim."); *Markson v. CRST Int'l, Inc.*, 2019 WL 6354400, at *4 (C.D. Cal. Mar. 7, 2019) ("Defendants' argument that Plaintiffs must specifically allege which persons, on behalf of Defendants, consummated the conspiracy and exactly when they did so goes beyond the pleading requirement . . . ."); *In re Pork Antitrust Litig.*, 495 F. Supp. 3d 753, 768–71

---

[3] *See also SD3, LLC v. Black & Decker (U.S.) Inc.*, 801 F.3d 412, 428-29, 432 (4th Cir. 2015) ("Allegations of communications and meetings among conspirators can support an inference of agreement . . . ."); *Polyurethane Foam Antitrust Litig.*, 152 F. Supp. 3d at 992 (finding defendants had opportunities to conspire where, *inter alia* "certain Defendants were members of flexible foam industry trade associations . . . as well as trade associations chiefly comprised of the intermediate users of flexible foam products"); *In re Generic Pharms. Pricing Antitrust Litig.*, 338 F. Supp. 3d 404, 442, 449-50 (E.D. Pa. 2018) (finding plaintiffs alleged an antitrust conspiracy based on circumstantial evidence, including allegations concerning defendants' participation in trade association meetings).

(D. Minn. 2020) (it is sufficient that Plaintiffs make "specific allegations related to each Defendant," and need "not provide specifics" for every Defendant, "given the inherent difficulty of obtaining solid information of an antitrust conspiracy"). Plaintiffs have pled both allegations specific to AIR and allegations to reasonably infer AIR's participation in the conspiracy, as discussed. That is enough.

Relatedly, AIR attempts to dismiss allegations that it engaged in the same acts as other Defendants in the conspiracy as impermissible "group pleading," or "generic" and "boilerplate allegation[s.]" AIR MTD at 8. But courts have confirmed that similar allegations about multiple defendants are not a basis for dismissal, and in fact make perfect sense in a conspiracy alleging defendants engaged in the same conduct as its competitors. As the court explained in *Perdue Farms,* "that factual allegations against [the defendant] are the same or similar to those made against other Defendants is not evidence that the allegations are insufficient or vague, but rather reflects instead Plaintiffs' specific assertion that it engaged in the same conduct as its competitors." *Jien v. Perdue Farms, Inc.*, 2021 WL 927456, at *3 (D. Md. Mar. 10, 2021). *See also Diamond Resorts U.S. Collection Dev., LLC v. Sumday Vacations, LLC*, 2020 WL 3250130, at *2 (M.D. Fla. Feb. 21, 2020) (the complaint "will not be dismissed for group pleading" where it "alleges that Defendants engaged in the same or similar conduct and would have the same or similar liability for the alleged claims"). Naturally, where Plaintiffs' theory is that multiple Defendants "engaged [in] the same pattern of conduct," Plaintiffs need not "reiterate [their] allegations against each defendant individually," as doing so "would exponentially increase the length of pleadings while adding no substantive value." *In re Nat'l Prescription Opiate Litig.*, 2019 WL 3737023, at *3 (N.D. Ohio June 13, 2019). Here, Plaintiffs allege that AIR engaged in the same conduct as its competitors, using RealPage's RMS to set prices, knowing that "its competitors were, likewise,

using RealPage RMS to set their rental price in the submarkets in which [AIR] operated." ¶ 68.

AIR makes much of Plaintiffs' withdrawal of the allegation that AIR "agreed to share its confidential information with competitors[.]" AIR MTD at 7. However, each conspirator does not have to commit all the acts of their co-conspirators. *In re Processed Egg Prod. Antitrust Litig.*, 821 F. Supp. 2d 709, 742 (E.D. Pa. 2011) ("[T]here is no requirement that allegations pertaining to one defendant mirror those against other defendants in terms of specific conduct or 'quantity' of alleged 'bad acts.' Indeed, a defendant need not be accused of having engaged in all activities alleged to have advanced the conspiracy.").[4] Rather, Plaintiffs need only "allege that each individual defendant joined the conspiracy and played *some* role in it." *Capacitors*, 106 F. Supp. 3d at 1066. The Complaint clearly does so.

