| | |
|---|---|
| IN RE: REALPAGE, INC., RENTAL SOFTWARE ANTITRUST LITIGATION (NO. II) | Case No. 3:23-md-3071<br>MDL No. 3071<br><br>Chief Judge Waverly D. Crenshaw, Jr.<br><br>JURY DEMAND<br><br>**This Document Relates to:** |

| | |
|---|---|
| 3:23-cv-00330 | 3:23-cv-00380 |
| 3:23-cv-00331 | 3:23-cv-00979 |
| 3:23-cv-00332 | 3:23-cv-00381 |
| 3:23-cv-00326 | 3:23-cv-00387 |
| 3:23-cv-00333 | 3:23-cv-00388 |
| 3:23-cv-00334 | 3:23-cv-00389 |
| 3:23-cv-00335 | 3:23-cv-00390 |
| 3:23-cv-00336 | 3:23-cv-00391 |
| 3:23-cv-00337 | 3:23-cv-00410 |
| 3:23-cv-00338 | 3:23-cv-00411 |
| 3:23-cv-00339 | 3:23-cv-00419 |
| 3:23-cv-00344 | 3:23-cv-00413 |
| 3:23-cv-00345 | 3:23-cv-00412 |
| 3:23-cv-00356 | 3:23-cv-00414 |
| 3:23-cv-00357 | 3:23-cv-00416 |
| 3:23-cv-00358 | 3:23-cv-00415 |
| 3:23-cv-00377 | 3:23-cv-00440 |
| 3:23-cv-00378 | 3:23-cv-00445 |
| 3:23-cv-00379 | 3:23-cv-00552 |
| 3:22-cv-01082 | 3:23-cv-00742 |

# PLAINTIFFS' OPPOSITION TO DEFENDANTS' RULE 12(b)(6) MOTION TO DISMISS LRO CLAIMS FOR FAILURE TO STATE A CLAIM

I.   **INTRODUCTION**

Plaintiffs' Second Amended Complaint ("AC")[1] includes substantive additional factual allegations directed specifically to the role that LRO and its users played in the alleged price-fixing cartel. Despite this, LRO Users'[2] renewed Motion to Dismiss LRO Claims, Dkt. 582 ("Motion"), restates the same futile points raised in their initial motion (Dkt. 324). This includes (yet again) a distorted account of certain Plaintiffs' prior (and now long-superseded) pleadings and Plaintiffs' current operative pleading. The Motion ignores allegations in the AC that plausibly plead LRO Users' conscious commitment to the cartel, misapprehends the applicable law and facts, inappropriately raises evidentiary and factual disputes, and relies on inapposite authorities that address fundamentally different claims and issues than those before the Court. The Court should deny the Motion for at least the following reasons.

First, LRO Users erroneously claim that the AC "fails to plead that RealPage has ever used non-public information to suggest prices to LRO users." Def. Br. at 1. This is incorrect. LRO Users continue to misconstrue the essence of the conspiracy: each Defendant agreed to delegate their rental price and supply decisions to RealPage—decisions dependent on the proprietary data

---

[1] Unless specified otherwise, (1) all references to "¶" or "¶¶" are to paragraphs from Plaintiffs' Second Amended Consolidated Class Action Complaint, Dkt. 530; (2) all terms are used according to their definition in the AC; (3) emphasis is added; and (4) internal quotations and citations are omitted.

[2] "LRO Users" are Defendants Bell Partners, Inc. ("Bell"); Brookfield Properties Multifamily LLC ("Brookfield"); CONAM Management Corporation ("CONAM"); ECI Group, Inc. ("ECI"), Equity Residential ("Equity"); Independence Realty Trust, Inc. ("IRT"); Mid-America Apartment Communities, Inc. ("MAA"); Morgan Properties Management Company, LLC ("Morgan"); The Related Companies, L.P. and Related Management Company, L.P. (collectively "Related"); Security Properties Residential LLC ("Security"); Simpson Property Group, LLC ("Simpson"); Thrive Communities Management, LLC ("Thrive"); Windsor Property Management Company ("Windsor"); and WinnCompanies LLC and WinnResidential Manager Corp. (collectively, "Winn"). S*ee* Dkt. 582, fn. 1 (herein cited as "Def. Br.").

