# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

|  |  |
|---|---|
| IN RE: REALPAGE, INC., RENTAL SOFTWARE ANTITRUST LITIGATION (NO. II) | Case No. 3:23-md-3071<br>MDL No. 3071<br><br>Chief Judge Waverly D. Crenshaw, Jr.<br><br>JURY DEMAND<br><br>This Document Relates to: |

| | |
|---|---|
| 3:23-cv-00330 | 3:23-cv-00380 |
| 3:23-cv-00331 | 3:23-cv-00979 |
| 3:23-cv-00332 | 3:23-cv-00381 |
| 3:23-cv-00326 | 3:23-cv-00387 |
| 3:23-cv-00333 | 3:23-cv-00388 |
| 3:23-cv-00334 | 3:23-cv-00389 |
| 3:23-cv-00335 | 3:23-cv-00390 |
| 3:23-cv-00336 | 3:23-cv-00391 |
| 3:23-cv-00337 | 3:23-cv-00410 |
| 3:23-cv-00338 | 3:23-cv-00411 |
| 3:23-cv-00339 | 3:23-cv-00419 |
| 3:23-cv-00344 | 3:23-cv-00413 |
| 3:23-cv-00345 | 3:23-cv-00412 |
| 3:23-cv-00356 | 3:23-cv-00414 |
| 3:23-cv-00357 | 3:23-cv-00416 |
| 3:23-cv-00358 | 3:23-cv-00415 |
| 3:23-cv-00377 | 3:23-cv-00440 |
| 3:23-cv-00378 | 3:23-cv-00445 |
| 3:23-cv-00379 | 3:23-cv-00552 |
| 3:22-cv-01082 | 3:23-cv-00742 |

## PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE MULTIFAMILY CONSOLIDATED AMENDED COMPLAINT

# TABLE OF CONTENTS

I.    **INTRODUCTION** .................................................................................................. **1**

II.   **FACTUAL BACKGROUND** ................................................................................ **1**

III.  **THE PLEADING STANDARD IN AN ANTITRUST CASE** ............................... **4**

IV.  **ARGUMENT** ......................................................................................................... **5**

   A.   The Complaint Adequately Alleges a *Per Se* Price-Fixing Agreement............................ 6

      1.   Plaintiffs Allege a *Per Se* Violation. ..................................................................... 6

      2.   The Complaint Alleges Direct Evidence of Agreement. ......................................... 12

      3.   The Complaint Includes Circumstantial Factual Allegations of Agreement.............. 15

         a.   Plaintiffs Allege Parallel Conduct. ........................................................ 15

         b.   The Complaint Pleads Plus Factors Supporting an Inference of Agreement.......... 20

      4.   The Complaint Provides Each Defendant Notice of the Claims Against It. .............. 27

      5.   Defendants' Factual Disputes Are Inappropriate at the Pleading Stage.................... 29

   B.   The Complaint States a Claim Under the Quick Look or Rule of Reason. ...................... 31

      1.   Plaintiffs Allege Direct Evidence of Market Power. .................................................. 31

      2.   Plaintiffs Define Relevant Antitrust Markets and Submarkets. ............................... 33

      3.   Plaintiffs Allege the Defendants Had Market Power. ............................................... 35

   C.   Plaintiffs Have Antitrust Standing to Bring Their Claims............................................. 37

   D.   Plaintiffs Have Adequately Alleged State Law Claims................................................. 38

V.    **CONCLUSION** ................................................................................................... **40**

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Am. Tobacco Co. v. United States*,
    328 U.S. 781 (1946) ...................................................................................................... 6

*Anderson News, L.L.C. v. Am. Media, Inc.*,
    680 F.3d 162 (2d Cir. 2012) ....................................................................................... 20

*Arizona v. Maricopa Cnty. Med. Soc.*,
    457 U.S. 332 (1982) ...................................................................................................... 7

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ...................................................................................................... 5

*Baird Tree Co. v. City of Oak Ridge*,
    2008 WL 2510581 (Tenn. Ct. App. June 24, 2008) ................................................... 39

*Bennett v. Visa U.S.A. Inc.*,
    198 S.W.3d 747 (Tenn. Ct. App. 2006) ..................................................................... 39

*Bell Atlantic Corp. v. Twombly*,
    550 U.S. 544 (2007) ............................................................................................*passim*

*Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*,
    509 U.S. 209 (1993) .................................................................................................... 32

*Brown Shoe Co. v. United States*,
    370 U.S. 294 (1962) .................................................................................................... 34

*Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.*,
    429 U.S. 477 (1977) .................................................................................................... 38

*Budicak, Inc. v. Lansing Trade Grp., LLC*,
    452 F. Supp. 3d 1029 (D. Kan. 2020) ................................................................. 14, 15

*B & R Supermarket v. Visa, Inc.*,
    2016 WL 5725010 (N.D. Cal. Sep. 30, 2016) ........................................................... 12

*Cal. Dental Ass'n v. FTC*,
    526 U.S. 756 (1999) ................................................................................................ 6, 11

*Catalano, Inc. v. Target Sales, Inc.*,
    446 U.S. 643 (1980) ...................................................................................................... 7

*Cataldo v. U.S. Steel Corp.*,
  676 F.3d 542 (6th Cir. 2012) .................................................................................... 40

*Champagne Metals v. Ken-Mac Metals, Inc.*,
  458 F.3d 1073 (10th Cir. 2006) ........................................................................... 12, 14

*City of Philadelphia v. Bank of Am. Corp.*,
  498 F. Supp. 3d 516 (S.D.N.Y. 2020) ..................................................................... 17

*City of Rockford v. Mallinckrodt ARD, Inc.*,
  360 F. Supp. 3d 730 (N.D. Ill. 2019) ........................................................................ 6

*Concord Assocs., L.P. v. Entm't Props. Trust*,
  2014 WL 1396524 (S.D.N.Y. Apr. 9, 2014) ........................................................... 28

*Cont'l Ore Co. v. Union Carbide & Carbon Corp.*,
  370 U.S. 690 (1962) ................................................................................................ 15

*Cupp v. Alberto-Culver USA, Inc.*,
  310 F. Supp. 2d 963 (W.D. Tenn. 2004) .................................................................. 35

*Dickson v. Microsoft Corp.*,
  309 F.3d 193 (4th Cir. 2002) ................................................................................... 36

*Diverse Power, Inc. v. City of LaGrange*,
  2018 WL 9651475 (N.D. Ga. Feb. 21, 2018) .......................................................... 39

*Doe v. Baum*,
  903 F3d 575 (6th Cir. 2018) .................................................................................... 37

*Dover v. British Airways, PLC (UK)*,
  2014 WL 317845 (E.D.N.Y. Jan. 24, 2014) ............................................................ 17

*Erie Cnty. v. Morton Salt, Inc.*,
  702 F.3d 860 (6th Cir. 2012) ............................................................................ *passim*

*FTC. v. Ind. Fed'n of Dentists*,
  476 U.S. 447 (1986) .................................................................................... 31, 32, 33

*Fallick v. Nationwide Mut. Ins. Co.*,
  162 F.3d 410 (6th Cir. 1998) ................................................................................... 40

*Fox v. Saginaw Cnty., Michigan*,
  67 F.4th 284 (6th Cir. 2023) .................................................................................... 40

*Gelboim v. Bank of Am. Corp.*,
  823 F.3d 759 (2d Cir. 2016) ........................................................................... 7, 37, 38

*Gibson v. MGM Resorts Int'l*,
2023 WL 7025996 (D. Nev. Oct. 24, 2023) ............................................................ 29

*Hogan v. Cleveland Ave. Rest. Inc.*,
2018 WL 1475398 (S.D. Ohio Mar. 26, 2018) ........................................................ 15

*Hosp. Auth. of Metro. Gov't of Nashville and Davidson Cnty., Tennessee v. Momenta Pharmaceuticals, Inc.*,
333 F.R.D. 390 (M.D. Tenn. 2019) ........................................................................ 40

*Hyland v. HomeServices of Am., Inc.*,
771 F.3d 310 (6th Cir. 2014) ........................................................................... 5, 23

*In re Amazon.com, Inc. eBook Antitrust Litig.*,
2023 WL 6006525 (S.D.N.Y. July 31, 2023) .......................................................... 36

*In re Auto. Parts Antitrust Litig.*,
2013 WL 2456586 (E.D. Mich. June 6, 2013) ........................................................ 28

*In re Blood Reagents Antitrust Litig.*,
756 F. Supp. 2d 623 (E.D. Pa. 2010) ..................................................................... 16

*In re Blue Cross Blue Shield Antitrust Litig.*,
2017 WL 2797267 (N.D. Ala. June 28, 2017) ........................................................ 35

*In re Broiler Chicken Antitrust Litig.*,
290 F. Supp. 3d 772 (N.D. Ill. 2017) ......................................................... 18, 20, 30

*In re Cardizem CD Antitrust Litig.*,
332 F.3d 896 (6th Cir. 2003) ................................................................................. 11

*In re Cast Iron Soil Pipe & Fittings Antitrust Litig.*,
2015 WL 5166014 (E.D. Tenn. June 24, 2015) ........................................... 5, 15, 39

*In re Commodity Exch., Inc.*,
213 F. Supp. 3d 631 (S.D.N.Y. 2016) .................................................................... 38

*In re Currency Conversion Fee Antitrust Litig.*,
264 F.R.D. 100 (S.D.N.Y. 2010) ........................................................................... 19

*In re Dealer Mgmt. Sys. Antitrust Litig.*,
313 F. Supp. 3d 931 (N.D. Ill. 2018) ..................................................................... 14

*In re Dealer Mgmt. Sys. Antitrust Litig.*,
362 F. Supp. 3d 510 (N.D. Ill. 2019) ..................................................................... 39

*In re Diisocyanates Antitrust Litig.*,
2020 WL 1140244 (W.D. Pa. Mar. 9, 2020) .......................................................... 19

*In re Domestic Airline Travel Antitrust Litig.*,
   2023 WL 5930973 (D.D.C. Sept. 12, 2023) ................................................................ 10, 11, 17

*In re Domestic Airline Travel Antitrust Litig.*,
   221 F. Supp. 3d 46 (D.D.C. 2016) ........................................................... 17, 19, 20, 29

*In re Dynamic Random Access Memory (DRAM) Indirect Purchaser Antitrust Litig.*,
   28 F.4th 42 (9th Cir. 2022) ........................................................................................... 22

*In re Flat Glass Antitrust Litig.*,
   385 F.3d 350 (3d Cir. 2004) .......................................................................................... 21

*In re Foreign Exch. Benchmark Rates Antitrust Litig.*,
   74 F. Supp. 3d 581 (S.D.N.Y. 2015) ............................................................................ 38

*In re Generic Pharms. Pricing Antitrust Litig.*,
   394 F. Supp. 3d 509 (E.D. Pa. 2019) ........................................................................... 31

*In re GSE Bonds Antitrust Litig.*,
   396 F. Supp. 3d 354 (S.D.N.Y. 2019) .......................................................................... 17

*In re High Fructose Corn Syrup Antitrust Litig.*,
   295 F.3d 651 (7th Cir. 2002) ........................................................................................ 26

*In re ICE LIBOR Antitrust Litig.*,
   2020 WL 1467354 (S.D.N.Y. Mar. 26, 2020) .............................................................. 24

*In re K-Dur Antitrust Litig.*,
   2008 WL 2660780 (D.N.J. Feb. 28, 2008) ................................................................... 38

*In re Local TV Advert. Antitrust Litig.*,
   2020 WL 6557665 (N.D. Ill. Nov. 6, 2020) ..................................................... 8, 17, 24, 38

*In re Local TV Advert. Antitrust Litig.*,
   2022 WL 3716202 (N.D. Ill. Aug. 29, 2022). ............................................................... 25

*In re Musical Instruments & Equip. Antitrust Litig.*,
   798 F.3d 1186 (9th Cir. 2015) ...................................................................................... 17

*In re Nat'l Prescription Opiate Litig.*,
   2019 WL 3737023 (N.D. Ohio June 13, 2019) ............................................................ 28

*In re Packaged Ice Antitrust Litig.*,
   723 F. Supp. 2d 987 (E.D. Mich. 2010) .................................................................... 5, 28

*In re Plasma-Derivative Protein Therapies Antitrust Litig.*,
   764 F. Supp. 2d 991 (N.D. Ill. 2011) ........................................................................... 18

*In re Polyurethane Foam Antitrust Litig.*,
  152 F. Supp. 3d 968 (N.D. Ohio 2015) ........................................................ 21

*In re Pre-Filled Propane Tank Antitrust Litig.*,
  860 F.3d 1059 (8th Cir. 2017) ..................................................................... 27

*In re Publ'n Paper Antitrust Litig.*,
  690 F.3d 51 (2d Cir. 2012) .......................................................................... 26

*In re Se. Milk Antitrust Litig.*,
  555 F. Supp. 2d 934 (E.D. Tenn. 2008) ............................................. 5, 26, 28

*In re Se. Milk Antitrust Litig.*,
  739 F.3d 262 (6th Cir. 2014) ................................................................. 33, 34

*In re Smith*,
  866 F.2d 576 (3d Cir. 1989) ....................................................................... 38

*In re Text Messaging Antitrust Litig.*,
  630 F.3d 622 (7th Cir. 2010) ...................................................................... 20

*In re Travel Agent Comm'n Antitrust Litig.*,
  2007 WL 3171675 (N.D. Ohio Oct. 29, 2007) ............................................. 29

*In re Travel Agent Comm'n Antitrust Litig.*,
  583 F.3d 896 (6th Cir. 2009) ................................................................. 4, 29

*In re Urethane Antitrust Litig.*,
  913 F. Supp. 2d 1145 (D. Kan. 2012) .......................................................... 12

*In re Urethane Antitrust Litig.*,
  768 F.3d 1245 (10th Cir. 2014) ................................................................... 12

*In re Wiring Device Antitrust Litig.*,
  498 F. Supp. 79 (E.D.N.Y. 1980) ................................................................ 39

*Ins. Brokerage Antitrust Litig.*,
  618 F.3d 300 (3d Cir. 2010) .................................................................. 12, 23

*Interstate Circuit v. United States*,
  306 U.S. 208 (1939) ........................................................................... *passim*

*Jefferson Parish Hosp. Dist. No. 2 v. Hyde*,
  466 U.S. 2 (1984) ....................................................................................... 36

*Jien v. Perdue Farms, Inc.*,
  2022 WL 2818950 (D. Md. July 19, 2022) ................................................... 35

*John v. Whole Foods Mkt. Grp., Inc.*,
  858 F.3d 732 (2d Cir. 2017) ........................................................ 17

