# IN THE UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF TENNESSEE
# NASHVILLE DIVISION

| | |
|---|---|
| IN RE: REALPAGE, INC., RENTAL SOFTWARE ANTITRUST LITIGATION (NO. II) | Case No. 3:23-md-3071<br>MDL No. 3071<br><br>This Document Relates to:<br>3:23-cv-00742<br>3:23-cv-00979 |

**REPLY IN SUPPORT OF DEFENDANT APARTMENT INCOME REIT CORP.'S ("AIR") MOTION TO DISMISS**

# INTRODUCTION

Plaintiffs' opposition[1] confirms they have not adequately pled an antitrust conspiracy claim against AIR. Stripped of their core factual allegation against Property Defendants[2]—which they have withdrawn against AIR—Plaintiffs are left to rely on sweeping, unsupported inferences based solely on AIR's prior limited use of a RealPage Revenue Management System ("RMS"), without agreeing to any reciprocal exchange of confidential data. That means AIR is alleged to have done even less than the hundreds of other RealPage customers that are not alleged to have joined the conspiracy. Such allegations of AIR's <u>limited use</u> of RealPage's RMS cannot support the conspiracy alleged in Plaintiffs' Second Amended Complaint ("SAC") (ECF 530).

Plaintiffs allege a "common scheme" built on a reciprocal arrangement in which "all members" of the alleged conspiracy agreed to provide RealPage their confidential price information for the benefit of their competitors in exchange for access to RealPage's price recommendations (which they supposedly agreed to implement). (*E.g.*, SAC ¶¶ 5−6.) Plaintiffs claim that accepting this purported quid pro quo—i.e., "<u>agreeing to regularly share confidential, competitively sensitive pricing and lease information with horizontal competitors in order to allow them to adjust prices</u>"—is how each Property Defendant "agreed to join a cartel with those horizontal conspirators." (*See id.* ¶¶ 68−193 (emphasis added).)

Each Property Defendant except AIR, that is. Plaintiffs' opposition confirms their agreement to withdraw, as to AIR, the key allegation regarding the purported quid pro quo at the heart of their alleged conspiracy (as shown below and in Plaintiffs' counsel's declaration):

> During the Conspiracy Period, Defendant AIR entered a written contract, paid for, and used at least one RealPage RMS—YieldStar—to manage some or all of its more than 25,000 multifamily rental units nationwide, ~~knowing that doing so~~

---

[1] *See* Pls.' Mem. of Law in Opp'n to Def. AIR's Mot. to Dismiss ("Pls.' Opp."), ECF 619.
[2] "Property Defendants" includes the Owner, Owner-Operator, and Managing Defendants.

> ~~required it to share confidential, competitively sensitive pricing and lease information with its horizontal competitors in order to allow them to adjust their rental prices, and in turn,~~ to allow AIR to benefit from its horizontal competitors' sensitive pricing and lease information before it set or adjusted its own rental prices. ~~By agreeing to regularly share confidential, competitively sensitive pricing and lease information with horizontal competitors in order to allow them to adjust prices,~~ AIR agreed to join a cartel with those horizontal competitors. . . .

(Decl. of Swathi Bojedla ¶ 7, ECF 620.[3]) Plaintiffs' withdrawal of this core allegation confirms their inability to state a plausible conspiracy claim against AIR given the remaining allegations in the SAC.[4] Indeed, as to AIR, Plaintiffs allege little more than AIR's limited use of RealPage's RMS. Even if the SAC raised a plausible inference of a conspiracy as to the Property Defendants (it does not, for the reasons stated in Defendants' joint motion to dismiss and reply), Plaintiffs' failure to allege any facts indicating AIR did anything more than other RealPage customers that are not named as Defendants—and Plaintiffs' reliance on conclusory assertions regarding all RealPage customers instead—are fatal to their claim against AIR.

## ARGUMENT

### I. Plaintiffs Do Not Plausibly Allege that AIR Agreed to Join the Alleged Conspiracy, Which Is Predicated on Reciprocal Sharing of Confidential Information

To state a Section 1 claim against AIR based on its use of RealPage's RMS, Plaintiffs must plead enough <u>facts</u> to support a plausible inference that <u>AIR's alleged conduct</u>—contracting with RealPage to use its RMS—was the result of an illegal agreement among Defendants to fix rent prices, not the result of AIR's independent decision-making. (AIR Mem. 5−7, ECF 569.) In

---

[3] Plaintiffs' counsel's declaration is the first time that Plaintiffs have specifically identified which allegations they are withdrawing. Plaintiffs' failure to formally amend the SAC to include only those allegations that they have a good faith basis to assert against AIR—particularly when, as here Plaintiffs purport to partially withdraw a portion of two allegations in a way that changes their meaning—is procedurally improper and further supports dismissal of their claims.

