**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | |
|---|---|
| **IN RE: REALPAGE, INC., RENTAL SOFTWARE ANTITRUST LITIGATION (NO. II)** | **Case No. 3:23-MD-3071**<br>**MDL No. 3071**<br><br>**This Document Relates to:**<br>**3:23-cv-00757 (M.D. Tenn.)**<br>**3:23-cv-00792 (M.D. Tenn.)**<br><br>**Chief Judge Waverly D. Crenshaw, Jr.** |

**DEFENDANTS' REPLY MEMORANDUM OF LAW IN SUPPORT OF**
**MOTION TO DISMISS STUDENT PLAINTIFFS' FIRST AMENDED CONSOLIDATED**
**CLASS ACTION COMPLAINT**

# TABLE OF CONTENTS

**Page**

I.   INTRODUCTION ................................................................................................ 1

II.  ARGUMENT ..................................................................................................... 1

    A.   Plaintiffs Do Not Plead Facts Establishing Any Plausible Agreement Between Student Lessors ................................................................ 1

        i.   Plaintiffs Do Not Plead Facts Plausibly Showing Each Defendant Joined An Unlawful Conspiracy ................................................................. 2

        ii.  Plaintiffs Do Not Plead Circumstantial Facts Plausibly Establishing A Conspiracy ............................................................................ 3

            a)   Plaintiffs Do Not Plead Facts Plausibly Showing Each Defendant Engaged In Parallel Conduct ...................................... 3

            b)   Plaintiffs Do Not Plead Facts Plausibly Establishing Plus Factors For Each Defendant ......................................................... 4

    B.   Plaintiffs Do Not State A Rule Of Reason Claim Because They Do Not Plead Facts Establishing Plausible Relevant Markets or Anticompetitive Effects ............................................................................. 11

        i.   The Rule of Reason Applies To Plaintiffs' Section 1 Claims ................. 11

        ii.  Plaintiffs Do Not Plead Facts Plausibly Establishing Relevant Markets ................................................................................... 12

        iii. Plaintiffs Do Not Plead Facts Plausibly Establishing Anticompetitive Effects .......................................................................... 13

    C.   Plaintiffs Do Not Plead Facts Supporting Antitrust Standing ............................ 14

    D.   Plaintiffs' State-Law Claims Fail ..................................................................... 14

    E.   Plaintiffs Do Not Plead Fraudulent Concealment With Particularity ................. 15

III. CONCLUSION ................................................................................................. 15

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*ARJN #3 v. Cooper,*
  517 F. Supp. 3d 732 (M.D. Tenn. 2021) ................................................................... 13

*Bell Atl. Corp. v. Twombly,*
  550 U.S. 544 (2007) .............................................................................................. 2, 5

*Brown v. JBS USA Food Co.,*
  2023 WL 6294161 (D. Colo. Sept. 27, 2023) ......................................................... 13

*Cal. Dental Ass'n v. FTC,*
  526 U.S. 756 (1999) ............................................................................................... 12

*Carrier Corp. v. Outokumpu Oyj,*
  673 F.3d 430 (6th Cir. 2012) ................................................................................. 15

*Deom v. Walgreen Co.,*
  591 F. App'x 313 (6th Cir. 2014) ............................................................................. 5

*Erie Cnty. v. Morton Salt, Inc.,*
  702 F.3d 860 (6th Cir. 2012) ................................................................................. 11

*Expert Masonry, Inc. v. Boone Cnty.,*
  440 F.3d 336 (6th Cir. 2006) ................................................................................. 12

*Finley v. Kelly,*
  384 F. Supp. 3d 898 (M.D. Tenn. 2019) ................................................................ 11

*Fox v. Saginaw County,*
  67 F.4th 284 (6th Cir. 2023) ................................................................................. 15

*Gibson v. MGM Resorts Int'l,*
  2023 WL 7025996 (D. Nev. Oct. 24, 2023) ................................................... 1, 3, 6, 9

*Hinds Cnty. v. Wachovia Bank, N.A.,*
  620 F. Supp. 2d 499 (S.D.N.Y. 2009) ...................................................................... 9

*Hobart-Mayfield, Inc. v. Nat'l Op. Comm. on Standards for Athletic Equip.,*
  48 F.4th 656 (6th Cir. 2022) ................................................................................ 3, 4

*Hyland v. Homeservices of Am., Inc.,*
  2007 WL 2407233 (W.D. Ky. Aug. 17, 2007) ........................................................ 5, 9

*Hyland v. HomeServices of Am., Inc.*,
     771 F.3d 310 (6th Cir. 2014) ................................................. 8

*In re Auto. Parts Antitrust Litig.*,
     29 F. Supp. 3d 982 (E.D. Mich. 2014) ..................................... 9

*In re Baby Food Antitrust Litig.*,
     166 F.3d 112 (3d Cir. 1999) ................................................ 10

*In re Broiler Chicken Antitrust Litig.*,
     290 F. Supp. 3d 772 (N.D. Ill. 2017) .................................... 4, 5

*In re Dynamic Random Access Memory (DRAM) Indirect Purchaser Antitrust Litig.*,
     28 F.4th 42 (9th Cir. 2022) ................................................. 8

*In re Elevator Antitrust Litig.*,
     502 F.3d 47 (2d Cir. 2007) ................................................ 10

*In re Fair Fin. Co.*,
     834 F.3d 651 (6th Cir. 2016) ............................................... 9

*In re GPU Antitrust Litig.*,
     527 F. Supp. 2d 1011 (N.D. Cal. 2007) ................................... 9

*In re Local TV Advert. Antitrust Litig.*,
     2022 WL 3716202 (N.D. Ill. Aug. 29, 2022) ........................... 5, 7

*In re Musical Instruments & Equip. Antitrust Litig.*,
     798 F.3d 1186 (9th Cir. 2015) ............................................ 11

*In re Packaged Ice Antitrust Litig.*,
     723 F. Supp. 2d 987 (E.D. Mich. 2010) ................................... 9

