1   IN THE UNITED STATES DISTRICT COURT
    MIDDLE DISTRICT OF TENNESSEE
2   NASHVILLE DIVISION

3   IN RE:  REALPAGE, INC.,        ) Case No. 3:23-md-03071
    Rental Software Antitrust      )
4   Litigation (No. II), et al.    ) CHIEF JUDGE CRENSHAW

5   - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

6                   BEFORE THE HONORABLE
7
        CHIEF DISTRICT JUDGE WAVERLY D. CRENSHAW, JR.
8
                 TRANSCRIPT OF PROCEEDINGS
9
                    December 11, 2023
10  - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

11

12

13

14

15

16

17

18

19

20

21

22

23  PREPARED BY:
              LISE S. MATTHEWS, RMR, CRR, CRC
24                 Official Court Reporter
              719 Church Street, Suite 2300
25                 Nashville, TN 37203
              lise_matthews@tnmd.uscourts.gov

1   APPEARANCES:

2
    **FOR THE PLAINTIFFS:**
3
    **Patrick J. Coughlin**
4   Scott+Scott Attorneys At Law, LLP

5   **Stacey P. Slaughter**
    Robins Kaplan Llp
6
    **Swathi Bojedla**
7   Hausfeld Llp

8   **Gary I. Smith, Jr**
    Hausfeld LLP (SF)
9
    **Steve W. Berman**
10  Hagens, Berman, Sobol, Shapiro, LLP (Seattle Office)

11  **Geoffrey H. Kozen**
    Robins Kaplan LLP
12
    **Carmen A. Medici**
13  Scott & Scott Attorneys at Law LLP

14  **Tricia R. Herzfeld**
    Herzfeld Suetholz Gastel
15

16  **FOR THE DEFENDANTS:**

17  **Jay P. Srinivasan**
    Gibson Dunn & Crutcher LLP (LA/CA)
18
    **David D. Cross**
19  Morrison & Foerster LLP

20  **Stephen McIntyre**
    O'Melveny & Myers, LLP (LA Office)
21
    **Stephen Weissman**
22  Gibson Dunn & Crutcher (DC)

23  **Stephen C. Whittaker**
    Gibson, Dunn & Crutcher, LLP (Irvine, CA Office)
24
    **Thomas H. Dundon**
25  Neal & Harwell, PLC

1  (APPEARANCES CONTINUED)

2

3  **FOR THE DEFENDANTS:**

   **Ian Simmons**
4  O'Melveny and Myers, LLP

5  **Robert W. Manoso**
   Morrison & Foerster LLP (DC)
6
   **Eliot A. Adelson**
7  Morrison & Foerster LLP (San Francisco Office)

8  **Joshua L. Burgener**
   Dickinson Wright PLLC (Nashville Office)
9

10 **Interested Party**
   **United States of America**:
11
   **Michael Charles Tackeff**
12 U.S. Attorney's Office (Nashville)

13 **Yixi (Cecilia) Cheng**
   U.S. Department of Justice, Antitrust Division
14

15 **ALSO PRESENT**:

16 Yehudah L. Buchweitz
   Gregory J. Casas
17 Edward Steele Clayton, IV
   Emily W. Collins
18 Joshua C. Cumby
   Andrew B. Dickson
19 Thomas L. Dyer
   Daniel T. Fenske
20 Danielle R. Foley
   Evan M. Fray-Witzer
21 Samuel P. Funk
   Marisa Secco Giles
22 Diane Rebecca Hazel
   Tyson Y Herrold
23 Carl W Hittinger
   Ryan Thomas Holt
24 James G. Kress
   Ryan P. Loofbourrow
25 Kaya R. Lurie
   Michael M. Maddigan

1  (APPEARANCES CONTINUED)

2  **ALSO PRESENT**:

3  Stephen M. Medlock
   Sarah B. Miller
4  Michael K Molzberger
   William Leitzsey Monts, Ill
5  Lynn H Murray
   Emily Newton
6  Scott Perlin
   Noah Byron Pinegar
7  Rachael Racine
   Heather T Rankie
8  Todd R. Seelman
   Margaret M. Siller
9  Alyse F Stach
   Christopher E. Thorsen
10  David Alan Walton
   Bradley C Weber
11  Travis C. Wheeler
   Marguerite S. Willis
12  Judith A Zahid
   Jessalyn H. Zeigler
13  Stephen J. Zralek

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                      I N D E X

 2              Monday, December 11, 2023

 3

 4                      EXHIBITS

 5                              MARKED   RECEIVED   WITH-
      PLAINTIFFS' EXHIBIT       FOR I.D.  IN EVD.   DRAWN
 6
      A      RealPage Proven B and C      15
 7           Assets
      B      Proven in Any Market Cycle   29
 8    C      A+ Performance: Student     185
             Properties Outperform the
 9           Market up to 14%

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1    The above-styled cause came on to be heard on

2  December 11, 2023, before the Honorable Waverly D.

3  Crenshaw, Jr., Chief District Judge, when the following

4  proceedings were had, to-wit:

5    THE COURT:  All right.  Be seated.

6    All right.  We're here on Case 23-md-3071,

7  In Re:  RealPage, Inc.

8    And we're here for oral argument on the primary

9  motion to dismiss.  So I'm sure that -- and we've got the

10 United States?  And we have them here.

11    So I'm sure you all have prepared for the oral

12 argument.  And I want to get to that before we leave here

13 today.  But what I'd really find more helpful as I'm trying

14 to make a decision, is to go through a list of questions that

15 I have.  And I've got a list.  I've got list.

16    And then once we do that, then to the extent you

17 think it's helpful, I'm glad to hear your speeches, and let

18 you do that.  But I would prefer to go -- let me go through

19 my questions -- it's going to cover a lot -- and go from

20 there.

21    So I'm going to ask the plaintiffs -- so I

22 apologize.  We didn't do the roll call when you all walked

23 in.  I think we're going is to be here long enough that I'm

24 going to need to take a break.  And we'll take a break, and

25 then the courtroom deputy will get everybody who wants to

1  make an appearance on the record on the record.

2          But for the time being, I'm going to ask the

3  plaintiff -- I guess make your appearance, who is going to be

4  arguing, and then the same for the defense.

5          MR. COUGHLIN:  Thank you, Your Honor.  Patrick

6  Coughlin on behalf of the plaintiff class.

7          MS. SLAUGHTER:  Stacey Slaughter, also on behalf

8  of the plaintiff class.

9          MR. BOJEDLA:  And Swathi Bojedla on behalf of the

10  plaintiffs class.

11          MR. BERMAN:  Steve Berman on behalf of the

12  plaintiffs class.

13          MR. SRINIVASAN:  Your Honor, Jay Srinivasan of

14  Gibson Dunn on behalf of RealPage.

15          MR. CROSS:  Your Honor, David Cross of Morrison &

16  Foerster on behalf of UDR.

17          MR. MCINTYRE:  Your Honor, Stephen McIntyre

18  with O'Melveny & Myers for BH Management, B.HOM Student

19  Living, and Timberline Real Estate Ventures.

20          THE COURT:  And so I don't have to do this a

21  lot -- just be sure you all speak up, especially -- and

22  preferably we stand.  And as we go through the question and

23  answer do it at the podium, so the court reporter and

24  everybody can hear.

25          MR. MCINTYRE:  Understood.  Thank you.

| | |
|---|---|
| 1 | THE COURT:  All right.  Anybody else? |
| 2 | MR. TACKEFF:  Mike Tackeff on behalf of the United |
| 3 | States. |
| 4 | MS. CHENG:  And Cecilia Cheng on behalf of the |
| 5 | United States. |
| 6 | THE COURT:  And I'm going to let's you all say |
| 7 | whatever you want to say, probably at the end. |
| 8 | MS. CHENG:  Thank you, Your Honor. |
| 9 | THE COURT:  So I've read everything a few hundred |
| 10 | times.  At least.  And do appreciate the hard work and |
| 11 | strategies evidenced in the -- in the briefing. |
| 12 | The second thing that will help us -- you help |
| 13 | me -- is if you all have a copy of your respective |
| 14 | complaints.  Because that's the focus.  So if you've got that |
| 15 | handy, that's going to be -- because I anticipate we're going |
| 16 | to talk about specific paragraphs in specific complaints. |
| 17 | And I'm going to do that right now. |
| 18 | All right.  So I recognize this is the defendants' |
| 19 | motion.  And typically, you know, I would let you all start |
| 20 | first, but for the reason -- I think everybody's going to |
| 21 | have plenty of chance to talk here today. |
| 22 | So, Mr. Coughlin, I think you're going to be the |
| 23 | person I understand is going to take the general. . . |
| 24 | I guess I should -- any preliminary announcements |
| 25 | from you all that I need to know about? |

1              MR. COUGHLIN:  What, Your Honor?

2              THE COURT:  Any preliminary announcements --

3              MR. COUGHLIN:  No.

4              MR. SRINIVASAN:  No, Your Honor.

5              THE COURT:  Okay.  So as I read the Second Amended

6    Consolidated Complaint, the Multifamily plaintiffs say the

7    conspiracy start in January of 2016.  Correct?

8              MR. COUGHLIN:  Yes.

9              THE COURT:  What do you allege -- what event or

10   what happened that started it in January of 2016?

11             MR. COUGHLIN:  We have a RealPage document that

12   says there was a critical mass -- and I can't remember

13   exactly what footnote it was.  There was a critical mass of

14   people using RMS software as of the beginning of 2016.

15             The other economic evidence that we have is that

16   we have a positive relation starting in 20- -- at the end of

17   2015, going into 2016, between vacancies and rents both going

18   up.  Historically they've moved in opposite directions.  As

19   rents went up, vacancies -- vacancies went up or occupancy

20   went down.

21             Now, starting in 2016, we see a trend where those

22   things are different.  And we also know that RealPage has

23   taken credit for a fundamental shift in the industry at least

24   in and about that time.

25             THE COURT:  Okay.  But a critical mass of people,

1    customers of RealPage, doesn't establish a conspiracy.

2            MR. COUGHLIN:  No, that's just why we picked that

3    date of when the conspiracy started.  I can go through what

4    the direct evidence that I believe we have of the -- of the

5    conspiracy --

6            THE COURT:  In January of 2016?

7            MR. COUGHLIN:  No.

8            THE COURT:  Or after?

9            MR. COUGHLIN:  I've got two documents that I

10   wanted to show the direct evidence.  And they're 2019 and

11   2020.

12           THE COURT:  Of the conspiracy?

13           MR. COUGHLIN:  Yes.

14           THE COURT:  Okay.  Well, let's -- let's do that.

15           But just so I'm clear, it was the fact that

16   RealPage had a critical mass of customers --

17           MR. COUGHLIN:  Yes.

18           THE COURT:  -- that leads you to believe that it

19   started in January of 2016?

20           MR. COUGHLIN:  That's right.

21           THE COURT:  Okay.  And -- but then you really jump

22   from 2016 to 2020.

23           And I agree you do allege there that things became

24   more robust in terms of the number of -- perfecting sort of

25   the algorithm and all the information there and the number of

```
 1   people involved, but that wasn't until, what, 2020 --
 2              MR. COUGHLIN:  2019.
 3              THE COURT:  2019 maybe.
 4              MR. COUGHLIN:  2019/2020, where the -- you know,
 5   the final integration took place between the three revenue
 6   managements, the -- YieldStar, LRO, and the A- --
 7              THE COURT:  AI.  Okay.
 8              All right.  Go ahead.  You wanted to share --
 9              MR. COUGHLIN:  Your Honor, let me --
10              THE COURT:  So you're saying this is direct
11   evidence of, what, the conspiracy?
12              MR. COUGHLIN:  This is direct evidence of the
13   conspiracy.
14              THE COURT:  Okay.
15              MR. COUGHLIN:  The defendants, when they opposed
16   our motion to dismiss, they cited a number of documents from
17   RealPage and put in a declaration from Mr. Whittaker of
18   those.  I'm only going to talk about two documents from the
19   complaint.
20              THE COURT:  And what's the docket number for
21   those --
22              MR. COUGHLIN:  And the documents are not in yet.
23   But the documents are cited in paragraph 9 --
24              THE COURT:  Of?
25              MR. COUGHLIN:  Of the Second Amended Complaint.
```

1          THE COURT:  And page?  Paragraph 9.  Okay.  Go
2      ahead.
3          MR. COUGHLIN:  Paragraph 9, paragraph 13, and
4      paragraph 211.  And the actual cites are in footnote 10,
5      footnote 14, and footnote 98.  And, of course, the Second
6      Amended Complaint is at the Document Number 530.
7          MR. CROSS:  Your Honor, could I just ask a
8      clarification?  These are documents that have not been cited
9      in the briefing?
10          MR. COUGHLIN:  These are documents that have been
11      cited in the Complaint.  These are the hard copies of those
12      documents.
13          MR. CROSS:  So they're not cited in the briefing?
14          MR. COUGHLIN:  They're not cited in -- well,
15      they're cited in the briefing, cited as the paragraphs from
16      the complaint.  And those are the complaint numbers.
17          And let me give Your Honor a copy.  Excuse me.
18          Your Honor, if I can approach.
19          THE COURT:  You can just give it to her.
20          MR. COUGHLIN:  Your Honor, the first document
21      we're going to talk about is the "RealPage, Proven B & C
22      Assets, Ace the Market."  It's the orange copy.
23          THE COURT:  And is this from footnote 10?
24          MR. COUGHLIN:  This is cited at paragraph 9 and
25      footnote 10.

```
1              THE COURT:  10.  Okay.

2              MR. COUGHLIN:  And, Your Honor, if we can flip in

3       to page 5 of this document.  It's a case study of one of the

4       defendants, ECI.  And it's a case study of Bs and Cs.  And Bs

5       and Cs are the level of property.  That's the level -- you

6       either have A property, A-plus or B or C.

7              And this is a case study that RealPage had on its

8       website, basically an invitation to all other property owners

9       and managers throughout the country about what RealPage could

10      do for you.  Okay?

11             So here ACI, an Emily Mask, who is a VP of

12      operations at ECI, says, "The design and functionality of LRO

13      offers detailed insight into how actual competitors impact

14      pricing strategies."  And that's right under "The Solution"

15      at page 5.  Okay?  That's what RealPage does.

16             The two paragraphs before that in the Complaint,

17      paragraphs 4 and 5, assert that RealPage asserts that they

18      set the prices for its customers.  And the CEO specifically

19      says we set rents.  Okay?

20             If you go down, you see that ECI, at the bottom of

21      that second paragraph, "We rarely make overrides to the

22      recommendations."  That's what they assert.

23             If you flip over to the next page, ECI says, "Even

24      though as apartment owners/operators we are all technically

25      competitors, LRO helps us to work together, to share
```

challenges and experience in an effort to make us all more
successful in our pricing."

So she's basically saying we're working together
as a community on pricing. And that, under Section 1, is
something you can't do. You can't give up your own
independent decision-making. And that's what this document
certainly demonstrates that they were doing.

ECI doesn't override, according to ECI, the
recommendations that they receive from RealPage. And we
don't believe that RealPage is in a true vertical
relationship to these property defendants. They're a
facilitator. They're not in the real estate business.
They're not like a manufacturing that's going up and down a
line. What they're providing is a software that helps these
owners -- owners/managers get together and set pricing.

And what kind of pricing do they set? They say at
the bottom of page 6, "LRO is designed to work with a
community in pricing strategies, not work separately." We
think that's direct evidence of a conspiracy. You can't get
any more than that than a competitor saying we work with --
although, we're technically competitors, we work with our
competitors on pricing strategy. That's the heart of this
case, is that the horizontal -- the horizontal defendants
here, the property owners and managers, are working together
on pricing strategy. And it only works if they all work

together.  And -- because if somebody undercuts it, of
course -- if somebody doesn't go in, they'll steal business
away from the others.  Because the others are raising the
price of the recommendations that RealPage -- and RealPage
doesn't just say, hey, we're going to set your prices.  They
say we're going to set your prices; you're going to get a
super competitive return.  We're going to set your prices
above the market.

THE COURT:  Well, let's unpack some of that.

MR. COUGHLIN:  Okay.

THE COURT:  I guess starting -- starting with --
you know -- and we need to mark this for identification, this
"How Two Companies Pushed Performance".  I guess, we'll make
that number A.

MR. COUGHLIN:  Okay.

THE COURT:  Plaintiffs' Exhibit A.

(Whereupon Plaintiffs' Exhibit A was marked for
identification.)

THE COURT:  But one point the defendants make is
that this doesn't -- the defendants you've sued does not
represent all of RealPage's customers.  And that leads to the
inference that not everybody is using RealPage in the way
that the plaintiff's alleging here.  What do you say to that?

MR. COUGHLIN:  I don't think it leads to that
inference.  And they say they all have to -- and the next

1   document -- it will actually tell you what RealPage does.  If
2   we could look at the next document --
3               THE COURT:  Well, answer my question.  What do you
4   make of the fact that these defendants -- as many as in the
5   courtroom now -- still don't represent all of RealPage's
6   customers, all the customers who are presumably providing
7   sensitive, confidential data to RealPage, all customers who
8   are going into the algorithm to spit out new prices around
9   the country?
10              MR. COUGHLIN:  You're right --
11              THE COURT:  Are they part -- they're not alleged
12  to be part of this conspiracy?
13              MR. COUGHLIN:  They're not named in this
14  Complaint.
15              THE COURT:  Right.
16              MR. COUGHLIN:  But there certainly could be
17  unnamed co-conspirators.  In other words, there is no
18  indication from RealPage or the property defenders that
19  there's a deviation from these recommendations.  You just saw
20  that that ECI person, the VP, said we rarely deviate.
21              THE COURT:  So let's talk about that.  It's -- you
22  keep referring to it -- and everybody in the briefing calls
23  it, it's a recommendation.  Sometimes you use the word
24  decision, but I think more times than often it's used as a
25  price recommendation.  Correct?

 1          MR. COUGHLIN:  They say -- RealPage says it's a

 2    price recommendation.

 3          THE COURT:  And even some of the quotes in your

 4    complaint says that we almost accept their recommendation,

 5    you know, X number of times.  Although, in the student

 6    complaint it's a really high number -- 98 to 99 percent.  But

 7    in the Multifamily complaint you say up to -- what was it?

 8    -- 80- -- 85 percent?

 9          MR. COUGHLIN:  Actually -- actually, what it

10    says -- and it's CW7, I think at paragraph 241.  It says at

11    least 80 percent of the time.

12          THE COURT:  Right.

13          MR. COUGHLIN:  They try to get -- CW7 also says in

14    those following paragraphs they're trying to get 100 percent

15    acceptance of the recommendation; they at least get 80

16    percent, and they don't want it to fall below 85 percent.

17          THE COURT:  Okay.  Well, call it what you want.

18    Call it a recommendation.  Call it a decision.  But if, in

19    fact, all of the horizontal competitors had decided to use

20    whatever RealPage told them to use on a weekly basis --

21          MR. COUGHLIN:  Daily.

22          THE COURT:  Daily.  Weekly some -- most -- and

23    daily.  You go both ways.  Why do you all need this

24    enforcement mechanism?  If the whole purpose of the

25    conspiracy is to get the highest price for our units, why do

1   you need these price advisors; why do you need the resident
2   managers to enforce the recommendation?  I thought we had
3   agreed to use them.  Doesn't that show there's some
4   independent discretion still left with the defendants on
5   whether or not they --
6           MR. COUGHLIN:  There's some -- there's some
7   independent that they don't adopt it all the time.  But even
8   then they have a starting point.  In other words, if you give
9   everybody a price, whether they actually accept exactly that
10  price or not, or they do some variance, like in the vitamin
11  cases and other cases that we cited, you have a starting
12  fixed price that is part of an illegal conspiracy price.
13  Okay?  So whether you go down a little or up a little from
14  that price, you're starting with a violation, a price that
15  violates the Sherman Act.  And so even if you vary a
16  little -- in fact --
17          THE COURT:  But that's assuming they use the
18  recommendation to set the final price.
19          MR. COUGHLIN:  Well, they've got the
20  recommendation.  They paid for the recommendation.
21          THE COURT:  And that assumes they used it, but --
22          MR. COUGHLIN:  Well, I don't know why you pay for
23  something that you're not -- you're not using.  We should --
24          THE COURT:  Well, business people do all kind of
25  things for all kind of reasons.  But again, it's an

assumption that their final price was based at least in part
on this price created through illegal price fixing.

        MR. COUGHLIN:  Yes.  You know, at least in part
it's based on that.  You're receiving it every day, and
you're using it, you know, 80 percent of the time, at least
80 percent of the time.  And the DC complaint that we cited
in a footnote here, Your Honor, says that if you don't use
it -- if you don't use it at least 75 percent of the time
you're dropped.  Now, we don't have discovery.

        THE COURT:  Yeah.

        MR. COUGHLIN:  You know, so we don't have that.
But the DC complaint has that.

        What we have is --

        THE COURT:  So that's the other thing.  And you're
getting all the questions -- we'll get there.

        In a horizontal price fixing conspiracy --
typically there's some agreement among the horizontal
competitors.  And clearly I don't have anything -- well, you
don't allege anything in the Complaint that any of these
defendants have a written agreement with any other defendant
to -- to fix prices.

        MR. COUGHLIN:  No, Your Honor.

        THE COURT:  No.  So what I've got is
circumstantial allegations, from which you want me to
infer an agreement -- and case law clearly allows that.

1  Right?

2          MR. COUGHLIN:  Yes, Your Honor.  But before we get

3  to the circumstantial evidence of the parallel pricing --

4  right? and the plus factors -- I think what we have direct

5  evidence.  If she says that they're working with their

6  competitors and she gives that testimony, and they're working

7  on pricing, that's direct evidence of conspiracy.

8          Now, there's another paragraph, paragraph 23 --

9          THE COURT:  So go back through that again.  On

10  page --

11          MR. COUGHLIN:  Well, if you look at page 5.

12          THE COURT:  I think you were repeating what's in

13  the Complaint, but go ahead.

14          MR. COUGHLIN:  I --

15          THE COURT:  Page 5.  All right.

16          MR. COUGHLIN:  Page 5:  "The design and

17  functionality of LRO offers detailed insight into how actual

18  competitors impact pricing strategies."

19          Now take a look at that statement there.  There's

20  a case called *Masonite*.  And *Masonite* is a case that the

21  government relied on heavily.  And it's a 1942 case.  And

22  that's the case where *Masonite* had people -- they had a

23  patent, and they had people that wanted to use a broad board

24  like they had.  They had people sign contracts.  The Supreme

25  Court found that that was enough, the fact that these

        competitors knew that everybody else was signing a standard
        contract, just like RealPage is signing with their --
                    THE COURT:  I mean, this is why I'm having oral
        argument.  I don't have an allegation that any of these
        defendants have signed any agreements between themselves.  We
        know there's an agreement between RealPage and each
        defendant.  Right?
                    MR. COUGHLIN:  That's right.  And that's what the
        Supreme Court in that *Masonite* case said.  Hey, there's an
        agreement with *Masonite* -- not between the horizontal
        competitors.  But because that agreement -- that agreement
        just flows down from *Masonite* to all the horizontal
        competitors.  Why?  Because they're aware of that agreement.
                    THE COURT:  Okay.
                    MR. COUGHLIN:  They're aware that others in the --
                    THE COURT:  I'm with you there.  But how does this
        sentence help you?  Because -- quite frankly, it seems a
        little vague.  "The design and functionality of LRO offers
        detailed insight into how actual competitors impact pric-" --
        what does that tell me?  What do you want me to infer from
        that?
                    MR. COUGHLIN:  Well, the main --
                    THE COURT:  It doesn't say that LRO -- although it
        may be referenced in your complaint.  It doesn't say that LRO
        allows me to see my competitors' pricing.

1    MR. COUGHLIN:  Well, what you're told -- and
2    from --
3    THE COURT:  But this sentence.  I just want to
4    stay -- I want to make sure I'm getting out of this sentence
5    everything you want me to get out of it.
6    MR. COUGHLIN:  Okay.  This sentence deals with
7    pricing strategies.  It's the number one thing that the
8    Sherman Act is trying to prohibit --
9    THE COURT:  Yeah.  "How actual competitors impact
10   pricing strat-" -- I don't even know if it's a complete
11   sentence.  What's --
12   MR. COUGHLIN:  I don't know if it's a complete
13   sentence or not.
14   THE COURT:  Yeah.  I don't know what my subject is
15   here.
16   MR. COUGHLIN:  It sure tells me I'm working with
17   competitors on pricing strategies.  And that's what the
18   Sherman Act prohibits.  You can't work with your competitors
19   on pricing strategies.  That's illegal.  And that's what --
20   that's what they're doing here.  And that's what they say --
21   THE COURT:  So let's read your complaint as true
22   and give you every inference.
23   So you want me to infer that because they contract
24   with RealPage, and because RealPage says I'm going to help
25   each defendant reach its optimum price in the market on a

weekly, daily, on a periodic basis -- where is -- where is
the -- okay.  Where is the allegations to let me tie that
back to each individual --

MR. COUGHLIN:  Well, RealPage says that the
purpose of RMS -- in the first couple paragraphs of the
complaint:  The purpose of RMS is to set prices --

THE COURT:  Yeah.

MR. COUGHLIN:  -- and set rents.  Okay?  And
that's what they tell the owners/operators they're going to
do.  Okay?  And the owners/operators we know accept their
recommendation, according to CW7, at least 80 percent of the
time.

THE COURT:  Yeah, but you never did answer my
question.  If they are going to accept the recommendation and
it makes good business sense to do so because I'm going to
make more -- get to charge more and make -- why do they need
to enforce it?  That's what I -- why do I need this
enforcement mechanism when we're all agreed we're going to
put this price in place --

MR. COUGHLIN:  Because it doesn't -- it doesn't
work unless enough of the property owners, you know,
accept -- just -- I'm going to --

THE COURT:  Sure.

MR. COUGHLIN:  -- answer that question.

-- accept the price given.

1          In other words, if you have a cheater -- if you

2    have a cheater over there who 15 percent of the time -- let's

3    say they get the price recommendation --

4          THE COURT:  Yeah.

5          MR. COUGHLIN:  -- $2,000 for this -- for this type

6    of apartment that month.  And you know what that person

7    does --

8          THE COURT:  I totally agree with you.  But the

9    problem is the enforcement mechanism, at least as described,

10   it doesn't kick anybody out.  It doesn't penalize anybody who

11   does that.  All they do is go up to the upper management of

12   each defendant and put pressure on that lower person to get

13   in line.

14         MR. COUGHLIN:  Your Honor, if you don't think that

15   putting in a POV2, which is a report to the management that

16   you've got an employee that's trying to deviate, and if you

17   don't think that's a valid enforcement mechanism -- first of

18   all --

19         THE COURT:  No.  No.

20         MR. COUGHLIN:  -- you're jeopardizing somebody's

21   job.

22         THE COURT:  No.  No.  But I get it.  But that's to

23   -- that's within the defendant.  That's within the corporate

24   being of the defendant.  That's not telling -- that's not

25   telling a defendant if you don't accept this price 80 to 90

1   percent of the time you're out.

2               MR. COUGHLIN:  We don't have discovery.

3               THE COURT:  Or you're going to be penalized a half

4   million dollars, or whatever.

5               MR. COUGHLIN:  Well, here's what they do.  They

6   give you a report --

7               THE COURT:  Yeah.

8               MR. COUGHLIN:  -- that goes to your superiors that

9   John over here tried to deviate from the price

10  recommendation.  And you know what that did?  That cost you

11  15 basis points.  And they report that every month --

12              THE COURT:  Right.  And you're not going to get

13  your -- you're not going to get what we predict to be your

14  optimum price because John and Mary here are deviating.

15              MR. COUGHLIN:  Right.  And John and Mary don't

16  deviate for too long when they know that they're not going to

17  get a bonus; they may be fired for not doing it.  The

18  property managers want them to do it.  As you'll see,

19  Greystar wants them to accept that recommendation --

20              THE COURT:  And makes them -- and gets back with

21  them.  But that's all within Greystar.  That's all within the

22  defendant.  That's not -- that's not part of the agreement,

23  the conspirator agreement.

24              MR. COUGHLIN:  It's not all within Greystar

25  because that -- that enforcement of that comes from RealPage.

1   RealPage tells Greystar, hey, somebody's not accepting that.
2   Okay?  So they're -- you are being hurt by that --
3              THE COURT:  Yeah.
4              MR. COUGHLIN:  -- so you should accept that.  It's
5   just like --
6              THE COURT:  And RealPage doesn't have -- I mean,
7   correct me if I'm wrong.  But I don't see that RealPage has
8   any authority to do anything except tattletale.
9              MR. COUGHLIN:  Well, sometimes tattletales can
10  have --
11             THE COURT:  Sometimes.
12             MR. COUGHLIN:  -- a terrific -- most of the time
13  tattletales can have, you know, a terrific impact.
14             RealPage has to get from 3 to 7 percent above the
15  market.  And they say, hey, you're going to get 3 to 7
16  percent above your competitors.  They actually say that.
17  They say that in the next document on the website we're going
18  to look through.  So if there are people cheating or
19  deviating from the price -- okay?  -- they're not going to
20  get that.  RealPage is not going to get that.  They want
21  everybody in line.  And for the most part the property owners
22  want everybody in line.  You know what happens?  John and
23  Mary over here, they've been at that apartment building for a
24  long time.  They don't want to set that supracompetitive
25  rent.  They don't want to raise the prices we have in one

```
1    paragraph, 27 percent.  No, they don't want -- they may even
2    know the people in that apartment building, so they deviate.
3    Okay?  They deviate -- John and Mary deviate for their
4    friends.  And the next thing happens, you know, John and Mary
5    are out.
6              THE COURT:  Okay.  So I think -- maybe I can put
7    this to rest.  That the enforcement mechanism that's alleged
8    in the complaint, is really designed to lower-level defendant
9    employees, the assistant to the assistant to the assistant
10   property manager at this place?
11             MR. COUGHLIN:  It's designed, as you said,
12   tattletale on a --
13             THE COURT:  At a low level.
14             MR. COUGHLIN:  But it rises all the way to the
15   top.  The report doesn't just go, hey, Mary and John, what
16   are you doing?  The report goes to Mr. CEO, you know, up here
17   at the top.  And he learns that they've deviated.  And they
18   tell 'em, hey, you just lost 15 percent of your profit
19   because John and Mary over here didn't follow the
20   recommendation that you're paying for.  It's anything but a
21   recommendation.  It's a price setting mechanism to beat the
22   market 3 to 7 percent.  Okay?  And they get enough people to
23   accept it and then they move forward.  And that's what's
24   happening here.
25             THE COURT:  So let's go back to the beginning.
```

1  And I'm going to let you come back, but this is helpful.

2  Don't forget where you are.

3          So what is it that plaintiffs say -- I'll just

4  tell you.  As I read and reread both complaints, what's the

5  confidential, sensitive price and supply information they're

6  providing?  I guess -- I'm left --

7          MR. COUGHLIN:  They are providing their most

8  sensitive --

9          THE COURT:  Well, in the complaint.  Do you ever

10  tell me what that is?

