# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF TENNESSEE
# NASHVILLE DIVISION

| | |
|---|---|
| IN RE: REALPAGE, INC., RENTAL SOFTWARE ANTITRUST LITIGATION (NO. II) | Case No. 3:23-md-3071<br>MDL No. 3071<br><br>Chief Judge Waverly D. Crenshaw, Jr.<br><br>JURY DEMAND<br><br>This Document Relates to:<br>3:23-cv-00742<br>3:23-cv-00979 |

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT APARTMENT INCOME REIT CORP.'S RENEWED MOTION TO DISMISS PLAINTIFFS' SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT**

## TABLE OF CONTENTS

I. INTRODUCTION ........................................................................................................... 1

II. BACKGROUND ............................................................................................................ 1

III. LEGAL STANDARD .................................................................................................... 2

IV. ARGUMENT ................................................................................................................. 2

    A. Plaintiffs adequately plead AIR's participation in the conspiracy. .................................... 2

    B. Plaintiffs adequately plead that AIR engaged in parallel conduct. .................................... 6

    C. AIR's remaining arguments fail. ......................................................................................... 8

V. CONCLUSION ............................................................................................................. 10

CERTIFICATE OF SERVICE ................................................................................................ 1

## I. INTRODUCTION

As the Court recently found, Plaintiffs' Second Amended Consolidated Class Action Complaint[1] sufficiently alleges an illegal agreement between RealPage and some of the largest owners and managers of multifamily apartment buildings in the United States, to artificially inflate rental prices by using competitors' confidential pricing, occupancy (supply), and lease information regarding their rental units. Defendant Apartment Income REIT Corp. d/b/a AIR Communities ("AIR") joined the cartel when it elected to outsource its rental pricing decisions to RealPage's Revenue Management Solutions ("RMS") software, allowing AIR the benefit of its competitors' confidential, competitively sensitive information in its own pricing, and enabling interference with free market setting of rents for not only AIR's multifamily properties, but also of its competitors' multifamily housing units across the United States.

AIR is not off the hook simply because it did not contribute certain of its own confidential information. A co-conspirator need not take part in every aspect of the cartel, nor commit as many "bad acts" as other co-conspirators, to participate in it. An individual defendant is a co-conspirator so long as it acted knowing the general nature and extent of the conspiracy. AIR is a co-conspirator because it used RealPage with knowledge of the broader conspiracy—knowing that AIR's competitors were contributing their confidential information, that AIR would benefit from that information in setting its own prices, and that AIR's co-conspirators would, like AIR, coordinate through RealPage's RMS to artificially inflate rental prices. Accordingly, AIR's Renewed Motion to Dismiss should be denied.

## II. BACKGROUND

Plaintiffs allege that AIR used RealPage's RMS to manage some or all of its more than

---

[1] Unless specified otherwise, all references to "¶" or "¶¶" are to paragraphs from the Multifamily Plaintiffs' Second Amended Complaint, Dkt. 530 ("the Complaint").

25,000 multifamily rental units nationwide, knowing that doing so allowed AIR to "benefit from its horizontal competitors' sensitive pricing and lease information before it set or adjusted its own rental prices" and to charge supracompetitive rents, knowing that its competitors were doing the same. ¶¶ 1, 7-9, 11-12, 14, 25, 30, 68, 204, 244-45, 309, 311-12. To be clear, Plaintiffs have only withdrawn allegations that AIR shared its own commercially sensitive information with other Defendants via RealPage's RMS. Mot. to Withdraw, Dkt. 680. All other allegations as to AIR remain, including that it reaped the benefits of its competitors' sensitive pricing and leasing information through its use of RMS.

