**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF TENNESEE**
**NASHVILLE DIVISION**

| | | |
|---|---|---|
| IN RE: REALPAGE, INC., RENTAL SOFTWARE ANTITRUST LITIGATION (NO. II) | ) ) ) ) ) ) ) ) ) | Case No. 3:23-md-3071<br>MDL No. 3071<br><br>**This Document Relates to:**<br><br>3:23-cv-00552<br>3:23-cv-00742<br>3:23-cv-00979 |

## DEFENDANT MORGAN PROPERTIES MANAGEMENT COMPANY, LLC'S ANSWER TO PLAINTIFFS' SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

Defendant Morgan Properties Management Company, LLC ("Morgan Properties"), by and through its undersigned counsel, answers Second Amended Consolidated Class Action Complaint ("SAC") of Multifamily Plaintiffs as set forth below.

To the extent the SAC's paragraphs are grouped under headings, Morgan Properties responds generally that some headings do not contain factual assertions, and therefore do not require an admission or denial. To the extent any heading in the SAC contains factual assertions or legal conclusions, Morgan Properties denies them. To the extent the SAC includes attached appendices (Appendix A, B, and C), Figures, Tables or untitled images, Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth or accuracy of their contents and denies them on that basis. To the extent that an averment includes a mix of alleged factual assertions and legal conclusions, Morgan Properties denies such commingled allegations except those that are specifically admitted. On those occasions in the SAC when Plaintiffs make allegations against all Defendants, unless otherwise noted in this Answer, Morgan Properties answers for itself only, and any allegations directed against other Defendants will be denied. Morgan Properties incorporates this statement by reference into its response to any paragraph in the SAC that makes allegations against Defendants collectively.

Morgan Properties denies all allegations not specifically admitted herein and denies that Plaintiffs are entitled to any relief. In response to Plaintiffs' opening, unnumbered paragraphs in the SAC, Morgan Properties admits only that Plaintiffs have filed suit against a number of Defendants, including Morgan Properties. Morgan Properties denies that Morgan Properties is liable to Plaintiffs and denies that Plaintiffs are entitled to any relief.

# I. INTRODUCTION

1.     From at least January 2016, through the present (the "Conspiracy Period"), Defendants engaged in a nationwide conspiracy to fix and inflate the price of multifamily rental housing across the country.  Leveraging their control of the multifamily rental housing market from at least January 2016, Defendants conspired to limit supply and raise multifamily rental housing prices, causing substantial damages to Plaintiffs and other members of the Class whose ability to obtain affordable housing depended on getting competitive prices for the units they rented.  Several witness accounts, including 12 discussed herein, rental price and occupancy data, economic evidence, and public investigations,[1] confirm the anticompetitive conduct taken pursuant to this agreement.

## ANSWER TO PARAGRAPH 1:

Morgan Properties denies the allegations in Paragraph 1.

2.     Defendants are RealPage, the developer of an integrated technology platform that provides software solutions for the multifamily rental housing markets, including revenue management software solutions—a category which includes RealPage products "RealPage Revenue Management," Lease Rent Options ("LRO"), YieldStar, and AI Revenue Management ("AIRM")—and several owners and managers of large-scale multifamily residential apartment buildings that used RealPage's Revenue Management Solutions[2] to coordinate and agree upon rental housing pricing and supply.

## ANSWER TO PARAGRAPH 2:

Morgan Properties admits that, at times during the alleged relevant time period from

January 1, 2016, to the present, it has operated, and has used the Lease Rent Options ("LRO")

software in operating, multifamily residential properties, but otherwise denies the allegations in

Paragraph 2.

3.     Although the Owner Defendants operate strictly as the owners of the multifamily residential properties that used RealPage's RMS, the majority of defendants in this action are Owner-Operators—meaning they operate as both owners and operators of multifamily residential properties.  There are also several Managing Defendants that operate strictly in the role of property managers for the properties utilizing RealPage' s RMS to price their multifamily units.  The Managing Defendants act as agents for the property owners and

---

[1] Heather Vogell, *Rent Going Up? One Company's Algorithm Could Be Why.*, PROPUBLICA (Oct. 15, 2022), https ://www. propublica.org/article/yieldstar-rent-increase-realpage-rent (ProPublica report shedding light on Defendants' conspiracy and showing that rents in areas where RealPage clients control a higher percentage of rental units have increased at a significantly higher rate). Unless otherwise indicated, all internet citations were last visited on September 6, 2023.

[2] RealPage's revenue management software solutions, including RealPage Revenue Management, LRO, YieldStar, and AI Revenue Management, will be referred to collectively herein as "Revenue Management Solutions" or "RMS."

knowingly used RMS to coordinate and agree upon rental housing and supply. (Discussed in ¶¶ 196-98, *infra.*).

**ANSWER TO PARAGRAPH 3:**

Morgan Properties admits that, at times during the alleged relevant time period from January 1, 2016, to the present, it has operated multifamily residential properties, but otherwise denies the allegations in Paragraph 3.

4.  What RealPage RMS offered seemed too good to be true: software that would use a database of rental prices in the area (including competitors' prices) and provide the optimal price to charge prospective tenants, with both short-and-long-term goals of increasing revenues by raising rents. This aim was transparent to all. RealPage, as the developer of RMS, was not shy about its intent to create coordination amongst RMS users. Defendant RealPage acknowledged this in public statements, advertisement material, and repeated statements made to the multifamily rental industry emphasizing that its RMS used non-public data from other RealPage clients. In fact, RealPage touted its use of non-public data as a competitive differentiator from other revenue management service providers in its marketing material. RealPage publicly advertises that its RMS would help multifamily owners and operators raise rents and "outperform the market."[3]

**ANSWER TO PARAGRAPH 4:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 4 and denies them on that basis.

5.  Use of RealPage's RMS was conditioned on contributing non-public, competitively sensitive data to RealPage's data pool. That was the bargain on offer—to access this price-setting tool that promised revenue growth even in a down market, every member (including the Owners, Owner-Operators, and Managing Defendants) agreed to participate in the data co-operative and price their multifamily rental units according to RealPage's RMS. As RealPage recognized, "because certain solutions we provide depend on access to client data," "decreased access to this data . . . could harm our business."[4] Indeed, RealPage coordinates meetings between property managers and owners of multifamily rental properties so that they can discuss their use of RealPage's RMS platform. While discovery will reveal to what extent Owner Defendants were involved in the day-to-day disclosures for their respective properties, witness interviews confirm that ultimately the decision whether to use RealPage's RMS rested on the desires of the ownership group.

---

[3] YieldStar Predicts Market Impact Down to Unit Type and Street Location, REALPAGE, http s ://www. realpage. com/videos/yieldstar-data-scientists-help-manage- supply-demand/.

[4] RealPage Inc., 2020 Annual Report (Form 10-K) at 32, https://www. sec. gov/Archives/edgar/data/1286225/ 000128622521000007/rp-20201231.htm ("RealPage 2020 Form 10-K").

**ANSWER TO PARAGRAPH 5:**

Morgan Properties denies the allegations in Paragraph 5.

6.   By using RealPage's RMS, each Owner, Owner-Operator, and Managing Defendants[5] agreed with the overarching principles of the cartel: that (1) all members, who were otherwise horizontal competitors, would share the proprietary data necessary for RealPage's RMS to generate rental price recommendations; (2) all members would delegate their rental price and supply decisions to a common decision maker, RealPage; and (3) knowing that cooperation was essential to the successful operation of the scheme, all members would abide by RealPage's price and supply decisions generated by RMS.

**ANSWER TO PARAGRAPH 6:**

Morgan Properties denies the allegations in Paragraph 6.

7.   As RealPage put it, it offered clients the ability to "outsource daily pricing and ongoing revenue oversight"[6] to RealPage, allowing Defendant RealPage to set prices for its clients' properties "as though we [RealPage] own them ourselves."[7] RealPage' s CEO confirmed that the purpose of its revenue management software is to "set rents" for its clients, including the Owners, Owner-Operators, and Managing Defendants named in this litigation.[8] Defendant Camden Property Trust ("Camden") confirmed that once RealPage's RMS is engaged, there is not much to do beyond checking the software to ensure that it is continuing to push prices higher.[9]

**ANSWER TO PARAGRAPH 7:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 7 and denies them on that basis.

8.   In the words of the Supreme Court in *Interstate Circuit, Inc. v. United States*, "[i]t is elementary that an unlawful conspiracy may be and often is formed without simultaneous action or agreement on the part of the conspirators. Acceptance by competitors, without previous agreement, of an invitation to participate in a plan, the necessary consequence of which, if carried out, is restraint of interstate commerce, is sufficient to establish an

---

[5] See definitions at ¶¶ 195-97, infra. See also Appendix A, attached hereto, listing Defendants in each category (Table A-1: Managing Defendants; Table A-2: Owner-Operators; Table A-3: Owners).

[6] Press Release, RealPage, Inc., YieldStar Offers Revenue Advisory Services to Multifamily Owners and Managers (Mar. 1, 2010), https://www.realpage.com/news/yieldstar-offers-revenue-advisory-services-to-multifamily-owners-and-managers/.

[7] RealPage Renewal Reporting Presentation, MEDVE, https://medve.com/assets/airm-renewal-reporting.pdf.

[8] RealPage Inc. at William Blair Growth Stock Conference (June 11, 2020) (Stephen T. Winn, Chairman & CEO, RealPage: "We set rents using a revenue management system.").

[9] RealPage Live at NMHC: James Flick of Camden, RealPage, https://www.realpage.com/videos/facebook-live-nmhc-james-flick-camden/ (video at 3:05).

4

unlawful conspiracy under the Sherman Act." 306 U.S. 208 (1939) (cleaned up). Here, each Owner, Owner-Operator, and Managing Defendant knew that their competitors had accepted RealPage's invitation to participate in the agreement to fix the price of multifamily rental units, regulate supply, and interfere with the free market across the United States through their receipt of marketing materials, participation in RealPage information sharing events, and knowledge of competitors using RealPage's RMS—and with this information, Defendants accepted RealPage's invitation to participate in the scheme.

**ANSWER TO PARAGRAPH 8:**

Paragraph 8 of the SAC accurately quotes from the cited case. Morgan Properties

otherwise denies the allegations in Paragraph 8.

## II. BACKGROUND

9. Rather than function as separate economic entities, the Owners, Owner-Operators, and Managing Defendants agreed to make key competitive decisions regarding the price and supply of multifamily apartments, collectively. As Emily Mask, Associate Vice President of Revenue Management and Systems Support for Defendant ECI Group, Inc. ("ECI") explained in 2019, "[t]he design and functionality of [RealPage's] LRO offers detailed insight into how actual competitors impact pricing strategies . . . With LRO we rarely make any overrides to the [pricing] recommendations . . . [W]e are all technically competitors, LRO helps us to work together . . . to make us all more successful in our pricing . . . LRO is designed to work with a community in pricing strategies, not work separately ."[10] In a promotional video posted on RealPage's website, a representative from Defendant BH Management Services, LLC ("BH") explained that, while in a competitive market "there's a tendency . . . to let your competitors drive your pricing," RealPage's RMS price-setting function "keeps you from subjectively adjusting to what the market is doing.[11] Defendant BH's Vice President of Business Intelligence Systems, Brandy Daniel, echoed this sentiment in a webcast hosted by RealPage in which BH participated, along with competitors from Defendants Cortland Management, LLC ("Cortland"), Pinnacle Property Management Services, L.P. ("Pinnacle"), and Independence Realty Trust, Inc. ("IRT"). In addition to BH's Daniel, participants in the webcast included Connie Aldape, the Director of Revenue Management for Defendant Pinnacle, America Melragon, Defendant IRT's

---

[10] The RealPage e-book, PROVEN: B & C Assets Ace the Market with RealPage: How Two Companies Pushed Performance Over 3+% Above Market (2019) ("RealPage e-book B & C Assets Ace the Market") (detailing two case studies in which RealPage clients achieved revenue growth and outperformed the market after adopting RealPage's pricing recommendations. Defendant ECI Group achieved 5%-7% year-over-year revenue growth after adopting RealPage's pricing recommendations and Defendant BH Management Services, LLC saw a 4.8% "outperformance to the market," and 4% between its own properties using RealPage's pricing recommendations against those that had not yet adopted RealPage pricing.

[11] Tim Blackwell, *Six Ways Revenue Management Software Benefits B and C Properties*, RealPage (June 12, 2019), https://www.realpage.com/blog/six-ways-revenue-management-software-benefits-b-c-properties/.

former Vice President of Revenue Management, and Kelly Nichols, the Director of Revenue Management for Defendant Cortland.

**ANSWER TO PARAGRAPH 9:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the statements alleged in Paragraph 9 and denies them on that basis. Morgan Properties otherwise denies the allegations in Paragraph 9.

10. When asked how revenue management has allowed BH to "stay ahead of the market and avoid any sort of reactionary behaviors," Ms. Daniel responded that for BH "being able to see [competitors'] transaction-level data has been really important to keeping decisions in line for each market. Our very first goal that we came out with immediately out of the gate is that we will not be the reason any particular submarket takes a rate dive. So for us our strategy was to hold steady and to keep an eye on the communities around us and our competitors."[12] In other words, despite the presence of market conditions that may warrant rental price adjustments in certain markets in order to attract potential renters and/or retain existing tenants, if the RMS system showed competitors were remaining steady with their rental prices in those, and perhaps other markets, Defendant BH committed to pricing its own units according to its competitors' pricing rather than true market conditions so as not to be the cause of any rental rate dips. Defendant BH made its commitment to the conspiracy between and amongst the Defendants known during this information-sharing session with competitors.

**ANSWER TO PARAGRAPH 10:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 10 and denies them on that basis.

11. The Owners, Owner-Operators, and Managing Defendants knew that their mutual access to the data available through their use of RealPage's RMS allowed them to price their units according to their collective goal of securing revenue lifts by increasing rents without regard for the typical market forces that drive supply and demand in a competitive environment. Defendant Cortland's Director of Revenue Management, Kelly Nichols, acknowledged this during the same webcast with her competitors and Defendants BH, Pinnacle, and IRT. Responding to the same question regarding how revenue management has allowed Cortland to "stay ahead of the market," Ms. Nichols replied: "having access to the daily transaction level data at the floor plan level really has been key. Without having that, we may not have been able to keep our strategy as regular. We likely would have been focusing more on what's going on in the market." Imagine that. Defendant Pinnacle's

---

[12] *Smart Solutions: How to Outperform in a Changing Market*, REALPAGE VIDEOS (May 4, 2020), https://www.real page.com/web casts/smart-solutions-outperform-changing-market/ ("Smart Solutions: How to Outperform in a Changing Market").

Director of Revenue Management, Connie Aldape, emphasized that of the lessons learned from the last economic downturn, "what really resonated with me is that our industry really learned the value of leveraging data to make better pricing decisions," including what Aldape characterized as "less emotional" decisions.[13]

## ANSWER TO PARAGRAPH 11:

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the statements alleged in Paragraph 11 and denies them on that basis. Morgan Properties otherwise denies the allegations in Paragraph 11.

12.     Each Defendant knew that the plan, if carried out, would result in increased rents while restricting demand, and with this knowledge—each Owner, Owner-Operator, and Managing Defendant participated in the plan. The Owner, Owner-Operators, and Managing Defendants all shared an interest in seeing that their competitors subscribed to RealPage's RMS pricing. Witness interviews confirm that through RealPage's RMS platform, the user was in fact able to ascertain the identity of competitors that were using RealPage's RMS based on the address of the properties that were listed as comparables on the RMS platform. That is, if a property appeared on the platform and/or was listed as a comparable, that indicates to the user that, that property had similarly input their transactional data into RealPage's RMS.

## ANSWER TO PARAGRAPH 12:

Morgan Properties denies the allegations in Paragraph 12.

13.     Cartel members provide RealPage with vast amounts of their non-public proprietary data, including their lease transactions, rent prices, and occupancy and inventory levels. This commercially sensitive data is fed into a common data pool, along with additional data collected by Defendant RealPage' s other data-analytics, benchmarking, and rental-management software products. RealPage then trains its machine learning and artificial intelligence algorithms across that pool of proprietary data, generating rental prices daily for each RMS user's available units, singularly focused on increasing revenues by raising rent. Defendants boast about their ability to increase revenue by way of increasing rents regardless of true market conditions, including economic downturns or an all-out recession. Indeed, RealPage emphasizes to clients and prospective clients that "there is always money to be made regardless of market conditions."[14]

---

[13] *Id.*

[14] Tim Blackwell, Revenue Management: Proven in Any Market Cycle: See How These Top Companies Outperformed During Downturns, REALPAGE E-BOOK, https://www.realpage.com/blog/revenue-management-proven-market-cycle-ebook/ ( "Revenue Management: Proven in Any Market Cycle").

**ANSWER TO PARAGRAPH 13:**

    Morgan Properties denies the allegations in Paragraph 13.

14.    For that price-setting function of RealPage, Owners, Owner-Operators, and Managing Defendants pay handsomely. RealPage charges a one-time licensing fee as well as a monthly per unit fee for its RMS, ranging from at least $1 to $2 per unit, with some RealPage clients paying even more. RealPage also charges thousands of dollars in various other ancillary fees, such as consulting fees and site-training fees, monthly Pricing Advisory Services fees (which are charged on a per unit basis and can double the per unit fee), and corporate training fees. Accounting for all these fees (and the large number of units each of the Defendants owns or manages, ranging from 5,000 to as many as 698,000 units, as discussed further below), Owners, Owner-Operators, and Managing Defendants collectively pay millions of dollars each year for RealPage's RMS and associated services. Indeed, RealPage seeks to set the price for as many of its clients' units as the client will allow, explaining that the more units and properties included in the RMS system, the better its algorithm can raise rent across all properties. RealPage also generally requires clients to enter into an agreement with a term of at least one year to use its services.

**ANSWER TO PARAGRAPH 14:**

    Morgan Properties admits that it paid certain fees for the use of the LRO software. Morgan Properties otherwise lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 14 and denies them on that basis.

15.    Unsurprisingly, given the cost of use and promise of enormous financial gain, RMS users, including the Owners, Owner-Operators, and Managing Defendants agree to adopt RealPage RMS pricing up to 80%-90% of the time. Rents continued to rise while at the same time Defendants reported unprecedented earnings. During a recent 2023 reported earnings call with Defendant IRT, IRT proudly reported its extraordinary FFO (Funds from Operations') per share growth, with over a 106% cumulative growth compared as to five years prior. Scott Schaeffer, President, CEO and Chairman of IRT further explained "our key performance metrics in the second quarter include, average rental rate increased 7% year-over-year, supporting a 6.2% increase in revenue." [15] Still, despite this massive growth at the expense of renters, James Sebra, Defendant IRT's CFO and Treasurer

---

[15] Q2 2023 Independence Realty Trust Inc. Earnings Call — Final, *yahoo!finance*, July 27, 2023, https://finance.yahoo.com/news/q2-2023-independence-realty-trust-060808068.html?guccounter=l&guce_referrer=aHR0cHM6Ly93d3cuZ29vZ2x1LmNvbS8&gucereferrer_sig=AQA AAIUMo3YTFurjnS6ofErOLbU9yLBT4oT08L7pbhdcBz9EwLdpogFmYvtSiXqn6Fxzd9_uDanws9d-MK5cm5mwW3IyKCDyLoU-0OeFsVNahAvCqU2fgmKwEs_2uaWqoBGBuxEjaCz9dowUi4u8RXDkxifQkkNNsmLmNCff LmtpdtC.

announced that IRT expected to see an average net effective rent growth of 4.2% across its properties in the second half of 2023.[16]

## ANSWER TO PARAGRAPH 15:

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the statements alleged in Paragraph 15 and denies them on that basis. Morgan Properties otherwise denies the allegations in Paragraph 15.

16.     Jeffrey Roper, RealPage's main RMS architect, publicly described the dilemma that RealPage's RMS solved as: "If you have idiots undervaluing, it costs the whole system."[17] To prevent their staff from exercising independent judgment when setting rents, Defendants have established a rigorous monitoring and compliance system to ensure cartel members adhere to RealPage's RMS pricing.

## ANSWER TO PARAGRAPH 16:

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the statement alleged in Paragraph 16 and denies them on that basis. Morgan Properties otherwise denies the allegations in Paragraph 16.

17.     For example, Defendant RealPage assigns its clients "Pricing Advisors," also called "Revenue Managers,"[18] to monitor the client's compliance with RMS pricing, and to disseminate confidential and commercially sensitive information provided to RealPage by the client's competitors to encourage RMS price compliance. As RealPage put it to its clients, "[y]our Pricing Advisor is an extension of your team and empowered with the authority required for success."[19] RealPage's Senior Vice President of Revenue Management estimates that RealPage's own Pricing Advisors are used for approximately

---

[16] *Id.*

[17] Vogell, *supra*, note 1.

[18] *RealPage Al Revenue Management*, REALPAGE, INC., https://www.realpage.com/asset-optimization/revenue-management/?utm source=google&utm medium=cpc&utm campaign =Spear+-+HDDR+Revenue+Management+-+Search&utm content=search&utm adgroup =Revenue+Management&utm device=c&utm keyword=ai%20revenue%20management& gad=1&gclid=Cj0KCQjwmZejBhC ARIsAGhCqndpmEtz 7CgdbVOuCLdRHSoZ1U42vJD2ors 4fYig6K9svH0x1SoJ9saAnadEALw wcB (describing RealPage's Revenue Management Advisory services as providing "expert oversight of [clients'] pricing strategy"). In a video posted on RealPage's website titled "Best Practices for Revenue Management Webcast," hosted by RealPage's Chief Economist, Greg Willett, Tracy Paulk, who holds two titles at RealPage according to Linkedln—VP Consumer Solutions and Revenue Management and VP, LRO Professional Services—explained "You'll hear someone referred to as a revenue manager or pricing advisor, they're the same thing." *Best Practices for Revenue Management Webcast*, RealPage Videos, at (10:39-10:58), https://www.realpage.com/videos/best-practices-revenue-management-webcast/ ("Best Practices Webcast"). Reference to "Pricing Advisors" herein refers to both Pricing Advisors and Revenue Managers.

[19] *Al Revenue Management*, THE MEDVE GROUP, INC., (June 23, 2021), https://medve. com/assets/airm-manager-training-medve-management-6 .23 .2021-(1).pdf.

60% of all units using RealPage's RMS.[20]  While the majority of RealPage's clients use RealPage's Pricing Advisors, some of RealPage's largest property management clients (like Defendants Pinnacle, BH, Essex Property Trust, Inc. ("Essex"), and RPM Living, LLC ("RPM")) bring this same function in house, utilizing RealPage to train their own internal revenue managers to serve as in-house RMS pricing advisors.[21] RealPage's RMS generally understand that they must either use a RealPage Pricing Advisor or else train someone internally to take on that role.

## ANSWER TO PARAGRAPH 17:

Morgan Properties lacks knowledge or information sufficient to form as belief as to the truth of the allegations in Paragraph 17 and denies them on that basis.

18.  For RealPage RMS users, including the Owner-Operators and Managing Defendants, to diverge from RealPage's RMS pricing requires approval from a RealPage Pricing Advisor or an internal RealPage-trained revenue manager, and often approval from senior management within the Owner-Operator and/or Managing Defendant organization, and even from Owner Defendants.  Very few justifications are accepted for any requested deviation, and Owners, Owner-Operators, and Managing Defendants routinely reject deviations based on claims that RealPage' s prices were off-market or out-of-step with local property conditions.  While RealPage claims that all pricing decisions are ultimately left to its clients, various witnesses confirm that, in their experience, no modifications can be made to RMS recommended pricing without prior approval from either RealPage or the Owners, Owner-Operators, and/or Managing Defendants' senior management.  According to one former RealPage Pricing Advisor ("Witness 1"),[22] at least some Pricing Advisors informed Owner-Operators and Managing Defendants' employees that they were without discretion to override RMS pricing and that they had to adhere to RMS prices.[23] As one leasing manager at a RealPage client ("Witness 2")[24] put it, "I knew [RealPage' s prices] were way too high, but [RealPage] barely budged [when I requested a deviation]."

---

[20] Smart Solutions: How to Outperform in a Changing Market, *supra* note 12.

[21] According to RealPage's VP of Consumer Relations and Revenue Management, and VP of LRO Solutions, "often times when you hit that 20,000 unites or more, you start to see the value [in hiring an internal revenue manager]. Best Practices Webcast, *supra* note 18 (17:40-18:53).

[22] Defendants and the Court were provided with the identities of certain witnesses named herein, at the time of the filing of Plaintiffs' Amended Consolidated Complaint, Dkt. 291, and will submit herewith a supplemental disclosure identifying additional witnesses.

[23] Witness 1 worked as a RealPage Pricing Advisor from 2015 through 2018.

[24] Witness 2 worked as the Assistant Community Manager for Sunrise Management (now "CloudTen Residential") from 2020 through August 2022, where she had regular, direct interactions with RealPage Pricing Advisors and was responsible for reviewing RealPage's daily price recommendations for the properties she managed. Prior to that, Witness 2 worked as a leasing consultant for Defendant Greystar (October 2019 to June 2020), utilizing RealPage' s pricing platform. Witness 2 also worked as a leasing consultant with Defendant FPI Management, Inc. ("FPI Management"), however she did not use RealPage's pricing platform at Defendant FPI Management as the building she worked at was classified as affordable housing.

10

Likewise, a former leasing agent for Defendant Essex ("Witness 3")[25]25 indicated that during his tenure with the company, many tenants complained about Essex's rental price increases and asked for concessions and recalled that "Essex was raising rents hella" during that time. Witness 3 indicated he worked at two Essex properties, both of which used YieldStar to price their multifamily units. However, he was also called into provide short-term leasing services for other Essex properties, all of which similarly used YieldStar for pricing.

**ANSWER TO PARAGRAPH 18:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the statements alleged in Paragraph 18 and denies them on that basis. Morgan Properties otherwise denies the allegations in Paragraph 18.

19.　Aside from daily and weekly interactions, RealPage provides many of its RMS clients with quarterly one-on-one "Performance to Market" meetings, designed to identify how compliant the client was with RealPage's pricing recommendations during the prior quarter, and quantify any purported revenue loss that RealPage attributed to the client's deviations from its pricing recommendations. A former RealPage executive ("Witness 4")[26] who was instrumental in the development of RealPage's RMS confirmed that RealPage's pricing recommendations were accepted at "very high rates."

**ANSWER TO PARAGRAPH 19:**

Morgan Properties denies the allegations in Paragraph 19.

20.　Executives from Owner Defendants, Owner-Operators, and Managing Defendants' companies placed pressure on their leasing managers to implement RealPage's prices. For example, Defendant Lincoln Property Company ("Lincoln") forced leasing managers wishing to deviate from RealPage's prices to submit a request to the corporate office. A former Lincoln Leasing Consultant in Nashville, Tennessee ("Witness 5") recalls that these deviation requests were rejected almost 99% of the time, and that Lincoln's corporate office would reiterate that RealPage's "rates are what they are." Likewise, a former Leasing Professional for Cushman & Wakefield, the parent company for Defendant Pinnacle ("Witness 6") stated that she was unable to change or modify the rents set by YieldStar.[27] When Witness 6 raised concerns about RealPage's RMS pricing, she was told

---

[25] Witness 3 worked as a Leasing Agent for Defendant Essex from December 2017 through November 2019 in San Diego, California. Witness 3 utilized YieldStar on a daily basis in connection with his work as a Leasing Agent with Defendant Essex.

[26] 26 Witness 4 is a data scientist and former innovation and marketing executive at RealPage, from 2015 through 2019.

[27] Witness 6 worked as a Leasing Professional for Defendant Pinnacle from April 2021 through May 2022, in the Greater Portland Metro Area. Witness 6 regularly interfaced with RealPage's YieldStar representatives to pull various pricing reports, among the "tons of different reports" available through the RealPage system.

by the property manager that there was "not much we can do" to change YieldStar's pricing. A former RealPage Pricing Advisor ("Witness 7") recalls the agitation expressed by Christina Agra-Hughes, President of co-conspirator property management company First Pointe Management Group ("First Pointe"), upon learning about her staff's deviation from Defendant RealPage's prices during a meeting with RealPage staff and asked rhetorically, "why the hell aren't my teams following the model!?" To help their clients discipline staff, RealPage rolled out a new version of its RMS products in 2019, referred to internally as "Price Optimization 2" or "POV2." That update tracked not only a client's acceptance rate, but also the identity of the client's staff that requested a deviation from RealPage's price. Additionally, to discourage any "temptation to override the [RealPage pricing] algorithm if rents appear too aggressive,"[28] compensation for certain property management personnel are tied to compliance with RealPage's pricing recommendations.

## ANSWER TO PARAGRAPH 20:

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the statements alleged in Paragraph 20 and denies them on that basis. Morgan Properties otherwise denies the allegations in Paragraph 20.

21. As the stated goal of RealPage's RMS is for its clients to "outperform the market [by] 3% to 7%,"[29] the inevitable outcome of coordinated price setting by Owners, Owner-Operators, and Managing Defendants was that rents have been pushed above competitive levels. Defendant RealPage's Chief Economist, Greg Willett, recently reported to the National Apartment Association ("NAA") that the "use of revenue management systems is much more common today than in 2008-2009."[30] Indeed, increased usage of RealPage's RMS corresponds with increasing rents over that same period. Figure 1 below shows the steady increase in rental prices in various metropolitan areas as more and more property owners and managers adopted RealPage.

---

[28] Paul R. Bergeron III, *Revenue Management: Why It Works*, NAT'L APARTMENT ASS'N (July 30, 2015; updated Oct. 27, 2016), https://www.naahq.org/revenue-management-why-it-works.

[29] Vogell, *supra*, note 1 (citing RealPage website, *YieldStar Predicts Market Impact Down to Unit Type and Street Location*, *supra* note 3.

[30] "Worst Markets for Free Rent Slowly Recover," NAT'L APARTMENT ASS'N (Aug. 24, 2021), https:www.naahq.org/worst-markets-free-rent-slowly-recover.

**Figure 1: Average Rents in Various Metro Areas, 2015-2023**



**ANSWER TO PARAGRAPH 21:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 21 and Figure 1 and denies them on that basis.

22.     Plaintiffs reviewed historical pricing data for properties owned and/or managed by the Owners, Owner-Operators, and Managing Defendants across all Metropolitan Statistical Areas discussed in § VI, from 2013 through the present. Figure 2 illustrates how Defendants kept their rental prices in mutual alignment during and throughout the Conspiracy Period by adopting common price increases, and which parallel pricing cannot be explained by typical economic factors (discussed further below in § IV(G)).

**Figure 2: Average Asking Rent Per Unit of Properties Managed by Defendants in MSAs**



ANSWER TO PARAGRAPH 22:

**ANSWER TO PARAGRAPH 22:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 22 and Figure 2 denies them on that basis.

23. Defendant RealPage and its clients admit the impact that the use of RealPage's RMS has on multifamily rental prices. After praising a 14% increase in average rental prices across 2021 at an industry event, RealPage's Vice President Jay Parsons asked Andrew Bowen, RealPage's then Vice President of Investor Markets, what role he thought RealPage had played in the unprecedented increase. "I think it's driving it, quite honestly," Bowen replied.[31] Individuals who previously worked for RealPage and its clients express dismay with the way RealPage has enabled multifamily operators, including Owners, Owner-Operators, and Managing Defendants to collectively set and raise rents and confirm that rental prices were artificially raised. For example, one Leasing Manager (Witness 2) reported that, in 2021, the first year the property she worked at employed RealPage to set rents with YieldStar, rents for the building's standard two-bedroom units were raised from $1,650/month to $2,100/month, an increase of approximately 27%, despite no improvements made to the units. A former business manager at Defendant Pinnacle ("Witness 8")[32] said that RealPage caused them to raise monthly rents on some units by several hundreds of dollars during the beginning and middle of the COVID-19 pandemic: "[RealPage] was recommending that I raise rents $400 to $500 a month per unit[.] It was a nightmare. It was embarrassing. It was absolutely ridiculous." Witness 2, who also worked with RealPage in connection with her role as a Leasing Consultant with Defendant Greystar

---

[31] Vogell, *supra* note 1.

[32] Witness 8 worked as a Business Manager for Defendant Pinnacle Property Management Services, LLC in Chicago, Illinois from 2019 through 2020.

Property Management Services, LLC ("Greystar") "completely agrees" that rental prices in her region were artificially inflated upon the adoption of RMS pricing.

**ANSWER TO PARAGRAPH 23:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 23 and denies them on that basis.

24.  Indeed, Defendant RealPage and its clients pride themselves on their ability to raise rents during economic downturns. As RealPage's Senior Vice President of Asset Optimization, Keith Dunkin explained, "RealPage AI Revenue Management works best when volatility is high."[33] In a "case study" highlighting Defendant Trammell Crow Residential Company's ("Trammell Crow") success utilizing RealPage's RMS in the midst of an economic recession, RealPage reports Defendant Trammel Crow was able to increase revenue over 3 percent. "Stuck in the middle of the latest recession, Trammell Crow was looking for a revenue management system that could help maximize their revenue streams . . . YieldStar Revenue Management provided Trammell Crow with a solution . . . Trammell Crow Residential achieved revenue boosts of over 3% during the recession."[34] Similarly, "while initially skeptical about RealPage Revenue Management's ability to outperform during down market cycles [Defendant Pinnacle's President and CEO, Rick] Graf was pleasantly surprised to experience the opposite outcome - a 4% revenue lift when the market took a severe dive that left many owners/operators without RealPage making concessions[35] that proved detrimental to their profitability."[36] Graf goes on to explain that "if [RMS] could work in that environment," it could work in any "[a]nd the tool I think really helped us fight through that [downturn] not just as a company but as an industry."[37] [Emphasis added.]

**ANSWER TO PARAGRAPH 24:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 24 and denies them on that basis.

25.  Witness 4, a former RealPage executive who was directly involved in the creation of the original software that is now integrated into RealPage's RMS expressed dismay with the way RealPage has enabled lessors to collectively raise rents at record pace. Witness 4

---

[33] *RealPage AI Revenue Management Boosts Yields in Uncertain Times*, RealPage Newsroom, May 11, 2020, https ://www.realpage.com/news/ai-revenue-management-boosts-yields-in-uncertain-times/.

[34] Revenue Management: Proven in Any Market Cycle, *supra* note 14.

[35] Concessions are adjustments by a property manager or owner-operator to the rental price charged for its units, typically made in a sluggish market, including for example during the COVID-19 pandemic when many tenants were unable to make their rent payments.

[36] *Rick Graf, Pinnacle CEO, on RealPage Revenue Management's 4% Revenue Lift*, REALPAGE VIDEOS (2023) https://www.realpage.com/videos/rick-graf-pinnacle-yieldstar-revenue-lift/RealPage Videos.

[37] *Id*.

described this practice of centrally setting, and consistently raising rental rates as having "bastardized" RealPage's original "supply and demand model."

**ANSWER TO PARAGRAPH 25:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 25 and denies them on that basis.

26.     In 2017, RealPage acquired the revenue management software LRO, developed by the Rainmaker Group.  By integrating LRO into its own revenue management system, RealPage acknowledged the combined "data science talent and modeling tools through these acquisitions allows our customers to achieve better harvesting and placement of capital in the rental housing industry."[38] According to RealPage, "[t]his acquisition extended our revenue management footprint, augmented our repository of real-time lease transaction data, and increased our data science talent and capabilities.  We also expect the acquisition of LRO to increase the market penetration of our YieldStar Revenue Management solution and drive revenue growth in our other asset optimization solutions."[39] RealPage' s acquisition of LRO indeed increased market penetration of its RMS, precipitating a structural shift in the forces of supply and demand.

**ANSWER TO PARAGRAPH 26:**

Morgan Properties Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 26 and denies them on that basis.

27.     Both parties to the acquisition were excited by the concentration of data that would result from the deal, and in the hands of RealPage.  In a February 28, 2017 article concerning the pending deal, Tammy Farley, President of the Rainmaker Group was quoted as saying, "[w]e're obviously proud of our LRO successes over the past decade and this combining of two powerhouse players presents exciting opportunities and the ideal platform for our multifamily team to execute in a much bigger way on a global scale."[40] Likewise, RealPage's Chairman and CEO, Steve Winn, echoed, "With many apartment markets softening around the US, now is the right time to bring together the best data-science talent, a comprehensive lease-transaction database and RealPage's powerful suite of pricing, demand and credit optimization tools into one comprehensive platform."[41] [Emphasis added.]

---

[38] RealPage Inc., 2017 Annual Report (Form 10-K) at 39 (Mar. 1, 2018), https://www. sec. gov/Archives/edgar/data/1286225/000128622518000008/rp-20171231x10k.htm ("RealPage 2017 Form 10-K").

[39] *Id.*

[40] *The Rainmaker Group Announces Sale of Multifamily Housing Assets to RealPage, Inc*., HOSPITALITY NET (Feb. 28, 2017), https://www.hospitalitynet.org/news/4081257.html.

[41] Paul Bubny, *RealPage Adds LRO to Analytics Platform*, ALM GLOB., LLC (Feb. 28, 2017), http s ://www. globest.com/sites/paulbubny/2017/02/28/realpage-adds-lro-to-analytics-platform/.

**ANSWER TO PARAGRAPH 27:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 27 and denies them on that basis.

28.     RealPage has since made "enhancements" to LRO and integrated both YieldStar and LRO
        to "form the industry's most comprehensive suite of solutions for precision data analytics
        and asset optimization for rental housing assets,"[42] introduced as "AI Revenue
        Management" in 2020.

**ANSWER TO PARAGRAPH 28:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 28 and denies them on that basis.

29.     Witness 4 explained that in facilitating ever-increasing prices, RealPage warped the
        original model and ultimately created what he described as "massive collusion."[43] Another
        early developer of RealPage' s pricing software ("Witness 9")[44] reflected on how
        RealPage' s facilitation of collusion among property management companies and owners
        has pushed rents higher at a breakneck pace: "[T]hese optimization systems are really
        efficient at extracting value and they will push things until they start to break."

**ANSWER TO PARAGRAPH 29:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth

of the statements alleged in Paragraph 29 and denies them on that basis.  Morgan Properties

otherwise denies the allegations in Paragraph 29.

30.     Aside from raising rents, the Owners', Owner-Operators' and Managing Defendants'
        collective delegation of their decision-making authority to Defendant RealPage also raised
        vacancy rates and impacted the supply of multifamily apartments.

**ANSWER TO PARAGRAPH 30:**

Morgan Properties denies the allegations in Paragraph 30.

---

[42] *RealPage Closes Acquisition of Lease Rent Options*, LRO®, BUSINESS WIRE (Dec. 4, 2017),
https://www.businesswire.          com/news/home/20171204006136/en/RealPage-Closes-Acquisition-of-Lease-Rent-
Options-LRO%C2%AE.

[43] Upon the announcement of a potential antitrust investigation by the Department of Justice into RealPage's
algorithmic pricing, on or around November 2022, Witness 4 turned around and disclaimed these statements.

[44] Witness 9 worked in project management with the Rainmaker Group (developer of Lease Rent Options ("LRO")),
from 2011 through 2017, at which time RealPage acquired LRO. Discussed further *infra*.

31.    Vacancy rates rose because each Owner, Owner-Operator, and Managing Defendant could (and did) allow a larger share of their units to remain vacant, thereby artificially restricting supply, while maintaining higher rental prices across their properties. This behavior is only rational if Defendants know that their competitors are setting rental prices using RealPage's RMS and thus would not attempt to undercut them. Indeed, Owners, Owner-Operators, and Managing Defendants alike have a clear view into which of its competitors use RealPage's RMS to price their multifamily units. Witness 6 confirmed that "at least monthly," Defendant RealPage disseminated communications to Pinnacle which advertised the fact that Pinnacle's local competitors were using RealPage's RMS to price their multifamily rental units. These monthly communications contained details regarding not only Pinnacle's properties using RMS, but details concerning buildings owned and/or managed by Pinnacle's competitors in the region who were also using RMS. Indeed, RealPage discloses to its RMS clients exactly whose non-public data is being used for pricing decisions. For each client, including the Owners, Owner-Operators, and Managing Defendants, RealPage maintains a "peer list" of that client's competitors within a specific distance and whose transaction data will be used as an input in RealPage's RMS for that client's specific property. Peer lists explicitly state that the competitors listed will be used "to determine the magnitude of a change in rent...." In fact, clients, including the Owners, Owner-Operators, and Managing Defendants, are able to review and comment on their peer list, and can even request that specific competitors are included on the list. RealPage then quickly pushes the non-public, daily, real-time data from those competitors' properties into its RMS to influence RealPage's pricing decisions. With this, each Owner, Owner-Operator, and Managing Defendant is provided not only with a view into their competitors' compliance with the scheme, but also unequivocal, repeat invitations to participate and adhere to the scheme. In this way, each Owner, Owner-Operator, and Managing Defendant consciously commits to using non-public data from its direct horizontal competitors to price its own multifamily units.

## ANSWER TO PARAGRAPH 31:

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the statements alleged in Paragraph 31 and denies them on that basis. Morgan Properties otherwise denies the allegations in Paragraph 31.

32.    Before the introduction of coordinated rent-setting software, residential property owners and managers independently set prices, and generally did so to maximize occupancy. If supply was high, market prices would drop, as allowing apartments to stand vacant at their advertised rental prices made little sense when similar apartments in the area were available for less. Thus, in the past, property owners and managers of multifamily housing properties had incentive to lower rents until all available units were occupied.

## ANSWER TO PARAGRAPH 32:

Morgan Properties denies the allegations in Paragraph 32.

33.     Defendant RealPage has not been shy about its desire to raise vacancy rates. During a 2017 earnings call, then-CEO of RealPage, Steve Winn, described how a client identified as "Morgan Communities," who at the time was managing over 40,000 units, drastically increased its profit by operating at a vacancy rate that "would have made [that property manager's] management uncomfortable before."[45] Morgan Communities had previously targeted 97% or 98% occupancy rates in markets where it was a leader. After outsourcing rent prices and lease terms to RealPage, the company began targeting 3%-4% revenue growth while operating at a 95% occupancy rate (i.e., 5% vacancy rate).[46]

## ANSWER TO PARAGRAPH 33:

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 33 and denies them on that basis.

34.     The impact of the Owners, Owner-Operators, and Managing Defendants' shift from a "heads in beds" strategy to RealPage's revenue maximization strategy is apparent from comparing average rental and vacancy rates as depicted in Figures 3 and 4, below. These graphs demonstrate that the forces of supply and demand no longer control the price of rent in some of the most populated and sought-out metropolitan areas in the country. Specifically, these graphs show that from 2016 to the onset of the COVID-19 pandemic in 2020, Defendants were able to increase rents every year, whether vacancies were rising or falling, and in most instances, both rents and vacancy rates trended higher from 2014-2020, across various metropolitan regions where RealPage operates. For example, in the Greater Nashville Metro Area,[47] (Figure 3), despite rising vacancies, with the help of RealPage, Defendants were able to continue to raise rents year-over-year-over-year, demonstrating the disconnect between supply and demand. Likewise, Figure 4 demonstrates that beginning on or around 2016, rental prices continued to climb notwithstanding a consequent increase in vacancies in the Dallas metro area.

---

[45] Vogell, *supra* note 1.

[46] Q4 2017 RealPage Inc Earnings Call — Final, SEEKING ALPHA, https://seekingalpha.com/arti cl e/4151484-realpages-rp-ceo-steve-winn-on- q4-2017-results-earnings-call-transcript.

[47] As used throughout this Complaint, the Greater Nashville Metro Area is coterminous with the Nashville-Davidson-Murfreesboro-Franklin, TN Metropolitan Statistical Area, as established by the United States Office of Management and Budget. Specifically, the Greater Nashville Metro Area consists of the Tennessee cities of Nashville, Murfreesboro, Franklin, and their surrounding areas. References to Nashville throughout this Complaint, unless specifically limited, refer to the Greater Nashville Metro Area. Metropolitan Statistical Areas are discussed further in § V.

**Figure 3: Rent vs. Occupancy in the Greater Nashville Metro Area (2014-2019)**



**Figure 4: Rent vs. Occupancy in the Dallas Metro Area (2014-2022)**

## ANSWER TO PARAGRAPH 34:

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 34 and Figures 3 and 4 and denies them on that basis.

35. Defendants also worked together to avoid periods of oversupply that might detrimentally impact rental prices. Using its record of its clients' lease expirations and housing inventory, Defendant RealPage's daily pricing recommendations are accompanied with

suggested lease terms that are staggered to avoid temporary periods of oversupply resulting from the natural ebb and flow of the market.[48] As one executive explained in 2019, about one of RealPage's RMS products, "LRO is mapping out for our teams how they should be pacing their [lease] expirations" [49]

## ANSWER TO PARAGRAPH 35:

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the alleged statement in Paragraph 35 and denies them on that basis. Morgan Properties otherwise denies the allegations in Paragraph 35.

36. Witness 8,[50] a former business manager for Defendant Pinnacle explained how RealPage helped Pinnacle avoid a situation where there were a significant number of units renewing at the same time. RealPage "would recommend a 10-month lease instead of a 12-month lease on certain people [to avoid simultaneous renewals]," he said. "Or a 13-month lease— to try to get it to that next month [so that] instead of having 15 renewals, you would end up with 10 renewals." Witness 6 confirmed the same. Collectively manipulating supply to minimize naturally occurring periods of oversupply removes a source of periodic downward price pressure on rents, which is the strongest during these temporary oversupply periods. As RealPage puts it, "[t]he game here is to stack the correct number of expirations in months where we anticipate demand, whether that demand is from historical understandings or from prospect information."[51]

## ANSWER TO PARAGRAPH 36:

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the statements alleged in Paragraph 36 and denies them on that basis. Morgan Properties otherwise denies the allegations in Paragraph 36.

37. The Owners, Owner-Operators, and Managing Defendants also pursued direct contacts amongst themselves to facilitate information exchanges and coordinate prices, using RealPage as the conduit. Defendant RealPage hosts online forums, organizes in-person

---

[48] Revenue Management: Proven in Any Market Cycle, *supra* note 14 (". . . identifying the excess supply period and time horizon will allow [property owners and managers] to strategize which lease terms will allow expirations to be minimized during the excess supply time horizon, therefore reducing the number of expirations and potential [revenue] exposure [property owners and managers] will experience during this excess supply time").

[49] *RealPage Revenue Management Maximizes Market Opportunity,* REALPAGE VIDEOS (Dec. 7, 2019), https://www.realpage.com/videos/revenue-management-maximi ze s-market-opportunity/.

[50]

[51] RealPage e-book B & C Assets Ace the Market, *supra* note 10.

events for its clients,[52] and maintains standing committees of cartel members—including the 1,000-member-strong "User Group" governed by a steering committee of RealPage clients—to advise on pricing strategy.[53] RealPage hosts webinars, screen-sharing training modules, frequent calls, in-person "roundtables," hosted happy hours, and annual conferences in efforts to combine forces with the largest industry players in the multifamily rental space in the United States, including property owners, property management companies, and investors, to align on price-setting methods in the multifamily rental housing market.[54] RealPage along with Owners, Owner-Operators, and Managing Defendants would use these events to explain the many financial benefits of working together instead of as competitors.

## ANSWER TO PARAGRAPH 37:

Morgan Properties denies the allegations in Paragraph 37.

38.     In a recent example, Breanna Berry, Senior Asset Manager for Defendant Prometheus Real Estate Group ("Prometheus"), participated in a RealPage-hosted "information series" whereby "industry leaders [ ] opened up their playbook to share their 2022 operation and asset management strategies," with competitors. Berry discussed Defendant Prometheus' use of RealPage's RMS to "make informed pricing decisions," among other proprietary and strategic insights provided into Defendant Prometheus' revenue management and operational strategies.[55] Through participation in similar information-sharing forums and industry events, Owners, Owner-Operators, and Managing Defendants often publicly affirm to one another, and the industry at large, that they are willing participants in the scheme. In another example, Defendant BH's Senior Revenue Manager, Sierra Garza spoke on a RealPage "Smart Solutions" webcast "about the strategic insight and operational visibility they gain with the transactional metrics from RealPage Market Analytics. Instead of relying on arbitrary targets like asking rents, they draw upon actual

---

[52] *See* Susan Gaide, *Real World 2022 Customer Conference Recap*, REALPAGE, INC., (July 29, 2022), https://www.real page.com/blog/realworld-2022-custom er-conference-recap/ (three-day conference hosted by RealPage in Las Vegas with over 1,500 industry attendees, including keynote speakers, "Lynne Ann Chase, Chief Accounting Officer for Winn Residential (the ninth largest apartment manager in the country with more than 103,000 units under management across affordable housing, military housing and conventional), Yetta Tropper, Head of Multifamily Asset Manager for PGIM (the real estate investment arm of Prudential) and Scott Pechersky, Chief Technology Officer for RPM Living (#7 on the NMHC manager list with more than 112,000 units.")).

[53] *User Group Overview*, REALPAGE, INC., https://www.realp age. com/user-group/overview/ (last accessed September 3, 2023) ("User Group Overview") (formed in 2003, the User Group "is the organization recognized by RealPage to improve communications between RealPage and the user community, and to promote communications between users.").

[54] Since 2000, every year the executive-level users of RealPage convene for a three-day conference called the "RealWorld User Conference" ("RealWorld"). *See RealPage® Sets Stage in Vegas for 11th Annual RealWorld User Conference*, REALPAGE NEWSROOM (Mar. 14, 2011), http s ://www. real p age. com/news/real page-sets-stage-in-vegas-for-11th-annual-realworld-user-conference/; *see also* Chris Wood, New Expectations *in* Multifamily Technology *ROI: Q&A With RealPage 's Steve Winn*, MULTIFAMILY EXECUTIVE (July 15, 2009), https://www. multi family executive. com/technology/new-expectation s-in-multi family-technology-roi-q-a-with-realpages-steve-winn_o.

[55] *22 Voices for 2022: How Revenue Management Can Solve Loss-to-Lease, Rent Control & Rising Costs*, REALPAGE WEBCASTS (Mar. 21, 2022), https://www.realpage.com/webcast s/22-voice s-revenue-management/.

lease transaction data . . . to make the right decisions and forecasts for a stronger portfolio."[56]  In a promotional video displayed on RealPage's website, Luke Dean, Revenue Manager for Defendant Essex, shares how YieldStar revenue management allows Essex to offer "optimal rates, getting the most from every unit."[57]

## ANSWER TO PARAGRAPH 38:

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 38 and denies them on that basis.

39.     The Owners, Owner-Operators, and Managing Defendants have an interest in seeing that their competitors join the conspiracy.  An article published by the NAA and written by Hale McNinch, the former Vice President of Revenue Management for Defendant Bell Partners, Inc. ("Bell"), highlights this. McNinch touts how "Bell Partner continues to optimize its rents through revenue management technology." In fact, Bell had "seen a 2 percent to 5 percent revenue lift as a result of the technology.  Knowing this, it's surprising that many operators still don't use the technology to enhance their revenue." The article goes on to explain the top five ways to get the best out of RMS "for those operators who are thinking about using the technology."[58] A former Business Manager for Defendant Lincoln ("Witness 10") explained it was common knowledge that Defendant Lincoln's "biggest competitors in the country were using RealPage" to set rents, "because that's just what everyone did."[59]

## ANSWER TO PARAGRAPH 39:

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth

of the statements alleged in Paragraph 39 and denies them on that basis.  Morgan Properties

otherwise denies the allegations in Paragraph 39.

40.     RealPage also encourages its clients, including the Owner-Operators and Managing Defendants, to communicate directly with one another to exchange pricing information.  In training materials that RealPage provides to clients, in a section addressing how property managers should answer initial pricing inquiries titled "Overcoming Objections Guide," RealPage gives the following "Protips" on how its clients can verify the confidential, competitively sensitive information shared through its platform—by communicating directly with one another:

---

[56] *Smart Solutions: BH Management Responds in Real Time with RealPage Market Analytics*, RealPage Webcast (July 14, 2020), https://www.realpage.com/videos/bh-responds-with-market-analytics/ (last accessed August 31, 2023).

[57] https ://www. real p age. com/vi deo s/yieldstar-asset-optimization-reviews-luke-dean/.

[58] Hale McNinch, *5 ways to maximize revenue management: Bell Partners continues to optimize its rents through revenue management technology*, 36:9 NAT'L APARTMENT ASS'N, Sept. 2012, at 67.

[59] Witness 10 worked as a Business Manager for Defendant Lincoln from May 2021 through January 2022 in Denver, Colorado.

**Figure 5: Excerpt from RealPage's Overcoming Objections Guide Protips**



**Protips**
- Shop your competitors over the phone, in-person, and view their websites. Be knowledgeable about their pricing, specials, and product
- Utilize a calendar to narrow down a lease start date
- Utilize a calculator to compute their savings

## ANSWER TO PARAGRAPH 40:

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 40 and Figure 5 and denies them on that basis.

41. Interviews with witnesses who worked at various Owner-Operators' and/or Managing Defendants' companies confirm this practice. One former Property Manager for Defendant Mid-America Apartment Communities, Inc., and Mid-America Apartments, L.P. (together, "MAA") ("Witness 11")[60] described that to assist in collecting competitors' pricing data, RealPage even provided a form containing the names of competitors to call and the information to obtain. According to the witness, she called competing properties every Tuesday to obtain updated pricing information, or "the price for that day," and would use the RealPage form to guide those calls: "You kind of just go down the list and fill out the blanks."

## ANSWER TO PARAGRAPH 41:

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 41 and denies them on that basis.

42. After ProPublica's reporting brought Defendants' misconduct to light, multiple members of Congress have urged the Department of Justice ("DOJ") and the Federal Trade Commission ("FTC") to investigate the collusion facilitated by the collection and use of rent data input and exchanged through RealPage's RMS. While the DOJ has yet to announce any formal investigation into RealPage, Plaintiffs are informed and believe, and based upon such information and belief, allege that the DOJ, along with various State Attorneys General have launched investigations into the anticompetitive conduct alleged herein. Further, the DOJ has announced that it will hold an expert workshop "to inform potential guidance updates around anticompetitive information sharing" in consumer facing markets, including the multifamily rental housing market.[61]

---

[60] Witness 11 worked as a property manager with Defendant MAA from 2019 through 2021.
[61] Chris May, *US DOJ to Support FTC, CFPB Push Against Rent Prices with Guidance on Anticompetitive Information Sharing,* MLEX (Jan. 25, 2023), https://content.mlex.com/#/content/ 1445159.

**ANSWER TO PARAGRAPH 42:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 42 and denies them on that basis.

43. Defendants' price-fixing conspiracy is a *per se* unlawful restraint of trade under Section 1 of the Sherman Act. The Owners, Owner-Operators and Managing Defendants are competitors at the same level of market structure—providers of multifamily rental units and/or the decision maker behind whether those properties will utilize RealPage's RMS to price its units—who have engaged in concerted action in furtherance of the conspiracy, which has resulted in artificially inflated rent prices and a diminished supply of multifamily rental units throughout the United States. Plaintiffs and the Class, who rent multifamily rental units from property owners and managers that use Defendant RealPage's RMS, paid significant overcharges on rent, and suffered harm from the reduced availability of rental units they could reasonably afford. This suit is brought to recover for that harm.

**ANSWER TO PARAGRAPH 43:**

Morgan Properties denies the allegations in Paragraph 43.

### III. JURISDICTION AND VENUE

44. Plaintiffs bring this antitrust class action lawsuit pursuant to Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15 and 26), to recover treble damages and the costs of suit, including reasonable attorneys' fees, for the injuries sustained by Plaintiffs and members of the Class; to enjoin Defendants' anticompetitive conduct; and for such other relief as is afforded under the laws of the United States for Defendants' violations of Section 1 of the Sherman Act (15 U.S.C. § 1).

**ANSWER TO PARAGRAPH 44:**

The allegations in Paragraph 44 are legal conclusions not subject to admission or denial.

To the extent a response is necessary, Morgan Properties denies the allegations in Paragraph 44.

45. This Court has subject matter jurisdiction pursuant to 28 U. S.C . §§ 1331, 1337, and Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15(a), 26).

**ANSWER TO PARAGRAPH 45:**

The allegations in Paragraph 45 are legal conclusions not subject to admission or denial.

To the extent a response is necessary, Morgan Properties denies the allegations in Paragraph 45.

46. Venue is proper in this District pursuant to Order of the Judicial Panel on Multidistrict Litigation transferring related actions to this District ("Related Actions"). *See*, *In re:*

*RealPage, Inc., Rental Software Antitrust Litigation (No. II)*, No. MDL 3071, Dkt. 205 (U.S. Jud. Pan. Mult. Lit. Apr. 10, 2023).

**ANSWER TO PARAGRAPH 46:**

The allegations in Paragraph 46 are legal conclusions not subject to admission or denial.

To the extent a response is necessary, Morgan Properties denies the allegations in Paragraph 46.

47. This Court has personal jurisdiction over each Defendant to the same extent that the transferor court had personal jurisdiction in each Related Action, pre-transfer. Because each Defendant leased residential units to individuals in the transferor District, and also: (a) transacted business throughout the United States; and (b) engaged in an antitrust conspiracy that was directed at and had a direct, foreseeable, and intended effect of causing injury to the business or property of persons residing in, located in, or doing business throughout the United States; this Court has personal jurisdiction over all Defendants. Moreover, this Court also has personal jurisdiction over all incorporated Defendants pursuant to the Clayton Act, 15 U. S.C. § 22.

**ANSWER TO PARAGRAPH 47:**

The allegations in Paragraph 47 are legal conclusions not subject to admission or denial.

To the extent a response is necessary, Morgan Properties denies the allegations in Paragraph 47.

48. The activities of the Defendants and their co-conspirators, as described herein, were within the flow of, were intended to, and did have direct, substantial, and reasonably foreseeable effects on the interstate commerce of the United States.

**ANSWER TO PARAGRAPH 48:**

Morgan Properties denies the allegations in Paragraph 48.

49. No other forum would be more convenient for the parties and witnesses to litigate this case.

**ANSWER TO PARAGRAPH 49:**

The allegation in Paragraph 49 is a legal conclusion not subject to admission or denial. To the extent a response is necessary, Morgan Properties denies the allegations in Paragraph 49.

## IV.  THE PARTIES

50. Plaintiff Jason Goldman is a resident of Nashville, Tennessee. Mr. Goldman rented a residential unit in a property known as Lincoya Bay Apartments in Nashville, Tennessee from April 2021 through the present. During that time, Defendant Morgan Properties Management Company, LLC ("Morgan") owned and managed the property using

Defendant RealPage's LRO and Morgan imposed on Mr. Goldman two rent increases on or around November 15, 2021, and November 15, 2022, representing a 4.6% increase, and a nearly 10% increase, respectively, year-over-year. Consequently, Mr. Goldman paid higher rental prices by reason of the violations alleged herein.

**ANSWER TO PARAGRAPH 50:**

Morgan Properties admits that it has managed, and has used LRO in managing, Lincoya Bay Apartments in Nashville, Tennessee from September 17, 2018, to the present. Morgan Properties further admits that an individual named Jason Goldman leased an apartment at the Lincoya Bay Apartments in Nashville, Tennessee from April 15, 2021, to September 14, 2023, and that his rent increased after the lease term ending on November 14, 2021, and after the lease term ending on November 14, 2022. Morgan Properties otherwise denies the allegations in Paragraph 50.

51.     Plaintiff Jeffrey Weaver is a resident of Denver, Colorado. Mr. Weaver rented a residential unit in a property known as Belleview Station Community in Denver, Colorado, from April 2017 through September 2020. During that time, Defendant Camden Property Trust ("Camden") owned and managed the property using YieldStar and imposed on Mr. Weaver two rent increases on or around July 30, 2018, and September 2, 2019, representing a 7.5% increase, and 2.7% increase, year-over-year. Mr. Weaver also rented a residential unit in Denver, Colorado, known as Bell Fund VI Denver Tech Center, from October 2021 through the present. During that time, Defendant Bell Partners, Inc. owned and managed the property using RealPage's RMS and imposed on Mr. Weaver a rent increase on or around September 30, 2022. Consequently, beginning in 2017 through the date of this filing. Mr. Weaver has paid higher rental prices by reason of the violations alleged herein.

**ANSWER TO PARAGRAPH 51:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 51 and denies them on that basis.

52.     Plaintiff Billie Jo White is a resident of Peabody, Massachusetts. Ms. White has rented a residential unit in a property known as Highlands at Dearborn in Peabody, Massachusetts, from 2016 through the date of this filing. During that time, Defendant Simpson Property Group, LLC owned and managed this property using Defendant RealPage's RMS. Consequently, Billie Jo White paid higher rental prices by reason of the violations alleged herein.

**ANSWER TO PARAGRAPH 52:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 52 and denies them on that basis.

53. Plaintiff Nancy Alexander is a resident of Vienna, Austria. Ms. Alexander rented a multifamily residential unit in a property known as the Verde Vista apartments in Asheville, North Carolina, beginning in approximately January 2021 through January 2022. During that time, Defendant Bell Partners, Inc. managed this property using Defendant RealPage's RMS, including at least YieldStar and/or LRO. Consequently, Ms. Alexander has paid higher rental prices by reason of the violations alleged herein.

**ANSWER TO PARAGRAPH 53:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 53 and denies them on that basis.

54. Plaintiff Brandon Watters is a resident of Antioch, Tennessee. Mr. Watters rented a residential unit in a property known as 2010 West End in Nashville, Tennessee, from 2021 through 2022. During that time Defendant Lincoln Property Company and Pegasus Property Management managed the property using RealPage's RMS. Mr. Watters also rented a residential unit in a property known as The Preserve in Brentwood, Tennessee, from 2019 through 2021. During that time, Defendant UDR, Inc. owned and managed this property using Defendant RealPage's RMS. Consequently, Mr. Watters paid higher rental prices by reason of the violations alleged herein.

**ANSWER TO PARAGRAPH 54:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 54 and denies them on that basis.

55. Plaintiffs Priscilla Parker and Patrick Parker are residents of Odessa, Florida. Mrs. and Mr. Parker rented a residential unit in a property known as Lantower Asturia in Odessa, Florida, from 2019 through August 2023. During that time, Defendant Lantower Luxury Living, LLC owned and managed the property using RealPage RMS for at least portions of the Plaintiffs' tenancy. Between August of 2021 and August 2022, Defendant Lantower imposed on Mrs. and Mr. Parker a $877 per month rent increase, an increase of over 50% year-over-year. Consequently, Mrs. and Mr. Parker have paid higher rental prices by reason of the violations alleged herein.

**ANSWER TO PARAGRAPH 55:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 55 and denies them on that basis.

56.     Plaintiff Barry Amar-Hoover is a resident of Jacksonville, Florida. Mr. Amar-Hoover rented a residential unit in a property known as the Florida Club at Deerwood in Jacksonville, Florida, from 2018 through the date of this filing.  During that time, Defendant CONAM Management Corporation owned and managed the property using RealPage's RMS.  Between September 1, 2020 to the present, Defendant CONAM imposed on Mr. Amar-Hoover three rent increases: the first took effect on or around September 1, 2020, representing an 8% year-over-year rent increase; the second increase took effect on or around August 1, 2021, representing a 9.5% year-over-year increase; and the third rent increase took effect on July 1, 2022, representing an increase of over 13.5% year-over-year.  Consequently, Mr. Amar-Hoover paid higher rental prices by reason of the violations alleged herein.

**ANSWER TO PARAGRAPH 56:**

        Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 56 and denies them on that basis.

57.     Plaintiff Joshua Kabisch is a resident of Brookline, Massachusetts. Mr. Kabisch rented a residential unit in a property known as The Cooper in Chicago, Illinois, from April 2019 to July 2020.  During that time, Defendant Bozzuto Management Company managed the property using Defendant RealPage's RMS software. Joshua Kabisch also rented a residential unit in a property known as Harlowe in Nashville, Tennessee, from June 2022 to June 2023.   During that time, Defendant Greystar Management Services, LLC ("Greystar") owned and managed Harlowe using RealPage's RMS software. Consequently, Joshua Kabisch paid higher rental prices during the tenures of each of his respective leases, by reason of the violations alleged herein.

**ANSWER TO PARAGRAPH 57:**

        Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 57 and denies them on that basis.

58.     Plaintiff Meghan Cherry (formerly known as Christopher Berg) is a resident of Seattle, Washington. Ms. Cherry rented a residential unit in Seattle, Washington, at a property known as the Summit at Madison Park, from November 2019 through August 2020. During that time, Defendant Greystar managed the building using RealPage's RMS. Ms. Cherry also rented a residential unit in a property known as the Audrey at Belltown in Seattle Washington, from July 2020 through July 2021, during which time Defendant Essex Property Trust Inc., owned and managed the property using RealPage RMS, including YieldStar. Consequently, Ms. Cherry has paid higher rental prices by reason of the violations alleged herein.

**ANSWER TO PARAGRAPH 58:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 58 and denies them on that basis.

59.     Plaintiff Selena Vincin is a resident of Pittsburgh, Pennsylvania. Ms. Vincin rented
        residential units in multifamily properties managed by Defendant CONTI Texas
        Organization, Inc., d/b/a CONTI Capital, using RealPage's RMS, at various times between
        2015 through 2020, including in a property known as Creekside Village Apartments in
        Plano, Texas. Consequently, Ms. Vincin has paid higher rental prices by reason of the
        violations alleged herein.

**ANSWER TO PARAGRAPH 59:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 59 and denies them on that basis.

60.     Plaintiff Maya Haynes is a resident of Atlanta, Georgia. Ms. Haynes rented a residential
        unit in a property known as Seven Springs in Atlanta, Georgia, from August 2020 to
        September 2022.  During that time, Defendant Lincoln Property Company managed the
        property using Defendant RealPage's RMS software and imposed on Ms. Haynes a rent
        increase effective September 4, 2021, representing a 6.5% increase year-over-year for her
        lease expiring on September 3, 2022.  On or around July 8, 2022, or less than 60-days
        before Ms. Haynes' lease was set to expire, Ms. Haynes received a notice from Seven
        Springs informing of a rent increase amounting to over $300/month or a 25% year-over-
        year increase, to take effect October 1, 2023.  Owing to this massive increase in her rent,
        Ms. Haynes did not renew her lease at Seven Springs at its expiration. Ms. Haynes also
        rented a residential unit in a property known as Alexan Summerhill in Atlanta, Georgia
        from January 2023 to the present.  The Alexan Summerhill is a property owned by
        Defendants Trammell Crow Residential Company and Crow Holdings L.P and managed
        by Defendant Bozzuto Management Company using Defendant RealPage's RMS software.
        Consequently, Ms. Haynes has paid higher rental prices during the tenures of each of her
        respective leases by reason of the violations alleged herein.

**ANSWER TO PARAGRAPH 60:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 60 and denies them on that basis.

61.     Defendant RealPage, Inc. is a corporation headquartered in Richardson, Texas, organized
        and existing under the laws of Delaware.  RealPage provides software and services to
        managers of residential rental apartments, including the RMS described herein.  RealPage
        was a public company from 2010 until December 2020, when it was purchased by Chicago-
        based private equity firm Thoma Bravo, LP, in a transaction that valued RealPage at

approximately \$10.2 billion.[62] At that time, RealPage had over 31,700 clients, including "owner operators" and "each of the ten largest multifamily property management companies in the United States."[63]

**ANSWER TO PARAGRAPH 61:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 61 and denies them on that basis.

62. Defendants Thoma Bravo Fund XIII, L.P. and Thoma Bravo Fund XIV, L.P. are Delaware limited partnerships (collectively, "Thoma Bravo Funds"). Defendant Thoma Bravo L.P. ("Thoma Bravo") is a Delaware limited partnership. Thoma Bravo is a private equity firm that has had a "100% software focus" since 2008.[64] In its capacity as the investment manager of over \$122 billion in assets spread across several investment vehicles, including the Thoma Bravo Funds, Thoma Bravo controls the strategic operation and investment decisions of those funds and the assets they own. In April 2021, Thoma Bravo directed the Thoma Bravo Funds to acquire RealPage in an all-cash go-private transaction. On information and belief, Thoma Bravo was aware of RealPage's anticompetitive activities and acquired RealPage with the intent to maintain and enhance its cartel profits, which RealPage, with Thoma Bravo's active guidance and participation, has done. Thoma Bravo had been closely following RealPage's growth as a company since RealPage went public in 2010.[65] Thoma Bravo had identified that RealPage was the "clear market leader" in multifamily real estate software and the "leading provider of software [and] data…to the [residential] rental real estate industry."[66] Thoma Bravo specifically identified RealPage's RMS, which it described as "a data analytics product that helps in decision making around pricing in rental units," as a key item in RealPage's software portfolio.[67]

**ANSWER TO PARAGRAPH 62:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 62 and denies them on that basis.

63. Thoma Bravo had RealPage "at the very top of [Thoma Bravo's] wish list" for nearly a decade,[68] and in November 2020, Thoma Bravo approached RealPage about a potential go-private transaction.[69] Thoma Bravo learned that Steve Winn, founder and then-CEO of

---

[62] Press Release, RealPage, Inc., Thoma Bravo Completes Acquisition of RealPage (Apr. 22, 2021), https ://www. real page. com/news/thoma-bravo-completes-acquisition-of-real page/ ("Merger Closing Press Release").
[63] RealPage 2020 Form 10-K, *supra* note 4.
[64] Scott Crabill, *Thoma Bravo Public-to-Private at RealPage*, YouTube (Oct. 3 2022). https://youtube/H1hzG4yby_g?si=zUmW21jnb-48q_5Kx, at 4:00.
[65] *Id*. at 18:00.
[66] *Id*. at 5:00.
[67] *Id*. at 6:00.
[68] *Id*. at 14:00.
[69] *Id.*

RealPage, was preparing to step back from the day-to-day control of RealPage. This succession planning was the "catalyst" of the transaction, and Thoma Bravo acquired RealPage aware that Thoma Bravo would be hiring a new leadership team.[70]

## ANSWER TO PARAGRAPH 63:

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 63 and denies them on that basis.

64.     During pre-transaction due diligence, Thoma Bravo "had [access to RealPage's] data" and was able to identify the sources of RealPage's growth with "100% confidence," while also validating that RealPage had a "95% plus" retention rate on a property-by-property basis.[71] Thoma Bravo's purchase of RealPage was announced in December 2020, and closed in April 2021.

## ANSWER TO PARAGRAPH 64:

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 64 and denies them on that basis.

65.     Both RealPage and Thoma Bravo anticipated Thoma Bravo would provide strategic guidance to RealPage post-acquisition. In the Merger Closing Press Release, Steve Winn, Chairman of the Board and CEO of RealPage, stated that "Thoma Bravo brings significant expertise from its deep experience with software companies, and together we are committed to helping our customers innovate, grow and serve the next generation of multifamily operators and residents."[72] Thoma Bravo Founder and Managing Partner Orlando Bravo added: "As a firm, we embrace these fundamental shifts in industries where software driven solutions are making meaningful advancements and we have the expertise and resources to help grow these capabilities at companies like RealPage. We believe our partnership can accelerate RealPage's momentum as it innovates on behalf of its customers."[73] Orlando Bravo provided further insight into Thoma Bravo's *modus operandi,* describing: "Our world is to do due diligence for two months, to get to know a company for 15 years, to get to know how the recurring revenue is doing, their net retention, gross retention, and really get to know management."[74]

---

[70] *Id.*

[71] *Id.* at 24:00. Crabill acknowledged that "20-30%" of large multifamily properties change ownership each year, a process he described as "churn." However, while the owner (or manager) of a particular property may change, Thoma Bravo was able to determine that the owner or manager change very rarely led to the property ceasing RealPage usage.

[72] Merger Closing Press Release, *supra note* 62.

[73] *Id.*

[74] Bloomberg Television, *Private Equity Secrets of Thoma Bravo's Billionaire Boss*, YouTube (June 30, 2021), https://www.youtube.com/watch?v=zN4emAH2ivo (at 6:16).

**ANSWER TO PARAGRAPH 65:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 65 and denies them on that basis.

66.     Thoma Bravo has carried through on those stated intentions and is actively involved in the day-to-day operations of RealPage, including selecting and approving acquisition targets for RealPage,[75] setting company policies,[76] and hiring top RealPage executives from other Thoma Bravo companies, including CEO Dana Jones and COO Vinit Doshi, both of whom were recruited from Thoma Bravo subsidiary Sparta Systems.[77] Thoma Bravo Operating Partner Charles Goodman is Chairman of RealPage's board of directors.[78]

**ANSWER TO PARAGRAPH 66:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 66 and denies them on that basis.

67.     Owner-Operator Defendant Apartment Income REIT Corp., d/b/a Air Communities ("AIR"), is a publicly traded real estate investment trust ("REIT") headquartered in Denver, Colorado.  AIR operates in at least the following regional submarkets: Atlanta, Boston, Chicago, Denver, Los Angeles, Miami, Minneapolis, Nashville, New York, Philadelphia, Providence, Raleigh, San Diego, San Francisco, San Jose, and Washington. AIR' s horizontal competitors and their agents from among the named Defendants in this litigation, include each "Owner," "Owner-Operator," and "Managing Defendant" that operates in the same regional submarkets as AIR.

**ANSWER TO PARAGRAPH 67:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 67 and denies them on that basis.

68.     During the Conspiracy Period, Defendant AIR entered a written contract, paid for, and used at least one RealPage RMS—YieldStar—to manage some or all of its more than 25,000 multifamily rental units nationwide, knowing that doing so required it to share confidential, competitively sensitive pricing and lease information with its horizontal competitors in order to allow them to adjust their rental prices, and in turn, to allow AIR to benefit from its horizontal competitors' sensitive pricing and lease information before it set or adjusted

---

[75] Crabill, *supra* note 64, at 10:00 (Thoma Bravo made 4 tuck-in acquisitions in the 12 months after acquiring RealPage).

[76] *Id*. at 26:00 (describing some operational challenges Thoma Bravo has faced in the first 12 months as it tries to "drive . . . operational efficiencies" at RealPage).

[77] *Id*. at 32:00 — 35:00 (describing the process of hiring CEO Dana Jones and COO Vinit Doshi).

[78] Press Release, RealPage, Inc., RealPage Appoints Dana Jones as Chief Executive Officer (June 29, 2021), https://www.realpage.com/news/realpage-appoints-dana-j ones-as-chief-executive- officer/.

33

its own rental prices. By agreeing to regularly share confidential, competitively sensitive pricing and lease information with horizontal competitors in order to allow them to adjust prices, AIR agreed to join a cartel with those horizontal competitors. The conspiracy resulted in higher prices for multifamily residential leases across the nation and in each submarket in which AIR operates. AIR would not have paid for RealPage's RMS pricing services unless: (1) doing so enabled it to set prices above a competitive level; and (2) it knew its competitors were, likewise, using RealPage RMS to set their rental prices in the submarkets in which it operated.

**ANSWER TO PARAGRAPH 68:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 68 and denies them on that basis.

69.    Owner-Operator Defendant Allied Orion Group, LLC ("Allied Orion") is a limited liability company headquartered in Houston, Texas, organized and existing under the laws of Texas. Allied Orion operates in at least the following regional submarkets: Austin, Dallas-Fort Worth, Denver, Houston, Orlando, and San Antonio. Allied Orion's horizontal competitors and their agents, from among the named Defendants in this litigation, include each "Owner" "Owner-Operator," and "Managing Defendant" that operates in the same regional submarkets as Allied Orion.

**ANSWER TO PARAGRAPH 69:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 69 and denies them on that basis.

70.    During the Conspiracy Period, Allied Orion entered a written contract, paid for, and used at least one RealPage RMS—LRO—to manage some or all of its more than 20,000 multifamily rental units nationwide, knowing that doing so required it to share confidential, competitively sensitive pricing and lease information with its horizontal competitors in order to allow them to adjust their rental prices, and in turn, to allow Allied Orion to benefit from its horizontal competitors' sensitive pricing and lease information before it set or adjusted its own rental prices. At a minimum, Allied Orion's President of Property Management Loyal Profitt is involved in implementing RealPage's RMS within Allied Orion. By agreeing to regularly share confidential, competitively sensitive pricing and lease information with horizontal competitors in order to allow them to adjust prices, Allied Orion agreed to join a cartel with those horizontal competitors. The conspiracy resulted in higher prices for multifamily residential leases across the nation and in each submarket in which Allied Orion operates. Allied Orion would not have paid for RealPage's RMS pricing services unless: (1) doing so enabled it to set prices above a competitive level; and (2) it knew its competitors were, likewise, using RealPage RMS to set their rental prices in the submarkets in which it operated.

**ANSWER TO PARAGRAPH 70:**

34

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 70 and denies them on that basis.

71.     Managing Defendant Apartment Management Consultants, LLC ("AMC") is a Utah limited liability corporation headquartered in Sandy, Utah.  AMC is the sixth largest apartment management company in the United States, operating in at least the following regional submarkets: Atlanta, Austin, Birmingham, Charlotte, Chicago, Cleveland, Columbus, Dallas-Fort Worth, Denver, Houston, Jacksonville, Kansas City, Las Vegas, Los Angeles, Louisville, New Orleans, Oklahoma City, Orlando, Phoenix, Portland, Raleigh, Sacramento, Salt Lake City, San Antonio, San Diego, San Francisco, San Jose, Seattle, and Tucson.  AMC's horizontal competitors and their agents, from among the named Defendants in this litigation, include each "Owner," "Owner-Operator," and "Managing Defendant" that operates in the same regional submarkets as AMC.

## ANSWER TO PARAGRAPH 71:

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 71 and denies them on that basis.

72.     During the Conspiracy Period, AMC entered a written contract, paid for, and used at least one RealPage RMS—YieldStar—to manage some or all of its more than 90,000 multifamily rental units across the country, knowing that doing so required it to share confidential, competitively sensitive pricing and lease information with its horizontal competitors in order to allow them to adjust their rental prices, and in turn, to allow AMC to benefit from its horizontal competitors' sensitive pricing and lease information before it set or adjusted its own rental prices.  At a minimum, AMC's Regional Property Manager, Ashley Campbell, is involved in implementing RealPage's RMS within AMC.  By agreeing to regularly share confidential, competitively sensitive pricing and lease information with horizontal competitors in order to allow them to adjust prices, AMC agreed to join a cartel with those horizontal competitors.  The conspiracy resulted in higher prices for multifamily residential leases across the nation and in each submarket in which AMC operates.  AMC would not have paid for RealPage's RMS pricing services unless: (1) doing so enabled it to set prices above a competitive level; and (2) it knew its competitors were, likewise, using RealPage RMS to set their rental prices in the submarkets in which it operated.

## ANSWER TO PARAGRAPH 72:

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 72 and denies them on that basis.

73.     Managing Defendant Avenue5 Residential, LLC ("Avenue5") is a limited liability company headquartered in Seattle, Washington, organized and existing under the laws of Delaware.  Avenue5 operates in at least the following regional submarkets: Atlanta, Austin,

Baltimore, Charlotte, Dallas-Fort Worth, Denver, Houston, Las Vegas, Los Angeles, Philadelphia, Phoenix, Portland, Raleigh, Sacramento, Salt Lake City, San Antonio, San Diego, San Jose, Seattle, Tampa, Tucson, and Washington. From among the named Defendants in this litigation, Avenue5's horizontal competitors and their agents include each "Owner," "Owner-Operator," and "Managing Defendant" that operates in the same regional submarkets as Avenue5.

**ANSWER TO PARAGRAPH 73:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 73 and denies them on that basis.

74. During the Conspiracy Period, Avenue5 entered a written contract, paid for, and used at least one RealPage RMS—YieldStar—to manage some or all of its over 86,000 rental units, knowing that doing so required it to share confidential, competitively sensitive pricing and lease information with its horizontal competitors in order to allow them to adjust their rental prices, and in turn, to allow Avenue5 to benefit from its horizontal competitors' sensitive pricing and lease information before it set or adjusted its own rental prices. At a minimum, Avenue5's Chief Administrative Officer, Marysusan Wanich, is involved in implementing RealPage' s RMS within Avenue5.

**ANSWER TO PARAGRAPH 74:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 74 and denies them on that basis.

75. By agreeing to regularly share confidential, competitively sensitive pricing and lease information with horizontal competitors in order to allow them to adjust prices, Avenue5 agreed to join a cartel with those horizontal competitors. The conspiracy resulted in higher prices for multifamily residential leases across the nation and in each submarket in which Avenue5 operates. Avenue5 would not have paid for RealPage's RMS pricing services unless: (1) doing so enabled it to set prices above a competitive level; and (2) it knew its competitors were, likewise, using RealPage RMS to set their rental prices in the submarkets in which it operated.

**ANSWER TO PARAGRAPH 75:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 75 and denies them on that basis.

76. Owner-Operator Defendant Bell Partners, Inc. ("Bell Partners") is a corporation headquartered in Greensboro, North Carolina, organized and existing under the laws of North Carolina. Bell Partners operates in at least the following regional submarkets: Atlanta, Austin, Baltimore, Boston, Charlotte, Dallas-Fort Worth, Denver, Jacksonville,

Los Angeles, Orlando, Raleigh, San Antonio, San Diego, San Francisco, Seattle, Tampa., Washington, and Wilmington. From among the named Defendants in this litigation, Bell Partner's horizontal competitors and their agents include each "Owner," "Owner-Operator," and "Managing Defendant" that operates in the same regional submarkets as Bell Partners.

**ANSWER TO PARAGRAPH 76:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 76 and denies them on that basis.

77.    During the Conspiracy Period, Bell Partners entered a written contract, paid for, and used at least two RealPage RMS—YieldStar and LRO—to manage some or all of its approximately 69,000 multifamily rental units nationwide, knowing that doing so required it to share confidential, competitively sensitive pricing and lease information with its horizontal competitors in order to allow them to adjust their rental prices, and in turn, to allow Bell Partners to benefit from its horizontal competitors' sensitive pricing and lease information before it set or adjusted its own rental prices. At a minimum, Bell Partners' VP of Operations, Tracey Whitson, and former SVP of Business Intelligence, Jay Denton, were and/or are involved in implementing RealPage's RMS within Bell Partners.

**ANSWER TO PARAGRAPH 77:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 77 and denies them on that basis.

78.    By agreeing to regularly share confidential, competitively sensitive pricing and lease information with horizontal competitors in order to allow them to adjust prices, Bell Partners agreed to join a cartel with those horizontal competitors. The conspiracy resulted in higher prices for multifamily residential leases across the nation and in each submarket in which Bell Partners operates. Bell Partners would not have paid for RealPage's RMS pricing services unless: (1) doing so enabled it to set prices above a competitive level; and (2) it knew its competitors were, likewise, using RealPage RMS to set their rental prices in the submarkets in which it operated.

**ANSWER TO PARAGRAPH 78:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 78 and denies them on that basis.

79.    Owner-Operator Defendant BH Management Services, LLC ("BH") is a limited liability company headquartered in Des Moines, Iowa, organized and existing under the laws of Iowa. BH operates in at least the following regional submarkets: Atlanta, Austin, Birmingham, Charlotte, Chicago, Cincinnati, Columbus, Dallas-Fort Worth, Denver,

Houston, Indianapolis, Jacksonville, Kansas City, Las Vegas, Louisville, Memphis, Minneapolis, Miami, Nashville, New Orleans, Orlando, Phoenix, Raleigh, Richmond, Saint Louis, San Antonio, Tampa, and Washington. From among the named Defendants in this litigation, BH's horizontal competitors and their agents include each "Owner," "Owner-Operator," and "Managing Defendant" that operates in the same regional submarkets as BH.

## ANSWER TO PARAGRAPH 79:

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 79 and denies them on that basis.

80. During the Conspiracy Period, BH entered a written contract, paid for, and used at least one RealPage RMS—YieldStar—to manage some or all of its more than 106,000 apartments nationally, including approximately five properties in the Greater Nashville Metro Area. BH did so knowing that use of Yieldstar required it to share confidential, competitively sensitive pricing and lease information with its horizontal competitors in order to allow them to adjust their rental prices, and in turn, to allow BH to benefit from its horizontal competitors' sensitive pricing and lease information before it set or adjusted its own rental prices. At a minimum, BH's Chief Data Officer, Brandy Daniel, and Director of Performance Strategy, Sierra Garza, are involved in implementing RealPage's RMS within BH.

## ANSWER TO PARAGRAPH 80:

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 80 and denies them on that basis.

81. By agreeing to regularly share confidential, competitively sensitive pricing and lease information with horizontal competitors in order to allow them to adjust prices, BH agreed to join a cartel with those horizontal competitors. The conspiracy resulted in higher prices for multifamily residential leases across the nation and in each submarket in which BH operates. BH would not have paid for RealPage's RMS pricing services unless: 1) doing so enabled it to set prices above a competitive level; and (2) it knew its competitors were, likewise, using RealPage RMS to set their rental prices in the submarkets in which it operated.

## ANSWER TO PARAGRAPH 81:

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 81 and denies them on that basis.

82. Managing Defendant Bozzuto Management Company ("Bozzuto") is a corporation headquartered in Greenbelt, Maryland, organized and existing under the laws of Maryland.

Bozzuto is the thirteenth largest manager of multifamily rental real estate in the United States with over 83,000 multifamily units under management in 12 states. Bozzuto operates in at least the following regional submarkets: Atlanta, Baltimore, Boston, Charlotte, Chicago, Hartford, Los Angeles, Miami, Milwaukee, Nashville, New York, Philadelphia, Pittsburgh, Providence, San Jose, Seattle, Tampa, and Washington. From among the named Defendants in this litigation, Bozzuto's horizontal competitors and their agents include each "Owner," "Owner-Operator," and "Managing Defendant" that operates in the same regional submarkets as Bozzuto.

## ANSWER TO PARAGRAPH 82:

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 82 and denies them on that basis.

83.     During the Conspiracy Period, Bozzuto entered a written contract, paid for, and used at least one RealPage RMS—YieldStar—to manage some or all of its over 83,000 units nationwide, knowing that doing so required it to share confidential, competitively sensitive pricing and lease information with its horizontal competitors in order to allow them to adjust their rental prices, and in turn, to allow Defendant Bozzuto to benefit from its horizontal competitors' sensitive pricing and lease information before it set or adjusted its own rental prices. At a minimum, Bozzuto's Property Manager, Michael Jalil, is involved in implementing RealPage's RMS within Bozzuto. By agreeing to regularly share confidential, competitively sensitive pricing and lease information with horizontal competitors in order to allow them to adjust prices, Bozzuto agreed to join a cartel with those horizontal competitors. The conspiracy resulted in higher prices for multifamily residential leases across the nation and in each submarket in which Bozzuto operates. Bozzuto would not have paid for RealPage's RMS pricing services unless: (1) doing so enabled it to set prices above a competitive level; and (2) it knew its competitors were, likewise, using RealPage RMS to set their rental prices in the submarkets in which it operated.

## ANSWER TO PARAGRAPH 83:

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 83 and denies them on that basis.

84.     Owner-Operator Defendant Brookfield Properties Multifamily LLC ("Brookfield") is a Delaware limited liability company headquartered in New York, New York. Brookfield operates in at least the following regional submarkets: Baltimore, Boston, Chicago, Cleveland, Dallas-Fort Worth, Denver, Detroit, Houston, Los Angeles, Milwaukee, Nashville, New York, Orlando, Philadelphia, Pittsburgh, Portland, Richmond, San Diego, San Francisco, San Jose, Washington, and Wilmington. From among the named Defendants in this litigation, Brookfield's horizontal competitors and their agents include each "Owner," "Owner-Operator," and "Managing Defendant" that operates in the same regional submarkets as Brookfield.

**ANSWER TO PARAGRAPH 84:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 84 and denies them on that basis.

85. During the Conspiracy Period, Brookfield entered a written contract, paid for, and used at least one RealPage RMS—LRO—to manage some or all of its over 27,000 multifamily rental units throughout the United States, knowing that doing so required it to share confidential, competitively sensitive pricing and lease information with its horizontal competitors in order to allow them to adjust their rental prices, and in turn, to allow Defendant Brookfield to benefit from its horizontal competitors' sensitive pricing and lease information before it set or adjusted its own rental prices. At a minimum, Brookfield's VP of Revenue Management, Michael Lilly, and Executive Vice President, Annie McCulloh, are involved in implementing RealPage' s RMS within Brookfield.

**ANSWER TO PARAGRAPH 85:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 85 and denies them on that basis.

86. By agreeing to regularly share confidential, competitively sensitive pricing and lease information with horizontal competitors in order to allow them to adjust prices, Brookfield agreed to join a cartel with those horizontal competitors. The conspiracy resulted in higher prices for multifamily residential leases across the nation and in each submarket in which Brookfield operates. Brookfield would not have paid for RealPage's RMS pricing services unless: (1) doing so enabled it to set prices above a competitive level; and (2) it knew its competitors were, likewise, using RealPage RMS to set their rental prices in the submarkets in which it operated.

**ANSWER TO PARAGRAPH 86:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 86 and denies them on that basis.

87. Owner-Operator Defendant Camden Property Trust ("Camden") is a real estate investment trust headquartered in Houston, Texas, organized and existing under the laws of Texas. Camden operates in at least the following regional submarkets: Atlanta, Austin, Charlotte, Dallas-Fort Worth, Denver, Houston, Los Angeles, Miami, Nashville, Orlando, Phoenix, Raleigh, San Diego, Tampa, and Washington. From among the named Defendants in this litigation, Camden's horizontal competitors and their agents include each "Owner," "Owner-Operator," and "Managing Defendant" that operates in the same regional submarkets as Camden.

**ANSWER TO PARAGRAPH 87:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 87 and denies them on that basis.

88. During the Conspiracy Period, Camden entered a written contract, paid for, and used at least two RealPage RMS—YieldStar and AIRM—to manage some or all of its over 58,000 rental units, including approximately two properties in the Greater Nashville Metro Area. Camden did so knowing that use of Yieldstar and AIRM required it to share confidential, competitively sensitive pricing and lease information with its horizontal competitors in order to allow them to adjust their rental prices, and in turn, to allow Defendant Camden to benefit from its horizontal competitors' sensitive pricing and lease information before it set or adjusted its own rental prices. At a minimum, Camden's VP of Revenue Management, James Flick, and Revenue Manager, Wandy Martinez, are involved in implementing RealPage's RMS within Camden.

**ANSWER TO PARAGRAPH 88:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 88 and denies them on that basis.

89. By agreeing to regularly share confidential, competitively sensitive pricing and lease information with horizontal competitors in order to allow them to adjust prices, Camden agreed to join a cartel with those horizontal competitors. The conspiracy resulted in higher prices for multifamily residential leases across the nation and in each submarket in which Camden operates. Camden would not have paid for RealPage's RMS pricing services unless: (1) doing so enabled it to set prices above a competitive level; and (2) it knew its competitors were, likewise, using RealPage RMS to set their rental prices in the submarkets in which it operated.

**ANSWER TO PARAGRAPH 89:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 89 and denies them on that basis.

90. Owner-Operator Defendant CH Real Estate Services, LLC ("Carter-Haston") is Delaware limited liability corporation headquartered in Nashville, Tennessee. It is a privately owned real estate firm involved in real estate investment, property management, and leasing worldwide. Carter-Haston operates in at least the following regional submarkets: Atlanta, Birmingham, Charlotte, Dallas-Fort Worth, Indianapolis, Miami, Nashville, Orlando, Saint Louis, and Tampa. From among the named Defendants in this litigation, Carter-Haston's horizontal competitors and their agents include each "Owner," "Owner-Operator," and "Managing Defendant" that operates in the same regional submarkets as Carter-Haston.

**ANSWER TO PARAGRAPH 90:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 90 and denies them on that basis.

91.    During the Conspiracy Period, Carter-Haston entered a written contract, paid for, and used at least one RealPage RMS—YieldStar—to manage some or all of its approximately 21,000 multifamily rental units in the United States, knowing that doing so required it to share confidential, competitively sensitive pricing and lease information with its horizontal competitors in order to allow them to adjust their rental prices, and in turn, to allow Defendant Carter-Haston to benefit from its horizontal competitors' sensitive pricing and lease information before it set or adjusted its own rental prices. At a minimum, Carter-Haston's Vice President of Revenue Management, Ashleigh Von Einem, and former Revenue Manager, Wesley Jones, were and/or are involved in implementing RealPage's RMS within Carter-Haston.

## ANSWER TO PARAGRAPH 91:

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 91 and denies them on that basis.

92.    By agreeing to regularly share confidential, competitively sensitive pricing and lease information with horizontal competitors in order to allow them to adjust prices, Carter-Haston agreed to join a cartel with those horizontal competitors. The conspiracy resulted in higher prices for multifamily residential leases across the nation and in each submarket in which Carter-Haston operates. Carter-Haston would not have paid for RealPage's RMS pricing services unless: (1) doing so enabled it to set prices above a competitive level; and (2) it knew its competitors were, likewise, using RealPage RMS to set their rental prices in the submarkets in which it operated.

## ANSWER TO PARAGRAPH 92:

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 92 and denies them on that basis.

93.    Owner-Operator Defendant CONAM Management Corporation ("CONAM") is a California corporation headquartered in San Diego, California. CONAM is the one of the largest managers of multifamily rental real estate in the United States. CONAM operates in at least the following regional submarkets: Atlanta, Austin, Dallas-Fort Worth, Denver, Jacksonville, Las Vegas, Los Angeles, Orlando, Phoenix, Portland, Sacramento, San Antonio, San Diego, Seattle, Tampa, and Tucson. From among the named Defendants in this litigation, CONAM's horizontal competitors and their agents include each "Owner," "Owner-Operator," and "Managing Defendant" that operates in the same regional submarkets as CONAM.

## ANSWER TO PARAGRAPH 93:

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 93 and denies them on that basis.

94. During the Conspiracy Period, CONAM entered a written contract, paid for, and used at least two RealPage RMS—YieldStar and LRO—to manage some or all of its more than 51,000 multifamily rental units, knowing that doing so required it to share confidential, competitively sensitive pricing and lease information with its horizontal competitors in order to allow them to adjust their rental prices, and in turn, to allow Defendant CONAM to benefit from its horizontal competitors' sensitive pricing and lease information before it set or adjusted its own rental prices. At a minimum, CONAM's Senior Revenue Manager, Zack Hollard, is involved in implementing RealPage's RMS within CONAM.

**ANSWER TO PARAGRAPH 94:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 94 and denies them on that basis.

95. By agreeing to regularly share confidential, competitively sensitive pricing and lease information with horizontal competitors in order to allow them to adjust prices, CONAM agreed to join a cartel with those horizontal competitors. The conspiracy resulted in higher prices for multifamily residential leases across the nation and in each submarket in which CONAM operates. CONAM would not have paid for RealPage's RMS pricing services unless: (1) doing so enabled it to set prices above a competitive level; and (2) it knew its competitors were, likewise, using RealPage RMS to set their rental prices in the submarkets in which it operated.

**ANSWER TO PARAGRAPH 95:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 95 and denies them on that basis.

96. Owner Defendant CONTI Texas Organization, Inc. d/b/a CONTI Capital ("CONTI") is a corporation headquartered in Dallas, Texas, organized and existing under the laws of Texas. CONTI operates in at least the following regional submarkets: Austin, Dallas-Fort Worth, Denver, Orlando, and Tampa. From among the named Defendants in this litigation, CONTI' s horizontal competitors and their agents include each "Owner," "Owner-Operator," and "Managing Defendant" that operates in the same regional submarkets as CONTI.

**ANSWER TO PARAGRAPH 96:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 96 and denies them on that basis.

97.     During the Conspiracy Period, CONTI entered into a written contract, paid for, and used, and/or directed its agents to enter into a written contract pay for, and use RealPage's RMS to manage some or all of its over 13,000 multifamily rental units in multiple states throughout the country, knowing that doing so required the properties it owned to share confidential, competitively sensitive pricing and lease information with its horizontal competitors in order to allow them to adjust their rental prices, and in turn, to allow Defendant CONTI to benefit from its horizontal competitors' sensitive pricing and lease information before it set or adjusted its own rental prices.

**ANSWER TO PARAGRAPH 97:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 97 and denies them on that basis.

98.     By agreeing to regularly share confidential, competitively sensitive pricing and lease information with horizontal competitors in order to allow them to adjust prices, CONTI agreed to join a cartel with those horizontal competitors. The conspiracy resulted in higher prices for multifamily residential leases across the nation and in each submarket in which CONTI operates. CONTI would not have paid for RealPage's RMS pricing services unless: (1) doing so enabled it to set prices above a competitive level; and (2) it knew its competitors were, likewise, using RealPage RMS to set their rental prices in the submarkets in which it operated.

**ANSWER TO PARAGRAPH 98:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 98 and denies them on that basis.

99.     Owner-Operator Defendant Cortland Management, LLC ("Cortland") is a limited liability company headquartered in Atlanta, Georgia, organized and existing under the laws of Georgia. Cortland operates in at least the following regional submarkets: Atlanta, Austin, Birmingham, Charlotte, Chicago, Columbus, Dallas-Fort Worth, Denver, Houston, Miami, Minneapolis, Nashville, Orlando, Phoenix, Raleigh, San Antonio, Tampa, Tucson, and Washington. From among the named Defendants in this litigation, Cortland's horizontal competitors and their agents include each "Owner," "Owner-Operator," and "Managing Defendant" that operates in the same regional submarkets as Cortland.

**ANSWER TO PARAGRAPH 99:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 99 and denies them on that basis.

100.    During the Conspiracy Period, Cortland entered a written contract, paid for, and used at least one RealPage RMS—YieldStar—to manage some or all of its more than 58,000

44

multifamily rental units nationwide, including approximately three properties in the Greater Nashville Metro Area. Cortland did so knowing that use of RealPage's RMS required it to share confidential, competitively sensitive pricing and lease information with its horizontal competitors in order to allow them to adjust their rental prices, and in turn, to allow Defendant Cortland to benefit from its horizontal competitors' sensitive pricing and lease information before it set or adjusted its own rental prices. At a minimum, Cortland's Chief Technology Officer, Scott Moore, Senior Director of Revenue Management, Kelly Nichols, and Project Manager, Jessica Sanders, are involved in implementing RealPage's RMS within Cortland.

**ANSWER TO PARAGRAPH 100:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 100 and denies them on that basis.

101. By agreeing to regularly share confidential, competitively sensitive pricing and lease information with horizontal competitors in order to allow them to adjust prices, Cortland agreed to join a cartel with those horizontal competitors. The conspiracy resulted in higher prices for multifamily residential leases across the nation and in each submarket in which Cortland operates. Cortland would not have paid for RealPage's RMS pricing services unless: (1) doing so enabled it to set prices above a competitive level; and (2) it knew its competitors were, likewise, using RealPage RMS to set their rental prices in the submarkets in which it operated.

**ANSWER TO PARAGRAPH 101:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 101 and denies them on that basis.

102. Owner-Operator Defendant CWS Apartment Homes LLC ("CWS") is a Delaware limited liability company headquartered in Austin, Texas. CWS is one of the largest owner-operated property managers of multifamily rental real estate in the United States. CWS operates in at least the following regional submarkets: Atlanta, Austin, Charlotte, Dallas-Fort Worth, Denver, Houston, Nashville, Phoenix, Raleigh, Sacramento, San Antonio, and Seattle. From among the named Defendants in this litigation, CWS's horizontal competitors and their agents include each "Owner," "Owner-Operator," and "Managing Defendant" that operates in the same regional submarkets as CWS.

**ANSWER TO PARAGRAPH 102:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 102 and denies them on that basis.

103. During the Conspiracy Period, CWS entered into a written contract, paid for, and used at least one RealPage RMS—YieldStar—to manage some or all of its more than 29,000 multifamily rental units throughout the United States, knowing that doing so required it to share confidential, competitively sensitive pricing and lease information with its horizontal competitors in order to allow them to adjust their rental prices, and in turn, to allow Defendant CWS to benefit from its horizontal competitors' sensitive pricing and lease information before it set or adjusted its own rental prices. At a minimum, CWS's Revenue Manager, Carol Cordell, is involved in implementing RealPage's RMS within CWS.

**ANSWER TO PARAGRAPH 103:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 103 and denies them on that basis.

104. By agreeing to regularly share confidential, competitively sensitive pricing and lease information with horizontal competitors in order to allow them to adjust prices, CWS agreed to join a cartel with those horizontal competitors. The conspiracy resulted in higher prices for multifamily residential leases across the nation and in each submarket in which CWS operates. CWS would not have paid for RealPage's RMS pricing services unless: (1) doing so enabled it to set prices above a competitive level; and (2) it knew its competitors were, likewise, using RealPage RMS to set their rental prices in the submarkets in which it operated.

**ANSWER TO PARAGRAPH 104:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 104 and denies them on that basis.

105. Owner-Operator Defendant Dayrise Residential, LLC ("Dayrise") is a limited liability company headquartered in Houston, Texas, organized and existing under the laws of Texas. Dayrise operates in at least the following regional submarkets: Atlanta, Austin, Charlotte, Chicago, Dallas-Fort Worth, Houston, San Antonio, and Tucson. From among the named Defendants in this litigation, Dayrise's horizontal competitors and their agents include each "Owner," "Owner-Operator," and "Managing Defendant" that operates in the same regional submarkets as Dayrise.

**ANSWER TO PARAGRAPH 105:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 105 and denies them on that basis.

106. During the Conspiracy Period, Dayrise entered into a written contract, paid for, and used at least one RealPage RMS—YieldStar—to manage some or all of its 81 multifamily rental properties nationwide, knowing that doing so required it to share confidential,

competitively sensitive pricing and lease information with its horizontal competitors in order to allow them to adjust their rental prices, and in turn, to allow Defendant Dayrise to benefit from its horizontal competitors' sensitive pricing and lease information before it set or adjusted its own rental prices. At a minimum, Dayrise's Senior Director of Marketing, Courtney Bastian, is involved in implementing RealPage's RMS within Dayrise.

## ANSWER TO PARAGRAPH 106:

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 106 and denies them on that basis.

107. By agreeing to regularly share confidential, competitively sensitive pricing and lease information with horizontal competitors in order to allow them to adjust prices, Dayrise agreed to join a cartel with those horizontal competitors. The conspiracy resulted in higher prices for multifamily residential leases across the nation and in each submarket in which Dayrise operates. Dayrise would not have paid for RealPage's RMS pricing services unless: (1) doing so enabled it to set prices above a competitive level; and (2) it knew its competitors were, likewise, using RealPage RMS to set their rental prices in the submarkets in which it operated.

## ANSWER TO PARAGRAPH 107:

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 107 and denies them on that basis.

108. Owner-Operator Defendant ECI Group, Inc. ("ECI") is a Georgia corporation with its principal place of business in Atlanta, Georgia. Defendant ECI manages over 5,000 multifamily rental units in various states throughout the United States. ECI operates in at least the following regional submarkets: Atlanta, Houston, Nashville, Orlando, and Tampa. From among the named Defendants in this litigation, ECI's horizontal competitors and their agents include each "Owner," "Owner-Operator," and "Managing Defendant" that operates in the same regional submarkets as ECI.

## ANSWER TO PARAGRAPH 108:

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 108 and denies them on that basis.

109. During the Conspiracy Period, ECI entered into a written contract, paid for, and used at least one RealPage RMS—LRO—to manage some or all of the multifamily rental units under its management, knowing that doing so required it to share confidential, competitively sensitive pricing and lease information with its horizontal competitors in order to allow them to adjust their rental prices, and in turn, to allow Defendant ECI to

benefit from its horizontal competitors' sensitive pricing and lease information before it set or adjusted its own rental prices. At a minimum, ECI's Vice President of Revenue Management and Systems Support, Emily Mask, is involved in implementing RealPage's RMS within ECI.

**ANSWER TO PARAGRAPH 109:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 109 and denies them on that basis.

110. By agreeing to regularly share confidential, competitively sensitive pricing and lease information with horizontal competitors in order to allow them to adjust prices, ECI agreed to join a cartel with those horizontal competitors. The conspiracy resulted in higher prices for multifamily residential leases across the nation and in each submarket in which ECI operates. ECI would not have paid for RealPage's RMS pricing services unless: (1) doing so enabled it to set prices above a competitive level; and (2) it knew its competitors were, likewise, using RealPage RMS to set their rental prices in the submarkets in which it operated.

**ANSWER TO PARAGRAPH 110:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 110 and denies them on that basis.

111. Owner-Operator Defendant Equity Residential ("Equity") is a real estate investment trust headquartered in Chicago, Illinois, organized and existing under the laws of Maryland. Equity operates in at least the following regional submarkets: Atlanta, Austin, Boston, Dallas-Fort Worth, Denver, Los Angeles, New York, San Diego, San Francisco, San Jose, Seattle, and Washington. From among the named Defendants in this litigation, Equity's horizontal competitors and their agents include each "Owner," "Owner-Operator," and "Managing Defendant" that operates in the same regional submarkets as Equity.

**ANSWER TO PARAGRAPH 111:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 111 and denies them on that basis.

112. During the Conspiracy Period, Equity entered into a written contract, paid for, and used at least two RealPage RMS—YieldStar and LRO—to manage some or all of its more than 80,000 multifamily rental units nationwide, knowing that doing so required it to share confidential, competitively sensitive pricing and lease information with its horizontal competitors in order to allow them to adjust their rental prices, and in turn, to allow Defendant Equity to benefit from its horizontal competitors' sensitive pricing and lease

48

information before it set or adjusted its own rental prices. At a minimum, Equity's Revenue Manager, Brent Pender, is involved in implementing RealPage's RMS within Equity.

**ANSWER TO PARAGRAPH 112:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 112 and denies them on that basis.

113. By agreeing to regularly share confidential, competitively sensitive pricing and lease information with horizontal competitors in order to allow them to adjust prices, Equity agreed to join a cartel with those horizontal competitors. The conspiracy resulted in higher prices for multifamily residential leases across the nation and in each submarket in which Equity operates. Equity would not have paid for RealPage's RMS pricing services unless: (1) doing so enabled it to set prices above a competitive level; and (2) it knew its competitors were, likewise, using RealPage RMS to set their rental prices in the submarkets in which it operated.

**ANSWER TO PARAGRAPH 113:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 113 and denies them on that basis.

114. Owner-Operator Defendant Essex Property Trust, Inc. ("Essex") is a Maryland corporation headquartered in San Mateo, California. Essex is the twenty-fourth largest manager of multifamily rental real estate in the United States, with over 61,00 units under management in California and Washington. Essex operates in at least the following regional submarkets: Los Angeles, San Diego, San Francisco, San Jose, and Seattle. From among the named Defendants in this litigation, Essex's horizontal competitors and their agents include each "Owner," "Owner-Operator," and "Managing Defendant" that operates in the same regional submarkets as Essex.

**ANSWER TO PARAGRAPH 114:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 114 and denies them on that basis.

115. During the Conspiracy Period, Essex entered into a written contract, paid for, and used at least one RealPage RMS—YieldStar—to manage some or all of its nearly 10,000 multifamily rental units nationwide, knowing that doing so required it to share confidential, competitively sensitive pricing and lease information with its horizontal competitors in order to allow them to adjust their rental prices, and in turn, to allow Defendant Essex to benefit from its horizontal competitors' sensitive pricing and lease information before it set or adjusted its own rental prices. At a minimum, Essex's Vice President of Marketing

& Revenue Management, Joyce Chen, and Revenue Manager Luke Dean, are and/or were involved in implementing RealPage's RMS within Essex during the Conspiracy Period.

**ANSWER TO PARAGRAPH 115:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 115 and denies them on that basis.

116. By agreeing to regularly share confidential, competitively sensitive pricing and lease information with horizontal competitors in order to allow them to adjust prices, Essex agreed to join a cartel with those horizontal competitors. The conspiracy resulted in higher prices for multifamily residential leases across the nation and in each submarket in which Essex operates. Essex would not have paid for RealPage's RMS pricing services unless: (1) doing so enabled it to set prices above a competitive level; and (2) it knew its competitors were, likewise, using RealPage RMS to set their rental prices in the submarkets in which it operated.

**ANSWER TO PARAGRAPH 116:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 116 and denies them on that basis.

117. Managing Defendant First Communities Management, Inc. ("First Communities") is a corporation headquartered in Atlanta, Georgia, organized and existing under the laws of the State of Georgia. Defendant First Communities has managed over 200,000 multifamily rental units throughout the United States spanning 1,200 apartment communities, including over 140 properties with over 30,000 multifamily rental units currently under its management. First Communities operates in at least the following regional submarkets: Atlanta, Austin, Birmingham, Charlotte, Dallas-Fort Worth, Houston, Jacksonville, Kansas City, Louisville, Nashville, Orlando, Raleigh, San Antonio, Tampa, Washington, and Wilmington. From among the named Defendants in this litigation, First Communities' horizontal competitors and their agents include each "Owner," "Owner-Operator," and "Managing Defendant" that operates in the same regional submarkets as First Communities.

**ANSWER TO PARAGRAPH 117:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 117 and denies them on that basis.

118. During the Conspiracy Period, Defendant First Communities entered into a written contract, paid for, and used at least one RealPage's RMS—YieldStar—to manage some or all of its multifamily rental units throughout the United States, knowing that doing so required it to share confidential, competitively sensitive pricing and lease information with

its horizontal competitors in order to allow them to adjust their rental prices, and in turn, to allow Defendant First Communities to benefit from its horizontal competitors' sensitive pricing and lease information before it set or adjusted its own rental prices.

**ANSWER TO PARAGRAPH 118:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 118 and denies them on that basis.

119.  By agreeing to regularly share confidential, competitively sensitive pricing and lease information with horizontal competitors in order to allow them to adjust prices, First Communities agreed to join a cartel with those horizontal competitors. The conspiracy resulted in higher prices for multifamily residential leases across the nation and in each submarket in which First Communities operates. First Communities would not have paid for RealPage's RMS pricing services unless: (1) doing so enabled it to set prices above a competitive level; and (2) it knew its competitors were, likewise, using RealPage RMS to set their rental prices in the submarkets in which it operated.

**ANSWER TO PARAGRAPH 119:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 119 and denies them on that basis.

120.  Managing Defendant FPI Management, Inc. ("FPI Management") is a corporation headquartered in Folsom, California, organized and existing under the laws of California. FPI Management operates in at least the following regional submarkets: Atlanta, Austin, Dallas-Fort Worth, Denver, Houston, Inland Empire, Jacksonville, Las Vegas, Los Angeles, Miami, New Orleans, Phoenix, Portland, Sacramento, San Antonio, San Diego, San Francisco, San Jose, and Seattle. From among the named Defendants in this litigation, FPI Management's horizontal competitors and their agents include each "Owner," "Owner-Operator" and "Managing Defendant" that operates in the same regional submarkets as FPI Management.

**ANSWER TO PARAGRAPH 120:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 120 and denies them on that basis.

121.  for During the Conspiracy Period, FPI Management entered into a written contract, paid for, and used at least two RealPage RMS—YieldStar and LRO—to manage some or all of its more than 140,000 multifamily rental units nationwide, knowing that doing so required it to share confidential, competitively sensitive pricing and lease information with its horizontal competitors in order to allow them to adjust their rental prices, and in turn, to allow Defendant FPI to benefit from its horizontal competitors' sensitive pricing and lease

51

information before it set or adjusted its own rental prices.  At a minimum, FPI Management VP of Operations, Angela Boyd, is involved in implementing RealPage RMS within FPI Management.

**ANSWER TO PARAGRAPH 121:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 121 and denies them on that basis.

122.    By agreeing to regularly share confidential, competitively sensitive pricing and lease information with horizontal competitors in order to allow them to adjust prices, FPI Management agreed to join a cartel with those horizontal competitors.  The conspiracy resulted in higher prices for multifamily residential leases across the nation and in each submarket in which FPI Management operates. FPI Management would not have paid for RealPage's RMS pricing services unless: (1) doing so enabled it to set prices above a competitive level; and (2) it knew its competitors were, likewise, using RealPage RMS to set their rental prices in the submarkets in which it operated.

**ANSWER TO PARAGRAPH 122:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 122 and denies them on that basis.

123.    Owner-Operator Defendant Greystar Management Services, LLC ("Greystar") is a limited liability company headquartered in Charleston, South Carolina, organized and existing under the laws of Delaware. Greystar is by far the largest manager of residential rental apartments in the country. Greystar operates in at least the following regional submarkets: Atlanta, Austin, Baltimore, Birmingham, Boston, Charlotte, Chicago, Cincinnati, Cleveland, Dallas-Fort Worth, Denver, Detroit, Hartford, Houston, Indianapolis, Jacksonville, Kansas City, Las Vegas, Los Angeles, Louisville, Memphis, Miami, Milwaukee, Minneapolis, Nashville, New Orleans, New York, Norfolk, Oklahoma City, Orlando, Philadelphia, Phoenix, Pittsburgh, Portland, Providence, Raleigh, Richmond, Sacramento, Saint Louis, Salt Lake City, San Antonio, San Diego, San Francisco, San Jose, Seattle, Tampa, Tucson, Washington, and Wilmington. From among the named Defendants in this litigation, Greystar's horizontal competitors and their agents include each "Owner," "Owner-Operator," and "Managing Defendant" that operates in the same regional submarkets as Greystar.

**ANSWER TO PARAGRAPH 123:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 123 and denies them on that basis.

124.   During the Conspiracy Period, Greystar entered into a written contract, paid for, and used at least three RealPage RMS—YieldStar, LRO, and AIRM—to manage some or all of its more than 698,000 multifamily rental units throughout the United States, including those within its approximately 21 properties in the Greater Nashville Metro Area. Greystar did so knowing that Yieldstar, LRO, and AIRM required it to share confidential, competitively sensitive pricing and lease information with its horizontal competitors in order to allow them to adjust their rental prices, and in turn, to allow Defendant Greystar to benefit from its horizontal competitors' sensitive pricing and lease information before it set or adjusted its own rental prices. At a minimum, Greystar's Director of Revenue Management, Teri Greene, and Manager of Revenue Management Implementation, Stephanie Bishop, are involved in implementing RealPage's RMS within Greystar.

**ANSWER TO PARAGRAPH 124:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 124 and denies them on that basis.

125.   By agreeing to regularly share confidential, competitively sensitive pricing and lease information with horizontal competitors in order to allow them to adjust prices, Greystar agreed to join a cartel with those horizontal competitors. The conspiracy resulted in higher prices for multifamily residential leases across the nation and in each submarket in which Greystar operates. Greystar would not have paid for RealPage's RMS pricing services unless: (1) doing so enabled it to set prices above a competitive level; and (2) it knew its competitors were, likewise, using RealPage RMS to set their rental prices in the submarkets in which it operated.

**ANSWER TO PARAGRAPH 125:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 125 and denies them on that basis.

126.   Managing Defendant Highmark Residential, LLC ("Highmark") is a limited liability company headquartered in Dallas, Texas, organized and existing under the laws of Delaware. Highmark operates in at least the following regional submarkets: Atlanta, Austin, Charlotte, Dallas-Fort Worth, Denver, Houston, Indianapolis, Jacksonville, Louisville, Memphis, Miami, Nashville, Orlando, Philadelphia, Phoenix, Raleigh, Richmond, Salt Lake City, San Antonio, Tampa, Tucson, Washington, and Wilmington. From among the named Defendants in this litigation, Highmark's horizontal competitors and their agents include each "Owner," "Owner-Operator," and "Managing Defendant" that operates in the same regional submarkets as Highmark.

**ANSWER TO PARAGRAPH 126:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 126 and denies them on that basis.

127. During the Conspiracy Period, Highmark entered into a written contract, paid for, and used at least one RealPage RMS—YieldStar—to manage some or all of its more than 79,000 multifamily rental units nationwide, including those within its approximately eight properties in the Greater Nashville Metro Area. Highmark did so knowing that use of Yieldstar required it to share confidential, competitively sensitive pricing and lease information with its horizontal competitors in order to allow them to adjust their rental prices, and in turn, to allow Defendant Highmark to benefit from its horizontal competitors' sensitive pricing and lease information before it set or adjusted its own rental prices. At a minimum, Highmark's Vice President of Revenue Management, Beck Weathers, Community Director, Milena Urbina, and former Systems Support Specialist, Carol Cline, were or are involved in implementing RealPage's RMS within Highmark.

**ANSWER TO PARAGRAPH 127:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 127 and denies them on that basis.

128. By agreeing to regularly share confidential, competitively sensitive pricing and lease information with horizontal competitors in order to allow them to adjust prices, Highmark agreed to join a cartel with those horizontal competitors. The conspiracy resulted in higher prices for multifamily residential leases across the nation and in each submarket in which Highmark operates. Highmark would not have paid for RealPage's RMS pricing services unless: (1) doing so enabled it to set prices above a competitive level; and (2) it knew its competitors were, likewise, using RealPage RMS to set their rental prices in the submarkets in which it operated.

**ANSWER TO PARAGRAPH 128:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 128 and denies them on that basis.

129. Owner-Operator Defendant Independence Realty Trust, Inc. ("IRT") is a real estate investment trust headquartered in Philadelphia, Pennsylvania, organized and existing under the laws of Maryland. IRT operates in at least the following regional submarkets: Atlanta, Austin, Birmingham, Charlotte, Chicago, Cincinnati, Columbus, Dallas-Fort Worth, Denver, Houston, Indianapolis, Louisville, Memphis, Nashville, Oklahoma City, Orlando, Raleigh, San Antonio, and Tampa. From among the named Defendants in this litigation, IRT's horizontal competitors and their agents include each "Owner," "Owner-Operator," and "Managing Defendant" that operates in the same regional submarkets as IRT.

**ANSWER TO PARAGRAPH 129:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 129 and denies them on that basis.

130. During the Conspiracy Period, IRT entered into a written contract, paid for, and used at least two RealPage RMS—YieldStar and LRO—to manage some or all of its more than 36,000 multifamily rental units, including approximately five properties in the Greater Nashville Metro area. IRT did so knowing that use of Yieldstar and LRO required it to share confidential, competitively sensitive pricing and lease information with its horizontal competitors in order to allow them to adjust their rental prices, and in turn, to allow Defendant IRT to benefit from its horizontal competitors' sensitive pricing and lease information before it set or adjusted its own rental prices. At a minimum, IRT's former Vice President of Revenue Management, America Melragon, was involved in implementing RealPage's RMS within IRT during the Conspiracy Period.

**ANSWER TO PARAGRAPH 130:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 130 and denies them on that basis.

131. By agreeing to regularly share confidential, competitively sensitive pricing and lease information with horizontal competitors in order to allow them to adjust prices, IRT agreed to join a cartel with those horizontal competitors. The conspiracy resulted in higher prices for multifamily residential leases across the nation and in each submarket in which IRT operates. IRT would not have paid for RealPage's RMS pricing services unless: (1) doing so enabled it to set prices above a competitive level; and (2) it knew its competitors were, likewise, using RealPage RMS to set their rental prices in the submarkets in which it operated.

**ANSWER TO PARAGRAPH 131:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 131 and denies them on that basis.

132. Owner-Operator Defendant Kairoi Management, LLC ("Kairoi") is a limited liability company headquartered in Dallas, Texas, organized and existing under the laws of Texas. Kairoi operates in at least the following regional submarkets: Austin, Dallas-Fort Worth, Denver, Houston, Salt Lake City, and San Antonio. From among the named Defendants in this litigation, Kairoi's horizontal competitors and their agents include each "Owner," "Owner-Operator," and "Managing Defendant" that operates in the same regional submarkets as Kairoi.

**ANSWER TO PARAGRAPH 132:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 132 and denies them on that basis.

133.    During the Conspiracy Period, Kairoi entered into a written contract, paid for, and used at
        least one RealPage RMS—YieldStar—to manage some or all of its more than 28,000
        multifamily rental units nationwide, knowing that doing so required it to share confidential,
        competitively sensitive pricing and lease information with its horizontal competitors in
        order to allow them to adjust their rental prices, and in turn, to allow Defendant Kairoi to
        benefit from its horizontal competitors' sensitive pricing and lease information before it
        set or adjusted its own rental prices.  At a minimum, Kairoi's "RealPage System
        Administrator," Dawn Walters, and current independent consultant/former Director of
        Revenue Management, Marla Moss, were or are involved in implementing RealPage's
        RMS within Kairoi.

**ANSWER TO PARAGRAPH 133:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 133 and denies them on that basis.

134.    By agreeing to regularly share confidential, competitively sensitive pricing and lease
        information with horizontal competitors in order to allow them to adjust prices, Kairoi
        agreed to join a cartel with those horizontal competitors.  The conspiracy resulted in higher
        prices for multifamily residential leases across the nation and in each submarket in which
        Kairoi operates. Kairoi would not have paid for RealPage's RMS pricing services unless:
        (1) doing so enabled it to set prices above a competitive level; and (2) it knew its
        competitors were, likewise, using RealPage RMS to set their rental prices in the submarkets
        in which it operated.

**ANSWER TO PARAGRAPH 134:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 134 and denies them on that basis.

135.    Owner-Operator Defendant Knightvest Residential ("Knightvest") is a limited liability
        company headquartered in Dallas, Texas, organized and existing under the laws of Texas.
        Knightvest operates in at least the following regional submarkets: Austin, Charlotte,
        Dallas-Fort Worth, Houston, Orlando, Phoenix, Raleigh, and San Antonio. From among
        the named Defendants in this litigation, Knightvest's horizontal competitors and their
        agents include each "Owner," "Owner-Operator," and "Managing Defendant" that
        operates in the same regional submarkets as Knightvest.

**ANSWER TO PARAGRAPH 135:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 135 and denies them on that basis.

136.    During the Conspiracy Period, Knightvest entered into a written contract, paid for, and used at least one RealPage RMS—YieldStar—to manage some or all of its more than 30,000 multifamily rental units nationwide, knowing that doing so required it to share confidential, competitively sensitive pricing and lease information with its horizontal competitors in order to allow them to adjust their rental prices, and in turn, to allow Defendant Knightvest to benefit from its horizontal competitors' sensitive pricing and lease information before it set or adjusted its own rental prices.  At a minimum, Knightvest's Residential Senior Luxury Leasing Consultant, Vanessa Aurelus, and Vice President of Operations Support, Allison Crawford, are involved in implementing RealPage's RMS within Knightvest.

**ANSWER TO PARAGRAPH 136:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 136 and denies them on that basis.

137.    By agreeing to regularly share confidential, competitively sensitive pricing and lease information with horizontal competitors in order to allow them to adjust prices, Knightvest agreed to join a cartel with those horizontal competitors.  The conspiracy resulted in higher prices for multifamily residential leases across the nation and in each submarket in which Knightvest operates.  Knightvest would not have paid for RealPage's RMS pricing services unless: (1) doing so enabled it to set prices above a competitive level; and (2) it knew its competitors were, likewise, using RealPage RMS to set their rental prices in the submarkets in which it operated.

**ANSWER TO PARAGRAPH 137:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 137 and denies them on that basis.

138.    Owner-Operator Defendant Lantower Luxury Living, LLC ("Lantower") is a limited liability company headquartered in Dallas, Texas, organized and existing under the laws of Delaware.   Lantower operates in at least the following regional submarkets: Austin, Charlotte, Dallas-Fort Worth, Miami, Orlando, Raleigh, and Tampa. From among the named Defendants in this litigation, Lantower's horizontal competitors and their agents include each "Owner," "Owner-Operator," and "Managing Defendant" that operates in the same regional submarkets as Lantower.

**ANSWER TO PARAGRAPH 138:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 138 and denies them on that basis.

139.    During the Conspiracy Period, Lantower entered into a written contract, paid for, and used at least one RealPage RMS—YieldStar—to manage some or all of its more than 3,800 multifamily rental units nationwide, knowing that doing so required it to share confidential, competitively sensitive pricing and lease information with its horizontal competitors in order to allow them to adjust their rental prices, and in turn, to allow Defendant Lantower to benefit from its horizontal competitors' sensitive pricing and lease information before it set or adjusted its own rental prices. At a minimum, Lantower's Revenue Manager, Laura Scales, is involved in implementing RealPage's RMS within Lantower.

## ANSWER TO PARAGRAPH 139:

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 139 and denies them on that basis.

140.    By agreeing to regularly share confidential, competitively sensitive pricing and lease information with horizontal competitors in order to allow them to adjust prices, Lantower agreed to join a cartel with those horizontal competitors. The conspiracy resulted in higher prices for multifamily residential leases across the nation and in each submarket in which Lantower operates. Lantower would not have paid for RealPage's RMS pricing services unless: (1) doing so enabled it to set prices above a competitive level; and (2) it knew its competitors were, likewise, using RealPage RMS to set their rental prices in the submarkets in which it operated.

## ANSWER TO PARAGRAPH 140:

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 140 and denies them on that basis.

141.    Owner-Operator Defendant Lincoln Property Company ("Lincoln") is a corporation headquartered in Dallas, Texas, organized and existing under the laws of Texas. Lincoln operates in at least the following regional submarkets: Atlanta, Austin, Baltimore, Birmingham, Boston, Charlotte, Chicago, Cleveland, Dallas-Fort Worth, Denver, Houston, Indianapolis, Jacksonville, Kansas City, Louisville, Miami, Milwaukee, Minneapolis, Nashville, New York, Orlando, Philadelphia, Phoenix, Pittsburgh, Portland, Providence, Raleigh, Saint Louis, San Antonio, Seattle, Tampa, Washington, and Wilmington. From among the named Defendants in this litigation, Lincoln's horizontal competitors and their agents include each "Owner," "Owner-Operator," and "Managing Defendant" that operates in the same regional submarkets as Lincoln.

**ANSWER TO PARAGRAPH 141:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 141 and denies them on that basis.

142. During the Conspiracy Period, Lincoln entered into a written contract, paid for, and used at least one RealPage RMS—YieldStar—to manage some or all of its more than 210,000 multifamily rental units, including approximately 31 properties in the Greater Nashville Metro Area. Lincoln did so knowing that use of YieldStar required it to share confidential, competitively sensitive pricing and lease information with its horizontal competitors in order to allow them to adjust their rental prices, and in turn, to allow Defendant Lincoln to benefit from its horizontal competitors' sensitive pricing and lease information before it set or adjusted its own rental prices. At a minimum, Lincoln's Vice President of Revenue Management, Michelle Artz, is involved in implementing RealPage's RMS within Lincoln.

**ANSWER TO PARAGRAPH 142:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 142 and denies them on that basis.

143. By agreeing to regularly share confidential, competitively sensitive pricing and lease information with horizontal competitors in order to allow them to adjust prices, Lincoln agreed to join a cartel with those horizontal competitors. The conspiracy resulted in higher prices for multifamily residential leases across the nation and in each submarket in which Lincoln operates. Lincoln would not have paid for RealPage's RMS pricing services unless: (1) doing so enabled it to set prices above a competitive level; and (2) it knew its competitors were, likewise, using RealPage RMS to set their rental prices in the submarkets in which it operated.

**ANSWER TO PARAGRAPH 143:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 143 and denies them on that basis.

144. Owner-Operator Defendant Mid-America Apartments, L.P., a limited partnership headquartered in Germantown, Tennessee, organized and existing under the laws of Tennessee, is a wholly owned subsidiary of Mid-America Apartment Communities, Inc., is a corporation headquartered in Germantown, Tennessee, organized and existing under the laws of Tennessee (both collectively, "MAA"). While Defendant MAA has represented that Mid-America Apartment Communities, Inc., is a holding company that does not itself own/operate multifamily rental housing, a review of MAA's property data consistently lists Mid-America Apartment Communities, Inc., as the "true owner" of the properties MAA manages. The coordinated activity of a parent and its wholly owned subsidiary must be viewed as that of a single enterprise for the purposes of § 1 of the

59

Sherman Act. As such, both MAA entities are actively involved in the conspiracy alleged herein. MAA operates in at least the following regional submarkets: Atlanta, Austin, Birmingham, Charlotte, Dallas-Fort Worth, Denver, Houston, Jacksonville, Kansa City, Las Vegas, Louisville, Memphis, Nashville, Orlando, Phoenix, Raleigh, Richmond, San Antonio, Tampa, and Washington. From among the named Defendants in this litigation, MAA's horizontal competitors and their agents include each "Owner," "Owner-Operator," and "Managing Defendant" that operates in the same regional submarkets as MAA.

## ANSWER TO PARAGRAPH 144:

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 144 and denies them on that basis.

145. During the Conspiracy Period, MAA entered into a written contract, paid for, and used at least two RealPage RMS—YieldStar and LRO—to manage some or all of its more than 100,000 multifamily rental units, including approximately 12 properties in the Greater Nashville Metro Area. MAA did so knowing that use of Yieldstar and LRO required it to share confidential, competitively sensitive pricing and lease information with its horizontal competitors in order to allow them to adjust their rental prices, and in turn, to allow Defendant MAA to benefit from its horizontal competitors' sensitive pricing and lease information before it set or adjusted its own rental prices. At a minimum, MAA's Director of Financial Planning and Analysis, Chris Lynn, and Director of Revenue Management, Bill Kiesel, are involved in implementing RealPage' s RMS within MAA.

## ANSWER TO PARAGRAPH 145:

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 145 and denies them on that basis.

146. By agreeing to regularly share confidential, competitively sensitive pricing and lease information with horizontal competitors in order to allow them to adjust prices, MAA agreed to join a cartel with those horizontal competitors. The conspiracy resulted in higher prices for multifamily residential leases across the nation and in each submarket in which MAA operates. MAA would not have paid for RealPage's RMS pricing services unless: (1) doing so enabled it to set prices above a competitive level; and (2) it knew its competitors were, likewise, using RealPage RMS to set their rental prices in the submarkets in which it operated.

## ANSWER TO PARAGRAPH 146:

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 146 and denies them on that basis.

60

147.     Managing Defendant Mission Rock Residential, LLC ("Mission Rock") is a Delaware limited liability company headquartered in Denver, Colorado. Mission Rock is one of the largest managers of multifamily rental real estate in the United States. Mission Rock operates in at least the following regional submarkets: Atlanta, Austin, Baltimore, Charlotte, Denver, Houston, Kansas City, Las Vegas, Nashville, Orlando, Phoenix, Portland, Saint Louis, Salt Lake City, San Antonio, San Francisco, Seattle, Tampa, Tucson, and Washington. From among the named Defendants in this litigation, Mission Rock's horizontal competitors and their agents include each "Owner," "Owner-Operator," and "Managing Defendant" that operates in the same regional submarkets as Mission Rock.

**ANSWER TO PARAGRAPH 147:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 147 and denies them on that basis.

148.     During the Conspiracy Period, Mission Rock entered into a written contract, paid for, and used at least one RealPage RMS—YieldStar—to manage some or all of its more than 29,000 multifamily rental units across the country, knowing that doing so required it to share confidential, competitively sensitive pricing and lease information with its horizontal competitors in order to allow them to adjust their rental prices, and in turn, to allow Defendant Mission Rock to benefit from its horizontal competitors' sensitive pricing and lease information before it set or adjusted its own rental prices. At a minimum, Mission Rock's Vice President of Learning and Development and former Director of Training, Anissa Fuas, Revenue Manager, Raven Bahamundi, and former Revenue Manager, David Snyder, are or were involved in implementing RealPage's RMS within Mission Rock.

**ANSWER TO PARAGRAPH 148:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 148 and denies them on that basis.

149.     By agreeing to regularly share confidential, competitively sensitive pricing and lease information with horizontal competitors in order to allow them to adjust prices, Mission Rock agreed to join a cartel with those horizontal competitors. The conspiracy resulted in higher prices for multifamily residential leases across the nation and in each submarket in which Mission Rock operates. Mission Rock would not have paid for RealPage's RMS pricing services unless: (1) doing so enabled it to set prices above a competitive level; and (2) it knew its competitors were, likewise, using RealPage RMS to set their rental prices in the submarkets in which it operated.

**ANSWER TO PARAGRAPH 149:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 149 and denies them on that basis.

150.    Owner-Operator Defendant Morgan Properties Management Company, LLC ("Morgan") is a Delaware limited liability company headquartered in King of Prussia, Pennsylvania. Morgan is the eleventh largest property manager of multifamily rental properties in the United States. Morgan operates in at least the following regional submarkets: Atlanta, Baltimore, Birmingham, Buffalo, Charlotte, Chicago, Cincinnati, Cleveland, Columbus, Dallas-Fort Worth, Detroit, Indianapolis, Jacksonville, Memphis, Nashville, New Orleans, New York, Philadelphia, Pittsburgh, Raleigh, Tampa, and Washington. From among the named Defendants in this litigation, Morgan's horizontal competitors and their agents include each "Owner," "Owner-Operator," and "Managing Defendant" that operates in the same regional submarkets as Morgan.

**ANSWER TO PARAGRAPH 150:**

Morgan Properties admits that it is a Delaware limited liability company headquartered in King of Prussia, Pennsylvania. Morgan Properties admits that, at various times during the alleged relevant time period from January 1, 2016, to the present, it has operated multifamily rental properties in the following metropolitan areas: (i) Atlanta, Georgia, (ii) Baltimore, Maryland, (iii) Buffalo, New York, (iv) Charlotte, North Carolina, (v) Chicago, Illinois, (vi) Cincinnati, Ohio, (vii) Cleveland, Ohio, (viii) Columbus, Ohio, (ix) Dallas, Texas, (x) Detroit, Michigan, (xi) Indianapolis, Indiana, (xii) Jacksonville, Florida, (xiii) Memphis, Tennessee, (xiv) Nashville, Tennessee, (xv) Philadelphia, Pennsylvania, (xvi) Pittsburgh, Pennsylvania, (xvii) Raleigh, North Carolina, (xviii) Tampa, Florida, and (xix) Washington, D.C. Morgan Properties otherwise denies the allegations in Paragraph 150.

151.    During the Conspiracy Period, Morgan entered into a written contract, paid for, and used at least two RealPage RMS—YieldStar and LRO—to manage some or all of its more than 96,000 multifamily rental units across 20 states, including those within its five properties in the Greater Nashville Metro area. Morgan did so knowing that use of Yieldstar and LRO required it to share confidential, competitively sensitive pricing and lease information with its horizontal competitors in order to allow them to adjust their rental prices, and in turn, to allow Defendant Morgan to benefit from its horizontal competitors' sensitive pricing and lease information before it set or adjusted its own rental prices. At a minimum, Morgan's Director of Operational Initiatives and Implementation, Jennifer Villani, and Senior Vice President of Corporate Strategy, Amy Weissberger, are involved in implementing RealPage's RMS within Morgan.

**ANSWER TO PARAGRAPH 151:**

Morgan Properties admits that, at times during the alleged relevant time period from January 1, 2016, to the present, it has operated, and has used the Lease Rent Options ("LRO") software in operating, multifamily residential properties. Otherwise, Morgan Properties denies the allegations in Paragraph 151.

152. By agreeing to regularly share confidential, competitively sensitive pricing and lease information with horizontal competitors in order to allow them to adjust prices, Morgan agreed to join a cartel with those horizontal competitors. The conspiracy resulted in higher prices for multifamily residential leases across the nation and in each submarket in which Morgan operates. Morgan would not have paid for RealPage's RMS pricing services unless: (1) doing so enabled it to set prices above a competitive level; and (2) it knew its competitors were, likewise, using RealPage RMS to set their rental prices in the submarkets in which it operated.

**ANSWER TO PARAGRAPH 152:**

Morgan Properties denies the allegations in Paragraph 152.

153. Owner-Operator Defendant Pinnacle Property Management Services, LLC ("Pinnacle") is a Delaware limited liability corporation headquartered in Addison, Texas. Pinnacle operates in at least the following regional submarkets Atlanta, Austin, Baltimore, Birmingham, Boston, Charlotte, Chicago, Dallas-Fort Worth, Denver, Houston, Inland Empire, Jacksonville, Kansas City, Las Vegas, Los Angeles, Louisville, Memphis, Miami, Minneapolis, Nashville, New Orleans, New York, Norfolk, Orlando, Philadelphia, Phoenix, Portland, Providence, Raleigh, Sacramento, Saint Louis, San Antonio, San Diego, San Francisco, San Jose, Seattle, Tampa, and Washington. From among the named Defendants in this litigation, Pinnacle's horizontal competitors and their agents include each "Owner," "Owner-Operator," and "Managing Defendant" that operates in the same regional submarkets as Pinnacle.

**ANSWER TO PARAGRAPH 153:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 153 and denies them on that basis.

154. During the Conspiracy Period, Pinnacle entered into a written contract, paid for, and used at least two RealPage RMS—YieldStar and LRO—to manage some or all of its approximately 172,000 multifamily rental units nationwide, including 10 properties in the Greater Nashville Metro Area. Pinnacle did so knowing that use of YieldStar and LRO required it to share confidential, competitively sensitive pricing and lease information with its horizontal competitors in order to allow them to adjust their rental prices, and in turn, to allow Defendant Pinnacle to benefit from its horizontal competitors' sensitive pricing and lease information before it set or adjusted its own rental prices. At a minimum,

Pinnacle's Director of Revenue Management, Connie Aldape, is involved in implementing RealPage's RMS within Pinnacle.

**ANSWER TO PARAGRAPH 154:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 154 and denies them on that basis.

155. By agreeing to regularly share confidential, competitively sensitive pricing and lease information with horizontal competitors in order to allow them to adjust prices, Pinnacle agreed to join a cartel with those horizontal competitors. The conspiracy resulted in higher prices for multifamily residential leases across the nation and in each submarket in which Pinnacle operates. Pinnacle would not have paid for RealPage's RMS pricing services unless: (1) doing so enabled it to set prices above a competitive level; and (2) it knew its competitors were, likewise, using RealPage RMS to set their rental prices in the submarkets in which it operated.

**ANSWER TO PARAGRAPH 155:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 155 and denies them on that basis.

156. Owner-Operator Defendant Prometheus Real Estate Group, Inc. ("Prometheus") is a California corporation headquartered in San Mateo, California. Prometheus is one of the largest managers of multifamily rental real estate in the United States. Prometheus operates in at least the following regional submarkets: Portland, San Francisco, San Jose, and Seattle. From among the named Defendants in this litigation, Prometheus' horizontal competitors and their agents include each "Owner," "Owner-Operator," and "Managing Defendant" that operates in the same regional submarkets as Prometheus.

**ANSWER TO PARAGRAPH 156:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 156 and denies them on that basis.

157. During the Conspiracy Period, Prometheus entered into a written contract, paid for, and used at least one RealPage RMS—YieldStar—to manage some or all of its 12,000 multifamily rental units in California, Oregon, and Washington. Prometheus did so knowing that use of Yieldstar required it to share confidential, competitively sensitive pricing and lease information with its horizontal competitors in order to allow them to adjust their rental prices, and in turn, to allow Defendant Prometheus to benefit from its horizontal competitors' sensitive pricing and lease information before it set or adjusted its own rental prices. At a minimum, Prometheus' Senior Director of Business Solutions, Jason Kenworthy, former Senior Asset Manager, Breanna Berry, and Regional

Neighborhood Director, Alan Bradford, are or were involved in implementing RealPage's RMS within Prometheus.

**ANSWER TO PARAGRAPH 157:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 157 and denies them on that basis.

158. By agreeing to regularly share confidential, competitively sensitive pricing and lease information with horizontal competitors in order to allow them to adjust prices, Prometheus agreed to join a cartel with those horizontal competitors. The conspiracy resulted in higher prices for multifamily residential leases across the nation and in each submarket in which Prometheus operates. Prometheus would not have paid for RealPage's RMS pricing services unless: (1) doing so enabled it to set prices above a competitive level; and (2) it knew its competitors were, likewise, using RealPage RMS to set their rental prices in the submarkets in which it operated.

**ANSWER TO PARAGRAPH 158:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 158 and denies them on that basis.

159. Owner-Operator Defendants The Related Companies L.P. and Related Management Company L.P. (collectively, "Related") are respectively, a property owner and property manager, and acted as a single economic unit. Both are incorporated and headquartered in New York, New York. Related operates in at least the following regional submarkets: Atlanta, Austin, Baltimore, Boston, Buffalo, Chicago, Cincinnati, Dallas-Fort Worth, Denver, Hartford, Houston, Los Angeles, Milwaukee, Minneapolis, Nashville, New York, Orlando, Philadelphia, Pittsburgh, Raleigh, Richmond, Saint Louis, San Antonio, San Diego, San Francisco, San Jose, and Washington. From among the named Defendants in this litigation, Related's horizontal competitors and their agents include each "Owner," "Owner-Operator," and "Managing Defendant" that operates in the same regional submarkets as Related.

**ANSWER TO PARAGRAPH 159:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 159 and denies them on that basis.

160. During the Conspiracy Period, Related entered into a written contract, paid for, and used at least one RealPage RMS—LRO—to manage some or all of its more than 65,000 multifamily rental units nationwide, knowing that doing so required it to share confidential, competitively sensitive pricing and lease information with its horizontal competitors in order to allow them to adjust their rental prices, and in turn, to allow Defendant Related to

benefit from its horizontal competitors' sensitive pricing and lease information before it set or adjusted its own rental prices. At a minimum, Related's Leasing Director Richard Key, RealPage Systems Help Desk and Operations Specialist, Mandy Lewis, and Operating Expenses Support Manager, Jessica Seago, are involved in implementing RealPage's RMS within Related.

**ANSWER TO PARAGRAPH 160:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 160 and denies them on that basis.

161. By agreeing to regularly share confidential, competitively sensitive pricing and lease information with horizontal competitors in order to allow them to adjust prices, Related agreed to join a cartel with those horizontal competitors. The conspiracy resulted in higher prices for multifamily residential leases across the nation and in each submarket in which Related operates. Related would not have paid for RealPage's RMS pricing services unless: (1) doing so enabled it to set prices above a competitive level; and (2) it knew its competitors were, likewise, using RealPage RMS to set their rental prices in the submarkets in which it operated.

**ANSWER TO PARAGRAPH 161:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 161 and denies them on that basis.

162. Owner-Operator Defendant Rose Associates, Inc. ("Rose Associates") is a New York corporation with its principal place of business in New York, New York. Rose Associates operates in at least the following regional submarket: New York. From among the named Defendants in this litigation, Rose Associates' horizontal competitors and their agents include each "Owner," "Owner-Operator," and "Managing Defendant" that operates in the same regional submarkets as Rose Associates.

**ANSWER TO PARAGRAPH 162:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 162 and denies them on that basis.

163. During the Conspiracy Period, Rose Associates entered into a written contract, paid for, and used at least two RealPage RMS—YieldStar and AIRM—to manage some or all of its more than 24,000 multifamily rental units, knowing that doing so required it to share confidential, competitively sensitive pricing and lease information with its horizontal competitors in order to allow them to adjust their rental prices, and in turn, to allow Defendant Rose Associates to benefit from its horizontal competitors' sensitive pricing and lease information before it set or adjusted its own rental prices. At a minimum, Rose

Associates' President and CEO, Amy Rose, and Executive Director of Multifamily Management, Scott Marino, are involved in implementing RealPage's RMS within Rose Associates.

**ANSWER TO PARAGRAPH 163:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 163 and denies them on that basis.

164. By agreeing to regularly share confidential, competitively sensitive pricing and lease information with horizontal competitors in order to allow them to adjust prices, Rose agreed to join a cartel with those horizontal competitors. The conspiracy resulted in higher prices for multifamily residential leases across the nation and in each submarket in which Rose operates. Rose would not have paid for RealPage's RMS pricing services unless: (1) doing so enabled it to set prices above a competitive level; and (2) it knew its competitors were, likewise, using RealPage RMS to set their rental prices in the submarkets in which it operated.

**ANSWER TO PARAGRAPH 164:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 164 and denies them on that basis.

165. Owner-Operator Defendant RPM Living, LLC ("RPM") is a limited liability company headquartered in Austin, Texas, organized and existing under the laws of Texas. RPM operates in at least the following regional submarkets: Atlanta, Austin, Baltimore, Charlotte, Chicago, Cleveland, Dallas-Fort Worth, Denver, Detroit, Houston, Indianapolis, Jacksonville, Kansas City, Las Vegas, Los Angeles, Louisville, Memphis, Miami, Minneapolis, Nashville, New Orleans, New York, Oklahoma City, Orlando, Phoenix, Raleigh, Richmond, San Antonio, San Diego, San Jose, Tampa, Tucson, and Washington. From among the named Defendants in this litigation, RPM's horizontal competitors and their agents include each "Owner," "Owner-Operator," and "Managing Defendant" that operates in the same regional submarkets as RPM.

**ANSWER TO PARAGRAPH 165:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 165 and denies them on that basis.

166. During the Conspiracy Period, RPM entered into a written contract, paid for, and used at least three RealPage RMS—YieldStar, LRO, and AIRM—to manage some or all of its more than 112,000 multifamily rental units nationwide, knowing that doing so required it to share confidential, competitively sensitive pricing and lease information with its horizontal competitors in order to allow them to adjust their rental prices, and in turn, to

allow Defendant RPM to benefit from its horizontal competitors' sensitive pricing and lease information before it set or adjusted its own rental prices. At a minimum, RPM's Chief Technology Officer, Scott Pechersky, is involved in the implementation of RealPage's RMS within RPM.

**ANSWER TO PARAGRAPH 166:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 166 and denies them on that basis.

167. By agreeing to regularly share confidential, competitively sensitive pricing and lease information with horizontal competitors in order to allow them to adjust prices, RPM agreed to join a cartel with those horizontal competitors. The conspiracy resulted in higher prices for multifamily residential leases across the nation and in each submarket in which RPM operates. RPM would not have paid for RealPage's RMS pricing services unless: (1) doing so enabled it to set prices above a competitive level; and (2) it knew its competitors were, likewise, using RealPage's RMS to set their rental prices in the submarkets in which it operated.

**ANSWER TO PARAGRAPH 167:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 167 and denies them on that basis.

168. Owner-Operator Defendant Sares Regis Group Commercial, Inc. ("Sares Regis") is a California corporation headquartered in Newport Beach, California. Sares Regis is one of the largest managers of multifamily rental real estate in the United States. Sares Regis operates in at least the following regional submarkets: Dallas-Fort Worth, Denver, Las Vegas, Los Angeles, Phoenix, Sacramento, San Diego, San Francisco, San Jose, and Seattle. From among the named Defendants in this litigation, Sares Regis' horizontal competitors and their agents include each "Owner," "Owner-Operator," and "Managing Defendant" that operates in the same regional submarkets as Sares Regis.

**ANSWER TO PARAGRAPH 168:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 168 and denies them on that basis.

169. During the Conspiracy Period, Sares Regis entered into a written contract, paid for, and used at least one RealPage RMS—YieldStar—to manage some or all of its more than 29,000 multifamily rental units across the country, knowing that doing so required it to share confidential, competitively sensitive pricing and lease information with its horizontal competitors in order to allow them to adjust their rental prices, and in turn, to allow Defendant Sares Regis to benefit from its horizontal competitors' sensitive pricing and

lease information before it set or adjusted its own rental prices. At a minimum, Sares Regis' Vice President, Karen Bowman, is involved in implementing RealPage's RMS within Sares Regis.

**ANSWER TO PARAGRAPH 169:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 169 and denies them on that basis.

170.    By agreeing to regularly share confidential, competitively sensitive pricing and lease information with horizontal competitors in order to allow them to adjust prices, Sares Regis agreed to join a cartel with those horizontal competitors. The conspiracy resulted in higher prices for multifamily residential leases across the nation and in each submarket in which Sares Regis operates. Sares Regis would not have paid for RealPage's RMS pricing services unless: (1) doing so enabled it to set prices above a competitive level; and (2) it knew its competitors were, likewise, using RealPage's RMS to set their rental prices in the submarkets in which it operated.

**ANSWER TO PARAGRAPH 170:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 170 and denies them on that basis.

171.    Owner-Operator Defendant Security Properties Residential, LLC ("Security") is a limited liability company headquartered in Seattle, Washington, organized and existing under the laws of Washington. Security operates in at least the following regional submarkets: Austin, Denver, Las Vegas, Nashville, Phoenix, Pittsburgh, Portland, Sacramento, Salt Lake City, San Jose, Seattle, and Washington. From among the named Defendants in this litigation, Security's horizontal competitors and their agents include each "Owner," "Owner-Operator," and "Managing Defendant" that operates in the same regional submarkets as Security.

**ANSWER TO PARAGRAPH 171:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 171 and denies them on that basis.

172.    During the Conspiracy Period, Security entered into a written contract, paid for, and used at least two RealPage RMS—YieldStar and LRO—to manage some or all of its more than 22,000 multifamily rental units nationwide, including approximately seven properties in the Greater Nashville Metro Area. Security did so knowing that use of YieldStar and LRO required it to share confidential, competitively sensitive pricing and lease information with its horizontal competitors in order to allow them to adjust their rental prices, and in turn,

to allow Defendant Security to benefit from its horizontal competitors' sensitive pricing and lease information before it set or adjusted its own rental prices.

**ANSWER TO PARAGRAPH 172:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 172 and denies them on that basis.

173.    By agreeing to regularly share confidential, competitively sensitive pricing and lease information with horizontal competitors in order to allow them to adjust prices, Security agreed to join a cartel with those horizontal competitors. The conspiracy resulted in higher prices for multifamily residential leases across the nation and in each submarket in which Security operates. Security would not have paid for RealPage's RMS pricing services unless: (1) doing so enabled it to set prices above a competitive level; and (2) it knew its competitors were, likewise, using RealPage RMS to set their rental prices in the submarkets in which it operated.

**ANSWER TO PARAGRAPH 173:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 173 and denies them on that basis.

174.    Owner-Operator Defendant Sherman Associates, Inc. ("Sherman") is a corporation headquartered in Minneapolis, Minnesota, organized and existing under the laws of Minnesota. Sherman operates in at least the following regional submarkets: Denver, Kansas City, Milwaukee, and Minneapolis. From among the named Defendants in this litigation, Sherman's horizontal competitors and their agents include each "Owner," "Owner-Operator," and "Managing Defendant" that operates in the same regional submarkets as Sherman.

**ANSWER TO PARAGRAPH 174:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 174 and denies them on that basis.

175.    During the Conspiracy Period, Sherman entered into a written contract, paid for, and used at least one RealPage RMS—YieldStar—to manage some or all of its more than 7,000 multifamily rental units nationwide, knowing that doing so required it to share confidential, competitively sensitive pricing and lease information with its horizontal competitors in order to allow them to adjust their rental prices, and in turn, to allow Defendant Sherman to benefit from its horizontal competitors' sensitive pricing and lease information before it set or adjusted its own rental prices. At a minimum, Sherman's Vice President of Asset Management, Matthew Haggerty, and former Regional Property Manager, Leanore Mata, are or were involved in implementing RealPage's RMS within Sherman.

**ANSWER TO PARAGRAPH 175:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 175 and denies them on that basis.

176.     By agreeing to regularly share confidential, competitively sensitive pricing and lease
information with horizontal competitors in order to allow them to adjust prices, Sherman
agreed to join a cartel with those horizontal competitors. The conspiracy resulted in higher
prices for multifamily residential leases across the nation and in each submarket in which
Sherman operates. Sherman would not have paid for RealPage's RMS pricing services
unless: (1) doing so enabled it to set prices above a competitive level; and (2) it knew its
competitors were, likewise, using RealPage RMS to set their rental prices in the submarkets
in which it operated.

**ANSWER TO PARAGRAPH 176:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 176 and denies them on that basis.

177.     Owner-Operator Defendant Simpson Property Group, LLC ("Simpson") is a limited
liability company in Denver, Colorado, formed under the laws of Delaware. Simpson
operates in at least the following regional submarkets: Atlanta, Austin, Boston, Charlotte,
Dallas-Fort Worth, Denver, Houston, Las Vegas, Los Angeles, Miami, Minneapolis,
Nashville, Phoenix, Portland, Raleigh, Richmond, San Diego, Seattle, and Washington.
From among the named Defendants in this litigation, Simpson's horizontal competitors
and their agents include each "Owner," "Owner-Operator," and "Managing Defendant"
that operates in the same regional submarkets as Simpson.

**ANSWER TO PARAGRAPH 177:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 177 and denies them on that basis.

178.     During the Conspiracy Period, Simpson, alongside its affiliate, Simpson Housing LLP,[79]
entered into a written contract, paid for, and used at least one RealPage RMS—LRO—to
manage some or all of its more than 17,000 multifamily rental units across 100 properties
throughout the country, including approximately four properties in the Greater Nashville
Metro Area. Simpson did so knowing that use of LRO required it to share confidential,

---

[79] Simpson markets Simpson Property Group, LLC and Simpson Housing, LLP, as a joint enterprise, offering a "fully
integrated real estate firm providing services in commercial and multifamily property management, development and
construction." See e.g., http s ://www. simpsonpropertygroup. com/ab out (" Simpson Housing [LLLP] and Simpson
Property Group, LLC was established for the purpose of building and operating high-quality residential communities
in the Southwest. The Company has since become one of the largest privately-held residential developers and
managers in the nation, we operate throughout the United States and continue to expand.").

71

competitively sensitive pricing and lease information with its horizontal competitors in order to allow them to adjust their rental prices, and in turn, to allow Defendant Simpson to benefit from its horizontal competitors' sensitive pricing and lease information before it set or adjusted its own rental prices. At a minimum, Simpson's Regional Vice Presidents of Revenue Management, Wendy Woltman and Julia Sharp, are involved in implementing RealPage's RMS within Simpson.

**ANSWER TO PARAGRAPH 178:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 178 and denies them on that basis.

179. By agreeing to regularly share confidential, competitively sensitive pricing and lease information with horizontal competitors in order to allow them to adjust prices, Simpson agreed to join a cartel with those horizontal competitors. The conspiracy resulted in higher prices for multifamily residential leases across the nation and in each submarket in which Simpson operates. Simpson would not have paid for RealPage's RMS pricing services unless: (1) doing so enabled it to set prices above a competitive level; and (2) it knew its competitors were, likewise, using RealPage RMS to set their rental prices in the submarkets in which it operated.

**ANSWER TO PARAGRAPH 179:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 179 and denies them on that basis.

180. Managing Defendant Thrive Communities Management, LLC ("Thrive") is a Washington Limited Liability Company headquartered in Seattle, Washington. Thrive has over 18,000 multifamily rental units under management in the greater Pacific Northwest. Thrive operates in at least the following regional submarkets: Portland and Seattle. From among the named Defendants in this litigation, Thrive's horizontal competitors and their agents include each "Owner-Operator" and "Managing Defendant" that operates in the same regional submarkets as Thrive.

**ANSWER TO PARAGRAPH 180:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 180 and denies them on that basis.

181. During the Conspiracy Period, Thrive entered a written contract, paid for, and used at least one RealPage RMS—LRO—to manage some or all of its 122 multifamily rental properties, knowing that doing so required it to share confidential, competitively sensitive pricing and lease information with its horizontal competitors in order to allow them to adjust their rental prices, and in turn, to allow Defendant Thrive to benefit from its horizontal

competitors' sensitive pricing and lease information before it set or adjusted its own rental prices. By agreeing to regularly share confidential, competitively sensitive pricing and lease information with horizontal competitors in order to allow them to adjust prices, Thrive agreed to join a cartel with those horizontal competitors. The conspiracy resulted in higher prices for multifamily residential leases across the nation and in each submarket in which Thrive operates. Thrive would not have paid for RealPage's RMS pricing services unless: 1) doing so enabled it to set prices above a competitive level; and (2) it knew its competitors were, likewise, using RealPage RMS to set their rental prices in the submarkets in which it operated.

**ANSWER TO PARAGRAPH 181:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 181 and denies them on that basis.

182. Owner Defendant Crow Holdings, LP ("Crow Holdings") is a Delaware limited partnership headquartered in Dallas, Texas. Crow Holdings is the parent company of Owner Defendant Trammell Crow Residential Company ("Crow Residential"),[80] which itself is a Delaware corporation headquartered in Dallas, Texas (Crow Holdings and Crow Residential collectively, "Trammell Crow"). Trammell Crow has developed hundreds of thousands of multifamily units throughout the country and operates in at least the following regional submarkets: Atlanta, Austin, Boston, Boulder, Buffalo, Charlotte, Chicago, Dallas-Fort Worth, Denver, East Bay, Fort Myers, Houston, Inland Empire, Los Angeles, Miami, Nashville, New York, Orlando, Palm Beach, Philadelphia, Phoenix, Pittsburgh, Portland, Raleigh, San Antonio, San Diego, San Francisco, Seattle, Tampa, and Washington. From among the named Defendants in this litigation, Trammell Crow's horizontal competitors and their agents include each "Owner" and "Owner-Operator" that operates in the same regional submarkets as Trammell Crow.

**ANSWER TO PARAGRAPH 182:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 182 and denies them on that basis.

183. During the Conspiracy Period, Trammell Crow entered a written contract, paid for, and used — and/or directed its agents to enter into a written contract, pay for, and use at least one RealPage RMS—YieldStar—to manage some or all of the multifamily rental units

---

[80] *See* Julia Bunch, Why You Need to Know Michael Levy, DALLAS MAGAZINE (February 26, 2018) https ://www. dmagazine.com/publication s/d-ceo/2018/m arch/michael-levy-crow-holdi ngs/ (referring to Crow Residential as Crow Holdings' "real estate development arm"); About Us, CROW HOLDINGS, https ://www.crowholdings.com/about/, (listing "luxury multifamily communities" as among "Crow Holdings' properties" and showing examples indicating properties held by Crow Residential).

under its management and/or control in the United States,"[81] knowing that doing so required it to share confidential, competitively sensitive pricing and lease information with its horizontal competitors in order to allow them to adjust their rental prices, and in turn, to allow Defendant Trammell Crow to benefit from its horizontal competitors' sensitive pricing and lease information before it set or adjusted its own rental prices. At a minimum, Trammell Crow's Revenue Manager Laura Klein and Vice President of Asset Management, Shawnee Tharp, are involved in implementing RealPage's RMS within Trammell Crow.

**ANSWER TO PARAGRAPH 183:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 183 and denies them on that basis.

184. By agreeing to regularly share confidential, competitively sensitive pricing and lease information with horizontal competitors in order to allow them to adjust prices, Trammell Crow agreed to join a cartel with those horizontal competitors. The conspiracy resulted in higher prices for multifamily residential leases across the nation and in each submarket in which Trammell Crow operates. Trammell Crow would not have paid for RealPage's RMS pricing services unless: (1) doing so enabled it to set prices above a competitive level; and (2) it knew its competitors were, likewise, using RealPage RMS to set their rental prices in the submarkets in which it operated.

**ANSWER TO PARAGRAPH 184:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 184 and denies them on that basis.

185. Owner-Operator Defendant UDR, Inc. ("UDR") is a corporation headquartered in Highlands Ranch, Colorado, organized and existing under the laws of Maryland. UDR operates in at least the following regional submarkets: Austin, Baltimore, Boston, Dallas-Fort Worth, Denver, Los Angeles, Nashville, New York, Orlando, Philadelphia, Portland, Richmond, San Diego, San Francisco, San Jose, Seattle, Tampa and Washington. From among the named Defendants in this litigation, UDR's horizontal competitors and their agents include each "Owner," "Owner-Operator," and "Managing Defendant" that operates in the same regional submarkets as UDR.

**ANSWER TO PARAGRAPH 185:**

---

[81] See Press Release, CROW HOLDINGS, Crow Holdings Enters Strategic Partnership with RealPage (July 22, 2019) https ://www. crowhol di ng s. com/i n si ghts/crow-hol di ng s-enters- strategi c-partnership-with-realpage/ (announcing Crow Holdings' intent to employ "RealPage's broad suite of innovative, first-to-market property and investment management technology solutions" "across its national real estate platform").

74

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 185 and denies them on that basis.

186.    During the Conspiracy Period, UDR entered into a written contract, paid for, and used at least one RealPage RMS—YieldStar—to manage some or all of its more than 56,000 multifamily rental units nationwide, including approximately eight properties in the Greater Nashville Metro Area. UDR did so knowing that use of YieldStar required it to share confidential, competitively sensitive pricing and lease information with its horizontal competitors in order to allow them to adjust their rental prices, and in turn, to allow Defendant UDR to benefit from its horizontal competitors' sensitive pricing and lease information before it set or adjusted its own rental prices. By agreeing to regularly share confidential, competitively sensitive pricing and lease information with horizontal competitors in order to allow them to adjust prices, UDR agreed to join a cartel with those horizontal competitors. The conspiracy resulted in higher prices for multifamily residential leases across the nation and in each submarket in which UDR operates. UDR would not have paid for RealPage's RMS pricing services unless: (1) doing so enabled it to set prices above a competitive level; and (2) it knew its competitors were, likewise, using RealPage RMS to set their rental prices in the submarkets in which it operated.

## ANSWER TO PARAGRAPH 186:

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 186 and denies them on that basis.

187.    Owner-Operator Defendant Windsor Property Management Company ("Windsor") is a Delaware corporation headquartered in Boston, Massachusetts. Windsor operates in at least the following regional submarkets: Atlanta, Austin, Baltimore, Boston, Charlotte, Chicago, Dallas-Fort Worth, Denver, Houston, Los Angeles, Miami, New York, Portland, San Diego, San Francisco, San Jose, Seattle, and Washington. From among the named Defendants in this litigation, Windsor's horizontal competitors and their agents include each "Owner," "Owner-Operator," and "Managing Defendant" that operates in the same regional submarkets as Windsor.

## ANSWER TO PARAGRAPH 187:

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 187 and denies them on that basis.

188.    During the Conspiracy Period, Windsor entered into a written contract, paid for, and used at least one RealPage RMS—LRO—to manage some or all of its more than 86,000 multifamily rental units nationwide, knowing that doing so required it to share confidential, competitively sensitive pricing and lease information with its horizontal competitors in order to allow them to adjust their rental prices, and in turn, to allow Defendant Windsor to benefit from its horizontal competitors' sensitive pricing and lease information before it

set or adjusted its own rental prices. By agreeing to regularly share confidential, competitively sensitive pricing and lease information with horizontal competitors in order to allow them to adjust prices, Windsor agreed to join a cartel with those horizontal competitors. The conspiracy resulted in higher prices for multifamily residential leases across the nation and in each submarket in which Windsor operates. Windsor would not have paid for RealPage's RMS pricing services unless: (1) doing so enabled it to set prices above a competitive level; and (2) it knew its competitors were, likewise, using RealPage RMS to set their rental prices in the submarkets in which it operated.

## ANSWER TO PARAGRAPH 188:

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 188 and denies them on that basis.

189. Owner-Operator Defendant WinnCompanies LLC and WinnResidential Manager Corp. (collectively "Winn") are respectively a property owner and property manager, part of a family of companies headquartered in Boston, Massachusetts, organized and existing under the laws of Massachusetts. Winn operates in at least the following regional submarkets: Baltimore, Boston, Buffalo, Charlotte, Dallas-Fort Worth, Hartford, Houston, Los Angeles, Miami, New York, Philadelphia, Phoenix, Pittsburgh, Providence, Raleigh, Richmond, Sacramento, San Antonio, San Diego, San Jose, Tampa, Tucson, and Washington. From among the named Defendants in this litigation, Winn's horizontal competitors and their agents include each "Owner," "Owner-Operator," and "Managing Defendant" that operates in the same regional submarkets as Winn.

## ANSWER TO PARAGRAPH 189:

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 189 and denies them on that basis.

190. During the Conspiracy Period, Winn entered a written contract, paid for, and used at least one RealPage RMS—LRO—to manage some or all of its more than 103,000 multifamily rental units nationwide, knowing that doing so required it to share confidential, competitively sensitive pricing and lease information with its horizontal competitors in order to allow them to adjust their rental prices, and in turn, to allow Defendant Winn to benefit from its horizontal competitors' sensitive pricing and lease information before it set or adjusted its own rental prices. At a minimum, Winn's Vice President of Management Operations Software, Jennifer Coberth, Regional Property Manager, Autumn Robinson, Software Support Specialist, Weam Alsarabi, and Software Support Specialist, Allie Colby, are involved in implementing RealPage's RMS within Winn.

## ANSWER TO PARAGRAPH 190:

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 190 and denies them on that basis.

191.    By agreeing to regularly share confidential, competitively sensitive pricing and lease
        information with horizontal competitors in order to allow them to adjust prices, Winn
        agreed to join a cartel with those horizontal competitors. The conspiracy resulted in higher
        prices for multifamily residential leases across the nation and in each submarket in which
        Winn operates. Winn would not have paid for RealPage's RMS pricing services unless: (1)
        doing so enabled it to set prices above a competitive level; and (2) it knew its competitors
        were, likewise, using RealPage RMS to set their rental prices in the submarkets in which
        it operated.

**ANSWER TO PARAGRAPH 191:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 191 and denies them on that basis.

192.    Managing Defendant ZRS Management, LLC ("ZRS") is a Florida limited liability
        company headquartered in Orlando, Florida. ZRS is the one of the largest managers of
        multifamily rental real estate in the United States. ZRS operates in at least the following
        regional submarkets: Atlanta, Austin, Baltimore, Charlotte, Chicago, Dallas-Fort Worth,
        Houston, Jacksonville, Miami, Nashville, Orlando, Raleigh, San Antonio, Tampa, and
        Washington. From among the named Defendants in this litigation, ZRS's horizontal
        competitors and their agents include each "Owner," "Owner-Operator," and "Managing
        Defendant" that operates in the same regional submarkets as ZRS.

**ANSWER TO PARAGRAPH 192:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 192 and denies them on that basis.

193.    During the Conspiracy Period, ZRS entered a written contract, paid for, and used at least
        one RealPage RMS—YieldStar—to manage some or all of its over 60,000 units across the
        country, knowing that doing so required it to share confidential, competitively sensitive
        pricing and lease information with its horizontal competitors in order to allow them to
        adjust their rental prices, and in turn, to allow Defendant ZRS to benefit from its horizontal
        competitors' sensitive pricing and lease information before it set or adjusted its own rental
        prices. By agreeing to regularly share confidential, competitively sensitive pricing and
        lease information with horizontal competitors in order to allow them to adjust prices, ZRS
        agreed to join a cartel with those horizontal competitors. The conspiracy resulted in higher
        prices for multifamily residential leases across the nation and in each submarket in which
        ZRS operates. ZRS would not have paid for RealPage's RMS pricing services unless: (1)
        doing so enabled it to set prices above a competitive level; and (2) it knew its competitors

were, likewise, using RealPage RMS to set their rental prices in the submarkets in which it operated.

**ANSWER TO PARAGRAPH 193:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 193 and denies them on that basis.

194. Plaintiffs sought to license data from ALN, a commercial data provider, that recorded what RealPage RMS product each Owner, Owner-Operator, and Managing Defendant used for their specific properties, and for what period. ALN declined to license Plaintiffs this data, citing its concern that Defendants would retaliate.

**ANSWER TO PARAGRAPH 194:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 194 and denies them on that basis.

195. Various other persons, firms, and corporations not named as defendants have participated as co-conspirators with Defendants and have performed acts and made statements in furtherance of the conspiracy. The Defendants are jointly and severally liable for the acts of their co-conspirators whether or not named as defendants in this Complaint.

**ANSWER TO PARAGRAPH 195:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 195 and denies them on that basis.

196. Whenever reference is made to any act of any corporation, property trust, LP, LLC, LLP, or other business entity, the allegation means that the entity engaged in the act by or through its officers, directors, agents, partners, employees, or representatives while they were actively engaged in the management, direction, control, or transaction of the corporation's business or affairs.

**ANSWER TO PARAGRAPH 196:**

The allegations in Paragraph 196 are legal conclusions not subject to admission or denial.

To the extent a response is necessary, Morgan Properties denies the allegations in Paragraph 196.

197. "Managing Defendants" are entities who function exclusively in the management and day-to-day operations of multifamily rental properties that utilize RealPage's RMS to price its multifamily rental units. (See App'x A, Table A-1). Managing Defendants do not have ownership interests in the buildings they manage, and on information and belief, in any

multifamily rental property that utilizes RealPage's RMS. Instead, the Managing Defendants are acting as agents of the Owners, Owner-Operators, and/or co-conspirator owners of multifamily rental housing properties that price their units according to RealPage's RMS.

**ANSWER TO PARAGRAPH 197:**

Morgan Properties denies the allegations in Paragraph 197.

198.    The "Owner-Operator" Defendants are entities who both owned and managed multifamily rental properties that use RealPage's RMS during the Conspiracy Period. (See App'x A, Table A-2). While in many instances Owner-Operators provide property management services to the properties under its ownership, that is not always the case. That is, an Owner-Operator may also own a multifamily rental property that it does not provide property management services for—and vice versa—it may provide property management services for a multifamily rental property that is not within its ownership umbrella. As an example, a former business manager for Defendant Lincoln ("Witness 10") explained that while Lincoln manages a number of properties it also owns — called "owner-operated" properties — the majority of buildings Lincoln manages are independently owned and managed by Lincoln for a fee paid by the property owners, on whom rests the decision as to whether the property will utilize RealPage's RMS to price its units. Therefore, Owner-Operators function in both capacities—as owners of multifamily rental properties with ultimate discretion as to whether the properties in its portfolio will price rental units according to RealPage's RMS—and as property managers acting as agents on behalf of the property owner, with direct access to RealPage's RMS platform.

**ANSWER TO PARAGRAPH 198:**

Morgan Properties admits that, at times during the alleged relevant time period from January 1, 2016, to the present, it has operated multifamily rental properties but otherwise denies the allegations in Paragraph 198.

199.    "Owner" Defendants are owners of multifamily rental properties that use RealPage's RMS to price their multifamily rental units, but who do not provide any on-site property management services to the properties they own. While property management companies, including the Owner-Operators and Managing Defendants in this case may manage the day-to-day operations of an Owner's building, it is ultimately up to the Owner whether or not a multifamily rental property will price its units according to RealPage's RMS, and any property management company assigned, contracted with, and/or hired to provide property management services to the Owners' buildings are acting as the Owners' agent.

**ANSWER TO PARAGRAPH 199:**

Morgan Properties denies the allegations in Paragraph 199.

200. Each of the Defendants named herein acted as the agent of, or for, the other Defendants with respect to the acts, violations, and common course of conduct alleged herein. Defendants are also liable for acts done in furtherance of the alleged conspiracy by companies they acquired through mergers and acquisitions.

**ANSWER TO PARAGRAPH 200:**

Morgan Properties denies the allegations in Paragraph 200.

201. Plaintiffs reached out to the Defendants named in this litigation and informed them that Plaintiffs had dismissed several Defendants who did not subscribe to nor use any RealPage RMS. Plaintiffs further requested that any Defendant that did not use RealPage's RMS contact Plaintiffs, so Plaintiffs could dismiss them from the case. To the extent that Defendants were willing and able to submit a declaration that they, or their officers, employees, or agents, did not use RealPage's RMS, Plaintiffs have dismissed those Defendants. For this reason, Plaintiffs believe that every Defendant remaining in this Complaint caused RealPage's RMS to be used and is properly a party of the conspiracy alleged herein.

**ANSWER TO PARAGRAPH 201:**

Morgan Properties denies the allegations in Paragraph 201.

## V.  FACTUAL ALLEGATIONS

### A.  Historical Competition Among Residential Property Managers.

202. Before the widespread adoption of RealPage's RMS, competition in the multifamily rental housing market was driven by property owners' and managers' desire to keep "heads in beds"—in other words, maintain the highest possible occupancy levels and keep turnover among tenants to a minimum.[82] Adherence to the "heads in beds" strategy ny property owners and managers signaled the market was operating competitively.

**ANSWER TO PARAGRAPH 202:**

Morgan Properties denies the allegations in Paragraph 202.

203. That "heads in beds" is the prevailing competitive response is easy to intuit. Not only do vacant apartments lead to lost rental income, but it also saves the property manager almost no marginal cost because the costs of owning and maintaining a rental apartment are not significantly different whether the unit is occupied or not. This provides a strong incentive for multifamily operators, including owners and property managers to lower their rents to fill vacant units. While property owners and managers knew in theory that if they all resisted this temptation, they would all benefit from higher average rents, any individual property that lowered its rents to fill vacancies while the others did not would be able to

---

[82] Vogell, *supra* note 1.

gain market share at the others' expense and achieve lower vacancy rates, higher revenues, and higher profits.

**ANSWER TO PARAGRAPH 203:**

Morgan Properties denies the allegations in Paragraph 203.

204.    As Donald Davidoff, the principal developer of the competing price-setting software that Defendant RealPage acquired in 2017, LRO, explained in a 2020 blog post:

All [property managers] would be better off limiting their rent reductions; however, should one property manager lower their rents while the others don't, then that operator would outperform.  The result can be a race to the bottom that is not good for anyone, but the fear of missing out coupled with laws prohibiting collusion make this the most likely outcome.[83]

Mr. Davidoff described this paradigm as a "classic prisoners' dilemma." This so-called "race to the bottom" might be bad for all property managers but is, of course, good for renters and is what the law demands.  It represents healthy price competition.  With knowledge that competitors were increasingly using RealPage's RMS to price their multifamily rental units, and in efforts to avoid the "race to the bottom," the Owners, Owner-Operators, and Managing Defendants adhered to the scheme to fix the price of multifamily rental housing units throughout the United States when they accepted the invitation to outsource their pricing decisions to RealPage, thereby shielding themselves from competition while boosting revenue, at the expense of Plaintiffs and members of the Class.

**ANSWER TO PARAGRAPH 204:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the statements alleged in Paragraph 204 and denies them on that basis.  Morgan Properties otherwise denies the allegations in Paragraph 204.

205.    Absent collusion, property owners and managers could not unilaterally raise rents above market rates.  Any property manager or owner that did so would lose tenants to its competitors who offered rental units at market rates, earning those competitors a higher share of the available profits.  This dynamic causes rental prices in a competitive marketplace to be sensitive to changes in demand. For example, rents have historically gone up quickly in areas that become trendy or where new public transportation infrastructure is added, and have fallen in areas where businesses close or which new generations find less desirable than previous ones did.  Any number of factors that make

---

[83] Donald Davidoff, *They're Heckling Revenue Management Again*, THE DEMAND SOLUTIONS BLOG (Aug. 18, 2020), https://www.d2demand.com/mfhblog/theyre-heckling-revenue-management-again.

people want to live in a certain area could cause rents to rise or fall accordingly. Rents were also historically responsive to changes in renters' average income.

**ANSWER TO PARAGRAPH 205:**

Morgan Properties denies the allegations in Paragraph 205.

206.    As described more fully below, Defendants' conspiracy avoids the competition-driven race to the bottom.  As Donald Davidoff explained, "[n]ow, rent growth and occupancy are co-equals."[84]  David Romano, the vice president of pricing and revenue management at Defendant Equity, one of the largest publicly traded apartment owners in the United States, is quoted in a New York Times article dated November 29, 2011, as saying, "[w]e don't have occupancy targets per se.  We let the system determine at what rate revenue is maximized at a given occupancy level."[85]

**ANSWER TO PARAGRAPH 206:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the statements alleged in Paragraph 206 and denies them on that basis.  Morgan Properties otherwise denies the allegations in Paragraph 206.

207.    The "system"—RealPage's RMS—does so, however, at the financial expense of renters—Plaintiffs and the Class.  With competition between the Owners, Owner-Operators, and Managing Defendants reduced or eliminated, renters are forced to spend higher and higher portions of their incomes on housing.  According to RealPage's Chief Economist, Greg Willett, "[a]doption of revenue management systems absolutely has played a role in th[e] shift [away from rent concessions]."[86]  "Property managers were more likely to offer concessions during the recession of 2008 and 2009, when free rent was offered for as much as 55% of the available apartments," which is three times the rate of apartments that offered free rent during the COVID-19 pandemic. But the "[u]se of revenue management systems is much more common today than in 2008-2009.  Those systems generally will trim rents with a scalpel, rather than a machete."[87]

**ANSWER TO PARAGRAPH 207:**

---

[84] Joe Bousquin, *In the Back Office, Revenue Management Software is Causing a Revolution*, MULTIFAMILY EXEC. (Apr. 20, 2009), https://www.multifamilyexecutive.com/technology/in-the-back-office-revenue-management-software-is-causing-a-revolution_o.

[85] Matt Hudgins, *When Apartment Rents Climb, Landlords Can Say 'The Computer Did It,'* N.Y. TIMES (Nov. 29, 2011), https://www.nytimes.com/2011/11/30/realestate/commercial/landlords-use-computers-to-arrive-at-the-right-rental-fee.html.

[86] *Worst Markets for Free Rent Slowly Recover*, NAT'L APARTMENTS ASS'N (Aug. 24, 2021), https://www.naahq.org/worst-markets-free-rent-slowly-recover.

[87] *Id*.

Morgan Properties denies the allegations in Paragraph 207.

**B.    Evolution of RealPage's Revenue Management Solutions.**

208.    Defendant RealPage provides a "comprehensive platform of data analytics and on demand software solutions and services for the rental real estate industry."[88] Its clients are owners and managers of residential rental apartments.  While other RealPage products facilitate gathering its clients' confidential competitive information, RealPage's RMS services are the linchpin of Defendants' anticompetitive scheme.

## ANSWER TO PARAGRAPH 208:

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 208 and denies them on that basis.

209.    RealPage was founded in 1998.  In 2002, it acquired an early iteration of revenue management software, YieldStar, from Defendant Camden.[89] Since RealPage acquired YieldStar, it has made substantial changes to the software.  In fact, in 2004, two years after RealPage hired Jeffrey Roper as its principal scientist to improve RealPage revenue management software performance and grow its client base,[90] Roper saw that RealPage's customers could use that software to drive higher average rents, but in order to do so, RealPage needed huge amounts of detailed data regarding rent prices and occupancy of individual units across many properties.[91] RealPage began collating data from its clients and other sources in a "data warehouse," for the algorithms that now power Defendant RealPage's RMS to train on.  Beyond rent prices and occupancy rates, RealPage collects records of actual lease transactions, signed lease documents, lease renewal dates, records of rent payments, and detailed data on tenants and their finances.

## ANSWER TO PARAGRAPH 209:

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 209 and denies them on that basis.

210.    RealPage's increased access to data, coupled with advances in machine learning and artificial intelligence technology used to synthesize and analyze large pools of data, led Roper to design a pricing and lease term algorithm for the multifamily rental industry.  This algorithm built upon the price-setting software that Roper designed for Alaska Airlines, who was accused by the DOJ of illegally facilitating information exchanges and price-

---

[88] RealPage 2020 Form 10-K, *supra*, note 4, at 6.

[89] Press Release, RealPage, Inc., RealPage Acquires YieldStar Multifamily Revenue Management System (July 19, 2002), https://www.realpage.com/news/realpage-acquires-yieldstar-multifamily-revenue-management-system/.

[90] *See* Vogell, *supra* note 1.

[91] See *id.*

fixing between 1988-1992.[92] During Roper's tenure as the director of revenue management at Alaska Airlines—1986-1991— Alaska Airlines and its competitor airlines began using a common software, designed by Roper, to exchange information regarding planned routes and ticket prices before that information became public.[93] Roper's software allowed the airlines using it to avoid price competition that would have lowered ticket prices. The DOJ's Antitrust Division filed suit against eight of the largest U.S. airlines, alleging that Roper's software-enabled information exchange amounted to anticompetitive price fixing under the antitrust laws.[94] A government economist calculated that the scheme cost consumers up to $1.9 billion.[95] All eight airlines eventually entered into consent decrees requiring them to eliminate the information exchange features of the software that had enabled the conspiracy.[96] Roper—who had his computer and documents seized by federal agents— relayed about that experience, "[W]e all got called up before the Department of Justice in the early 1980s because we were colluding." He added that at the time, "we had no idea" that conduct was unlawful. Having now brought analogous coordinated algorithmic pricing to multifamily residential real estate leasing after the DOJ's airline settlements, however, Roper can no longer claim ignorance of the unlawful nature of this conduct.[97]

## ANSWER TO PARAGRAPH 210:

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 210 and denies them on that basis.

211. Much like the airlines' price-fixing cartel, Defendants' cartel eliminates price competition and the "race to the bottom" during periods of oversupply. As Defendant RealPage declared to both its existing and potential clients in a 2020 advertisement e-book: "You don't have to sacrifice rent growth during a softening market . . . you shouldn't lose sight of this of this proven fact: There is always money to be made regardless of market conditions."[98] Included in this material are "case study snapshots" to demonstrate this point. These "snapshots" detail the challenges three clients faced, the solution RealPage's RMS offered—which for each was YieldStar Revenue Management—and the revenue lifts that resulted for each after the adoption of RealPage's RMS. The RealPage clients featured in these snapshots are Defendants Greystar, Carter-Haston, and Trammell Crow. For Defendant Greystar, "[b]y applying effective pricing strategies across their diverse portfolio, Greystar properties using RealPage's YieldStar® Revenue Management

---

[92] Press Release, U.S. Dep't of Just., Justice Department Settles Airlines Price Fixing Suit, May Save Consumers Hundreds of Millions of Dollars (Mar. 17, 1994), https://www.justice.gov/archive/atr/public/press_releases/1994/211786.htm ("DOJ Press Release, Mar. 17, 1994").
[93] Vogell, *supra* note 1.
[94] Press Release, U.S. Dep't of Just., Justice Department Files Price Fixing Suit Against Eight Airlines and Fare Dissemination System (Dec. 21, 1992) ,
https://www.justice.gov/archive/atr/public/press_releases/1992/211323.htm.
[95] DOJ Press Release, Mar. 17, 1994, *supra*, note 92.
[96] *Id.*
[97] Vogell, *supra* note 1.
[98] Revenue Management: Proven in Any Market Cycle, *supra*, note 14.

throughout fluctuating market conditions outperformed their markets by 4.8%."[99] Defendant Carter-Haston's "[p]ricing centered around a robust set of data points, taking into consideration more than just market data," which strategy increased renewal rents by 7% and resulted in 3.5% increase in revenue.[100] And Defendant Trammell Crow was able to "achieve[] revenue boost of over 3% during the recession." The "Highlights" of the Trammell Crow case study snapshot stated that "YieldStar not only determines prices quickly, it also provides information to justify those prices," even during a recession.[101]

## ANSWER TO PARAGRAPH 211:

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 211 and denies them on that basis.

212. Efforts by Owners, Owner-Operators, and Managing Defendants to raise rents in concert through RealPage's RMS became more effective as RealPage continued to acquire competing revenue management products and additional property managers and owners implemented it, such that its algorithms were able to take information from more market participants into account. Beginning no later than early 2016, as the RealPage pricing platform became more sophisticated and gained user confidence and additional data inputs, it was used less as an advisory product and more as a rent-setting software.

## ANSWER TO PARAGRAPH 212:

Morgan Properties denies the allegations in Paragraph 212.

213. Defendant RealPage became the primary price-setting vendor to the multifamily housing rental software market through acquisitions of its competitors. RealPage began buying up similar and competing software companies, and it has completed 44 acquisitions since its founding.[102] According to its 2021 S-1 filing with the Securities and Exchange Commission ("SEC"), RealPage acknowledged "As part of our strategy, we plan to continue to pursue acquisitions of complementary businesses, products, and technologies."[103]

## ANSWER TO PARAGRAPH 213:

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 213 and denies them on that basis.

214. The most important of these transactions came in 2017, when RealPage acquired LRO, RealPage's strongest rival. The acquisition included LRO's revenue-management

---

[99] *Id*. at 6.
[100] *Id*. at 10.
[101] *Id*. at 8.
[102] https://www.crunchbase.com/search/acquisitions/field/organizations/num_acquisitions/realpage
[103] RealPage 2020 Form 10-K, *supra*, note 4.

software, which at the time of acquisition, provided revenue management services for over 1.5 million apartments throughout the country.[104]

**ANSWER TO PARAGRAPH 214:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 214 and denies them on that basis.

215. A 2013 article concerning Defendant ECI's pre-acquisition use of LRO, titled "ECI Management Achieving Market Gains with Competitor Data from Rainmaker LRO," highlights the value the LRO acquisition brought to RealPage.[105] At that time, Rainmaker was the leading provider of revenue management and profit optimization solutions. "By leveraging the analytically-driven market and competitor data intelligence used by Rainmaker LRO, [Defendant] ECI has realized 2.8 percent net effective rent increases" when comparing year-over-year. Defendant "ECI recognized the need to have historical market *and competitor data* in order to best price their communities and [ECI was] excited LRO delivered the success they were looking for." Indeed, LRO's software was not the most valuable piece of the acquisition for Defendant RealPage, however—LRO's loyal customer base was. At the time of the merger, RealPage's RMS was pricing 1.5 million units. That number doubled with the acquisition.[106] [Emphasis added.]

**ANSWER TO PARAGRAPH 215:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 215 and denies them on that basis.

216. RealPage merged LRO into its existing RMS, announcing that "[a]s revenue management becomes more broadly accepted, we expect [LRO and RealPage's] combined platform to drive accelerated, sustained revenue growth in our Asset Optimization[107] product family over the long run."[108] RealPage announced that "the acquisition of LRO will extend our revenue management footprint, augment our repository of real-time lease transaction data, and increase our data science talent and capabilities. We expect the acquisition of LRO to increase the market penetration of our YieldStar Revenue Management solution and drive revenue growth in our other asset optimization solutions."[109] The reference to

---

[104] Mary Salmonsen, "RealPage Agrees to Acquire LRO Revenue Management Services, *Multifamily Executives* (Feb. 28, 2017), https://www.multifamilyexecutive.com/business-finance/transactions/realpage-agrees-to-acquire-lro-revenue-management-services_o.

[105] *ECI Management Achieving Market Gains with Competitor Data from Rainmaker LRO[TM]*, PRWEB NEWSWIRE (Apr. 18, 2013).

[106] Vogell, *supra* note 1.

[107] RealPage's Asset Optimization product suite includes among other things, its revenue management software, business intelligence and benchmarking software, and market analytics tools. *See Asset Optimization Solutions*, RealPage, Inc., https://www.realpage.com/asset-optimization/.

[108] Press Release, RealPage, Inc., RealPage to Acquire Lease Rent Options, LRO, (Feb. 27, 2017), https://www.realpage.com/news/realpage-to-acquire-lease-rent-options/.

[109] RealPage, Inc., Quarterly Report (Form 10-Q) (Mar. 31, 2017), at 11

"augment[ing]" RealPage's "repository of real-time lease transaction" made it clear that RealPage intended to comingle the data pools on which Yieldstar and LRO previously trained their pricing algorithms, expanding the volume of commercially sensitive data that Yieldstar and LRO users were receiving and providing to their competitors to permit RealPage to make pricing decisions on their behalf.

## ANSWER TO PARAGRAPH 216:

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 216 and denies them on that basis.

217.    While the DOJ issued a "Second Request" in connection with the proposed merger due to its potential effects on competition, the DOJ took no further action, and RealPage completed the acquisition.[110] Even Jeffrey Roper, RealPage's principal data scientist exclaimed, "I was surprised the DOJ let that go through."[111]

## ANSWER TO PARAGRAPH 217:

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 217 and denies them on that basis.

218.    After its acquisition of LRO, RealPage effectively had a monopoly, such that RealPage's RMS would influence rental prices over the entire market. In a letter urging Congress to investigate potential anticompetitive practices by RealPage, Senators Garcia and Schakowsky explained "RealPage has achieved a position of dominance in the industry through controversial acquisitions. In 2017, RealPage purchased its biggest competitor, Lease Rent Options (LRO). This acquisition made RealPage the nation's most dominant provider of rent-setting software."[112] After the acquisition, RealPage's CEO told investors that RealPage's RMS would account for over two-thirds of all revenue management usage, with its next competitor, Yardi, at a distant second place.[113] RealPage's RMS market share is believed to have continued to increase following the LRO acquisition.

## ANSWER TO PARAGRAPH 218:

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 218 and denies them on that basis.

219.    Market participants knew that using LRO, particularly after its acquisition by RealPage, could lead to information sharing and price setting that posed grave antitrust concerns. In

---

[110] Vogell, *supra* note 1.
[111] *Id.*
[112] Letter from Senators Jesus G. "Chuy" Garcia and Jan Schakowsky (Nov. 14, 2022), https://chuygarcia.house.gov/sites/evo-subsites/chuygarcia.house.gov/files/evo-media-document/realpage-letter.pdf.
[113] Transcript, RealPage Inc. at Stephens Investor Conference—Final, June 6, 2017.

March of 2017, AvalonBay Communities Inc. ("AvalonBay"), one of the country's largest property management companies, entered into a contract with Rainmaker (predecessor to Defendant RealPage) for the use of LRO. A month after RealPage's acquisition was announced on February 27, 2017, AvalonBay insisted on a contractual provision in its March 27, 2017 LRO Master Services Agreement ("LRO MSA") that prohibited Rainmaker (and later, RealPage)[114] from: (1) utilizing any data in the LRO solution provided to AvalonBay other than AvalonBay's own data and publicly available data; and (2) utilizing AvalonBay's data or disclosing the LRO recommendations made to AvalonBay to any other Rainmaker (later, RealPage) client:

4.5  With respect to the LRO® Revenue Management Solutions, **Rainmaker** shall be responsible for the following:

- In no event will Rainmaker utilize any data other than data provided by Customer expressly for such purpose or data obtained through publicly available sources or such other sources as identified in the applicable Module which Customer has opted to purchase in writing in the Rainmaker System licensed to Customer without the prior express written consent of Customer (the "Data Entry Representation").

- In no event will Rainmaker utilize in the Rainmaker System licensed to anyone other than Customer any Customer Data that is not obtained through other sources or otherwise developed independently by Rainmaker without use of the Customer Data provided by Customer to Rainmaker. Furthermore, Rainmaker will not provide any recommendations as to rent provided to Customer for

---

6

---

Customer's Managed Properties through the Rainmaker System to any other parties (the "Input Representation")

## ANSWER TO PARAGRAPH 219:

Morgan Properties denies the allegations in Paragraph 219 and the untitled image incorporated therein.

220. AvalonBay was apparently so concerned by the possibility that Rainmaker and RealPage's RMS might use AvalonBay's data to set competitors' prices and/or use those competitors' prices to set AvalonBay's prices—notwithstanding that Clause 4.5 prohibits them from doing so—that AvalonBay insisted on even further protection. It required clauses that required Rainmaker and RealPage to expressly "represent and warrant that [they] will not violate the Input Representation or the Data Entry Representation," Clause 8.1.6, and "indemnify, defend and hold harmless [AvalonBay] from and against any and all claims, costs, expenses, losses, damages and liabilities (including legal costs and reasonable attorney's fees) incurred by [AvalonBay] in the event that" Rainmaker and RealPage breach these terms. Clause 8.1.1. The indemnification requirement is repeated again in Clause 9.2: "Rainmaker shall defend, indemnify and hold harmless [AvalonBay and its

---

[114] RealPage signed an amendment to the LRO MSA in 2022, which kept in place the Input Representation and Data Entry Representation, and labelled RealPage "The Rainmaker Group Real Estate, LLC['s]" "successor in interest".

employees] from any claims, damages and liabilities arising out of (i) any violation of the Input Representation or the Data Entry Representation...".

**ANSWER TO PARAGRAPH 220:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 220 and denies them on that basis.

221. The integration of LRO and YieldStar is understood to have begun shortly after LRO's acquisition closed at the beginning of January 2018.[115] During a February 25, 2019 earnings call with investors, RealPage's CEO, Steve Winn, was asked about the status of RealPage's integration of LRO and YieldStar into a unified platform. Winn responded, "The LRO, YieldStar database integration is partially complete. We have populated both databases with the overlap or the missing data that was in each of the individual databases, but they are still separate. They will remain separate *until we deploy the next generation of our revenue management*, which shouldn't—should be next year some time."[116] [Emphasis added.] Soon thereafter, in 2020, RealPage announced a new Revenue Management Solution: AI Revenue Management, or AIRM, which it touted as a combination of its legacy revenue management platforms and a "super-charged price optimization and revenue management tool."[117] "Following decades of proven performance with our YieldStar and LRO solutions, we've supercharged the next generation of price optimization. Bringing components of both systems together to provide even more pricing precision and extending optimization to amenities, to identify hidden yield within each unit."[118] "AI Revenue Management is a game-changing innovation in price optimization that maximizes asset value. By combining the best of YieldStar and LRO with improved algorithms, precision AI forecasting and optimized amenity pricing, it can help you realize a 400% year-one ROI [return on investment], achieve up to 200 basis points (bps) and outperform the market by 2%-7% year over year."[119] Built upon the bedrock of its legacy products, LRO and YieldStar, "[t]he backbone of AIRM is historical data collected from six million lease transactions across the U.S. over the last five years."[120]

**ANSWER TO PARAGRAPH 221:**

---

[115] Mary Salmonsen, *RealPage Closes on Lease Rent Options Acquisition*, MULTIFAMILY EXEC. (Jan. 3, 2018), https://www.multifamilyexecutive.com/business-finance/realpage-closes-on-lease-rent-options-acquisition/ ("Integration is expected to be completed in 2018.").
[116] Q4 2018 RealPage Inc Earnings Call - Final, SEEKING ALPHA (Feb. 25, 2019), https://seekingalpha.com/article/4244097-realpage-inc-s-rp-ceo-steve-winn-on-q4-2018-results-earnings-call-transcript
[117] Guy Leman, *Don't Miss This! Unveiling of "AIRM" AI Revenue Management at RealWorld*, REALPAGE BLOG (Sept. 8, 2020), https://www.realpage.com/blog/dont-miss-this-unveiling-of-airm-ai-revenue-management-at-realworld/.
[118] *Id*.
[119] The RealPage e-book, *Introducing AI Revenue Management: Next-Generation Price Optimization That Unlocks Hidden Yield*, REALPAGE, INC. (2020) ("Introducing AI Revenue Management e-book").
[120] Wendy Broffman, *Same Assets. Better Performance*, YIELD PRO (Oct. 16, 2022), https://yieldpro.com/2022/10/same-assets-better-performance.

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 221 and denies them on that basis.

222. While it remains unclear whether RealPage offers new subscriptions to its legacy revenue management products—YieldStar and LRO—according to Steve Winn, YieldStar and LRO were fully integrated and the databases combined upon the launch of AI Revenue Management, no later than 2020, at which time all RealPage RMS were combined into a single unified database.

## ANSWER TO PARAGRAPH 222:

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 222 and denies them on that basis.

223. That RealPage may continue to license YieldStar and LRO, or some iteration thereof, is inconsequential given that RealPage's RMS are integrated on the RealPage side at the software and data levels. Indeed, the Terms of Service governing RealPage's post-acquisition licensing of LRO confirms that when a LRO customer inputs data into the RealPage system, that data is not treated as confidential if "transformed or aggregated" at RealPage's discretion, and not specifically identifiable to the customer.[121] Moreover, while RealPage continues to license LRO in some fashion, the LRO program available post-RealPage acquisition "include[es] Enhancements provided by RealPage" and allows RealPage to make "ongoing modifications."[122] Additionally, the Terms of Service provide that "RealPage will assume or otherwise facilitate the role of Pricing Revenue Manager" for LRO customers.[123]

## ANSWER TO PARAGRAPH 223:

Morgan Properties admits that there are Terms of Service for LRO, but states that the document speaks for itself. Morgan Properties otherwise lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 223 and denies them on that basis.

---

[121] Terms of Service for Rainmaker System Modules (Dec. 7, 2017), https://www.realpage.com/rainmakermfh-terms/.

[122] *Id*.

[123] Notably, numerous individuals who currently hold the title of Revenue Manager or Revenue Management Consultant at RealPage, simultaneously hold the position of "LRO Advisor." See, *e.g.*, Kristin Brown, LinkedIn, https://www.linkedin.com/in/kristin-brown-a851828/?jobid=1234; Miranda Sorrels, LinkedIn, https://www.linkedin.com/in/miranda-sorrels-62b1417/; Stanely Seth Scott, LinkedIn, https://www.linkedin.com/in/stanleysethscott/ (profiles list "LRO Advisor" and "Revenue Manager" or "Revenue Management Consultant" as concurrently held positions).

224.    RealPage's control over multifamily rental prices continued to grow after its acquisition of LRO. By the end of 2022, RealPage claimed that its RMS set the price for more than four million rental units.[124] These four million units, however, provide only a portion of the data available to train Defendant RealPage's algorithm. RealPage is also able to mine data from property owners and managers that rely on RealPage software other than its RMS. According to RealPage's last annual report before it was acquired by Thoma Bravo, as of December 31, 2020, its "client base of over 31,700 clients used one or more of [its] integrated data analytics or on demand software solutions to help manage the operations of approximately 19.7 million rental real estate units."[125]

**ANSWER TO PARAGRAPH 224:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 224 and denies them on that basis.

225.    RealPage's vast client base provides it with real-time data on every aspect of the rental housing market, including actual rent prices as opposed to advertised rents—data which was previously unavailable to landlords.  With this data, Defendant RealPage is able to calculate and disseminate supracompetitive unit-by-unit pricing on a daily basis for use by the Managing Defendants and Owner-Operators, touting that its algorithms "crunches *millions of transactions each night*, pinpointing price shifts for *every single unit* on the platform at any point in time."[126] [Emphasis added.]

**ANSWER TO PARAGRAPH 225:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 225 and denies them on that basis.

226.    Figure 6, below, is a diagram from an eBook published by Defendant RealPage on its website.[127] It demonstrates how RealPage aggregates the data (including nonpublic lease transaction data) that enables RealPage to coordinate pricing among its clients.

---

[124] RealPage AI Revenue Management, REALPAGE, INC., https://www.realpage.com/asset-optimization/revenue-management/.
[125] See RealPage 2020 Form 10-K, *supra*, note 4.
[126] *YieldStar Calculates the Right Rent Price at the Right Time*, REALPAGE VIDEOS, https://www.realpage.com/videos/yieldstar-measures-price-elasticity/.
[127] *3 Ways to Leverage AI for Maximum NOI*, REALPAGE EBOOKS (2022), https://www.realpage.com/ebooks/leverage-ai-maximum-noi/ ..

**Figure 6: Excerpt from RealPage e-Book "3 Ways to Leverage AI for Maximum NOI"**



## ANSWER TO PARAGRAPH 226:

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 226 and Figure 6 and denies them on that basis.

### C. Property Management Companies Effectively Outsourced Pricing and Supply Decisions to RealPage, Eliminating Competition.

227.    RealPage clients, including the Owners, Operating-Owners, and Managing Defendants, provide RealPage with detailed, real-time, and non-public information concerning pricing, inventory, occupancy rates, as well as their units and unit types available, or that will soon be available for rent.  Owners, Owner-Operators, and Managing Defendants share this proprietary data knowing that RealPage will use it to assist them and their competitors, including through price and lease term recommendations.  Defendants also share this proprietary data with Defendant RealPage so that they can benefit from the proprietary data that their competitors are likewise providing to RealPage.

## ANSWER TO PARAGRAPH 227:

Morgan Properties denies the allegations in Paragraph 227.

228.    The U.S. Department of Justice has stated that the exchange of the kind of information that Defendants here agree to exchange with their direct competitors raises serious antitrust concerns:

> . . . the sharing of information related to a market in which . . . the participants are actual or potential competitors may increase the likelihood

of collusion on matters such as price, output, or other competitively sensitive variables. The competitive concern depends on the nature of the information shared. Other things being equal, the sharing of information relating to price, output, costs, or strategic planning is more likely to raise competitive concern than the sharing of information relating to less competitively sensitive information.[128]

**ANSWER TO PARAGRAPH 228:**

Plaintiffs correctly quote from the source cited in footnote 128. Morgan Properties otherwise denies the allegations in Paragraph 228.

229.     In 2017, then Chairman of the Federal Trade Commission, Maureen Ohlhausen, similarly explained how multiple firms outsourcing pricing decisions to a single third-party actor—as the Owners, Managing Defendants, and Owner-Operators have done with RealPage—raise serious antitrust concerns:

> What if algorithms are not used in such a clearly illegal way, but instead effectively become a clearing house for confidential pricing information? Imagine a group of competitors sub-contracting their pricing decisions to a common, outside agent that provides algorithmic pricing services. Each firm communicates its pricing strategy to the vendor, and the vendor then programs its algorithm to reflect the firm's pricing strategy. But because the same outside vendor now has confidential price strategy information from multiple competitors, it can program its algorithm to maximize industry-wide pricing. In effect, the firms themselves don't directly share their pricing strategies, but that information still ends up in common hands, and that shared information is then used to maximize market-wide prices. Again, this is fairly familiar territory for antitrust lawyers, and we even have an old-fashioned term for it, the hub-and-spoke conspiracy. Just as the antitrust laws do not allow competitors to exchange competitively sensitive information directly in an effort to stabilize or control industry pricing, they also prohibit using an intermediary to facilitate the exchange of confidential business information. Let's just change the terms of the hypothetical slightly to understand why. Everywhere the word "algorithm" appears, please just insert the words "a guy named Bob". *Is it ok for a guy named Bob to collect confidential price strategy information from all the participants in a market, and then tell everybody how they should price? If*

---

[128] US DOJ and FTC, Antitrust Guidelines for Collaboration Among Competitors (April 2000) at 15, https://www.ftc.gov/sites/default/files/documents/public_events/joint-venture-hearings-antitrust-guidelines-collaboration-among-competitors/ftcdojguidelines-2.pdf.

*it isn't ok for a guy named Bob to do it, then it probably isn't ok for an algorithm to do it either.*[129]

## ANSWER TO PARAGRAPH 229:

Plaintiffs correctly quote from the source cited in footnote 129. Morgan Properties otherwise denies the allegations in Paragraph 229.

230. Not content to merely facilitate this anticompetitive information exchange, RealPage prices each client's multifamily rental "properties as though we [RealPage] own them ourselves,"[130] with the benefit of the Owners', Managing Defendants', and Owner-Operators' past, current, and future pricing, and leasing decisions. RealPage then pressures and actively assists its clients to "outsource [their] daily pricing and ongoing revenue oversight" to RealPage.[131]

## ANSWER TO PARAGRAPH 230:

Morgan Properties denies the allegations in Paragraph 230.

231. Following their adoption of RealPage's RMS, the Owner, Owner-Operators, and Managing Defendants all concertedly shifted from prioritizing occupancy (*i.e.*, market share) over price, to prioritizing price over occupancy—a telltale sign of anticompetitive coordination.

## ANSWER TO PARAGRAPH 231:

Morgan Properties denies the allegations in Paragraph 231.

232. By enabling property managers and owners to outsource lease pricing decisions to RealPage's RMS, Defendant RealPage has corrupted rental markets, replacing independent centers of decision making with a single effective decisionmaker: RealPage. A former industry executive closely involved in the development of LRO (Witness 9) explained that, in conjunction with Pricing Advisors, the vast amount of data RealPage holds allows its RMS to act as "a deterministic tool" wherein "if you put in the same values you get the same results" across users.

---

[129] Maureen K. Ohlhausen, *Should We Fear The Things That Go Beep In the Night*? Some Initial Thoughts on the Intersection of Antitrust law and Algorithmic Pricing, FED. TRADE COMM'N (May 23, 2017), https://www.ftc.gov/system/files/documents/public_statements/1220893/ohlhausen_-_concurrences_5-23-17.pdf (last visited on July 3, 2023) (emphasis added).
[130] RealPage Renewal Reporting Presentation, *supra* note 7.
[131] Press Release, RealPage, Inc., YieldStar Offers Revenue Management Advisory Services to Multifamily Owners and Managers, *supra* note 6.

**ANSWER TO PARAGRAPH 232:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth

of the statements alleged in Paragraph 232 and denies them on that basis. Morgan Properties

otherwise denies the allegations in Paragraph 232.

233.    A former Leasing Consultant and Assistant Property Manager for two properties managed by Defendant Lincoln in the Greater Nashville Metro Area (Witness 5)[132] explained that rental rates in Lincoln's new leases were auto-populated by RealPage's RMS. Witness 5 indicated that renewal rates were also generated by RealPage and subject to a 3%-5% increase, despite the fact that at times, vacant units in the property were offered for rent for less than renewal units subject to RealPage's imposed price increase. Defendant Equity's Vice President of Pricing confirmed that Equity "was able to raise revenue 3 to 5 percent," using RealPage's RMS, and further admitted that Equity "let the system determine at what rate revenue is maximized...."[133]

**ANSWER TO PARAGRAPH 233:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 233 and denies them on that basis.

234.    As Defendant Camden's Regional Manager, Bill Ramsey, explained, "[w]e trust the system . . . [w]e don't have to sit and look at all the comps and decide, 'what is the [unit] going to lease for today?' That is all history now."[134] Likewise, James Flick, head of Revenue Management at Defendant Camden, offers his perspective: "As a longtime leader in leveraging technology to drive performance, we know the importance of getting it right...all the time. We rely heavily on RealPage's Revenue Management system, analytics and team of advisors to identify opportunities to preserve NOI and drive revenue."[135] Defendants' frequent announcements to the market concerning their use of RealPage's RMS and financial benefits obtained therefrom, serve as signals to the market of their assent to the agreement, and compliance with the scheme to price according to RealPage's RMS.

**ANSWER TO PARAGRAPH 234:**

---

[132] From 2017 through 2018, Witness 5 worked as a Leasing Consultant at a property located in the Greater Nashville Metro Area and managed by Defendant Lincoln. Subsequently, from 2019 until 2020, Witness 5 worked as an Assistant Property Manager at another property in the Greater Nashville Metro Area managed by Defendant Lincoln. In both these roles, Witness 5 checked RealPage's pricing recommendations daily. However, he was unable to change or offer different pricing terms than that provided by RealPage.

[133] Hudgins, *supra* note 85

[134]    Rachel    Azoff,    *New    Dynamic*,    MULTIFAMILY    EXEC.    (Oct.    17,    2005), https://www.multifamilyexecutive.com/property-management/new-dynamic_o.

[135] *RealPage AI Revenue Management Boosts Yields in Uncertain Times*, RealPage Newsroom (May 10, 2020), https://www.realpage.com/news/ai-revenue-management-boosts-yields-in-uncertain-times/..

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 234 and denies them on that basis.

235.    Where lease prices were formerly set to maximize occupancy rates, RealPage's RMS has
        one goal: increasing overall revenue by raising prices on individual rental units. David
        Hannan, senior vice president at the Morgan Group, a Houston-based property manager
        that saw its revenues grow by 5% above expectations when it implemented AI Revenue
        Management, characterized the transformation like this: "My generation grew up
        worshiping the occupancy gods. We learned that if you were not 95 percent-plus
        occupied, the asset was failing. But that's not necessarily true anymore . . . [RealPage]
        totally turns the industry upside down."[136] Defendant Bell Partners' CFO confirms this;
        while previously Bell's "strategy was to push occupancy to help offset rent declines," after
        adoption of RealPage RMS, "[n]ow, clearly, the focus is on maximizing rents."[137]
        RealPage characterizes this transformation as a shift from an "occupancy focus" to "rent
        growth" focus.[138] This is a central mantra of RealPage, to sacrifice "physical" occupancy
        (*i.e.*, to decrease output) in exchange for "economic" occupancy, a manufactured term
        RealPage uses to refer to increasing prices and decreasing physical occupancy levels
        (output) in the market.

**ANSWER TO PARAGRAPH 235:**

        Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 235 and denies them on that basis.

236.    At the same time RealPage was policing the cartel's agreement to increase prices at the
        expense of occupancy rates, it was also facilitating a reduction in supply. Speaking on a
        2018 earnings call, RealPage's Chairman and CEO, Steve Winn, explained that a RealPage
        product catering to short-term rentals (services like Airbnb) "allows owners to push
        inventory out of the long-term rental pool which then constrains supply. Our revenue
        management platform can then monetize this constrained supply for owners in the form of
        higher rents."[139]

**ANSWER TO PARAGRAPH 236:**

        Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 236 and denies them on that basis.

---

[136] Bousquin, *supra* note 84.
[137] Jerry Ascierto, *CFO Strategies Survey Benchmarks Multifamily Industry's Optimism*, MULTIFAMILY EXEC.
(Sept. 22, 2011), https://www.multifamilyexecutive.com/property-management/apartment-trends/cfo-strategies-survey-benchmarks-multifamily-industrys-optimism-1_o.
[138] Vogell, *supra* note 1.
[139] Q2 2018 RealPage Inc. Earnings Call (Aug. 2, 2018).

237.    A former RealPage Pricing Advisor (Witness 7)[140] disclosed that in addition to daily pricing recommendations, RealPage provides its clients, including Owners, Managing Defendants, and Owner-Operators, with a wealth of information during one-on-one, quarterly "Performance to Market" meetings ("PTMs").

**ANSWER TO PARAGRAPH 237:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 237 and denies them on that basis.

238.    Witness 7 stated that the PTMs were attended by high-ranking executives from the client and RealPage's then Director of YieldStar Revenue Management, Jonathan Olson, the client's assigned Pricing Advisors, and at least one member from RealPage's Analyst group.

**ANSWER TO PARAGRAPH 238:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 238 and denies them on that basis.

239.    The purpose of these meetings, per Witness 7, is to provide clients with information regarding overall market performance within the applicable region, as well as a client-specific performance review.

**ANSWER TO PARAGRAPH 239:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 239 and denies them on that basis.

240.    Witness 7, along with other Pricing Advisors and their respective supervisors and analysts, spent weeks reviewing client and market data to prepare compelling charts to be presented at these PTMs.

**ANSWER TO PARAGRAPH 240:**

---

[140] During her tenure as a Pricing Advisor, Witness 7 worked closely with RealPage clients that utilized its pricing platform. Witness 7 interfaced with property management companies daily to provide training and guidance on RealPage's Revenue Management Solutions and to discuss specific aspects of the system and its processes. Witness 7 stressed that it was incumbent on her and other Pricing Advisors to train and remind clients to enter all required leasing information into the revenue management system daily. While a typical RealPage Pricing Advisor was expected to maintain a portfolio between 60 and 65 properties, Witness 7 was responsible for overseeing 90 properties that used RealPage software and her primary contacts at the property management companies included on-site managers, Regional Managers, as well as Vice Presidents and Asset Managers. Witness 7, along with other Pricing Advisors, also interfaced quarterly with senior ranking executives from the property management companies they were responsible for.

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 240 and denies them on that basis.

241.     Revenue growth is strongly emphasized to multifamily property owners and managers during these meetings, according to Witness 7, and consistent with RealPage's push to ensure RMS clients accept its price and term recommendations at least 80% of the time.

## ANSWER TO PARAGRAPH 241:

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 241 and denies them on that basis.

242.     Witness 7 explained that the need to accept price and occupancy recommendations was RealPage's constant focus. RealPage continually reiterated to its clients that "you can run a property with fewer people living there, and still meet or exceed what you've made in the past."

## ANSWER TO PARAGRAPH 242:

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 242 and denies them on that basis.

243.     As part of RealPage's ongoing "education" and "training" of its clients, RealPage's Pricing Advisors frequently explained that any losses incurred due to units remaining vacant are recaptured through higher rental prices when a lease is executed. Witness 7 explained that every day a unit sits vacant, that vacancy "loss" is "built into" RealPage's daily pricing recommendation in that market.

## ANSWER TO PARAGRAPH 243:

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 243 and denies them on that basis.

244.     Put another way, by outsourcing their pricing decisions to RealPage, each Owner, Managing Defendant, and Owner-Operator knows that the impact of the ever-rising prices set by RealPage's RMS will outpace their vacancy losses.  In the absence of coordinated behavior, this price-over-volume strategy is economically irrational behavior, particularly for a perishable resource like multifamily rentals (if a unit sits vacant for a month, that Managing Defendant(s) can never monetize that lost month of rent).

## ANSWER TO PARAGRAPH 244:

Morgan Properties denies the allegations in Paragraph 244.

245.  This irrational behavior was only accomplishable because Owners, Managing Defendants, and Owner-Operators alike knew that their competitors were similarly making pricing and supply decisions according to RealPage's RMS. A former Business Manager for Defendant Lincoln ("Witness 10") confirmed she was well aware that Defendant Lincoln's "biggest competitors in the country were using RealPage" to set rents.[141] This was common knowledge. According to Witness 10, "all the major players used [RealPage RMS] because that's just what everyone did." Witness 10 confirmed that through RealPage's RMS platform, the user was easily able to ascertain the identity of competitors that were using RealPage's RMS based on the address of the properties that were listed as comparables on the RMS platform. Witness 10 explained that if a property appeared on the RMS platform and/or was listed as a comparable, that indicated the property had similarly input their rental information into RealPage's RMS.

**ANSWER TO PARAGRAPH 245:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the statements alleged in Paragraph 245 and denies them on that basis. Morgan Properties otherwise denies the allegations in Paragraph 245.

246.  Witness 6 also stated that "at least monthly," the Cushman & Wakefield [Defendant Pinnacle] property she worked at received communications from RealPage wherein RealPage advertised the fact that Pinnacle's competitors were using RealPage's RMS to price their multifamily rental units. Witness 6 explained that these communications contained detailed information concerning not only Pinnacle's properties, but also of its regional competitors' properties who were pricing according to RealPage's RMS.

**ANSWER TO PARAGRAPH 246:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 246 and denies them on that basis.

247.  During PTMs, RealPage shares market intelligence with its clients, which Witness 7 explains was obtained from two sources. The first of these is "survey data" which is collected through in-person or telephone interviews and obtained by RealPage through third-party vendors such as CoStar.[142] The second source is what RealPage refers to as "transactional data," which means the actual lease terms, rental prices, vacancy rates, and other data points that RealPage requires its RMS clients, as well as its business intelligence and data analytics clients to provide to RealPage. Witness 7 explains that "survey data" and "transactional data" are "blended" into a comprehensive data set used during PTM

---

[141] Witness 10 worked as a Business Manager for Defendant Lincoln from May 2021 through January 2022 in Denver, Colorado.

[142] CoStar is the self-described, "industry leader in commercial real estate information, analytics, and news [ ] provid[ing] clients with the data and tools they need to make smart decisions and stay ahead of competition," including in the multifamily rental housing market. *About CoStar*, COSTAR, https://www.costar.com/about.

meetings to compare the region's market performance with clients' performance.[143] Despite the "blended" nature of this data set, Witness 7 explained that RealPage representatives regularly advise and emphasize to clients at PTM meetings that the data presented contains ample and granular transactional data, pooled from the client's direct competitors in the region.

**ANSWER TO PARAGRAPH 247:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the statements alleged in Paragraph 247 and denies them on that basis. Morgan Properties otherwise denies the allegations in Paragraph 247.

248. Witness 7 reports that this was often done in instances when a client would bring their own dataset (largely based on survey data) to PTMs to assess whether RealPage's data varied. When it did, RealPage representatives were quick to qualify its own data as more reliable than any data pulled by a property owner or property management company independently, as RealPage's data contained actual transactional data from across the market and from the client's key competitors, Witness 7 clarified that "any time we use the term 'transactional data' we make clear to the client that [this] is RealPage user's data."

**ANSWER TO PARAGRAPH 248:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 248 and denies them on that basis.

249. Witness 7 stated that during weekly Revenue Management team conference calls and annual team summits, RealPage Vice President and Industry Principal, Andrew Bowen[144] often shared his "talking points" that contained information he intended to convey to RealPage clients during meetings with their executives. Bowen's "talking points" typically emphasized how RealPage's transactional data was a significant differentiator in the

---

[143] Similarly, to track its legacy LRO users' performance post-acquisition, RealPage provided users with certain historic reports "determined by RealPage in its sole discretion," including "aggregate[d] historical reports that include data regarding [at least 5] third party comparable properties (as determined by RealPage)," and identified the market or submarkets for which the reports were developed. (Terms of Service, *supra* note 121). Additionally, RealPage notified its LRO users that the data they input into the RealPage host system "in a method and format prescribed by RealPage," did not qualify as "confidential information or trade secrets" per the Terms of Service, "if transformed or aggregated" by RealPage, and not identifiable to the LRO customer. *Id*.

[144] At the time, Witness 7 worked as a Pricing Advisor, Andrew Bowen served as RealPage's "Industry Principal— Asset Optimization," a role Bowen held from October 2010 through February 2022, in which his "expertise center[ed] around [RealPage's] Investment Analytics, Performance Analytics, Business Intelligence and Revenue Management solutions, and how [RealPage's] partners can leverage them to produce the results they desire." Bowen served in several roles over the course of his career at RealPage, including as a consultant implementing YieldStar Revenue Management, a manager of RealPage's Professional Service team, assisting clients in "maximiz[ing] the effectiveness of YieldStar," and as Director of Business Development for all RealPage Asset Optimization products. See Andrew Bowen, LINKEDIN, https://www.linkedin.com/in/andrewbowen2/ (last accessed June 14, 2023).

industry and impressed "the importance of explaining to our clients the benefits of transactional data that's coming from other RealPage users," in other words—the Managing Defendants' and Owner-Operators' competitors.

## ANSWER TO PARAGRAPH 249:

Morgan Properties denies the allegations in Paragraph 249.

250. Witness 7 explained that data relating to "vacant days"—how many days rental units remained vacant—was also discussed with clients during PTMs. This data was also displayed as a comparison between the client and regional competitors.

## ANSWER TO PARAGRAPH 250:

Morgan Properties denies the allegations in Paragraph 250.

251. RealPage Pricing Advisors frequently discussed the upside to units remaining vacant for periods beyond what conventional industry wisdom might suggest. Witness 7 states that these discussions were typically framed as to whether it was worth having units "sit vacant for a few more days to get $50 more for a month in rent?" During PTMs, RealPage personnel stressed the benefits of relying on the pricing recommendation offered by RealPage's RMS, even when that meant a certain unit or units might remain vacant for longer periods. Defendants' coordinated efforts have been effective in driving anticompetitive outcomes: higher rental prices and lower occupancy levels.

## ANSWER TO PARAGRAPH 251:

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the statements alleged in Paragraph 251 and denies them on that basis. Morgan Properties otherwise denies the allegations in Paragraph 251.

252. RealPage also encouraged its clients, including Owners, Managing Defendants, and Owner-Operators, to abandon other traditional market share maximizing practices, such as keeping low turnover rates. Ric Campo, the CEO of Defendant Camden, admitted that Camden's turnover rates increased around 15 percentage points in 2006 after implementing YieldStar. Despite that increase in turnover rates, Defendant Camden's overall same-property revenue grew over 7% in its first year using YieldStar. "What we found," Campo said, "was that driving our turnover rate up actually captured additional revenue."[145] While Defendant Camden's turnover expenses increased by $2.5 million, revenue increased $12.5 million. According to Campo, "[T]he net effect of driving revenue and pushing people out was $10 million in income."[146]

---

[145] Bousquin, *supra* note 84.
[146] *Id*.

**ANSWER TO PARAGRAPH 252:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the statements alleged in Paragraph 252 and denies them on that basis. Morgan Properties otherwise denies the allegations in Paragraph 252.

253. Defendant RealPage also provides its customers with real-time information about their competitors' lease terms, and provides lease term recommendations aimed at avoiding oversupply of units caused by natural ebbs and flows in the market. RealPage's RMS use the occupancy data that it collects to recommend lease renewal dates that are staggered to avoid any period of oversupply. Property owners and managers can then hold units vacant for a period, while keeping rent prices inflated.[147] This strategy of the staggering of lease renewal dates smooths out natural fluctuations of supply and demand, which further reduces any incentive for Defendants and their coconspirators to undercut their inflated prices. This incentive is always the greatest in periods of oversupply, when the individual benefits of reducing rents to increase occupancy are highest. As the CFO of Minneapolis-based Investor Real Estate Trust ("IRET") explained in 2019, "LRO is mapping out for our teams how they should be pacing their [lease] expirations."[148]

**ANSWER TO PARAGRAPH 253:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the statements alleged in Paragraph 253 and denies them on that basis. Morgan Properties otherwise denies the allegations in Paragraph 253.

254. A former Assistant Community Manager at co-conspirator Sunrise Management and Greystar Leasing Consultant (Witness 2) confirmed that among the factors considered in RealPage's pricing recommendation is the number of months in a lease term, as pricing would go up or down depending on the length of the lease to avoid too many vacancies and/or renewals falling on the same month.

**ANSWER TO PARAGRAPH 254:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 254 and denies them on that basis.

    **D.**     **Defendants Collectively Monitor Compliance with the Scheme.**

---

[147] RealPage e-book B & C Assets Ace the Market, *supra* note 10, at 4-5.
[148] RealPage Revenue Management Maximizes Market Opportunity, *supra* note 49.

255.    Defendant RealPage has various stops in place to closely monitor its clients, including the Owners, Owner-Operators, and Managing Defendants' "discipline," or compliance, with the price-fixing scheme. In its training materials, RealPage tells its RMS clients, including the Defendants, that it would conduct "[r]egular secret shops and surveys to confirm successful adoption" of RealPage's RMS software functionality. Each member of the conspiracy thus knew that RealPage would be monitoring its actions closely to ensure compliance. RealPage's RMS "best practices" also include a requirement that property managers review weekly reports from RealPage Pricing Advisors and communicate directly with regional managers and Pricing Advisors about any adoption issues.

## ANSWER TO PARAGRAPH 255:

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 255 and denies them on that basis.

256.    Other compliance mechanisms include specific "workflows," pictured below and taken from RealPage's "YieldStar Revenue Management—Manager Training" deck, which details the times and processes by which property managers accept RealPage's pricing "recommendations":

**Figure 7: "Daily Workflow" Slide from RealPage's 2022 "YieldStar Revenue Management – Manager Training" Deck[149]**



---

[149] Hereinafter, "RealPage's YieldStar Manager Training Deck." "Community Manager," "Regional Manager," and "Asset Manager" refer to individuals who work for the property management company. The price acceptance process begins with the Community Manager who is responsible for reviewing RealPage's daily pricing recommendations. "Revenue Management Advisor" refers to RealPage's Pricing Advisors assigned to that particular property management company or internal RealPage-trained revenue managers who worked for the property management company.

**ANSWER TO PARAGRAPH 256:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 256 and Figure 7 and denies them on that basis.

257.     Witness 7 explained that Pricing Advisors received daily alerts as to when a particular client had reviewed the daily price recommendations. As part of their daily responsibilities, RealPage Pricing Advisors were required to review the pricing recommendations issued for each assigned client.

**ANSWER TO PARAGRAPH 257:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 257 and denies them on that basis.

258.     Any review had to occur before 9:30 a.m. local time. *See* Fig. 6 above. Witness 7 recalls that the client is able to: (1) "Accept"; (2) "keep yesterday"; or (3) "propose override" for each pricing recommendation.

**ANSWER TO PARAGRAPH 258:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 258 and denies them on that basis.

259.     To the extent a client elected to keep the previous day's proposed pricing or propose an override altogether, the client was met with a "mandatory" on-screen prompt to provide a legitimate "business reason" in writing to justify to Defendant RealPage the client's decision to veer from RealPage's daily pricing recommendations. As Witness 7 explained, "if the model recommended a price increase and the client said 'no,' [RealPage] would need to know what the business reason was." Figure 8 below contains an image of the pricing screen for training purposes, as depicted in RealPage's YieldStar Manager Training Deck.

**Figure 8: "Rate Review" Slide from RealPage's 2022 YieldStar Manager Training Deck**



## ANSWER TO PARAGRAPH 259:

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 259 and Figure 8 and denies them on that basis.

260.    Pricing Advisors were trained to use the phrase "business reason" when interacting with clients regarding their justification for an override. Witness 7 explained this was designed to impart the notion that a client's explanation had to provide acceptable reasons pertaining to property management operations to override a pricing recommendation.

## ANSWER TO PARAGRAPH 260:

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 260 and denies them on that basis.

261.    Witness 7 explained that if a client sought to override a pricing recommendation because the property had a higher vacancy rate, for example, RealPage Pricing Advisors were trained to push back and communicate that vacancy rates were not an "acceptable business reason" because the algorithm(s) had already taken vacancy rates into account when making its daily pricing recommendation.

## ANSWER TO PARAGRAPH 261:

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 261 and denies them on that basis.

262.    For Pricing Advisors, a legitimate business reason had to be "something that the model could not see." To ensure clients remained "in the 80 to 85% acceptance rate" target that RealPage sought, Witness 7 and other Pricing Advisors often spent considerable time communicating this premise to "educate" clients on the pricing methodology and associated benefits of accepting all, or almost all RealPage pricing recommendations, despite increasing vacancy rates. While Witness 7 references an appropriate acceptance range would be between 80 to 85%, in her practice, Witness 1 reported that RealPage recommended RMS clients accept RealPage's pricing recommendations "100% of the time," other than in limited circumstances.

**ANSWER TO PARAGRAPH 262:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 262 and denies them on that basis.

263.    Witness 2 "consistently" relayed to RealPage representatives that the price recommendations provided for her community were "way too high." Based on her experience in the market, Witness 2 believed the fair market rents for the properties in that region were much lower than RealPage's pricing recommendations. Witness 2 reported that she, "knew [rental prices] were way too high, but [RealPage] barely budged."

**ANSWER TO PARAGRAPH 263:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 263 and denies them on that basis.

264.    Witness 2 recalled that while most of the reasons offered to RealPage for a pricing override were deemed not "good enough," RealPage *never* accepted any attempt by the client to reject its recommendation on the basis that the price did not reflect fair market values.

**ANSWER TO PARAGRAPH 264:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 264 and denies them on that basis.

265.    Highlighting this, Witness 2 noted that she understood the property markets in the areas [she] acted in, while RealPage's Texas-based employees were not familiar with the individual local markets in which their pricing recommendations are pushed: "I'm on the ground, I see the value." In Witness 2's opinion, that value was constantly overstated by RealPage's pricing recommendations to the detriment of renters, but because RealPage is such a "monster" in the industry, people were reticent to speak up against the system.

**ANSWER TO PARAGRAPH 265:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 265 and denies them on that basis.

266.　Witness 5 explained that if his property management team wanted to make changes to the price that YieldStar autogenerated every morning, before they could even reach out to RealPage the property management team was required to contact Defendant Lincoln Property's corporate office. In response to a request to Lincoln's corporate office for any modification to RealPage's recommended pricing, Witness 5 explained that "99% of the time," field employees were told "the rates are what they are."

**ANSWER TO PARAGRAPH 266:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 266 and denies them on that basis.

267.　In fact, Witness 5 explained that any adjustments to rental prices were only accepted if Defendant Lincoln's website advertised a different price than that recommended by RealPage for a given unit, which would have occurred only as a result of human error. In these instances, Witness 5's Regional Manager was required to obtain approval from Defendant Lincoln's corporate office to veer from RealPage's pricing recommendation.

**ANSWER TO PARAGRAPH 267:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 267 and denies them on that basis.

268.　Defendant RealPage closely tracked the rates at which property managers accepted its recommendations. Witness 7 explained that RealPage created "Rate Acceptance Reports" that detail the rate at which any given client accepted the daily recommended price provided by the RealPage algorithm over the last 28 days.

**ANSWER TO PARAGRAPH 268:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 268 and denies them on that basis.

269.　Beginning in late 2019, Defendant RealPage began the rollout of a new version of one of its RMS products, referred to internally as "Price Optimization 2" or "POV2." Witness 7 recalls that with this updated technology, RealPage began tracking not only a client's acceptance rate, but also the identity of the personnel within a client's business that issued a "keep yesterday" or "propose override" request. This increased granularity in the reports provided by RealPage and enabled property management companies to monitor acceptance rates more closely within their own ranks.

**ANSWER TO PARAGRAPH 269:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 269 and denies them on that basis.

270.     Reports tracking a client's rent rates and rent variances – the amount the rent prices charged varied from what the model suggested—were used by Defendant RealPage Pricing Advisors to review with Regional Managers or Vice Presidents from the property management and/or owner company during periodic performance reviews, including Performance to Market meetings. During these reviews, Pricing Advisors would notify their client if they were succeeding in "embracing the algorithm," or if the property was underperforming.

**ANSWER TO PARAGRAPH 270:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 270 and denies them on that basis.

271.     In addition to Rate Acceptance Reports, Defendant RealPage created "Lease Compliance Reports" which Witness 7 referred to as "one of [RealPage's] top auditing tools," which is consistent with RealPage's training materials describing Lease Compliance Reports as an "[a]uditing tool to ensure accepted rates are consistent with [recommended] lease rates to hold teams accountable." Beyond the acceptance rate, Lease Compliance Reports show the variance between a particular pricing action taken by a client for a given unit, and the pricing terms of the executed lease for that unit. On the left-hand side, these reports display the pricing action taken by the client (accept, keep yesterday, or override) and the right-hand side displays the rental price in the associated lease. In other words, the Lease Compliance Reports show whether a property management company actually charged the renter the price RealPage's RMS recommended, and which the property management company accepted.

**ANSWER TO PARAGRAPH 271:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth

of the statements alleged in Paragraph 271 and denies them on that basis. Morgan Properties

otherwise denies the allegations in Paragraph 271.

272.     Witness 7 explained that Lease Compliance Reports also list an overall compliance rate at the bottom of the report, which is expressed as a negative percentage. During her tenure as Pricing Advisor 2 (2014-2020), if a client was fully "compliant" in transferring Defendant RealPage's RMS pricing recommendations into the executed lease, they received a score of zero percent. If a client deviated by 15% it would be expressed as - 15%. Per Witness 7 acceptable deviation rates between the client's pricing decision in the

RealPage RMS and executed leases should be no higher than -2% to -3%.[150] RealPage Pricing Advisors would regularly reach out to chastise RMS clients who had higher deviations.

**ANSWER TO PARAGRAPH 272:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 272 and denies them on that basis.

273.    Importantly, Lease Compliance Reports provide a figure for the total revenue lost due to a client's deviation, including present losses and extended losses calculated over the course of a one-year period.  These figures are intended to impress on cartel members the collective benefit of adherence to Defendant RealPage's pricing recommendations. Witness 7 stressed that during PTMs, RealPage personnel were trained to, and did, emphasize the significant pecuniary impact associated with non-compliance.

**ANSWER TO PARAGRAPH 273:**

Morgan Properties denies the allegations in Paragraph 273.

274.    Defendant RealPage's provision of these reports and resources to the Owners, Owner-Operators, and Managing Defendants is economically irrational absent a price-fixing cartel and is done for the sole purpose of encouraging acceptance rates to be as high as possible, and deviations from accepted pricing in executed leases as close to zero as possible, by helping Owners, Managing Defendants, and Owner-Operators to identify employees that deviated from RMS pricing.

**ANSWER TO PARAGRAPH 274:**

Morgan Properties denies the allegations in Paragraph 274.

275.    Through the review and discussion of these Lease Compliance Reports during PTM meetings, Witness 7 reported that Defendant RealPage personnel successfully persuaded clients that it was in their best interest to: (1) accept all or substantially all of RealPage's pricing recommendations; and (2) ensure those rates were effectively included in the operative lease agreement.

**ANSWER TO PARAGRAPH 275:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 275 and denies them on that basis.

---

[150] Note, this a separate measurement to acceptance of the rate recommended by RealPage in the software environment.

276. Because Defendant RealPage's revenue is largely derived from "license and subscription fees relating to [RealPage's] on demand software solutions, typically licensed over one year terms; commission income from sales of renter's insurance policies; and transaction fees for certain of our on demand software solutions," in addition to selling new software licenses, RealPage has an interest in facilitating the cartel to ensure property management companies see the revenue increases RealPage claims its RMS products yield, thereby incentivizing existing clients to renew their software licenses annually.[151]

## ANSWER TO PARAGRAPH 276:

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 276 and denies them on that basis.

277. Witness 7 explained that when Lease Compliance Reports reflected lower than expected compliance rates, high-ranking executives from property management companies often expressed frustration with their own internal compliance measures. As one example, Witness 7 indicated that during discussions concerning the compliance rate reflected in the Lease Compliance Report prepared for co-conspirator and RealPage RMS client, First Pointe, First Pointe President Christina Agra-Hughes became agitated at the deviation rate reported and asked rhetorically during the PTM, "why the hell aren't my teams following the model!?"

## ANSWER TO PARAGRAPH 277:

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 277 and denies them on that basis.

278. According to Witness 7, Defendant RealPage would, in addition to the PTMs, and depending on the client, have its Pricing Advisors host weekly, bi-weekly, and/or monthly calls with property owners and/or management companies.[152] During these calls, Pricing Advisors would conduct "Performance Reviews." A RealPage Pricing Advisor's task was to assist clients in understanding the methodology behind RealPage's RMS so that clients would more closely adhere to the scheme. Notably, Witness 7 stated that Defendant RealPage almost exclusively recruited its Pricing Advisors/Manager from property management companies, trusting that this permitted its Pricing Advisors to exude a level of expertise and authority that would convince clients to trust RealPage's pricing recommendations over their local knowledge. Likewise, Witness 7 explained that property management companies recruit their internal RMS experts from RealPage Pricing Advisors.

---

[151] RealPage 2020 Form 10-K, *supra* note 4.
[152] Likewise, as part of the Terms of Service to license LRO from RealPage, LRO users were required to participate in weekly pricing calls with RealPage. See Terms of Service, *supra*, note 121.

**ANSWER TO PARAGRAPH 278:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 278 and denies them on that basis.

279.   Following her employer's implementation of YieldStar in or around 2021, Witness 2 attended weekly meetings with RealPage representatives during which the Pricing Advisor would review Sunrise Management's acceptance rate and executed leases. During one of these meetings, Witness 2 was questioned as to why certain leases did not adopt RealPage's RMS pricing. In one instance, Witness 2 explained that a rental unit was advertised at $1,650/month despite the RMS price of $1,895/month, nearly 15% higher. Witness 2 elected to honor the advertised price over RealPage's RMS price and was consequently reprimanded by her supervisor, a Sunrise Management Regional Manager.

**ANSWER TO PARAGRAPH 279:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 279 and denies them on that basis.

280.   RealPage Pricing Advisors ensure and advance coordination in price setting between multifamily rental operators, including the Owners, Managing Defendants, and Owner-Operators. RealPage assigns each Pricing Advisor to a group of competing lessors in a given geographic area or city, who are tasked with integrating themselves into each of their assigned competing lessor's price setting processes. It is problematic enough that groups of competing lessors in a given area or city are outsourcing their price-setting functions to RealPage's RMS. But the resulting antitrust concerns are heightened by their use of common Pricing Advisors.

**ANSWER TO PARAGRAPH 280:**

Morgan Properties denies the allegations in Paragraph 280.

281.   Not only does each Pricing Advisor coordinate price increases amongst their clients, but they also coordinate price increases with other Pricing Advisors that are assigned to different groups of competing lessors in the same region or city. They are incentivized to coordinate with other Pricing Advisors and their clients because a percentage of each Pricing Advisor's compensation is linked to the amount that prices increase across their assigned geographic area or city—not to their ability to meet revenue goals for the individual lessors they advise. Pricing Advisors accordingly aim to raise rental prices across their assigned group of competing lessors as well as coordinate with other Pricing Advisors assigned to different groups of competing lessors in the same area or city on forward-looking pricing, thereby collectively inflating prices across an area or city.

**ANSWER TO PARAGRAPH 281:**

Morgan Properties denies the allegations in Paragraph 281.

282.    Witness 4 confirmed that either there are no firewalls in place to prevent a Pricing Advisor representing one group of competing lessors in an area or city from coordinating on pricing with Pricing Advisors representing different groups of competing lessors, or that, if there are such firewalls, they are systematically disregarded, and Pricing Advisors regularly engage in precisely this type of coordination.

## ANSWER TO PARAGRAPH 282:

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 282 and denies them on that basis.

283.    A former RealPage Pricing Analyst ("Witness 12")[153] explained that some property management companies did not subscribe to Defendant RealPage's advisory services and therefore, were not assigned a Pricing Advisor, but instead had their own internal revenue managers. Witness 12 explained that in order to become a certified internal revenue management advisor at a property management company, one would have to undergo an extensive two-to-three-day training session with RealPage, and the title was granted only after passing a cumulative final exam about pricing theory, RMS settings, and strategies.

## ANSWER TO PARAGRAPH 283:

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 283 and denies them on that basis.

284.    After years working as a Pricing Analyst for Defendant RealPage, Witness 7 was recruited by a property management company to serve as their in-house RealPage RMS manager. Witness 7 explained that RealPage maintains two groups that provide RMS support. The first group is known as "Client Services" and this group supports clients that have dedicated internal staff which serve in a capacity similar to RealPage's Pricing Advisors, working daily with RealPage's RMS. The second group is called "Pricing Advisory Services" and is the group that services clients who do not have internal pricing advisory or revenue management capabilities (*i.e.*, RealPage's Pricing Advisors). Consistent with Witness 12's account, Witness 7 explained that the Client Services group had fewer day-to-day interactions with property management clients compared to those in the Pricing Advisory group.

## ANSWER TO PARAGRAPH 284:

---

[153] Witness 12 worked as a RealPage Pricing Analyst from May 2017 through December 2019. In this role, Witness 12 was responsible for reviewing reports for his portfolio of properties.

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 284 and denies them on that basis.

285.     Witness 12 stated that typically "smaller and mid-tiered" clients paid for Defendant RealPage's Pricing Advisory services, while larger property management companies often had their own internal revenue manager.  Those that utilized RealPage's Pricing Advisors had daily calls with RealPage, which was the only way their RMS software settings could be calibrated.  In a Webcast hosted by RealPage's Chief Economist, Greg Willett, Tracy Paulk, who currently holds two titles at RealPage—VP, Consumer Solutions and Revenue Management, and VP, LRO Professional Services—explained that typically, once a property management company manages twenty thousand or more units, "you start to see the value" in having an in-house expert.[154] While Paul explained that RealPage "offer[s] full-on training . . . whether it's a certification process or a meeting once a month," RealPage's Chief Economist intimated that RealPage in fact "do[es] a lot of babysitting" for those who work for a property management company as internal advisors of RealPage's RMS.[155] Defendants BH, RPM, and Essex, all employ in-house revenue management teams.

## ANSWER TO PARAGRAPH 285:

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 285 and denies them on that basis.

286.     Notably, Witness 12 stated that a property management company using Defendant RealPage revenue management advisory services had no ability to change their own settings in any way that could impact pricing.  In order to change any settings, a property management company employee at the Regional Manager level or higher needed to speak directly with a RealPage Pricing Advisor.  While companies with internal RealPage revenue advisors had more access to adjust their own settings in accordance with their RealPage training, still, Witness 12 explained that even for companies with internal revenue managers, there were periodic reviews with RealPage Pricing Advisors, particularly if the company was underperforming, had a low acceptance rate of RealPage's pricing recommendations, or high variance rate.  In these instances, if a RealPage Pricing Advisor concluded that RealPage's pricing platform was not being used "correctly," then the situation was escalated.

## ANSWER TO PARAGRAPH 286:

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 286 and denies them on that basis.

---

[154] Best Practices Webcast, *supra* note 18 at 17:00-19:00.
[155] *Id*. at 20:00-22:00.

E.  **Property Owners and Managers Who Adopted RealPage's Pricing Recommendations Did So With the Common Goal of Raising Rent Prices Which Caused Inflated Rental Prices and Reduced Occupancy Levels in Their Respective Metro Areas.**

287.  Cartel members share their confidential data with the knowledge that Defendant RealPage will recommend rents to their competitors based on the data provided, in essence providing their competitors with clear insight into their confidential business information. Cartel members also know their competitors are likewise sharing their own confidential business information with RealPage, from which each cartel member can glean information about its competitors' pricing, as well as other data points. Defendant RealPage informs both current and prospective clients that its RMS utilizes its horizontal competitors' rent data. RealPage provided this confidential, non-public information to cartel members before they implemented or adjusted the rent prices they charged to renters. RealPage provided this confidential, non-public information about horizontal competitors to cartel members who either entered a written contract with it and paid monthly fees to access that information and service or who were their agents with knowledge of the contract.

**ANSWER TO PARAGRAPH 287:**

Morgan Properties denies the allegations in Paragraph 287.

288.  First, RealPage tells its RMS clients that it has access to non-public, daily real-time leasing data from a huge supply of multi-family buildings. In its training materials, RealPage tells clients that its "Building Blocks of Price" includes "Competitive Market Data" consisting of "[e]ffective competitor rents." RealPage goes on to tell its RMS clients that "Competitive Data is selected and updated from... Lease Transaction Data: Data collection from OneSite, RealPage Revenue Management, Business Intelligence and Performance Analytics." OneSite and RealPage Revenue Management collect detailed, daily information not otherwise available publicly about leasing activity and pricing from each of RealPage's clients. Thus, each Defendant using RealPage RMS knows that it is using non-public data from its horizontal competitors to make pricing decisions.

**ANSWER TO PARAGRAPH 288:**

Morgan Properties denies the allegations in Paragraph 288.

289.  RealPage also tells its RMS clients exactly whose non-public data is being used for pricing decisions. For each client, including Owners, Owner-Operators, and Managing Defendants, RealPage maintains a "peer list" of that client's peers whose transaction data will be used as an input in RealPage's algorithm for that client's pricing. Peer lists explicitly state that the competitors listed will be used "to determine the magnitude of a change in rent...." Clients, including Defendants, are able to review and comment on their peer list, and they can even request that specific competitors are included on the list. RealPage then quickly pushes the non-public, daily, real-time data from those competitors' properties into its algorithm to influence RealPage's pricing decisions. In this way, each Owner

Defendant, Owner-Operator, and Managing Defendant consciously commits to using non-public data from its direct horizontal competitors to price its own units.

**ANSWER TO PARAGRAPH 289:**

Morgan Properties denies the allegations in Paragraph 289.

290. Witness 6 explained that Cushman & Wakefield received "at least monthly" communications from RealPage, in which RealPage advertised and reiterated the fact that its RMS factored in C&W's regional competitors' data. Those communications also identify specific local competitor properties that use RealPage's RMS to price their multifamily rental units. Witness 7 also confirmed that RealPage representatives regularly advised clients during PTMs that the pooled data reviewed during these meetings contained their regional competitors' transactional data. Likewise, per the Terms of Service, LRO users are informed that their data may be included in pooled data sets and that they likewise may be provided with their regional competitors' pooled data.

**ANSWER TO PARAGRAPH 290:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the statements alleged in Paragraph 290 and denies them on that basis. Morgan Properties admits that there are Terms of Service for LRO, but states that the document speaks for itself. Morgan Properties otherwise denies the allegations in Paragraph 290.

291. Defendant RealPage calls this information exchange "continuous optimization through connected intelligence" and brags that it is "[b]uilt on the market's largest real-time data set."[156] Coordinated algorithmic pricing allows property owners and managers to, in RealPage's own words, "outsource daily pricing and ongoing revenue oversight" to RealPage, allowing RealPage to set prices for clients' properties "as though we [RealPage] own them ourselves."[157] Put differently, RealPage's RMS allow Owners, Managing Defendants, and Owner-Operators to function as if they were one company setting prices at the monopoly level, which is the goal of any cartel. This mutual sharing of information only makes sense when cartel members are confident that their competitors will not use the information to gain a competitive advantage by lowering rents to lure away customers. As Davidoff stated, while all property owners and management companies "would be better off limiting their rent reductions," if any property owner or management company "lower[ed] their rents while the others don't, then that [property management company]

---

[156] *Introducing AI Revenue Management: Next-Generation Price Optimization That Unlocks Hidden Yield, supra* note 119.

[157] RealPage Renewal Reporting Presentation, *supra*, note 7.

would outperform."[158] Recognizing this, Defendant RealPage urged its clients to "shop your competitors over the phone, in-person, and view their websites."[159]

**ANSWER TO PARAGRAPH 291:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the statements alleged in Paragraph 291 and denies them on that basis. Morgan Properties otherwise denies the allegations in Paragraph 291.

292. Members of the conspiracy recognize that widespread adoption of RealPage RMS allows property owners and managers to raise rents in ways they otherwise might not have been able to; as an executive from Defendant Simpson told fellow property owners and managers in the early stages of revenue management, "[i]f it becomes a common practice in the industry, it will benefit everyone...."[160] Another conspirator, Archstone-Smith's CEO R. Scott Sellers summarized, "A rising tide lifts all boats"—i.e. the ability to increase prices without fear of competition benefits all members of the conspiracy, a classic feature of a price-fixing cartel.[161] And that goal has been met; as Defendant Camden's CEO admitted in 2021, referring to YieldStar, "all of our competitors use it."[162] Another Camden executive confirmed: "[T]he public companies where we compete with them, they make—we all make the market better. I mean they all use revenue management. They are smart. They raised rents when they should."[163]

**ANSWER TO PARAGRAPH 292:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the statements alleged in Paragraph 292 and denies them on that basis. Morgan Properties otherwise denies the allegations in Paragraph 292.

293. Property owners and managers who use Defendant RealPage's RMS do so with the explicit and common goal of increasing rents for all members of the cartel by using coordinated algorithmic pricing.

**ANSWER TO PARAGRAPH 293:**

Morgan Properties denies the allegations in Paragraph 293.

---

[158] Davidoff, *supra*, note 83.
[159] See Figure 5, *supra*.
[160] Wendy Broffman, *The bottom line on revenue management*, YIELDPRO (Apr. 1, 2007), https://yieldpro.com/2007/04/the-bottom-line-on-revenue-management/.
[161] *Id.*
[162] Transcript, Camden Property Trust at Citi Global Property Conference (Virtual), March 8, 2021.
[163] Transcript, Q2 2021 Camden Property Trust Earnings Call – Final, July 20, 2021.

294. Defendant Equity's CEO credited RealPage RMS with implementing rent increases at levels that property owners and managers would not have otherwise had the "courage" to impose: "We've raised rents hundreds of dollars in some markets and I don't think the people onsite, given the way we'd trained them to think about pricing, would have had the courage to push it as aggressively as this program has."[164]

**ANSWER TO PARAGRAPH 294:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 294 and denies them on that basis.

295. Defendant Camden's COO agreed that absent RealPage RMS, it was not otherwise in property owners' and managers' "DNA to raise pricing $150 to $200 per unit on a lease turn."[165]

**ANSWER TO PARAGRAPH 295:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 295 and denies them on that basis.

296. Defendant CONAM's CEO has also explained that RealPage RMS "has been helpful in forcing the issue on pricing, . . . . We don't see a reason to take the foot off the pedal."[166]

**ANSWER TO PARAGRAPH 296:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 296 and denies them on that basis.

297. Defendant Pinnacle's CEO praised RealPage's RMS for helping it maintain or raise rents during a market downturn, achieving a 4% revenue lift due to algorithmic pricing preventing Pinnacle from making price concessions to renters.[167] As have Defendants Greystar ("Greystar properties using RealPage's YieldStar Revenue Management throughout fluctuating market conditions outperformed their markets by 4%"); Carter-Haston ("Facing low occupancy during renovations and market decline, Carter-Haston Holdings employed an asset strategy that increased renewal rents by 7% and outperformed

---

[164] Broffman, *supra* note 149.

[165] *Id.*

[166] Brendix Anderson, *Winning the Rental Game*, MULTIFAMILY EXEC. (Mar. 12, 2012), https://www.multifamilyexecutive.com/property-management/rent-trends/winning-the-rental-game_o.

[167] Rick Graf, *Pinnacle CEO, on RealPage Revenue Management's 4% Revenue Lift*, REALPAGE VIDEOS, https://www.realpage.com/videos/rick-graf-pinnacle-yieldstar-revenue-lift/.

competitors by 3.5%"); and Trammel Crow ("Trammell Crow Residential achieved revenue boosts of over 3% during the recession.").[168]

**ANSWER TO PARAGRAPH 297:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 297 and denies them on that basis.

298. Defendants themselves directly tie adoption of RealPage RMS with increasing rents. A 2020 RealPage report includes a case study indicating that Defendant Carter-Haston increased rents by nearly three percent within two months of adopting RealPage's YieldStar management solution.[169] Defendant Lincoln did its own internal study, comparing units priced according to RealPage's RMS with a control units set priced without it. Across three markets— Atlanta, Dallas, and South Florida, properties priced through RealPage's RMS "showed a 4.3% lift over the eight control properties."[170] Thus, Defendant Lincoln's own study shows how RealPage's RMS causes prices to increase over competitive levels. Defendant Greystar also found that units priced with RealPage's RMS achieved nearly 3% higher rents than those set competitively.[171]

**ANSWER TO PARAGRAPH 298:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 298 and denies them on that basis.

299. It is no surprise, then, that RealPage advertises that its customers outperform the market by 3–7% year over year.[172] RealPage's clients find its RMS particularly helpful because, as RealPage explains, those services allow the property owners and managers to "make sure we're limiting our supply when there isn't too much demand."[173] In a promotional video on Defendant RealPage's website, Holly Casper, Vice President of Operations for co-conspirator RKW Residential described that RealPage takes on the burden of

---

[168] Revenue Management: Proven in Any Market Cycle, RealPage e-book, *supra* note 14.

[169] *Id*.

[170] *Lincoln Property Company Proves Value of Automated Price Setting with 4.3% Lift in Challenging Rental Market*, HOTEL ONLINE (Nov. 2009), https://www.hotel-online.com/News/PR2009_4th/Nov09_RainmakerLincoln.html.

[171] Hudgins, *supra* note 133("Greystar, a third-party apartment manager based in Charleston, S.C., has found that the apartment communities it prices with YieldStar Price Optimizer outperform the other properties in its portfolio by about 2.7 percent, said Tom Bumpass, the company's chief information officer.").

[172] *YieldStar Predicts Market Impact Down to Unit Type and Street Location, supra* note 3 ("Find out how YieldStar can help you outperform the market 3% to 7%").

[173] RealPage Revenue Management Maximizes Market Opportunity, *supra* note 49 (interview with John Kirchmann, CFO of IRET Property Management).

"implementing the increases in these rents . . . it's running the lease expiration for us and we're not manually doing it which means we're increasing our revenue for those units."[174]

**ANSWER TO PARAGRAPH 299:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 299 and denies them on that basis.

300. In training materials provided to Defendant RealPage clients, titled "Revenue Management System, Quick Reference Guide" (2022), RealPage describes its RMS as one specifically designed to "maximize rents," and explained that "RealPage['s] Revenue Management system allows you to continuously maximize asset value by leveraging data to consistently reduce vacancy and maximize rent."

**ANSWER TO PARAGRAPH 300:**

Morgan Properties denies the allegations in Paragraph 300.

301. Witness 7 explained that every Friday, Witness 7, along with other Pricing Advisors and members of the revenue management team, participated in conference calls to discuss various operational matters. During these calls, Defendant RealPage executives, including Andrew Bowen, regularly stressed to call participants that a key company objective was the rate at which clients accepted RealPage's pricing recommendation.

**ANSWER TO PARAGRAPH 301:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 301 and denies them on that basis.

302. In a 2018 promotional video posted on Defendant RealPage's website, an executive from co-conspirator TruAmerica Multifamily, credits the 10% growth achieved for a Denver, Colorado property that previously "had issues" maintaining rent growth, on her team having "really embraced LRO," otherwise, having consistently accepted RealPage's recommended pricing.[175]

---

[174] *YieldStarTM Revenue Management Optimizes Rent Pricing*, REALPAGE VIDEOS (Sept. 10, 2019), https://www.realpage.com/videos/yieldstar-optimizes-rent-pricing/ (testimonial of Holly Casper, Vice President of Operations for RKW Residential).
[175] LRO Revenue: Lynn Owen of TruAmerica Multifamily, REALPAGE VIDEOS (Nov. 13, 2018), https://www.realpage.com/videos/revenue-management-software-review-truamerica-multifamily/.

**ANSWER TO PARAGRAPH 302:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 302 and denies them on that basis.

303.    By enforcing price discipline and setting rents that result in lower occupancy rates, Defendant RealPage provides assurances that all property owners and managers using its RMS are doing the same thing—raising rents and accepting lower occupancy instead of lowering the price to fill units.  It also provides assurances to each of RealPage's clients to know that their competitors will not be able to "cheat" on the cartel and expand market share by undercutting RealPage's price recommendations.  In this way, RealPage enables property owners and managers to overcome the prisoner's dilemma that prevented coordinated pricing in the historical market for residential rental apartments.[176] As Defendant BH's Revenue Manager explained in a testimonial on RealPage's website, "[b]eing able to see transaction level data has been really important to keeping decisions in line in each market" and prevented BH from lowering prices to trigger price competition (because, as BH's Revenue Manager put it, BH did not want to "be the reason any particular submarket takes a rate dive.")[177]

**ANSWER TO PARAGRAPH 303:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth

of the statements alleged in Paragraph 303 and denies them on that basis.  Morgan Properties

otherwise denies the allegations in Paragraph 303.

304.    Members of the cartel likely have their own internal measures in place to enforce price discipline in accordance with the conspiracy.  Amy R. Smith, Managing Partner of co-conspirator Bella Investment Group, LLC ("Bella") explained that during her revenue management system training, "[w]e were warned that the biggest hurdle is overcoming the emotions and instincts of experienced property managers.  Many managers and regional staff will see rents rising at a rate greater than they are used to and may want to override what the system suggests we charge.  Because of the rent-based parameters we set within the system that is generally not necessary." To combat this and encourage adherence to Defendant RealPage's recommendations, many property management companies base staff members' bonuses, in part, on revenue. Smith explained that without such incentives the staff might: "bring a level of caution to rental rates that they might set," and that "[u]ntil they trust the system, there will be temptation to override the algorithm if rents appear too aggressive."[178] Put another way, Smith admits that RealPage leads Bella to set prices at

---

[176] *See* Salil K. Mehra, Price Discrimination-Driven Algorithmic Collusion: Platforms for Durable Cartels, 26 STAN. J.L. BUS. & FIN. 171, 197-203 (2021).

[177] *Smart Solutions: How to Outperform in a Changing Market with Revenue Management*, REALPAGE WEBCASTS, https://www.realpage.com/webcasts/smart-solutions-outperform-changing-market/.

[178] Bergeron III, *supra*, note 28.

levels higher than it otherwise would if "experienced property managers" were allowed to set rents.

## ANSWER TO PARAGRAPH 304:

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the statements alleged in Paragraph 304 and denies them on that basis. Morgan Properties otherwise denies the allegations in Paragraph 304.

305. Defendants and their co-conspirators are aware that the higher revenues they obtain using Defendant RealPage's RMS are the result of increasing average rent prices in the neighborhoods they serve. In a video to attract additional cartel members that was shown at a conference for real estate executives in the summer of 2021, RealPage Vice President Jay Parsons noted that average rents had recently shot up by 14%. "Never before have we seen these numbers," he said.[179] Parsons then asked Andrew Bowen, RealPage's then Vice President of Investor Markets, what role he thought the company had played in the unprecedented increase. "I think it's driving it, quite honestly," Bowen replied.[180]

## ANSWER TO PARAGRAPH 305:

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the statements alleged in Paragraph 305 and denies them on that basis. Morgan Properties otherwise denies the allegations in Paragraph 305.

306. Witness 2 explained that in 2020, prior to implementing Defendant RealPage's RMS, a two-bedroom unit in the Sunrise Management community she oversaw was priced at $1,650/month. Upon adopting a RealPage RMS the following year in 2021, rents for those same units immediately increased over 27% to nearly $2,100, with no improvements to the units whatsoever. Witness 2 characterized these units as "very basic, standard homes" built in the 40s, with no in-unit washer and dryer, and "completely agrees" that rental prices in her region were artificially inflated upon its adoption of RealPage pricing recommendations.

## ANSWER TO PARAGRAPH 306:

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 306 and denies them on that basis.

---

[179] Vogell, *supra* note 1.
[180] *Id.*

307. After her tenure at Defendant RealPage, Witness 7 assisted a Seattle-based property management company with the rollout of its first five RMS-enabled (YieldStar/AI Revenue Management) properties. Prior to using RealPage's RMS, the management company was "really [a] mom and pop" operation. Since implementing RealPage's RMS however, it has enjoyed significant revenue increases by accepting RealPage's daily recommended pricing for a portfolio of properties that had not raised rents "for years."

**ANSWER TO PARAGRAPH 307:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 307 and denies them on that basis.

308. Indeed, Witness 7 confirmed that every RealPage client she managed during her tenure as a Pricing Advisor saw revenue growth once they adopted RealPage's RMS. For example, one RealPage client saw a revenue increase of 21% in the first year after adopting YieldStar. Prior to implementing YieldStar, this client had increased rents by 3% every year, around $25 per lease renewal. The incredible growth after the client adopted AI Revenue Management was realized across all of client's 20 properties, confirming that RealPage's RMS, rather than any other factors, drove the results.

**ANSWER TO PARAGRAPH 308:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 308 and denies them on that basis.

309. Defendant RealPage's impact on the multifamily rental market through its RMS is best summarized by Kortney Balas, Director of co-conspirator JVM Realty Corporation in a testimonial video since removed from RealPage's website: "the beauty of using YieldStar is that it pushes you to go places that you wouldn't have gone if you weren't using it."[181] In other words, RealPage pushes rents higher in a way that would be economically irrational if firms were behaving unilaterally, as opposed to collectively.

**ANSWER TO PARAGRAPH 309:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 309 and denies them on that basis.

310. Senior Vice President for Management at co-conspirator Post Properties, Jamie Teabo, similarly noted that "[i]n our Florida markets, we let the system push as hard as it would

---

[181] Id.

go, and we saw increases as high as 20 percent . . . Left to our own devices, I can assure you we would have never pushed rents that hard.  That was a big number."[182]

**ANSWER TO PARAGRAPH 310:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 310 and denies them on that basis.

311.    Defendant RealPage's RMS not only facilitates price hikes, but also allows conspirators to *maintain* higher prices. RealPage claims that property owners, managers, and their co-conspirators were able to maintain rent prices 7% above the competitive market rate.

**ANSWER TO PARAGRAPH 311:**

Morgan Properties denies the allegations in Paragraph 311.

312.    Defendants' conspiracy allows property owners and managers to hike rents when demand is strong without needing to lower them when it is weak.  It untethers rent prices from their natural constraints, forcing renters to spend more money than they would have in a competitive rental market.  This collusion has contributed to the national housing crisis by placing massive pressure on renters' efforts to keep roofs over their heads.

**ANSWER TO PARAGRAPH 312:**

Morgan Properties denies the allegations in Paragraph 312.

> **F.    Property Owners and Managers Conspired Through Trade Associations to Standardize Lease Terms Unfavorable to Plaintiffs and Members of the Class.**

313.    Even before Defendants began to collude on rental rates through their use of RealPage RMS, the standardization of leases and lease terms by the National Apartment Association ("NAA") and local and state affiliates of the NAA constitutes overt coordination in violation of the Sherman Act.  As explained below, this coordination began in Texas before spreading through the channel of the NAA to other parts of the United States.

**ANSWER TO PARAGRAPH 313:**

Morgan Properties denies the allegations in Paragraph 313.

314.    Many Defendants in this action are members of or have otherwise supported the Texas Apartment Association ("TAA"), the Texas state affiliate of the NAA, including Defendants Camden, Greystar, BH, Dayrise, UDR, Lincoln, Allied Orion, Equity, and Highmark "From the beginning, [the TAA]'s founding members understood that [the multifamily rental] industry would have more impact and credibility from a united

---

[182] Bousquin, *supra* note 84.

front."[183] Reflecting on the TAA's early years, the association's first treasurer described how "[t]he people that were building apartments, that had apartments, were so generous and giving. You could go to them and say, 'We've got a problem,' and they would share."[184]

**ANSWER TO PARAGRAPH 314:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 314 and denies them on that basis.

315. Beginning in approximately 1970,[185] the TAA undertook to promulgate and promote a standardized form lease, nominally for the purpose of industry self-regulation.[186] The TAA's efforts to promote the standardized lease form were very successful, and the form lease is used by "90 percent of [TAA members], or 95 percent perhaps" with the result being that "the vast majority of apartment units [in Texas] utilize the TAA form lease.[187]

**ANSWER TO PARAGRAPH 315:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 315 and denies them on that basis.

316. Proposed changes to the standard lease are drafted by a committee of the TAA, which is comprised of members of the association, including some Defendants in this action. The TAA board of directors, composed of approximately 140 TAA members, then votes to accept or reject all proposed changes.[188] Beyond other opportunities for collusion alleged herein, such committee meetings and other TAA meetings provide an additional opportunity for collusion amongst a group of landlords who have shared economic goals.

**ANSWER TO PARAGRAPH 316:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 316 and denies them on that basis.

317. The TAA lease revision committees typically meet approximately every other year to discuss changes to the standard lease form, including changes requested by TAA

---

[183] *Building the Industry for 50 Years . . . and counting*, TEXAS APARTMENTS (A Publication of the Texas Apartment Ass'n) (Winter 2013), at 45.

[184] *50 years of the Texas Apartment Association*, TEXAS APARTMENTS (A Publication of the Texas Apartment Ass'n) (Summer 2012), at 44.

[185] *Building the Industry for 50 Years . . . and counting*, *supra* note 183 at 43.

[186] Transcript of Hearing at 128, 131, and 151, Texas Apartment Ass'n v. U.S., No. A-86-CA-511 (W.D. Tex. Dec. 21, 1987) (Neimann testimony).

[187] *Id*. at 61 (Plaintiff's Pretrial Brief at 7); *Id*. at 43 (Jerry Adams cross).

[188] Id. at 142 (Niemann testimony).

members.[189] This regular process has gradually expanded the TAA form lease from two pages to eight,[190] typically consisting of revisions which, unsurprisingly, have favored landlords. The TAA also takes steps to prevent members from using older, more tenant-favorable versions of the lease form, including by inserting "this lease is void if signed after [date]" clauses into its forms and having TAA's general counsel tell members "we don't want people to be using those old forms."[191] In addition to the other impacts alleged herein, lease standardization also facilitates and encourages the coordination of prices through Defendant RealPage's RMS because it narrows the areas where landlords are competing, which makes competitor price information significantly more informative and, therefore, valuable to each Defendant.

## ANSWER TO PARAGRAPH 317:

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 317 and denies them on that basis.

318.    Starting in approximately 2017, TAA added a class action waiver clause to the standard lease form that purports to prohibit the lessee from bringing, or even participating in, a class action against the lessor.[192] Simultaneously with its promulgation of the new lease form, the TAA caused its old lease forms to expire and become unavailable, meaning that TAA members could no longer use versions of the TAA lease without a class action waiver clause.

## ANSWER TO PARAGRAPH 318:

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 318 and denies them on that basis.

319.    The addition of the class action waiver to the TAA form lease sought to insulate property managers from the expense imposed by the accountability of collective action. In TAA's own words, "statutory penalt[ites] of three times the amount [...] and attorneys' fees, [...] can quickly add up, especially in a class action lawsuit."[193] The TAA's advice to landlords on the importance of the alleged class action waiver clause makes the Association's collective priority of limiting a tenant's legal remedies clear: if a potential lessee refuses to agree to the clause, then "just tell them they will have to live elsewhere."[194]

---

[189] TAA Forms and REDBOOK revisions in process, Texas Apartments (A Publication of the Texas Apartment Ass'n) (Fall 2011), at 39.
[190] Larry Niemann, *TAA's first 50 years through the eyes of its first legal counsel*, TEXAS APARTMENTS (A Publication of the Texas Apartment Ass'n) (Fall 2012) at 23.
[191] 2014 Sephri Webinar, at 65.
[192] TAA Apartment Lease Contract.
[193] *Late Fee: The Lease, the law and Lessons*, TEXAS APARTMENTS ASS'N (2019) https://www.taa.org/wp-content/uploads/2019/08/Late-Fee-Article-Revised-4.pdf.
[194] William S. Warren, *Law In Order: The Warren Report, The 2018 TAA Lease In Depth*, WINDOW ON RENTAL HOUSING (Mar/Apr 2018).

**ANSWER TO PARAGRAPH 319:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 319 and denies them on that basis.

320.    Both the TAA and the NAA are part of the same federation of landlord industry groups, such that all TAA members are also and automatically members of the NAA.[195] However, while the TAA is concerned primarily with Texas, the NAA is an association that has 170 state and local affiliates across the country. Many Defendants in this action have also been members of or otherwise supported the NAA, including Bozzuto, Bell Partners, Camden, CONAM, Greystar, BH, Dayrise, Essex, UDR, Lincoln, Allied Orion, Equity, Highmark, Sares Regis, Mission Rock, Winn, and ZRS.

**ANSWER TO PARAGRAPH 320:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 320 and denies them on that basis.

321.    Like the TAA, the NAA publishes and promotes standardized form leases. Like the TAA, the NAA has a Lease Advisory Committee that is responsible for drafting, revising, and proposing changes to its national lease forms.[196] In addition to amending its standard lease form, the Lease Advisory Committee is responsible for marketing the standard lease form for adoption by companies who do not already use it.[197]

**ANSWER TO PARAGRAPH 321:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 321 and denies them on that basis.

322.    Importantly, the NAA adopted the TAA lease form as its own starting point for standard leases in states other than Texas.[198]

**ANSWER TO PARAGRAPH 322:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 322 and denies them on that basis.

323.    In 2018, the NAA followed the TAA's lead and adopted the alleged class action waiver addendum in its own standard lease forms, which, as stated previously, the NAA actively

---

[195] Transcript of Hearing at 18-19, *supra* note 186.
[196] NAA Policies & Procedures Handbook NAT'L APARTMENT ASS'N
[197] *Id*.
[198] Warren, *supra* note 194.

markets for adoption.[199] Other state associations that are affiliated with the NAA are understood to have likewise adopted a class action waiver in their model leases.

**ANSWER TO PARAGRAPH 323:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 323 and denies them on that basis.

324. The intent of adopting a class action waiver provision across all leases is to prohibit effective redress by tenants whose individual losses are too small to justify bringing an individual action. In this way, landlords, including Defendants, can avoid liability for wrongdoing by making class actions more difficult to bring.

**ANSWER TO PARAGRAPH 324:**

Morgan Properties denies the allegations in Paragraph 324.

325. The timeline of the implementation of the standard class action waiver lease term is evident by referring to two leases signed by Plaintiff Weaver for the rental of an apartment managed by Defendant Camden.

**ANSWER TO PARAGRAPH 325:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 325 and denies them on that basis.

326. Plaintiff Weaver signed a standard form lease with Defendant Camden for the lease of an apartment beginning in April 2017 and continuing through July 29, 2018. The lease had no class action waiver provision.

**ANSWER TO PARAGRAPH 326:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 326 and denies them on that basis.

327. Plaintiff Weaver then signed a renewal lease in May 2018 for the same apartment for the contract term of July 30, 2018, through September 1, 2019. The latter lease was identical in almost every way, except that it, importantly, contained language similar to that of the class action waiver provisions adopted by TAA and NAA.

**ANSWER TO PARAGRAPH 327:**

---

[199] NAA Class Action Waiver Addendum, NAA Clock & Lease powerpoint, "Class Action Waiver" (Live in 2018).

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 327 and denies them on that basis.

328. The class action waiver provision in Plaintiff Weaver's lease with Defendant Camden is also inapplicable to the instant action because it appears in a paragraph regarding actions amounting to default by Defendant Camden for "repairs and performance under this Lease."

**ANSWER TO PARAGRAPH 328:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 328 and denies them on that basis.

329. Plaintiff Watters rented an apartment managed by Defendant Lincoln (which maintains leadership positions in both the TAA and NAA) in August 2021 for a contract term beginning on August 14, 2021, and extending through October 13, 2022. That contract contains the alleged standard class action waiver addendum, which prominently bears the logos and copyright insignia of the NAA, indicating that it is a standard contract promulgated by the NAA.

**ANSWER TO PARAGRAPH 329:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 329 and denies them on that basis.

330. Plaintiff Watters did not sign the page of the lease that contains the class action waiver addendum, which is contrary to the explicit lease terms that requires a signature on each such page.

**ANSWER TO PARAGRAPH 330:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 330 and denies them on that basis.

331. In addition to the troubling consequences of standardizing the prohibition of class actions by lessees, a number of the standardized provisions that have been implemented by the TAA and the NAA are directly linked to rent prices, which further exacerbates the impact of the increase of rent prices due to Defendants' conduct alleged herein. For example, standardized lease terms introduced and adopted by the TAA and the NAA include an interest rate of 18% on all amounts owed by the tenant and a late penalty for a broken lease of approximately 85% of one month's rent. Because Defendants' conduct has had the effect of increasing rent prices, it has also increased the costs of such penalties incurred by lessees under the contracts.

128

**ANSWER TO PARAGRAPH 331:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 331 and denies them on that basis.

### G. Preliminary Economic Analysis Confirms the Impact of RealPage's Revenue Management on Multifamily Rental Markets Nationwide.

332. Preliminary economic analysis provides a glimpse into the impact of Defendant RealPage's RMS on multifamily rental markets and corroborates evidence of the alleged conspiracy, including witness accounts. Specifically, it suggests: (i) Defendants' increased revenues were the result of proportionally higher and artificially inflated rental price increases paid by Plaintiffs and Members of the Class; and (ii) the increase in multifamily rental housing prices near the start of 2016, and through the present, cannot be explained by common supply or demand drivers, but rather a significant structural break in these relationships can be observed in various multifamily rental housing markets near the start of the Conspiracy Period.

**ANSWER TO PARAGRAPH 332:**

Morgan Properties denies the allegations in Paragraph 332.

### i. Defendants' Increased Revenues Resulted from Proportionally Higher, Artificially Inflated Rent Increases.

333. As discussed in Section E, Defendant RealPage's RMS model works to increase revenue by raising rent prices while accepting lower occupancy levels. RealPage has not been shy about this mechanism of action. During a 2017 earnings call, then-CEO of RealPage, Steve Winn, offered as an example one large property company, managing over 40,000 units, which learned it could make more profit by operating at a lower occupancy level that "would have made [that company's] management uncomfortable before."[200] Prior to adopting RealPage's RMS, here, YieldStar, the company had targeted 97% or 98% occupancy rates in markets where it was a leader. After outsourcing rent prices and lease terms to RealPage, the company began targeting 3%-4% revenue growth while operating at a 95% occupancy rate. In other words, RealPage claimed to increase the revenue of rental properties by 2%-7%[201] despite the cost of having vacancy rates that were at least two percentage points higher on average. Since the property manager realizes the increase revenue despite leasing fewer units, the property manager's per-unit rental price increased by more than 2%-7%.

**ANSWER TO PARAGRAPH 333:**

---

[200] Vogell, *supra* note 1.
[201] *Id.*

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 333 and denies them on that basis.

334. Consider the scenario depicted in Figure 9, which reflects the Nashville market. Prior to 2015, monthly rents in the Greater Nashville Metro area were $1,258.89 according to the Zillow Observed Rent Index Model ("ZORI"),[202] and vacancy rates were 3.70% according to the United States Census Bureau, in December 2015. Thus, a building with 100 units representative of the Nashville area as of December 2015 would have 96.3 occupied units,[203] and assuming rental price of $1,258.89 across those units, implies monthly revenue of $121,230.72 to the owners ($1,258.89 x 96.3 occupied units).

**Figure 9: Demonstrative Table Using Zillow Zori Model and U.S. Census Bureau 2015 Data (Without RealPage)**

| *Without RealPage* | | |
|---|---|---|
| Building Number of Units | (A) | 100 |
| Nashville Monthly Rental Prices (Zillow Zori Model) | (B) | $1,258.89 |
| Nashville Vacancy Rates (US Census) | (C) | 3.70% |
| Occupied Building Units | (D=A x (1-C)) | 96.30 |
| **Total Revenue/Month** | (E=B x D) | $121,230.72 |

## ANSWER TO PARAGRAPH 334:

Morgan Properties denies the allegations in Paragraph 334 and Figure 9.

335. Figure 10 below demonstrates the following: at the low end of the range Defendant RealPage advertised increased revenue of 2%, this would amount to an increase of $2,424.62 in revenue per month, for a total monthly revenue of $123,655.34 for this same building. However, assuming a simultaneous increase of vacancy by two percentage points like that touted by RealPage's CEO during its 2017 earnings call, this would result in only 94.3 units occupied. This implies that to achieve the targeted 2% revenue increase the monthly rent per unit would need to rise to $1,311.30 per month, a 4.16% rise. To achieve RealPage's advertised revenue increase of 7%, RealPage clients would need to raise their monthly rent by 9.27% to recover the vacancy increase. These increases amount to $52.41 to $116.69 in extra monthly rent per unit, respectively.

---

[202] The ZORI Model measures changes in asking rents over time, controlling for the changes in the quality of available rental stock. ZORI is currently calculated at the national, metropolitan, county, city, and ZIP Code levels for all regions where sufficient data is available. Joshua Clark, *Methodology: Zillow Observed Rent Index (ZORI), ZILLOW* (Sept. 19, 2022), https://www.zillow.com/research/methodology-zori-repeat-rent-27092/.
[203] For the purpose of this simple regression model, fractional units are assumed possible.

**Figure 10: Demonstrative Table Using Zillow Zori Model and U.S. Census Bureau 2015 Data (with RealPage)**

| *With RealPage* | | | |
|---|---|---|---|
| Increased Performance Scenario | (F) | 2% | 7% |
| New Revenue | (G=E x (1+ F)) | $123,655.34 | $129,716.87 |
| New Vacancy Rate (2 percentage points higher) | (H) | 5.700% | 5.700% |
| Occupied Building Units | (I=A x (1-H)) | 94.3 | 94.3 |
| Nashville Rental Prices (Using RealPage) | (J=G/I) | $1,311.30 | $1,375.58 |
| **Increase in Rent (%)** | | **4.16%** | **9.27%** |
| **Increase in Rent ($)/Month** | | | |
| | | **$52.41** | **$116.69** |

## ANSWER TO PARAGRAPH 335:

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 335 and Figure 10 denies them on that basis.

336. Further, as discussed above, market participants perceived that Defendant RealPage's price decisions raised rental prices above competitive levels. For example, Witness 2, who also worked with RealPage in connection with her role as a Leasing Consultant with Defendant Greystar, confirmed she "completely agrees" that rental prices were artificially inflated upon the adoption of RealPage pricing recommendations through its RMS.

## ANSWER TO PARAGRAPH 336:

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 336 and denies them on that basis.

### ii. Owners, Owner-Operators, and Managing Defendants Engaged in Tacit Collusion to Artificially Increase Multifamily Rental Prices.

337. Here, without the benefit of discovery at the pleadings stage, Plaintiffs have reviewed and presented substantial economic evidence, including historical pricing data that demonstrates the Owner Defendants, Owner-Operators, and Managing Defendants have consistently and nearly simultaneously raised the prices of their multifamily rental units during and throughout the Conspiracy Period. They did so with prior knowledge of their horizontal competitors' rent prices by using RealPage's RMS. Appendix B,[204] attached hereto, depicts the perfectly coordinated price increases by Owners, Owner-Operators, and Managing Defendants in each MSA (addressed *infra* in § VI), during and throughout the Conspiracy Period. Table B-1 shows rental price increases across Owners, Owner-

---

[204] Note Appendix B, Table B-1 contains the same data presented in Figure 2, *supra*.

Operators, and Managing Defendants' multifamily properties overall; Table B-2 depicts the coordinated price increases for these same Defendants' 1-bedroom units; and Table B-3, Defendants' 2-bedroom units.

**ANSWER TO PARAGRAPH 337:**

Morgan Properties denies the allegations in Paragraph 337, Appendix B, and Tables B-1,

B-2, and B-3.

338. The rates of Defendants' price increases during and throughout the Conspiracy Period is further highlighted below, in Figures 11 through 19, which plot the average price Owner-Operators and Managing Defendants charged for 1-bedroom apartments across all property classes in nine MSAs where every Owner, Owner-Operator, and Managing Defendant owns and/or manages multifamily rental properties in one or more of these submarkets: Atlanta, Boston, Dallas, Denver District of Columbia, Miami, Portland, Nashville, and New York. Figures 11-19 demonstrate that across all property classes, Owners, Owner-Operators, and Managing Defendants caused multifamily rental rates to increase at a similar rate across the Conspiracy Period.

**ANSWER TO PARAGRAPH 338:**

Morgan Properties denies the allegations in Paragraph 338 and Figures 11, 12, 14, and 19.

Morgan Properties lacks knowledge or information regarding Figures 13, 15, 16, 17, and 18, and

denies the allegations on that basis.

339. The following Defendants operate in the Nashville submarket: AIR, BH, Bozzuto, Brookfield, Camden, Carter-Haston, Cortland, CWS, ECI, First Communities, Greystar, Highmark, IRT, Lincoln, MAA, Mission Rock, Morgan, Pinnacle, RPM, Security, Simpson, Related, Trammell Crow, UDR, and ZRS.

**Figure 11: Owners, Owner-Operators, and Managing Defendants' Price Increases 1-Bedroom (Nashville MSA)**[205]



**ANSWER TO PARAGRAPH 339:**

Morgan Properties admits that, at times during the alleged relevant time period from January 1, 2016, to the present, it has operated properties in the Nashville metropolitan area, as defined by the U.S. Census Bureau. Otherwise, Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 339 and Figure 11 and denies them on that basis.

340.    The following Defendants operate in the Atlanta submarket: AIR, AMC, Avenue5, Bell Partners, BH, Bozzuto, Camden, Carter-Haston, CONAM, Cortland, CWS, Dayrise, ECI, Equity, First Communities, FPI Management, Greystar, Highmark, IRT, Lincoln, MAA, Mission Rock, Morgan, Pinnacle, RPM, Simpson, Related, Trammell Crow, Windsor, and ZRS.

---

[205] All data used for Figures 11-28 was obtained via CoStar.

**Figure 12: Owners, Owner-Operators, and Managing Defendants' Price Increases 1-Bedroom (Atlanta MSA)**



## ANSWER TO PARAGRAPH 340:

Morgan Properties admits that, at times during the alleged relevant time period from January 1, 2016, to the present, it has operated properties in the Atlanta metropolitan area, as defined by the U.S. Census Bureau. Otherwise, Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 340 and Figure 12 and denies them on that basis.

341. The following Defendants operate in the Boston submarket: AIR, Bell Partners, Bozzuto, Brookfield, Equity, Greystar, Lincoln, Pinnacle, Simpson, Related, Trammell Crow, UDR, Windsor, and Winn.

**Figure 13: Owners, Owner-Operators, and Managing Defendants' Price Increases 1-Bedroom (Boston MSA)**



**ANSWER TO PARAGRAPH 341:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 341 and Figure 13 and denies them on that basis.

342.    The following Defendants own and/or manage multifamily rental properties in the Dallas submarket: AIR, AMC, Avenue5, Bell Partners, BH, Brookfield, Camden, Carter-Haston, CONAM, CONTI, Cortland, CWS, Dayrise, Equity, First Communities, FPI Management, Greystar, Highmark, IRT, Kairoi, Knightvest, Lantower, Lincoln, MAA, Morgan, Pinnacle, RPM, Sares Regis, Simpson, Related, Trammell Crow, UDR, Windsor, Winn, and ZRS.

**Figure 14: Owners, Owner-Operators, and Managing Defendants' Price Increases 1-Bedroom (Dallas MSA)**



**ANSWER TO PARAGRAPH 342:**

Morgan Properties admits that, at times during the alleged relevant time period from January 1, 2016, to the present, it has operated properties in the Dallas metropolitan area, as defined by the U.S. Census Bureau. Morgan Properties otherwise lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 342 and Figure 14 and denies them on that basis.

343.  The following Defendants own and/or manage multifamily rental properties in the Denver submarket: Allied Orion, AIR, AMC, Avenue5, Bell Partners, BH, Brookfield, Camden, CONAM, CONTI, Cortland, CWS, Equity, FPI Management, Greystar, Highmark, IRT, Kairoi, Lincoln, MAA, Mission Rock, Pinnacle, RPM, Sares Regis, Security, Sherman, Simpson, Related, Trammell Crow, UDR, and Windsor.

136

**Figure 15: Owners, Owner-Operators, and Managing Defendants' Price Increases 1-Bedroom (Denver MSA)**



<u>**ANSWER TO PARAGRAPH 343:**</u>

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 343 and Figure 15 and denies them on that basis.

344.    The following Defendants own and/or manage multifamily rental properties in the District of Columbia submarket: AIR, Avenue5, Bell Partners, BH, Bozzuto, Brookfield, Camden, Cortland, Equity, First Communities, Greystar, Highmark, Lincoln, MAA, Mission Rock, Morgan, Pinnacle, RPM, Security, Simpson, Related, Trammell Crow, UDR, Windsor, Winn, and ZRS.

**Figure 16: Owners, Owner-Operators, and Managing Defendants' Price Increases 1-Bedroom (D.C. MSA)**



## ANSWER TO PARAGRAPH 344:

Morgan Properties admits that, at times during the alleged relevant time period from January 1, 2016, to the present, it has operated properties in the Washington, D.C. metropolitan area, as defined by the U.S. Census Bureau. Morgan Properties otherwise lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 344 and Figure 16 and denies them on that basis.

345.    The following Defendants own and/or manage multifamily rental properties in the Miami submarket: AIR, BH, Bozzuto, Camden, Carter-Haston, Cortland, FPI Management, Greystar, Highmark, Lantower, Lincoln, Pinnacle, RPM, Simpson, Trammell Crow, Windsor, Winn, and ZRS.

**Figure 17: Owners, Owner-Operators, and Managing Defendants' Price Increases 1-Bedroom (Miami MSA)**



**ANSWER TO PARAGRAPH 345:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 345 and Figure 17 and denies them on that basis.

346.   The following Defendants own and/or manage multifamily rental properties in the Portland submarket: AMC, Avenue5, Brookfield, CONAM, FPI Management, Greystar, Lincoln, Mission Rock, Pinnacle, Prometheus, Security, Simpson, Thrive, Trammell Crow, UDR, and Windsor.

**Figure 18: Owners, Owner-Operators, and Managing Defendants' Price Increases 1-Bedroom (Portland MSA)**



**ANSWER TO PARAGRAPH 346:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 346 and Figure 18 and denies them on that basis.

347.    The following Defendants own and/or manage multifamily rental properties in the New York submarket: AIR, Bozzuto, Brookfield, Equity, Greystar, Lincoln, Morgan, Pinnacle, Rose Associates, RPM, Related, Trammell Crow, UDR, Windsor, and Winn.

**Figure 19: Owners, Owner-Operators, and Managing Defendants' Price Increases 1-Bedroom (New York MSA)**



**ANSWER TO PARAGRAPH 347:**

Morgan Properties denies the allegations in Paragraph 347 and Figure 19; Morgan Properties does not operate properties in the New York City metropolitan area, as defined by the U.S. Census Bureau.

348.    Moreover, when accounting for the separate property classes offered, the rents are also strikingly similar, as shown below in Figures 20-28, which plot the average price Owner-Operators and Managing Defendants charged for 1-bedroom apartments in Class A properties.

**Figure 20: Owners, Owner-Operators, and Managing Defendants' Price Increases 1-Bedroom (Nashville MSA)**



**Figure 21: Owners, Owner-Operators, and Managing Defendants' Price Increases Class A 1-Bedroom (Atlanta MSA)**



**Figure 22: Owners, Owner-Operators, and Managing Defendants' Price Increases Class A 1-Bedroom (Boston MSA)**



**Figure 23: Owners, Owner-Operators, and Managing Defendants' Price Increases Class A 1-Bedroom (Dallas MSA)**



**Figure 24: Owners, Owner-Operators, and Managing Defendants' Price Increases Class A 1-Bedroom (Denver MSA)**



**Figure 25: Owners, Owner-Operators, and Managing Defendants' Price Increases Class A 1-Bedroom (D.C. MSA)**



**Figure 26: Owners, Owner-Operators, and Managing Defendants' Price Increases Class A 1-Bedroom (Miami MSA)**



**Figure 27: Owners, Owner-Operators, and Managing Defendants' Price Increases Class A 1-Bedroom (Portland MSA)**



**Figure 28: Owners, Owner-Operators, and Managing Defendants' Price Increases Class A 1-Bedroom (New York MSA)**



**ANSWER TO PARAGRAPH 348:**

Morgan Properties denies the allegations in Paragraph 348 and Figures 20 through 28.

349. This type of parallel pricing was made possible through Defendants' use of RealPage's RMS. Indeed, the price changes exhibit an unusual pattern whereby prices increase during lower occupancy periods, and even periods of economic downturns. Plaintiffs have alleged that the Owners, Owner-Operators, and Managing Defendants coordinated and communicated their pricing strategies through various means, including participation in information sharing programs hosted by Defendant RealPage, attendance at meetings, phone calls, and on information and belief, through other forms communication including emails and otherwise, to ensure uniform adherence to the plan to price their units according to RealPage's RMS, thereby charging Plaintiffs and members of the Class supracompetitive prices for the rentals of their multifamily rental units.

**ANSWER TO PARAGRAPH 349:**

Morgan Properties denies the allegations in Paragraph 349.

350. Defendants' coordinated price hikes have led to substantial increases in rental costs to Plaintiffs and members of the Class. The resultant reduction in competition has left renters with fewer options for the quality and variety of affordable housing available to them in the market.

**ANSWER TO PARAGRAPH 350:**

Morgan Properties denies the allegations in Paragraph 350.

### iii. Supply and Demand Factors Do Not Explain Inflated Rental Prices.

351. A regression analysis is a statistical method that describes the relationship between two or more variables. Typically expressed in a graph, the regression method tests the relationship between a dependent variable against independent variables.

## ANSWER TO PARAGRAPH 351:

Morgan Properties denies the allegations in Paragraph 351.

352. Preliminary regression analyses conducted in several regional sub-markets for multifamily rental housing suggest a structural break between the forces of supply and demand nearing the start of the Conspiracy Period. For the purpose of this preliminary regression, the markets analyzed include the cities within the Atlanta, Phoenix, Orlando, and Dallas Submarkets, as defined below in §V1.C, collectively referred to here at the "Regression Submarkets."

## ANSWER TO PARAGRAPH 352:

Morgan Properties denies the allegations in Paragraph 352.

353. Figure 29 below illustrates the rising rental costs in the Regression Submarkets from 2015 through 2023.

**Figure 29: Average Rents in Phoenix, AZ, Orlando, FL, Fort Worth, TX, and Atlanta, GA.**



## ANSWER TO PARAGRAPH 353:

Morgan Properties denies the allegations in Paragraph 353 and Figure 29.

354. Here, each regression first tested the impact of vacancy rates on rental rates in the respective submarket during the period from 2011 through 2016 ("pre-period") to understand the relationship between vacancy rates and rental prices in the time period before Defendant RealPage's RMS became pervasive. The pre-period is depicted on the left side of the regression models in Figures 30, 32-36. The right-side of each regression model represents the same regression analysis performed, but for the post-2016 period ("post-period"), during which RealPage's RMS were increasingly adopted.

**ANSWER TO PARAGRAPH 354:**

Morgan Properties denies the allegations in Paragraph 354.

### iv. Atlanta Submarket.

355. Property management companies and owner-operated firms use revenue management software to set rents for approximately 81.30% of all multifamily rental units in Atlanta, Georgia. Widespread adoption of Defendant RealPage's RMS has caused rents to increase explosively in recent years, with renters in Atlanta paying approximately 80% more in rent today than they paid in 2016. The regression model depicted in Figure 30 below tests the relationship between vacancy rates and rental prices in the Atlanta Submarket and demonstrates the effects of Defendants' conspiracy.

**ANSWER TO PARAGRAPH 355:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 355 and denies them on that basis.

356. The left side of Figure 30 shows that during the pre-period, there was a negative relationship between effective rents and vacancy rates in the Atlanta Submarket, which is expected from economic theory. That is, it shows that an increase in vacancy rates (supply) generally resulted in a decrease in rental price. Specifically, during the pre-period, the regression suggests that a one percentage point increase in the vacancy rate in Atlanta will reduce rental prices by $33.02 per month. While the pre-period regression is simplistic, it yielded a R-square[206] of 83.1%, which is substantial. In other words, during the pre-period, 83% of rental price variations in the Atlanta Submarket can be explained by the operative vacancy rate.

---

[206] 206 R-square is a statistical measure in a regression model that determines the proportion of variance in the dependent or "response" variable (rental prices) that can be explained by the independent variable or "mean" (vacancy rates). 0% represents a model that does not explain any of the variation in the response variable around the mean and R-square of 100% represents a model that explains all the variation in the response on the mean.

148

**Figure 30: Atlanta Effective Rents and Vacancy Rates Regression (2011 – 2022)**



**ANSWER TO PARAGRAPH 356:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 356 and Figure 30 and denies them on that basis.

357.    The pre-period regression results are consistent with property managers previously
pursuing the "heads in beds" policy to rent setting.

**ANSWER TO PARAGRAPH 357:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 357 and denies them on that basis.

358.    Note that during the post-period depicted on the right side of Figure 30, rental prices no
longer exhibited any relation to vacancy rates, but in general tended to move in the opposite
direction than that predicted by economic theory.  That is, as vacancy rates trended
upwards, meaning there was an increase in supply of multifamily rental housing units,
rental prices did not decrease in response as they had in the pre-period.  Instead, rents
continued to rise in conflict to basic economic principles of supply and demand.  Indeed,
the post-period R-square of 19.3% indicates that the previously strong relationship between
vacancy rates and rental prices had been severed in the post 2016 period.[207] This structural
break is indicative of the impact of the Owner-Operators' and Managing Defendants'
adoption of RealPage's pricing decisions.

---

[207] R-square figures corresponding to the Atlanta, Georgia preliminary regression differ from that cited in the Goldman
v. RealPage, Inc., complaint, owing to updates to Reis's quarterly data.

**ANSWER TO PARAGRAPH 358:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 358 and Figure 30 denies them on that basis.

359.    The structural shift between vacancy rates and rental prices observed in the Atlanta Submarket regression is further depicted in Figure 31 below, which graphically represents the relationship between rental prices and occupancy rates for properties managed by Defendant Camden in Atlanta, Georgia.  Note that in Figure 31, the percentage of vacant units is expressed as an "occupancy rate" rather than a vacancy rate.  That is, as the occupancy rate increases, vacancies decrease, and vice versa.

**Figure 31: Defendant Camden Property Trust - Effective Rents and Occupancy Rates in Atlanta, GA (2008-2022)**



**ANSWER TO PARAGRAPH 359:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 359 and Figure 31 and denies them on that basis.

360.    Notably, Figure 31 demonstrates that as occupancy rates at Defendant Camden's Atlanta properties decreased rapidly beginning 2017, rental prices drastically increased over that same time.  As an example, in the second quarter of 2017, the occupancy rates across Defendant Camden's Atlanta properties measured approximately 95.8%, while the average rental price was $1,299.  While occupancy rates at these same properties in fact dropped by Q2 2018 to 95.6%, and to their lowest since prior to the time captured in this graph sometime between 2017 and 2018, rents at Defendant Camden's Atlanta properties had increased *over 31%* in the span of just one year.

**ANSWER TO PARAGRAPH 360:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 360 and Figure 31 and denies them on that basis.

      **v.    Orlando Submarket.**

361.    Property management companies and owner-operated firms use revenue management software to set rents for approximately 72% of all multifamily rental units in the Orlando Submarket. A preliminary regression analysis was performed for the Orlando Submarket, testing the relationship between vacancy rates and rental prices in the pre-and-post 2016 periods. Figure 32 demonstrates the pre-period negative, and subsequent inverse directional relationship between vacancy rates and rental prices in the Orlando Submarket as observed in Figure 30 above. The Orlando Submarket pre-period regression yielded a R-square of 84.2%, showing a significant correlation between rental prices and vacancy rates before 2016. Specifically, during the pre-period, the regression suggests that a one percentage point increase in the vacancy rate in Orlando will reduce rental prices by $40.39 per month. In the post-2016 period, vacancy rates only explained about 21% of rental price variations (21.1% R-square).

**Figure 32: Orlando Effective Rents and Vacancy Rates Regression (2011 – 2022)**



**ANSWER TO PARAGRAPH 361:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 361 and Figures 30 and 32 and denies them on that basis.

### vi. Phoenix Submarket.

362. Property management companies and owner-operated firms use revenue management software to set rents for approximately 74.70% of all multifamily rental units in the Phoenix Submarket. Widespread adoption of Defendant RealPage's RMS has caused rents to increase significantly in recent years, whereby Phoenix renters are paying nearly 68% more in rent today than they paid in 2017. Figure 33 demonstrates the pre-and-post-2016 regression performed in the Phoenix Submarket, which yielded a pre-period R-square figure of 74.3% and post-period of 19.7%, evincing another significant break from observed forces of supply and demand in some of the most sought out metropolitan regions in the United States. Here, the regression suggests that prior to 2016, a one percentage point increase in the vacancy rate in Phoenix would reduce rental prices by $25.45 per month.

**Figure 33: Phoenix Effective Rents and Vacancy Rates Regression (2011 – 2022)**



### ANSWER TO PARAGRAPH 362:

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 362 and Figure 33 and denies them on that basis.

### vii. Fort Worth (Dallas Submarket).

363. Property owners and managers who use revenue management software account for approximately 76% of all multifamily rental units in the Dallas-Fort Worth Submarket. Figure 34 represents a preliminary regression performed for the Fort Worth region of the Dallas Submarket,

### ANSWER TO PARAGRAPH 363:

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 363 and Figure 34 and denies them on that basis.

364.    The Forth Worth regression indicates that prior to 2016, approximately 74.8% of rental price variations could be explained by examining the vacancy rate at a given time. Specifically, during the pre-period, the regression suggests that a one percentage point increase in the vacancy rate in the Fort Worth section of the Dallas Metro area will reduce rental prices by $28.02 per month. After property management companies and owner-operated firms increasingly adopted Defendant RealPage's RMS in the post-2016 period, the significant correlation between rental prices and vacancies ceased, as illustrated by the post-period R-square of 18.8%.

**Figure 34: Fort Worth Effective Rents and Vacancy Rates Regression (2011 – 2022)**



**ANSWER TO PARAGRAPH 364:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 358 and Figure 34 and denies them on that basis.

365.    The foregoing preliminary economic evidence corroborates the existence of the alleged conspiracy and confirms the impact of Defendant RealPage's rental pricing recommendations provided through its RMS on Plaintiffs and Members of the Class.

**ANSWER TO PARAGRAPH 365:**

Morgan Properties denies the allegations in Paragraph 365.

H. **"Plus Factors" in the Multifamily Rental Housing Market Provide Additional Evidence of a Price Fixing Conspiracy.**

366. The presence of a number of factors, referred to as "plus factors" and "super plus factors" render the market for multifamily rental housing units highly conducive to collusion. Plus factors are "economic actions and outcomes, above and beyond parallel conduct by oligopolistic firms, that are largely inconsistent with unilateral conduct but largely consistent with explicitly coordinated action," and therefore support an inference of collusion.[208] "Super plus factors are actions or outcomes that would almost never be observed in the absence of collusion, [such that], it is reasonable to presume that the cartel finds these conducts or outcomes important to the implementation and operation of the collusive structures."[209]

**ANSWER TO PARAGRAPH 366:**

Morgan Properties denies the allegations in Paragraph 366.

367. Specifically, the following plus and super plus factors support an inference that Defendants' actions constituted a *per se* unlawful price fixing conspiracy, not merely parallel conduct: the multifamily rental housing market (i) is highly concentrated; (ii) has high barriers to entry for would-be competitors; (iii) has high switching costs for renters; (iv) has inelastic demand; and (v) offers a fungible product. In addition, Defendants (vi) exchange competitively sensitive information; and (vii) have motive, opportunities, and invitations to collude.

**ANSWER TO PARAGRAPH 367:**

Morgan Properties denies the allegations in Paragraph 367.

i. **The Multifamily Rental Market Is Highly Concentrated.**

368. The market for multifamily rental housing units is highly concentrated. A relatively small number of large property owners and management companies, including the Owner, Owner-Operators, and Managing Defendants, control a significant number of the multifamily rental housing properties in metropolitan areas throughout the United States. Moreover, the market for multifamily revenue management software is even more concentrated. While Defendant RealPage claims it collects data on over 16 million units, its 2020 10-K filing indicates RealPage clients in fact control 19.7 million, out of a total 22 million, investment-grade units in the country. In other words, RealPage's clients comprise nearly 90% of the U.S. market for multifamily rental housing units.[210]

---

[208] William E. Kovacic, *Plus Factors and Agreement in Antitrust Law*, 110 MICH. L. REV. 393, 393 (2011).

[209] *See id.* at 426.

[210] Gal Meiron, *How Business Intelligence Can Clear Up a Cloudy Forecast*, REALPAGE, INC., (July 29, 2020), https://www.realpage.com/blog/how-business-intelligence-can-clear-up-a-cloudy-forecast/ (last visited on July 3, 2023).

**ANSWER TO PARAGRAPH 368:**

Morgan Properties denies the allegations in Paragraph 368.

### ii. High Barriers to Entry.

369.    Any prospective competitor seeking to enter the market for multifamily rental housing and compete with the large property owners or management companies faces significant barriers to entry, including the time and financial resources needed to develop a multifamily rental housing property portfolio through some combination of acquisition and new construction.

**ANSWER TO PARAGRAPH 369:**

Morgan Properties denies the allegations in Paragraph 369.

370.    In addition to the costs to build or acquire, developing and maintaining a multifamily rental housing property takes years, meaning new entrants into the market are unlikely to discipline cartel pricing in the short or medium term.

**ANSWER TO PARAGRAPH 370:**

Morgan Properties denies the allegations in Paragraph 370.

371.    Similarly, any software company seeking to provide software that competes with Defendant RealPage—in a non-collusive manner—faces significant barriers to entry, including convincing cartel members to switch to a service that will, by definition, provide them with less revenue and less profit than the RealPage cartel does, given the vast swaths of data collected by RealPage.

**ANSWER TO PARAGRAPH 371:**

Morgan Properties denies the allegations in Paragraph 371.

### iii. High Switching Costs for Renters.

372.    Significant switching costs prevent effective price competition in the multifamily rental housing market. A significant portion of Defendants' anticompetitive scheme involves increasing rents to supracompetitive levels when a lease comes up for renewal. Many tenants are forced to absorb inflated rents owing to the costs associated with moving altogether, the time and labor required to locate a new apartment, and the disruption to family, work, and personal life caused by moving, thereby making switching to a better-priced alternative challenging—if one were available.

**ANSWER TO PARAGRAPH 372:**

Morgan Properties denies the allegations in Paragraph 372.

373. Additionally, for renters who seek to switch to a better-priced alternative—if one were available—mid-lease, they will likely face significant financial penalties for doing so. These penalties may include, among other things: the forfeiture of a security deposit that typically amounts to at least one month's rent or the requirement that the renter continue paying rent until the property is rented again.

**ANSWER TO PARAGRAPH 373:**

Morgan Properties denies the allegations in Paragraph 373.

374. Because of these high switching costs and lack of substitutability, renters cannot readily switch from one rental unit to another in the event their current rental unit no longer aligns with market prices. This creates a certain degree of natural market power for owners and managers of rental properties and makes collusion more effective because even if a competing property owner or manager were to offer lower prices on available units, customers will not typically break their leases to enter a lease for a lower cost property given the substantial cost of doing so. Moreover, where price increases are occurring throughout broad geographic areas—as they do when the dominant landlords all enter a pricing cartel—renters often do not have any lower-priced options available in reasonable proximity to their work, school, or home. As such, renters cannot simply turn to alternative lessors in their region to discipline cartel pricing.

**ANSWER TO PARAGRAPH 374:**

Morgan Properties denies the allegations in Paragraph 374.

### iv. Inelasticity of Demand.

375. The demand for multifamily rental housing units is highly inelastic, meaning an increase in rental housing prices tends to result in increased profits to the property owner and management company without triggering substitutions sufficient to outweigh the benefit of profits reaped from units rented at the higher price points. The only reasonable alternative to renting is purchasing a home, and for many renters, that is not an option either financially or logistically. Owing to this and the high switching costs discussed above, no reasonable substitutes exist to discipline cartel pricing.

**ANSWER TO PARAGRAPH 375:**

Morgan Properties denies the allegations in Paragraph 375.

376. In addition, apartment rental demand is inelastic because moving imposes substantial costs on renters, including disruption to the most basic and important aspects of life, such as keeping their jobs, sending their kids to school, or having access to medical care. Tenants are therefore less likely to react to a moderate price increase, which allowed Defendants to collectively maintain and increase rents every year.

**ANSWER TO PARAGRAPH 376:**

Morgan Properties denies the allegations in Paragraph 376.

### v.    Multifamily Rental Housing Units Are a Fungible Product.

377.    When controlling for certain characteristics of multifamily rental housing properties, including among other things, the age of the building, the number of bedrooms and bathrooms, amenities available, location, and access to public transportation, units within like classes of properties are generally interchangeable. That is, each unit has the basic requirements for all tenants which drive marketing, sales, and leasing decisions for units within that class.

**ANSWER TO PARAGRAPH 377:**

Morgan Properties denies the allegations in Paragraph 377.

378.    Indeed, many units in multifamily rental housing properties located in metro areas have similar amenities, including parking, exercise facilities, swimming pools, common areas, business centers, and internet access, and are thus readily comparable based on these objective features, as well as by rent and square footage. Defendant RealPage itself recognizes this and through its analytics services classifies and clusters similar multifamily rental properties by class and use as a reference point like classified buildings at the market, submarket and ZIP code level. According to RealPage, through its classification and benchmarking services, it provides its clients, including the Owners, Owner-Operators, and Managing Defendants, with "a true apples-to-apples comparison" between largely fungible apartments in its RMS pricing recommendations.[211]

**ANSWER TO PARAGRAPH 378:**

Morgan Properties denies the allegations in Paragraph 378.

379.    Property owners and management companies recognize this too. Emily Mask, Defendant ECI Group's Associate VP of Operations and Revenue has acknowledged that, Defendant RealPage is "correctly looking at 'like' competitor properties and 'truly comparing apples to apples' as it relates to competitor apartment pricing."[212]

**ANSWER TO PARAGRAPH 379:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 379 and denies them on that basis.

---

[211] Brandon Crowell, *Property Classification: It's Important to Get it Right*, REALPAGE ANALYTICS (Mar. 21, 2016), https://www.realpage.com/analytics/property-classification-its-important-to-get-right/ (last access on July 3, 2023).
[212] RealPage e-book B & C Assets Ace the Market, *supra*, note 10, at 5.

### vi. Defendants Exchange Competitively Sensitive Information.

380. The reciprocal sharing of firm-specific competitively sensitive information that would normally remain private is a "super plus factor" that leads to a strong inference of active collusion.[213] As described above, Defendant RealPage requires clients to input data on actual rents paid and occupancy rates, along with detailed records of lease transactions. This data, which would normally be kept private, is fed into RealPage's RMS algorithm(s) which sets coordinated rents among competing property owners and managers. RealPage disseminates building-specific comparables data to its clients, thereby providing clients, including Owners, Owner-Operators, and Managing Defendants not only with knowledge as to which of its competitors use RealPage's RMS to price their multifamily units, but also the specific levels at which competitors are pricing their multifamily units. Importantly, individual property owners and managers would be competitively disadvantaged by providing private data to other property owners or managers unilaterally, and rational actors will only do so with the expectation that they will benefit from similar private information shared by their competitors. These horizontal competitors, then, have access to others' confidential pricing information prior to implementing their own rent prices.

### ANSWER TO PARAGRAPH 380:

Morgan Properties denies the allegations in Paragraph 380.

### vii. Motive, Opportunities, and Invitations to Collude.

381. Defendant RealPage provides property owners and managers with a motive to conspire by advertising its RMS can increase revenue by 3% to 7%.[214]

### ANSWER TO PARAGRAPH 381:

Morgan Properties denies the allegations in Paragraph 381.

382. Defendant RealPage's RMS provides its clients with an opportunity to coordinate prices and thereby achieve revenues that would be unavailable if a rental management company acted unilaterally. RealPage's advertisements are explicit that this is both the goal and the effect – a naked invitation to collude.

### ANSWER TO PARAGRAPH 382:

Morgan Properties denies the allegations in Paragraph 382.

383. Defendants have multiple opportunities to conspire through virtual or face-to-face meetings, online user groups, and through participation in various trade associations. For example, Defendant RealPage's User Group provides Owner-Operators and Managing

---

[213] Christopher R. Leslie, *The Probative Synergy of Plus Factors in Price-Fixing Litigation*, 115 NW. UNIV. L. REV. 1581, 1608 (2021).
[214] Revenue Management: Proven in any Market Cycle, *supra*, note 14, at 6.

Defendants with a private, password-protected forum that is only available to RealPage clients and its employees, in which Defendants can "interact with product managers and other clients"[215] and "create a completely integrated solution for the multifamily industry."[216] The User Group has over 1,000 members and includes an "Idea Exchange" forum, monitored by RealPage, in which Defendants are encouraged to share ideas and comment on RealPage practices.

## ANSWER TO PARAGRAPH 383:

Morgan Properties denies the allegations in Paragraph 383.

384.    Additionally, Defendant RealPage hosts online forums and in-person conferences for property owners and managers[217] and maintains standing committees of cartel members to advise on pricing strategy,[218] all of which provide opportunities for more direct collusion. Committee members are required to join quarterly conference calls and attend the annual meeting at the "RealWorld" conference, discussed below.

## ANSWER TO PARAGRAPH 384:

Morgan Properties denies the allegations in Paragraph 384.

385.    Defendant RealPage hosts an annual RealWorld three-day conference, which typically draws over 1,000 attendees, including representatives from the Owner-Operators' and Managing Defendants' companies, among others, and which not only provides Defendants with the opportunity to collude, but also in fact *encourages* the exchange of ideas between and among Owner-Operators and Managing Defendants. Various Owner-Operators and Managing Defendants executives have served as speakers at RealWorld, including executives from Defendants Greystar, CWS, Bell Partners, Pinnacle, and UDR.

## ANSWER TO PARAGRAPH 385:

Morgan Properties denies the allegations in Paragraph 385.

386.    Industry trade associations serve as conduits of the cartel and facilitate opportunities to conspire and exchange information through meetings, webinars, and information portals, all of which are accessible only to trade association members. For example, the National Multifamily Housing Council ("NMHC") hosts several events each year in cities throughout the United States, which have been attended by Defendants, including Avenue5, Bozzuto, First Communities, FPI, Highmark, Mission Rock, ZRS, Air Communities, Apartment Management Consultants, Bell, Brookfield, CONAM, Dayrise, Equity, Greystar, Independence, Lantower, Lincoln, Sares Regis, and Security Properties. NMHC's officers include executives from Defendant companies, such as Trammell Crow, Bozzuto, and Camden. NMHC's sponsors have included Defendants RealPage, Greystar,

---

[215] *Best Practices*, REALPAGE, INC., https://www.realpage.com/user-group/best-practices/.
[216] User Group Overview, *supra*, note 53.
[217] *RealWorld 2023*, REALPAGE, INC., https://www.realpage.com/realworld/.
[218] User Group Overview, *supra*, note 53.

159

Bozzuto, Camden, Lincoln, Equity, and UDR, among other prominent property owners and management companies.

**ANSWER TO PARAGRAPH 386:**

Morgan Properties denies the allegations in Paragraph 386.

387. As discussed previously, many Defendants in this action are members of the TAA, which drafts and revises standard leases for use by Texas landlords. The committee meetings where standard leases are amended and ratified, as well as other meetings of the TAA, provide more opportunities for collusion amongst a large group of landlords who have shared economic goals. Moreover, RealPage has sponsored TAA conferences, with Donald Davidoff, the principal developer of LRO, presenting topics on "rent price optimization." RealPage was also a winning bidder in the TAA Education Foundation's Live Auction, which "featur[es] face-time with key industry decision-makers."[219]

**ANSWER TO PARAGRAPH 387:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 387 and denies them on that basis.

388. Similarly, the NAA committee meetings where the TAA standard leases are adopted, as well as other meetings of the NAA, provide even more opportunities for collusion amongst landlords who have shared economic goals. RealPage has also been an NAA sponsor, with Mr. Davidoff and RealPage's Head of Data Science, Rich Hughes, presenting on the "in-depth analytics of pricing discovery," during which they explained that "intangible benefits" of revenue management include "[b]etter, more consistent insight into the competitive market space," and "[m]ovement away from market rent and toward net effective pricing."[220] As discussed previously, a number of Owner, Owner-Operators, and Managing Defendants have been involved with the NAA, including Bozzuto, Bell, Camden, CONAM, Greystar, BH, Dayrise, Essex, UDR, Lincoln, Allied Orion, Equity, Highmark, Sares Regis, Mission Rock, Winn, and ZRS.

**ANSWER TO PARAGRAPH 388:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 388 and denies them on that basis.

389. Nearly 50 additional national and regional trade associations (or their local chapters) serve as conduits of the cartel, much like NMHC and the TAA, by providing venues for

---

[219] Texas Apartments, Summer 2012, at 30.
[220] D. Davidoff, A. McCulloh, R. Hughes, *In-depth Analytics of Pricing Discovery*, (2015), at 37, https://www.naahq.org/sites/default/files/mamconf/Pre-Conference%20Workshop%20In-Depth%20Analytics%20of%20Pricing%20Discovery.pdf.

Defendant RealPage and its participating Owner-Operators and Managing Defendants to further their cartel's goals.

**ANSWER TO PARAGRAPH 389:**

Morgan Properties denies the allegations in Paragraph 389.

390. National industry trade associations include: (1) Institute of Real Estate Management, (2) National Apartment Association, (3) National Association of Residential Property Managers, (4) Pension and Real Estate Association, and (5) Urban Land Institute.

**ANSWER TO PARAGRAPH 390:**

Morgan Properties denies the allegations in Paragraph 390.

391. Regional associations and chapters include, among others: (1) Alabama Apartment Association, (2) Apartment and Office Building Association, (3) Arkansas Apartment Association, (4) Apartment Association of Central Oklahoma, (5) Apartment Association of Greater Dallas, (6) Apartment Association of the Greater Inland Empire, (7) Apartment Association of Greater Memphis, (8) Apartment Association of Greater New Orleans, (9) Apartment Association of Greater Orlando, (10) Apartment Association of Greater Los Angeles, (11) Apartment Association of Louisiana, (12) Apartment Association of Metro Denver, (13) Apartment Association of Metropolitan Pittsburgh, (14) Apartment Association of Kansas City, (15) Apartment Association of North Carolina, (16) Apartment Association of Orange County, (17) Apartment Association of Southeast Texas, (18) Apartment Association of Southeastern Wisconsin, (19) Associated Builders and Owners of Greater New York, (20) Apartment Owners Association of California, Inc., (21) Apartment Professionals Trade Society of New York, (22) Arizona Multihousing Association, (23) Atlanta Apartment Association, (24) Austin Apartment Association, (25) Austin Board of REALTORS, (26) Bay Area Apartment Association, (27) Baltimore Real Estate Investors Association, (28) Berkeley Property Owners Association, (29) California Apartment Association, (30) California Business Properties Association, (31) California Landlord Association, (32) California Rental Housing Association, (33) Chicagoland Apartment Association, (34) Colorado Apartment Association, (35) Colorado Landlords Association, (36) Columbus Apartment Association, (37) Delaware Apartment Association, (38) East Bay Rental Housing Association, (39) East Hartford/Manchester & Greater Hartford Property Owners Association, (40) First Coast Apartment Association, (41) Florida Apartment Association, (42) Georgia Apartment Association, (43) Greater Birmingham Apartment Association, (44) Greater Charlotte Apartment Association, (45) Greater Cincinnati Northern Kentucky Apartment Association, (46) Greater Boston Real Estate Board, (47) Houston Apartment Association, (48) Illinois Rental Property Owners Association, (49) Indiana Apartment Association, (50) KC Regional Housing Alliance, (51) Landlord Protection Agency of CA, (52) Louisville Apartment Association, (53) Maryland Multi-Housing Association, (54) Massachusetts Apartment Association, (55) Massachusetts Rental Housing Association, (56) Miami Dade Real Estate Investors Association, (57) Mid-Atlantic Real Estate Investors Association, (58) Minnesota Multi-Housing Association, (59) Missouri Apartment Association, (60) Mississippi Apartment

Association, (61) Multifamily NW, (62) Greater Nashville Apartment Association, (63) Nevada State Apartment Association, (64) New Jersey Apartment Association, (65) Nor Cal Rental Property Association, (66) North Central Florida Apartment Association, (67) Northern Ohio Apartment Association, (68) Northwest Florida Apartment Association, (69) Ohio Apartment Association, (70) Oklahoma Multi-Housing Association, (71) Oregon Apartment Association, (72) Oregon Rental Housing Association, (73) Pennsylvania Apartment Association, (74) Phoenix Metro Chapter of the National Association of Residential Property Managers, (75) Portland Area Rental Owners Association, (76) Professional Property Management Association of San Francisco, (77) Real Estate Council of Austin, (78) Rental Housing Association of Sacramento, (79) Rental Housing Association of Washington, (80) Rhode Island Apartment Association, (81) San Antonio Apartment Association, (82) San Diego County Apartment Association, (83) San Diego Creative Investors Association, (84) San Francisco Apartment Association, (85) South Coast Apartment Association, (86) Southern Arizona/Tucson Chapter of the National Association of Residential Property Managers, (87) South East Florida Apartment Association, (88) Southeast Regional Advisory Council for Apartment Life, (89) Southern California Rental Housing Association, (90) Southwest Florida Apartment Association, (91) St. Louis Apartment Association, (92) Tennessee Apartment Association, (93) Texas Apartment Association, (94) Triangle Apartment Association, (95) Utah Apartment Association, (96) Utah Rental Housing Association, (97) Virginia Apartment and Management Association, (98) Washington Multi-Family Housing Association, (99) Washington Landlord Association, (100) Wilmington Apartment Association, (101) Connecticut Apartment Association, and the (102) Wisconsin Apartment Association.

**ANSWER TO PARAGRAPH 391:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 391 and denies them on that basis.

## VI. RELEVANT MARKET

392. Defendants' actions described herein constitute a single unlawful conspiracy to fix, raise, stabilize, or maintain at artificially high levels of rental costs charged for multifamily residential real estate across the United States, and is *per se* illegal under the Sherman Act. This agreement among horizontal competitors was supported by a reciprocal exchange of competitively sensitive information through Defendant RealPage, which was a facilitating practice in furtherance of Defendants' cartel.

**ANSWER TO PARAGRAPH 392:**

Morgan Properties denies the allegations in Paragraph 392.

393. Further, because the conduct alleged here increased prices and reduced output, if the Court declines to analyze this case under the *per se* mode of analysis, the Court could analyze this case under the "quick look" mode of analysis. Under either mode of analysis, Plaintiffs are not required to prove that Defendants had market power in any defined antitrust market.

162

**ANSWER TO PARAGRAPH 393:**

Morgan Properties denies the allegations in Paragraph 393.

### A. The Relevant Product Market Is Multifamily Residential Real Estate Leases.

394. To the extent the Court ultimately applies the "rule of reason" mode of analysis to these claims—notwithstanding the horizontal nature of the alleged conspiracy—the relevant product market is the market for the lease of multifamily residential real estate.

**ANSWER TO PARAGRAPH 394:**

Morgan Properties denies the allegations in Paragraph 394.

395. From the perspective of the consumer, multifamily rental apartment units are not an economic substitute with apartments, condominiums, or homes for purchase because, among other reasons, purchase of real estate requires the ability to make a substantial down payment and to obtain financing.

**ANSWER TO PARAGRAPH 395:**

Morgan Properties denies the allegations in Paragraph 395.

396. Additionally, from the perspective of the consumer, single-family real estate is not an economic substitute for multifamily residential real estate. For example, single-family properties typically do not offer amenities and security. Indeed, industry participants in the multifamily residential real estate market typically distinguish between multifamily and single-family real estate when discussing customer preferences and market trends, including concerning their disparate respective pricing.

**ANSWER TO PARAGRAPH 396:**

Morgan Properties denies the allegations in Paragraph 396.

397. Defendant RealPage itself differentiates the multifamily residential real estate market as a separate and distinct market from other residential markets. On its website, for example, RealPage lists "Multifamily" as its own market, distinct from affordable, military, senior, single-family, and student housing, as well as commercial properties.

**ANSWER TO PARAGRAPH 397:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 397 and denies them on that basis.

398. Thus, the multifamily residential real estate lease market satisfies the test for market definition used by federal antitrust enforcement agencies, widely known as the "SSNIP

test." The test asks whether a hypothetical monopolist in a proffered market could profitably impose a small but significant (typically 5%), non-transitory increase in price (a "SSNIP"), without causing a sufficient number of customers to switch to other products or services such that the SSNIP would be unprofitable to the monopolist. If the SSNIP is profitable, the market is properly defined. If the SSNIP is not profitable, the market is too narrowly defined, and does not encompass sufficient economic substitutes.

**ANSWER TO PARAGRAPH 398:**

Morgan Properties denies the allegations in Paragraph 398.

399.    Here, the SSNIP test is satisfied, and the market is properly defined. As described above and below, pursuant to the Owners', Owner-Operators', and Managing Defendants' agreement not to compete on price, Defendants are able to increase rents "year over year, between 5% and 12% in every market," (*see e.g.*, Figures 9-10) yet those increases have not driven enough renters out of the market such that the SSNIP has become unprofitable to Defendants. Because Owners, Owner-Operators and Managing Defendants are able to increase prices by a SSNIP without losing sufficient sales to render the increase unprofitable, the Multifamily Rental Market is properly defined.

**ANSWER TO PARAGRAPH 399:**

Morgan Properties denies the allegations in Paragraph 399 and Figures 9 and 10.

**B.      Defendants' Market Power in the Multifamily Residential Real Estate Market.**

400.    The Managing Defendants, Owner-Operators, and Owner Defendants are able to collectively exercise market power in nationwide multifamily residential real estate market and in each submarket in which they operate, as detailed below. While traditional antitrust doctrine uses market share as a rough proxy for market power, that proxy does not tell the full story in the multifamily residential real estate market for at least two reasons. First, there are considerable search, transaction, and relocation costs associated with moving. Second, because of the staggered nature of the rental leases, many of the units nominally part of the housing stock in a given metropolitan area will not actually be available to a renter at the time of their least renewal. Units filled by other renters on longer term contracts are not reasonably interchangeable, because renters cannot simply choose to be homeless until a unit at a competitive price becomes available. These acts give Defendants greater market power at lower market share levels than might be the case in other industries.

**ANSWER TO PARAGRAPH 400:**

Morgan Properties denies the allegations in Paragraph 400.

401.    As to the first, switching costs give apartment owners and managers significant market power even in a competitive market. As noted above, in order to move, renters must: search for a new apartment; negotiate a new lease; pack up their possessions; move those possessions— often including furniture—often in a single day between leases; unpack in a

new location; learn a new neighborhood and a new route to work or school. The list goes on.

## ANSWER TO PARAGRAPH 401:

Morgan Properties denies the allegations in Paragraph 401.

402. The U.S. Census Bureau's Current Population Survey provides additional evidence to bolster the conclusion that most renters do not move for small but significant changes in housing price. The one-year migration survey shows that the moving rate in the rental market has been trending downward since 1988. In 2022, the renters who lived in the Metropolitan Statistical Area (see ¶406, *supra*) and moved in the past year only represent 14% of the total renting households in the U.S. In 2013, the number was 21%. On average, 98% of the renting households did not move or did not move for lower prices. In other words, only 2% of renting households on average moved for cheaper housing—despite Managing Defendants and Owner Defendants regularly imposing SSNIPs on renewed leases.

**Figure 35: Renters in Metropolitan CBSAs Who Moved for Cheaper Housing Chart**

| Year | Renters in Metropolitan CBSAs Who Moved For Cheaper Housing in the Past Year As A Percentage of The Total Renters in the U.S. at the Household Level |
|---|---|
| 2005 | 3% |
| 2006 | 3% |
| 2007 | 2% |
| 2008 | 2% |
| 2009 | 3% |
| 2010 | 3% |
| 2020 | 1% |
| 2021 | 2% |
| 2022 | 2% |
| Average | 2% |

Source: U.S. Census Current Population Survey Annual Social and Economic Supplement (CPS ASEC)
Note: The data between 2011 and 2019 are unavailable.

## ANSWER TO PARAGRAPH 402:

Morgan Properties denies the allegations in Paragraph 402 and Figure 35.

403. Landlords such as Managing Defendants and Owner-Operators are also able to impose SSNIPs with lower market share than in traditional markets because while there is a nominal housing supply in any given area, in practice most of those units are occupied by others, most of whom have signed long term leases. Because housing is a necessity, renters cannot choose simply to be homeless until more units open for renewal, allowing additional competition.

**ANSWER TO PARAGRAPH 403:**

Morgan Properties denies the allegations in Paragraph 403.

404.     In other words, for any given renter, their options to find an alternative apartment is not the entire multifamily housing of a metropolitan area, but rather only those leases which are available at the time their previous lease ends. That is why one of the services RealPage provided to the Managing Defendants, Owner-Operator Defendants, and Owner Defendants in operating the cartel is staggering lease renewal dates.

**ANSWER TO PARAGRAPH 404:**

Morgan Properties denies the allegations in Paragraph 404.

**C.      Regional Submarkets**

405.     Defendant RealPage operates a nationwide business, with offices across the country and clients in every major metropolitan area. RealPage's RMS operate throughout the country in the same way, accounting for any regional variations in rental market conditions. Tenants across the country are impacted by the conspiracy facilitated by RealPage, as nationwide rental prices increase and output declines.

**ANSWER TO PARAGRAPH 405:**

Morgan Properties denies the allegations in Paragraph 405.

406.     Nearly every Owner, Owner-Operator, and Managing Defendant operates in multiple regions across the country. The table attached hereto as Appendix C indicates each MSA in which the Owners, Owner-Operators, and Managing Defendants operate. Appendix C illustrates the strong presence the Owners, Owner-Operators, and Managing Defendants have throughout the nation and in each submarket. It also provides a window into the many overlapping MSAs in which the Defendants operate together, thereby identifying each Defendants' horizontal competitors according to their places of operation. Given that commuting distance to a place of work or school is a significant (if not the primary) geographic constraint on where a person chooses to live, housing markets are regional, and many are tied to a center of commerce or education and the immediately surrounding areas.

**ANSWER TO PARAGRAPH 406:**

Morgan Properties admits that, at times during the alleged relevant time period from

January 1, 2016, to the present, it has operated properties in the following metropolitan areas:

(i) Atlanta, Georgia, (ii) Baltimore, Maryland, (iii) Buffalo, New York, (iv) Charlotte, North

Carolina, (v) Chicago, Illinois, (vi) Cincinnati, Ohio, (vii) Cleveland, Ohio, (viii) Columbus, Ohio,

(ix) Dallas, Texas, (x) Detroit, Michigan, (xi) Indianapolis, Indiana, (xii) Jacksonville, Florida,

(xiii) Memphis, Tennessee, (xiv) Nashville, Tennessee,(xv) Philadelphia, Pennsylvania,

(xvi) Pittsburgh, Pennsylvania, (xvii) Raleigh, North Carolina, (xviii) Tampa, Florida, and

(xix) Washington, D.C., but otherwise denies the allegations in Paragraph 406 and Appendix C.

407.    The U.S. Census Bureau and Office of Management and Budget establishes a Metropolitan
        Statistical Area ("MSA") for each major metropolitan area in the country. The Census
        Bureau defines an MSA as a geographic entity associated with at least one core urbanized
        area of 50,000 or more population, plus adjacent territory that has a high degree of social
        and economic integration with the core as measured by commuting ties.[221]

**ANSWER TO PARAGRAPH 407:**

        Morgan Properties denies the allegations in Paragraph 407.

408.    Renters in any given MSA do not consider multifamily residential leases in other MSAs as
        adequate substitutes for multifamily residential leases in their own MSA. Leases outside a
        MSA are not substitutable for leases inside a MSA because they would leave renters with
        inordinately long commutes to schools or jobs. As a consequence, multifamily residential
        real estate outside the MSA are not within the relevant geographic markets for antitrust
        purposes.

**ANSWER TO PARAGRAPH 408:**

        Morgan Properties denies the allegations in Paragraph 408.

409.    Plaintiffs allege that Defendants' scheme harmed competition in at least the following
        MSAs, each of which compromises a separate and distinct relevant regional geographic
        market under any potential Rule of Reason analysis:

**ANSWER TO PARAGRAPH 409:**

        Morgan Properties denies the allegations in Paragraph 409.

        **i.      Nashville, Tennessee**

410.    The Nashville Submarket corresponds to the Census Bureau's Nashville-Davidson-
        Murfreesboro-Franklin MSA and includes Davidson and 12 other Tennessee counties.
        There are approximately 156,928 multifamily rental units within the Nashville Regional
        Submarket.

---

[221] *See* https://www.gpo.gov/fdsys/pkg/FR-2010-06-28/pdf/2010-15605.pdf;
https://www2.census.gov/geo/pdfs/reference/GARM/Ch13GARM.pdf.

**ANSWER TO PARAGRAPH 410:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 410 and denies them on that basis.

411. Through its suite of business products, including its RMS, Defendant RealPage collects
and shares pricing and occupancy information for a high concentration of multifamily
residential apartment units within the Nashville Submarket, as self-reported by RealPage
on its website:[222]



**ANSWER TO PARAGRAPH 411:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 411 and denies them on that basis.

412. Property management companies and owners who use revenue management software
account for approximately 73% of all multifamily rental units in the Nashville Submarket.
Given that RealPage's RMS accounts for over two-thirds of revenue management software
used in the U.S. multifamily rental housing industry by both owners and managers, the
Owners, Owner-Operators, and Managing Defendants, along with their co-conspirators
who use RealPage's RMS, account for over 48% of the multifamily rental market in the
Nashville Submarket.

**ANSWER TO PARAGRAPH 412:**

---

[222] https://www.realpage.com/explore/main/tn/nashville-davidson-murfreesboro-franklin.

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 412 and denies them on that basis.

413. Within the Nashville Submarket, the following Defendants own or operate multifamily units priced with RealPage RMS: AIR, BH, Bozzuto, Brookfield, Camden, Carter-Haston, Cortland, CWS, ECI, First Communities, Greystar, Highmark, IRT, Lincoln, MAA, Mission Rock, Morgan, Pinnacle, Related, RPM, Security, Simpson, Trammell Crow, UDR, and ZRS.

## ANSWER TO PARAGRAPH 413:

Morgan Properties admits that, at times during the alleged relevant time period from January 1, 2016, to the present, it has operated properties in the Nashville metropolitan area, as defined by the U.S. Census Bureau. Morgan Properties otherwise lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 413 and denies them on that basis.

414. Widespread adoption of Defendant RealPage's RMS has caused rent to increase explosively in recent years, with Nashville renters paying 51% more in rent today than they paid in 2016.

## ANSWER TO PARAGRAPH 414:

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 414 and denies them on that basis.

415. Outside the use of RealPage's RMS, two active trade associations—the Greater Nashville Apartment Association and Tennessee Apartment Association—serve as conduits of the cartel, by providing venues for RealPage and participating Nashville Submarket Owner-Operators and Managing Defendants to further their cartel's goals.

## ANSWER TO PARAGRAPH 415:

Morgan Properties denies the allegations in Paragraph 415.

### ii.     Atlanta, Georgia

416. The Atlanta Submarket corresponds to the Census Bureau's Atlanta–Sandy Springs–Alpharetta MSA. There are approximately 483,529 multifamily rental units within the Atlanta Regional Submarket.

**ANSWER TO PARAGRAPH 416:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 416 and denies them on that basis.

417. Through its suite of business products, including RMS, Defendant RealPage collects and shares pricing and occupancy information for a high concentration of multifamily residential apartment units within the Atlanta Submarket, as self-reported by RealPage on its website:[223]



**ANSWER TO PARAGRAPH 417:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 417 and denies them on that basis.

418. Property management companies and owners who use revenue management software account for approximately 81% of all multifamily rental units in the Atlanta Submarket. Given that RealPage's RMS accounts for over two-thirds of revenue management software used in the U.S. multifamily rental housing industry by both owners and managers, the Owners, Managing Defendants, and Owner-Operators, along co-conspirators who use RealPage's RMS, account for over 53% of the multifamily rental market in the Atlanta Submarket.

**ANSWER TO PARAGRAPH 418:**

---

[223] https://www.realpage.com/explore/main/ga/atlanta-sandy-springs-roswell.

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 418 and denies them on that basis.

419. Within the Atlanta Submarket, the following Defendants own or operate multifamily units priced with RealPage RMS: AIR, AMC, Avenue5, Bell, BH, Bozzuto, Camden, Carter-Haston, CONAM, Cortland, CWS, Dayrise, ECI, Equity, First Communities, FPI Management, Greystar, Highmark, IRT, Lincoln, MAA, Mission Rock, Morgan, Pinnacle, Related, RPM, Simpson, Trammell Crow, and ZRS.

## ANSWER TO PARAGRAPH 419:

Morgan Properties admits that, at times during the alleged relevant time period from January 1, 2016, to the present, it has operated properties in the Atlanta metropolitan area, as defined by the U.S. Census Bureau. Morgan Properties otherwise lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 419 and denies them on that basis.

420. Widespread adoption of Defendant RealPage's RMS has caused rent to increase explosively in recent years, with Atlanta renters paying approximately 56% more in rent today than they paid in 2016.

## ANSWER TO PARAGRAPH 420:

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 420 and denies them on that basis.

421. Outside the use of the Defendant RealPage's RMS, three active trade associations—the Atlanta Apartment Association, Georgia Apartment Association, and Southeast Regional Advisory Council for Apartment Life—serve as conduits of the cartel, by providing venues for RealPage and participating Atlanta Submarket Owner-Operators and Managing Defendants to further their cartel's goals.

## ANSWER TO PARAGRAPH 421:

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 421 and denies them on that basis.

### iii.    Austin, Texas

422. The Austin Submarket corresponds to the Austin-Round Rock-Georgetown MSA, and consists of the City of Austin, Bastrop County, Caldwell County, Hays County, Travis County, and Williamson County. There are approximately 289,198 units within the Austin Regional Submarket.

## ANSWER TO PARAGRAPH 422:

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 422 and denies them on that basis.

423. Through its suite of business products, including RMS, Defendant RealPage collects and shares pricing and occupancy information for a high concentration of multifamily residential apartment units within the Austin Submarket, as self-reported by RealPage on its website:[224]



## ANSWER TO PARAGRAPH 423:

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 423 and denies them on that basis.

424. Property owners and managers who use revenue management software account for approximately 70% of all multifamily rental units in the Austin Submarket. Given that RealPage's RMS accounts for over two-thirds of revenue management software used in the U.S. multifamily rental housing industry by both owners and managers, the Owners,

---

[224] https://www.realpage.com/explore/main/tx/austin-round-rock.

Managing Defendants, and Owner-Operators, along with their co-conspirators who use RealPage's RMS, account for over 46% of the multifamily rental market in the Austin Submarket.

## ANSWER TO PARAGRAPH 424:

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 424 and denies them on that basis.

425.    Within the Austin Submarket, the following Defendants own or operate multifamily units priced with RealPage RMS: Allied Orion, AMC, Avenue5, Bell, BH, Camden, CONAM, CONTI, Cortland, CWS, Dayrise, Equity, First Communities, FPI Management, Greystar, Highmark, IRT, Kairoi, Knightvest, Lantower, Lincoln, MAA, Mission Rock, Pinnacle, Related, RPM, Security, Simpson, Trammell Crow, UDR, Windsor, and ZRS.

## ANSWER TO PARAGRAPH 425:

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 425 and denies them on that basis.

426.    Widespread adoption of Defendant RealPage's RMS has caused rent to increase explosively in recent years, with Austin renters paying 49% more in rent today than they paid in 2016.

## ANSWER TO PARAGRAPH 426:

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 426 and denies them on that basis.

427.    Outside the use of the Defendant RealPage's RMS, several active trade associations—the Austin Apartment Association, Texas Apartment Association, Austin Board of REALTORS, Austin, and the Real Estate Council of Austin—serve as conduits of the cartel, by providing venues for RealPage and participating Austin Submarket Owner-Operators and Managing Defendants to further their cartel's goals.

## ANSWER TO PARAGRAPH 427:

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 427 and denies them on that basis.

### iv. Baltimore, Maryland

428. The Baltimore Submarket corresponds to the Census Bureau's Baltimore-Columbia-Towson MSA and consists of the City of Baltimore and six counties in Maryland. There are approximately 199,885 multifamily rental units within the Baltimore Regional Submarket.

## ANSWER TO PARAGRAPH 428:

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 428 and denies them on that basis.

429. Through its suite of business products, including RMS, Defendant RealPage collects and shares pricing and occupancy information for a high concentration of multifamily residential apartment units within the Baltimore Submarket, as self-reported by RealPage on its website:[225]



## ANSWER TO PARAGRAPH 429:

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 429 and denies them on that basis.

430. Property owners and managers who use revenue management software account for approximately 57% of all multifamily rental units in the Baltimore Submarket. Given that RealPage's RMS accounts for over two-thirds of revenue management software used in the U.S. multifamily rental housing industry by both owners and managers, the Owners,

---

[225] https://www.realpage.com/explore/main/md/baltimore-columbia-towson.

Managing Defendants, and Owner-Operators, along co-conspirators who use RealPage's RMS, account for over 37% of the multifamily rental market in the Baltimore Submarket.

**ANSWER TO PARAGRAPH 430:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 430 and denies them on that basis.

431. Within the Baltimore Submarket, the following Defendants own or operate multifamily units priced with RealPage RMS: Avenue5, Bell, Bozzuto, Brookfield, Greystar, Lincoln, Mission Rock, Morgan, Pinnacle, Related, RPM, UDR, Windsor, Winn, and ZRS.

**ANSWER TO PARAGRAPH 431:**

Morgan Properties admits that, at times during the alleged relevant time period from January 1, 2016, to the present, it has operated properties in the Baltimore metropolitan area, as defined by the U.S. Census Bureau. Morgan Properties otherwise lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 431 and denies them on that basis.

432. Widespread adoption of Defendant RealPage's RMS has caused rent to increase explosively in recent years, with Baltimore renters paying nearly 26% more in rent today than they paid in 2016.

**ANSWER TO PARAGRAPH 432:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 432 and denies them on that basis.

433. Outside the use of the Defendant RealPage's RMS, two active trade associations— the Maryland Multi-housing Association and the Baltimore Real Estate Investors Association— serve as conduits of the cartel, by providing venues for RealPage and participating Baltimore Submarket Owner-Operators and Managing Defendants to further their cartel's goals.

**ANSWER TO PARAGRAPH 433:**

Morgan Properties denies the allegations in Paragraph 433.

434. In addition to the high adoption of Defendant RealPage's RMS, competition in the Baltimore Submarket is also stymied by local permitting requirements, which inhibit new entrants to the market.

## ANSWER TO PARAGRAPH 434:

Morgan Properties denies the allegations in Paragraph 434.

### v. Boston, Massachusetts

435. The Boston Submarket corresponds to the Census Bureau's Boston-Cambridge-Newton MSA, and includes Suffolk, Essex, Middlesex, Norfolk, and Plymouth counties in Massachusetts. There are approximately 171,981 multifamily rental units within the Boston Regional Submarket.

## ANSWER TO PARAGRAPH 435:

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 435 and denies them on that basis.

436. Through its suite of business products, including RMS, Defendant RealPage collects and shares pricing and occupancy information for a high concentration of multifamily residential apartment units within the Boston Submarket, as self-reported by RealPage on its website:[226]



---

[226] https://www.realpage.com/explore/main/ma/boston-cambridge-newton.

**ANSWER TO PARAGRAPH 436:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 436 and denies them on that basis.

437. Property owners and managers who use revenue management software account for approximately 71% of all multifamily rental units in the Boston Submarket. Given that RealPage's RMS accounts for over two-thirds of revenue management software used in the U.S. multifamily rental housing industry by both owners and managers, the Managing Defendants and Owner-Operators, along with their co-conspirators who use RealPage's RMS, account for over 46% of the multifamily rental market in the Boston Submarket.

**ANSWER TO PARAGRAPH 437:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 437 and denies them on that basis.

438. Within the Boston Submarket, the following Defendants own or operate multifamily units priced with RealPage RMS: AIR, Bell, Bozzuto, Brookfield, Equity, Greystar, Lincoln, Pinnacle, Related, Simpson, Trammell Crow, UDR, Windsor, and Winn.

**ANSWER TO PARAGRAPH 438:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 438 and denies them on that basis.

439. Widespread adoption of Defendant RealPage's RMS has caused rent to increase explosively in recent years, with Boston renters paying 40% more in rent in 2023 than they paid in 2016.

**ANSWER TO PARAGRAPH 439:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 439 and denies them on that basis.

440. Outside the use of the Defendant RealPage's RMS, two active trade associations— the Greater Boston Real Estate Board and its affiliate, the Massachusetts Apartment Association— serve as conduits of the cartel, by providing venues for RealPage and participating Boston Submarket Owner-Operators and Managing Defendants to further their cartel's goals.

**ANSWER TO PARAGRAPH 440:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 440 and denies them on that basis.

441.    In addition to the high adoption of Defendant RealPage's RMS, competition in the Boston
Submarket is also stymied by local zoning laws which include direct restrictions on
multifamily housing construction, building height, and dwelling units per acre, and which
inhibit new entrants to the market.

**ANSWER TO PARAGRAPH 441:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 441 and denies them on that basis.

### vi.    Charlotte, North Carolina

442.    The Charlotte Submarket corresponds to the Census Bureau's Charlotte-Gastonia-Concord
MSA and includes 11 counties in North and South Carolina. There are approximately
205,487 rental units within the Charlotte Regional Submarket.

**ANSWER TO PARAGRAPH 442:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 442 and denies them on that basis.

443.    Through its suite of business products, including RMS, Defendant RealPage collects and
shares pricing and occupancy information for a high concentration of multifamily
residential apartment units within the Charlotte Submarket, as self-reported by RealPage
on its website:[227]

---

[227] https://www.realpage.com/explore/main/nc/charlotte-concord-gastonia.



**ANSWER TO PARAGRAPH 443:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 443 and denies them on that basis.

444. Property owners and managers who use revenue management software account for approximately 76% of all multifamily rental units in the Charlotte Submarket. Given that RealPage's RMS accounts for over two-thirds of revenue management software used in the U.S. multifamily rental housing industry by both owners and managers, the Owners, Managing Defendants, and Owner-Operators, along with their co-conspirators who use RealPage's RMS, account for over 50% of the multifamily rental market in the Charlotte Submarket.

**ANSWER TO PARAGRAPH 444:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 444 and denies them on that basis.

445. Within the Charlotte Submarket, the following Defendants own or operate multifamily units priced with RealPage RMS: AMC, Avenue5, Bell, BH, Bozzuto, Camden, Carter-Haston, Cortland, CWS, Dayrise, First Communities, Greystar, Highmark, IRT, Knightvest, Lantower, Lincoln, MAA, Mission Rock, Morgan, Pinnacle, RPM, Simpson, Trammell Crow, Windsor, Winn, and ZRS.

**ANSWER TO PARAGRAPH 445:**

Morgan Properties admits that, at times during the alleged relevant time period from January 1, 2016, to the present, it has operated properties in the Charlotte metropolitan area, as defined by the U.S. Census Bureau. Morgan Properties otherwise lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 445 and denies them on that basis.

446. Widespread adoption of Defendant RealPage's RMS has caused rent to increase explosively in recent years, with Charlotte renters paying 54% more in rent today than they paid in 2016. Given that RealPage's RMS accounts for over two-thirds of revenue management software used in the multifamily rental housing industry by both owners and managers, the Managing Defendants and Owner-Operators, along co-conspirators who use RealPage's RMS, account for over 30% of the multifamily rental market in the Charlotte submarket.

**ANSWER TO PARAGRAPH 446:**

Morgan Properties denies the allegations in Paragraph 446.

447. Outside the use of the Defendant RealPage's RMS, two active trade associations— the Greater Charlotte Apartment Association and the Apartment Association of North Carolina— serve as conduits of the cartel, by providing venues for RealPage and participating Charlotte Submarket Owner-Operators and Managing Defendants to further their cartel's goals.

**ANSWER TO PARAGRAPH 447:**

Morgan Properties denies the allegations in Paragraph 447.

**vii.  Chicago, Illinois**

448. The Chicago Submarket corresponds to the Census Bureau's Chicago-Naperville-Elgin MSA, and includes 14 counties in Illinois, Indiana, and Wisconsin. There are approximately 306,667 multifamily rental units within the Chicago Regional Submarket.

**ANSWER TO PARAGRAPH 448:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 448 and denies them on that basis.

449. Through its suite of business products, including RMS, Defendant RealPage collects and shares pricing and occupancy information for a high concentration of multifamily residential apartment units within the Chicago Submarket, as self-reported by RealPage on its website:[228]



**ANSWER TO PARAGRAPH 449:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 449 and denies them on that basis.

450. Property owners and managers who use revenue management software account for approximately 53% of all multifamily rental units in the Chicago Submarket. Given that RealPage's RMS accounts for over two-thirds of revenue management software used in the U.S. multifamily rental housing industry by both owners and managers, the Owners, Managing Defendants, and Owner-Operators, along with their co-conspirators who use RealPage's RMS, account for over 34% of the multifamily rental market in the Chicago Submarket.

**ANSWER TO PARAGRAPH 450:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 450 and denies them on that basis.

451. Within the Chicago Submarket, the following Defendants own or operate multifamily units priced with RealPage RMS: AIR, AMC, BH, Bozzuto, Brookfield, Cortland, Dayrise,

---

[228] https://www.realpage.com/explore/main/il/chicago-naperville-elgin.

Greystar, IRT, Lincoln, Morgan, Pinnacle, Related, RPM, Trammell Crow, Windsor, and ZRS.

## ANSWER TO PARAGRAPH 451:

Morgan Properties admits that, at times during the alleged relevant time period from January 1, 2016, to the present, it has operated properties in the Chicago metropolitan area, as defined by the U.S. Census Bureau. Morgan Properties otherwise lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 451 and denies them on that basis.

452. Widespread adoption of Defendant RealPage's RMS has caused rent to increase explosively in recent years, with Chicago renters paying a year over year increase in rent of 5-19%.

## ANSWER TO PARAGRAPH 452:

Morgan Properties denies the allegations in Paragraph 452.

453. Outside the use of the Defendant RealPage's RMS, active trade associations, including the Chicagoland Apartment Association, serve as conduits of the cartel, by providing venues for RealPage and participating Chicago Submarket Owner-Operators and Managing Defendants to further their cartel's goals.

## ANSWER TO PARAGRAPH 453:

Morgan Properties denies the allegations in Paragraph 453.

### viii. Dallas, Texas

454. The Dallas Submarket corresponds to the Census Bureau's Dallas-Fort Worth-Arlington MSA and includes 11 Texas counties. There are approximately 862,113 multifamily rental units within the Dallas Regional Submarket.

## ANSWER TO PARAGRAPH 454:

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 454 and denies them on that basis.

455. Through its suite of business products, including RMS, Defendant RealPage collects and shares pricing and occupancy information for a high concentration of multifamily

residential apartment units within the Dallas Submarket, as self-reported by RealPage on its website:[229]



**ANSWER TO PARAGRAPH 455:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 455 and denies them on that basis.

456.    Property owners and managers who use revenue management software account for approximately 76% of all multifamily rental units in the Dallas Submarket. Given that RealPage's RMS accounts for over two-thirds of revenue management software used in the U.S. multifamily rental housing industry by both owners and managers, the Owners, Managing Defendants, and Owner-Operators, along with their co-conspirators who use RealPage's RMS, account for over 50% of the multifamily rental market in the Dallas Submarket.

**ANSWER TO PARAGRAPH 456:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 456 and denies them on that basis.

457.    Within the Dallas Submarket, the following Defendants own or operate multifamily units priced with RealPage RMS: Allied Orion, AMC, Avenue5, Bell, BH, Brookfield, Camden, Carter-Haston, CONAM, CONTI, Cortland, CWS, Dayrise, Equity, FPI Management, Greystar, Highmark, IRT, Kairoi, Knightvest, Lantower, Lincoln, MAA, Morgan,

---

[229] https://www.realpage.com/explore/main/tx/dallas-plano-irving.

Pinnacle, Related, RPM, Sares Regis, Simpson, Trammell Crow, UDR, Windsor, Winn, and ZRS.

**ANSWER TO PARAGRAPH 457:**

Morgan Properties admits that, at times during the alleged relevant time period from January 1, 2016, to the present, it has operated properties in the Dallas metropolitan area, as defined by the U.S. Census Bureau. Morgan Properties otherwise lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 457 and denies them on that basis.

458. Widespread adoption of Defendant RealPage's RMS has caused rent to increase explosively in recent years, with Dallas renters paying 51% more in rent today than they paid in 2016.

**ANSWER TO PARAGRAPH 458:**

Morgan Properties denies the allegations in Paragraph 458.

459. Outside the use of the Defendant RealPage's RMS, two active trade associations— the Apartment Association of Greater Dallas and the Texas Apartment Association—serve as conduits of the cartel, by providing venues for RealPage and participating Dallas Submarket Owner-Operators and Managing Defendants to further their cartel's goals.

**ANSWER TO PARAGRAPH 459:**

Morgan Properties denies the allegations in Paragraph 459.

**ix.    Denver, Colorado**

460. The Denver Submarket corresponds to the Census Bureau's Denver-Aurora-Lakewood MSA, and ten Colorado Counties: the City and County of Denver, Arapahoe County, Jefferson County, Adams County, Douglas County, the City and County of Broomfield, Elbert County, Park County, Clear Creek County, and Gilpin County. There are approximately 248,726 multifamily rental units within the Denver Regional Submarket.

**ANSWER TO PARAGRAPH 460:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 460 and denies them on that basis.

461.    Through its suite of business products, including RMS, Defendant RealPage collects and shares pricing and occupancy information for a high concentration of multifamily residential apartment units within the Denver Submarket, as self-reported by RealPage on its website:[230]



## ANSWER TO PARAGRAPH 461:

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 461 and denies them on that basis.

462.    Property owners and managers who use revenue management software account for approximately 78% of all multifamily rental units in the Denver Submarket. Given that RealPage's RMS accounts for over two-thirds of revenue management software used in the U.S. multifamily rental housing industry by both owners and managers, the Owners, Managing Defendants, and Owner-Operators, along with their co-conspirators who use RealPage's RMS, account for over 51% of the multifamily rental market in the Denver Submarket.

## ANSWER TO PARAGRAPH 462:

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 462 and denies them on that basis.

463.    Within the Denver Submarket, the following Defendants own or operate multifamily units priced with RealPage RMS: AIR, Allied Orion, AMC, Avenue5, Bell, BH, Brookfield, Camden, CONAM, CONTI, Cortland, CWS, Equity, FPI Management, Greystar,

---

[230] https://www.realpage.com/explore/main/co/denver-aurora-lakewood.

Highmark, IRT, Kairoi, Lincoln, MAA, Mission Rock, Pinnacle, Related, RPM, Sares Regis, Security, Sherman, Simpson, Trammell Crow, Windsor, and UDR.

**ANSWER TO PARAGRAPH 463:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 463 and denies them on that basis.

464.   Widespread adoption of Defendant RealPage's RMS has caused rent to increase explosively in recent years. RealPage reported that "[o]ver the past five years, annual rent growth in the Denver, CO, area averaged 4.9%" and that some months, the top 20% of properties saw year-over-year revenue increase as much as 30.7%.[231]

**ANSWER TO PARAGRAPH 464:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 464 and denies them on that basis.

465.   Outside the use of the Defendant RealPage's RMS, several active trade associations—the Colorado Apartment Association, Apartment Association of Metro Denver, and the Colorado Landlords Association—serve as conduits of the cartel, by providing venues for RealPage and participating Denver Submarket Owner-Operators and Managing Defendants to further their cartel's goals.

**ANSWER TO PARAGRAPH 465:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 465 and denies them on that basis.

466.   In addition to the high adoption of Defendant RealPage's RMS, competition in the Denver Submarket is also stymied by local regulatory and low-income housing requirements, which inhibit new entrants to the market.

**ANSWER TO PARAGRAPH 466:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 466 and denies them on that basis.

---

[231] *See* https://www.realpage.com/explore/main/co/denver-aurora-lakewood (last accessed Feb. 13, 2023).

### x. Detroit, Michigan

467. The Detroit Submarket corresponds to the Census Bureau's Detroit-Warren-Dearborn MI MSA and includes the counties of Wayne, Oakland, Macomb, Livingston, St. Clair, and Lapeer. There are approximately 191,584 multifamily rental units within the Detroit Regional Submarket.

## ANSWER TO PARAGRAPH 467:

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 467 and denies them on that basis.

468. Through its suite of business products, including RMS, Defendant RealPage collects and shares pricing and occupancy information for a high concentration of multifamily residential apartment units within the Detroit Submarket, as self-reported by RealPage on its website:[232]



## ANSWER TO PARAGRAPH 468:

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 468 and denies them on that basis.

469. Property owners and managers who use revenue management software account for approximately 38% of all multifamily rental units in the Detroit Submarket. Given that RealPage's RMS accounts for over two-thirds of revenue management software used in the U.S. multifamily rental housing industry by both owners and managers, the Owners,

---

[232] https://www.realpage.com/explore/main/mi/detroit-warren-dearborn.

Managing Defendants, and Owner-Operators, along with their co-conspirators who use RealPage's RMS, account for over 25% of the multifamily rental market in the Detroit Submarket.

**ANSWER TO PARAGRAPH 469:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 469 and denies them on that basis.

470. Within the Detroit Submarket, the following Defendants own or operate multifamily units priced with RealPage RMS: Brookfield, Greystar, Morgan, and RPM.

**ANSWER TO PARAGRAPH 470:**

Morgan Properties admits that, at times during the alleged relevant time period from January 1, 2016, to the present, it has operated properties in the Detroit metropolitan area, as defined by the U.S. Census Bureau. Morgan Properties otherwise lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 470 and denies them on that basis.

471. Widespread adoption of Defendant RealPage's RMS has caused rent to increase explosively in recent years, with Detroit renters paying 38% more in rent in 2023 than they paid in 2016.

**ANSWER TO PARAGRAPH 471:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 471 and denies them on that basis.

472. Outside the use of the Defendant RealPage's RMS, two active trade associations—the Detroit Metropolitan Apartment Association and the Property Management Association of Michigan—serve as conduits of the cartel, by providing venues for RealPage and participating Detroit Submarket Owners, Owner-Operators, and Managing Defendants to further their cartel's goals.

**ANSWER TO PARAGRAPH 472:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 472 and denies them on that basis.

### xi.    Houston, Texas

473.    The Houston Submarket corresponds to the Census Bureau's Houston-The Woodlands-Sugarland MSA and includes all of Harris County as well as the surrounding counties of Montgomery, Liberty, Austin, Chambers, Waller, Fort Bent, Brazoria, and Galveston. There are approximately 712,202 multifamily rental units within the Houston Regional Submarket.

**ANSWER TO PARAGRAPH 473:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 473 and denies them on that basis.

474.    Through its suite of business products, including RMS, Defendant RealPage collects and shares pricing and occupancy information for a high concentration of multifamily residential apartment units within the Houston Submarket, as self-reported by RealPage on its website.[233]



**ANSWER TO PARAGRAPH 474:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 474 and denies them on that basis.

475.    Property owners and managers who use revenue management software account for approximately 66% of all multifamily rental units in the Houston Submarket. Given that RealPage's RMS accounts for over two-thirds of revenue management software used in

---

[233] https://www.realpage.com/explore/main/tx/houston-the-woodlands-sugar-land.

the U.S. multifamily rental housing industry by both owners and managers, the Owners, Managing Defendants, and Owner-Operators, along with their co-conspirators who use RealPage's RMS, account for over 43% of the multifamily rental market in the Houston Submarket.

**ANSWER TO PARAGRAPH 475:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 475 and denies them on that basis.

476.    Within the Houston Submarket, the following Defendants own or operate multifamily units priced with RealPage RMS: Allied Orion, AMC, Avenue5, BH, Brookfield, Camden, Cortland, CWS, Dayrise, ECI, First Communities, FPI Management, Greystar, Highmark, IRT, Kairoi, Knightvest, Lincoln, MAA, Mission Rock, Pinnacle, Related, RPM, Simpson, Trammell Crow, Windsor, Winn, and ZRS.

**ANSWER TO PARAGRAPH 476:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 476 and denies them on that basis.

477.    Widespread adoption of Defendant RealPage's RMS has caused rent to increase explosively in recent years, with Houston renters paying 33% more in rent today than they paid in 2016.

**ANSWER TO PARAGRAPH 477:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 477 and denies them on that basis.

478.    Outside the use of the Defendant RealPage's RMS, two active trade associations— the Houston Apartment Association and the Texas Apartment Association—serve as conduits of the cartel, by providing venues for RealPage and participating Houston Submarket Owner-Operators and Managing Defendants to further their cartel's goals.

**ANSWER TO PARAGRAPH 478:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 478 and denies them on that basis.

### xii.    Jacksonville, Florida

479.    The Jacksonville Submarket corresponds to the Census Bureau's Jacksonville MSA, and includes Duval, St. Johns, Clay, Nassau, and Baker counties. There are approximately 110,219 rental units within the Jacksonville Regional Submarket.

## ANSWER TO PARAGRAPH 479:

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 479 and denies them on that basis.

480.    Through its suite of business products, including RMS, Defendant RealPage collects and shares pricing and occupancy information for a high concentration of multifamily residential apartment units within the Jacksonville Submarket, as self-reported by RealPage on its website:[234]



## ANSWER TO PARAGRAPH 480:

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 480 and denies them on that basis.

481.    Property owners and managers who use revenue management software account for approximately 65% of all multifamily rental units in the Jacksonville Submarket. Given that RealPage's RMS accounts for over two-thirds of revenue management software used in U.S. multifamily rental housing industry by both owners and managers, the Owners, Managing Defendants and Owner-Operators, along with their co-conspirators who use

---

[234] https://www.realpage.com/explore/main/fl/jacksonville.

RealPage's RMS, account for over 42% of the multifamily rental market in the Jacksonville Submarket.

**ANSWER TO PARAGRAPH 481:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 481 and denies them on that basis.

482.    Within the Jacksonville Submarket, the following Defendants own or operate multifamily units priced with RealPage RMS: AMC, Bell, BH, CONAM, First Communities, FPI Management, Greystar, Highmark, Lincoln, MAA, Morgan, Pinnacle, RPM, and ZRS.

**ANSWER TO PARAGRAPH 482:**

Morgan Properties admits that, at times during the alleged relevant time period from

January 1, 2016, to the present, it has operated properties in the Jacksonville metropolitan area, as

defined by the U.S. Census Bureau.  Morgan Properties otherwise lacks knowledge or information

sufficient to form a belief as to the truth of the allegations in Paragraph 482 and denies them on

that basis.

483.    Widespread adoption of Defendant RealPage's RMS has caused rent to increase explosively in recent years, with Jacksonville renters paying 35% more in rent today than they paid in 2016.

**ANSWER TO PARAGRAPH 483:**

Morgan Properties denies the allegations in Paragraph 483.

484.    Outside the use of the Defendant RealPage's RMS, two active trade associations— the First Coast Apartment Association and Florida Apartment Association—serve as conduits of the cartel, by providing venues for RealPage and participating Jacksonville Submarket Owner-Operators and Managing Defendants to further their cartel's goals.

**ANSWER TO PARAGRAPH 484:**

Morgan Properties denies the allegations in Paragraph 484.

**xiii.    Las Vegas, Nevada**

485.    The Las Vegas Submarket corresponds to the Census Bureau's Las Vegas-Henderson-Paradise MSA and includes all of Clark County. There are approximately 183,900 rental units within the Las Vegas Regional Submarket.

**ANSWER TO PARAGRAPH 485:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 485 and denies them on that basis.

486.    Through its suite of business products, including RMS, Defendant RealPage collects and
        shares pricing and occupancy information for a high concentration of multifamily
        residential apartment units within the Las Vegas Submarket, as self-reported by RealPage
        on its website:[235]



**ANSWER TO PARAGRAPH 486:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 486 and denies them on that basis.

487.    Property owners and managers who use revenue management software account for
        approximately 61% of all multifamily rental units in the Las Vegas Submarket. Given that
        RealPage's RMS accounts for over two-thirds of revenue management software used in
        U.S. the multifamily rental housing industry by both owners and managers, the Owners,
        Managing Defendants, and Owner-Operators, along with their co-conspirators who use
        RealPage's RMS, account for over 40% of the multifamily rental market in the Las Vegas
        Submarket.

**ANSWER TO PARAGRAPH 487:**

---

[235] https://www.realpage.com/explore/main/nv/las-vegas-henderson-paradise.

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 487 and denies them on that basis.

488.    Within the Las Vegas Submarket, the following Defendants own or operate multifamily units priced with RealPage RMS: AMC, Avenue5, BH, CONAM, FPI Management, Greystar, MAA, Mission Rock, Pinnacle, RPM, Sares Regis, Security, and Simpson.

**ANSWER TO PARAGRAPH 488:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 488 and denies them on that basis.

489.    Widespread adoption of Defendant RealPage's RMS has caused rent to increase explosively in recent years, with Las Vegas renters paying 63% more in rent today than they paid in 2016.

**ANSWER TO PARAGRAPH 489:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 489 and denies them on that basis.

490.    Outside the use of the Defendant RealPage's RMS, active trade associations— including the Nevada State Apartment Association—serve as conduits of the cartel, by providing venues for RealPage and participating Las Vegas Submarket Owner-Operators and Managing Defendants to further their cartel's goals.

**ANSWER TO PARAGRAPH 490:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 490 and denies them on that basis.

xiv.    **Los Angeles, California**

491.    The Los Angeles Submarket corresponds to the Census Bureau's Los Angeles-Long Beach-Anaheim MSA and includes Los Angeles and Orange counties. There are approximately 522,937 multifamily rental units within the Los Angeles Regional Submarket.

**ANSWER TO PARAGRAPH 491:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 491 and denies them on that basis.

492.     Through its suite of business products, including Defendant RealPage's RMS, RealPage collects and shares pricing and occupancy information for a high concentration of multifamily residential apartment units within the Los Angeles Submarket, as self-reported by RealPage on its website:[236]



**ANSWER TO PARAGRAPH 492:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 492 and denies them on that basis.

493.     Property owners and managers who use revenue management software account for approximately 79% of all multifamily rental units in the Los Angeles Submarket. Given that RealPage's RMS accounts for over two-thirds of revenue management software used in U.S. the multifamily rental housing industry by both owners and managers, the Owners, Managing Defendants, and Owner-Operators, along with their co-conspirators who use RealPage's RMS, account for over 52% of the multifamily rental market in the Los Angeles Submarket.

**ANSWER TO PARAGRAPH 493:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 493 and denies them on that basis.

494.     Within the Los Angeles Submarket, the following Defendants own or operate multifamily units priced with RealPage RMS: AIR, AMC, Avenue5, Bell, Bozzuto, Brookfield,

---

[236] https://www.realpage.com/explore/main/ca/los-angeles-long-beach-glendale.

Camden, CONAM, Equity, Essex, FPI Management, Greystar, Pinnacle, Related, Sares Regis, Simpson, Trammell Crow, UDR, Windsor, and Winn.

## ANSWER TO PARAGRAPH 494:

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 494 and denies them on that basis.

495. Widespread adoption of Defendant RealPage's RMS has caused rent to increase explosively in recent years, with Los Angeles renters paying 41% more in rent today than they paid in 2016.

## ANSWER TO PARAGRAPH 495:

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 495 and denies them on that basis.

496. Outside the use of the Defendant RealPage's RMS, six active trade associations— the Apartment Association of Greater Los Angeles, California Rental Housing Association, California Apartment Association, Landlord Protection Association of CA, Apartment Owners Association of California, and Building Owners and Managers' Association's Los Angeles Chapter—serve as conduits of the cartel, by providing venues for RealPage and participating Los Angeles Submarket Owner-Operators and Managing Defendants to further their cartel's goals.

## ANSWER TO PARAGRAPH 496:

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 496 and denies them on that basis.

497. In addition to the high adoption of RealPage's RMS, competition in the Los Angeles Submarket is also stymied by local rent control and stabilization ordinances, which inhibit new entrants to the market.

## ANSWER TO PARAGRAPH 497:

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 497 and denies them on that basis.

xv. **Memphis, Tennessee**

498. The Memphis Submarket corresponds to the Census Bureau's Memphis TN-MS-AR MSA and includes the counties of Benton, Fayette, Shelby, and Tipton in Tennessee; DeSoto,

Marshall, Tate, and Tunica counties in Mississippi; and Crittenden County in Arkansas. There are approximately 91,170 multifamily rental units within the Memphis Regional Submarket.

**ANSWER TO PARAGRAPH 498:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 498 and denies them on that basis.

499. Through its suite of business products, including RMS, Defendant RealPage collects and shares pricing and occupancy information for a high concentration of multifamily residential apartment units within the Memphis Submarket, as self-reported by RealPage on its website:



**ANSWER TO PARAGRAPH 499:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 499 and denies them on that basis.

500. Property owners and managers who use revenue management software account for approximately 39.1% of all multifamily rental units in the Memphis Submarket. Given that RealPage's RMS accounts for over two-thirds of revenue management software used in the U.S. multifamily rental housing industry by both owners and managers, the Owners, Managing Defendants, and Owner-Operators, along with their co-conspirators who use RealPage's RMS, account for over 26% of the multifamily rental market in the Memphis Submarket.

**ANSWER TO PARAGRAPH 500:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 500 and denies them on that basis.

501. Within the Memphis Submarket, the following Defendants own or operate multifamily
units priced with RealPage RMS: BH, Greystar, Highmark, IRT, MAA, Morgan, Pinnacle,
and RPM.

**ANSWER TO PARAGRAPH 501:**

Morgan Properties admits that, at times during the alleged relevant time period from

January 1, 2016, to the present, it has operated properties in the Memphis metropolitan area, as

defined by the U.S. Census Bureau. Morgan Properties otherwise lacks knowledge or information

sufficient to form a belief as to the truth of the allegations in Paragraph 501 and denies them on

that basis.

502. Widespread adoption of Defendant RealPage's RMS has caused rent to increase
explosively in recent years, with Memphis renters paying 24% more in rent in 2023 than
they paid in 2016.

**ANSWER TO PARAGRAPH 502:**

Morgan Properties denies the allegations in Paragraph 502.

503. Outside the use of the Defendant RealPage's RMS, three active trade associations—the
Apartment Association of Greater Memphis, the Arkansas Apartment Association, and the
Mississippi Apartment Association—serve as conduits of the cartel, by providing venues
for RealPage and participating Memphis Submarket Owners, Owner-Operators, and
Managing Defendants to further their cartel's goals.

**ANSWER TO PARAGRAPH 503:**

Morgan Properties denies the allegations in Paragraph 503.

**xvi.    Miami, Florida**

504. The Miami Submarket corresponds to the Census Bureau's Miami-Fort Lauderdale-
Pompano Beach MSA, and includes Miami-Dade County, Broward County, and Palm
Beach County. There are approximately 301,268 multifamily rental units within the Miami
Regional Submarket.

**ANSWER TO PARAGRAPH 504:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 504 and denies them on that basis.

505.   Through its suite of business products, including RMS, Defendant RealPage collects and shares pricing and occupancy information for a high concentration of multifamily residential apartment units within the Miami Submarket, as self-reported by RealPage on its website:[237]



**ANSWER TO PARAGRAPH 505:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 505 and denies them on that basis.

506.   Property owners and managers who use revenue management software account for approximately 79% of all multifamily units in the Miami Submarket. Given that RealPage's RMS accounts for over two-thirds of revenue management software used in the U.S. multifamily rental housing industry by both owners and managers, the Owners, Managing Defendants, and Owner-Operators, along with their co-conspirators who use RealPage's RMS, account for over 52% of the multifamily rental market in the Miami Submarket.

**ANSWER TO PARAGRAPH 506:**

---

[237] https://www.realpage.com/explore/main/fl/miami-miami-beach-kendall.

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 506 and denies them on that basis.

507. Within the Miami Submarket, the following Defendants own or operate multifamily units priced with RealPage RMS: AIR, BH, Bozzuto, Camden, Carter-Haston, Cortland, FPI Management, Greystar, Highmark, Lantower, Lincoln, Pinnacle, RPM, Simpson, Trammell Crow, Windsor, Winn, and ZRS.

**ANSWER TO PARAGRAPH 507:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 507 and denies them on that basis.

508. Widespread adoption of Defendant RealPage's RMS has caused rent to increase explosively in recent years, with Miami renters paying 23% more in rent in 2021 than they paid in 2016.

**ANSWER TO PARAGRAPH 508:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 508 and denies them on that basis.

509. Outside the use of the Defendant RealPage's RMS, two active trade associations—the Florida Apartment Association and the Southeast Florida Apartment Association—serve as conduits of the cartel, by providing venues for RealPage and participating Miami Submarket Owner-Operators and Managing Defendants to further their cartel's goals.

**ANSWER TO PARAGRAPH 509:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 509 and denies them on that basis.

**xvii.    Milwaukee, Wisconsin**

510. The Milwaukee Submarket corresponds to the Census Bureau's Milwaukee-Waukesha, Wisconsin MSA and includes Dode, Jefferson, Milwaukee, Ozaukee, Racine, Walworth, Washington, and Waukesha counties. There are approximately 73,178 multifamily rental units within the Milwaukee Regional Submarket.

**ANSWER TO PARAGRAPH 510:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 510 and denies them on that basis.

511.     Through its suite of business products, including RMS, Defendant RealPage collects and shares pricing and occupancy information for a high concentration of multifamily residential apartment units within the Milwaukee Submarket, as self-reported by RealPage on its website:[238]



**ANSWER TO PARAGRAPH 511:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 511 and denies them on that basis.

512.     Property owners and managers who use revenue management software account for approximately 40.4% of all multifamily rental units in the Milwaukee Submarket. Given that RealPage's RMS accounts for over two-thirds of revenue management software used in the U.S. multifamily rental housing industry by both owners and managers, the Owners, Managing Defendants, and Owner-Operators, along with their co-conspirators who use RealPage's RMS, account for over 26% of the multifamily rental market in the Milwaukee Submarket.

**ANSWER TO PARAGRAPH 512:**

---

[238] https://www.realpage.com/explore/main/wi/milwaukee-waukesha-west-allis.

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 512 and denies them on that basis.

513.     Within the Milwaukee Submarket, the following Defendants own or operate multifamily units priced with RealPage RMS: Bozzuto, Brookfield, Greystar, Lincoln, Sherman, and Related.

**ANSWER TO PARAGRAPH 513:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 513 and denies them on that basis.

514.     Widespread adoption of Defendant RealPage's RMS has caused rent to increase explosively in recent years, with Milwaukee renters paying 21% more in rent in 2023 than they paid in 2016.

**ANSWER TO PARAGRAPH 514:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 514 and denies them on that basis.

515.     Outside the use of the Defendant RealPage's RMS, two active trade associations— the Wisconsin Apartment Association and the Apartment Association of Southeastern Wisconsin—serve as conduits of the cartel, by providing venues for RealPage and participating Milwaukee Submarket Owners, Owner-Operators, and Managing Defendants to further their cartel's goals.

**ANSWER TO PARAGRAPH 515:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 515 and denies them on that basis.

**xviii.   Minneapolis, Minnesota**

516.     The Minneapolis Submarket corresponds to the Census Bureau's Minneapolis-Saint Paul MSA and includes Anoka, Carver, Chisago, Dakota, Hennepin, Isanti, Le Sueur, Mille Lacs, Ramsey, Scott, Sherburne, Sibley, Washington, and Wright counties in Minnesota, and Pierce, St. Croix County in Wisconsin. There are approximately 201,640 multifamily rental units within the Minneapolis Regional Submarket.

**ANSWER TO PARAGRAPH 516:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 516 and denies them on that basis.

517. Through its suite of business products, including RMS, Defendant RealPage collects and shares pricing and occupancy information for a high concentration of multifamily residential apartment units within the Minneapolis Submarket, as self-reported by RealPage on its website:[239]



**ANSWER TO PARAGRAPH 517:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 517 and denies them on that basis.

518. Property owners and managers who use revenue management software account for approximately 49.3% of all multifamily rental units in the Minneapolis Submarket. Given that RealPage's RMS accounts for over two-thirds of revenue management software used in the U.S. multifamily rental housing industry by both owners and managers, the Owners, Managing Defendants, and Owner-Operators, along with their co-conspirators who use RealPage's RMS, account for over 32% of the multifamily rental market in the Minneapolis Submarket.

**ANSWER TO PARAGRAPH 518:**

---

[239] https://www.realpage.com/explore/main/mn/minneapolis-st-paul-bloomington.

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 518 and denies them on that basis.

519. Within the Minneapolis Submarket, the following Defendants own or operate multifamily units priced with RealPage RMS: AIR, BH, Cortland, Greystar, Lincoln, Pinnacle, Related, RPM, Sherman, and Simpson.

**ANSWER TO PARAGRAPH 519:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 519 and denies them on that basis.

520. Widespread adoption of Defendant RealPage's RMS has caused rent to increase explosively in recent years, with Minneapolis renters paying 35% more in rent in 2023 than they paid in 2016.

**ANSWER TO PARAGRAPH 520:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 520 and denies them on that basis.

521. Outside the use of the Defendant RealPage's RMS, at least one active trade association—the Minnesota Multi-Housing Association—serves as conduit of the cartel, by providing venues for RealPage and participating Minneapolis Submarket Owners, Owner-Operators, and Managing Defendants to further their cartel's goals.

**ANSWER TO PARAGRAPH 521:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 521 and denies them on that basis.

**xix. New York, New York**

522. The New York Submarket corresponds to the Census Bureau's New York-Newark-Jersey City MSA, and spans parts of New York, New Jersey, and Pennsylvania. There are approximately 527,575 multifamily rental units within the New York Regional Submarket.

**ANSWER TO PARAGRAPH 522:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 522 and denies them on that basis.

523.     Through its suite of business products, including RMS, Defendant RealPage collects and shares pricing and occupancy information for a high concentration of multifamily residential apartment units within the New York Submarket, as self-reported by RealPage on its website:[240]



**ANSWER TO PARAGRAPH 523:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 523 and denies them on that basis.

524.     Property owners and managers who use revenue management software account for approximately 60% of all multifamily rental units in the New York Submarket. Given that RealPage's RMS accounts for over two-thirds of revenue management software used in U.S. the multifamily rental housing industry by both owners and managers, the Owners, Managing Defendants, and Owner-Operators, along with their co-conspirators who use RealPage's RMS, account for over 39% of the multifamily rental market in the New York Submarket.

**ANSWER TO PARAGRAPH 524:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 524 and denies them on that basis.

525.     Within the New York Submarket, the following Defendants own or operate multifamily units priced with RealPage RMS: AIR, Bozzuto, Brookfield, Equity, Greystar, Lincoln,

---

[240] https://www.realpage.com/explore/main/ny/new-york-white-plains.

Morgan, Pinnacle, Related, Rose Associates, RPM, Trammell Crow, UDR, Windsor, and Winn.

**ANSWER TO PARAGRAPH 525:**

Morgan Properties denies the allegations in Paragraph 525; Morgan Properties does not operate properties in the New York City metropolitan area, as defined by the U.S. Census Bureau.

526. Widespread adoption of Defendant RealPage's RMS has caused rent to increase explosively in recent years, with New York renters paying 28% more in rent today than they paid in 2016.

**ANSWER TO PARAGRAPH 526:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 526 and denies them on that basis.

527. Outside the use of the Defendant RealPage's RMS, active trade associations— including the Apartment Professionals Trade Society of New York—serve as conduits of the cartel, by providing venues for RealPage and participating New York Submarket Owner-Operators and Managing Defendants to further their cartel's goals.

**ANSWER TO PARAGRAPH 527:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 527 and denies them on that basis.

528. In addition to the high adoption of Defendant RealPage's RMS, competition in the New York Submarket is also stymied by local rent stabilization and construction permitting requirements, which inhibit new entrants to the market.

**ANSWER TO PARAGRAPH 528:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 528 and denies them on that basis.

**xx.  Orlando, Florida**

529. The Orlando Submarket corresponds to the Census Bureau's Orlando-Kissimmee-Sanford MSA, and includes all of Orange, Kissimmee, Sanford, and Like counties. There are approximately 221,482 multifamily rental units within the Orlando Regional Submarket.

**ANSWER TO PARAGRAPH 529:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 529 and denies them on that basis.

530. Through its suite of business products, including RMS, Defendant RealPage collects and shares pricing and occupancy information for a high concentration of multifamily residential apartment units within the Orlando Submarket, as self-reported by RealPage on its website:[241]



**ANSWER TO PARAGRAPH 530:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 530 and denies them on that basis.

531. Property owners and managers who use revenue management software account for approximately 72% of all multifamily rental units in the Orlando Submarket. Given that RealPage's RMS accounts for over two-thirds of revenue management software used in the U.S. multifamily rental housing industry by both owners and managers, the Owners, Managing Defendants, and Owner-Operators, along with their co-conspirators who use RealPage's RMS, account for over 47% of the multifamily rental market in the Orlando Submarket.

---

[241] https://www.realpage.com/explore/main/fl/orlando-kissimmee-sanford.

**ANSWER TO PARAGRAPH 531:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 531 and denies them on that basis.

532. Within the Orlando Submarket, the following Defendants own or operate multifamily units priced with RealPage RMS: Allied Orion, AMC, Bell, BH, Bozzuto, Brookfield, Camden, Carter-Haston, CONAM, CONTI, Cortland, ECI, First Communities, Greystar, Highmark, IRT, Knightvest, Lantower, Lincoln, MAA, Mission Rock, Pinnacle, Related, RPM, Trammell Crow, UDR, and ZRS.

**ANSWER TO PARAGRAPH 532:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 532 and denies them on that basis.

533. Widespread adoption of Defendant RealPage's RMS has caused rent to increase explosively in recent years, with Orlando renters paying 43% more in rent in 2023 than they paid in 2016.

**ANSWER TO PARAGRAPH 533:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 533 and denies them on that basis.

534. Outside the use of the Defendant RealPage's RMS, two active trade associations—the Florida Apartment Association and the Apartment Association of Greater Orlando—serve as conduits of the cartel, by providing venues for RealPage and participating Orlando Submarket Owner-Operators and Managing Defendants to further their cartel's goals.

**ANSWER TO PARAGRAPH 534:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 534 and denies them on that basis.

xxi. **Philadelphia, Pennsylvania**

535. The Philadelphia Submarket corresponds to the Census Bureau's Philadelphia-Camden-Wilmington MSA, which includes Philadelphia, Montgomery, and Bucks counties in Pennsylvania; Camden, Burlington, and Gloucester counties in New Jersey; Cecil County in Maryland; and Kent and Newcastle counties in Delaware. There are approximately 268,628 multifamily rental units within the Philadelphia Regional Submarket.

**ANSWER TO PARAGRAPH 535:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 535 and denies them on that basis.

536. Through its suite of business products, including RMS, Defendant RealPage collects and shares pricing and occupancy information for a high concentration of multifamily residential apartment units within the Philadelphia Submarket, as self-reported by RealPage on its website:[242]



**ANSWER TO PARAGRAPH 536:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 536 and denies them on that basis.

537. Property owners and managers who use revenue management software account for approximately 47% of all multifamily rental units in the Philadelphia Submarket. Given that RealPage's RMS accounts for over two-thirds of revenue management software used in the U.S. multifamily rental housing industry by both owners and managers, the Owners, Managing Defendants, and Owner-Operators, along with their co-conspirators who use RealPage's RMS, account for over 31% of the multifamily rental market in the Philadelphia Submarket.

---

[242] https://www.realpage.com/explore/main/pa/philadelphia-camden-wilmington.

209

**ANSWER TO PARAGRAPH 537:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 537 and denies them on that basis.

538. Within the Philadelphia Submarket, the following Defendants own or operate multifamily units priced with RealPage RMS: AIR, Avenue5, Bozzuto, Brookfield, Greystar, Highmark, Lincoln, Morgan, Pinnacle, Related, Trammell Crow, UDR, and Winn.

**ANSWER TO PARAGRAPH 538:**

Morgan Properties admits that, at times during the alleged relevant time period from

January 1, 2016, to the present, it has operated properties in the Philadelphia metropolitan area, as

defined by the U.S. Census Bureau.  Morgan Properties otherwise lacks knowledge or information

sufficient to form a belief as to the truth of the allegations in Paragraph 538 and denies them on

that basis.

539. Widespread adoption of Defendant RealPage's RMS has caused rent to increase explosively in recent years, with Philadelphia renters paying 23% more in rent in 2023 than they paid in 2016. Outside the use of the Defendant RealPage's RMS, various active trade associations—the Pennsylvania Apartment Association, the New Jersey Apartment Association, the Maryland Multi-Housing Association, and the Delaware Apartment Association—serve as conduits of the cartel, by providing venues for RealPage and participating Philadelphia Submarket Owners, Owner-Operators, and Managing Defendants to further their cartel's goals.

**ANSWER TO PARAGRAPH 539:**

Morgan Properties denies the allegations in Paragraph 539.

**xxii.    Phoenix, Arizona**

540. The Phoenix Submarket corresponds to the Census Bureau's Phoenix-Mesa-Chandler MSA and includes all of Maricopa and Pinal counties. There are approximately 339,083 multifamily rental units within the Phoenix Regional Submarket.

**ANSWER TO PARAGRAPH 540:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 540 and denies them on that basis.

541.    Through its suite of business products, including RMS, Defendant RealPage collects and shares pricing and occupancy information for a high concentration of multifamily residential apartment units within the Phoenix Submarket, as self-reported by RealPage on its website:



**ANSWER TO PARAGRAPH 541:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 541 and denies them on that basis.

542.    Property owners and managers who use revenue management software account for approximately 75% of all multifamily rental units in the Phoenix Submarket. Given that RealPage's RMS accounts for over two-thirds of revenue management software used in the U.S. multifamily rental housing industry by both owners and managers, the Owners, Managing Defendants and Owner-Operators, along with their co-conspirators who use RealPage's RMS, account for over 50% of the multifamily rental market in the Phoenix Submarket.

**ANSWER TO PARAGRAPH 542:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 542 and denies them on that basis.

543.    Within the Phoenix Submarket, the following Defendants own or operate multifamily units priced with RealPage RMS: AMC, Avenue5, BH, Camden, CONAM, Cortland, CWS, FPI Management, Greystar, Highmark, Knightvest, Lincoln, MAA, Mission Rock, Pinnacle, RPM, Sares Regis, Security, Simpson, Trammell Crow, and Winn.

**ANSWER TO PARAGRAPH 543:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 543 and denies them on that basis.

544.    Widespread adoption of Defendant RealPage's RMS has caused rent to increase explosively in recent years, with Phoenix renters paying 76% more in rent in 2023 than they paid in 2016.[243]

**ANSWER TO PARAGRAPH 544:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 544 and denies them on that basis.

545.    Outside the use of the Defendant RealPage's RMS, two active trade associations— the Arizona Multihousing Association and the Phoenix Metro Chapter of the National Association of Residential Property Managers—serve as conduits of the cartel, by providing venues for RealPage and participating Phoenix Submarket Owner-Operators and Managing Defendants to further their cartel's goals.

**ANSWER TO PARAGRAPH 545:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 545 and denies them on that basis.

546.    In addition to the high adoption of Defendant RealPage's RMS, competition in the Phoenix Submarket is also stymied by local tax licensing and construction permitting requirements, which inhibit new entrants to the market.

**ANSWER TO PARAGRAPH 546:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 546 and denies them on that basis.

    xxiii.   **Pittsburgh, Pennsylvania**

547.    The Pittsburgh Submarket corresponds to the Census Bureau's Pittsburgh, Pennsylvania MSA and includes Allegheny, Armstrong, Beaver, Butler, Fayette, Lawrence, Washington, and Westmoreland counties. There are approximately 63,207 multifamily rental units within the Pittsburgh Regional Submarket.

---

[243] Moody's Analytics REIS data.

**ANSWER TO PARAGRAPH 547:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 547 and denies them on that basis.

548. Through its suite of business products, including RMS, Defendant RealPage collects and shares pricing and occupancy information for a high concentration of multifamily residential apartment units within the Pittsburgh Submarket, as self-reported by RealPage on its website:[244]



**ANSWER TO PARAGRAPH 548:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 548 and denies them on that basis.

549. Property owners and managers who use revenue management software account for approximately 40.4% of all multifamily rental units in the Pittsburgh Submarket. Given that RealPage's RMS accounts for over two-thirds of revenue management software used in the U.S. multifamily rental housing industry by both owners and managers, the Owners, Managing Defendants, and Owner-Operators, along with their co-conspirators who use RealPage's RMS, account for over 26% of the multifamily rental market in the Pittsburgh Submarket.

**ANSWER TO PARAGRAPH 549:**

---

[244] https://www.realpage.com/explore/main/pa/pittsburgh.

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 549 and denies them on that basis.

550.    Within the Pittsburgh Submarket, the following Defendants own or operate multifamily units priced with RealPage RMS: Bozzuto, Brookfield, Greystar, Lincoln, Morgan, Security, Related, Trammell Crow, and Winn.

## ANSWER TO PARAGRAPH 550:

Morgan Properties admits that, at times during the alleged relevant time period from January 1, 2016, to the present, it has operated properties in the Pittsburgh metropolitan area, as defined by the U.S. Census Bureau. Morgan Properties otherwise lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 550 and denies them on that basis.

551.    Widespread adoption of Defendant RealPage's RMS has caused rent to increase explosively in recent years, with Pittsburgh renters paying 37% more in rent in 2023 than they paid in 2016.

## ANSWER TO PARAGRAPH 551:

Morgan Properties denies the allegations in Paragraph 551.

552.    Outside the use of the Defendant RealPage's RMS, two active trade associations— the Apartment Association of Metropolitan Pittsburgh and the Pennsylvania Apartment Association—serve as conduits of the cartel, by providing venues for RealPage and participating Pittsburgh Submarket Owners, Owner-Operators, and Managing Defendants to further their cartel's goals.

## ANSWER TO PARAGRAPH 552:

Morgan Properties denies the allegations in Paragraph 552.

### xxiv.   Portland, Oregon

553.    The Portland Submarket corresponds to the Census Bureau's Portland-Vancouver-Hillsboro MSA and is comprised of seven counties in Oregon and Washington state. There are approximately 153,476 multifamily rental units within the Portland Regional Submarket.

**ANSWER TO PARAGRAPH 553:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 553 and denies them on that basis.

554. Through its suite of business products, including RMS, Defendant RealPage collects and shares pricing and occupancy information for a high concentration of multifamily residential apartment units within the Portland Submarket, as self-reported by RealPage on its website:[245]



**ANSWER TO PARAGRAPH 554:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 554 and denies them on that basis.

555. Property owners and managers who use revenue management software account for approximately 63% of all multifamily rental units in the Portland Submarket. Given that RealPage's RMS accounts for over two-thirds of revenue management software used in the U.S. multifamily rental housing industry by both owners and managers, the Owners, Managing Defendants, and Owner-Operators, along with their co-conspirators who use RealPage's RMS, account for over 41% of the multifamily rental market in the Portland Submarket.

---

[245] https://www.realpage.com/explore/main/or/portland-vancouver-hillsboro.

**ANSWER TO PARAGRAPH 555:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 555 and denies them on that basis.

556. Within the Portland Submarket, the following Defendants own or operate multifamily units priced with RealPage RMS: AMC, Avenue5, Brookfield, CONAM, FPI Management, Greystar, Lincoln, Mission Rock, Pinnacle, Prometheus, Security, Simpson, Thrive, Trammell Crow, UDR, and Windsor.

**ANSWER TO PARAGRAPH 556:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 556 and denies them on that basis.

557. Widespread adoption of Defendant RealPage's RMS has caused rent to increase explosively in recent years, with Portland renters paying 52% more in rent today than they paid in 2016.

**ANSWER TO PARAGRAPH 557:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 557 and denies them on that basis.

558. Outside the use of the Defendant RealPage's RMS, two active trade associations—Multifamily NW and the Portland Area Rental Owners Association—serve as conduits of the cartel, by providing venues for RealPage and participating Portland Submarket Owner-Operators and Managing Defendants to further their cartel's goals.

**ANSWER TO PARAGRAPH 558:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 558 and denies them on that basis.

559. In addition to the high adoption of Defendant RealPage's RMS, competition in the Portland Submarket is also stymied by local permitting and affordable housing requirements, which inhibit new entrants to the market.

**ANSWER TO PARAGRAPH 559:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 559 and denies them on that basis.

216

### xxv. San Diego, California

560. The San Diego Submarket corresponds to the Census Bureau's San Diego-Carlsbad-San Marcos MSA and includes all of San Diego County. There are approximately 184,355 multifamily rental units within the San Diego Regional Submarket.

**ANSWER TO PARAGRAPH 560:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 560 and denies them on that basis.

561. Through its suite of business products, including RMS, Defendant RealPage collects and shares pricing and occupancy information for a high concentration of multifamily residential apartment units within the San Diego Submarket, as self-reported by RealPage on its website:[246]



**ANSWER TO PARAGRAPH 561:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 561 and denies them on that basis.

562. Property owners and managers who use revenue management software account for approximately 63% of all multifamily rental units in the San Diego Submarket. Given that RealPage's RMS accounts for over two-thirds of revenue management software used in the U.S. multifamily rental housing industry by both owners and managers, the Owners, Managing Defendants, and Owner-Operators, along with their co-conspirators who use

---

[246] https://www.realpage.com/explore/main/ca/san-diego-carlsbad.

RealPage's RMS, account for over 41% of the multifamily rental market in the San Diego Submarket.

**ANSWER TO PARAGRAPH 562:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 562 and denies them on that basis.

563. Within the San Diego Submarket, the following Defendants own or operate multifamily units priced with RealPage RMS: AIR, AMC, Avenue5, Bell, Brookfield, Camden, CONAM, Equity, Essex, FPI Management, Greystar, Pinnacle, Related, Sares Regis, Simpson, Trammell Crow, UDR, Windsor, and Winn.

**ANSWER TO PARAGRAPH 563:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 563 and denies them on that basis.

564. Widespread adoption of Defendant RealPage's RMS has caused rent to increase explosively in recent years, with San Diego renters paying 41% more in rent today than they paid in 2016.

**ANSWER TO PARAGRAPH 564:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 564 and denies them on that basis.

565. Outside the use of the Defendant RealPage's RMS, several active trade associations—the Southern California Rental Housing Association, California Apartment Association, San Diego County Apartment Association, and San Diego Creative Investors Association—serve as conduits of the cartel, by providing venues for RealPage and participating San Diego Submarket Owner-Operators and Managing Defendants to further their cartel's goals.

**ANSWER TO PARAGRAPH 565:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 565 and denies them on that basis.

566. In addition to the high adoption of Defendant RealPage's RMS, competition in the San Diego Submarket is also stymied by restrictive zoning and permitting requirements, which inhibit new entrants to the market.

**ANSWER TO PARAGRAPH 566:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 566 and denies them on that basis.

### xxvi.   San Francisco, California

567.    The San Francisco Submarket corresponds to the Census Bureau's San Francisco-Oakland-
Fremont MSA, and includes San Francisco, Alameda, Marin, Contra Costa, and San Mateo
counties. There are approximately 194,642 rental units within the San Francisco Regional
Submarket.

**ANSWER TO PARAGRAPH 567:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 567 and denies them on that basis.

568.    Through its suite of business products, including RMS, Defendant RealPage collects and
shares pricing and occupancy information for a high concentration of multifamily
residential apartment units within the San Francisco Submarket, as self-reported by
RealPage on its website:[247]



**ANSWER TO PARAGRAPH 568:**

---

[247] https://www.realpage.com/explore/main/ca/san-francisco-redwood-city-south-san-francisco.

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 568 and denies them on that basis.

569.    Property owners and managers who use revenue management software account for approximately 70% of all multifamily rental units in the San Francisco Submarket. Given that RealPage's RMS accounts for over two-thirds of revenue management software used in the U.S. multifamily rental housing industry by both owners and managers, the Owners, Managing Defendants, and Owner-Operators, along with their co-conspirators who use RealPage's RMS, account for over 46% of the multifamily rental market in the San Francisco Submarket.

**ANSWER TO PARAGRAPH 569:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 569 and denies them on that basis.

570.    Within the San Francisco Submarket, the following Defendants own or operate multifamily units priced with RealPage RMS: AIR, AMC, Bell, Brookfield, Equity, Essex, FPI Management, Greystar, Mission Rock, Pinnacle, Prometheus, Related, Sares Regis, Trammell Crow, UDR, and Windsor.

**ANSWER TO PARAGRAPH 570:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 570 and denies them on that basis.

571.    Widespread adoption of Defendant RealPage's RMS has caused rent to increase explosively in recent years, with San Francisco renters paying 12% more in rent today than they paid in 2016.

**ANSWER TO PARAGRAPH 571:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 571 and denies them on that basis.

572.    Outside the use of the Defendant RealPage's RMS, three active trade associations—the San Francisco Apartment Association, California Apartment Association, and Professional Property Management Association of San Francisco—serve as conduits of the cartel, by providing venues for RealPage and participating San Francisco Submarket Owner-Operators and Managing Defendants to further their cartel's goals.

**ANSWER TO PARAGRAPH 572:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 572 and denies them on that basis.

573. In addition to the high adoption of Defendant RealPage's RMS, competition in the San Francisco Submarket is also stymied by local rent stabilization requirements, which inhibit new entrants to the market.

**ANSWER TO PARAGRAPH 573:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 573 and denies them on that basis.

**xxvii. San Jose, California**

574. The San Jose Submarket corresponds to the Census Bureau's San Jose-Sunnyvale-Santa Clara MSA and includes all of San Benito and Santa Clara counties. There are approximately 123,166 multifamily rental units within the San Jose Regional Submarket.

**ANSWER TO PARAGRAPH 574:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 574 and denies them on that basis.

575. Through its suite of business products, including RMS, Defendant RealPage collects and shares pricing and occupancy information for a high concentration of multifamily residential apartment units within the San Jose Submarket, as self-reported by RealPage on its website:[248]

---

[248] https://www.realpage.com/explore/main/ca/san-jose-sunnyvale-santa-clara.



**ANSWER TO PARAGRAPH 575:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 575 and denies them on that basis.

576.    Property owners and managers who use revenue management software account for approximately 66% of all multifamily rental units in the San Jose Submarket. Given that RealPage's RMS accounts for over two-thirds of revenue management software used in the U.S. multifamily rental housing industry by both owners and managers, the Owners, Managing Defendants, and Owner-Operators, along with their co-conspirators who use RealPage's RMS, account for over 43% of the multifamily rental market in the San Jose Submarket.

**ANSWER TO PARAGRAPH 576:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 576 and denies them on that basis.

577.    Within the San Jose Submarket, the following Defendants own or operate multifamily units priced with RealPage RMS: AIR, AMC, Avenue5, Bozzuto, Brookfield, CONAM, Equity, Essex, FPI Management, Greystar, Pinnacle, Prometheus, Related, RPM, Sares Regis, Security, UDR, Windsor, and Winn.

**ANSWER TO PARAGRAPH 577:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 577 and denies them on that basis.

578.   Widespread adoption of Defendant RealPage's RMS has caused rent to increase explosively in recent years, with San Jose renters paying 20% more in rent today than they paid in 2016.

**ANSWER TO PARAGRAPH 578:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 578 and denies them on that basis.

579.   Outside the use of the Defendant RealPage's RMS, several active trade associations—the California Rental Housing Association, California Apartment Association, Landlord Protection Association of CA, and Apartment Owners Association of California. Inc.—serve as conduits of the cartel, by providing venues for RealPage and participating San Jose Submarket Owner-Operators and Managing Defendants to further their cartel's goals.

**ANSWER TO PARAGRAPH 579:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 579 and denies them on that basis.

580.   In addition to the high adoption of Defendant RealPage's RMS, competition in the San Jose Submarket is also stymied by rent control and/or stabilization ordinances, which inhibit new entrants to the market.

**ANSWER TO PARAGRAPH 580:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 580 and denies them on that basis.

**xxviii. Seattle, Washington**

581.   The Seattle Submarket corresponds to the Census Bureau's Seattle-Tacoma-Bellevue MSA and contains the three largest counties in the state: King, Pierce, and Snohomish counties. There are approximately 292,565 multifamily rental units within the Seattle Regional Submarket.

**ANSWER TO PARAGRAPH 581:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 581 and denies them on that basis.

582.   Through its suite of business products, including RMS, Defendant RealPage collects and shares pricing and occupancy information for a high concentration of multifamily

residential apartment units within the Seattle Submarket, as self-reported by RealPage on its website:[249]



**ANSWER TO PARAGRAPH 582:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 582 and denies them on that basis.

583.  Property owners and managers who use revenue management software account for approximately 74% of all multifamily rental units in the Seattle Submarket. Given that RealPage's RMS accounts for over two-thirds of revenue management software used in the U.S. multifamily rental housing industry by both owners and managers, the Owners, Managing Defendants, and Owner-Operators, along with their co-conspirators who use RealPage's RMS, account for over 48% of the multifamily rental market in the Seattle Submarket.

**ANSWER TO PARAGRAPH 583:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 583 and denies them on that basis.

584.  Within the Seattle Submarket, the following Defendants own or operate multifamily units priced with RealPage RMS: AMC, Avenue5, Bell, Bozzuto, CONAM, Equity, Essex, FPI Management, Greystar, Lincoln, Mission Rock, Pinnacle, Prometheus, Sares Regis, Security, Simpson, Thrive, Trammell Crow, UDR, and Windsor.

---

[249] https://www.realpage.com/explore/main/wa/seattle-bellevue-everett.

**ANSWER TO PARAGRAPH 584:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 584 and denies them on that basis.

585.    Widespread adoption of Defendant RealPage's RMS has caused rent to increase
        explosively in recent years, with Seattle renters paying 51% more in rent today than they
        paid in 2016.

**ANSWER TO PARAGRAPH 585:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 585 and denies them on that basis.

586.    Outside the use of the Defendant RealPage's RMS, two active trade associations— the
        Rental Housing Association of Washington and the Washington Multi-Family Housing
        Association—serve as conduits of the cartel, by providing venues for RealPage and
        participating Seattle Submarket Owner-Operators and Managing Defendants to further
        their cartel's goals.

**ANSWER TO PARAGRAPH 586:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 586 and denies them on that basis.

587.    In addition to the high adoption of Defendant RealPage's RMS, competition in the Seattle
        Submarket is also stymied by local construction permitting requirements and a housing
        voucher program for low-income individuals, which inhibit new entrants to the market.

**ANSWER TO PARAGRAPH 587:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 587 and denies them on that basis.

**xxix.    St. Louis, Missouri**

588.    The St. Louis Submarket corresponds to the Census Bureau's St. Louis, MO-IL MSA and
        includes the Illinois counties of Bond, Calhoun, Clinton, Jersey, Macoupin, Madison,
        Monroe, and St. Clair; and the Missouri counties of Crawford, Franklin, Jefferson, Lincoln,
        St. Charles, St. Louis, and Warren. There are approximately 106,884 multifamily rental
        units within the St. Louis Regional Submarket.

**ANSWER TO PARAGRAPH 588:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 588 and denies them on that basis.

589.    Through its suite of business products, including RMS, Defendant RealPage collects and shares pricing and occupancy information for a high concentration of multifamily residential apartment units within the St. Louis Submarket, as self-reported by RealPage on its website:[250]



## ANSWER TO PARAGRAPH 589:

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 589 and denies them on that basis.

590.    Property owners and managers who use revenue management software account for approximately 42.6% of all multifamily rental units in the St. Louis Submarket. Given that RealPage's RMS accounts for over two-thirds of revenue management software used in the U.S. multifamily rental housing industry by both owners and managers, the Owners, Managing Defendants, and Owner-Operators, along with their co-conspirators who use RealPage's RMS, account for over 28% of the multifamily rental market in the St. Louis Submarket.

## ANSWER TO PARAGRAPH 590:

---

[250] https://www.realpage.com/explore/main/mo/st-louis.

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 590 and denies them on that basis.

591.    Within the St. Louis Submarket, the following Defendants own or operate multifamily units priced with RealPage RMS: BH, Carter-Haston, Greystar, Lincoln, Mission Rock, Pinnacle, and Related.

**ANSWER TO PARAGRAPH 591:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 591 and denies them on that basis.

592.    Widespread adoption of Defendant RealPage's RMS has caused rent to increase explosively in recent years, with St. Louis renters paying 20% more in rent in 2023 than they paid in 2016.

**ANSWER TO PARAGRAPH 592:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 592 and denies them on that basis.

593.    Outside the use of the Defendant RealPage's RMS, two active trade associations— the St. Louis Apartment Association and the Missouri Apartment Association—serve as conduits of the cartel, by providing venues for RealPage and participating St. Louis Submarket Owners, Owner-Operators, and Managing Defendants to further their cartel's goals.

**ANSWER TO PARAGRAPH 593:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 593 and denies them on that basis.

**xxx.    Tampa, Florida**

594.    The Tampa Submarket corresponds to the Census Tampa-St. Petersburg-Clearwater MSA, and includes all of Hernando, Pasco, Pinellas, and Hillsborough counties. There are approximately 213,780 multifamily rental units within the Tampa Regional Submarket.

**ANSWER TO PARAGRAPH 594:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 594 and denies them on that basis.

595.    Through its suite of business products, including RMS, Defendant RealPage collects and shares pricing and occupancy information for a high concentration of multifamily residential apartment units within the Tampa Submarket, as self-reported by RealPage on its website:[251]



## ANSWER TO PARAGRAPH 595:

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 595 and denies them on that basis.

596.    Property owners and managers who use revenue management software account for approximately 62% of all multifamily rental units in the Tampa Submarket. Given that RealPage's RMS accounts for over two-thirds of revenue management software used in the U.S. multifamily rental housing industry by both owners and managers, the Owners, Managing Defendants, and Owner-Operators, along with their co-conspirators who use RealPage's RMS, account for over 41% of the multifamily rental market in the Tampa Submarket.

## ANSWER TO PARAGRAPH 596:

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 596 and denies them on that basis.

597.    Within the Tampa Submarket, the following Defendants own or operate multifamily units priced with RealPage RMS: Avenue5, Bell, BH, Bozzuto, Camden, Carter-Haston, CONAM, CONTI, Cortland, ECI, First Communities, Greystar, Highmark, IRT, Lantower,

---

[251] https://www.realpage.com/explore/main/fl/tampa-st-petersburg-clearwater.

Lincoln, MAA, Mission Rock, Morgan, Pinnacle, RPM, Trammell Crow, UDR, Winn, and ZRS.

**ANSWER TO PARAGRAPH 597:**

Morgan Properties admits that, at times during the alleged relevant time period from January 1, 2016, to the present, it has operated properties in the Tampa metropolitan area, as defined by the U.S. Census Bureau. Morgan Properties otherwise lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 597 and denies them on that basis.

598. Widespread adoption of Defendant RealPage's RMS has caused rent to increase explosively in recent years, with Tampa renters paying 47% more in rent in 2023 than they paid in 2016.

**ANSWER TO PARAGRAPH 598:**

Morgan Properties denies the allegations in Paragraph 598.

599. Outside the use of the Defendant RealPage's RMS, two active trade associations— the Florida Apartment Association and the Bay Area Apartment Association—serve as conduits of the cartel, by providing venues for RealPage and participating Tampa Submarket Owner-Operators and Managing Defendants to further their cartel's goals.

**ANSWER TO PARAGRAPH 599:**

Morgan Properties denies the allegations in Paragraph 599.

**xxxi. Tucson, Arizona**

600. The Tucson Submarket corresponds to the Census Bureau's Tucson MSA and includes all of Pima County. There are approximately 69,004 multifamily rental units within the Tucson Regional Submarket.

**ANSWER TO PARAGRAPH 600:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 600 and denies them on that basis.

601. Through its suite of business products, including RMS, Defendant RealPage collects and shares pricing and occupancy information for a high concentration of multifamily

residential apartment units within the Tucson Submarket, as self-reported by RealPage on its website:[252]



**ANSWER TO PARAGRAPH 601:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 601 and denies them on that basis.

602. Property owners and managers who use revenue management software account for approximately 54% of all multifamily rental units in the Tucson Submarket. Given that RealPage's RMS accounts for over two-thirds of revenue management software used in the U.S. multifamily rental housing industry by both owners and managers, the Owners, Managing Defendants, and Owner-Operators, along with their co-conspirators who use RealPage's RMS, account for over 35% of the multifamily rental market in the Tucson Submarket.

**ANSWER TO PARAGRAPH 602:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 602 and denies them on that basis.

603. Within the Tucson Submarket, the following Defendants own or operate multifamily units priced with RealPage RMS: AMC, Avenue5, CONAM, Cortland, Dayrise, Greystar, Highmark, Mission Rock, RPM, and Winn.

---

[252] https://www.realpage.com/explore/main/az/tucson.

**ANSWER TO PARAGRAPH 603:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 603 and denies them on that basis.

604.    Widespread adoption of Defendant RealPage's RMS has caused rent to increase
        explosively in recent years, with Tucson renters paying 35% more in rent today than they
        paid in 2016.

**ANSWER TO PARAGRAPH 604:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 604 and denies them on that basis.

605.    Outside the use of the Defendant RealPage's RMS, two active trade associations— the
        Arizona Multihousing Association and the Southern Arizona/Tucson Chapter of
        the National Association of Residential Property Managers—serve as conduits of the cartel,
        by providing venues for RealPage and participating Tucson Submarket Owner-Operators
        and Managing Defendants to further their cartel's goals.

**ANSWER TO PARAGRAPH 605:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 605 and denies them on that basis.

**xxxii.   Washington, District of Columbia**

606.    The Washington D.C. Submarket corresponds to the Census Bureau's Washington-
        Arlington-Alexandria MSA and spans the District of Columbia and parts of Virginia and
        Maryland. There are approximately 548,398 multifamily rental units within the
        Washington D.C. Regional Submarket.

**ANSWER TO PARAGRAPH 606:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 606 and denies them on that basis.

607.    Through its suite of business products, including RMS, Defendant RealPage collects and
        shares pricing and occupancy information for a high concentration of multifamily

residential apartment units within the Washington D.C. Submarket, as self-reported by RealPage on its website:[253]



**ANSWER TO PARAGRAPH 607:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 607 and denies them on that basis.

608.  Property owners and managers who use revenue management software account for approximately 79% of all multifamily rental units in the Washington D.C. Submarket. Given that RealPage's RMS accounts for over two-thirds of revenue management software used in the U.S. multifamily rental housing industry by both owners and managers, the Owners, Managing Defendants, and Owner-Operators, along with their co-conspirators who use RealPage's RMS, account for over 52% of the multifamily rental market in the Washington D.C. Submarket.

**ANSWER TO PARAGRAPH 608:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 608 and denies them on that basis.

609.  Within the Washington D.C. Submarket, the following Defendants own or operate multifamily units priced with RealPage RMS: AIR, Avenue5, Bell, BH, Bozzuto, Brookfield, Camden, Cortland, Equity, Greystar, Highmark, Lincoln, MAA, Mission

---

[253] https://www.realpage.com/explore/main/dc/washington-arlington-alexandria.

Rock, Morgan, Pinnacle, Related, RPM, Security, Simpson, Trammell Crow, UDR, Windsor, Winn, and ZRS.

**ANSWER TO PARAGRAPH 609:**

Morgan Properties admits that, at times during the alleged relevant time period from January 1, 2016, to the present, it has operated properties in the Washington, D.C. metropolitan area, as defined by the U.S. Census Bureau. Morgan Properties otherwise lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 609 and denies them on that basis.

610. Widespread adoption of Defendant RealPage's RMS has caused rent to increase explosively in recent years, with Washington D.C. renters paying 35% more in rent in 2022 than they paid in 2016.

**ANSWER TO PARAGRAPH 610:**

Morgan Properties denies the allegations in Paragraph 610.

611. Outside the use of the Defendant RealPage's RMS, active trade associations— including the Apartment and Office Building Association—serve as conduits of the cartel, by providing venues for RealPage and participating Washington D.C. Submarket Owner-Operators and Managing Defendants to further their cartel's goals.

**ANSWER TO PARAGRAPH 611:**

Morgan Properties denies the allegations in Paragraph 611.

612. In addition to the high adoption of Defendant RealPage's RMS, competition in the Washington D.C. Submarket is also stymied by local zoning and rent control requirements, which inhibit new entrants to the market.

**ANSWER TO PARAGRAPH 612:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 612 and denies them on that basis.

**xxxiii. Wilmington, North Carolina**

613. The Wilmington Submarket corresponds to the Census Bureau's Wilmington MSA and includes Pender and New Hanover counties. There are approximately 22,820 multifamily rental units within the Wilmington Regional Submarket.

233

**ANSWER TO PARAGRAPH 613:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 613 and denies them on that basis.

614. Through its suite of business products, including RMS, Defendant RealPage collects and shares pricing and occupancy information for a high concentration of multifamily residential apartment units within the Wilmington Submarket, as self-reported by RealPage on its website:[254]



**ANSWER TO PARAGRAPH 614:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 614 and denies them on that basis.

615. Property owners and managers who use revenue management software account for approximately 62% of all multifamily rental units in the Wilmington Submarket. Given that RealPage's RMS accounts for over two-thirds of revenue management software used in the U.S. multifamily rental housing industry by both owners and managers, the Owners, Managing Defendants, and Owner-Operators, along with their co-conspirators who use RealPage's RMS, account for over 41% of the multifamily rental market in the Wilmington Submarket.

---

[254] https://www.realpage.com/explore/main/nc/wilmington.

**ANSWER TO PARAGRAPH 615:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 615 and denies them on that basis.

616.    Within the Wilmington Submarket, the following Defendants own or operate multifamily units priced with RealPage RMS: Bell, Brookfield, First Communities, Greystar, Highmark, and Lincoln.

**ANSWER TO PARAGRAPH 616:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 616 and denies them on that basis.

617.    Widespread adoption of Defendant RealPage's RMS has caused rent to increase explosively in recent years, with Wilmington renters paying 66% more in rent today than they paid in 2016.

**ANSWER TO PARAGRAPH 617:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 617 and denies them on that basis.

618.    Outside the use of the Defendant RealPage's RMS, two active trade associations— the Apartment Association of North Carolina and the Wilmington Apartment Association—serve as conduits of the cartel, by providing venues for RealPage and participating Wilmington Submarket Owner-Operators and Managing Defendants to further their cartel's goals.

**ANSWER TO PARAGRAPH 618:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 618 and denies them on that basis.

619.    Defendants and their co-conspirators operate in the additional following submarkets, using RealPage's RMS to set prices for a significant number of units. When Plaintiffs attempted to purchase RMS data for these MSAs from ALN for purposes of this pleading, ALN refused to sell Plaintiffs such data because of its close relationships with Defendants and their coconspirators. Further discovery will allow Plaintiffs to demonstrate the specific RMS usage in each submarket. As outlined *infra*, however, given the unique nature of the multi-family rental market, Defendants and their co-conspirators have the power to affect pricing in each submarket and thus have market power.

**ANSWER TO PARAGRAPH 619:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 619 and denies them on that basis.

### xxxiv. Birmingham-Hoover, AL MSA

620.    The Birmingham Submarket corresponds to the Census Bureau's Birmingham-Hoover, Alabama MSA and includes the counties of Bibb, Blount, Chilton, Jefferson, St. Clair, Shelby, and Walker. Through its suite of business products, including RMS, Defendant RealPage collects and shares pricing and occupancy information for a high concentration of multifamily residential apartment units within the Birmingham Submarket, as self-reported by RealPage on its website:[255]



**ANSWER TO PARAGRAPH 620:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 620 and denies them on that basis.

621.    Discovery will demonstrate that property owners and managers who use revenue management software account for a significant portion of all multifamily rental units in the Birmingham Submarket, though Plaintiffs have not been allowed to purchase data regarding specific market share numbers.

**ANSWER TO PARAGRAPH 621:**

---

[255] https://www.realpage.com/explore/main/al/birmingham-hoover.

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 621 and denies them on that basis.

622.    Within the Birmingham Submarket, the following Defendants own or operate multifamily units priced with RealPage RMS: AMC, BH, Carter-Haston, Cortland, First Communities, Greystar, IRT, Lincoln, MAA, Morgan, and Pinnacle.

## ANSWER TO PARAGRAPH 622:

Morgan Properties denies the allegations in Paragraph 622; Morgan Properties does not operate properties in the Birmingham metropolitan area, as defined by the U.S. Census Bureau.

623.    Widespread adoption of Defendant RealPage's RMS has caused rent to increase explosively in recent years, with Birmingham renters paying 26% more in rent in 2023 than they paid in 2016.

## ANSWER TO PARAGRAPH 623:

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 623 and denies them on that basis.

624.    Outside the use of the Defendant RealPage's RMS, two active trade associations— the Greater Birmingham Apartment Association and the Alabama Apartment Association— serve as conduits of the cartel, by providing venues for RealPage and participating Birmingham Submarket Owners, Owner-Operators, and Managing Defendants to further their cartel's goals.

## ANSWER TO PARAGRAPH 624:

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 624 and denies them on that basis.

### xxxv.   Buffalo, New York

625.    The Buffalo Submarket corresponds to the Census Bureau's Buffalo-Cheektowaga, New York MSA and includes Erie, Niagara, and Cattaraugus counties. Through its suite of business products, including RMS, Defendant RealPage collects and shares pricing and occupancy information for a high concentration of multifamily residential apartment units within the Buffalo Submarket, as self-reported by RealPage on its website:[256]

---

[256] https://www.realpage.com/explore/main/ny/buffalo-cheektowaga-niagara-falls.



**ANSWER TO PARAGRAPH 625:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 625 and denies them on that basis.

626.    Discovery will demonstrate that property owners and managers who use revenue
management software account for a significant portion of all multifamily rental units in the
Buffalo Submarket, though Plaintiffs have not been allowed to purchase data regarding
specific market share numbers.

**ANSWER TO PARAGRAPH 626:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 626 and denies them on that basis.

627.    Within the Buffalo Submarket, the following Defendants own or operate multifamily units
priced with RealPage RMS: Morgan, Related, Trammell Crow, and Winn.

**ANSWER TO PARAGRAPH 627:**

Morgan Properties admits that, at times during the alleged relevant time period from

January 1, 2016, to the present, it has operated properties in the Buffalo metropolitan area, as

defined by the U.S. Census Bureau.  Morgan Properties otherwise lacks knowledge or information

sufficient to form a belief as to the truth of the allegations in Paragraph 627 and denies them on

that basis.

628.    Widespread adoption of Defendant RealPage's RMS has caused rent to increase
        explosively in recent years, with Buffalo renters paying 39% more in rent in 2023 than they
        paid in 2016.

**ANSWER TO PARAGRAPH 628:**

        Morgan Properties denies the allegations in Paragraph 628.

629.    Outside the use of the Defendant RealPage's RMS, two active trade associations— the
        Apartment Professional Trade Society of New York and the Associated Builders and
        Owners of greater New York—serve as conduits of the cartel, by providing venues for
        RealPage and participating Buffalo Submarket Owners, Owner-Operators, and Managing
        Defendants to further their cartel's goals.

**ANSWER TO PARAGRAPH 629:**

        Morgan Properties denies the allegations in Paragraph 629.

        **xxxvi.  Cincinnati, Ohio**

630.    The Cincinnati Submarket corresponds to the Census Bureau's Cincinnati OH-KY-IN
        MSA and includes the Ohio counties of Hamilton, Butler, Warren, Clermont, Brown, and
        Clinton; the Kentucky counties of Boone, Kenton, Campbell, Pendleton, Grant, Bracken,
        Gallatin, and Mason; and the Indiana counties of Dearborn, Franklin, Ohio County, and
        Union County. Through its suite of business products, including RMS, Defendant
        RealPage collects and shares pricing and occupancy information for a high concentration
        of multifamily residential apartment units within the Cincinnati Submarket, as self-
        reported by RealPage on its website:[257]

---

[257] https://www.realpage.com/explore/main/oh/cincinnati.



**ANSWER TO PARAGRAPH 630:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 630 and denies them on that basis.

631. Discovery will demonstrate that property owners and managers who use revenue management software account for a significant portion of all multifamily rental units in the Cincinnati Submarket, though Plaintiffs have not been allowed to purchase data regarding specific market share numbers.

**ANSWER TO PARAGRAPH 631:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 631 and denies them on that basis.

632. Within the Cincinnati Submarket, the following Defendants own or operate multifamily units priced with RealPage RMS: BH, Greystar, IRT, Morgan, and Related.

**ANSWER TO PARAGRAPH 632:**

Morgan Properties admits that, at times during the alleged relevant time period from

January 1, 2016, to the present, it has operated properties in the Cincinnati metropolitan area, as

defined by the U.S. Census Bureau. Morgan Properties otherwise lacks knowledge or information

sufficient to form a belief as to the truth of the allegations in Paragraph 632 and denies them on

that basis.

633.   Widespread adoption of Defendant RealPage's RMS has caused rent to increase explosively in recent years, with Cincinnati renters paying 34% more in rent in 2023 than they paid in 2016.

## ANSWER TO PARAGRAPH 633:

Morgan Properties denies the allegations in Paragraph 633.

634.   Outside the use of the Defendant RealPage's RMS, two active trade associations— the Ohio Apartment Association and the Greater Cincinnati Northern Kentucky Apartment Association—serve as conduits of the cartel, by providing venues for RealPage and participating Cincinnati Submarket Owners, Owner-Operators, and Managing Defendants to further their cartel's goals.

## ANSWER TO PARAGRAPH 634:

Morgan Properties denies the allegations in Paragraph 634.

### xxxvii. Cleveland, Ohio

635.   The Cleveland Submarket corresponds to the Census Bureau's Cleveland-Elyria, OH MSA and includes the counties of Cuyahoga, Ashtabula, Geauga, Lake, Lorain, and Medina. Through its suite of business products, including RMS, Defendant RealPage collects and shares pricing and occupancy information for a high concentration of multifamily residential apartment units within the Cleveland Submarket, as self-reported by RealPage on its website:[258]

---

[258] https://www.realpage.com/explore/main/oh/cleveland-elyria.



**ANSWER TO PARAGRAPH 635:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 635 and denies them on that basis.

636. Discovery will demonstrate that property owners and managers who use revenue management software account for a significant portion of all multifamily rental units in the Cleveland Submarket, though Plaintiffs have not been allowed to purchase data regarding specific market share numbers.

**ANSWER TO PARAGRAPH 636:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 636 and denies them on that basis.

637. Within the Cleveland Submarket, the following Defendants own or operate multifamily units priced with RealPage RMS: AMC, Brookfield, Greystar, Lincoln, Morgan, and RPM

**ANSWER TO PARAGRAPH 637:**

Morgan Properties admits that, at times during the alleged relevant time period from

January 1, 2016, to the present, it has operated properties in the Cleveland metropolitan area, as

defined by the U.S. Census Bureau. Otherwise, Morgan Properties lacks knowledge or information

sufficient to form a belief as to the truth of the allegations in Paragraph 637 and denies them on that basis.

638. Widespread adoption of Defendant RealPage's RMS has caused rent to increase explosively in recent years, with Cleveland renters paying 30% more in rent in 2023 than they paid in 2016.

**ANSWER TO PARAGRAPH 638:**

Morgan Properties denies the allegations in Paragraph 638.

639. Outside the use of the Defendant RealPage's RMS, two active trade associations— the Ohio Apartment Association and the Northern Ohio Apartment Association—serve as conduits of the cartel, by providing venues for RealPage and participating Cleveland Submarket Owners, Owner-Operators, and Managing Defendants to further their cartel's goals.

**ANSWER TO PARAGRAPH 639:**

Morgan Properties denies the allegations in Paragraph 639.

**xxxviii.    Columbus, Ohio**

640. The Columbus Submarket corresponds to the Census Bureau's Columbus, Ohio MSA and includes Delaware, Fairfield, Franklin, Hocking, Licking, Madison, Morrow, Perry, Pickaway, and Union counties. Through its suite of business products, including RMS, Defendant RealPage collects and shares pricing and occupancy information for a high concentration of multifamily residential apartment units within the Columbus Submarket, as self-reported by RealPage on its website:[259]

---

[259] https://www.realpage.com/explore/main/oh/columbus.



**ANSWER TO PARAGRAPH 640:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 640 and denies them on that basis.

641. Discovery will demonstrate that property owners and managers who use revenue management software account for a significant portion of all multifamily rental units in the Columbus Submarket, though Plaintiffs have not been allowed to purchase data regarding specific market share numbers.

**ANSWER TO PARAGRAPH 641:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 641 and denies them on that basis.

642. Within the Columbus Submarket, the following Defendants own or operate multifamily units priced with RealPage RMS: AMC, BH, Cortland, IRT, and Morgan.

**ANSWER TO PARAGRAPH 642:**

Morgan Properties admits that, at times during the alleged relevant time period from

January 1, 2016, to the present, it has operated properties in the Columbus metropolitan area, as

defined by the U.S. Census Bureau. Morgan Properties otherwise lacks knowledge or information

sufficient to form a belief as to the truth of the allegations in Paragraph 642 and denies them on

that basis.

643.     Widespread adoption of Defendant RealPage's RMS has caused rent to increase explosively in recent years, with Columbus renters paying 38% more in rent in 2023 than they paid in 2016.

**ANSWER TO PARAGRAPH 643:**

Morgan Properties denies the allegations in Paragraph 643.

644.     Outside the use of the Defendant RealPage's RMS, two active trade associations— the Columbus Apartment Association and the Ohio Apartment Association—serve as conduits of the cartel, by providing venues for RealPage and participating Columbus Submarket Owners, Owner-Operators, and Managing Defendants to further their cartel's goals.

**ANSWER TO PARAGRAPH 644:**

Morgan Properties denies the allegations in Paragraph 644.

**xxxix.  Hartford, Connecticut**

645.     The Hartford Submarket corresponds to the Census Bureau's Hartford-East Hartford-Middletown, Connecticut MSA and includes Hartford, Middlesex, and Tolland counties. Through its suite of business products, including RMS, Defendant RealPage collects and shares pricing and occupancy information for a high concentration of multifamily residential apartment units within the Hartford Submarket, as self-reported by RealPage on its website:[260]

---

[260] https://www.realpage.com/explore/main/ct/hartford-west-hartford-east-hartford.



## ANSWER TO PARAGRAPH 645:

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 645 and denies them on that basis.

646. Discovery will demonstrate that property owners and managers who use revenue management software account for a significant portion of all multifamily rental units in the Hartford Submarket, though Plaintiffs have not been allowed to purchase data regarding specific market share numbers.

## ANSWER TO PARAGRAPH 646:

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 646 and denies them on that basis.

647. Within the Hartford Submarket, the following Defendants own or operate multifamily units priced with RealPage RMS: Bozzuto, Greystar, Related, and Winn.

## ANSWER TO PARAGRAPH 647:

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 647 and denies them on that basis.

648. Widespread adoption of Defendant RealPage's RMS has caused rent to increase explosively in recent years, with Hartford renters paying 26% more in rent in 2023 than they paid in 2016.

**ANSWER TO PARAGRAPH 648:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 648 and denies them on that basis.

649.    Outside the use of the Defendant RealPage's RMS, two active trade associations— the
        Connecticut Apartment Association and the East Hartford/Manchester & Greater Hartford
        Property Owners Association—serve as conduits of the cartel, by providing venues for
        RealPage and participating Hartford Submarket Owners, Owner-Operators, and Managing
        Defendants to further their cartel's goals.

**ANSWER TO PARAGRAPH 649:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 649 and denies them on that basis.

### xl.    Riverside, California

650.    The Riverside Submarket corresponds to the Census Bureau's Riverside-San Bernardino-
        Ontario, California MSA and includes Riverside and San Bernardino counties. Through its
        suite of business products, including RMS, Defendant RealPage collects and shares pricing
        and occupancy information for a high concentration of multifamily residential apartment
        units within the Riverside Submarket, as self-reported by RealPage on its website:[261]



**ANSWER TO PARAGRAPH 650:**

---

[261] https://www.realpage.com/explore/main/ca/riverside-san-bernardino-ontario.

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 650 and denies them on that basis.

651.    Discovery will demonstrate that property owners and managers who use revenue management software account for a significant portion of all multifamily rental units in the Riverside Submarket, though Plaintiffs have not been allowed to purchase data regarding specific market share numbers.

**ANSWER TO PARAGRAPH 651:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 651 and denies them on that basis.

652.    Within the Riverside Submarket, the following Defendants own or operate multifamily units priced with RealPage RMS: AMC, Avenue5, Bell, Camden, CONAM, Equity, FPI Management, Greystar, Pinnacle, RPM, Sares Regis, Trammell Crow, UDR, and Winn.

**ANSWER TO PARAGRAPH 652:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 652 and denies them on that basis.

653.    Widespread adoption of Defendant RealPage's RMS has caused rent to increase explosively in recent years, with Riverside renters paying 46% more in rent in 2023 than they paid in 2016.

**ANSWER TO PARAGRAPH 653:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 653 and denies them on that basis.

654.    Outside the use of the Defendant RealPage's RMS, two active trade associations— the Apartment Association of Orange County and the Apartment Association of the Greater Inland Empire—serve as conduits of the cartel, by providing venues for RealPage and participating Riverside Submarket Owners, Owner-Operators, and Managing Defendants to further their cartel's goals.

**ANSWER TO PARAGRAPH 654:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 654 and denies them on that basis.

### xli. Sacramento, California

655.    The Sacramento Submarket corresponds to the Census Bureau's Sacramento-Roseville-Folsom, California MSA and includes El Dorado, Nevada, Placer, Sacramento, Sutter, Yolo, and Yuba counties. Through its suite of business products, including RMS, Defendant RealPage collects and shares pricing and occupancy information for a high concentration of multifamily residential apartment units within the Sacramento Submarket, as self-reported by RealPage on its website:[262]



### ANSWER TO PARAGRAPH 655:

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 655 and denies them on that basis.

656.    Discovery will demonstrate that property owners and managers who use revenue management software account for a significant portion of all multifamily rental units in the Sacramento Submarket, though Plaintiffs have not been allowed to purchase data regarding specific market share numbers.

### ANSWER TO PARAGRAPH 656:

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 656 and denies them on that basis.

---

[262] https://www.realpage.com/explore/main/ca/sacramento-roseville-arden-arcade.

657.    Within the Sacramento Submarket, the following Defendants own or operate multifamily units priced with RealPage RMS: AMC, Avenue5, CONAM, FPI Management, Greystar, Pinnacle, Sares Regis, Security, and Winn.

## ANSWER TO PARAGRAPH 657:

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 657 and denies them on that basis.

658.    Widespread adoption of Defendant RealPage's RMS has caused rent to increase explosively in recent years, with Sacramento renters paying 68% more in rent in 2023 than they paid in 2016.

## ANSWER TO PARAGRAPH 658:

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 658 and denies them on that basis.

659.    Outside the use of the Defendant RealPage's RMS, various active trade associations, including the California Apartment Association, California Rental Housing Association, and the Rental Housing Association of Sacramento, serve as conduits of the cartel, by providing venues for RealPage and participating Sacramento Submarket Owners, Owner-Operators, and Managing Defendants to further their cartel's goals.

## ANSWER TO PARAGRAPH 659:

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 659 and denies them on that basis.

### xlii.    Salt Lake City, Utah

660.    The Salt Lake City Submarket corresponds to the Census Bureau's Salt Lake City, Utah MSA and includes Salt Lake and Tooele counties. Through its suite of business products, including RMS, Defendant RealPage collects and shares pricing and occupancy information for a high concentration of multifamily residential apartment units within the Salt Lake City Submarket, as self-reported by RealPage on its website:[263]

---

[263] https://www.realpage.com/explore/main/ut/salt-lake-city-ogden-clearfield.



**ANSWER TO PARAGRAPH 660:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 660 and denies them on that basis.

661.    Discovery will demonstrate that property owners and managers who use revenue
management software account for a significant portion of all multifamily rental units in the
Salt Lake City Submarket, though Plaintiffs have not been allowed to purchase data
regarding specific market share numbers.

**ANSWER TO PARAGRAPH 661:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 661 and denies them on that basis.

662.    Within the Salt Lake City Submarket, the following Defendants own or operate multifamily
units priced with RealPage RMS: AMC, Avenue5, Greystar, Highmark, Kairoi, Mission
Rock, and Security.

**ANSWER TO PARAGRAPH 662:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 662 and denies them on that basis.

663.    Widespread adoption of Defendant RealPage's RMS has caused rent to increase
explosively in recent years, with Salt Lake City renters paying 56% more in rent in 2023
than they paid in 2016.

**ANSWER TO PARAGRAPH 663:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 663 and denies them on that basis.

664.    Outside the use of the Defendant RealPage's RMS, two active trade associations— the Utah Apartment Association and the Utah Rental Housing Association—serve as conduits of the cartel, by providing venues for RealPage and participating Salt Lake City Submarket Owners, Owner-Operators, and Managing Defendants to further their cartel's goals.

**ANSWER TO PARAGRAPH 664:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 664 and denies them on that basis.

### xliii.    San Antonio, Texas

665.    The San Antonio Submarket corresponds to the Census Bureau's San Antonio-New Braunfels, Texas MSA and includes Atasoca, Bandera, Bexar, Comal, Guadalupe, Kendall, Medina, and Wilson counties. Through its suite of business products, including RMS, Defendant RealPage collects and shares pricing and occupancy information for a high concentration of multifamily residential apartment units within the San Antonio Submarket, as self-reported by RealPage on its website:[264]



**ANSWER TO PARAGRAPH 665:**

---

[264] https://www.realpage.com/explore/main/tx/san-antonio-new-braunfels.

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 665 and denies them on that basis.

666.     Discovery will demonstrate that property owners and managers who use revenue management software account for a significant portion of all multifamily rental units in the San Antonio Submarket, though Plaintiffs have not been allowed to purchase data regarding specific market share numbers.

**ANSWER TO PARAGRAPH 666:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 666 and denies them on that basis.

667.     Within the San Antonio Submarket, the following Defendants own or operate multifamily units priced with RealPage RMS: Allied Orion, AMC, Avenue5, Bell, BH, CONAM, Cortland, CWS, Dayrise, First Communities, FPI Management, Greystar, Highmark, IRT, Kairoi, Knightvest, Lincoln, MAA, Mission Rock, Pinnacle, Related, RPM, Trammell Crow, Winn, and ZRS.

**ANSWER TO PARAGRAPH 667:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 667 and denies them on that basis.

668.     Widespread adoption of Defendant RealPage's RMS has caused rent to increase explosively in recent years, with San Antonio renters paying 39% more in rent in 2023 than they paid in 2016.

**ANSWER TO PARAGRAPH 668:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 668 and denies them on that basis.

669.     Outside the use of the Defendant RealPage's RMS, two active trade associations— the Texas Apartment Association and the San Antonio Apartment Association—serve as conduits of the cartel, by providing venues for RealPage and participating San Antonio Submarket Owners, Owner-Operators, and Managing Defendants to further their cartel's goals.

**ANSWER TO PARAGRAPH 669:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 669 and denies them on that basis.

### xliv.   San Juan, Puerto Rico

670.    The San Juan Submarket corresponds to the Census Bureau's San Juan-Bayamón-Caguas, PR MSA and includes the area surrounding the Municipality of San Juan, Puerto Rico, including Bayamón, Carolina, Cataño, Guaynabo, and Trujjilo Alto. Through its suite of business products, including RMS, Defendant RealPage collects and shares pricing and occupancy information for a high concentration of multifamily residential apartment units within the San Juan Submarket.

## ANSWER TO PARAGRAPH 670:

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 670 and denies them on that basis.

671.    Discovery will demonstrate that property owners and managers who use revenue management software account for a significant portion of all multifamily rental units in the San Juan Submarket, though Plaintiffs have not been allowed to purchase data regarding specific market share numbers.

## ANSWER TO PARAGRAPH 671:

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 671 and denies them on that basis.

672.    Widespread adoption of Defendant RealPage's RMS has caused rent to increase explosively in recent years, with San Juan renters paying 13% more in rent in 2023 than they paid in 2016.

## ANSWER TO PARAGRAPH 672:

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 672 and denies them on that basis.

### xlv.    Virginia Beach, Virginia

673.    The Virginia Beach Submarket corresponds to the Census Bureau's Virginia Beach-Norfolk-Newport News VA-NC MSA and includes the Virginia counties of Gloucester, Isle of Wight, James City, Matthews, Southampton, and York, and North Carolina counties of Camden, Currituck, and Gates. Through its suite of business products, including RMS, Defendant RealPage collects and shares pricing and occupancy information for a high

concentration of multifamily residential apartment units within the Virginia Beach Submarket, as self-reported by RealPage on its website:[265]



**ANSWER TO PARAGRAPH 673:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 673 and denies them on that basis.

674. Discovery will demonstrate that property owners and managers who use revenue management software account for a significant portion of all multifamily rental units in the Virginia Beach Submarket, though Plaintiffs have not been allowed to purchase data regarding specific market share numbers.

**ANSWER TO PARAGRAPH 674:**

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 674 and denies them on that basis.

675. Within the Virginia Beach Submarket, the following Defendants own or operate multifamily units priced with RealPage RMS: Greystar and Pinnacle.

**ANSWER TO PARAGRAPH 675:**

---

[265] https://www.realpage.com/explore/main/va/virginia-beach-norfolk-newport-news.

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 675 and denies them on that basis.

676.    Widespread adoption of Defendant RealPage's RMS has caused rent to increase
        explosively in recent years, with Virginia Beach renters paying 15% more in rent in 2023
        than they paid in 2016.

## ANSWER TO PARAGRAPH 676:

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 676 and denies them on that basis.

677.    Outside the use of the Defendant RealPage's RMS, two active trade associations— the
        Apartment Association of North Carolina and the Virginia Apartment and Management
        Association—serve as conduits of the cartel, by providing venues for RealPage and
        participating Virginia Beach Submarket Owners, Owner-Operators, and Managing
        Defendants to further their cartel's goals.

## ANSWER TO PARAGRAPH 677:

Morgan Properties lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 677 and denies them on that basis.

678.    Multifamily real estate leases in each MSA therefore comprise of a distinct product and
        geographic market for antitrust purposes.

## ANSWER TO PARAGRAPH 678:

Morgan Properties denies the allegations in Paragraph 678.

679.    While Plaintiffs have identified the foregoing distinct geographic sub-markets, Plaintiffs
        anticipate that additional submarkets and co-conspirators will be uncovered in the course
        of discovery and upon expert analysis of the data produced, given that Defendants operate
        nationwide. Additional sub-markets will be included as appropriate, after sufficient
        discovery.

## ANSWER TO PARAGRAPH 679:

Morgan Properties denies the allegations in Paragraph 679.

680.    Defendants and their co-conspirators, through their adoption and use of RealPage's RMS
        to set prices on their multifamily residential leases, have caused direct anticompetitive
        effects across the nation and each regional submarket in the form of higher prices and
        decreased output.

**ANSWER TO PARAGRAPH 680:**

    Morgan Properties denies the allegations in Paragraph 680.

## VII. CLASS ACTION ALLEGATIONS

681.    Plaintiffs bring this action on behalf of themselves and all others similarly situated as a class action under Federal Rules of Civil Procedure 23(a) and 23(b)(3), seeking damages as well as equitable and injunctive relief, on behalf of the following Class:

> All persons and entities in the United States and its territories who paid rent on at least one multifamily residential real estate lease from any Owner, Managing Defendants and/or Owner-Operator participating in RealPage's Revenue Management Solutions, including its pricing software and/or lease renewal staggering software programs, or from a division, subsidiary, predecessor, agent, or affiliate of any such Owner, Managing Defendant, and/or Owner-Operator, at any time during the period of October 18, 2018 until the Defendants' unlawful conduct and its anticompetitive effects cease to persist ("Class Period").

**ANSWER TO PARAGRAPH 681:**

    The allegations in Paragraph 681 are legal conclusions not subject to admission or denial.

To the extent a response is necessary, Morgan Properties denies the allegations in Paragraph 681.

682.    Specifically excluded from this Class are Defendants; the officers, directors, or employees of any Defendant; any entity in which any Defendant has a controlling interest; and any affiliate, legal representative, heir or assign of any Defendant. Also excluded from this Class are any federal, state, or local governmental entities, any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, any juror assigned to this action, and any co-conspirator identified in this action.

**ANSWER TO PARAGRAPH 682:**

    The allegations in Paragraph 682 are legal conclusions not subject to admission or denial.

To the extent a response is necessary, Morgan Properties denies the allegations in Paragraph 682.

683.    The Class is so numerous as to make joinder impracticable. Plaintiffs do not know the exact number of Class members because such information is presently in the exclusive control of Defendants. Plaintiffs believe that, due to the nature of the residential rental market, there are likely millions of Class members in the United States.

**ANSWER TO PARAGRAPH 683:**

The allegations in Paragraph 683 are legal conclusions not subject to admission or denial.

To the extent a response is necessary, Morgan Properties denies the allegations in Paragraph 683.

684.  Common questions of law and fact exist as to all members of the Class. Plaintiffs and the Class were injured by the same unlawful price-fixing conspiracy, and Defendants' anticompetitive conduct was generally applicable to all the members of the Class, and relief to the Class as a whole is appropriate. Common issues of fact and law include, but are not limited to the following:

    (a)  Whether Defendants and their co-conspirators engaged in a combination or conspiracy to fix, raise, maintain or stabilize rent prices for multifamily residential units in the United States;

    (b)  The duration of the conspiracy alleged herein and the acts performed by Defendants and their co-conspirators in furtherance of the conspiracy;

    (c)  Whether such combination or conspiracy violated the federal antitrust laws;

    (d)  Whether the conduct of Defendants and their co-conspirators, as alleged in this Complaint, caused injury to the Plaintiffs and other members of the Class;

    (e)  Whether Defendants caused Plaintiffs and the Class to suffer damages in the form of overcharges on rent for their multifamily residential units;

    (f)  The appropriate class-wide measure of damages; and

    (g)  The nature of appropriate injunctive relief to restore competition in the market for the lease of multifamily residential real estate.

## ANSWER TO PARAGRAPH 684:

The allegations in Paragraph 684 are legal conclusions not subject to admission or denial.

To the extent a response is necessary, Morgan Properties denies the allegations in Paragraph 684,

including subparts (a) through (g).

685.  Plaintiffs' claims are typical of the claims of Class members, and Plaintiffs will fairly and adequately protect the interests of the Class. Plaintiffs and all members of the Class are similarly affected by Defendants' unlawful conduct in that they paid artificially inflated rent for residential units managed by cartel members.

## ANSWER TO PARAGRAPH 685:

The allegations in Paragraph 685 are legal conclusions not subject to admission or denial.

To the extent a response is necessary, Morgan Properties denies the allegations in Paragraph 685.

686.     Plaintiffs' claims arise out of the same common course of conduct giving rise to the claims of the other members of the Class. Plaintiffs' interests are coincident with and typical of, and not antagonistic to, those of the other members of the Class.

**ANSWER TO PARAGRAPH 686:**

The allegations in Paragraph 686 are legal conclusions not subject to admission or denial.

To the extent a response is necessary, Morgan Properties denies the allegations in Paragraph 686.

687.     Plaintiffs have retained counsel with substantial experience litigating complex antitrust class actions in myriad industries and courts throughout the nation.

**ANSWER TO PARAGRAPH 687:**

The allegations in Paragraph 687 are legal conclusions not subject to admission or denial.

To the extent a response is necessary, Morgan Properties denies the allegations in Paragraph 687.

688.     The questions of law and fact common to the members of the Class predominate over any questions affecting only individual members, including issues relating to liability and damages.

**ANSWER TO PARAGRAPH 688:**

The allegations in Paragraph 688 are legal conclusions not subject to admission or denial.

To the extent a response is necessary, Morgan Properties denies the allegations in Paragraph 688.

689.     Class action treatment is a superior method for the fair and efficient adjudication of the controversy, in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining redress for claims that it might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in management of this class action. Moreover, the prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

**ANSWER TO PARAGRAPH 689:**

The allegations in Paragraph 689 are legal conclusions not subject to admission or denial.

To the extent a response is necessary, Morgan Properties denies the allegations in Paragraph 689.

690.    Plaintiffs know of no difficulty likely to be encountered in the maintenance of this action as a class action under Federal Rule of Civil Procedure 23.

**ANSWER TO PARAGRAPH 690:**

The allegations in Paragraph 690 are legal conclusions not subject to admission or denial.

To the extent a response is necessary, Morgan Properties denies the allegations in Paragraph 690.

## VIII.  ANTITRUST INJURY

691.    Defendants' anticompetitive conduct had the following effects, among others:

(a)    Competition among Owner-Operators and Managing Defendants has been restrained or eliminated with respect to the leasing of multifamily residential rental units nationwide, including in the MSAs enumerated in § VI(C), above;

(b)    The price of residential rental units has been fixed, stabilized, or maintained at artificially high levels, including in the MSAs enumerated in § VI(C);

(c)    The output of multifamily residential leases has been fixed, stabilized, or maintained at artificially low levels, including in the MSAs enumerated in § VI(C); and

(d)    Individuals have been deprived of free and open competition, including in the MSAs enumerated in § VI(C).

(e)    Tenants have been compelled to agree to one-sided lease contracts that contain various harmful clauses, including class action waivers, arbitration clauses, and penalty interest rates, that they would not have been subject to in a free market.

**ANSWER TO PARAGRAPH 691:**

Morgan Properties denies the allegations in Paragraph 691, including subparts (a) through

(e).

692.    Defendants' violations of the antitrust laws have caused Plaintiffs and the Class to pay higher prices for residential rental units in the United States than they would have in the absence of Defendants' illegal contract, combination, or conspiracy, and as a result, have suffered damages in the form of overcharges paid on their rental units.

**ANSWER TO PARAGRAPH 692:**

Morgan Properties denies the allegations in Paragraph 692.

693.    This is an injury of the type that the antitrust laws were meant to punish and prevent.

**ANSWER TO PARAGRAPH 693:**

Morgan Properties denies the allegations in Paragraph 693.

## IX. CONTINUING VIOLATION

694.    Plaintiffs' Sherman Act claims, which are subject to a four-year statute of limitations period, are timely under the continuing violations doctrine. The first complaint against Defendant RealPage was filed on October 18, 2022.[266] The conspiracy alleged above began at least as early as January 1, 2016, and continued into the non-time-barred Class Period, October 18, 2018, and beyond. Each month, Defendant Owners, Owner-Operators, and their agents—the Managing Defendants—made a payment to Defendant RealPage pursuant to a written agreement in exchange for access to confidential, competitively sensitive information about rental pricing submitted by their horizontal competitors.

**ANSWER TO PARAGRAPH 694:**

Morgan Properties denies the allegations in Paragraph 694.

695.    This complaint alleges Owner-Operators and Managing Defendants set prices pursuant to recommendations from Defendant RealPage's RMS using algorithms trained on a pool of competitively sensitive transaction data within the four-year statutory period. *See* Section IV.C, above.

**ANSWER TO PARAGRAPH 695:**

Morgan Properties denies the allegations in Paragraph 695.

696.    As a result of the anticompetitive conduct challenged in this complaint, throughout the Class Period and to the present, Owner-Operators and Managing Defendants were able to and did inflate prices for multifamily housing.

**ANSWER TO PARAGRAPH 696:**

Morgan Properties denies the allegations in Paragraph 696.

697.    Plaintiffs and members of the proposed Class purchased multifamily housing directly from an Owner-Operator and/or Managing Defendant at artificially inflated prices, caused by the conduct challenged in this complaint, throughout the Class Period.

**ANSWER TO PARAGRAPH 697:**

Morgan Properties denies the allegations in Paragraph 697.

---

[266] *See Bason et al. v. RealPage, Inc., et al.*, No. 22-CV-1611 (S.D. Cal. Oct. 18, 2022), Dkt. 1.

698.    Thus, each Owner-Operator and Managing Defendant's sale of multifamily housing leases at artificial and non-competitive prices constituted a new overt act causing injury to the proposed Class.

**ANSWER TO PARAGRAPH 698:**

Morgan Properties denies the allegations in Paragraph 698.

699.    Accordingly, Plaintiffs and members of the proposed Class were injured and may recover for damages suffered at any point during the conspiracy.

**ANSWER TO PARAGRAPH 699:**

Morgan Properties denies the allegations in Paragraph 699.

700.    Defendants' unlawful acts and practices described above continue to this day.

**ANSWER TO PARAGRAPH 700:**

Morgan Properties denies the allegations in Paragraph 700.

## X.  CLAIMS FOR RELIEF

### COUNT I
### Price Fixing in Violation of
### Section 1 of the Sherman Act (15 U.S.C. § 1)

701.    Plaintiffs repeat the allegations set forth above as if fully set forth herein.

**ANSWER TO PARAGRAPH 701:**

Morgan Properties denies the allegations in Paragraph 701.

702.    Beginning at a time currently unknown to Plaintiffs, but at least as early as January 1, 2016 (further investigation and discovery may reveal an earlier date), and continuing through the present, Defendants and their co-conspirators entered and engaged in a contract, combination, or conspiracy to unreasonably restrain trade in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

**ANSWER TO PARAGRAPH 702:**

Morgan Properties denies the allegations in Paragraph 702.

703.    The contract, combination, or conspiracy consisted of an agreement among the Defendants and their co-conspirators to fix, raise, stabilize, or maintain at artificially high levels the rents they charge for residential units in Metro Areas nationwide, and involved the

exchange of competitively sensitive information between and among Defendants, causing anticompetitive effects without sufficient procompetitive justifications.

**ANSWER TO PARAGRAPH 703:**

Morgan Properties denies the allegations in Paragraph 703.

704. Plaintiffs and members of the Class have been injured and will continue to be injured in the form of overcharges on rent.

**ANSWER TO PARAGRAPH 704:**

Morgan Properties denies the allegations in Paragraph 704.

705. Defendants' anticompetitive conduct had the following effects, among others:

    (a)    Competition among Owner-Operators and Managing Defendants has been restrained or eliminated with respect to residential rental units;

    (b)    The price of residential rental units has been fixed, stabilized, or maintained at artificially high levels;

    (c)    The output of multifamily residential leases has been fixed, stabilized, or maintained at artificially low levels;

    (d)    Individuals have been deprived of free and open competition; and

    (e)    Tenants have been compelled to agree to one-sided lease contracts that contain various harmful clauses, including class action waivers, arbitration clauses, and penalty interest rates, that they would not have been subject to in a free market.

**ANSWER TO PARAGRAPH 705:**

Morgan Properties denies the allegations in Paragraph 705, including subparts (a) through

(e).

706. This conduct is unlawful under the *per se* standard. Defendants' conduct is also unlawful under either a "quick look" or rule of reason analysis because the agreement is factually anticompetitive with no valid procompetitive justifications. Moreover, even if there were valid procompetitive justifications, such justifications could have been reasonably achieved through means less restrictive of competition.

**ANSWER TO PARAGRAPH 706:**

Morgan Properties denies the allegations in Paragraph 706.

707.     Plaintiffs and members of the Class are entitled to treble damages, attorneys' fees and costs, and an injunction against Defendants to end the ongoing violations alleged herein.

## ANSWER TO PARAGRAPH 707:

Morgan Properties denies the allegations in Paragraph 707.

## COUNT II
### Violation of State Antitrust Statutes
### (On behalf of Plaintiffs and the Class)

708.     Plaintiffs repeat and reiterate the allegations set forth above as if fully set forth herein, and each of the state-specific causes of action described below incorporates the allegations as if fully set forth therein.

## ANSWER TO PARAGRAPH 708:

Morgan Properties incorporates its answers to all preceding allegations (Paragraphs 1 through 707) set forth above.

709.     During the Class Period, Defendants and their co-conspirators entered and engaged in a contract, combination, or conspiracy to fix, raise, stabilize, or maintain at artificially high levels, the rents they charge for residential units in various states to unreasonably restrain trade and commerce in violation of the various state antitrust laws set forth below.

## ANSWER TO PARAGRAPH 709:

Morgan Properties denies the allegations in Paragraph 709.

710.     In formulating and effectuating this conspiracy, Defendants and their coconspirators performed acts in furtherance of the combination and conspiracy, including: agreeing to fix, increase, maintain, or stabilize rents at artificially high levels which injured Plaintiffs and members of the Class; exchange of competitively sensitive information between and among Defendants; and participating in meetings and trade association conversations among themselves in the United States and elsewhere to implement, adhere to, and police the unlawful agreements they reached.

## ANSWER TO PARAGRAPH 710:

Morgan Properties denies the allegations in Paragraph 710.

711.     Defendants and their co-conspirators engaged in actions described above for the purpose of carrying out their unlawful agreements to fix, increase, maintain, or stabilize prices of rents for residential units at artificially high levels. As a direct and proximate result of Defendants' conduct, Plaintiffs and members of the Class were deprived of free and open competition and paid more to rent their apartments than they otherwise would have in the

absence of Defendants' unlawful conduct. This injury is of the type that the antitrust laws of the below states were designed to prevent and flows from that which makes Defendants' conduct unlawful.

## ANSWER TO PARAGRAPH 711:

Morgan Properties denies the allegations in Paragraph 711.

712. In addition, Defendants have profited significantly from the conspiracy. Defendants' profits derived from their anticompetitive conduct and come at the expense of and to the detriment of Plaintiffs and members of the Class.

## ANSWER TO PARAGRAPH 712:

Morgan Properties denies the allegations in Paragraph 712.

713. Accordingly, Plaintiffs and the members of the Class in each of the following jurisdictions seek damages (including statutory damages where applicable), to be trebled or otherwise increased as permitted by each particular jurisdiction's antitrust law, and costs of suit, including reasonable attorneys' fees, to the extent permitted by the following state laws.

## ANSWER TO PARAGRAPH 713:

Morgan Properties denies the allegations in Paragraph 713.

714. Defendants' anticompetitive acts described above were knowing and willful and constitute violations of the following state antitrust statutes.

## ANSWER TO PARAGRAPH 714:

Morgan Properties denies the allegations in Paragraph 714.

715. **ALABAMA:** Defendants entered into an unlawful agreement to restrain trade in the State of Alabama in violation of ALA. CODE § 6-5-60, *et seq*. Due to Defendants' unlawful conduct, (1) price competition for rentals was restrained, suppressed, and eliminated within Alabama; (2) price of residential rental units in the State of Alabama were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition. Defendants' conspiracy substantially affected Alabama commerce and accordingly, Plaintiffs and the members of the Class seek all forms of relief available under ALA. CODE § 6-5-60, *et seq*.

## ANSWER TO PARAGRAPH 715:

Morgan Properties denies the allegations in Paragraph 715.

716. **ALASKA:** Defendants have entered into an unlawful agreement in restraint of trade in violation of ALASKA STAT. § 45.50.562 *et seq*. Defendants' conspiracies had the

following effects: (1) price competition for rentals was restrained, suppressed, and eliminated throughout Alaska; (2) price of residential rental units in the State of Alaska were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition. During the Class Period, Defendants' illegal conduct substantially affected Alaska commerce. Accordingly, Plaintiffs and members of the Class seek all forms of relief available under ALASKA STAT. § 45.50.562 *et seq*.

## ANSWER TO PARAGRAPH 716:

Morgan Properties denies the allegations in Paragraph 716; Morgan Properties does not operate properties in Alaska.

717.    **ARIZONA:** Defendants have entered into an unlawful agreement in restraint of trade in violation of ARIZ. REV. STAT. § 44-1401, *et seq*. Defendants' conspiracies had the following effects: (1) price competition for rentals was restrained, suppressed, and eliminated throughout Arizona; (2) price of residential rental units in the State of Arizona were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition. During the Class Period, Defendants' illegal conduct substantially affected Arizona commerce. Accordingly, Plaintiffs and members of the Class seek all forms of relief available under ARIZ. REV. STAT. §44-1401, *et seq*.

## ANSWER TO PARAGRAPH 717:

Morgan Properties denies the allegations in Paragraph 717; Morgan Properties does not operate properties in Arizona.

718.    **CALIFORNIA:** Defendants have entered into an unlawful agreement in restraint of trade in violation of CAL. BUS. & PROF. CODE § 16700, *et seq*. During the Class Period, Defendants and their co-conspirators entered into and engaged in a continuing unlawful trust in restraint of trade and commerce. Each defendant has acted in violation of CAL. BUS. & PROF. CODE § 16720 to fix, raise, stabilize, and maintain prices of residential apartment rentals at supracompetitive levels. The violations of CAL. BUS. & PROF. CODE § 16720 consisted, without limitation, of a continuing unlawful trust and concert of action among Defendants and their coconspirators, the substantial terms of which were to fix, raise, maintain, and stabilize the prices of residential apartment units. For the purpose of forming and effectuating the unlawful trust, Defendants and their co-conspirators have done those things which they combined and conspired to do, including, but not limited to, the acts, practices and course of conduct set forth above, and creating a price floor, fixing, raising, and stabilizing the price of residential rentals. Defendants' conspiracies had the following effects: (1) price competition for rentals was restrained, suppressed, and eliminated throughout California; (2) price of residential rental units in the State of California were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition. As a result of Defendants'

violation of CAL. BUS. & PROF. CODE § 16720, Plaintiffs and members of the Class seek treble damages and their cost of suit, including a reasonable attorneys' fee, pursuant to CAL. BUS. & PROF. CODE § 16750(a).

## ANSWER TO PARAGRAPH 718:

Morgan Properties denies the allegations in Paragraph 718; Morgan Properties does not

operate properties in California.

719. **DISTRICT OF COLUMBIA:** Defendants' actions have violated D.C. CODE § 284501, *et seq*. Defendants' combinations or conspiracies had the following effects: (1) competition in the residential rental apartment market was restrained, suppressed, and eliminated throughout the District of Columbia; (2) residential apartment prices were raised, fixed, maintained, and stabilized at artificially high levels throughout the District of Columbia; and (3) Plaintiffs and members of the Class, including those who resided in the District of Columbia and rented an apartment in the District of Columbia, paid supracompetitive, artificially inflated prices for their rentals. During the Class Period, Defendants' illegal conduct substantially affected commerce in the District of Columbia. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of D.C. CODE § 28-4501, *et seq*. Accordingly, Plaintiffs and members of the Class seek all forms of relief available under D.C. CODE § 28-4501, *et seq*.

## ANSWER TO PARAGRAPH 719:

Morgan Properties denies the allegations in Paragraph 719; Morgan Properties does not

operate properties in the District of Columbia.

720. **FLORIDA:** Defendants have violated the FL. STAT. § 542.15 *et seq*. through their anticompetitive actions. Through their actions and actions of co-conspirators, rents of residential units in the State of Florida were raised, fixed, maintained, and stabilized at artificially high level, thereby injuring Plaintiffs and the Class. Throughout the Class Period, competition in the residential rental apartment market was restrained, suppressed, and eliminated throughout Florida. Plaintiffs and members of the Class, including those who resided and rented an apartment in the State of Florida, paid supracompetitive, artificially inflated prices for their rentals. During the Class Period, Defendants' illegal conduct substantially affected commerce in Florida. Accordingly, Plaintiffs and members of the Class seek all forms of relief available under FL. STAT. § 542.15, *et seq*.

## ANSWER TO PARAGRAPH 720:

Morgan Properties denies the allegations in Paragraph 720.

721. **GEORGIA:** Defendants have entered into an unlawful agreement in restraint of trade in violation of GA. CODE § 13-8-2.1, *et seq*. Defendants' combinations or conspiracies had the following effects: (1) competition in residential rental market was restrained,

suppressed, and eliminated throughout Georgia, and (2) residential rental prices were raised, fixed, maintained and stabilized at artificially high levels throughout Georgia. During the Class Period, Defendants' illegal conduct substantially affected Georgia commerce. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of GA. CODE § 13-8-2.1. Though GA. CODE § 13-8-2.1 lacks a private right of action, Georgia recognizes a common-law tort for restraint of trade that the Georgia Supreme Court has recognized encompasses the rights protected by GA. CODE § 13-8-2.1. Accordingly, Plaintiffs and members of the Class seek all forms of relief available under GA. CODE § 13-8-2.1, *et seq.*

**ANSWER TO PARAGRAPH 721:**

Morgan Properties denies the allegations in Paragraph 721.

722. **HAWAII:** Defendants have violated Haw. Rev. Stat. Ann. § 480-1, *et seq.*, through their actions. *See* HAW. REV. STAT. § 480-4, 480-13. Through Defendants' actions and the actions of their co-conspirators, rents of residential units in the State of Hawaii were raised, fixed, maintained, and stabilized at artificially high levels, thereby injuring Plaintiffs and the Class. Throughout the Class Period, competition in the residential rental apartment market was restrained, suppressed, and eliminated throughout Hawaii. Plaintiffs and members of the Class, including those who resided in the State of Hawaii and rented an apartment in Hawaii, paid supracompetitive, artificially inflated prices for their rentals. During the Class Period, Defendants' illegal conduct substantially affected commerce in Hawaii. Accordingly, Plaintiffs and members of the Class seek all forms of relief available under HAW. REV. STAT. § 480-1, *et seq.*

**ANSWER TO PARAGRAPH 722:**

Morgan Properties denies the allegations in Paragraph 722; Morgan Properties does not operate properties in Hawaii.

723. **IDAHO:** Defendants have violated the IDAHO CODE § 48-101, *et seq.* through their anticompetitive actions. Through their actions and actions of co-conspirators, rents of residential units in the State of Idaho were raised, fixed, maintained, and stabilized at artificially high level, thereby injuring Plaintiffs and the Class. Throughout the Class Period, competition in the residential rental apartment market was restrained, suppressed, and eliminated throughout Idaho. Plaintiffs and members of the Class, including those who resided in the State of Idaho and rented an apartment in Idaho, paid supracompetitive, artificially inflated prices for their rentals. During the Class Period, Defendants' illegal conduct substantially affected commerce in Idaho. Accordingly, Plaintiffs and members of the Class seek all forms of relief available under IDAHO CODE § 48-101, *et seq.*

**ANSWER TO PARAGRAPH 723:**

Morgan Properties denies the allegations in Paragraph 723; Morgan Properties does not operate properties in Idaho.

724. **ILLINOIS:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Section 740 ILCS 10/1, *et seq.* Defendants' combinations or conspiracies had the following effects: (1) competition in residential rental market was restrained, suppressed, and eliminated throughout Illinois, and (2) residential rental prices were raised, fixed, maintained and stabilized at artificially high levels throughout Illinois. During the Class Period, Defendants' illegal conduct substantially affected Illinois commerce. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Section 740 ILCS 10/1, *et seq.* Accordingly, Plaintiffs and members of the Class seek all forms of relief available under Section 740 ILCS 10/1, *et seq.*

**ANSWER TO PARAGRAPH 724:**

Morgan Properties denies the allegations in Paragraph 724.

725. **INDIANA:** Defendants violated the IND. CODE §§ 24-1-2-1, *et seq.* and 24-1-3-1, *et seq.* by entering into an unlawful agreement in restraint of trade in the State of Indiana. Specifically, Defendants' combinations or conspiracies detrimentally affected the competition in the Indiana residential rental market by restraining, suppressing, and eliminating competition. Further, Defendants' unlawful conduct raised, fixed, maintained, and stabilized rents in Indiana at artificially high levels. During the Class Period, Defendants' illegal conduct substantially affected Indiana commerce. Accordingly, Plaintiffs and Members of the Class seek all relief available under IND. CODE §§ 24-1-2-1, *et seq.* and 24-1-3-1, *et seq.*

**ANSWER TO PARAGRAPH 725:**

Morgan Properties denies the allegations in Paragraph 725.

726. **IOWA:** Defendants have entered into an unlawful agreement in restraint of trade in violation of IOWA CODE § 553.1, *et seq.* Defendants' combinations or conspiracies had the following effects: (1) competition in residential rental market was restrained, suppressed, and eliminated throughout Iowa, and (2) residential rental prices were raised, fixed, maintained and stabilized at artificially high levels throughout Iowa. During the Class Period, Defendants' illegal conduct substantially affected Iowa commerce. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of IOWA CODE § 553.1, *et seq.* Accordingly, Plaintiffs and members of the Class seek all forms of relief available under Iowa Code § 553.1, *et seq.*

**ANSWER TO PARAGRAPH 726:**

Morgan Properties denies the allegations in Paragraph 726; Morgan Properties does not operate properties in Iowa.

727. **KANSAS:** Defendants have entered into an unlawful agreement in restraint of trade in violation of KAN. STAT. § 50-101, *et seq*. Defendants' combinations or conspiracies had the following effects: (1) price competition for rentals was restrained, suppressed, and eliminated throughout Kansas; (2) price of residential rental units in the State of Kansas were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition. During the Class Period, Defendants' illegal conduct substantially affected Kansas commerce. Accordingly, Plaintiffs and members of the Class seek all forms of relief available under KAN. STAT. § 50-101, *et seq*.

**ANSWER TO PARAGRAPH 727:**

Morgan Properties denies the allegations in Paragraph 727; Morgan Properties does not operate properties in Kansas.

728. **LOUISIANA:** Defendants have entered into an unlawful agreement in restraint of trade in violation of LA. STAT. § 51:121, *et seq*. Defendants' combinations or conspiracies had the following effects: (1) price competition for rentals was restrained, suppressed, and eliminated throughout Louisiana; (2) price of residential rental units in the State of Louisiana were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition. During the Class Period, Defendants' illegal conduct substantially affected Louisiana commerce. Accordingly, Plaintiffs and members of the Class seek all forms of relief available under LA. STAT. § 51:121, *et seq*.

**ANSWER TO PARAGRAPH 728:**

Morgan Properties denies the allegations in Paragraph 728.

729. **MAINE:** Defendants have entered into an unlawful agreement in restraint of trade in violation of ME. REV. STAT. ANN. tit. 10, § 1101. Defendants' combinations or conspiracies had the following effects: (1) competition in the Maine residential rental market was restrained, suppressed, and eliminated, and (2) rental prices for Maine residential units were raised, fixed, maintained, and stabilized at artificially high levels. During the Class Period, Defendants' illegal conduct substantially affected Maine commerce. Accordingly, Plaintiffs and members of the Class seek all relief available under ME. REV. STAT. ANN. tit. 10, § 1104.

**ANSWER TO PARAGRAPH 729:**

Morgan Properties denies the allegations in Paragraph 729; Morgan Properties does not operate properties in Maine.

730. **MARYLAND:** Defendants violated the MD. CODE ANN., COM. LAW § 11-201, *et seq*. by entering into unlawful agreement in restraint of trade in the State of Maryland.

270

Specifically, Defendants' combinations or conspiracies detrimentally affected the competition in the Maryland residential rental market by restraining, suppressing, and eliminating competition. Further, Defendants' unlawful conduct raised, fixed, maintained, and stabilized rents in Maryland at artificially high levels. During the Class Period, Defendants' illegal conduct substantially affected Maryland commerce. Accordingly, Plaintiffs and members of the Class seek all relief available under MD. CODE ANN., COM. LAW § 11-201, *et seq*.

**ANSWER TO PARAGRAPH 730:**

Morgan Properties denies the allegations in Paragraph 730.

731. **MASSACHUSETTS:** Defendants have entered into an unlawful agreement in restraint of trade in violation of MASS. GEN. LAWS ch. 93A, § 1, *et seq*. Defendants' combinations or conspiracies had the following effects: (1) competition in the Massachusetts residential rental market was restrained, suppressed, and eliminated, and (2) Massachusetts residential rental prices were raised, fixed, maintained, and stabilized at artificially high levels. During the Class Period, Defendants' illegal conduct substantially affected Massachusetts commerce. Accordingly, Plaintiffs and members of the Class seek all relief available under MASS. GEN. LAWS ch. 93A, § 1, *et seq*.

**ANSWER TO PARAGRAPH 731:**

Morgan Properties denies the allegations in Paragraph 731; Morgan Properties does not operate properties in Massachusetts.

732. **MICHIGAN:** Defendants have entered into an unlawful agreement in restraint of trade in violation of MICH. COMP. LAWS § 445.771, *et seq*. Defendants' combinations or conspiracies had the following effects: (1) competition in the residential rental market was restrained, suppressed, and eliminated throughout Michigan, and (2) residential rental prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Michigan. During the Class Period, Defendants' illegal conduct substantially affected Michigan commerce. Accordingly, Plaintiffs and members of the Class seek all relief available under MICH. COMP. LAWS § 445.771, *et seq*.

**ANSWER TO PARAGRAPH 732:**

Morgan Properties denies the allegations in Paragraph 732.

733. **MINNESOTA:** Defendants have violated the MINN. STAT. § 325D.49, *et seq*. through their anticompetitive actions. Through their actions and actions of co-conspirators, rents of residential units in the State of Minnesota were raised, fixed, maintained, and stabilized at artificially high level, thereby injuring Plaintiffs and the Class. Throughout the Class Period, competition in the residential rental apartment market was restrained, suppressed, and eliminated throughout Minnesota. Plaintiffs and members of the Class, including those who resided in the State of Minnesota and rented an apartment there, paid

supracompetitive, artificially inflated prices for their rentals. During the Class Period, Defendants' illegal conduct substantially affected commerce in Minnesota. Accordingly, Plaintiffs and members of the Class seek all forms of relief available under MINN. STAT. § 325D.49, *et seq*.

**ANSWER TO PARAGRAPH 733:**

Morgan Properties denies the allegations in Paragraph 733; Morgan Properties does not operate properties in Minnesota.

734. **MISSISSIPPI:** Defendants have entered into an unlawful agreement in restraint of trade in violation of MISS. CODE § 75-21-1, *et seq*. Defendants' combinations or conspiracies had the following effects: (1) competition in the residential rental market was restrained, suppressed, and eliminated throughout Mississippi, and (2) residential rental prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Mississippi. During the Class Period, Defendants' illegal conduct substantially affected Mississippi commerce. Accordingly, Plaintiffs and members of the Class seek all relief available under MISS. CODE § 75-21-1, *et seq*.

**ANSWER TO PARAGRAPH 734:**

Morgan Properties denies the allegations in Paragraph 734; Morgan Properties does not operate properties in Mississippi.

735. **MISSOURI:** Defendants have entered into an unlawful agreement in restraint of trade in violation of MO. REV. STAT. § 416.011, *et seq*. Defendants' combinations or conspiracies had the following effects: (1) competition in the residential rental market was restrained, suppressed, and eliminated throughout Missouri, and (2) residential rental prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Missouri. During the Class Period, Defendants' illegal conduct substantially affected Missouri commerce. Accordingly, Plaintiffs and members of the Class seek all relief available under MO. REV. STAT. § 416.011, *et seq*.

**ANSWER TO PARAGRAPH 735:**

Morgan Properties denies the allegations in Paragraph 735; Morgan Properties does not operate properties in Missouri.

736. **MONTANA:** Defendants have entered into an unlawful agreement in restraint of trade in violation of MONT. CODE ANN. § 30-14-201, *et seq*. See also MONT. CODE ANN. § 30-14205. Specifically, Defendants' combinations or conspiracies detrimentally affected the competition in the Montana residential rental market by restraining, suppressing, and eliminating competition. Further, Defendants' unlawful conduct raised, fixed, maintained, and stabilized rents in Montana at artificially high levels. During the Class Period,

Defendants' illegal conduct substantially affected Montana commerce. Accordingly, Plaintiffs and Members of the Class seek all relief available under MONT. CODE ANN. § 30-14-201, *et seq.*

## ANSWER TO PARAGRAPH 736:

Morgan Properties denies the allegations in Paragraph 736; Morgan Properties does not operate properties in Montana.

737. **NEBRASKA:** Defendants restrained trade and commerce in the State of Nebraska by entering into an unlawful agreement in violation of NEB. REV. STAT. § 59-801, *et seq.* Defendants' combinations or conspiracies had the following effects: (1) competition in the residential rental market was restrained, suppressed, and eliminated throughout Nebraska, and (2) residential rental prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Nebraska. During the Class Period, Defendants' illegal conduct substantially affected Nebraska commerce. Accordingly, Plaintiffs and members of the Class seek all relief available under NEB. REV. STAT. § 59-801, *et seq.*

## ANSWER TO PARAGRAPH 737:

Morgan Properties denies the allegations in Paragraph 737.

738. **NEW HAMPSHIRE:** Defendants have entered into an unlawful agreement in restraint of trade in violation of N.H. REV. STAT. ANN. § 356:1, *et seq.* Specifically, Defendants' combinations or conspiracies detrimentally affected the competition in the New Hampshire residential rental market by restraining, suppressing, and eliminating competition. Further, Defendants' unlawful conduct raised, fixed, maintained, and stabilized rents in New Hampshire at artificially high levels. During the Class Period, Defendants' illegal conduct substantially affected New Hampshire commerce. Accordingly, Plaintiffs and members of the Class seek all relief available under N.H. REV. STAT. ANN. § 356:1, *et seq.*

## ANSWER TO PARAGRAPH 738:

Morgan Properties denies the allegations in Paragraph 738; Morgan Properties does not operate properties in New Hampshire.

739. **NEW JERSEY:** Defendants restrained trade and commerce in the State of New Jersey by entering into an unlawful agreement in violation of N.J. REV. STAT. § 56:9-1, *et seq.* Defendants' combinations or conspiracies had the following effects: (1) competition in the residential rental market was restrained, suppressed, and eliminated throughout New Jersey, and (2) residential rental prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New Jersey. During the Class Period, Defendants' illegal conduct substantially affected New Jersey commerce. Accordingly, Plaintiffs and members of the Class seek all relief available under N.J. REV. STAT. § 56:9-1, *et seq.*

**ANSWER TO PARAGRAPH 739:**

Morgan Properties denies the allegations in Paragraph 739.

740. **NEW MEXICO:** Defendants violated the N.M. STAT. ANN. § 57-1-1, *et seq*. by entering into unlawful agreement in restraint of trade in the State of New Mexico. Specifically, Defendants' combinations or conspiracies detrimentally affected the competition in the New Mexico residential rental market by restraining, suppressing, and eliminating competition. Further, Defendants' unlawful conduct raised, fixed, maintained, and stabilized rents in New Mexico at artificially high levels. During the Class Period, Defendants' illegal conduct substantially affected commerce in New Mexico. Accordingly, Plaintiffs and Members of the Class seek all relief available under N.M. STAT. ANN. § 57-1-1, *et seq*.

**ANSWER TO PARAGRAPH 740:**

Morgan Properties denies the allegations in Paragraph 740; Morgan Properties does not operate properties in New Mexico.

741. **NEW YORK:** Defendants have entered into an unlawful agreement in restraint of trade in violation of N.Y. GEN. BUS. LAW § 340, *et seq*. Defendants' combinations or conspiracies had the following effects: (1) competition in the residential rental market was restrained, suppressed, and eliminated throughout New York, and (2) residential rental prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New York. During the Class Period, Defendants' illegal conduct substantially affected New York commerce. The conduct set forth above is a per se violation of the Donnelly Act, N.Y. GEN. BUS. LAW § 340, *et seq*. Accordingly, Plaintiffs and members of the Class seek all relief available under N.Y. GEN. BUS. LAW § 340, *et seq*.

**ANSWER TO PARAGRAPH 741:**

Morgan Properties denies the allegations in Paragraph 741.

742. **NORTH CAROLINA:** Defendants have entered into an unlawful agreement in restraint of trade in violation of N.C. GEN. STAT. § 75-1, *et seq*. Defendants' combinations or conspiracies had the following effects: (1) competition in the residential rental market was restrained, suppressed, and eliminated throughout North Carolina, and (2) residential rental prices were raised, fixed, maintained, and stabilized at artificially high levels throughout North Carolina. During the Class Period, Defendants' illegal conduct substantially affected North Carolina commerce. Accordingly, Plaintiffs and members of the Class seek all relief available under N.C. GEN. STAT. § 75-1, *et seq*.

**ANSWER TO PARAGRAPH 742:**

Morgan Properties denies the allegations in Paragraph 742.

743. **NORTH DAKOTA:** Defendants' actions have violated the N.D. CENT. CODE § 51-08.1-01, *et seq.* through their anticompetitive actions. Through their actions and actions of coconspirators, rents of residential units in the State of North Dakota were raised, fixed, maintained, and stabilized at artificially high level, thereby injuring Plaintiffs and the Class. Throughout the Class Period, competition in the residential rental apartment market was restrained, suppressed, and eliminated throughout North Dakota. Plaintiffs and members of the Class, including those who resided in the State of North Dakota and rented an apartment there, paid supracompetitive, artificially inflated prices for their rentals. During the Class Period, Defendants' illegal conduct substantially affected commerce in North Dakota. Accordingly, Plaintiffs and members of the Class seek all forms of relief available under N.D. CENT. CODE § 51-08.1-01, *et seq.*

## ANSWER TO PARAGRAPH 743:

Morgan Properties denies the allegations in Paragraph 743; Morgan Properties does not operate properties in North Dakota.

744. **OHIO:** Defendants violated the OHIO REV. CODE § 1331:01, *et seq.* by entering into unlawful agreement in restraint of trade in the State of Ohio. Specifically, Defendants' combinations or conspiracies detrimentally affected the competition in the Ohio residential rental market by restraining, suppressing, and eliminating competition. Further, Defendants' unlawful conduct raised, fixed, maintained, and stabilized rents in Ohio at artificially high levels. During the Class Period, Defendants' illegal conduct substantially affected commerce in Ohio. Accordingly, Plaintiffs and Members of the Class seek all relief available under OHIO REV. CODE § 1331:01, *et seq.*

## ANSWER TO PARAGRAPH 744:

Morgan Properties denies the allegations in Paragraph 744.

745. **OKLAHOMA:** Defendants have entered into an unlawful agreement in restraint of trade in violation of OKLA. STAT. tit. 79 § 201, *et seq.* Defendants' combinations or conspiracies had the following effects: (1) competition in the Oklahoma residential rental market was restrained, suppressed, and eliminated, and (2) Oklahoma residential rental prices were raised, fixed, maintained, and stabilized at artificially high levels. During the Class Period, Defendants' illegal conduct substantially affected Oklahoma commerce. Accordingly, Plaintiffs and members of the Class seek all relief available under OKLA. STAT. tit. 79 § 201, *et seq.*

## ANSWER TO PARAGRAPH 745:

Morgan Properties denies the allegations in Paragraph 745; Morgan Properties does not operate properties in Oklahoma.

746. **OREGON:** Defendants have entered into an unlawful agreement in restraint of trade in violation of OR. REV. STAT. § 646.725, *et seq*. Defendants' combinations or conspiracies had the following effects: (1) price competition for rentals was restrained, suppressed, and eliminated throughout Oregon; (2) price of residential rental units in the State of Oregon were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition. During the Class Period, Defendants' illegal conduct substantially affected Oregon commerce. Accordingly, Plaintiffs and members of the Class seek all forms of relief available under OR. REV. STAT. § 646.725, *et seq*.

**ANSWER TO PARAGRAPH 746:**

Morgan Properties denies the allegations in Paragraph 746; Morgan Properties does not operate properties in Oregon.

747. **PENNSYLVANIA:** Defendants have violated the Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 PA. CONS. STAT. § 201-1, *et seq*., through their actions. Defendants engaged in unfair trade practice that artificially raised, fixed, maintained, and stabilized rent prices for residential units in Pennsylvania. *See* 73 PA. CONS. STAT. § 201-1(4)(xxi). Throughout the Class Period, competition in the residential rental apartment market was restrained, suppressed, and eliminated throughout Pennsylvania. Plaintiffs and members of the Class, including those who resided in Pennsylvania and rented an apartment there, paid artificially inflated prices for their residential units. During the Class Period, Defendants' illegal conduct substantially affected commerce in Pennsylvania. Accordingly, Plaintiffs and members of the Class seek all forms of relief available under 73 PA. CONS. STAT. § 201-1, *et seq*.

**ANSWER TO PARAGRAPH 747:**

Morgan Properties denies the allegations in Paragraph 747.

748. **SOUTH CAROLINA:** Defendants' have violated the antitrust laws of South Carolina, S.C. CODE ANN. § 39-3-10, *et seq*., through their anticompetitive actions. Through Defendants' actions and the actions of their co-conspirators, rents of residential units in the State of South Carolina were raised, fixed, maintained, and stabilized at artificially high levels, thereby injuring Plaintiffs and the Class. Throughout the Class Period, competition in the market for residential units was restrained, suppressed, and eliminated throughout South Carolina. Plaintiffs and members of the Class, including those who resided in the State of South Carolina and rented residential units there, paid supracompetitive, artificially inflated prices for their rentals. During the Class Period, Defendants' illegal conduct substantially affected commerce in South Carolina. Accordingly, Plaintiffs and members of the Class seek all forms of relief available under S.C. CODE ANN. § 39-3-10, *et seq*.

**ANSWER TO PARAGRAPH 748:**

Morgan Properties denies the allegations in Paragraph 748.

749. **SOUTH DAKOTA:** Defendants have violated the S.D. CODIFIED LAWS § 37-13.1, *et seq*. through their anticompetitive actions. Through their actions and actions of coconspirators, rents of residential units in the State of South Dakota were raised, fixed, maintained, and stabilized at artificially high level, thereby injuring Plaintiffs and the Class. Throughout the Class Period, competition in the residential rental apartment market was restrained, suppressed, and eliminated throughout South Dakota. Plaintiffs and members of the Class, including those who resided in the State of South Dakota and rented an apartment there, paid supracompetitive, artificially inflated prices for their rentals. During the Class Period, Defendants' illegal conduct substantially affected commerce in South Dakota. Accordingly, Plaintiffs and members of the Class seek all forms of relief available under S.D. CODIFIED LAWS § 37-1-3.1, *et seq*.

## ANSWER TO PARAGRAPH 749:

Morgan Properties denies the allegations in Paragraph 749; Morgan Properties does not operate properties in South Dakota.

750. **TENNESSEE:** Defendants have entered into an unlawful agreement in restraint of trade in violation of TENN. CODE ANN. § 47-25-101, *et seq*. Defendants' combinations or conspiracies had the following effects: (1) price competition for the rental of real property, a tangible good, was restrained, suppressed, and eliminated throughout Tennessee; (2) price of residential rental of real property units, a tangible good, in the State of Tennessee were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition. During the Class Period, Defendants' illegal conduct substantially affected commerce in Tennessee. Accordingly, Plaintiffs and members of the Class seek all forms of relief available under TENN. CODE ANN. § 47-25-101, *et seq*.

## ANSWER TO PARAGRAPH 750:

Morgan Properties denies the allegations in Paragraph 750.

751. **UTAH:** Defendants violated the UTAH CODE ANN. § 76-10-3101, *et seq*. by entering into unlawful agreement in restraint of trade in the State of Utah. Specifically, Defendants' combinations or conspiracies detrimentally affected the competition in the Utah residential rental market by restraining, suppressing, and eliminating competition. Further, Defendants' unlawful conduct raised, fixed, maintained, and stabilized rents in Utah at artificially high levels. During the Class Period, Defendants' illegal conduct substantially affected commerce in Utah. Accordingly, Plaintiffs and Members of the Class seek all relief available under UTAH CODE ANN. § 76-10-3101, *et seq*.

## ANSWER TO PARAGRAPH 751:

Morgan Properties denies the allegations in Paragraph 751; Morgan Properties does not operate properties in Utah.

752. **VERMONT:** Defendants have entered into an unlawful agreement in restraint of trade in violation of VT. STAT. ANN. tit 9, § 2453, *et seq*. Defendants' combinations or conspiracies had the following effects: (1) price competition for rentals was restrained, suppressed, and eliminated throughout Vermont; (2) price of residential rental units in Vermont were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition. During the Class Period, Defendants' illegal conduct substantially affected commerce in the State of Vermont. Accordingly, Plaintiffs and members of the Class seek all forms of relief available under VT. STAT. ANN. tit 9, § 2465, *et seq*.

**ANSWER TO PARAGRAPH 752:**

Morgan Properties denies the allegations in Paragraph 752; Morgan Properties does not operate properties in Vermont.

753. **VIRGINIA:** Defendants have entered into an unlawful agreement in restraint of trade in violation of VA. CODE ANN. § 59.1-9.1, *et seq*. Defendants' combinations or conspiracies had the following effects: (1) price competition for rentals was restrained, suppressed, and eliminated throughout Virginia; (2) price of residential rental apartments were raised, fixed, maintained, and stabilized at artificially high levels throughout Virginia; and (3) individuals have been deprived of free and open competition. During the Class Period, Defendants' illegal conduct substantially affected commerce in the State of Virginia. Accordingly, Plaintiffs and members of the Class seek all forms of relief available under VA. CODE ANN. § 59.1-9.1, *et seq*.

**ANSWER TO PARAGRAPH 753:**

Morgan Properties denies the allegations in Paragraph 753.

754. **WASHINGTON:** Defendants have entered into an unlawful agreement in restraint of trade in violation of WASH. REV. CODE ANN. § 19.86.010, *et seq*. *See* WASH. REV. CODE ANN. § 19.86.030. Defendants' combinations or conspiracies had the following effects: (1) price competition for residential units was restrained, suppressed, and eliminated throughout Washington; (2) price of residential units was raised, fixed, maintained, and stabilized at artificially high levels throughout Washington; and (3) individuals have been deprived of free and open competition for residential units. During the Class Period, Defendants' illegal conduct substantially affected commerce in the State of Washington. Accordingly, Plaintiffs and members of the Class seek all forms of relief available under WASH. REV. CODE ANN. § 19.86.010, *et seq*.

**ANSWER TO PARAGRAPH 754:**

Morgan Properties denies the allegations in Paragraph 754; Morgan Properties does not operate properties in Washington.

755. **WEST VIRGINIA:** Defendants have violated the W. VA. CODE § 47-18-3, *et seq*. through their anticompetitive actions. Through their actions and actions of co-conspirators, rents of residential units in West Virginia were raised, fixed, maintained, and stabilized at artificially high levels, thereby injuring Plaintiffs and the Class. Throughout the Class Period, competition in the residential rental apartment market was restrained, suppressed, and eliminated throughout West Virginia. Plaintiffs and members of the Class, including those who resided in the State of West Virginia and rented an apartment there, paid supracompetitive, artificially inflated prices for their rentals. During the Class Period, Defendants' illegal conduct substantially affected commerce in West Virginia. Accordingly, Plaintiffs and members of the Class seek all forms of relief available under W. VA. CODE § 47-18-3, *et seq*.

**ANSWER TO PARAGRAPH 755:**

Morgan Properties denies the allegations in Paragraph 755; Morgan Properties does not operate properties in West Virginia.

756. **WISCONSIN:** Defendants have entered into an unlawful agreement in restraint of trade in violation of WIS. STAT. §133.01, *et seq*. Defendants' combinations or conspiracies had the following effects: (1) price competition for rentals was restrained, suppressed, and eliminated throughout Wisconsin; (2) price of residential rental apartments were raised, fixed, maintained, and stabilized at artificially high levels throughout Wisconsin; and (3) individuals have been deprived of free and open competition. During the Class Period, Defendants' illegal conduct substantially affected commerce in the State of Wisconsin. Accordingly, Plaintiffs and members of the Class seek all forms of relief available under WIS. STAT. § 133.01, *et seq*.

**ANSWER TO PARAGRAPH 756:**

Morgan Properties denies the allegations in Paragraph 756; Morgan Properties does not operate properties in Wisconsin.

757. **WYOMING:** Defendants' actions have violated the WY. STAT. ANN. § 0-4-101, *et seq*. through their anticompetitive actions. Through their actions and actions of co-conspirators, rents of residential units in Wyoming were raised, fixed, maintained, and stabilized at artificially high level, thereby injuring Plaintiffs and the Class. Throughout the Class Period, competition in the residential rental apartment market was restrained, suppressed, and eliminated throughout Wyoming. Plaintiffs and members of the Class, including those who resided in the State of Wyoming and rented an apartment in Wyoming, paid supracompetitive, artificially inflated prices for their rentals. During the Class Period, Defendants' illegal conduct substantially affected commerce in Wyoming. Accordingly, Plaintiffs and members of the Class seek all forms of relief available under WY. STAT. ANN. § 40-4-101, *et seq*.

**ANSWER TO PARAGRAPH 757:**

Morgan Properties denies the allegations in Paragraph 757; Morgan Properties does not operate properties in Wyoming.

## XI.  PRAYER FOR RELIEF

Morgan Properties denies that plaintiffs are entitled to the requested relief described on pages 296 to 297 of the SAC.

## AFFIRMATIVE DEFENSES

Without assuming any burden that it would not otherwise bear, Morgan Properties asserts the following avoidances and defenses to Plaintiffs' claims.

Federal Rule of Civil Procedure 8 sets forth the avoidances and defenses that must be affirmatively stated in a pleading.  *See* Fed. R. Civ. P. 8(c) ("In responding to a pleading, a party must affirmatively state any avoidance or affirmative defense . . . .").

To the extent necessary, Morgan Properties alleges Plaintiffs' claims are barred because the acts Plaintiffs allege Morgan Properties undertook in furtherance of the alleged conspiracy were done independently, were not the result of any unlawful contract, combination, or conspiracy between Morgan Properties and any other person or entity, and were in Morgan Properties' unilateral business interest.  Morgan Properties does not admit any liability, that Plaintiffs have been injured or damaged in any way, or that Plaintiffs are entitled to any relief whatsoever. Nevertheless, Morgan Properties pleads in the alternative the following affirmative defenses. Morgan Properties does not assume the burden of proof for any issue as to which applicable law places the burden upon Plaintiffs.

## FIRST DEFENSE

1.      Plaintiffs' claims are barred in whole or in part because Plaintiffs' SAC fails to state facts upon which relief can be granted and fails to plead conspiracy with the particularity required under applicable law.

## SECOND DEFENSE

2.     Plaintiffs' claims against Morgan Properties are barred, in whole or in part, by the applicable statute of limitations, including, but not limited to, Alabama, Louisiana, South Carolina, and Tennessee.

3.     To the extent Plaintiffs seek to bring claims outside the applicable statute of limitations, Plaintiffs' SAC is time-barred.

4.     To the extent that Plaintiffs rely on information made public more than four years ago, Plaintiff's SAC is time-barred.

## THIRD DEFENSE

5.     Plaintiffs' claims are barred, in whole or in part, because Plaintiffs have not suffered any injury in fact or any injury cognizable under the antitrust laws and therefore lack standing.

6.     Plaintiffs' alleged harm lies in their speculation that many companies colluded seamlessly through a conspiracy, resulting in their harm.  In essence, Plaintiffs complain about the impact of naturally unpredictable changes in the market conditions that exist in the global, national, and local economy.

7.     To the extent that Plaintiffs maintain that they were injured by these events, such an injury is not cognizable under the antitrust laws.

## FOURTH DEFENSE

8.     Plaintiffs' claims are barred, in whole and/or in part, because Morgan Properties is not liable for the acts of any other Defendant.

## FIFTH DEFENSE

9.     Plaintiffs' claims are barred, in whole or in part, because Plaintiffs failed to exercise reasonable care to mitigate any damages they may have suffered.

10.     To the extent Plaintiffs believed that Morgan Properties agreed to use RealPage Revenue Management software and that such agreement had the effect of raising rental prices above competitive levels, Plaintiffs had an obligation to mitigate their damages by seeking other sources of supply, including from other property managers or owners.  Plaintiffs' failure to exercise reasonable care to mitigate damages was the complete or partial cause of any damages Plaintiffs may have suffered.  Alternatively, any damages sustained by Plaintiffs and members of the purported Plaintiff class, which Morgan Properties denies, must be reduced by the amount that such damages would have been reduced had Plaintiffs and the members of the purported plaintiff class exercised reasonable diligence in mitigating their damages.

## SIXTH DEFENSE

11.     Plaintiffs' claims are barred, in whole or in part, because any alleged injuries and damages either were not legally or proximately caused by any acts or omissions of Morgan Properties or were caused, if at all, solely and proximately by Plaintiffs' conduct or by the conduct of other parties including, without limitation, the prior, intervening, or superseding conduct of Plaintiffs or such third parties.

## SEVENTH DEFENSE

12.     Plaintiffs' claims are barred, in whole or in part, by the doctrine of waiver.

13.     Plaintiffs' continued rental leases at what they now allege are prices above the competitive level manifest an intention to waive any right to bring this suit and are inconsistent with any other intention.

14.     Plaintiffs, by their actions, accepted the benefits of an ongoing relationship with Morgan Properties and relinquished their rights to bring suit.

## EIGHTH DEFENSE

15.     Plaintiffs' claims are barred by the equitable doctrine of laches.

16.    Plaintiffs demonstrated an unreasonable lack of diligence in bringing their claims.

17.    Plaintiffs attempt to allege a conspiracy spanning seven or more years that they claim resulted in their paying higher prices for the services in issue, but Plaintiffs allege no facts that explain or justify their delay in bringing the lawsuit. To the extent Plaintiffs could have brought essentially the same claims years earlier, Plaintiffs are barred from pursuing all or part of such a claim by the doctrines of estoppel and laches.

18.    Plaintiffs' unreasonable lack of diligence in bringing their claims now bars them.

## NINTH DEFENSE

19.    Plaintiffs' claims are barred, in whole or in part, due to their ratification of, and consent to, the lease agreements with Morgan Properties.

20.    Plaintiffs' SAC demonstrates its long-standing ratification of and consent to the complained-of conduct.

21.    Accordingly, because Plaintiffs have been aware for years of the very same conduct they now challenge—and because some of that conduct provided Plaintiffs a direct benefit— Plaintiffs' claims are barred by the doctrine of ratification.

## TENTH DEFENSE

22.    Plaintiffs' claims are barred, in whole or in part, to the extent Plaintiffs seek to impose liability on Morgan Properties based on the exercise of any person or entity's right to petition federal, state, and local governmental bodies, including through public statements, because such conduct was immune under the *Noerr-Pennington* doctrine and privileged under the First Amendment to the U.S. Constitution.

## ELEVENTH DEFENSE

23.    Plaintiffs' claims are barred, in whole or in part, to the extent the rental lease agreements pursuant to which Plaintiffs rented their apartments contain arbitration clauses, clauses

providing a different forum for the resolution of their claims, or provisions waiving a Plaintiff's ability to bring a representative or class action claim.

## TWELFTH DEFENSE

24.     Without admitting the existence of any contract, combination, or conspiracy in restraint of trade, and expressly denying same, Plaintiffs' claims are barred, in whole or in part, by non-settling Defendants' right to set off any amounts paid to Plaintiffs by any Defendants who have settled, or do settle, Plaintiffs' claims against them in this action.

## THIRTEENTH DEFENSE

25.     Without admitting the existence of any contract, combination, or conspiracy in restraint of trade, and expressly denying same, Plaintiffs' claims are barred, in whole or in part, to the extent that Plaintiffs entered into contracts that do not include any purported overcharge.

## FOURTEENTH DEFENSE

26.     Plaintiffs' claims are barred, in whole or in part, to the extent they seek improper multiple damage awards, treble damages, or damage awards duplicative of those sought in other actions, in violation of the Due Process guarantees of the Fifth and Fourteenth Amendments of the United States Constitution and of the Eighth Amendment of the United States Constitution.

## FIFTEENTH DEFENSE

27.     Plaintiffs' claims are barred, in whole or in part, by the Plaintiffs' knowing acquiescence to the alleged restraints of trade set forth in the SAC.

## SIXTEENTH DEFENSE

28.     Upon information and belief, Plaintiffs' claims are barred, in whole or in part, by Defendants' right to set off any amount paid to Plaintiffs by damages attributable to Plaintiffs' conduct to the extent Plaintiffs unlawfully shared information found to be competitively sensitive regarding their rental lease agreements or potential alternative rental lease agreements.

## SEVENTEENTH DEFENSE

29.     Some or all of Plaintiffs' state-law claims cannot be brought against Morgan Properties for a lack of jurisdiction. For instance, the laws of the states cited in Count II of the SAC are not intended to, and do not, apply to conduct occurring outside of those states, and Plaintiffs' SAC does not include any Plaintiff from the States of Alaska, Arizona, District of Columbia, Hawaii, Idaho, Indiana, Iowa, Kansas, Louisiana, Maine, Maryland, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, New Hampshire, New Jersey, New Mexico, New York, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, Pennsylvania, South Carolina, South Dakota, Utah, Vermont, Virginia, West Virginia, Wisconsin, and Wyoming.

30.     Many of the state laws allegedly giving rise to Plaintiffs' claims do not apply because the alleged conduct did not occur within or substantially affect the citizens or commerce of the respective states, or because Morgan Properties had no specific intent to impact the commerce of those states. As a result, the application of those state laws to Morgan Properties' conduct would violate the Due Process Clauses and Commerce Clause of the U.S. Constitution, the principle of federalism, and the constitutions and laws of the respective states at issue.

31.     To the extent that the SAC seeks to assert claims or obtain relief on behalf of multifamily renters located outside of the jurisdictions governed by those laws, those claims are barred as improper assertions of extraterritorial jurisdiction and any effort to enforce those laws as to residents of other states would violate the Due Process Clause and the Commerce Clause of the U.S. Constitution and various state laws and constitutions.

## EIGHTEENTH DEFENSE

32.     Some of Plaintiffs' state-law claims are barred, in whole or in part, to the extent Plaintiffs seek damages under state laws that do not permit recovery of damages by private plaintiffs.

285

## NINETEENTH DEFENSE

33.     Plaintiffs' claims are barred, in whole or in part, to the extent that Plaintiffs failed to comply with the notice requirements under various state laws, including, without limitation: Alabama, Delaware, Florida, Georgia, Illinois, Indiana, Louisiana, Maryland, Michigan, Nebraska, New Jersey, New York, North Carolina, Ohio, Pennsylvania, South Carolina, Tennessee, Texas, and Virginia.

## TWENTIETH DEFENSE

34.     Any and all of Morgan Properties' actions alleged by Plaintiffs were lawful, justified, procompetitive, and carried out in Morgan Properties' legitimate business interests and constitute bona fide competitive activity.

## TWENTY-FIRST DEFENSE

35.     To the extent that the rate paid for a multifamily residential rental unit by any Plaintiff or putative class member was subject to or influenced by rates filed with any applicable federal, state, or local regulator, whether under rent-control laws or otherwise, Plaintiffs' and putative class members' claims are barred by the immunities and exemptions, including those conferred by the filed rate doctrine.

## TWENTY-SECOND DEFENSE

36.     Some or all of the respective state-law claims at issue, including, without limitation, any claims brought under the laws of Alabama, Delaware, Florida, Georgia, Illinois, Indiana, Louisiana, Maryland, Michigan, Nebraska, New Jersey, New York, North Carolina, Ohio, Pennsylvania, South Carolina, Tennessee, Texas, and Virginia, cannot be, and were not intended to be, applied in the class-action context.

## TWENTY-THIRD DEFENSE

37.     Morgan Properties adopts and incorporates by reference any and all other defenses asserted by any other Defendant to the extent that the defense would apply to Morgan Properties.

## TWENTY-FOURTH DEFENSE

38.     Morgan Properties hereby gives notice that it intends to rely upon any other defense that may become available or appear during discovery proceedings in this case and reserves the right to amend this Answer to assert any such defense as this action proceeds up to and including the time of trial.

## TWENTY-FIFTH DEFENSE

39.     The relief sought by Plaintiffs would be contrary to the public interest, harm consumers, and is otherwise inequitable, impractical, and unworkable.

## TWENTY-SIXTH DEFENSE

40.     Plaintiffs' alleged damages are too remote and speculative to form the basis for relief or to be apportioned and are not of the nature or to the extent alleged.

## TWENTY-SEVENTH DEFENSE

41.     Furthermore, this action may not be maintained as a class action pursuant to Federal Rules of Civil Procedure 23(a) or 23(b)(3) because, without waiving any other arguments, Plaintiffs have not defined a cognizable class or class period, common questions of law or fact common to members of the putative class do not predominate over any questions affecting only individual members, and a class action is not superior to other available methods for fairly and efficiently adjudicating this controversy.

42.     Plaintiffs' putative class should be stricken or dismissed because the Plaintiffs are not proper or adequate class representatives and their claims are not representative of the putative class.

43.  Plaintiffs' claims are improperly joined within the meaning of the Federal Rules of Civil Procedure 20 or 23 because they did not arise out of the same transaction, occurrence, or series of transactions or occurrences, and/or do not involve questions of law or fact common to all defendants.

44.  Plaintiffs' claims may not properly be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure.


Morgan Properties reserves the right to supplement its Answer and affirmative defenses with additional defenses that become available or apparent in the course of investigation, preparation, and/or discovery, and to amend its Answer accordingly.

## MORGAN PROPERTIES' PRAYER FOR RELIEF

Wherefore, Morgan Properties prays for relief as follows:

(a)  That the SAC against Morgan Properties be dismissed in its entirety, with prejudice;

(b)  That Morgan Properties be awarded its attorneys' fees and costs and expenses of the suit; and

(c)  That the Court award such other and further relief to Morgan Properties as the Court deems just and proper.

DATED: FEBRUARY 5, 2024

WILSON SONSINI GOODRICH & ROSATI PC

*/s/ Jeffrey C. Bank*
Jeffrey C. Bank
1700 K Street NW, Fifth Floor
Washington, DC 20006
Telephone: (202) 973-8800
jbank@wsgr.com

Rachael Racine
1301 Avenue of the Americas, 40th Floor
New York, NY 10019
Tel: (212) 453-2857
rracine@wsgr.com

*Attorneys for Defendant, Morgan Properties Management Company, LLC*

## **CERTIFICATE OF SERVICE**

I certify that counsel of record who are registered for CM/ECF filing will be served

electronically with this filing on February 5, 2023.

*/s/ Rachael Racine*
Rachael Racine

1