# EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| IN RE: REALPAGE, INC., RENTAL SOFTWARE ANTITRUST LITIGATION (NO. II) | Case No. 3:23-md-3071<br>MDL No. 3071<br><br>**Chief Judge Waverly D. Crenshaw, Jr.**<br><br>**JURY DEMAND**<br><br>**This document relates to:**<br>**ALL CASES** |

## [PROPOSED] CASE MANAGEMENT ORDER

Pursuant to Rule 16 of the Federal Rules of Civil Procedure, the Local Rules of this Court, and the Court's January 5, 2024, Order (ECF No. 693), and to secure the just, speedy, and inexpensive determination of this action, the Court orders that the following schedule shall govern these proceedings.

Any motion to modify the case management order or any case management deadline shall be filed at least seven days in advance of the earliest impacted deadline. Unless a joint motion, the motion for modification should include a statement confirming that counsel for the moving Party has met and conferred with opposing counsel about the requested modification(s) or extension(s), and whether there is any objection. The motion for modification should also include: (i) the trial date and all deadlines, even unaffected deadlines, so that it will not be necessary for the Court to review one or more previous case management orders in consideration of the motion and (ii) a statement that the requested extension will still conform to the requirements of Local Rule 16.01(h)(1) that no dispositive motion deadline, including response and reply briefs, shall be

later than 90 days in advance of the trial date. Motions for extensions should also demonstrate good cause as required by Fed. R. Civ. P. 16(b)(4). Counsel must promptly notify the Court of developments in the case that could significantly affect the case management schedule.

The Court expects the Parties and their counsel to work cooperatively throughout this litigation to narrow the issues in dispute, and to use reasonable, good faith, and proportional efforts to preserve, request, identify, and produce relevant information and resolve discovery disputes.

**DISCOVERY DEADLINES AND LIMITS**

1. For purposes of Rule 26(d)(1), discovery requests may be served on or after **February 16, 2024**.

2. The Parties shall serve their initial disclosures required by Rule 26(a)(1) on or before **February 26, 2024**. In all subsequently consolidated actions, all newly added Parties shall serve initial disclosures within **21 days** of consolidation. If the newly-added Parties disclose documents by category and location pursuant to Fed. R. Civ. P. 26(a)(1)(A)(ii), they will produce copies of the documents themselves in response to discovery requests.

3. On or before **March 15, 2024**, Defendants shall produce all documents and correspondence that, as of February 29, 2024, Defendants produced to the Department of Justice, the Federal Trade Commission, Congress, any State Attorney General, and/or any other state or federal regulatory agency in relation to any civil investigative demand or any formal or informal document discovery, any white papers, narrative responses, or any other manner of discovery provided to such regulators, concerning its Revenue Management Solutions.

4. The Parties must disclose the documents and/or information described in Attachment 1 on or before **April 1, 2024**, without the need for a request pursuant to Fed. R. Civ. P. 34 ("Attachment 1 Disclosures"). In all subsequently consolidated actions, the newly added Parties shall serve Attachment 1 Disclosures within **30 days** of consolidation.

5. Fact discovery must be commenced in time to be completed on or before **November 21, 2025**. Privilege log procedures shall be governed by the ESI Order. To facilitate the scheduling and taking of depositions and the briefing of class certification, the Court also establishes the following interim deadlines for the production of documents and data:

    a. The Parties shall begin meeting and conferring about custodians no later than **March 11, 2024**.

b. The production of structured data responsive to Plaintiffs' First Set of Structured Data Requests, and any data upon which Defendants intend to rely in their defense of the litigation, (together, "Structured Data") shall be complete by **October 25, 2024.** Defendants shall each produce a sample of their Structured Data databases no later than **May 1, 2024**. Plaintiffs shall meet and confer with Defendants, including raising questions about sample productions by **June 5, 2024**, and Defendants shall answer questions about the form and contents of the Structured Data and any perceived deficiencies therein by **July 10, 2024**, in order to facilitate the timely production of an agreed upon scope of Structured Data by **October 25, 2024**.

c. The Parties must complete all of their document productions by **March 28, 2025**.

d. A responding Party shall begin rolling productions of documents from non-custodial sources in response to requests for production of documents by **April 26, 2024** or within **60 days** of receipt, whichever is later. A responding Party shall begin rolling production of documents from custodial sources no later than **60 days** after finalization of all custodians; provided, however, that if the Parties have a dispute over any specific custodian, the 60 day deadline for that custodian will start upon resolution of any impasse.

