1    UNITED STATES DISTRICT COURT
     MIDDLE DISTRICT OF TENNESSEE
2         NASHVILLE DIVISION

3

4   IN RE: REALPAGE, INC.,      )    Case No. 3:23-md-3071
    RENTAL SOFTWARE ANTITRUST   )    MDL No. 3071
5   LITIGATION (NO. II)         )

6

7   - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

8              BEFORE THE HONORABLE

9      CHIEF DISTRICT JUDGE WAVERLY D. CRENSHAW, JR.

10            TRANSCRIPT OF PROCEEDINGS

11              February 13, 2024
    - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
12

13

14

15

16

17

18

19

20

21

22

23   PREPARED BY:
              LISE S. MATTHEWS, RMR, CRR, CRC
24              Official Court Reporter
            719 Church Street, Suite 2300
25               Nashville, TN 37203
            lise_matthews@tnmd.uscourts.gov

1                          **APPEARANCES**

2   **For the Plaintiffs**:

3   Patrick J. Coughlin
    Stacey Slaughter
4   Swathi Bojedla

5
    **For the Defendants**:
6   Jay P. Srinivasan
    Carl W. Hittinger
7   Gregory J. Casas
    Samuel P. Funk
8   Judith A. Zahid
    Ferdose al-Taie
9   Bethany Carroll
    Yehudah L. Buchweitz

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           The above-styled cause came on to be heard on

2  February 13, 2024, before the Honorable Waverly D.

3  Crenshaw, Jr., Chief District Judge, when the following

4  proceedings were had, to-wit:

5           THE COURT:  All right.  Well, thank you all for

6  being here.  And I appreciate all the work that's gone into

7  the filings that you made on Friday that I had a chance to

8  look at.  And, quite frankly, I wanted to talk to the lead

9  lawyers because with a few questions, I'm not real sure we

10  need to get together on Friday, but we can discuss that at

11  the end.

12           So I had a list of things to try to get some

13  clarification on, and I just want to go through those.  And I

14  guess I would ask that somebody in the leadership on the

15  plaintiff and defendant sides respond to it -- to my

16  questions.

17           MR. SRINIVASAN:  We can do that, Your Honor.

18           MR. COUGHLIN:  And this is Patrick Coughlin.  We

19  can do that, Your Honor.

20           THE COURT:  Okay.

21           All right.  So I guess, Mr. Coughlin, I understand

22  that you all want the defendants to produce before discovery

23  starts certain items.  And in your submissions, the first

24  sentence says, Plaintiffs served first and second set of

25  requests for production of documents and information requests

1  so you could get the -- essentially information on any

2  governmental regulatory responses defendants have made.

3          So you've already sent those out before discovery

4  started?  Is that right?

5          MR. COUGHLIN:  We sent them out before.

6          THE COURT:  So --

7          MR. COUGHLIN:  Of course, they're not -- they're

8  not due yet.

9          THE COURT:  Right.  But I guess that's what I'm

10 getting to.  If you've already sent them out and discovery is

11 going to start by Friday, why do we really need this extra

12 provision that on or before March 15 they produce whatever

13 they've given to DOJ and the FTC and the state Attorney

14 Generals?  You're going to get that in the normal course

15 since you've already sent that out.

16         MR. COUGHLIN:  I don't disagree that we'll get it

17 in the normal course, Your Honor.  But I don't know exactly

18 how it will be identified, or not.  I think we should just

19 get it all at once so we know what they produced to the

20 government and have it separate.  If they're going to all

21 produce it, you know, on that timeline, that would be one

22 thing.  Also, Appendix 1 also asks for other information that

23 we hope would narrow our additional request, and has been

24 approved in at least a couple of courts, like in the cattle

25 litigation, and things like that.  So that's why we put that

1   in there.

2          MS. SLAUGHTER:  And, Your Honor, this is Stacey

3   Slaughter, and I was prepared to talk about this a little,

4   too.

5          Because under our current case management plan --

6   I mean, discovery will be going on until 2025.  So

7   theoretically these could be produced at the very end.  And

8   so what we're asking for is this information upfront.  This

9   is going to help us set the stage and be able to negotiate

10  other things, like document custodians and search terms and

11  all those things.  And the government documents are going to

12  be key in that, as well.  And there is no burden to get these

13  right away.  And that's what we're really asking for here.

14  And I understand your point.  And your point is, you know,

15  we're going to get these anyway.  But the difference is we're

16  asking for the production to be made on March 15th, not to

17  wait for some responses and then go through the -- the hoops

18  of their objections and why they shouldn't have to produce

19  this stuff that's already clearly relevant and already been

20  produced.  And that's the point, Your Honor.

21         THE COURT:  Right.  Why wouldn't their production

22  be due, what, within 30 days?

23         MS. SLAUGHTER:  Because they may object, and then

24  there's going to be meet and confer, and then there's rolling

25  productions.  So, in other words, they wouldn't have to

1    produce these right away; they could just be in the back of

2    stuff that's getting produced.  Which again, as I said, goes

3    out to 2025.

4              THE COURT:  Well, it's not going to be 2025.

5    So -- that's -- that's not reasonable.  Okay.

6              MS. SLAUGHTER:  Well, that's why we asked for a

7    date.  I mean, that's clearly why we're asking for a date.

8    Because we want to know -- as Mr. Coughlin said, we want

9    these to be this upfront/right now production that helps us

10   set the stage to be able to negotiate all these other things.

