**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | |
|---|---|
| **IN RE: REALPAGE, INC., RENTAL SOFTWARE ANTITRUST LITIGATION (NO. II)** | **Case No. 3:23-md-03071**<br>**ALL CASES**<br><br>**Judge Waverly D. Crenshaw, Jr.** |

**STATEMENT OF INTEREST OF STATE ATTORNEYS GENERAL**
**REGARDING PRELIMINARY APPROVAL OF PROPOSED SETTLEMENTS**

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

BACKGROUND .............................................................................................................. 1

ARGUMENT ................................................................................................................... 3

    I.    Courts Recognize the Unique Interests of State AGs in Protecting Their
        Citizens' Interests ............................................................................................. 3

    II.    Preliminary Approval as to Overlap Defendants' Proposed Settlements
        Should be Denied as to State AGs' Citizens ................................................... 5

        A.    The State AGs' *Parens Patriae* Actions are the Superior Avenues
                in which to Resolve Our Residents' Claims. ............................................. 6

        B.    Overlap Defendants' CAFA Notices Are Deficient Because They
                Do Not Include Information About the Class Members or Their
                Proportionate Share of Claims. ............................................................... 10

        C.    The Preliminary Approval Papers Provide Insufficient Information
                About the Adequacy of the Proposed Settlements .................................... 12

        D.    The State AGs Have Evidence of Overlap Defendants' Culpability
                that the Proposed Settlements Could Not Have Considered .................... 14

        E.    The Proposed Settlements Include Weak Injunctive Terms and
                Provide Meager Monetary Relief in Exchange for Broad Releases. ........ 16

    III.    In the Alternative, the State AGs Respectfully Request that the Court Hold
        the Motion for Preliminary Approval in Abeyance Unless and Until More
        Information Can Be Obtained. ........................................................................ 20

CONCLUSION ................................................................................................................ 21

# TABLE OF AUTHORITIES

**Cases**

*Allen v. Similasan Corp.*,
    318 F.R.D. 423 (S.D. Cal. 2016) ............................................................4

*Allen v. Similasan Corp.*,
    No. 12-cv-376 (S.D. Cal. July 28, 2016) ................................................4

*In re Am. Invs. Life Ins. Co. Annuity Mktg. & Sales Pracs. Litig.*,
    No. 05-MD-1712, 2013 WL 3463503 (E.D. Pa. July 10, 2013)................9

*Maryland ex rel. Brown v. RealPage, Inc.*,
    No. C-24-CV-25-003948 (Cir. Ct. Balt. City) ........................................3

*Burlington Indus. v. Milliken & Co.*,
    690 F.2d 380 (4th Cir. 1982) ................................................................19

*Cannon v. Ashburn Corp.*,
    No. 16-cv-1452 (D.N.J. Feb. 23, 2018) ..................................................4

*Coleman v. RealPage, Inc.*,
    No. 2:25-cv-00093 (E.D. Ky.) ................................................................3

*In re CorrectCare Data Breach Litig.*,
    No. 5:22-cv-319-DCR, 2024 WL 1403075 (E.D. Ky. Apr. 1, 2024) .........................12, 13, 16

*Dist. of Columbia v. RealPage, Inc.*,
    No. 2023-CAB-6762 (D.C. Super. Ct.) ..................................................2

*In re Elec. Books Antitrust Litig.*,
    11-md-2293 (S.D.N.Y. July 16, 2014), Dkt. 642...................................21

*Figueroa v. Sharper Image Corp.*,
    517 F. Supp. 2d 1292 (S.D. Fla. 2007) ..................................................4

*In re Flint Water Cases*,
    499 F. Supp. 3d 399 (E.D. Mich. 2021)..................................................6

*In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*,
    55 F.3d 768 (3d Cir. 1995)......................................................................9

*Gunnells v. Healthplan Servs., Inc.*,
    348 F.3d 417 (4th Cir. 2003) ..................................................................7

*Hicks v. State Farm Fire & Cas. Co.*,
965 F.3d 452 (6th Cir. 2020) ...................................................................6

*Illinois v. Abbott & Assocs., Inc.*,
460 U.S. 557 (1983)...............................................................................8

*New Mexico ex rel. King v. Capital One Bank (USA) N.A.*,
980 F. Supp. 2d 1346 (D.N.M. 2013) ...............................................9, 20

*Local No. 93, Int'l Ass'n of Firefighters, AFL-CIO C.L.C. v. City of Cleveland*,
478 U.S. 501 (1986)..............................................................................20

*In re Minolta Camera Prods. Antitrust Litig.*,
668 F. Supp. 456 (D. Md. 1987) ...............................................................3

*In re Montgomery Cnty. Real Est. Antitrust Litig.*,
No. B-77-513, 1988 WL 125789 (D. Md. July 17, 1988) .........................8

*Morris v. PHH Mortg. Corp.*,
No. 20-cv-60633 (S.D. Fla. Jan. 29, 2021) ...............................................4

*In re Papa John's Emp. & Franchise Emp. Antitrust Litig.*,
No. 3:18-cv-825 (W.D. Ky. Aug. 7, 2025), Dkt. 270 .................................6

*Pennsylvania v. Budget Fuel Co.*,
122 F.R.D 184 (E.D. Pa. 1988).................................................................8

*In re RealPage, Inc., Rental Software Antitrust Litig. (No.II)*,
709 F. Supp. 3d 537 (M.D. Tenn. 2023)..................................................19

*Romstadt v. Apple Computer, Inc.*,
948 F. Supp. 701 (N.D. Ohio 1996).........................................................5

*Sage v. Appalachian Oil Co.*,
No. 93-cv-229, 1994 WL 637443 (E.D. Tenn. Sept. 7, 1994)...................7

*Shane Grp., Inc. v. Blue Cross Blue Shield*,
825 F.3d 299 (6th Cir. 2016) .......................................................5, 12, 13

*Thornton v. State Farm Mut. Auto Ins. Co.*,
No. 6-cv-18, 2006 WL 3359482 (N.D. Ohio Nov. 17, 2006)..................7, 8

*In re Toys R Us Antitrust Litig.*,
191 F.R.D. 347 (E.D.N.Y. 2000) ..............................................................4

*In re Tricor Indirect Purchaser Antitrust Litig.*,
No. 05–360–SLR, 2009 WL 3460769 (D. Del. Oct. 28, 2009)................20

*United States v. Greystar Mgmt. Servs., LLC*,
No. 24-cv-00710 (M.D.N.C. Aug. 8, 2025), Dkt. 152-1 ...................................14, 17