AIR also impermissibly views its pleaded acts in isolation to argue that each is insufficient to plausibly suggest AIR's participation in the conspiracy. AIR MTD at 8-9. For starters, the AC plausibly alleges how receiving competitor data and then using RealPage's RMS *to inflate prices*

---

[4] *See also Broiler Chicken*, 290 F. Supp. 3d at 792 (finding sufficient Plaintiffs' allegations of parallel conduct and conspiratorial agreement "[d]espite Defendants' attempts to highlight the aspects of their alleged conduct that are not absolutely uniform"). As the American Bar Association's Model Jury Instructions in Civil Antitrust Cases explain: "A person can become a member without full knowledge of all of the details of the conspiracy, the identity of all of its members, or the parts such members played in the charged conspiracy. . . Similarly, it is not essential that all persons acted exactly alike, nor is it necessary that they all possessed the same motive for entering the agreement." ABA Model Jury Instructions in Civil Antitrust Cases, Instruction 2A.1 (2016); *see also id.* Instruction 2A.4 ("A person who knowingly joins an existing conspiracy, *or who participates only in part of a conspiracy with knowledge of the overall conspiracy*, is just as responsible as if he or she had been one of those who formed or began the conspiracy and participated in every part of it.") (emphasis added); *id.* ("Once you have found that a defendant is a member of a conspiracy, he, she, or it . . . is responsible *for all actions taken by all coconspirators* during and in furtherance of the conspiracy . . . Although a defendant who was a member of a conspiracy may withdraw from and abandon the conspiracy, *that defendant is still liable with all other coconspirators for any illegal acts committed* by that defendant or *by any coconspirator* while that defendant was a member of the conspiracy up until the time of that defendant's withdrawal from the conspiracy.") (emphasis added).

is economically irrational and against independent economic self-interest absent the existence of a cartel agreement. ¶¶ 202-207, 245, 303. AIR's contrary argument that receiving competitor data and utilizing RealPage's price-setting functionality is instead independently economically rational absent a cartel impermissibly tests the truth of Plaintiffs' well-pled allegations. Plaintiffs' allegations must be credited. *Watson Carpet & Floor Covering, Inc. v. Mohawk Indus., Inc.*, 648 F.3d 452, 458 (6th Cir. 2011) ("Ferreting out the most likely reason for the defendants' actions is not appropriate at the pleadings stage. [T]he plausibility of [the defendants'] reason for the refusals to sell carpet does not render all other reasons implausible."); *Erie Cnty., Ohio v. Morton Salt, Inc.*, 702 F.3d 860, 869 (6th Cir. 2012) (At the motion to dismiss stage, a Section 1 "plaintiff need not allege a fact pattern that 'tends to exclude the possibility' of lawful, independent conduct. . . . The 'plausibly suggesting' threshold for a conspiracy complaint remains considerably less than the 'tends to rule out the possibility' standard for summary judgment.") (citing Philip E. Areeda & Herbert Hovenkamp, Antitrust Law ¶ 307d1 at 118 (3d ed. 2010)).[5]

Indeed, courts must "read the complaint[] as a whole" to determine whether allegations sufficiently plead that a defendant "participated in a conspiracy 'in restraint of trade or commerce.'" *Auto. Parts*, 2013 WL 2456586, at *3; *In re Int. Rate Swaps Antitrust Litig.*, 261 F. Supp. 3d 430, 478 (S.D.N.Y. 2017) ("[T]he dispositive issues are whether, viewing the

---

[5] Similarly, AIR posits that attending industry events is "more readily explained by unilateral, free-market behavior." AIR MTD 8-9. But Plaintiffs' allegation that such events "serve as conduits of the cartel and facilitate opportunities to conspire," ¶ 386, must be credited. And while "opportunity to conspire does not, *standing alone*, plausibly suggest an illegal agreement," (*In re Travel Agent Comm'n Antitrust Litig.*, 583 F.3d at 911), Plaintiffs have not alleged AIR's attendance at industry events in a vacuum. *See* AIR MTD at 8–9. Rather, Plaintiffs' AC situates this "opportunity to conspire" evidence in the context of rich economic analysis showing that Defendants' conduct is *not* "equally consistent with independent conduct." *Cf. In re Polyurethane Foam Antitrust Litig.*, 152 F. Supp. 3d at 977 ("[C]ircumstantial evidence alone cannot support a finding of conspiracy when the evidence is equally consistent with independent conduct.").