Defendants provide RealPage with in exchange for its RMS pricing determinations—and to abide by those decisions, knowing that their competitors were doing the same. ¶¶ 4-6.

Second, LRO Users compound this mistake by continuing to erroneously claim that Plaintiffs have "plead[ed] themselves out of court." Def. Br. at 10. Contrary to Defendants' tortured readings of Plaintiffs' prior complaints, Plaintiffs never "admitted . . . that LRO is not anti-competitive because it uses public information." *Id*. at 11. Rather, the portions of the specific superseded pleadings cited by LRO Users address only the *original design* of LRO 10 years before RealPage acquired it—*i.e.*, what LRO *used* to do. Those allegations do not contradict allegations regarding how LRO has since been altered, including *after* RealPage purchased LRO in 2017, or specific allegations pertaining to each Defendant who used LRO during the Relevant Time Period.[3]

Third, even if there was a disconnect between the AC and these prior pleadings—and there is not—LRO Users ignore that "amended pleadings supersede original pleadings." *Braden v. United States*, 817 F.3d 926, 930 (6th Cir. 2016). Thus, any alleged "admission" is (at most) an evidentiary issue that has no bearing at the motion to dismiss stage. *See Uhlig LLC v. CoreLogic, Inc.*, 2023 WL 4234612, at *11 (D. Kan. June 28, 2023).

## II. RELEVANT FACTS

From at least January 2016 through the present, Defendants engaged in a nationwide conspiracy to fix and inflate the price of multifamily rental housing across the country. ¶ 1. Defendants are (a) RealPage, the developer of an integrated technology platform that provides

---

[3] The following paragraphs in the AC contain specific allegations concerning Defendants' use of LRO, including Defendants Pinnacle Property Management Services, LLC ("Pinnacle") and RPM Living, LLC ("RPM") who did not join in this Motion: (1) Bell, ¶¶ 50, 53, 77-78; (2) Brookfield, ¶¶ 85-86; (3) CONAM, ¶¶ 94-95; (4) ECI, ¶¶ 109-10; (5) Equity, ¶¶ 112-13; (6) IRT, ¶¶ 130-31; (7) MAA, ¶¶ 145-46; (8) Morgan, ¶¶ 50, 151-52; (9) Pinnacle, ¶¶ 154-55; (10) Related, ¶¶ 160-61; (11) RPM, ¶¶ 166-67; (12) Security, ¶¶ 172-73; (13) Simpson, ¶¶ 178-79; (14) Thrive, ¶¶ 181-82; (15) Windsor, ¶¶ 188-89; and (16) Winn, ¶¶ 190-91.

Revenue Management Solutions ("RMS") for the multifamily rental housing market, including at least "RealPage Revenue Management," LRO, YieldStar, and AI Revenue Management ("AIRM"); and (b) owners and managers of large-scale multifamily residential apartment buildings—including the 16 LRO Users—that admittedly used at least one RealPage RMS to coordinate and agree upon rental housing pricing and supply. ¶ 2; *see supra*, note 3.

RealPage acquired LRO from the Rainmaker Group in 2017, thereby doubling the lease transaction data used to provide pricing decisions to Defendants. ¶¶ 26, 214, 221. Since its acquisition and integration of LRO, RealPage has made "enhancements" to the original LRO design. ¶¶ 26-28, 223. Indeed, the Terms of Service governing the use of RealPage's LRO ("TOS") provide a specific confidentiality carveout for "customer data" that is transformed or aggregated by RealPage. ¶¶ 223 n.121 (citing TOS, attached as Exhibit 1 to Declaration of Tricia Herzfeld ("Ex. 1")), 247 n.143, 290. The TOS defines "customer data" as "any and all *proprietary information owned by Customer prior to or independent of its use of the Rainmaker System.*" Ex. 1, at 2. Thus, by its very terms, not only do LRO Users input their proprietary information into RealPage's platform, but also explicitly consent to RealPage's right to disseminate their competitively sensitive information to other RealPage clients for, *inter alia*, the purpose of making rental price determinations to other RMS users. ¶¶ 223 n.121, 247 n.143, 290. With this knowledge and through their continued use of LRO, LRO Users consciously choose to "work together" with their "competitors" and with RealPage as a "community in pricing strategies." ¶¶ 9, 35, 211, 253.