*Jones v. Micron Tech. Inc.*,
  400 F. Supp. 3d 897 (N.D. Cal. 2019) (dismissing .................................. 26

*Jones v. Varsity Brands, LLC*,
  618 F. Supp. 3d 725 (W.D. Tenn. 2022) ............................................ 34

*Kleen Prods. LLC v. Georgia-Pacific LLC*,
  910 F.3d 927 (7th Cir. 2018) ................................................... 5, 29

*Kleen Prods. LLC v. Int'l Paper*,
  276 F. Supp. 3d 811 (N.D. Ill. 2017) ............................................ 29

*Landworks Creations, LLC v. U.S. Fid. & Guar. Co.*,
  2008 WL 660341 (D. Mass. Feb. 6, 2008) .......................................... 39

*Lie v. St. Joseph Hosp.*,
  964 F.2d 567 (6th Cir. 1992) ................................................ 31, 35

*Lifeline Ltd. No. II v. Conn. Gen. Life Ins. Co.*,
  821 F. Supp. 1201 (E.D. Mich. 1993) ............................................. 30

*Llacua v. W. Range Ass'n*,
  930 F.3d 1161 (10th Cir. 2019) .................................................. 29

*Maris Distrib. Co. v. Anheuser-Busch, Inc.*,
  302 F.3d 1207 (11th Cir. 2002) ................................................. 36

*Markson v. CRST Int'l, Inc.*,
  2019 WL 6354400 (C.D. Cal. Mar. 7, 2019) .................................... 18, 28

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
  475 U.S. 574 (1986) ............................................................. 30

*Meyer v. Kalanick*,
  174 F. Supp. 3d 817 (S.D.N.Y. 2016) ...................................... 6, 7, 9, 22

*Mich. Div.-Monument Builders of N. Am. v. Mich. Cemetery Ass'n*,
  524 F.3d 726 (6th Cir. 2008) ................................................... 35

*Midwest Auto Auction, Inc. v. McNeal*,
  2012 WL 3478647 (E.D. Mich. Aug. 14, 2012) ..................................... 24

*Monsanto Co. v. Spray-Rite Serv. Corp.*,
  465 U.S. 752 (1984) ............................................................. 11

*Mosaic Health Inc. v. Sanofi-Aventis U.S., LLC,*
  2022 WL 4017895 (W.D.N.Y. Sept. 2, 2022) .......................................................... 19

*Nat'l Hockey League Players Ass'n v. Plymouth Whalers Hockey Club,*
  419 F.3d 462 (6th Cir. 2005) ........................................................................... 35

*NCAA v. Bd. of Regents,*
  468 U.S. 85 (1984) ....................................................................................... 11

*New Orleans Ass'n of Cemetery Tour Guides & Cos. v. New Orleans Archdiocesan Cemeteries,*
  56 F.4th 1026 (5th Cir. 2023) .......................................................................... 35

*Olean Wholesale Grocery Coop., Inc. v. Agri Stats, Inc.,*
  2020 WL 6134982 (N.D. Ill. Oct. 19, 2020) ............................................................ 8

*Palmer v. Atl. Ice & Coal,*
  173 S.E. 424 (Ga. 1934) ................................................................................. 39

*Par v. Wolfe Clinic, P.C.,*
  70 F.4th 441 (8th Cir. 2023) ........................................................................... 35

*Park Irmat Drug Corp. v. Express Scripts Holding Co.,*
  911 F.3d 505 (8th Cir. 2018) ........................................................................... 19

*PharmacyChecker.com, LLC v. Nat'l Ass'n of Bds. of Pharmacy,*
  530 F. Supp. 3d 301 (S.D.N.Y. 2021) .................................................................. 35

*Re/Max Int'l, Inc. v. Realty One, Inc.,*
  173 F.3d 995 (6th Cir. 1999) ............................................................ 20, 21, 22, 25

*Realcomp II, Ltd. v. FTC,*
  635 F.3d 815 (6th Cir. 2011) ....................................................................... 31, 33

*Rebel Oil Co., Inc. v. Atl. Richfield Co.,*
  51 F.3d 1421 (9th Cir. 1995) ........................................................................... 36

*SD3, LLC v. Black & Decker (U.S.) Inc.,*
  801 F.3d 412 (4th Cir. 2015) ...................................................................... 18, 24

*Semertzides v. Bethesda N. Hosp.,*
  2014 WL 2573073 (S.D. Ohio June 9, 2014) ........................................................... 34

*Snyder-Hill v. Ohio State Univ.,*
  48 F.4th 686 (6th Cir. 2022) ........................................................................... 40

*Stanislaus Food Prods. Co. v. USS-POSCO Indus.,*
  803 F.3d 1084 (9th Cir. 2015) ......................................................................... 23

*Starr v. Sony BMG Music Ent.*,
    592 F.3d 314 (2d Cir. 2010) ................................................................ 18, 28

*Strougo v. Tivity Health*,
    551 F. Supp. 3d 839 (M.D. Tenn. 2021) ............................................ 37

*Thompson v. 1-800 Contacts, Inc.*,
    2018 WL 2271024 (D. Utah May 17, 2018) ...................................... 33

*Tichy v. Hyatt Hotels Corp.*,
    376 F. Supp. 3d 821 (N.D. Ill. 2019) ................................................ 22

*Todd v. Exxon Corp.*,
    275 F.3d 191 (2d Cir. 2001) .............................................................. 7, 24

*Toledo Mack Sales & Service, Inc. v. Mack Trucks, Inc.*,
    530 F.3d 204 (3d Cir. 2008) .............................................................. 14

*Total Benefits Planning Agency Inc. v. Anthem Blue Cross & Blue Shield*,
    630 F. Supp. 2d 842 (S.D. Ohio 2007) .............................................. 28, 29

*Total Benefits Planning Agency Inc. v. Anthem Blue Cross & Blue Shield*,
    552 F.3d 430 (6th Cir 2008) .............................................................. 28, 29

*Toys "R" Us, Inc. v. FTC*,
    221 F.3d 928 (7th Cir. 2000) ........................................................... 9, 10, 11

*Trails End Campground, LLC v. Brimstone Recreation, LLC*,
    2015 WL 388313 (Tenn. Ct. App. Jan. 29, 2015) ............................. 39

*U.S. Anchor Mfg., Inc. v. Rule Indus.*,
    7 F.3d 986 (11th Cir. 1993) ............................................................... 38

*United States v. Apple, Inc.*,
    791 F.3d 290 (2d Cir. 2015) .............................................................. 6, 7, 9, 10

*United States v. Blue Cross Blue Shield of Mich.*,
    809 F. Supp. 2d 665 (E.D. Mich. 2011) ............................................ 35

*United States v. Brown Univ.*,
    5 F.3d 658 (3d Cir. 1993) .................................................................. 11

*United States v. Conn. Nat'l Bank*,
    418 U.S. 656 (1974) .......................................................................... 35

*United States v. Socony-Vacuum Oil Co.*,
    310 U.S. 150 (1940) .......................................................................... 6, 7, 11

*United States v. U.S. Gypsum Co.*,
  438 U.S. 422 (1978) ................................................................................................ 8

*Valley Liquors, Inc. v. Renfield Importers*, *Ltd.*,
  822 F.2d 656 (7th Cir. 1987) ................................................................................. 37

*Value Drug Co. v. Takeda Pharms., U.S.A., Inc.*,
  2022 WL 952896 (E.D. Pa. Mar. 30, 2022) .......................................................... 22

*Wash. Cnty. Health Care Auth., Inc. v. Baxter Int'l Inc.*,
  328 F. Supp. 3d 824 (N.D. Ill. 2018) .................................................................... 15

*Watson Carpet & Floor Covering, Inc. v. Mohawk Indus., Inc.*,
  648 F.3d 452 (6th Cir. 2011) ........................................................ 11, 14, 22, 26

*White & White, Inc. v. Am. Hosp. Supply Corp.*,
  723 F.2d 495 (6th Cir. 1983) ................................................................................. 35

*White v. R.M. Packer Co.*,
  635 F.3d 571 (1st Cir. 2011) ................................................................................. 26

*Wilk v. Am. Med. Ass'n*,
  895 F.2d 352 (7th Cir. 1990) ................................................................................. 36

**Statutes**

Ind. Code § 24-1-2-1 ............................................................................................. 39

S.C. Code § 39-3-10 ............................................................................................... 39

Mass. Gen. Laws ch. 93A, § 9 ............................................................................... 39

73 Pa. Stat. § 201-9.2 ............................................................................................ 38

**Rules**

Fed. R. Civ. P. 8 ............................................................................................. 12, 27

Fed. R. Civ. P. 23 ........................................................................................... 12, 27

**Other Authorities**

ABA Model Jury Instructions in Civil Antitrust Cases (2d ed. 2016) .................... 18

Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* (4th ed. Supp. 2015) .......................... 23

Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* (5th ed. Supp. 2022) ...................... 6, 8

## I.     INTRODUCTION

Plaintiffs' Complaint articulates how some of the largest property owners, owner/operators, and managers of apartment buildings (the "Property Defendants") in the U.S. entered into an agreement—publicly and openly facilitated by RealPage—to artificially inflate prices for multifamily residential leases. In lieu of the smoke-filled rooms and golf course agreements of prior generations' cartels, Defendants modernized their agreement through use of a pricing algorithm. Each Defendant knowingly entered into a common scheme: RealPage would drive price increases on behalf of Property Defendants using RealPage's Revenue Management Solutions software ("RMS") through the use of algorithmic pricing informed by the massive cache of non-public data that Property Defendants provided to RealPage to facilitate the scheme. Each Property Defendant provided its data to RealPage knowing that its would-be horizontal competitors would follow suit, allowing them all to increase prices above competitive levels. In the words of Defendant ECI Group, Inc.: while "we [Property Defendants] are all technically competitors," RealPage RMS "helps us work together . . . to make us all more successful in our pricing . . . to work with a community in pricing strategies, not work separately." ¶ 9.[1]

## II.    FACTUAL BACKGROUND

RealPage provides real estate management software, including RMS products. ¶ 2. Each day, RealPage RMS relies on a dataset that includes a breathtaking volume of commercially sensitive rental pricing data received from clients like Property Defendants and provides those clients with a revenue-maximizing price to charge. ¶¶ 13-14. RealPage RMS thus facilitates a cartel of Property Defendants to increase rent prices nationwide. RealPage publicly advertises this cartel to induce clients to join, telling potential cartel members that it offers them the ability to

---

[1] Second Am. Cons. Class Action Compl., Dkt. 530 ("Complaint" or "AC"). All references to "¶," "¶¶," or "Fig." are to paragraphs and figures, respectively, from the Complaint.

"outsource daily pricing and ongoing revenue oversight," allowing RealPage to set prices for Defendants' properties "as though we [RealPage] own them ourselves." ¶ 7.

The stated purpose of RealPage RMS is to set prices for Defendants. ¶¶ 7, 21-25, 29, 33-35, 300, 333-36. Witnesses at Property Defendant properties describe RealPage as auto-populating rental rates and setting prices such that the property managers no longer needed to "look at all the comps and decide, 'what is the [unit] going to lease for today?'" ¶¶ 4, 232-34. Property Defendants' adoption of RealPage RMS "replac[ed] independent centers of decision making with a single effective decisionmaker: RealPage." ¶ 232. To police and enforce the cartel agreement, RealPage deployed Pricing Advisors, who facilitated coordinated price-setting across units priced by RealPage. ¶¶ 17, 20, 237-51, 257-62, 270-73, 278-86. Clients understood they must either use a RealPage Pricing Advisor or else train someone internally to take on that role. ¶ 17.

To enable RealPage to set their prices, each of the Property Defendants provided RealPage with "detailed, real-time, and non-public information concerning pricing, inventory, occupancy rates, as well as their units and unit types available, or that will soon be available for rent." ¶ 227.[2] Property Defendants share this non-public information knowing that RealPage will use it to assist them and their competitors to set prices and control supply. ¶¶ 6, 10-13, 17, 223, 287-99. They also share this information so that they can benefit from the proprietary data their competitors are likewise providing to RealPage. ¶¶ 10-12, 227, 247-49, 253.[3]

Property Defendants use many mechanisms to ensure that cartel members adopt

---

[2] As noted in Defendant Apartment Income REIT Corp.'s ("AIR") Motion to Dismiss, Dkt. 569, Plaintiffs have withdrawn their allegation that AIR shares its own data with its competitors. Given that AIR still signed an agreement with RealPage to *receive* its horizontal competitors' confidential pricing information and allows RealPage to set prices for AIR's own units, that is a distinction without a difference, as detailed in Plaintiffs' opposition to AIR's Motion to Dismiss.

[3] For specific allegations relating to each Defendant's knowledge of and commitment to the conspiracy, *see generally* ¶¶ 67-193.

RealPage's pricing recommendations, even though many of those recommendations defied (independent) economic logic. ¶¶ 233, 241, 255-75, 301-02. RealPage polices Property Defendants both within its software and through its personnel. ¶¶ 259-62. RealPage told its RMS clients that it would conduct "[r]egular secret shops and surveys to confirm successful adoption" of RMS software functionality. ¶ 255. One employee for Defendant Greystar recalled that RealPage never accepted a client's attempt to override a price recommendation on the basis that it did not reflect fair market value. ¶¶ 254, 264. A former Leasing Consultant for Defendant Lincoln Property Company explained that "99% of the time," his team was told by Lincoln's corporate office that RealPage's rates could not be modified. ¶¶ 20, 266. Some Pricing Advisors informed their assigned clients that the clients had no discretion to override pricing determined by RealPage. *Id.* Pricing Advisors monitored clients' compliance with RealPage's pricing and disseminated commercially sensitive information provided to RealPage by the client's competitors to encourage compliance. ¶¶ 17-19. RealPage's policing was successful: property managers accept RealPage's pricing recommendations 80 to 90% of the time. ¶¶ 241, 262, 301-02, 307. [4] And it makes sense that they would, given that they pay handsomely to use RealPage's pricing software. ¶ 14.