[4] Plaintiffs mischaracterize the parties' conferral regarding Plaintiffs' withdrawal of allegations against AIR, including by presenting an incomplete excerpt of the email chain between counsel. A complete version of that email chain is attached. (Decl. of Judith Youngman ¶¶ 3-4 & Ex. 1.) Regardless, however, the actual withdrawn allegations speak for themselves.

Section 1 cases, plausibility is "evaluated with reference to well-settled antitrust jurisprudence that limits the range of permissible inferences from ambiguous evidence," such as alleged conduct that is just as consistent with an illegal agreement as it is with rational, independent conduct. *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 361 (3d Cir. 2010) (internal quotation marks omitted); *accord In re Travel Agent Comm'n Antitrust Litig.*, 583 F.3d 896, 902−04 (6th Cir. 2009). "If, in the circumstances alleged," the defendant's alleged conduct "'could just as well be independent action,' then the complaint has failed to plead a § 1 claim" against that defendant. *Ins. Brokerage*, 618 F.3d at 362 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007))).

Here, Plaintiffs attempt to raise an inference of concerted action among Defendants by alleging that use of RealPage's RMS was "conditioned on" a purported quid pro quo: "to access this price-setting tool," every member of the alleged conspiracy agreed to "contribut[e] non-public, competitively sensitive data to RealPage's data pool" and to price their units "according to RealPage's RMS." (SAC ¶ 5; *see also id.* ¶ 6 (alleging that "[b]y using RealPage's RMS, each [Defendant] agreed to the overarching principles of the cartel[,]" including that "all members, who were otherwise horizontal competitors, would share the proprietary data necessary for RealPage's RMS to generate rental price recommendations" for those competitors).)

The SAC is replete with allegations depicting this purported quid pro quo—the <u>reciprocal sharing of confidential information</u>—as the fundamental core of the alleged conspiracy.[5] Most telling is Plaintiffs' uniform (albeit conclusory) allegation that each Property Defendant—except AIR—joined the conspiracy, specifically, "<u>[b]y agreeing to regularly share confidential, competitively sensitive pricing and lease information with horizontal competitors in order to</u>

---

[5] Notably, the SAC's allegations that Defendants agreed to a reciprocal exchange of confidential data are not factually supported or well-pled, as set forth in the joint motion to dismiss and reply.

allow them to adjust prices" using that information. (*See id.* ¶¶ 68−193 (emphasis added); Bojedla Decl. ¶ 7.) Plaintiffs also claim the alleged conspiracy to fix prices "was supported by a reciprocal exchange of competitively sensitive information through Defendant RealPage . . . ." (SAC ¶ 392 (emphasis added).) And, according to Plaintiffs, the alleged mutual sharing of confidential information bolsters their claim of concerted (rather than unilateral) conduct because such conduct would be against each Property Defendant's self-interest in the absence of the alleged conspiracy. (SAC ¶¶ 291, 380 (emphasis added).)

Plaintiffs' oppositions to Defendants' other motions to dismiss double down on this characterization. They identify the "essence of the conspiracy" as Defendants' alleged agreement to provide RealPage confidential, propriety data "in exchange for its RMS pricing determinations" and to "abide by those [pricing] decisions, knowing that their competitors were doing the same." (Pls.' Opp. to Mot. to Dismiss LRO Claims 1-2, ECF 621.) Plaintiffs, in fact, argue that each Property Defendant demonstrated its "conscious commitment to join the horizontal price-fixing scheme" by accepting a proposed quid pro quo premised on sharing confidential information that would allow all Defendants to set supracompetitive prices:

> RealPage publicly offered Property Defendants an invitation: if Property Defendants shared their non-public and competitively sensitive data with RealPage and adhered to its pricing decisions, RealPage RMS would allow them to raise rents up to 7% above market levels. The fact that Property Defendants accepted that offer and contracted with RealPage demonstrates a conscious commitment to join the horizontal price-fixing scheme.

(Pls.' Opp. to Defs.' Joint Mot. to Dismiss 10 (emphasis added), ECF 623; *see also id.* at 1 ("Each Property Defendant provided its data to RealPage knowing that its would-be horizontal competitors would follow suit, allowing them all to increase prices above competitive levels.").) That "baseline" is the crux of the conspiracy Plaintiffs allege. (*Id.* at 20.)

Thus, to survive AIR's motion to dismiss, Plaintiffs must "delineate[] to some sufficiently

4

specific degree that [AIR] purposefully joined and participated in" <u>that</u> alleged conspiracy. *In re Processed Egg Prods. Antitrust Litig.*, 821 F. Supp. 2d 709, 720 (E.D. Pa. 2011). That, in turn, requires allegations of "particularized facts" showing that AIR "undertook certain acts[] or engaged in certain conduct . . . that plausibly suggest" it embraced and agreed to the overarching principles of that conspiracy—including the purported quid pro quo that is central to Plaintiffs' antitrust conspiracy claim. *Id.* at 721. But the SAC is devoid of any such allegations as to AIR.