*In re Plasma-Derivative Protein Therapies Antitrust Litig.*,
     764 F. Supp. 2d 991 (N.D. Ill. 2011) ..................................... 4

*In re Polyurethane Foam Antitrust Litig.*,
     152 F. Supp. 3d 968 (N.D. Ohio 2015) .................................. 5, 7

*In re Polyurethane Foam Antitrust Litig.*,
     799 F. Supp. 2d 777 (N.D. Ohio 2011) .................................... 2

*In re Pork Antitrust Litig.*,
     2019 WL 3752497 (D. Minn. Aug. 8, 2019) ........................... 2, 3, 5

*In re Se. Milk Antitrust Litig.*,
739 F.3d 262 (6th Cir. 2014) ................................................ 11

*In re Text Messaging Antitrust Litig.*,
630 F.3d 622 (7th Cir. 2010) .................................................. 5

*In re Travel Agent Comm'n Antitrust Litig.*,
583 F.3d 896 (6th Cir. 2009) ................................................ 10

*In re Turkey Antitrust Litig.*,
642 F. Supp. 3d 711 (N.D. Ill. 2022) ................................... 4, 5

*In re Urethane Antitrust Litig.*,
768 F.3d 1245 (10th Cir. 2014) .............................................. 8

*Interstate Cir. v. United States*,
306 U.S. 208 (1939) ............................................................... 3

*Jones v. Micron Tech. Inc.*,
400 F. Supp. 3d 897 (N.D. Cal. 2019) ................................... 8

*Kleen Prods. LLC v. Georgia-Pacific LLC*,
910 F.3d 927 (7th Cir. 2018) .................................................. 6

*Kleen Prods., LLC v. Packaging Corp. of Am.*,
775 F. Supp. 2d 1071 (N.D. Ill. 2011) .................................... 4

*Meyer v. Kalanick*,
174 F. Supp. 3d 817 (S.D.N.Y. 2016) ................................... 8, 9

*Mich. Div.-Monument Builders of N. Am. v. Mich. Cemetery Ass'n*,
524 F.3d 726 (6th Cir. 2008) ........................................... 12, 13

*Sheet Metal Workers Local 441 Health & Welfare Plan v. GlaxoSmithKline, PLC*,
737 F. Supp. 2d 380 (E.D. Pa. 2010) ................................... 14

*Suture Exp., Inc. v. Cardinal Health 200, LLC*,
963 F. Supp. 2d 1212 (D. Kan. 2013) ................................... 12

*Todd v. Exxon Corp.*,
275 F.3d 191 (2d Cir. 2001) .................................................. 5

*Total Benefits Planning Agency, Inc. v. Anthem Blue Cross & Blue Shield*,
552 F.3d 430 (6th Cir. 2008) .................................................. 2

# TABLE OF AUTHORITIES
(continued)

*United States v. Apple, Inc.*,
   791 F.3d 290 (2d Cir. 2015) .................................................................................... 4, 12

*United States. v. U.S. Gypsum Co.*,
   438 U.S. 422 (1978) ...................................................................................................... 12

*Williamson Oil Co. v. Philip Morris USA*,
   346 F.3d 1287 (11th Cir. 2003) ................................................................................... 10

# I.    INTRODUCTION

Plaintiffs' Opposition confirms their theory of the case: that any Student Lessor that used one of RealPage's revenue management software (RMS) products at any point during a thirteen-year period joined a price-fixing conspiracy spanning rental markets across the country.[1] That theory is implausible. Just last month, in a decision Plaintiffs ignore, a court dismissed similar allegations against hotel operators and a revenue management software provider. *Gibson v. MGM Resorts Int'l*, 2023 WL 7025996, at *3-4, *6 (D. Nev. Oct. 24, 2023).[2] The Court should grant Defendants' Motion because, as in *Gibson*, the Complaint does not plead facts showing each Defendant joined an unlawful conspiracy. The Complaint should also be dismissed because Plaintiffs do not allege a plausible *per se* or rule-of-reason claim, do not allege antitrust standing, do not allege viable state-law claims, and do not allege fraudulent concealment with particularity.

# II.    ARGUMENT

## A.    Plaintiffs Do Not Plead Facts Establishing Any Plausible Agreement Between Student Lessors

Plaintiffs agree that their claims are premised on a purported horizontal agreement between Student Lessors (Opp. 28), and do not argue they have alleged direct evidence of any agreement (Opp. 4). Plaintiffs also concede that to establish the existence of a conspiratorial agreement based on circumstantial evidence, they must allege both (1) parallel conduct and (2) "plus factors" tending to exclude the possibility of independent conduct. Opp. 4. Plaintiffs do not allege either.

---

[1] As used herein, "FASC" or "Complaint" refers to the First Amended Consolidated Class Action Complaint filed on September 7, 2023 (ECF No. 527). "Mot." or "Motion" refers to Defendants' Memorandum of Law In Support of Motion to Dismiss (ECF No. 588). "Opp." or "Opposition" refers to Student Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Dismiss (ECF No. 617). "Student Lessors" refers to Defendants who owned or managed student housing.

[2] Unless otherwise noted, all internal quotation marks and alterations are omitted and emphasis is added.

1

### i. Plaintiffs Do Not Plead Facts Plausibly Showing Each Defendant Joined An Unlawful Conspiracy

Plaintiffs concede that they must "allege that each individual defendant joined the conspiracy and played some role in it." Opp. 5. Yet despite positing a sweeping, thirteen-year-long conspiracy between at least a dozen companies, Plaintiffs merely "alleg[e] misconduct against defendants without specifics as to the role each played." *Total Benefits Planning Agency, Inc. v. Anthem Blue Cross & Blue Shield*, 552 F.3d 430, 436 (6th Cir. 2008). Plaintiffs' generalized allegations are woefully inadequate to meet their admitted pleading burden.