11          MR. COUGHLIN:  We tell you -- we can list out what

12  it is and what it covers.

13          THE COURT:  Okay.  Where is that?

14          MR. COUGHLIN:  Okay.

15          THE COURT:  I know it's in part -- at least at one

16  time it included some LRO public information.  But all that

17  got merged together.  So what got merged together?  What is

18  it that when I sign up for -- or when the defendants sign up

19  with RealPage and they agree to provide their confidential,

20  sensitive data, what is it?  Where in the Complaint do I go

21  to find that?

22          MR. COUGHLIN:  Well, in this document I was just

23  about to go through --

24          THE COURT:  Okay.

25          MR. COUGHLIN:  -- at paragraph 13 and paragraph --

```
 1              THE COURT:  What document are we looking at now?
 2              MR. COUGHLIN:  And now we're looking at the second
 3   document.  The blue document.
 4              THE COURT:  The blue document.  That's going to be
 5   Number B.
 6              MR. COUGHLIN:  B.
 7              (Whereupon Plaintiff's Exhibit B was marked for
 8   identification.)
 9              MR. COUGHLIN:  And that's "Proven in Any Market
10   Cycle."
11              THE COURT:  What page are you?
12              MR. COUGHLIN:  And we're going to go to page 6.
13              THE COURT:  Okay.
14              MR. COUGHLIN:  And I'm going to go further and get
15   to the details that you wanted.
16              But first I wanted to say, so this is Greystar
17   saying they've got a revenue lift, using RealPage's
18   YieldStar, of 4.8 percent.
19              In other words, that's a supracompetitive price.
20   And they've outperformed the market by that.  And look at the
21   next line.  "Delivering a sustained, verifiable revenue
22   premium of 3 to 7 percent."
23              In other words --
24              THE COURT:  I'm sorry.  Where is that?  Oh, at the
25   top.
```

1          MR. COUGHLIN:  Right at the top:  "Delivering a

2   sustained, verifiable revenue premium of 3 to 7 percent."

3   Think of what -- this is on their website, RealPage's

4   website.  Here's one of their biggest clients, Greystar.

5   Okay?  And they're saying, hey, using -- using YieldStar we

6   outperformed the market -- our markets -- by 4.8 percent.

7   That's above the competitive rate.  Okay?  That they have

8   done.  And RealPage says it's verifiable.  Now, we can't

9   verify it you know right at this time.  What we have is a

10  number of these defendants talking about how they

11  outperformed the market.  Then we have the pricing charts

12  that I know you're going to get to a little later that --

13  that -- and they give you actual numbers.

14          In other words, in 2021 at a national conference

15  they say, hey, rents have gone up 14 percent across the

16  nation.  And who takes credit for it?  RealPage says, yeah,

17  that's us; I think we're driving that 14 percent increase.

18  Okay?  Well, that's an above-market rate.  Okay?  That's a

19  supracompetitive price.  That's not okay.  That's illegal.

20          And here is Greystar saying, hey, we got a revenue

21  lift.  Okay?  And then they talk about how comfortable they

22  are using the solution.  But you were asking about what's the

23  data.  If we look -- if we flip to page 8, we've got a

24  different client.

25          First of all, early in the complaint, in

paragraphs 9 and 11, we detailed that several of the
defendants got together and did a video and said, hey,
this -- this transactional data that we get from RealPage is
critical.  And -- and they say, well, you know, you admit
that transactional data is anonymized.  Okay?  And we don't
admit that.  What we know is that they take the data from all
the competitors and they spit back a price.  Defendants make
a lot of the argument, hey, well, they didn't --

           THE COURT:  Well, can I at least -- just so I can
follow you.  Is the -- is the data that RealPage customers
provide to RealPage a combination of public information and
private information?

           MR. COUGHLIN:  No.

           THE COURT:  No?

           MR. COUGHLIN:  No, it's just their own -- it's
their own private information.  These guys then combine it,
with public information that they have, into one big
information center.  Right?

           THE COURT:  And is the private information
consisting of stuff on the web that anybody can go and look
at?

           MR. COUGHLIN:  Everywhere.  From credit
agencies -- everywhere.  Okay?  You're saying -- but now
here's what's important.  In their 10-Ks -- the last 10-K
that RealPage filed in 2020 -- they said that if they didn't

1  maintain access to the client confidential data their

2  business would be hurt.  That's how important it was, the

3  client data.  Like, you're thinking, oh, well, they're

4  getting all this public data over here, so what's it matter

5  we throw in a little private data?  They actually say in

6  their 10-K filed with the SEC, if they -- if we lose access

7  to this -- okay? -- to this private data from the clients,

8  our business is going to be hurt.  Okay?  That's just before

9  they sold themselves for $10 billion to Thoma Bravo.

10            So they're admitting that the critical thing is

11  that the client information, the private competitive

12  information they get from each client -- and that's why I

13  wanted you to look at page 8.

14            THE COURT:  Okay.

15            MR. COUGHLIN:  Okay?  And if you go down to the

16  solution:  "YieldStar revenue management provided Trammell

17  Crow with a solution that determines unit pricing based on

18  unit type, availability, move-in date" -- this is all

19  information coming from Trammell Crow.  Because they're the

20  ones who have the occupancy rates.  They're the ones that

21  know when the lease is up.  So RealPage goes back to them,

22  after they get all this confidential private information,

23  about at least these ten different terms here, and then they

24  recommend -- what do they recommend?  They recommend a price

25  based on the unit type, the availability, the move-in date,

the lease terms, current and historical demand, rent leasing,
velocity and more.  Okay?  So they're getting the private
information from Trammell Crow -- because they don't know
when the leases are up.  Only Trammell Crow know when the
leases are up.  They don't know exactly what unit -- you
know, is it facing out?  Has it got a high ceiling?  All of
these things go into it.  And they give it to RealPage.
RealPage spits back out to them a price every day -- they
have to accept it by 9:30 or not -- every day, hey, here's
the price for that unit, unit B on the third floor, you know,
with the internal stairwell.  You know?  That price then --
even if it -- even if they --

             THE COURT:  So when you all refer in the complaint
to transactional data, that's something different?

             MR. COUGHLIN:  No.  That's this.

             THE COURT:  That's this?

             MR. COUGHLIN:  That's part of this.

             THE COURT:  Oh, okay.  All right.

             MR. COUGHLIN:  That's what this is.

             THE COURT:  All right.  Because I think the
Student complaint actually does a better job laying that out.
But I see what you're saying.

             MR. COUGHLIN:  Well, Mr. Berman is an excellent
lawyer.  And so he probably did a better job than me laying
that out.

```
 1              THE COURT:  I've got some questions for him, too.
 2    Don't worry.
 3              So that's referencing what's being provided?
 4              MR. COUGHLIN:  Yes.
 5              THE COURT:  Okay.
 6              MR. COUGHLIN:  I mean you're providing -- you're
 7    providing -- you wouldn't provide your competitor your
 8    pricing data, you know, and everything you were doing for a
 9    particular unit if you didn't have an agreement.  And that's
10    what they're doing.  They are using RealPage to facilitate
11    that.  They go through RealPage.  Okay?  And -- so they don't
12    need to share that information directly with the competitors.
13    They -- it's even -- you know, it's like supercharged.
14    Right?  That's the only way they can outperform the market by
15    3 to 7 percent.  And they say it's verifiable.
16              THE COURT:  Okay.  So let's talk about the
17    conspiracy.  What exactly are you alleging?  It's a
18    horizontal conspiracy among competitors or --
19              MR. COUGHLIN:  That's it.  That's the main
20    competition --
21              THE COURT:  That's it and nothing more, or does it
22    have some vertical aspects to it?
23              MR. COUGHLIN:  No.  RealPage is in it.  They're
24    facilitating it -- right? -- so they're a coconspirator.
25              THE COURT:  So you're calling -- so you're
```

alleging RealPage is a facilitator to the defendants'

agreement to fix prices?

MR. COUGHLIN:  Right.  The question is are they

vertical.  And I say, no, RealPage is not a real vertical

player in this market.

Now, we talked about three cases a lot.  And those

three cases were *Interstate Circuit*, *Toys R Us* and *Apple*.

Okay?  And that's where you have like a real vertical player.

Lets take *Interstate Circuit*, where you have the owner, a big

owner of dealers, and they -- and that owner writes to the

distributors and say, hey, I want you to charge 40 cents

first run, 25.  And it's an extreme departure, you know, from

anything that's happened before.  And there's no agreement

between those distributors.  They all just do it.  It's

concerted action.  Concerted action takes the place of an

actual formal agreement.

The defendants keep trying to put us into a box;

say, where is the smokey room; who got in; who said what --

and I'm going to get to the who, what, where and when from

your *C.S. Sewell* case.  But who said what and when at a

certain time and shook hands and had either an oral or

written agreement.  That's not what happened here.  Okay?

You don't have an oral or written agreement.  But you do have

concerted action.  Okay?  And --

THE COURT:  And what's the concerted action among

1  the horizontal competitors?

2          MR. COUGHLIN:  The concerted action is the

3  agreement to accept the RealPage, quote, recommendation, and

4  work together to raise the rents 3 to 7 percent, you know,

5  across the nation.  So that's the agreement that the

6  horizontal competitors by their action enter into.  Okay?

7          THE COURT:  So -- so -- and I'm not trying to put

8  words in your mouth here.  So are you alleging there's some

9  kind of hub-and-spoke conspiracy here or just purely

10  horizontal participants using RealPage as a facilitator?

11          MR. COUGHLIN:  I -- both.  Right?  I think --

12          THE COURT:  Okay.

13          MR. COUGHLIN:  I think that if you decide -- our

14  argument is that their -- it's really just a facilitator

15  argument and that it's not a hub-and-spoke hierarchy, like we

16  have in *Apple* or *Toys R Us*, okay?  And our argument is that

17  it's an agreement among the horizontal competitors to give up

18  their independent decision-making on pricing.  And that's

19  what *American Needle* prohibits.

20          THE COURT:  So I'm with you there.  And I'm with

21  you in terms of understanding your argument.

22          What I'm -- what I'm looking for, where are the

23  allegations that allow me to infer the horizontal agreement

24  to accomplish this through the intermediary RealPage?

25          MR. COUGHLIN:  Got it.

1          THE COURT:  Where is that?

2          MR. COUGHLIN:  Well, in these two documents that

3   we just looked at that are on RealPage's website -- that's

4   where we got them.  Okay?  That's an invitation to literally

5   all the property owners across the country.  You know, ECI

6   acknowledges they're competitors but says we work together on

7   the pricing strategy.  I think that's enough for -- to show

8   the agreement among -- especially when you've got an 80

9   percent --

10          THE COURT:  When you say they work together on the

11  pricing strategy, that means they're using what RealPage is

12  giving them for pricing.  What I'm trying to find is behavior

13  of the defendants indicative of the conspiracy using RealPage

14  as -- as an intermediary.

15          MR. COUGHLIN:  Well, first of all, the sharing of

16  your private information would dispel that it's independent

17  action.  You don't share your private confidential

18  information with your com- -- with --

19          THE COURT:  So that they share that information

20  with knowledge all my competitors are doing it, too?

21          MR. COUGHLIN:  Yes.

22          THE COURT:  Okay.  Now I see what you're saying.

23          MR. COUGHLIN:  Yeah, all my competitors are doing

24  it, too.  That's the main thing.  Is that, like in the

25  *Masonite* case, they entered into vertical agreements with

1  *Masonite* -- right?  -- but all the other horizontal players,
2  who didn't talk to each other, knew that everybody was
3  signing the same type of contract.  That's what's going on
4  here with RealPage.  All the competitors are signing the same
5  type of contract, and they all know that they're
6  participating.
7            THE COURT:  And how do I know that my competitors
8  are also doing this?
9            MR. COUGHLIN:  You don't have to -- you don't have
10  to wonder.  They give you a peer list in your area of your
11  competitors.  Not only do they give you a peer list, you
12  know, they give you the addresses of --
13            THE COURT:  I don't know if I know that when I
14  sign up for the first time and send in that first fee to
15  RealPage.  I don't know if I have the peer list.
16            MR. COUGHLIN:  I guarantee you that the first
17  thing they went and told you was, hey, you're going to get a
18  list of your peer group, and if you think we left somebody
19  out -- and there's a couple paragraphs in the middle of the
20  complaint about the peer list and the providing of the peer
21  list -- and if you think we left somebody out, you know,
22  we'll include them in that peer list, and get that
23  documentary evidence; if we can, of course.  They have to
24  be -- they are told whether they are using RealPage's RMS.
25  They're given the address of the building.  So even if you

didn't have the name, but you have it with the peer list.  So
they know exactly who in their area is using RealPage, and
getting that pricing recommendation.  And that pricing
recommendation for all the information that they're giving
over comes back, and if the unit is just the same as your
competitor's -- you know, third floor, two windows, you know,
a two bedroom thing, they're going to have a price raised
just the same as yours.  Nobody's going to be disadvantaged.
You're all going to get a lift somewhere between 3 and 7
percent above your market.  So you can't do better than that.
And so there's no reason not to do it.  And they paid
millions of dollars a year to get this information.  So it's
not like they're just not using it.  They are using it.

          And we talked -- so that's some of the direct
evidence we have.  We also have one of the early engineers --
I think it's paragraph 23.

          CW4, one of the early engineers, said that what
was going on at RealPage was that (as read):

          The practice of centrally setting and consistently
raising rental rates having bastardized the RealPage original
supply and demand model.

          THE COURT:  So are you looking at paragraph 23?

          MR. COUGHLIN:  I'm looking at paragraph 29.

          THE COURT:  29.

          MR. COUGHLIN:  Paragraph 19, note 26 and 25 and

paragraph 29.

                    According to CW4 (as read):

                    RealPage warped the original model and ultimately
created what CW4 described as massive collusion.

                    That's an admission of guilt.  That's what
*Highland* says -- right? -- that you need for direct evidence,
is -- the Sixth Circuit case *Highland* -- is an admission of
guilt.

                    We're on the government's side, that if you're
just trying to show concerted action you don't need an
admission of guilt.  But here -- here's a guy that worked
there, a former employee, admitting to massive collusion.
That's some of the direct evidence that we have.

                    RealPage says we set the prices.  These people say
they adopt the prices that RealPage recommends.  You know.
And then we have two things.  This industry was turned upside
down by what RealPage was doing.  And people throughout --
and it's noted a number of times when we talk about heads in
beds and the vacancies.  There was a fundamental change in
this industry that went from trying to keep the places
occupied to a new paradigm.  And that was, hey, we're going
to maximize rent over occupancy.  And that was a change that
had never occurred before in this industry.  And the new
focus is on rents versus occupancy.  And that's at paragraph
235 in the complaint.

1          And then you have the CEO of RealPage in paragraph

2    33 talk about how people at Morgan Communities went from 2

3    and 3 percent vacancy, being as comfortable, up to 5 percent

4    vacancy.  And then we have other people saying this was a

5    fundamental change in how this business operated.  And that's

6    the same thing we have in the three cases that we were

7    talking about, Interstate Circle [sic], *Apple* and *Toys R Us*.

8    There was a fundamental change in the industry.

9          Those -- those rent hikes in *Interstate Circuit*

10   were like 10 or 15 cents a movie above what they had been

11   before.  The Apple agency agreement, where the publishers

12   entered into an agency agreement with Apple, that had never

13   happened before.  So that was a fundamental change in the

14   industry.  And then Toys R Us got the manufacturers to quit

15   selling to the wholesalers.  That was a fundamental change.

16   They had always competed, Toys R Us, head to head with that.

17   That was a big change.

18          And a case that's kind of also on point is the

19   *Uber* case.  The case -- the *Meyer* case, *Meyer versus*

20   *Kalanick*, out of the District Court of New York, Judge

21   Rakoff.  He talks about the drivers have an agreement with

22   Uber.  Right?  They have an agreement.  There's not real

23   evidence -- they didn't get together with one big conference.

24   And these guys get together for big conferences all the time.

25          THE COURT:  So let's come back to this case.  It's

1  no doubt -- at least from your argument, you concede that the
2  defendants, even those -- after they've signed up for
3  RealPage, after they have provided their confidential
4  sensitive information to them, and they get the price
5  recommendation/decision from Real -- from RealPage, each
6  defendant still maintains some, quote, independent discretion
7  on how to use that.  Yes?
8              MR. COUGHLIN:  And I --
9              THE COURT:  Correct?
10             MR. COUGHLIN:  No.
11             THE COURT:  Okay.
12             (Overlapping speech.)
13             THE COURT:  Why is that?
14             MR. COUGHLIN:  If you get the price
15  recommendation -- okay?  -- you know what everybody else is
16  starting from, and that's the violation right then.  When you
17  cheat on it --
18             THE COURT:  Wait a minute.  I don't know that you
19  alleged that when I get my -- or defendant gets their
20  individual weekly pricing recommendation -- I did not see an
21  allegation they get everybody's else's too.
22             MR. COUGHLIN:  No, they don't.
23             THE COURT:  Okay.  I thought that's what you said.
24             MR. COUGHLIN:  No.  No.
25             THE COURT:  That's my question.  Once I get my

1  individual defendant pricing -- weekly pricing

2  recommendation --

3          MR. COUGHLIN:  Right.

4          THE COURT:  -- I still have -- I have some

5  independent discretion on what to do with it.  Because if I

6  didn't, you wouldn't need the enforcement mechanism.

7          MR. COUGHLIN:  Maybe.  But you have -- but I say

8  once you have a starting point that it's set at illegal in a

9  supracompetitive price.  What you do with that after that --

10         THE COURT:  Oh.

11         MR. COUGHLIN:  -- is irrelevant.

12         THE COURT:  So it just poisoned the water and

13 really nothing you can do to take the poison out?

14         MR. COUGHLIN:  Well, I don't know if you spend

15 millions of dollars on something that you just say, you know,

16 let's see what they say today.  No.  They're trying to get

17 that supracompetitive rate.  And, in fact, according to the

18 testimonials on RealPage's cites, these companies are beating

19 the market.  Okay?  That's what RealPage is telling all the

20 competitors out there.  Hey, if you do this, you can beat the

21 market.  Look at these guys.  These guys beat the market.

22 Okay?  And they're giving examples -- when you have an

23 example like Greystar, one of the largest property

24 owner/operators in the country saying, hey, we got a lift of

25 4.8 percent, and then right next to that they say -- RealPage

says, delivering a sustained, verifiable revenue premium of 3
to 7 percent. Okay? That's -- that's an illegal agreement
between the horizontal competitors to all stay in line so
they can raise their rents across the country. And that's
what happened. That's what they did in location after
location.

So we were getting into the circumstantial
evidence. And we first talked about the fundamental change
in the heads in beds versus rent maximization. But then we
also showed -- we show a rise in price across the country
from -- from 2013 to 2023.

THE COURT: So are you going to your charts now?

MR. COUGHLIN: I wouldn't want to get there before
you wanted to get there, but I know you were going to get
there.

THE COURT: Well, you mentioned the rise in price.
And that's alleged as one of the parallel conduct.

MR. COUGHLIN: It is. And -- well, we have more
than pricing charts.

THE COURT: Well, let's just go to the charts.
Because I'm able to see them. And you gave me larger
versions of them. But that's one question I have. What
exactly -- and I'm looking at the charts at paragraph 22.

MR. COUGHLIN: Oh, you're looking at first --
paragraph 22?

```
 1              THE COURT:  Yeah.
 2              MR. COUGHLIN:  Yeah.
 3              THE COURT:  And I just wanted -- yeah.  Page --
 4              MR. COUGHLIN:  What paragraph?
 5              THE COURT:  Paragraph 22, page 17 in Document 530,
 6      Figure 2.
 7              So easy question.  What do the plaintiffs want me
 8      to take from this?  And -- as I go through, you know, the
 9      analysis here to determine if there's a plausible claim.
10              MR. COUGHLIN:  Well, if you take a look -- if you
11      take a look at Figure 2, paragraph 22 that you just referred
12      to -- and that is the first -- I think that is the first
13      document in Appendix B.
14              THE COURT:  Yeah.
15              MR. COUGHLIN:  Okay?
16              THE COURT:  What do you want me to make of this?
17              MR. COUGHLIN:  I want you to take a look at that
18      and say to yourself, how did all these guys stay in such line
19      for all of these years.  Because RealPage started a little
20      earlier than 2016.  And they started to gain more momentum.
21      And so then I want you to take a look at the jumps.  Like,
22      when we said -- when those guys at RealPage -- let's take a
23      look at a jump from --
24              THE COURT:  Well, first thing is, what am I to
25      make of 2013 to '16?  Because '16 is when the conspiracy
```

1  starts.  What do I do with those three years?

2         MR. COUGHLIN:  I just think you see that, you

3  know, as people are adopting it we are getting a parallel

4  movement in price.  Okay?  This isn't the end-all be-all --

5         THE COURT:  Well, kind of, but it's not -- it's

6  certainly -- I think you all described -- almost perfect --

7  you said in the complaint.  It's kind of, but it's -- it's

8  not consistent at every point.

9         MR. COUGHLIN:  It's not consistent in every place

10 and everywhere.  But I'll tell you what, it's consistently --

11 and -- and almost in line raising rents across all of these

12 defendants.  Okay?  That's -- that's a stunning rent raise,

13 you know; especially as it gets higher, as we move into the

14 2017, 2018, and 2019 timeframe.  Those are -- those movements

15 of up -- and even in a down market they're still saying

16 you're going to outperform the market.

17        THE COURT:  Well, looks like -- I mean, help me

18 here.  2017 to 2018 looks pretty flat.  Look at that -- I

19 can't tell who is the -- all the --

20        MR. COUGHLIN:  Well, if you look at those numbers

21 you may say it looks pretty flat, but that's a 100 to $200

22 rent raise really in those dots that are going up in that

23 period of time.  Because they're starting at a thousand if

24 you move over there.  You're almost at 1200 if you move

25 across the line.  If your -- let's say your rent was 1600 --

okay? -- in 2016. In 2017, if you just follow the green
line -- I guess it's CWS Apartments. If you just follow
that, that has gone up. It doesn't look like a lot. But to
a renter 100, $200 a month is a lot of money.

THE COURT: So I should take from this figure,
Figure 2, paragraph 22, this shows consistently rising --
well, I won't say consis- -- this shows a trend of rising
rates from -- beginning in 2016 at least?

MR. COUGHLIN: At least. And it's quarterly data.
You know, defendants complain that it's not daily pricing
data. Well, we don't have access to daily pricing data.
This is the best historical data we could get at this time
without discovery. And all's we're trying to show with this
is that there's -- there is more parallel -- you could draw
an inference that this is parallel pricing. Parallel pricing
alone doesn't get you there. Right? It's not enough. Okay?
You have to have parallel pricing, when we're talking about
circumstantial evidence, and something else.

Well, we started with parallel conduct in the
heads in beds versus vacancies. Okay? So we have two types
of parallel conduct going on here before we get to the plus
factors. And what's the first plus factor? The first plus
factor here is, would you do this -- okay? -- if there wasn't
agreement? In other words, would you raise your rent and
increase your vacancies unless you knew that the -- the

1  property down the street was doing the same thing.  It would
2  be economically against your interest.  And that's really the
3  crux of the big plus factor here.  You can't -- you can't
4  raise your rents in a given metropolitan statistical area --
5  okay? -- if your competitors aren't.  If the people that are
6  just the same, your peer list -- your peer group, if they're
7  not doing the same, your vacancies are going to rise through
8  the roof.
9           So, that -- the fact that it -- that's not what
10 happened.  The fact that they didn't go extreme in vacancies,
11 even though they were doing rent maximization versus trying
12 to get, you know, at least -- less than 2 percent of vacancy
13 rate, the fact that they were able to do that shows two types
14 of parallel conduct.  One, this pricing chart, and, two, the
15 conduct of heads in beds.  And then we go to the economic
16 interest.  Right?  It would be against the economic interest
17 to do that.  And what's the next plus factor?  The next plus
18 factor is sharing -- if you share your competitive sensitive
19 information, that dispels -- according to at least five or
20 six cases that we've cited -- that dispels independent
21 action.  Okay?  If you -- if you are -- you don't share your
22 competitive information -- right? -- and keep your
23 independence.  You're giving it away to somebody else to make
24 those decisions.  You're giving it to RealPage.  That's
25 contrary to your own -- keeping your own independent

decision.  And that's what that sharing of the confidential
information was.

        We talked about the enforcement that we talked
about.  And the other two factors are motive and opportunity.
Think about the opportunity that's presented here.  We all
know the motive.  Right?  They want to outperform the market.
But the opportunity here -- with RealPage facilitating this,
on a daily timeframe, at 9:30 in the morning, and you have to
accept, and if you don't accept it, you have to give a
business reason.  Which according to numerous people in our
complaint said is rejected 99 percent of the time.  Right?
Because John and Mary, they don't have a business reason for
not, you know, raising it all the way up.  They just like
that family over there so they didn't want to raised rent 27
percent.  Okay?

        If you don't give a valid business reason, you
don't get to deviate.  So you said, oh, well, it's just a
recommendation.  But if you don't give a valid business
reason, you don't -- you could override it.  You're right.
Probably top management could override it and say, no, we're
going to deviate anyway.  But it's anything but easy to
deviate.

        So that's why I -- we say here we've got direct
evidence of concerted action among the horizontal players.
And that's what we're really looking at here, right?

1          We don't care if RealPage makes a ton of money.
2     We don't care.  What we care about here is what is the impact
3     that the horizontal competitors getting together and raising
4     prices is having.  What's the effect of that activity.  And
5     the effect of that activity is it's, you know, pricing people
6     out of their homes.  And that's the crux of this complaint.
7     We have -- we have an effect.  And the government's going to
8     say they don't need an effect to police this type of
9     activity.  But we have effect, and we have an impact here
10    from the collusive activity.
11          THE COURT:  So I took down notes of what you are
12    relying upon as the plus factors.  Any others?
13          MR. COUGHLIN:  No.
14          THE COURT:  Okay.
15          MR. COUGHLIN:  I think I added two that were not
16    in the Sixth Circuit, *Remax* and *Highland* cases.
17          THE COURT:  So can we go to paragraph 160 to 161.
18          MR. COUGHLIN:  161, Your Honor?
19          THE COURT:  Oh, I'm sorry.  That was in the
20    Student complaint.
21          Actually, I want to go to the allegations you make
22    in the complaint where we -- where you talk about market
23    power.  And as I read it, you're relying upon -- well, let me
24    make sure I know what you're relying upon.  You're relying
25    upon an earnings call and what was said during that call.

1  Correct?

2          MR. COUGHLIN:  In part.

3          THE COURT:  Okay.  And what's the other part?

4          MR. COUGHLIN:  Okay.

5          THE COURT:  That's the first part.

6          MR. COUGHLIN:  What we're really relying on is in

7  a per se violation we don't have to demonstrate product

8  market -- product or a product market and because we show an

9  effect, an impact.  And the market power is just a surrogate

10 for actual that somebody can impact it.  So our main argument

11 is talking about how we have an effect -- we have an effect

12 here.  Okay?  So we don't -- we don't necessarily need --

13         THE COURT:  But if I get to that issue what are

14 you relying on?

15         MR. COUGHLIN:  Well, when you get to that issue --

16 of course, I'm going to give it to my partner to --

17         THE COURT:  Well, I'm just asking you to show me

18 in the complaint.  Because I've got earning calls.  We agreed

19 on that.  Is it anything other than that?

20         MR. COUGHLIN:  And she can better answer that

21 question because she's talking about -- I'll find it.  I'll

22 find it for you and give it -- but do they have market power

23 more than the 30 percent that he says?  Let's assume that we

24 accept it's not the 70 percent that he said first, that it's

25 the 30 percent.  Our argument in the complaint is that that

1  30 percent is enough market power in this type of market --
2  and the reason that it is is because there are high costs to
3  enter -- as a property defendant to enter into this market.
4  The -- it's hard for renters to move.  So it's inelastic
5  here.  And -- so when you combine all these things, that the
6  fact that they have a low -- let's say Toys R Us had 40
7  percent of the market power -- and so here we have 30
8  percent.  We'll accept that they say, hey, it wasn't 70.  He
9  was actually -- meant be to say 30 percent.  That that's
10 enough market power --
11             THE COURT:  And what case do you want me to rely
12 upon --
13             MR. COUGHLIN:  Well, you can look at the *Toys R Us*
14 case that said 40 percent.  And there's another case that
15 says 20 percent.  And I can't think of it at the moment.  But
16 before we get done here I'll tell you what that case is.
17             THE COURT:  Okay.
18             MR. COUGHLIN:  But I know we have the case.
19             MS. BOJEDLA:  And, Your Honor, if you'd like to
20 talk more about this transcript --
21             THE COURT:  I just want to know the case name
22 right now.
23             MS. BOJEDLA:  Oh, the case number for 30 percent?
24             THE COURT:  For 20 percent.
25             MS. BOJEDLA:  For 20 percent.  Oh, sure.  I'll

1    find that right now.

2                THE COURT:  While she's doing that, did we finish

3    your Exhibits A and B?