## III. LEGAL STANDARD

In analyzing a motion to dismiss, courts "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." *In re Travel Agent Comm'n Antitrust Litig.*, 583 F.3d 896, 903 (6th Cir. 2009). *Bell Atlantic Corp. v. Twombly* calls for "a complaint with enough factual matter (taken as true) to suggest that" a violation of the Sherman Act occurred. 550 U.S. 544, 556 (2007). *Twombly* does "not require heightened fact pleading of specifics," and instead only requires facts that "nudge[] the[] claim[] across the line from conceivable to plausible[.]" 550 U.S. at 570. Plaintiffs' allegations must simply "put defendants on notice concerning the basic nature of [plaintiff's] complaints against the defendants and the grounds upon which their claims exist." *In re Se. Milk Antitrust Litig.*, 555 F. Supp. 2d 934, 943 (E.D. Tenn. 2008).

## IV. ARGUMENT

### A. Plaintiffs adequately plead AIR's participation in the conspiracy.

The existence of a conspiracy under Section 1 of the Sherman Act, and an individual defendant's participation in it, are two different inquiries. "Once the existence of a conspiracy is shown, the evidence linking an individual defendant to that conspiracy need only be slight." *In re*

2

*Polyurethane Foam Antitrust Litig.*, 152 F. Supp. 3d 968, 978 (N.D. Ohio 2015) (quoting *United States v. Pritchett*, 749 F.3d 417, 431 (6th Cir. 2014)); *In re Capacitors Antitrust Litig.*, 106 F. Supp. 3d 1051, 1066 (N.D. Cal. 2015) (a complaint need only "allege that each individual defendant joined the conspiracy and played *some* role in it"). The defendant "need not be an active participant in every phase of the conspiracy, so long as [it] is a party to the general conspiratorial agreement." *Polyurethane Foam,* 152 F. Supp. 3d at 998 (quoting *United States v. Hodges*, 935 F.2d 766, 773 (6th Cir. 1991)).

Put simply, a conspiracy is larger than one defendant's role in it, and once a defendant enters a conspiracy in any capacity, joint and several liability attaches. "[T]here is no requirement that allegations pertaining to one defendant mirror those against other defendants in terms of specific conduct or 'quantity' of alleged 'bad acts.' Indeed, a defendant need not be accused of having engaged in all activities alleged to have advanced the conspiracy." *In re Processed Egg Prod. Antitrust Litig*, 821 F. Supp. 2d 709, 742 (E.D. Pa. 2011). "Conspiracies, particularly when alleged among a large group, are not always tidy and symmetric" and individual "[c]onspirators may aid the common venture via techniques and stratagems that are consistent and reinforcing but not entirely overlapping." *In re Int. Rate Swaps Antitrust Litig.*, 261 F. Supp. 3d 430, 479 (S.D.N.Y. 2017).[2] Neither does a conspiracy "fragment into multiple conspiracies because a

---

[2] *See also SD3, LLC v. Black & Decker (U.S.) Inc.*, 801 F.3d 412, 428-29 (4th Cir. 2015) (parallel conduct need not be "simultaneous" or "identical," nor must defendants move in "lockstep" for conspiracy to be plausible); *In re Broiler Chicken Antitrust Litig.*, 290 F. Supp. 3d 772, 792 (N.D. Ill. 2017) (finding plaintiffs' allegations of parallel conduct and conspiratorial agreement sufficient "[d]espite Defendants' attempts to highlight the aspects of their alleged conduct that are not absolutely uniform"). As the American Bar Association's Model Jury Instructions in Civil Antitrust Cases explain: "A person can become a member without full knowledge of all of the details of the conspiracy, the identity of all of its members, or the parts such members played in the charged conspiracy. . . Similarly, it is not essential that all persons acted exactly alike, nor is it necessary that they all possessed the same motive for entering the agreement." ABA Model Jury

3

Case 3:23-md-03071    Document 707    Filed 01/22/24    Page 5 of 17 PageID #: 7896

member does not. . . 'know of or become involved in all of the activities in furtherance of the conspiracy.'" *Polyurethane Foam,* 152 F. Supp. 3d at 979. So "the fact that [a defendant was] involved in only a portion of [a conspiracy] does not undermine the existence of the conspiracy itself or [the defendant's role] as a participant." *In re Elec. Books Antitrust Litig*., 859 F. Supp. 2d 671, 690 (S.D.N.Y. 2012).