6. Limitations on Written Discovery:

   a. <u>Interrogatories</u>: Interrogatories will be counted in accordance with Fed. R. Civ. P. 33(a)(1). The Parties must coordinate efforts and each side must avoid serving duplicative or unduly burdensome interrogatories.

      i. *Plaintiffs*: Plaintiffs may jointly serve 30 interrogatories on each Defendant.[1]

      ii. *Defendants*: Defendants may jointly serve 30 interrogatories on each of the individual named Plaintiffs, but no more than 60 unique interrogatories across all named Plaintiffs.

   b. <u>Rule 34 Document Requests</u>: Consistent with Fed. R. Civ. P. 34, there shall be no limits on the number of requests to produce the Parties may serve. Each side must endeavor to jointly serve their requests where there is overlap. Plaintiffs may direct their requests to Defendants or, for any discrete issues, to individual Parties. Defendants may direct their requests

---

[1] In this Order, the discovery limits applying to a "Defendant" shall apply to each named Defendant in a Defendant family. Similarly, the discovery limits applying to a "Plaintiff" shall apply to each Plaintiff family (*i.e.*, spouses suing as joint tenants). These limitations do not apply to third-party discovery sought from entities who are not named Defendants.

3

to all Plaintiffs or, for any discrete issues, to an individually named Plaintiff. No rights, obligations, or objections available by the Federal Rules of Civil Procedure are modified by this section.

- c. Requests for Admission:

    i. The Parties will meet and confer in good faith to agree on a process for a stipulation and/or a deferred Rule 30(b)(6) deposition concerning various evidentiary issues addressed in the Federal Rules of Evidence ("FRE"), including authenticity (FRE 902 & 903), duplicates (FRE 1001(4) & 1003), the requirement for a sponsoring witness to establish authenticity or best evidence, and status of a document as a business record (FRE 803(6)).

    ii. With respect to evidentiary issues not addressed in the prior paragraph, all Parties must endeavor to coordinate to ensure that any such requests do not cause unnecessary duplication. With respect to such non-evidentiary issues:

        1. *Plaintiffs*: Plaintiffs may jointly serve 50 Requests for Admission on each Defendant. These limitations exclude requests to establish the authenticity and/or admissibility of documents.

        2. *Defendants*: Defendants may jointly serve 30 Requests for Admission on each named Plaintiff, but no more than 60 unique requests across all named Plaintiffs.

    iii. Requests for Admission must be served no later than **August 21, 2025**, except for requests to establish the authenticity and/or admissibility of documents.

- d. Depositions: Depositions shall be governed by the Order for Deposition Protocol and any additional Court orders concerning discovery limits.

- e. Third Party Subpoenas:

    i. Absent good cause to the contrary, all third-party subpoenas must be served in sufficient time, taking into account the nature and volume of the material requested, to allow for resolution of reasonably anticipated disputes and production of the material requested no later than the deadline for the completion of all fact discovery. In no event shall third-party subpoenas be served less than 45 days prior to the deadline for completion of fact discovery.

    ii. Plaintiffs and Defendants must give each side notice of the issuance of a third-party subpoena. Such notice must be given at least two (2) business days in advance per Local Rule 45.01(d). Plaintiffs and

4

Case 3:23-md-03071    Document 776-1    Filed 02/09/24    Page 5 of 18 PageID #: 14143

> Defendants must exchange all third-party productions within 7 days of receipt of the productions or at least 14 days before the deposition of the producing third party, whichever is earlier.