11   These are very important documents.  They're isolated.

12   They're segregated.  They're already --

13             THE COURT:  Right.  But if you're anticipating

14   that some of the defendants are going to have objections,

15   we're going to have to resolve those concerns early -- at

16   some point anyway.  So even if I order it done on March the

17   15th, I guess Mr. Srinivasan and his team will raise the

18   objection, and we'll have our first discovery dispute and get

19   it resolved.  And once I resolve it, I'll give them a period

20   of time to produce it.  That's going to happen one way or the

21   other, from what I hear you saying are.

22             MS. SLAUGHTER:  Well -- and actually, maybe

23   that's -- maybe that's what happens.  I mean, if there are

24   going to be objections -- but as long as we get that

25   production date.  Right?  Because right now we would like to

1  get these on March 15th because it's going to help us
2  identify custodians.  And that's one of the reasons why we
3  weren't able to come -- yet -- we still have a placeholder on
4  the number of depositions, or the hours depositions are going
5  to take, because we don't even have any idea who the
6  custodians are going to be in this case yet.  And so we're
7  trying to make sure -- everything has to fall into place to
8  keep this case moving efficiently.  And that's kind of why we
9  wanted to ask for this information upfront.
10             THE COURT:  Yeah, I think we're talking about two
11  different things.  Right now -- you're talking about your
12  attachment 1.  I'm just talking about the request that they
13  produce essentially DOJ, FTC, any governmental regulatory
14  documents they've already produced.  So that's what -- that's
15  what you anticipate -- and I guess, Mr. Srinivasan, why don't
16  you just end the discussion.  Do you anticipate some or all
17  of your folks are going to have issues with that?  Because I
18  do think, to the extent any of the defendants have already
19  sent materials to DOJ or FTC, you kept a copy of it.  It's
20  not going to be that difficult to make a copy of the copy and
21  send it to the plaintiffs.
22             MR. SRINIVASAN:  Your Honor, and -- well, I think
23  the issue for us is that it just simply varies from defendant
24  to defendant.  And again, I can only -- you know, we've
25  talked to some defendants, but -- but can't speak for all of

them.  But the issue is -- you know, like we would typically
get in litigation, the request comes in -- and I think you're
talking specifically about the documents that have been
produced to a government agency.  You know, people make
objections to that.  They make objections based on a
privilege or a scope or what have you.  We just can't
anticipate what everybody's going to do.  And all we wanted
is the flexibility of a formal request -- as you said, Your
Honor, you know, folks will serve their objections and
responses.  And to the extent an objection gets teed up, it
will come to you, you'll make a ruling, and then everybody
will -- you know, presumably everybody will abide by it.  But
we're simply asking that we go through that process, rather
than sort of an informal just give us everything you sent to
the government, and, you know, without an ability to object
and think -- you know, work through those issues.

        THE COURT:  Okay.  Anything else on the
plaintiffs' side before I move on?

        MR. COUGHLIN:  No, Your Honor.

        MS. SLAUGHTER:  No, Your Honor?

        THE COURT:  Then the next thing -- and I don't
know if you've got your attachment -- I mean Appendix A.  But
on page 4 you talk about written discovery limits.  And I've
read this over and over.  You all's -- I'm not seeing --
what's the big difference here?  What you have on page 4 is

<pre>
 1   identical, as far as I can tell.  So what am I missing?
 2             MR. COUGHLIN:  Well, it's very close, Your Honor.
 3   The -- I guess what we didn't want it limited to is if there
 4   was a family of named defendants, you know, a subsidiary, you
 5   know, that it wasn't just that the interrogs just don't go
 6   to, you know, let's say the parent, and the four different
 7   affiliates don't have to answer.  And that was the first
 8   point of that.  And usually -- and there may be there's no
 9   real disagreement there.  As I understand that.
10             MS. BOJEDLA:  Your Honor, this is Swathi Bojedla
11   for the plaintiffs.  If I may clarify this.  The -- one of
12   the big disputes is that on the defendants' proposal, you'll
13   see that each defendant is also entitled to serve up to ten
14   individual interrogatories on plaintiffs.  Which if there are
15   something like 40 defendants, that would be 400 additional
16   interrogatories on each individual plaintiff.  And we're
17   trying to avoid that.
18             THE COURT:  So -- yeah, I thought about that.  But
19   aren't the defendants going to send interrogatories to those
20   plaintiffs that had rental agreements in their facility?  Why
21   would a defendant send an interrogatory to a defendant -- a
22   plaintiff who never slept in one of their apartments?
23             MS. BOJEDLA:  The way that this is written does
24   not limit it in that way.
25             THE COURT:  Right.  But Mr. -- Mr. Srinivasan,
</pre>

1  don't the defendants have common sense?

2          MR. SRINIVASAN:  We do, Your Honor.  And you're

3  exactly right.  The way it's written is each defendant gets

4  ten on plaintiffs.  They're not going to randomly send their

5  ten to some strange plaintiff.  We think it's vital that each

6  defendant be able to ask a few questions of, you know,

7  sometimes one or more plaintiffs.  And some defendants have

8  more than one plaintiff alleged to be renting from their

9  facility.  And so that's all this is.

10          Their request is we get 60 across the named

11  plaintiffs.  But that means, you know, one and-a-half

12  interrogatories per defendant, and a defendant has two, for

13  instance, renters, or even if they have one, and they want to

14  ask them just three simple questions, we wouldn't be able to

15  do that.

16          We think -- and just to be clear, it's not that a

17  defendant can ask ten questions -- interrogatories of every

18  plaintiff.  It's just total.  They get ten.  And of course

19  they're going to limit it to the people that they are, you

20  know, in alleged relationship with.

21          MS. BOJEDLA:  Your Honor, I wonder if we could go

22  back and speak with the defendants about a way to tighten up

23  this language so as to get those points that you made and

24  that Mr. Srinivasan just expressed?