*In re Uranium Antitrust Litig.*,
552 F. Supp. 518 (N.D. Ill. 1982) .........................................................................19

*New York ex rel. Vacco v. Reebok Int'l Ltd.*,
96 F.3d 44 (2d Cir. 1996).......................................................................................3

*Ware v. CKF Enters., Inc.*,
No. CV 5:19-183-DCR, 2020 WL 5087766 (E.D. Ky. Aug. 26, 2020) ...................6

*Wilson v. DirectBuy, Inc.*,
No. 09-CV-590, 2011 WL 2050537 (D. Conn. May 16, 2011)...........................4, 5

**Statutes**

28 U.S.C. § 1715 ............................................................................................1, 10, 11

Class Action Fairness Act, 28 U.S.C. § 1711 *et seq.*..........................................*passim*

D.C. Code § 28–4515..............................................................................................19

Md. Code Ann., Com. Law § 11-209(c) ...................................................................7

**Other Authorities**

18A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure*
§ 4458.1 (3d ed. 2025) ............................................................................................7

Fed. R. Civ. P. 23 ...................................................................................5, 6, 8, 12, 13

*Greystar Takes Over Top Spot From MAA As Nation's Largest Apartment Owner*,
CoStar (Apr. 3, 2024), https://www.costar.com/article/329788865/greystar-takes-over-top-spot-from-maa-as-nations-largest-apartment-owner ......................19

Margaret H. Lemos, *Aggregate Litigation Goes Public: Representative Suits by State Attorneys General*, 126 Harv. L. Rev. 486, 505 (2012)...................................7

National Apartment Association, *Greystar Tops NMHC 50 List of Owners, Managers* (Apr. 21, 2025), https://naahq.org/greystar-tops-nmhc-50-list-owners-managers ........................................................................................................18

S. Rep. No. 109-14 (2005) ...................................................................................4, 11

The Attorneys General for the District of Columbia, the Commonwealth of Kentucky ("Kentucky"), Maryland, and New Jersey (collectively, "State AGs") respectfully submit this Statement of Interest regarding Class Plaintiffs' motion for preliminary approval of proposed settlements (Dkt. 1246).

## INTRODUCTION

As the chief law enforcement officers of their respective States—and in the role Congress conferred in the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1711 *et seq.*—the State AGs object to the proposed settlements and related CAFA notices. The State AGs respectfully request that the Court withhold preliminary approval until: (1) the parties to these settlements provide sufficient information to establish that the settlements merit preliminary approval and that the CAFA notices comply with the requirements of 28 U.S.C. § 1715; and (2) the State AGs and the settling defendants named in their pending actions have an opportunity to address the extent to which the proposed settlements implicate those ongoing proceedings.

## BACKGROUND

Acting in part in their *parens patriae* capacities, the State AGs are vigorously prosecuting state and federal antitrust actions against RealPage, Inc. and many of the same landlord defendants named in this multidistrict litigation ("MDL")—including six of the settling defendants at issue in the proposed settlements ("Overlap Defendants"): Avenue5, Bell, BH Management, Bozzuto, First Communities Management, and Greystar. These public enforcement actions, and the investigations leading up to their initiation, have been collectively underway for years, have advanced beyond the MDL in material ways, and reflect substantial state investment and evidence development.

1

The State AGs have been investigating the conduct at issue in these cases for years. Informed by its investigation of public information and numerous interviews, the D.C. Attorney General ("DCAG") issued civil investigative demands in April of 2023, and uncovered evidence that RealPage's Revenue Management Software ("RM Software") was used to set rents for tens of thousands of apartments across the District, in violation of the District's Antitrust Act. On November 1, 2023, the DCAG filed suit against RealPage and fourteen of the largest residential landlords in the District—including Overlap Defendants Avenue5, Bell, Bozzuto, and Greystar—for colluding to illegally raise rents for tens of thousands of District residents. *District of Columbia v. RealPage, Inc.*, No. 2023-CAB-6762 (D.C. Super. Ct.). The District's suit seeks damages as well as injunctive relief and penalties.

The D.C. case has advanced much further than the MDL, with trial set for March 2027. Fact discovery in the D.C. case is substantially complete, with more than 100 depositions completed (including 28 depositions from Overlap Defendants), millions of pages of documents reviewed, and terabytes of data analyzed. Armed with this robust evidentiary foundation, the DCAG has already secured meaningful relief: on June 2, 2025, the DCAG reached a settlement with defendant W.C. Smith for $1,050,000 along with substantial injunctive relief and cooperation in ongoing discovery. W.C. Smith managed approximately ███ apartment units in the District that used RealPage's RM Software during the relevant period.

Investigations by the Maryland and New Jersey Attorneys General built upon the District's extensive investigation and discovery record, revealing that RealPage's RM Software has been used to set rents for more than 100,000 apartments across Maryland and more than 90,000 in New Jersey, harming hundreds of thousands of renters. Maryland sued RealPage and six of the State's largest landlords—including Overlap Defendants Greystar and Bozzuto—in January 2025.

*Maryland ex rel. Brown v. RealPage, Inc.*, No. C-24-CV-25-003948 (Cir. Ct. Balt. City). Similarly, New Jersey Plaintiffs filed suit against RealPage and ten of New Jersey's largest landlords—including Overlap Defendants Greystar and Bozzuto—shortly thereafter, in April 2025. *Platkin v. RealPage, Inc.*, No. 2:25-cv-03057 (D.N.J.). Like the DCAG, both Maryland and New Jersey seek damages for residents, civil penalties, and an order enjoining the defendants' anticompetitive conduct.

The Commonwealth of Kentucky also is pursuing an independent action, which was filed on July 2, 2025. *Coleman v. RealPage, Inc.*, No. 2:25-cv-00093 (E.D. Ky.). Approximately 560,000 Kentucky households are occupied by renters, a majority of whom live in multifamily housing. RealPage sells its commercial RM Software to landlords throughout Kentucky. The Commonwealth seeks damages, injunctive and equitable relief, disgorgement, and civil penalties against three of the Overlap Defendants: BH Management, First Communities Management, and Greystar.

## ARGUMENT

### I. Courts Recognize the Unique Interests of State AGs in Protecting Their Citizens' Interests.

The State AGs are uniquely charged with protecting the public interest. *See, e.g.*, *New York ex rel. Vacco v. Reebok Int'l Ltd.*, 96 F.3d 44, 48 (2d Cir. 1996) (noting that in cases involving the State, "the motivating factor is the enforcement of antitrust laws by the States acting as *parens patriae* for their citizens").[1] That unique responsibility compels the State AGs to prevent unjust and inadequate settlement agreements from receiving court approval.