complaints as a whole, they satisfactorily allege the existence of the § 1 conspiracy" and "includ[e] the factual connection of that defendant to the scheme . . . ."). Viewing the AC as a whole, AIR's use of the RealPage's RMS *to set and raise* rent prices, coupled with the knowledge its competitors were doing the same, sufficiently supports the existence of the cartel and AIR's participation therein. ¶¶ 6, 9, 68, 230, 251, 289.

Finally, AIR asserts that "none of Plaintiff's allegations even hint at an agreement by AIR" to "delegate pricing and supply decisions to RealPage, or to abide by RealPage's recommendations." AIR MTD at 9. This assertion is incorrect and contrary to the pleading standard, under which courts "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." *Travel Agent*, 583 F.3d at 903. The AC alleges that AIR delegates its pricing decisions to RealPage and abides by its recommendations because of RealPage's many mechanisms to ensure clients' compliance with its recommendations, including: "[r]egular secret shops and surveys to confirm successful adoption," ¶ 255; YieldStar workflow processes in which RealPage's Pricing Advisors review clients' acceptance of its recommendations daily and clients must give a legitimate "business reason" to justify veering from the recommendation, ¶¶ 256-259; RealPage insiders' admissions that Pricing Advisors were "trained to push back" and reject any "business reason" to deviate from RealPage's prices and to "ensure clients remained 'in the 80 to 85% acceptance rate,'" ¶¶ 261-262; and, client witness admissions that "RealPage *never* accepted any attempt by the client to reject its recommendation on the basis that the price did not reflect fair market values." ¶ 264.

Taken together, AIR's Motion to Dismiss fails to rebut its participation in and benefit from the RealPage pricing conspiracy, the facts of which are detailed extensively in Plaintiffs' AC.

V. **CONCLUSION**

For the foregoing reasons, Plaintiffs respectfully request that the Court deny AIR's Motion.

Dated: November 8, 2023

/s/ Tricia R. Herzfeld
Tricia R. Herzfeld (#26014)
Anthony A. Orlandi (#33988)
**HERZFELD SUETHOLZ GASTEL LENISKI AND WALL, PLLC**
223 Rosa L. Parks Avenue, Suite 300
Nashville, TN 37203
Telephone: (615) 800-6225
tricia@hsglawgroup.com
tony@hsglawgroup.com

*Liaison Counsel*

Patrick J. Coughlin
Carmen A. Medici
Fatima Brizuela
**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
600 West Broadway, Suite 3300
San Diego, CA 92101
Telephone: (619) 798-5325
Facsimile: (619) 233-0508
pcoughlin@scott-scott.com
cmedici@scott-scott.com
fbrizuela@scott-scott.com

Patrick McGahan
Amanda F. Lawrence
Michael Srodoski
G. Dustin Foster
Isabella De Lisi
**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
156 South Main Street
P.O. Box 192
Colchester, CT 06145
Telephone: (860) 537-5537
Facsimile: (860) 537-4432
pmcgahan@scott-scott.com
alawrence@scott-scott.com
msrodoski@scott-scott.com
gfoster@scott-scott.com
idelisi@scott-scott.com

Stacey Slaughter
Thomas J. Undlin
Geoffrey H. Kozen

Stephanie A. Chen
J. Austin Hurt
**ROBINS KAPLAN LLP**
800 LaSalle Avenue, Suite 2800
Minneapolis, MN 55402
Telephone: (612) 349-8500
Facsimile: (612) 339-4181
sslaughter@robinskaplan.com
tundlin@robinskaplan.com
gkozen@robinskaplan.com
schen@robinskaplan.com
ahurt@robinskaplan.com

Swathi Bojedla
Mandy Boltax
**HAUSFELD LLP**
888 16th Street, N.W., Suite 300
Washington, DC 20006
Telephone: (202) 540-7200
sbojedla@hausfeld.com
mboltax@hausfeld.com