As demonstrated more fully in Section III.A., Plaintiffs allege that LRO Users adopted LRO to delegate their price and supply decisions to RealPage, with the explicit and common goal of increasing rents for all RealPage RMS users, including those who subscribed to LRO, YieldStar, and/or AIRM. ¶¶ 11, 13, 171-74, 293-96, 298. "[T]o access this price-setting tool that promised

3

Case 3:23-md-03071   Document 621   Filed 11/08/23   Page 4 of 18 PageID #: 6868

revenue growth even in a down market, [] [Defendants] agreed to participate in the data co-operative" by "contributing [their] non-public, competitively sensitive data to RealPage's data pool" in order to "price their multifamily rental units according to RealPage's RMS." ¶¶ 5, 13, 208, 289, 380.

III.   **LEGAL STANDARD**

In analyzing a motion to dismiss, courts "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." *In re Travel Agent Comm'n Antitrust Litig.*, 583 F.3d 896, 902-03 (6th Cir. 2009). *Bell Atlantic Corp. v. Twombly* calls for "a complaint with enough factual matter (taken as true) to suggest that" a violation of the Sherman Act occurred. 550 U.S. 544, 556 (2007). The reviewing court must determine not whether the plaintiff will ultimately prevail, but whether the facts permit the court to infer "more than the mere possibility of misconduct," which is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). In the Sixth Circuit, a complaint must simply "put defendants on notice concerning the basic nature of [plaintiff's] complaints against the defendants and the grounds upon which their claims exist." *In re Se. Milk Antitrust Litig.*, 555 F. Supp. 2d 934, 943 (E.D. Tenn. 2008).

IV.   **ARGUMENT**

   **A. Plaintiffs Plausibly Plead an Antitrust Conspiracy Involving LRO.**

   **1. Plaintiffs Plead that LRO Used Non-Public Information to Provide Pricing Decisions to LRO Users.**

LRO Users argue that the AC fails to plead that "LRO has ever used non-public information to suggest prices to LRO users." Def. Br. at 1, 6. This ignores over 100 paragraphs in the AC establishing just the opposite. As to each LRO User, Plaintiffs allege at least the following:

> During the Conspiracy Period [Defendant] entered a written contract, paid for, and used [] LRO to manage some or all of its [] multifamily rental units nationwide, knowing that doing so *required it to share confidential, competitively sensitive pricing and lease information* with its horizontal competitors in order to allow them to adjust their rental prices, and in turn, to allow [Defendant] to benefit from its horizontal competitors' sensitive pricing and lease information before it set or adjusted its own rental prices.

*See supra* note 3. The AC also alleges that at the time it acquired LRO, RealPage merged LRO with its existing "modeling tools" and the data on which they trained, thereby doubling the amount of *lease transaction data* that RealPage uses to provide pricing decisions to RMS clients, including LRO Users. ¶¶ 26, 214, 221. Moreover, lease transaction data refers to a client's actual lease terms, rental prices, vacancy rates, and other data points that are unique, non-public, and proprietary to each client. ¶¶ 226, 247-48, 288, 380. The fact that RealPage doubled its lease transaction data when it acquired LRO shows that LRO had already begun to abandon its original design—which purportedly only used public data inputs in its rental price recommendations model—*even before* RealPage acquired LRO. ¶ 215. The AC further alleges that RMS users input their lease transaction data into RealPage's RMS systems to generate the price recommendations provided to them, and other RMS users, including LRO Users. RealPage touts the use of its clients' transactional data to determine rental prices for their competitors as a "competitive differentiator" between RealPage and other revenue management services. ¶¶ 4, 247-49.

No later than February 2019, RealPage "populated [the YieldStar and LRO] databases with the overlap or the missing data that was in each of the individual databases." ¶ 221. In other words, the transactional data from each database was integrated into a unitary database to be used as inputs for the pricing determinations generated for LRO and YieldStar users alike, using a combined set of commercially sensitive transactional lease data as inputs. The AC contains detailed allegations about how this collected data was then used to price RMS users' properties, including the LRO Users' properties (*see supra*, note 3; ¶¶ 13, 208, 289, 380), and how LRO Users were aware that

5

the LRO pricing generated for their respective units was based in part on their ***competitors'*** commercially sensitive and proprietary transactional data. ¶¶ 287-92.