The widespread adoption of RealPage RMS upended the multifamily rental housing market, to the detriment of renters. ¶¶ 34-35. Prior to its adoption, Property Defendants set lease

---

[4] A recent complaint filed by the D.C. Attorney General with the benefit of pre-complaint discovery confirms that discovery will prove up Plaintiffs' allegations. Complaint, https://oag.dc.gov/release/attorney-general-schwalb-sues-realpage-residential ("D.C. Complaint"), ¶ 60 (citing internal GreyStar presentation acknowledging that RealPage RMS users "should each seek to accept at least 95% of the RealPage-generated prices" and emphasizing that "Discipline [o]f using revenue management increases more consistent outcomes."); *id.* (Greystar employees "confirmed that negotiating rents other than those set by the RealPage RM Software was unacceptable"); *id.* ¶¶ 61-62 (revealing existence of "auto-pilot" feature allowing clients to automatically accept RealPage pricing and disclosing RealPage messaging to clients requiring its use: "[n]ot an ask of the client. This is a command to the client. It isn't an optional process.").

prices to maximize occupancy rates and keep "heads in beds." ¶¶ 202-05, 235. This is economically rational behavior: vacant apartments lead to lost rental income and save few marginal costs, because the costs of owning and maintaining a rental unit are not significantly different whether the unit is occupied or not. ¶¶ 202-03. RealPage RMS instead allowed Property Defendants to focus on increasing rent while sacrificing physical occupancy (*i.e.*, reducing output). ¶¶ 231, 235, 242-43. Doing so is economically irrational absent collusion: emphasizing high prices over occupancy risks significant losses absent assurances that competitors are acting likewise. ¶¶ 205-06. Defendants admit as much: "the beauty of using Yieldstar is that it pushes you to go places that *you wouldn't have gone if you weren't using it*" and instead were acting unilaterally. ¶ 309. "[B]y outsourcing their pricing decisions to RealPage, each [Property Defendant] knows that the impact of the ever-rising prices set by RealPage RMS will outpace their vacancy losses." ¶ 244. And Defendants' cartel has been a success. Preliminary data analysis demonstrates that Defendants severed the relationship between occupancy rate and rent, and were therefore able to – and did in fact –raise rental prices in parallel, even during periods of lower demand and economic downturn. Figs. 11-28, ¶¶ 333-36, 349.

## III.    THE PLEADING STANDARD IN AN ANTITRUST CASE

In analyzing a motion to dismiss, courts "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." *In re Travel Agent Comm'n Antitrust Litig.*, 583 F.3d 896, 903 (6th Cir. 2009).[5] *Bell Atlantic Corp. v. Twombly* calls for "a complaint with enough factual matter (taken as true) to suggest that" a violation of the Sherman Act occurred. 550 U.S. 544, 556 (2007).

*Twombly* imposes neither "a probability requirement at the pleading stage," *id.*, nor a

---

[5] Unless otherwise indicated, internal citations and quotations are omitted and emphasis is added.

heightened pleading standard. *In re Cast Iron Soil Pipe & Fittings Antitrust Litig.*, 2015 WL 5166014, at *11 (E.D. Tenn. June 24, 2015). *Twombly* also does "not require heightened fact pleading of specifics," and instead only requires facts that "nudge[] the[] claims across the line from conceivable to plausible . . . ." 550 U.S. at 570. Thus, a complaint must simply "put defendants on notice concerning the basic nature of [plaintiff's] complaints against the defendants and the grounds upon which their claims exist." *In re Se. Milk Antitrust Litig.*, 555 F. Supp. 2d 934, 943 (E.D. Tenn. 2008) ("*Se. Milk I*"). The reviewing court must then determine *not* whether the plaintiff will ultimately prevail, but whether the facts permit the court to infer "more than the mere possibility of misconduct," which is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).

## IV.    ARGUMENT

To state a Section 1 claim, the threshold question is whether the plaintiff has plausibly alleged "an agreement, tacit or express . . . ." *Twombly*, 550 U.S. at 553.[6] Plaintiffs need not point to a written admission of agreement; rather, the complaint need only contain "plausible grounds to infer an agreement.'" *Twombly*, 550 U.S. at 556; *Kleen Prods. LLC v. Georgia-Pacific LLC*, 910 F.3d 927, 936 (7th Cir. 2018) ("[E]ven a wink and a nod [suffice]—formal agreements have never been required . . . ."). An agreement exists where the conspirators have "a unity of purpose" or "common understanding . . . ." *Hyland v. HomeServices of Am., Inc.*, 771 F.3d 310, 318 (6th Cir.

---

[6] Defendants assert that the AC does not answer "basic questions" of "who, did what, to whom (or with whom), where, and when?", MTD 9, but this criticism should be rejected. The AC alleges that each Defendant (who) joined a price-fixing cartel facilitated by RealPage RMS (did what) that inflated prices paid by renters (to whom), nationwide (where), from 2016 to present (when). To the extent that Defendants suggest more specific allegations are required, that heightened pleading standard has been rejected repeatedly in the Sixth Circuit. *See, e.g., Se. Milk I*, 555 F. Supp. 2d at 943 (complaints need not answer "all specific questions about 'who, what, when and where'"); *In re Packaged Ice Antitrust Litig.*, 723 F. Supp. 2d 987, 1008 (E.D. Mich. 2010) (denying motion to dismiss over defendants' repeated "refrain throughout their briefs" that the complaint omitted "the who, what, when and where" of the alleged conspiracy).

2014).[7] *See also Meyer v. Kalanick*, 174 F. Supp. 3d 817, 825 (S.D.N.Y. 2016) (denying motion to dismiss pricing algorithm conspiracy case and finding that "[s]ophisticated conspirators often reach their agreements as much by the wink and the nod as by explicit agreement, and the implicit agreement may be far more potent, and sinister, just by virtue of being implicit."). Here, Defendants' "unity of purpose" is established through written and oral admissions from the Defendants, market analyses, and economic analysis.

### A. The Complaint Adequately Alleges a *Per Se* Price-Fixing Agreement.

#### 1. Plaintiffs Allege a *Per Se* Violation.

A restraint of trade can be analyzed under three different levels of scrutiny: *per se*, quick look, or full Rule of Reason scrutiny. *Cal. Dental Ass'n v. FTC,* 526 U.S. 756, 770 (1999). The Court need not decide at the pleading stage which mode of analysis to apply.[8] Despite this, Defendants argue that Plaintiffs' allegations cannot be evaluated under a *per se* standard. Defendants' Omnibus Motion to Dismiss, Dkt. 593 ("MTD"), 27-29. Their argument rests on mischaracterization of the allegations in the Complaint and the relevant authority.

"[P]*er se* condemnation is not limited to agreements that literally set or restrict prices." *United States v. Apple, Inc.*, 791 F.3d 290, 327 (2d Cir. 2015). Any agreement between horizontal competitors with the purpose or effect of "raising, depressing, fixing, pegging, or stabilizing [prices]," constitutes a *per se* violation of Section 1 of the Sherman Act. *United States v. Socony-*

---

[7] Proof of agreement includes "evidence of [] action taken in concert," and can be found in or inferred from a common "course of dealings or other circumstances as well as in any exchange of words." *Am. Tobacco Co. v. United States*, 328 U.S. 781, 809-10 (1946). "No formal agreement is necessary." *Id*. at 809.

[8] Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law*, ¶ 305 (5th ed. Supp. 2022) ("Often, however, the decision about which rule is to be employed will await facts that are developed only in discovery."); *City of Rockford v. Mallinckrodt ARD, Inc.*, 360 F. Supp. 3d 730, 754 (N.D. Ill. 2019) ("After discovery, the court can better determine whether and how to take a more detailed look at the effects of defendants' conduct. . . . At this stage, it is sufficient for plaintiffs to plausibly allege that defendants engaged in conduct that resulted in an unreasonable restraint of trade.").

*Vacuum Oil Co.*, 310 U.S. 150, 222-23 (1940) (*per se* unlawful "price-fixing includes more than the mere establishment of uniform prices"); *Catalano, Inc. v. Target Sales, Inc.*, 446 U.S. 643, 647-48 (1980) (even "agreements . . . [with a] less direct impact on price" still "fall[] squarely within the traditional per se rule against price fixing").

Defendants ask the Court to ignore this well-settled law and abjure the *per se* standard. First, Defendants claim that, because courts have not specifically dealt with the use of revenue management software before, Rule of Reason must apply. MTD 28. But it is the purpose and effect that dictate the mode of analysis; "the precise 'machinery employed . . . is immaterial.'" *Apple*, 791 F.3d at 327 (quoting *Socony-Vacuum*, 310 U.S. at 223); *Gelboim v. Bank of Am. Corp.*, 823 F.3d 759, 771 (2d Cir. 2016) (the "unfamiliar context of" a claim "provides no basis to disturb application of the *per se* rule"). Courts are perfectly familiar with price-fixing, and application of the *per se* rule need not be "rejustified for every industry that has not been subject to significant antitrust litigation." *Arizona v. Maricopa Cnty. Med. Soc.*, 457 U.S. 332, 348-51 (1982); *Meyer*, 174 F. Supp. 3d at 825 (denying dismissal of *per se* allegations of horizontal price-fixing through pricing algorithm and emphasizing that "[t]he advancement of technological means for the orchestration of large-scale price-fixing conspiracies need not leave antitrust law behind.").

Second, Defendants claim that information sharing among competitors, without more, is not *per se* unlawful. MTD 29 n.12. They ignore that Plaintiffs plead more. Plaintiffs allege that Defendants' information exchange facilitated a naked price-fixing agreement subject to *per se* treatment. *Todd v. Exxon Corp.*, 275 F.3d 191, 198 (2d Cir. 2001) ("Information exchange is an example of a facilitating practice that can help support an inference of a price-fixing agreement.").[9]

---

[9] Notably, the footnote that Defendants selectively cite on this score (MTD 29 n.12) concludes that "[e]xchanges of current price information, of course, have the greatest potential for generating

Third, Defendants argue that because RealPage's relationship with each Property Defendant is vertical (not horizontal), Plaintiffs cannot plausibly allege a horizontal restraint subject to *per se* scrutiny. MTD 9, 28. Calling a relationship vertical does not make it so, and RealPage makes no attempt to explain how it is vertically related to Property Defendants within a single distribution chain, which is the relationship in every case that Defendants cite. Instead, RealPage acts as an intermediary *between* horizontal competitors pertaining to those horizontal competitors' sales functions. For that reason, traditional horizontal-price fixing authority applies.[10]

Even if RealPage's relationships with Property Defendants were vertical, Plaintiffs' claims satisfy the applicable pleading standards under a hub-and-spoke theory.[11] In *Interstate Circuit v. United States*, the Supreme Court affirmed a decision holding a group of horizontal competitors liable for participating in a conspiracy with a common distributor. 306 U.S. 208 (1939). There, the hub of the conspiracy sent a letter to each of the distributor conspirators outlining the terms of the conspiracy. While, unlike here (*infra* § IV(A)), there was *no direct evidence of agreement between the horizontal competitors*, the Court found that "[i]t was enough that, knowing that concerted action was contemplated and invited, the distributors gave their adherence to the scheme and participated in it." *Id.* at 226. Here, even if the Court does not construe the Complaint to allege

_____

anticompetitive effects" and "have consistently been held to violate the Sherman Act." *United States v. U.S. Gypsum Co.*, 438 U.S. 422, 443 n.16 (1978). *See also* Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law*, ¶ 2113 (5th ed. Supp. 2022) ("direct inter[firm] communications of current prices on specific transactions [are] nearly naked restraints" of trade).

[10] *In re Local TV Advert. Antitrust Litig.*, 2020 WL 6557665, at *8 (N.D. Ill. Nov. 6, 2020) (upholding conspiracy claims against Sales Rep Firms that acted as intermediaries between colluding horizontal competitors); *Olean Wholesale Grocery Coop., Inc. v. Agri Stats, Inc.*, 2020 WL 6134982, at *6 (N.D. Ill. Oct. 19, 2020) (competitors' exchange of data through Agri Stats, knowing "of each other's participation in the information exchange," sufficient for *per se* claim).

[11] Defendants' main argument to exclude their conduct from hub-and-spoke liability is that, they claim, Plaintiffs have not alleged a "rim" agreement among the spokes. MTD at 9. But as described *infra* § IV(A)(2)-(3), the Complaint more than plausibly alleges an agreement.

8

direct evidence of agreement, Defendants' acceptance of RealPage's "invitation to participate in a plan, the necessary consequence of which, if carried out, is restraint of interstate commerce, is sufficient to establish an unlawful conspiracy . . . ." *Id.* at 227.

Similarly, in *Toys "R" Us, Inc. v. FTC*, the hub of the conspiracy was a toy retailer that was losing sales to warehouse-store competitors. 221 F.3d 928 (7th Cir. 2000). To avoid that competition, the retailer coordinated a group boycott of the warehouse stores among several competing toy manufacturers. This benefited the manufacturers, who did not want to compete on price at the warehouse stores, but (absent the conspiracy) worried that demanding higher prices from warehouse stores would allow their competitors to gain an advantage in that growing niche. The FTC, and then the Seventh Circuit, found this to be a *per se* restraint of trade, inferring a horizontal restraint based on evidence that the manufacturers would not limit sales to warehouse stores without assurance that their competitors would too. *Id.* at 932, 935-36; *Meyer*, 174 F. Supp. 3d at 824 (horizontal conspiracy plausible where drivers sign up for Uber "on the understanding that the other [drivers] were agreeing to the same pricing algorithm, and in which drivers' agreements with Uber would be against their own interests were they acting independently.").

Similarly, like in *Toys "R" Us*, the publisher defendants in *United States v. Apple* were frustrated that Amazon (rather than the publishers) set e-book prices made on its e-bookstore, and did so at levels substantially below what publishers charged for new, hardcover books, which in turn lowered the publishers' revenues. 791 F.3d 290. In response, Apple offered to allow publishers to set their own prices for sales made through Apple's e-bookstore, with Apple taking a cut of the sale price. However, both Apple and the publishers realized that there would be no benefit from the deal if Apple was "left with a brand new marketplace brimming with titles, but devoid of customers." *Id.* at 303. To solve the problem, Apple required all the competitor

publishers to "switch all of their other ebook retailers—including Amazon" to the same pricing model Apple adopted. *Id.* at 303-04. Both Apple and the publishers "knew [the change] would result in higher consumer-facing ebook prices." *Id.* at 316. In evaluating the deal, the circuit court explained that "the promise of higher prices as a bargaining chip to induce the Publisher Defendants to participate in the iBookstore constituted a conscious commitment to the goal of raising ebook prices." *Id.* at 317. Same here. RealPage publicly offered Property Defendants an invitation: if Property Defendants shared their non-public and competitively sensitive data with RealPage and adhered to its pricing decisions, RealPage RMS would allow them to raise rents up to 7% above market levels. The fact that Property Defendants accepted that offer and contracted with RealPage demonstrates a conscious commitment to join the horizontal price-fixing scheme.[12]

Each of these cases shares another feature with this litigation—the abrupt shift in strategy brought on by the alleged agreement. In *Interstate Circuit*, the Supreme Court noted that the distributors' agreement with the manufacturer's proposal involved a "radical departure from the previous business practices of the industry" and a "drastic increase" in prices. *Interstate Circuit*, 306 U.S. at 222. In *Toys "R" Us*, the court found that "not only was the manufacturers' decision to stop dealing with the warehouse clubs an abrupt shift from the past," but considered alongside alleged actions against interest, and competitor communications, tended to support concerted action. *Toys "R" Us*, 221 F.3d at 935-36. Similarly, in *Apple*, the defendants' switch from one sales model to another signaled collusion. *Apple*, 791 F.3d at 318. Here, too, Property Defendants'

---

[12] *See also In re Domestic Airline Travel Antitrust Litig.*, 2023 WL 5930973, at *28 (D.D.C. Sept. 12, 2023) (denying summary judgment where agreement was inferred from investor statements about capacity discipline and finding that "courts have found it appropriate to draw inferences of conspiracy from public statements") (collecting cases) ("*Domestic Airline II*").

shift from maximizing volume to maximizing margin signals the existence of a *per se* agreement.[13]

*See also Domestic Airline II*, 2023 2023 WL 5930973, at *17 (denying summary judgment where plaintiffs advanced "colorable argument" that shift towards "capacity discipline" inferred horizontal agreement, creating triable issue of fact).