Instead, Plaintiffs have <u>withdrawn</u> their core allegation that AIR agreed to share its confidential information with its competitors, or that it "agreed to join" the alleged conspiracy by doing so—which means Plaintiffs' claims against AIR must fail. Simply put, Plaintiffs allege no facts raising any reasonable inference that AIR agreed to the "common scheme" actually alleged in the SAC—a conspiracy predicated on the mutual exchange of confidential pricing information.[6] That alone is a sufficient reason to grant AIR's motion to dismiss. *Cf. Alaska Dep't of Rev., Treasury Div. v. Manku*, No. 20-1759-cv, 2021 WL 3027170, at *4 (2d Cir. July 19, 2021) (noting that "we evaluate plaintiffs' claims as they are alleged" and affirming dismissal of conspiracy claim as implausible, despite allegations of individual anticompetitive conduct).

## II. Plaintiffs Do Not Otherwise State a Claim Against AIR Through Their Broad, Unsupported Allegations Applicable to All RealPage Customers

Plaintiffs make no attempt to show that AIR took any action to join the alleged conspiracy. Instead, Plaintiffs resort to broad, unsupported assertions about RealPage, RealPage's RMS, and RealPage customers generally. That, however, cannot salvage their claim against AIR.

---

[6] The Court must evaluate the plausibility of Plaintiffs' claims against AIR in light of the conspiracy alleged in the SAC, not the conspiracy suggested by the Department of Justice ("DOJ") in its Statement of Interest. That said, the DOJ recognizes that "not every use of an algorithm to set price qualifies" as an antitrust violation, and the SAC alleges Defendants "acted in concert" by sharing information on the "mutual understanding" that their competitors would do the same. (Statement of Interest 15, 20, ECF 628.)

5

Case 3:23-md-03071     Document 636     Filed 11/22/23     Page 6 of 11 PageID #: 7060

For example, Plaintiffs argue, "AIR's use of the RealPage's RMS to set and raise rent prices, coupled with the knowledge its competitors were doing the same, sufficiently supports the existence of the cartel and AIR's participation therein." (Pls.' Opp. 10 (emphasis omitted).) Plaintiffs contend that, by licensing RealPage's RMS, AIR must have "delegate[d] their rental price and supply decisions" to RealPage and agreed to "abide" by its recommendations because RealPage attempted to ensure clients had an 80 to 85 percent acceptance rate through compliance measures, like its "Pricing Advisors." (*Id.* at 6, 10.) But Plaintiffs do not allege any <u>facts</u> showing that <u>AIR</u> was subject to the alleged compliance measures or that AIR accepted RealPage's recommendations 80 to 85% of the time. On the contrary, the SAC acknowledges that some RealPage customers did not have Pricing Advisors and some customers had "low acceptance rates" and retained independent discretion when setting prices (*i.e.,* some did <u>not</u> delegate price and supply decisions to RealPage). (*See* AIR Mem. 4, 9 (citing SAC ¶¶ 17, 286), ECF 569.)

Plaintiffs cannot satisfy the plausibility standard based on an allegation of AIR's limited use of a RealPage RMS without a reciprocal exchange of confidential data, which means AIR allegedly did even <u>less</u> than the hundreds of other RealPage customers that are not alleged to have joined any conspiracy. That is not the nature of the conspiracy alleged in the SAC.

Moreover, the alleged conduct does not plausibly suggest that AIR joined any antitrust conspiracy, as there is nothing anticompetitive about the use of a revenue management tool that is widely used by the public. *Cf. Processed Egg Prods.*, 821 F. Supp. 2d at 737−39 (defendant's participation in export program, which plaintiffs alleged was coordinated to illegally reduce egg supply, did not raise inference of participation in conspiracy where complaint "[did] not plausibly suggest that *all* exports" under program had anticompetitive traits consistent with conspiracy). This is particularly true, given Plaintiffs' acknowledgement that RealPage's RMS provides *recommendations* that AIR is free to reject. *See Gibson v. MGM Resorts Int'l*, No. 2:23-

6

cv-00140-MMD-DJA, 2023 WL 7025996, at *3 (D. Nev. Oct. 24, 2023) (plaintiffs' failure to allege that hotel operators "must accept the prices" recommended by software, coupled with fact that 10% of operators did not accept them, was "fatal deficiency" in plaintiffs' ability to allege plausible "agreement to accept the elevated prices recommended by the pricing algorithm").