The sum total of Plaintiffs' allegations against each Student Lessor consists of (1) the number of beds or cities each Student Lessor serves; (2) a claim that each Student Lessor has used RealPage RMS, and that some experienced improved performance; (3) a suggestion that certain Student Lessors communicated with RealPage about pricing recommendations; and (4) the assertion that one Student Lessor frequently (but not always) accepted RealPage's recommendations and one other adopted them unless "specifically overridden." Opp. 6-8.

To be clear, Plaintiffs do not plead *all* of these facts for *any* (much less every) Student Lessor. But even if they did, that would not establish that each Lessor joined a conspiracy because Plaintiffs do not specify any "specific time, place, or person involved." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 565 n.10 (2007). Plaintiffs' selective quotations notwithstanding (*e.g.*, Opp. 8), their own cases—including *In re Polyurethane Foam Antitrust Litigation*—recognize this requirement.[3]

---

[3] *See In re Polyurethane Foam Antitrust Litig.*, 799 F. Supp. 2d 777, 792 (N.D. Ohio 2011) ("[A]n antitrust defendant is not provided sufficient notice of his role in an alleged conspiratorial agreement spanning a seven-year period in which no 'who, where, or when' allegations are advanced.") (citing *Twombly*, 550 U.S. at 565 n.10); *In re Pork Antitrust Litig.*, 2019 WL 3752497, at *8 (D. Minn. Aug. 8, 2019) (requiring "specific information regarding each Defendant" to analyze "which, how many, or when any of the individual Defendants may have affirmatively acted").

### ii. Plaintiffs Do Not Plead Circumstantial Facts Plausibly Establishing A Conspiracy

To plead a plausible conspiracy with circumstantial evidence, Plaintiffs must allege *both* parallel conduct by each Defendant *and* plus factors suggesting each Defendant joined the conspiracy. *Hobart-Mayfield, Inc. v. Nat'l Op. Comm. on Standards for Athletic Equip.*, 48 F.4th 656, 665 (6th Cir. 2022). Plaintiffs allege neither.

### a) Plaintiffs Do Not Plead Facts Plausibly Showing Each Defendant Engaged In Parallel Conduct

Plaintiffs' claims should be dismissed because they do not allege parallel conduct by *any* Student Lessor. *See In re Pork*, 2019 WL 3752497, at *7 ("[P]lus factors without plausible allegations of parallel conduct are insufficient to establish an inference of an agreement.").

*First*, Plaintiffs overlook their own allegations that Student Lessors use different RMS products, rely on different RealPage services, and employ different software configurations. Mot. 13. These differences preclude any inference of parallel conduct. *See Gibson*, 2023 WL 7025996, at *4 ("Between not alleging what software Hotel Operators all agreed to use, who entered into any purported agreement, and when they entered into [it], the Court cannot infer parallel conduct.").

*Second*, Plaintiffs suggest that Student Lessors' mere use of RealPage's RMS—including sharing information with RealPage and receiving price recommendations—"at the same time on an ongoing basis" establishes parallel conduct. Opp. 8. Not so. Plaintiffs do not plead a single word about when each Student Lessor adopted RealPage RMS, which RMS it adopted, when it used that RMS, or at which properties it used the RMS. Whether conduct is "simultaneous" or "sequential" (*see* Opp. 8), Plaintiffs must allege *some* temporal proximity or pattern between Defendants' actions to demonstrate parallelism, as Plaintiffs' own cases confirm. *See Interstate Cir. v. United States*, 306 U.S. 208, 221-22 (1939) (defendants imposed minimum price nearly simultaneously

after receiving same letter); *United States v. Apple, Inc.*, 791 F.3d 290, 296 (2d Cir. 2015) (publishers agreed to same terms within "two months").[4]

*Third*, Plaintiffs suggest they can show parallel conduct based on a "regression" purporting to show Student Lessors' prices were higher than those of other lessors and general assertions that Student Lessors charged "above market" prices at unspecified times in unspecified places. Opp. 9. But Plaintiffs concede their "regression" is just a snapshot of a single month that did not study price changes *over time*. FASC ¶ 141. It does not show—and Plaintiffs do not allege—that any Student Lessors engaged in parallel *changes* in price or supply, unlike the cases Plaintiffs cite. *See, e.g.*, *Apple*, 791 F.3d at 303-311 (parallel activities included *shifting* from a wholesale to an agency model); *Broiler Chicken*, 290 F. Supp. 3d at 788 (parallel activities included production *cuts* and price *increases*). At most, Plaintiffs allege that average rents at some Student Lessor properties were higher than average rents elsewhere. This does not satisfy the parallel conduct requirement.

### b) Plaintiffs Do Not Plead Facts Plausibly Establishing Plus Factors For Each Defendant

As Plaintiffs acknowledge, they must allege sufficient evidence "tending to exclude the possibility of independent conduct." Opp. 4 (quoting *Hobart-Mayfield*, 48 F.4th at 664). Plaintiffs' suggestion that non-conspiratorial explanations for Defendants' behavior are irrelevant at this stage (Opp. 24) is incorrect; when "factual allegations [are] at most consistent with both conduct

---

[4] *See also In re Turkey Antitrust Litig.*, 642 F. Supp. 3d 711, 719-25 (N.D. Ill. 2022) (alleging "two [two year] periods of coordinated supply reductions" and "two [two year] periods of raising prices and maintaining supply restraints"); *In re Broiler Chicken Antitrust Litig.*, 290 F. Supp. 3d 772, 792 (N.D. Ill. 2017) (alleging "that all of the defendants engaged in production cuts at the same time" during two 1-2 year periods); *Kleen Prods., LLC v. Packaging Corp. of Am.*, 775 F. Supp. 2d 1071, 1077 (N.D. Ill. 2011) (alleging "Defendants raised prices simultaneously or most Defendants raised prices closely following announced price increases by a small number of Defendants"); *In re Plasma-Derivative Protein Therapies Antitrust Litig.*, 764 F. Supp. 2d 991, 996, 1000 (N.D. Ill. 2011) (alleging series of supply cuts matched by defendants over the course of 10-month period, followed by continuous low growth).