4                MR. COUGHLIN:  Yes.

5                THE COURT:  Okay.

6                MR. BOJEDLA:  Your Honor, that's at page 37 of our

7    brief.  We cite to *Valley Liquors*, which is 822 F2d at 667.

8    That's a Seventh Circuit decision saying market share between

9    17 percent and 25 percent is legally sufficient to establish

10   market power.

11               And I'm happy to talk about the transcript more if

12   you'd like.

13               THE COURT:  Okay.  Thanks.

14               MR. COUGHLIN:  Your Honor, we talked a little bit

15   about the description of what data --

16               THE COURT:  I'm sorry.  Say again.

17               MR. COUGHLIN:  We had talked a little bit about

18   the description of what data is given over.  And we were

19   looking at Exhibit B that you have up there in front of you.

20   But also, if you take a look at paragraph 227 of the

21   complaint.

22               THE COURT:  Okay.

23               MR. COUGHLIN:  And also, for a list of allegation,

24   if you want to take a look at 289.

25               THE COURT:  You said 289?

1          MR. COUGHLIN:  -89.

2          THE COURT:  I thought you said 229.  I didn't see

3     it on here.

4          Okay.  So can we finish up then on the charts?  I

5     don't want to get too far from the charts.

6          So you gave me the first one -- we talked about

7     the first one.  What about -- now I think we're moving to the

8     charts that are --

9          MR. COUGHLIN:  The second one is one bedroom.  And

10    you see the rents rise in the same way.  And the third one,

11    you'll notice, is two bedrooms.  But it's also broken out by

12    the grade of the property.  So you might have a defendant in

13    twice.  You know, if they have an A grade, they're up here,

14    and then a B grade property, and the lines follow.

15         THE COURT:  And I get you on that A grade, B

16    grade.  But I didn't see that in the complaint either.

17         MR. COUGHLIN:  I don't know if it's mentioned.

18    That's the way this chart was --

19         THE COURT:  Because I know all property is not

20    equal.

21         MR. COUGHLIN:  Yes.

22         THE COURT:  So I'm looking at paragraph -- let's

23    go back to the chart so we can wrap that up.

24         MR. COUGHLIN:  On that point about all property

25    not being equal, on A and B, if you take a look at those two

1   documents I gave you, they talk about A, B and C properties.
2   And so they were referenced in the complaint.
3          THE COURT:  Yeah.  Now I'm on paragraph 338.  And
4   then you give me these charts, about seven of them, that
5   break it down per, I guess, region -- or for city, Nashville
6   and Atlanta.  What are you trying to communicate to me here?
7          MR. COUGHLIN:  What we're trying to do is to show
8   parallel pricing for each defendant in a given metropolitan
9   area.  So we cover -- at least -- some are -- you know, like
10  Greystar's in most of them or something.  We're trying to
11  capture parallel pricing for each defendant in a market.
12         THE COURT:  And I guess in a nutshell what do you
13  say is the standard of review I am to apply on a motion to
14  dismiss when I look at these charts?
15         MR. COUGHLIN:  I think that these charts are
16  statistical evidence -- that you have to suggest at this
17  stage if they suggest that there's plausible parallel action.
18         THE COURT:  That suggests plausible --
19         MR. COUGHLIN:  An inference that there is parallel
20  action.
21         THE COURT:  And you have a case that applies that
22  to statistics?
23         MR. COUGHLIN:  Yes.
24         THE COURT:  Okay.
25         MR. COUGHLIN:  And I'll give you those two names.

1  I have two or three cases specifically --

2       THE COURT:  Show me where I missed it in your

3  brief -- or it may be new cases.

4       MR. BOJEDLA:  Sure, Your Honor.  That's at page

5  17, note 18.

6       THE COURT:  Note 18?

7       MR. BOJEDLA:  Correct.

8       THE COURT:  Okay.  May have touched on this, but

9  just so I know I have it clear.  Other than the parallel

10  pricing, what other parallel conduct are you relying upon

11  to --

12       MR. COUGHLIN:  The main parallel conduct that

13  we're relying on is the fundamental change in the industry,

14  that they all went from heads in beds to a rent maximization.

15  That is a fundamental change, like in the hub-and-spoke

16  cases.  And that's what we're mainly relying on here.

17       We also have the -- then we have the parallel

18  pricing, which we think is due deference at this stage.  And

19  then the next thing we have, is we have the charts that are a

20  little further in that talk about a flip between the -- a

21  positive -- a positive relationship between vacancies and

22  rents rising, both going up the same.  We only have a few of

23  those charts.  But that is another -- that's another

24  regression analysis that shows that there is a fundamental

25  change in what's happening versus rents versus occupancy.

```
 1    That's aside from the actual statements of the defendants
 2    that there's been a fundamental change, an admission by
 3    RealPage and the various property defendants, that there is a
 4    fundamental change in the industry.
 5                THE COURT:  Okay.  I think I heard you.
 6                MR. COUGHLIN:  Okay.
 7                THE COURT:  All right.  What's next on your list
 8    before I go next?
 9                MR. COUGHLIN:  I don't have --
10                THE COURT:  I cut you off in the beginning so. . .
11                MR. COUGHLIN:  No.  I won't do anything more right
12    now.  I'll respond to the defendants because it's their
13    motion.
14                THE COURT:  Okay.
15                MR. COUGHLIN:  I don't want to start creating my
16    own issues, Your Honor.  I have a tough time answering
17    theirs.
18                THE COURT:  All right.  Then let me hear from the
19    defendants I guess as to the concerns I raised with the
20    plaintiffs.
21                MR. SRINIVASAN:  Thank you, Your Honor.
22                We have some slides, Your Honor, to pass around --
23                THE COURT:  Sure.
24                MR. SRINIVASAN:  -- if that's okay with Your
25    Honor.
```

1          May I approach, Your Honor?

2          THE COURT:  Sure.

3          MR. SRINIVASAN:  So Your Honor, I would like to --

4    I'm sure you have questions for us.  But I would like to

5    actually address the issues that you raised with

6    Mr. Coughlin.

7          We actually have some of the same areas that we

8    wanted to cover.  And I would like to just start, if that's

9    okay, Your Honor, with this idea of why 2016 is what you

10   started with.  And we think that's an important question.

11   And part of it is, keep in mind the standard.  Right?  The

12   standard here on can you infer a conspiracy versus lawful

13   independent self-interest conduct is the talisman here.  As

14   you wrote in the *C.S. Sewell* case, the question is do you

15   raise an inference of coordination or do they negate the

16   likelihood -- and do they negate the likelihood of

17   independent action.  But the question is would this make

18   sense on an independent basis.  Now, what they've told you is

19   it makes --

20         THE COURT:  Well, they don't have to negate it on

21   a motion to dismiss.  Agreed?

22         MR. SRINIVASAN:  Well, I think that was in your

23   opinion and that --

24         THE COURT:  I said they don't have to negate it on

25   a motion to dismiss.

1          MR. SRINIVASAN:  Fair enough, Your Honor.

2          THE COURT:  Right.

3          MR. SRINIVASAN:  They still have to allege enough.

4    They have to cross that rubicon of saying this doesn't --

5    these allegations don't make sense unless there was

6    coordinated action, unless there was a conspiracy.

7          Now, they start by telling you that there was no

8    coordinated action, that it makes absolute sense for a lessor

9    defendant to use -- to license and use the software before

10   2016.  The allegation is that the software was introduced

11   roughly in 2006.  And so for a decade you had folks signing

12   up --

13         THE COURT:  A conspiracy can start any time I

14   guess it's worth conspiring about.  So --

15         MR. SRINIVASAN:  Fair enough.

16         THE COURT:  -- I get what they're saying on 2016.

17         MR. SRINIVASAN:  Well, on the -- and I'll get to

18   that specifically.  But, in fact, they have to explain why

19   for a decade folks -- it was in -- building lessor

20   defendants' independent self-interest to use this software.

21   And we'll talk about it.  It's because, they allege over and

22   over, is to maximize revenue, which is a perfectly

23   procompetitive pursuit.

24         THE COURT:  Does RealPage admit that was something

25   it touted to the public?

1      MR. SRINIVASAN:  Of course.

2      THE COURT:  Okay.

3      MR. SRINIVASAN:  Maximizing revenue is all about

4  competition.  It's what firms are supposed to do, maximize

5  revenue, maximize profits.

6      THE COURT:  You just can't get together and fix

7  the price.

8      MR. SRINIVASAN:  That's correct.  And nor is the

9  allegation that they -- that RealPage maximized price

10  somehow -- that the algorithm maximized price.  Now, they may

11  throw that in in conclusory manner, but let me get to --

12      THE COURT:  I didn't understand that last, nor is

13  it the allega- -- what do you mean nor --

14      MR. SRINIVASAN:  In other words, they occasionally

15  say it was to increase prices.  But when you look at the

16  allegations that they make in the complaint of what RealPage

17  actually said, it wasn't increasing price; it was increasing

18  revenue.  Now, sometimes that's increasing rent.  Sometimes

19  that's increasing occupancy.  And, in fact, they have

20  allegations, Your Honor -- and that's why I would like to

21  walk you through it.  Because what they say to you is that it

22  was okay to use the software before 2016.  And just from a

23  plausibility standpoint, let's think about the implications

24  of that.  Somebody signed up in 2008 and said, this is great,

25  it's maximizing revenue, this is what I'm supposed to be

doing, it's helping me -- and we'll talk about some of those

allegations.  Suddenly -- and they're going on for years

doing that.  In 2016, according to plaintiffs, something

happened.  It's very conclusory.  They say it's a shift.  But

suddenly that entity who was using RealPage happily and

independently, and in, you know, in ways that made sense,

that they said made sense, are now part of a conspiracy?

Well, where is the allegation that suddenly in 2016 the folks

got together and said, you know what, we've got to do this

differently?  There is no factual allegation about what

happened.

          Now, I can do you one better, though.

Mr. Coughlin got up and he said -- he said no, no, no, there

was a shift.  There was a shift in 2016 from prioritizing

occupancy -- or we used to put people -- heads in beds --

that's what they said -- to prioritizing rents.  That was --

that was what he told you.  I'm not sure that's actually

alleged in the complaint, but what I can tell you is the

opposite is alleged in the complaint.

          First of all, before I get to the complaint -- he

showed you Exhibit A.  I had never actually seen Exhibit A

before.  I hadn't clicked on it.  But he opened us up to page

5.

          THE COURT:  You're looking at A or B or both?

          MR. SRINIVASAN:  A, the orange one.  Page 5.  And

this was the star witness of his presentation.  If you read
the first -- first of all, the heading of Exhibit -- page 5
says Focus on Revenue Growth.  Right?  Not price growth.
Revenue growth.  And that's what RealPage does.  That's what
the aim, the purpose of the software is.  That's perfectly --

THE COURT:  I guess to be fair with plaintiff,
they would say revenue growth through coordinating your
price.

MR. SRINIVASAN:  They say that.  But they don't
prove that with any facts.

THE COURT:  Okay.  Well --

MR. SRINIVASAN:  So -- but what I'm saying is
revenue growth is what everybody sees.  If you're a business,
is it in your -- it's not, hey, collude with us and you'll
make money.  It's we'll help you with your business.  We'll
help you grow your business.

But really the punch line is that first sentence
of this is, "When under performance prompted major change in
2011, the multifamily industry was experiencing a
resurgence."

This document is talking about -- any shift in
strategy that this document was talking about -- Mr. Coughlin
said this document was from 2019, when he says we turned into
a conspiracy.  Now, I just think it's nonsense that people
that lawfully use a product suddenly are turned into

conspirators when a specific date is crossed or a certain
number of customers sign up.  But this document that he
showed you is from 2011, well before the conspiracy started.
So according to him, according to the complaint, 2011,
whatever we were doing was fine.  It was revenue growth.  It
was profit maximization.  It was fine.

Now, I can go to the complaint as well.  In the
complaint -- you asked for specific paragraphs.  Paragraph
252 of the complaint -- Your Honor, let me know when you're
there.

THE COURT:  Go ahead.

MR. SRINIVASAN:  Now, paragraph 252 is about a
defendant Camden in 2006.  So now this is ten years before
the conspiracy -- of the alleged conspiracy that they allege.
They talk about in that paragraph despite -- well, they say
(as read):

Rick Campo, the CEO of Camden, admitted that
Camden's turnover rates increased around 15 percentage points
around 2006 after implementing YieldStar.

Despite that increase in turnover rates -- which
is not heads in beds but getting people out -- defendant
Camden's overall same-property revenue grew over 7 percent.

Revenue is supposed to grow.

Paragraph 235.

Paragraph 235, Your Honor, is talking about

```
 1    conduct in April of 2009, seven years before the alleged
 2    conspiracy was apparently hatched.
 3              Quote, my -- this is from an executive at Morgan
 4    Group.  And he says (as read):
 5              My generation grew up worshipping the occupancy
 6    gods.  We learned if you were not 95 percent-plus occupied
 7    the asset was failing, but that's not necessarily true
 8    anymore.  RealPage turns the industry upside down.
 9              Now, the fact is that the sometimes favoring
10    occupancy is what generates revenue.  At other times,
11    favoring rents, leaving some unoccupied, generates revenue.
12    RealPage software helps people make that decision.  It was
13    always and continues to be in every lessor defendant's
14    independent interest.
15              THE COURT:  So why are you enforcing it at the
16    assistant property manager level?
17              MR. SRINIVASAN:  And -- and the answer is --
18              THE COURT:  Because they've got -- they can do it
19    or not -- if they can do it or not, why do you have that
20    enforcement mechanism?
21              MR. SRINIVASAN:  And let's talk about it.  And I
22    would disagree that there is any enforcement mechanism.  And
23    you're right.  Bear with me for a second.  You were right.
24              THE COURT:  Well, let's just pretend like there
25    is.  Because I think the complaint can be fairly read to
```

suggest that RealPage, along with the upper management of the
defendants, has an interest in making sure -- they allege
that recommended price being accepted.

MR. SRINIVASAN:  Sure they have an interest.

THE COURT:  Why do you need that then if they've
got discretion to accept it or not?

MR. SRINIVASAN:  So I would just start by saying
the discretion to accept a decision -- a recommendation --
excuse me -- is not a decision.  You have not dealt -- nobody
has delegated their authority to RealPage.  Right?  If that
had a happened -- which is again, the talisman of an
inference of a horizon- -- a delegation of independent
decision-making to a central figure.  Recommendation -- which
they allege -- and that's the truth.  It is a recommendation.
They did allege that.

THE COURT:  Let's call it recommendation/decision.
Now everybody's happy.

MR. SRINIVASAN:  Okay.  Well, that's not what's
alleged.  But, okay, fine.  Fair enough.

THE COURT:  It can be fairly read that --

MR. SRINIVASAN:  But what I would say, though, is
a conspiracy that is founded on a -- an admitted
recommendation by the software is no conspiracy at all.

THE COURT:  Yeah.  But that doesn't answer my
question.  Why do you need these price advisors and managers

```
1   having these calls --
2            MR. SRINIVASAN:  Sure.
3            THE COURT:  -- and weekly meetings and the student
4   complaint zoom meetings on this weekly -- on these daily and
5   weekly recommendations/decisions?
6            MR. SRINIVASAN:  Sure.  And because it's a
7   recommendation, and because people don't have to accept it --
8   RealPage believes in its product.  It says we are helping you
9   maximize your revenue, which is, again, a pro competitive
10  goal.
11           THE COURT:  So you need to accept this price to
12  maximize --
13           MR. SRINIVASAN:  You don't have to accept it.
14           THE COURT:  Right.
15           MR. SRINIVASAN:  In fact, if you --
16           THE COURT:  But that's what the meeting's about.
17           MR. SRINIVASAN:  Well, the meetings are -- and
18  these, again, are the allegations, Your Honor.  Paragraph
19  277, the pricing advisors persuade clients.  They, in 278,
20  assist clients in understanding.  This is unlike any
21  conspiracy we read about in any of these cases.
22           As you, Your Honor --
23           THE COURT:  Yeah, we'll get to that.  But let's
24  stay with this one right now.
25           MR. SRINIVASAN:  Sure.
```

```
1        THE COURT:  I'm still fixated on this --
2        MR. SRINIVASAN:  Why.
3        THE COURT:  -- the monitoring, the enforcement
4  efforts, call it what you will -- they call it enforcement
5  efforts.  That -- that -- the other side of that, that is
6  opposite that they were free to reject it or not.  You can
7  say I've got a recommendation to do something, but then when
8  you come back to me to see if I'm doing it, and you get with
9  my boss, his argument, the plaintiff's argument, if I'm doing
10 it, it becomes something a little bit more than a voluntarily
11 recommendation.
12        MR. SRINIVASAN:  Well, it -- what I would say,
13 Your Honor -- in fact, even --- this is, again, plaintiff's
14 allegations.  I'm trying to stick to their allegations.
15 Their allegations are not any kind of coercion.  It's
16 persuasion, et cetera.  The reality is -- the reality is, the
17 lessor defendants pay RealPage a license.  They pay them
18 money to say, hey, I'm paying you to license your software
19 because you're going to make me money, not because of a
20 conspiracy, but because I'm going to make more revenue.
21        One of the other allegation for instance --
22        THE COURT:  So let's stop there.  Isn't that
23 annual software fee that they pay to RealPage indicative of
24 their reaffirmation, whenever this conspiracy started, as
25 they allege, every time they paid the software fee, then I
```

think there were monthly fees that get paid based on the
pricing.  Every time -- you're not one of the -- one of the
property defendants -- paid that to you, they reaffirmed I'm
in, I'm all in, here's my money.

MR. SRINIVASAN:  Correct.  And what RealPage wants
to make sure is people are happy with the software and will
continue to use it.  Just like if --

THE COURT:  And it's certainly indicative of an
agreement of some sort.

MR. SRINIVASAN:  There's a vertical -- I mean,
they've alleged that we have independent vertical agreements
with every one of these clients.  Right?  Just like a lawyer
does have with a client.  The client pays you money.  You
say, hey, do this or don't do this.  You have an interest in
saying, hey, are you going to follow my advice?  Because my
reputation is at stake here as a lawyer.  You're paying me
money.  I'm giving you advice that's going to help you; I
want you to take it.  And RealPage of course wants every --
unrelated to whether defendant A, B or C is taking it,
defendant Q, who is a -- lessor defendant Q, the property
manager, the customer, Q, in front of RealPage, we want you
to get the best experience out of this software.  Right?  And
as you said, Your Honor, there's no separate enforcement
mechanism.  There's no we kicked you out.  Or some other
defendant came up to us and said, guess what, you're not --

1   this guy over there isn't taking the recommendation, kick him
2   out, police him.  There's no allegation of that at all.  At
3   best, RealPage says -- and he's got the story about Tom, Dick
4   and Jane.  But the idea would be that, listen, you've got
5   folks in units all over the country.  You've got a manager
6   over here who we're giving him good advice, the software is
7   suggesting you're not maximizing revenues.  And we think you
8   ought to think about that.  That's just good business.  And
9   most importantly, it's independent.  It's unrelated to any
10  conspiracy.
11          And just quickly on that, there's another
12  allegation in here, for instance, that they talk about,
13  smoothing out vacancies.  And I can give you the -- I can
14  give you the number.  It is paragraph 35 and 36, about, you
15  know, some of these apartments weren't particularly careful
16  about where vacancies would crop up and they would happen at
17  the same time.  The RealPage software, the RealPage service
18  said, this is something we can smooth out for you that's
19  going to increase your revenue.  That has nothing to do with
20  a conspiracy.
21          THE COURT:  Well, at some point in time, during
22  the alleged conspiracy, your customers got to know who the
23  other customers were.  True?
24          MR. SRINIVASAN:  Sure.  That's likely happened.
25          THE COURT:  And at some point in time during the

conspiracy, from their Second Amended Complaint -- I think I
know this.  I know that -- and you're not one of them -- but
your customers, the other defendants here, they paid you that
initial fee.  Correct?

MR. SRINIVASAN:  That's correct.

THE COURT:  The initial contract fee.

MR. SRINIVASAN:  Sure.

THE COURT:  When they signed up they had to pay a
fee.

And as a result of that contract they started
providing you confidential -- what they call confidential
sensitive -- I'll call it confidential pricing and supply
information, correct?

MR. SRINIVASAN:  The allegation is at some point
some confidential information was provided --

THE COURT:  Provided.  And as a result of that,
RealPage offered them a recommendation/strong suggestion of
what you should price for a particular point in time, a day
or a weekly basis.

MR. SRINIVASAN:  They'll use the data aggregated
and for a particular unit that's individualized for each
defendant.

THE COURT:  So -- and they paid a one-time fee.
You've already said they paid monthly fees.  They paid
software annual fees.  That shows, first, at least an

1  agreement with you.

2          MR. SRINIVASAN:  Absolutely.

3          THE COURT:  Okay.  And it shows at least they --

4  your customer's desire to continue to participate with you to

5  obtain the benefits that RealPage touted we're going to

6  optimize your pricing.

7          MR. SRINIVASAN:  Correct.  And according to

8  plaintiffs' complaint, Your Honor, for ten years that was

9  fine.  It was fine to do.  It wasn't -- it wasn't in --

10  collusive.  It was in everybody's independent economic

11  interest.  And there is no allegation that transforms that

12  fundamental relationship between RealPage and the customer --

13  by the way, they allege that the data -- the information

14  sharing was occurring.

15          THE COURT:  Except as they became part of the

16  contract with you they got to fine tune it, allegedly, so

17  that it was more helpful for their competition in the market.

18  And by fine tuning it, they -- they allege -- and I think I

19  can -- they got access to their competitors' information.

20          MR. SRINIVASAN:  There is -- that allegation does

21  not exist, Your Honor.  There is no allegation that they

22  received access to any information from any competitor.  The

23  only allegation that Mr. Coughlin --

24          THE COURT:  Not from any competitor.

25          MR. SRINIVASAN:  From RealPage.

1          THE COURT:  But they were able to discern from the
2     RealPage recommendation -- the RealPage recommendation was
3     indeed based upon their competitors.
4          MR. SRINIVASAN:  So that --
5          THE COURT:  True?
6          MR. SRINIVASAN:  No.  That's not true.
7          THE COURT:  So the RealPage recommendation was not
8     based -- you're saying -- well, I think they allege that.
9          MR. SRINIVASAN:  Well, you said discern.  So let
10    me unpack that a little bit.  In other words -- here's the
11    allegation.
12         THE COURT:  I thought it was just point blank,
13    that when you put it through the algorithm they combine the
14    customer's information, the competitors' information to spit
15    out a price.
16         MR. SRINIVASAN:  Fair.  That's roughly fair.  Now,
17    you asked Mr. Coughlin a question about --
18         THE COURT:  Well, let's continue down this road
19    and then we'll come back to that.
20         MR. SRINIVASAN:  So, yes.
21         THE COURT:  And once they -- once your customer
22    gets that recommendation, they may not know explicitly, but
23    by the lawyers here, they're good businessmen and women, I
24    know who my competitors are.
25         MR. SRINIVASAN:  Well --

1          THE COURT:  Hold on.  I know who my competitors

2    are.  So if I'm in Nashville, I know who my competitors are.

3    And I also know who's property is A, B, and C.  Now, that's

4    not in the complaint, but I think it's intuitive.  And I'm

5    not a real estate lawyer.

6               So I also know who my competitors are.  I know who

7    my real competitors are in terms of who has property similar

8    to mine.  And, you know, I'm -- I'm -- I'm trading off of

9    them.  I know where it's located.  So I know pretty good that

10   when I get that recommendation, or either from the process of

11   deduction, I know whose data is being used.  And I also know

12   they're a client of RealPage.  And by virtue of the

13   recommendation I get and the enforcement mechanism to employ

14   it, I feel pretty -- it's more likely than not that they're

15   going to employ and use that -- that pricing recommendation.

16   So I know what I'm doing.  And I know what my competitors are

17   doing.  And I think that's what plaintiffs are saying -- or

18   arguing or presenting in the complaint as the conspiracy to

19   fix prices.  So what do you say to that?

20          MR. SRINIVASAN:  Sure.  And what I would say is,

21   first of all, that's -- that's not alleged exactly.  But I

22   will get through that.

23          THE COURT:  Say it's a fair inference.

24          MR. SRINIVASAN:  Okay.  And that's not -- that's

25   not liability under the law.  And what I mean by that, Your

1    Honor --

2           THE COURT:  And we're not -- this is not summary

3    judgment.  I'm just trying to say does this case go on or

4    does this case need to stop.

5           MR. SRINIVASAN:  So I think, Your Honor, if you

6    look at slide -- if you can flip to your slide.  I want to

7    start with what they allege about the way the data --

8           THE COURT:  Well, I really wish you just go -- I'm

9    going to let you do that.  But while I --

10          MR. SRINIVASAN:  Well, it's important, Your

11   Honor --

12          THE COURT:  Just go ahead and tell me -- do you

13   disagree that that is enough for -- that does not make a

14   plausible claim.  That's the bottom line, your position.

15          MR. SRINIVASAN:  Correct.  And in part because --

16   and let me explain why.

17          THE COURT:  The because is real good.

18          MR. SRINIVASAN:  This is the way they alleged

19   their complaint.  They alleged that the data that each

20   customer provides to RealPage is aggregated, it's anonymized,

21   it's crutched, it's pooled.  In other words, it gets into a

22   giant pool -- of -- by the way, you asked Mr. Coughlin the

23   question of public information, as well as private

24   information.  That's actually in paragraph it 247.  All of

25   this is put into a soup.  And then a recommendation -- the

allegation is -- then the algorithm does its thing and it gives you a number. Now, the number it gives you is for your units. That's a two bedroom, looking over a pool, with the washer and dryer included versus not, with a gym in the building. And that's a very tailored, specific number that you get. From that number there is little that you can say about any other competitor that's in your market. Even if you kind of know who's across the street, you don't know that they have an equivalent rent.

THE COURT: Oh, I do. I can look across the street and see the pool, and I can see the people at the pool and out there drinking in the summer. I can see them working out in the gym, doing that. I can see all that.

MR. SRINIVASAN: But the allegation is -- excuse me. But the inferences there are also that the algorithm uses -- you know, if you're asking about how the algorithm works, it uses historical information from that building. And, in fact, this is not in the complaint, but the algorithm doesn't even use third-party information to determine if the price should go -- recommend a price up or down. It's very complicated. They talk about data analytics. It's compressed. It's -- excuse me -- processed over and over in various ways.

What the case law says is you need to be able to reverse engineer from that number -- in this case we get a

number.  Let me just step back.  You asked about, you know,
they know who the competitors are, et cetera.  That is
alleged.  That's the one thing that they do allege about --
that's not anonymized.  But cases like the local TV
advertising antitrust litigation, the various Agri Stats
cases I know we've cited and you've read -- in those cases,
data is actually aggregated and then disseminated to the
various folks.  The folks not only know who's part of the
group that's getting the information and who's participating,
but they get aggregated anonymized data.  And the TV case
says, quote, Courts seek concrete allegations -- allegations,
not evidence -- concrete allegations that the conduit
defendant compromised the ostensible anonymity of
competitively sensitive information through its publication.

          In every one of these cases, Your Honor, the data
was so specific -- and it was a mountain of data that each
defendant got in those cases.

          THE COURT:  -- an allegation that your customers
can say they get the peer guide, and they can say, well, I
need to add X, Y and Z, and you all do that.

          MR. SRINIVASAN:  Well, you -- I don't know if I
understood your question exactly, Your Honor.

          THE COURT:  They can add to the list of people
that are being used by --

          MR. SRINIVASAN:  Sure.

```
 1              THE COURT:  And people they know to be their
 2    competitor.
 3              MR. SRINIVASAN:  That's correct.  That's correct.
 4    There's various confounding data --
 5              THE COURT:  And you can't add them unless they've
 6    signed up with RealPage.  Because if I'm just a property
 7    defendant out there minding my own business, you're not going
 8    to get my sensitive information unless I sign up with you.
 9              MR. SRINIVASAN:  Well, maybe not sensitive --
10              THE COURT:  Correct?
11              MR. SRINIVASAN:  Not sensitive information, but
12    keep in mind, Your Honor, the allegation is public
13    information --
14              THE COURT:  Right.  But it's sensitive
15    information.
16              MR. SRINIVASAN:  Maybe.
17              THE COURT:  Whatever that means.
18              MR. SRINIVASAN:  Sure.  But list prices --
19              THE COURT:  And when you say yes I can add X, Y
20    and Z to your peer list of people, then I know they're with
21    you and they're subject to the same rules that I am.
22              MR. SRINIVASAN:  Well, except that the data when
23    it's aggravated and spits out your number --
24              THE COURT:  Right.
25              MR. SRINIVASAN:  -- and includes all other kinds
```

```
1  of confounding information you don't know what's being
2  weighted --
3              THE COURT:  Well, why do I care?  Why do I care?
4  All I care about is that my competitors are using you --
5  you're using their information, you're spitting out them a
6  number like you spit me out a number.  So we all -- we may
7  not have met, you know, at the club and come up with our
8  price, but we may have -- we did -- we did meet.  We met
9  through RealPage.  And as the government -- or, no, the FTC
10 lady.  Says you're Bob.  And we couldn't let Bob do it and we
11 can't let you do.
12             MR. SRINIVASAN:  Right.  Except what RealPage is
13 doing is nothing like what Bob -- in her hypothetical
14 everybody gives the information to Bob, and Bob tells them
15 what to do.  They delegate to Bob and Bob says here's what
16 everybody's doing.  You have none of that here.
17             THE COURT:  And Real- -- and your customers are
18 saying, all right, RealPage, do what you tell me you were
19 going to do, optimize my price.
20             MR. SRINIVASAN:  Sure.  What the customer is
21 saying is, yes, optimize my price, make me more profitable,
22 independent of anybody else.  And that's important because
23 for ten years they said that was okay.
24             THE COURT:  I agree.
25             MR. SRINIVASAN:  Right?  Anyway, so Bob --
```

1          THE COURT:  So even if that's true --

2          MR. SRINIVASAN:  Yes.

3          THE COURT:  And you know the standard of review on

4    a motion to dismiss.  Help me.  How do I get to your position

5    under the existing standard?