AIR's Renewed Motion to Dismiss ("AIR MTD") boils down to a simple premise: because AIR benefited from its competitors' sensitive information in setting its own prices, but did not share its own in the process, it did not participate in the alleged conspiracy. AIR contends that Plaintiffs are unable to plead that AIR participated in the conspiracy, because the "'most persuasive' basis for inferring the existence of a horizontal agreement" is Defendants' sharing of confidential information. AIR MTD 6-7 (discussing Mem. Op., Dkt. 690 ("Mem. Op.")). That argument rests on a fundamental misunderstanding of the law.

While the sharing of confidential information may be persuasive evidence of the *existence* of the conspiracy, it is not dispositive of AIR's participation in the cartel. AIR provides no support for its premise that its participation depends entirely on whether AIR personally committed to all aspects of the conspiracy at the pleading stage. Moreover, it is contrary to well-established law that a conspirator may have a different and lesser role than their co-conspirators. *See, e.g.*

---

Instructions in Civil Antitrust Cases, Instruction 2A.1 (2016); *see also id.* Instruction 2A.4 ("A person who knowingly joins an existing conspiracy, *or who participates only in part of a conspiracy with knowledge of the overall conspiracy*, is just as responsible as if he or she had been one of those who formed or began the conspiracy and participated in every part of it.") (emphasis added); *id.* ("Once you have found that a defendant is a member of a conspiracy, he, she, or it . . . is responsible *for all actions taken by all coconspirators* during and in furtherance of the conspiracy . . . Although a defendant who was a member of a conspiracy may withdraw from and abandon the conspiracy, *that defendant is still liable with all other coconspirators for any illegal acts committed* by that defendant or *by any coconspirator* while that defendant was a member of the conspiracy up until the time of that defendant's withdrawal from the conspiracy.") (emphasis added).

4

*Polyurethane Foam,* 152 F. Supp. 3d at 998*; Processed Egg,* 821 F. Supp. 2d at 742; *Rate Swaps*, 261 F. Supp. 3d at 479.

AIR participated in the cartel because it acted with knowledge of "the essential nature of the plan and their connection [] with it." *Polyurethane Foam*, 152 F. Supp. 3d at 978. "[A] single act may support an inference of involvement in a conspiracy if 'of a nature justifying an inference of knowledge of the broader conspiracy[,]'" including its "general nature and extent." *Rate Swaps*., 261 F. Supp. 3d at 482 (quoting *United States v. Huezo*, 546 F.3d 174, 180 (2d Cir. 2008)). Such an act sufficiently evinces the conspirator's "conscious commitment to a common scheme." *Polyurethane Foam*, 152 F. Supp. 3d at 978 (quoting *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 764 (1984)).

AIR's acts certainly meet this standard. AIR entered into a written contract, paid for, and used at least one RealPage RMS—YieldStar—to manage some or all of its more than 25,000 multifamily rental units nationwide, knowing that doing so would allow it to benefit from RealPage's price-setting function, informed by AIR's horizontal competitors' sensitive pricing and lease information. ¶¶ 68, 230, 292. The benefit to AIR derived from the stated purpose of RealPage's RMS: to set and raise the price of its clients' units, including AIR's. ¶¶ 7, 14. Critically, AIR acted with the knowledge that its co-conspirators were providing their sensitive pricing information to RealPage and that they were similarly using RealPage's RMS to set and raise rent prices based on competitors' competitively sensitive information, because:

- AIR is a RealPage RMS client, ¶ 68, and "RealPage discloses to its RMS clients exactly whose non-public data is being used for pricing decisions" through "[p]eer lists [that] explicitly state that the competitors listed will be used 'to determine the magnitude of a change in rent . . . .'" Mem. Op. 32 (quoting ¶ 31).

5

- AIR "could determine who among their competitors were also RealPage clients because RealPage provided [clients] with the property addresses using RealPage's RMS." *Id.* (quoting ¶¶ 12, 245).