**ADDITIONAL DISCOVERY ORDERS**

1. The Protective Order, Deposition Protocol, Rule 502(d) Order, Expert Discovery Order, and ESI Protocol entered by the Court shall automatically apply to Parties in all subsequently consolidated actions, unless modified by the Court in response to a motion filed by such newly added party within 14 days of their consolidation.

**RULE 26(A) DISCLOSURES AND EXPERT DISCOVERY**

1. All Parties must serve all expert reports on issues on which they have the burden of proof (including class and merits issues) ("Opening Reports") on or before **February 19, 2026**.[2]

2. All Parties must serve opposition expert reports ("Rebuttal Reports") on or before **April 20, 2026**.

3. All Parties must serve reply expert reports ("Reply Reports") on or before **June 4, 2026**.

4. Expert depositions regarding an expert's opinions for an Opening or Rebuttal Report shall be conducted within 30 days of service of the respective report, unless otherwise agreed upon in writing by the Parties.

5. All expert material, including back-up data, relied upon in any expert report must be produced no later than three (3) business days after service of the expert report, unless otherwise agreed upon in writing by the Parties.

**CLASS CERTIFICATION AND *DAUBERT***

Upon conclusion of expert disclosures, the Parties will brief class certification and any motions to exclude expert opinions, whether relating to class or merits issues.

1. Plaintiffs must file and serve their opening motion for class certification on or before **July 20, 2026**. In addition, all Parties must also file and serve any *Daubert* motion seeking to exclude expert opinions pertaining to an Opening Report on or before **July 20, 2026**.

---

[2] These deadlines are contingent on Defendants satisfying their obligations regarding the timely production of Structured Data and providing satisfactory answers to Structured Data questions.

2. Defendants must file and serve their opposition to Plaintiffs' motion for class certification on or before **September 7, 2026**. In addition, all Parties must also file and serve: a) any *Daubert* motion seeking to exclude expert opinions pertaining to a Rebuttal Report; and b) any opposition to a *Daubert* motion pertaining to an Opening Report.

3. Plaintiffs must file and serve their reply in support of their motion for class certification on or before **October 7, 2026.** In addition, all Parties must also file and serve: a) any oppositions to a *Daubert* motion pertaining to a Rebuttal Report; and b) any replies in support of a *Daubert* motion pertaining to an Opening Report.

4. On or before **November 6, 2026**, all Parties must file and serve any replies in support of a *Daubert* motion pertaining to a Rebuttal Report.

5. A hearing on class certification and *Daubert* will be held in **November 2026**.

## DISPOSITIVE MOTIONS AND TRIAL READY DATE

Motions for summary judgment under Rule 56(a) shall be made in accordance with the following schedule. No Party may file a motion for summary judgment before all fact and expert discovery has been completed without first obtaining permission from the Court. Permission must be sought by electronically filing a letter of no more than three (3) pages briefly setting forth the basis for the motion, whether discovery relating to the issue or issues to be addressed by the motion is complete, and why judicial efficiency would be served by allowing the motion to proceed. The other Party or Parties may file brief letters in support of or in response to the request within five (5) days. Denial of a request for permission to file an interim dispositive motion shall not be taken as an indication of the Court's view about the merits of the proposed motion.

Before filing or responding to a summary judgment motion, attorneys are required to read and follow Judge Richardson's guidance in *McLemore v. Gumucio*, 619 F. Supp. 3d 816 (M.D. Tenn. 2021), regarding what should (or should not) be included in the movant's "statement of undisputed material facts." Counsel must carefully draft the statement of undisputed material facts and responses to ensure that it is a narrow statement of facts (not opinions, argument, or legal

conclusions) that are material to the outcome of the case and are undisputed as supported by the record.

Assuming resolution of Plaintiffs' motion for class certification no later than January 15, 2027, the following deadlines shall apply to the Parties' motions for summary judgment under Rule 56.

1. The Parties shall file any motions for summary judgment on or before **March 1, 2027**.

2. Parties must file and serve their memoranda in response to any summary judgment motions on or before **April 30, 2027**.