25          THE COURT:  Okay.  So you want to give me a new

1   version then on the interrogatory portion?

2           MS. BOJEDLA:  I think that would be helpful.

3           THE COURT:  All right.  Now, moving on then to the

4   request for admission.  This is the one where -- yeah.  The

5   defendants in their requests for admission -- I'm sorry.  On

6   the plaintiffs' side -- you all say, Defendants may jointly

7   serve 30 requests for admission on each named plaintiff, but

8   no more than 60 unique requests across all named plaintiffs.

9           Can somebody on the plaintiffs' side -- what are

10  you trying to say there?  I'm not getting the distinction.

11  What do you mean by unique requests?

12          MS. BOJEDLA:  Sure.  So the way -- what we were

13  trying to plan for here was that, for example, you know,

14  defendants didn't serve 30 unique RFA's on each of the named

15  plaintiffs so that there were somehow 180 or 210, or whatever

16  the number is, RFA's that were totally different across all

17  of the plaintiffs.  And what we're trying to basically solve

18  for is, you know, ask an RFA of one plaintiff on one issue,

19  that kind of applies to the whole case, and you do that 30

20  times across, and then you ask another plaintiff another

21  issue that kind of applies to the whole case, you do that 30

22  times.  So we were trying to kind of streamline this so we

23  were having the same (indiscernible) across the same

24  plaintiffs.

25          THE COURT:  Okay.  That also sounds like one you

1 all can get together and come up with some more precise

2 language.

3 　　　　MS. BOJEDLA:  I think we can, Your Honor.  I think

4 we can.  I think we're pretty aligned on not trying to create

5 an excessive amount of written discovery here.

6 　　　　THE COURT:  All right.  So I'm going to hold off

7 on that one.

8 　　　　The next thing you all have here is a difference

9 on whether it's going to be full completion or substantial.

10 My order's just going to say completion of document

11 production by March 28th, 2025.

12 　　　　MR. SRINIVASAN:  Your Honor, if I can be heard on

13 that -- it sounds like you're pretty firm on that.  But, you

14 know, for us it's just a matter of getting everything -- you

15 know, be kind of doing the vast majority of it, and then you

16 have sort of things that fall out of privilege and a cleanup

17 thing here or there, and that's all we wanted to give

18 ourselves, that buffer, and that was the reason for

19 substantial completion.

20 　　　　THE COURT:  Okay.  Well, we've got some excellent

21 lawyers here.  And I think y'all will be able to work it out.

22 　　　　So let me share a couple of things I added to the

23 case management order that shouldn't be a surprise.  But on

24 the section regarding summary judgment, I added in there --

25 which is required by the local rules -- that the

1  plaintiffs -- whoever makes a motion for summary judgment,
2  you have to file your motion, your statement of undisputed
3  facts and your memorandum.  So you all left out the statement
4  of undisputed facts.  And then, obviously, when they respond,
5  they have to respond to the statement of undisputed facts or
6  add additional facts, as the local rules allow.
7           Also, on the mediation and alternative dispute,
8  that's all fine with me.  However, I am going -- I am adding
9  that you all -- that all the parties should anticipate that
10 you're going to engage in multiple good faith mediation or
11 direct case resolution efforts with each other.  So I'm
12 not -- I'm not right now requiring you go through mediation
13 because it seems like some of the defendants are talking
14 directly to the plaintiffs, and in fact that's resulted in
15 some settlements, which is good.  But I am adding a statement
16 that there are going to be multiple good faith mediations or
17 case resolution efforts by your August 2027 deadline.
18          Also, I'm adding that on or before April the 30th
19 all parties will certify to the Court they've either engaged
20 in mediation or engaged in substantive case resolution
21 settlement discussions without a third-party.
22          And finally I'm going to add that all the parties
23 are going to be required to engage in multiple good faith
24 mediation or case resolution every six months during the life
25 of the case.  I'm also adding specific case management

conference dates from March to December of this year. Those
are going to be at 1:00 on the second Friday in every month,
if I calculated it right.

Now, what you haven't given me that I specifically
talked to Mr. Coughlin and Srinivasan about is the joint
status report form. Remember I wanted that to be a living,
breathing document.

So how are y'all coming on that?

MR. COUGHLIN: This is Patrick Coughlin. We fell
down on that, Your Honor. We were looking at all the stuff
that we were submitting with the protective order and the ESI
protocol, and we were thinking that -- that as far as getting
this stuff in, that -- at least my own thoughts were -- that
we were complying with what Your Honor needed now. I
understood what you --

THE COURT: Yeah.

MR. COUGHLIN: -- what you wanted, that we would
build on it as we go forward. And, actually, Mr. Srinivasan
and I could talk about that and get something in --

THE COURT: Okay.

MR. COUGHLIN: -- by this Friday in -- because it
sounds like we're not going to be actually getting together.

THE COURT: Well, I don't think so. But I've got
a couple more items to go. Y'all did a great job on this.
So I think -- I'm going to be able to get you something out.

1          If you could get it -- well, if you -- if you and

2    Mr. Srinivasan could either do it or get a subset of your

3    all's respective teams to look at -- I do think y'all need to

4    put some -- I'm sure you will -- put some thought into it

5    down the road.  I don't think you want me trying to do it

6    because I can't anticipate the kind of things y'all might

7    want to report on.  And that's why I wanted you all to take

8    the first -- the first cut with it.  So --

9          MR. COUGHLIN:  We'll do that, Your Honor.

10         THE COURT:  Okay.  So now let's go to your --

11   y'all really did narrow everything down.  So let's go to the

12   ESI protocol.

13         And I thank you for providing the full documents.

14   Quite frankly that made it a lot easier to understand the

15   difference once I get to read everything that's -- that's

16   there.  And I guess I'll go to the defendants.