_____

[1] *See also In re Minolta Camera Prods. Antitrust Litig.*, 668 F. Supp. 456, 460 (D. Md. 1987) ("The Court cannot overlook the governmental nature of these *parens patriae* suits in which the primary concern of the Attorneys General is the protection of and compensation for the States'

3

Additionally, Congress deliberately vested State Attorneys General with a critical oversight of class action settlements. Under CAFA, defendants must notify state and federal officials of any proposed class settlement "so that they may voice concerns if they believe that the class action settlement is not in the best interest of their citizens." S. Rep. No. 109-14, at 5 (2005). Congress intended this requirement to provide "a check against inequitable settlements." *Id.* at 35. Consistent with this purpose, State Attorneys General have frequently stepped in to identify problematic provisions in proposed settlements in furtherance of their constituents' interests.[2]

Where State Attorneys General have raised concerns, courts have given those concerns due weight and declined to approve proposed settlements as a result. *See*, *e.g.*, *Figueroa v. Sharper Image Corp.*, 517 F. Supp. 2d 1292, 1328 (S.D. Fla. 2007) (noting that the vigorous objections of multiple Attorneys General "distinguishes this case from other class actions" and weighed strongly against approval); *see also Allen v. Similasan Corp.*, 318 F.R.D. 423, 426, 428, 428 n.3 (S.D. Cal. 2016) (giving weight to and agreeing with concerns of Attorneys General regarding proposed settlement in denying settlement approval).

As the court recognized in *Wilson v. DirectBuy, Inc.*, No. 09-CV-590, 2011 WL 2050537 (D. Conn. May 16, 2011), the views of State Attorneys General are "especially helpful" and should

---

resident consumers . . . ."); *In re Toys R Us Antitrust Litig.*, 191 F.R.D. 347, 351 (E.D.N.Y. 2000) ("[T]he participation of the State Attorneys General furnishes extra assurance that consumers' interests are protected.").

[2] *See, e.g.*, Brief of *Amici Curiae* of Nineteen State Attorneys General Opposing Final Approval of Proposed Settlement at 1, *Cannon v. Ashburn Corp.*, No. 16-cv-1452 (D.N.J. Feb. 23, 2018) (opposing approval of coupon settlement); Brief of *Amici Curiae* Attorneys General in Opposition to Motion for Preliminary Approval of the Settlement at 2, *Morris v. PHH Mortg. Corp.*, No. 20-cv-60633 (S.D. Fla. Jan. 29, 2021) (opposing preliminary approval of class action settlement because of "genuine concerns about the reasonableness, adequacy and fairness" of the settlement terms); Brief of *Amici Curiae* State Attorneys General Opposing Final Approval of Proposed Settlement and Related Motions for Entry of Final Judgment and Award of Fees at 1, *Allen v. Similasan Corp.*, No. 12-cv-376 (S.D. Cal. July 28, 2016) (urging rejection of settlement raising adequacy concerns).

be viewed "as a placeholder for many absent class members' objections." *Id.* at *9. The court went on to note that the media attention devoted to the States' views might lead an absent class member in one of those states to "reasonably assume that her interests are being protected by the involvement of her state's attorney general." *Id.* at *9 n.11. The same is true here, where the State AGs' ongoing enforcement actions have prompted considerable media attention and—even more significantly—an outpour of constituent contact with the State AGs' offices in support of their enforcement actions and requesting assistance with obtaining relief from their public representatives.

Regardless of media attention, when sovereign law enforcement officers, acting pursuant to their state mandates and consistent with congressional intent, warn that a settlement is unfair, their objections deserve particular weight—both because of their institutional expertise and because they speak for the very citizens Rule 23(e) is designed to protect. Such respect for State views is especially appropriate where, as here, the State AGs have unique knowledge of the underlying misconduct gleaned from their own investigations and have separate, ongoing litigation seeking remediation of their citizens' injuries.

## II. Preliminary Approval as to Overlap Defendants' Proposed Settlements Should be Denied as to State AGs' Citizens.

At this stage, the Court is tasked with conducting an initial assessment of a proposed class settlement to determine whether final approval is likely, and whether the proposed settlement thus warrants the time and expense associated with issuing notice to the class and soliciting reactions from the class. *See generally Shane Grp., Inc. v. Blue Cross Blue Shield*, 825 F.3d 299, 309 (6th Cir. 2016); *Romstadt v. Apple Computer, Inc.*, 948 F. Supp. 701, 705 (N.D. Ohio 1996).

As discussed more fully herein, there is ample cause for denying preliminary approval as to the citizens in our jurisdictions.[3] While the Court cannot "rewrite the [terms of the proposed] settlement[s]," *In re Flint Water Cases*, 499 F. Supp. 3d 399, 409 (E.D. Mich. 2021), it is not uncommon for courts to deny preliminary approval in the first instance and later grant approval once particular issues have been addressed.[4] Such prudence conserves judicial and party resources and helps to ensure just results are obtained.

### A. The State AGs' *Parens Patriae* Actions are the Superior Avenues in Which to Resolve Our Residents' Claims.

In deciding whether to preliminarily approve the proposed settlements, the Court must determine the appropriateness of certifying a settlement class. Fed. R. Civ. P. 23(e)(1)(B). Certification of a settlement class requires, among other things, a finding that class-wide resolution is the superior method of resolving the case. *Hicks v. State Farm Fire & Cas. Co.*, 965 F.3d 452, 463 (6th Cir. 2020). Because the State AGs' *parens patriae* actions present superior mechanisms for resolving this matter as to our citizens' claims against the entities named in our suits, certification of the settlement class as currently structured is inappropriate.

When State *parens patriae* actions and class actions regarding the same conduct proceed concurrently, courts often recognize that State cases are superior in the context of Rule 23 class

---

[3] The State AG enforcement actions seek relief on behalf of persons who are or were, at any time during the periods covered by the State AGs' respective damages claims, citizens of those States. For brevity, this Statement of Interest refers to these persons as "citizens" of our jurisdictions.