Gary I. Smith, Jr.
Joanne Bui
**HAUSFELD LLP**
600 Montgomery Street, Suite 3200
San Francisco, CA 94111
Tel: (415) 633-1908
gsmith@hausfeld.com

Katie R. Beran
**HAUSFELD LLP**
325 Chestnut Street, Suite 900
Philadelphia, PA 19106
Telephone: 1 215 985 3270
kberan@hausfeld.com

*Interim Co-Lead Counsel*

Eric L. Cramer
Michaela L. Wallin
**BERGER MONTAGUE PC**
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Telephone: (215) 875-3000
ecramer@bm.net
mwallin@bm.net

Daniel J. Walker
**BERGER MONTAGUE PC**
2001 Pennsylvania Avenue, NW, Suite 300
Washington, DC 20006
Telephone: (202) 559-9745
dwalker@bm.net

Brendan P. Glackin
Dean M. Harvey
**LIEFF CABRASER HEIMANN & BERNSTEIN, LLP**
275 Battery Street, Suite 2900
San Francisco, CA 94111
Telephone: 415-956-1000
bglackin@lchb.com
dharvey@lchb.com

Mark P. Chalos
Hannah R. Lazarz
Kenneth S. Byrd
**LIEFF CABRASER HEIMANN & BERNSTEIN, LLP**
222 2nd Avenue South, Ste. 1640
Nashville, TN 37201
(615) 313-9000
mchalos@lchb.com
hlazarz@lchb.com
kbyrd@lchb.com

Steve W. Berman
Breanna Van Engelen
**HAGENS BERMAN SOBOL SHAPIRO LLP**
1301 Second Avenue, Suite 2000
Seattle, Washington 98101
Telephone: (206) 623-7292

Christian P. Levis
Vincent Briganti
Peter Demato
Radhika Gupta
**LOWEY DANNENBERG, P.C.**
44 South Broadway, Suite 1100
White Plains, NY 10601
Telephone: (914) 997-0500
Facsimile: (914) 997-0035
vbriganti@lowey.com
clevis@lowey.com
pdemato@lowey.com
rgupta@lowey.com

Christopher M. Burke
Walter W. Noss
Yifan (Kate) Lv
**KOREIN TILLERY P.C.**
707 Broadway, Suite 1410
San Diego, CA 92101
Telephone: (619) 625-5621
Facsimile (314) 241-3525
cburke@koreintillery.com
wnoss@koreintillery.com
klv@koreintillery.com

Joseph R. Saveri
Steven N. Williams
Cadio Zirpoli
Kevin E. Rayhill
**JOSEPH SAVERI LAW FIRM, LLP**
601 California Street, Suite 1000
San Francisco, CA 94108
Telephone: (415) 500-6800
jsaveri@saverilawfirm.com
swilliams@saverilawfirm.com
czirpoli@saverilawfirm.com
krayhill@saverilawfirm.com

Jennifer W. Sprengel
Daniel O. Herrera
Alexander Sweatman
**CAFFERTY CLOBES MERIWETHER & SPRENGEL LLP**
135 S. LaSalle, Suite 3210
Chicago, IL 60603

Facsimile: (206) 623-0594
steve@hbsslaw.com
breannav@hbsslaw.com

Benjamin J. Widlanski
Javier A. Lopez
**KOZYAK TROPIN &
THROCKMORTON LLP**
2525 Ponce de Leon Blvd., 9th Floor
Coral Gables, Florida 33134
Telephone: (305) 372-1800
bwidlanski@kttlaw.com
jal@kttlaw.com

Telephone: 312-782-4880
Facsimile: 312-782-4485
jsprengel@caffertyclobes.com
dherrera@caffertyclobes.com
asweatman@caffertyclobes.com

*Plaintiffs' Steering Committee Counsel for Plaintiffs*

# CERTIFICATE OF SERVICE

I hereby certify that on November 8, 2023, I caused the foregoing to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the email addresses denoted on the Electronic Mail Notice List.

                                               */s/ Tricia R. Herzfeld*
                                               Tricia R. Herzfeld