### 2. The AC Pleads LRO Users' Conscious Commitment to the Anticompetitive Scheme.

The AC alleges that LRO Users consciously committed to a common scheme, design, and understanding to "work together" with their "competitors" and RealPage, accept RealPage's pricing decisions, and, in doing so, "make . . . all [RealPage RMS clients] more successful in our pricing." ¶ 9. As Defendant ECI Group's President of Revenue Management explained in 2019:

> [t]he design and functionality of [RealPage's] LRO offers detailed insight into how actual competitors impact pricing strategies . . . With LRO we rarely make any overrides to the [pricing] recommendations . . . [W]e are all technically competitors, LRO helps us to work together . . . to make us all more successful in our pricing . . . LRO is designed to work with a community in pricing strategies, not work separately.

*Id.* Aware of the antitrust concerns posed by using RealPage's LRO, at least one LRO user, AvalonBay, demanded a contractual provision (renewed last year) that prohibited RealPage from: (1) utilizing any data in the LRO pricing determinations provided to AvalonBay other than AvalonBay's own data and publicly available data; and (2) utilizing AvalonBay's data or LRO pricing determinations for the benefit of any other RealPage RMS user. ¶¶ 219-20.

Without refuting whatsoever that LRO uses competitively sensitive data collected from not only other LRO users, but all other RMS users when LRO makes price determinations for their units, Defendants still seek to differentiate themselves from other RMS users. While Plaintiffs do not contend or concede that LRO Users used a different interface or received repackaged competitor data to achieve the same ultimate objective as that of all other RMS users, even if they had, such a fact would be immaterial. *See SD3, LLC v. Black & Decker (U.S.) Inc.,* 801 F.3d 412, 427 (4th Cir. 2015), *as amended on reh'g in part* (Oct. 29, 2015) (rejecting defendants' argument that their conduct must be "deemed dissimilar," and therefore not parallel, because they did not

6

uniformly adhere to the alleged conspiracy or achieve the alleged objective in the same way).

In *SD3*, the Fourth Circuit rejected defendant's argument that a plaintiff must allege parallel conduct in "relative lockstep," finding that argument to have "no support in any existing authority" and holding instead that "[a] plaintiff establishes parallel conduct when it pleads facts indicating that the defendants acted 'similarly.'" *Id.* at 427-29. "[I]t is well settled . . . that the law does not require every defendant to participate in the conspiracy by identical means throughout the entire class period." *In re Currency Conversion Fee Antitrust Litig.*, 264 F.R.D. 100, 114 (S.D.N.Y. 2010).[4] There is no requirement that LRO Users participate in all aspects of the agreement or respond identically for the agreement to be plausible. Plaintiffs plead sufficient facts to show that: (1) LRO Users joined the common agreement to delegate pricing decisions to RealPage; (2) that those prices were generated using the competitively sensitive and proprietary information that RealPage's RMS clients—including LRO Users—input into its system; and (3) LRO Users abided by that agreement. ¶¶ 26-28, 30, 214-24, 253. That is sufficient to state a claim and to put Defendants on notice of the claims made against them.

---

[4] *See also* ABA Model Jury Instructions in Civil Antitrust Cases at 13 (2d ed. 2016) ("The members of the conspiracy need not necessarily have met together, directly stated what their object or purpose was to one another, or stated the details or the means by which they would accomplish their purpose. . . . A conspiracy may be formed without all parties coming to an agreement at the same time. Similarly, it is not essential that all persons acted exactly alike, nor is it necessary that they all possessed the same motive for entering the agreement."); *Anderson News, L.L.C. v. Am. Media, Inc.,* 680 F.3d 162, 191 (2d Cir. 2012) (holding that defendants' "varied" actions during the initial stages of the alleged conspiracy did not render the existence of a conspiracy implausible); *In re Diisocyanates Antitrust Litig.*, 2020 WL 1140244, at *3 (W.D. Pa. Mar. 9, 2020) ("[T]he bulk of Defendants' assertions are more appropriate for resolution at a later stage in this litigation . . . At [the motion to dismiss] stage, for example, Plaintiffs need not explain why some Defendants took many actions and others took few.").