Defendants argue that unless "virtually all" market participants agree to enter the cartel, no agreement can be inferred. MTD 12. None of those cases recognize Defendants' fabricated pleading requirement. In *Toys "R" Us*, for example, the defendant manufacturers made up *only 40%* of the toy market, a far cry from "virtually all" market participants. 221 F.3d at 937. Instead, the dispositive issue in each case is whether the conduct would be economically rational absent knowledge that some (but not necessarily all) other competitors would undertake the same course of conduct—with such collective action diminishing the possibility that the cartel's supracompetitive prices would be disciplined by innocent market actors.[14]

_____

[13] If not subject to *per se*, discovery will demonstrate that Defendants' agreements should be subject to "quick look" scrutiny—an "intermediate" abbreviated Rule of Reason standard, applied "where *per se* condemnation is inappropriate, but where 'no elaborate industry analysis is required to demonstrate the anticompetitive character' of an inherently suspect restraint." *United States v. Brown Univ.*, 5 F.3d 658, 669 (3d Cir. 1993) (quoting *NCAA v. Bd. of Regents*, 468 U.S. 85, 109 (1984)). Under quick look, the Court need not conduct a detailed market analysis where "an observer with even a rudimentary understanding of economics could conclude that the arrangements in question would have an anticompetitive effect on customers and markets." *Cal. Dental Ass'n,* 526 U.S. at 770. Here, Plaintiffs plead the common sense and rudimentary economic theory supporting their claims.

[14] Defendants' additional argument that they have innocent explanations for their adoption of RealPage RMS cannot be credited at the pleading stage. *Erie Cnty. v. Morton Salt, Inc.*, 702 F.3d 860, 869 (6th Cir. 2012) (explaining that, at the motion to dismiss stage, a § 1 "plaintiff need not allege a fact pattern that 'tends to exclude the possibility' of lawful, independent conduct") (quoting *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 764 (1984)); *Watson Carpet & Floor Covering, Inc. v. Mohawk Indus., Inc.*, 648 F.3d 452, 458 (6th Cir. 2011) ("Ferreting out the most likely reason for the defendants' actions is not appropriate at the pleadings stage."). Further, to the extent Defendants' argument is construed as a procompetitive justification for their conduct, where *per se* scrutiny is applied, the "presence of procompetitive effects is irrelevant." *In re Cardizem CD Antitrust Litig.*, 332 F.3d 896, 909 (6th Cir. 2003); *Socony-Vacuum*, 310 U.S. at 224

## 2. The Complaint Alleges Direct Evidence of Agreement.

"[S]ufficiently detailed" allegations of direct evidence "are independently adequate" to plead an agreement under Fed. R. Civ. P. 8. *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 323 (3d Cir. 2010) (citing *Twombly,* 550 U.S. at 564). Allegations are "sufficiently detailed" where Plaintiffs offer "enough fact to raise a reasonable expectation that discovery will reveal" evidence of the illegal agreement." *Ins. Brokerage*, 618 F.3d at 324 (quoting *Twombly,* 550 U.S. at 556). Direct evidence can include witness statements, such as a co-conspirator's reference to horizontal competitors working together, jointly, or through "collective action," *Champagne Metals v. Ken-Mac Metals, Inc.*, 458 F.3d 1073, 1084 (10th Cir. 2006), or an admission from a co-conspirator that they "needn't worry about low pricing from competitors because [they] had already talked to the competition." *In re Urethane Antitrust Litig.*, 913 F. Supp. 2d 1145, 1154 (D. Kan. 2012), *aff'd,* 768 F.3d 1245 (10th Cir. 2014). In *B & R Supermarket v. Visa, Inc.*, a much less explicit statement by a MasterCard executive that "the card brands are not going to delay the liability shift date" was credited as direct evidence of an agreement among Visa, MasterCard, and American Express to shift liability to merchants. 2016 WL 5725010, at *6 (N.D. Cal. Sep. 30, 2016).

Plaintiffs allege several pieces of direct evidence that Defendants agreed to fix rent prices. First, RealPage and its employees have admitted to the existence of the alleged agreement. Defendants admit that: (1) RealPage allowed horizontal competitors to work jointly together as a "community" in their pricing, not separately; (2) Property Defendants consciously sought to "outsource daily pricing and ongoing revenue oversight" to RealPage, permitting it to set their prices "as though we [RealPage] own[ed their properties] ourselves," ¶¶ 7, 230, 291; (3) RealPage

n.59 ("the law does not permit an inquiry into [*per se* restraints'] reasonableness" or the "economic justifications" defendants might proffer, such restraints "are all banned because of their actual or potential threat to the central nervous system of the economy").

Pricing Advisors served as "an extension of [RealPage Lessors'] team and empowered with the authority required for success," ¶ 17 & n.18; and (4) RMS works by shifting Property Defendants from an "occupancy focus" to an economically irrational "rent growth" focus. ¶ 235; ¶ 19 (former RealPage executive reported that clients accepted RealPage pricing at "very high rates").

Second, RealPage published guides encouraging RMS clients to directly share confidential, competitively sensitive information, ¶ 40 Fig. 5, and established a "User Group" web forum that exists to "promote communications between" RealPage RMS clients, leaving no doubt that Property Defendants were consciously aware of each other's commitments to RealPage's pricing decision. ¶¶ 37 n.53, 383-385. And Property Defendants know exactly which of their competitors are participating in the scheme because RealPage discloses to Property Defendants a monthly "peer list" that shows for each Property Defendant the competitors who also use RealPage RMS and whose sensitive data is utilized by RealPage. ¶¶ 31, 246, 289. Indeed, Property Defendants publicly admitted that they knew that "all of our competitors use it" and they knew that their competitors "raised rents when they should." ¶ 292.

Property Defendants gave effective control of their price setting to RealPage, leading to aggressive price hikes. ¶ 20 (witness reported that Lincoln rejected requests by local leasing managers to deviate from RealPage pricing 99% of the time); *id.* (leasing professional raised concerns about RealPage's pricing, but was told by the property manager that there was "not much we can do" to change the rents set by RealPage); ¶ 18 (leasing manager stated "I knew [RealPage's prices] were way too high, but [RealPage] barely budged" when she requested deviations); ¶¶ 18, 263 (business manager at Pinnacle confirmed delegation of pricing authority, despite RealPage increasing rents by "$400 to $500 a month per unit," a move she described as "a nightmare[,] . . . embarrassing [and] . . . absolutely ridiculous"); ¶ 23 (leasing manager reported that RealPage

instructed that rents for the building's standard two-bedroom units be increased approximately 27%, despite no improvements being made to the units). Such behavior would not have occurred had RealPage RMS clients not been confident that other RMS users were doing the same.

Courts regularly find that these types of admissions constitute direct evidence sufficient to generate a fact issue on motions for *summary judgment*, which is a far higher standard than the pleading stage. In *Toledo Mack Sales & Service, Inc. v. Mack Trucks, Inc.*, the court held that testimony describing statements of Mack truck dealers that they "did not compete on price," and other testimony that dealers had a "gentlemen's agreement" or "unwritten understandings" not to compete in each other's territories, was direct evidence of an agreement precluding judgment. 530 F.3d 204, 220 (3d Cir. 2008). Importantly, even at summary judgment the court rejected the argument Defendants raise here: that Plaintiffs' proffered statements did not describe direct communications among competing dealers or the "exact extent" of the alleged agreements. *Id.* Instead, the court found that while such evidence could potentially "leave a jury unpersuaded that such agreements did in fact exist," that did not "mean that the jury should not consider it." *Id.*

Defendants cannot dismiss Plaintiffs' allegations of agreement with claims that the alleged agreement was "practically and economically implausible." MTD 26-27. *Erie Cnty.*, 702 F. 3d at 869; *Watson Carpet*, 648 F.3d at 458.[15] Defendants also cannot undercut Plaintiffs' allegations of agreement by asking the Court to accept Defendant-friendly inferences from those allegations. *Budicak, Inc. v. Lansing Trade Grp., LLC*, 452 F. Supp. 3d 1029, 1047, 1052 (D. Kan. 2020)

---

[15] *See also In re Dealer Mgmt. Sys. Antitrust Litig.*, 313 F. Supp. 3d 931, 952 (N.D. Ill. 2018) (rejecting defendants' arguments that "alleged confessions [were] 'nonsensical'" as the court could not "ignore well-pleaded allegations of fact (that the executives admitted the agreement)"); *Champagne Metals*, 458 F.3d at 1085 ("concerns over the reasonableness of inferences do not apply to direct evidence of an agreement" and the court "need not worry whether such an agreement would have been a rational one to enter into").

(defendants' alternative reading of plaintiffs' allegations was "at best . . . a competing inference that may be weighed by a fact-finder at later stages of the proceeding"). As Plaintiffs have offered direct evidence of Defendants' agreement, the Court should deny Defendants' motion without further consideration of their other arguments.

### 3. The Complaint Includes Circumstantial Factual Allegations of Agreement.

An agreement among competitors can be inferred circumstantially from parallel conduct, along with "plus factors" that allow courts to infer, pre-discovery, that the conduct may have been concerted rather than independent. *Cast Iron*, 2015 WL 5166014, at *11. In evaluating circumstantial allegations of agreement, this Court must look at the complaint as a whole rather than "dismembering it and viewing its separate parts." *Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962); *Erie Cnty.,* 702 F.3d at 870 (same). Plaintiffs' allegations of parallel conduct and plus factors, viewed in their totality, support the plausible inference that Defendants had a unity of purpose or common understanding to increase prices and restrict supply.

### a. Plaintiffs Allege Parallel Conduct.

The AC alleges parallel conduct—a marked shift in the multifamily rental housing market after widespread adoption of RealPage RMS. Before the conspiracy period, competition in the multifamily rental housing market was driven by keeping "heads in beds," an economically rational way to manage properties absent collusion. ¶¶ 202-203.[16] Starting no later than 2016, and potentially earlier, the AC alleges that traditional supply and demand principles began to lose hold

---

[16] Although Plaintiffs plead parallel conduct through Property Defendants' parallel pricing and change in pricing/occupancy strategy, parallel conduct is not required, but rather "is but one of many varieties of circumstantial evidence plaintiffs can employ to state a" *per se* price fixing claim. *Wash. Cnty. Health Care Auth., Inc. v. Baxter Int'l Inc.*, 328 F. Supp. 3d 824, 840 (N.D. Ill. 2018); *Hogan v. Cleveland Ave. Rest. Inc.*, 2018 WL 1475398, at *4 (S.D. Ohio Mar. 26, 2018) ("Plaintiffs are not required to show parallel conduct; it is merely a vehicle . . . that can be used to show circumstantial evidence of a conspiracy.").

15

as more and more Property Defendants adopted RealPage RMS, abandoned their longstanding practices, and prioritized rent growth over occupancy—an anticompetitive price-over-volume strategy that is economically irrational absent collusion. ¶¶ 351-365. That led to explosive rent growth even in the face of declining occupancy, a structural break strongly indicative of collusive activity among market participants. ¶¶ 355-365, Figs. 30-34.

During the last round of briefing, Defendants complained that Plaintiffs "say nothing about [individual] Defendants' actual pricing at all," and so parallel conduct could not be established. Dkt. 341 at 15. To respond to Defendants' criticism, Plaintiffs purchased *Defendant-specific* pricing data from CoStar, a respected industry data source, to conduct a detailed analysis of pricing. The results of that analysis, shown in Figs. 11-28, demonstrate how *each Defendant* made parallel increases in price across nine Metropolitan Statistical Areas ("MSAs"). The Complaint alleges that these parallel price increases were made possible by each Property Defendant's use of RealPage RMS. ¶ 349. The parallel nature of these pricing changes is all the more remarkable, and suggestive of agreement, given that Defendants increased prices even during periods of lower demand and periods of economic downturns. It is simply disingenuous to claim, as Defendants do, that Plaintiffs' complaint fails to allege "how [a Property Defendant's] actions compared with those of its co-conspirators," given the detailed pricing analysis that does exactly that. MTD 16.

Faced with what they asked for, Defendants now move the goalposts, disparaging highly detailed, Defendant-specific pricing data as "generic," and making the incredible argument that Plaintiffs are required to allege *daily* parallel pricing, down to the property level, without discovery, in order to plead a claim. MTD 15-16. Defendants' preferred standard is contrary to *Twombly* and its progeny. *Twombly*, 550 U.S. at 556; *In re Blood Reagents Antitrust Litig.*, 756 F. Supp. 2d 623, 630 (E.D. Pa. 2010) (Plaintiffs "are not required to plead simultaneous price

increases—or that the price increases were identical—in order to demonstrate parallel conduct.").[17]

Without the benefit of discovery (and having to rely on publicly available data), Plaintiffs formulated statistical and economic analyses—which need only be plausible[18]—to show how using RealPage RMS, and subsequent exchanges of information by Defendants, caused a market-wide shift in pricing strategy and a parallel increase in prices across Defendants and across MSAs. ¶¶ 34, 332-65; Figs. 11-28. Unlike *Musical Instruments*, upon which Defendants rely, Plaintiffs here have tied their statistical and economic analysis to other plausible factual allegations about the cartel. *Compare In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1197 (9th Cir. 2015) ("Plaintiffs do not allege any facts connecting the purported price increase to an illegal agreement among competitors.") *with Local TV Advert.*, 2020 WL 6557665, at *8 ("Unlike the plaintiffs in *Musical Instruments*, however, Plaintiffs do not fail to connect the aggregate data to price increases; instead, they specifically allege that Defendants' conduct has caused . . . prices to rise."). In addition, the results of these analyses reinforce Plaintiffs' allegations that RealPage had market power in the RMS market, ¶ 217, and that Defendants knew RealPage RMS was "driving" explosive rent increases. ¶ 23. At the pleading stage, that is sufficient. *John v. Whole Foods Mkt.*

---

[17] *Cf. Domestic Airline II*, 2023 WL 5930973, *18 (at summary judgment, finding that plaintiffs' argument that allegations of a systemwide conspiracy "do not require a demonstration of parallel conduct at the route level").