Plaintiffs likewise get no closer to meeting the plausibility standard by alleging that AIR, like all RealPage customers, knew other entities used RealPage's RMS and "benefited" from receiving its recommendations (Pls.' Opp. 4−5, ECF 619). *See Processed Egg Prods.*, 821 F. Supp. 2d at 735 (allegations suggesting only that defendant "was aware of what other [d]efendants were doing, knew the implications or restricted supply and increased prices, and even likely benefited from the increased market prices" did not support the "the requisite factual leap" that defendant "outright agreed to and participated in the conspiracy"). To hold otherwise would mean that merely using RealPage's RMS would, by itself, raise a plausible inference that every RealPage customer agreed to the alleged price-fixing conspiracy.

Additionally, Plaintiffs' vague allegations pertaining to the acceptance rates of, and enforcement mechanisms used on, RealPage customers generally, including Property Defendants as a whole, cannot support plausible inferences of AIR's purported embrace of the alleged conspiracy. *See Travel Agent*, 583 F.3d at 905 (recognizing that "vague allegations" and "indeterminate assertions" referring to "defendants," collectively, "represent precisely the type of naked conspiratorial allegations rejected by the Supreme Court in *Twombly*"). While it may be permissible to use the same language to allege the same concrete facts about a group of defendants, Plaintiffs cannot survive dismissal with speculative assertions that lack factual support as to AIR. Here, the SAC contains no well-pled facts suggesting AIR "delegated" pricing and supply decisions to RealPage and agreed to "abide" by, and actually complied with,

RealPage's price and supply recommendations. (AIR Mem. 5, 8−9, ECF 569.)

Nor can Plaintiffs' purported "plus factors" save their claims from dismissal:

*Actions against self-interest.* Plaintiffs assert, "the [SAC] plausibly alleges" that use of RealPage's RMS "is economically irrational . . . absent the existence of a cartel agreement" because it reflects a strategic shift from prioritizing occupancy over rental rates. (Pls.' Opp. 8−9; *see also* Pls.' Opp. to Defs.' Joint Mot. to Dismiss Multifamily Consol. Am. Compl. 21.) But, again, Plaintiffs offer no factual allegations suggesting that AIR's conduct reflected this strategic shift in any way. Instead, Plaintiffs ask the Court to assume that, because RealPage and others allegedly touted the benefits of a price-over-occupancy strategy, all RealPage customers, including AIR, must have implemented that strategy too. But that factual leap is not supported and would apply equally to hundreds of other RealPage customers.

*Attendance at industry events.* Plaintiffs' vague allegation that AIR attended events for a single trade group likewise does not move the needle, whether standing alone or considered alongside the SAC's other factual allegations. (*See* Pls.' Opp. 5−6, 9 n.5.) Plaintiffs allege nothing more than passive attendance at unspecified events (SAC ¶ 386), which is "presumed legitimate and is not a basis from which to infer a conspiracy, without more." *In re Graphic Processing Units Antitrust Litig.*, 527 F. Supp. 2d 1011, 1023 (N.D. Cal. 2007); *see also Processed Egg Prods.*, 821 F. Supp. 2d at 722 ("[A]ctive participation, rather than merely passive presence [at industry events], [is] key in inferring agreement to the conspiracy.").

## CONCLUSION

Plaintiffs' allegations do not raise a plausible inference that AIR joined the conspiracy alleged in the SAC. The Court should reject Plaintiffs' arguments that AIR's limited use of RealPage RMS is enough to support their conspiracy claims, and dismiss all claims against AIR.

Dated: November 22, 2023                    Respectfully submitted,


                                            */s/ Kathryn A. Reilly*
                                            Kathryn A. Reilly
                                            Michael T. Williams
                                            Judith P. Youngman
                                            Wheeler Trigg O'Donnell LLP
                                            370 Seventeenth Street, Suite 4500
                                            Denver, CO 80202
                                            Telephone:  303.244.1800
                                            Facsimile:  303.244.1879
                                            Email: reilly@wtotrial.com
                                                         williams@wtotrial.com
                                                         youngman@wtotrial.com

                                            And

                                            Mark Bell
                                            Holland & Knight LLP
                                            511 Union Street, Suite 2700
                                            Nashville, Tennessee 37219
                                            Telephone:  615.244.6380
                                            Email: mark.bell@hklaw.com

                                            Attorneys for Apartment Income REIT Corp.

9

**CERTIFICATE OF SERVICE (CM/ECF)**

I HEREBY CERTIFY that on November 22, 2023, I electronically filed the foregoing REPLY IN SUPPORT OF DEFENDANT APARTMENT INCOME REIT CORP'S ("AIR") MOTION TO DISMISS with the Clerk of Court using the CM/ECF system which will send notification of such filing to all counsel of record.

*s/ Claudia Jones on behalf of Kathryn A. Reilly*