4

that is actionable and conduct that is not, more is required to 'nudge the claims across the line from conceivable to plausible.'" *Deom v. Walgreen Co.*, 591 F. App'x 313, 320 (6th Cir. 2014) (quoting *Twombly*, 550 U.S. at 570). All of Plaintiffs' alleged plus factors are equally—in reality, more— consistent with unilateral, self-interested conduct than with a vast, nationwide conspiracy.

**Information Sharing.** Plaintiffs' information-sharing allegations do not support an inference of conspiracy for at least three reasons. *First*, Plaintiffs concede that that any data used by RealPage RMS to recommend prices is aggregated and anonymized. Opp. 15. In all of the cases Plaintiffs cite, competitors shared specific, detailed pricing information either directly or through a data-conduit hub.[5] In the various cases involving Agri Stats, for example, Agri Stats (the hub) provided users so much detail they could identify specific pricing and capacity data of their competitors.[6] Plaintiffs expressly acknowledge this case is distinguishable, conceding RealPage did not share the "volume of underlying data that the processors received in the Agri Stats cases." Opp. 15. And Plaintiffs do not explain how the aggregated data used by RealPage RMS could permit Defendants "to police a secret or tacit conspiracy to fix prices." *In re Local TV Advert. Antitrust Litig.*, 2022 WL 3716202, at *6 (N.D. Ill. Aug. 29, 2022); *see, e.g.*, *In re Pork*, 2019 WL 3752497, at *4 (Agri Stats "serve[d] as an indispensable monitoring function, allowing each

---

[5] *In re Text Messaging Antitrust Litig.*, 630 F.3d 622, 628 (7th Cir. 2010) (defendants "exchanged price information directly"); *Todd v. Exxon Corp.*, 275 F.3d 191, 212 (2d Cir. 2001) (direct exchange of "massive amounts of extremely detailed information"); *In re Polyurethane Foam Antitrust Litig.*, 152 F. Supp. 3d 968, 980 (N.D. Ohio. 2015) ("Defendants would exchange published [price increase announcements] . . . as a means of verifying that coordination had taken place."); *Hyland v. Homeservices of Am., Inc.*, 2007 WL 2407233, at *3 (W.D. Ky. Aug. 17, 2007) (direct "exchange of price-information and catalogues between the parties").

[6] *In re Turkey*, 642 F. Supp. 3d at 717 (with Agri Stats, "subscribers could and did reverse engineer the monthly data reports to identify which competitors correspond with data sets"); *Broiler Chicken*, 290 F. Supp. 3d at 781 ("[T]he reports are so detailed that a reasonably informed producer can discern the other producers' identities, and it is common knowledge among producers that this is possible.").

member of the cartel to police each other's production figures . . . for signs of cheating"); *cf.* *Gibson*, 2023 WL 7025996 at *6 (information exchange with hotel price-recommendation software vendor not a plus factor unless the hotels "exchange nonpublic information with each other through their use of that same software"). Nor does Plaintiffs' argument that "underlying data need not be exchanged" with Student Lessors because RealPage uses the data to make "pricing determinations" (Opp. 15) move the needle—as Plaintiffs acknowledge, RealPage makes pricing *recommendations* that may be accepted or rejected (*e.g.*, FASC ¶ 59), and there are no allegations that any Student Lessor knows recommendations provided to any other Student Lessor.

*Second*, Plaintiffs claim that even if Student Lessors could not monitor each other, RealPage could "enforce[]" the conspiracy through its own "policing mechanisms." Opp. 15-19. But Plaintiffs allege nothing suggesting that RealPage could enforce (or has enforced) adherence. Mot. 20-21. Conspirators commonly use "policing" or other "enforcement mechanisms" (Opp. 19) "to impose disciplinary measures on the 'cheaters' who did not go along with the price increases." *Kleen Prods. LLC v. Georgia-Pacific LLC*, 910 F.3d 927, 937 (7th Cir. 2018). Yet Plaintiffs acknowledge that Lessors can and do deviate from RealPage's pricing recommendations (*e.g.*, FASC ¶¶ 87-88), and they do not allege any means by which these deviators could be or are identified or punished by RealPage or other Lessors (*see* Mot. 20-21). Plaintiffs' Opposition points to the allegations that housing managers must "justify, in writing, deviations from RealPage's recommended pricing" and that RealPage sometimes "push[ed] back" on one Student Lessor charging lower-than-recommended prices. Opp. 19 (citing FASC ¶¶ 6, 58). But Plaintiffs do not allege how either practice could permit RealPage to "enforce" the alleged conspiracy given that, as Plaintiffs concede, Student Lessors always retained discretion over pricing. *E.g.*, FASC ¶ 87. Plaintiffs also point to information provided to individual Lessors on "internal dashboards" about

*their own* compliance rates (Opp. 20 (citing FASC ¶ 86)), but never explain how knowing one's *own* compliance rate could assist in determining whether *others* are complying.

*Third*, Student Lessors had independent, non-conspiratorial reasons to share information with RealPage (Mot. 18-19), and Plaintiffs' argument that self-interested Lessors would not provide information to RealPage absent conspiracy (Opp. 17-18) is not supported by any factual allegations. Plaintiffs cite only one case suggesting that competitors would be expected to avoid sharing their information, and it involved "privately exchang[ing]" detailed price information *between competitors*, not supplying information that would be aggregated into industry-level ranges. *See* Opp. 17 (quoting *Polyurethane Foam*, 152 F. Supp. 3d at 989). That RealPage uses Student Lessors' data to analyze the market and generate price recommendations is not a plus factor suggesting conspiracy: it is a feature of RealPage's RMS, which Plaintiffs plead helps Lessors "maximiz[e] profitability and total revenue" (FASC ¶ 71), a goal that serves each Lessor's independent interest. *Cf. Local TV*, 2022 WL 3716202, at *6 (dismissing claims against defendant that used competitor data in product that "helped companies adjust prices in response to market behavior to maximize their profits").