6          MR. SRINIVASAN:  So under the existing standard,

7    the standard is can you infer that this was -- that this

8    alleged conduct only makes sense if there's a conspiracy.

9    You can write that in a paragraph.  And you can say --

10          THE COURT:  I don't think we agree on the

11   standard.

12          MR. SRINIVASAN:  Well, in what way, Your Honor?

13          THE COURT:  I mean, the way I'm reading Sixth

14   Circuit cases, they're saying what I'm determining here is

15   whether the door should be open -- do they present enough

16   plausible information, pleadings, that satisfy the elements

17   to state a plausible violation to open up the doors to

18   discovery.

19          MR. SRINIVASAN:  Well -- so --

20          THE COURT:  And that's -- I think that's Judge

21   Gilman.

22          MR. SRINIVASAN:  That's In Re: *Travel Agent*

23   *Commission*, Sixth Circuit.  Right?  They say the standard is

24   -- the correct -- quote, the correct standard is, there must

25   be evidence that tends to exclude the possibility of

1   independent action.

2            THE COURT:  Yeah.  That -- yeah, we're not -- I'll

3   deal with that later.  I disagree.  I think Judge Gilman

4   came -- came in later in -- it may be the case you cited.

5   And he put to rest that the tend to exclude is summary

6   judgment language, and that's a published Sixth Circuit

7   decision.  So I don't have any choice but to follow it.

8            MR. SRINIVASAN:  In any event, Your Honor, the

9   allegation has to be plausible.  There has to be -- the

10  only -- well --

11           THE COURT:  -- focusing on that ten-year period

12  because I'm like you.  I'm bothered by that, too.  What do I

13  do with that on a motion to dismiss?

14           MR. SRINIVASAN:  Well, I don't understand how

15  that's an allegation that they can overcome.  If they tell

16  you, as they have --

17           THE COURT:  But what difference does it make if

18  they're saying it started in 2016?  I agree -- you're --

19  you're absolutely right.  But does that make the rest of it

20  not plausible?

21           MR. SRINIVASAN:  Well, they have to tell you

22  what's different.  I mean, you usually don't have a

23  complaint -- and this is a very unusual complaint.  You don't

24  have a complaint saying everybody was doing this thing for

25  ten years, and then suddenly it's a conspiracy.  They usually

1  say there was a pre period where things were a certain way

2  and then something happened, a letter, a series of meetings,

3  something, then transformed that -- the allegation has to

4  give you some belief that there was an inciting event.

5          Now, he's told you the inciting event was heads in

6  beds.  But that's not true.  The allegation is the heads in

7  beds allegation that RealPage was giving occurred well before

8  2016 by their own allegations.

9          Usually you don't have this, Your Honor.  Usually

10  the evid- -- we have to come in later and tell you no, no,

11  no, that's not how it is.  This is how the software has

12  always worked.  There was no shift in 2016.  There wasn't

13  nothing -- there wasn't anything magical that occurred.

14  That's exactly what they -- but here they have told you it

15  was fine.  And then he said conclusory there was a shift.

16  And then he tells you this is exactly what the shift is.  And

17  the allegations in the complaint have examples of that

18  happening before.

19          THE COURT:  So you know the essential elements of

20  a Section 1 violation better than I do.  Where -- what

21  essential element does that go to?

22          MR. SRINIVASAN:  Excuse me?

23          THE COURT:  What essential element does that go

24  to?

25          MR. SRINIVASAN:  That goes to the plausibility of

```
 1   -- you know, have they alleged -- have they alleged --
 2              THE COURT:  On a conspiracy?
 3              MR. SRINIVASAN:  A -- can you make an inference --
 4              THE COURT:  Okay.
 5              MR. SRINIVASAN:  -- that this was only because of
 6   a conspiracy, or even likely because of a conspiracy, or are
 7   the allegations, infer, independent economic self-interest.
 8              The other piece of this, Your Honor, is the
 9   recommendation.  I do just want to just spend --
10              THE COURT:  All right --
11              MR. SRINIVASAN:  -- one second on that.
12              THE COURT:  Okay.
13              MR. SRINIVASAN:  Because -- there is, again, a
14   misstatement made about the allegations in the complaint
15   about a recommendation.  The allegations in the -- are
16   that --
17              THE COURT:  What page are you on now?
18              MR. SRINIVASAN:  Excuse me?
19              THE COURT:  What page of the complaint?
20              MR. SRINIVASAN:  Paragraph 15, Your Honor.
21              THE COURT:  Oh, 15.  That was -- okay.
22              MR. SRINIVASAN:  Paragraph 15 is that folks take
23   the recommendation up to --
24              THE COURT:  Oh, yeah.
25              MR. SRINIVASAN:  Up to -- I know -- okay.  Up to
```

89 percent of the time.  Well, you know, Judge Du in Las
Vegas, the *Gibson v. MGM* case --

        THE COURT:  Yeah, I think I'm way ahead of her
because I've already let them amend the complaint.  I read
that opinion.  Very helpful.  But all she did is say no right
now, but can you amend, and they'll come back to where we
are.  So I think --

        MR. SRINIVASAN:  Well --

        THE COURT:  I think -- I think we're ahead of her.

        MR. SRINIVASAN:  Well, a little bit.  But she said
90 percent.  90 percent.  This is, remember, up to 80 to 90
percent.  That could be five percent.  And actually, they do
allege something like that and I'll get to that.  But
Judge Du said 90 percent is not enough.  We don't even have
that here.  So in that sense -- you may be ahead of her.  I'm
sure you are, Your Honor.  But threes guys are behind her.
Behind those plaintiffs, I should say.  Some of them are the
same folks.  90 percent was not enough.

        The other thing I want to make clear here, is that
they also say at a different point in the complaint that --
they concede that some of the defendants don't -- they don't
say which ones, they don't say how many, have, quote, low
acceptance rates.  Low acceptance.  That's paragraph 286.

        So again, what kind of a conspiracy -- and this
gets to can you draw the inference, can you draw an inference

of parallel conduct --

THE COURT:  And I'll ask you what difference does it make if it's -- if it's all 75 defendants here or if it's a mere 25?  It's still a conspiracy that they allege violates Section 1.

MR. SRINIVASAN:  Well --

THE COURT:  Maybe when we get to -- if we get to class, then maybe it comes down.  But what difference would it make if this --

MR. SRINIVASAN:  Well, you can't -- you know, and Mr. Cross is going to address the group pleading -- and -- my colleague here.  You can't just say, hey, we're throwing 50 people against the wall as being part of the conspiracy. Maybe when this all washes out 12 of them will still be in it.  That's not how a conspiracy works.  And that's not how -- you can't allege a conspiracy that way.  And, you know, we've had all the material on group pleading.  But just from a plausibility standpoint, Your Honor, think about that. Leave aside that we don't know which percentage are in and who aren't.  They don't tell us who they are.  How would a bunch of people get together?  How would these 45 defendants and RealPage get together and say here's what we're going to do when we know that everybody is free to undercut whatever they claim is a fixed price -- which it's not.  It's just a recommendation for an individualized unit.  But the

    allegation is that we would get together and agree we're
    gonna do this, we're gonna keep doing this.  And if everybody
    out there -- anybody out there can say, you know what, I can
    opt out.  I can just undercut everybody at any time on any
    whim for any reason.  I've just got to tell my boss about it
    according to Mr. -- that's fine.  But that is not a plausible
    conspiracy.  There is no conspiracy in any of these cases
    where the allegation or evidence or the conclusion was
    anybody could -- it was anything goes.  There's no policing.
    There is, in fact -- and that's the *Llacua v. Range* case from
    the Tenth Circuit, that says affirming dismissal where you
    fail to allege an enforcement mechanism.
            THE COURT:  So you agree there -- so now you're
    saying there isn't one here?
            MR. SRINIVASAN:  There is no enforcement
    mechanism, Your Honor.
            THE COURT:  Okay.
            MR. SRINIVASAN:  I mean, we have a semantic
    difference.  What I would say is RealPage has an incentive to
    go and convince people to use the benefits of the software.
    That's all they're saying.  It's just --
            THE COURT:  And RealPage does that.
            MR. SRINIVASAN:  And they're -- they allege to
    have -- do that and they do it.  They have pricing advisors.
            THE COURT:  They do it through pricing advisors?

1          MR. SRINIVASAN:  They do it in various ways.

2          THE COURT:  They do it through managers?

3          MR. SRINIVASAN:  Sure.  I'm happy to concede that

4   RealPage would like its customers to get the full benefit of

5   what they're paying for, which is independent --

6          THE COURT:  And RealPage takes action to make sure

7   they do get the full benefit.

8          MR. SRINIVASAN:  Well, you say they take action.

9          THE COURT:  They have these meetings.

10          MR. SRINIVASAN:  Sure they do.

11          THE COURT:  Okay.

12          MR. SRINIVASAN:  They do.  We're not denying that

13   any of that happens.  But none of that is enforcing a

14   conspiracy.

15          THE COURT:  But on a motion to dismiss.

16          MR. SRINIVASAN:  But they have to allege it, Your

17   Honor.  They don't allege it.

18          THE COURT:  Well, you don't call it enforcement.

19   But on a motion to dismiss don't I have to --

20          MR. SRINIVASAN:  Well, again I --

21          THE COURT:  I have to construe it -- yeah I know.

22   I do have to construe it in their favor.  And it may not be

23   much of an enforcement mechanism.  It may -- it may need some

24   improvement.  But they're still alleging it.  I guess I need

25   to determine if it's plausible.

1          MR. SRINIVASAN:  Okay.  You have to determine if
2     it's plausible.  And I would actually -- I mean, I would
3     respectfully disagree, in the sense of saying that it's a
4     recommendation is enough -- is dispositive of the issue.  It
5     is not delegation.  Right?  The DOJ in its brief also said --
6          THE COURT:  Well, if it was a recommendation they
7     wouldn't need the pricing advisors.
8          MR. SRINIVASAN:  Well, I would say --
9          THE COURT:  You could really just say do with it
10    what you want, we could care less, and we're not going to do
11    any follow-up one way or the other.
12         MR. SRINIVASAN:  Well -- okay.
13         THE COURT:  And then when I don't meet my revenue
14    targets that you predicted for me, you say nobody but your
15    ownself; you didn't follow those recommendations.
16         MR. SRINIVASAN:  Well, Your Honor -- sure.  But
17    that's not enforcement or policing in any way that the
18    antitrust laws talk about.  That's just sort of -- I mean,
19    you've said they come in -- you know, they wag their finger.
20    But it's really just to say -- the pricing advisors are just
21    another tool to say here's how we can help you.  And again,
22    they don't say the pricing advisors mandate anything.  All
23    they say is that they suggest, they advise, they recommend.
24    And again, it -- it is a -- a conspiracy requires a conscious
25    commitment to an unlawful objective.  You've got to come

1   together.

2           In all these cases folks came together and we are

3   going to agree to do X.  And we are -- and then the

4   allegations are that they did X.  They agreed to do X, and

5   they carried through and did X.  Here we don't have that.

6           We have -- the allegation is that they never

7   agreed horizontally to do anything and they never agreed to

8   do it.  In fact, they say a lot of people don't do it.  Some

9   people -- some unnamed people don't follow it.  Up to even 90

10  percent.  I mean, that's not the same as a conscious

11  commitment to achieve an unlawful objective.  These

12  allegations don't create that inference.

13          And I do think the 2019 -- the 2016 thing just

14  puts a point on it.  Because they know that it was fine to

15  do.  It was fine to do.  There was nothing collusive about it

16  for decades.  And you keep asking me, well, I know that's a

17  problem for me.  It's a dispositive problem.  It's not

18  something that's a gotcha.  Most people don't come in and

19  allege that a product -- because most people don't have to

20  allege -- here they did have to allege that this product was

21  a legitimate procompetitive tool to -- that was in the

22  economic self-interest of each one of these customers.

23          THE COURT:  So what were the procompetitive

24  benefits of the product?

25          MR. SRINIVASAN:  Sure.  And that's alleged in

```
1   complaint.  I'm glad you asked.
2              THE COURT:  No -- yeah.
3              MR. SRINIVASAN:  It was to maximize revenue.  It
4   was to provide optimal pricing, which is just a better -- a
5   way of saying, hey, we're going to help you find out where
6   supply meets demand.  You're sort of doing this crudely with
7   property managers sort of throwing a dart on a wall.  We're
8   going to bring data analytics to it.  They say, quote -- this
9   is paragraph 4 (as read).
10             RealPage software was to provide the optimal
11  price.
12             Paragraph 11:  To learn the value of leveraging
13  data to make better pricing decisions.
14             Paragraph 26:  Use data, science, talent and
15  modeling that allows our customers to achieve better
16  harvesting and placement of capital.
17             Paragraph 28:  Offer, quote, the most
18  comprehensive-suite of solutions for precision data analytics
19  and asset optimization.
20             And finally paragraph 38:  To make informed
21  pricing decisions.
22             That's just through -- you know, through paragraph
23  38.  There's more and more.
24             THE COURT:  And are those the same
25  procompetitive -- procompetitive points that I should use in
```

1  applying the rule of reason?

2          MR. SRINIVASAN:  Whether it's -- well, what I

3  would say, first of all --

4          THE COURT:  Well, yes or no or you don't know.

5          MR. SRINIVASAN:  Yes, you should use those for the

6  rule of reason --

7          THE COURT:  Because you know the Sixth Circuit

8  sort of sets forth the burden of proof.  And this burden

9  shifts to you to determine -- to show procompetitive

10  rationale for the restraint.  And what you've articulated is

11  what you want me to rely upon, correct?

12          MR. SRINIVASAN:  Sure.  If --

13          THE COURT:  Okay.

14          MR. SRINIVASAN:  -- they've shown anticompetitive

15  effects it gets to procompetitive reasons but --

16          THE COURT:  Do you want to add anything else to

17  that?

18          MR. SRINIVASAN:  Absolutely, Your Honor.

19          THE COURT:  Let me hear that.

20          MR. SRINIVASAN:  Yeah, so if I could just --

21          THE COURT:  Well, let me hear it now while we're

22  there.  Because you're good and I'll forget what I'm asking

23  you.

24          MR. SRINIVASAN:  So on the rule of reason --

25  you're asking about rule of reason?

1          THE COURT:  I'm specifically asking -- you've

2   given me a list of your procompetitive rationale.

3          MR. SRINIVASAN:  Sure.

4          THE COURT:  My question is, do you want to add

5   anything else to that list?

6          MR. SRINIVASAN:  Sure.  I mean, these are all --

7          THE COURT:  So if you do, what is that?

8          MR. SRINIVASAN:  Gotcha.  And the allegation is,

9   over and over, that this software allows people to maximize

10  their revenue, which is a procompetitive rationale.  There

11  was a discussion about supracompetitive pricing.  That's not

12  alleged in the complaint, or if it is, it's a conclusory

13  term.

14          In fact, in our motion we said that you -- the

15  plaintiffs don't establish anticompetitive effects.  There's

16  no allegation of anticompetitive effects.  Why is that?  It's

17  because all they say is prices went up.  Well, that's not

18  enough, as you asked Mr. Coughlin.  Prices going up is not

19  enough.  Is it because of the software?  Is there any

20  analysis done of the software?  None of that is alleged in

21  the complaint.  And *Brooke Group*, by the way, says very

22  specifically -- the Supreme Court said, just because you've

23  alleged or shown prices went up, that doesn't mean

24  anticompetitive conduct.  You have to show supracompetitive

25  prices.  You have to show that the software caused prices to

1  go up in a way that rents didn't otherwise go up anyway, in a
2  way that was because of collusive activity.  Now, that's not
3  alleged anywhere, Your Honor.  So we would say -- and, in
4  fact, plaintiffs say in the reply brief -- excuse me.  In
5  their opposition brief.  They say we don't have to show
6  supracompetitive pricing.  We can just prove that at trial.
7  That's not true.  They have to allege it.  And what they
8  allege currently is just simply that prices went up.  And I'm
9  not sure that the charts that they show even establish any
10 trend or break point.  Mr. Cross has a fantastic analysis of
11 those charts if you're interested, Your Honor.  But on the
12 rule of reason --
13            THE COURT:  Who?
14            MR. SRINIVASAN:  Mr. Cross.  I'm sorry --
15            THE COURT:  Oh, I'm sorry.
16            MR. SRINIVASAN:  The -- the rule of reason points
17 are they don't allege anticompetitive effects, such that you
18 would get to procompetitive --
19            THE COURT:  But if I get there.
20            MR. SRINIVASAN:  If you get to it.  If you're
21 going to give them that then, sure, we have -- --
22            THE COURT:  Anything else?
23            MR. SRINIVASAN:  Well, let me say -- I'm going to
24 sound a little bit like a broken record.
25            THE COURT:  That's okay.  I just want to make sure

1  I've heard everything.

2      MR. SRINIVASAN:  The very fact that they allege

3  and concede that this software was perfectly procompetitive

4  for a decade and they don't plausibly allege to you that that

5  changed.  That, of course, informs the procompetitive

6  benefits of this software.  The examples they've given you of

7  various things that folks have done maximizing revenue, which

8  can be through increasing price, increasing occupancy,

9  smoothing out vacancies -- these are all things alleged in

10  the complaint.  I can give you --

11      THE COURT:  I don't know if I can get that far on

12  that graph.  I mean --

13      MR. SRINIVASAN:  No, not from the graph.  These

14  are allegations in their complaint, Your Honor.

15      THE COURT:  Right.  But as to the ten-year period

16  you're talking about -- I don't mind making an inference.  I

17  can make an inference.  But it's got to be based on -- it has

18  to be a reasonable inference based on firm allegations.  So I

19  don't -- I hear what you're saying, though.

20      MR. SRINIVASAN:  Okay.  I'm saying those are

21  procompetitive benefits that they concede.

22      THE COURT:  All right.

23      MR. SRINIVASAN:  The anticompetitive effects they

24  have not shown through the graphs.  The graphs do not show

25  you that the prices went up in a supracompetitive manner

attributable to the software.  They don't even try.  They
just say prices went up in a period of inflation in this
country and in a period where we could probably use more
housing.  You know, that's not disaggregated from it.

         And then the other issue of course they have, Your
Honor -- and last thing on rule of reason -- just on the
facts, not the law necessarily -- is, of course, if they have
not shown that the software binds the defendants together in
a horizontal conspiracy -- which they never have, there's no
allegation anywhere.  Right?  There's not a single allegation
that any defendant did anything other than license the
software with RealPage.  We talked about that.  There is an
agreement there.  We concede that that was alleged.  That is
the only allegation.

         And the law that we cited, Your Honor, in our
reply brief on the rule of reason says that when there isn't
an allegation of horizontal agreements, and it's just a
series of vertical agreements, you don't get to aggregate
those market shares.  You don't get to aggregate those market
shares.  And, of course, they do that.  They put all their
eggs in that basket.  But that's not fair.

         In a rule of reason analysis you would have to
look at RealPage's agreement with each individual lessor
defendant and see if there is anticompetitive effects from
that individual agreement.  There's no allegation there

1    either.  There's simply no allegation there.

2           But if, Your Honor -- the last question is if you

3    -- or the last point I'll make is if your view is what should

4    I think about -- in terms of rule of reason analysis -- it is

5    the case -- I mean, we would agree with you, definitively --

6    well, even if that was your conclusion -- that there is

7    nothing remotely close to a per se case here.  There is

8    nothing -- and again, I think Mr. Cross would like to address

9    some of the things about the *Brewbaker* case that Mr. Coughlin

10   brought up and some of the *Interstate Circuit* and things like

11   that.

12          But if you take us outside of that paradigm and

13   you bring us to rule of reason, you do have to assess these

14   things.  Right?  We think they don't show a rule of reason

15   case.  But a case like this -- I think one thing -- this is I

16   think an argument for why this isn't a per se case.  When you

17   have conduct that the plaintiff has conceded is

18   procompetitive in certain circumstances, that's precisely

19   what a rule of reason analysis says.  We need to look this --

20   and this is not one of these I can waive my hand and say this

21   is a price fixing conspiracy.  When the plaintiff itself is

22   telling you -- themselves are telling you it was fine to use

23   this software and some things changed, well, that's the type

24   of case that at a minimum you would want to think about as a

25   rule of reason case, not, hey, this is per se, we know this

1  is bad.  Plaintiffs are telling you that's not true.  That

2  never happens.  That never happens in an antitrust case.  I

3  don't know why it happened here.  We're lucky.  I'm glad.

4  But it (indiscernible).

5          THE COURT:  All right.  So we've been at it a

6  while.  I think we need to have a refreshment break.

7          MR. CROSS:  Your Honor, can I --

8          THE COURT:  I'm sorry.  Who?

9          MR. CROSS:  Can I just ask a couple things --

10         THE COURT:  What we're going to do next?

11         MR. CROSS:  Well, I was going to ask if I could

12 address a couple things that you were asking about now before

13 the break.

14         THE COURT:  And I'm going to -- you know,

15 everybody is going to get a chance to say everything they

16 want to say.  But when we come back, I want to go through my

17 list with Mr. Berman, and then whoever's going to respond on

18 the student side.

19         MR. SRINIVASAN:  And I think Mr. Cross, if you

20 would indulge us, Your Honor, may have a few points on the

21 main student case before we --

22         THE COURT:  Okay.  Let's wait until we get to the

23 student case.

24         MR. SRINIVASAN:  The Multifamily case.  I'm sorry.

25 He may have a few points to add to what I just said because

1  he was ready to argue some other things.

2          MR. CROSS:  Yes.  I can do that now or --

3          THE COURT:  Realizing that the Court's mind is

4  otherwise focused right now.

5          MR. CROSS:  I want to answer your questions.

6          THE COURT:  I want to go ahead and -- okay.  Then

7  let's take a break.

8          MR. CROSS:  Okay.

9          (Recess.)

10          THE COURT:  All right.  Be seated.

11          All right.  So in the interim I think the

12  courtroom deputy obtained the names of everybody who wants to

13  make an appearance.  So everyone who wants to make an

14  appearance provided her a name.  If you didn't and you want

15  to be noted, let us know.  Otherwise, we'll just put that in

16  the record.

17          All right.  Go ahead.

18          MR. CROSS:  Thank you, Your Honor.  David Cross

19  for UDR.  I'm not going to repeat what Mr. Srinivasan had to

20  say, but there are a couple points that I think to answer the

21  specific questions Your Honor asked, and I wanted to

22  emphasize if I could.

23          One thing that's gotten lost and conflated today

24  that's critically important -- and it's one of the most

25  important facts on the face of the complaint that shows why

1   you cannot infer a plausible horizontal conspiracy.  And it's
2   this.  This is just one of the points that I'll touch on.
3   Revenue maximization is not the same as price increases.
4            THE COURT:  But price has a big part in revenue.
5            MR. CROSS:  100 percent.
6            THE COURT:  It's not a small player.
7            MR. CROSS:  True.  But here's why it matters here
8   and why you can't infer a horizontal conspiracy.  Because
9   there's no dispute that the way the software works -- sure,
10  sometimes it may offer a price increase, but very frequently,
11  in fact every day, it suggests price decreases.  It
12  frequently suggests no --
13           THE COURT:  Where is that in your complaint?
14           MR. CROSS:  I'm sorry?
15           THE COURT:  Where is that in the complaint?
16           MR. CROSS:  So that is at -- I just pulled that
17  up.  If you look at Docket 594 --
18           THE COURT:  I'm looking at the complaint, Docket
19  530.  If it's not there, I can't consider it.
20           MR. CROSS:  It's a document that they cited in
21  their complaint.  Let me grab --
22           THE COURT:  Okay.
23           MR. MANOSO:  594-1.
24           MR. CROSS:  The docket number is 594-1.  I'll get
25  you the citation.

1          THE COURT:  What is 594?

2          MR. CROSS:  It's an exhibit.  I think was attached

3    to the Whittaker declaration.  It's a document they cite in

4    the complaint, much like Mr. Coughlin brought up today.

5    We'll get you where they cite --

6          THE COURT:  -- have that.

7          MR. CROSS:  And what that document shows, Your

8    Honor -- it's one example of how prices go not just up but

9    often down or the same.  I'll also just note, Your Honor,

10   that in the original complaint they filed --

11         THE COURT:  So that's a document from the defense?

12         MR. CROSS:  It's a document they cite in the

13   Complaint.

14         THE COURT:  Right.  Okay.

15         MR. MANOSO:  They cite it at paragraph 17, note

16   19.  And then the defendant submitted it with the motion to

17   dismiss, Your Honor.

18         MR. CROSS:  It's a document -- Your Honor, the

19   reason that matters is because it takes it out of the realm

20   of every other case they rely on.  Any lessor defendant like

21   my client using this software has no expectation that the

22   recommendation coming out of the software is going to be a

23   price increase.  Because the best way to maximize revenue

24   very often is to lower your price and sell more units.

25         And so when you look at *Interstate Circuit*,

everyone raised their price to the same.  Look at *Goldfarb*.
The same minimum prices.  Look at *Flat Glass*, the same
starting list prices.

THE COURT:  But Mr. Srinivasan made clear it was a
mere recommendation.

MR. CROSS:  Exactly.  Which --

THE COURT:  -- not going to do it.

MR. CROSS:  That's right.  Which gets to the next
point, Your Honor.  Not only is the expectation the price may
go down, which is antithetical to a price increase -- a
conspiracy where you would infer that horizontal competitors
all had an understanding that the software was going to push
their prices up.  That does not make any plausible or
reasonable sense in a world where your expectation is it
might tell you to lower your price.  But here's the other
point.

Take a look, if you would, at the slide deck in
front of you, which are the -- I'm just going to show a
couple of their pricing slides.  If you have our slides in
front of you -- or you can use the complaint.  I'm going to
start with Figure 11 out of their complaint.  And I've also
got --

THE COURT:  Which slide is it?

MR. CROSS:  Slide 19, Your Honor.

THE COURT:  Okay.  I've got it.  Okay.

1          MR. CROSS:  And so what did Mr. Coughlin say

2    today?  You asked him what he was relying on for an inference

3    of conspiracy.  He said two things.  One was this critical

4    mass of customers that signed up -- that apparently signed up

5    in 2016.  Mr. Srinivasan addressed that.  I'm not going to

6    come back to that.  Then he said, but most principally it's

7    our parallel pricing.  Look at their pricing charts, Your

8    Honor.  There are a few things to note here.  And this is

9    their primary evidence from which to infer a conspiracy.

10   Horizontal conspiracy.

11         One -- Mr. Coughlin also said this.  And I wrote

12   it down.  He said you can't raise your rents if your peer

13   group is not doing the same thing.  Okay.  Well, let's look

14   at his pricing charts.  They say the conspiracy started in

15   2016.  You can look at every single figure they've put in.

16   The price before 2016, for years leading up, is going up.

17   It's going up.  If you look -- there's some prices that are

18   going down, but generally they're going up.  And if you look

19   particularly at Figure 11, what do we see?  We see after the

20   start of the alleged conspiracy much more price volatility

21   than before.  And this is what's important; why I started

22   with this point.  If you look, Your Honor.  You have lots of

23   prices that are going down.  Many, many prices in there that

24   are not raised.

25         THE COURT:  Well, you have to take out the period

1   during the pandemic.  That was pretty special.

2              MR. CROSS:  Well, Your Honor, I would -- I would,

3   I guess, strongly respectfully urge you against that because

4   that's not allowed.  They've pled a conspiracy that they say

5   began in 2016 --

6              THE COURT:  But I can't -- I can't ignore reality.

7   The world came to an end.

8              MR. CROSS:  Completely agree, Your Honor.  Which

9   is why one of the things we've pointed out is their complaint

10  doesn't account for reality.  Because when you look at the

11  pricing it's actually perfectly consistent with what we know

12  about the real world, that there are market factors that

13  explain this.  But let's just be clear.  Some prices are

14  going up.  Some prices are going down.  Some prices are the

15  same.  That is unlike any case that they have put before this

16  Court.  They've not identified a single case where, one, the

17  expectation is that the tool may tell you to lower your

18  prices; two, you have unmitigated discretion to reject that;

19  and, three, whatever the pricing that comes out of this is

20  very far from parallel.  Folks are pricing in all sorts of

21  different directions, Your Honor.

22             THE COURT:  Okay.

23             MR. CROSS:  That is not what you can support for a

24  horizontal conspiracy.

25             And, Your Honor, to a question you asked

Mr. Srinivasan.  I do want to be the clear about the
standard.  In the *Hobart-Mayfield* case, the Sixth Circuit
just last year reaffirmed --

             THE COURT:  I read it.

             MR. CROSS:  -- that they have --

             THE COURT:  I read it.

             MR. CROSS:  I'm sorry?

             THE COURT:  I've read it.

             MR. CROSS:  Okay.  I just wanted to make we were
clear they have to have evidence tending to exclude the
possibility of independent conduct.  And I would say, Your
Honor, when you have pricing figures one after another where
the pricing becomes more volatile, more competitive, and many
of the alleged conspirators are lowering their price, that
doesn't look like any case.  You would be plowing new ground.
And it doesn't support a horizontal conspiracy.

             Your Honor, quickly also, the enforcement
mechanism, there was a lot of talk about this --

             THE COURT:  So I'm really not going to let you --
I want to do the Student.  Thank you.

             So, Mr. Berman, let's go forward here.  I need to
cover this.  Then I'm going to let you all come back and
finish everything you want to say.

             MR. CROSS:  Thank you, Your Honor.