- "RealPage offered opportunities for horizontal competitors to engage directly with one another through "webinars, screen-sharing training modules[]" and "[c]ompetitors also interact with each other through trade associations." Mem. Op. 32 (quoting ¶¶ 37, 383-85). This includes AIR attending National Multifamily Housing Council events that "facilitate opportunities to conspire and exchange information" with competitors. ¶ 386.

- AIR's conspirators spoke publicly about their use of RealPage's RMS to coordinate on pricing and RealPage published such statements, including Defendant ECI Management, LLC's executive's statement, "*[W]e are all technically competitors, LRO helps us to work together. . . LRO is designed to work with a community in pricing strategies, not work separately.*" ¶ 9; *see* Mem. Op. 22 (considering this statement significant, along with other circumstantial evidence of an illegal agreement).

These allegations are more than enough to justify the inference that AIR acted with knowledge of the general nature and extent of the cartel, despite that AIR may not have contributed its own sensitive information to RealPage. AIR "cannot absolve itself by showing that, though it knew the conspiracy extended [further], it participated only in [a portion]" of the conspiracy. *Polyurethane Foam*, 152 F. Supp. 3d at 998.

### B. Plaintiffs adequately plead that AIR engaged in parallel conduct.

AIR improperly demands more "specific allegations pertaining to AIR" to establish that it "engaged in parallel conduct by adopting a price-over-occupancy strategy[,]" such as statements from AIR reflecting the strategy and even *more* regression analyses beyond that demonstrating the

6

shift in the relationship between rental prices and vacancy rates in Atlanta, where AIR operates. AIR MTD 7-8. This is far beyond the pleading standard, in which "detailed defendant by defendant allegations are not necessary" and there is no "particularity requirement akin to Rule 9(b) to explain each defendant's own, unique role" in the conspiracy. *Capacitors*, 106 F. Supp. 3d at 1066 (internal quotations and citations omitted); *In re Auto. Parts Antitrust Litig.*, 2013 WL 2456586, at *3 (E.D. Mich. June 6, 2013) ("Dismissal is not required merely because Plaintiffs did not name each Defendant in the allegations pleaded in support of their Sherman Act claim."); *Markson v. CRST Int'l, Inc.*, 2019 WL 6354400, at *4 (C.D. Cal. Mar. 7, 2019) ("Defendants' argument that Plaintiffs must specifically allege which persons, on behalf of Defendants, consummated the conspiracy and exactly when they did so goes beyond the pleading requirement . . . ."); *In re Pork Antitrust Litig.*, 495 F. Supp. 3d 753, 768–71 (D. Minn. 2020) (plaintiffs need "not provide specifics" for every defendant, "given the inherent difficulty of obtaining solid information of an antitrust conspiracy.").[3]

The Court already rejected other Defendants' invitations to employ an improper, heightened pleading standard. In finding that "Plaintiffs have plausibly alleged that Defendants engaged in parallel conduct when they each became RealPage RMS clients and began prioritizing

---

[3] Neither must Plaintiffs reiterate allegations against each individual Defendant, where Defendants are alleged to engage in the same or similar conduct. "That factual allegations against [the defendant] are the same or similar to those made against other Defendants is not evidence that the allegations are insufficient or vague, but rather reflects instead Plaintiffs' specific assertion that it engaged in the same conduct as its competitors." *Jien v. Perdue Farms, Inc.*, 2021 WL 927456, at *3 (D. Md. Mar. 10, 2021). *See also Diamond Resorts U.S. Collection Dev., LLC v. Sumday Vacations, LLC*, 2020 WL 3250130, at *2 (M.D. Fla. Feb. 21, 2020) (the complaint "will not be dismissed for group pleading" where it "alleges that Defendants engaged in the same or similar conduct and would have the same or similar liability for the alleged claims"). Naturally, where Plaintiffs' theory is that multiple Defendants "engaged in the same pattern of conduct," Plaintiffs need not "reiterate their allegations against each defendant individually," as doing so "would exponentially increase the length of pleadings while adding no substantive value." *In re Nat'l Prescription Opiate Litig.*, 2019 WL 3737023, at *3 (N.D. Ohio June 13, 2019).