3. Parties must file and serve their replies in support of any summary judgment motions on or before **June 14, 2027**.

4. Argument on the Parties' summary judgment motions, will be held in **July 2027** (if necessary, *see* Local Rule 78.01).

5. For cases filed in the Middle District of Tennessee, the Parties shall be trial ready no later than **October 1, 2027**. The Court will set a trial for four weeks starting on a convenient date shortly thereafter.

## MEDIATION AND ALTERNATIVE DISPUTE RESOLUTION

1. The Parties are engaged in ongoing mediation efforts and expect to do so on a dual track alongside of the litigation track. In the event the Parties have not resolved the claims, they shall engage in at least one additional good-faith mediation effort no later than **August 13, 2027**.

2. Nothing in this Order shall prevent the Parties, or a subset of the Parties, from engaging in additional mediation or settlement conferences with the aim of resolving the claims in this case.

3. The Court may *sua sponte* schedule status conferences or settlement conferences to explore options for alternative dispute resolution.

## REQUESTS TO SEAL DOCUMENTS OR PORTIONS OF DOCUMENTS

Any Party requesting that documents or portions of documents be sealed, including without limitation for use as exhibits at trial, must file a motion to seal in accordance with Section 5.07 of Administrative Order No. 167-1 (Administrative Practices and Procedures for Electronic Case

Filing) and Local Rules 5.03 and 7.01, which demonstrates compelling reasons to seal the documents and that the sealing is narrowly tailored to those reasons. The motion to seal, even if unopposed, must specifically analyze in detail, document by document, the propriety of secrecy, providing factual support and legal citations. Generally, only trade secrets, information covered by a recognized privilege (such as the attorney-client privilege), and information required by statute to be maintained in confidence is typically enough to overcome the presumption of public access. Failure to comply with these procedures or to provide sufficiently compelling reasons may result in denial of the request to seal documents or portions of documents.

**CASE MANAGEMENT CONFERENCES**

1. The Parties shall conduct status conferences before Judge Crenshaw approximately **every 30 days** from **February 16, 2024** to **August 1, 2026**. The Parties will provide their availability for these conferences through March 2025 within ten days of entry of this Order.

2. The Parties will submit a joint status report **seven days** before each status conference. To the extent that the Parties have a small number of agenda items for a status conference, the Court may elect to conduct the status conference telephonically. If there are no agenda items for a status conference, the Court may cancel the conference.

**IT IS SO ORDERED.**

Date: _____, 2024

_____
Hon. Waverly Crenshaw, Jr.

# ATTACHMENT 1

As part of these initial, limited disclosures, the Parties need not disclose every document falling within items 1-6 below but will disclose documents sufficient to show the requested information for each year for the period from January 1, 2016, through December 1, 2023. Such disclosures will be subject to a duty to supplement or amend the disclosures once discovery commences.

By providing information pursuant to these disclosures, the Parties do not waive or limit their respective rights to object to, or oppose, any request for further disclosure or discovery.

The omission of any particular category of documents from this Order does not preclude the Parties from seeking such documents in discovery once discovery commences. In making the disclosures pursuant to this Attachment, a disclosing party is not making any representations regarding whether it may use any documents, people, or information in support of its claims or defenses, reserves all rights to challenge the relevance of any disclosures, and is not agreeing that the persons disclosed possess information relevant to the claims or defenses.

1. **Key Personnel and Lease Information**

    a. **Owner, Owner-Operator, and Managing Defendants:**

      i. Provide documents sufficient to show the names and titles of individuals with the following positions or responsibilities relating to your ownership and/or management of Multifamily rental housing properties ("Properties"):

        1. member of the board of directors;

2. all executives with the title of Director, Vice President, or higher (such as SVP, CEO, COO, CFO, etc.), as well as their administrative assistants or secretaries;

3. investor and/or creditor relations;