17         I guess what I'm -- look like the difference here

18   is -- is when you have emails that have been -- there are

19   multiple versions of -- well, it's the same version of the

20   email, but the string of who's received it has gotten longer.

21   You all just want to make one entry on the privilege log for

22   that email.  And I guess I wanted to hear a little bit more

23   because -- what your thinking was there.

24         MR. SRINIVASAN:  Yes, Your Honor.  This is

25   Mr. Srinivasan.  I don't know if there is -- you know,

various people on our team negotiated these other documents.
And I think it was Mr. Medlock, who is not on this call, who
was the chief negotiator for our side, but I think -- you
know, I'll -- I'll take -- give it a high level shot, which I
do understand, and others, hopefully, on our side -- on the
defendants' side should chime in if they have more detail.
But at a very high level, Your Honor, we have -- our
experience has been on a privilege log if you have a 12, you
know, email chain email, with 12 emails, or more, or whatever
it is, three or four, going back and forth, that when that
whole thread appears, that we provide all of the information
on one entry rather than 12 entries, which is onerous and
burdensome.  So in the one entry you would still get the
various participants on that chain.  You wouldn't just
isolate one out of the 12 emails.  And, you know, the
description of the subject matter, which again if the subject
matter meanders across topics, then that would all be -- all
the subject matters would be noted, and the dates, the range
et cetera.  In other words, you're getting all the privilege
log related information but in one entry versus 12, which we
just find to be unnecessarily onerous and burdensome.

                THE COURT:  And I guess --

                (Overlapping speech.)

                THE COURT:  And I kind of see that point, but as I
read -- read the language you all are proposing here, if

the -- if the plaintiff, I guess, made a request, you would
then provide a -- a more fulsome response to that string of
emails.

　　　　　MR. COUGHLIN:  Your Honor, this is Patrick
Coughlin.  Then we would have to give reasons -- we would get
in a big fight, just as an example.  Let's say the CFO and
CEO are at the end of a thread, and they looped in, you know,
the in-house general counsel.  Well, all's we know -- we
don't know when the general counsel was looped in.  We don't
know if outside -- when outside counsel may have been looped
in or not.  We don't know who the first, you know, two emails
are between or anything.  And so what happens is the burden
comes back to us to actually provide reasons why this should
not be privileged when we don't have any more information
than -- than the 15 people involved in the email.  And it may
be that the in-house general counsel and outside counsel are
both listed there.  They're not going to be listed on each
individual email that's drawn.  They're just going to be
listed.  We just got a production in another case where 90
percent of the documents had a privileged and confidential
stamp on them and attorneys's eyes only.  And it was just the
common practice of the company to list that.  And so that's
why we think that -- it shouldn't be our burden.  If they
think something's privileged, you know, break it out of the
email and mark it as privileged and confidential.

1      MS. BOJEDLA:  Your Honor, this is Swathi Bojedla.

2  I would just add, we really think that this is going to

3  create less disputes and not more, for us to be able to know

4  exactly what's being withheld and why, as opposed to having

5  to guess what's going on in an email chain, go back to the

6  defendants and ask for all of the emails in the chain and

7  then argue from there.

8      MR. SRINIVASAN:  Respectfully, Your Honor -- I

9  mean, certainly I don't know that it would result in any

10 fewer disputes.  What I do know is it's going to result in a

11 lot more needless work on our side, and particularly, you

12 know, given deadlines, you know, to the extent it's a full

13 completion deadline.  These things all add up and having to

14 do these massive privilege logs for lengthy chains, which,

15 you know, in today's modern practice is common.  This is not

16 something we're talking about that's a one-off issue.  It

17 would be substantially burdensome.  And I guess I still don't

18 understand the issue of why something is being hidden here if

19 there's a particularly long chain or there's a -- there's a

20 log entry that has a number of people on it and they want to

21 ask us about it, we said we would accommodate that.  And it

22 seems like a good compromise as opposed to a prophylactic

23 rule that says you've got to do each one individually.

24 You're also going to have, you know, very, very, very long

25 privilege logs that will be difficult to use by anybody.

1          MR. COUGHLIN:  But we won't know where the -- we

2    won't know where the attorney comes into it or at what point

3    in that long email chain, you know, is it that the attorney

4    comes into it or that you're claiming the attorney/client

5    privilege on.  You're not -- you're not telling us -- or are

6    you?  Are you saying that you would break that out?  That

7    individual email between let's say two discrete people within

8    that let's say 15 person email chain?