[4] *See, e.g., Ware v. CKF Enters., Inc.,* No. CV 5:19-183-DCR, 2020 WL 5087766, at *1 (E.D. Ky. Aug. 26, 2020) (describing the reasons why the court granted plaintiffs' third motion for preliminary approval of a proposed settlement after denying the first two motions as insufficient); Op. & Order Preliminarily Approving Settlement Class & Authorizing Notice, *In re Papa John's Emp. & Franchise Emp. Antitrust Litig.*, No. 3:18-cv-825 (W.D. Ky. Aug. 7, 2025), Dkt. 270 (granting preliminary approval of settlement after noting that an "initial motion [] for preliminary approval" was denied).

certification, even if the State action is filed later in time than the class action. *See Gunnells v. Healthplan Servs., Inc.*, 348 F.3d 417, 434 n.11 (4th Cir. 2003) ("[I]f a governmental unit has brought suit on the same issue, a court may decide that the proposed class action is unnecessary and an inferior method of adjudication." (quoting 5 Moore's Federal Practice § 23.49[3] (1997))).[5] Some states, like Maryland, have statutory provisions expressly establishing that an action "brought by the Attorney General as parens patriae . . . is presumed superior to any class action brought on behalf of any person." Md. Code Ann., Com. Law § 11-209(c). Regardless of whether this principle is made express, however, "[p]roceedings by the state . . . are presumably taken with the best interests of state residents in mind" and are superior to class actions. *Thornton*, 2006 WL 3359482, at *3.[6]

Although private counsel generally act in good faith and class actions can be essential to securing relief for individuals, State Attorneys General—entrusted with representing all affected residents—are best positioned to advance those residents' interests (allowing them to obtain better results). 18A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 4458.1 (3d ed. 2025) ("Private litigation may be precluded by public action, since 'governments are by their nature representative of the cumulative rights of private citizens.'" (quoting *United States v.*

---

[5] *See also Sage v. Appalachian Oil Co.,* No. 93-cv-229, 1994 WL 637443, at *2 (E.D. Tenn. Sept. 7, 1994) (describing the denial of a previous motion for class certification because the State's *parens patriae* action was superior, even though the State action was filed more than a year after the putative class action); *Thornton v. State Farm Mut. Auto Ins. Co.*, No. 6-cv-18, 2006 WL 3359482, at *3 (N.D. Ohio Nov. 17, 2006) ("If courts consistently allow *parallel* or subsequent class actions in spite of state action, the state's ability to obtain the best settlement for its residents may be impacted . . . ." (emphasis added)); Margaret H. Lemos, *Aggregate Litigation Goes Public: Representative Suits by State Attorneys General*, 126 Harv. L. Rev. 486, 505 (2012) (courts "tend to presume that public adjudication is superior to private alternatives").

[6] *See also Sage*, 1994 WL 637443, at *2 ("the State should be the preferred representative of a class of all persons . . . that were affected by the alleged price-fixing conspiracy.").

*E. Baton Rouge Par. Sch. Bd.*, 594 F.2d 56, 58 n.6 (5th Cir. 1989))); *Thornton*, 2006 WL 3359482, at *3 (noting state actions "often" obtain better results).

*Parens patriae* actions are superior not just because of the judiciary's view that State Attorneys General are the most logical choice to vindicate their citizens' rights, but because they are easier to win: "[t]he superiority of the *parens patriae* action over the class action is evidenced by the lack of any provision or requirement for court approval or certification of a *parens patriae* action." *Pennsylvania v. Budget Fuel Co.*, 122 F.R.D 184, 185 (E.D. Pa. 1988).[7] Congress recognized these advantages when it amended the Clayton Act to authorize *parens patriae* antitrust suits by States, precisely because Rule 23's procedural hurdles had frustrated the ability to obtain redress for large groups of consumers. *See Illinois v. Abbott & Assocs., Inc.*, 460 U.S. 557, 573 n.29 (1983) (explaining that Section 4C of the Clayton Act was enacted to "remedy the[] problems" of "the difficulty of achieving class certification of consumer actions under Rule 23").

Recognizing the superiority of States' *parens patriae* claims also prevents defendants from engaging in forum shopping and manipulation of the judicial process. When defendants can use private class settlements to cut off public enforcement actions, they effectively gain the power to select their forum and opposing counsel. That dynamic enables defendants to secure releases that shield them from governmental accountability—allowing them to "buy peace" through private

---

[7] Congress intended States to pursue such cases unencumbered by Rule 23's procedural constraints, and courts have consistently read that intent to favor the primacy of public enforcement over private enforcement in the antitrust context. *See, e.g.*, *In re Montgomery Cnty. Real Est. Antitrust Litig.*, No. B-77-513, 1988 WL 125789, at *2 (D. Md. July 17, 1988) ("The *parens patriae* action is plainly superior to the class action as a mode for adjudication of collective claims. . . . To allow private party preemption of *parens patriae* representation by the Attorney General would be tantamount to ignoring [the Clayton Act] and the Congressional intention evidenced therein."); *Thornton*, 2006 WL 3359482, at *3; *Budget Fuel Co.*, 122 F.R.D. at 185.

deals that leave consumers undercompensated, misconduct undeterred, and Congress's will frustrated.[8]

Here, the State AGs' enforcement actions illustrate why public suits are often superior to private class settlements: the State AGs have conducted extensive investigations and filed lawsuits designed to secure comprehensive monetary relief, halt the anticompetitive misconduct alleged, and deter similar violations going forward. By contrast, the MDL plaintiffs negotiated the instant settlements without the benefit of significant discovery and face risks to class certification—beyond the superiority concerns identified herein—that further diminish the value of their claims.[9]

Yet the proposed class settlements jeopardize our residents' ability to obtain meaningful relief through sovereign enforcement efforts. The settlements purport to enjoin class members from prosecuting claims against Overlap Defendants in *any* forum,[10] potentially interfering with the State AGs' ability to call witnesses or to continue prosecuting their pending enforcement actions. Courts have, in certain circumstances, gone even further, enjoining States from pursuing *parens patriae* damages when their citizens have already received compensation (however nominal) through class action settlements.[11] Although the State AGs disagree with these holdings,

---

[8] These risks are particularly acute in pre-certification settlements, which "create the possibility of negotiation from a position of weakness" and may "result in denying other plaintiffs' counsel information that is necessary for them to make an effective evaluation of the fairness of any settlement that results." *In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 788 (3d Cir. 1995) (citations omitted).

[9] As the MDL plaintiffs themselves acknowledge, the requirements of class certification are "demanding" and pose unique "risks, expenses, and delays" due to the "unpredictable" nature of class action litigation. Pls.' Mem. of Law in Supp. of Mot. Prelim. Approval of Class Settlements and for Appointment of Settlement Class Representatives, Settlement Class Counsel, and Settlement Administrator at 13, Dkt. 1247 ("Pls.' Mem.").

[10] *See* Proposed Order Preliminarily Approving Settlements at 6, Dkt. 1246-1.