## B. LRO Users Mischaracterize the Superseded Pleadings to Obscure the AC's Properly Plead and Operative Allegations.

### 1. LRO Users Mischaracterize Plaintiffs' Prior Pleadings.

The Court's task is to evaluate whether Plaintiffs' AC (not prior, superseded pleadings) states a claim. And for the reasons stated above, the AC clearly does. The LRO Users attempt to shift the Court's gaze to their distorted view of other long-superseded pleadings should be rejected. Def. Br. at 1, 3-4. Specifically, LRO Users attempt to create an "admission against [Plaintiffs]" by warping the following statement that appeared in certain Plaintiffs pre-MDL complaints:

> Naturally, YieldStar's coordinated pricing strategy became more and more effective as more property managers implemented it. To this end, Defendant RealPage began buying up similar and competing software companies, and it has completed 26 acquisitions since its founding. The most important of these transactions came in 2017, when RealPage acquired Lease Rent Options ("LRO"), a company which offered a similar rent-setting software that was YieldStar's strongest rival. *Instead of relying on nonpublic data from competitors, however, LRO's algorithm used only public market data as [an] input. LRO's chief architect, Donald Davidoff, designed it that way specifically to avoid the potential antitrust violations arising from the use of nonpublic data to coordinate prices among competitors.*

*Id.* at 3-4 (emphasis in original). LRO Users contend that the AC cannot be squared with that allegation, which LRO Users define as the "LRO Allegation." That is not accurate. As is clear from the face of the LRO Allegation, it concerns LRO's structure at its *origin*:

> Instead of relying on nonpublic data from competitors, [ ] LRO's algorithm *used* only public market data as [an] input. LRO's chief architect, Donald Davidoff, *designed* it that way specifically to avoid the potential antitrust violations arising from the use of nonpublic data to coordinate prices among competitors.

*Id.* at 4. That language describes only the *original* design of the LRO software—*before* the program was acquired by RealPage and altered to collect and utilize commercially sensitive competitor data as an input for pricing recommendations made to LRO clients. The LRO Users suggest that the Court should read the language as speaking to the operation of LRO for all time, but that would require the Court to draw a host of unwarranted inferences in Defendants' favor in

8

violation of the Rule 12 standard. At the pleading stage, Defendants are not entitled to have inferences drawn in their favor. Nor would these inferences be reasonable anyway. The AC and Plaintiffs' prior complaints are *consistent*: they speak to how LRO operated at different points in time, under different ownership (*i.e.*, the pre-RealPage acquisition period and the post-RealPage acquisition period). There is no contradiction between the LRO Allegation and the operative allegations in the AC. Accordingly, the LRO Users are incorrect that Plaintiffs have somehow "plead[ed] themselves out of court." Def. Br. at 6 (citing *NicSand, Inc. v. 3M Co.*, 507 F.3d 442, 458 (6th Cir. 2007)).[5]

The AC pleads facts sufficient to show that LRO, upon its acquisition by RealPage, functioned in substantively the same manner as RealPage's other RMS system. Each program allowed Defendants to collectively set prices by and through the exchange of non-public information within RealPage's platform. The LRO Allegation does not contradict that.

### 2. Plaintiffs' AC Supersedes All Prior Pleadings.

Even if the LRO Allegation were incompatible with the AC—and it is not—LRO Users ignore black letter law that "amended pleadings supersede original pleadings[,]" *Braden*, 817 F.3d at 930, such that "the original pleading no longer performs any function in the case." *Leggett v. W. Express, Inc.*, 2020 WL 1161974, at *1 n.1 (M.D. Tenn. Jan. 6, 2020) (cleaned up). Accordingly, the superseded pleadings are not germane to the Court's evaluation of the AC.