[18] *City of Philadelphia v. Bank of Am. Corp.*, 498 F. Supp. 3d 516, 528 (S.D.N.Y. 2020) ("[A] statistical analysis, like any other allegation, need only be plausible. Merely pointing out that there are problems with the analysis, or that a better method is available, will not suffice."); *id.* ("[T]he Court need not now engage in a *Daubert*-like analysis of Plaintiffs' statistical pleadings. Instead, the Court may, indeed must, accept as true Plaintiffs' factual assertions regarding pricing and other economic data."); *In re GSE Bonds Antitrust Litig.,* 396 F. Supp. 3d 354, 364 (S.D.N.Y. 2019); *In re Domestic Airline Travel Antitrust Litig.*, 221 F. Supp. 3d 46, 69 (D.D.C. 2016) (analyzing plaintiffs' economic analysis as factual allegation) ("*Domestic Airline I*"); *Dover v. British Airways, PLC (UK),* 2014 WL 317845, at *2 (E.D.N.Y. Jan. 24, 2014) ("[Plaintiff's] statistical analysis is not a conclusory assertion; it is a factual allegation that the Court must credit.").

*Grp., Inc.*, 858 F.3d 732, 737 (2d Cir. 2017) (pleadings stage "is not the proper stage to determine" either "the accuracy" of allegations or the "methodology" that underlies them).

Even in the face of parallel pricing and coordinated shift in pricing/occupancy strategy, Defendants argue that *any* variations in behavior preclude a finding of parallel conduct. This is not the law. "The Supreme Court has long held that simultaneous action is not a requirement to demonstrate parallel conduct." *In re Broiler Chicken Antitrust Litig.*, 290 F. Supp. 3d 772, 791 (N.D. Ill. 2017); *Interstate Circuit*, 306 U.S. at 227 ("It is elementary that an unlawful conspiracy may be and often is formed without simultaneous action or agreement on the part of the conspirators."); *SD3, LLC v. Black & Decker (U.S.) Inc.*, 801 F.3d 412, 428-29 (4th Cir. 2015) (defendants need not "move in relative lockstep" or by "identical means").[19]

For example, Defendants fault the Complaint for not identifying the specific date on which each Defendant adopted RealPage RMS. MTD 14. But there is no requirement for Plaintiffs to do so at the pleading stage. *Starr v. Sony BMG Music Ent.*, 592 F.3d 314, 325 (2d Cir. 2010) (under *Twombly*, "plaintiffs [are] not required to mention a specific time, place or person involved in each conspiracy allegation"); *Markson v. CRST Int'l, Inc.*, 2019 WL 6354400, at *4 (C.D. Cal. Mar. 7,

---

[19] *See also* ABA Model Jury Instructions in Civil Antitrust Cases at 13 (2d ed. 2016) ("The members of the conspiracy need not necessarily have met together, directly stated what their object or purpose was to one another, or stated the details or the means by which they would accomplish their purpose. . . . A conspiracy may be formed without all parties coming to an agreement at the same time. Similarly, it is not essential that all persons acted exactly alike, nor is it necessary that they all possessed the same motive for entering the agreement."); *id.* Instruction 2A.4 ("A person who knowingly joins an existing conspiracy, *or who participates only in part of a conspiracy with knowledge of the overall conspiracy*, is just as responsible as if he or she had been one of those who formed or began the conspiracy and participated in every part of it."); *id.* ("Once you have found that a defendant is a member of a conspiracy, he, she, or it . . . is responsible *for all actions taken by all coconspirators* during and in furtherance of the conspiracy . . . Although a defendant who was a member of a conspiracy may withdraw from and abandon the conspiracy, *that defendant is still liable with all other coconspirators for any illegal acts committed* by that defendant or *by any coconspirator* while that defendant was a member of the conspiracy up until the time of that defendant's withdrawal from the conspiracy.").

18

2019). Indeed, doing so is virtually impossible without discovery. *In re Plasma-Derivative Protein Therapies Antitrust Litig.*, 764 F. Supp. 2d 991, 1003 n.10 (N.D. Ill. 2011) (noting that for private plaintiffs "who do not have access to inside information . . . the pleading standard must take into account the fact that a complaint will ordinarily be limited to allegations pieced together from publicly available data."). Moreover, Defendants' argument ignores the actual basis for Plaintiffs' claims of parallel conduct— which is not each Defendants' date of adoption of RealPage RMS, but rather Defendants' shift in pricing strategy once a critical level of RealPage RMS adoption had been reached around January 2016. ¶¶ 6-7, 30, 34, 202-205. Unlike *Mosaic Health Inc. v. Sanofi-Aventis U.S., LLC*, 2022 WL 4017895, at *6 (W.D.N.Y. Sept. 2, 2022), where plaintiffs did not allege that defendants' conduct "achieved the same or substantially similar end result," and *Park Irmat Drug Corp. v. Express Scripts Holding Co.*, 911 F.3d 505, 517 (8th Cir. 2018), where the alleged conduct was executed under "dissimilar circumstances" and temporally unrelated, Plaintiffs here have alleged parallel shifts in strategy, and similar means of execution, that reflect parallel conduct indicative of an agreement. *See Domestic Airline I*, 221 F. Supp. 3d at 69 (plaintiffs need not allege that conspirators acted "in exactly the same way in order to adequately allege parallel conduct," but rather a "marked change in industry" was sufficient).

Defendants point to other minor differences in RMS adoption and usage: some Defendants used RealPage's Pricing Advisors while the rest used internal Pricing Advisors *trained by RealPage*; and some Defendants adopted RealPage's pricing at higher rates than others. But "it is well settled . . . that the law does not require every defendant to participate in the conspiracy by identical means throughout the entire class period." *In re Currency Conversion Fee Antitrust Litig.*, 264 F.R.D. 100, 114 (S.D.N.Y. 2010); *Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162, 191 (2d Cir. 2012) (holding that defendants' "varied" actions during the initial stages of the alleged

conspiracy did not render the existence of a conspiracy implausible); *In re Diisocyanates Antitrust Litig.*, 2020 WL 1140244, at *3 (W.D. Pa. Mar. 9, 2020) ("At [the motion to dismiss] stage . . . Plaintiffs need not explain why some Defendants took many actions and others took few.").

Put another way, all Property Defendants agreed to the same basic methodology and ultimate goal: providing pricing and other confidential data to RealPage and delegating pricing decisions to RealPage. From that baseline, some participated in the agreement more actively. The fact that some members of the cartel were more enthusiastic and avid price-fixers than others does not excuse those who may have fixed prices less frequently or more surreptitiously. Defendants do not cite any authority suggesting otherwise.[20]

### b. The Complaint Pleads Plus Factors Supporting an Inference of Agreement.

In the Sixth Circuit, courts consider four non-exhaustive plus factors in evaluating the circumstantial allegations offered in support of a Section 1 claim:

> (1) whether the defendants' actions, if taken independently, would be contrary to their economic self-interest; (2) whether the defendants have been uniform in their actions; (3) whether the defendants have exchanged or have had the opportunity to exchange information relative to the alleged conspiracy; and (4) whether the defendants have a common motive to conspire.

*Re/Max Int'l, Inc. v. Realty One, Inc.*, 173 F.3d 995, 1009 (6th Cir. 1999).[21]

Plaintiffs plausibly allege all four plus factors identified by the Sixth Circuit, as well as one

---

[20] Defendants' arguments claiming differences between YieldStar, Lease Rent Options ("LRO"), and AIRM fare no better, as they wrongly presume there is a material difference between the three software interfaces relevant for the purposes of Plaintiffs' Complaint. MTD 13-14. There is not. ¶¶ 221-23. Each was used by Defendants to delegate their pricing to RealPage with the knowledge that competitors were doing likewise.

[21] Plus factors "must be evaluated holistically." *Domestic Airline I*, 221 F. Supp. 3d at 58; *Broiler Chicken*, 290 F. Supp. 3d at 797 (improper to "argue against Plaintiffs' claim by isolating each factor"). The Court should decline Defendants' request to parse each factor and view it in isolation, and instead should consider whether the plus factors, together with Plaintiffs' allegations of parallel conduct, support the inference of an agreement. *In re Text Messaging Antitrust Litig.*, 630 F.3d 622, 627 (7th Cir. 2010) ("mixture of parallel behaviors, details of industry structure, and industry practices" sufficient to state a claim).

other.[22] Viewed collectively and with Plaintiffs' allegations of parallel conduct, these alleged factors compel an inference of price fixing.

**Actions Against Self Interest**: Defendants' conduct against their self-interest "will consistently tend to exclude the likelihood of independent conduct." *Re/Max Int'l, Inc.*, 173 F.3d at 1009. The AC shows that Defendants acted against self-interest by shifting from prioritizing occupancy to prioritizing rent increases, artificially restricting supply while maintaining higher rental prices. ¶¶ 31, 231, 235-36, 251, 303, 312. Those allegations are inconsistent with Defendants' unilateral self-interest because, if following that strategy unilaterally in a competitive market, the higher rent prices would cause them to lose renters to other lessors and lead to lower revenues as units sat empty. *In re Flat Glass Antitrust Litig.*, 385 F.3d 350, 360-61 (3d Cir. 2004) ("Evidence that the defendant acted contrary to its interests means evidence of conduct that would be irrational assuming that the defendant operated in a competitive market."). "In a competitive industry, for example, a firm would cut its price with the hope of increasing its market share if its competitors were setting prices above marginal costs." *Id*. Defendants admit that their conduct was against their unilateral self-interest and that, but for RealPage's assurances of collective action, they would not have undertaken it. ¶ 309 (RealPage "pushes you to go places that you wouldn't have gone if you weren't using it."); ¶ 294 (Property Defendants would not have "had the courage to push [prices] as aggressively as [RealPage RMS] has.").

Defendants' behavior is only economically rational if they knew competitors were also setting rental prices using the same algorithm, and thus would not attempt to undercut them. ¶ 31; *In re Polyurethane Foam Antitrust Litig.*, 152 F. Supp. 3d 968, 989 (N.D. Ohio 2015) ("[D]efendants' behavior would not be reasonable or explicable (i.e.[,] not in their legitimate

---

[22] Discussion of Defendants' uniform conduct is *supra* § IV(A)(3)(a).

economic self-interest) if they were not conspiring to fix prices or otherwise restrain trade—that is, that the defendants would not have acted as they did had they not been conspiring in restraint of trade."); *Meyer*, 174 F. Supp. 3d at 824 (where drivers sign up for Uber's app, and thus allow Uber to set prices for their services that result in their foregoing individual business opportunities, "[i]t is consistent with the co-conspirators' collective interest, but against each Defendants' individual interest"); *Tichy v. Hyatt Hotels Corp.*, 376 F. Supp. 3d 821, 836 (N.D. Ill. 2019) ("forego[ing] opportunities to take business away from the other Defendants" is against a firm's unilateral self-interest). As such, Defendants' conduct "tend[s] to exclude the likelihood of independent conduct." *Re/Max Int'l, Inc.*, 173 F.3d at 1009.

Defendants claim that they had other, lawful reasons for acting as they did. MTD 17-18. But Plaintiffs "need not disprove all possible reasons" for Defendants' actions to "plausibly plead the actions constituted actions against their unilateral interest. . . ." *Value Drug Co. v. Takeda Pharms., U.S.A., Inc.*, 2022 WL 952896, at *5 (E.D. Pa. Mar. 30, 2022). *See also Erie Cnty.*, 702 F. 3d at 869; *Watson Carpet*, 648 F.3d at 458. Finally, Property Defendants argue that their shift of pricing strategy away from occupancy, "without more," is independently rational and lawful. MTD at 17. But there *is* more; the AC is replete with statements from RealPage, Defendants, and co-conspirators explaining exactly how RealPage RMS helped them make this shift and maximize revenues, and economic analysis demonstrates a shift around 2016 as RealPage RMS adoption grew. These "further factual allegations to suggest a preceding agreement," which were missing in the authority cited by Defendants, exist here. MTD at 17-18; *In re Dynamic Random Access Memory (DRAM) Indirect Purchaser Antitrust Litig.*, 28 F.4th 42, 50 (9th Cir. 2022).

**Motive to Collude**: "It is an uncontroversial tenet of antitrust law that [t]he clarity and intensity of a motivation may bear on the inferences to be drawn from ambiguous evidence of

coordinated behavior." *Stanislaus Food Prods. Co. v. USS-POSCO Indus.*, 803 F.3d 1084, 1090 n.3 (9th Cir. 2015) (quoting Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law*, ¶ 1412f (4th ed. Supp. 2015)). Here, Defendants admit they had a common motive to collude: to increase revenues beyond what could be achieved in a competitive market. ¶¶ 24, 381-82. Each Defendant knew that if they and their competitors agreed to delegate price and supply decisions to RealPage, and abide by those decisions, they could achieve greater profit than by acting alone. ¶¶ 6-9, 245. *See Interstate Circuit*, 306 U.S. at 222 ("strong motive" to collude when loss of business would be expected without collusion, but "prospect of increased profits" could be achieved by colluding).

Defendants cite *Hyland* for the proposition that profit maximization is not a motive that supports the inference of agreement. MTD 18. *Hyland* was decided at summary judgment, where the Sixth Circuit found that plaintiffs' circumstantial evidence was inadequate to *rule out* the possibility of independent conduct. 771 F.3d at 321. That is not the standard at the pleading stage. *Erie Cnty.*, 702 F. 3d at 869 (at the pleading stage, "plaintiff need not allege a fact pattern that tends to exclude the possibility of lawful, independent conduct"). In any event, the AC alleges more than just an abstract desire for profit—RealPage advertised to Defendants that joining the cartel could increase their revenues by up to 7% over competitive levels. ¶¶ 21, 221, 299, 333, 381. Defendants also cite *Insurance Brokerage* to argue that knowledge of a competitors' use of a product does not infer a horizontal agreement. MTD 18, 21; *Ins. Brokerage*, 618 F.3d at 330–31. But *Insurance Brokerage* did not involve common usage of *a price-setting product*, and lacked the factual background of this case, where use of RealPage RMS allowed Defendants to make pricing and supply decisions that they would not have made independently.