**Shift in Pricing Strategy.** Plaintiffs argue the Student Lessors' "shift in strategy to maximizing price over occupancy" would have been against the individual interests of Student Lessors absent conspiracy. Opp. 18. This argument is factually, logically, and legally flawed.

To start, as Defendants explained, there are no factual allegations in the Complaint that support Plaintiffs' conclusory assertions that *any* Student Lessors (much less all) restricted supply or shifted from a "heads in beds" strategy to a collusive "price over volume" strategy. Mot. 14-15. Plaintiffs' only response is that the supposed "shift in strategy does not mean that vacancy rates necessarily increased"; it just means Student Lessors "leas[e] to achieve maximum revenue."

Opp. 17. But seeking to maximize revenue is perfectly normal, self-interested business conduct. *See Hyland v. HomeServices of Am., Inc.*, 771 F.3d 310, 321 (6th Cir. 2014) (the "motive to maximize profits cannot support an inference of a conspiracy").

Even if Plaintiffs had pleaded that Student Lessors all adopted a "price over volume" strategy, increasing prices is consistent with unilateral efforts to maximize revenue. Opp. 17 (acknowledging that RealPage users "leas[ed] to achieve maximize revenue"). Companies may increase prices at the expense of quantity in order to maximize profits. *See In re Dynamic Random Access Memory (DRAM) Indirect Purchaser Antitrust Litig.*, 28 F.4th 42, 49-50 (9th Cir. 2022) (affirming grant of motion to dismiss and rejecting "against self-interest" plus factor; "economically rational" to "focus on profitability" instead of market share); *see also Jones v. Micron Tech. Inc.*, 400 F. Supp. 3d 897, 915-21 (N.D. Cal. 2019) (similar). The only case Plaintiffs cite in support of their "price over volume" argument, *In re Urethane Antitrust Litig.*, 768 F.3d 1245 (10th Cir. 2014), involved entirely different factual circumstances ("lockstep price increase announcements" and a "widespread pattern of communication") and a different sort of "price over volume" allegation ("stick[ing] to . . . . list prices"). *Id.* at 1265.

Finally, Plaintiffs attempt to analogize this case to *Meyer v. Kalanick*, 174 F. Supp. 3d 817 (S.D.N.Y. 2016), but they ignore key distinctions between Uber and RealPage. The *Meyer* court found the plaintiff had alleged a plausible horizontal conspiracy between Uber drivers, who "agree with Uber to charge certain fares with the clear understanding that all other Uber drivers are agreeing to charge the same fares." *Id.* at 824. As the court noted, "[d]rivers using the Uber app do not compete on price," "cannot negotiate fares with drivers for rides," and must "charge the fares set by the Uber algorithm" because "there is no practical mechanism by which drivers can" depart. *Id.* at 820-21. Agreeing to these restrictions "would be against their own interests were they acting

independently." *Id.* at 824. In stark contrast, Plaintiffs here concede that Student Lessors retained discretion over pricing (*e.g.*, FASC ¶ 87), which only underscores that using RealPage is consistent with rational, independent conduct. *See Gibson*, 2023 WL 7025996, at *3 (that Plaintiffs did not allege "Hotel Operators are required to accept the prices that the unspecified pricing software recommends to them[] further undermin[es] the plausibility of their conclusory allegations that Defendants entered into a conspiracy to charge higher prices by accepting the prices recommended to them by algorithmic pricing software").

**Government Investigations.** The government activity cited by Plaintiffs (Opp. 22-23) carries no weight. Not only do Plaintiffs rely exclusively on allegations from outside the Complaint—which is reason enough to disregard their argument, *In re Fair Fin. Co.*, 834 F.3d 651, 656 n.1 (6th Cir. 2016)—the reality is that government investigations "carr[y] no weight in pleading an antitrust conspiracy claim," particularly when, as here, "[i]t is unknown whether the investigation will result in indictments or nothing at all." *In re GPU Antitrust Litig.*, 527 F. Supp. 2d 1011, 1024 (N.D. Cal. 2007); *see also Hinds Cnty. v. Wachovia Bank, N.A.*, 620 F. Supp. 2d 499, 514 (S.D.N.Y. 2009) ("the various investigations, inquiries, and subpoenas do not make the CAC's allegations [of conspiracy] plausible"). The cases cited by Plaintiffs all involved *results* from government investigations that supported Plaintiffs' alleged conspiracy. *See, e.g.*, *In re Packaged Ice Antitrust Litig.*, 723 F. Supp. 2d 987, 1008 (E.D. Mich. 2010) (guilty pleas); *In re Auto. Parts Antitrust Litig.*, 29 F. Supp. 3d 982, 995 (E.D. Mich. 2014) (same); *Hyland*, 2007 WL 2407233, at *3 ("enforcement actions" and "admissions of price-fixing by real estate brokers").

**RealPage's "Mastermind."** That "one of the main architects of RealPage's software" was allegedly involved an airline industry price-fixing incident 40 years ago (Opp. 24) does not bolster the plausibility of Plaintiffs' conspiracy allegations. "[A]bsent any evidence of linkage between"

those conspiracies and the allegations at issue, a plaintiff cannot simply suggest that "it happened there, [so] it could have happened here." *In re Elevator Antitrust Litig.*, 502 F.3d 47, 52 (2d Cir. 2007). Even when plaintiffs allege significant similarities between the prior conspiracy and the one alleged by plaintiffs—which Plaintiffs do not do here[7]—courts routinely find that the prior conspiracy has no bearing on whether plaintiffs have plausibly alleged a new conspiracy. *See, e.g.*, *In re Elevator*, 502 F.3d at 51-52 (conspiracy in European relevant market did not support allegations of a conspiracy in U.S. market); *Williamson Oil Co. v. Philip Morris USA*, 346 F.3d 1287, 1316-17 (11th Cir. 2003) (excluding evidence of contemporaneous foreign conspiracies involving cigarette manufacturers also charged with a domestic conspiracy).