             MR. BERMAN:  Good afternoon, Your Honor.

```
 1              THE COURT:  You got your complaint?
 2              MR. BERMAN:  I sure do.
 3              THE COURT:  Let me get that one out.  So one of
 4   your big arguments in opposing the motion is the student
 5   housing market is unique.  It's unique.  It's unique.
 6              So I thought it would be helpful for us to
 7   start -- maybe we can even reach agreement on what makes the
 8   student housing market unique.
 9              So, I'm going to construe the complaint in your
10   favor.  What says you -- how is the student market -- just
11   give me a one, two, three.  And I want to see if it matches
12   mine.
13              MR. BERMAN:  Well, I would look at paragraphs 97
14   and 98.
15              THE COURT:  Okay.
16              MR. BERMAN:  Which I think I've outlined why it's
17   unique.
18              First of all, there's no question that RealPage
19   and other participants in the real estate industry recognized
20   that the student housing market is unique.
21              THE COURT:  That doesn't make it unique.  I'm
22   looking for the qualities, the characteristics.
23              MR. BERMAN:  The characteristics are you have
24   students on a campus at a very short timeframe.
25              THE COURT:  There you go.
```

```
 1                 MR. BERMAN:  That makes it different than --
 2                 THE COURT:  Well, you've got a unique leasing
 3      cycle.
 4                 MR. BERMAN:  Exactly.
 5                 THE COURT:  Okay go.
 6                 MR. BERMAN:  And as a parent of college students,
 7      I can tell you I'm well aware of it.
 8                 THE COURT:  What?
 9                 MR. BERMAN:  Well aware of that cycle.
10                 THE COURT:  Okay.  I just didn't hear what you
11      said.
12                 MR. BERMAN:  As a parent, you know --
13                 THE COURT:  Oh, as a parent you know.  So we've
14      got a unique leasing cycle.
15                 Go ahead.
16                 MR. BERMAN:  That would be my answer, Your Honor.
17                 THE COURT:  The beginning and the end?
18                 MR. BERMAN:  It really is.  Because student
19      housing beds are very different than a multifamily bed.
20                 THE COURT:  Right.  And I thought you would
21      mention that as part of the uniqueness.  That in some cases
22      the student defendants rent beds as opposed to units.
23                 MR. BERMAN:  Exactly.
24                 THE COURT:  So I think that makes it different
25      from the multifamily.
```

```
 1              MR. BERMAN:  Exactly.
 2              THE COURT:  And then the -- and it seems like
 3    you're alleging here that the information they got from
 4    RealPage was grandular not only to units, but also to floor
 5    plans and beds.
 6              MR. BERMAN:  That's correct.
 7              THE COURT:  So the information they got from
 8    RealPage was different.
 9              MR. BERMAN:  It --
10              THE COURT:  Was unique to the student housing.
11              MR. BERMAN:  That's correct.
12              THE COURT:  Okay.
13              All right.  So have I covered all the ways that
14    this -- this market is different?
15              MR. BERMAN:  You have, Your Honor.
16              THE COURT:  Then I want to go back to paragraph
17    51.
18              MR. BERMAN:  Yes, sir.
19              THE COURT:  And your diagram in paragraph 51.  Can
20    you explain to me, what is it you want me to take from this
21    diagram?  And, in particular, what does it -- what do you say
22    it tells me about competition -- the competition?
23              MR. BERMAN:  Well, I think it's summed up in
24    paragraph 52.  Because what --
25              THE COURT:  I read that and I still didn't
```

```
1    understand.  So help me.
2              MR. BERMAN:  Okay.  What it's telling people who
3    subscribe --
4              THE COURT:  So just walk through the diagram.
5    That would be the first thing.
6              MR. BERMAN:  Okay.  Well, I have to confess, Your
7    Honor, I can't read it.
8              THE COURT:  Oh, I have to use --
9              MR. BERMAN:  Even with my reading glasses on.
10             THE COURT:  Yeah.
11             MR. BERMAN:  So I'm somewhat embarrassed and
12   apologize.  I can't just read this in my copy.
13             THE COURT:  Because I was trying to -- I was
14   trying to find in the diagram where it reaffirms what's in 52
15   (as read):
16             The RealPage tool is valuable precisely because it
17   gives insight to competitors.
18             And that's what was I trying to figure out here.
19   And where is --
20             MR. BERMAN:  Here we go.
21             THE COURT:  Do you want to --
22             MR. BERMAN:  Well, paragraph 51 doesn't mention
23   competitors.  Okay?
24             THE COURT:  Right.  But it's in 52.
25             MR. BERMAN:  It's in 52.  And we're quoting a
```

1    slide.  And it's a direct quote from a slide.

2            THE COURT:  Okay.

3            MR. BERMAN:  It says, competitor insight that

4    allows for pricing visibility relative to the market.

5            THE COURT:  Now, that's why I wanted to go through

6    the chart.  Because I'm trying to understand how those

7    conclusions come from. . .  Hmm.  Okay.

8            MR. BERMAN:  They're telling people who subscribe

9    that this is what we're doing, we're giving you competitor

10   insight.

11           THE COURT:  Where is that?

12           MR. BERMAN:  It's right --

13           THE COURT:  You're saying this is some kind of

14   advertising?

15           MR. BERMAN:  This is --

16           THE COURT:  This is from the RealPage eBook that

17   shows --

18           MR. BERMAN:  That's right.  This is from RealPage

19   promotional material that they make available to subscribers

20   telling them this is what we're going to do for you.

21           THE COURT:  That's what the RealPage eBook is?

22           MR. BERMAN:  That's what the -- yes.  That's

23   correct, Your Honor.

24           THE COURT:  So it's promotional material?

25           MR. BERMAN:  Correct.

1    THE COURT: And where is that in the complaint?

2    MR. BERMAN: It's cited in footnote 66.

3    THE COURT: Okay. Oh.

4    MR. BERMAN: But I think to -- to follow-up on

5 that, Your Honor, I would go to paragraph 9. Because in -- I

6 think paragraph 9 is -- is the most precise place where we

7 summarize exactly what is going on here. And it says we're

8 providing these -- we're providing illustrative defendants

9 the unprecedented ability to, quote, facilitate collaboration

10 among operations and track your competitors' rent with

11 precision.

12    So they're telling folks you're going to be

13 able -- for you to track your rent, your competitors' rent.

14 And we're going to give you information for each unit, the

15 floor plan, the lease terms, the amenities. We take this

16 data, and we then recommend a price for you. So someone

17 knows that they're crunching the competitors' data, they're

18 crunching your data, and they're giving you a price.

19    THE COURT: Okay.

20    All right. So go to paragraph 69 where we have

21 specific allegations about defendant Campus Advantage.

22    MR. BERMAN: Okay.

23    THE COURT: So the first thing it looks like

24 you're saying that there's other information that's provided

25 other than pricing information to -- to the -- to the student

```
 1   defendants?
 2           MR. BERMAN:  That's correct.
 3           THE COURT:  Then it says RealPage then compares
 4   that property manager's rent to the top and bottom of the
 5   competitive range for their selected competitor, and finally
 6   assigns a price position for each lease.  By applying a
 7   single, common pricing algorithm to a shared dataset of
 8   competitors in a given market RealPage provided the conduit
 9   through which lessor defendants colluded to raise student
10   rents.  Correct?
11           MR. BERMAN:  That's correct.
12           THE COURT:  So I'll ask you as I asked
13   Mr. Coughlin, when you all were -- and you can explain this.
14   Is this based upon public information or private information
15   or both?  When they -- yeah.
16           MR. BERMAN:  This is based on sources cited,
17   which, you know, we got from the internet.  So it would be
18   public --
19           THE COURT:  Oh, no.  I'm sorry.  The allegation
20   that says RealPage then compares that property manager's rent
21   to the top and bottom of the competitive range for their
22   selected competitors.  Public information?  Private
23   information?  Or what?
24           MR. BERMAN:  That description is in something
25   that's public.  We got it out of the internet.
```

1          THE COURT:  Okay.

2          MR. BERMAN:  Okay?

3          THE COURT:  But when they do the top and bottom --

4          MR. BERMAN:  That's private.

5          THE COURT:  -- analysis, is that based upon public

6   information or private information?

7          MR. BERMAN:  It's based on a combination of public

8   and private.

9          THE COURT:  Okay.  What's in the -- what's in the

10  RealPage software system?

11         MR. BERMAN:  Exactly.  And some of the private

12  information that they're crunching is the competitive

13  information that they've gotten from selected competitors.

14  That's not public.  They take the pricing information from

15  each of the competitors, use all the other factors in the

16  algorithm, and they printout a suggested price for each of

17  the defendants.

18         THE COURT:  And that's all action taken by

19  RealPage?

20         MR. BERMAN:  That's correct.

21         THE COURT:  So how does action -- how do the --

22  how does action taken by RealPage provide a conduit for the

23  lessor defendants to collude?

24         MR. BERMAN:  Because it's a classic *Interstate*

25  *Circuit* conduit.

So absent RealPage functioning this way, and to
say what my colleague Mr. Coughlin said, prior to the start
of this conspiracy, they didn't know what their competitors
were going to do with precision.  And they would compete
based upon heads in beds.  And so because of this price
fixing conspiracy they no longer have to compete based on
heads in beds.  That's normal competition.  Now they can
raise prices without fear of being undercut, because they
know all these other folks are subscribing to RealPage.

THE COURT:  But that conspiracy did not start in
2010?

MR. BERMAN:  Well, I knew you were going to go
there.  We allege it starts in 2010.  And here's why.  We
know that RealPage started using YieldStar in 2009.  And we
allege that they said they had gotten a buy-in from a
critical mass by 2010.  We know Greystar has been using it
for at least ten years.  That's in paragraph 56.  And we know
that by 2013 RealPage had said this is now working so well
that we've gotten 3 to 7 percent outperformance of the
market.  So we know it was working.

THE COURT:  In 2013?

MR. BERMAN:  In 2013.

THE COURT:  That's not 2010.

MR. BERMAN:  But -- no.  With Greystar -- I would
submit to, Your Honor, when Greystar joins -- right?  --

1    that's the start of the conspiracy.  Right?

2              THE COURT:  Why?  Why is Greystar the start of the

3    conspiracy?

4              MR. BERMAN:  Because Greystar must have been

5    assuming that other folks were going to join this conspiracy.

6    Otherwise, why would they agree to this?

7              THE COURT:  Oh, I don't know if I can "must have

8    been assuming" on a motion --

9              MR. BERMAN:  Well, it's a plausible inference,

10   because it would be an act against economic self-interest --

11             THE COURT:  Oh, wow.

12             MR. BERMAN:  -- to be the one to subscribe and --

13   and be faced with competition that would not -- not -- would

14   compete based on market share.  You wouldn't do that unless

15   you knew or had reason to believe that others would join the

16   conspiracy.

17             THE COURT:  But there are no allegations to that.

18   You just want me to infer that from the complaint as a whole?

19             MR. BERMAN:  Well, I want you to infer from the

20   complaint, that at least by 2013 we don't know who was in it

21   precisely, but we know that RealPage thought it was working.

22             THE COURT:  Okay.  So throughout your complaint --

23   I won't say throughout.  But on numerous occasions you refer

24   to historical data from 2013.  And I can give you some

25   examples of that.  But what are you trying to communicate by

```
 1    referring to historical data from 2013?
 2              MR. BERMAN:  Can you give me a reference so I can
 3    put it in context?
 4              THE COURT:  Sure.  We looked at it this morning.
 5    Where is it?  Oh, paragraph 68.  It's five more paragraphs
 6    that refer to it, as well.  But that's one.  I'm just trying
 7    to figure out what -- yeah.
 8              MR. BERMAN:  Paragraph 68.  Oh, I see.  Well,
 9    we're just quoting RealPage.  They're saying we put together
10    the most comprehensive historical dataset which includes over
11    1 million student beds of in-depth market data.  We're just
12    showing the Court that they had a tremendous amount of data
13    on rents in the student housing market.
14              THE COURT:  Okay.  Then paragraph 86.  I think
15    this graph is a little bit clearer.  What is it that you want
16    me to take from that?
17              MR. BERMAN:  What we want you to take from that is
18    that there was strict adherence to the plan.
19              THE COURT:  Oh.  Let's walk through that.  Show me
20    how this graph shows me strict adherence.
21              MR. BERMAN:  Well, you're looking at the graph?
22              THE COURT:  Yeah.  It starts on paragraph 86 and
23    goes from page 38 to 39.
24              MR. BERMAN:  Well, the context of this is
25    Confidential Witness 1.
```

```
 1              THE COURT:  Say again.
 2              MR. BERMAN:  The context of this is Confidential
 3    Witness 1.
 4              THE COURT:  Right.
 5              MR. BERMAN:  And she's saying, look, we take those
 6    recommendations 98 to 90- -- 90 percent of the time.  And
 7    they -- they track -- the purpose of the slide is just to
 8    show that RealPage was tracking compliance.
 9              THE COURT:  Okay.  How did this -- can you see
10    that well enough to walk me through?  How does it do that?  I
11    can read the words.  But I don't think you want me putting my
12    spin on it.
13              MR. BERMAN:  Let me get some assistance here.
14    Sorry, Your Honor.  I think the next paragraph explains the
15    point of the graph.
16              THE COURT:  Okay.  Go ahead.
17              MR. BERMAN:  And so the next paragraph is
18    basically explaining the graph, saying that if we see and if
19    it's reported back to us that someone doesn't want to accept
20    our recommendation, they have to provide commentary for that.
21              THE COURT:  Okay.  But this graph is presumably
22    from RealPage.
23              MR. BERMAN:  That's correct.
24              THE COURT:  How does it show -- if you can -- if
25    not, we can move on.  That property -- how does it show
```

strict adherence to the pricing recommendation?

MR. BERMAN:  Well, there's -- in the top it says lease compliance.  And so this is --

THE COURT:  Yeah.

MR. BERMAN:  This is a chart showing how the (indiscernible) works at RealPage.

THE COURT:  But you can't explain what these numbers mean?

MR. BERMAN:  I can't.  Just -- I'm sorry.

THE COURT:  That's what I was trying to get done. I wanted to appreciate the numbers.

And then maybe the same answer here.  But paragraph 141.  The regression analysis.  Can you walk through that?

MR. BERMAN:  Yes, sir, I can.  That I can read.

Now, on the regression analysis -- first of all, the regression analysis is a backstop.  And the reason I say it's a backstop, because this is an unusual case.  What we're trying to show is that there are direct economic impacts. Right?  That normally you might not see.  And here we have direct economic impact that's admitted to by the defendants. So if you bear with me.  At paragraph 107 RealPage states that its products help, quote, outperform the market, and that its student housing prices are at an all time high, with rent increases being more than triple the average.  That's

1   paragraph 105.  And then -- I'm getting to the graph because
2   it's a lead up.  And then Campus Advantage admits that by
3   partnering with RealPage its revenues -- it increased its
4   rent by 11 percent.  So that's not revenues, which they keep
5   harping.  It's rent.
6            So then we said, okay, we know that the defendants
7   are attributing the rent increases to the RealPage tool.
8   Let's do a regression.  Now, normally in an antitrust
9   complaint you don't do a regression.  That comes later when
10  you bring your experts in.  But we decided to test some data
11  from a specific area that's outlined here.  And what a
12  regression does is says all else being equal, you know, how
13  did these other non-RealPage rental defendants do.  And they
14  had lower prices.  So there can't -- there is no other
15  explanation other than the higher prices are caused by the
16  RealPage tool.
17            THE COURT:  Okay.
18            MR. BERMAN:  That's what a regression does.
19            THE COURT:  Well, I appreciate that.  I guess what
20  I was hoping -- well, what's not alleged is some of the
21  detail behind how the analysis was done so the Court would
22  have some basis to give it consideration.
23            MR. BERMAN:  Well, I think -- to go to that point,
24  when we talked about statistical evidence or --
25            THE COURT:  Right.  But I was hoping you could --

```
 1   maybe answer -- there are no allegations in the complaint
 2   from which the Court can understand how the regression
 3   analysis was performed so that I can give it consideration?
 4            MR. BERMAN:  Well, I would -- I would point to
 5   again the following language, Your Honor.  That regression
 6   analysis -- I'm on paragraph 141 -- controlled for various
 7   property and geographic features, including the size of the
 8   unit and the distance of the property from the university.
 9   So those are at least two of the variables that we -- that
10   our experts applied.
11            THE COURT:  Okay.
12            MR. BERMAN:  And so you don't have to apply that
13   many factors to make it plausible.  All we have to do is
14   allege plausibility here.  Because --
15            THE COURT:  I guess I do have to conclude that the
16   graph has some reasonable basis on its own.
17            MR. BERMAN:  Right.  So the defendants say, well,
18   it could have been inflation.  We don't say here we -- we
19   guarded for inflation.  But if inflation were a factor you
20   wouldn't have this difference.  Because inflation would
21   affect all the defendants and non defendants.
22            THE COURT:  So what parallel conduct are you
23   relying upon here in the student housing complaint?
24            MR. BERMAN:  Well, much the same parallel conduct
25   that --
```

1          THE COURT:  Well, where is it in this complaint?

2          MR. BERMAN:  In this complaint.  Well, I would

3    start with -- I think this whole thing -- to put the parallel

4    conduct in context, starts with paragraph 71.  And I have

5    that as my very first slide.

6          THE COURT:  Okay.

7          MR. BERMAN:  And so this is the architect of the

8    RealPage program, Jeffrey Roper.  And he's describing you've

9    got a problem here.  And the problem here is we have -- you

10   have, quote, idiots undervaluing it that cost the whole

11   system.

12         So what was RealPage's solution?  So the solution

13   was for all the competitors, in parallel, to submit the

14   realtime pricing to Realdata.  Then they would allow Realdata

15   to assign a price for each lessor defendant.  And in doing so

16   they all joined together to become one collective

17   decision-making body instead of two.  And the parallel

18   conduct is all of them, you know, agreeing to this --

19         THE COURT:  All agreeing to this -- this being the

20   joining --

21         MR. BERMAN:  RealPage.

22         THE COURT:  All right.  Go ahead.

23         MR. BERMAN:  The other parallel conduct would be

24   -- well, of course, parallel conduct is they all joined

25   RealPage.  They all met with pricing advisors.  And that's at

 1  paragraph -- well, I haven't -- page 5, my handout,
 2  summarizes for you --
 3              THE COURT:  I don't think I have your handout.
 4              MR. BERMAN:  I'm sorry, Your Honor.  I think I
 5  have not handed it up to you yet.  May I approach?
 6              THE COURT:  Sure.
 7              MR. BERMAN:  So what I tried to do on page 5 was
 8  to summarize -- because there's a lot of briefing for you --
 9  what I think the parallel conduct is for each of these
10  defendants.  And so we've listed the paragraphs where they
11  joined, how they met with pricing advisors --
12              THE COURT:  Did the defendants get a copy of this?
13              MR. BERMAN:  Yes, they did.
14              THE COURT:  Okay.
15              MR. BERMAN:  I just forgot to give it to the most
16  important person, but I gave it to defense.
17              They all adopted RealPage's prices.  Most of them
18  all signalled use to each other that they were using
19  RealPage.
20              THE COURT:  Let's stop there.  Through video
21  testimony of Sierra Gars- -- oh, paragraph 57.  Okay.  I can
22  look at that.
23              MR. BERMAN:  Okay.  And they all made public
24  statements about how joining RealPage allowed them to profit
25  increasing rents, not just revenue.  So this is the parallel

```
1   conduct.
2              THE COURT:  All right.
3              All right.  Paragraphs 160 to 161.  So where you
4   make your allegations on market power.  So -- and this may be
5   one for the housing -- student defendants.
6              What do you say, you know, at the motion to
7   dismiss stage, what's the required allegations to
8   establish -- to properly allege market power in this kind of
9   case?
10             MR. BERMAN:  Okay.  Well, first I --
11             THE COURT:  If you have a case I can look at, that
12  would be great.
13             MR. BERMAN:  First I would say we don't have to
14  get to market power.
15             THE COURT:  I got you.  But in case I get there.
16             MR. BERMAN:  Okay.  And let me get my case out.  I
17  think the case that we look at -- well, the case that I
18  would -- before we get to that -- is Realcomp.  We think that
19  the Realcomp case, which says the purpose of the inquiry into
20  market definition is to determine whether the arrangement has
21  the potential for genuine adverse effects on competition
22  because actual anticompetitive effects may be difficult to
23  demonstrate.
24             We've already shown I think anticompetitive
25  effects.  But if we want to talk about the case that we rely
```

on the most for our market power definitions, it would be
*Southeast Milk*, 739 F.3d at 270.  The reason -- that's one
case.  The reason -- that's one case.

            THE COURT:  Did you say 270 or 207?

            MR. BERMAN:  739 F.3d at 270.

            THE COURT:  Thanks.

            MR. BERMAN:  Okay?  Which says that it's a highly
fact based analysis that really requires discovery, that
should come later in the case.  Second, the *Gien*, G-i-e-n,
case -- that's the poultry wage case, 2020 WL 5544183.  And
what the Court says there -- that was also an information
exchange case.  It's one of my cases.  And the Court says
there what you really want to worry about is not an overbroad
market share but too narrow of a market share.  Because if
it's too narrow of a market share, then you're always going
to have market power.  And I don't think we have that problem
here.  Because we have a nationwide market.  Obviously not
too narrow.  And we have the regional markets, which are
really logically aligned to what happens.  You go to a
campus, Ann Arbor, Austin, Texas, whatever, and there's
competition among landlords at those markets.

            THE COURT:  All right.  I'm not trying to cut you
off.  But I guess let's go back to 160 and 161.  In both you
refer to the SSNIP test and this 2 to 5 percent revenue out
performance.  And then the next allegations go into each of

1  the regional submarkets.

2              MR. BERMAN:  Yes.

3              THE COURT:  Are you alleging that I should use

4  that 2 to 7 percent revenue outperformance on each of the

5  regional submarkets?

6              MR. BERMAN:  Well, we -- we were just --

7              THE COURT:  So is that a yes, a no --

8              MR. BERMAN:  That's a no.

9              THE COURT:  That's a no.  Okay.  Now go.  Okay.

10  Good.

11             MR. BERMAN:  That was just for the national

12  market.

13             THE COURT:  Okay.  So what do you allege on these

14  regional markets?

15             MR. BERMAN:  The regional market is just factual

16  plausibility.  We've established how -- that, you know, they

17  target these campuses.  Right?  They say each campus is

18  unique, student housing is unique.  We've alleged -- we've

19  alleged -- take Knoxville, Tennessee.  There are

20  approximately 34,000 student.  There's five student housing

21  properties.  That's the logical market for this student

22  housing market.  I mean, once you accept the notion that

23  student housing is different than multifamily, then the

24  question is what's a logical submarket.  And the logical

25  submarket is the universities and the surrounding area.

```
 1              THE COURT:  So the only allegations you have about
 2    market power pertain to the national market, not any of the
 3    regional markets?
 4              MR. BERMAN:  Well, there's -- there's -- you mean
 5    the SSNIP test?  Relates to the national.
 6              THE COURT:  Right.
 7              MR. BERMAN:  Right.  The regional ones just
 8    relates to -- is based just on the allegations in this
 9    complaint.
10              THE COURT:  And they don't refer to any particular
11    percentage?
12              MR. BERMAN:  No.  What we would be relying on to
13    show market power is just the defendants' admissions that
14    they've been able to raise profits and rents at above market
15    levels.
16              And since they all operate in the submarkets, it's
17    logical to infer that those rents are being raised in these
18    submarkets.
19              THE COURT:  I'm sorry.  What's logical to infer?
20              MR. BERMAN:  Well, if they're saying -- we know
21    that these defendants operate in these markets.  Okay?  And
22    they're promoting themselves as profiting having rent
23    increases above normal because of RealPage.  So it had to
24    have occurred in these submarkets.
25              THE COURT:  Okay.  But again, there's no specific
```

```
 1   allegations about specific market power in any of the
 2   submarkets?
 3            MR. BERMAN:  There is not, Your Honor.
 4            THE COURT:  Okay.  Anything else before I hear
 5   from the student defendants?
 6            MR. BERMAN:  No.  I'll just save the rest for
 7   response to their motion, Your Honor.
 8            THE COURT:  All right.
 9            MR. BERMAN:  Thank you, Your Honor.
10            MR. MCINTYRE:  Your Honor, my name is Stephen
11   McIntyre, with O'Melveny & Myers, for BH Management, B.HOM
12   Student Living, and Timberline Real Estate Ventures.
13            Your Honor, I think your questions hit on exactly
14   the right points.  And I'd like to go through and respond to
15   some of the points Mr. Berman made in relation to the student
16   housing complaint.  But going first to paragraphs 51 and 53
17   of the complaint.  51 through 53.  I apologize.
18            Paragraph 51, beginning on the bottom of page 21,
19   says (as read):
20            The following diagram from a RealPage eBook shows
21   how RealPage aggregates its data.  It collects information
22   from lessors and it aggregates that data together with a lot
23   of other information and data that it collects.
24            Going to the top of page 22.  This was the chart
25   that you directed Mr. Berman's attention to.  I find this
```

1    very interesting.  This is kind of a flow chart of how

2    RealPage collects data and what it does with the data.  The

3    center item, categorizing -- this is after they've collected

4    data and processed it.

5              It says aggregation and summarization.  Again,

6    RealPage is aggregating the data.  Again in paragraph 53 the

7    student plaintiffs allege that RealPage aggregates the data.

8              Now, in the student plaintiffs' opposition to our

9    motion to dismiss they place a lot of emphasis on a number of

10   cases involving the company Agri Stats.  This is a company

11   that operates in the protein industry.  And, in fact, they go

12   so far as to say that Agri Stats is the protein industry's

13   RealPage.

14             What I find notable about that is that in each of

15   the cases they cite, broiler chicken, turkey, pork, the

16   allegation against Agri Stats was not only that it collected

17   data from its clients, but that it provided the data to its

18   clients in such a form that it could be easily disaggregated

19   and deanonymized so the competitors can identify exactly

20   their competitor's specific prices, supply information, other

21   information identified with specific competitors.

22             There were also allegations that Agri Stats had

23   one-on-one meetings with its clients in the protein industry

24   and that in those meetings Agri Stats deliberately

25   deanonymized data.  Emphatically the student plaintiffs do

1  not plead anything remotely similar.

2          THE COURT:  Yeah, but they plea other allegations

3  from which they want me to try to make an inference that

4  they -- the defendants knew who their competitors -- that

5  their competitors were participating with them, and,

6  critically, that -- just like in the multifamily case --

7  their competitors were offering up their confidential, secret

8  data on pricing and supply.  And after all, people --

9  businessmen and women know who their competition is.

10          MR. MCINTYRE:  Well, respectfully, Your Honor, I

11  don't think the student plaintiffs actually allege that the

12  lessor defendants were able to determine who -- who their

13  competitors were who used RealPage in any given market.

14          THE COURT:  Well, look at Campus Advantage,

15  paragraph 58 (as read):

16          Campus Advantage employees would collect

17  competitor pricing data directly from competitors.  Campus

18  Advantage employees would then enter the competitor pricing

19  information to YieldStar Student.  And Campus Advantage would

20  then receive recommendations from YieldStar about how much it

21  should raise its prices.

22          MR. MCINTYRE:  Well, this is -- respectfully, Your

23  Honor, this is only relating to a single defendant that's

24  collecting its own information, providing that information to

25  RealPage.  This is not an allegation that RealPage is taking

1  another competitor's data and providing it to Campus

2  Advantage, or that RealPage is identifying who Campus

3  Advantage's competitors are who use RealPage.

4           THE COURT:  Okay.  But the idea is that the

5  competitors's information was poured into RealPage to spit

6  out a price.

7           MR. MCINTYRE:  I don't -- that's what the

8  plaintiffs allege, Your Honor.

9           THE COURT:  Right.  Which I have to take as true.

10          MR. MCINTYRE:  Yes, that's very true, Your Honor.

11 But I think what's notable is that they merely allege the

12 information, when it was spat back out, the information that

13 was provided to each individual client was aggregated.

14          THE COURT:  Right.  But then if they didn't see

15 their competitor, they could add competitors to the next

16 group of price recommendations.  Yeah.

17          MR. MCINTYRE:  Maybe I misunderstand, Your Honor.

18 Because there is no allegation that RealPage provides the

19 identity of competitors, nor is there --

20          THE COURT:  Right.  The clients told them we want

21 these competitors added, and RealPage did so.

22          MR. MCINTYRE:  Well, I think the allegation here

23 is saying that Campus Advantage was finding information out

24 in the market, it fed that information back to RealPage.  And

25 it says RealPage put that -- it pooled that information.

1  Elsewhere in the complaint it says that RealPage crutches the
2  information and then its spitting back out a price
3  recommendation.  It's not identifying any specific
4  competitors or specific competitors's private pricing
5  information.
6          And that's what distinguishes this case from the
7  cases the plaintiffs rely upon.  In the local TV advertising
8  case, the District Court recognized that where aggregated
9  data is what's being provided, the antitrust laws look
10 favorably on that.  And that Court, it cited the *Todd v.*
11 *Exxon* decision in the Second Circuit, which was written
12 by who was then Judge Sotomayor.  She also recognized in that
13 case that as a general matter, when it comes to price sharing
14 or information sharing, when the information is aggregated,
15 when it's not transaction specific, that's something that the
16 antitrust laws are less concerned with.  It is more
17 concerning in cases like the protein cases, where the
18 allegation was that the Agri Stats, the intermediary, the
19 hub, was not only collecting data, but deanonymizing it.  And
20 the reason that's problematic, Your Honor, is because it
21 provides an enforcement mechanism.  It allows one competitor
22 to know what its other competitors are doing.  It can confirm
23 whether its competitors are abiding by the alleged agreement
24 or whether they're diverging from it.  And we don't have that
25 allegation here.  There is no allegation that the -- that

1  each individual lessor had any way of determining whether the
2  other lessors in the market who use RealPage were doing
3  anything, were taking any particular action --
4          THE COURT:  Wouldn't that be a reasonable
5  inference that you would make, that if I'm providing my
6  sensitive price and supply information, others who are part
7  of RealPage are doing the same?
8          MR. MCINTYRE:  But the question is --
9          THE COURT:  Well, no.  My question is, is that a
10  reasonable inference that could be made?
11          MR. MCINTYRE:  I think that it's a reasonable
12  inference that other RealPage customers are doing something
13  with the information they receive from RealPage.
14          THE COURT:  And it's a reasonable -- if I'm
15  providing my sensitive information and they're going to
16  crunch me out a number unique to me and my market, my
17  competitors' information is also being provided to them.
18          MR. MCINTYRE:  Well, competitors who are using
19  RealPage.
20          THE COURT:  Right.  Right.
21          MR. MCINTYRE:  And again, there's no --
22          THE COURT:  And if I see a competitor -- and if I
23  ask you to add a competitor, it's alleged those competitors
24  would be added.  That means they must -- they must have a
25  contract with RealPage.