7

raising rent prices over decreasing vacancy rates," the Court found support in statements reflecting the shift by some—*not all*—Defendants and regression analyses for four—*not all*—markets in which Defendants operate. Mem. Op. 25-27. It is sufficient that, as Plaintiffs allege, AIR engaged in this parallel conduct by becoming a RealPage RMS client to set and raise rent prices with the benefit of its competitors' sensitive information, knowing its competitors were doing the same, and prioritizing price over occupancy as demonstrated by the regression analyses, including in at least one market in which AIR operates—Atlanta. ¶¶ 12, 33, 67, 68, 245, 352-360.

Moreover, by crediting Plaintiffs' regression analyses, the Court already addressed AIR's argument that a regression analysis of an "entire regional market" cannot "suggest that individual market participants . . . engaged in any shift in pricing strategy." AIR MTD. 8. And the Court explicitly rejected AIR's demand for regression analyses of all the relevant markets in which Defendants operate, finding that Plaintiffs "need not do so for the Court to find it plausible that, following discovery, Plaintiffs will be able to show similar results in other submarkets." Mem. Op. 27.

### C. AIR's remaining arguments fail.

Next, AIR impermissibly views several "plus factors" in isolation to argue that each is insufficient to plausibly infer AIR's participation in the conspiracy. AIR MTD 8-10 ("There is nothing unusual or anticompetitive about licensing a revenue management tool[,]" attending industry events "is not a basis from which to infer a conspiracy, without more[,]" and "allegations about a market are at best neutral and offer little, if any, insight"). As the Court noted, AIR's "approach of separately evaluating and dissecting each plus factor is legally flawed" and the Court "must assess plus factors holistically." Mem. Op. 31. The Court found that each of these plus factors—use of RealPage's RMS, attending industry events, and market characteristics—bolster

8

allegations of parallel conduct and, taken together with Plaintiffs' other allegations, "support a 'reasonable expectation that discovery will reveal evidence of [an] illegal agreement.'" Mem. Op. 32-33.[4]

AIR also improperly assumes facts not alleged in the Complaint to minimize its use of RealPage's RMS, in asserting that AIR "had 'low acceptance' rates and did not use RealPage employed or trained Pricing Advisors." AIR MTD 9 (quoting ¶ 286). AIR's citation of ¶ 286 in support of these propositions is highly misleading. That paragraph states:

> "While companies with internal RealPage revenue advisors had more access to adjust their own settings in accordance with their RealPage training, still, Witness 12 explained that even for companies with internal revenue managers, there were periodic reviews with RealPage Pricing Advisors, particularly if the company was underperforming, had a low acceptance rate of RealPage's pricing recommendations, or high variance rate." ¶ 286.

The Complaint does *not* allege that AIR, or any other Defendant, used an internal revenue manager and had a low RMS acceptance rate. AIR's assumption is also contrary to the pleading standard, under which courts "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." *Travel Agent*, 583 F.3d at 903. The Complaint alleges that Defendants "agree to adopt RealPage RMS pricing up to 80%-90% of the time" and that some RealPage RMS clients are assigned Pricing Advisors. ¶¶ 15, 17. Construing the allegations in the light most favorable to Plaintiffs requires

---

[4] Communications between conspirators, including attendance at trade associations, can support an inference of conspiracy. *See SD3, LLC v. Black & Decker (U.S.) Inc.*, 801 F.3d 412, 428-29, 432 (4th Cir. 2015) ("Allegations of communications and meetings among conspirators can support an inference of agreement . . . ."); *Polyurethane Foam*, 152 F. Supp. 3d at 992 (finding overlapping trade association membership to support inference of agreement); *In re Generic Pharms. Pricing Antitrust Litig.*, 338 F. Supp. 3d 404, 442, 449-50 (E.D. Pa. 2018) (same). Market structure can also constitute a plus factor from which an inference of agreement can be drawn. *In re Publ'n Paper Antitrust Litig.*, 690 F.3d 51, 65 (2d Cir. 2012); *In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 656-57 (7th Cir. 2002).