4. the person(s) who have responsibility for:

    a. determining, setting, adopting, or implementing the rental price at which each of your units is set at each of your Properties;

    b. determining, setting, adopting, or implementing occupancy strategies and/or policies for each of your Properties;

    c. gathering competitive intelligence and/or comparable ("comps"), regarding prices, occupancy, and revenue management in the Multifamily rental housing market;

    d. handling tenant complaints concerning the pricing of their unit(s) within your Properties;

    e. communicating with RealPage and/or any RealPage Pricing Advisor, Revenue Manager, and/or LRO Advisor concerning pricing, lease terms, occupancy, market data, and/or competitive intelligence relating to the Multifamily rental housing market;

5. the person(s) who supervise the department(s) responsible for pricing, leasing, occupancy, market data, and/or competitive intelligence;

6. all executives with the title of Director, Vice President, or higher, as well as certain limited executives with the title of Manager,[3] who were an officer, board member, or otherwise formally-designated participant (such as a member of a relevant committee) of any of the following:

    a. National Apartment Association;

    b. National Multifamily Housing Council;

    c. Institute of Real Estate Management;

    d. National Association of Residential Property Managers;

    e. Pension and Real Estate Association;

    f. Urban Land Institute;

    g. Texas Apartment Association; and

    h. Any other regional trade association and chapter, including rental housing associations, multifamily housing associations, apartment associations, real estate associations, property management associations, and/or property owners' associations in the Multifamily rental housing submarkets within which you operate.

ii. All executives with the title of Director, Vice President, or higher, as well as certain limited executives with the title of Manager, whose responsibilities

---

[3] "Manager" refers to an individual who oversees a business unit within the Defendant, but not individuals with the position of 'manager' who report to such individuals.

    include determining and/or approving unit pricing, leasing, or occupancy decisions for your Properties.

 iii. You may create a list of individuals with the job responsibilities listed in item 1(a)(i)-(ii) above in lieu of producing a formal organizational chart, so long as such a list provides, to the extent the information is readily available, the individual's name, title(s), the time period during which they held each title(s), and for item 1(a)(i)(6) above, the name of the trade association(s) of which the individual was an officer, board member, or formally-designated participant and any committee memberships held.

 iv. Provide documents or information sufficient to identify whether you were assigned a RealPage Pricing Advisor, Pricing Analyst, Revenue Manager, and/or LRO Advisor (together, "Pricing Advisor"), and if so, identify: (1) the Property or Properties for which a Pricing Advisor is/was used, including by Property name and address; (2) the identities of all Pricing Advisors assigned to the Properties identified in sub-paragraph (1); (3) the RealPage RMS[4] for which the Pricing Advisor provided advisory services for at the Properties identified in sub-paragraph (1); and (4) the time period during which each Pricing Advisor was in this role for their respective Property assignments.

---

[4] "RMS" means RealPage's revenue management software solutions, including RealPage Revenue Management, Lease Rent Options ("LRO"), YieldStar, and AI Revenue Management, and all versions thereof.

      v.      If during the relevant time period, you did not use a Pricing Advisor, identify whether you employed any in-house personnel who once worked for RealPage and/or was trained by RealPage in its RMS, including YieldStar, LRO, and AI Revenue Management, who were responsible for, without limitation, reviewing, accepting, and/or overriding RealPage's RMS pricing. If so, (1) identify those individuals, including by their titles and tenure; (2) identify the Property or Properties for which they were responsible; and (3) identify the RMS for which those individuals provided internal advisory services for at each Property identified in sub-paragraph (2).

      vi.     Provide documents or information sufficient to identify whether any of your standard Property lease agreements contain an arbitration provision, jury waiver, class action waiver, or release of claims, and if so, identify all states in which your standard lease agreements contain such provisions, and produce examples of all such leases.