9          MR. SRINIVASAN:  Absolutely.  Let me be clear

10   about it.  Leaving aside, you know, sort of the rare cases

11   where -- or, you know, exceptions where there can be

12   privileged discussions where an attorney is not present, if

13   we had a long chain where the attorney didn't join until the

14   middle of it, the previous portion would not be part of the

15   same chain.  That wouldn't likely even be privileged.  We are

16   not intending to hide nonprivileged emails within a broader

17   chain.  In other words, the only chains that you're going to

18   see that we are proposing to log together is where there's

19   the attorney throughout.  Every -- every email is -- has a

20   privilege assertion attached to it within that chain.  Every

21   email will have an attorney on every constituent email, again

22   absent, you know, those rare cases where somebody's acting on

23   instructions of an attorney.  But, yes, that -- so these

24   chains are -- are not going to include nonprivileged emails

25   as a constituent component.  So there's nothing you will

1  lose.  There will be no questioning of when the attorney got
2  involved.  The attorney got involved at the beginning, which
3  is why the entire chain is privileged.
4          (Multiple people speaking)
5          MS. BOJEDLA:  Your Honor, if I may step in for a
6  moment.  You know, I appreciate that -- the representation
7  that only documents that are actually privileged because they
8  have an attorney on them are going to be withheld.  You know,
9  we all litigate privilege logs for months or years on end.
10 And that is just not always the case.  We often have disputes
11 as to whether an attorney is operating in their business or
12 legal capacities.  And so it's just -- that's why the rules
13 require the sort of specificity and the case level requires
14 sort of the specificity for anything that is being withheld.
15 You know, we need that information to evaluate the claim and
16 decide whether to challenge it.  And, frankly, you know, I
17 understand the burden that's being made.  But privilege logs
18 are typically made up of metadata, and then the last field
19 that's filled in, and if the privilege is the same for every
20 document in the email chain, then they will just extend that
21 same -- they will copy and paste that same argument all the
22 way down the log, and the only additional burden is the
23 metadata that's being added in, which is not a burden at all.
24 So I understand the concern about wanting to have shorter
25 privilege logs, but shorter privilege logs actually

1 prejudices us, and there is not a huge amount of additional

2 burden in creating those metadata logs, plus the additional

3 description that would be the same for every document --

4 　　　　THE COURT:  Well -- well, thank -- I want to thank

5 everybody.  That's helpful.

6 　　　　What I want to do, though, is Mr. Srinivasan why

7 don't you get to your point person on this issue and file

8 with the Court an example of such an email that -- and how it

9 might contain some attorney/client privilege in parts of the

10 email string and other parts not.  So, one, the Court has

11 something that it can look at, and the plaintiffs can as

12 well, to see if this might -- might work.

13 　　　　I am sensitive that there's going to be a lot of

14 documents in this case.  And right now we're working in a

15 vacuum, but to the extent you could get with your person and

16 give me a couple of examples, file them.  Obviously they're

17 fake examples.  But something that you think realistically

18 come up.  Can you get me that maybe by tomorrow 3:00

19 Nashville time?  And share it with the plaintiffs.  And then

20 that might give me a better understanding of what you

21 propose.

22 　　　　MR. SRINIVASAN:  We will do that, Your Honor.

23 　　　　THE COURT:  Okay.  Now, the next thing on the ESI,

24 I will give the gold star award to Mr. Coughlin.  I think

25 it's a great idea, but I -- I don't think it's really

feasible at this point regarding the presumption of
authenticity.  But I do think it's a great idea.  In fact,
I'm -- I think y'all got enough to work in this case -- I do
kind of wonder why the defendants wouldn't want to know from
the beginning are my documents authentic.  But I can recall
in my practice, I had a case where one of my clients thought
he was doing -- I don't know what he thought he was doing --
but messed with some documents and -- that I thought were
authentic and they weren't.  But I like the idea,
Mr. Coughlin, but I don't think we should try it in this case
in terms of dealing with the issues of authenticity.

MR. COUGHLIN:  I understand, Your Honor.  It's a
blanket thing.  I just had a trial last week -- two weeks ago
in Connecticut and the issue came up.  And so we thought we
would put it in here.

THE COURT:  You know, since the time I've been on
the bench, I think in all the trials I may have had two real
objections to authenticity.  It's usually not an issue.

Okay.  So that takes me through -- that takes me
through your case management order, the ESI.  Oh.  Oh, yeah.
So that takes me to your protective order.

UNIDENTIFIED SPEAKER:  Page --

THE COURT:  Who is that?  Who is speaking?

MR. COUGHLIN:  This is Patrick Coughlin.  Page 8 I
think, Your Honor.

1          THE COURT:  Well, yeah, I want to go to page 8.

2     I'll start with the defendants.  I'm not quite understanding

3     what you all want to do, because in your submission you said

4     you want advance notice, and then as I read through your

5     proposal, there's no advance notice language there for either

6     confidential or highly confidential information.  So I'm --

7     I'm looking at page 8 of your protective order, paragraph 7,

8     witnesses at hearings.  And help me walk -- I think

9     something's been left out.  Because I know you want some kind

10    of advance notice, and then some kind of express

11    authorization but I'm not -- I can't understand what you want

12    because of the language here isn't descriptive.

13         MR. CASAS:  Sure, Your Honor.  This is Greg Casas

14    from Greenberg.  My team handled the protective order.

15         THE COURT:  Great.  Great.  Go ahead.

16         MR. CASAS:  Thank you, Your Honor.  And I'm

17    looking at page 8 right now of the protective order.  I'm

18    also looking at Appendix C to the filing that we made on

19    Friday.  And we do want advance notice.

20         The issue -- you know, and we looked at several

21    other protective orders from other larger antitrust cases.

22    And the advance notice, Your Honor, ran all the way from, you

23    know, the day of the deposition, at the deposition, to three

24    or five days before the deposition giving notice to the

25    producing party so that the producing party can decide

whether or not there's any objections.  And we tried to
engage with the plaintiffs.  It was -- from their
perspective -- which is fine -- they just said that advance
notice was a nonstarter.  So we couldn't really engage in any
negotiation on that one point, though we were able to
negotiate and come to terms on everything else, which I
thought was a great fete from our perspective.

            And so we are just trying to get, Your Honor, some
kind of advance notice, whether it be the day before, three
days before, five days before, what have you.  Because what
we don't want is when you're dealing with a case like this,
when you've got alleged competitors and you've got an alleged
sharing of nonpublic information, what we don't want is
company A's representative shown company B's nonpublic
information when there really is no basis for that
information to be shown unless the producing party thinks
that there's no objection for that document to be used in
that manner.