[11] *See, e.g.*, *New Mexico ex rel. King v. Capital One Bank (USA) N.A.*, 980 F. Supp. 2d 1346, 1356 (D.N.M. 2013); *In re Am. Invs. Life Ins. Co. Annuity Mktg. & Sales Pracs. Litig.*, No. 05-MD-1712, 2013 WL 3463503, at *8 (E.D. Pa. July 10, 2013).

their ability to vindicate the public interest through sovereign enforcement could nonetheless be compromised. Moreover, approval of the proposed settlements would impose unnecessary complexity and burden on the courts presiding over the State AG actions, forcing those courts to grapple with the interrelationship between the private settlements and the States' public enforcement cases.

### B. Overlap Defendants' CAFA Notices Are Deficient Because They Do Not Include Information About the Class Members or Their Proportionate Share of Claims.

Overlap Defendants' CAFA notices are deficient. Consequently, the parties have deprived the State AGs of information they are entitled to by statute so that they may prevent inequitable settlements. That failure is an additional, independent reason the Court should deny preliminary approval as currently requested.

Congress enacted CAFA's notice provisions precisely to prevent private settlements from compromising States' sovereign interests or depriving their residents of meaningful redress. Under CAFA, each defendant who files a proposed class action settlement has a strict 10-day deadline for submitting information about the settlement to appropriate State officials. Such information must include:

> (A) if feasible, the names of class members who reside in each State and the estimated proportionate share of the claims of such members to the entire settlement to that State's appropriate State official; or

> (B) if the provision of information under subparagraph (A) is not feasible, a reasonable estimate of the number of class members residing in each State and the estimated proportionate share of the claims of such members to the entire settlement[.]

28 U.S.C. § 1715(b)(7).

*None* of the Overlap Defendants have complied with Section 1715(b)(7) as to the State AGs.[12] The CAFA notices received by State AGs offer only placeholders—they fail to provide even basic information about class members, such as an estimated number of class members in the notified State. For example, a "Master Notice" sent to the DCAG and the Maryland Attorney General "on behalf of certain defendants" includes only the following information:

> **28 U.S.C. § 1715(b)(7)(B)-Estimate of Class Members**: At this time, it is not feasible for the Settling Defendants to provide a list of known class member names and their state of residence. The estimated proportional share of the Settlement benefits is not available at this time. Based on the information currently available, the Settling Defendants do not have any reason to believe that the proportionate share of claims will differ in any material way from the proportionate share of class members in each state, as nothing about the settlement suggests or incentivizes differing claims rates across states and the size of a claimant's award does not depend on the state in which he or she resides.

Ex. A at 3. Another settling defendant informed the Maryland Attorney General in its CAFA notice that it "cannot feasibly determine the names of the class members residing in each state, and therefore cannot feasibly estimate the proportionate share of the claims of such members to the entire settlement." Ex. B at 3.

These deficiencies are more than mere procedural mishaps. The purpose of section 1715(b)(7)'s requirement is to "ensure" that States "receive[] information about proposed class action settlements and [are] in a position to react if the settlement appears unfair to some or all class members." S. Rep. No. 109–14 at 32. Absent any information about the MDL parties' understanding of how many class members will recover from the proposed settlements, the State AGs will have difficulty evaluating the settlements' fairness and playing the protective role that CAFA contemplates. Indeed, absent information about the estimated number of potential class

---

[12] In addition, the State AGs did not receive some CAFA notices from settling defendants until Friday of last week—taking mailroom processing time into account, they have had only one or two days to review.

members, neither the State AGs nor the Court can evaluate the significance (or adequacy) of the proposed settlements for the renters whose claims would be released.

More importantly, these deficiencies highlight a broader concern regarding the settling parties' own understanding of the fairness of the proposed settlements. Surely, the parties possessed (or should have possessed) information regarding both the total number of class members and the number in each state and, accordingly, how settlement funds might be allocated among them. If the parties did not reach an agreement armed with, at least, this sort of basic information, then the settlements could not have been fairly or meaningfully negotiated. Thus, either the settling defendants—including Overlap Defendants—are withholding information from the State AGs (and the Court) that is necessary for evaluating the settlements (and required by law), or they have negotiated agreements without the critical data required to ensure that the settlements are adequate and equitable for our citizens. In either scenario, the result undermines confidence in the integrity of the negotiation process and casts serious doubt on whether the proposed settlements satisfy the fairness, reasonableness, and adequacy requirements of Rule 23(e).

### C. The Preliminary Approval Papers Provide Insufficient Information About the Adequacy of the Proposed Settlements.

Beyond the deficient CAFA notices, the preliminary approval memorandum provides insufficient information for either the Court or the State AGs to evaluate the adequacy of the settlements' relief. Importantly, the "primary purpose of preliminary approval is to ensure that the settlement is 'fair enough' to begin the class-notice process." *In re CorrectCare Data Breach Litig.*, No. 5:22-cv-319-DCR, 2024 WL 1403075, at *6 (E.D. Ky. Apr. 1, 2024) (quoting *Moeller v. Week Pubs., Inc.*, 649 F. Supp. 3d 530, 540 (E.D. Mich. 2023)). Where, as here, insufficient information exists to assess the adequacy of a proposed settlement, preliminary approval is

inappropriate. *Id.* at *7–8 (denying preliminary approval because "questions remain with respect to the relief that will be available to plaintiffs seeking an alternative cash payment"); *cf. Shane Grp., Inc.*, 825 F.3d at 310 (final approval requires a "careful analysis that acknowledges what the unnamed class members would give up in this settlement" and "includes a reasoned explanation as to whether—in light of the merits of this case specifically—the settlement is fair").

Plaintiffs' preliminary approval memorandum does not estimate the amount each class member may receive and provides no substantive analysis of the relief obtained for class members. It does not address—at all—how settlement funds will be distributed, how attorneys' fees or litigation expenses will be handled, or whether the settlements are adequate relative to the harms allegedly suffered by class members. The memorandum never compares the total settlement amounts to estimated aggregate damages, rent overcharges, or any percentage recovery figure (e.g., "X % of potential damages"). Instead, the memorandum expressly defers discussion of allocation, distribution, and notice to a later date, explaining that Plaintiffs' experts are still analyzing data and that they will "present the Court at a later date a notice plan for these settlements—as well as any future settlements—that complies with Rule 23(c)(2)(B)." Pls.' Mem. at 10.