In an effort to get around this, LRO Users cite inapposite cases to paint the LRO Allegation as an "admission[] against the pleader." Def. Br. at 11. In the 70-year-old case cited by Defendants,

---

[5] LRO Users' reliance on *NicSand* is unavailing. *NicSand* was a Sherman Act § 2 case in which one competitor (NicSand) sued another (3M), alleging 3M had monopolized or attempted to monopolize the market for automotive sandpaper. 507 F.3d at 449. Explaining "courts typically have permitted such claims to proceed only when one of the rivals has engaged in some form of predatory pricing," the court affirmed dismissal owing to NicSand's concession that its "Amended Complaint [Was] Not Premised on Predatory Pricing." *Id.* at 451-52.

the court found that statements made in an original pleading, later altered substantially (unlike here), could be considered "admissions against the pleader." *Penn. R. Co. v. City of Girard*, 210 F.2d 437, 440-41 (6th Cir. 1954). The Sixth Circuit has since acknowledged its error in doing so. *Shell v. Parrish*, 448 F.2d 528, 530 (6th Cir. 1971) ("While we have on one occasion on appeal taken judicial notice of a superseded pleading . . . we think the better rule is against such practice.") (citing *Penn. R.*, 448 F.2d at 437); *Hayward v. Cleveland Clinic Found.*, 759 F.3d 601, 617 (6th Cir. 2014) ("Generally, amended pleadings supersede original pleadings.").[6] Sixth Circuit law mandates that Plaintiffs' AC supersedes any prior allegations. For that reason, the Court can dispense with Defendants' flawed dissection of Plaintiffs' prior pleadings.

### 3. Evidentiary Issues Are Improper at The Motion to Dismiss Stage.

Even if the LRO Allegation *was* an "admission," this presents an evidentiary issue that cannot be resolved at the motion to dismiss stage. *See Uhlig,* 2023 WL 4234612, at *11 (denying request that the court treat factual allegations from abandoned pleadings as admissions, concluding that doing so "poses an evidentiary issue—not an issue the court can decide on a motion to dismiss."); *see also Davis v. Echo Valley Condo. Ass'n*, 349 F. Supp. 3d 645, 653 (E.D. Mich. 2018), *aff'd*, 945 F.3d 483 (6th Cir. 2019) (holding that while "pleadings withdrawn or superseded by amended pleadings [might be] admissions against the pleader in the action in which they were filed . . . those 'admissions' are evidentiary admissions, not judicial admissions."); *United States v. Avanir Pharms., Inc.*, 2020 WL 4339339, at *5 (N.D. Ohio July 28, 2020) (concluding that

---

[6] Defendants also cite *PetroJebla, SA de C.V. v. Betron Enters., Inc.*, 2020 WL 95802 (E.D. Mich. Jan. 8, 2020), which involved an anomalous set of facts involving a *pro se* corporate defendant. In *Betron*, that *pro se* defendant initially claimed that it no longer existed, but later obtained counsel and stated that it did exist—in order to avoid personal liability for the owner. At summary judgment, the court held the defendant to the statement it made about itself in its original answer. This is much more akin to a typical evidentiary admission against interest than a statement in a class action complaint. The case is therefore inapplicable and lacks persuasive weight.

under *Pennsylvania Railroad,* even superseded pleadings that constitute admissions against interest "may be refuted by competent evidence at the appropriate time."). Thus, any alleged "admission" is an evidentiary issue that has no bearing at the motion to dismiss stage and can be overcome by contrary record evidence developed through fact discovery in this MDL.

LRO Users also claim the Court may "consider the allegations in the ProPublica article" concerning the origins of LRO because Plaintiffs' AC cites the article. Def. Br. at 10-11. This argument is flawed from the start: the publication does not make any "allegations," so unalleged statements in the article are irrelevant. Further, although Federal Rule of Evidence 201 allows a court to take notice of facts not subject to reasonable dispute, the Rule plays no role here for multiple reasons. First, the LRO Users do not establish that the *ProPublica* article is a satisfactory source under Rule 201—because news article seldom are.[7] Second, the LRO Users are asking the Court to take notice of the ProPublica article to *refute* the allegations in the AC—effectively putting facts in dispute and taking it outside the bounds of Rule 201 judicial notice.[8] Third, even if the Court did consider the article, it would reinforce what Plaintiffs already allege: at its creation, LRO used public data and was designed to avoid potential antitrust violations, but after RealPage acquired and integrated LRO into its other RMS, LRO no longer operates that way.

---

[7] *See, e.g.*, *Amos v. Cain*, 2020 WL 6688864, at *5 (N.D. Miss. Nov. 12, 2020) ("Newspaper articles are 'seldom' considered satisfactory sources under Rule 201. . . . This Court agrees that a newspaper article is not a source whose accuracy cannot be questioned. Accordingly, the requests for judicial notice premised on statements in newspaper articles must be denied.") (cleaned up).