**Opportunities to Collude**: The AC plausibly alleges that Defendants had opportunities to collude via their participation in virtual or face-to-face meetings, online user groups, and through

various trade associations. ¶¶ 382-91. In particular, the AC describes how RealPage hosted "webinars, screen-sharing training modules, frequent calls, in-person 'roundtables,' hosted happy hours, and annual conferences" to explain the many financial benefits of working together instead of as competitors. ¶ 37. RealPage also maintains standing committees of cartel members to advise on pricing strategy. *Id.* RealPage sponsors other industry groups, of which Defendants are members, where it has presented on "rent price optimization" and use of revenue management to set above-market pricing. ¶¶ 387-88. Compare those allegations—where Defendants are alleged to have discussed the benefits of working together, coordinated on pricing strategy, and discussed use of revenue management—with Defendants' cited cases, which consisted only of "conclusory allegations of 'numerous opportunities'" to conspire (*Midwest Auto Auction, Inc. v. McNeal*, 2012 WL 3478647, at *10 (E.D. Mich. Aug. 14, 2012) or "simply alleging an opportunity to conspire" without alleging that "discussions actually took place" (*In re ICE LIBOR Antitrust Litig.*, 2020 WL 1467354, at *6 (S.D.N.Y. Mar. 26, 2020)). Plaintiffs' allegations here support the inference of agreement. *Re/Max*, 173 F.3d at 1009. *See also SD3, LLC* 801 F.3d at 432 ("Allegations of communications and meetings among conspirators can support an inference of agreement . . . .").

**Information Exchange**: Plaintiffs also allege that Defendants had ample opportunity to agree through their exchange of confidential information. *Re/Max*, 173 F.3d at 1009; *Todd*, 275 F.3d at 198 ("[i]nformation exchange . . . support an inference of a price-fixing agreement"). Although Defendants argue that they shared competitively sensitive information through RealPage, and not directly among themselves, MTD 19-20, that is a distinction without a difference in the case law. *Local TV Advert.*, 2020 WL 6557665, at *9 (exchanges of information through "Sales Rep Firms" acting as "conduits" of horizontal competitors supported a *per se* Section 1 claim). RealPage hangs its hat on the argument that data was never shared at the

transaction-level but instead was aggregated. MTD 20-21. But RealPage didn't need to share transaction-level data to allow Defendants to set prices collusively; *it* had the transaction-level data in its RMS, and its software used that data to set collusive prices *on behalf of* the other Defendants—who adopted those collusive prices in high numbers. ¶¶ 13, 15, 230. This key fact distinguishes this case from *In re Local TV Advertising Antitrust Litigation*, where there was no allegation that an intermediary was using competitor data or a common algorithm and formula to determine price recommendations for horizontal competitors; not all co-conspirators even received the intermediaries' recommendations; and there was no allegation that the prices were adopted on more than an infrequent basis. 2022 WL 3716202, at *8 (N.D. Ill. Aug. 29, 2022).

The AC also: (1) details specific mechanisms by which RealPage encourages Defendants to exchange competitively sensitive information (on standard RealPage generated forms) *directly with* one another, without providing the information to RealPage as an intermediate step, and provides witness evidence that Defendants' employees *complied* with these "Protips," ¶¶ 37-41; (2) alleges that RealPage directly discloses confidential data collected from a client's competitors during quarterly one-on-one "Performance to Market," or PTM, meetings; ¶¶ 237, 247-48, and (3) reveals that Defendants know and can choose which competitors' data is used in setting that Defendant's own pricing, ¶ 31. Defendants wave away such information sharing as common practice to check competitors' rates when making pricing decisions. MTD 21-22. Again, the question for the Court is whether Plaintiffs' allegations, coupled with information sharing through RealPage RMS, the other plus factors, and alleged parallel conduct, are together enough to infer agreement. ¶¶ 41, 227. Taken together, these actions plausibly infer an agreement on price.

**Market Structure**: Finally, the structure of the multifamily rental market is such that it cultivates collusive agreements. ¶ 368 (market concentration); ¶¶ 369-71 (barriers to entry);

¶¶ 372-74 (switching costs); ¶¶ 375-76 (inelastic demand); ¶¶ 377-79 (fungibility). That industry structure constitutes a plus factor from which an inference of agreement can be drawn. *In re Publ'n Paper Antitrust Litig.*, 690 F.3d 51, 65 (2d Cir. 2012); *In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 656-57 (7th Cir. 2002).

Defendants challenge those allegations first by erroneously claiming that the allegations are not specific to any submarkets. In each submarket, Plaintiffs detail the highly concentrated nature of RMS adoption, barriers to entry, and opportunities to collude unique to that market. ¶¶ 405-673. Defendants next claim that allegations of market characteristics, "without more," do not allow the inference of agreement. MTD 23. But, again, *there is more*. Plaintiffs' allegations should be viewed in conjunction with the other allegations of plus factors and parallel conduct. *Compare Erie Cnty.*, 702 F.3d at 870 ("Standing alone, [market characteristics] do not give rise to an inference of an unlawful agreement (*though they might, when combined with the other factors, strengthen the plausibility of such an inference*).") *with Jones v. Micron Tech. Inc.*, 400 F. Supp. 3d 897, 917 (N.D. Cal. 2019) (dismissing complaint where plaintiffs relied *exclusively* on market structure allegations "without more").[23] Properly placed in context, Plaintiffs' allegations "strengthen the plausibility" of an inference of unlawful agreement. *Erie Cnty.*, 702 F.3d at 870.

As a last-ditch effort, Defendants disclaim all of Plaintiffs' plus-factor allegations as equally consistent with independent, unilateral behavior. MTD 17. That is the summary judgment standard, not the pleading standard. *Erie Cnty.*, 702 F. 3d at 869; *Watson Carpet*, 648 F.3d at 458.[24]

---

[23] In *White v. R.M. Packer Co.*, found that at summary judgment, Plaintiffs' market structure arguments could not *rule out* the possibility of conscious parallelism. 635 F.3d 571, 582 (1st Cir. 2011). As noted, Plaintiffs need not rule out alternative explanations at the pleading stage.

[24] *See also Se. Milk I*, 555 F. Supp. 2d at 944 (E.D. Tenn. 2008) ("Whether the acts committed by the defendants are simple, benign business decisions made by these individual defendants or whether they represent concerted effort in violation of the Sherman Act are issues of fact which this Court cannot decide on the pleadings and which require discovery prior to resolution.").

The AC details how Defendants' parallel shift to a price-over-occupancy pricing strategy, coupled with the plus factors, weighs strongly against independent conduct. The facts alleged in the AC, taken as true, raise a plausible inference of agreement. That is all that is required at this stage.

### 4. The Complaint Provides Each Defendant Notice of the Claims Against It.

Under Fed. R. Civ. P. 8(a)(2) and *Twombly*, Plaintiffs are obligated to provide each Defendant "fair notice of what the . . . claim is and the grounds upon which it rests." *Twombly*, 550 U.S. at 555. Plaintiffs "need not provide specific facts in support of their allegations" but only "sufficient factual information to provide the grounds on which the claim rests." *In re Pre-Filled Propane Tank Antitrust Litig.*, 860 F.3d 1059, 1070 (8th Cir. 2017). Plaintiffs have done so here. Over a 300+ page Complaint, Plaintiffs detail for each Defendant: (1) the period in which they "entered into a written contract, paid for, and used, at least one RealPage RMS;" (2) the RMS solution they used; (3) the approximate number of properties that they managed using a RealPage RMS; (4) the regional submarkets in which they operate and use RealPage RMS; (5) their horizontal competitors in each submarket; and, (6) for many Defendants, the specific employees that were involved in implementing RealPage RMS. ¶¶ 67-193. Plaintiffs also include public statements from RealPage and multiple Property Defendants confirming the nature and effect of the agreement. It is hard to imagine, without access to a defendant's internal emails or depositions of their witnesses that would occur in discovery, how more could be pled.

Despite the clarity and detail of those allegations, Defendants claim that Plaintiffs have engaged in impermissible group pleading because, for example, they did not name every single individual involved in the cartel, the exact date each Defendant entered the cartel, or spell out every Defendant's name throughout the claim, in lieu of using the term "Defendants." MTD at 9-10. Defendants' argument misunderstands the group pleading doctrine. Group pleading occurs when "allegations are made against families of affiliated entities," such that the complaint does

not include enough factual allegations to connect each defendant to the conspiracy. *Concord Assocs., L.P. v. Entm't Props. Trust*, 2014 WL 1396524, at \*24 (S.D.N.Y. Apr. 9, 2014), *aff'd*, 817 F.3d 46 (2d Cir. 2016). The "argument that Plaintiffs must specifically allege which persons, on behalf of Defendants, consummated the conspiracy and exactly when they did so goes beyond the pleading requirement." *Markson*, 2019 WL 6354400, at \*4.[25] Group pleading does not occur where, as here, a plaintiff makes allegations that a group of entities engaged *in the same conduct*, and refers to the conduct of that group with the term "defendants," rather than spelling out each defendant's name dozens of times in the complaint. *In re Auto. Parts Antitrust Litig.*, 2013 WL 2456586, at \*3 (E.D. Mich. June 6, 2013) ("Dismissal is not required merely because Plaintiffs did not name each Defendant in the allegations pleaded in support of their Sherman Act claim."). *Cf. In re Nat'l Prescription Opiate Litig.*, 2019 WL 3737023, at \*3 (N.D. Ohio June 13, 2019) (where "multiple defendants are alleged to have engaged in the same pattern of conduct," a plaintiff need not "reiterate its allegations against each defendant individually" as doing so "would exponentially increase the length of pleadings while adding no substantive value").

*Total Benefits Planning Agency, Inc. v. Anthem Blue Cross & Blue Shield* demonstrates the difference between impermissible group pleading and Plaintiffs' allegations here. 552 F.3d 430 (6th Cir 2008). In *Total Benefit*s, the plaintiffs' *eleven-page* complaint alleged only that the defendants "had an agreement and common understanding" with respect to commissions paid and prices charged, and the district court found that, beyond those conclusory allegations, there were no other "plausible grounds to infer an agreement." *Total Benefits Planning Agency Inc. v. Anthem*

---

[25] To the extent that Defendants seek to impose a threshold on Plaintiffs to "identify the specific time, place, or person related to each conspiracy allegation," that standard is "incorrect" at the pleading stage. *Starr v. Sony BMG Music Entm't*, 592 F.3d 314, 325 (2d Cir. 2010); *Se. Milk I*, 555 F. Supp. 2d at 943-44 (same); *Packaged Ice*, 723 F. Supp. 2d at 1008 (same).

*Blue Cross & Blue Shield*, 630 F. Supp. 2d 842, 851 (S.D. Ohio 2007), *aff'd,* 552 F.3d 430 (6th Cir. 2008). In contrast, the AC contains *over 300 pages* of detailed allegations, including interviews with Defendant employees and public oral and written admissions by Defendants.[26] It details why any Property Defendant's use of RealPage RMS products to set prices demonstrates a conscious commitment to participate in the cartel. And the AC includes the very thing that *Total Benefits* said was missing—the "complex and historically unprecedented changes in pricing structure" made "for no other discernible reason." *Total Benefits*, 630 F. Supp. 2d at 851.[27]

### 5. Defendants' Factual Disputes Are Inappropriate at the Pleading Stage.

Defendants' remaining arguments amount to improper factual disputes and attempts to "argue that each allegation in isolation is not sufficient to support an antitrust conspiracy claim." *Domestic Airline I*, 221 F. Supp. 3d at 68 (court "is tasked with reviewing the Complaint as a whole when determining whether the allegations are sufficient").

First, Defendants fault Plaintiffs for not alleging a "disciplinary mechanism," MTD 25, but none of their cited cases find that such a mechanism is necessary, particularly at the pleadings stage. *Llacua v. W. Range Ass'n*, 930 F.3d 1161, 1180 & n.30 (10th Cir. 2019) (dismissing claims due to lack of plausible inference of agreement, not because of lack of "enforcement mechanism"); *Kleen Prods. LLC v. Int'l Paper*, 276 F. Supp. 3d 811, 842 (N.D. Ill. 2017), *aff'd,* 910 F.3d 927 (7th Cir. 2018) (at summary judgment, finding a punishment mechanism to constitute a non-

---

[26] This contrasts with *In re Travel Agent Comm'n Antitrust Litig*, upon which Defendants rely, where the plaintiffs did not even purport to tie certain defendants to any common understanding. 2007 WL 3171675, at *3 (N.D. Ohio Oct. 29, 2007), *aff'd,* 583 F.3d 896 (6th Cir. 2009).

[27] A Nevada district court's recent decision to dismiss litigation relating to RMS usage in hotels is similarly inapposite. *Gibson v. MGM Resorts Int'l*, 2023 WL 7025996 (D. Nev. Oct. 24, 2023). The judge there faulted the plaintiffs, who filed a 26-page complaint lacking the detailed statistical and economic analysis present here, for failing to allege that the defendant's algorithm used sensitive information. *Id.* at *4-6. This stands in stark contrast to Plaintiffs' claims here, which center on the sharing of sensitive pricing information, bolstered by economic and statistical analysis and interviews with and quotes from employees of the co-conspirators.

exclusive means of excluding the possibility of independent action). *See also Broiler Chicken*, 290 F. Supp. 3d at 797 (rejecting the argument at the pleading stage that a punishment mechanism is required). In any event, the AC includes detailed allegations about how price discipline was enforced. *Supra* 2-3.[28] While Defendants contest those factual allegations, the Court may not resolve that dispute at the pleading stage. And although Defendants argue that some of them cheated on the cartel in the 10-20% of the time where they rejected prices, member cheating does not preclude the existence of a cartel. Plaintiffs plausibly allege RealPage's enforcement efforts.

Next, Defendants argue that the agreement alleged is implausible, relying on a 1993 district court case from Michigan. MTD 26, 27.[29] There, the court found that plaintiff's alleged agreement made no economic sense because it conferred no economic benefit upon the conspirators. *Lifeline Ltd. No. II v. Conn. Gen. Life Ins. Co.*, 821 F. Supp. 1201, 1205 (E.D. Mich. 1993). In contrast, the AC details Defendants' economic motivation to engage in the cartel—the ability to increase rents more than would have been possible absent collective action. ¶ 309 (RealPage "pushes you to go places that you wouldn't have gone if you weren't using it."); ¶ 294 (Property Defendants lacked "courage to push [rent prices] as aggressively as this [RealPage RMS] program has.").

Defendants also claim that it is not plausible for a conspiracy to take hold where Defendants and their co-conspirators account for less than half of the submarket at issue. MTD 26. As an initial matter, they cite no authority in support, and in their original MTD, they conceded that a cartel could take hold with 30% or more market share, which Plaintiffs alleged here in nearly every

---

[28] *See also* D.C. Complaint ¶ 69 (revealing that if reports of recommended price adoption "indicated poor compliance—for example, failure to impose RealPage-generated rents at least 75% of the time—landlords could be expelled from the cartel").