**Motive to Conspire.** Plaintiffs assert that Student Lessors have the "common motive to conspire" because they have a motive to "raise prices." Opp. 11 (quoting FASC ¶¶ 15, 140, 142); *see also* Opp. 12 (asserting Student Lessors use software "knowing that the purpose of the algorithmic pricing was to achieve supracompetitive student rents"). But even if the Complaint did allege a motive to increase prices,[8] that merely reflects a "legitimate understandable motive to increase profits." *In re Baby Food Antitrust Litig.*, 166 F.3d 112, 137 (3d Cir. 1999).

**Opportunity to Conspire.** The conferences, summits, and other unspecified communications that Plaintiffs deem "opportunities to collude" (Opp. 22-23) are consistent with proper business conduct. *See In re Travel Agent Comm'n Antitrust Litig.*, 583 F.3d 896, 910-11 (6th Cir. 2009) ("Gather[ing] at industry trade association meetings" is "more likely explained by

---

[7] While Plaintiffs attempt to draw parallels between this case and the DOJ's investigation of information sharing between certain airlines in the 1980s and 1990s (FASC ¶ 83), the differences are patent. As Plaintiffs acknowledge, the airlines shared airline-specific, granular competitive data, including "nonpublic planned routes and prices." *Id.*

[8] Plaintiffs' actual allegations relate not to prices but to other business metrics like revenues, occupancies, and "performance." FASC ¶¶ 15, 140, 142.

[] lawful, free-market behavior."). That there was some "discussion of [RealPage's] pricing platform" (Opp. 22) is similarly benign. *See In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1196 (9th Cir. 2015) ("[P]articipation in trade-organization meetings where information is exchanged and strategies are advocated does not suggest [conspiracy].").

**Market Structure.** Plaintiffs' generic allegations about market structure—including high entry and exit barriers, inelastic demand, concentrated markets, and fungibility (Opp. 20-21)— "are simply descriptions of the market, not allegations of anything that the defendants did." *Erie Cnty. v. Morton Salt, Inc.*, 702 F.3d 860, 870 (6th Cir. 2012). And whether or not the Court considers the implied market shares Defendants calculated based on documents cited in the Complaint,[9] Plaintiffs do not allege Student Lessors (with or without the unspecified John Doe Defendants) controlled enough rental units in any regional submarket such that Student Lessors could feel "assured" their prices would not be undercut. Mot. 22-23.

**B.     Plaintiffs Do Not State A Rule Of Reason Claim Because They Do Not Plead Facts Establishing Plausible Relevant Markets or Anticompetitive Effects**

**i.     The Rule of Reason Applies To Plaintiffs' Section 1 Claims**

Plaintiffs' Opposition offers no justification to depart from the Sixth Circuit's "automatic presumption in favor of the rule of reason." *In re Se. Milk Antitrust Litig.*, 739 F.3d 262, 273 (6th Cir. 2014). The Court should reject Plaintiffs' argument for *per se* illegality for several reasons.

---

[9] Plaintiffs argue Exhibit D to Defendants' Motion should be stricken (Opp. 26-27), but it is based entirely on allegations in the Complaint and the sources cited therein (*see* ECF No. 589-4). Defendants have merely done arithmetic that Plaintiffs could have done before filing this case. *See Finley v. Kelly*, 384 F. Supp. 3d 898, 908 (M.D. Tenn. 2019) (Crenshaw, J.) ("[A] court may consider a document not formally incorporated by reference in a complaint when the complaint refers to the document and the document is central to the claims.").

*First*, Plaintiffs do not dispute that the rule of reason applies to alleged information-sharing agreements. Opp. 27-28. Nor could they. Mot. 23-24. That admission alone dooms their argument that the Court should apply the *per se* rule here.

*Second*, Plaintiffs argue that whether the *per se* rule applies should await further discovery. Opp. 28. But courts routinely determine at the motion-to-dismiss stage whether a complaint states a claim under a *per se* theory. *See, e.g.*, *Suture Exp., Inc. v. Cardinal Health 200, LLC*, 963 F. Supp. 2d 1212, 1220 (D. Kan. 2013) (plaintiff alleged "no factors . . . from which the court could infer that discovery would produce evidence to support a per se tying claim").

*Third*, Plaintiffs argue that *United States v. Apple* justifies applying the *per se* standard here. Opp. 28. In *Apple*, the Second Circuit upheld applying the *per se* rule because there was sufficient evidence of a horizontal agreement between book publishers to "eliminate Amazon's $9.99 pricing." 791 F.3d at 327. As explained, Plaintiffs do not adequately allege a horizontal agreement between Student Lessors. *Supra* Section II.A. And even if Plaintiffs had alleged a horizontal agreement to use RealPage RMS software, that would not "clearly and unquestionably fall[] within one of the handful of categories that have been collectively deemed *per se* anticompetitive." *Expert Masonry, Inc. v. Boone Cnty.*, 440 F.3d 336, 343-44 (6th Cir. 2006).

*Fourth*, Plaintiffs' passing mention that the "quick look" analysis should apply (Opp. 27, n.108) fails for the same reasons. The "quick look" analysis is appropriate only when the conduct clearly has an anticompetitive effect, and Plaintiffs have not so alleged. *See Cal. Dental Ass'n v. FTC*, 526 U.S. 756, 770 (1999); *United States. v. U.S. Gypsum Co.*, 438 U.S. 422, 441 n.16 (1978).