1          MR. MCINTYRE:  Well, I think the allegation you

2    just referred to, Your Honor, was Campus Advantage collecting

3    some information from the market, providing it to RealPage --

4    I don't read that allegation as suggesting that the

5    competitor's information that was collected from the market,

6    that those competitors --

7          THE COURT:  No, I wasn't referring to Campus.

8          MR. MCINTYRE:  Okay.

9          THE COURT:  I was referring to other allegations

10   that -- that the defendants had the option of adding

11   competitors.  But I see your point.

12         MR. MCINTYRE:  I apologize, Your Honor.

13         THE COURT:  That's all right.

14         MR. MCINTYRE:  But I do want to -- this is an

15   important point.  And I want to go to another chart that we

16   looked at, I believe earlier today.  I'm going to go to --

17   this is page 21.  And I apologize.  I don't recall if this is

18   one of the ones we looked at.

19         THE COURT:  Page 21 the complaint?

20         MR. MCINTYRE:  Page 21 of the student complaint.

21         THE COURT:  Okay.

22         MR. MCINTYRE:  Because the question -- the issue I

23   was just getting to, Your Honor, was that, even if I know

24   that my competitors are using RealPage -- and again, there's

25   no allegation that the student defendants are able to figure

1 out which of their competitors are using the product. Even
2 if I know that they're using it, I don't know what they're
3 doing with the information. I don't know what
4 recommendations --
5          THE COURT: Well, they're doing what the
6 defendant -- your defendant's doing. They're using it to set
7 their prices.
8          MR. MCINTYRE: Okay. Well, I might be receiving
9 the information. And I might decide, you know what, I'm
10 going to -- I'm going to be a maverick --
11          THE COURT: Well, that's the inference I guess the
12 plaintiffs want me to make.
13          MR. MCINTYRE: Well, I think this will help, Your
14 Honor. And this is actually -- if you'd like, we have a
15 blown-up image of this. This is in the defendant's slide
16 presentation. Para- -- I'm sorry. Page 29.
17          THE COURT: The recommendation -- oh, page.
18          MR. MCINTYRE: Yes. Yes. So this is kind of --
19 on page 29 this is a blown-up image.
20          THE COURT: Of the --
21          MR. MCINTYRE: Of what appeared --
22          THE COURT: Of the complaint? On page 21?
23          MR. MCINTYRE: That's correct, Your Honor.
24          THE COURT: Thanks.
25          MR. MCINTYRE: And so the plaintiffs -- according

to paragraph 50, they describe this as a slide showing how daily prices are recommended to lessors.  So this shows price recommendations, appears to be over a five-week period, rather than on a daily basis, from August 26th to September 30th.  And we can see here some weeks RealPage is recommending upward price adjustments.  Other times it's recommending downward adjustments.  So, for example, on September 9th, September 16th, RealPage both of those weeks was recommending downward price adjustments.

And what's significant here, Your Honor, is that this also shows that this particular client was not following the recommendations.  And so I find this to be a very interesting example.  If we look at from the week September 16th to September 23rd.  We can see that on September 23rd RealPage was recommending an upward price adjustment from $1,378 to $1,385.  Well, what did the client do?  If we look at the row that says "current."  That's this client's current price.  Well, between those two weeks the client moved in the opposite direction.  The client moved downward from $1,372 to $1,362.  This client was going in the opposite direction from what RealPage recommended.

And, by the way, this is not the only example in the student complaint of RealPage recommending downward price adjustments.  I won't go through the other ones.  But on page 3 of the Complaint, Your Honor, there's a graphic that

appears under paragraph 6. This is another screen shot. It
shows a downward price recommendation. And I can slow down,
Your Honor, if you'd like.

THE COURT: Go ahead.

MR. MCINTYRE: Page 3. It shows a downward price
recommendation from January 7th, 2019, to January 6th, 2019,
recommending a price adjustment -- I'm sorry -- from January
6th to January 7th, 2019, recommending a downward price
adjustment from $1,381 to $1,373.

And so this gets to another issue that you
discussed with plaintiff's counsel. That is paragraph 86.
And I apologize for jumping around here.

THE COURT: Okay.

MR. MCINTYRE: Paragraph 86 -- now, in the -- in
their opposition to our motion to dismiss, the plaintiffs,
they state as a factual matter, that they allege that there
was a high adoption of RealPage's price recommendations among
the student lessors. This is what they allege. The first
sentence of paragraph 86 says: These recommendations are
overwhelming accepted. That's a conclusion. That's not a
fact. Let's see what facts they allege.

All of the factual allegations here are about a
single defendant, Greystar. They allege that Greystar, based
on information from an alleged confidential witness, who I
believe only worked at one Greystar property. She indicated

1    that in her experience Greystar chose to adopt RealPage's

2    price recommendations 98 to 99 percent of the time.

3                    THE COURT:  Do you agree that the Student Housing

4    used a similar enforcement mechanism that we've already

5    discussed in the public -- in the Multifamily?

6                    MR. MCINTYRE:  I agree that the students make

7    similar allegations.  I would respectfully disagree that they

8    have adequately alleged an enforcement mechanism.

9                    THE COURT:  Okay.  For the reasons we've already

10   discussed?  Or any new reasons?

11                   MR. MCINTYRE:  As Mr. Srinivasan discussed -- I

12   agree with what he said.  I don't believe that they have

13   shown that there was any monitoring or enforcement between

14   different lessors.  What they've described is in a single

15   vertical line, RealPage going to individuals, to supervisors

16   within an individual lessor, to monitor and encourage them to

17   adopt RealPage recommendations.  There's no allegation of

18   monitoring an enforcement between different lessors, which is

19   vital, because they've alleged the horizontal conspiracy.

20                   THE COURT:  Yeah, we've talked about that.  But it

21   is reasonable for me to infer that if one student defendant

22   was being monitored in the ways described in the complaint,

23   other of student defendants were more likely than not being

24   monitored in the same way?

25                   MR. MCINTYRE:  Respectfully, Your Honor, I don't

1    think the allegations support that.

2              THE COURT:  No.  I'm saying that's an inference I

3    can make.

4              MR. MCINTYRE:  I think the allegations actually go

5    the other way, Your Honor.

6              THE COURT:  Okay.  So you say that's not in --

7              MR. MCINTYRE:  I would agree.

8              THE COURT:  All right.

9              MR. MCINTYRE:  So the allegation -- they describe

10   the RealPage pricing advisors and revenue managers as being

11   the instruments for monitoring how people use the software.

12   The student --

13             THE COURT:  No.  My -- my point was, if one

14   lease -- student defendant is being monitored in the way

15   described in the allegation, it's reasonable to infer that

16   other student defendants were being monitored in the same

17   way?

18             MR. MCINTYRE:  I'm sorry if I'm not being clear,

19   Your Honor.  But I respectfully disagree.  And that's

20   because --

21             THE COURT:  Okay.  Why?  Why can I not make

22   that --

23             MR. MCINTYRE:  The student plaintiffs allege in

24   paragraph 54 that RealPage's clients, student lessors, are

25   not required to use pricing advisors or revenue managers.

```
1    That's an additional service that RealPage provides for a
2    fee.
3              THE COURT:  But that doesn't stop my inference.
4              MR. MCINTYRE:  Well, all of the plaintiffs'
5    allegations about --
6              THE COURT:  If you're also being monitored with
7    student -- with advisors and others, then if they are -- if
8    that's also occurring with others -- that is also occurring
9    with others if it's happening to one, if they've elected
10   that.
11             MR. MCINTYRE:  I think if they've elected.  And I
12   think that is a critical --
13             THE COURT:  And I think there are allegations that
14   if you don't elect that there's yet other processes they go --
15             MR. MCINTYRE:  Well, their allegation is that if
16   you don't elect to use these individuals at RealPage you can
17   use someone at your own company.
18             THE COURT:  That is then trained by RealPage.
19             MR. MCINTYRE:  Trained by RealPage.
20             THE COURT:  Right.
21             MR. MCINTYRE:  But again, what they're trying to
22   allege is an enforcement mechanism.
23             THE COURT:  Right.  I agree.
24             MR. MCINTYRE:  And what I think is key, they also --
25             THE COURT:  It may not be a perfect one, and you
```

1  and I may not understand it, but that's up to RealPage.  Its
2  their business.
3           MR. MCINTYRE:  Well, I think it is plaintiffs'
4  burden to plead that there was an effective enforcement
5  mechanism.  And what's missing here, Your Honor, is there's
6  no penalty or punishment.  They don't allege -- they say,
7  okay, RealPage encourages you; it tries to spell out value
8  proposition of using its software.  But what they don't
9  allege is that if you decide not to adopt the recommendation
10 that there's any penalty or punishment from RealPage or from
11 any of the other alleged co-conspirators.  Because again,
12 there's no allegation that they even know what you're doing.
13 For all they know you might be using the software like the
14 client that we saw on page 21, where RealPage is recommending
15 price -- upward price recommendations on one day and they're
16 going in the opposite direction.  Maybe they're being a
17 maverick.
18          THE COURT:  But I can reasonably infer that if
19 they keep taking -- keep rejecting employing downward pricing
20 they're going to have a hard time reaching the revenue
21 itemization that RealPage --
22          MR. MCINTYRE:  I would disagree with that because --
23          THE COURT:  I'm going to continue to reduce my
24 price but yet make more money?
25          MR. MCINTYRE:  That happens all the time, Your

```
 1   Honor.
 2              THE COURT:  But is it a reasonable inference here?
 3              MR. MCINTYRE:  There is more than one way to --
 4              THE COURT:  Is it a reasonable inference?
 5              MR. MCINTYRE:  I don't think there is a reasonable
 6   inference that --
 7              THE COURT:  I do.  But I see your point.
 8              MR. MCINTYRE:  Okay.
 9              THE COURT:  I see your point.
10              MR. MCINTYRE:  I agree, Your Honor.
11              I would say that in light of what we've seen with
12   this client that appears on the face of the complaint
13   deviating downward from RealPage's price recommendations, we
14   see RealPage recommending downward price adjustments, I do
15   think it's reasonable to infer that one can enhance one's
16   revenue, can maximize one's revenue, without necessarily
17   charging higher prices.
18              THE COURT:  Just keep lowering them.
19              MR. MCINTYRE:  Okay.
20              THE COURT:  Let's go to the -- you know, one
21   unique thing here is the leasing cycle.  Do you understand?
22   And we've described it here.  From the -- the student
23   defendants' standpoint -- do you make anything of that?  It's
24   just a different -- I want your take on that.
25              MR. MCINTYRE:  Sure.  So they do allege that there
```

1  is a different leasing cycle.  We take those allegations as
2  they are pleaded.  I'm not commenting on it as a factual
3  matter.
4            As we pointed out in our complaint -- I'm sorry.
5  -- in our opposite -- in our motion to dismiss -- took me a
6  few times to get it right.  As we point out in a motion, we
7  do think that there is some tension with the markets as they
8  have alleged.  So as Mr. Berman noted --
9            THE COURT:  What's the tension that you --
10            MR. MCINTYRE:  The allegation is that these
11  markets, they are centered around campuses.  Right?  Because
12  students, they need to live near school because they need to
13  be able to get to school easily.  But then they don't allege
14  markets that are based on campuses.  They allege these
15  markets that are -- well, first of all they allege a national
16  market.  Which I have a hard time believing there's a
17  national market, given that students need to be close to
18  their campuses.  But looking at the 27 submarkets, they
19  allege submarkets based on cities.  And in several of these
20  alleged markets there's more than one campus.  And as we
21  pointed out --
22            THE COURT:  I think they identify the campus
23  they're focusing on.
24            MR. MCINTYRE:  They admit that in some of the
25  cities there are two campuses.

1          THE COURT:  We know the one they're focusing on in
2     Knoxville, let's put it that way.
3          MR. MCINTYRE:  In Knoxville, that's right.
4          But I think the tension is they focus so much on
5     the allegation that students need to live near their campuses
6     and yet they allege markets that in some instances include
7     more than one campus.
8          THE COURT:  I think you're referencing the New
9     York/Pennsylvania thing.
10         MR. MCINTYRE:  That's right.  That's right.
11         THE COURT:  All right.
12         MR. MCINTYRE:  And we think it's implausible that
13    a student who attends campus A would opt for housing across
14    the city near campus B instead of, say, going with an
15    alternative near campus A, such as a multifamily unit.  But
16    we think that the real problem -- and this gets to the rule
17    of reason claim.  And I think that's where we're going.
18         To state a rule of reason claim -- and to be
19    clear, we think that, to the extent their claims are subject
20    to antitrust scrutiny at all, it would be under the rule of
21    reason.  They have to plead that there's an agreement and
22    restraint of trade.  They have to plead that the agreement
23    caused an adverse anticompetitive effect within the market.
24    How do they purport to plead that here?  Well, I want to
25    go --

1      THE COURT:  Well, what I want to talk about -- and
2  I'm with you.  You're exactly right on what you're saying.
3  But I'm relying on what appears to be a case that everybody
4  cites.  And it says, the plaintiff has the initial burden to
5  prove that the challenged restraint has a substantial
6  anticompetitive effect that harms consumers in the relevant
7  market.  If the plaintiff carries its burden, then the burden
8  shifts to the defendant to show a procompetitive rationale
9  for the restraint.
10      What say you is that procompetitive rationale for
11  the restraint?
12      MR. MCINTYRE:  Sure.  I have a few examples from
13  the student complaint, Your Honor, if you'll give me a
14  second.
15      THE COURT:  Thank you.
16      MR. MCINTYRE:  So one thing I do want to stress is
17  that we don't get to the second step in the rule of reason
18  unless they've satisfied this first step.
19      THE COURT:  I'm with you.  That's why I want to
20  talk about it.  If I get there, I want to know what to write.
21      MR. MCINTYRE:  But if we get to the second step --
22  the plaintiffs allege -- these are from the student
23  complaint.  Paragraph 77.  They say that RealPage helps
24  student housing clients better understand supply and demand
25  in their markets.  Of course, being able to understand supply

1  and demand, that helps one compete more effectively and set

2  their prices in a more informed way.

3          Paragraph the 48 of the complaint, the student

4  plaintiffs allege the RealPage software makes it possible to

5  consistently reduce vacancies.

6          And so the student complaint, because they talk a

7  lot about this supposed shift from focusing on occupancy to

8  then focusing on price or revenue, without -- while

9  deprioritizing occupancy.  I don't think their factual

10 allegations actually show that that happened.

11         So in paragraph 48 they, of course, allege that

12 RealPage makes it possible to consistently reduce vacancies.

13 And notably, they don't allege that vacancies were going up

14 throughout the class period.  Rather, they allege that

15 occupancy was high in the student housing industry.

16         So, for example, paragraph 123 of the complaint --

17 it talks about how prior to COVID student housing saw 95

18 percent occupancy, despite a lot of new building going on.

19 That's high occupancy.  They're not showing -- if this shift

20 actually occurred, I would have expected to see occupancy

21 rates rise.  They don't allege that.  I'm sorry.  Vacancy

22 rates rise.  They don't allege that.

23         Rather, they allege that RealPage not only helps

24 with maximizing revenue, it helps consistently reduce

25 vacancies.  And so these are just a few --

1          THE COURT:  That's it?  Those two?

2          MR. MCINTYRE:  Well, I think in addition to

3    everything that Mr. Srinivasan --

4          THE COURT:  So you're done?

5          MR. MCINTYRE:  Yes.  Yes.  And I would urge Your

6    Honor, that when they say -- the plaintiffs talk a lot about

7    beating the market, going above market.  They consistently

8    conflate price and revenue.  I don't want to retread old

9    ground.  But I do think that's an important distinction.  I

10   would note that in the student plaintiffs' opposition

11   brief -- I reread it yesterday.  It uses the term above

12   market 22 times.  I think 20 or 21 of those times it's in

13   reference to prices.  The complaint uses that phrase twice,

14   both in reference to performance.  More specifically, to

15   revenue performance.

16          And this also brings me, Your Honor, to the SSNIP

17   allegations in paragraphs 160 and --

18          THE COURT:  Can I divert you to something I need

19   an answer to?

20          MR. MCINTYRE:  Sure.

21          THE COURT:  Okay.  So this may be a little bit

22   premature, but you raise it in your brief.

23          Did your fraudulent -- does your fraudulent

24   concealment argument really take into account the alleged --

25   they allege a conspiracy, whether it's one or not.  They do

```
 1   make that attempt.  And doesn't that take care of your
 2   argument on fraudulent concealment?
 3              MR. MCINTYRE:  I don't think so, Your Honor.
 4              THE COURT:  You don't think they allege one?  I
 5   know you don't think they do.  But if I find there is one,
 6   does that not take care of your --
 7              MR. MCINTYRE:  If you find that they have alleged
 8   the conspiracy -- which, of course, we don't think they've
 9   alleged one.
10              THE COURT:  Right.
11              MR. MCINTYRE:  If you were to find that, I very
12   much disagree that that would dispose of the --
13              THE COURT:  Tell me why.
14              MR. MCINTYRE:  Because -- first of all, a
15   conspiracy is not automatically concealing.  And I find this
16   notable.
17              THE COURT:  Well, you're not admitting that your
18   clients did it in the open, are you?
19              MR. MCINTYRE:  Well, I don't -- my -- our
20   position, of course, is that our clients -- there was no
21   conspiracy.
22              THE COURT:  Okay.  Just tell me why doesn't the
23   conspiracy --
24              MR. MCINTYRE:  Well, a couple of points.  So --
25   the multifamily plaintiffs -- I find this interesting.  This
```

```
 1    is in their opposition to our motion to dismiss on page 1.
 2    They say the conspiracy was publicly and openly facilitated
 3    by RealPage.
 4              If we go to paragraph 142 of the student
 5    complaint.  It says, as discussed above, RealPage boasts
 6    openly and often about the fact that by using its revenue
 7    management solution software lessor defendants can beat the
 8    market.  The complaint relies substantially on public domain
 9    material, including materials from many, many years ago, as
10    early as 2013 and 2014.
11              If this conspiracy was being transacted in the
12    open, if RealPage was out openly boasting about it, I don't
13    see how the plaintiffs --
14              THE COURT:  Yeah.  I think you're -- I can't go
15    with you.  But I want this to be helpful.  I can't go with
16    you on -- RealPage is touting its ability to help people make
17    more money, increase their revenues, et cetera.  My point is,
18    you've raised an opposition or argument on fraudulent
19    concealment.  I just didn't see anywhere in your papers that
20    you took in account if the Court finds a conspiracy that
21    resolves that issue.
22              MR. MCINTYRE:  Well, this -- this line of thinking
23    seems to assume that a conspiracy is self-concealing or
24    inherently fraudulent.  And respectfully, I don't think that
25    the cases support that, Your Honor.
```

1          THE COURT:  What about the conspiracy here?

2          MR. MCINTYRE:  I don't think that they've made

3    those allegations as to this conspiracy either.

4          THE COURT:  All right.  Last chance.

5          Tell -- okay.  Is that -- you want me to go with

6    that --

7          MR. MCINTYRE:  No.  What I --

8          THE COURT:  -- because I just didn't see anything

9    in your papers.

10         MR. MCINTYRE:  Well, what I would like to go is to

11   the *Scrap Metal* case.  This is the Sixth Circuit case that

12   the plaintiffs themselves rely on.  And they say,

13   essentially, well, a conspiracy itself is concealing, which

14   they apparently think obviates pleading the affirmative act

15   of concealment, that the Carrier Corporation case requires.

16   Which by the way, requires more than mere silence.  There

17   needs to be some trick or contrivance.  We don't think

18   they've alleged that.  But in response they point us to Scrap

19   Metal and say, well, a conspiracy is self-concealing.

20         Well, in that case the defendants objected to a

21   jury instruction the judge had given which suggested that a

22   conspiracy was self-concealing.  The Sixth said this in

23   response (as read):

24         Indeed, in the law of this circuit a plaintiff

25   seeking to invoke the doctrine of fraudulent concealment, in

order to toll the statute of limitations in an antitrust

case, must prove affirmative action of concealment.

Concealment by mere silence is not enough.

        Now, the reason the Sixth Circuit there did not --

        THE COURT:  And your position is there's simply no

allegations of that; therefore, you're still right on the

fraud --

        MR. MCINTYRE:  That's correct, Your Honor.

        THE COURT:  Anything else?

        MR. MCINTYRE:  No, Your Honor.

        THE COURT:  All right.  I got it.

        MR. MCINTYRE:  Now, Your Honor, if it's okay by

you I would like to return to the topic of the SSNIP analysis

in paragraphs 160 to 161.

        THE COURT:  Uh-huh.

        MR. MCINTYRE:  So plaintiffs -- as we heard from

Mr. Berman, plaintiffs, they allege a national market, and

they purport to allege 27 discrete submarkets.  To state a

rule of reason claim they have to plead that the defendants

have market power in the proposed relevant market.  Now, in

the *PSI Repair Services* case the Sixth Circuit tells us that

we ordinarily infer market power from market shares.  The

Sixth Circuit said there that really as a floor you need to

be above a 30 percent market share.

        The student plaintiffs do not purport to plead

market shares for any defendant in any market, not in the
national market, not in any of the 27 discrete submarkets.
They say, well -- in response they don't really dispute that.
What they say is, well, we have the SSNIP allegation in
paragraph 160 to 161.

There's a crucial error here.  As paragraph 160
tells us -- a SSNIP, it stands for a small but significant
nontransitory increase in price.

Then in paragraph 161, they go to talking about
revenue performance again.  Again, they're conflating price
and revenue.  One can see an increase in revenues without
increasing one's prices.  Even if we were to set that
aside -- I think we just heard from plaintiffs' counsel they
admit the SNIP allegations don't even -- don't even relate to
the 27 discrete submarkets.  And so they haven't pleaded
anything on market power.  No market shares, no SNIP as to
those 27 markets.

THE COURT:  Can I point you to paragraph 132?

MR. MCINTYRE:  Yes.

THE COURT:  I'll give you a chance to read it.
And I'm sure you'll have an explanation.

MR. MCINTYRE:  Thank you, Your Honor.  I've read
it.

THE COURT:  What say you?

MR. MCINTYRE:  So this paragraph -- as you point

out, it points to a RealPage guide, in which RealPage exhorts
lessors to shop their competitors over the phone, in person
or view their websites, be knowledgeable about their pricing
specials and products.  Respectfully, I don't think this
allegation says much of anything.  It's routine in any market
to want to know what your competitors are charging.  For
example, the -- in the Gypsum case in 1978, the Supreme Court
recognized that even if you have competitor-to-competitor
direct information exchanges of nonpublic pricing
information -- we don't think the plaintiffs have actually
gone that far in alleging that here -- the Supreme Court said
that can make markets more, rather than less competitive.
Now, that's typically why we apply the rule of reason to
information exchange claims.  But notably they don't allege
instances where people are having these lessor-to-lessor
exchanges.

        THE COURT:  So let's just take the allegation for
what it is.  And I know you dispute it.  But say one of the
student defendants read that and took them up on that and
picked up the phone and called its competitors to get their
pricing.  And after getting that pricing information from the
competitors it looked at what RealPage had sent and
RealPage's pricing was -- was way above what their
competitors was doing.  Might I then decide to reject the
RealPage price?  Yeah, I'm going to go down.  I may not go

down as far as they are, but I may still adjust my pricing

appropriately.  That might explain why some of them

selected -- decided to reject the price recommendation.

MR. MCINTYRE:  That could explain it, Your Honor,

and I think that that would go to --

THE COURT:  Do I not have to engage in that

inference?  And I keep coming to that because I want you all

to tell me why I don't.

MR. MCINTYRE:  Well, I think the inference cuts

the other way, Your Honor.

THE COURT:  Okay.

MR. MCINTYRE:  So this is -- it's a reflection --

THE COURT:  How does it cut the other way?

MR. MCINTYRE:  Each of the lessors has its own

independent price making judgment and authority.

THE COURT:  Right.

MR. MCINTYRE:  So the plaintiffs and the

Department of Justice, they put a lot of emphasis on this

idea that the lessors allegedly delegate to RealPage pricing

decision-making authority.

THE COURT:  Yeah, I'm not assuming that.  I'm

assuming what I just said, that I called my competitors, I

looked at the Real price.  I am going to reject that.  That's

too high.  I'm going to go down, because I've talked to my

competitors and I know what the high price I can put on it.

1           MR. MCINTYRE:  Respectfully, I think that's just
2 sometimes how prices are set in the market.  This would
3 indicate that the lessor has independent pricing authority.
4 They're making decisions on their own, because again --
5           THE COURT:  Even after I talk to my competitor?
6           MR. MCINTYRE:  Yes.
7           THE COURT:  Okay.
8           MR. MCINTYRE:  Because -- again, we've talked
9 about the standard of -- for a motion to dismiss a few times
10 today.  In the *Hobart-Mayfield* case, again the Sixth Circuit
11 said the plaintiffs must plead plausible facts that tend to
12 exclude the possibility of independent --
13           THE COURT:  Yeah, but *Hobart* went off on the first
14 element, just said there was no agreement.  I don't know if
15 it got to the rest of the analysis.
16           And again, I think Judge Gilman's published
17 decision tell the District Courts what to do.  I'm going to
18 reconsider what you're saying.
19           MR. MCINTYRE:  Okay.  And I think in the -- in the
20 *Walton Carpet* case that the plaintiffs rely on -- that is
21 another Sixth Circuit decision.  It -- I believe it postdates
22 the decision you were referring to.  That one also refers to
23 the tends to exclude standard in addition to *Hobart-Mayfield*.
24           THE COURT:  I think you have to read them
25 carefully to see to what point that's -- that's part of their

1   rationale for the decision.

2           And you didn't differ with -- I think I asked you

3   this.  Just to make sure.  When Mr. Berman and I went through

4   some of the unique difference -- you're good with -- the

5   student -- the student housing market does have some unique

6   differences from the multi- --

7           MR. MCINTYRE:  I do think they do plead some valid

8   distinctions between multifamily housing and student housing.

9           THE COURT:  And I need to consider that?

10          MR. MCINTYRE:  Of course the Court should take the

11  allegations as pleaded.

12          THE COURT:  I think that covers my questions.

13          MR. MCINTYRE:  Thank you, Your Honor.

14          THE COURT:  All right.

15          All right.  So where does that take us now?

16          MR. COUGHLIN:  I think it takes us to The

17  Department of Justice, Your Honor.

18          THE COURT:  Okay.  But you're -- you don't want to

19  say anything --

20          MR. COUGHLIN:  I'd like to.  I just want make sure --

21          THE COURT:  -- to respond to Mr. Srinivasan?

22          MR. COUGHLIN:  Since its his motion, if he wants

23  to go first --

24          THE COURT:  Everybody's going to get to say all

25  they want to say.  I'm not going to cut you off.

1          MR. COUGHLIN:  I'll wait if he has more to say and

2     I'll respond.

3          THE COURT:  Oh, I didn't know he did.

4          MR. SRINIVASAN:  Sure.

5          THE COURT:  Okay.

6          MR. SRINIVASAN:  Thank you, Your Honor.

7          Your Honor, I just want to go over a few points

8     and won't repeat what we went over.  But one area that we --

9     you had considerable questions about was the allegations

10    regarding pricing advisors.

11         There is one piece of this that's an important

12    context here, which is the allegations -- again, focussing on

13    the allegations -- are that pricing advisors were not used --

14    were used only by -- not used by everybody.  In fact,

15    affirmatively plaintiffs say approximately 60 percent of the

16    units used pricing advisors.

17         THE COURT:  But I understood it that if you didn't

18    use an advisor you then could get RealPage to give you some

19    in-house training for your own people to do it.

20         MR. SRINIVASAN:  Certainly, Your Honor.

21         THE COURT:  Yeah.

22         MR. SRINIVASAN:  But again, the allegation is not

23    the advisor -- whether the separate advisor or an in-house

24    trainer -- and let's look at it as an in-house trainer -- was

25    certainly not doing and not alleged to be in a position to

say we need to do X, Y and Z because the next -- the people
down the street are doing the same thing.  Right?  You're
talking about enforcement.  Think about this.  I mean, the
allegation is simply that RealPage persuades, assists, asks
clients to embrace.  And the reason for that is each client
has a specific strategy.  For some it might be increased
price; for some it might be increased occupancy, whatever it
is for their revenue mix.  There's nothing beyond this
alleged either.  That -- the advisor is advising them about
their strategy.

        THE COURT:  Right.

        MR. SRINIVASAN:  There is no allegation that
they're saying anything about the guy next door is doing
this, you got -- it's not in there.

        THE COURT:  Yeah, there is an allegation.  I can
pull it for you -- it shocked me when I read it -- that the
pricing advisors don't have any ethical walling.  So you may
have the same price advisor representing and advising their
competitors, as well as that particular defendant.

        So pricing advis- -- there is an allegation to
that effect.  I know it's there because I read it a couple of
times.  There was no ethical walls around the pricing
advisors.

        MR. SRINIVASAN:  And I'm not familiar with that
allegation.  But in any event, Your Honor, the point being

1   there's certainly not an allega- --

2            THE COURT:  I'm told it's 282.

3            MR. SRINIVASAN:  Okay.  And I'll accept that as an

4   allegation.

5            THE COURT:  Okay.

6            MR. SRINIVASAN:  Considering that they have all

7   these confidential witnesses, you would expect one of them to

8   say the pricing advisor did this, they told company X to do

9   company Y.  I mean, they make a big deal out of these

10  witnesses that are not really anybody special, but --

11           THE COURT:  Oh, I'm glad you raised that.  I

12  didn't mean to cut you off.  But I thought earlier I said I

13  wanted those people the named, and I don't know that the

14  plaintiffs have done that.

15           MR. SRINIVASAN:  They have sent us --

16           THE COURT:  Oh, you know who it --

17           MR. SRINIVASAN:  Yes, they have given us --

18           THE COURT:  So you know who it is?

19           MR. SRINIVASAN:  We do.  We do.

20           THE COURT:  All right.  Well very good.  Very

21  good.