9

Case 3:23-md-03071    Document 707    Filed 01/22/24    Page 11 of 17 PageID #: 7902

that the Court reject AIR's request to draw inferences directly contrary to those allegations at the pleading stage.[5]

Finally, AIR contends that the "plus factor" of actions against self-interest does not apply to AIR because AIR did not contribute its own confidential information. AIR MTD 9. But this mischaracterizes Plaintiffs' claims; AIR acted against its self-interest by shifting from prioritizing occupancy to prioritizing rent increases, artificially restricting supply while maintaining higher rental prices. ¶¶ 31, 231, 235-36, 251, 303, 312. These acts are inconsistent with AIR's unilateral self-interest because, if following that strategy unilaterally in a competitive market, the higher rent prices would cause AIR to lose renters to other lessors and lead to lower revenues as units sat empty. *In re Flat Glass Antitrust Litig.*, 385 F.3d 350, 360-61 (3d Cir. 2004) ("Evidence that the defendant acted contrary to its interests means evidence of conduct that would be irrational assuming that the defendant operated in a competitive market."). "In a competitive industry, for example, a firm would cut its price with the hope of increasing its market share if its competitors were setting prices above marginal costs." *Id.* As AIR's co-conspirators admit, this conduct was against their unilateral self-interest and but for RealPage's assurances of collective action, they would not have undertaken it. ¶ 309 (RealPage "pushes you to go places that you wouldn't have gone if you weren't using it."); ¶ 294 (Property Defendants would not have "had the courage to push [prices] as aggressively as [RealPage RMS] has.").

## V. CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court deny AIR's Motion.

---

[5] As the Court found, "Defendants [including AIR] paid RealPage substantial monthly fees of as much as $1 to $2 per unit for RealPage's pricing recommendations, leading to the inference that Defendants' intended to abide by those recommendations." Mem. Op. 32 (citing ¶ 14).

| | |
|---|---|
| Dated: January 22, 2024 | */s/ Tricia R. Herzfeld* |

                                              Tricia R. Herzfeld (#26014)
Anthony A. Orlandi (#33988)
**HERZFELD SUETHOLZ GASTEL LENISKI AND WALL, PLLC**
223 Rosa L. Parks Avenue, Suite 300
Nashville, TN 37203
Telephone: (615) 800-6225
tricia@hsglawgroup.com
tony@hsglawgroup.com

*Liaison Counsel*

Patrick J. Coughlin
Carmen A. Medici
Fatima Brizuela
**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
600 West Broadway, Suite 3300
San Diego, CA 92101
Telephone: (619) 798-5325
Facsimile: (619) 233-0508
pcoughlin@scott-scott.com
cmedici@scott-scott.com
fbrizuela@scott-scott.com

Patrick McGahan
Amanda F. Lawrence
Michael Srodoski
G. Dustin Foster
Isabella De Lisi
**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
156 South Main Street
P.O. Box 192
Colchester, CT 06145
Telephone: (860) 537-5537
Facsimile: (860) 537-4432
pmcgahan@scott-scott.com
alawrence@scott-scott.com
msrodoski@scott-scott.com
gfoster@scott-scott.com
idelisi@scott-scott.com

Stacey Slaughter
Thomas J. Undlin
Geoffrey H. Kozen
Stephanie A. Chen

11

J. Austin Hurt
Caitlin E. Keiper
**ROBINS KAPLAN LLP**
800 LaSalle Avenue, Suite 2800
Minneapolis, MN 55402
Telephone: (612) 349-8500
Facsimile: (612) 339-4181
sslaughter@robinskaplan.com
tundlin@robinskaplan.com
gkozen@robinskaplan.com
schen@robinskaplan.com
ahurt@robinskaplan.com
ckeiper@robinskaplan.com