**b. RealPage/Thoma Bravo Defendants:**

      i.      Organizational charts and/or documents sufficient to show the names and titles of individuals with the following positions or responsibilities relating to RealPage's RMS for the Multifamily rental housing market, as well as price optimization, benchmarking, market analytics, and any other functionality that communicates with any RealPage pricing algorithm that generates recommended rental prices for the Multifamily rental housing market:

1. members of the board of directors;

2. all executives with the title of Director, Vice President, or higher (such as SVP, CEO, COO, CFO, etc.), as well as their administrative assistants or secretaries;

3. investor and/or creditor relations;

4. the person(s) who have responsibility for:

    a. the design, innovation, and implementation of RealPage's RMS;

    b. overseeing the gathering and compiling of the data RealPage uses in its RMS to make pricing and occupancy recommendations to its clients, including but not limited to survey data and transactional data inputs into the RealPage RMS platform;

    c. business development with current or potential client Multifamily property management companies or owners who use, or may use in the future, RealPage's RMS; and

    d. communications with clients concerning a client's acceptance, deviation, and/or variance rate, in relation to RealPage's recommended RMS pricing or occupancy levels at the client's Property and/or Properties;

ii. Identify the person(s) and department(s) responsible for supervising and training Pricing Advisors as well as any of your employees responsible for

interpreting the output and/or pricing recommendations of any RealPage RMS;

iii. Identify all Pricing Advisors, including the Property Owners, Owner-Operators, and Managers (as named in the operative complaint) and the geographic regions within the U.S. to which each Pricing Advisor was assigned, and time periods for which the Pricing Advisor was assigned to each Property Owners, Owner-Operators, and Managers and region identified;

iv. Identify all executives with the title of Director, Vice President, or higher, as well as certain limited executives with the title of Manager, who were an officer or board member of, or otherwise formally-designated participant (such as a member of a relevant committee) of any of the following:

    1. National Apartment Association;

    2. National Multifamily Housing Council;

    3. Institute of Real Estate Management;

    4. National Association of Residential Property Managers;

    5. Pension and Real Estate Association;

    6. Urban Land Institute; and

    7. Any other regional trade association and chapter, including rental housing associations, multifamily housing associations, apartment associations, real estate associations, property management associations, and/or property owners' associations in the

> Multifamily rental housing market and submarkets within which you operate.

    c. **Additional Thoma Bravo Disclosure:** Identify the person(s) who had and/or have primary responsibility for: (a) Thoma Bravo's acquisition of RealPage; (b) management of Thoma Bravo's financial investment in RealPage; and (c) communication with RealPage's executives.

    d. **Plaintiffs:** Identify the units within the Property or Properties within which the Plaintiffs named in the operative complaint rented during the relevant time period, by name, address and Property Owner, Owner-Operator, or Manager, as well as any rental price increase(s) experienced during that time.

2. **Email Systems:** Identification of the email system used, including the name of the email system, version number (including applicable dates for different versions, if readily available), and time period or number of days for which email is retained on the system.

3. **Non-custodial Data Sources:** A list of known non-custodial data sources (*e.g.*, shared drives, servers, etc.), if any, that are likely to contain discoverable ESI. These lists will identify all databases that are likely to contain discoverable structured data, and the particular type of data each source of structured data contains.

4. **Document Retention Policies:** Document retention and/or destruction policies, including policies or systems that automatically delete certain types of documents or data (*e.g.*, email) after a certain time period, that applied to documents and data are likely to be relevant to the claims or defenses in these cases and that were in effect at any time during the period from January 1, 2016 to June 30, 2023.

5. **Employee Technology Use Policies:** Employee Technology Use Policies in effect during the period of January 1, 2016 to June 30, 2023, including (if they exist) policies concerning use by employees of cellphones, notebook computers, and tablets for business purposes. Without intending to limit, such policies may go by the following names: bring-your-own device (BYOD) policies, choose-your-own-device (CYOD) policies, corporate-liable-employee-owned (CLEO) policies, corporate-owned/personally enabled (COPE) policies, mobile-device-management (MDM) policies, and dual-use device policies. Plaintiffs and Defendants will disclose if they had no such policies during the identified time period.

6. **Inaccessible Data:** A list of known data sources, if any, likely to contain discoverable ESI and that the Party asserts are not reasonably accessible under Rule 26(b)(B) or Rule 26(b)(2)(C)(i).