            THE COURT:  Okay.  Well, we could be more --
Mr. Casas, you can help me more if you go to page 8,
paragraph 7.  I'm looking at your proposal.  Do you see your
proposal?

            MR. CASAS:  Page 8, paragraph 7, Witnesses At
Hearings and Depositions.

            THE COURT:  Right.  And I've got the annotated

1 version.  Do you?

2          MR. CASAS:  I believe so.  I think we have the

3 same document, Your Honor.

4          THE COURT:  Okay.  Good.  So we come down -- so

5 everybody's going to sign Attachment A.  Right?  For any

6 confidential or highly confidential documents.  Right?

7          MR. COUGHLIN:  That's right, Your Honor.

8          MR. CASAS:  Yes, Your Honor.  That's correct.

9          THE COURT:  And then your next sentence says,

10 Disclosure to such person is limited to, one, the portion of

11 the document of which the person has knowledge.  You're not

12 asking for notice about that, are you?

13          MR. CASAS:  No, Your Honor.

14          THE COURT:  Okay.

15          MR. CASAS:  If you look at the red line down,

16 there was an option 2 and an option 3.

17          THE COURT:  I don't have a red line version.  So

18 that's what I'm missing.  I can't tell what your proposal is.

19          MR. CASAS:  I understand now.

20          THE COURT:  All I've got is 1 makes sense; 2, the

21 portion of the document in which the person has knowledge,

22 you have no problem.  And then it says "or" 3, and it starts

23 off "counsel".  And that doesn't -- that doesn't -- that's

24 not consistent with the rest of the sentence.

25          MR. CASAS:  Right.  And so counsel for the

producing party expressly authorizes in writing disclosure of
the information to the witnesses prior to its disclosure.
And, Your Honor, I agree there's no deadline in there.
There's no date in there.  And so that was that last point
that I was speaking to, which is if a document doesn't fall
into -- or if a document or a witness doesn't fall into
categories 1 or 2, and yet a questioning counsel does want to
ask a witness about a document outside of subcategories 1 or
2, he has to -- he or she simply has to ask the producing
party whether they authorize or object to the use of that
produced document in the deposition.

        THE COURT:  So why doesn't -- I'm sorry.

        Why doesn't Attachment A take care of that?  "And
not disclose any such confidential or highly confidential
information to any other person, firm or concern."  If
they've already signed that, what are you -- I don't
understand the -- what you're trying to cure.

        MR. CASAS:  Well, I think the issue there is
Attachment A doesn't address the fact -- or doesn't address
the scenario where witness Jane Smith from Lincoln Property
is being deposed, and counsel for the plaintiff wants to ask
Ms. Smith about a document produced by another defendant that
contains that other defendant's highly confidential
information.  And Ms. Smith has never seen it, never heard
about it and never -- didn't even know it existed.  We just

think that, while plaintiffs may have the right to ask
questions of Ms. Smith about that document from the other
defendant, the producing party, that other defendant needs to
be told about that so that they can either file for
protective order or agree that there is no -- there is no
objection to the use of their highly confidential information
in the other party's deposition.  And Attachment A does not
address that concern.

THE COURT:  Why not?  It says, "and not disclose
any such confidential or highly confidential information to
any other person, firm or concern."  So even if they look at
it, they can't share it with anybody.

MR. CASAS:  Well, Your Honor, I understand what
you're saying.  It's just that, given that that document now
will be in the deposition record and disclosed to a number of
people who might not otherwise have seen it, there is a
concern from our part that these deposition questions -- or
these documents rather are going to be used in a manner
that -- you know, that the protective order really does
prevent or should prevent from the defendant's perspective.
And so we just want the plaintiffs, or the defendants, if
they're going to be using a document that is confidential or
highly confidential, and they want to use it with regard to a
deposition that is of a person or of an entity that did not
write or produce that document, that the party that produces

it just be given notice of that use of that document so that

they can either object and come to Your Honor and ask for

protective order of that document or they can agree that that

document can be used.  It's a very -- I mean, we've seen that

actually, Your Honor, not just in antitrust cases, but there

are two protective orders that your magistrate's, Your Honor,

have approved that also have this -- these kinds of

provisions.  And so that's what we're also trying to -- to

just have put into this protective order here.  If you look

at the Shipman case or the Top Tobacco case, both of which

was -- one was with Magistrate Judge Frensley, and the other

one was with Magistrate -- another one of your magistrate

judges there, Your Honor, Judge Holmes, both of which have

those provisions that allow for the use of the documents but

only in a situation where notice is provided to that

producing party.

THE COURT:  So is this a party that is not a -- is

this -- is this an entity that's not a party to this lawsuit?

MR. SRINIVASAN:  It could be, Your Honor.  It

could be an entity that is a part of the lawsuit.  The issue

is a use of a highly confidential or confidential document

with a witness that the document was not drafted by that

witness or prior received by that witness through the normal

course of business or was -- or is a document that that

witness's entity has no knowledge of, we just don't think

1  that a document can be used randomly unless the producing

2  party has agreed to the use of that document in advance.