In short, the memorandum provides nothing to enable the Court and class members—or the State AGs—to fully evaluate the fairness, reasonableness, or adequacy of the settlements under Rule 23(e). That alone is grounds for denying the pending motion for preliminary approval. *CorrectCare*, 2024 WL 1403075, at *6 (denying preliminary approval without prejudice due to the lack of adequate information on relief and an allocation plan); *cf. Shane*, 825 F.3d at 306 (reversing final settlement approval in part because "the class [was] able to access only

fragmentary information about the conduct giving rise to [the] litigation, and next to nothing about the bases of the settlement itself").

### D. The State AGs Have Evidence of Overlap Defendants' Culpability that the Proposed Settlements Could Not Have Considered.

In this circuit, "the amount of discovery engaged in by the parties" is a factor that "guide[s] the Court's inquiry into whether a proposed class action settlement is fair," including at the preliminary approval stage. *CorrectCare*, 2024 WL 1403075, at *6 (citing *UAW v. GMC*, 497 F.3d 615, 631 (6th Cir. 2007)). That factor weighs against preliminary approval here, particularly given the substantial liability evidence that the State Attorneys General have since uncovered—evidence unavailable to the MDL plaintiffs when these settlements were negotiated, as those negotiations occurred well before the completion of fact discovery in the MDL. Indeed, several of the proposed settlements appear to have been reached without the benefit of any deposition testimony from the settling entities.

By contrast, the State AGs' extensive investigations—along with the DCAG's more than 100 depositions—have produced compelling evidence of a coordinated, nationwide scheme to inflate rental prices. By way of illustration, the State AGs have gathered the following evidence regarding four of the Overlap Defendants:

- **Greystar:** Greystar played a central role in advancing the alleged conspiracy.


After the onset of the pandemic, for example,

---

[13] Ex. C, Bumpass Dep. Ex. 3 at 2.

[14] Ex. D, Emley Tr. 111:2-111:8.

[15] Ex. E, Greystar 30(b)(6) Tr. 100:4-15; Ex. F, Hunt Dep. Ex. 9.

████████████████████████████████ [16]
█████████████████████ [17] ████████████████████████████████ "
██████████████████████. [18] As one of the nation's largest managers of multifamily housing—with thousands of units in the State AGs' jurisdictions—Greystar's role in the conspiracy was significant.

- **Bozzuto:** Bozzuto likewise played an active role in the alleged conspiracy. ████████████████████████████████████████████████████████████ [19] Bozzuto's ████████████████████████████████████████ [20] Bozzuto's participation extended beyond ████████████████████████████████████████████████ [21] ██████████████. [22]

- **Bell:** Senior Bell employees ████████████████████████████████████████ ████████████. [23] Bell's adoption of RealPage's RM Software was driven from the top: in the company's early use of the Software, then-Chief Investment Officer (now CEO) Lili

---

[16] Ex. G, Emley Dep. Ex. 27.

[17] Ex. D, Emley Tr. 207:11-208:7.

[18] Ex. D, Emley Tr. 261:6-9.

[19] Ex. H, Dreyfuss Tr. 196:6-197:3 (█████████████████████████████████ ████████████████████████████████).

[20] Ex. I, Kumah Tr. 205:1-206:12, 211:24-212:22; Ex. J, Scotch Tr. 194:17-201:6.

[21] Ex. K, Smith Dep. Ex. 19; Ex. L, Smith Tr. 204:11-205:17, 213:21-217:5 (███████████████████████████████████████████████████████ " █████████████ ").

[22] Ex. L, Smith Tr. 102:7-18, 112:3-8, 113:16-114:2 (███████████████████ ██████ " ██████ " ████████████████████████ " ████ " █████████████████████ " ██████████████); see also Ex. S, Smith Dep. Ex. 12 at 1–3 (███████████████████); Ex. T, Smith Dep. Ex. 16 at 1–3 (██████████████████████████); Ex. L, Smith Tr. 198:22-200:6 ████████████████████████████████████).

[23] See, e.g., Ex. M, Manley Dep. Ex. 14 at 1–2.

Dunn wrote that she: "████████████████████████████" at a particular property, expressing the hope that "██████████████████████████████."[24]

- **Avenue5:** Avenue5 not only shared its non-public data with RealPage for use in competitors' pricing decisions, ████████████████████████████████ [25] Additionally, Avenue5 actively facilitated the use of RealPage RM Software at many of the properties it managed—and for good reason: ████████████████████████████████████████████████ [26]

In other words, concrete evidence exists that four of the Overlap Defendants meaningfully participated in the alleged conspiracy. The proposed settlements were reached without the benefit of this and related evidence, which counsels against preliminary approval. *See CorrectCare*, 2024 WL 1403075, at *6.

### E. The Proposed Settlements Include Weak Injunctive Terms and Provide Meager Monetary Relief in Exchange for Broad Releases.

Based on the limited information available, the State AGs do not regard the relief obtained from Overlap Defendants to be sufficient, reinforcing the superiority of the State AGs' *parens patriae* suits.

Beginning with injunctive relief, the proposed settlements do not address much of the core conduct alleged to be anticompetitive in these cases—*i.e.*, the collective use of pricing software programmed to achieve anticompetitive effects. While most of the proposed settlements prohibit landlords from using RM Software that generates prices using competitors' non-public data (though, for many, even this is limited to a five-year period and conditional on whether subsequent

---

[24] Ex. N, Bell 30(b)(6) Dep. Ex. 9 at 2.

[25] Ex. O, Hagedorn Dep. Ex. 12 at 1 (writing, ████████████████████████████████████████████████████████████████████████████████████████████████████.")

[26] *See* Ex. P, Corn Dep. Ex. 6 at 19–22 (██████ "████████████████████").

decisions authorize such use), the settlements fail to address core features of this software that limit competition, such as rules pursuant to which key price components can never fall below competitors' current prices.[27] These features limit the circumstances and extent to which prices *ever* go down and are the equivalent to an agreement that users not undercut one another—a textbook antitrust violation *regardless of whether non-public information is involved*.

Moreover, all Overlap Defendants save Greystar are allowed to continue using RealPage's RM Software.[28] But RealPage's RM Software ████████████████████████████ ████████████████████████████.[29] Proposed settlements that purport to *release* our citizens' claims against landlords for having used pricing software to charge inflated rents— while allowing landlords to continue their use of that exact software—pose significant concerns for the State AGs. Indeed, *only* the Greystar settlement (copying one negotiated by the U.S. Department of Justice) prohibits licensing RM Software that uses a model or algorithm that was "train[ed]" on non-public data—Avenue5, Bozzuto, Bell, BH Management, and First Communities Management are free to continue using such software.