[8] *See Downing v. Ford Motor Co.*, 2018 WL 4621955, at *1 (6th Cir. Sept. 24, 2018) (confirming "judicial notice is only proper where the fact is adjudicative, relevant, and beyond reasonable controversy"); *M.A.C. by next friend M.E.C. v. Smith*, 576 F. Supp. 3d 552, 557 (M.D. Tenn. 2021) (same). Even if the Court were to take judicial notice of the *ProPublica* article, it would do so only of the fact of the publication, and not for the truth of the matter asserted therein. *In re Omnicare, Inc. Sec. Litig.*, 769 F.3d 455, 467 (6th Cir. 2014) (taking judicial notice "only of the fact that Omnicare filed the Audit Committee Charter and what that filing said, but we could not consider the statements contained in the document for the truth of the matter asserted, even at the motion-to-dismiss stage.").

### C. Plaintiffs' AC Pleads Each LRO Users' Role in the Alleged Infringement.

Plaintiffs' AC alleges a plausible conspiracy among the Owners, Owner-Operators, and Managing Defendants, facilitated by RealPage. Unlike most Rule 12 "group pleading" arguments, LRO Users do not argue that Plaintiffs have named broad corporate families of affiliated entities without alleging what role each entity played. Instead, they argue that by grouping RealPage's integrated revenue management solutions under one acronym, "RMS," Plaintiffs have engaged in "impermissible group pleading[s]." Def. Br. at 8-9. This argument lacks merit. For the purpose of establishing liability under Section 1 of the Sherman Act (*see above*), Plaintiffs allege that LRO functioned in a substantially identical manner to RealPage's other RMS products. This supports an inference that LRO Users exchanged confidential information through RealPage and adhered to its pricing decisions, just as the users of YieldStar and/or AIRM did. Accordingly, in compliance with Rule 8's "short and plain statement" requirement and in the interest of efficiency, Plaintiffs chose not to burden the Court by repeating six words throughout ("'RealPage Revenue Management,' LRO, YieldStar, and AIRM") when two sufficed ("RealPage RMS"). The LRO Users are on fair notice of the claims brought against them and grounds upon which those claims rest. *See Twombly*, 550 U.S. at 555. That is all that Rule 8 requires.

## V. CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court deny the LRO Users' Motion to Dismiss in its entirety.

Dated: November 8, 2023                    /s/ *Tricia R. Herzfeld*

Tricia R. Herzfeld (#26014)
Anthony A. Orlandi (#33988)
**HERZFELD SUETHOLZ GASTEL LENISKI AND WALL, PLLC**
223 Rosa L. Parks Avenue, Suite 300
Nashville, TN 37203
Telephone: (615) 800-6225
tricia@hsglawgroup.com
tony@hsglawgroup.com

*Liaison Counsel*

Patrick J. Coughlin
Carmen A. Medici
Fatima Brizuela
**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
600 West Broadway, Suite 3300
San Diego, CA 92101
Telephone: (619) 798-5325
Facsimile: (619) 233-0508
pcoughlin@scott-scott.com
cmedici@scott-scott.com
fbrizuela@scott-scott.com

Patrick McGahan
Amanda F. Lawrence
Michael Srodoski
G. Dustin Foster
Isabella De Lisi
**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
156 South Main Street
P.O. Box 192
Colchester, CT 06145
Telephone: (860) 537-5537
Facsimile:  (860) 537-4432
pmcgahan@scott-scott.com
alawrence@scott-scott.com
msrodoski@scott-scott.com
gfoster@scott-scott.com
idelisi@scott-scott.com

Stacey Slaughter
Thomas J. Undlin
Geoffrey H. Kozen
Stephanie A. Chen
J. Austin Hurt
**ROBINS KAPLAN LLP**
800 LaSalle Avenue, Suite 2800
Minneapolis, MN 55402
Telephone: (612) 349-8500
Facsimile: (612) 339-4181
sslaughter@robinskaplan.com
tundlin@robinskaplan.com
gkozen@robinskaplan.com
schen@robinskaplan.com
ahurt@robinskaplan.com