[29] Defendants admit that their only other case, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986), is both procedurally and substantively dissimilar to this case. MTD 27 n.11.

relevant submarket.[30] More fundamentally, Defendants' argument is belied by the AC's well-pled allegations, which explain how the conspiracy did, in fact, cause a marked shift in pricing strategy across the industry, with parallel price increases for each Defendant in common submarkets. To the extent that Defendants contest those allegations, that cannot be resolved at the pleading stage. Finally, Defendants' argument that there can be no single unlawful conspiracy to fix prices unless every Defendants' geographic competitive footprint overlaps perfectly has no support in case law. *In re Generic Pharms. Pricing Antitrust Litig.*, 394 F. Supp. 3d 509, 526 (E.D. Pa. 2019) (plaintiffs plausibly pled a single, overarching conspiracy even though some drug manufacturer defendants did not compete directly with others, noting that the single-drug conspiracies "were connected by common goals, methods, or actors so as to form a broader overarching conspiracy").

### B. The Complaint States a Claim Under the Quick Look or Rule of Reason.

Even if the Court were to analyze Plaintiffs' claims under the Rule of Reason, Plaintiffs need only plausibly allege that Defendants possessed sufficient market power such that their restraint would be expected to harm competition. They can satisfy that burden by providing direct allegations of market power through "actual detrimental effects," such as increased prices or reduced output, or by providing indirect allegations of market power through the demonstration of sufficiently high shares in a properly defined antitrust market. *FTC. v. Ind. Fed'n of Dentists*, 476 U.S. 447, 460-61 (1986); *Realcomp II, Ltd. v. FTC*, 635 F.3d 815, 827 (6th Cir. 2011); *Lie v. St. Joseph Hosp.*, 964 F.2d 567, 569-70 (6th Cir. 1992). Plaintiffs offer both.

### 1. Plaintiffs Allege Direct Evidence of Market Power.

Plaintiffs allege that the challenged agreement had multiple anticompetitive effects, which

---

[30] Defendants point out that RealPage RMS is used on approximately 20% of units nationwide. MTD 26. Those numbers are far higher in metropolitan areas, as detailed in Plaintiffs' MSA allegations, and range up to 81% in some submarkets. ¶ 418. This is consistent with a conspiracy focused on metropolitan areas, leaving rural parts of the country with far lower RMS usage.

provide direct evidence of market power. *Ind. Fed'n of Dentists*, 476 U.S. at 460. To start, Plaintiffs allege an increase in rental prices. In 45 submarkets, Plaintiffs allege that prices increased up to 76% over the relevant period. ¶¶ 410-680. Plaintiffs used Defendant-specific pricing data to plot rent increases across all Defendants in several illustrative MSAs over the relevant period. Fig. 1, 2, 11-19. Plaintiffs also allege (using RealPage's own words) that the cartel increased Defendants' revenues by up to 7%. ¶ 333. Further, Plaintiffs allege that normal supply and demand drivers cannot explain these price increases. ¶ 352. Plaintiffs conducted preliminary regression analyses in four submarkets; all four regressions found a negative relationship between rent and vacancy rates before the conspiracy, meaning that prices increased when supply decreased, as expected in a competitive market, but that those relationships evaporated during the conspiracy period. ¶¶ 352-56, 358, 361, 362, 364. Plaintiffs allege specific instances in which Defendants increased rental prices at the behest of RealPage RMS. ¶¶ 23, 294, 298 (Defendant Lincoln's internal study showed that properties priced through RealPage RMS "showed a 4.3% lift").[31]

Defendants misstate the law when they claim Plaintiffs must prove, at the pleading stage, that the agreement has caused prices to rise to a supracompetitive level. MTD 33. Defendants' citation to *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209 (1993), a Robinson-Patman Act discriminatory pricing case decided after trial, is misplaced. *Brooke Grp.* noted only that "a jury may not infer competitive injury from price and output data absent some evidence that tends to prove that output was restricted or prices were above a competitive level." *Id.* at 237. Plaintiffs do not dispute that, at trial, they will have to demonstrate that Defendants'

---

[31] Plaintiffs also allege the other textbook anticompetitive effect: reduced output. ¶ 31; Figs. 3, 4, 29, 30, 32, 34; ¶ 333 (RealPage's CEO stating that its RMS caused one of its large clients to decrease its targeted occupancy rates from at least 97% down to 95%).

price increases were supracompetitive. But that is not the standard at the pleading stage, without the benefit of discovery and expert testimony. *Thompson v. 1-800 Contacts, Inc.*, 2018 WL 2271024, at *4 (D. Utah May 17, 2018) (rejecting argument that, at the pleading stage, plaintiffs were required to compare defendant and non-defendant pricing to demonstrate anticompetitive effects: "Defendants ask Plaintiffs to provide an economic analysis that requires specific data and expert testimony. That is too much to expect of Plaintiffs at this stage.").

Failing to defeat Plaintiffs' plausible allegations of higher prices, Defendants focus most of their argument on market definition and power. But an inquiry into market power is a "surrogate for detrimental effects." *Realcomp II*, 635 F.3d at 827 (quoting *Ind. Fed'n of Dentists*, 476 U.S. at 461). The only purpose of that inquiry "is to determine whether an arrangement has the potential for genuine adverse effects on competition." *Ind. Fed'n of Dentists*, 476 U.S. at 460-61 (quotation omitted). However, "[i]f adverse effects are clear, inquiry into market power is unnecessary." *Realcomp II*, 635 F.3d at 827. Where, as here, horizontal price competition has been restrained, direct evidence of market power (increased prices and lower supply) not only satisfies Plaintiffs' burden under the Rule of Reason, but it is *preferable* to indirect forms of proof that are only a "surrogate" for the direct evidence Plaintiffs allege. *Ind. Fed'n of Dentists*, 476 U.S. at 460-61.

### 2. Plaintiffs Define Relevant Antitrust Markets and Submarkets.

In any event, Plaintiffs have alleged relevant markets. The Sixth Circuit recognizes the so-called "SSNIP test" used by federal regulators as an analytical framework for courts analyzing antitrust violations. *In re Se. Milk Antitrust Litig.*, 739 F.3d 262, 277-78 (6th Cir. 2014) ("*Se. Milk II*"). That test asks whether a hypothetical monopolist could impose a SSNIP, a small but significant—typically 5%—non-transitory increase in price. If the SSNIP is profitable, the market is properly defined.

Here, the relevant product market is multifamily residential real estate leases, and the

relevant geographic market is the United States. ¶ 394.[32] Plaintiffs also allege that at least fifty-four MSAs are regional submarkets. ¶¶ 61-193, 405-678. A geographic market is "the region in which the seller operates, and to which the purchaser can practicably turn for supplies." *Se. Milk II*, 739 F.3d at 277. The Complaint explains how the SSNIP test is satisfied: pursuant to the Property Defendants' "agreement not to compete on price, Defendants are able to increase rents 'year over year, between 5% and 12% in every market,' yet those increases have not driven enough renters out of the market such that the SSNIP has become unprofitable to Defendants." ¶ 399.

Defendants argue against MSAs as submarkets. MTD 30-32. Defendants dispute whether a renter in the New York, NY submarket would consider, for example, Jersey City, NJ as an adequate substitute. Defendants' argument not only contradicts the AC's allegations (based on the U.S. government's determination) that MSAs are defined by social and economic integration and commuting ties, which are highly relevant to one's decision where to live (¶ 407)—but also highlights that defining a market is a deeply fact-intensive inquiry, which is why courts are hesitant to dismiss for failure to plead a relevant market until a factual inquiry into the commercial realities facing consumers is undertaken. *Se. Milk II*, 739 F.3d at 277; *Jones v. Varsity Brands, LLC*, 618 F. Supp. 3d 725, 749 (W.D. Tenn. 2022). Further, the relevant question is whether a hypothetical monopolist of a given MSA could profitably sustain a SSNIP. The AC alleges it could, based on

---

[32] Defendants claim that Plaintiffs' national market allegations contradict their submarket allegations. MTD 30 n.14. If Defendants were correct, no plaintiff could ever allege a submarket, which cannot be squared with the Supreme Court's acknowledgement that while there may be broad "outer boundaries" of a market, "within [that] broad market, well-defined submarkets may exist.'" *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962). Recognizing that "practical indicia" of submarkets exist, *id.*, does not negate that an outer boundary also exists. Defendants' only cited case does not hold otherwise. *Semertzides v. Bethesda N. Hosp.*, 2014 WL 2573073, at *4 (S.D. Ohio June 9, 2014) (plaintiff pled multiple definitions for a *single* geographic market, identifying the "Tri-State area" but also "Ohio, Kentucky, Indiana and beyond" as sole relevant market).

U.S. government data. ¶ 402; Fig. 35 (on average, 2% of renters change MSAs under a SSNIP). And contrary to Defendants' argument, courts recognize MSAs as plausible geographic markets.[33]

Defendants also contend the markets are too big. But an overly *broad* market definition is not deficient and does not warrant dismissal of pleadings. *Jien v. Perdue Farms, Inc.*, 2022 WL 2818950, at *10 (D. Md. July 19, 2022); *PharmacyChecker.com, LLC v. Nat'l Ass'n of Bds. of Pharmacy*, 530 F. Supp. 3d 301, 348 (S.D.N.Y. 2021). While an overly *narrow* market "could create the illusion of market power where no market power exists, via the exclusion of [competitors]" and is thus deficient, *Jien*, 2022 WL 2818950, at *10, the type of overbroad market Defendants claim Plaintiffs allege cannot create that illusion. *Id.* If Defendants have power to reduce competition in a larger market, they *ipso facto* can reduce it in a smaller, narrower market. None of the cases Defendants rely on hold otherwise. MTD 30-32.[34]

### 3. Plaintiffs Allege the Defendants Had Market Power.

Though Plaintiffs' direct allegations of anticompetitive effects "obviate the need to prove the defendant's market power," *Lie*, 964 F.2d at 570, Plaintiffs nonetheless allege that Property

---

[33] *United States v. Blue Cross Blue Shield of Mich.*, 809 F. Supp. 2d 665, 673 (E.D. Mich. 2011); *In re Blue Cross Blue Shield Antitrust Litig.*, 2017 WL 2797267, at *11 (N.D. Ala. June 28, 2017). Defendants' cited authority, both decided after discovery and trial, are inapposite. *United States v. Conn. Nat'l Bank*, 418 U.S. 656, 6658, 670 (1974) (following appeal from "lengthy trial" and "extensive findings and conclusions", noting that MSAs are designed "principally on the basis of the commuting patterns of residents" and "not defined in terms of banking criteria, and they were not developed as a tool for analyzing banking markets); *White & White, Inc. v. Am. Hosp. Supply Corp.*, 723 F.2d 495, 498, 504 (6th Cir. 1983) (after "voluminous" evidentiary record and 80-day trial, evidence of actual sales outside of the MSA rendered market definition inappropriate).

[34] *Mich. Div.-Monument Builders of N. Am. v. Mich. Cemetery Ass'n*, 524 F.3d 726, 734-36 (6th Cir. 2008) (rejecting proposed geographic market as too narrow for including only a single provider of burial plots); *Nat'l Hockey League Players Ass'n v. Plymouth Whalers Hockey Club*, 419 F.3d 462, 472-73 (6th Cir. 2005) (rejecting product market as too narrow for failing to address reasonable substitutes); *New Orleans Ass'n of Cemetery Tour Guides & Cos. v. New Orleans Archdiocesan Cemeteries*, 56 F.4th 1026, 1039 (5th Cir. 2023) (same); *Par v. Wolfe Clinic, P.C.*, 70 F.4th 441, 448 (8th Cir. 2023) (rejecting geographic market as too narrow for failing to consider reasonable alternative); *Cupp v. Alberto-Culver USA, Inc.*, 310 F. Supp. 2d 963, 970 (W.D. Tenn. 2004) (granting dismissal where "Plaintiff neglects entirely to define a geographic market").

Defendants possess power in the relevant market. First, the AC alleges how a SSNIP test demonstrates market power even without looking at market shares. ¶¶ 402-03 (showing that most renters do not move for small but significant changes in housing price). Second, total market shares of the overall "combination" can provide circumstantial evidence of market power. *Wilk v. Am. Med. Ass'n*, 895 F.2d 352, 360 (7th Cir. 1990); *accord Rebel Oil Co., Inc. v. Atl. Richfield Co.*, 51 F.3d 1421, 1438 (9th Cir. 1995) ("The aggregation of market shares of several rivals is justified if the rivals are alleged to have conspired to monopolize.").[35] Collective market shares of at least 30%, coupled with barriers to entry, establish market power. *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 30 (1984).

Here, with respect to almost every MSA, Plaintiffs allege that Property Defendants using RealPage RMS constitute more than 30% of each regional submarket, along with high barriers to entry (¶¶ 369-70) and high switching costs (¶¶ 372-74), which, together, support an inference that RealPage's unlawful scheme wields market power in each relevant submarket. These market power allegations are bolstered by pricing data showing Defendants' ability to consistently raise prices, even during low occupancy periods and in the face of economic downturns. ¶ 349.

Defendants make two arguments. First, they argue that any submarket in which Plaintiffs have not alleged a 30% or greater market share must be dismissed. MTD 35. Courts have found

---

[35] Defendants' citations contending that shares cannot be aggregated are distinguishable because they do not involve allegations of conspiracy, unlike the Complaint. *Dickson v. Microsoft Corp.*, 309 F.3d 193, 210 (4th Cir. 2002) (as complaint "did not allege a conspiracy among Microsoft and all OEMs," shares could not be aggregated); *In re Amazon.com, Inc. eBook Antitrust Litig.*, 2023 WL 6006525, at *25 (S.D.N.Y. July 31, 2023) (rejecting aggregation "absent evidence of conspiracy"); *Maris Distrib. Co. v. Anheuser-Busch, Inc.*, 302 F.3d 1207, 1218 (11th Cir. 2002) (rejecting aggregation in pure vertical conduct case, with no allegations of conspiracy).

lower market shares to plausibly infer market power. *E.g. Valley Liquors, Inc. v. Renfield Importers*, *Ltd.*, 822 F.2d 656, 667 (7th Cir. 1987) (market share between 17% and 25% legally sufficient to establish market power). Further, Plaintiffs have independently alleged market power in each MSA through a SSNIP (¶ 399), and the AC explains how traditional market share measures are inapt for this industry, where Defendants can have greater market power at lower market shares. ¶ 400. Finally, Plaintiffs' ability to purchase data concerning RMS adoption has been hamstrung by a third-party's concern over retaliation from Defendants. ¶ 194. Plaintiffs, and the putative class, should not be punished for that. Second, Defendants claim that their interpretation of RealPage's share of the RMS market should be accepted over Plaintiffs' plausible interpretation. MTD 36. Plaintiffs allege that after acquiring LRO, RealPage had a 2/3 share of the RMS market. ¶ 218. This is consistent with the U.S. Senate's statement that, upon acquiring LRO, RealPage became "the nation's most dominant provider of rent-setting software." *Id.* [36]

### C. Plaintiffs Have Antitrust Standing to Bring Their Claims.

Plaintiffs allege that each of them leased directly from one of the Property Defendants and "paid higher rental prices by reason of" Defendants' anticompetitive scheme. ¶¶ 50-60. Therefore, each named Plaintiffs paid "prices that no longer reflect[ed] ordinary market conditions" sufficient to establish both Article III and antitrust standing. *Gelboim*, 823 F.3d at 772.