### ii. Plaintiffs Do Not Plead Facts Plausibly Establishing Relevant Markets

Plaintiffs must plead facts showing a plausible geographic market to establish a rule-of-reason claim. *Mich. Div.-Monument Builders of N. Am. v. Mich. Cemetery Ass'n*, 524 F.3d 726, 733 (6th Cir. 2008). With respect to their alleged national market, Plaintiffs make no attempt to

reconcile their own contradictory allegations that students live near their academic institutions. Mot. 26. Instead, Plaintiffs suggest they will allege submarkets "currently unknown to Plaintiffs." Opp. 31. But that is a promise to re-plead (again), not a defense of a national market. As for the alleged submarkets, Plaintiffs suggest the Court should apply light scrutiny at this stage (Opp. 30), but courts commonly grant "motions to dismiss on the basis of an insufficiently pled or totally unsupportable proposed market." *Mich. Cemetery Ass'n*, 524 F.3d at 733. Plaintiffs do not dispute that at least half of their alleged submarkets contain more than one campus (Opp. 32) and do not explain why any student would travel miles from campus to a building near another campus rather than opt for a non-student housing building closer to campus (Mot. 26-27).

### iii. Plaintiffs Do Not Plead Facts Plausibly Establishing Anticompetitive Effects

Plaintiffs fail to plead anticompetitive effects directly or indirectly. Mot. 27-31. As alleged direct evidence, Plaintiffs rely on their "regression" purporting to compare Student Lessors' prices with other lessors for a single month in 2023 in four cities. Opp. 29-30. Plaintiffs ignore Defendants' arguments that (1) because all the "regression" purports to show is that the *average* prices charged by Student Lessors were higher than other properties, it does not show *each* Student Lessor charged elevated prices (Mot. 28); and (2) elevated prices are not necessarily supracompetitive when output is increasing, as the Complaint alleges (Mot. 28). *See ARJN #3 v. Cooper*, 517 F. Supp. 3d 732, 750 (M.D. Tenn. 2021) (failure to respond to defendants' argument is abandonment). And Plaintiffs are incorrect that *Brown v. JBS USA Food Co.*, 2023 WL 6294161 (D. Colo. Sept. 27, 2023), suggests their single-month "regression" suffices to show anticompetitive effects over a thirteen-year period in numerous submarkets; in that case, unlike here, the plaintiffs alleged facts showing *both* that their data analysis was probative of their claims, *and* that the underlying data sample was representative. *See id.* at *4, *10.

Regarding indirect evidence, Plaintiffs nowhere contest Defendants' showing that the Complaint does not allege market power, by each Defendant or collectively. Mot. 30. Plaintiffs ask the Court to ignore the implications of their allegations—a paltry 2% to 10% combined market share in each relevant submarket alleged (Mot. 31)—but do not dispute the calculations. Opp. 26-27. Plaintiffs also purport to perform a "SSNIP" test finding that Student Lessors could profitably increase prices by at least 5%, but the quote they cite in support relates to increased *revenues* (the product of price times quantity sold), not prices. Opp. 33 ("2% to 7% revenue outperformance").

### C.     Plaintiffs Do Not Plead Facts Supporting Antitrust Standing

Plaintiffs must allege facts showing that they suffered an injury causally linked to the anticompetitive conduct they allege. The three named Plaintiffs[10] have not alleged that the Defendants from which they allegedly leased units—CA Student Living, Campus Advantage, and Cardinal Group (*see* FASC ¶¶ 17, 19, 20)—*even used* RealPage RMS at the buildings where Plaintiffs rented. *See, e.g.*, *id.* ¶¶ 58-60, 166, 169. Even if Plaintiffs had alleged RealPage RMS was used in those buildings, Plaintiffs acknowledge that Defendants rejected RealPage recommendations as they saw fit. *E.g.*, *id.* ¶ 59 (Campus Advantage would "either accept or reject the rent recommendations"). There is no basis to infer that the rents Plaintiffs paid were recommended by RealPage RMS. Mot. 31-32.

### D.     Plaintiffs' State-Law Claims Fail

Plaintiffs mischaracterize their state law claims and the law. Opp. 34-36. They do not mention the Pennsylvania UTPCPL claim permitted in *Sheet Metal Workers Local 441 Health & Welfare Plan v. GlaxoSmithKline, PLC*, 737 F. Supp. 2d 380, 421 (E.D. Pa. 2010), was predicated on "deceptive" conduct, not antitrust violations. They concede Georgia's antitrust law has no

---

[10] Plaintiff Lauder has been dismissed from this case. ECF No. 564.

private right of action but argue Georgia recognizes a common-law tort for restraint of trade, which they did not plead. FASC ¶ 249. They note "merchandise" has been defined as "objects of commerce" for purposes of certain federal statutes, but do not explain why this definition is relevant here. Opp. 35. They concede they plead a claim under a Massachusetts statute that excludes real property (FASC ¶ 259) but assert Defendants are on notice of a claim under a *different* statute mentioned in the *Multifamily Complaint*. Opp. 35. They assert, without citation to any authority, that Alabama's intrastate requirement is satisfied. Opp. 35. And they argue they have standing to assert claims under the laws of states where they neither lived nor were injured, relying on a decision this Court made before the Sixth Circuit decided *Fox v. Saginaw County*, 67 F.4th 284 (6th Cir. 2023); *see* Opp. 35-36. *Fox* held that named plaintiffs cannot rely on absent class members for standing; they must have standing for each claim they bring. 67 F.4th at 295. Plaintiffs do not.

### E. Plaintiffs Do Not Plead Fraudulent Concealment With Particularity

Plaintiffs' scant pleadings on fraudulent concealment show neither actual concealment by Defendants nor that Plaintiffs could not discover the operative facts with due diligence. Plaintiffs can hardly plead the operative facts of this supposed conspiracy were concealed when Plaintiffs rely on public documents that pre-date November 2018 discussing the fact that RealPage made pricing recommendations to Lessors based on information collected from Lessors. *See, e.g.*, FASC ¶¶ 11-13, 42-44, 68-69. Plaintiffs suggest that Defendants concealed the conspiracy through RealPage-provided "trainings" on "how to explain these pricing differences without mentioning RealPage" (Opp. 37), but "[m]ere silence or unwillingness to divulge wrongful activities is not sufficient." *Carrier Corp. v. Outokumpu Oyj*, 673 F.3d 430, 446 (6th Cir. 2012).