22           MR. SRINIVASAN:  And again, it's -- they're called

23  confidential witnesses.  They're just witnesses, but the fact

24  is --

25           THE COURT:  You know the actual names?

1          MR. SRINIVASAN:  We now know the names.

2          THE COURT:  Okay.

3          MR. SRINIVASAN:  And -- but the point is, despite

4    having all of these people -- which, again, you don't always

5    have in a complaint -- they still haven't been able to allege

6    that pricing advisors share information between clients of

7    RealPage.  It would be very easy for them to do so.  They did

8    not.  Instead they say most people don't have pricing

9    advisors; pricing advisors persuade -- and again, the point

10   of these pricing advisors is to help maximize revenue, which

11   is pro competitive.

12          And then finally on the internal advisors, that

13   allegation makes it even more clear that an internal advisor

14   who has been trained RealPage -- which by the way, is the

15   majority.  Right?  I mean, they have an allegation, for

16   instance, that say when a lessor defendant is greater than

17   20,000 units typically there's no pricing advisor; they do it

18   internally.

19          And -- so for -- which is most of the defendants

20   in this room, they have more than 20,000 units.  They're

21   trained.  And what is their internal person doing?  They're

22   not even in a position to know what RealPage is saying to

23   anybody else.  They're there to advise their own client,

24   their own management, their own people out there making

25   pricing decisions all over the country, to say here's how we

1  can effectively use the software.  In fact, that allegation I

2  think is actually -- kind of draws the opposite inference.

3  Right?  Why would you train somebody, let them go, and say

4  you can -- you can have -- better use our software.  They're

5  never coming back to the mother ship, those people who are

6  trained.  They're not connected to anybody else.  They're not

7  in a position to be connected to anybody else, and I think

8  that's an important concession.

9          THE COURT:  Yeah, I think they also got some

10 follow-up training.  And I think they got invited to the big

11 trade party -- association party.

12         MR. SRINIVASAN:  There may be that allegation.

13 But think about it.  How could that be part of the

14 conspiracy.  Then they come in, they retrain -- you know,

15 it's --

16         THE COURT:  Well, they want me to infer that, you

17 know, they weren't -- they weren't sharing recipes for

18 brownies at the trade --

19         MR. SRINIVASAN:  Well -- and that's fine, Your

20 Honor.  And there's the plus factors that say that just the

21 opportunity to go to a trade association, it shouldn't lend

22 itself to anything more.

23         THE COURT:  All right.

24         MR. SRINIVASAN:  They were learning how to use the

25 software.  There's nothing about anything collusive there.

1  But I think we've sort of made that point.

2          I just want to make a couple quick points on the

3  rule of reason.  I wasn't able to get through some of the

4  points I wanted to make there.

5          Your Honor had asked about this idea of

6  information sharing and how that works.  And Mr. McIntyre

7  made I think a very important distinction between information

8  coming in, being mixed and being aggregated, blended, pooled,

9  and then certain information, not that information, but

10  information that can't be reversed engineered being

11  disseminated.

12          The Courts have been very clear that, at best,

13  that's a rule of reason case.  And that's TV -- TV

14  Advertising again:  In Re:  *Local TV Advertising*.  And I can

15  read the quote.  But they say it's a rule of -- I mean, it's

16  "exchange of information, it's not illegal per se but can be

17  found unlawful under a rule of reason analysis," which

18  considers a number of factors, which, you know, of course,

19  you've been asking about.  *Olean Wholesale Grocery versus*

20  *Agri Stats* -- and one of the Agri Stats cases cited also

21  says, "Courts evaluate information claims under the rule of

22  reason."

23          This is very -- you know, we don't even have the

24  type of information sharing where there's aggregation and

25  dissemination of confidential information in aggregated

```
1   anonymized form.  We don't have that here, Your Honor.  And
2   even in those cases they say it's rule of reason.  And, of
3   course, Mr. McIntyre went all the way back to U.S. v. Gypsum,
4   said the same thing:  You can actually do that, and in some
5   cases you can inquire and see whether that is.
6             So at a minimum -- at a minimum -- and again,
7   coupled with the allegation that plaintiffs have said that
8   this was perfectly lawful activity for a long time, this
9   cannot be per se.  At best it's a ruling of reason case.
10            Lastly, on the MSAs, you asked about in the
11  student housing -- I was remiss in mentioning that -- you had
12  asked about the investor call, Your Honor.  I'm happy to go
13  through that.  The issue, of course, is that the individual
14  really meant 30 percent.  But even if he meant 70 percent --
15  they say two-thirds.  They apply two-thirds, which -- the
16  math doesn't work out.  It's two- --
17            THE COURT:  Right.  But they've adopted 20 percent
18  now.
19            MR. SRINIVASAN:  Well -- and -- okay.  And let's
20  get to that percentage.  I'm glad you went there.  The --
21            THE COURT:  I didn't go there.  When I --
22            MR. SRINIVASAN:  I'm sorry.  You led me to my next
23  point.  Which is that -- you know, Jefferson Parish has long
24  said -- United States Supreme Court has said you -- below 30
25  percent is presumptively not enough market power.  We cited
```

1  for you -- and I don't have the page number -- but it's in
2  the opening brief, Your Honor -- half a dozen cases that talk
3  about you need at least 30 percent, and quite often 30
4  percent is not enough.
5          I say all of that, because at a minimum in this --
6  you asked Mr. McIntyre -- also in the multifamily case -- a
7  number of their MSAs they allege a share that's below 30
8  percent.  So even under what's clear law under *Jefferson*
9  *Parish* as being insufficient market power -- there's Detroit,
10 Memphis -- I mean, it's -- we can give you paragraph 469 and
11 500.  You can see it.  You can read it there.  That's all we
12 did.  Where they do not provide any market share -- or I'm
13 sorry.  They provide market share below 30 percent, is the
14 allegation.  And then there's another dozen where they
15 provide no market share data at all.
16         And because there's no direct allegation of direct
17 effects and they're not able to show -- of course, we don't
18 think you shouldn't be able to aggregate the various
19 agreements, but even if you could, that it's below 30
20 percent.  At a minimum the Court should consider throwing out
21 those MSAs as a way to narrow the case and make it more
22 manageable, but it's also justified by the law.  Under a rule
23 of reason analysis, those MSAs should not be in this case.
24         And so with that -- I'll just conclude with a
25 final comment, Your Honor.  Which is, you had asked about 45

people in which 25 are in it. What I would ask -- you know,
want you to think about, in terms of an inference of whether
there is a conspiracy here, there is no limiting principle to
their conspiracy. There's 40X defendants here who are
RealPage customers. The only thing they did, according to
plaintiffs, is use the software. There are hundreds of other
RealPage customers outside this courtroom that do the exact
same thing. They have -- those folks they don't think are
part of the conspiracy. And many of the folks here started
before 2016. So that's not the reason they're not here. It
is literally randomly picking a group of a couple dozen
people, saying you're in the conspiracy. If you ask them why
these -- why the people in this room versus why everybody
else, they won't be able to tell you why. If you ask them
why before 2016, or in Mr. Berman's view 2010, they haven't
really given you a satisfactory answer.

          The fact is every one of these defendants were
acting in their unilateral self-interest. They signed up for
some software that would help them, would maximize revenue,
which you're supposed to do in a healthy competitive
environment, and yet we're all here. And that should bother
you. That should prevent you from making an inference that
there is collusive conduct here, and by the plaintiffs own
allegations. And so I'd ask just that you think about that.
When you asked me before why should I infer a conspiracy, I

```
 1   think that's pretty powerful for why you can't.
 2               THE COURT:  Okay.  Mr. Collins.
 3               MR. COUGHLIN:  Your Honor --
 4               THE COURT:  Oh, no.  I want to let the defendants
 5   finish.  I'm sorry.  I thought it was Mr. Collins.
 6               MR. CROSS:  Cross.
 7               THE COURT:  I'm sorry.  Mr. Cross.  Let's let the
 8   defendants finish and then you all --
 9               MS. BOJEDLA:  Thank you, Your Honor.
10               THE COURT:  And then we'll get to the United
11   States.
12               MR. CROSS:  Thank you, Your Honor.
13               So Your Honor, let me pick up on the enforcement
14   mechanism, which has gotten a lot of discussion today.
15   Because I think the water has gotten muddied.  And this is
16   really a critical point.  Your Honor has picked up on it
17   rightly.
18               The enforcement mechanism that the Court's talked
19   about -- and I'm going to talk about two in particular cases
20   that we cite -- is not what's discussed here.  It's not a
21   mechanism from RealPage.  There has to be a mechanism by
22   which a lessor defendant has a stick, a bat, something that
23   they can go after a competing lessor and punish them if they
24   do not adhere to the agreement.  Meaning that they price
25   below whatever the collusive price is supposed to be.
```

1          And if you look at the cases we cited on this,

2   Your Honor:  The *Llacua* case out of the Tenth Circuit, *Clean*

3   *Products* out of the Seventh Circuit -- they're both very

4   explicit on this.  That a key factor is an enforcement

5   mechanism binding all members.  That's out of the *Llacua*

6   case.  *Clean Products*, affirmed by the Seventh Circuit, says

7   with no punishment or even a mechanism to punish the

8   inference towards -- the inference tends toward no agreement.

9          There is no allegation here that any lessor

10  defendant has any mechanism to punish anyone, to have anyone

11  adhere to any sort of recommended price.  We don't even know

12  what that recommended price is.

13         And again, if you look at the pricing charts,

14  which is -- I will confess, it's -- Your Honor mentioned one

15  thing that's was shocking to you -- and I'm going to come to

16  that in a minute -- those are shocking to us.  They are

17  antithetical to any sort of collusive conduct where you have

18  some sort of parallel conduct.

19         And again, pick your case that they cite.  It is

20  completely at odds with what they have pictured.  And

21  instead, what you have pictured is exactly what the Court

22  talks about without an enforcement mechanism where -- in the

23  *Llacua* case, the Tenth Circuit, it says -- this was a wage

24  fixing case.

25         It says (as read):

1          Low wages were just as likely to result from
2     individual decisions to use the recommended minimum wage
3     there.  And then goes on to say, The allegations do not
4     plausibly lead to the conclusion that the association members
5     gave up control over the wages they were setting.  That's
6     this case.
7          And then the most that Mr. Coughlin would say,
8     well, RealPage can tattle, if you've got some low-level
9     property manager, they can report them to the boss if that
10    person is fixing prices at 15 percent of the time, or
11    accepting the recommendation then.  They characterize it as
12    fixing prices.  That's not an enforcement mechanism.  It's
13    got to be at the company-decision level, so that if someone
14    is not doing what they're supposed to the other lessor
15    defendants come in and punish them.
16         And instead what you have is prices going up and
17    down, competitive prices.  Again, pick your figure.  They're
18    telling you every price line in every one of those figures.
19    Take Nashville.  That those are competing prices for a
20    fungible unit.  They're saying a two bedroom, sitting in
21    Nashville, whatever the figure is.  Those are competing
22    prices.  First of all, they range from about 750 to 3,500.
23    Nothing like the cases where we're talking about where it's
24    the same prices everyone's operating from.  Secondly, they're
25    going up and down.  There is no enforcement mechanism here at

1    all and that is a critical factor that they have to plead,
2    Your Honor.
3              Now, Your Honor mentioned on the pricing
4    advisors -- I won't belabor the point Mr. Srinivasan said.  I
5    will say -- I can't speak a lot to pricing advisors because
6    my client doesn't use it.  As Mr. Srinivasan said, a lot of
7    clients do use it.  And they admit that.  And here's the
8    other point, Your Honor.  You said it was shocking --
9              THE COURT:  -- an in-house person?
10             MR. CROSS:  I'm sorry?
11             THE COURT:  Do your folks have an in-house person?
12             MR. CROSS:  That's exactly the great question.  So
13   what they allege is that there's someone who's trained on the
14   system.
15             THE COURT:  Y'all don't have one of those?  Your
16   client?
17             MR. CROSS:  We have people who know how to use the
18   software, of course.  They have to know how to use the
19   software.
20             THE COURT:  No.  I mean to monitor the price
21   recommendations.
22             MR. CROSS:  We do not have anyone that fits the
23   description that they allege where it's an employee of UDR
24   that sits in-house and makes sure there's some sort of
25   adherence to a particular recommendation.  And -- but -- and

1  I don't want to get outside of the complaint in fairness to

2  them.  My only point is, I ask them to point you to one case

3  where the enforcement mechanism is an employee sitting with

4  any member company.  That's not what we're talking about.

5  It's a decisionmaker that tells the other competitor you're

6  cheating, we're going to punish you.  The person sitting

7  internally is making their own independent decisions.

8          But, Your Honor, on this ethical wall point -- I

9  do want to be clear on this.  Your Honor pointed out that

10 there is a witness who talked about that.  If you look at

11 footnote -- if you look at paragraph 29 I think it is --

12 paragraph 29, footnote 43.  They admit that that witness,

13 witness 4, disclaimed the allegations in the complaint.  He

14 disavowed them.  And so I respectfully suggest, Your Honor, I

15 don't think it would can be appropriate --

16         THE COURT:  In the Amended Complaint?

17         MR. CROSS:  Yes, in the Amended Complaint.  If you

18 turn to paragraph 29, footnote 43.  And this is -- this is

19 important.  And here's why, Your Honor.  Because today

20 Mr. Coughlin has relied heavily on that particular witness --

21 it's witness -- witness 4.  Your Honor brought it up, rightly

22 so.  But he also said their best evidence of collusion is the

23 witness who said there was massive collusion.  That's witness

24 4.  And immediately behind that is the footnote that says

25 this person disavowed that.  I respectfully suggest that Your

1   Honor can't rely on --

2            THE COURT:  And I don't know how helpful him

3   saying that --

4            MR. CROSS:  Totally understood.  I just wanted to

5   make sure it was clear that that's not something the Court I

6   think can rely on, Your Honor.

7            Your Honor, the last point I will make -- and I'll

8   sit down.  One of the things that I think has gotten lost

9   here, if you look at the slides that we handed up -- and I

10  think it's important to read what they actually plead, Your

11  Honor.

12           THE COURT:  Your slides or their slides?

13           MR. CROSS:  Yes, Your Honor.  I think it's slides

14  15 -- if you go to slides 15 and 16.  Start with 15.  They

15  have told this Court that there are three components of the

16  alleged conspiracy.  The first is the information exchange

17  part that Mr. Srinivasan has talked about.  The other two --

18  number two is that all members would delegate their rental

19  pricing and supply decisions to RealPage.  So they have to

20  plead that.  The second is that they will abide by those

21  decisions.  But, Your Honor, if you go to the next slide,

22  that's not actually what they allege.  They allege the

23  opposite --

24           THE COURT:  Are you talking about your slides

25  or --

```
 1              MR. CROSS:  Yes, Your Honor.  Slide 16.
 2              THE COURT:  Page 16?
 3              MR. CROSS:  Page 16.
 4              THE COURT:  Oh, yeah, we're looking at different
 5      things.  I'm looking --
 6              MR. CROSS:  You should have --
 7              THE COURT:  Oh, no.  This is the students.  I'm
 8      sorry.
 9              MR. CROSS:  I'm sorry, Your Honor.  It should say
10      Defendants Presentation on the front.
11              THE COURT:  Yes.  Now I've got you.
12              MR. CROSS:  So if you go to slide 15 first.
13              THE COURT:  Okay.
14              MR. CROSS:  So there are three elements that they
15      have to plead, by their own terms.  Focusing just on the last
16      two for the moment.  It has to be delegation of
17      decision-making to RealPage.  Which DOJ says it is a key
18      feature.  DOJ acknowledges that that has to be pled.  And
19      then that the members of the conspiracy, the lessor
20      defendants, will abide by the RMS suggestions.  Well, Your
21      Honor, that's not actually what they plead when they describe
22      the alleged agreement.
23              And so if Your Honor flips to the next slide,
24      slide 16.  This keeps getting lost.  Here's what they
25      actually say the agreement was:
```

1          Defendants agree to adopt RealPage RMS pricing up

2    to 80 to 90 percent of the time.

3          Those two words "up to", DOJ wants to ignore them.

4    The plaintiffs want to ignore them.  They eviscerate the

5    case.  Because what they do is they take it out of the world

6    of every other case where the agreement is to some sort of

7    minimum price.  *Interstate Circuit*, you've agreed to 25 cents

8    or higher.  *Goldfarb*, you've agreed to minimum rates.  *Flat*

9    *Glass*, you've agreed to list prices of some minimum level.

10          What they are telling you is, that when

11   Mr. Coughlin says someone is at a 15 percent acceptance rate,

12   that's not cheating.  Because if your agreement is up to 80

13   to 90 percent, anything between zero and 80 to 90 is within

14   the terms of the agreement.  And so what we've got here --

15   and they acknowledge that there are low variance rates --

16   high variance rates and low acceptance rates, Your Honor.

17   And so what we are left with is much like what the Court said

18   in *Clean Products*, in the *Llacua* case in Tenth Circuit.  The

19   conduct here is just as consistent -- in fact, far more

20   consistent with independent decision-making, because, one, we

21   the lessor defendants, have been using the same software

22   since the early aughts.

23          And just quickly on that, Your Honor.  The blue

24   document that Mr. Coughlin brought up earlier, the blue one

25   -- Proven in Any Market Cycle.  He took you to page 8 of

that.  And he emphasized here The Solution.

And when you asked him what's your evidence of a horizontal conspiracy.  And he said, well, this is it, The Solution.  And he says YieldStar determines unit pricing based on unit type, availability, move-in date -- he read that whole piece.  That's been true for 20 years.  And that's what's getting lost here, Your Honor.  Is everything they are citing, everything they're relying on, has been true for 20 years.  They have one answer to that.  And it's when they say, well, in 2016 there was an abrupt shift in the market; something changed in 2016.  And to that, Your Honor, I point you to the pricing charts.  Because what you see in cases when that happens, when a case survives at the pleading stage, it's when they've come forward with a pricing chart that refers -- and we like to call it a hockey stick.  Prices are going here, and then they go up.  Their prices are the opposite.  No not only are they going up well before the start of the conspiracy -- the alleged conspiracy.  But once you get into 2016 and beyond, prices are all over the place.

And so I will leave you with that, Your Honor, unless there are any further questions.

THE COURT:  All right.  Thank you.

MR. CROSS:  Thank you, Your Honor.

THE COURT:  So any other defendant?  Okay.

All right.  Mr. Coughlin.

1      MR. COUGHLIN:  Actually we have a different
2  respondent to that.

3      THE COURT:  Okay.

4      MS. BOJEDLA:  Thank you, Your Honor.  I will be
5  very brief.  I promise.  I wanted to address just a few
6  points that were made by the defendants.

7      First, this issue of recommendations -- pricing
8  recommendations versus pricing requirements.  And I wanted to
9  just bring up some of the case law that Mr. Coughlin was
10 discussing and give you some case citations.

11     So under *Socony-Vacuum*, and also the Second
12 Circuit decision in *Golan*, which we've cited in our brief, in
13 823 F3d at 76, a conspiracy -- a price fixing conspiracy
14 doesn't require that the conspirators actually adhere to the
15 prices set.  This is very important and elemental antitrust
16 law.  It's enough that the agreement influenced the starting
17 point on prices.

18     And I'll also point out In Re: High Fructose Corn
19 Syrup, which is 295 F.3d at 656.  That also holds that an
20 agreement to fix list prices is a per se violation, even if
21 most, or for that matter, all transactions occur at lower
22 prices.  Same again from the *Golan* case, where plaintiffs
23 allege manipulation of the LIBOR rate, a component of price.
24 It was a pro se allegation:  Even if none of the appellants'
25 financial instruments paid interest at that rate.

1          So I know we've been talking a lot about whether

2     these were recommendations or requirements, but fixing the

3     starting price in and of itself is an appropriately alleged

4     per se conspiracy, at least the pleading stage.

5          We've also talked a lot about enforcement.  And I

6     want to stress that there is no pleading requirement that

7     plaintiffs have to show an enforcement mechanism.  That does

8     not exist.  They do cite to a couple of cases -- and we've

9     distinguished them in our brief.  The first is *Llacua*, which

10    is the Tenth Circuit case.  We talk about this at page 29 of

11    our brief.  And if you look at that case, it's actually a

12    dismissal based on lack of a plausible inference of an

13    agreement, not because -- and not solely because of the lack

14    of an enforcement mechanism.  That case does not stand for

15    the proposition that you need an enforcement mechanism.  They

16    also cited to *Clean Products*.  That's a case at summary

17    judgment, finding that a punishment mechanism was not an

18    exclusive means of excluding the possibility of independent

19    action.  And we've cited to the broiler chickens case 290

20    F.supp 3d at 797 that specifically rejected the exact

21    argument defendants are making here, that a punishment

22    mechanism is required at the pleading stage.

23          Your Honor also raised the issue much earlier in

24    the day about whether it's really an enforcement mechanism if

25    low-level employees are involved.

1          We allege in our complaint that these are the

2   individuals who actually are setting the prices on a

3   day-to-day basis.  So when they're being threatened with

4   docks in pay or having their supervisors told on them, that

5   is a very effective enforcement mechanism.  Those are the

6   people who are setting the prices.  So if they're worried

7   about their jobs that's a good way enforce a curtail.

8          THE COURT:  Yeah, I think their point, though, is

9   that's all within that particular defendant's entity.  It's

10  not an enforcement to others' allegedly, involved,

11  horizontally and other competitors.  Or even --

12          MS. BOJEDLA:  Your Honor --

13          THE COURT:  Or even -- or even by RealPage.

14          MS. BOJEDLA:  Your Honor, that is correct to an

15  extent.  RealPage is creating the mechanisms by which these

16  reports are being made.  And as Mr. Coughlin also mentioned,

17  though we haven't had discovery yet we know from the DC

18  Attorney General's complaint, and we believe discovery will

19  show, that if you do not accept those recommendations 75

20  percent of the time you'll be kicked off the platform.

21  Which, had we had that discovery ahead of time --

22          THE COURT:  I knew somebody was going to say that,

23  but --

24          MS. BOJEDLA:  Have to say it --

25          THE COURT:  -- we almost got through today without

1    -- yeah, I don't think I can consider that.

2              MS. BOJEDLA:  Sure.  Understood.

3              Another quick point.  So the defendants keep

4    saying that we agree that this was all procompetitive before

5    2016.  That is not alleged anywhere in the complaint.

6              Part of the reason we selected 2016 as a starting

7    of point for our conspiracy period, which does not mean it's

8    the entire start of the conspiracy, is because that's when we

9    started to see widespread impact and effects.

10             We absolutely are not conceding that they were

11   doing something procompetitive and then suddenly on January

12   1st, 2016, it became anticompetitive.

13             That's really when we started to see the impact in

14   the market and the break in behavior that shows us that they

15   changed their behavior in a way that can infer an agreement.

16             THE COURT:  And other than the chart with the

17   parallel pricing, what else should I look at?  On that point.

18             MS. BOJEDLA:  Sure.  That's the allegations in our

19   complaint about the change in the market.  So the -- so the

20   graphs showing how -- and actually, this goes to another

21   period that Mr. Cross was making.  It is true that we have

22   prices going up over the course of 2013 until the present,

23   with some volatility around COVID, as Your Honor recognized.

24   But you have to look at those charts in relation to the

25   charts that also show that around 2016 there was this break

```
 1  where are price increases were no longer related to vacancy
 2  and occupancy.
 3          So, you know, it's actually pretty remarkable to
 4  see that prices continued to increase even as vacancies were
 5  not at the same time decreasing.
 6          THE COURT:  Okay.  Where is that?  Because I
 7  didn't see that.
 8          MS. BOJEDLA:  I am glad that you asked.  So at 361
 9  to 364.
10          THE COURT:  Hold on.  Let me find my charts.
11          MS. BOJEDLA:  361 to 364.  And, you know, we do
12  allege in the complaint at length that revenues were not
13  increasing by lowering vacancies.  So the defendants are
14  asking you to draw an inference in their favor to believe
15  that they could also increase revenues by decreasing
16  vacancies.  That's just not what's alleged in the complaint.
17  It's exactly the opposite.
18          And I will -- if you'll indulge me one more
19  minute.  Mr. Cross also argued that price decreases --
20          THE COURT:  Okay.  Let's go to the charts.  I
21  found mine.
22          MS. BOJEDLA:  Oh, sure.  Go ahead.
23          THE COURT:  What chart are you referring to?
24          MS. BOJEDLA:  Okay.
25          MR. COUGHLIN:  Your Honor, they're the vacancy
```

1  charts at paragraph 357, and then they pick up again at 361

2  to 364, and you see a structural break between -- or

3  a positive relationship --

4           THE COURT:  Paragraph 357?

5           MS. BOJEDLA:  Sure.  They start around --

6           THE COURT:  I'm just trying to -- paragraph 357?

7           MR. COUGHLIN:  Paragraph 357.  There's a chart

8  there.

9           THE COURT:  Okay.

10          MS. BOJEDLA:  Yeah.  There are charts -- are --

11          MR. COUGHLIN:  Oh, I guess 355 is the first chart.

12          MS. BOJEDLA:  And the figures are Figure 30, 31,

13  32, 33, 34.

14          THE COURT:  So just so I'm clear, you're talking

15  about Figure 30, Atlanta Effective Rents and Vacancies?

16          MS. BOJEDLA:  That's one of the examples.  We've

17  done these charts for several of the MSAs.

18          THE COURT:  All right.

19          MS. BOJEDLA:  Okay.  Mr. Cross also argued that

20  price decreases -- if you see price decreases in the parallel

21  conduct charts, you have to rule out the existence of an

22  agreement.  That's not correct.

23          First of all, there is no allegation in the

24  complaint that the product was ever actually suggesting or

25  recommending price decreases.  They cite to docket 594-1,

1   which is a presentation that shows sample work flows.  It

2   doesn't actually show any evidence of price decreases.  So

3   plaintiffs certainly have not alleged that prices decreased.

4           And also is a *Socony-Vacuum*, the Supreme Court

5   case we have cited a number of times in our brief, holds that

6   even price decreases when set -- even price decreases can

7   serve as evidence of a conspiracy.  You know, it says when

8   the result was to place a floor under the market, a floor

9   which served the function of increasing the stability and

10  firmness of market prices, that is also per se unlawful.  And

11  that's *Socony-Vacuum* 310 U.S. at 223.

12          THE COURT:  So these charts you want me to look

13  at --

14          MS. BOJEDLA:  Sure.

15          THE COURT:  -- they're all -- it's Atlanta,

16  Phoenix.  Seems like they're city -- Orlando -- market

17  specific.

18          MS. BOJEDLA:  Correct.  We're using them as

19  representative examples.

20          THE COURT:  Of the entire market?  Representative

21  examples of what?

22          MS. BOJEDLA:  Of the -- of the change in conduct

23  around --

24          THE COURT:  In 2016?

25          MS. BOJEDLA:  Around 2016.  Correct.  And we

describe them in paragraph 351 to 352.

        THE COURT:  Okay.

        MS. BOJEDLA:  One last point -- or two last points quickly.  I heard Mr. Srinivasan discuss procompetitive rationales for the restraints.  None of the procompetitive rationales I heard today are actually procompetitive under the antitrust laws.  They're all about making more money for the defendants.

        THE COURT:  And I asked him that, if I get to that point in the analysis --

        MS. BOJEDLA:  Okay.  Okay.

        THE COURT:  I just wanted to make sure I understood that.

        MS. BOJEDLA:  And I just want the record to be clear that we don't believe making more revenue is a procompetitive justification for a restraint.

        THE COURT:  Okay.

        MS. BOJEDLA:  And then, finally, Mr. Cross also discussed this "up to" 80 to 90 percent allegation in paragraph 15.  We have alleged in the complaint through Witness 7 that it was at least 80 percent at paragraph 241 and 80 to 85 percent at paragraph 262.  So I don't want it -- again, I want to correct the record that we have allegations at a higher level.  And that is all I will burden the Court with right now.

1          THE COURT:  All right.  Mr. Berman.

2          MR. BERMAN:  I'll be very brief, Your Honor.

3          First I want to start with the argument that

4   RealPage is not Agri Stats.  In fact, RealPage is worse than

5   Agri Stats.  Why do I say that?  So in Agri Stats, in

6   chicken, pork, turkey and red meat -- poultry wages -- I'm

7   lead counsel on all those cases.  So I understand those

8   cases.  The defendants, yes, they pulled apart the data and

9   they sent it to the chicken manufacturers, and they could see

10  the supply and price of each chicken manufacturer.  That's

11  not happening here.  Oh, and then each chicken person --

12  manufacturer would decide supply and price.  Okay?  They had

13  the information; they made their decisions.  Agri Stats

14  facilitated the conspiracy.  This is worse because what's

15  happening here is the competitors are sending in their

16  information; it's being crunched by RealPage.  RealPage sends

17  the price decision.  RealPage takes away all the independent

18  pricing decision.  And it makes it worse than the broilers

19  cases, not better.  That's the same thing that's true in the

20  TV Ads case.  They did not give price adjustments.

21          Second, market power and market percentages.  Our

22  main point on market power is we don't need to get there

23  under *Realcomp*.  Because if you look at paragraphs 48, 63, 80

24  and 107, what they say is "We're outperforming in every

25  market and charging top tier prices even as we stop leasing

1    to a target occupancy."  So we can clearly see the

2    anticompetitive effects.

3              Procompetitive justification.  I know you haven't

4    said you're getting there.  But counsel went to paragraph 77

5    of the student housing complaint to show a procompetitive

6    justification.  And I just leave the Court with reading this

7    paragraph.  It actually shows the impact of the conspiracy,

8    not a procompetitive justification.

9              It says in a case study about lessor defendant

10   Campus Advantage:  Campus Advantage outperformed the market

11   by 14.1 percent even with below average occupancy rates.

12             So they're saying even though we normally would

13   have had -- you know, we would have lowered our price, we

14   were able to keep the price up.  And then it goes on to

15   quote -- the quote that he had, from Jennifer Cassidy that

16   says, yes, this helps us better understand the market.  Yeah,

17   understand it so you can charge supracompetitive prices.