Swathi Bojedla
Mandy Boltax
**HAUSFELD LLP**
888 16th Street, N.W., Suite 300
Washington, DC 20006
Telephone: (202) 540-7200
sbojedla@hausfeld.com
mboltax@hausfeld.com

Gary I. Smith, Jr.
Joanne Bui
**HAUSFELD LLP**
600 Montgomery Street, Suite 3200
San Francisco, CA 94111
Tel: (415) 633-1908
gsmith@hausfeld.com

Katie R. Beran
**HAUSFELD LLP**
325 Chestnut Street, Suite 900
Philadelphia, PA 19106
Telephone: 1 215 985 3270
kberan@hausfeld.com

*Interim Co-Lead Counsel*

Eric L. Cramer
Michaela L. Wallin
**BERGER MONTAGUE PC**
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Telephone: (215) 875-3000
ecramer@bm.net
mwallin@bm.net

Daniel J. Walker
**BERGER MONTAGUE PC**
2001 Pennsylvania Avenue, NW, Suite 300
Washington, DC 20006
Telephone: (202) 559-9745
dwalker@bm.net

Brendan P. Glackin
Dean M. Harvey
**LIEFF CABRASER HEIMANN & BERNSTEIN, LLP**
275 Battery Street, Suite 2900
San Francisco, CA 94111
Telephone: 415-956-1000
bglackin@lchb.com
dharvey@lchb.com

Mark P. Chalos
Hannah R. Lazarz
Kenneth S. Byrd
**LIEFF CABRASER HEIMANN & BERNSTEIN, LLP**
222 2nd Avenue South, Ste. 1640
Nashville, TN 37201
(615) 313-9000
mchalos@lchb.com
hlazarz@lchb.com
kbyrd@lchb.com

Benjamin J. Widlanski
Javier A. Lopez
**KOZYAK TROPIN & THROCKMORTON LLP**
2525 Ponce de Leon Blvd., 9th Floor
Coral Gables, Florida 33134
Telephone: (305) 372-1800

Christian P. Levis
Vincent Briganti
Peter Demato
Radhika Gupta
**LOWEY DANNENBERG, P.C.**
44 South Broadway, Suite 1100
White Plains, NY 10601
Telephone: (914) 997-0500
Facsimile: (914) 997-0035
vbriganti@lowey.com
clevis@lowey.com
pdemato@lowey.com
rgupta@lowey.com

Christopher M. Burke
Walter W. Noss
Yifan (Kate) Lv
**KOREIN TILLERY P.C.**
707 Broadway, Suite 1410
San Diego, CA 92101
Telephone: (619) 625-5621
Facsimile (314) 241-3525
cburke@koreintillery.com
wnoss@koreintillery.com
klv@koreintillery.com

**JOSEPH SAVERI LAW FIRM, LLP**
Joseph R. Saveri
Steven N. Williams
Cadio Zirpoli
Kevin E. Rayhill
601 California Street, Suite 1000
San Francisco, CA 94108
Telephone: (415) 500-6800
jsaveri@saverilawfirm.com
swilliams@saverilawfirm.com
czirpoli@saverilawfirm.com
krayhill@saverilawfirm.com

Jennifer W. Sprengel
Daniel O. Herrera
Alexander Sweatman
**CAFFERTY CLOBES MERIWETHER & SPRENGEL LLP**
135 S. LaSalle, Suite 3210
Chicago, IL 60603

13

bwidlanski@kttlaw.com
jal@kttlaw.com

Telephone: 312-782-4880
Facsimile: 312-782-4485
jsprengel@caffertyclobes.com
dherrera@caffertyclobes.com
asweatman@caffertyclobes.com

*Plaintiffs' Steering Committee Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on January 22, 2024, I caused the foregoing to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the email addresses denoted on the Electronic Mail Notice List.

*/s/ Tricia R. Herzfeld*
Tricia R. Herzfeld