3          MR. COUGHLIN:  And, Your Honor, this is Patrick

4  Coughlin.  It's just a way to prevent us from using -- now we

5  have to get written notice -- first of all, we're not going

6  to be using documents from one unrelated entity, you know,

7  with somebody else at another unrelated entity.  You know,

8  that -- that's absurd.  We have to have a good faith basis

9  that the person has or should have knowledge of that

10  document.  In other words, they would have received it, you

11  know, either in a communication between two defendants or

12  something like that.  We're not just going to be taking

13  somebody's internal information and showing it, you know, to

14  another defendant and say, hey, do you know this?  And then

15  number two, it should be a person that we think has

16  knowledge, right?  They -- the way they have written it, the

17  person has to have knowledge, i.e., received it in the normal

18  course, according to Mr. Casas.  Right?  And then we're

19  supposed to give counsel, you know, notice of that before we

20  go take the deposition.  So that's going to prevent us from,

21  you know, using, like, many documents that we would just go

22  in and ask the person, you know, from the entity that -- that

23  somebody else authored it or that they were somehow in part

24  of the email chain, about that document.  This just

25  completely hamstrings us, you know, from conducting a

1  deposition and gives them basically a road map if they, you
2  know, stamp a lot of documents confidential or highly
3  confidential, and we think that -- you know, we're certainly
4  willing to do the Attachment A and have them sign it ahead of
5  time, and they can't disclose it to anybody else, and we have
6  to have a good faith effort.  So we think that the way they
7  have written it basically prevents us from, you know,
8  conducting the depositions in the way that we should.
9              MR. SRINIVASAN:  Your Honor, if I can reply.
10             THE COURT:  Well, let me ask you a question
11  instead.
12             Mr. Casas, why wouldn't during -- if it comes up
13  during a deposition, why can't the parties and the lawyers
14  agree to put that portion of the deposition under seal until
15  it's been addressed by me?
16             MR. COUGHLIN:  We agree.
17             MR. CASAS:  Your Honor, I guess that could work in
18  certain circumstances, but the focus here is -- and we're not
19  talking about a -- in my client's case, a situation where a
20  witness who is employed by Lincoln Property is being deposed
21  and plaintiffs want to use a highly confidential document
22  produced by Lincoln Property.  That's not what this prior
23  notice is addressing, but, rather -- let's say there is a
24  deposition of a witness from Lincoln Property and the
25  plaintiffs want to use a highly confidential document that

1   was produced by another defendant.  That's the situation
2   where we want to make sure that for that document the
3   plaintiff have gone to the producing party of that document
4   and said we're going to use this -- we're going to use your
5   document, defendant X, when we depose the witness from
6   Lincoln.  And we want to make sure that there is some sort of
7   prior discussion just between the plaintiffs and that
8   producing party.  We're not saying that they need to talk to
9   the entire defense group about that, but rather just the
10  producing party to see whether the producing party, defendant
11  X in this -- my analogy, or my example, has any problem with
12  the use of a highly confidential document when deposing, in
13  that situation, Lincoln Property witnesses.
14          We think -- and so doing what Your Honor is
15  saying, that it's put under seal until you can address it --
16  you know, these -- it's just -- it's something that we can
17  work out a lot quicker, I think, if it's done before the
18  deposition.  And it doesn't have to be in writing.  It could
19  be email.  It can just be a phone call.  But we think it will
20  be much more streamline, just like it is in other cases
21  where, you know, this kind of a prior notice has been used,
22  which would be in the Persian Gulf case In Re: *Local TV*
23  *Advertising*, the tobacco case, Your Honor, in front of --
24  from your bench as well as the Glenda Shipman case.  It's
25  been done before, and it has worked very well.  And that's

1   what we're trying to accomplish here.

2           THE COURT:  Okay.  Well, let me suggest that maybe

3   -- I'm not convinced.  I think Attachment A has meaning, and

4   the idea that we're just going to ignore what somebody has

5   said in Attachment A is not something I'm willing to accept.

6   I've offered myself up to resolve it so you all can do the

7   deposition and get it done and then bring it to me if it

8   needs resolution.

9           So with that in mind, Mr. Casas -- and I hear your

10  arguments and they're -- they're sound -- maybe -- maybe you

11  and the plaintiffs talk to come up with some other agreeable

12  language.  But I'm not sure I can go with what you're

13  proposing here.  And again, I don't have the red line

14  language so I really don't even know what you're proposing.

15          MR. CASAS:  I understand, Your Honor.  Yes, I and

16  my team will get with Mr. Coughlin and his group and we'll

17  see if we can come up with something that's mutually

18  agreeable, Your Honor.

19          THE COURT:  All right.  So that takes care of the

20  protective order.

21          Oh, also you all reference something called the

22  Order of Deposition Protocol.  And I don't think I've seen

23  that.

24          (Overlapping speech.)

25          THE COURT:  Everybody's talking so I can't hear

1  anybody.

2            Mr. Coughlin, do you have the Order of Deposition

3  Protocol?

4            MR. COUGHLIN:  It has not been submitted yet.

5            THE COURT:  Okay.  Are y'all still working on it?

6            MR. COUGHLIN:  I think we're done working on it.

7  So I think we're ready to submit it, and we will I think

8  later today.

9            THE COURT:  Okay.  Well, again, that's -- again,

10  these are the things I had concerns with.  And I don't

11  know -- let me hear what you all think.  But I can wrap this

12  up without you all spending all this money flying to

13  Nashville.  I think you're going to have plenty of

14  opportunities to come to Nashville.

15            MS. BOJEDLA:  Your Honor, this is Swathi Bojedla.

16  Just on the issue of the written discovery limits, I don't

17  want to hold up Your Honor getting a scheduling order out.

18  So if it would be possible, could we include that in our

19  forthcoming negotiations and proposed order on deposition

20  limits and --

21            THE COURT:  Oh, that's -- you need not worry.

22  You're not going -- because I want all that by tomorrow at

23  3:00 as well.