---

[27] *See, e.g.*, Joint Decl. of Interim Co-Lead Counsel in Supp. of Pls.' Mot. for Prelim. Approval of Class Settlements and for Appointment of Settlement Class Reps., Settlement Class Counsel, and Settlement Administrator ("Joint Decl."), Ex. A-6 at 237, Dkt. 1250-2 (Bozzuto proposed settlement) (describing agreements regarding "RealPage Data Sharing"). Moreover, the word "non-public" is defined in only one of the proposed settlements (Greystar). This is a glaring omission, as the definition of "non-public" is a hotly contested issue in at least one State AG case.

[28] The Greystar proposed settlement (Joint Decl., Ex. A-14, Dkt. 1250-4) includes comparatively robust injunctive provisions that largely mirror the terms of the separate settlement reached between Greystar and the Department of Justice, which requires the company to cease using RealPage's RM Software and to implement compliance safeguards. *See generally* Proposed Final J., *United States v. Greystar Mgmt. Servs., LLC*, No. 24-cv-00710 (M.D.N.C. Aug. 8, 2025), Dkt. 152-1.

[29] *See* Ex. Q, Emley Dep. Ex. 6 at 3 (████████████████████████████ ████████████████████████████ ████████████████████████ ").

17

The financial relief the settlements provide our residents likewise reflects deficiencies. Although expert analysis is ongoing, RealPage represented to landlords that ████████████████ ████████████ "████████████" ████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████.[30] A factfinder could therefore reasonably conclude that damages to our residents ████████████████████████ if not more.

Neither the settling defendants' CAFA notices (to the extent provided) nor the memorandum in support of preliminary approval provide any information about how the proposed settlements compare to estimated damages. But even a very rough analysis suggests that these settlements reflect very low recoveries compared to the harms suffered. For example, Greystar is the largest apartment manager in the United States.[31] If the Greystar settlement were allocated according to how many of Greystar's apartments in each state were priced using RealPage's RM Software, D.C. residents collectively could expect to receive a little less than $400,000 total for six years of damages. But thousands of renters in D.C. paid inflated rents annually due to Greystar's participation in this conspiracy. Accordingly, the DCAG's conservative damages estimate for Greystar in D.C. alone is at least $7 million at a 2% overcharge (assuming a conservative average rent) *just* for the units Greystar specifically priced—and that is before

---

[30] *See, e.g.*, Ex. R, Germano Dep. Ex. 15 at 11 (████████████████████ "████████████"); Ex. H, Dreyfuss Tr. 89:6-92:7 (██████████████); *see also* Complaint at 48, *Platkin v. RealPage, Inc.,* No. 25-cv-3057 (D.N.J. Apr. 23, 2025), Dkt. 1 (quoting a RealPage marketing document that touted revenue lifts of 3% to 7% and cited 4.8% outperformance by Greystar since 2009 across 16 markets).

[31] National Apartment Association, *Greystar Tops NMHC 50 List of Owners, Managers* (Apr. 21, 2025), https://naahq.org/greystar-tops-nmhc-50-list-owners-managers.

considering Greystar's risk of joint and several liability should it proceed to trial.[32] As such, the settlement likely reflects a tiny percentage of District residents' damages.[33]

To put the proposed MDL settlements' monetary relief in perspective, the DCAG's recent settlement with defendant W.C. Smith—one of the smallest players in the DCAG action— recovered over $1 million. That settlement amounts to more than $700 in recovery per apartment priced using RealPage RM Software during the relevant time period and includes injunctive relief ensuring that the anticompetitive practices will cease.[34] That level of recovery and deterrence far exceeds the modest relief offered under the proposed class settlement with Greystar—which comes out to less than $150 in recovery per D.C. apartment (over a six-year period) when calculated using the same approximating methodology.[35]

---

[32] *See Burlington Indus. v. Milliken & Co.,* 690 F.2d 380, 391 (4th Cir. 1982) ("From the earliest days of the Sherman Act, courts have treated antitrust violations as akin to torts, and have therefore applied to treble-damage awards the common-law rule that tortfeasors who act in concert to commit a wrong are jointly and severally liable for the entire amount of the resulting damages."); *In re Uranium Antitrust Litig.*, 552 F. Supp. 518, 522 (N.D. Ill. 1982) ("[I]t has long been the law that an antitrust defendant is jointly and severally liable for the acts of its co-conspirators."); D.C. Code § 28–4515 (providing that federal court interpretations of federal antitrust law should guide interpretation of D.C. antitrust law).

[33] This same analysis holds true for the residents of other State AGs' jurisdictions with respect to other Overlap Defendants.

[34] This rough calculation does not account for associated fees or variations in rents paid for different apartments. Neither does our calculation of the Greystar settlement, however, because information about those expenses and rents was not provided.

[35] That several Overlap Defendant act as third-party property managers does not meaningfully alter this analysis. *See* Pls.' Mem. at 6 (nothing that, "[w]ith few exceptions, Settling Defendants are many of the smallest Defendants, and many are property managers only."). As a threshold matter, Overlap Defendants include Greystar, a "property giant" that both owns and manages more apartments than any other entity in the United States. *See* Jon Leckie, *Greystar Takes Over Top Spot From MAA As Nation's Largest Apartment Owner*, CoStar (Apr. 3, 2024), https://www.costar.com/article/329788865/greystar-takes-over-top-spot-from-maa-as-nations-largest-apartment-owner. In any event, this Court already permitted class plaintiffs' agency theory of liability to proceed, rejecting the property manager defendants' arguments that they cannot be liable as agents of their owners. *See In re RealPage, Inc., Rental Software Antitrust Litig. (No.II)*,

While the proposed settlements do not—and, indeed, could not—release the State AGs' *parens patriae* claims or claims for civil penalties,[36] the proposed settlements purport to release virtually all of class members' claims arising from or relating to Overlap Defendants' alleged participation in the pricing conspiracy.[37] The limited relief provided for under the proposed settlements does little to protect our residents, particularly to the extent the broad releases in these settlements endanger the State AGs' ability to secure meaningful relief for residents in our *parens patriae* actions.

### III.    In the Alternative, the State AGs Respectfully Request that the Court Hold the Motion for Preliminary Approval in Abeyance Unless and Until More Information Can Be Obtained.

For the reasons provided above, the State AGs believe that the best course of action is to deny the pending motion for preliminary approval of the proposed settlements with respect to Overlap Defendants.