Swathi Bojedla
Mandy Boltax
**HAUSFELD LLP**
888 16th Street, N.W., Suite 300
Washington, DC 20006
Telephone: (202) 540-7200
sbojedla@hausfeld.com
mboltax@hausfeld.com

Gary I. Smith, Jr.
**HAUSFELD LLP**
600 Montgomery Street, Suite 3200
San Francisco, CA 94111
Tel: (415) 633-1908
gsmith@hausfeld.com

Katie R. Beran
**HAUSFELD LLP**
325 Chestnut Street, Suite 900
Philadelphia, PA 19106
Telephone: 1 215 985 3270
kberan@hausfeld.com

*Interim Co-Lead Counsel*

14

Eric L. Cramer
Michaela L. Wallin
**BERGER MONTAGUE PC**
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Telephone: (215) 875-3000
ecramer@bm.net
mwallin@bm.net

Daniel J. Walker
**BERGER MONTAGUE PC**
2001 Pennsylvania Avenue, NW, Suite 300
Washington, DC 20006
Telephone: (202) 559-9745
dwalker@bm.net

Brendan P. Glackin
Dean M. Harvey
**LIEFF CABRASER HEIMANN & BERNSTEIN, LLP**
275 Battery Street, Suite 2900
San Francisco, CA 94111
Telephone: 415-956-1000
bglackin@lchb.com
dharvey@lchb.com

Mark P. Chalos
Hannah R. Lazarz
Kenneth S. Byrd
**LIEFF CABRASER HEIMANN & BERNSTEIN, LLP**
222 2nd Avenue South, Ste. 1640
Nashville, TN 37201
(615) 313-9000
mchalos@lchb.com
hlazarz@lchb.com
kbyrd@lchb.com

Steve W. Berman
Breanna Van Engelen
**HAGENS BERMAN SOBOL SHAPIRO LLP**
1301 Second Avenue, Suite 2000
Seattle, Washington 98101
Telephone: (206) 623-7292

Christian P. Levis
Vincent Briganti
Peter Demato
Radhika Gupta
**LOWEY DANNENBERG, P.C.**
44 South Broadway, Suite 1100
White Plains, NY 10601
Telephone: (914) 997-0500
Facsimile: (914) 997-0035
vbriganti@lowey.com
clevis@lowey.com
pdemato@lowey.com
rgupta@lowey.com

Christopher M. Burke
Walter W. Noss
Yifan (Kate) Lv
**KOREIN TILLERY P.C.**
707 Broadway, Suite 1410
San Diego, CA 92101
Telephone: (619) 625-5621
Facsimile (314) 241-3525
cburke@koreintillery.com
wnoss@koreintillery.com
klv@koreintillery.com

Joseph R. Saveri
Steven N. Williams
Cadio Zirpoli
Kevin E. Rayhill
**JOSEPH SAVERI LAW FIRM, LLP**
601 California Street, Suite 1000
San Francisco, CA 94108
Telephone: (415) 500-6800
jsaveri@saverilawfirm.com
swilliams@saverilawfirm.com
czirpoli@saverilawfirm.com
krayhill@saverilawfirm.com

Jennifer W. Sprengel
Daniel O. Herrera
Alexander Sweatman
**CAFFERTY CLOBES MERIWETHER & SPRENGEL LLP**
135 S. LaSalle, Suite 3210
Chicago, IL 60603

15

Facsimile: (206) 623-0594
steve@hbsslaw.com
breannav@hbsslaw.com

Benjamin J. Widlanski
Javier A. Lopez
**KOZYAK TROPIN & THROCKMORTON LLP**
2525 Ponce de Leon Blvd., 9th Floor
Coral Gables, Florida 33134
Telephone: (305) 372-1800
bwidlanski@kttlaw.com
jal@kttlaw.com

Telephone: 312-782-4880
Facsimile: 312-782-4485
jsprengel@caffertyclobes.com
dherrera@caffertyclobes.com
asweatman@caffertyclobes.com

*Plaintiffs' Steering Committee Counsel for Plaintiffs*

**CERTIFICATE OF SERVICE**

   I hereby certify that on November 8, 2023, I caused the foregoing to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the email addresses denoted on the Electronic Mail Notice List.

              */s/ Tricia R. Herzfeld*
              Tricia R. Herzfeld