The Court should reject Defendants' well-worn argument that Plaintiffs cannot connect their harm to Defendants' conduct, which "ultimately amounts to a demand for specifics that are

---

[36] Defendants argue for a different inference to be drawn in their favor. MTD 36. But the quote at issue—that YieldStar, LRO, and another competitor are the main players in RMS, and the rest of the market uses its own software to set pricing—supports Plaintiffs' plausible inference that two-thirds of all RMS usage can be attributed to RealPage. *Strougo v. Tivity Health*, 551 F. Supp. 3d 839, 845 (M.D. Tenn. 2021) ("[T]he Court must accept the complaint's factual allegations as true, draw all reasonable inferences in the plaintiff's favor, and 'take all of those facts and inferences and determine whether they plausibly give to an entitlement to relief.'") (quoting *Doe v. Baum*, 903 F3d 575, 581 (6th Cir. 2018)).

not required, and that Plaintiffs could not be reasonably expected to know, at the pleading stage."

*In re Foreign Exch. Benchmark Rates Antitrust Litig.*, 74 F. Supp. 3d 581, 595 (S.D.N.Y. 2015). "Generally, when consumers, because of a conspiracy, must pay prices that no longer reflect ordinary market conditions, they suffer 'injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful.'" *Gelboim*, 823 F.3d at 772 (quoting *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.*, 429 U.S. 477, 489 (1977)).[37] Further, the Court should reject Defendants' assumption that the prices they set during the 10-20% of the time they overrode RealPage pricing reflected competitive conditions such that renters in those units suffered no harm. It is plausible that even the overridden prices Defendants charged were inflated above competitive levels as a result of the cartel's market-wide distortion of prices.

### D. Plaintiffs Have Adequately Alleged State Law Claims.

Defendants' arguments to dismiss Plaintiffs' state antitrust claims fail for largely the same reasons that their arguments to dismiss Plaintiffs' Sherman Act claims are unsuccessful. Additional, state-specific arguments raised by Defendants are similarly incorrect or misguided.

First, contrary to Defendants' assertion, the laws of Pennsylvania and Georgia permit antitrust claims pursuant to either a private right of action or a common law tort action, respectively. *See* 73 Pa. Stat. § 201-9.2; *U.S. Anchor Mfg., Inc. v. Rule Indus.*, 7 F.3d 986, 1002 (11th Cir. 1993). Defendants' cited cases are inapposite. MTD at 39 & n.20.[38]

---

[37] *In re Commodity Exch., Inc.*, 213 F. Supp. 3d 631, 653 (S.D.N.Y. 2016) (finding sufficient injury-in-fact where "Defendants artificially depressed the price of gold for some period of time around the PM Fixing in order to profit from gold and gold futures trading at prices that were advantageous to them vis à vis Plaintiffs and other less-informed market participants"); *Local TV Advert.*, 2020 WL 6557665, at *6 (rejecting argument that plaintiffs must plead that they suffered harm from specific exchanges of information tied to specific transactions).

[38] *In re K-Dur Antitrust Litig.*, 2008 WL 2660780 (D.N.J. Feb. 28, 2008) misstates Pennsylvania law. *See In re Smith*, 866 F.2d 576, 583 (3d Cir. 1989) (Section 9.2 provides "a private remedy for all violations . . . which might otherwise escape remedy because they [are not] subject to

Second, while Tennessee law distinguishes between "tangible goods" and "intangible services," *Bennett v. Visa U.S.A. Inc.*, 198 S.W.3d 747, 752 (Tenn. Ct. App. 2006); *Baird Tree Co. v. City of Oak Ridge*, 2008 WL 2510581, at *7 (Tenn. Ct. App. June 24, 2008), it is far from clear that the provision of apartments to lessees constitutes a "service," rather than a "good." *Cf. In re Dealer Mgmt. Sys. Antitrust Litig.*, 362 F. Supp. 3d 510, 551 (N.D. Ill. 2019) (allowing claims under Tennessee Trade Practices Act to proceed over challenge that software is "intangible" and so not a "good" under the Act). Despite Defendants' desire that it do so, *Trails End Campground, LLC v. Brimstone Recreation, LLC*, does not provide clarity, as the market there consisted of the use of "off-road trails networks in and near the Town of Huntsville," not residential leases. 2015 WL 388313, at *1 (Tenn. Ct. App. Jan. 29, 2015). Similarly, in addressing South Carolina's statute, Defendants neglect S.C. Code § 39-3-10 (the section setting forth Plaintiffs' cause of action), fail to cite to any caselaw, and ignore South Carolina's "policy that state antitrust laws be interpreted consistently with federal antitrust precedent." *In re Wiring Device Antitrust Litig.*, 498 F. Supp. 79, 87 (E.D.N.Y. 1980). Likewise, Defendants ignore Ind. Code § 24-1-2-1, which states that "[e]very scheme, contract, or combination in restraint of trade or commerce, or to create or carry out restrictions in trade or commerce" is illegal. *Id.*[39]

Third, Defendants are also incorrect that any claims are subject to dismissal based on statutes of limitations. MTD 39. It is well established that the statute of limitations is an affirmative

---

enforcement by the Attorney General[.]"). *Palmer v. Atl. Ice & Coal Co.*, 173 S.E. 424 (Ga. 1934), is based on lack of standing, not unavailability of a common law antitrust claim. *See Diverse Power, Inc. v. City of LaGrange*, 2018 WL 9651475, at *7 (N.D. Ga. Feb. 21, 2018), *aff'd*, 934 F.3d 1270 (11th Cir. 2019) (holding that plaintiff sufficiently alleged a Georgia antitrust claim).

[39] Defendants are wrong that Plaintiffs have failed to comply with Section 9 of Mass. Gen. Laws ch. 93A, requiring the service of a demand letter on defendants; Plaintiffs "are not required to comply with this provision because they are bringing their claims pursuant to Sections 2 and 11 of the statute, not [S]ection 9." *Cast Iron*, 2015 WL 5166014, at *34 (citing *Landworks Creations, LLC v. U.S. Fid. & Guar. Co.*, 2008 WL 660341, at *7 (D. Mass. Feb. 6, 2008)).

defense, *Snyder-Hill v. Ohio State Univ.*, 48 F.4th 686, 698 (6th Cir. 2022), and therefore a Rule 12(b)(6) motion "is generally an inappropriate vehicle for dismissing a claim based upon the statute of limitations," *Cataldo v. U.S. Steel Corp.*, 676 F.3d 542, 547 (6th Cir. 2012).

Finally, Defendants' argument that Plaintiffs' claims arising under the laws of states in which they do not reside must be dismissed for lack of standing does not square with this Court's recent decision in *Hosp. Auth. of Metro. Gov't of Nashville and Davidson Cnty., Tenn. v. Momenta Pharmaceuticals, Inc.* 333 F.R.D. 390 (M.D. Tenn. 2019) (Crenshaw, J.). There, this Court considered and rejected Defendants' position, recognizing that while "[t]hreshold individual standing is a prerequisite for all actions, including class actions . . . 'once an individual has alleged a distinct and palpable injury to himself he has standing to challenge a practice even if the injury is of a sort shared by a large class of possible litigants.'" *Id.* (quoting *Fallick v. Nationwide Mut. Ins. Co.*, 162 F.3d 410, 423 (6th Cir. 1998)). After such injury is established, "whether a plaintiff will be able to represent the putative class, including absent class members, depends solely on whether he is able to meet" Fed. R. Civ. P. 23's additional criteria. *Id.* at 413. In light of that principle, this Court determined that the plaintiffs had standing to bring claims not only under the antitrust law of the states in which they lived, but also "under the various states' [antitrust] statutes on behalf of absent class members," reasoning that the statutes at issue were materially identical such that success "under one state's law will more or less dictate success under another state's law." *Id.* at 414. This Court should adopt its own sound reasoning in *Momenta*.[40]

## V.    CONCLUSION

Plaintiffs respectfully request that the Court deny Defendants' MTD.

_____

[40] Defendants' reliance on *Fox v. Saginaw Cnty., Michigan*, 67 F.4th 284 (6th Cir. 2023), is misplaced. That case involved an attempt by a plaintiff to name *defendants* who had not harmed her personally and were not jointly and severally liable. *Id.* at 293-94.

Dated: November 8, 2023

/s/ Tricia R. Herzfeld
Tricia R. Herzfeld (#26014)
Anthony A. Orlandi (#33988)
**HERZFELD SUETHOLZ GASTEL LENISKI
AND WALL, PLLC**
223 Rosa L. Parks Avenue, Suite 300
Nashville, TN 37203
Telephone: (615) 800-6225
tricia@hsglawgroup.com
tony@hsglawgroup.com

*Liaison Counsel*

Patrick J. Coughlin
Carmen A. Medici
Fatima Brizuela
**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
600 West Broadway, Suite 3300
San Diego, CA 92101
Telephone: (619) 798-5325
Facsimile: (619) 233-0508
pcoughlin@scott-scott.com
cmedici@scott-scott.com
fbrizuela@scott-scott.com

Patrick McGahan
Amanda F. Lawrence
Michael Srodoski
G. Dustin Foster
Isabella De Lisi
**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
156 South Main Street
P.O. Box 192
Colchester, CT 06145
Telephone: (860) 537-5537
Facsimile: (860) 537-4432
pmcgahan@scott-scott.com
alawrence@scott-scott.com
msrodoski@scott-scott.com
gfoster@scott-scott.com
idelisi@scott-scott.com

Stacey Slaughter
Thomas J. Undlin
Geoffrey H. Kozen
Stephanie A. Chen

J. Austin Hurt
**ROBINS KAPLAN LLP**
800 LaSalle Avenue, Suite 2800
Minneapolis, MN 55402
Telephone: (612) 349-8500
Facsimile: (612) 339-4181
sslaughter@robinskaplan.com
tundlin@robinskaplan.com
gkozen@robinskaplan.com
schen@robinskaplan.com
ahurt@robinskaplan.com

Swathi Bojedla
Mandy Boltax
**HAUSFELD LLP**
888 16th Street, N.W., Suite 300
Washington, DC 20006
Telephone: (202) 540-7200
sbojedla@hausfeld.com
mboltax@hausfeld.com

Gary I. Smith, Jr.
**HAUSFELD LLP**
600 Montgomery Street, Suite 3200
San Francisco, CA 94111
Tel: (415) 633-1908
gsmith@hausfeld.com

Katie R. Beran
**HAUSFELD LLP**
325 Chestnut Street, Suite 900
Philadelphia, PA 19106
Telephone: 1 215 985 3270
kberan@hausfeld.com

*Interim Co-Lead Counsel*

Eric L. Cramer
Michaela L. Wallin
**BERGER MONTAGUE PC**
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Telephone: (215) 875-3000
ecramer@bm.net
mwallin@bm.net

Daniel J. Walker
**BERGER MONTAGUE PC**
2001 Pennsylvania Avenue, NW, Suite
300
Washington, DC 20006
Telephone: (202) 559-9745
dwalker@bm.net

Brendan P. Glackin
Dean M. Harvey
**LIEFF CABRASER HEIMANN &**
**BERNSTEIN, LLP**
275 Battery Street, Suite 2900
San Francisco, CA 94111
Telephone: 415-956-1000
bglackin@lchb.com
dharvey@lchb.com

Mark P. Chalos
Hannah R. Lazarz
Kenneth S. Byrd
**LIEFF CABRASER HEIMANN &**
**BERNSTEIN, LLP**
222 2nd Avenue South, Ste. 1640
Nashville, TN 37201
(615) 313-9000
mchalos@lchb.com
hlazarz@lchb.com
kbyrd@lchb.com

Steve W. Berman
Breanna Van Engelen
**HAGENS BERMAN SOBOL**
**SHAPIRO LLP**
1301 Second Avenue, Suite 2000
Seattle, Washington 98101
Telephone: (206) 623-7292

Christian P. Levis
Vincent Briganti
Peter Demato
Radhika Gupta
**LOWEY DANNENBERG, P.C.**
44 South Broadway, Suite 1100
White Plains, NY 10601
Telephone: (914) 997-0500
Facsimile: (914) 997-0035
vbriganti@lowey.com
clevis@lowey.com
pdemato@lowey.com
rgupta@lowey.com

Christopher M. Burke
Walter W. Noss
Yifan (Kate) Lv
**KOREIN TILLERY P.C.**
707 Broadway, Suite 1410
San Diego, CA 92101
Telephone: (619) 625-5621
Facsimile (314) 241-3525
cburke@koreintillery.com
wnoss@koreintillery.com
klv@koreintillery.com

Joseph R. Saveri
Steven N. Williams
Cadio Zirpoli
Kevin E. Rayhill
**JOSEPH SAVERI LAW FIRM, LLP**
601 California Street, Suite 1000
San Francisco, CA 94108
Telephone: (415) 500-6800
jsaveri@saverilawfirm.com
swilliams@saverilawfirm.com
czirpoli@saverilawfirm.com
krayhill@saverilawfirm.com

Jennifer W. Sprengel
Daniel O. Herrera
Alexander Sweatman
**CAFFERTY CLOBES MERIWETHER &**
**SPRENGEL LLP**
135 S. LaSalle, Suite 3210
Chicago, IL 60603

Facsimile: (206) 623-0594
steve@hbsslaw.com
breannav@hbsslaw.com

Benjamin J. Widlanski
Javier A. Lopez
**KOZYAK TROPIN &
THROCKMORTON LLP**
2525 Ponce de Leon Blvd., 9th Floor
Coral Gables, Florida 33134
Telephone: (305) 372-1800
bwidlanski@kttlaw.com
jal@kttlaw.com

Telephone: 312-782-4880
Facsimile: 312-782-4485
jsprengel@caffertyclobes.com
dherrera@caffertyclobes.com
asweatman@caffertyclobes.com

*Plaintiffs' Steering Committee Counsel for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that on November 8, 2023, I caused the foregoing to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the email addresses denoted on the Electronic Mail Notice List.

/s/ Tricia R. Herzfeld
Tricia R. Herzfeld