### III. CONCLUSION

The Court should dismiss Plaintiffs' claims with prejudice.

DATED: November 22, 2023

Respectfully submitted,

| /s/ Jay Srinivasan | /s/ Ian Simmons |
|---|---|

Jay Srinivasan (admitted *pro hac vice*)
jsrinivasan@gibsondunn.com
Daniel G. Swanson (admitted *pro hac vice*)
dswanson@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071
Telephone: (213) 229-7430

Stephen Weissman (admitted *pro hac vice*)
sweissman@gibsondunn.com
Michael J. Perry (admitted *pro hac vice*)
mjperry@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, NW
Washington, DC 20036
Telephone: (202) 955-8678

Stephen C. Whittaker (admitted *pro hac vice*)
cwhittaker@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
1361 Michelson Drive
Irvine, CA 92612
Telephone: (212) 351-2671

Ben A. Sherwood (admitted *pro hac vice*)
bsherwood@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166
Telephone: (212) 351-2671

Thomas H. Dundon (SBN: 004539)
tdundon@nealharwell.com
Neal & Harwell, PLC
1201 Demonbreun Street, Suite 1000
Nashville, TN 37203
Telephone: (615) 244-1713

*Counsel for Defendant RealPage, Inc.*

Ian Simmons
isimmons@omm.com
O'MELVENY & MYERS LLP
1625 Eye Street, NW
Washington, DC 20006
Telephone: (202) 383-5196

Stephen McIntyre
smcintyre@omm.com
O'MELVENY & MYERS LLP
400 South Hope Street, 18th Floor
Los Angeles, CA 90071
Telephone: (213) 430-6000

*Counsel for Defendants BH Management
Services, LLC, B.HOM Student Living LLC,
and TREV Management II LLC*

16

*/s/ Marisa Secco Giles*

Marisa Secco Giles
mgiles@velaw.com
VINSON & ELKINS LLP
200 West 6th Street, Suite 2500
Austin, Texas 78701
Telephone: (512) 542-8781

Jason M. Powers
jpowers@velaw.com
VINSON & ELKINS LLP
845 Texas Avenue, Suite 4700
Houston, Texas 77002
Telephone: (713) 758-2522

*/s/ Samuel P. Funk*

Samuel P. Funk (#19777)
sfunk@simsfunk.com
Grace A. Fox (#37367)
gfox@simsfunk.com
SIMS|FUNK, PLC
3322 West End Ave., Ste. 200
Nashville, TN 37203
Telephone: (615) 292-9335

*Counsel for Defendant Campus Advantage, Inc.*

*/s/ Timothy R. Beyer*

Timothy R. Beyer
tim.beyer@bclplaw.com
BRYAN CAVE LEIGHTON PAISNER LLP
1700 Lincoln Street, Suite 4100
Denver, CO 80203
Telephone: (303) 866-0481

Sarah Hartley
sarah.hartley@bclplaw.com
BRYAN CAVE LEIGHTON PAISNER LLP
1155 F Street, N.W.
Washington, DC 20004
Telephone: (303) 866-0363

*/s/ Samuel P. Funk*

Samuel P. Funk (#19777)
sfunk@simsfunk.com
Grace A. Fox (#37367)
gfox@simsfunk.com
SIMS|FUNK, PLC
3322 West End Ave., Ste. 200
Nashville, TN 37203
Telephone: (615) 292-9335

*Counsel for Defendant Cardinal Group Holdings LLC*

*/s/ Michael F. Murray*
Michael F. Murray
michaelmurray@paulhastings.com
PAUL HASTINGS LLP
2050 M Street, NW
Washington, DC 20036
Telephone: (202) 551-1730

Noah Pinegar
noahpinegar@paulhastings.com
PAUL HASTINGS LLP
200 Park Avenue
New York, NY 10166
Telephone: (212) 318-6057

*/s/ Samuel P. Funk*
Samuel P. Funk (#19777)
sfunk@simsfunk.com
Grace A. Fox (#37367)
gfox@simsfunk.com
SIMS|FUNK, PLC
3322 West End Ave., Ste. 200
Nashville, TN 37203
Telephone: (615) 292-9335

*Counsel for Defendant CA Student Living*
*Operating Company, LLC*

*/s/ James H. Mutchnik*
James H. Mutchnik
james.mutchnik@kirkland.com
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, IL 60654
Telephone: (312) 862-2000

*Counsel for Defendants Thoma Bravo L.P.,*
*Thoma Bravo Fund XIII, L.P., and Thoma*
*Bravo Fund XIV, L.P.*

*/s/ Michael M. Maddigan*
Michael M. Maddigan
michael.maddigan@hoganlovells.com
HOGAN LOVELLS US LLP
1999 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067
Telephone: (310) 785-4727

William L. Monts, III
william.monts@hoganlovells.com
Benjamin F. Holt
benjamin.holt@hoganlovells.com
HOGAN LOVELLS US LLP
555 Thirteenth Street, NW
Washington, DC 20004
Telephone: (202) 637-6440

Joshua C. Cumby (BPR No. 37949)
joshua.cumby@arlaw.com
F. Laurens Brock (BPR No. 17666)
larry.brock@arlaw.com
Rocklan W. King, III (BPR No. 30643)
rocky.king@arlaw.com
ADAMS AND REESE LLP
1600 West End Avenue, Suite 1400
Nashville, Tennessee 37203
Telephone: (615) 259-1450

*Counsel for Defendant Greystar*
*Management Services, LLC*

**CERTIFICATE OF SERVICE**

I hereby certify that on November 22, 2023, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all attorneys of record registered on the CM/ECF system.

DATED this 22nd day of November, 2023.


_____/s/ _Ian Simmons_____
Ian Simmons