18   That actually helps us.

19             And by the way, Your Honor, just as an aside, this

20   Jennifer Cassidy is the same person that we quote in our

21   complaint who was training people -- training lessor

22   defendants not to disclose that they were using this revenue

23   management.  She was helping with the concealment.  She was

24   the one who went out and said don't tell anyone what we're

25   doing here.

1          And finally, Your Honor, you were shown a graph

2    where sometimes the prices went down and didn't quite follow

3    the recommendation.  In the broilers case Judge Durken said,

4    a conspiracy doesn't have to work perfectly every day, and

5    there can be some ups and downs.

6          That's all the I have, Your Honor.

7          Thank you.

8          THE COURT:  All right.  Anybody else on the

9    plaintiffs side?

10         MR. COUGHLIN:  I have --

11         THE COURT:  Oh, okay.

12         MR. COUGHLIN:  I have three quick --

13         THE COURT:  And then I'm going to let the defense

14   have the last.  It's their motion.

15         MR. COUGHLIN:  The first point is they brought up

16   CW4 and said he withdraw his allegations.  It was upon the

17   announcement of a potential antitrust investigation by the

18   Department of Justice into RealPage algorithm and pricing on

19   or around November 22nd Witness 4 turned around and

20   disclaimed those statements when the investigation was

21   announced.

22         The second period I want to make is that the

23   defendant said, you know, up to 80 percent and they pointed

24   to a paragraph.  I think it was paragraph 15.  But in

25   paragraphs 242 and 262 CW7 said that we got at least 80

percent compliance.  At least.  So the criticism of the
government's argument is not there.  And finally, as this --
this 2016 has become a bigger issue.  At footnote 126 in the
complaint, we cite an AI document.  And in that document it
says it wasn't until 2016 that the multifamily industry was
reported as having achieved critical mass for revenue
management adoption.

        Thank you, Your Honor.

        THE COURT:  All right.  So I'm going to let the
defense.  And then I'll let the United States make its
comments.

        MR. MCINTYRE:  Your Honor, I will try to be brief.

        Mr. Berman just told you that in the Local TV
Advertising case, the alleged intermediary, a company called
Share Builders, did not provide price recommendations to its
clients.  That's false.

        Reading from the star -- page star 3 -- this is a
Westlaw decision (as read):

        Third, Share Builders provided some clients with
weekly rate cards which set forth recommended pricing for
each time slot.  Finally, Share Builders circulated weekly
bottom prices which some defendants used as the lowest rates
they should go for any given program in a specific week.

        Plaintiffs allege that some defendants used these
weekly listings to set the prices they charged to the market.

1          The intermediary shareholders provided price
2   recommendations to its clients after collecting data from
3   hundreds of clients across the country.
4          The Court still found there was not a plausible
5   allegation that Share Builders had facilitated a conspiracy
6   between its clients.
7          The Court said (as read):
8          To plausibly infer that a defendant facilitated a
9   conspiracy, plaintiffs must allege facts showing that the
10  conduit's circulation of information enabled co-conspirators
11  to tacitly communicate with one another.  Courts seek
12  concrete allegations that the conduit defendant compromised
13  the ostensible anonymity of competitively sensitive
14  information through its publication of market research,
15  analytics, among other things.
16         The plaintiffs have not pleaded those facts here.
17         Mr. Berman also referred to the Campus Advantage
18  case study.  I do have copies of that.  I apologize.  I
19  should have brought more.  I have two.  I would be happy to
20  provide one --
21         THE COURT:  I'll take one.
22         MR. MCINTYRE:  Mr. Berman referred to this Campus
23  Advantage case study, which is cited a few times in the
24  complaint.  And I would like to direct the Court's attention --
25         THE COURT:  So the record -- I didn't mean to

1    interrupt you, but we need to make sure our record is clear.

2            So this is going to be Exhibit C to today's oral

3    argument.  And then the plaintiff's blue document is Exhibit

4    B.  And plaintiff's red document is Exhibit A.

5            (Whereupon Plaintiff's Exhibit C was marked for

6    identification.)

7            THE COURT:  All right.

8            MR. MCINTYRE:  So I would like to direct the

9    Court's attention to the third page of the document if we're

10   counting the cover as page 1.  And this -- it's a page that

11   has a bunch of arrows on it.  And there's a heading that

12   says, 2017 to 2018 Revenue Performance Compared to Market.

13   So, one, again, we're talking about revenue, not prices.

14           This study -- it looked at seven different

15   properties run by Campus Advantage.  It doesn't say where the

16   specific properties are located other than to give general

17   geographic information.  And what the study showed was that

18   six of these properties outperformed relative to the market

19   on revenue.  Again, not on price.

20           Mr. Berman referred to a 14.1 percent figure.

21   That's property A in this study.  Which had a 14.1 percent

22   increase in revenue relative to the rest of the market.

23   Mr. Berman talked about deprioritizing occupancy in favor of

24   revenue.  This study, it indicates the occupancy change for

25   this property.  So property A, the occupancy change of year

1    over year was negative 0.7 percent.  This is a property with

2    576 beds it says.  That works out to four beds.  So they

3    leased four fewer beds that year.

4            Now, looking at the six properties in total that

5    performed better relative to the rest of the market.  That's

6    properties A, B, C, D, E and G.  Of those six properties,

7    three of them had an increase in occupancy year over year.

8    So, for example, property G, the last one, this is the

9    biggest property in the study, 930 beds.  It outperformed the

10   market on revenue to the tune of 7.3 percent.  It also had an

11   occupancy change of positive 1.4 percent.  So they were

12   renting more beds, which is a good thing.

13           Thank you, Your Honor.  Unless you have any

14   further questions, I'll leave it with that.

15           THE COURT:  All right.  Mr. Srinivasan, Mr. --

16           MR. SRINIVASAN:  I have nothing more but Mr. Cross

17   is going to have some final comments.

18           THE COURT:  All right.

19           MR. CROSS:  Thank you, Your Honor.  And I will be

20   brief.

21           Just a few quick points.  The figures 30 to 34

22   that we just now somewhat heard about, where they say that

23   there is a structural break.  Again, what the Court is to

24   rely on are factual allegations.  The factual allegations

25   that they have admitted is that there's no change in price

coincident with 2016.  And if there was some sort of
structural break that wasn't part of the devised litigation
narrative we would see that in the prices.  Those are the
facts they put into the record.  They cannot run from them.

Briefly, Your Honor, you mentioned before the
pandemic is something that has to be factored in.  I would
encourage Your Honor to look at the figures through the end.
You can pick any of them.  26 and 27 jumped out quickly.  The
price volatility includes through 2023.  So this wasn't a
blip due to the pandemic.  What you see when you go figure by
figure is just the type of competition one would expect when
lessor defendants are still making their own pricing
decisions.

We heard today there's no allegation in the
complaint that the tool recommends price decreases.  I will
tell you candidly, Your Honor, that that's a troubling
position to take.  They're basing that on the fact that there
was a particular FAQ document that they cited and relied on
in their prior complaint.  They removed that from the new
complaint after we pointed out that among many things it said
repeatedly was, that there are price reductions.  I will
leave Your Honor to make your own judgment about the degree
to which the plaintiffs have been forthright with the Court
in having removed something that is still in the record and
that they relied on extensively and was destructive to their

1    claims.

2         Your Honor, quickly on the -- we -- the point

3    about the enforcement mechanism. *Broiler Chicken* ws brought

4    up.  It's important to see what the Court actually said in

5    *Broiler Chicken*.  And what it says is, in *Broiler Chicken* the

6    reason it was less important for an enforcement mechanism is

7    that was a supply reduction.  And the Court emphasizes this

8    and says the point at which horizontal competitors have

9    agreed to reduce supply -- just by the nature of economics

10   prices are going to go up.  So you don't need an enforcement

11   mechanism to reap the benefit of those prices.  Conversely,

12   it points out that you do need an enforcement mechanism when

13   you're just trying to protect your monopoly, trying to

14   monopoly rents up.  And that if you don't have that it tends

15   to negate the inference of a horizontal conspiracy.

16        And the last thing I would leave Your Honor with,

17   only because we haven't really talked about it -- I think

18   it's critically important -- there are no suggestion of any

19   horizontal communications among the lessor defendants at all.

20   And I would end on that, because what we're really talking

21   about today -- we've talked about a lot of things.

22        They do not have factual allegations that

23   plausibly support an inference of conspiracy.  And when you

24   look at each of their cases, it's so far removed from what

25   they're talking about Apple eBooks, for example -- lots of

communications alleged among the publishers specifically
about the conduct.  If you take Toys R Us, it was one
distributor specifically saying I will boycott the
wholesalers if everyone else does.  And that was the
communication that they wanted conveyed allegedly to the --
their competitors.

There is nothing like this here.  We even heard an
exaggeration where Mr. Coughlin said we have numerous people
that say they're accepting the rates at 99 percent.  There's
one witness that says that.  There's not even an indication
that that's after the alleged the conspiracy.

So what we are left with is a few random
statements, none of which admit collusion, discuss collusion,
except for the one guy who disavowed and said what you put in
your complaint is not what I said to you.

Thank you, Your Honor.

THE COURT:  Anybody else on the. . .

All right.  If the United States wants to make
some comments.

MS. CHENG:  Thank you, Your Honor.  Good
afternoon.  Cecilia Cheng on behalf of the United States.

With Your Honor's indulgence, I would like to
start with some points on the legal framework where our
primary interests lie in this case, and then I would like to
switch to address some of the topics that's discussed today,

1    in particular the idea that recommendations are necessary and
2    that price decreases matter in a per se price fixing case.
3              Your Honor, thank you for giving us a chance to
4    share our views in this very important and timely issue in
5    antitrust.
6              The Sherman Act has been in place for over 130
7    years.  During this time it has always protected competition,
8    especially price competition, by banning price fixing among
9    actual or potential competitors, no matter what technology or
10   machinery these price fixers use.
11             In this case, the property owners allegedly fixed
12   rent prices using algorithms.  Given the vast amounts of data
13   the algorithms can process, algorithmic price fixing may be
14   even more concerning than other forms of price fixing in the
15   fast.
16             But courts have been clear, Your Honor.  It
17   doesn't matter what the means are for price fixing.  All
18   forms of horizontal price fixing are banned.
19             Our primary interest in this case is the legal
20   framework.  Defendants have urged overly narrow definitions
21   of the concepts of both concerted action and of price fixing.
22   Their versions of these concepts are inconsistent with
23   settled law and could constrain antitrust enforcement against
24   price fixing going forward more than just this case.  I want
25   to first point out the legal principles involved here and

1    then discuss them in more depth.

2              As to concerted action, Your Honor, defendants

3    repeatedly asked, well, how could 40 people come together,

4    agree -- to agree, and keep suggesting that there must be

5    some allegations that a group of competitors expressly agreed

6    and gathered together to do the same thing at the same time.

7    But that's not the law, Your Honor.  There are many different

8    forms of concerted action and many ways of proving it.  At

9    bottom, the ultimate question, as the Supreme Court tells us

10   in *American Needle*, is whether the arrangement joins together

11   independent decisionmakers.  Proof of parallel conduct and

12   plus factors, which defendants focus a lot of their briefing

13   on, is one way to make that showing of concerted action, but

14   it is by no means the only way.  Another method, as we

15   mentioned in our memorandum of law, is that it can include an

16   invitation of concerted action and subsequent acceptance of

17   that invitation.  This suffices to meet the first elements of

18   the Sherman Act.

19             THE COURT:  Do you think that's here?

20             MS. CHENG:  Yes, Your Honor.  We believe --

21             THE COURT:  What facts do you -- allegations are

22   you relying on?

23             MS. CHENG:  So, Your Honor, plaintiffs can speak

24   and provide more details on this.  But the reason we believe

25   that an *Interstate Circuit* style invitation conspiracy is

1    alleged here is the marketing materials, public materials,

2    and promotion materials that's alleged in this case, Your

3    Honor, shows that the pitch to the landlords was one of

4    concerted action.  Meaning, that the way the landlords

5    construed the pitch themselves is one where collaboration

6    among the competitors was envisioned.  And that is what they

7    accepted when they participated as part of the scheme.  And I

8    have particular examples here from the quotes of the

9    landlords that's in paragraphs 9 to 10 of the multifamily

10   complaint.  One of the landlords says we are all competitors

11   and RealPage helps us to work together, not work separately.

12   This is an example, Your Honor, of how the landlords have

13   interpreted the pitch that RealPage makes to them.  And in

14   accepting this type of invitation, Your Honor, this is a

15   plausible -- this type of allegation makes it plausible so

16   that a conspiracy exists.

17            Now, Your Honor, as to price fixing itself --

18            THE COURT:  But I think -- I think the defendants

19   would say it -- it doesn't aid in any communication between

20   the horizontal competitors.

21            MS. CHENG:  Your Honor --

22            THE COURT:  I think that's what they would say.

23            MS. CHENG:  You're right, Your Honor, that is

24   likely what they would say.  Our view here, though, is that

25   direct communication among the landlords is not necessary for

there to be a tacit agreement, a mutual understanding or
meeting of the minds among the landlords.  In fact,
RealPage's scheme --
              THE COURT:  Right.  But where do I have concerted
action, to use your terminology, between the horizontal --
              MS. CHENG:  Well, Your Honor, the term -- where
you have it, Your Honor, is in the recommendations that show
that the landlords understand that they are part of a common
scheme, that they're not in this by themselves as individual
competitors, but that they're a part of a common scheme or
arrangement with other competitors.  And there are
allegations that show in the complaint -- and plaintiffs may
have additional ones to point to -- that make it clear that
when these competitors participate in this scheme -- this is
a two-part scheme -- when it's pitched to them they're aware
that the same pitch is made to other competitors, and when
they join the conspiracy by giving RealPage what it's asking
for, which is private data, they know that their competitors
are on the prog- -- are using the same RealPage and are part
of the scheme, as well.
              So, Your Honor, as to price fixing, I want to talk
a little bit more about this concept, which again defendants
have tried to narrow and put into a category here as
requiring just setting the same prices.  But horizontal price
fixing, Your Honor, includes competitors jointly relying on a

```
 1   common agent for key aspects of the pricing process.
 2              THE COURT:  What case says that?
 3              MS. CHENG:  Your Honor, so this follows from cases
 4   both on delegation, which we cite in our statement.  This
 5   includes *Citizens Publishing*, a Supreme Court case from 1969,
 6   as well as *Virginia Excelsior Mills*, which is a Fourth
 7   Circuit from 1958.
 8              THE COURT:  Okay.  Thanks.
 9              MS. CHENG:  And Your Honor, it is price fixing
10   where multiple competitors give nonpublic data to a common
11   agent so that that agent can use these data to tell
12   competitors how they should price instead.  And this is price
13   fixing, Your Honor, even if these competitors retain some
14   pricing authority and judgment.  This follows directly from
15   the cases defining price fixing, to include agreeing on a
16   pricing formula, to include agreeing on list or sticker
17   prices, even if those list or sticker prices are rarely
18   charged.  And it also follows, Your Honor, from cases about
19   delegation.
20              Now, to expand on these points I'll start with
21   concerted action and talk about the many forms that concerted
22   action can take.
23              THE COURT:  And if you want to tie it to this
24   case, that would be most helpful.
25              MS. CHENG:  Will do, Your Honor.
```

1          Here defendants have talked about how there's no

2   need -- how there's no direct communications among the

3   landlords; we don't see one landlord approaching another.

4   But there's simply no need for direct communications among

5   the defendants at all in a situation when an intermediary,

6   like RealPage, makes this unnecessary.

7          So where there is some type of joint delegation

8   that's alleged here, towards a common decision maker, which

9   courts sometimes refer to as a combination, which is the word

10  that's used in the statute, plaintiffs can show the existence

11  of concerted action by showing some type of tacit agreement

12  or mutual understanding without any direction -- without any

13  direct communication among the landlords, because they can

14  show their participation in the scheme through their conduct.

15         In this way, Your Honor, an antitrust conspiracy

16  is no different from any other type of conspiracy, criminal

17  or otherwise.  The guiding standard here for concerted action

18  ultimately comes from *American Needle*, which is whether the

19  scheme joins together separate decisionmakers in a way that

20  deprives the marketplace of independent centers of

21  decision-making.

22         And the Sixth Circuit in *Elizabeth Place* in

23  2016 -- this is at 817 F.3d 934 -- confirm once again that

24  this is the standard to use in determining whether there is

25  concerted action or not.  If conduct joins together separate

economic decision makers, Your Honor, that is concerted
action.  If the concerted action is among actual or potential
competitors, it is horizontal.  And if this horizontal
arrangement involves jointly relying on a common agent for
aspects of pricing, Your Honor, then it is price fixing.

Finally, I'll turn to how concerted action can be
proved, and, in particular, the allegations here.

Defendants try to narrow the proof in this case to
one method.  And their argument has two parts.  First,
defendants claim that plaintiffs must show parallel conduct;
that is, defendants doing the same thing at the same time,
and, second, defendants claim there must be plus factors.
But again, Your Honor, this is not the law.  While we agree
with defendants that in the Sixth Circuit allegations of
parallel conduct must be supplemented with allegations of
plus factors, we disagree that proving parallel conduct is
required in all cases.

In particular, Your Honor, we think that the
allegations here comfortably fit into the mold of *Interstate
Circuit* and *Masonite*, where the Court said it is sufficient
to show concerted action if, one, there is an invitation that
contemplates concerted action among competitors, and, two, a
course of conduct among these competitors showing acceptance.
Or to put it in plain English, to map onto the allegations
here, if there is proof that an entity went around to a group

1   of competitors and essentially invited them to act together

2   on prices, and prove that all these competitors accepted that

3   invitation, Your Honor, then there's no need to also look for

4   parallel conduct and plus factors because we know there's

5   concerted action on pricing.

6           Defendants have disagreed with this and suggested

7   that this is not enough.  But here's what the Supreme Court

8   has said.  First, in *Interstate Circuit* on page 277, quote,

9   It was enough that knowing that concerted action was

10  contemplated and invited, the distributors gave their

11  adherence to the scheme and participated in it.  This is at

12  page 226 to -27.  And then the Court reaffirmed it in

13  *Paramount Pictures* at page 142, and again in *Masonite* on

14  pages 274 to -76.  These cases are good law.  They are

15  binding precedent.  And the Courts of Appeals, Your Honor, in

16  a footnote on -- that we cite in footnote -- sorry -- I

17  apologize.  The Courts of Appeals, which we describe in

18  footnote 6 of our memorandum of law, including the Sixth

19  Circuit, have continued to rely on these cases and recognized

20  that proving such an invitation and acceptance is a viable

21  path.

22          Now, Your Honor, I'll turn briefly to the forms of

23  price fixing.  Price fixing is a broad category encompassing

24  many different types of restraints on the pricing process.

25  It does not need to involve competitors setting the same

prices.  It can also include them agreeing to a range of
prices or using the same pricing formula.  It also includes
agreements among competitors to peg, to stabilize, to raise,
and to set prices together.  And this follows directly from
*Socony-Vacuum* and the many cases thereafter.

Critically, Your Honor, price fixing also includes
what's alleged in this case.  Which is competitors allegedly
knowingly combining their sensitive, nonpublic pricing and
supply information in an algorithm that they rely upon in
making pricing decisions with the knowledge and expectation
that other landlord competitors are doing the same.

So to be the clear, Your Honor, it doesn't matter
if as part of the joint reliance on a common agent here
competitors hold on to some of their decision-making.  What
does matter is that competitors have come together to rely on
a common algorithm that uses shared competitive information
for some part of the decision-making process so that the
price setting process is no longer fully independent.  And
I'll have more to say on this topic later when I switch to
talking about recommendations.

But, Your Honor, this case is best summed up by
the words of RealPage's own chief architect who Mr. Berman
quoted earlier.  And this is on paragraph 71 of the student
complaint and paragraph 16 of the multifamily complaint.  He
said, quote, if you have idiots undervaluing, it costs the

whole system, unquote.  But what RealPage calls idiots

undervaluing we call landlords competing.  And when RealPage

says lower prices costs the whole system, Your Honor, they

mean that it costs landlords as competitors as a group.

These landlords used to compete on prices.  But now they

allegedly set their prices together at the expense of renters

and students who now have to pay noncompetitive rents as a

result.

Based on the allegations here, because of

RealPage, renters miss out on the fully independent pricing

of a competitive market, and that's the violation.

With that, Your Honor, I would like to turn to

address in particular some of the points people have made

today on pricing and the importance that price

recommendations are adhered to.

So, Your Honor, as plaintiffs' counsel said,

prices do not need to be fully adhered to.  And so whether

it's up to 80 percent, up to 90 percent, or up to 60 percent,

it's simply immaterial as a legal matter.  And perhaps an

example or a comparison here with a drug cartel might be

helpful here.  A drug cartel cannot come into this courtroom

and defend itself by saying our foot shoulders are

coordinated 80 percent of the time, and, therefore, we are

not in a conspiracy.

An antitrust conspiracy is no different, Your

Honor.  It doesn't matter if the conspiracy is successful.
And it doesn't matter if the conspiracy is effective.  What
matters is the illegality here -- the illegality here stems
from the joint delegation of aspects of pricing.  And again,
Your Honor, it doesn't matter if this delegation refers to
the starting period of prices, the end point of prices, or
somewhere in the middle.  And this follows from cases making
it illegal to fix the sticker price or the list price of
products even if companies often deviate from these prices.
That's irrelevant as a legal matter.

       Now, I know Ms. Bojedla had talked about two cases
in particular.  But I wanted, with the Court's indulgence, to
expand on some of the quotes here because I --

       THE COURT:  Yeah, I don't mind indulging you, but
I will tell you it's 5:30.  And we started at 1.

       MS. CHENG:  That's fair, Your Honor.

       THE COURT:  At some period people are going to
start complaining here.

       MS. CHENG:  That's fair, Your Honor.  Well, I'll
try -- I'll quote a very small portion of it, Your Honor,
that I think is helpful to thinking through this.  In In Re:
*High Fructose Corn Syrup* -- this is the Judge Posner decision
from the Seventh Circuit.  Judge Posner said the third trap
is failing to distinguish between the existence of a
conspiracy and its efficacy.

1    The defendants point out that many of the actual

2  sales during the period were made at prices below the

3  defendants' list prices.  That is wrong.  An agreement to fix

4  list prices is a per se violation of the Sherman Act even if

5  most or for that matter all transactions occur at lower

6  prices.  Anyway, sellers would not bother to fix list prices

7  if they thought that there would be no effect on transaction

8  prices.  The defendants acknowledge that their list price

9  served a useful purpose.  The only useful purpose they might

10  serve is as a guide to likely transaction prices.

11    And, Your Honor, a similar point is made in the

12  *Galbon* case as well, which we also have cited in our

13  statement here.

14    And second, Your Honor, I wanted to briefly

15  address defendants' points about the price decreases.  It is

16  per se illegal to fix prices even if the scheme is one to

17  depress prices.  The Supreme Court made that clear in

18  *Socony-Vacuum*.  That a price fixing scheme --

19    THE COURT:  Yeah, I don't think that's what he was

20  arguing.

21    MS. CHENG:  Well, Your Honor --

22    THE COURT:  I don't think that's why he said that.

23    MS. CHENG:  My understanding from his argument

24  here is that -- well, I just do want to clarify.

25    THE COURT:  Yeah, he was just saying that so there

```
 1  really wasn't an agreement, because the prices fluctuated,
 2  not that they had a conspiracy to decrease prices.
 3          MS. CHENG:  That's (indiscernible) the case, Your
 4  Honor.  But I do want to emphasize that even if that was the
 5  agreement and prices were fluctuating and everyone was not
 6  adhering to it, it would not save the alleged conspiracy from
 7  per se treatment, Your Honor.
 8          THE COURT:  All right.
 9          MS. CHENG:  Thank you.  And I want to respect the
10  Court's time.  I know it's getting late.  Thank you very much
11  for giving us a chance --
12          THE COURT:  Anything new that's not in your
13  statement that would -- anything new that's not in your
14  written statement?
15          MS. CHENG:  Your Honor, I think that our statement
16  should capture --
17          THE COURT:  Okay.
18          MS. CHENG:  -- our key interests here.
19          THE COURT:  All right.
20          MS. CHENG:  Thank you very much, Your Honor.
21          THE COURT:  All right.  Anything -- anybody from
22  the plaintiff?
23          All right.  Mr. Cross.
24          MR. CROSS:  Thank you, Your Honor.  I will
25  definitely be brief.
```

```
1          THE COURT:  Can I limit you to three points?
2          MR. CROSS:  Yes.
3          THE COURT:  Number one.
4          MR. CROSS:  I think that captures it.
5          First, Your Honor, we heard very little about the
6  allegations here.  And I think we would suggest there's
7  really nothing of value, with all due respect to the Justice
8  Department, because they're not talking about the allegations
9  in this case.  They're making a policy position.
10         THE COURT:  All right.  Number two.
11         MR. CROSS:  Number two:  Your Honor, their point
12 that the landlords understood that they're part of a common
13 scheme -- Your Honor, again there's no allegations to suggest
14 anything that anyone here understood that.  There's no
15 suggestion like the price -- like the cases they cite,
16 Interstate Circuit, that any lessor had any insight, one,
17 into what a price recommendation someone else got, and, two,
18 whether they accepted or rejected it, and, three, what their
19 actual prices were.  All of the cases they're relying on,
20 particularly Interstate Circuit, you have that transparency,
21 and that's critically important.  And I will say, by the way,
22 they're only here arguing per se.  Interstate Circuit is a
23 rule of reason case.  It's a Fifth Circuit --
24         THE COURT:  Number three.
25         MR. CROSS:  I've got one left.  So give me one
```

1   second so I can to figure out what's the most important thing

2   I want to say, Your Honor.

3           Lastly, Your Honor, I will say, their principle

4   position is that -- and this is what she said:  You must join

5   together independent decision makers.  And as we've seen -- I

6   won't go through the facts again.  There is no allegation

7   here that there is a joinder of independent decision makers

8   at any level, Your Honor.  And all of the cases they're

9   talking about, whether it's *Socony*, whether are it's *Apple*

10  *eBooks*, *Interstate Circuit* or others, there is that

11  horizontal agreement that's reflected in the market with

12  pricing.  And the last point just related to that, Your

13  Honor.  I did want to just say on the -- the pricing charts

14  Your Honor mentioned before about the impact of the

15  pandemic -- and one thing I forgot to say -- in a conspiracy

16  that shouldn't matter, because the point of a price fixing

17  conspiracy is that supply and demand factors no longer

18  matter.  You have now taken that out and you're just pushing

19  prices to whatever level you want them.  And so even during

20  the pandemic, and certainly after, you should see the sort of

21  parallel pricing we should see if the government was right,

22  that everyone had just joined together and let an app set

23  their prices.  And we don't see that.

24          Thank you, Your Honor.

25          MR. COUGHLIN:  Just really briefly, Your Honor.

```
 1              THE COURT:  I'm going to limit you to two points.
 2              And you're going to have one point.  And I'm going
 3    home and y'all --
 4              MR. COUGHLIN:  I'm just going to make one point.
 5              THE COURT:  All right.
 6              Then that leaves you to no points.
 7              MR. COUGHLIN:  They act like there's no
 8    information in the complaint bringing these competitors
 9    together.  Well, what's the purpose of a peer letter?  What's
10    the purpose of giving the addresses when you give the
11    recommendation of the price?  They know who they are -- their
12    competitors are in that market.  And there's no other reason
13    to do that.
14              THE COURT:  You can just speak from your chair.
15              MS. BOJEDLA:  Your Honor --
16              MR. MCINTYRE:  Thank you, Your Honor.  One quick
17    point for the students.
18              On page 14 of the DOJ's brief in footnote 8, the
19    DOJ states that they take no position on the plaintiffs' plus
20    factor and parallel conduct allegations.  The student
21    plaintiffs only purport to plead a conspiracy through
22    parallel conduct and plus factors.  They do not claim to
23    plead any direct evidence of a conspiracy.  And so the DOJ's
24    brief, it's simply not relevant to these student plaintiffs'
25    arguments.  It's a non event.
```

1          MS. BOJEDLA:  Your Honor, I just want to respond

2     to the claim that *Interstate Circuit* was not a per se case

3     with the citation to *Apple* in the Second Circuit, 791 F3d at

4     345.  You can read it for yourself.  I won't quote it to you.

5          THE COURT:  And I will.

6          So let me thank everyone for your patience,

7     especially those that I had pointed questions.  Those were

8     the questions, along with all the arguments, have been

9     helpful.  Obviously the Court's been busy looking at this

10    motion and your other motions.  And I appreciate what -- it's

11    been very helpful.  And didn't mean to take this much of your

12    time.  And I certainly am glad I'm not your client having to

13    pay for it.  But I do appreciate y'all being here.

14         MR. COUGHLIN:  Thank you, Your Honor.

15         THE COURT:  So I'm aware -- I'm aware of timing,

16    and I will -- I'll get you a decision as soon as I can.

17         ALL:  Thank you, Your Honor.

18         (Court adjourned.)

19

20

21

22

23

24

25

1  REPORTER'S CERTIFICATE

2

3          I, Lise S. Matthews, Official Court Reporter for

4  the United States District Court for the Middle District of

5  Tennessee, with offices at Nashville, do hereby certify:

6          That I reported on the Stenograph machine the

7  proceedings held in open court on December 11, 2023, in the

8  matter of IN RE:  REALPAGE, INC., RENTAL SOFTWARE ANTITRUST

9  LITIGATION (NO. II) Case No. 3:23-md-03071; that said

10  proceedings in connection with the hearing were reduced to

11  typewritten form by me; and that the foregoing transcript

12  (pages 1 through 206) is a true and accurate record of said

13  proceedings.

14          This the 15th day of December, 2023.

15

16                              /s/ Lise S. Matthews
                                LISE S. MATTHEWS, RMR, CRR, CRC
17                              Official Court Reporter

18

19

20

21

22

23

24

25