24            MS. BOJEDLA:  Okay.  Okay.

25            THE COURT:  Okay.  And then the last thing I have

1    here -- and you can think about this.  Meet and talk to each
2    other.  But I'm taking seriously what's in your joint
3    submission about the structured data discovery.  And I want
4    to give that some more thought of what the Court needs to do
5    to be prepared.  So I would really appreciate if both sides
6    would come up with two names that the Court might employ
7    either as a special master or a court-appointed expert, but I
8    want to get ahead of you all so that when these issues come
9    up I'm -- I'm ready to rule.  So I'm going to ask -- you
10   don't have to do that by Friday.  But give it -- give it --
11   give it a thought.  I would like the plaintiffs to give me
12   two people I should talk to to be the special master or
13   court-appointed expert on structured data discovery, and then
14   get the defendants to give me two nominees so I can look into
15   that.  And I rather have them ready than need them and not
16   have them ready.
17          So that -- that's all I had.  Do we need to go
18   over what I need from everybody by 3:00 tomorrow?
19          MR. COUGHLIN:  Yes.  Just to be helpful.
20          MR. SRINIVASAN:  Yes.
21          THE COURT:  So I think you're going to get me
22   revised language on the interrogatories, revised language on
23   the requests for admission, perhaps revised language on the
24   use of confidential and highly confidential documents in --
25   when the witness does not have knowledge of that particular

1   document in the scenario that Mr. Casas explained.  And. . .

2           MR. SRINIVASAN:  Your Honor wanted an example --

3           THE COURT:  Oh, yes.  I wanted examples of the --

4   oh, good point.  Those are the four things.

5           MS. BOJEDLA:  And, Your Honor, you don't need

6   anything more from us on the schedule beyond those items,

7   right?

8           THE COURT:  On the case management order?  I think

9   I'm good.  I've got a pretty good working draft incorporating

10  all of you all's hard work here.  So it's not -- it's not

11  changing -- I mean, y'all are very close on this.  So I think

12  I've got a version we can get out.  What I don't have, I

13  guess, is the final version -- I guess -- for my approval,

14  entering an order approving it on Friday for both the ESI and

15  then the protective order and then the deposition protocol.

16  That's what I don't have finalized.

17         MR. COUGHLIN:  And, Your Honor, I'm kind of loathe

18  to bring up some.  But one of the issues, or kind of a main

19  issue, that the plaintiffs had is that we wanted to at least

20  complete discovery before we do the expert reports for the

21  class CIRT.  We also thought that while class CIRT will go

22  ahead of summary judgment, that the expert reports and the

23  merits summary judgment reports so overlap that to the extent

24  that we can just do both of those at one time, we would hope

25  that we could, and so the Daubert motions could be done on

that.  If the defendants have raised the issue about whether
they want to add additional experts for summary judgment, I
don't think we address that in the back and forth.  But
certainly they could, you know, at that stage if we're past
class certification.  So that was just an issue I wanted to
flag that that's a big issue between the parties.

THE COURT:  It is a big issue.  You gave me a lot
to look at.  I think I'm pretty much there, but I want to
complete reading some of the citations that you both
provided.  But I don't think I need anything more from you
all on that.

MR. COUGHLIN:  Thank you, Your Honor.

THE COURT:  Okay.  So I'll start with the
plaintiffs.  And Ms. Slaughter, as well as Ms. Bojedla,
anything else?  Is there anything -- any other reason we need
to get together on Friday?

MS. SLAUGHTER:  No, Your Honor.  As much as I like
coming to Nashville, I think you have covered everything, as
far as I know.  Unless Ms. Bojedla has anything else.

MS. BOJEDLA:  No, Your Honor.  Thank you so much.

THE COURT:  And then, Mr. Srinivasan and
Mr. Hittinger and Mr. Casas -- and Sam Funk hasn't said a
word.  Is he still -- is he asleep?

MR. FUNK:  I am still here, Your Honor.  I've just
been riveted and thought I would let the smarter people --

 1          THE COURT:  Well, if you're riveted with this
 2    discussion about discovery, you're about to go to hog heaven.
 3          MR. FUNK:  Your Honor, this is Sam Funk.  We do
 4    have one issue.
 5          Jay, do you want to address the personal
 6    jurisdiction briefing or whether anything additional is
 7    needed on that?
 8          MR. SRINIVASAN:  You just did it, unless Judith
 9    wants to -- Your Honor, there was supplemental submissions on
10    the personal jurisdiction issue that was filed on Friday.
11    And the question was did you want to hear oral argument on
12    it.  I think the answer sounds like no.  But that's our
13    question.
14          THE COURT:  You're a smart lawyer.  I think I have
15    all I need on that.  I think I've got all I need.  We'll get
16    you something out pretty soon.
17          (Overlapping speech.)
18          THE COURT:  Well, thank you all again.  Y'all did
19    collectively great work on this.  You really narrowed down
20    these -- we've got very few issues and I know it's because
21    we've got good lawyers who are working hard.  So I appreciate
22    it.  Take care.
23          (Court adjourned.)
24
25

1    REPORTER'S CERTIFICATE

2

3           I, Lise S. Matthews, Official Court Reporter for

4    the United States District Court for the Middle District of

5    Tennessee, with offices at Nashville, do hereby certify:

6           That I reported on the Stenograph machine the

7    proceedings held in open court on February 13, 2024, in the

8    matter of In Re: Realpage, Inc., Rental Software Antitrust

9    Litigation (No. II); that said proceedings in connection with

10   the hearing were reduced to typewritten form by me; and that

11   the foregoing transcript (pages 1 through 37) is a true and

12   accurate record of said proceedings.

13          This the 22nd day of April, 2024.

14

15                              /s/ Lise S. Matthews
                                LISE S. MATTHEWS, RMR, CRR, CRC
16                              Official Court Reporter

17

18

19

20

21

22

23

24

25