In the alternative, the State AGs respectfully request that the Court hold the motion for preliminary approval in abeyance until the State AGs and the MDL parties have had an opportunity to confer and reach an agreement clarifying the scope and impact of the proposed settlements, and

---

709 F. Supp. 3d 537, 543 (M.D. Tenn. 2023). Moreover, the State AGs' investigations have revealed that certain Overlap Defendants also own and control properties within their portfolios. Ex. L, Smith Tr. 32:24–35:6 (explaining that Bozzuto-related entities maintain ownership interests in certain multifamily properties). Even apart from agency principles, property manager defendants are not passive intermediaries but active participants who profited from inflated rents through the conspiracy. *See also supra* note 32 (addressing joint and several liability).

[36] *See, e.g.*, *Local No. 93, Int'l Ass'n of Firefighters, AFL-CIO C.L.C. v. City of Cleveland*, 478 U.S. 501, 529 (1986); *In re Tricor Indirect Purchaser Antitrust Litig.*, No. 05–360–SLR, 2009 WL 3460769, at *1 (D. Del. Oct. 28, 2009); *New Mexico ex rel. King v. Cap. One Bank (USA) N.A.*, 980 F. Supp. 2d 1346, 1356 (D.N.M. 2013).

[37] For example, the Bozzuto settlement provides that class members release "any and all claims" that they "ever had, now have, or may ever have in the future . . . whether known or unknown" arising from "any act or omission" that was "alleged or could have been alleged in this Action based on any or all of the same factual predicate of the Action." Joint Decl., Dkt. 1250-2 at 13–14.

until the settling defendants comply with CAFA's requirements. Given the substantial overlap between the MDL and the ongoing State AG enforcement actions, proceeding in this action without coordination risks undermining sovereign enforcement efforts and creating inconsistent or duplicative relief. Holding the motion in abeyance would allow the State AGs to complete their review of the settlement terms and attempt—as we have begun to do—to negotiate clarifying language or carveouts that preserve the States' ability to vindicate the public interest. This brief period of coordination would serve the goals of fairness, efficiency, and comity—ensuring that any class settlements approved by this Court complement, rather than conflict with, active state enforcement proceedings.

It is not uncommon for state enforcement agencies and class plaintiffs to work together to obtain relief satisfactory to all sides under circumstances like these. For example, in a landmark price-fixing suit against Apple Inc., class counsel worked closely with the Department of Justice and thirty-three Attorneys General to obtain comprehensive relief for consumers. The case demonstrates how cooperation between public enforcers and private litigants can maximize relief for victims of antitrust violations. *See* Mem. in Supp. of Pls.' Mot. for Prelim. Approval of Settlement with Apple Inc., *In re Elec. Books Antitrust Litig.*, 11-md-2293 (S.D.N.Y. July 16, 2014), Dkt. 642. Such cooperation is possible here, too, but not under the current terms of the proposed settlements.

## CONCLUSION

For the reasons outlined above, the Court should deny the pending motion for preliminary approval of the proposed settlement agreements. Alternatively, the State AGs respectfully request that the Court hold the motion for preliminary settlement approval in abeyance until the MDL

parties and the State AGs have negotiated a workable solution that addresses the concerns outlined above.

October 24, 2025

Respectfully submitted,

*/s/ John Spragens*
John Spragens (Bar No. 031445)
**SPRAGENS LAW PLC**
311 22nd Ave. N.
Nashville, TN 37203
(615) 983-8533
john@spragenslaw.com

*Attorney for the District of Columbia*

BRIAN L. SCHWALB
Attorney General for the District of Columbia

COTY MONTAG
Deputy Attorney General
Public Advocacy Division

Adam Gitlin (D.C. Bar 90004308)
Adam.Gitlin@dc.gov
Mehreen Imtiaz (D.C. Bar 1030205)
Mehreen.Imtiaz@dc.gov
Ashley Walters (D.C. Bar 1632195)
Ashley.Walters@dc.gov
Public Advocacy Division
OFFICE OF THE ATTORNEY GENERAL FOR
THE DISTRICT OF COLUMBIA
400 6th St. NW, 10th Floor
Washington, D.C. 20001
(202) 442-9864

ANTHONY G. BROWN
ATTORNEY GENERAL OF MARYLAND

Schonette J. Walker (MD Attorney No.
0522900098)

Assistant Attorney General
Chief, Antitrust Division
Melissa L. English (MD Attorney No.
1512140006)
Deputy Division Chief
OFFICE OF THE ATTORNEY GENERAL OF MARYLAND
200 St. Paul Place
Baltimore, MD 21202
(410) 576-6470
swalker@oag.state.md.us
menglish@oag.state.md.us


MATTHEW J. PLATKIN
ATTORNEY GENERAL OF NEW JERSEY

Brian F. McDonough (NJ Attorney ID 026121980)
Assistant Attorney General
Brian.McDonough@law.njoag.gov

David Reichenberg (NJ Attorney ID 507282024)
Deputy Attorney General
Section Chief, Antitrust Section
David.Reichenberg@law.njoag.gov

Jesse J. Sierant (NJ Attorney ID 049342013)
Deputy Attorney General
Section Chief, Consumer Fraud Prosecution Section
Jesse.Sierant@law.njoag.gov

Douglas T. Post (NJ Attorney ID 405852022)
Deputy Attorney General
Antitrust Section
Douglas.Post@law.njoag.gov

New Jersey Office of the Attorney General
124 Halsey Street, 5th Floor
Newark, NJ 07101
Tel: 973-504-6200


Emmy L. Levens
Robert A. Braun
COHEN MILSTEIN SELLERS & TOLL PLLC
1100 New York Avenue NW, Suite 800
Washington, DC 20005

(202) 408-4600
elevens@cohenmilstein.com
rbraun@cohenmilstein.com

Aaron J. Marks
COHEN MILSTEIN SELLERS & TOLL PLLC
88 Pine Street, 14th Floor
New York, NY 10005
(212) 838-7797
amarks@cohenmilstein.com

*Counsel for the District of Columbia, the State of Maryland, and the State of New Jersey*

RUSSELL COLEMAN
Attorney General of Kentucky

JONATHAN E. FARMER *(pro hac vice forthcoming)*
1024 Capital Center Drive, Suite 200
Frankfort, KY 40601
(502) 696-5448
Jonathan.Farmer@ky.gov

*Counsel for the Commonwealth of Kentucky*

24

**CERTIFICATE OF SERVICE**

I hereby certify that on October 24, 2025, I electronically filed the foregoing *Statement of Interest of State Attorneys General Regarding Preliminary Approval of Proposed Settlements* with the Clerk of the Court using the CM/ECF system, which will send a Notice of Electronic filing to all parties of record.

Dated:    October 24, 2025                          */s/ John Spragens*                          
                                                                    John Spragens